139. Following this announcement, shares of Organogenesis fell to as low as $0.63 per share on April 16, 2002. In the days that followed, shares of the Company traded even lower, to as low as $0.41 per share by May 1, 2002.

140. Remarkably, in response to this statement by PricewaterhouseCoopers, the same day, April 26, 2002, defendants issued a release on *Business Wire* which stated that, although Organogenesis had received the aforementioned report, that "we believe that, based on our current forecasts, the Company has sufficient liquidity to finance operations and ***achieve break even by year-end 2002.***" (Emphasis added) This post-Class Period statement was as far from the truth as defendants' other statements made within the relevant period. Despite this absurd claim, on August 16, 2002, defendants revealed that the Company would delay filing its quarterly report for 2Q:02 and that Organogenesis was reviewing a possible material "asset impairment charge." According to a statement made by the Company at this time, "Management is unable to conclude the amount of such impairment or that the financial statements are probably presented on a 'going concern' basis rather than on a 'liquidation of assets' basis."

141. **Needham Rating Suspended.** It was not until July 12, 2002, with shares of the Company now trading below $0.20 per share, however, that analysts at Needham & Co. finally placed the Company's stock rating "Under Review." With Organogenesis on "life-support" Needham analysts reported the following:

* Recent events leave *future uncertain.*
* ***Disappointing sales figures/ higher than expected burn rate.*** Organogenesis announced that Apligraf sales decreased approximately 7-10% for 2Q02, compared with our estimates for an increase in sales of 25%.

Additionally, the company stated that the burn rate for the quarter was $7.5MM, versus our estimates of $4.3MM, resulting in $3.7MM of cash at the end of 2Q02. Additional cost cutting measures have been initiated to lower the burn rate from $2.5MM/month to $1.1MM/month. Using the

revised burn rate, Organogenesis will be able to fund operations for 3Q02 before seeking additional capital.

> * Challenging management strategy. Organogenesis announced that it has entered into discussions with Novartis Pharma AG to reacquire commercialization rights to Apligraf. However, in order to complete negotiations, *Organogenesis must raise sufficient capital necessary to reacquire [rights to] Apligraf and build the necessary infrastructure necessary to market and distribute the product.*
>
> Additionally, Oganogenesis stated that it would seek a corporate partner for the marketing of the Fortagen, Fortaperm, and Revitix product lines. While this decision will result in a reduction of costs related to the sales and marketing infrastructure set up by the company, the partnership will also result decreased revenues, as revenues become royalty based.
>
> * Our conclusions. Despite the efforts of management, *Apligraf sales continue to grow at a slower than anticipated rate. The lower than expected sales growth and higher than anticipated burn rate results in approximately 3 months of cash ($3.7MM) for on going operations, which leaves the company below budgeted forecasts.* While major initiatives are being discussed including the reacquiring of rights to Apligraf and raising of funds for continued operations, we believe that *multiple challenges exist for Organogenesis.*
>
> Therefore, given the lack of Apligraf sales growth, the higher than expected burn rate, the challenging business strategy undertaken by management, and sub-optimal cash position, we are placing our rating under review. We are currently evaluating the company's options and will continue to monitor events going forward. [Emphasis added.]

142. **Never Achieve Profitability. Huge Layoffs. Halt Apligraf Production.** On August 21, 2002, with Organogenesis shares trading at $0.09 per share, *the Company's common stock was suspended from trading on the American Stock Exchange.* On September 13, 2002, the Company announced that it had temporarily halted shipments of Apligraf and had furloughed over 110 of its employees, as a result of the Company's "current lack of cash flow." Defendants also blamed the current crisis upon its inability to renegotiate its marketing agreement with Novartis, which was described as "unsustainable." On September 13, 2002, defendants also revealed that a Chapter 11 bankruptcy filing was a possibility.

143. **Product Recalls.** In addition to the foregoing, by mid September 2002, production quality at Organogenesis had deteriorated so substantially that an entire batch of Apligraf had been recalled. Alarmingly, because Apligraf has such a short shelf life, at the time of this "recall," of the 193 affected units at least 72 had already been applied to patients. In total, this was the fourth time since 1999 that the Company had been forced to recall Apligraf because of contamination.

144. **Post Class Period Scheme to Leverage Buyout.** Having reduced the value of the Company's stock to mere pennies per share, and having lost the ability to sell more stock or offer debt, or raise money through private or public offerings, defendants next sought to take what was left of Organogenesis for themselves. Thus, on or about September 25, 2002, defendants caused the Company to file for Chapter 11 protection from creditors in United States Bankruptcy Court in the Eastern District of Massachusetts.

145. As defendants knew throughout the Class Period, Organogenesis could not produce enough cash flow from operations to support its operations under the terms of its agreement with Novartis since it was losing money on each sale under the Novartis agreement. Thus, on November 20, 2002, immediately after defendants placed the Company into bankruptcy defendants forced Novartis to agree to transfer back to them the worldwide marketing and distribution rights for Apligraf. Novartis acquiesced to defendants' demand, rather than risk losing its entire investment in the Company -- including at least $10 million in unsecured debt which Novartis still hoped to collect.

146. The following day, November 21, 2002, the *Boston Globe* reported that, pursuant to the terms of the proposed, revised deal between Novartis and defendants:

> *    The two companies had agreed to work together for another seven months, during which Novartis would continue to market and distribute Apligraf.

- \*   When the Company emerges from Chapter 11 bankruptcy protection, marketing and distribution rights will return to defendants. Two years later, Novartis will earn royalties on sales of Apligraf, lasting for five years.

- \*   Novartis also agreed to purchase at least 200 units of the product each week from defendants.

- \*   Novartis also agreed to loan $3 million to Organogenesis, to be repaid 18 months after the company emerges from bankruptcy.

- \*   Novartis agreed to have a $10 million investment it made in the company last year treated as a general claim, to be repaid with other unsecured creditors of Organogenesis.

- \*   The pact also provides hope for dozens of employees who were laid off in September, when Organogenesis abruptly shut down, with a minimum of 75 people anticipated to return to work within several weeks of this announcement.

Although the precise payment terms were sealed by the Bankruptcy Court, at that time Organogenesis' vice president and general counsel, Jeffrey L. Dow, stated that, "The prices are considerably more favorable than the $350 a unit we were getting under the old payments. It's clear we are getting the great bulk of the revenue from Novartis' sales..."

147. By June 23, 2003, defendants announced that they had caused the Company to file an Amended Plan of Reorganization with the United States Bankruptcy Court. According to defendants, the Plan incorporated "a funding proposal from a group of unsecured creditors -- including current and former officers and directors of the Company," and put in motion a timeline for emerging from Chapter 11 protection in August 2003. The Plan also anticipated a cash distribution of 35% to be made to the holders of allowed general unsecured claims, but that no distribution would be made on shares of the Company's outstanding preferred and common stock, which would be cancelled on the Plan's effective date. Under the Plan, all shares of new

common stock of the Company, as reorganized, will be distributed to the members of the plan funding group and the holder(s) of the $10.35 million allowed claim of Novartis.

148.    Days later, however, on June 26, 2003, the *Boston Globe* reported more disturbing news regarding defendants' continued interference with the bankruptcy proceeding and documented their continued attempts to place their own interests over and above the interests of the outside shareholders of the Company, as follows:

> If all goes as expected at a hearing in US Bankruptcy Court in Boston today, creditors could be solicited next week for their approval of a reorganization plan turning ownership of the life sciences company and its sophisticated medical technology to a group led by two cousins who operate chains of clothing stores like Strawberry and Pay-Half.
>
> Did recently installed chief executive Alan Ades, also a leader of the group in line to buy the company, impede other potential bidders, a tactic that could have protected his own financial interests? Did the previous CEO, seemingly ousted last fall, try to use his own inside connections seeking proprietary information for a bid with private investors that could have put him back in charge?
>
> \* \* \*
>
> ***Ades, his cousin Albert Erani, and a small group of others that includes their relatives would end up with the company at a seemingly modest price***, though their total cost is hard to calculate....
>
> \* \* \*
>
> Steven Bernitz, the company's chief executive at the time of the bankruptcy filing, quit as he was about to be fired in October and Ades took charge, according to the company. A short time later, the company tracked cellphone calls between Bernitz and another executive still employed at Organogenesis, Jeffrey Dow, and fired him. Company lawyers questioned whether confidential information was being leaked.
>
> Soon, it became clear Bernitz was formally advising a private equity firm circling to make a bid on company assets. ***His lawyer claimed the company was harassing Bernitz because Ades "wants to end up with the company."***

64

*"He has been very successful at chilling the sale," the lawyer, Stephen Gordon, said in a transcript of a bankruptcy court hearing.* [Emphasis added.]

149.  Despite defendants actions, on August 14, 2003, Judge William Hillman in U.S. Bankruptcy Court for the Eastern District of Massachusetts in Boston cleared the way for the defendants to emerge from bankruptcy with the Company under their full dominance and control by or about August 26.  The insider group led by interim CEO Alan Ades and his partner and cousin Albert Erani will buy a $10.5 million unsecured claim in the form of a bond held by pharmaceutical giant Novartis.  Ades, who co-founded A&E Stores with Erani, will be the interim CEO, president and chairman of the new company.  Novartis agreed to convert the $3 million in debtor-in-possession financing it provided into a $3 million exit loan.  According to John Hutchins, Boston counsel for Novartis at Kirkpatrick & Lockhart LLP, who was quoted at this time, the final terms of this bankruptcy restructuring actually amounted to a "leveraged acquisition" by the insider group because they have bought up the $10.5 million Novartis unsecured claim and are investing additional funding.

150.  Thus, in less than one year, not only were defendants successful in thwarting other interested bidders and in facilitating defendants Erani and Ades and their family members' gaining total control over the Company, but within that time defendants were also able to cause Organogenesis to emerge from bankruptcy having completed its restructuring plan.  As a result of this restructuring, new shares were issued to defendant Erani and Ades and their family members -- the new owners of the Company -- and the shareholders who purchased and/or otherwise acquired shares of the Company during the Class Period received NOTHING for their Organogenesis shares!

151. The market for Organogenesis securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Organogenesis common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Organogenesis securities relying upon the integrity of the market price of Organogenesis securities and market information relating to Organogenesis, and have been damaged thereby.

152. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Organogenesis common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

153. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Organogenesis' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Organogenesis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

154. As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Organogenesis, their control over, and/or receipt and/or modification of Organogenesis' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Organogenesis, participated in the fraudulent scheme alleged herein.

155. In addition, throughout the Class Period, while in possession of material adverse non-public information, defendants caused the Company to issue and/or register for the sale of millions of shares of Company stock. Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to raise *over $68.1 million* in total proceeds from the sales of Organogenesis securities through public stock offerings, private equity offerings and other debt and/or equity sales, which defendants failed to utilize in avoiding Organogenesis' bankruptcy. Moreover, further evidence of defendants' motivation to engage in the illegal scheme described herein, on or about April 21, 2000 defendant Stein was motivated to, and did register the authorized sale over $6.9 million of his privately held Organogenesis stock -- approximately half of the Company shares he personally owned and controlled. Company insiders, including defendants Herbert Stein and Michael Sabolinski, took advantage of the artificially inflated prices of the Company's securities during

67

the Class Period by selling their shares of the securities ("Selling Shareholders") and reaping millions of dollars in proceeds therefrom. These insider sales are set forth below:

| INSIDER | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | $3.02 | $36,877.93 |
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | $10.39 | $126,841.12 |
| Herbert Stein | 4/21/2000 | 732,423.00 | $9.44 | $6,912,242.10 |
| Anton E. Schrafl | 7/20/2001 | 36,623.00 | $2.97 | $108,755.66 |
| Nancy L. Parenteu | 5/14/2001 | 31,334.00 | $3.53 | $110,696.76 |
| Nancy L. Parenteu | 5/11/2001 | 3,666.00 | $3.43 | $12,575.85 |
| Nancy L. Parenteu | 5/10/2001 | 15,000.00 | $8.18 | $122,640.00 |
| Nancy L. Parenteu | 5/9/2001 | 5,000.00 | $8.56 | $42,813.00 |
| Nancy L. Parenteu | 5/7/2001 | 10,000.00 | $9.00 | $90,000.00 |
| Nancy L. Parenteu | 5/7/2001 | 5,000.00 | $8.97 | $44,850.00 |
| **TOTAL** | | **863,462.00** | | **$7,608,292.42** |

156. The sales of millions of shares of Company stock during the Class Period, which sales were designed and/or permitted by the Individual Defendants as well as numerous other high-level senior executives of Organogenesis further evidences defendants' motive to perpetrate the fraudulent scheme detailed herein. In addition, defendants also caused the Company to engage in the sale of tens of millions of dollars in other sales of Organogenesis securities pursuant to stock offerings, private equity offerings and other debt and/or equity sales during the Class Period, including the following:

| TRANSACTION | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| $9.4M Equity Sale | 2/24/2000 | 688,000 | | $9,400,000.00 |
| $1.4M Equity Sale | 2/25/2000 | 100,000 | | $1,400,000.00 |
| $5.27M Equity Sale | 3/09/2000 | 300,000 | | $5,270,000.00 |
| $1.9M Share Offering | 4/27/2001 | 1,900,000 | $7.75 | $13,500,000.00 |
| $1.44M Private Placement | 6/18/2001 | 186,000 | | $1,440,000.00 |
| $10M Equity Sale to Novartis | 8/07/2001 | | | $10,000,000.00 |

| | | | |
|---|---|---|---|
| $20.25M additional Funding | 10/16/2001 | 2,173,876 | $20,250,000.00 |
| **TOTAL** | | | **$61,260,000** |

**TOTAL ALL DEBT AND EQUITY SALES BY DEFENDANTS AND INSIDERS DURING THE CLASS PERIOD = $68,868,292**

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

157. At all relevant times, the market for Organogenesis's securities was an efficient market for the following reasons, among others:

(a) Organogenesis stock met the requirements for listing, and was listed and actively traded on the American Stock Exchange, a highly efficient and automated market;

(b) As a regulated issuer, Organogenesis filed periodic public reports with the SEC and the American Stock Exchange;

(c) Organogenesis regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Organogenesis was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

158. As a result of the foregoing, the market for Organogenesis securities promptly digested current information regarding Organogenesis from all publicly available sources and

reflected such information in Organogenesis stock price. Under these circumstances, all purchasers of Organogenesis securities during the Class Period suffered similar injury through their purchase of Organogenesis securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

159. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Organogenesis who knew that those statements were false when made.

## FIRST CLAIM

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

160. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

161. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enable the Individual Defendants and other Organogenesis insiders to sell more than $7.6 million of the Company's and/or their personally-held Organogenesis common stock to the unsuspecting public; and (iii) cause plaintiff and other members of the Class to purchase Organogenesis securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them,) took the actions set forth herein.

162. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Organogenesis securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

163. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Organogenesis as specified herein.

164. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Organogenesis' value and performance and continued substantial growth, which included the making of, or the

71

participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Organogenesis and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Organogenesis securities during the Class Period.

165. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

166. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Organogenesis' operating condition and future business prospects from the investing public and

supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

167. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Organogenesis securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Organogenesis' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Organogenesis securities during the Class Period at artificially high prices and were damaged thereby.

168. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Organogenesis was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Organogenesis securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

169. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

170. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

171. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

172. The Individual Defendants acted as controlling persons of Organogenesis within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

173. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

74

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

174.  As set forth above, Organogenesis and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.  Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.  Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 2, 2004

MOULTON & GANS, P.C.

By: /s/ Nancy Freeman Gans (auth)
Nancy Freeman Gans, BBO #184540
33 Broad Street, Suite 1100
Boston, MA 02109-4216
Telephone: (617) 369-7979
Facsimile: (617) 369-7980

**MILBERG WEISS BERSHAD
 HYNES & LERACH LLP**
Steven G. Schulman
Andrei V. Rado
Sharon M. Lee
One Pennsylvania Plaza - 49th Floor
New York, NY 10119
(212) 594-5300

**SCOTT + SCOTT LLC**
David R. Scott
Michael A. Swick
P.O. Box 192
108 Norwich Avenue
Colchester, CT 06415
(860) 537-5537

**Attorneys for Plaintiff**

# CERTIFICATION OF BRUNO HOFMANN IN SUPPORT OF ORGANOGENESIS CLASS ACTION COMPLAINT

Bruno Hofmann ("Plaintiff") declares, as to the claims asserted under federal securities laws, that:

1. Plaintiff has reviewed the complaint prepared by counsel in the above captioned case, and authorizes its filing.

2. Plaintiff did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the proposed class period, plaintiff made the following transactions in Organogenesis securities: See attached Schedule A

5. In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class action filed under federal securities law except: *none*

6. Plaintiff will not accept payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to representation of the class as ordered or approved by the court.

**I declare under penalty on perjury that the foregoing is true and correct.**

Executed this ___5th___ day of ___January___, 2004.

*[signature: Bruno Hofmann]*
Bruno Hofmann

Schedule A
Bruno Hofmann Transactions in
Organogenesis CP

Purchases:

| Date | Number of Shares | Price Per Share |
|---|---|---|
| 01/14/00 | 300 | 9.5000 |
| 01/18/00 | 1,500 | 9.5000 |
| 01/25/00 | 700 | 9.5000 |
| 01/28/00 | 2,500 | 9.2500 |
| 01/31/00 | 5,000 | 8.8750 |
| 02/18/00 | 5,000 | 14.3750 |
| 02/18/00 | 5,000 | 14.7500 |
| 02/18/00 | 5,000 | 15.5000 |
| 03/03/00 | 5,000 | 13.5625 |
| 03/16/00 | 5,000 | 15.5000 |
| 04/18/00 | 5,000 | 10.7500 |

Sales:

| Date | Number of Shares | Price Per Share |
|---|---|---|
| 11/16/00 | 9,000 | 10.0000 |
| 11/16/00 | 1,000 | 10.0300 |

