UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE ORGANOGENESIS SECURITIES LITIGATION | MASTER FILE NO. 04-10027 JLT<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, through their attorneys, bring this action on behalf of themselves and all others similarly situated, on personal knowledge as to themselves and their activities, and on all other matters based upon the investigation of counsel, including, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Organogenesis, Inc. ("Organogenesis" or the "Company"), securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, newspaper articles and media reports about the Company, and interviews with former employees of the Company and other companies who are knowledgeable about the businesses those companies. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE COMPLAINT

1. This is a federal class action on behalf of purchasers of the securities of Organogenesis between November 15, 1999 and February 7, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.  Throughout the Class Period, Organogenesis was a Company with only one commercially available product — Apligraf, a unique skin replacement therapy used for severe skin wounds. Thus, most if not all of the Company's revenues were generated from the sale of Apligraf. Organogenesis describes Apligraf as having a structure similar to human skin and as being a "skin construct," composed of living cells. The product's human skin-like properties allow this product to be used by doctors to aid in the healing of certain types of skin ulcers, and other epidermal injuries.

3.  At all times throughout the Class Period, defendants were well aware that the Company's business model was entirely dependent upon their ability to mass-produce Apligraf and market it to physicians as an "off-the-shelf," cost-effective product that doctors could use on patients absent hospitalization. While the Company encountered some difficulties in manufacturing and marketing Apligraf during the first half of 1999, by the inception of the Class Period, defendants assured investors:

(a)  that Organogenesis maintained the expertise and ability to manufacture sufficient quantities of Apligraf so that it was foreseeable that the Company could achieve economies of scale and achieve profitability through the sales of only this product;

(b)  that the Company maintained marketing agreements with experienced partners such as defendant Novartis Pharma AG ("Novartis"), which would allow Organogenesis to obtain the marketing support necessary to sell sufficient quantities of Apligraf, while at the same time retaining enough of the revenue split in these deals to fund operations and achieve profitability; and

(c) that between the Company's marketing agreements with Novartis and others, and through other foreseeable sources of available debt and equity, Organogenesis could foreseeably achieve profitability and commercial self-sufficiency.

4. Thus, by the inception of the Class Period, while it was fully disclosed that the Company would need to raise additional funding at some point in the future to increase production and distribution, throughout the Class Period, defendants consistently reported that Organogenesis had the necessary funding in place to allow it to achieve the Company's stated, foreseeable near-term objectives. In fact, according to the Company's 1999 Form 10-K, filed with the SEC on or about March 29, 2000, Organogenesis stated that, *"future capital comprised of product sales, research and development support payments and debt and equity financings will be sufficient to fund future operations into 2001 . . ."*

5. Accordingly, throughout the Class Period, plaintiffs and other members of the Class were led to believe that Organogenesis was able to manufacture Apligraf in sufficient quantities and that other sources of funding were available such that the Company would be able to achieve profitability in the foreseeable near-term. Defendants repeatedly stated that Organogenesis' results were *"consistent with the transition in progress from a research focused company to a research based operating company with a novel medical product in introduction phase,"* and that the Company was operating according to defendants' plan for sufficiency. Central to defendants' plan was a key agreement with Novartis, Organogenesis' Apligraf marketing partner, which purportedly allowed Organogenesis to access *at least $20 million* from Novartis through the exercise of a "put" option.[1] Defendants represented to investors that this

---

[1] A "put" option is an option contract that gives the holder (here, Organogenesis) the right to sell a certain quantity of an underlying security to the writer of the option (here, Novartis), at a specified price up to a specified date.

3

agreement allowed the Company to raise this money at "any time" during the Class Period, "at [the Company's] discretion and at [the Company's] option," and thereby maintain a large mega-million dollar "safety net" for the Company. The Novartis put option agreement was, therefore, during the Class Period, a critical part of the Individual Defendants' announced plan to achieve profitability and to avoid bankruptcy.

6. At all times during the Class Period, therefore, Organogenesis represented that it was able to make Apligraf commercially available in a cost-effective manner which — even if the Company were forced to incur losses at the early stages of development — would allow Organogenesis to ramp up production and soon be able to fund operations from sales. Both prior to and during the Class Period, defendants consistently represented that the Company was sufficiently well funded, or had access to sufficient funding to carry out defendants' business plan.

7. Unbeknownst to investors, however, the reality was far different than defendants' representations. In the words of one former employee who worked at Organogenesis during the Class Period, *"it was always a series of smoke and mirrors."* According to a confidential document created in October 2001 by defendant Arcari, then the Company's Chief Financial Officer (the "Confidential Arcari Document") — which has since been obtained by Plaintiffs' counsel in the course of their investigation of this action — the Company was informed by stock brokers in 2001 that defendant Erani, then Chairman of the Company's board of directors, sought to have them *"manipulate the market for the Company's stock."* According to the Confidential Arcari Document, defendant Erani also "encouraged the Company to prepare *overly optimistic financial projections* to existing and potential service providers." Neither defendant Arcari, the

4

other defendants, nor the Company ever disclosed this scheme to manipulate the Company's stock to the public and overstate the Company's financial projections.

8.   In furtherance of this scheme defendants withheld from investors the true facts about the Company's dismal and ever-deteriorating financial condition and business prospects. Throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors that were negatively impacting its business and that would cause it to report declining financial results — materially less than the market expectations defendants had caused and cultivated — and eventually to file for bankruptcy. In particular:

- At all times during the Class Period, *it was not true that defendants could achieve profitability through the sale of Apligraf under the terms, or even the revised terms, of the Novartis marketing agreement,* which did not provide Organogenesis with enough of the revenues or profits provided through such Apligraf sales to offset the extremely high cost of production or to offset other undisclosed manufacturing problems such as defective products and recalls. Indeed, as defendants were well aware but did not publicly disclose, throughout the Class Period the Company was actually *losing money on every unit of Apligraf sold due to the adverse terms of the marketing agreement with Novartis*.

- Throughout the Class Period, undisclosed problems related to the manufacture and marketing of Apligraf were leading to even higher costs and further reducing profitability. Manufacturing problems and delays were retarding production scale, and marketing issues were reducing sales and damaging future sales development prospects. As plaintiffs would only learn following the Class Period, Novartis' inexperienced and inadequately trained sales force was encountering resistance throughout that time concerning the cost and complexity of its products and the actual and/or perceived difficulties in physician reimbursement for Apligraf.

- Throughout the Class Period, Organogenesis was underfunded and there was no reasonable basis to report that the Company could foreseeably fund operations throughout the Class Period, based on product sales, available sources of loans, debt and/or equity sales. Indeed, defendants knew but did not disclose that, as reported by defendant Arcari in the Confidential Arcari Document, *the Company's own auditors — defendant PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") — had in 2001 "refused to grant any consents or additional comfort letters"* for future financing initiatives and that the Company had lost credibility in the eyes of PricewaterhouseCoopers. Moreover, as defendants were well aware but failed to disclose to investors, it was not true that the Company could access the full complement of funding from Novartis as defendants consistently represented, given that certain undisclosed conditions precedent existed. *Organogenesis could not meet conditions*

5

*precedent to Novartis' requirement to provide at least $10 million of its purported commitment to Organogenesis.* It also was not true that other sources of funding remained available to so that the Company could preserve corporate viability.

- Throughout the Class Period, defendants failed to disclose that high management turn-over at the Company and in-fighting among its senior officers and directors was having, and would continue to have a disruptive effect on the operations and oversight of Organogenesis, such that it was also not foreseeable at any time during the Class Period that Organogenesis would be able to achieve profitability in the near-term or to attain the guidance sponsored and/or endorsed by defendants.

- As a result of the aforementioned adverse conditions that defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Organogenesis was operating according to plan, that sufficient sources of funding were achieved and/or available to Organogenesis or that the Company could maintain profitability or even remain a viable entity in the foreseeable near-term.

9. Defendants were motivated to and did embark on this scheme to "manipulate the market for the Company's stock," to conceal the true operational and financial condition of Organogenesis, and to materially misrepresent and fail to disclose the conditions that were adversely affecting Organogenesis throughout the Class Period, because *it enabled insiders, including certain defendants, to sell over 6.2 million shares of Company stock and/or securities valued at over $68.8 million, prior to any proper disclosure to the market.*

10. Defendants' scheme also, ultimately, allowed defendants Erani and Ades and their family members to improperly acquire the remaining assets of Organogenesis through a leveraged buyout during bankruptcy — after defendants' actions drove the Company into bankruptcy and after they sufficiently interfered with these proceedings so as to guarantee that Erani and Ades and their family members acquired total domination and control over what was left of Organogenesis.

11. Thus, through their illegal and improper actions which ultimately forced the Company into bankruptcy, defendants not only were able to wipe out the equity interest of all of the Company's outside shareholders, but they were also able to renegotiate their agreement with

6

Novartis — *which, as defendants knew, throughout the Class Period was causing the Company to lose money on every unit of Apligraf.*

12. During the Class Period, defendant PricewaterhouseCoopers, the Company's purported independent auditors, participated in this scheme in the following ways:

(a) PricewaterhouseCoopers recklessly disregarded suspicious behavior by the Company's Chairman, which impugned his integrity and caused PricewaterhouseCoopers to lose faith in the credibility of the Company's officers and directors and failed to disclose the truth about PricewaterhouseCoopers' true opinion of the Company's officers and directors. According to the Confidential Arcari Document, by March 2001 *PricewaterhouseCoopers' "confidence in managements [sic] and the Boards [sic] representations" had been "eroded."* Further, other actions by Erani caused a "loss of the Company's credibility" with PricewaterhouseCoopers. At no time during the Class Period did PricewaterhouseCoopers ever disclose this erosion of its confidence in the Company's management and Board or the loss of the Company's credibility in the eyes of PricewaterhouseCoopers.

(b) Despite this lack of confidence in the integrity of the Company's representations, PricewaterhouseCoopers continued to certify the Company's year-end financial statements and its cash position;

(c) PricewaterhouseCoopers failed to disclose that, as a result of Company's violation of a commitment to PricewaterhouseCoopers in connection with the exercise of the first tranche of the Novartis put option in May 2001, PricewaterhouseCoopers informed defendants that it refused to support any future financing initiatives by the Company. According to the Confidential Arcari Document, defendant Erani "[h]indered the process for gaining approval to exercise the Novartis put option by May 31, 2001, a commitment, which was made to

PricewaterhouseCoopers (PWC), our independent auditors." The Company had made this commitment to exercise the put option to PricewaterhouseCoopers in order to "gain [sic] necessary comfort letter from PWC to allow us to sell common shares" under an equity offering with UBS Warburg. The Confidential Arcari Document states that *"[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment."*[2] PricewaterhouseCoopers, however, never publicly disclosed the Company's "hindering" of the process for obtaining critical funding or its own refusal to support the Company's future financing initiatives; and

(d) PricewaterhouseCoopers consistently failed to alert investors to the fact that, throughout the Class Period, the Company lacked the ability to fund operations through product sales, or that Organogenesis was actually losing money on each sale of Apligraf due to the disadvantageous terms, or revised terms, of the Novartis marketing agreement.

13. It was only after the end of the Class Period, after the Company had finally disclosed that it was impossible to fund operations with product sales that PricewaterhouseCoopers belatedly issued a "going concern opinion" on the Company — an opinion that should have been in place at least since the inception of the Class Period.

14. It was only beginning on January 30, 2002 that the truth about Organogenesis began to emerge. On that day, defendants announced that the Company was running out of money and would be forced into insolvency unless it could raise at least $15 million in the immediate near term. At the same time, the Company also disclosed that it would not be able to access the $10 million funding commitment from Novartis that they had previously touted as a

---

[2] A "comfort letter" is an auditor's statement provided to a company preparing for a public offering, confirming that unaudited financial data in the prospectus follows Generally Accepted Accounting Principles.

8

"safety net" because of significant conditions precedent to that funding — conditions that defendants had never before disclosed. Defendants also revealed that, contrary to their previous representations that the Company could remain properly funded and could achieve profitability, the "***extent of future losses and the time required to achieve profitability are highly uncertain, and we may never achieve a profitable level of operations or, even if we achieve profitability, we may not be able to sustain it on an ongoing basis.***" Defendants also announced that because of the Company's inability to raise necessary funds it might be forced to "***curtail or discontinue our activities.***"

15. In the wake of these disclosures, shares of Organogenesis fell to as low as $1.32 on February 7, 2002 — a decline of almost 95% compared to the Class Period high of over $22.00 per share reached on March 7, 2000.

16. In September 2002, the Company filed for bankruptcy protection — from which it later emerged under a plan that allowed defendants Erani and Ades to buy the Company at a steep bargain while liquidating the Company's stock — thus leaving the Company's shareholders with ***nothing***.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under, and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Organogenesis maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

20.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

21.     Court-appointed lead plaintiffs Bruno Hofmann, John Bowie, Richard Madigan and Richard Conen purchased the common stock of Organogenesis at artificially inflated prices during the Class Period and have been damaged thereby. The certifications of the lead plaintiffs in this action previously have been filed with the Court.

22.     Non-party Organogenesis is a Delaware corporation with its principal place of business at 150 Dan Road, Canton, MA 02021. Organogenesis designs, manufactures and sells medical products containing living cells and/or natural connective tissue, including living tissue replacements, cell-based organ asset devices and other tissue-engineered products. The Company's lead product, Apligraf living skin construct, is promoted as being the only product containing living human cells to gain Food and Drug Administration ("FDA") marketing approval in the United States.

23.     Non-party Novartis Pharma Ag is a Swiss-based pharmaceutical and drug company with substantial operations in the United States, which throughout the Class Period was the purported marketing partner of the Company and a principal shareholder in Organogenesis,

holding as many as 2.88 million shares, or more than 6% of the Company's shares issued and outstanding during that time.

24.     Defendant **PRICEWATERHOUSECOOPERS LLP** was, throughout the Class Period, the purported independent auditor of the Company.

25.     Defendant **PHILIP LAUGHLIN** ("Laughlin") was during the relevant period, President and a Director and member of the Company's Executive Committee of Organogenesis. Defendant Laughlin assumed these positions immediately prior to the inception of the Class Period, on or about, October 5, 1999 and later, on or about January 1, 2001, also assumed the role of Chief Executive Officer. Defendant Laughlin retained these positions of power and control over the Company until his sudden and unexpected departure, which was announced on or about May 16, 2001. During the Class Period, defendant Laughlin signed the Company's SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the materially false and misleading Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*).

26.     Defendant **MICHAEL SABOLINSKI** ("Sabolinski") was during the Class Period, President, Chief Executive Officer and a member of the Board of the Company, having assumed those positions on or about May 16, 2001, upon the resignation of defendant Laughlin. Prior to assuming the aforementioned positions and also during the Class Period, defendant Sabolinski also served as the Company's Senior Vice President, Medical and Regulatory Affairs. Defendant Sabolinski abandoned his position at the Company on or about April 5, 2002, less than one year after assuming the leadership of Organogenesis. During the Class Period, defendant Sabolinski signed the Company's SEC filings, including, but not limited to,

Organogenesis' Form(s) 10-K and/or the materially false and misleading Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*).

27.  Defendant **ALBERT ERANI** ("Erani") was during the relevant period, a member of the Board of the Company and on or about January 1, 2000 assumed the role of Chairman of the Board of Organogenesis. Defendant Erani served as Chairman of the Board of the Company until his sudden and unexpected departure on or about January 4, 2002. During the Class Period, defendant Erani signed the Company's SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the materially false and misleading Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*).

28.  Defendant **ALAN ADES** ("Ades") was nominated and appointed Chairman, President and Chie Executive Officer of the Company following the end of the Class Period on or about October 2002. Defendant Ades is the cousin of defendant Erani, and was also a member of the group of investors who took the Company private through a leveraged acquisition in bankruptcy. Defendant Ades was an active participant in the fraud alleged herein. It has been reported that defendant Ades, with the aid and complicity of other defendants named herein, acted to assure that other interested parties were not able to successfully participate in the ultimate sale of the Company and that defendant Ades, with the aid and complicity of other insiders, was then able to acquire the Company for a lower price, further depriving investors of a return on their investment in Organogenesis.

29.  Defendant **DONNA ABELLI LOPOLITO** ("Lopolito") was during the relevant period, Chief Financial Officer and Vice President, Finance and Administration of

Organogenesis. During the Class Period, defendant Lopolito signed the Company's SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the materially false and misleading Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*).

30. Defendant **JOHN J. ARCARI** ("Arcari") was during the relevant period, Chief Financial Officer and Vice President - Finance and Administration of Organogenesis, having replaced defendant Lopolito on or about April 30, 2000. Defendant Arcari served in the aforementioned positions until his sudden and unexpected departure on or about May 14, 2002. During the Class Period, defendant Arcari signed the Company's SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the materially false and misleading Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*).

31. Defendant **HERBERT M. STEIN** ("Stein") was at the inception of the Class Period, Chairman of the Board and Chief Executive Officer, until his resignation on or about January 1, 2000. Upon his retirement from the aforementioned positions, defendant Stein remained at the Company as a member of the Board and Chairman Emeritus until March 2000. During the Class Period defendant Stein made materially false and misleading statements about the Company and/or filed to disclose material information necessary to make such statements not false. During the Class Period, defendant Stein also signed the Company's SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the materially false and misleading Registration Statements and joint Proxy/Prospectus issued in connection with the sale

and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*).

32. Defendant **ALAN W. TUCK** ("Tuck") was during the Class Period, Chief Strategic Officer of the Company. During the Class Period, defendant Tuck also made materially false and misleading statements and/or signed the Company's SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the materially false and misleading Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*).

33. The defendants referenced above in paragraphs 26-32 are referred to herein as the "Individual Defendants."

34. Because of the Individual Defendants' positions with the Company, or relations with Company insiders, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith and/or otherwise actively participated in the fraudulent scheme alleged herein.

35. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of these

14

defendants, by virtue of their high-level positions with the Company and/or relations with company insiders, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein and/or otherwise actively participated in the fraudulent scheme alleged herein. These defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

36.     As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the American Stock Exchange (the "AMEX"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

37.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained

therein and omissions therefrom, and were aware of their materially false and misleading nature and/or otherwise actively participated in the fraudulent scheme alleged herein. Because of their Board membership and/or executive and managerial positions with Organogenesis, each of the Individual Defendants had access to the adverse undisclosed information about Organogenesis' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Organogenesis and its business, or adopted by the Company, materially false and misleading and/or otherwise actively participated in the fraudulent scheme alleged herein.

38. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, or relations with officers and/or directors, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein and/or otherwise actively participated in the fraudulent scheme alleged herein.

39. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Organogenesis common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public concerning defendants' attempt to manipulate the market for the Company's stock; (ii) deceived the investing public regarding Organogenesis' business, operations, management and the intrinsic value of Organogenesis

common stock; and (iii) enabled the defendants and Company insiders to sell over $68.8 million worth of Company stock to investors during the Class Period — of this amount defendants sold over 5.78 million shares of the Company's securities in a series of public stock offerings, private equity offerings and other debt and/or equity sales of Organogenesis stock; and (iv) caused plaintiffs and other members of the Class to purchase Organogenesis securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Organogenesis between November 15, 1999 and February 7, 2002 inclusive (the "Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

41. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Organogenesis common shares were actively traded on the American Stock Exchange. As of November 2, 2001, the Company had over 37.0 million shares issued and outstanding. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Organogenesis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a) whether the federal securities laws were violated by defendants' acts as alleged herein;

    (b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Organogenesis; and

    (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

45. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

46. **The Company**. Organogenesis was organized as a Delaware corporation in 1985. Throughout the Class Period, Organogenesis described itself as a "tissue engineering firm" that designs, develops and manufactures medical products containing living cells and/or natural connective tissue. For Organogenesis, tissue engineering involves developing and manufacturing medical products containing actual living human cells.

47. **Operations**. Prior to the inception of the Class Period, Organogenesis appeared to be a Company with a very unique product, but a Company that was research-centric and which had little product manufacturing experience. Complicating matters, the Company's main product, Apligraf a "tissue replacement" therapy, discussed in more detail below, was difficult to manufacture and required very specialized manufacturing procedures and techniques. As evidence of the difficulties associated with Apligraf production during mid-1999, the Company was even forced to recall several lots of Apligraf — accounting for more than 10% of monthly production at that time — for contamination reasons. In addition to manufacturing issues, the marketing of Apligraf was also difficult because, until early in the Class Period, Apligraf had *not* been approved for Medicare or Medicaid reimbursement — leaving doctors with a vast array of red tape to get reimbursed for the product.

48. The manufacture and marketing of Apligraf proved so difficult that in the year prior to the inception of the Class Period, sales of Apligraf were well below expectations. In fact, when the Company reported fiscal year 1998 results in March 1999, Organogenesis reported Apligraf sales of only $335,000 — well below product sales of $1.3 million that defendants had guided the market to expect. The result of these lower-than-expected sales was larger losses, and by the end of the fourth quarter of 1998 the Company had posted a loss of $0.19 per share.

49. Although during 1999 defendants reported less than consistent sales of Apligraf, the trend overall, bolstered by defendants' guidance, appeared bullish. For example, in April 1999, the Boston Business Journal reported the view of an investment analyst for Moors & Cabot, Inc. that Apligraf was a "revolutionary" product and a "major medical breakthrough" for which "it's simply a matter of time before it wins wide acceptance."

50. The manufacturing and marketing problems which limited the sale of Apligraf also raised issues concerning the funding of the Company and its ability to remain in operation long enough to achieve profitability. In this regard, while the Company initially had issued very aggressive predictions, forecasting operational break-even by the fourth quarter of 1999 and full funding by that time, by the inception of the Class Period, defendants had already revised these expectations and had taken a relatively longer-term view towards profitability. By the inception of the Class Period, and at all times thereafter, however, defendants consistently reported that sufficient sources of funding were available, that Organogenesis received or would receive sufficient profits from sales of Apligraf and that the Company still expected to achieve profitability in the foreseeable near-term.

51. **Funding Representations**. Thus, by the inception of the Class Period, while it was fully disclosed that the Company would need to raise additional funding at some point in the future to increase production and distribution, by this time and consistently thereafter, defendants reported that Organogenesis had the necessary funding in place to allow it to achieve the Company's stated, foreseeable near-term objectives. In fact, according to the Company's 1999 Form 10-K, filed with the SEC on or about March 29, 2000, Organogenesis stated that, *"future capital comprised of product sales, research and development support payments and debt and*