109.    **Needham Report.**    Following defendant Laughlin's well received CNBC appearance, analysts at Needham & Co. issued a report on Organogenesis, initiating a "BUY" rating and a near term price target of $18 per share on Organogenesis stock, and stating in part the following:

> INVESTMENT OPINION
>
> We are initiating coverage of Organogenesis Inc. with a ***BUY rating and a 12-month target price range of $16-$18.*** Management of skin disorders requiring tissue replacement represents a major unmet need. A leader in its segment of the $400B healthcare arena of regenerative medicine, ORG has developed Apligraf currently approved for two of the most common chronic wounds - venous stasis ulcers and diabetic foot ulcers... ***Apligraf sales continue to break volume records***, assisted by the recent approval for diabetic foot ulcers as well as expanded coverage by Medicare in August 2000... ***ORG's off-the-balance sheet strength such as the recently expanded relationship with Novartis, the enhanced management team under CEO Philip Laughlin*** (formerly President of Cardiac Surgery Business at Medtronic), ***and the proven scientific team will help promote the product portfolio.***

\*    \*    \*

> A Compelling Valuation. We believe ORG is ***currently undervalued compared to its peers*** in the regenerative medicine biology space. Applying two methods of valuation (market capitalization to revenue ratio of 11x as well as P/E ratio of 35x) to our 2004 estimates and discounting back at 10% annually, ***we arrive at a 12-month target range of $16-$18.*** [Emphasis added.]

110.    **Apligraf Sales 2/01.**    On March 5, 2001, Organogenesis announced that sales of Apligraf had reached another monthly record, with 1729 units sold in February 2001. In addition, this release again quoted defendant Arcari who stated that, "***Apligraf sales are showing sustained growth acceleration.*** Average daily sales in February surpassed those in January, and both are ahead of the level seen in our record fourth quarter. ***We are particularly pleased with this acceleration, because under the recently amended agreement with Novartis, Organogenesis now receives significantly higher payments for Apligraf.***" [Emphasis added.]

111. **Erani's Refusal To Provide Standard Audit Confirmations to PricewaterhouseCoopers.** Unbeknownst to the public, as stated by defendant Arcari — then the Company's CFO — in the Confidential Arcari Document obtained by plaintiffs' counsel, in March 2001 defendant Erani, then Chairman of the Board of Organogenesis, "[r]efused to sign standard audit confirmations sent to him by PricewaterhouseCoopers, the Company's auditors, relating to his holdings of the Company's convertible debt." According to the Confidential Arcari Document, "this eroded PricewaterhouseCoopers [sic] confidence in managements [sic] and the Boards [sic] representations." The Confidential Arcari document further states that other actions by Erani led to a "loss of the Company's credibility with the Company's service providers including . . . independent accountants."

112. **4Q and FY:00 Results.** On March 30, 2001, Organogenesis issued a release published on *Business Wire* which purported to announce financial results for the fourth quarter and full year 2000, as follows:

> For the three months ended December 31, 2000, total revenues were $1.5 million compared with $0.9 million for the same quarter in 1999.... Total operating costs and expenses were $8.5 million during the fourth quarter of 2000 compared with $8.9 million for the same quarter in 1999.... Net loss was $7.4 million ($0.21 per share) for the fourth quarter of 2000 compared with a net loss of $8.4 million ($0.27 per share) for the same quarter in 1999.

> For the year ended December 31, 2000, total revenues were $10.2 million compared with $2.7 million in 1999.... The 2000 full-year revenues include a $5 million milestone payment from Novartis for our achievement of FDA approval of Apligraf for diabetic foot ulcers. Full-year revenues also include $1.1 million in research and development support from Novartis recognized in 2000 under SAB 101. Total operating costs and expenses were $31.6 million in 2000 compared with $30.6 million in 1999.... Net loss was $22.3 million ($0.66 per share) in 2000 compared with a net loss of $28.4 million ($0.93 per share) in 1999. When the one-time cumulative effect charge against income due to adoption of SAB 101 is included, the 2000 net loss becomes $28.6 million ($0.85 per share).

In addition to the foregoing, defendant Laughlin also stated that defendants were also keeping a tight control over expenses and costs and that Apligraf sales were driving revenues, as follows:

> Our increased product revenue in the fourth quarter reflects a significant increase in our unit sales growth rate, compared to the prior quarter. Our first quarter 2001 financials will show an *important increase in revenue due to a continuation of this higher unit growth rate* as well as the *significantly higher revenue per unit* which we now receive from Novartis. *We are keeping a tight control on our corporate expenses while implementing programs to reduce our manufacturing costs.* [Emphasis added.]

113.    **2000 Form 10-K.**  The same day, March 30, 2001, Organogenesis also filed with the SEC its financial results for full year 2000, pursuant to Form 10-K, signed by defendants Laughlin, Erani and Arcari, among others.   In addition to repeating many of the same misrepresentations made in the Company's release, the 2000 Form 10-K also stated that Apligraf was "*mass-produced*" and "*available to physicians on demand.*"  In the section of the Form 10-K entitled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") defendants also touted the purported benefits of the recent amendment to the Novartis marketing agreement, stating that the amendment "*significantly increases payments we receive for Apligraf units.*"  The MD&A section of the Form 10-K further stated that although Organogenesis had "limited experience in sales, marketing and distribution" the Company had "developed a *long-term strategic relationship with Novartis, who has marketing and sales forces with technical expertise and distribution capability.*"  The MD&A section of the Form 10-K also stated that "*[w]e expect  Apligraf  commercial sales to continue to increase*" and that "*[w]e expect production volume to increase due to recent Medicare progress with coverage for Apligraf,* FDA approval of Apligraf for use in diabetic foot ulcers and *expanded Novartis sales and marketing support.*"   The MD&A section of Form 10-K also

63

touted the Company's purported ability to access funding from Novartis and other sources of capital, stating that:

> Based upon our current plans, *we believe existing working capital at December 31, 2000, together with the proceeds of product and other revenues in 2001 and proceeds available from exercising a portion or all of a $20,000,000 equity security put with Novartis, which is at our discretion, will be sufficient to finance operations through at least the first quarter of 2002*. We expect to raise additional funds in 2001 through equity financing. [Emphasis added.]

114.    Despite the erosion of PricewaterhouseCoopers' confidence in the representations of the senior officers and directors of Organogenesis and the "loss of the Company's credibility" with the Company's "independent accountants," as alleged above, PricewaterhouseCoopers on March 31, 2001 issued to the Company's shareholders a "Report of Independent    Accountants"    certifying    Organogenesis'    financial    statements. PricewaterhouseCoopers' report , which was included in Organogenesis' 2000 Form 10-K, stated:

> In our opinion, the accompanying consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Organogenesis, Inc. and its subsidiaries at December 31, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2000 in conformity with accounting principles generally accepted in the United States of America. . . . We conducted our audits of these statements in accordance  with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

115.    During April 2001, Organogenesis also hosted presentations at additional analyst conferences, including, but not limited to, the Tucker Anthony Sutro Capital Markets 2001 Health Care Conference, held at the Ritz Carlton in Laguna Niguel, CA, and the Fifth Annual American Stock Exchange Emerging Growth Conference, held at the Grand Hyatt Hotel in New

York City. On or about April 17, 2001 analysts at Needham & Co. reiterated their prior "BUY" rating and continued to encourage investors to expect a near-term price target of $18 per share.

116.    The statements made by defendants and contained in the Company's March 5, 2001 and March 30, 2001 releases and those statements contained in Organogenesis 2000 Form 10-K, reproduced herein, *supra*, including the MD&A section of that Form 10-K were each materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

(b)    Contrary to defendants' representation that the $20 million put option with Novartis was available "at [Organogenesis'] discretion," the Company did not have the ability to raise the full amount of that funding option at the discretion of the Company. As defendants knew but failed to disclose at the time, significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(c)    Contrary to defendants' representation that Apligraf could be, and was being "mass-produced," according to a former Senior Manager of Quality Systems Compliance for Organogenesis during the Class Period, there was "no way" that the Company could commercially mass-produce Apligraf given the Company's inadequate production infrastructure and processes.

(d)    Contrary to defendants' representation that the Company made Apligraf "available to physicians on demand," according to a former Tissue Engineering Specialist with Novartis during the Class Period, contamination of the product frequently resulted in physicians

not receiving the product when necessary, resulting in increased frustration and disappointment with the product among physicians.

(e)    Defendants' representation that "under the recently amended agreement with Novartis, Organogenesis now receives significantly higher payments for Apligraf" was materially misleading and incomplete given that even under the amended agreement Organogenesis would still receive revenue payments that were well below the product's manufacturing cost and that Organogenesis would continue losing money on every unit of Apligraf.

(f)    Defendants' representations touting the "important increase in revenue," the "significantly higher revenue per unit" and the "significant[] increases" in "payments the Company receive[d] for Apligraf units" were materially misleading and incomplete for the same reasons stated in subparagraph (e) above.

(g)    Defendants' representation that they expected Apligraf "commercial sales to increase" was untrue given the marketing problems that Novartis was experiencing and would continue to experience because of inadequate marketing support and the problems with the manufacturing and distribution of Apligraf that were causing frustration among purchasers, leading to reluctance among physicians to order or re-order Apligraf and damaging Apligraf's future sales development prospects.

(h)    Defendants' representations touting "record" sales for the month of February 2001 and "sustained growth acceleration" were materially misleading and incomplete given that, as confirmed by several former employees of Organogenesis, the Company was experiencing serious manufacturing and marketing problems that were inhibiting sales and damaging future sales development prospects. Further, as defendants knew, Novartis' marketing

66

team did not have the proper training or experience in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly.

(i)    Contrary to defendants' representation that they were "implementing programs to reduce [the Company's] manufacturing costs," the Company was incurring significant manufacturing costs due to the fact that under the revised Novartis marketing agreement, Organogenesis was required to produce Apligraf in sufficient quantities to meet Novartis' "always inflated" sales forecasts. According to former employees of Organogenesis, for every unit of Apligraf manufactured pursuant to Novartis' sales forecasts but not sold, Organogenesis was required to bear an even greater share of the manufacturing costs than for units that were sold.

(j)    Contrary to defendants' representation that Novartis had "marketing and sales forces with technical expertise and distribution capability," Novartis' marketing team did not have the proper training, experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly. In fact, as alleged above, according to former employees of Novartis and Organogenesis, Novartis *"had no idea what they were doing"* when it came to marketing a living-tissue product like Apligraf.

(k)    Contrary to defendants' representation that they "expect[ed] production volume to increase due to recent Medicare progress with coverage for Apligraf," defendants were encountering significant physician resistance to the product due to difficulties in obtaining Medicare and Medicaid reimbursement for Apligraf.

(l)    Defendants' representation heralding Novartis' "expanded Novartis sales and marketing support" was materially materially misleading and incomplete given that defendants failed to disclose that Novartis' marketing team did not have the proper training,

experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly. In fact, as alleged above, according to former employees of Novartis and Organogenesis, Novartis *"had no idea what they were doing"* when it came to marketing a living-tissue product like Apligraf.

(m)    Defendants' representation that it had, or had access to, sufficient funds to finance operations through "at least the first quarter of 2002" based in part on "proceeds of product," and proceeds available from the $20 million put option was untrue. As defendants were well aware but did not disclose (i) revenues from sales of Apligraf were well below costs of production and thus the product was actually causing the Company to lose money; and (ii) significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002. Indeed, well before the end of the first quarter of 2002, the Company revealed that it *"would have to curtail or discontinue"* all operations if it could not raise additional funding.

(n)    Defendant PricewaterhouseCoopers' certification of the Company's financial statements was materially misleading and incomplete because it failed to disclose that, according to the Confidential Arcari Document, PricewaterhouseCoopers' confidence in the representations of the senior officers and directors of Organogenesis had been eroded and that the Company had lost credibility in the eyes of PricewaterhouseCoopers.

117.    **1Q:01 Results.** On April 27, 2001, defendants announced more purported good news. That day, the Company published a release, announcing results for first quarter of 2001, with product revenues "nearly triple over prior year period." This release also stated that the Company had made another amendment to its marketing agreement with Novartis which

purportedly gave Organogenesis "significantly higher payments" on sales of Apligraf as well as additional funding support. In addition, this release also stated that:

> For the three months ended March 31, 2001, total revenues were $2.5 million compared with $1.2 million for the same quarter in 2000. Product sales to related party were $1.8 million in the first quarter of 2001, compared with $0.6 million for the same period in 2000, *due to increased sales of Apligraf and the higher payments Organogenesis now receives from Novartis for each unit of Apligraf.*
>
> Total operating costs and expenses were $8.6 million during the first quarter of 2001 compared with $7.3 million for the same quarter in 2000. The first quarter of 2001 cost of product sales increased by $0.7 million due to increased sales of Apligraf. During the same period, research and development costs increased by $0.6 million due to increased clinical, process development and product development expenses. General and administrative expenses decreased slightly. Net loss was $6.5 million ($0.19 per share) for the first quarter of 2001 compared with a net loss of $6.4 million ($0.21 per share) for the same quarter in 2000. When the one-time cumulative effect in change in accounting principle charge due to the adoption of SEC Staff Accounting Bulletin No. 101 - "Revenue Recognition in Financial Statements" is included, the first quarter of 2000 net loss becomes $12.8 million ($0.41 per share).

This release also quoted defendant Arcari, as follows:

> Our product margin improved significantly over last year. *Not only did product revenue increase, but per unit costs decreased as a result of process improvements. We tightly controlled our corporate expenses while increasing our investment in process development to further reduce manufacturing costs.* Under our amended agreement with Novartis, we received nearly $1.0 million in the first quarter of 2001 for manufacturing facility improvements. [Emphasis added.]

118.    **1Q:01 Form 10-Q.**  On or about April 27, 2001, defendants also filed with the SEC the Company's financial results for the first quarter of 2001, the period ended March 31, 2000, pursuant to a Form 10-Q signed by defendants Laughlin and Arcari. The Company's Form 10-Q for the first quarter of 2001 contained the same materially false and misleading financial information as had been announced previously, in addition to reporting, in part, the following:

> Basis of Presentation

- - - - - - - - - - - - - - - - - - - -

The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented....*

\* \* \*

Costs and Expenses

Cost of product sales:  Cost of product sales increased 50% to $2,196,000 in the first quarter of fiscal 2001, from $1,467,000 for the comparable quarter last year, due to increased unit sales of Apligraf to Novartis.  *Cost of product sales includes the direct costs to manufacture and package Apligraf and an allocation of our production related indirect costs.  Cost of product sales continues to exceed product sales due to the high costs associated with low volume production.  We expect production volume to increase and our margins to continue to improve during 2001.* [Emphasis added.]

\* \* \*

[W]e believe existing working capital at December 31, 2000, together with the proceeds of product and other revenues in 2001 and proceeds available from sales of shares to the underwriter and/or *exercising a portion or all of a $20,000,000 equity security put with Novartis, which is at our discretion, will be sufficient to finance operations through at least the first quarter of 2002.* We expect to raise additional funds in 2001 through equity financing.  [Emphasis added.]

119.    The statements made by defendants and contained in the Company's April 27, 2001 release and in the Form 10-Q  for the first quarter of 2001, reproduced herein, *supra*, were each materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

70

(b)    Defendants' representation that it had, or had access to, sufficient funds to finance operations through "at least the first quarter of 2002" based in part on "proceeds of product," and proceeds available from the $20 million put option was untrue.  As defendants were well aware but did not disclose (i) revenues from sales of Apligraf were well below costs of production and thus the product was actually causing the Company to lose money; and (ii) significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(c)    Contrary to defendants' that the $20 million put option with Novartis was available "at [Organogenesis'] discretion," the Company did not have the ability to raise the full amount of that funding option at the discretion of the Company.  As defendants knew but failed to disclose at the time, significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(d)    Defendants' representations touting  the "important increase in revenue," the "significantly higher revenue per unit" and the "significant[] increases" in "payments the Company receive[d] for Apligraf units" was materially misleading and incomplete because defendants failed to disclose that even under the amended agreement Organogenesis would still receive revenue payments that were well below the product's manufacturing cost and that Organogenesis would continue losing money on every unit of Apligraf.

(e)    Defendants' representations touting a "product revenue increase," the decrease of per unit costs and its investment "to further reduce manufacturing costs" were materially misleading and incomplete given that defendants knew but failed to disclose that the

71

Company was incurring significant manufacturing costs due to the fact that under the revised Novartis marketing agreement, Organogenesis was required to produce Apligraf in sufficient quantities to meet Novartis' "always inflated" sales forecasts. According to former employees of Organogenesis, for every unit of Apligraf manufactured pursuant to Novartis' sales forecasts but not sold, Organogenesis was required to bear an even greater share of the manufacturing costs than for units that were sold.

(f)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be*.

(g)    Contrary to defendants' representations, the Company's Form 10-Q for the first quarter of 2001 did not reflect the true financial condition of the Company because it failed

to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (f) above and in paragraphs 59-67, *supra*.

120.    **1.9 Million Share Offering**. Later the same day, April 27, 2001, Organogenesis also announced that it had filed a post-effective amendment to its registration statement covering the offering of an additional 1.9 million shares of common stock. Days later on May 8, 2001, Organogenesis published a release on *Business Wire* which announced that the Company had entered into an underwriting agreement with UBS Warburg LLC, as underwriter, providing that on any trading day during the next two years the Company could elect to issue and sell to the underwriter a number of shares of common stock that is not less than 5% and not more than 25% of the average trading volume of the common stock on the American Stock Exchange for the previous five days, up to an aggregate of 1,900,000 shares.[4]

121.    Following the announcement and report of results for the first quarter of 2001, analysts at Needham & Co. again reiterated a "BUY" rating on shares of Organogenesis and continued to advise investors to expect a near-term trading price of $18 per share for the Company.

122.    **Laughlin Quits.** On May 16, 2001, the Company issued a release announcing that defendant Laughlin had suddenly resigned from Organogenesis and that Michael Sabolinski, former Senior Vice President Medical and Regulatory Affairs, would become President, Chief Executive Officer and a member of the Board of the Company. According to the Company's release, defendant Sabolinski was primarily responsible for the development of Apligraf. In addition, the release also noted that, "this transition occurs at an important time for

---

[4]      The sale price of the shares to the underwriter was to be the volume-weighted average price per share at which shares of the common stock traded on the American Stock Exchange during regular trading hours on each purchase date less underwriter's commissions.

Organogenesis as the Company focuses on increasing market penetration with Apligraf and leveraging core technologies to commercialize new products." While no reason was given for defendant Laughlin's departure, defendant Sabolinski was quoted in this release as thanking defendant Laughlin for "all he achieved for Organogenesis."

123.    **$13.5 Million Equity Offering.** On or about May 17, 2001, defendants again capitalized on the artificial inflation in the price of Organogenesis shares that their false and misleading representations had caused, and filed a Prospectus with the SEC in connection with the sale of 1.9 million shares of Organogenesis common stock priced at $7.75 per share. Gross proceeds from the sales of these shares was estimated, at that time, at over $13.5 million. According to the Prospectus, this offering was part of the Company's previously filed, 3.0 million share Shelf Registration Statement.

124.    **PricewaterhouseCoopers' Refusal to Support Additional Funding Initiatives.** Unbeknownst to the public, as reported by defendant Arcari — then the Company's CFO — in the Confidential Arcari Document obtained by plaintiffs' counsel, in May 2001 defendant Erani, then Chairman of the Board of Organogenesis, "[h]indered the process for gaining approval to exercise the Novartis put option by May 31, 2001, a commitment which was made to PricewaterhouseCoopers (PWC), our independent auditors." The Company had made this commitment to exercise the put option to PricewaterhouseCoopers in order to "gain [sic] necessary comfort letter from PWC to allow us to sell common shares" under an equity offering with UBS Warburg. The Confidential Arcari Document goes on to state that "*[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment.*" PricewaterhouseCoopers apparently was sufficiently alarmed by the Company's hindrance of this process, and the violation of the Company's aforementioned commitment, that, according to

74

the Confidential Arcari Document, it refused to issue any further "comfort letters" to the Company. PricewaterhouseCoopers, however, never publicly disclosed the Company's "hindering" of the process for obtaining this critical funding or its own refusal to support the Company's future financing initiatives.

125.    **Apligraf Sales 5/01.**  On June 5, 2001, Organogenesis announced that sales of Apligraf had again reached above 1750 units, for May 2001.  According to defendant Sabolinski, who was quoted in the Company's release, *"[t]he May sales figures show sustained support for Apligraf use, and we have accelerated our plans to ramp up production to meet the strong growth forecast for the second half of this year."* [Emphasis added.]

126.    While sales for May 2001 were actually less than April sales (1758 units vs. 1813 units), defendants did not revise guidance in any way, and continued to advise analysts and investors that the Company was still on track to register sequential growth in unit sales and achieve profitability.  As evidence of defendants' further representations, on June 6, 2001, analysts at Needham & Co. reiterated a "BUY" rating on shares of the Company, and continued to maintain a near-term price target of $18.00 per share, and stated the slowdown in Apligraf was merely a "Bump in the Road" for Organogenesis.

127.    **$1.44 Million Private Placement**.  On June 18, 2001, Organogenesis raised another $1.44 million through the sale of shares of stock through the UBS Warburg underwriting previously announced. Pursuant to this agreement, between May 21, 2001 and June 18, 2001, defendants caused the Company to sell over 186,000 shares of stock for at least $1.44 million.

128.    **Apligraf Sales 7/01.**  On August 2, 2001, Organogenesis announced that sales of Apligraf reached another monthly record sales level: 2015 units sold in July 2001.  This release also quoted defendant Sabolinski, as stating that, *"[w]e are delighted with the growth in sales*

*seen between June and July.* Apligraf unit sales have multiple drivers in place . . . *We are planning accelerating growth in Apligraf production to meet the increasing demand anticipated."* [Emphasis added.]

129.    **$10 Million Equity Sale to Novartis**. On August 7, 2001, Organogenesis issued a release announcing that it had elected to sell $10 million in equity to Novartis, pursuant to the terms of its amended, $20 million stock sales agreement.

130.    **2Q:01 Results**. On August 13, 2001, defendants published a release on *Business Wire*, which purported to announce financial results for the second quarter 2001, the period ended June 30, 2001, which stated that there was "sustained market demand for Apligraf and the Company *accelerated its plans to ramp up production to meet the strong sales forecast for the second half of this year*," in addition to stating the following:

> Reflecting the growth in product sales and the 2001 amendment to the agreement with Novartis, for the three months ended June 30, 2001, product sales to related party were $1.7 million in 2001 compared with $0.7 million for the same period in 2000. Total operating revenues were $2.1 million in the second quarter of 2001 compared with $1.3 million for the same quarter in 2000, excluding a $5 million milestone payment from Novartis for the approval of Apligraf for diabetic foot ulcers. Total operating costs and expenses were $ 9.1million during the second quarter of 2001 compared with $8.0 million for the same quarter in 2000, excluding a $1.2 million ($0.04 per share) one-time severance expense in 2001 for a former executive officer. Cost of product sales increased by $1.3 million due to increased sales of Apligraf and ramping up production to meet anticipated increased demand; research and development as well as general and administrative costs slightly decreased. Net loss was $8.6 million ($0.25 per share) for the second quarter of 2001 compared with a net loss of $1.8 million ($0.05 per share) for the same quarter in 2000.
>
> *    *    *
>
> [Defendant] Arcari said, *"Our year-to-date revenue from product sales is nearly triple that of the same period last year. Our cost of goods per unit compares favorably with the same period last year*, but is up moderately from the previous quarter due to accelerating our plans to ramp up production. To strengthen our cash position, we have exercised our right to

sell Novartis $10 million in equity. *We retain the right to sell Novartis an additional $10 million in equity.*" [Emphasis added.]

131.    **2Q:01 Form 10-Q**.  The following day, August 14, 2001, the Company also filed

with the SEC the Company's financial results for the second quarter of 2001, the period ended

June 30, 2001, pursuant to a Form 10-Q signed by defendants Sabolinski and Arcari.   The

Company's Form 10-Q for the second quarter of 2001 contained the same materially false and

misleading financial information as had previously been announced, in addition to reporting, in

part, the following:

> Basis of Presentation
>
> - - - - - - - - - - - - - - - - - - - - -
>
> The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X.... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented....*
>
> *   *   *
>
> COSTS AND EXPENSES
>
> Cost of product sales:  Cost of product sales for the quarter ended June 30, 2001 increased 82% to $2,837,000, from $1,557,000 for the comparable quarter last year.  Cost of product sales for the six-month period ended June 30, 2001 increased 66% to 5,033,000, from $3,024,000 for the comparable period last year. These increases were due to increased unit sales of Apligraf to Novartis, additional scrap costs and higher allocations of depreciation and occupancy costs. Cost of product sales includes the direct costs to manufacture, quality inspect and package Apligraf and an allocation of our production-related indirect costs. Cost of product sales continues to exceed product sales due to the high costs associated with low volume production. *We expect production volume to increase and our margins to continue to improve during 2001. We expect that we will have to revise standard costs and the allocation of costs to product sales in the future as we continue to modify our manufacturing processes.* [Emphasis added.]

77

132.    In addition to the foregoing, the Form 10-Q for the second quarter of 2001 also reported that the Company paid severance to a retiring senior executive, as follows:

Severance Agreement:

- - - - - - - - - - - - - - - - - - - - -

In May 2001, we entered into a separation of employment agreement with a former executive officer, which resulted in the recording of a one-time severance expense of $1,233,000 during the quarter ended June 30, 2001. The separation of employment agreement provides for amounts to be paid over two years and supercedes the previous employment agreement.  It has been filed as exhibit 10(ff) to this Form 10Q.

Attached to the Form 10-Q for the second quarter of 2001 was a copy of defendant Laughlin's May 2001 Severance Agreement which reported that the vast majority of the Company's $1.233 million charge was to cover the cost of payments made by Organogenesis directly to Laughlin.

133.    The statements made by defendants and contained in the Company's August 2, 2001 and August 13, 2001 releases and those contained in the Company's Form 10-Q for the second quarter of 2001, reproduced herein, *supra*, were each materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

(b)    Defendants' announcement that the Company had elected to sell $10 million in equity to Novartis, pursuant to the terms of its amended $20 million stock sales agreement was materially misleading and incomplete given that defendants knew but failed to disclose that the Company was informed that defendant Erani had sought to have stock brokers *"manipulate the market for the Company's stock."*

(c)    Contrary to defendants' representation that Organogenesis "retain[s] the right to sell Novartis an additional $10 million in equity," the Company did not have the ability

78

to raise the full amount of that funding option at the discretion of the Company. As defendants knew but failed to disclose at the time, significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(d)    Defendants' representations touting "sustained support for Apligraf use," "sustained market demand for Apligraf," the acceleration of a plan to "ramp up production to meet the strong growth forecast for [the] second half of this year" and the "increasing demand anticipated" were materially misleading and incomplete given that defendants knew but failed to disclose that significant manufacturing and distribution problems, contamination issues, inadequate marketing support, and difficulties in obtaining reimbursement for Apligraf were causing increasing frustration among physicians, who were becoming less willing to order or re-order Apligraf for their patients. Further, defendants knew but failed to disclose that the purported "strong growth forecast" and "increasing demand anticipated" for Apligraf were illusory, given that, as confirmed by former employees of Organogenesis, Novartis' sales forecasts were "always inflated."

(e)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period,

79

Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.*

        (f)     Contrary to defendants' representations, the Company's Form 10-Q for the second quarter of 2001 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (e) above and in paragraphs 59-67, *supra*.

        134.    **Needham Report.**  The materially false and misleading statements issued by defendants had their intended effect. Following the publication of Organogenesis' second quarter 2001 results, on August 14, 2001, Needham issued another report on the Company which again reiterated a "BUY" rating and issued a near-term price target of $18 per share, and stating the following:

> We reiterate our BUY rating and 12-month target range of $16-$18. We used two methods to reach this valuation target. In the first instance, we applied a market capitalization to revenues ratio of 11x for the year 2004. In the second instance, we applied a 35x multiple to the 2004 estimates. To both these calculations, we used a 10% discount per year, given the fact that Apligraf is already on the market thereby less product uncertainty exists. Using these metrics, we arrived at a target price range of $16-18.

        135.    **Apligraf Sales August 2001.**  On September 6, 2001, Organogenesis issued a report which announced that sales of Apligraf reached another monthly record sales level, with 2150 units sold in August 2001. This release also quoted defendant Sabolinski, who stated that, *"We are pleased with the sustained strength in Apligraf sales that has been seen through the*