*summer months. We are on track for the third quarter of 2001 to have substantially higher sales than our record second quarter."* [Emphasis added.]

136. On September 7, 2001, defendants published a release which purported to announce that Organogenesis had increased its capacity to manufacture Apligraf. Accordingly, the Company's release quoted defendant Sabolinski, who stated the following:

> Our Company is now producing Apligraf at a rate of over 40,000 units per year. I am pleased that the manufacturing ramp-up I committed to when I became CEO in May is on track. *We anticipate increasing this production rate in the near term to meet forecasted demand.* The demand has been driven by an increase in sales and marketing activity, the diabetic foot ulcer supplement approval, and favorable reimbursement policies in the hospital and physician's office. [Emphasis added.]

137. On or about September 21, 2001, *Dow Jones* news service reported that Apligraf had received Medicare reimbursement in all 50 states.

138. **3 New Products.** On September 24, 2001, Organogenesis issued a release announcing that its experiences selling Apligraf had been so successful that defendants would begin commercializing three additional new proprietary products during the fourth quarter of 2001. According to the release, these products would be marketed directly by Organogenesis using its own marketing personnel and this purportedly would *"advance[e] the Company from a research, clinical/regulatory, manufacturing Company to a fully integrated medical products Company."* [Emphasis added.] This release also quoted defendant Sabolinski, as follows:

> Commercializing our own products, with our own sales and marketing team, brings Organogenesis to *a new stage.* We receive the full revenue from the products we commercialize ourselves, which will add to our revenue stream beginning in October. *We look forward to these products contributing to the overall profitability of the Company.* Having our own sales force also paves the way for Organogenesis commercializing additional products in the future. [Emphasis added.]

139. **Apligraf Sales 3Q:01.** On October 4, 2001, Organogenesis issued a release which purported to announce strong sales of Apligraf during the third quarter of 2001, with 6606

Apligraf units sold during the quarter. In addition to the foregoing, this release also quoted defendant Sabolinski, who stated that, *"[t]his has been a very significant quarter for the Company. Apligraf sales continue to increase* and the product is now reimbursed by Medicare in all fifty states. . . . In addition, we received marketing clearance for the third FortaFlex(TM)-based product, FortaGen(TM), and plan to launch four new products in October by an Organogenesis Institutional sales force." [Emphasis added.]

140.    On or about October 9, 2001, Organogenesis presented at the UBS Warburg Global Life Sciences Conference in New York City. Later on October 24, 2001, Organogenesis also presented at the Techvest Emerging Healthcare Forum, also held in New York City.

141.    **$20.25 Million Additional Funding.** On October 16, 2001, Organogenesis issued a release announcing that defendants had raised another $20.25 million from several financing activities, including another $10 million from Novartis and an additional $10.25 million from two equity placements to institutional investors and/or Company directors. One of the placements was made *via* the sale of the 1.67 million registered common shares remaining under the Company's existing shelf registration, the second placement was for 503,876 unregistered shares of common stock and attached warrants. This release also quoted defendant Sabolinski who stated that, *"we are pleased to have completed this round of financing, an important step in achieving key corporate milestones including realizing profitability sooner.* Furthermore, *these proceeds will enable us to accelerate additional key programs for our lead product, Apligraf, and other notable products in our development pipeline."*

142.    On November 1, 2001, *Dow Jones* news service reported that defendants had registered at least 2.7 million shares of common stock on behalf of certain shareholders. According to this report, of the shares registered 2.18 million were issuable to Novartis upon

82

conversion of a $10 million 7% convertible subordinated promissory note that would mature on March 29, 2004. In addition, at this time, Organogenesis also registered at least 503,876 shares issued to two of the Company's directors and an investor in a private equity transaction on September 5, 2001. According to this report, Organogenesis would receive no proceeds from the sale of the shares by the stockholders.

143.    **3Q:01 Results.**  On November 13, 2001, defendants published a release on *Business Wire*, which purported to announce financial results for the third quarter of 2001, the period ended September 30, 2001, which stated that:

> Organogenesis Inc. (AMEX: ORG) today reported its financial results for the third quarter and nine months ended September 30, 2001. Product sales to related party were $2.2 million in the third quarter of 2001, representing a 211% increase over $0.7 million for the same period in 2000. This increase reflects the growth in Apligraf(R) unit sales and the new pricing in the 2001 amended agreement with Novartis. Total revenues increased 124% to $3.0 million in the third quarter of 2001 compared with $1.3 million for the same quarter in 2000. Total operating costs and expenses were $9.8 million during the third quarter of 2001 compared with $7.7 million for the same quarter in 2000. Cost of product sales increased by $1.7 million due to increased sales of Apligraf and costs related to ramping up production to meet anticipated future increased Apligraf demand.
>
> Research and development costs decreased slightly to $4.1 million compared to $4.4 million in 2000. Selling, general and administrative costs increased by $0.7 million primarily due to selling expenses related to preparations for the commercial launches of the Company's FortaPerm(TM), FortaGen(TM) and Revitix(TM) products. Net loss was $7.4 million or $0.21 per share for the third quarter of 2001 compared with a net loss of $6.7 million or $0.19 per share for the same quarter in 2000.

Again, defendant Sabolinski was quoted in the Company's release as follows:

> Our latest financial results reflect our strategy of implementing programs to support the success of Apligraf, while embarking on initiatives that will position us to capitalize on additional opportunities in the emerging tissue engineering sector.

144.    **3Q:01 Form 10-Q.**  The following day, November 14, 2001, defendants also filed with the SEC the Company's financial results for the third quarter of 2001, the period ended

September 30, 2000, pursuant to a Form 10-Q signed by defendants Sabolinski and Arcari. The

Company's Form 10-Q for the third quarter of 2001 contained the same materially false and

misleading financial information as had previously been announced, in addition to reporting, in

part, the following:

> Basis of Presentation
>
> - - - - - - - - - - - - - - - - - - - - -
>
> The accompanying unaudited consolidated financial statements of
> Organogenesis Inc. have been prepared in accordance with generally
> accepted accounting principles for interim financial information and with
> the instructions to Form 10-Q and Article 10 of Regulation S-X... *In the
> opinion of management, the accompanying consolidated financial
> statements include all adjustments, consisting of normal recurring
> adjustments, necessary for a fair presentation of the financial position,
> results of operations and changes in cash flows for the periods
> presented....*
>
> *   *   *
>
> COSTS AND EXPENSES
>
> Cost of product sales:   Cost of product sales for the quarter ended
> September 30, 2001 increased 110% to $3,268,000, from $1,557,000 for the
> comparable quarter last year.   Cost of product sales for the nine-month
> period ended September 30, 2001 increased 81% to $8,301,000, from
> $4,581,000 for the comparable period last year.   These increases were due
> to increased unit sales of Apligraf to Novartis, higher allocation of
> depreciation and occupancy costs, and increased scrap charges during the
> month of September due to the suspension of commercial sales of Apligraf
> following the September 11, 2001 terrorist attack.   Cost of product sales
> includes the direct costs to manufacture, quality inspect and package
> Apligraf and an allocation of our production-related indirect costs.   Cost of
> product sales continues to exceed product sales due to the high costs
> associated with low volume production.   *We expect production volume to
> increase and our margins to continue to improve during the remainder of
> 2001.   We expect that we will have to revise standard costs and the
> allocation of costs to product sales in the future as we continue to modify
> our manufacturing processes.* [Emphasis added.]

145.    The statements made by defendants and contained in the Company's releases on

September 6, September 7, September 24, October 16, and November 13, 2001 and those

statements contained in the Company's Form 10-Q for the third quarter of 2001, reproduced

herein, *supra*, were each materially false and misleading and were known by defendants to be

false at that time, or were recklessly disregarded as such for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the

Company alleged in paragraphs 59-67, *supra*.

(b)    Defendants' October 16, 2001 release announcing the Company's equity

placements and defendant Sabolinski's representation that the Company's financing activities

were "an important step in achieving key corporate milestones including realizing profitability

sooner" were materially misleading and incomplete given that defendants knew but failed to

disclose that the Company had been informed that defendant Erani had sought to have stock

brokers "*manipulate the market for the Company's stock*."

(c)    Contrary to defendants' representations that they were expecting new

initiatives to help the Company achieve "overall profitability of the Company," defendants knew

that the Company's ultimate prospects for achieving profitability were severely compromised by

the problems alleged in paragraphs 59-67, *supra*, including the Company's serious

manufacturing and marketing problems, its inability to access adequate funding to keep the

Company viable, the difficulties in achieving reimbursement for Apligraf, and the disruptive

effect on operations that high turnover and infighting among the Company's senior management

was having, and would continue to have for the foreseeable future.

(d)    Defendants' representations touting "sustained strength in Apligraf sales,"

and "substantially higher sales" in the third quarter of 2001 were materially misleading and

incomplete given that defendants knew but failed to disclose that manufacturing and distribution

problems, contamination issues, inadequate marketing support, and difficulties in obtaining

reimbursement for Apligraf were causing increasing frustration among physicians, who were becoming less willing to order or re-order Apligraf for their patients. Further defendants knew but failed to disclose that the purported "strong growth forecast" and "increasing demand anticipated" for Apligraf were illusory, given that, as confirmed by former employees of Organogenesis, Novartis' sales forecasts were "always inflated."

(e)    Defendant Sabolinski's representation anticipating increasing the Apligraf "production rate in the near term to meet forecasted demand" were materially misleading and incomplete given that the Company was experiencing continuing significant manufacturing and marketing problems which were hampering manufacturing and which made it unfeasible to sufficiently increase production scale. Further defendants knew but failed to disclose that the purported "forecasted demand" for Apligraf was illusory, given that, as confirmed by former employees of Organogenesis, Novartis' sales forecasts were "always inflated."

(f)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that were well below the product's manufacturing cost. Given the revised terms of the

Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be*.

> (g)    Contrary to defendants' representations, the Company's Form 10-Q for the third quarter of 2001 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (h) above and in paragraphs 59-67, *supra*.

146.    **Needham Report.**    On November 16, 2001, with shares of the Company now trading at just above $4.00 per share, analysts at Needham & Co. were finally forced to adjust downward their near-term Organogenesis price target to $9.00-$11.00 per share from $16.00-$18.00 per share. At this time, however, Needham analysts did not reduce its "BUY" rating on the Company, and also stated that, at current trading levels shares of Organogenesis were "*currently undervalued,*" as follows:

> We believe that Organogenesis is *currently undervalued*, given that Apligraf is the first and only product containing living human cells to prove efficacy and gain FDA PMA marketing approval and now having qualified nationally for reimbursement under Medicare for outpatient use. *ORG's enhanced management team and Novartis agreement is a further indicator of ORG's potential*. In addition, we believe there will be a number of key events over the next several quarters that will serve to significantly increase the visibility of Organogenesis and its products and further attract substantial investor interest in the company and its products, such as continued growth in Apligraf sales and postmarketing research as well as progression of VITRIX clinical trials. [Emphasis added.]

147.    On January, 4, 2002, only days before the end of the Class Period, defendant Erani announced his sudden and unexpected departure from Organogenesis. According to the Company's release, defendant Erani resigned to "pursue personal business interests."

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION
## OF ORGANOGENESIS IS BELATEDLY DISCLOSED

148.   **No Money to Fund Operations**.  On or about January 30, 2002, defendants filed with the SEC a report pursuant to Form 8-K, signed by defendant Arcari, which stated for the first time that the Company was running out of money and that it would be forced into insolvency unless it could raise at least $15 million in the immediate near term.  The Form 8-K stated, in part, the following:

> On January 30, 2002, the Registrant filed a Registration Statement on Form S-3 to register the resale of shares held by certain of its selling security holders. As a part of that document, the Registrant included an updated set of risk factors relating to its business. The Registrant intends, by filing such updated risk factors with this Current Report on Form 8-K, to provide such risk factors as part of its documents filed pursuant to the Securities Exchange Act of 1934.
>
> *      *      *
>
> We have incurred significant operating losses in funding the research, development, testing and marketing of our products in every year of our existence. We incurred net losses of $14,031,000 for the year ended December 31, 1998, $28,350,000 for the year ended December 31, 1999, $28,605,000 for the year ended December 31, 2000 and $22,561,000 for the nine months ended September 30, 2001. ***The extent of future losses and the time required to achieve profitability are highly uncertain, and we may never achieve a profitable level of operations or, even if we achieve profitability, we may not be able to sustain it on an ongoing basis.*** [Emphasis added.]

149.   In addition to the foregoing, the January 30, 2002 Form 8-K also revealed for the first time that the Company would need to raise additional funds by the end of the first quarter of 2002, but that Organogenesis might be unable to raise such necessary funds, in which case it would then be forced to ***curtail or discontinue all operations***.  In this regard, the Form 8-K also stated, in part, the following:

> We will need to raise additional funds by the end of the first quarter of 2002, but may be unable to raise the funds, in which case ***we would have to curtail or discontinue our activities.*** [Emphasis added.]

We will seek to raise $15 million from the sale of equity securities that have not been registered under the Securities Act of 1933; such securities may not be sold in the United States absent registration or an exemption from registration. Based upon our current forecasts, we believe that proceeds from proposed equity financings of approximately $15 million, together with our existing cash, cash equivalents and credit line and product and other revenues, will be sufficient to finance operations through at least the next twelve months. This projection is based on assumptions regarding our operating cash requirements and revenues from sales of Apligraf and other products, any of which could prove to be incorrect. We are currently seeking additional funding but our research, development, manufacturing and other activities may require that we raise substantial additional funds. We may not be able to obtain the proposed $15 million in new financing or any additional funding on terms favorable to us or our stockholders, if at all. Equity financings would dilute your ownership in us.

150.    In answer to the question as to why the Company could not access the $10 million

that defendants had previously reported would be available, the Form 8-K suddenly revealed that

the Novartis commitment was subject to certain conditions — ones the Company had no way of

satisfying — such that this money was also not available, as follows:

> *Although we have a contractual put option to sell an additional $10 million of our securities to Novartis, we must satisfy a number of conditions in order to exercise that option*. If we do not satisfy these conditions and Novartis is unwilling to waive any unsatisfied conditions, we will be unable to sell additional securities to Novartis pursuant to the put option. In addition, even if we satisfied the conditions, the closing would occur no sooner than 90 days following the day we send the put option exercise notice. If adequate funds are not available to us when needed, we will be required to delay, scale back or eliminate our research and development programs or license to third parties products or technologies that we would otherwise undertake to develop ourselves and otherwise reduce our level of operations. *The failure to have adequate liquidity could result in our receiving a "going concern" opinion from our auditors.* [Emphasis added.]

151.    While shares of the Company made virtually no move on the day the Company's

Form 8-K was filed, in the days immediately before its filing, shares of the Company dropped

precipitously — falling over 40% due to leakage in the three days prior to its filing with the SEC.

Prior to this sudden and inexplicable decline, which occurred on volume abnormally above the

stock's daily average, shares of Organogenesis traded at approximately $3.70 per share, on

January 28, 2002. The day of the Form 8-K was filed, Organogenesis shares traded down to $2.44 per share. Within days, as investors digested the implications of the Company's SEC filing, shares of Organogenesis fell to as low as $1.32 on February 7, 2002 — a decline of almost 95% compared to the Class Period high of over $22.00 per share reached on March 7, 2000.

152. Later, on February 25, 2002, *Dow Jones* news service reported that Organogenesis had declared that it would engage in a "restructuring" and would lay-off at least 16% of its workforce in order to cut overhead by a at least $5 million. Also, according to *Dow Jones*, on March 21, 2002, the Company also achieved its goal of raising the $16 million necessary to continue operations, by issuing "convertible preferred shares," convertible into shares of common stock of the Company at a fixed conversion price of $1.45 per share. The "vulture capitalists" who arranged for these "toxic convertibles"[5] as well as the purchase of an additional 7.2 million shares for payments of only $10 million, were identified by the Company only as "institutional shareholders."

153. On April 3, 2002, Organogenesis announced sales of Apligraf for the first quarter of 2002 which, at 7,100 units, was well below forecast sales for 2002 of 40,000 units. Following the release of results for the first quarter of 2002, on April 11, 2002, defendants hosted a conference call, the transcript of which was subsequently published. During the question and answer, call-in section of this call, the following statements were also made:

> BRUCE BREWSTER (ph), BREWSTER ASSET MANAGEMENT: Over the last number of years it seems to be that you have been very successful from a medical point of view. And from the point of view of sales of Apligraf. *I don't think we can say the same thing about the business results.*

---

[5]    "Toxic," because the greater Organogenesis' share price declined, the more stock the Company would have to issue to meet this obligation, the greater shareholder dilution, the lower the price of the Stock, the more stock that would be required to be issued to meet this obligation...

90

*It seems to me that the underlying reason for your lack of success in — from a business point of view, is your original deals with Sandos (ph) and Novartis and the amount of revenue that you get from the sale of Apligraf.*

You're entering into — you did adjust that recently. You're entering into new transactions with other partners. Are these transactions organized in such a way that you'll have more possibility of overall profitability and therefore business success?

*    *    *

RICHARD CARAFF (ph), OPPENHEIMER: Yes, I certainly am pleased to hear of approval by the 50 states and hope that that word gets out to the doctors, many of whom at least in our limited experience in Boston are not completely aware.

But the other part which is a question, *some doctors that I've spoken to are very happy and satisfied with using Apligraf on complex cases. But they complain on less complex cases Apligraf is a rather expensive procedure to use compared to other procedures.* Do we have any way of broadening the market by means of price? Could you comment upon that please?

STEVEN BERNITZ: *I think the major — if it in looking at the cost of the product should be in looking at the pharmo-economics of the product rather than the price of the product.*

If you look at the complications associated with diabetic foot ulcers in terms of bone infections and amputations and actually mortality associated with the complications from these wounds, while I would like to say that we have done rigorous studies. And to show that I think one that there's an opportunity to do so, and I think that's an important area for both companies going forward.

There have been some studies with venous leg ulcers that show that Apligraf can be a very cost effective treatment for those. And actually given that, one would expect that data for diabetic foot ulcers to be more compelling.

And I think that you also touched on another important point which is the knowledge and confidence in the reimbursement process. Which is that a doctor may have tried the product, a year or so ago and or heard from a doctor that tried the product a year or more ago and had some difficulty. Or had to go through a rigorous approval process to get it the product reimbursed. [Emphasis added.]

154.    In addition to the foregoing, when asked about the why the Company could not access the second $10 million tranche of the aforementioned Novartis commitment, defendants stated the following:

91

JOHN BERGER (ph):  Could you also go over briefly the encumbrances on the second traunch of capital from — that's available from Novartis? And when that traunch would be available to be utilized since this latest financing.

JOHN ARCARI:  Well the second put is equal in amount to the first. It's 10 million.  The time period between exercising a put and receiving money is a minimum of 90 days.  *But the thing that really distinguishes the second put from the first is the hurdles you have to get through on the second put.*

*And they're inherently more difficult.  There are more hoops to jump through.  So it's much more difficult to access that money than was the first traunch.*

STEVEN BERNITZ:  So we look at that as an upside.  If it is available *there's no where in our plans that we are counting on that money.* And we don't anticipate exercising that put. [Emphasis added.]

155.    **Going Concern Opinion.**  On April 16, 2002, when the Company filed its year end financial statement with the SEC, pursuant to Form 10-K, its outside auditor PricewaterhouseCoopers LLP issued a "going concern" opinion, which stated that the *auditors had "substantial doubt" about Organogenesis' ability to continue as a going concern.* According to PricewaterhouseCoopers, "the Company has suffered recurring losses from operations, has a working capital deficiency, a stockholder's deficit, and has long-term debt that may become immediately due upon an event of default." [Emphasis added.]

156.    Following this announcement, shares of Organogenesis fell to as low as $0.60 per share on April 16, 2002.  In the days that followed, shares of the Company traded even lower, to as low as $0.41 per share by May 1, 2002.

157.    Remarkably, in response to this statement by PricewaterhouseCoopers, the same day, April 16, 2002, defendants issued a release on *Business Wire* which stated that, although Organogenesis had received the aforementioned report, "we believe that, based on our current forecasts, the Company has sufficient liquidity to finance operations and *achieve break even by year-end 2002."* [Emphasis added.]  This post-Class Period statement was as far from the truth

as defendants' other statements made within the Class Period. Despite this absurd claim, on August 16, 2002, defendants revealed that the Company would delay filing its quarterly report for the second quarter of 2002 and that Organogenesis was reviewing a possible material "asset impairment charge." According to a statement made by the Company at this time, "[m]anagement is unable to conclude the amount of such impairment or that the financial statements . . . are probably presented on a 'going concern' basis rather than on a 'liquidation of assets' basis."

158. **Needham Rating Suspended.** It was not until July 12, 2002, with shares of the Company now trading below $0.20 per share, however, that analysts at Needham & Co. finally placed the Company's stock rating "Under Review." With Organogenesis on "life-support" Needham analysts reported the following:

> \*    Recent events leave *future uncertain.*
>
> \*    *Disappointing sales figures/ higher than expected burn rate.* Organogenesis announced that Apligraf sales decreased approximately 7-10% for 2Q02, compared with our estimates for an increase in sales of 25%.
>
> Additionally, the company stated that the burn rate for the quarter was $7.5MM, versus our estimates of $4.3MM, resulting in $3.7MM of cash at the end of 2Q02. Additional cost cutting measures have been initiated to lower the burn rate from $2.5MM/month to $1.1MM/month. Using the revised burn rate, Organogenesis will be able to fund operations for 3Q02 before seeking additional capital.
>
> \*    Challenging management strategy. Organogenesis announced that it has entered into discussions with Novartis Pharma AG to reacquire commercialization rights to Apligraf. However, in order to complete negotiations, *Organogenesis must raise sufficient capital necessary to reacquire [rights to] Apligraf and build the necessary infrastructure necessary to market and distribute the product.*
>
> Additionally, Organogenesis stated that it would seek a corporate partner for the marketing of the Fortagen, Fortaperm, and Revitix product lines. While this decision will result in a reduction of costs related to the sales and marketing infrastructure set up by the company, the partnership will also result decreased revenues, as revenues become royalty based.

\*    Our conclusions.  Despite the efforts of management, *Apligraf sales continue to grow at a slower than anticipated rate.  The lower than expected sales growth and higher than anticipated burn rate results in approximately 3 months of cash ($3.7MM) for on going operations, which leaves the company below budgeted forecasts.* While major initiatives are being discussed including the reacquiring of rights to Apligraf and raising of funds for continued operations, we believe that *multiple challenges exist for Organogenesis.*

Therefore, given the lack of Apligraf sales growth, the higher than expected burn rate, the challenging business strategy undertaken by management, and sub-optimal cash position, we are placing our rating under review.  We are currently evaluating the company's options and will continue to monitor events going forward. [Emphasis added.]

159.    **Never Achieve Profitability.  Huge Layoffs.  Halt Apligraf Production.** On August 21, 2002, with Organogenesis shares trading at $0.09 per share, *the Company's common stock was suspended from trading on the American Stock Exchange.* On September 13, 2002, the Company announced that it had temporarily halted shipments of Apligraf and had furloughed over 110 of its employees, as a result of the Company's "current lack of cash flow."  Defendants also blamed the current crisis upon its inability to renegotiate its marketing agreement with Novartis, which was described as "unsustainable."  On September 13, 2002, defendants also revealed that a Chapter 11 bankruptcy filing was a possibility.

160.    **Product Recalls.**    In addition to the foregoing, by mid-September 2002, production quality at Organogenesis had deteriorated so substantially that an entire batch of Apligraf had been recalled.  Alarmingly, because Apligraf has such a short shelf life, at the time of this "recall," of the 193 affected units at least 72 had already been applied to patients.  In total, this was at least the fourth time since 1999 that the Company had been forced to recall Apligraf because of contamination.

161.    **Post Class Period Scheme to Leverage Buyout.** Having reduced the value of the Company's stock to mere pennies per share, and having lost the ability to sell more stock or offer debt, or raise money through private or public offerings, defendants next sought to take what was

left of Organogenesis for themselves.   Thus, on or about September 25, 2002, defendants caused

the Company to file for Chapter 11 protection from creditors in United States Bankruptcy Court

for the Eastern District of Massachusetts.

162.    As defendants knew throughout the Class Period, Organogenesis could not

produce enough cash flow from operations to support its operations under the terms of its

agreement with Novartis given that it was losing money on each sale under the Novartis

agreement. Thus, on November 20, 2002, immediately after defendants placed the Company into

bankruptcy, defendants forced Novartis to agree to transfer back to them the worldwide

marketing and distribution rights for Apligraf.   Novartis acquiesced to defendants' demand,

rather than risk losing its entire investment in the Company — including at least $10 million in

unsecured debt which Novartis still hoped to collect.

163.    The following day, November 21, 2002, the *Boston Globe* reported that, pursuant

to the terms of the proposed, revised deal between Novartis and defendants:

*     The two companies had agreed to work together for another seven  months,
      during which Novartis would continue to market and distribute Apligraf.

*     When the Company emerges from Chapter 11 bankruptcy protection, marketing
      and distribution rights will return to defendants.  Two years later, Novartis will
      earn royalties on sales of Apligraf, lasting for five years.

*     Novartis also agreed to purchase at least 200 units of the product each week from
      defendants.

*     Novartis also agreed to loan $3 million to Organogenesis, to be repaid 18 months
      after the company emerges from bankruptcy.

*     Novartis agreed to have a $10 million investment it made in the company last year
      treated as a general claim, to be repaid with other unsecured creditors of
      Organogenesis.

*     The pact also provides hope for dozens of employees who were laid off in
      September, when Organogenesis abruptly shut down, with a minimum of 75
      people anticipated to return to work within several weeks of this announcement.

Although the precise payment terms were sealed by the Bankruptcy Court, at that time Organogenesis' vice president and general counsel, Jeffrey L. Dow, stated that, "[t]he prices are considerably more favorable than the $350 a unit we were getting under the old payments. It's clear we are getting the great bulk of the revenue from Novartis' sales . . . ."

164.    By June 23, 2003, defendants announced that they had caused the Company to file an Amended Plan of Reorganization with the United States Bankruptcy Court. According to defendants, the Plan incorporated "a funding proposal from a group of unsecured creditors — including current and former officers and directors of the Company," and put in motion a timeline for emerging from Chapter 11 protection in August 2003. The Plan also anticipated a cash distribution of 35% to be made to the holders of allowed general unsecured claims, *but that no distribution would be made on shares of the Company's outstanding preferred and common stock, which would be cancelled on the Plan's effective date*. Under the Plan, all shares of new common stock of the Company, as reorganized, would be distributed to the members of the plan funding group and the holder(s) of the $10.35 million allowed claim of Novartis.

165.    Days later, however, on June 26, 2003, the *Boston Globe* reported more disturbing news regarding defendants' continued interference with the bankruptcy proceeding, and documented their continued attempts to place their own interests over and above the interests of the outside shareholders of the Company, as follows:

> If all goes as expected at a hearing in U.S. Bankruptcy Court in Boston today, creditors could be solicited next week for their approval of a reorganization plan turning ownership of the life sciences company and its sophisticated medical technology to a group led by two cousins who operate chains of clothing stores like Strawberry and Pay-Half.

96

Did recently installed chief executive Alan Ades, also a leader of the group in line to buy the company, impede other potential bidders, a tactic that could have protected his own financial interests? Did the previous CEO, seemingly ousted last fall, try to use his own inside connections seeking proprietary information for a bid with private investors that could have put him back in charge?

*  *  *

*Ades, his cousin Albert Erani, and a small group of others that includes their relatives would end up with the company at a seemingly modest price*, though their total cost is hard to calculate....

*  *  *

Steven Bernitz, the company's chief executive at the time of the bankruptcy filing, quit as he was about to be fired in October and Ades took charge, according to the company. A short time later, the company tracked cellphone calls between Bernitz and another executive still employed at Organogenesis, Jeffrey Dow, and fired him. Company lawyers questioned whether confidential information was being leaked.

Soon, it became clear Bernitz was formally advising a private equity firm circling to make a bid on company assets. *His lawyer claimed the company was harassing Bernitz because Ades "wants to end up with the company."*

*"He has been very successful at chilling the sale," the lawyer, Stephen Gordon, said in a transcript of a bankruptcy court hearing.* [Emphasis added.]

166.    Despite defendants' actions, on August 14, 2003, Judge William Hillman in U.S. Bankruptcy Court for the Eastern District of Massachusetts in Boston cleared the way for the Company to emerge from bankruptcy under the full dominance and control of the Individual Defendants by or about August 26.   The insider group led by interim CEO Alan Ades and his partner and cousin, Albert Erani, would buy a $10.5 million unsecured claim in the form of a bond held by pharmaceutical giant Novartis. Ades, who co-founded A&E Stores with Erani, would be the interim CEO, president and chairman of the new company.   Novartis agreed to

97

convert the $3 million in debtor-in-possession financing it provided into a $3 million exit loan. According to John Hutchins, Boston counsel for Novartis at Kirkpatrick & Lockhart LLP, who was quoted at this time, the final terms of this bankruptcy restructuring actually amounted to a "leveraged acquisition" by the insider group because they had bought up the $10.5 million Novartis unsecured claim and were investing additional funding.

167.    Thus, in less than one year, not only were defendants successful in thwarting other interested bidders and in facilitating defendants Erani and Ades and their family members' gaining total control over the Company but, within that time, defendants were also able to cause Organogenesis to emerge from bankruptcy having completed its restructuring plan. As a result of this restructuring, new shares were issued to defendant Erani and Ades and their family members — the new owners of the Company — and the shareholders who purchased and/or otherwise acquired shares of the Company during the Class Period received *nothing* for their Organogenesis shares.

168.    The market for Organogenesis securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Organogenesis common stock traded at artificially inflated prices during the Class Period.    Plaintiffs and other members of the Class purchased or otherwise acquired Organogenesis securities relying upon the integrity of the market price of Organogenesis securities and market information relating to Organogenesis, and have been damaged thereby.

169.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Organogenesis common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were

98

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

170.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Organogenesis' business, prospects and operations.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Organogenesis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL ALLEGATIONS AGAINST PRICEWATERHOUSECOOPERS

171.    Defendant PricewaterhouseCoopers is a worldwide firm of certified public accountants, auditors, and consultants.    According to its website, www.pwc.com, PricewaterhouseCoopers "is the world's leading professional services organization." PricewaterhouseCoopers touts its expertise pertaining to the pharmaceutical and healthcare industries, such as, Organogenesis, stating that PricewaterhouseCoopers is "the professional services firm of choice among the world's leading pharmaceutical and healthcare products companies" and  "the auditors of the largest share of the world's leading pharmaceutical companies and provide tax and business advisory services to many of the industry's other major players."

99

172.    Through its Boston, Massachusetts office, PricewaterhouseCoopers served as Organogenesis' auditor and principal accounting firm prior to and during the Class Period. By virtue of its relationship with Organogenesis and the nature of the auditing and consulting services rendered to the Company, defendant PricewaterhouseCoopers and its personnel were regularly present at Organogenesis and had intimate knowledge of Organogenesis' financial reporting practices based on its access to confidential internal corporate, financial, operating and business information.

173.    PricewaterhouseCoopers was required to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS"),[6] and to report the audit results to Organogenesis, the board of directors, the audit committee, and the members of the investing public, including plaintiffs and other members of the Class. With knowledge of Organogenesis' true financial condition, or in reckless disregard thereof, PricewaterhouseCoopers certified the materially false and misleading financial statements of Organogenesis, described below, and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements. Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

174.    In acting as the Company's independent auditors and certifying the Company's year-end financial statements, PricewaterhouseCoopers ignored multiple "red flags," which caused PricewaterhouseCoopers to lose faith in the credibility of the Company and eroded PricewaterhouseCoopers' confidence in the representations of the senior officers and directors of

---

[6] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA")' relate to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as the interpretation of GAAS.