the Company, despite the fact that auditors are required to exercise professional skepticism when performing audit procedures. In doing so, PricewaterhouseCoopers violated Generally Accepted Auditing Standards ("GAAS"). For example:

(a) According to the Confidential Arcari Document, by March 2001 **PricewaterhouseCoopers' "confidence in managements [sic] and the Boards [sic] representations" had been "eroded."**

(b) According to the Confidential Arcari Document, defendant Erani's failure to sign standard audit confirmations sent to him by PricewaterhouseCoopers, then the Company's Chairman of the Board, caused a "loss of the Company's credibility" with PricewaterhouseCoopers.

(c) According to the Confidential Arcari Document, as a result of the Company's violation of a commitment to PricewaterhouseCoopers in connection with the exercise of the first tranche of the Novartis put option in May 2001, PricewaterhouseCoopers informed defendants that it refused to support any future financing initiatives by the Company. According to the Confidential Arcari Document, defendant Erani "[h]indered the process for gaining approval to exercise the Novartis put option by May 31, 2001, a commitment, which was made to PricewaterhouseCoopers (PWC), our independent auditors." The Confidential Arcari Document states that "***[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment.***"

(d) PricewaterhouseCoopers knew of, or recklessly disregarded, the terms of the Novartis marketing agreement, which was economically unsustainable for Organogenesis given that Organogenesis was losing money on every unit of Apligraf that it produced and that this the Company lacked the ability to fund operations through product sales.

(e) Given these "red flags," PricewaterhouseCoopers knew or recklessly disregarded the fact that the Company suffered from a chronic and systemic lack of internal controls such that its internal financial reporting was inherently corruptible, subject to manipulation, and unreliable, resulting in materially false and misleading financial statements during the Class Period.

175. These "red flags" alerted PricewaterhouseCoopers that there were serious concerns with management's character and integrity. These concerns with management's character and integrity should, in turn, have caused PricewaterhouseCoopers to scrutinize the sufficiency of Organogenesis' internal controls. The internal control deficiencies include a lack of a stated and demonstrable commitment by senior management to set appropriate standards of ethics, integrity, accounting, and corporate governance.

176. PricewaterhouseCoopers' concerns with management's character and integrity also should have caused PricewaterhouseCoopers to re-evaluate its risk assessments. GAAS requires that "risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors." AU § 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is "*management's characteristics and influence over the control environment.*" AU § 316.16 (emphasis added). Those factors pertain to, among other things, management's "*attitude relating to internal control and the financial reporting process.*" *Id.* n. 27 (emphasis added). However, in contrast to the requirements of GAAS, PricewaterhouseCoopers conducted the financial statement audit for Organogenesis' year-end 2000, under an assessment of risk that

remained unchanged by facts and events that called into question the character and integrity of Organogenesis' most senior management, in contravention of GAAS.

177.   PricewaterhouseCoopers did not exercise due professional care in performing the audit and preparing the audit report, as it was required to do, because it failed to: (i) obtain sufficient competent evidential matter to support the assertions in the financial statements; (ii) maintain an attitude of professional skepticism; and (iii) render an accurate audit report on behalf of Organogenesis.

178.   PricewaterhouseCoopers violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated.  PricewaterhouseCoopers should have stated that no opinion could be issued by it on Organogenesis' year-end 2000 financial statement or issued an adverse opinion stating that the 2000 financial statement was not fairly presented.

179.   PricewaterhouseCoopers violated GAAS General Standard No.2 which requires that an independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

180.   PricewaterhouseCoopers violated Statement on Auditing Standards No. 82 in that it failed to adequately consider the risk that the audit financial statements of Organogenesis were free from material misstatement, whether caused by errors or fraud.  PricewaterhouseCoopers knew or recklessly disregarded numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Organogenesis during the Class period, which adversely affected Organogenesis' ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.

181.   PricewaterhouseCoopers violated GAAS and the standards set forth in Statement on Auditing Standards Nos. 1 and 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

182.   PricewaterhouseCoopers violated GAAS and the standards set forth in Statement on Auditing Standards No. 8, by failing to take appropriate action relating to material misstatements and omissions of fact contained in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of Organogenesis' 2000 Form 10-K.

183.   PricewaterhouseCoopers violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  This standard required PricewaterhouseCoopers to obtain a sufficient understanding of Organogenesis' internal control structure to adequately plan the audit and to determine the nature, timing and extent of tests to be performed.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures.  For example, "[t]he auditor's understanding of internal control over revenue transactions ordinarily will include the client's policies and procedures for . . . shipping goods, relieving inventory, billing and recording sales transactions, receiving and recording sales returns, and authorizing and

issuing credit memos." AICPA Audit Guide: Auditing Revenue in Certain Industries ("AAG-REV") 1.112.

184.   As a result of its failure to accurately report on Organogenesis' 2000 financial statement, PricewaterhouseCoopers utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. Accordingly, *the audit function must be meaningfully performed and the accountants' independence not compromised. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.* [Emphasis added.]

185.   As a result of PricewaterhouseCoopers opinions, which represented that Organogenesis' 2000 year-end financial statement was presented in conformity with GAAP, were materially false and misleading because PricewaterhouseCoopers knew that it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. PricewaterhouseCoopers, in issuing its unqualified opinions, knew or recklessly disregarded the fact that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

186.   PricewaterhouseCoopers knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Organogenesis' 2000 year-end

financial statements; or (b) withdrawn, corrected or modified its opinion for the year ended December 31, 2000.

### ADDITIONAL SCIENTER ALLEGATIONS

187. As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Organogenesis, their control over, and/or receipt and/or modification of Organogenesis' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Organogenesis, participated in the fraudulent scheme alleged herein.

188. In addition, throughout the Class Period, while in possession of material adverse non-public information, defendants caused the Company to issue and/or register for the sale of millions of shares of Company stock. Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to raise *over $68.1 million* in total proceeds from the sales of Organogenesis securities through public stock offerings, private equity offerings and other debt and/or equity sales, which defendants failed to utilize in avoiding Organogenesis' bankruptcy. Moreover, further evidence of defendants' motivation to engage in the illegal scheme described herein, on or about April 21, 2000 defendant Stein was motivated to, and did register the authorized sale *over $6.9 million* of his

privately held Organogenesis stock — approximately half of the Company shares he personally owned and controlled. Company insiders, including defendants Herbert Stein and Michael Sabolinski, took advantage of the artificially inflated prices of the Company's securities during the Class Period by selling their shares of the securities ("Selling Shareholders") and reaping millions of dollars in proceeds therefrom. These insider sales are set forth below:

| INSIDER | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
| --- | --- | --- | --- | --- |
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | $3.02 | $36,877.93 |
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | $10.39 | $126,841.12 |
| Herbert Stein | 4/21/2000 | 732,423.00 | $9.44 | $6,912,242.10 |
| Anton E. Schrafl | 7/20/2001 | 36,623.00 | $2.97 | $108,755.66 |
| Nancy L. Parenteu | 5/14/2001 | 31,334.00 | $3.53 | $110,696.76 |
| Nancy L. Parenteu | 5/11/2001 | 3,666.00 | $3.43 | $12,575.85 |
| Nancy L. Parenteu | 5/10/2001 | 15,000.00 | $8.18 | $122,640.00 |
| Nancy L. Parenteu | 5/9/2001 | 5,000.00 | $8.56 | $42,813.00 |
| Nancy L. Parenteu | 5/7/2001 | 10,000.00 | $9.00 | $90,000.00 |
| Nancy L. Parenteu | 5/7/2001 | 5,000.00 | $8.97 | $44,850.00 |
| **TOTAL** | | **863,462.00** | | **$7,608,292.42** |

189. The sales of millions of shares of Company stock during the Class Period, which sales were designed and/or permitted by the Individual Defendants as well as numerous other high-level senior executives of Organogenesis further evidences defendants' motive to perpetrate the fraudulent scheme detailed herein. In addition, defendants also caused the Company to engage in the sale of tens of millions of dollars in other sales of Organogenesis securities pursuant to stock offerings, private equity offerings and other debt and/or equity sales during the Class Period, including the following:

| TRANSACTION | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
| --- | --- | --- | --- | --- |
| $9.4M Equity Sale | 2/24/2000 | 688,000 | | $9,400,000.00 |
| $1.4M Equity Sale | 2/25/2000 | 100,000 | | $1,400,000.00 |

| | | | | |
|---|---|---|---|---|
| $5.27M Equity Sale | 3/09/2000 | 300,000 | | $5,270,000.00 |
| $1.9M Share Offering | 4/27/2001 | 1,900,000 | $7.75 | $13,500,000.00 |
| $1.44M Private Placement | 6/18/2001 | 186,000 | | $1,440,000.00 |
| $10M Equity Sale to Novartis | 8/07/2001 | | | $10,000,000.00 |
| $20.25M additional Funding | 10/16/2001 | 2,173,876 | | $20,250,000.00 |
| **TOTAL** | | | | **$61,260,000** |

**TOTAL ALL DEBT AND EQUITY SALES BY DEFENDANTS AND INSIDERS DURING THE CLASS PERIOD = $68,868,292**

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

190.   At all relevant times, the market for Organogenesis' securities was an efficient market for the following reasons, among others:

(a)   Organogenesis stock met the requirements for listing, and was listed and actively traded on the American Stock Exchange, a highly efficient and automated market;

(b)   As a regulated issuer, Organogenesis filed periodic public reports with the SEC and the American Stock Exchange;

(c)   Organogenesis regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Organogenesis was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

191. As a result of the foregoing, the market for Organogenesis securities promptly digested current information regarding Organogenesis from all publicly available sources and reflected such information in Organogenesis stock price. Under these circumstances, all purchasers of Organogenesis securities during the Class Period suffered similar injury through their purchase of Organogenesis securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

192. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Organogenesis who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

193.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

194.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) enable the Individual Defendants and other Organogenesis insiders to sell more than $7.6 million of the Company's and/or their personally-held Organogenesis common stock to the unsuspecting public; and (iii) cause plaintiff and other members of the Class to purchase Organogenesis securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them), took the actions set forth herein.

195.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Organogenesis securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

196.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Organogenesis as specified herein.

197. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Organogenesis' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Organogenesis and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Organogenesis securities during the Class Period.

198. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

199. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Organogenesis' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

200. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Organogenesis securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Organogenesis' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Organogenesis securities during the Class Period at artificially high prices and were damaged thereby.

201. At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff

and the other members of the Class and the marketplace known the truth regarding the problems that Organogenesis was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Organogenesis securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

202. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

203. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against The Individual Defendants

204. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

205. The Individual Defendants acted as controlling persons of Organogenesis within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

206. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

207. As set forth above, Organogenesis and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

208. As a direct and proximate result of the Individual Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 25, 2004                    **MOULTON & GANS, P.C.**

By: /s/ Nancy Freeman Gans
Nancy Freeman Gans, BBO #184540
33 Broad Street, Suite 1100
Boston, MA 02109-4216
Telephone: (617) 369-7979
Facsimile: (617) 369-7980

**Liaison Counsel and Local Counsel for Plaintiffs and the Class**

**MILBERG WEISS BERSHAD & SCHULMAN LLP**
Steven G. Schulman
Elaine S. Kusel
Peter Sloane
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**Lead Counsel for Plaintiffs and the Class**

**LAW OFFICES OF MICHAEL A. SWICK PLLC**
Michael A. Swick
One William Street, Suite 900
New York, NY 10004
(212) 584-0770

**Attorney for Plaintiffs and the Class**

## CERTIFICATE OF SERVICE

I, Nancy Freeman Gans, hereby certify that a true copy of the above document was served upon the attorney of record for each party.

/s/ Nancy Freeman Gans
Nancy Freeman Gans