# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE ORGANOGENESIS SECURITIES LITIGATION | **MASTER FILE NO. 04-10027 JLT** <br><br> **CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs, through their attorneys, bring this action on behalf of themselves and all others similarly situated, on personal knowledge as to themselves and their activities, and on all other matters based upon the investigation of counsel, including, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Organogenesis, Inc. ("Organogenesis" or the "Company"), securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, newspaper articles and media reports about the Company, and interviews with former employees of the Company and other companies who are knowledgeable about the businesses of those companies. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE COMPLAINT

1.    This is a federal class action on behalf of purchasers of the securities of Organogenesis between November 15, 1999 and February 7, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Throughout the Class Period, Organogenesis was a Company with only one commercially available product — Apligraf, a unique skin replacement therapy used for severe skin wounds. Thus, most if not all of the Company's revenues were generated from the sale of Apligraf. Organogenesis describes Apligraf as having a structure similar to human skin and as being a "skin construct," composed of living cells. The product's human skin-like properties allow this product to be used by doctors to aid in the healing of certain types of skin ulcers, and other epidermal injuries.

3.     At all times throughout the Class Period, defendants were well aware that the Company's business model was entirely dependent upon their ability to mass-produce Apligraf and market it to physicians as an "off-the-shelf," cost-effective product that doctors could use on patients absent hospitalization.    While the Company encountered some difficulties in manufacturing and marketing Apligraf during the first half of 1999, by the inception of the Class Period, defendants assured investors:

(a)     that Organogenesis maintained the expertise and ability to manufacture sufficient quantities of Apligraf so that it was foreseeable that the Company could achieve economies of scale and achieve profitability through the sales of only this product;

(b)     that  the Company maintained marketing agreements with experienced partners such as defendant Novartis Pharma AG ("Novartis"), which would allow Organogenesis to obtain the marketing support necessary to sell sufficient quantities of Apligraf, while at the same time retaining enough of the revenue split in these deals to fund operations and achieve profitability; and

2

(c)    that between the Company's marketing agreements with Novartis and others, and through other foreseeable sources of available debt and equity, Organogenesis could foreseeably achieve profitability and commercial self-sufficiency.

4.    Thus, by the inception of the Class Period, while it was fully disclosed that the Company would need to raise additional funding at some point in the future to increase production and distribution, throughout the Class Period, defendants consistently reported that Organogenesis had the necessary funding in place to allow it to achieve the Company's stated, foreseeable near-term objectives.  In fact, according to the Company's 1999 Form 10-K, filed with the SEC on or about March 29, 2000, Organogenesis stated that, "*future capital comprised of product sales, research and development support payments and debt and equity financings will be sufficient to fund future operations into 2001 . . .*"

5.    Accordingly, throughout the Class Period, plaintiffs and other members of the Class were led to believe that Organogenesis was able to manufacture Apligraf in sufficient quantities and that other sources of funding were available such that the Company would be able to achieve profitability in the foreseeable near-term.  Defendants repeatedly stated that Organogenesis' results were "*consistent with the transition in progress from a research focused company to a research based operating company with a novel medical product in introduction phase*," and that the Company was operating according to defendants' plan for sufficiency. Central to defendants' plan was a key agreement with Novartis, Organogenesis' Apligraf marketing partner, which purportedly allowed Organogenesis to access *at least $20 million* from Novartis through the exercise of a "put" option.[1]  Defendants represented to investors that this

---

[1] A "put" option is an option contract that gives the holder (here, Organogenesis) the right to sell a certain quantity of an underlying security to the writer of the option (here, Novartis), at a specified price up to a specified date.

3

agreement allowed the Company to raise this money at "any time" during the Class Period, "at [the Company's] discretion and at [the Company's] option," and thereby maintain a large mega-million dollar "safety net" for the Company. The Novartis put option agreement was, therefore, during the Class Period, a critical part of the Individual Defendants' announced plan to achieve profitability and to avoid bankruptcy.

6.      At all times during the Class Period, therefore, Organogenesis represented that it was able to make Apligraf commercially available in a cost-effective manner which — even if the Company were forced to incur losses at the early stages of development — would allow Organogenesis to ramp up production and soon be able to fund operations from sales. Both prior to and during the Class Period, defendants consistently represented that the Company was sufficiently well funded, or had access to sufficient funding to carry out defendants' business plan.

7.      Unbeknownst to investors, however, the reality was far different than defendants' representations. In the words of one former employee who worked at Organogenesis during the Class Period, "*it was always a series of smoke and mirrors*." According to a confidential document created in October 2001 by defendant Arcari, then the Company's Chief Financial Officer (the "Confidential Arcari Document") — which has since been obtained by Plaintiffs' counsel in the course of their investigation of this action — the Company was informed by stock brokers in 2001 that defendant Erani, then Chairman of the Company's board of directors, sought to have them "*manipulate the market for the Company's stock*." According to the Confidential Arcari Document, defendant Erani also "encouraged the Company to prepare *overly optimistic financial projections* to existing and potential service providers." Neither defendant Arcari, the

4

other defendants, nor the Company ever disclosed this scheme to manipulate the Company's stock to the public and overstate the Company's financial projections.

8.     In furtherance of this scheme defendants withheld from investors the true facts about the Company's dismal and ever-deteriorating financial condition and business prospects. Throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors that were negatively impacting its business and that would cause it to report declining financial results — materially less than the market expectations defendants had caused and cultivated — and eventually to file for bankruptcy. In particular:

•     At all times during the Class Period, *it was not true that defendants could achieve profitability through the sale of Apligraf under the terms, or even the revised terms, of the Novartis marketing agreement,* which did not provide Organogenesis with enough of the revenues or profits provided through such Apligraf sales to offset the extremely high cost of production or to offset other undisclosed manufacturing problems such as defective products and recalls. Indeed, as defendants were well aware but did not publicly disclose, throughout the Class Period the Company was actually *losing money on every unit of Apligraf sold due to the adverse terms of the marketing agreement with Novartis.*

•     Throughout the Class Period, undisclosed problems related to the manufacture and marketing of Apligraf were leading to even higher costs and further reducing profitability. Manufacturing problems and delays were retarding production scale, and marketing issues were reducing sales and damaging future sales development prospects. As plaintiffs would only learn following the Class Period, Novartis' inexperienced and inadequately trained sales force was encountering resistance throughout that time concerning the cost and complexity of its products and the actual and/or perceived difficulties in physician reimbursement for Apligraf.

•     Throughout the Class Period, Organogenesis was underfunded and there was no reasonable basis to report that the Company could foreseeably fund operations throughout the Class Period, based on product sales, available sources of loans, debt and/or equity sales. Indeed, defendants knew but did not disclose that, as reported by defendant Arcari in the Confidential Arcari Document, *the Company's own auditors — defendant PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") — had in 2001 "refused to grant any consents or additional comfort letters"* for future financing initiatives and that the Company had lost credibility in the eyes of PricewaterhouseCoopers. Moreover, as defendants were well aware but failed to disclose to investors, it was not true that the Company could access the full complement of funding from Novartis as defendants consistently represented, given that certain undisclosed conditions precedent existed. *Organogenesis could not meet conditions*

5

*precedent to Novartis' requirement to provide at least $10 million of its purported commitment to Organogenesis.* It also was not true that other sources of funding remained available so that the Company could preserve corporate viability.

• Throughout the Class Period, defendants failed to disclose that high management turn-over at the Company and in-fighting among its senior officers and directors was having, and would continue to have a disruptive effect on the operations and oversight of Organogenesis, such that it was also not foreseeable at any time during the Class Period that Organogenesis would be able to achieve profitability in the near-term or to attain the guidance sponsored and/or endorsed by defendants.

• As a result of the aforementioned adverse conditions that defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Organogenesis was operating according to plan, that sufficient sources of funding were achieved and/or available to Organogenesis or that the Company could maintain profitability or even remain a viable entity in the foreseeable near-term.

9. Defendants were motivated to and did embark on this scheme to "manipulate the market for the Company's stock," to conceal the true operational and financial condition of Organogenesis, and to materially misrepresent and fail to disclose the conditions that were adversely affecting Organogenesis throughout the Class Period, because *it enabled the Company and Company insiders, including certain defendants, to register for sale and/or sell over 6 million shares of Company stock and/or securities valued at over $68 million, prior to any proper disclosure to the market*.

10. Defendants' scheme also, ultimately, allowed defendants Erani and Ades and their family members to improperly acquire the remaining assets of Organogenesis through a leveraged buyout during bankruptcy — after defendants' actions drove the Company into bankruptcy and after they sufficiently interfered with these proceedings so as to guarantee that Erani and Ades and their family members acquired total domination and control over what was left of Organogenesis.

11. Thus, through their illegal and improper actions which ultimately forced the Company into bankruptcy, defendants not only were able to wipe out the equity interest of all of

6

the Company's outside shareholders, but they were also able to renegotiate their agreement with Novartis — *which, as defendants knew, throughout the Class Period was causing the Company to lose money on every unit of Apligraf.*

12.    During the Class Period, defendant PricewaterhouseCoopers, the Company's purported independent auditors, participated in this scheme in the following ways:

(a)    PricewaterhouseCoopers recklessly disregarded suspicious behavior by the Company's Chairman, which impugned his integrity and caused PricewaterhouseCoopers to lose faith in the credibility of the Company's officers and directors and failed to disclose the truth about PricewaterhouseCoopers' true opinion of the Company's officers and directors. According to the Confidential Arcari Document, by March 2001 *PricewaterhouseCoopers' "confidence in managements [sic] and the Boards [sic] representations" had been "eroded."* Further, other actions by Erani caused a "loss of the Company's credibility" with PricewaterhouseCoopers.  At no time during the Class Period did PricewaterhouseCoopers ever disclose this erosion of its confidence in the Company's management and Board or the loss of the Company's credibility in the eyes of PricewaterhouseCoopers.

(b)    Despite this lack of confidence in the integrity of the Company's representations, PricewaterhouseCoopers continued to certify the Company's year-end financial statements and its cash position;

(c)    PricewaterhouseCoopers failed to disclose that, as a result of Company's violation of a commitment to PricewaterhouseCoopers in connection with the exercise of the first tranche of the Novartis put option in May 2001, PricewaterhouseCoopers informed defendants that it refused to support any future financing initiatives by the Company.  According to the Confidential Arcari Document, defendant Erani "[h]indered the process for gaining approval to

7

exercise the Novartis put option by May 31, 2001, a commitment, which was made to PricewaterhouseCoopers (PWC), our independent auditors." The Company had made this commitment to exercise the put option to PricewaterhouseCoopers in order to "gain [sic] necessary comfort letter from PWC to allow us to sell common shares" under an equity offering with UBS Warburg. The Confidential Arcari Document states that *"[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment."*[2] PricewaterhouseCoopers, however, never publicly disclosed the Company's "hindering" of the process for obtaining critical funding or its own refusal to support the Company's future financing initiatives; and

       (d)    PricewaterhouseCoopers consistently failed to alert investors to the fact that, throughout the Class Period, the Company lacked the ability to fund operations through product sales, or that Organogenesis was actually losing money on each sale of Apligraf due to the disadvantageous terms, or revised terms, of the Novartis marketing agreement.

       13.    It was only after the end of the Class Period, after the Company had finally disclosed that it was impossible to fund operations with product sales that PricewaterhouseCoopers belatedly issued a "going concern opinion" on the Company — an opinion that should have been in place at least since the inception of the Class Period.

       14.    It was only beginning on January 30, 2002 that the truth about Organogenesis began to emerge. On that day, defendants announced that the Company was running out of money and would be forced into insolvency unless it could raise at least $15 million in the immediate near term. At the same time, the Company also disclosed that it would not be able to

---

[2] A "comfort letter" is an auditor's statement provided to a company preparing for a public offering, confirming that unaudited financial data in the prospectus follows Generally Accepted Accounting Principles.

access the $10 million funding commitment from Novartis that they had previously touted as a "safety net" because of significant conditions precedent to that funding — conditions that defendants had never before disclosed. Defendants also revealed that, contrary to their previous representations that the Company could remain properly funded and could achieve profitability, the "*extent of future losses and the time required to achieve profitability are highly uncertain, and we may never achieve a profitable level of operations or, even if we achieve profitability, we may not be able to sustain it on an ongoing basis.*" Defendants also announced that because of the Company's inability to raise necessary funds it might be forced to "*curtail or discontinue our activities.*"

15.     In the wake of these disclosures, shares of Organogenesis fell to as low as $1.32 on February 7, 2002 — a decline of almost 95% compared to the Class Period high of over $22.00 per share reached on March 7, 2000.

16.     In September 2002, the Company filed for bankruptcy protection — from which it later emerged under a plan that allowed defendants Erani and Ades to buy the Company at a steep bargain while liquidating the Company's stock — thus leaving the Company's shareholders with *nothing*.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under, and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Organogenesis maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

20.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

21.    Court-appointed lead plaintiffs Bruno Hofmann, John Bowie, Richard Madigan and Richard Conen purchased the common stock of Organogenesis at artificially inflated prices during the Class Period and have been damaged thereby.  The certifications of the lead plaintiffs in this action previously have been filed with the Court.

22.    Non-party Organogenesis is a Delaware corporation with its principal place of business at 150 Dan Road, Canton, MA 02021.  Organogenesis designs, manufactures and sells medical products containing living cells and/or natural connective tissue, including living tissue replacements, cell-based organ asset devices and other tissue-engineered products.  The Company's lead product, Apligraf living skin construct, is promoted as being the only product containing living human cells to gain Food and Drug Administration ("FDA") marketing approval in the United States.

23.    Non-party Novartis Pharma Ag is a Swiss-based pharmaceutical and drug company with substantial operations in the United States, which throughout the Class Period was the purported marketing partner of the Company and a principal shareholder in Organogenesis,

holding as many as 2.88 million shares, or more than 6% of the Company's shares issued and outstanding during that time.

24.     Defendant **PRICEWATERHOUSECOOPERS LLP** was, throughout the Class Period, the purported independent auditor of the Company.

25.     Defendant **PHILIP LAUGHLIN** ("Laughlin") was during the relevant period, President and a Director and member of the Company's Executive Committee of Organogenesis. Defendant Laughlin assumed these positions immediately prior to the inception of the Class Period, on or about, October 5, 1999 and later, on or about January 1, 2000, also assumed the role of Chief Executive Officer.  Defendant Laughlin retained these positions of power and control over the Company until his sudden and unexpected departure, which was announced on or about May 16, 2001.  During the Class Period, defendant Laughlin, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

26.     Defendant **MICHAEL SABOLINSKI** ("Sabolinski") was during the Class Period, President, Chief Executive Officer and a member of the Board of the Company, having assumed those positions on or about May 16, 2001, upon the resignation of defendant Laughlin. Prior to assuming the aforementioned positions and also during the Class Period, defendant Sabolinski also served as the Company's Senior Vice President, Medical and Regulatory Affairs. Defendant Sabolinski abandoned his position at the Company on or about April 5, 2002, less than one year after assuming the leadership of Organogenesis.   During the Class Period, defendant Sabolinski, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

27.     Defendant **ALBERT ERANI** ("Erani") was during the relevant period, a member of the Board of the Company and on or about January 1, 2000 assumed the role of Chairman of

11

the Board of Organogenesis. Defendant Erani served as Chairman of the Board of the Company until his sudden and unexpected departure on or about January 4, 2002.    During the Class Period, defendant Erani, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

28.    Defendant **ALAN ADES** ("Ades") was nominated and appointed Chairman, President and Chie Executive Officer of the Company following the end of the Class Period on or about October 2002.  Defendant Ades is the cousin of defendant Erani, and was also a member of the group of investors who took the Company private through a leveraged acquisition in bankruptcy. Defendant Ades was an active participant in the fraud alleged herein. It has been reported that defendant Ades, with the aid and complicity of other defendants named herein, acted to assure that other interested parties were not able to successfully participate in the ultimate sale of the Company and that defendant Ades, with the aid and complicity of other insiders, was then able to acquire the Company for a lower price, further depriving investors of a return on their investment in Organogenesis.

29.    Defendant **DONNA ABELLI LOPOLITO** ("Lopolito") was during the relevant period, Chief Financial Officer and Vice President, Finance and Administration of Organogenesis. During the Class Period, defendant Lopolito, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

30.    Defendant **JOHN J. ARCARI** ("Arcari") was during the relevant period, Chief Financial Officer and Vice President - Finance and Administration of Organogenesis, having replaced defendant Lopolito on or about April 30, 2000.  Defendant Arcari served in the aforementioned positions until his sudden and unexpected departure on or about May 14, 2002.

12

During the Class Period, defendant Arcari, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

31.     Defendant **HERBERT M. STEIN** ("Stein") was at the inception of the Class Period, Chairman of the Board and Chief Executive Officer, until his resignation on or about January 1, 2000.   Upon his retirement from the aforementioned positions, defendant Stein remained at the Company as a member of the Board and Chairman Emeritus until March 2000. During the Class Period defendant Stein made materially false and misleading statements about the Company and/or failed to disclose material information necessary to make such statements not false.   During the Class Period, defendant Stein also signed the Company's SEC filings, including, but not limited to, Organogenesis' Form 10-Q for the third quarter of 1999 and the materially false and misleading Registration Statements (including the Company's Registration Statements filed on December 27, 1999, the amended Registration Statement filed on February 3, 2000, and the second amended Registration Statement, filed on February 14, 2000) issued in connection with the sale and offering of stock by the Company.

32.     Defendant **ALAN W. TUCK** ("Tuck") was during the Class Period, Chief Strategic Officer of the Company.   During the Class Period, defendant Tuck also made materially false and misleading statements during the Class Period, as set forth herein.

33.     The defendants referenced above in paragraphs 25-32 are referred to herein as the "Individual Defendants."

34.     Because of the Individual Defendants' positions with the Company, or relations with Company insiders, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's

13

operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith and/or otherwise actively participated in the fraudulent scheme alleged herein.

35.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of these defendants, by virtue of their high-level positions with the Company and/or relations with company insiders, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein and/or otherwise actively participated in the fraudulent scheme alleged herein. These defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

36.    As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the American Stock Exchange (the "AMEX"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information

14

with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

37.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature and/or otherwise actively participated in the fraudulent scheme alleged herein. Because of their Board membership and/or executive and managerial positions with Organogenesis, each of the Individual Defendants had access to the adverse undisclosed information about Organogenesis' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Organogenesis and its business, or adopted by the Company, materially false and misleading and/or otherwise actively participated in the fraudulent scheme alleged herein.

38.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, or relations with officers and/or directors, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be

15

corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein and/or otherwise actively participated in the fraudulent scheme alleged herein.

39.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Organogenesis common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.     The scheme:    (i) deceived the investing public concerning defendants' attempt to manipulate the market for the Company's stock; (ii) deceived the investing public regarding Organogenesis' business, operations, management and the intrinsic value of Organogenesis common stock; and (iii) enabled the defendants and Company insiders to sell and/or register for sale over $68 million worth of Company stock to investors during the Class Period — of this amount defendants sold over 5 million shares of the Company's securities in a series of public stock offerings, private equity offerings and other debt and/or equity sales of Organogenesis stock; and (iv) caused plaintiffs and other members of the Class to purchase Organogenesis securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Organogenesis between November 15, 1999 and February 7, 2002 inclusive (the "Class") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16

41.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Organogenesis common shares were actively traded on the American Stock Exchange. As of November 2, 2001, the Company had over 37.0 million shares issued and outstanding. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Organogenesis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

44.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Organogenesis; and

17

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

45.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

46.    **The Company**. Organogenesis was organized as a Delaware corporation in 1985. Throughout the Class Period, Organogenesis described itself as a "tissue engineering firm" that designs, develops and manufactures medical products containing living cells and/or natural connective tissue.    For Organogenesis, tissue engineering involves developing and manufacturing medical products containing actual living human cells.

47.    **Operations**.    Prior to the inception of the Class Period, Organogenesis appeared to be a Company with a very unique product, but a Company that was research-centric and which had little product manufacturing experience. Complicating matters, the Company's main product, Apligraf a "tissue replacement" therapy, discussed in more detail below, was difficult to manufacture and required very specialized manufacturing procedures and techniques.    As evidence of the difficulties associated with Apligraf production during mid-1999, the Company was even forced to recall several lots of Apligraf — accounting for more than 10% of monthly production at that time — for contamination reasons. In addition to manufacturing issues, the marketing of Apligraf was also difficult because, until early in the Class Period, Apligraf had ***not***

18

been approved for Medicare or Medicaid reimbursement — leaving doctors with a vast array of red tape to get reimbursed for the product.

48.    The manufacture and marketing of Apligraf proved so difficult that in the year prior to the inception of the Class Period, sales of Apligraf were well below expectations. In fact, when the Company reported fiscal year 1998 results in March 1999, Organogenesis reported Apligraf sales of only $335,000 — well below product sales of $1.3 million that defendants had guided the market to expect. The result of these lower-than-expected sales was larger losses, and by the end of the fourth quarter of 1998 the Company had posted a loss of $0.19 per share.

49.    Although during 1999 defendants reported less than consistent sales of Apligraf, the trend overall, bolstered by defendants' guidance, appeared bullish. For example, in April 1999, the Boston Business Journal reported the view of an investment analyst for Moors & Cabot, Inc. that Apligraf was a "revolutionary" product and a "major medical breakthrough" for which "it's simply a matter of time before it wins wide acceptance."

50.    The manufacturing and marketing problems which limited the sale of Apligraf also raised issues concerning the funding of the Company and its ability to remain in operation long enough to achieve profitability. In this regard, while the Company initially had issued very aggressive predictions, forecasting operational break-even by the fourth quarter of 1999 and full funding by that time, by the inception of the Class Period, defendants had already revised these expectations and had taken a relatively longer-term view towards profitability. By the inception of the Class Period, and at all times thereafter, however, defendants consistently reported that sufficient sources of funding were available, that Organogenesis received or would receive

19

sufficient profits from sales of Apligraf and that the Company still expected to achieve profitability in the foreseeable near-term.

51.    **Funding Representations**. Thus, by the inception of the Class Period, while it was fully disclosed that the Company would need to raise additional funding at some point in the future to increase production and distribution, by this time and consistently thereafter, defendants reported that Organogenesis had the necessary funding in place to allow it to achieve the Company's stated, foreseeable near-term objectives. In fact, according to the Company's 1999 Form 10-K, filed with the SEC on or about March 29, 2000, Organogenesis stated that, "*future capital comprised of product sales, research and development support payments and debt and equity financings will be sufficient to fund future operations into 2001*," and additional sources could be relied on to fund operations thereafter.

52.    Moreover, according to statements made by defendants and filed with the SEC, while there could be "no assurance" that additional funding might not be required, Organogenesis' funding already was in place and sufficient. According to defendants, by the inception of the Class Period, the Company was sufficiently funded barring only unforeseen circumstances, unplanned contingencies, "delays," or unexpected "changes," such as the following:

•    Delays in obtaining regulatory approvals of products, and timing of product launches;

•    Delays in commercial acceptance and reimbursement when product launches occur;

•    Changes in the progress of research and development programs; and

•    Changes in the resources devoted to outside research collaborations or projects, self-funded projects, proprietary manufacturing methods and advanced technologies.

20

53.    Thus, throughout the Class Period, defendants led investors to believe that Organogenesis was able to manufacture Apligraf in sufficient quantities and that other sources of funding were available such that the Company would be able to achieve profitability in the foreseeable near-term.  Defendants consistently reported that the Company had necessary and available funding sources, from foreseeable sales of debt and equity to both private and public investors, which would allow Organogenesis to achieve defendants' plan for sufficiency.  Central to this plan was a key agreement with Novartis, Organogenesis' Apligraf marketing partner, which purportedly allowed defendants to access *at least $20 million* through the exercise of a "put" option.  This agreement purportedly would allow defendants to raise this money at any time, and thereby maintain a mega-million dollar "safety net" for the Company.

54.    **Apligraf.**   As stated above, throughout the Class Period, Apligraf was the Company's only commercially available product and was described by defendants as its "lead product."  Defendants touted Apligraf as a unique product — according to a November 15, 1999 press release issued by the Company, it was the first and only product to containing living human cells to gain FDA PMA approval.  Most if not all of the Company's revenues were at all times generated from the sale of Apligraf.  Apligraf has a structure similar to human skin — consisting of living cells — and is described as a "skin construct."   The product's human skin-like properties allow this product to be used by doctors to aid in the healing of certain types of skin ulcers, and other epidermal injuries.[3]  At all times throughout the Class Period, defendants were well aware that the Company's business model was entirely dependent upon its ability to

---

[3]      According to Organogenesis, Apligraf has an organized, two-layered structure, much like skin, and features the key components of skin — the lower dermal cells (fibroblasts), the upper epidermal cells (keratinocytes) and its keystructural protein (collagen).  Unlike human skin, however, Apligraf does not contain structures such as blood vessels, hair follicles and sweat glands or other cell types.

mass-produce Apligraf and market it to physicians as an "off-the-shelf," cost-effective product that doctors could use on patients absent hospitalization.

55.    By the inception of the Class Period, Apligraf was approved by the FDA for marketing in the United States for the treatment of venous leg ulcers and was pending approval for diabetic leg ulcers. At that time and during the Class Period, Apligraf was a registered trademark of Novartis, the Company's Apligraf marketing partner. At all times during the Class Period, the Company's marketing agreement with Novartis was consistently touted by defendants as a key to the Company's profitability. According to defendants' representations, the marketing agreement with Novartis (both prior to and following the time of its amendment) provided Organogenesis with enough of the revenue split generated through Apligraf sales to allow the Company to grow operations and achieve profitable growth in the foreseeable near-term. That impression was substantially reinforced when the Novartis marketing agreement was allegedly amended during the Class Period to provide even more revenues to the Company.

56.    In addition to simply marketing Apligraf, Novartis was also a significant owner of Organogenesis shares, and during the Class Period owned as many as 2.8 million Company shares — or over 6% of the Organogenesis shares issued and outstanding. Novartis had acquired its shares in the Company through several private equity investments, as well as through certain funding agreements which purportedly allowed Organogenesis to sell stock to Novartis at prices predetermined and at the election of the Company.

57.    The supposed ability of the Company to be able to sell stock to Novartis was also purportedly a critical part of Organogenesis' financing, because it should have allowed defendants to raise money whenever necessary — up to $20 million in equity financing in addition to any other sources of debt or equity financing available to the Company. Again, this

22

financing was also very important to investors, because it provided a purported "safety net" for Organogenesis — a reserve of cash which defendants could allegedly access as a last resort. The Novartis put option agreement was, therefore, during the Class Period, a critical part of defendants' announced plan to achieve profitability.

58.    At all times during the Class Period, therefore, Organogenesis represented that it was able to make Apligraf commercially available in a cost-effective manner which, even if the Company was forced to incur losses at the early stages of development, would allow Organogenesis to ramp up production and soon be able to fund operations from sales. Defendants consistently represented both prior to and during the Class Period that the Company was sufficiently well-funded to carry out defendants' business plan.

59.    Unbeknownst to investors, however, the reality was far different from defendants' representations. According to the Confidential Arcari Document — created by defendant Arcari, then the Company's Chief Financial Officer — defendant Erani, then the Company's Chairman of the Board, sought during the Class period to have stock brokers *"manipulate the market for the Company's stock."* According to the Confidential Arcari Document, Erani also "encouraged the Company to prepare *overly optimistic financial projections* to existing and potential service providers." Neither defendant Arcari, the other defendants, nor the Company ever disclosed this scheme to manipulate the Company's stock to the public or this attempt to have the Company overstate its financial projections.

60.    In furtherance of this scheme, defendants withheld from investors the true facts about the Company's dismal and ever-deteriorating financial condition and business prospects. In the words of one former employee of Organogenesis during the Class Period, *"it was always a series of smoke and mirrors."* Throughout the Class Period, the Company was suffering from a

host of undisclosed adverse factors which were negatively impacting its business and which would cause it to report declining financial results, materially less than the market expectations defendants had caused and cultivated. In particular:

- At all times during the Class Period, *it was not true that defendants could achieve profitability through the sale of Apligraf under the terms, or even the revised terms, of the Novartis marketing agreement,* which did not provide Organogenesis with enough of the revenues or profits provided through such Apligraf sales to offset the extremely high cost of production or to offset other undisclosed manufacturing problems such as defective products and recalls. Indeed, as defendants were well aware but did not publicly disclose, throughout the Class Period the Company was actually *losing money on every unit of Apligraf sold due to the adverse terms of the marketing agreement with Novartis.*

- Throughout the Class Period, undisclosed problems related to the manufacture and marketing of Apligraf were leading to even higher costs and further reducing profitability. Manufacturing problems and delays were retarding production scale, and marketing issues were reducing sales and damaging future sales development prospects. As plaintiffs would only learn following the Class Period, Novartis' inexperienced and inadequately trained sales force was encountering resistance throughout that time concerning the cost and complexity of its products and the actual and/or perceived difficulties in physician reimbursement for Apligraf.

- Throughout the Class Period, Organogenesis was underfunded and there was no reasonable basis to report that the Company could foreseeably fund operations based on product sales, available sources of loans, debt and/or equity sales. Indeed, defendants knew but did not disclose that, as reported by defendant Arcari in the Confidential Arcari Document, *the Company's own auditors — defendant PricewaterhouseCoopers — had in 2001 "refused to grant any consents or additional comfort letters"* for future financing initiatives and that the Company had lost credibility in the eyes of PricewaterhouseCoopers. Moreover, as defendants were well aware but failed to disclose to investors, it was not true that the Company could access the full complement of funding from Novartis as defendants consistently represented, given that certain undisclosed conditions precedent existed. Organogenesis could not meet conditions precedent to Novartis' requirement to provide at least $10 million of its purported commitment to Organogenesis. It also was not true that other sources of funding remained available so that the Company could preserve corporate viability.

- Throughout the Class Period, defendants failed to disclose that high management turn-over and in-fighting among the senior officers and directors of the Company was having, and would continue to have a disruptive effect on the operations and oversight of Organogenesis, such that it was also not foreseeable at any time during the Class Period that Organogenesis would be able to achieve profitability in the near-term or to attain the guidance sponsored and/or endorsed by defendants.

•     As a result of the aforementioned adverse conditions that defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Organogenesis was operating according to plan, that sufficient sources of funding were achieved and/or available to Organogenesis or that the Company could maintain profitability or even remain a viable entity in the foreseeable near-term.

61.    Contrary to defendants' public statements that they expected commercial sales to increase and that they had laid the foundations for future sales development, several former employees of Organogenesis and Novartis with knowledge of the relevant facts were privy to the aforementioned problems with the marketing of Apligraf, which damaged the reputation of Apligraf and Organogenesis among purchasers and severely limited the Company's sales prospects. Although defendants were aware of these problems, they did not disclose them to investors. For example:

(a)    Contrary to defendants' representations that Novartis had a "a marketing and sales force[] with *technical expertise* and distribution capability" to effectively market Apligraf, a former Tissue Engineering and Immunology Specialist with knowledge of the relevant facts who worked for Novartis Pharmaceutical Corporation, a U.S.-based business unit of Novartis, stated that although Novartis had expertise in marketing pharmaceuticals in pill form, Novartis *"had no idea what they were doing"* when it came to marketing a living-tissue product like Apligraf. According to this employee, Novartis' marketing team "had no idea about the condition, no idea how to influence a physician to change their practice to use the product because it wasn't a pill."

(b)    A former director (non-Board level) on the senior management team of Organogenesis during the Class Period who attended senior management meetings and who has knowledge of the relevant facts, confirmed that *Novartis' marketing team did not have the proper training, experience or expertise in marketing a living product, such as Apligraf,* as opposed to a drug — which hindered Novartis' ability to sell Apligraf. According to this former

Director, Novartis' efforts to market Apligraf suffered significantly, with the result that the Company was required to pay for the high cost of manufacturing many more units of Apligraf than Novartis could sell. The Company thus took a "huge loss" every time that Novartis was unable to sell units of the product that Organogenesis had manufactured.

(c)    According to a former Associate Director of Clinical Trials/Affairs for Organogenesis during the Class Period with knowledge of the relevant facts, the Novartis marketing team had "*no experience with a living product that had a five day shelf life*," such as Apligraf.

62.    Contrary to defendants' representations to investors that the Company expected to increase production volume and that it could achieve the mass production of Apligraf that was purportedly necessary to increase the Company's margins on sales, several former Organogenesis employees with knowledge of the relevant facts were privy to undisclosed manufacturing- and distribution-related problems with Apligraf that led to limited and delayed production, poor quality control — including at times shipping batches of Apligraf to physicians without first reviewing vital laboratory results — and, in some cases, contamination and recall of the product. As a result of these undisclosed manufacturing and distribution problems, the Company was not able to feasibly mass-produce Apligraf and the purchasers of the Company's product were steadily becoming less and less willing to order, or re-order Apligraf, thus damaging future sales prospects and adversely impacting the Company's purported attempt to achieve profitability. For example:

(a)    According to a former Senior Manager of Quality Systems Compliance for Organogenesis during the Class Period with knowledge of the relevant facts, *there was "no way"* *that the Company could commercially mass-produce Apligraf* given the Company's inadequate

production infrastructure and processes. According to this Senior Manager of Quality Systems Compliance at Organogenesis, at the direction of defendant Sabolinski, the Company often *shipped units of Apligraf for distribution to purchasers before obtaining the results of vital laboratory testing on those units*. In fact, according to this former employee, in some cases, Sabolinski himself signed the paperwork authorizing the release of units of Apligraf before obtaining laboratory results because Quality Assurance employees refused to sign the paperwork without first viewing the laboratory results.

(b)     Another former employee of the Company — a Maintenance Supervisor during the Class Period with knowledge of the relevant facts — confirmed that several times the Company "*would ship the product before they had the results back from the QC lab*." According to this former employee, on more than one occasion, the laboratory results received after the product had already been shipped to doctors — an in some cases, after patients had already been treated with it — indicated that the shipped units had *failed chemistry testing, requiring the Company to recall the shipped units*. According to a former Organogenesis employee who was employed during the Class Period as a Quality Assurance Documentation Specialist and who has knowledge of the relevant facts, the Company experienced substantial problems growing the cells that were necessary for the production of Apligraf.

(c)     According to a former employee of Novartis who was employed during the Class Period as a Tissue Engineering Specialist, and who was involved in the marketing of Apligraf, physicians who had ordered Apligraf grew frustrated and disappointed with the product because contamination of the product frequently resulted in physicians not receiving the product when necessary.

(d)    According to an individual who was employed during the Class Period as a Vice President of Information Technologies for Theracom, and who worked with Novartis to set up a hotline that could be used by health care providers who used Apligraf, physicians grew reluctant to re-order Apligraf because they "couldn't rely on it — they couldn't rely on it coming through."

63.    Several former employees during the Class Period at various levels of the Company witnessed how high management turnover and infighting among the Company's senior officers disrupted the operations and oversight of the Company.  For example, according to the former director (non-Board level) on the senior management team of Organogenesis mentioned above, the Company suffered from, *inter alia*, "too many presidents, and too many going in different directions — a lack of leadership."

64.    According to a former Project Engineer with Organogenesis with knowledge of the relevant facts, Novartis' sales forecasts were "***always inflated***" — a fact of which upper management at Organogenesis was well aware, but which defendants did not publicly disclose.

65.    Contrary to defendants' representations, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased.  According to a former Project Engineer for Organogenesis during the Class Period with knowledge of the relevant facts, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis.  Indeed, according to a former Maintenance Supervisor for Organogenesis during the Class Period with knowledge

28

of the relevant facts, this fact was known by "the whole company." Given the terms, and the revised terms, of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.

66.     Further, according to several former employees of Organogenesis during the Class Period with knowledge of the relevant facts — a Senior Director (non-Board level), a Project Engineer and a former Materials Handler — Organogenesis would not be reimbursed by Novartis for any units of Apligraf that were manufactured by Organogenesis pursuant to Novartis' sales forecasts, but that ultimately were not sold by Novartis. Thus, as alleged above, the Company took a "huge loss" every time that Novartis was unable to sell units of the product that Organogenesis had manufactured. The damage to the Company's bottom line caused by this failure to receive compensation for Apligraf units manufactured but not sold was compounded by the fact that, as alleged above, Novartis' sales forecasts were "*always inflated*." Defendants were motivated to and did conceal the true operational and financial condition of Organogenesis, and materially misrepresented and failed to disclose the adverse conditions that were adversely affecting Organogenesis throughout the Class Period, because it enabled the Company, defendants and Company insiders to register for sale and/or sell over 6 million shares of Company stock and/or securities valued at over $68 million, prior to any disclosure to the market.

67.     Indeed, according to the former director (non-Board level) on the senior management team of Organogenesis during the Class Period, several members of the senior management of the Company were more concerned with recouping their own personal investments in the Company than in pursuing the interests of shareholders. According to this

29

former director, *a culture of "corporate greed" prevailed among the senior management of the Company*, who were primarily interested in "taking care of themselves at the top." This former director personally attended a meeting of the members of the Company's board of directors that occurred after Defendant Stein had left the Company, at which defendants Erani as well as other members of the Board, said that "*they needed to get back their investments*" and that, in the words of these board members, they "'*were not going to have been taken by Herb Stein.*'"

## Defendants' Materially False and Misleading
## Statements Made During the Class Period

68.    The Class Period begins on November 15, 1999.   On that day, Organogenesis published a release on *Business Wire* announcing financial results for the third quarter of 1999, the period ending September 30, 1999.  For the third quarter of 1999, Organogenesis reported total revenues of $946,000, equal to a net loss of $0.21 per share, compared to a net loss of $0.25 per share the prior quarter. According to the release, total expenses for the third quarter of 1999 were $7.426 million, including one-time technology acquisition charges of $900,000, compared to a sequential loss of $8.527 million.  This release also quoted defendant Stein, as follows:

> Apligraf is a revolutionary technology development to provide significant advantages in wound healing. Alpigraf is FDA approved, *well-received by physicians* and can be a highly cost-effective therapy for many patients. The key remaining piece of the puzzle is gaining broad, standardized reimbursement. *Achieving standardized reimbursement for Apligraf is a top priority at both Novartis and Organogenesis and is being addressed aggressively by both companies*.

69.    A subsequent release, dated December 2, 1999, reported that Apligraf sales reached a "*record number*" in November 1999 — 755 units. In that release, defendant Tuck — the Company's Chief Strategic Officer, touted the marketing and sales efforts of Novartis, stating that "*[t]he growth now being seen is due to new Apligraf marketing and sales initiatives by*

30

*Novartis* and is independent of the efforts underway to gain standardized reimbursement for the product."

70.    **3Q:99 Form 10-Q.** On or about November 15, 1999, the Company filed with the SEC the Company's financial results for the third quarter of 1999, the period ended September 30, 1999, pursuant to its Form 10-Q signed by defendants Stein and Lopolito. The Company's Form 10-Q for the third quarter of 1999 stated that "*[w]e expect Apligraf commercial sales to increase.*" [Emphasis added.] The Form10-Q also stated that:

> Production costs exceeded product sales due to the start-up costs of new product introduction and the high costs associated with low volume production. *We expect production volume to increase and our margins to improve*. We expect to continue to *expand manufacturing operations* and advance the product pipeline during the remainder of 1999 and into 2000. [Emphasis added.]

71.    Following the publication of the Company's earnings announcement, the price of Organogenesis rallied — trading from a low of $6.81 per share on November 15, 1999, to above $12.30 per share on December 2, 1999.

72.    **$50 Million Shelf-Registration.** Taking full advantage of the artificial inflation in the price of Organogenesis stock caused by the publication of defendants' false and materially misleading statements, on or about December 27, 1999, defendants raced to the market to register for sale at least $50 million in mixed securities in a "shelf registration." The shelf registration would allow the Company to sell up to 3 million shares of common stock either directly or through convertible securities at the sole discretion of the Company. In connection with this shelf registration, the Company filed with the SEC a Registration Statement on December 27, 1999, and two amended Registration Statements, filed on February 3, 2000 and

31

February 14, 2000, respectively, all of which incorporated by reference the Company's Form 10-Q for the third quarter of 1999.

73.    On January 13, 2000, defendant Laughlin presented at the Hambrecht & Quist Annual Healthcare Conference held in San Francisco, California, where he reiterated former guidance and where he further conditioned investors to believe that the Company was operating according to plan. The following day, January 14, 2000, defendant Laughlin also provided a widely circulated interview, with *The Wall Street Transcript*, during which he also represented, in part, that "*we're not concerned that we won't ultimately be successful*," despite the fact that the adoption of Alpigraf had, to that point, "gone slower than we'd like." (Emphasis added)

74.    **Amended 3Q:99 Form 10-Q.** On or about February 14, 2000, defendants filed with the SEC the Company's amended financial results for the third quarter of 1999, the period ended September 30, 1999, pursuant to its amended Form 10-Q signed by defendants Laughlin and Lopolito. The Company's amended Form 10-Q for the third quarter of 1999 contained the same materially false and misleading information as had previously been announced on November 15, 1999, in addition to the following:

> Basis of Presentation:
>
> The accompanying unaudited consolidated financial statements of Organogenesis Inc., have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation.... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented.*...[Emphasis added].

75.    In addition to the foregoing, Organogenesis' Form 10-Q for the third quarter of 1999 also characterized rising costs during the third quarter as one-time events and predicted that costs would foreseeably remain in line with guidance, as follows:

> Production costs exceeded product sales due to the start-up costs of new product introduction and the high costs associated with low volume production. ***We expect production volume to increase and our margins to improve.*** We expect to continue to ***expand manufacturing operations*** and advance the product pipeline during the remainder of 1999 and into 2000. [Emphasis added.]

Regarding the $6.2 million payment for the conversion of the Series C convertible preferred shares, the Form 10-Q reported the existence of this payment, but it did ***not*** identify the recipients.

76.    The statements contained in Organogenesis' November 15, 1999 release, its SEC filings and those statements made by defendants to analysts, investors and the press during the period November 15, 1999 through February 14, 2000 referenced above, were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

(b)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf

33

sales that was below the product's manufacturing cost to Organogenesis.  Given the terms, and

the revised terms, of the Novartis marketing agreement — which caused Organogenesis to lose

money on every unit of Apligraf that it produced — *far from lowering costs, the more units of*

*Apligraf that Organogenesis produced, the greater its losses would be.*

        (c)    Contrary to defendants' representations that Apligraf was "*well-received*

*by physicians*" and that achieving standardized reimbursement for Apligraf was being

aggressively addressed by the Company, manufacturing and distribution problems,

contamination issues, inadequate marketing support, and difficulties in obtaining reimbursement

for Apligraf were causing increasing frustration among physicians, who were becoming less

willing to order or re-order Apligraf for their patients.  Continuing difficulties in obtaining

reimbursement for Apligraf were not being adequately addressed by either Organogenesis or

Novartis, which adversely affected Apligraf's future sales prospects.

        (d)    Defendants' public statements touting the "record number" of sales in

November 1999 and Novartis' "new Apligraf marketing and sales initiatives" were materially

misleading and incomplete given that, as confirmed by several former employees of

Organogenesis, the Company was experiencing serious manufacturing and marketing problems

that were inhibiting sales and damaging future sales development prospects.  Further, as

defendants knew but did not disclose, Novartis' marketing team did not have the proper training

experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to

market Apligraf suffered significantly.

        (e)    Defendants' representations that they expected Apligraf "commercial sales

to increase" was untrue given the marketing problems that Novartis was experiencing because of

inadequate marketing support and the problems with the manufacturing and distribution of

34

Apligraf that were causing frustration among purchasers, leading to reluctance among physicians to order or re-order Apligraf.

(f)    Contrary to defendants' representations that they were "not concerned that we won't ultimately be successful," defendants knew that the Company's ultimate prospects for achieving profitability were severely compromised by the fundamental problems alleged in paragraphs 59-67, *supra*, including the Company's serious manufacturing and marketing problems, its inability to access as necessary adequate funding to keep the Company viable, the difficulties in achieving reimbursement for Apligraf, and the disruptive effect on operations that high turnover and infighting among the Company's senior management was having and would continue to have for the foreseeable future.

(g)    Contrary to defendants' representations, the Company's amended Form 10-Q for the third quarter of 1999 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (f) above and in paragraphs 59-67, *supra*.

77.    **$9.4 Million Equity Sale**.    One month later, on February 24, 2000, with Organogenesis stock trading at almost $15.50 per share, defendants issued a release announcing that Organogenesis had completed the sale of over 688,000 shares of common stock for gross proceeds of $9.4 million. According to defendants, this was a remarkable accomplishment given that it allowed them to raise *more money than defendants had originally planned* — and presumably placed Organogenesis in a position of having *more money than needed to fulfill defendants' near-term objectives*. According to the Company's release, defendants' purported "goal" had been to raise $6.2 million but the offering priced at $14 per share was over-

subscribed due to the "strong interest in our Company." This placement raised the total number of Organogenesis shares outstanding to 31.3 million from 30.6 million.

78.    At the time of this offering, the Company stated that proceeds from the sale of these shares would enable, among other things, the retirement of $6.2 million in preferred stock. Defendants created the impression that the redemption of Organogenesis' preferred stock was necessary to bolster the Company's debt and equity ratings. The Company's February 24, 2000 release quoted defendant Tuck, who exhibited a complete knowledge of Organogenesis' financial and operational performance, stating that, "*The completion of this initial shelf-offering removes any concern among the investment community about the retirement of our $6.2 million of preferred stock.*" No disclosure was made as to the identity of the owners of these retired preferred shares.

79.    Moreover, the following day, February 25, 2000, the Company also issued a release announcing that defendants had raised an additional $1.4 million through the sale of an additional 100,000 shares to satisfy an additional over-subscription commitment.  This sale brought the total February 2000 Offering proceeds to over $10.8 million, and the total number of shares issued and outstanding to 31.4 million.

80.    **$16 Million In Equity Sales.** Taking further advantage of the artificial inflation in the price of Organogenesis stock defendants' misrepresentations and omissions had caused, on March 9, 2000, *defendants sold another 300,000 shares of Organogenesis common stock at approximately $17.60 per share* in a private-placement, thereby realizing another $5.27 million. Including this latest offering, the Company had issued a total of 1.088 million shares in less than 20 days in combined placements valued at over $16 million.

81.      On March 7, 2000, shares of the Company rallied to a Class Period high of over $22.37 per share on substantial volume of over 1.5 million shares, driven by management's optimistic guidance, and the false and misleading assurances that the Company was operating according to plan — capable of achieving profitability in the near-term — and that the Company had raised enough money to fund operations.  Within days, however, on March 13, 2000, defendant Stein suddenly and unexpectedly announced that he was resigning from the Board of the Company.  Stein had only accepted the position of Chairman Emeritus of the Board in January 2000, after resigning as Chairman and Chief Executive Officer effective January 1, 2000.  At the time of his resignation, no disclosure was made regarding the Company's inability to generate sufficient funds from operations or sources of debt or equity to allow Organogenesis to achieve profitability, or to foreseeably remain as a viable business.

82.      On or about March 21, 2000, as President and CEO of Organogenesis, defendant Laughlin showcased a presentation of the Company at the New York Society of Securities Analysts 4th Annual Health Care Conference, held in New York City.

83.      **$6.2 Million Series C Redemption.** Consistent with defendants' earlier announcement, on March 27, 2000, Organogenesis issued a release which reported that defendants had opted to use at least $6.2 million of its recently raised cash to pay for the redemption of the Company's outstanding Series C convertible preferred stock.  According to the Company's release, the Series C convertible stock had a mandatory conversion date of March 26, 2000, but these shares were redeemable in either common stock or cash, at the option of Organogenesis.  The Company's release did not reveal why the cash election was chosen by Organogenesis or who received the cash payments as a result of this redemption.

37

84.    **4Q and FY:99 Results.**  On March 31, 2000, Organogenesis issued a release published on *Business Wire* which purported to announce financial results for the fourth quarter and year end 1999.  According to the Company, results for the fourth quarter and full year 1999 were "*consistent with the transition in progress from a research focused company to a research based operating company with a novel medical product in introduction phase,*" in addition to stating the following:

> For the year ended December 31, 1999, revenue from product sales to related party and others was $1.8 million, compared with $1.1 million in 1998. Total revenues were $3.6 million for 1999, compared with $9.0 million in 1998, which included $6.8 million in milestone payments from Novartis Pharma AG. Total expenses (including manufacturing, research and development, and general and administrative costs) were $31.9 million in 1999, compared with $23.0 million in 1998. Net loss was $0.93 per share (or $28.4 million) for 1999 compared with a net loss of $0.48 per share (or $14.0 million) for 1998.
>
> The *increase in expenses was primarily due to: strengthening our employee base* through additions to our production, research and support teams; costs to support publication studies and other sponsored programs, as well as *increased activities in our corporate communications and business development functions*; interest expense on the convertible debt issued last March; *expanding our production and warehouse capacity* while consolidating our administrative space; and the acquisition of intellectual property and assets from Baxter Healthcare Corporation. [Emphasis added.]

In addition to the foregoing, defendant Laughlin also used this release to condition investors to believe that the Company was operating according to plan and was actually taking steps to *reduce* operating costs, as follows:

> Prior to the US commercialization of Apligraf, our corporate focus needed to be on supporting the validity of the product concept through solid research, clinical trials and manufacturing consistency.... *Now, as sales of Apligraf begin to develop, our focus must include driving down per unit manufacturing costs through the development and implementation of more efficient methods of production.* At the same time, we are continuing to support other programs in our pipeline — the VITRIX(TM) living soft tissue replacement product, the vascular graft, the liver assist device — important to our longer term growth. [Emphasis added.]