Attached to the Form 10-Q for the second quarter of 2001 was a copy of defendant Laughlin's

May 2001 Severance Agreement which reported that the vast majority of the Company's $1.233

million charge was to cover the cost of payments made by Organogenesis directly to Laughlin.

133.    The statements made by defendants on June 5, 2001 and contained in the

Company's August 2, 2001 and August 13, 2001 releases and in the Company's Form 10-Q for

the second quarter of 2001, reproduced herein, *supra*, were each materially false and misleading

and were known by defendants to be false at that time, or were recklessly disregarded as such for

the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the

Company alleged in paragraphs 59-67, *supra*.

(b)    Defendants' announcement that the Company had elected to sell $10

million in equity to Novartis, pursuant to the terms of its amended $20 million stock sales

agreement was materially misleading and incomplete given that defendants knew but failed to

disclose that the Company was informed that defendant Erani had sought to have stock brokers

"*manipulate the market for the Company's stock*."

(c)    Contrary to defendants' representation that Organogenesis "retain[s] the

right to sell Novartis an additional $10 million in equity," the Company did not have the ability

to raise the full amount of that funding option at the discretion of the Company. As defendants

knew but failed to disclose at the time, significant conditions precedent to the exercise of the put

option prevented the Company from accessing $10 million of the put option funding, which

ultimately led to the Company's inability to fund operations in 2002.

(d)    Defendants' representations touting "sustained support for Apligraf use,"

"sustained market demand for Apligraf," the acceleration of a plan to "ramp up production to

meet the strong growth forecast for [the] second half of this year" and the "increasing demand anticipated" were materially misleading and incomplete given that defendants knew but failed to disclose that significant manufacturing and distribution problems, contamination issues, inadequate marketing support, and difficulties in obtaining reimbursement for Apligraf were causing increasing frustration among physicians, who were becoming less willing to order or re-order Apligraf for their patients. Further, defendants knew but failed to disclose that the purported "strong growth forecast" and "increasing demand anticipated" for Apligraf were illusory, given that, as confirmed by a former employee of Organogenesis, Novartis' sales forecasts were "always inflated."

(e)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.*

(f)    Contrary to defendants' representations, the Company's Form 10-Q for the second quarter of 2001 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (e) above and in paragraphs 59-67, *supra*.

134.    **Needham Report.**  The materially false and misleading statements issued by defendants had their intended effect.  Following the publication of Organogenesis' second quarter 2001 results, on August 14, 2001, Needham issued another report on the Company which again reiterated a "Buy" rating and issued a near-term price target of $16-$18 per share, and stating the following:

> We reiterate our BUY rating and 12-month target range of $16-$18. We used two methods to reach this valuation target.  In the first instance, we applied a market capitalization to revenues ratio of 11x for the year 2004. In the second instance, we applied a 35x multiple to the 2004 estimates.  To both these calculations, we used a 10% discount per year, given the fact that Apligraf is already on the market thereby less product uncertainty exists. Using these metrics, we arrived at a target price range of $16-18.

135.    **Apligraf Sales August 2001.**  On September 6, 2001, Organogenesis issued a release which announced that sales of Apligraf reached another monthly record sales level, with 2150 units sold in August 2001.  This release also quoted defendant Sabolinski, who stated that, *"We are pleased with the sustained strength in Apligraf sales that has been seen through the summer months.  We are on track for the third quarter of 2001 to have substantially higher sales than our record second quarter."* [Emphasis added.]

136.    On September 7, 2001, defendants published a release which purported to announce that Organogenesis had increased its capacity to manufacture Apligraf.  Accordingly, the Company's release quoted defendant Sabolinski, who stated the following:

> Our Company is now producing Apligraf at a rate of over 40,000 units per year. I am pleased that the manufacturing ramp-up I committed to when I became CEO in May is on track. *We anticipate increasing this production*

80

*rate in the near term to meet forecasted demand*. The demand has been driven by an increase in sales and marketing activity, the diabetic foot ulcer supplement approval, and favorable reimbursement policies in the hospital and physician's office. [Emphasis added.]

137.    On or about September 21, 2001, *Dow Jones* news service reported that Apligraf had received Medicare reimbursement in all 50 states.

138.    **3 New Products.**   On September 24, 2001, Organogenesis issued a release announcing that its experiences selling Apligraf had been so successful that defendants would begin commercializing three additional new proprietary products during the fourth quarter of 2001. According to the release, these products would be marketed directly by Organogenesis using its own marketing personnel and this purportedly would "*advanc[e] the Company from a research, clinical/regulatory, manufacturing Company to a fully integrated medical products Company*." [Emphasis added.]  This release also quoted defendant Sabolinski, as follows:

> Commercializing our own products, with our own sales and marketing team, brings Organogenesis to *a new stage*. We receive the full revenue from the products we commercialize ourselves, which will add to our revenue stream beginning in October. *We look forward to these products contributing to the overall profitability of the Company*. Having our own sales force also paves the way for Organogenesis commercializing additional products in the future. [Emphasis added.]

139.    **Apligraf Sales 3Q:01.**   On October 4, 2001, Organogenesis issued a release which purported to announce strong sales of Apligraf during the third quarter of 2001, with 6606 Apligraf units sold during the quarter. In addition to the foregoing, this release also quoted defendant Sabolinski, who stated that, "*[t]his has been a very significant quarter for the Company. Apligraf sales continue to increase* and the product is now reimbursed by Medicare in all fifty states. . . . In addition, we received marketing clearance for the third FortaFlex(TM)-based product, FortaGen(TM), and plan to launch four new products in October by an Organogenesis Institutional sales force." [Emphasis added.]

81

140.    On or about October 9, 2001, Organogenesis presented at the UBS Warburg Global Life Sciences Conference in New York City.  Later on October 24, 2001, Organogenesis also presented at the Techvest Emerging Healthcare Forum, also held in New York City.

141.    **$20.25 Million Additional Funding.**  On October 16, 2001, Organogenesis issued a release announcing that defendants had raised another $20.25 million from several financing activities, including another $10 million from Novartis and an additional $10.25 million from two equity placements to institutional investors and/or Company directors.  One of the placements was made *via* the sale of the 1.67 million registered common shares remaining under the Company's existing shelf registration, and the other placement was for 503,876 unregistered shares of common stock and attached warrants.  This release also quoted defendant Sabolinski who stated that, *"[w]e are pleased to have completed this round of financing, an important step in achieving key corporate milestones including realizing profitability sooner. Furthermore, these proceeds will enable us to accelerate additional key programs for our lead product, Apligraf, and other notable products in our development pipeline."*

142.    On November 1, 2001, *Dow Jones* news service reported that defendants had registered at least 2.7 million shares of common stock on behalf of certain shareholders. According to this report, of the shares registered 2.18 million were issuable to Novartis upon conversion of a $10 million 7% convertible subordinated promissory note that would mature on March 29, 2004.  In addition, at this time, Organogenesis also registered at least 503,876 shares issued to two of the Company's directors and an investor in a private equity transaction on September 5, 2001.  According to this report, Organogenesis would receive no proceeds from the sale of the shares by the stockholders.

143.    **3Q:01 Results.**  On November 13, 2001, defendants published a release on

*Business Wire*, which purported to announce financial results for the third quarter of 2001, the

period ended September 30, 2001, which stated that:

> Organogenesis Inc. (AMEX: ORG) today reported its financial results for
> the third quarter and nine months ended September 30, 2001. Product sales
> to related party were $2.2 million in the third quarter of 2001, representing a
> 211% increase over $0.7 million for the same period in 2000. This increase
> reflects the growth in Apligraf(R) unit sales and the new pricing in the 2001
> amended agreement with Novartis. Total revenues increased 124% to $3.0
> million in the third quarter of 2001 compared with $1.3 million for the same
> quarter in 2000. Total operating costs and expenses were $9.8 million
> during the third quarter of 2001 compared with $7.7 million for the same
> quarter in 2000. Cost of product sales increased by $1.7 million due to
> increased sales of Apligraf and costs related to ramping up production to
> meet anticipated future increased Apligraf demand.
>
> Research and development costs decreased slightly to $4.1 million
> compared to $4.4 million in 2000. Selling, general and administrative costs
> increased by $0.7 million primarily due to selling expenses related to
> preparations for the commercial launches of the Company's
> FortaPerm(TM), FortaGen(TM) and Revitix(TM) products. Net loss was
> $7.4 million or $0.21 per share for the third quarter of 2001 compared with
> a net loss of $6.7 million or $0.19 per share for the same quarter in 2000.

Again, defendant Sabolinski was quoted in the Company's release as follows:

> Our latest financial results reflect our strategy of implementing programs to
> support the success of Apligraf, while embarking on initiatives that will
> position us to capitalize on additional opportunities in the emerging tissue
> engineering sector.

144.    **3Q:01 Form 10-Q.**  The following day, November 14, 2001, defendants also filed

with the SEC the Company's financial results for the third quarter of 2001, the period ended

September 30, 2000,  pursuant to a Form 10-Q signed by defendants Sabolinski and Arcari.  The

Company's Form 10-Q for the third quarter of 2001 contained the same materially false and

misleading financial information as had previously been announced, in addition to reporting, in

part, the following:

> Basis of Presentation

- - - - - - - - - - - - - - - - - - - - -

The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented....*

\*   \*   \*

COSTS AND EXPENSES

Cost of product sales:   Cost of product sales for the quarter ended September 30, 2001 increased 110% to $3,268,000, from $1,557,000 for the comparable quarter last year.   Cost of product sales for the nine-month period ended September 30, 2001 increased 81% to $8,301,000, from $4,581,000 for the comparable period last year.   These increases were due to increased unit sales of Apligraf to Novartis, higher allocation of depreciation and occupancy costs, and increased scrap charges during the month of September due to the suspension of commercial sales of Apligraf following the September 11, 2001 terrorist attack.   Cost of product sales includes the direct costs to manufacture, quality inspect and package Apligraf and an allocation of our production-related indirect costs.   Cost of product sales continues to exceed product sales due to the high costs associated with low volume production.   *We expect production volume to increase and our margins to continue to improve during the remainder of 2001.   We expect that we will have to revise standard costs and the allocation of costs to product sales in the future as we continue to modify our manufacturing processes.* [Emphasis added.]

145.   The statements made by defendants and contained in the Company's releases on September 6, September 7, September 24, October 16, and November 13, 2001 and those statements contained in the Company's Form 10-Q for the third quarter of 2001, reproduced herein, *supra*, were each materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such for the following reasons:

(a)   Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

84

(b)    Defendants' October 16, 2001 release announcing the Company's equity placements and defendant Sabolinski's representation that the Company's financing activities were "an important step in achieving key corporate milestones including realizing profitability sooner" were materially misleading and incomplete given that defendants knew but failed to disclose that the Company had been informed that defendant Erani had sought to have stock brokers "*manipulate the market for the Company's stock.*"

(c)    Contrary to defendants' representations that they were expecting new initiatives to help the Company achieve "overall profitability of the Company," defendants knew that the Company's ultimate prospects for achieving profitability were severely compromised by the problems alleged in paragraphs 59-67, *supra*, including the Company's serious manufacturing and marketing problems, its inability to access adequate funding to keep the Company viable, the difficulties in achieving reimbursement for Apligraf, and the disruptive effect on operations that high turnover and infighting among the Company's senior management was having, and would continue to have for the foreseeable future.

(d)    Defendants' representations touting "sustained strength in Apligraf sales," and "substantially higher sales" in the third quarter of 2001 were materially misleading and incomplete given that defendants knew but failed to disclose that manufacturing and distribution problems, contamination issues, inadequate marketing support, and difficulties in obtaining reimbursement for Apligraf were causing increasing frustration among physicians, who were becoming less willing to order or re-order Apligraf for their patients. Further defendants knew but failed to disclose that the purported "strong growth forecast" and "increasing demand anticipated" for Apligraf were illusory, given that, as confirmed by a former employee of Organogenesis, Novartis' sales forecasts were "always inflated."

85

(e)     Defendant Sabolinski's representation anticipating increasing the Apligraf "production rate in the near term to meet forecasted demand" were materially misleading and incomplete given that the Company was experiencing continuing significant manufacturing and marketing problems which were hampering manufacturing and which made it unfeasible to sufficiently increase production scale. Further defendants knew but failed to disclose that the purported "forecasted demand" for Apligraf was illusory, given that, as confirmed by a former employee of Organogenesis, Novartis' sales forecasts were "always inflated."

(f)     Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that were well below the product's manufacturing cost. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be*.

(g)     Contrary to defendants' representations, the Company's Form 10-Q for the third quarter of 2001 did not reflect the true financial condition of the Company because it failed

86

to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (h) above and in paragraphs 59-67, *supra*.

146.    **Needham Report.**  On November 16, 2001, with shares of the Company now trading at just above $4.00 per share, analysts at Needham & Co. were finally forced to adjust downward their near-term Organogenesis price target to $9.00-$11.00 per share from $16.00-$18.00 per share.  At this time, however, Needham did not reduce its "Buy" rating on the Company, and also stated that, at current trading levels shares of Organogenesis were *"currently undervalued,"* as follows:

> We believe that Organogenesis is *currently undervalued*, given that Apligraf is the first and only product containing living human cells to prove efficacy and gain FDA PMA marketing approval and now having qualified nationally for reimbursement under Medicare for outpatient use.  *ORG's enhanced management team and Novartis agreement is a further indicator of ORG's potential*.  In addition, we believe there will be a number of key events over the next several quarters that will serve to significantly increase the visibility of Organogenesis and its products and further attract substantial investor interest in the company and its products, such as continued growth in Apligraf sales and postmarketing research as well as progression of VITRIX clinical trials. [Emphasis added.]

147.    On January, 4, 2002, only days before the end of the Class Period, defendant Erani announced his sudden and unexpected departure from Organogenesis.  According to the Company's release, defendant Erani resigned to "pursue personal business interests."

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF ORGANOGENESIS IS BELATEDLY DISCLOSED

148.    **No Money to Fund Operations.**  On or about January 30, 2002, defendants filed with the SEC a report pursuant to Form 8-K, signed by defendant Arcari, which stated for the first time that the Company was running out of money and that it would be forced into insolvency unless it could raise at least $15 million in the immediate near term. The Form 8-K stated, in part, the following:

87

On January 30, 2002, the Registrant filed a Registration Statement on Form S-3 to register the resale of shares held by certain of its selling security holders. As a part of that document, the Registrant included an updated set of risk factors relating to its business. The Registrant intends, by filing such updated risk factors with this Current Report on Form 8-K, to provide such risk factors as part of its documents filed pursuant to the Securities Exchange Act of 1934.

\*   \*   \*

We have incurred significant operating losses in funding the research, development, testing and marketing of our products in every year of our existence. We incurred net losses of $14,031,000 for the year ended December 31, 1998, $28,350,000 for the year ended December 31, 1999, $28,605,000 for the year ended December 31, 2000 and $22,561,000 for the nine months ended September 30, 2001. *The extent of future losses and the time required to achieve profitability are highly uncertain, and we may never achieve a profitable level of operations or, even if we achieve profitability, we may not be able to sustain it on an ongoing basis.* [Emphasis added.]

149.    In addition to the foregoing, the January 30, 2002 Form 8-K also revealed for the

first time that the Company would need to raise additional funds by the end of the first quarter of

2002, but that Organogenesis might be unable to raise such necessary funds, in which case it

would then be forced to *curtail or discontinue all operations*.  In this regard, the Form 8-K also

stated, in part, the following:

We will need to raise additional funds by the end of the first quarter of 2002, but may be unable to raise the funds, in which case *we would have to curtail or discontinue our activities.* [Emphasis added.]

We will seek to raise $15 million from the sale of equity securities that have not been registered under the Securities Act of 1933; such securities may not be sold in the United States absent registration or an exemption from registration. Based upon our current forecasts, we believe that proceeds from proposed equity financings of approximately $15 million, together with our existing cash, cash equivalents and credit line and product and other revenues, will be sufficient to finance operations through at least the next twelve months. This projection is based on assumptions regarding our operating cash requirements and revenues from sales of Apligraf and other products, any of which could prove to be incorrect. We are currently seeking additional funding but our research, development, manufacturing and other activities may require that we raise substantial additional funds. We may not be able to obtain the proposed $15 million in new financing or

88

any additional funding on terms favorable to us or our stockholders, if at all. Equity financings would dilute your ownership in us.

150.    In answer to the question as to why the Company could not access the $10 million that defendants had previously reported would be available, the Form 8-K suddenly revealed that the Novartis commitment was subject to certain conditions — ones the Company had no way of satisfying — such that this money was also not available, as follows:

> *Although we have a contractual put option to sell an additional $10 million of our securities to Novartis, we must satisfy a number of conditions in order to exercise that option.* If we do not satisfy these conditions and Novartis is unwilling to waive any unsatisfied conditions, we will be unable to sell additional securities to Novartis pursuant to the put option. In addition, even if we satisfied the conditions, the closing would occur no sooner than 90 days following the day we send the put option exercise notice. If adequate funds are not available to us when needed, we will be required to delay, scale back or eliminate our research and development programs or license to third parties products or technologies that we would otherwise undertake to develop ourselves and otherwise reduce our level of operations. *The failure to have adequate liquidity could result in our receiving a "going concern" opinion from our auditors.* [Emphasis added.]

151.    While shares of the Company made virtually no move on the day the Company's Form 8-K was filed, in the days immediately before its filing, shares of the Company dropped precipitously — falling over 40% due to leakage in the three days prior to its filing with the SEC. Prior to this sudden and inexplicable decline, which occurred on volume abnormally above the stock's daily average, shares of Organogenesis traded at approximately $3.70 per share, on January 28, 2002. The day the Form 8-K was filed, Organogenesis shares traded down to $2.44 per share. Within days, as investors digested the implications of the Company's SEC filing, shares of Organogenesis fell to as low as $1.32 on February 7, 2002 — a decline of almost 95% compared to the Class Period high of over $22.00 per share reached on March 7, 2000.

152.    Later, on February 25, 2002, *Dow Jones* news service reported that Organogenesis had declared that it would engage in a "restructuring" and would lay-off at least

89

16% of its workforce in order to cut overhead by at least $5 million. Also, according to *Dow Jones* and a Company press release, on March 21, 2002, the Company raised $16 million by issuing "convertible preferred shares," convertible into shares of common stock of the Company at a fixed conversion price of $1.45 per share, and by selling 7.2 million unregistered shares of Company stock. The "vulture capitalists" who arranged for these "toxic convertibles"[5] as well as the purchase of an additional 7.2 million shares for payments of only $10 million, were identified by the Company only as "institutional shareholders."

153.    On April 3, 2002, Organogenesis announced sales of Apligraf for the first quarter of 2002 which, at 7,100 units, was well below forecast sales for 2002 of 40,000 units. Following the release of results for the first quarter of 2002, on April 11, 2002, defendants hosted a conference call, the transcript of which was subsequently published. During the question and answer, call-in section of this call, the following statements were also made:

> BRUCE BREWSTER (ph), BREWSTER ASSET MANAGEMENT: Over the last number of years it seems to be that you have been very successful from a medical point of view. And from the point of view of sales of Apligraf. *I don't think we can say the same thing about the business results.*
>
> *It seems to me that the underlying reason for your lack of success in — from a business point of view, is your original deals with Sandos (ph) and Novartis and the amount of revenue that you get from the sale of Apligraf.*
>
> You're entering into — you did adjust that recently. You're entering into new transactions with other partners. Are these transactions organized in such a way that you'll have more possibility of overall profitability and therefore business success?
>
> \*    \*    \*

_____

[5]    "Toxic," because the greater Organogenesis' share price declined, the more stock the Company would have to issue to meet this obligation, the greater shareholder dilution, the lower the price of the Stock, the more stock that would be required to be issued to meet this obligation...

RICHARD CARAFF (ph), OPPENHEIMER: Yes, I certainly am pleased to hear of approval by the 50 states and hope that that word gets out to the doctors, many of whom at least in our limited experience in Boston are not completely aware.

But the other part which is a question, *some doctors that I've spoken to are very happy and satisfied with using Apligraf on complex cases. But they complain on less complex cases Apligraf is a rather expensive procedure to use compared to other procedures.* Do we have any way of broadening the market by means of price? Could you comment upon that please?

STEVEN BERNITZ: *I think the major — if it in looking at the cost of the product should be in looking at the pharmo-economics of the product rather than the price of the product.*

If you look at the complications associated with diabetic foot ulcers in terms of bone infections and amputations and actually mortality associated with the complications from these wounds, while I would like to say that we have done rigorous studies. And to show that I think one that there's an opportunity to do so, and I think that's an important area for both companies going forward.

There have been some studies with venous leg ulcers that show that Apligraf can be a very cost effective treatment for those. And actually given that, one would expect that data for diabetic foot ulcers to be more compelling.

And I think that you also touched on another important point which is the knowledge and confidence in the reimbursement process. Which is that a doctor may have tried the product, a year or so ago and or heard from a doctor that tried the product a year or more ago and had some difficulty. Or had to go through a rigorous approval process to get it the product reimbursed. [Emphasis added.]

154.    In addition to the foregoing, when asked about the why the Company could not access the second $10 million tranche of the aforementioned Novartis commitment, defendants stated the following:

JOHN BERGER (ph): Could you also go over briefly the encumbrances on the second traunch of capital from — that's available from Novartis? And when that traunch would be available to be utilized since this latest financing.

JOHN ARCARI: Well the second put is equal in amount to the first. It's 10 million. The time period between exercising a put and receiving money is a minimum of 90 days. *But the thing that really distinguishes the second put from the first is the hurdles you have to get through on the second put.*

*And they're inherently more difficult. There are more hoops to jump through. So it's much more difficult to access that money than was the first traunch.*

STEVEN BERNITZ:  So we look at that as an upside.  If it is available *there's no where in our plans that we are counting on that money*.  And we don't anticipate exercising that put. [Emphasis added.]

155.    **Going Concern Opinion.**  On April 16, 2002, when the Company filed its year end financial statement with the SEC, pursuant to Form 10-K, its outside auditor PricewaterhouseCoopers LLP issued a "going concern" opinion, which stated that the *auditors had "substantial doubt" about Organogenesis' ability to continue as a going concern.* According to PricewaterhouseCoopers, "the Company has suffered recurring losses from operations, has a working capital deficiency, a stockholder's deficit, and has long-term debt that may become immediately due upon an event of default." [Emphasis added.]

156.    Following this announcement, shares of Organogenesis fell to as low as $0.60 per share on April 17, 2002.  In the days that followed, shares of the Company traded even lower, to as low as $0.41 per share by May 1, 2002.

157.    Remarkably, in response to this statement by PricewaterhouseCoopers, the same day, April 16, 2002, defendants issued a release on *Business Wire* which stated that, although Organogenesis had received the aforementioned report, "we believe that, based on our current forecasts, the Company has sufficient liquidity to finance operations and *achieve break even by year-end 2002."* [Emphasis added.]  This post-Class Period statement was as far from the truth as defendants' other statements made within the Class Period.  Despite this absurd claim, on August 16, 2002, defendants revealed that the Company would delay filing its quarterly report for the second quarter of 2002 and that Organogenesis was reviewing a possible material "asset impairment" charge.  According to a statement made by the Company at this time, "management

is unable to conclude the amount of such impairment or that the financial statements . . . are probably presented on a 'going concern' basis rather than on a 'liquidation of assets' basis."

158.    **Needham Rating Suspended.**  It was not until July 12, 2002, with shares of the Company now trading below $0.20 per share, however, that analysts at Needham & Co. finally placed the Company's stock rating "Under Review."    With Organogenesis on life-support, Needham analysts reported the following:

* Recent events leave *future uncertain*.

* ***Disappointing sales figures/ higher than expected burn rate.***
  Organogenesis announced that Apligraf sales decreased approximately 7-10% for 2Q02, compared with our estimates for an increase in sales of 25%.

* Additionally, the company stated that the burn rate for the quarter was $7.5MM, versus our estimates of $4.3MM, resulting in $3.7MM of cash at the end of 2Q02. Additional cost cutting measures have been initiated to lower the burn rate from $2.5MM/month to $1.1MM/month. Using the revised burn rate, Organogenesis will be able to fund operations for 3Q02 before seeking additional capital.

* Challenging management strategy.  Organogenesis announced that it has entered into discussions with Novartis Pharma AG to reacquire commercialization rights to Apligraf.  However, in order to complete negotiations, ***Organogenesis must raise sufficient capital necessary to reacquire [rights to] Apligraf and build the necessary infrastructure necessary to market and distribute the product.***

* Additionally, Organogenesis stated that it would seek a corporate partner for the marketing of the Fortagen, Fortaperm, and Revitix product lines.  While this decision will result in a reduction of costs related to the sales and marketing infrastructure set up by the company, the partnership will also result decreased revenues, as revenues become royalty based.

* Our conclusions.  Despite the efforts of management, ***Apligraf sales continue to grow at a slower than anticipated rate.  The lower than expected sales  growth and higher than anticipated burn rate results in approximately 3 months of cash ($3.7MM) for on going operations, which leaves the company below budgeted forecasts.***  While major initiatives are being discussed including the reacquiring of rights to Apligraf and raising of funds for continued operations, we believe that ***multiple challenges exist for Organogenesis.***  Therefore, given the lack of Apligraf sales growth, the higher than expected burn

rate, the challenging business strategy undertaken by management, and sub-optimal cash position, we are placing our rating under review. We are currently evaluating the company's options and will continue to monitor events going forward. [Emphasis added.]

159.    **Never Achieve Profitability. Huge Layoffs. Halt Apligraf Production.** On August 21, 2002, with Organogenesis shares trading at $0.09 per share, *the Company's common stock was suspended from trading on the American Stock Exchange.* On September 13, 2002, the Company announced that it had temporarily halted shipments of Apligraf and had furloughed over 110 of its employees, as a result of the Company's "current lack of cash flow." Defendants also blamed the current crisis upon its inability to renegotiate its marketing agreement with Novartis, which was described as "not sustainable." On September 13, 2002, defendants also revealed that a Chapter 11 bankruptcy filing was a possibility.

160.    **Product Recalls.** In addition to the foregoing, by mid-September 2002, production quality at Organogenesis had deteriorated so substantially that an entire batch of Apligraf had been recalled. Alarmingly, because Apligraf has such a short shelf life, at the time of this "recall," of the 193 affected units at least 72 had already been applied to patients. In total, this was at least the fourth time since 1999 that the Company had been forced to recall Apligraf because of contamination.

161.    **Post Class Period Scheme to Leverage Buyout.** Having reduced the value of the Company's stock to mere pennies per share, and having lost the ability to sell more stock or offer debt, or raise money through private or public offerings, defendants next sought to take what was left of Organogenesis for themselves. Thus, on or about September 25, 2002, defendants caused the Company to file for Chapter 11 protection from creditors in United States Bankruptcy Court for the Eastern District of Massachusetts.

162.    As defendants knew throughout the Class Period, Organogenesis could not produce enough cash flow from operations to support its operations under the terms of its agreement with Novartis given that it was losing money on each sale under the Novartis agreement. Thus, on November 20, 2002, immediately after defendants placed the Company into bankruptcy, defendants forced Novartis to agree to transfer back to them the worldwide marketing and distribution rights for Apligraf. Novartis acquiesced to defendants' demand, rather than risk losing its entire investment in the Company — including at least $10 million in unsecured debt which Novartis still hoped to collect.

163.    The following day, November 21, 2002, the *Boston Globe* reported that, pursuant to the terms of the proposed, revised deal between Novartis and defendants:

* The two companies had agreed to work together for another seven months, during which Novartis would continue to market and distribute Apligraf.

* When the Company emerges from Chapter 11 bankruptcy protection, marketing and distribution rights will return to defendants. Two years later, Novartis will earn royalties on sales of Apligraf, lasting for five years.

* Novartis also agreed to purchase at least 200 units of the product each week from defendants.

* Novartis also agreed to loan $3 million to Organogenesis, to be repaid 18 months after the company emerges from bankruptcy.

* Novartis agreed to have a $10 million investment it made in the company last year treated as a general claim, to be repaid with other unsecured creditors of Organogenesis.

* The pact also provides hope for dozens of employees who were laid off in September, when Organogenesis abruptly shut down, with a minimum of 75 people anticipated to return to work within several weeks of this announcement.

Although the precise payment terms were sealed by the Bankruptcy Court, at that time Organogenesis' vice president and general counsel, Jeffrey L. Dow, stated that, "[t]he prices are

95

considerably more favorable than the $350 a unit we were getting under the old payments. It's clear we are getting the great bulk of the revenue from Novartis' sales . . . ."

164.   By June 23, 2003, defendants announced that they had caused the Company to file an Amended Plan of Reorganization with the United States Bankruptcy Court. According to defendants, the Plan incorporated "a funding proposal from a group of unsecured creditors — including current and former officers and directors of the Company," and put in motion a timeline for emerging from Chapter 11 protection in August 2003. The Plan also anticipated a cash distribution of 35% to be made to the holders of allowed general unsecured claims, *but that no distribution would be made on shares of the Company's outstanding preferred and common stock, which would be cancelled on the Plan's effective date.* Under the Plan, all shares of new common stock of the Company, as reorganized, would be distributed to the members of the plan funding group and the holder(s) of the $10.35 million allowed claim of Novartis.

165.   Days later, however, on June 26, 2003, the *Boston Globe* reported more disturbing news regarding defendants' continued interference with the bankruptcy proceeding, and documented their continued attempts to place their own interests over and above the interests of the outside shareholders of the Company, as follows:

> If all goes as expected at a hearing in U.S. Bankruptcy Court in Boston today, creditors could be solicited next week for their approval of a reorganization plan turning ownership of the life sciences company and its sophisticated medical technology to a group led by two cousins who operate chains of clothing stores like Strawberry and Pay-Half.

> Did recently installed chief executive Alan Ades, also a leader of the group in line to buy the company, impede other potential bidders, a tactic that could have protected his own financial interests? Did the previous CEO, seemingly ousted last fall, try to use his own inside connections seeking proprietary information for a bid with private investors that could have put him back in charge?

* * *

*Ades, his cousin Albert Erani, and a small group of others that includes their relatives would end up with the company at a seemingly modest price*, though their total cost is hard to calculate....

* * *

Steven Bernitz, the company's chief executive at the time of the bankruptcy filing, quit as he was about to be fired in October and Ades took charge, according to the company. A short time later, the company tracked cellphone calls between Bernitz and another executive still employed at Organogenesis, Jeffrey Dow, and fired him. Company lawyers questioned whether confidential information was being leaked.

Soon, it became clear Bernitz was formally advising a private equity firm circling to make a bid on company assets. *His lawyer claimed the company was harassing Bernitz because Ades "wants to end up with the company."*

*"He has been very successful at chilling the sale," the lawyer, Stephen Gordon, said in a transcript of a bankruptcy court hearing.* [Emphasis added.]

166.    Despite defendants' actions, on August 14, 2003, Judge William Hillman in U.S. Bankruptcy Court for the Eastern District of Massachusetts in Boston cleared the way for the Company to emerge from bankruptcy under the full dominance and control of the Individual Defendants by or about August 26.   The insider group led by interim CEO Alan Ades and his partner and cousin, Albert Erani, would buy a $10.5 million unsecured claim in the form of a bond held by pharmaceutical giant Novartis. Ades, who co-founded A&E Stores with Erani, would be the interim CEO, president and chairman of the new company.   Novartis agreed to convert the $3 million in debtor-in-possession financing it provided into a $3 million exit loan. According to John Hutchins, Boston counsel for Novartis at Kirkpatrick & Lockhart LLP, who was quoted at this time, the final terms of this bankruptcy restructuring actually amounted to a

97

"leveraged acquisition" by the insider group because they had bought up the $10.5 million Novartis unsecured claim and were investing additional funding.

167.    Thus, in less than one year, not only were defendants successful in thwarting other interested bidders and in facilitating defendants Erani and Ades and their family members' gaining total control over the Company but, within that time, defendants were also able to cause Organogenesis to emerge from bankruptcy having completed its restructuring plan.  As a result of this restructuring, new shares were issued to defendant Erani and Ades and their family members — the new owners of the Company — and the shareholders who purchased and/or otherwise acquired shares of the Company during the Class Period received *nothing* for their Organogenesis shares.

168.    The market for Organogenesis securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Organogenesis common stock traded at artificially inflated prices during the Class Period.    Plaintiffs and other members of the Class purchased or otherwise acquired Organogenesis securities relying upon the integrity of the market price of Organogenesis securities and market information relating to Organogenesis, and have been damaged thereby.

169.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Organogenesis common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

170.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Organogenesis' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Organogenesis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL ALLEGATIONS AGAINST PRICEWATERHOUSECOOPERS

171.    Defendant PricewaterhouseCoopers is a worldwide firm of certified public accountants, auditors, and consultants. According to its website, www.pwc.com, PricewaterhouseCoopers "is the world's leading professional services organization." PricewaterhouseCoopers touts its expertise pertaining to the pharmaceutical and healthcare industries, such as, Organogenesis, stating that PricewaterhouseCoopers is "the professional services firm of choice among the world's leading pharmaceutical and healthcare products companies" and "the auditors of the largest share of the world's leading pharmaceutical companies and provide tax and business advisory services to many of the industry's other major players."

172.    Through its Boston, Massachusetts office, PricewaterhouseCoopers served as Organogenesis' auditor and principal accounting firm prior to and during the Class Period. By

99

virtue of its relationship with Organogenesis and the nature of the auditing and consulting services rendered to the Company, defendant PricewaterhouseCoopers and its personnel were regularly present at Organogenesis and had intimate knowledge of Organogenesis' financial reporting practices based on its access to confidential internal corporate, financial, operating and business information.

173. PricewaterhouseCoopers was required to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS"),[6] and to report the audit results to Organogenesis, the board of directors, the audit committee, and the members of the investing public, including plaintiffs and other members of the Class. With knowledge of Organogenesis' true financial condition, or in reckless disregard thereof, PricewaterhouseCoopers certified the materially false and misleading financial statements of Organogenesis, described below, and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements. Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

174. In acting as the Company's independent auditors and certifying the Company's year-end financial statements, PricewaterhouseCoopers ignored multiple "red flags," which caused PricewaterhouseCoopers to lose faith in the credibility of the Company and eroded PricewaterhouseCoopers' confidence in the representations of the senior officers and directors of the Company, despite the fact that auditors are required to exercise professional skepticism when

---

[6] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA")' relate to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as the interpretation of GAAS.

performing audit procedures. In doing so, PricewaterhouseCoopers violated Generally Accepted Auditing Standards ("GAAS"). For example:

(a)    According to the Confidential Arcari Document, by March 2001 *PricewaterhouseCoopers' "confidence in managements [sic] and the Boards [sic] representations" had been "eroded."*

(b)    According to the Confidential Arcari Document, defendant Erani's failure to sign standard audit confirmations sent to him by PricewaterhouseCoopers, then the Company's Chairman of the Board, caused a "loss of the Company's credibility" with PricewaterhouseCoopers.

(c)    According to the Confidential Arcari Document, as a result of the Company's violation of a commitment to PricewaterhouseCoopers in connection with the exercise of the first tranche of the Novartis put option in May 2001, PricewaterhouseCoopers informed defendants that it refused to support any future financing initiatives by the Company. According to the Confidential Arcari Document, defendant Erani "[h]indered the process for gaining approval to exercise the Novartis put option by May 31, 2001, a commitment, which was made to PricewaterhouseCoopers (PWC), our independent auditors." The Confidential Arcari Document states that "*[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment.*"

(d)    PricewaterhouseCoopers knew of, or recklessly disregarded, the terms of the Novartis marketing agreement, which was economically unsustainable for Organogenesis given that Organogenesis was losing money on every unit of Apligraf that it produced and that this the Company lacked the ability to fund operations through product sales.

101

(e)    Given these "red flags," PricewaterhouseCoopers knew or recklessly disregarded the fact that the Company suffered from a chronic and systemic lack of internal controls such that its financial reporting was inherently corruptible, subject to manipulation, and unreliable, resulting in materially false and misleading financial statements during the Class Period.

175.    These "red flags" alerted PricewaterhouseCoopers that there were serious concerns with management's character and integrity.   These concerns with management's character and integrity should, in turn, have caused PricewaterhouseCoopers to scrutinize the sufficiency of Organogenesis' internal controls.  The internal control deficiencies include a lack of a stated and demonstrable commitment by senior management to set appropriate standards of ethics, integrity, accounting, and corporate governance.

176.    PricewaterhouseCoopers' concerns with management's character and integrity also should have caused PricewaterhouseCoopers to re-evaluate its risk assessments.  GAAS requires that "risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors."  AU § 316.12, 316.14.  The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present."  AU § 316.25.  One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is "*management's characteristics and influence over the control environment.*"  AU § 316.16 (emphasis added).   Those factors pertain to, among other things, management's "*attitude relating to internal control and the financial reporting process.*"  *Id.* n. 27 (emphasis added). However, in contrast to the requirements of GAAS, PricewaterhouseCoopers conducted the financial statement audit for Organogenesis' year-end 2000, under an assessment of risk that

102

remained unchanged by facts and events that called into question the character and integrity of Organogenesis' most senior management, in contravention of GAAS.

177.    PricewaterhouseCoopers did not exercise due professional care in performing the audit and preparing the audit report, as it was required to do, because it failed to: (i) obtain sufficient competent evidential matter to support the assertions in the financial statements; (ii) maintain an attitude of professional skepticism; and (iii) render an accurate audit report on behalf of Organogenesis.

178.    PricewaterhouseCoopers violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. PricewaterhouseCoopers should have stated that no opinion could be issued by it on Organogenesis' year-end 2000 financial statement or issued an adverse opinion stating that the 2000 financial statement was not fairly presented.

179.    PricewaterhouseCoopers violated GAAS General Standard No.2 which requires that an independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

180.    PricewaterhouseCoopers violated Statement on Auditing Standards No. 82 in that it failed to adequately consider the risk that the audit financial statements of Organogenesis were free from material misstatement, whether caused by errors or fraud. PricewaterhouseCoopers knew or recklessly disregarded numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Organogenesis during the Class period, which adversely affected Organogenesis' ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.

181.    PricewaterhouseCoopers violated GAAS and the standards set forth in Statement on Auditing Standards Nos. 1 and 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

182.    PricewaterhouseCoopers violated GAAS and the standards set forth in Statement on Auditing Standards No. 8, by failing to take appropriate action relating to material misstatements and omissions of fact contained in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of Organogenesis' 2000 Form 10-K.

183.    PricewaterhouseCoopers violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. This standard required PricewaterhouseCoopers to obtain a sufficient understanding of Organogenesis' internal control structure to adequately plan the audit and to determine the nature, timing and extent of tests to be performed. In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure: the control environment, the accounting system, and control procedures. For example, "[t]he auditor's understanding of internal control over revenue transactions ordinarily will include the client's policies and procedures for . . . shipping goods, relieving inventory, billing and recording sales transactions, receiving and recording sales returns, and authorizing and

104

issuing credit memos." AICPA Audit Guide: Auditing Revenue in Certain Industries ("AAG-REV") 1.112.

184.    As a result of its failure to accurately report on Organogenesis' 2000 financial statement, PricewaterhouseCoopers utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. Accordingly, ***the audit function must be meaningfully performed and the accountants' independence not compromised. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.*** [Emphasis added.]

185.    As a result, PricewaterhouseCoopers' opinions, which represented that Organogenesis' 2000 year-end financial statement was presented in conformity with GAAP, were materially false and misleading because PricewaterhouseCoopers knew that it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. PricewaterhouseCoopers, in issuing its unqualified opinions, knew or recklessly disregarded the fact that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

186.    PricewaterhouseCoopers knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Organogenesis' 2000 year-end

financial statements; or (b) withdrawn, corrected or modified its opinion for the year ended December 31, 2000.

## ADDITIONAL SCIENTER ALLEGATIONS

187.    As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Organogenesis, their control over, and/or receipt and/or modification of Organogenesis' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Organogenesis, participated in the fraudulent scheme alleged herein.

188.    In addition, throughout the Class Period, while in possession of material adverse non-public information, defendants caused the Company to issue and/or register for sale millions of shares of Company stock.  Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to raise *over $68 million* in total proceeds from the sales of Organogenesis securities through public stock offerings, private equity offerings and other debt and/or equity sales, which defendants failed to utilize in avoiding Organogenesis' bankruptcy.  Moreover, as further evidence of defendants' motivation to engage in the illegal scheme described herein, on or about April 21, 2000 defendant Stein registered for sale over $6.9 million of his privately held Organogenesis stock — approximately half of the

106

Company shares he personally owned and controlled while in possession of material adverse non-public information. In addition to registering for sale over $6.9 million of his privately held Organogenesis stock on April 21, 2000, defendant Stein — according to defendant Stein's counsel — also sold a certain amount of stock in 2001 (during the Class Period) and 2002. According to defendant Stein's counsel, defendant Stein incurred losses on sales of Organogenesis stock "in excess of $7,000,000." Even if true, the representation by defendant Stein's counsel that defendant Stein did not profit from these stock sales does not negate the strong inference of scienter and motive created by his registration of stock for sale — a clear indication of his *intent* to sell the Company's stock and profit therefrom. Other company insiders, including Defendant Michael Sabolinski, took advantage of the artificially inflated prices of the Company's stock during the Class Period by selling shares of the Company's stock and reaping over $400,000 in proceeds therefrom. Company insiders, including defendants Stein and Sabolinski, registered for sale and/or sold Organogenesis shares while in possession of material adverse non-public information, as follows:

### SHARES REGISTERED FOR SALE

| INSIDER | DATE OF TRANSACTION | PROPOSED NO. OF SHARES | PROPOSED PRICE PER SHARE | TOTAL VALUE OF SECURITIES REGISTERED |
|---|---|---|---|---|
| Herbert Stein | 4/21/2000 | 732,423.00 | $9.44 | $6,912,242.10 |
| TOTAL | | 732,423.00 | | $6,912,242.10 |

## SHARES SOLD

| INSIDER | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | $10.39 | $126,841.12 |
| Nancy L. Parenteu | 5/10/2001 | 15,000.00 | $8.18 | $122,640.00 |
| Nancy L. Parenteu | 5/9/2001 | 5,000.00 | $8.56 | $42,813.00 |
| Nancy L. Parenteu | 5/7/2001 | 10,000.00 | $9.00 | $90,000.00 |
| Nancy L. Parenteu | 5/7/2001 | 5,000.00 | $8.97 | $44,850.00 |
| **TOTAL** | | **47,208** | | **$427,144.12** |

189.    The registration and/or sales of millions of shares of Company stock during the Class Period, which sales were designed and/or permitted by the Individual Defendants as well as numerous other high-level senior executives of Organogenesis further evidences defendants' motive to perpetrate the fraudulent scheme detailed herein. In addition, defendants also caused the Company to engage in the sale of tens of millions of dollars in other sales of Organogenesis securities pursuant to stock offerings, private equity offerings and other debt and/or equity sales during the Class Period, including the following:

| TRANSACTION | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| $9.4M Equity Sale | 2/24/2000 | 688,000 | | $9,400,000.00 |
| $1.4M Equity Sale | 2/25/2000 | 100,000 | | $1,400,000.00 |
| $5.27M Equity Sale | 3/09/2000 | 300,000 | | $5,270,000.00 |
| $1.9M Share Offering | 4/27/2001 | 1,900,000 | $7.75 | $13,500,000.00 |
| $1.44M Private Placement | 6/18/2001 | 186,000 | | $1,440,000.00 |
| $10M Equity Sale to Novartis | 8/07/2001 | | | $10,000,000.00 |
| $20.25M additional Funding | 10/16/2001 | 2,173,876 | | $20,250,000.00 |
| **TOTAL** | | | | **$61,260,000** |

**TOTAL ALL DEBT AND EQUITY REGISTERED FOR SALE AND/OR SOLD BY THE COMPANY, DEFENDANTS AND INSIDERS DURING THE CLASS PERIOD = $68,599,386.22**

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

190.    At all relevant times, the market for Organogenesis' securities was an efficient market for the following reasons, among others:

(a)    Organogenesis stock met the requirements for listing, and was listed and actively traded on the American Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Organogenesis filed periodic public reports with the SEC and the American Stock Exchange;

(c)    Organogenesis regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Organogenesis was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

191.    As a result of the foregoing, the market for Organogenesis securities promptly digested current information regarding Organogenesis from all publicly available sources and reflected such information in Organogenesis stock price.  Under these circumstances, all purchasers of Organogenesis securities during the Class Period suffered similar injury through

their purchase of Organogenesis securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

192.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Organogenesis who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

193.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

194.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) enable the Individual

110

Defendants and other Organogenesis insiders to register for sale and/or sell more than $68 million of the Company's and/or their personally-held Organogenesis common stock to the unsuspecting public; and (iii) cause plaintiff and other members of the Class to purchase Organogenesis securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them), took the actions set forth herein.

195.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Organogenesis securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

196.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Organogenesis as specified herein.

197.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Organogenesis' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Organogenesis and its business

111

operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Organogenesis securities during the Class Period.

198.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

199.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.    Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Organogenesis' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.    As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings

112

throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

200.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Organogenesis securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Organogenesis' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Organogenesis securities during the Class Period at artificially high prices and were damaged thereby.

201.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Organogenesis was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Organogenesis securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

202.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

203.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against The Individual Defendants

204.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

205.    The Individual Defendants acted as controlling persons of Organogenesis within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

206.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

114

207.    As set forth above, Organogenesis and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

208.    As a direct and proximate result of the Individual Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

115

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 22, 2004

**MOULTON & GANS, P.C.**


By: /s/ Nancy Freeman Gans
Nancy Freeman Gans, BBO #184540
33 Broad Street, Suite 1100
Boston, MA  02109-4216
Telephone:  (617) 369-7979
Facsimile:  (617) 369-7980

**Liaison Counsel and Local Counsel for
Plaintiffs and the Class**

**MILBERG WEISS BERSHAD
  & SCHULMAN LLP**
Steven G. Schulman
Elaine S. Kusel
Peter Sloane
One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300

**Lead Counsel for Plaintiffs and the Class**

**LAW OFFICES OF MICHAEL A.
  SWICK PLLC**
Michael A. Swick
One William Street, Suite 900
New York, NY 10004
(212) 584-0770

**Attorney for Plaintiffs and the Class**

116