# Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE ORGANOGENESIS SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) |

**MASTER FILE NO. 04-10027 JLT**

**CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Plaintiffs, through their attorneys, bring this action on behalf of themselves and all others similarly situated, on personal knowledge as to themselves and their activities, and on all other matters based upon the investigation of counsel, including, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Organogenesis, Inc. ("Organogenesis" or the "Company"), securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, newspaper articles and media reports about the Company, and interviews with former employees of the Company and other companies who are knowledgeable about the businesses of those companies. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE COMPLAINT

1.     This is a federal class action on behalf of purchasers of the securities of Organogenesis between November 15, 1999 and February 7, 2002, inclusive (the "Class

*provide at least $10 million of its purported commitment to Organogenesis*.  It also was not true that other sources of funding remained available ~~to~~ so that the Company could preserve corporate viability.

Throughout the Class Period, defendants failed to disclose that high management turn-over at the Company and in-fighting among its senior officers and directors was having, and would continue to have a disruptive effect on the operations and oversight of Organogenesis, such that it was also not foreseeable at any time during the Class Period that Organogenesis would be able to achieve profitability in the near-term or to attain the guidance sponsored and/or endorsed by defendants.

As a result of the aforementioned adverse conditions that defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Organogenesis was operating according to plan, that sufficient sources of funding were achieved and/or available to Organogenesis or that the Company could maintain profitability or even remain a viable entity in the foreseeable near-term.

9.    Defendants were motivated to and did embark on this scheme to "manipulate the market for the Company's stock," to conceal the true operational and financial condition of Organogenesis, and to materially misrepresent and fail to disclose the conditions that were adversely affecting Organogenesis throughout the Class Period, because *it enabled the Company and Company insiders, including certain defendants, to register for sale and/or sell over 6.26 million shares of Company stock and/or securities valued at over $68.868 million, prior to any proper disclosure to the market*.

10.    Defendants' scheme also, ultimately, allowed defendants Erani and Ades and their family members to improperly acquire the remaining assets of Organogenesis through a leveraged buyout during bankruptcy — after defendants' actions drove the Company into bankruptcy and after they sufficiently interfered with these proceedings so as to guarantee that Erani and Ades and their family members acquired total domination and control over what was left of Organogenesis.

11.    Thus, through their illegal and improper actions which ultimately forced the Company into bankruptcy, defendants not only were able to wipe out the equity interest of all of

holding as many as 2.88 million shares, or more than 6% of the Company's shares issued and outstanding during that time.

24.    Defendant **PRICEWATERHOUSECOOPERS LLP** was, throughout the Class Period, the purported independent auditor of the Company.

25.    Defendant **PHILIP LAUGHLIN** ("Laughlin") was during the relevant period, President and a Director and member of the Company's Executive Committee of Organogenesis. Defendant Laughlin assumed these positions immediately prior to the inception of the Class Period, on or about, October 5, 1999 and later, on or about January 1, ~~2001;~~2000, also assumed the role of Chief Executive Officer. Defendant Laughlin retained these positions of power and control over the Company until his sudden and unexpected departure, which was announced on or about May 16, 2001. During the Class Period, defendant Laughlin, *inter alia,* signed the Company's ~~SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the~~ materially false and misleading ~~Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*)~~SEC filings, as set forth herein.

26.    Defendant **MICHAEL SABOLINSKI** ("Sabolinski") was during the Class Period, President, Chief Executive Officer and a member of the Board of the Company, having assumed those positions on or about May 16, 2001, upon the resignation of defendant Laughlin. Prior to assuming the aforementioned positions and also during the Class Period, defendant Sabolinski also served as the Company's Senior Vice President, Medical and Regulatory Affairs. Defendant Sabolinski abandoned his position at the Company on or about April 5, 2002, less than one year after assuming the leadership of Organogenesis. During the Class Period, defendant Sabolinski, *inter alia,* signed the Company's ~~SEC filings, including, but not limited to,~~

11

~~Organogenesis' Form(s) 10-K and/or the~~ materially false and misleading ~~Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*)~~SEC filings, as set forth herein.

27.     Defendant **ALBERT ERANI** ("Erani") was during the relevant period, a member of the Board of the Company and on or about January 1, 2000 assumed the role of Chairman of the Board of Organogenesis.  Defendant Erani served as Chairman of the Board of the Company until his sudden and unexpected departure on or about January 4, 2002.    During the Class Period, defendant Erani, *inter alia*, signed the Company's ~~SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the~~ materially false and misleading ~~Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*)~~SEC filings, as set forth herein.

28.     Defendant **ALAN ADES** ("Ades") was nominated and appointed Chairman, President and Chie Executive Officer of the Company following the end of the Class Period on or about October 2002. Defendant Ades is the cousin of defendant Erani, and was also a member of the group of investors who took the Company private through a leveraged acquisition in bankruptcy. Defendant Ades was an active participant in the fraud alleged herein. It has been reported that defendant Ades, with the aid and complicity of other defendants named herein, acted to assure that other interested parties were not able to successfully participate in the ultimate sale of the Company and that defendant Ades, with the aid and complicity of other insiders, was then able to acquire the Company for a lower price, further depriving investors of a return on their investment in Organogenesis.

29.     Defendant **DONNA ABELLI LOPOLITO** ("Lopolito") was during the relevant period, Chief Financial Officer and Vice President, Finance and Administration of Organogenesis. During the Class Period, defendant Lopolito, *inter alia,* signed the Company's ~~SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the~~ materially false and misleading ~~Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein~~ *infra*)SEC filings, as set forth herein.

30.     Defendant **JOHN J. ARCARI**  ("Arcari") was during the relevant period, Chief Financial Officer and Vice President - Finance and Administration of Organogenesis, having replaced defendant Lopolito on or about April 30, 2000.   Defendant Arcari served in the aforementioned positions until his sudden and unexpected departure on or about May 14, 2002. During the Class Period, defendant Arcari, *inter alia,* signed the Company's ~~SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the~~ materially false and misleading ~~Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein~~ *infra*)SEC filings, as set forth herein.

31.     Defendant **HERBERT M. STEIN** ("Stein") was at the inception of the Class Period, Chairman of the Board and Chief Executive Officer, until his resignation on or about January 1, 2000.   Upon his retirement from the aforementioned positions, defendant Stein remained at the Company as a member of the Board and Chairman Emeritus until March 2000. During the Class Period defendant Stein made materially false and misleading statements about the Company and/or ~~filed~~failed to disclose material information necessary to make such statements not false.   During the Class Period, defendant Stein also signed the Company's SEC

filings, including, but not limited to, Organogenesis' Form(s) 10-K~~Q~~ for the third quarter of 1999 and/~~or~~ the materially false and misleading Registration Statements ~~and joint Proxy/Prospectus~~(including the Company's Registration Statements filed on December 27, 1999, the amended Registration Statement filed on February 3, 2000, and the second amended Registration Statement, filed on February 14, 2000) issued in connection with the sale and offering of stock by the Company ~~and certain "Selling Shareholders" (as defined herein *infra*)~~.

32.    Defendant **ALAN W. TUCK** ("Tuck") was during the Class Period, Chief Strategic Officer of the Company. During the Class Period, defendant Tuck also made materially false and misleading statements ~~and/or signed the Company's SEC filings, including, but not limited to, Organogenesis' Form(s) 10-K and/or the materially false and misleading Registration Statements and joint Proxy/Prospectus issued in connection with the sale and offering of stock by the Company and certain "Selling Shareholders" (as defined herein *infra*)~~.during the Class Period, as set forth herein.

33.    The defendants referenced above in paragraphs 26~~25~~-32 are referred to herein as the "Individual Defendants."

34.    Because of the Individual Defendants' positions with the Company, or relations with Company insiders, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other

39.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Organogenesis common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.    The scheme:    (i) deceived the investing public concerning defendants' attempt to manipulate the market for the Company's stock; (ii) deceived the investing public regarding Organogenesis' business, operations, management and the intrinsic value of Organogenesis common stock; and (iii) enabled the defendants and Company insiders to sell and/or register for sale over $68.868 million worth of Company stock to investors during the Class Period — of this amount defendants sold over 5.785 million shares of the Company's securities in a series of public stock offerings, private equity offerings and other debt and/or equity sales of Organogenesis stock; and (iv) caused plaintiffs and other members of the Class to purchase Organogenesis securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Organogenesis between November 15, 1999 and February 7, 2002 inclusive (the "Class") and who were damaged thereby.    Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

41.    The members of the Class are so numerous that joinder of all members is impracticable.    Throughout the Class Period, Organogenesis common shares were actively traded on the American Stock Exchange.    As of November 2, 2001, the Company had over 37.0 million

17

shares issued and outstanding. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Organogenesis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and hashave retained counsel competent and experienced in class and securities litigation.

44.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Organogenesis; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

45.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore,

18

Defendants consistently represented both prior to and during the Class Period that the Company was sufficiently well-funded to carry out defendants' business plan.

59.    Unbeknownst to investors, however, the reality was far different from defendants' representations. According to the Confidential Arcari Document — created by defendant Arcari, then the Company's Chief Financial Officer — defendant Erani, then the Company's Chairman of the Board, sought during the Class period to have stock brokers "*manipulate the market for the Company's stock*." According to the Confidential Arcari Document, Erani also "encouraged the Company to prepare *overly optimistic financial projections* to existing and potential service providers." Neither defendant Arcari, the other defendants, nor the Company ever disclosed this scheme to manipulate the Company's stock to the public or this attempt to have the Company overstate its financial projections.

60.    In furtherance of this scheme, defendants withheld from investors the true facts about the Company's dismal and ever-deteriorating financial condition and business prospects. In the words of one former employee of Organogenesis during the Class Period, "*it was always a series of smoke and mirrors*." Throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors which were negatively impacting its business and which would cause it to report declining financial results, materially less than the market expectations defendants had caused and cultivated. In particular:

> At all times during the Class Period, *it was not true that defendants could achieve profitability through the sale of Apligraf under the terms, or even the revised terms, of the Novartis marketing agreement*, which did not provide Organogenesis with enough of the revenues or profits provided through such Apligraf sales to offset the extremely high cost of production or to offset other undisclosed manufacturing problems such as defective products and recalls. Indeed, as defendants were well aware but did not publicly disclose, throughout the Class Period the Company was actually *losing money on every unit of Apligraf sold due to the adverse terms of the marketing agreement with Novartis*.

24

Throughout the Class Period, undisclosed problems related to the manufacture and marketing of Apligraf were leading to even higher costs and further reducing profitability. Manufacturing problems and delays were retarding production scale, and marketing issues were reducing sales and damaging future sales development prospects. As plaintiffs would only learn following the Class Period, Novartis' inexperienced and inadequately trained sales force was encountering resistance throughout that time concerning the cost and complexity of its products and the actual and/or perceived difficulties in physician reimbursement for Apligraf.

Throughout the Class Period, Organogenesis was underfunded and there was no reasonable basis to report that the Company could foreseeably fund operations based on product sales, available sources of loans, debt and/or equity sales. Indeed, defendants knew but did not disclose that, as reported by defendant Arcari in the Confidential Arcari Document, *the Company's own auditors — defendant PricewaterhouseCoopers — had in 2001 "refused to grant any consents or additional comfort letters*" for future financing initiatives and that the Company had lost credibility in the eyes of PricewaterhouseCoopers. Moreover, as defendants were well aware but failed to disclose to investors, it was not true that the Company could access the full complement of funding from Novartis as defendants consistently represented, given that certain undisclosed conditions precedent existed. Organogenesis could not meet conditions precedent to Novartis' requirement to provide at least $10 million of its purported commitment to Organogenesis. It also was not true that other sources of funding remained available so that the Company could preserve corporate viability.

Throughout the Class Period, defendants failed to disclose that high management turn-over and in-fighting among the senior officers and directors of the Company was having, and would continue to have a disruptive effect on the operations and oversight of Organogenesis, such that it was also not foreseeable at any time during the Class Period that Organogenesis would be able to achieve profitability in the near-term or to attain the guidance sponsored and/or endorsed by defendants.

As a result of the aforementioned adverse conditions that defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Organogenesis was operating according to plan, that sufficient sources of funding were achieved and/or available to Organogenesis or that the Company could maintain profitability or even remain a viable entity in the foreseeable near-term.

61.    Contrary to defendants' public statements that they expected to commercial sales to increase and that they had laid the foundations for future sales development, several former employees of Organogenesis and Novartis with knowledge of the relevant facts were privy to the aforementioned problems with the marketing of Apligraf, which damaged the reputation of Apligraf and Organogenesis among purchasers and severely limited the Company's sales

marketing team had "*no experience with a living product that had a five day shelf life*," such as Apligraf.

62.    Contrary to defendants' representations to investors that the Company expected to increase production volume and that it could achieve the mass production of Apligraf that was purportedly necessary to increase the Company's margins on sales, several former Organogenesis employees with knowledge of the relevant facts were privy to undisclosed manufacturing- and distribution-related problems with Apligraf that led to limited and delayed production, poor quality control — including at times shipping batches of Apligraf to physicians without first reviewing vital laboratory results — and, in some cases, contamination and recall of the product. As a result of these undisclosed manufacturing and distribution problems, the Company was not able to feasibly mass-produce Apligraf and the purchasers of the Company's product were steadily becoming less and less willing to order, or re-order Apligraf, thus damaging future sales prospects and adversely impacting the Company's purported attempt to achieve profitability.  For example:

(a)    According to a former Senior Manager of Quality Systems Compliance for Organogenesis during the Class Period with knowledge of the relevant facts, *there was "no way" that the Company could commercially mass-produce Apligraf* given the Company's inadequate production infrastructure and processes.  According to this Senior Manager of Quality Systems Compliance at Organogenesis, at the direction of defendant Sabolinski, the Company often *shipped units of Apligraf for distribution to purchasers before obtaining the results of vital laboratory testing on those units*.  In fact, according to this former employee, in some cases, Sabolinski himself signed the paperwork authorizing the release of units of Apligraf before

27

63.    Several former employees during the Class Period at various levels of the Company witnessed how high management turnover and infighting among the Company's senior officers disrupted the operations and oversight of the Company.  For example, according to the ~~Senior Director~~former director (non-Board level) on the senior management team of Organogenesis mentioned above, the Company suffered from, *inter alia*, "too many presidents, and too many going in different directions — a lack of leadership."

64.    According to a former Project Engineer with Organogenesis with knowledge of the relevant facts, Novartis' sales forecasts were *"always inflated"* — a fact of which upper management at Organogenesis was well aware, but which defendants did not publicly disclose.

65.    Contrary to defendants' representations, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased.  According to a former Project Engineer for Organogenesis during the Class Period with knowledge of the relevant facts, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis.  Indeed, according to a former Maintenance Supervisor for Organogenesis during the Class Period with knowledge of the relevant facts, this fact was known by "the whole company."  Given the terms, and the revised terms, of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.

29

66.    Further, according to several former employees of Organogenesis during the Class Period with knowledge of the relevant facts — a Senior Director (non-Board level), a Project Engineer and a former Materials Handler — Organogenesis would not be reimbursed by Novartis for any units of Apligraf that were manufactured by Organogenesis pursuant to Novartis' sales forecasts, but that ultimately were not sold by Novartis. Thus, as alleged above, the Company took a "huge loss" every time that Novartis was unable to sell units of the product that Organogenesis had manufactured. The damage to the Company's bottom line caused by this failure to receive compensation for Apligraf units manufactured but not sold was compounded by the fact that, as alleged above, Novartis' sales forecasts were "*always inflated*." Defendants were motivated to and did conceal the true operational and financial condition of Organogenesis, and materially misrepresented and failed to disclose the adverse conditions that were adversely affecting Organogenesis throughout the Class Period, because it enabled the Company, defendants and Company insiders to register for sale and/or sell over 6.26 million shares of Company stock and/or securities valued at over $68.868 million, prior to any disclosure to the market.

67.    Indeed, according to the former director (non-Board level) on the senior management team of Organogenesis during the Class Period, several members of the senior management of the Company were more concerned with recouping their own personal investments in the Company than in pursuing the interests of shareholders. According to this former director, *a culture of "corporate greed" prevailed among the senior management of the Company*, who were primarily interested in "taking care of themselves at the top." This former Directordirector personally attended a meeting of the members of the Company's board of directors that occurred after Defendant Stein had left the Company, at which defendants Erani as

30

30, 1999, pursuant to its Form 10-Q signed by defendants Stein and Lopolito. The Company's Form 10-Q for the third quarter of 1999 stated that "*[w]e expect Apligraf commercial sales to increase.*" [Emphasis added.] The Form10-Q also stated that:

> Production costs exceeded product sales due to the start-up costs of new product introduction and the high costs associated with low volume production. *We expect production volume to increase and our margins to improve.* We expect to continue to *expand manufacturing operations* and advance the product pipeline during the remainder of 1999 and into 2000. [Emphasis added.]

71.    Following the publication of the Company's earnings announcement, the price of Organogenesis rallied — trading from a low of $6.81 per share on November 15, 1999, to above $12.30 per share on December 2, 1999.

72.    **$50 Million Shelf-Registration.** Taking full advantage of the artificial inflation in the price of Organogenesis stock caused by the publication of defendants' false and materially misleading statements, on or about December 27, 1999, defendants raced to the market to register for sale at least $50 million in mixed securities in a "shelf registration." The shelf registration would allow the Company to sell up to 3 million shares of common stock either directly or through convertible securities at the sole discretion of the Company. In connection with this shelf registration, the Company filed with the SEC a Registration Statement on December 27, 1999, and two amended Registration Statements, filed on February 3, 2000 and February 14, 2000, respectively, all of which incorporated by reference the Company's Form 10-Q for the third quarter of 1999.

73.    On January 13, 2000, defendant Laughlin presented at the Hambrecht & Quist Annual Healthcare Conference held in San Francisco, California, where he reiterated former guidance and where he further conditioned investors to believe that the Company was operating

Regarding the $6.2 million payment for the conversion of the Series C convertible preferred shares, the Form 10-Q reported the existence of this payment, but it did ***not*** identify the recipients.

76.    The statements contained in Organogenesis' November 15, 1999 release, its SEC filings and those statements made by defendants to analysts, investors and the press during the period November 15, 1999 through February 14, 2000 referenced above, were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

(b)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that were was below the product's manufacturing cost to Organogenesis. Given the terms, and the revised terms, of the Novartis marketing agreement — which caused Organogenesis to

(f)     Contrary to defendants' representations that they were "not concerned that we won't ultimately be successful," defendants knew that the Company's ultimate prospects for achieving profitability were severely compromised by the fundamental problems alleged in paragraphs 59-67, *supra*, including the Company's serious manufacturing and marketing problems, its inability to access as necessary adequate funding to keep the Company viable, the difficulties in achieving reimbursement for Apligraf, and the disruptive effect on operations that high turnover and infighting among the Company's senior management was having and would continue to have for the foreseeable future.

(g)     Contrary to defendants' representations, the Company's amended Form 10-Q for the third quarter of 1999 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (f) above and in paragraphs 59-67, *supra*.

77.   **$9.4 Million Equity Sale**.   One month later, on February 24, 2000, with Organogenesis stock trading at almost $~~17.00~~15.50 per share, defendants issued a release announcing that Organogenesis had completed the sale of over 688,000 shares of common stock for gross proceeds of $9.4 million.    According to defendants, this was a remarkable accomplishment given that it allowed them to raise *more money than defendants had originally planned* — and presumably placed Organogenesis in a position of having *more money than needed to fulfill defendants' near-term objectives*.   According to the Company's release, defendants' purported "goal" had been to raise $6.2 million but the offering priced at $14 per share was over-subscribed due to the "strong interest in our Company." This placement raised the total number of Organogenesis shares outstanding to 31.3 million from 30.6 million.

36

78.    At the time of this offering, the Company stated that proceeds from the sale of these shares would enable, among other things, the retirement of $6.2 million in preferred stock. Defendants created the impression that the redemption of Organogenesis' preferred stock was necessary to bolster the Company's debt and equity ratings. The Company's February 24, 2000 release quoted defendant Tuck, who exhibited a complete knowledge of Organogenesis' financial and operational performance, stating that, *"The completion of this initial shelf-offering removes any concern among the investment community about the retirement of our $6.2 million of preferred stock."* No disclosure was made as to the identity of the owners of these retired preferred shares.

79.    Moreover, the following day, February 25, 2000, the Company also issued a release announcing that defendants had raised an additional $1.4 million through the sale of an additional 100,000 shares to satisfy an additional over-subscription commitment. This sale brought the total February 2000 Offering proceeds to over $10.8 million, and the total number of shares issued and outstanding to 31.4 million.

80.    **$16 Million In Equity Sales.** Taking further advantage of the artificial inflation in the price of Organogenesis stock defendants' misrepresentations and omissions had caused, on March 9, 2000, *defendants sold another 300,000 shares of Organogenesis common stock at approximately $17.60 per share* in a private-placement, thereby realizing another $5.27 million. Including this latest offering, the Company had issued a total of 1.088 million shares in less than 20 days in combined placements valued at over $16 million.

81.    On March 7, 2000, shares of the Company rallied to a Class Period high of over $22.37 per share on substantial volume of over 1.5 million shares, driven by ~~managements'~~management's optimistic guidance, and the false and misleading assurances that

37

result that Novartis' efforts to market Apligraf suffered significantly. In fact, as alleged above, according to former employees of Novartis and Organogenesis, Novartis *"had no idea what they were doing"* when it came to marketing a living-tissue product like Apligraf.

(c)     Contrary to defendants' suggestion, the Company's planned focus on "driving down per unit manufacturing costs" and implementing "more efficient methods of production" would not achieve profitability for the Company. As defendants[2] were well aware at the time but failed to disclose, and as confirmed by former employees of Organogenesis, Organogenesis was losing money on every unit of Apligraf that it produced because of the terms of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis and reimbursed Organogenesis for production costs in connection with unsold units at only a fraction of the actual costs of production.

(d)     Defendants' representation that they expected Apligraf "commercial sales to increase" was untrue given the marketing problems that Novartis was experiencing because of inadequate marketing support and the significant problems with the manufacturing and distribution of Apligraf that were causing frustration among purchasers, leading to reluctance among physicians to order or re-order Apligraf and damaging Apligraf's future sales development prospects.

(e)     Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the

41

regarding beneficial ownership of the common stock by the selling stockholder as of March 29, 2000:

| Name | Number of Shares Beneficially Owned Prior to the Offering | Number of Shares Being Offered | Number of Shares Beneficially Owned After Offering | Percentage of Class to be Beneficially Owned After Offering |
|------|------|------|------|------|
| Herbert M. Stein | 2,086,597 | 723,423 | 1,363,174 | 4.0% |

This registration represented almost half of defendant Stein's personal holdings (excluding approximately 1.1 million shares of common stock held by H.M. Stein Associates to which defendant Stein disclaimed beneficial ownership).

89.   **1Q:00 Results.**   On May 11, 2000, Organogenesis issued a release published on *Business Wire* which purported to announce financial results for the first quarter of 2000. Defendants again stated that the Company's quarterly results were "consistent with the Company's ongoing transition from being a research company to being a research-based operating company," in addition to stating the following:

> Revenue from product sales to related party and others were $646,000 for the first quarter of 2000 compared with $543,000 for the fourth quarter of 1999. The growth in product revenue was due to increased sales of Apligraf(R) to Novartis. Total revenues were $1,084,000 for the first quarter of 2000 compared with $1,015,000 for the fourth quarter of 1999. Total costs and expenses were $7,770,000 for the first quarter of 2000 compared with $9,368,000 for the fourth quarter of 1999, which had included disproportionately higher occupancy and financing costs. Net loss was $0.21 per share (or $6,686,000) for the first quarter of 2000 compared with $0.27 per share (or $8,353,000) for the fourth quarter of 1999.

> The first quarter of 2000 product revenues of $646,000 compare with $318,000 for the first quarter of 1999. The total revenues of $1,084,000 compare with $679,000 for the same quarter in 1999 and the total costs and

44

of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis. Given the terms, and the revised terms, of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be*.

(d)    Contrary to defendants' representations that they expected to "continue to expand production operations," the Company was experiencing serious problems in manufacturing Apligraf and, according to a former employee of Organogenesis, there was "no way" the Company could feasibly mass-produce Apligraf given the Company's inadequate production infrastructure and processes.

(e)    Contrary to defendants' representations, the Company's first quarter 2000 Form 10-Q did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (d) above and in paragraphs 59-67, *supra*.

92.    On or about June 14, 2000, as President and Chief Executive Officer of Organogenesis, defendant Laughlin showcased a very positive presentation of the Company at the Annual Sachs Healthcare Conference in Laguna Niguel, CA.

93.    On June 20, 2000, Organogenesis issued a release which announced that the FDA had given final approval of Apligraf treatment for diabetic foot ulcers in addition to its previous indication of venous leg ulcers. While no changes had been made to Apligraf for this market application, the FDA indication purportedly allowed Organogenesis to expand its market base to include this second group of foot ulcer sufferers. On this news, Organogenesis stock traded as high as $12.75 per share in intra-day trading.

quarter of 2001 was materially misleading and incomplete given that, as confirmed by several former employees of Organogenesis, the Company was experiencing serious manufacturing and marketing problems that were inhibiting sales and damaging future sales development prospects. Further, as defendants knew, Novartis' marketing team did not have the proper training, experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly.

(e)   Contrary to defendants' representations, the Company's Form 10-Q for the third quarter of 2000 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (d) above and in paragraphs 59-67, *supra*.

105.   **500,000 Share Repurchase.**  On December 6, 2000, defendants issued a release which announced that the Board of the Company had authorized the repurchase of up to 500,000 shares of Organogenesis common stock — "at the discretion of management."  According to defendant Laughlin, the decision to purchase the Company's stock was made by the Board because, "[o]ur Board is sensitive to shareholder dilution and *views current market conditions as an opportunity to purchase shares that the Company considers to be undervalued in view of our prospects*." [Emphasis added.]  In addition, defendant Laughlin also stated that, "the decision to authorize a stock buyback program demonstrates the confidence our Board has in the Company's future."  At the time of this announcement, shares of the Company were trading at approximately $8.00 7.50 per share.

106.   **Apligraf Sales January 2001.**  On February 5, 2001, Organogenesis announced that Apligraf sales had reached another record in January 2001, with 1771 units sold during that

GRIFFETH:      Third quarter of next year. OK. And as a result of this, I am curious, I mean are you finding or at least receiving approval for new applications for Apligraf? I am wondering why Novartis is doing this now. I know I should ask them but maybe you can provide some guidance on that.

LAUGHLIN:      I think **they are truly convinced that there is major business here. ....Everything is coming together. I think they are saying, yes, this is working. This is going to be a very big business. Let's get into it deeper. Let's commit to the business.**

*   *   *

**GRIFFETH:**      Now and you factor, when you provide this guidance for break even, is that a part of that guidance of the anticipated approval of those products and when they might be available for market?

LAUGHLIN:      **As we look into the things that go into our break even we are targeting to reach break even with or without those approvals.** One thing that we will hit before break even is we hope to be approved for launch into the European market in approximately the second quarter of next year. [Emphasis added.]

At the time of this interview shares of Organogenesis traded at above $12.00.

108.   The statements made by defendant Laughlin during the February 27, 2001 CNBC interview and those statements made by defendants and contained in the Company's February 5, 2001 release, reproduced herein, *supra*, were each materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such for the following reasons:

(a)      Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

(b)      Contrary to defendants' representations that the Company's stock was "undervalued in view of our prospects," defendants knew but failed to disclose that defendant Erani had sought to have stock brokers "*manipulate the market for the Company's stock*." Further, defendants knew but failed to disclose that the Company's ultimate prospects for achieving profitability were severely compromised by the problems alleged in paragraphs 61-

59

70,59-67 above, including the Company's serious manufacturing and marketing problems, its inability to access as necessary adequate funding to keep the Company viable, the difficulties in achieving reimbursement for Apligraf, and the disruptive effect on operations that high turnover and infighting among the Company's senior management was having, and would continue to have for the foreseeable future.

(c)    Defendant Laughlin's representation that Novartis' agreement to grant Organogenesis a $20 million put option was evidence of Novartis' conviction that "everything is coming together" and that "yes, this is working" and "is going to be a very big business" was materially misleading and incomplete for the same reasons as alleged in subparagraph (b) above.

(d)    Contrary to defendant Laughlin's representation that under the $20 million put option with Novartis the Company was "able *at our discretion and our option* to sell Novartis $20 million of shares" and that the put option was a "wonderful safety net to have in our pocket" was untrue. As later revealed by defendants, the Company did not have the ability to raise the full amount of that funding option at the discretion of the Company. As defendants knew but failed to disclose at the time, significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002. Thus, the "safety net" that defendants represented they had secured for the Company was only an illusion.

(e)    Defendant Laughlin's statements that the revised Novartis marketing agreement was a "turning point" for the Company and a  "major improvement in our economic situation" and that the Company would receive "a substantial increase in the percentage of the revenue" were untrue and materially misleading. As confirmed by former employees of the Company, even under the revised terms of the marketing agreement, Organogenesis' share of

revenue from Apligraf sales remained well below Organogenesis' manufacturing costs and could not lead to profitability. Further, even under the revised terms of the marketing agreement, Organogenesis was still required to manufacture Apligraf in conformity with Novartis sales forecasts, which, according to a former employee of Organogenesis, were "always inflated."

(f)    Contrary to defendant Laughlin's representation that "the increased revenue" and "the funding support that we will get" put the Company in the position to "pass through break even and reach profitability" by the third quarter of 2002, defendants knew that there was no way the Company could ever achieve profitability — much less achieve it by the third quarter of 2002 — based on the increased revenue from the revised Novartis marketing agreement and the $20 million put option with Novartis. Defendants were aware under the revised agreement Organogenesis would continue to lose money on every unit of Apligraf produced. Further, as defendants knew but did not disclose at the time, the Company did not have the ability to raise the full amount of the $20 million put option.

(g)    Contrary to defendant Laughlin's representation that the Company expected to "break even with or without" approvals of additional products, defendants knew that given the Company's loss of money on every unit of Apligraf under the revised Novartis marketing agreement and the restrictions on the exercise of the $20 million put option there was no way that the Company could break even based on sales of Apligraf alone.

109. **Needham Report.**    Following defendant Laughlin's well received CNBC appearance, analysts at Needham & Co. issued a report on Organogenesis, initiating a "BUYBuy" rating and a near term price target of $16-$18 per share on Organogenesis stock, and stating in part the following:

INVESTMENT OPINION

61