We are initiating coverage of Organogenesis Inc. with a *~~BUY~~Buy rating and a 12-month target price range of $16-$18.* Management of skin disorders requiring tissue replacement represents a major unmet need. A leader in its segment of the $400~~B~~ billion healthcare arena of regenerative medicine, ORG has developed Apligraf, currently approved for two of the most common chronic wounds —(venous stasis ulcers and diabetic foot ulcers.... *~~Apligraf sales continue to break volume records~~,* ~~assisted by the recent approval for diabetic foot ulcers as well as expanded coverage by Medicare in August 2000...~~ *~~ORG's off-the-balance sheet strength such as the recently expanded relationship with Novartis, the enhanced management team under CEO Philip Laughlin~~* ~~(formerly President of Cardiac Surgery Business at Medtronic),~~ *~~and the proven scientific team will help promote the product portfolio~~*).

* * *

~~A Compelling Valuation.~~ *We believe ORG is currently undervalued compared to* ~~its peers~~ ~~in the regenerative medicine biology space.~~ Applying two methods of valuation (market capitalization to revenue ratio of 11x as well as P/E ratio of 35x) to our 2004 estimates and discounting back at 10% annually, *we arrive at a 12-month target range of $16-$18.* [Emphasis added.]

110. **Apligraf Sales 2/01.** On March 5, 2001, Organogenesis announced that sales of Apligraf had reached another monthly record, with 1729 units sold in February 2001. In addition, this release again quoted defendant Arcari who stated that, *"Apligraf sales are showing sustained growth acceleration.* Average daily sales in February surpassed those in January, and both are ahead of the level seen in our record fourth quarter. *We are particularly pleased with this acceleration, because under the recently amended agreement with Novartis, Organogenesis now receives significantly higher payments for Apligraf."* [Emphasis added.]

111. **Erani's Refusal To Provide Standard Audit Confirmations to PricewaterhouseCoopers.** Unbeknownst to the public, as stated by defendant Arcari — then the Company's CFO — in the Confidential Arcari Document obtained by plaintiffs' counsel, in March 2001 defendant Erani, then Chairman of the Board of Organogenesis, "[r]efused to sign standard audit confirmations sent to him by PricewaterhouseCoopers, the Company's auditors,

114.    Despite the erosion of PricewaterhouseCoopers' confidence in the representations of the senior officers and directors of Organogenesis and the "loss of the Company's credibility" with the Company's "independent accountants," as alleged above, PricewaterhouseCoopers on March 31, 2001 issued to the Company's shareholders a "Report of Independent Accountants" certifying Organogenesis' financial statements. PricewaterhouseCoopers' report , which was included in Organogenesis' 2000 Form 10-K, stated:

> In our opinion, the accompanying consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Organogenesis, Inc. and its subsidiaries at December 31, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2000 in conformity with accounting principles generally accepted in the United States of America. . . .  We conducted our audits of these statements in accordance  with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

115.    During April 2001, Organogenesis also hosted presentations at additional analyst conferences, including, but not limited to, the Tucker Anthony Sutro Capital Markets 2001 Health Care Conference, held at the Ritz Carlton in Laguna Niguel, CA, and the Fifth Annual American Stock Exchange Emerging Growth Conference, held at the Grand Hyatt Hotel in New York City. On or about April 17, 2001 analysts at Needham & Co. reiterated their prior "BUY" rating and continued to encourage investors to expect a near-term price target of $16-$18 per share.

116.    The statements made by defendants and contained in the Company's March 5, 2001 and March 30, 2001 releases and those statements contained in Organogenesis 2000 Form 10-K, reproduced herein, *supra*, including the MD&A section of that Form 10-K were each

agreement, Organogenesis was required to produce Apligraf in sufficient quantities to meet Novartis' "always inflated" sales forecasts. According to former employees of Organogenesis, for every unit of Apligraf manufactured pursuant to Novartis' sales forecasts but not sold, Organogenesis was required to bear an even greater share of the manufacturing costs than for units that were sold.

(j)    Contrary to defendants' representation that Novartis had "marketing and sales forces with technical expertise and distribution capability," Novartis' marketing team did not have the proper training, experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly. In fact, as alleged above, according to former employees of Novartis and Organogenesis, Novartis *"had no idea what they were doing"* when it came to marketing a living-tissue product like Apligraf.

(k)    Contrary to defendants' representation that they "expect[ed] production volume to increase due to recent Medicare progress with coverage for Apligraf," defendants were encountering significant physician resistance to the product due to difficulties in obtaining Medicare and Medicaid reimbursement for Apligraf.

(l)    Defendants' representation heralding Novartis' "expanded Novartis sales and marketing support" was materially materially misleading and incomplete given that defendants failed to disclose that Novartis' marketing team did not have the proper training, experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly. In fact, as alleged above, according to former employees of Novartis and Organogenesis, Novartis *"had no idea what they were doing"* when it came to marketing a living-tissue product like Apligraf.

68

*sales of Apligraf and the higher payments Organogenesis now receives from Novartis for each unit of Apligraf.*

Total operating costs and expenses were $8.6 million during the first quarter of 2001 compared with $7.3 million for the same quarter in 2000. The first quarter of 2001 cost of product sales increased by $0.7 million due to increased sales of Apligraf. During the same period, research and development costs increased by $0.6 million due to increased clinical, process development and product development expenses. General and administrative expenses decreased slightly. Net loss was $6.5 million ($0.19 per share) for the first quarter of 2001 compared with a net loss of $6.4 million ($0.21 per share) for the same quarter in 2000. When the one-time cumulative effect in change in accounting principle charge due to the adoption of SEC Staff Accounting Bulletin No. 101 - "Revenue Recognition in Financial Statements" is included, the first quarter of 2000 net loss becomes $12.8 million ($0.41 per share).

This release also quoted defendant Arcari, as follows:

Our product margin improved significantly over last year. *Not only did product revenue increase, but per unit costs decreased as a result of process improvements. We tightly controlled our corporate expenses while increasing our investment in process development to further reduce manufacturing costs.* Under our amended agreement with Novartis, we received nearly $1.0 million in the first quarter of 2001 for manufacturing facility improvements. [Emphasis added.]

118.  **1Q:01 Form 10-Q.**  On or about April 27, 2001, defendants also filed with the

SEC the Company's financial results for the first quarter of 2001, the period ended March 31,

~~2000,~~2001, pursuant to a Form 10-Q signed by defendants Laughlin and Arcari. The Company's

Form 10-Q for the first quarter of 2001 contained the same materially false and misleading

financial information as had been announced previously, in addition to reporting, in part, the

following:

Basis of Presentation

- - - - - - - - - - - - - - - - - - - -

The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring*

70

production and thus the product was actually causing the Company to lose money; and (ii) significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(c) Contrary to defendants'_representation that the $20 million put option with Novartis was available "at [Organogenesis'] discretion," the Company did not have the ability to raise the full amount of that funding option at the discretion of the Company. As defendants knew but failed to disclose at the time, significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(d) Defendants' representations touting  the "important increase in revenue," the "significantly higher revenue per unit" and the "significant[] increases" in "payments the Company receive[d] for Apligraf units" waswere materially misleading and incomplete because defendants failed to disclose that even under the amended agreement Organogenesis would still receive revenue payments that were well below the product's manufacturing cost and that Organogenesis would continue losing money on every unit of Apligraf.

(e) Defendants' representations touting a "product revenue increase," the decrease of per unit costs and its investment "to further reduce manufacturing costs" were materially misleading and incomplete given that defendants knew but failed to disclose that the Company was incurring significant manufacturing costs due to the fact that under the revised Novartis marketing agreement, Organogenesis was required to produce Apligraf in sufficient quantities to meet Novartis' "always inflated" sales forecasts. According to former employees of Organogenesis, for every unit of Apligraf manufactured pursuant to Novartis' sales forecasts but

72

Organogenesis published a release on *Business Wire* which announced that the Company had entered into an underwriting agreement with UBS Warburg LLC, as underwriter, providing that on any trading day during the next two years the Company could elect to issue and sell to the underwriter a number of shares of common stock that is not less than 5% and not more than 25% of the average trading volume of the common stock on the American Stock Exchange for the previous five days, up to an aggregate of 1,900,000 shares.[4]

121.    Following the announcement and report of results for the first quarter of 2001, analysts at Needham & Co. again reiterated a "BUYBuy" rating on shares of Organogenesis and continued to advise investors to expect a near-term trading price of $16-$18 per share for the Company.

122.    **Laughlin Quits.** On May 16, 2001, the Company issued a release announcing that defendant Laughlin had suddenly resigned from Organogenesis and that Michael Sabolinski, former Senior Vice President Medical and Regulatory Affairs, would become President, Chief Executive Officer and a member of the Board of the Company. According to the Company's release, defendant Sabolinski was primarily responsible for the development of Apligraf. In addition, the release also noted that, "this transition occurs at an important time for Organogenesis as the Company focuses on increasing market penetration with Apligraf and leveraging core technologies to commercialize new products." While no reason was given for defendant Laughlin's departure, defendant Sabolinski was quoted in this release as thanking defendant Laughlin for "all he achieved for Organogenesis."

---

[4]    The sale price of the shares to the underwriter was to be the volume-weighted average price per share at which shares of the common stock traded on the American Stock Exchange during regular trading hours on each purchase date less underwriter's commissions.

125. **Apligraf Sales 5/01.** On June 5, 2001, Organogenesis announced that sales of Apligraf had again reached above 1750 units, for May 2001. According to defendant Sabolinski, who was quoted in the Company's release, "*[t]he May sales figures show sustained support for Apligraf use, and we have accelerated our plans to ramp up production to meet the strong growth forecast for the second half of this year.*" [Emphasis added.]

126. While sales for May 2001 were actually less than April sales (1758 units vs. 1813 units), defendants did not revise guidance in any way, and continued to advise analysts and investors that the Company was still on track to register sequential growth in unit sales and achieve profitability. As evidence of defendants' further representations, on June 6, 2001, analysts at Needham & Co. reiterated a "~~BUY~~Buy" rating on shares of the Company, and continued to maintain a near-term price target of $~~18.00~~16-$18 per share~~, and stated the slowdown in Apligraf was merely a "Bump in the Road" for Organogenesis~~.

127. **$1.44 Million Private Placement**. On June 18, 2001, Organogenesis raised another $1.44 million through the sale of shares of stock through the UBS Warburg underwriting previously announced. Pursuant to this agreement, between May 21, 2001 and June 18, 2001, defendants caused the Company to sell over 186,000 shares of stock for at least $1.44 million.

128. **Apligraf Sales 7/01.** On August 2, 2001, Organogenesis announced that sales of Apligraf reached another monthly record sales level: 2015 units sold in July 2001. This release also quoted defendant Sabolinski, as stating that, "*[w]e are delighted with the growth in sales seen between June and July.* Apligraf unit sales have multiple drivers in place . . . *We are planning accelerating growth in Apligraf production to meet the increasing demand anticipated.*" [Emphasis added.]

- - - - - - - - - - - - - - - - - - - - -

> In May 2001, we entered into a separation of employment agreement with a former executive officer, which resulted in the recording of a one-time severance expense of $1,233,000 during the quarter ended June 30, 2001. The separation of employment agreement provides for amounts to be paid over two years and supercedes the previous employment agreement. It has been filed as exhibit 10(ff) to this Form 10Q.

Attached to the Form 10-Q for the second quarter of 2001 was a copy of defendant Laughlin's

May 2001 Severance Agreement which reported that the vast majority of the Company's $1.233

million charge was to cover the cost of payments made by Organogenesis directly to Laughlin.

133. The statements made by defendants on June 5, 2001 and contained in the

Company's August 2, 2001 and August 13, 2001 releases and those contained in the Company's

Form 10-Q for the second quarter of 2001, reproduced herein, *supra*, were each materially false

and misleading and were known by defendants to be false at that time, or were recklessly

disregarded as such for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the

Company alleged in paragraphs 59-67, *supra*.

(b)    Defendants' announcement that the Company had elected to sell $10

million in equity to Novartis, pursuant to the terms of its amended $20 million stock sales

agreement was materially misleading and incomplete given that defendants knew but failed to

disclose that the Company was informed that defendant Erani had sought to have stock brokers

"*manipulate the market for the Company's stock.*"

(c)    Contrary to defendants' representation that Organogenesis "retain[s] the

right to sell Novartis an additional $10 million in equity," the Company did not have the ability

to raise the full amount of that funding option at the discretion of the Company. As defendants

knew but failed to disclose at the time, significant conditions precedent to the exercise of the put

79

option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(d)     Defendants' representations touting "sustained support for Apligraf use," "sustained market demand for Apligraf," the acceleration of a plan to "ramp up production to meet the strong growth forecast for [the] second half of this year" and the "increasing demand anticipated" were materially misleading and incomplete given that defendants knew but failed to disclose that significant manufacturing and distribution problems, contamination issues, inadequate marketing support, and difficulties in obtaining reimbursement for Apligraf were causing increasing frustration among physicians, who were becoming less willing to order or re-order Apligraf for their patients.  Further, defendants knew but failed to disclose that the purported "strong growth forecast" and "increasing demand anticipated" for Apligraf were illusory, given that, as confirmed by a former employeesemployee of Organogenesis, Novartis' sales forecasts were "always inflated."

(e)     Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf.  Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased.  As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf

sales that was well below the product's manufacturing cost to Organogenesis. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.*

        (f)    Contrary to defendants' representations, the Company's Form 10-Q for the second quarter of 2001 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (e) above and in paragraphs 59-67, *supra.*

134. **Needham Report.** The materially false and misleading statements issued by defendants had their intended effect. Following the publication of Organogenesis' second quarter 2001 results, on August 14, 2001, Needham issued another report on the Company which again reiterated a "~~BUY~~Buy" rating and issued a near-term price target of $~~16~~$18 per share, and stating the following:

> We reiterate our BUY rating and 12-month target range of $16-$18. We used two methods to reach this valuation target. In the first instance, we applied a market capitalization to revenues ratio of 11x for the year 2004. In the second instance, we applied a 35x multiple to the 2004 estimates. To both these calculations, we used a 10% discount per year, given the fact that Apligraf is already on the market thereby less product uncertainty exists. Using these metrics, we arrived at a target price range of $16-18.

135. **Apligraf Sales August 2001.** On September 6, 2001, Organogenesis issued a ~~report~~release which announced that sales of Apligraf reached another monthly record sales level, with 2150 units sold in August 2001. This release also quoted defendant Sabolinski, who stated that, *"We are pleased with the sustained strength in Apligraf sales that has been seen through the summer months. We are on track for the third quarter of 2001 to have substantially higher sales than our record second quarter."* [Emphasis added.]

81

136.  On September 7, 2001, defendants published a release which purported to announce that Organogenesis had increased its capacity to manufacture Apligraf.  Accordingly, the Company's release quoted defendant Sabolinski, who stated the following:

> Our Company is now producing Apligraf at a rate of over 40,000 units per year. I am pleased that the manufacturing ramp-up I committed to when I became CEO in May is on track. *We anticipate increasing this production rate in the near term to meet forecasted demand.* The demand has been driven by an increase in sales and marketing activity, the diabetic foot ulcer supplement approval, and favorable reimbursement policies in the hospital and physician's office. [Emphasis added.]

137.  On or about September 21, 2001, *Dow Jones* news service reported that Apligraf had received Medicare reimbursement in all 50 states.

138.  **3 New Products.**  On September 24, 2001, Organogenesis issued a release announcing that its experiences selling Apligraf had been so successful that defendants would begin commercializing three additional new proprietary products during the fourth quarter of 2001.  According to the release, these products would be marketed directly by Organogenesis using its own marketing personnel and this purportedly would "~~advance~~*advanc[e] the Company from a research, clinical/regulatory, manufacturing Company to a fully integrated medical products Company*." [Emphasis added.]   This release also quoted defendant Sabolinski, as follows:

> Commercializing our own products, with our own sales and marketing team, brings Organogenesis to *a new stage*. We receive the full revenue from the products we commercialize ourselves, which will add to our revenue stream beginning in October. *We look forward to these products contributing to the overall profitability of the Company.* Having our own sales force also paves the way for Organogenesis commercializing additional products in the future. [Emphasis added.]

139.  **Apligraf Sales 3Q:01.**  On October 4, 2001, Organogenesis issued a release which purported to announce strong sales of Apligraf during the third quarter of 2001, with 6606 Apligraf units sold during the quarter.  In addition to the foregoing, this release also quoted

defendant Sabolinski, who stated that, *"[t]his has been a very significant quarter for the Company. Apligraf sales continue to increase* and the product is now reimbursed by Medicare in all fifty states. . . . In addition, we received marketing clearance for the third FortaFlex(TM)-based product, FortaGen(TM), and plan to launch four new products in October by an Organogenesis Institutional sales force." [Emphasis added.]

140. On or about October 9, 2001, Organogenesis presented at the UBS Warburg Global Life Sciences Conference in New York City. Later on October 24, 2001, Organogenesis also presented at the Techvest Emerging Healthcare Forum, also held in New York City.

141. **$20.25 Million Additional Funding.** On October 16, 2001, Organogenesis issued a release announcing that defendants had raised another $20.25 million from several financing activities, including another $10 million from Novartis and an additional $10.25 million from two equity placements to institutional investors and/or Company directors. One of the placements was made *via* the sale of the 1.67 million registered common shares remaining under the Company's existing shelf registration, and the ~~second~~other placement was for 503,876 unregistered shares of common stock and attached warrants. This release also quoted defendant Sabolinski who stated that, *"~~we~~[w]e are pleased to have completed this round of financing, an important step in achieving key corporate milestones including realizing profitability sooner. Furthermore, these proceeds will enable us to accelerate additional key programs for our lead product, Apligraf, and other notable products in our development pipeline."*

142. On November 1, 2001, *Dow Jones* news service reported that defendants had registered at least 2.7 million shares of common stock on behalf of certain shareholders. According to this report, of the shares registered 2.18 million were issuable to Novartis upon conversion of a $10 million 7% convertible subordinated promissory note that would mature on

becoming less willing to order or re-order Apligraf for their patients. Further defendants knew but failed to disclose that the purported "strong growth forecast" and "increasing demand anticipated" for Apligraf were illusory, given that, as confirmed by a~~formeremployees~~employee of Organogenesis, Novartis' sales forecasts were "always inflated."

(e)    Defendant Sabolinski's representation anticipating increasing the Apligraf "production rate in the near term to meet forecasted demand" were materially misleading and incomplete given that the Company was experiencing continuing significant manufacturing and marketing problems which were hampering manufacturing and which made it unfeasible to sufficiently increase production scale. Further defendants knew but failed to disclose that the purported "forecasted demand" for Apligraf was illusory, given that, as confirmed by a~~former employees~~employee of Organogenesis, Novartis' sales forecasts were "always inflated."

(f)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that were well below the product's manufacturing cost. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of

Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.*

      (g)    Contrary to defendants' representations, the Company's Form 10-Q for the third quarter of 2001 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (h) above and in paragraphs 59-67, *supra*.

      146.  **Needham Report.**  On November 16, 2001, with shares of the Company now trading at just above $4.00 per share, analysts at Needham & Co. were finally forced to adjust downward their near-term Organogenesis price target to $9.00-$11.00 per share from $16.00-$18.00 per share.  At this time, however, Needham ~~analysts~~ did not reduce its "~~BUY~~Buy" rating on the Company, and also stated that, at current trading levels shares of Organogenesis were "*currently undervalued,*" as follows:

> We believe that Organogenesis is *currently undervalued*, given that Apligraf is the first and only product containing living human cells to prove efficacy and gain FDA PMA marketing approval and now having qualified nationally for reimbursement under Medicare for outpatient use. *ORG's enhanced management team and Novartis agreement is a further indicator of ORG's potential*. In addition, we believe there will be a number of key events over the next several quarters that will serve to significantly increase the visibility of Organogenesis and its products and further attract substantial investor interest in the company and its products, such as continued growth in Apligraf sales and postmarketing research as well as progression of VITRIX clinical trials. [Emphasis added.]

      147.  On January, 4, 2002, only days before the end of the Class Period, defendant Erani announced his sudden and unexpected departure from Organogenesis.  According to the Company's release, defendant Erani resigned to "pursue personal business interests."

stock's daily average, shares of Organogenesis traded at approximately $3.70 per share, on January 28, 2002. The day-of the Form 8-K was filed, Organogenesis shares traded down to $2.44 per share. Within days, as investors digested the implications of the Company's SEC filing, shares of Organogenesis fell to as low as $1.32 on February 7, 2002 — a decline of almost 95% compared to the Class Period high of over $22.00 per share reached on March 7, 2000.

152. Later, on February 25, 2002, *Dow Jones* news service reported that Organogenesis had declared that it would engage in a "restructuring" and would lay-off at least 16% of its workforce in order to cut overhead by-a at least $5 million. Also, according to *Dow Jones* and a Company press release, on March 21, 2002, the Company also achieved its goal of raising theraised $16 million necessary to continue operations, by issuing "convertible preferred shares," convertible into shares of common stock of the Company at a fixed conversion price of $1.45 per share, and by selling 7.2 million unregistered shares of Company stock. The "vulture capitalists" who arranged for these "toxic convertibles"[5]    as well as the purchase of an additional 7.2 million shares for payments of only $10 million, were identified by the Company only as "institutional shareholders."

153. On April 3, 2002, Organogenesis announced sales of Apligraf for the first quarter of 2002 which, at 7,100 units, was well below forecast sales for 2002 of 40,000 units. Following the release of results for the first quarter of 2002, on April 11, 2002, defendants hosted a conference call, the transcript of which was subsequently published. During the question and answer, call-in section of this call, the following statements were also made:

> BRUCE BREWSTER (ph), BREWSTER ASSET MANAGEMENT: Over the last number of years it seems to be that you have been very successful

[5]    "Toxic," because the greater Organogenesis' share price declined, the more stock the Company would have to issue to meet this obligation, the greater shareholder dilution, the lower the price of the Stock, the more stock that would be required to be issued to meet this obligation...

Organogenesis had received the aforementioned report, "we believe that, based on our current forecasts, the Company has sufficient liquidity to finance operations and *achieve break even by year-end 2002.*" [Emphasis added.] This post-Class Period statement was as far from the truth as defendants' other statements made within the Class Period. Despite this absurd claim, on August 16, 2002, defendants revealed that the Company would delay filing its quarterly report for the second quarter of 2002 and that Organogenesis was reviewing a possible material "asset impairment charge." According to a statement made by the Company at this time, "[m]anagement is unable to conclude the amount of such impairment or that the financial statements . . . are probably presented on a 'going concern' basis rather than on a 'liquidation of assets' basis."

158. **Needham Rating Suspended.** It was not until July 12, 2002, with shares of the Company now trading below $0.20 per share, however, that analysts at Needham & Co. finally placed the Company's stock rating "Under Review." With Organogenesis on "life-support", Needham analysts reported the following:

* Recent events leave *future uncertain.*

* *Disappointing sales figures/ higher than expected burn rate.* Organogenesis announced that Apligraf sales decreased approximately 7-10% for 2Q02, compared with our estimates for an increase in sales of 25%.

* Additionally, the company stated that the burn rate for the quarter was $7.5MM, versus our estimates of $4.3MM, resulting in $3.7MM of cash at the end of 2Q02. Additional cost cutting measures have been initiated to lower the burn rate from $2.5MM/month to $1.1MM/month. Using the revised burn rate, Organogenesis will be able to fund operations for 3Q02 before seeking additional capital.

* Challenging management strategy. Organogenesis announced that it has entered into discussions with Novartis Pharma AG to reacquire commercialization rights to Apligraf. However, in order to complete negotiations, *Organogenesis must raise sufficient capital necessary to reacquire [rights to] Apligraf and build the necessary infrastructure necessary to market and distribute the product.*

94

＊    Additionally, Organogenesis stated that it would seek a corporate partner for the marketing of the Fortagen, Fortaperm, and Revitix product lines.  While this decision will result in a reduction of costs related to the sales and marketing infrastructure set up by the company, the partnership will also result decreased revenues, as revenues become royalty based.

*    Our conclusions.  Despite the efforts of management, *Apligraf sales continue to grow at a slower than anticipated rate.  The lower than expected sales  growth and higher than anticipated burn rate results in approximately 3 months of cash ($3.7MM) for on going operations, which leaves the company below budgeted forecasts.* While major initiatives are being discussed including the reacquiring of rights to Apligraf and raising of funds for continued operations, we believe that *multiple challenges exist for Organogenesis.* Therefore, given the lack of Apligraf sales growth, the higher than expected burn rate, the challenging business strategy undertaken by management, and sub-optimal cash position, we are placing our rating under review.  We are currently evaluating the company's options and will continue to monitor events going forward. [Emphasis added.]

159.  **Never Achieve Profitability.  Huge Layoffs.  Halt Apligraf Production.** On August 21, 2002, with Organogenesis shares trading at $0.09 per share, *the Company's common stock was suspended from trading on the American Stock Exchange.*  On September 13, 2002, the Company announced that it had temporarily halted shipments of Apligraf and had furloughed over 110 of its employees, as a result of the Company's "current lack of cash flow."  Defendants also blamed the current crisis upon its inability to renegotiate its marketing agreement with Novartis, which was described as "~~unsustainable~~not sustainable."  On September 13, 2002, defendants also revealed that a Chapter 11 bankruptcy filing was a possibility.

160.  **Product Recalls.**  In addition to the foregoing, by mid-September 2002, production quality at Organogenesis had deteriorated so substantially that an entire batch of Apligraf had been recalled.  Alarmingly, because Apligraf has such a short shelf life, at the time of this "recall," of the 193 affected units at least 72 had already been applied to patients.  In total,

95

Organogenesis securities relying upon the integrity of the market price of Organogenesis securities and market information relating to Organogenesis, and have been damaged thereby.

169.  During the Class Period, defendants materially misled the investing public, thereby inflating the price of Organogenesis common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

170.  At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Organogenesis' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Organogenesis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in ~~plaintiff~~plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL ALLEGATIONS AGAINST PRICEWATERHOUSECOOPERS

171.  Defendant PricewaterhouseCoopers is a worldwide firm of certified public accountants, auditors, and consultants.  According to its website, www.pwc.com, PricewaterhouseCoopers "is the world's leading professional services organization."

Document states that "*[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment.*"

       (d)   PricewaterhouseCoopers knew of, or recklessly disregarded, the terms of the Novartis marketing agreement, which was economically unsustainable for Organogenesis given that Organogenesis was losing money on every unit of Apligraf that it produced and that this the Company lacked the ability to fund operations through product sales.

       (e)   Given these "red flags," PricewaterhouseCoopers knew or recklessly disregarded the fact that the Company suffered from a chronic and systemic lack of internal controls such that its internal financial reporting was inherently corruptible, subject to manipulation, and unreliable, resulting in materially false and misleading financial statements during the Class Period.

175.   These "red flags" alerted PricewaterhouseCoopers that there were serious concerns with management's character and integrity. These concerns with management's character and integrity should, in turn, have caused PricewaterhouseCoopers to scrutinize the sufficiency of Organogenesis' internal controls. The internal control deficiencies include a lack of a stated and demonstrable commitment by senior management to set appropriate standards of ethics, integrity, accounting, and corporate governance.

176.   PricewaterhouseCoopers' concerns with management's character and integrity also should have caused PricewaterhouseCoopers to re-evaluate its risk assessments. GAAS requires that "risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors." AU § 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. One of the principal categories of "risk factors that relate to

structure: the control environment, the accounting system, and control procedures. For example, "[t]he auditor's understanding of internal control over revenue transactions ordinarily will include the client's policies and procedures for . . . shipping goods, relieving inventory, billing and recording sales transactions, receiving and recording sales returns, and authorizing and issuing credit memos." AICPA Audit Guide: Auditing Revenue in Certain Industries ("AAG-REV") 1.112.

184.  As a result of its failure to accurately report on Organogenesis' 2000 financial statement, PricewaterhouseCoopers utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. Accordingly, *the audit function must be meaningfully performed and the accountants' independence not compromised. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.* [Emphasis added.]

185.  As a result—of. PricewaterhouseCoopers' opinions, which represented that Organogenesis' 2000 year-end financial statement was presented in conformity with GAAP, were materially false and misleading because PricewaterhouseCoopers knew that it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. PricewaterhouseCoopers, in issuing its unqualified opinions, knew or recklessly disregarded the fact that by doing so it was engaging in gross departures from GAAS, thus making its opinions

false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

186.  PricewaterhouseCoopers knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Organogenesis' 2000 year-end financial statements; or (b) withdrawn, corrected or modified its opinion for the year ended December 31, 2000.

## ADDITIONAL SCIENTER ALLEGATIONS

187.  As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Organogenesis, their control over, and/or receipt and/or modification of Organogenesis' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Organogenesis, participated in the fraudulent scheme alleged herein.

188.  In addition, throughout the Class Period, while in possession of material adverse non-public information, defendants caused the Company to issue and/or register for the sale of millions of shares of Company stock.  Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to raise *over $68.168 million* in total proceeds from the sales of Organogenesis securities through public stock offerings, private equity offerings and other debt and/or equity sales, which defendants failed to

utilize in avoiding Organogenesis' bankruptcy.  Moreover, as further evidence of defendants' motivation to engage in the illegal scheme described herein, on or about April 21, 2000 defendant Stein ~~was motivated to, and did register the authorized~~registered for sale over $6.9 million of his privately held Organogenesis stock — approximately half of the Company shares he personally owned and controlled.  ~~Company insiders, including defendants Herbert Stein and~~ while in possession of material adverse non-public information.  In addition to registering for sale over $6.9 million of his privately held Organogenesis stock on April 21, 2000, defendant Stein — according to defendant Stein's counsel — also sold a certain amount of stock in 2001 (during the Class Period) and 2002.  According to defendant Stein's counsel, defendant Stein incurred losses on sales of Organogenesis stock "in excess of $7,000,000."  Even if true, the representation by defendant Stein's counsel that defendant Stein did not profit from these stock sales does not negate the strong inference of scienter and motive created by his registration of stock for sale — a clear indication of his *intent* to sell the Company's stock and profit therefrom. Other company insiders, including Defendant Michael Sabolinski, took advantage of the artificially inflated prices of the Company's ~~securities~~stock during the Class Period by selling ~~their shares of the securities ("Selling Shareholders") and reaping millions of dollars in proceeds therefrom.  These insider sales are set forth below~~shares of the Company's stock and reaping over $400,000 in proceeds therefrom.  Company insiders, including defendants Stein and Sabolinski, registered for sale and/or sold Organogenesis shares while in possession of material adverse non-public information, as follows:

### SHARES REGISTERED FOR SALE

| INSIDER | DATE OF TRANSACTION | PROPOSED NO. OF SHARES | PROPOSED PRICE PER SHARE | TOTAL VALUE OF SECURITIES REGISTERED |
|---|---|---|---|---|
| Herbert Stein | 4/21/2000 | 732,423.00 | $9.44 | $6,912,242.10 |
| TOTAL | | 732,423.00 | | $6,912,242.10 |

108

**SHARES SOLD**

| INSIDER | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | ~~$3.02~~10.39 | ~~$36,877.93~~126,8 41.12 |
| ~~Michael L. Sabolinski~~ | ~~6/20/2000~~ | ~~12,208.00~~ | ~~$10.39~~ | ~~$126,841.12~~ |
| ~~Herbert Stein~~ | ~~4/21/2000~~ | ~~732,423.00~~ | ~~$9.44~~ | ~~$6,912,242.10~~ |
| ~~Anton E. Schrafl~~ | ~~7/20/2001~~ | ~~36,623.00~~ | ~~$2.97~~ | ~~$108,755.66~~ |
| ~~Nancy L. Parenteu~~ | ~~5/14/2001~~ | ~~31,334.00~~ | ~~$3.53~~ | ~~$110,696.76~~ |
| ~~Nancy L. Parenteu~~ | ~~5/11/2001~~ | ~~3,666.00~~ | ~~$3.43~~ | ~~$12,575.85~~ |
| Nancy L. Parenteu | 5/10/2001 | 15,000.00 | $8.18 | $122,640.00 |
| Nancy L. Parenteu | 5/9/2001 | 5,000.00 | $8.56 | $42,813.00 |
| Nancy L. Parenteu | 5/7/2001 | 10,000.00 | $9.00 | $90,000.00 |
| Nancy L. Parenteu | 5/7/2001 | 5,000.00 | $8.97 | $44,850.00 |
| **TOTAL** | | ~~863,462.00~~47,2 08 | | ~~$7,608,292.42~~42 7,144.12 |

189.    The registration and/or sales of millions of shares of Company stock during the Class Period, which sales were designed and/or permitted by the Individual Defendants as well as numerous other high-level senior executives of Organogenesis further evidences defendants' motive to perpetrate the fraudulent scheme detailed herein. In addition, defendants also caused the Company to engage in the sale of tens of millions of dollars in other sales of Organogenesis securities pursuant to stock offerings, private equity offerings and other debt and/or equity sales during the Class Period, including the following:

| TRANSACTION | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| $9.4M Equity Sale | 2/24/2000 | 688,000 | | $9,400,000.00 |
| $1.4M Equity Sale | 2/25/2000 | 100,000 | | $1,400,000.00 |
| $5.27M Equity Sale | 3/09/2000 | 300,000 | | $5,270,000.00 |
| $1.9M Share Offering | 4/27/2001 | 1,900,000 | $7.75 | $13,500,000.00 |
| $1.44M Private Placement | 6/18/2001 | 186,000 | | $1,440,000.00 |
| $10M Equity Sale to Novartis | 8/07/2001 | | | $10,000,000.00 |

109

| $20.25M additional Funding | 10/16/2001 | 2,173,876 | $20,250,000.00 |
| --- | --- | --- | --- |
| **TOTAL** | | | **$61,260,000** |

**TOTAL ALL DEBT AND EQUITY ~~SALES BY~~REGISTERED FOR SALE AND/OR ~~SOLD BY THE COMPANY,~~ DEFENDANTS AND INSIDERS DURING THE CLASS PERIOD = $~~68,868,292~~68,599,386.22**

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

190.    At all relevant times, the market for Organogenesis' securities was an efficient market for the following reasons, among others:

(a)    Organogenesis stock met the requirements for listing, and was listed and actively traded on the American Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Organogenesis filed periodic public reports with the SEC and the American Stock Exchange;

(c)    Organogenesis regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Organogenesis was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

110

### FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

193.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

194.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) enable the Individual Defendants and other Organogenesis insiders to register for sale and/or sell more than $7.668 million of the Company's and/or their personally-held Organogenesis common stock to the unsuspecting public; and (iii) cause plaintiff and other members of the Class to purchase Organogenesis securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them), took the actions set forth herein.

195.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Organogenesis securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

196.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

112