**Exhibit F**

Westlaw.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 1

**H**
**Motions, Pleadings and Filings**

United States District Court,
N.D. Texas, Dallas Division.

FINANCIAL ACQUISITION PARTNERS, LP,
and John D. May, on behalf of themselves
and all others similarly situated, Plaintiffs,
v.
L. Keith BLACKWELL, Jonathan S. Pettee,
Randolph E. Brown, Ron B. Kirkland, and
Deloitte & Touche, L.L.P., a Delaware Limited
Liability Partnership,
Defendants.

No. Civ.A.3:02-CV-1586-K.

Sept. 29, 2004.

William B. Federman, Federman & Sherwood, Oklahoma City, OK, for Plaintiffs.

Frederick W. Reynolds, III, Joe Bill Harrison, William G. Whitehill, Gardere Wynne Sewell, John Stuart Tonkinson, Karen L. Hirschman, Vinson & Elkins, Dallas, TX, for Defendants.

*MEMORANDUM OPINION AND ORDER*

KINKEADE, J.

*1 The following motions are currently pending before the Court: (1) Defendant Deloitte & Touche LLP's motion to strike the affidavit of Plaintiffs' alleged expert attached to Plaintiffs' Second Amended Complaint; (2) a motion to dismiss Plaintiffs' Second Amended Complaint filed by Defendant Jonathan S. Pettee; (3) a motion to dismiss filed by Defendants L. Keith Blackwell, Randolph E. Brown, and Ron B. Kirkland; and (4) a motion to dismiss Plaintiffs' Second Amended Complaint filed by Defendant Deloitte & Touche LLP. Because the conclusions contained in Plaintiffs' expert affidavit are inadmissable at this time, Deloitte's motion to strike the affidavit is GRANTED IN PART. Additionally, the Court finds that the Plaintiffs' Second Amended Complaint fails to adequately plead fraud against Defendants, and even if such allegations were properly pled, Plaintiffs fail to allege sufficient facts to support a strong inference that Defendants acted with the required mental state. Therefore, the motions to dismiss are GRANTED, and Plaintiffs will not be granted leave to file a third amended complaint. Accordingly, this case will be dismissed with prejudice by judgment filed today.

I. Background

This is a securities fraud case based on alleged improprieties involving the securities filings of AMRESCO, Inc. ("AMRESCO"), a financial services company which filed for bankruptcy, and is not a party to this action. Plaintiffs Financial Acquisition Partners, L.P. ("Financial Acquisition") and John D. May ("May") (collectively, "Plaintiffs") allege that Defendants L. Keith Blackwell, Jonathan S. Pettee, Randolph E. Brown, and Ron B. Kirkland, all officers of AMRESCO (collectively, the "Officer Defendants") and Deloitte and Touche, L.L.P ("Deloitte") committed securities fraud by making material representations about AMRESCO's financial status for the purpose of inflating the price of AMRESCO's stock.

A. AMRESCO's Business

The following background facts are found in Plaintiffs' Second Amended Complaint (hereinafter referred to as "Plaintiffs' Second Amended Complaint"). AMRESCO began operating in 1987, and its business involved providing asset management and resolution services to nonperforming and underperforming commercial and real estate loans. *See* Plaintiffs' Second Amended Complaint, ¶ 21. From 1994 through 1998, AMRESCO entered into the businesses of commercial mortgage banking, commercial finance, residential mortgage lending, and loan servicing. *See id.,* ¶ 22. In 1998, AMRESCO began

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 2

experiencing operating losses, which it attempted to limit by divesting or discontinuing many of its more problematic businesses. *See id.,* ¶ 23. These divestitures and discontinuances allowed AMRESCO to focus on its primary business, which it defined as a " 'small and middle market business lending company, making loans primarily to franchisees of nationally recognized restaurant, hospitality and service organizations and to small business owners." ' *Id.,* ¶ 24.

*2 According to AMRESCO's Form 10-K filed on March 30, 2001 ("the 2000 10- K") for the year ending December 31, 2000, AMRESCO was a small and middle market business lending company with three primary segments in continuing operations for financial statement presentation purposes: (1) commercial finance; (2) asset management; and (3) home equity lending. AMRESCO's operations centered around a commercial finance line of business which conducts small and middle market business lending. *See id.,* ¶ 25. Plaintiffs allege that AMRESCO's operations were centered around a commercial finance line of business which conducts small and middle market business lending, and the Company earns its revenues from its commercial finance line of business primarily from interest and fees on loans to small and middle market business owners, accrued earnings on retained interests in securitizations, and servicing fees on its loan portfolios being serviced. *See id.,* ¶ 26.

AMRESCO initiated its commercial finance line of business in 1997, with most of that business focused on conventional loans made to small and middle market businesses. *See id.,* ¶ 27. Conventional lending focuses on the origination, securitization, and servicing of loans made to small and middle market business owners. *See id.,* ¶ 28. The loans made in AMRESCO's conventional lending business were funded primarily by a dedicated warehouse financing facility until the time the loans were securitized and sold. *See id.* Plaintiffs allege that conventional lending comprised 55.5% of AMRESCO's commercial finance line of business for the year ending December 31, 2000, with the remaining 44.5% of business consisting of government-guaranteed Small Business Administration loans. *See id.,* ¶ 30.

For the year ending December 31, 2000, AMRESCO's commercial finance line of business had completed ten securitizations, which is the sale of a pool of loans to a third-party whereby the sale is collateralized by additional loans in which AMRESCO retains a subordinated interest. These securitizations totaled $1.6 billion with the securitizations consisting of multiple classes of investment grade certificates which are sold to private investors and an equity interest and subordinated certificates retained by AMRESCO. *See id,* ¶ 30. Plaintiffs' Second Amended Complaint states that the securitizations achieved investment grade ratings in part through limited cross-guaranteed loan provisions for the various borrowers with loans in certain securitization transactions. *See id,* ¶ 31. In plain English, this means that each borrower signed a note for an amount 5%--10% greater than their net loan proceeds and made payments based on the higher note amount, which was then rebated to the borrower assuming that no deficiencies existed in the securitization pool. *See id.* However, if deficiencies did occur within the pool of loans, the rebates of the performing loans were pledged to cure such deficiencies and were applied in the amount necessary to bring the loan pool to a non-delinquent status. *See id.,* ¶ 32.

*3 For each securitization loan pool, the cash flow from the subordinated interests retained by the Company was used as additional credit support for the payment of the investment grade rated securities issued in such securitizations, so that if the aggregate amount of all loan delinquencies in a pool exceeded the 5%--10% overpayment by borrowers, the cash flow to AMRESCO would be delayed. *See id.,* ¶ 33.

If such excessive delinquencies caused enough losses, the cash flow to the Company from its related subordinated interests could be substantially reduced, which would reduce the value of its subordinated interests. *See id.* If any loans in a pool were delinquent for more than a certain number of days, the payments to the investors related to the loans would be accelerated, and if the cash from the borrowers' 5%--10% overpayment was not sufficient to satisfy such accelerated payments, AMRESCO would have to use the cash flow from its subordinated interests, thus delaying cash flow to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 3

AMRESCO and reducing the value of its subordinated interests, and affecting the overall value of its retained interests in securitizations. *See id.*, ¶¶ 35-37.

In its 10-K for the year ending December 31, 2000, AMRESCO valued its retained interests in securitizations at $182 million. In reaching that amount, AMRESCO used a discount rate of 15% and assumed a credit loss risk of zero. *See id.*, ¶¶ 38, 40.

B. AMRESCO Files for Bankruptcy

Even after AMRESCO reorganized its businesses, it continued to struggle financially. AMRESCO's financial statements attached to its 10-K for the year ending December 31, 2000 reported losses of $69 million in 1998, $221 million in 1999, and $218 million in 2000. *See id.*, ¶ 82(5). Additionally, AMRESCO suffered a significant decline in revenue from 1999 to 2000. *See id.* AMRESCO also reported that the delinquency rate on the securitized loans in its commercial portfolio had increased from 2.43% to 8.98% over the preceding 12 months, resulting in a $4.6 million write down in its retained interests. *See id.*, ¶ 82(9).

Plaintiffs allege that despite AMRESCO's officers' and board of directors' representations that (1) they had made significant progress in the execution of a recovery plan and would continue to seek ways to reduce leverage and return to profitability; and (2) were enacting a strategic plan to revive AMRESCO, no such plans were being implemented. *See id.*, ¶¶ 41-42. AMRESCO ultimately filed for bankruptcy protection on July 2, 2001. *See id.*, ¶ 10.

Plaintiffs' Second Amended Complaint alleges that the Officer Defendants fraudulently made misstatements of material fact in and omitted material information from its public filings, and that Deloitte fraudulently misstated that it performed its audits in conformity with generally accepted accounting practices while failing to include in its audit opinion a qualification as to AMRESCO's ability to continue as a going concern. Defendants move to dismiss Plaintiffs' Second Amended Complaint for failure to adequately plead facts supporting their claims of fraud.

II. Defendants' Motion to Strike

*4 Deloitte has filed a motion to strike the affidavit of Mr. Victor C. Moore, whom Plaintiffs have retained as an expert in connection with this litigation. Plaintiffs attached an affidavit authored by Mr. Moore in which he gives his opinion that Deloitte violated generally accepted accounting principles ("GAAP") by failing to represent that AMRESCO's 10-K for the year ending December 31, 2000 misrepresented the value of its assets and by failing to issue a "going concern" qualification regarding AMRESCO's viability as a corporation in its audit opinion of AMRESCO's financial statements. Deloitte argues that Mr. Moore's affidavit improperly brings in matters outside the four corners of Plaintiffs' Second Amended Complaint, while Plaintiffs argue that the affidavit is properly included with the pleading under Federal Rule of Civil Procedure 10c), which allows a party to attach a "written instrument" to a pleading. Fed.R.Civ.P. 10c).

In another securities fraud case, *DeMarco v. Depotech Corporation*, 149 F.Supp.2d 1212 (S.D.Cal.2001), the court held that it had to disregard the affidavit of an expert in considering the defendant's motion to dismiss because considering the opinion of an expert included in an affidavit on a motion to dismiss forces a district court to confront a "myriad of complex evidentiary issues not generally capable of resolution at the summary judgment stage." *Id.* at 1221. That court stated that considering the expert affidavit would put the court in the position of essentially considering a motion for summary judgment, which is improper at the motion to dismiss stage of a securities fraud case. *Id.* However, despite striking the affidavit, the court did say that a plaintiff could include an expert's "nonconclusory assertions within specific paragraphs in the complaint." *Id.* at 1222.

Several cases have agreed with *DeMarco's* holding that an expert's affidavit is not properly considered when it is attached to a plaintiff's complaint. *See, e.g. In re Viropharma, Inc.*, 2003 WL 1824914 (E.D.Penn. Apr. 7, 2003); *In re Empyrean Biosciences, Inc. Securities Litigation*, 219 F.R.D. 408 (N.D.Ohio 2003); *Benzon v. Stanley*, 2004 WL 62747 (M.D.Tenn. Jan.8, 2004).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 4

The Court agrees with the rationale of the courts which have refused to consider an expert's affidavit at the motion to dismiss stage of a securities fraud case. Two cases cited by Plaintiffs for the proposition that the Court should not strike Mr. Moore's affidavit, *Mortensen v. Americredit Corp.,* 123 F.Supp.2d 1018 (N.D.Tex.2000) and *In re Resource American Securities Litigation,* 2000 WL 1053861 (E.D.Penn. July 26, 2000), do not speak directly to the issue. In those cases, the courts merely acknowledged that the plaintiffs in those cases included affidavits with their complaints. However, no motions to strike were at issue in those cases, and neither court affirmatively held that an expert's affidavit at this stage in the litigation was appropriate.

*5 Deloitte's motion to strike Mr. Moore's affidavit is GRANTED insofar as the Court will not consider any conclusions reached by Mr. Moore in making its decision on the Defendants' motions to dismiss. However, the Court DENIES Deloitte's motion to the extent it seeks an order striking those nonconclusory, factual portions of Mr. Moore's affidavit found in Plaintiffs' Second Amended Complaint.

III. Applicable Legal Standards

A. Standard for Motion to Dismiss

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "is viewed with disfavor and is rarely granted." *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997). A district court cannot dismiss a complaint for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995). In reviewing a motion to dismiss, the court cannot look beyond the pleadings, and must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996); *Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir.1999). The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid cause of action when it is viewed in the light most favorable to the plaintiff, with every doubt resolved in plaintiff's favor. *Lowrey,* 117 F.3d at 247. A plaintiff must plead specific facts, not mere conclusory allegations, to avoid dismissal. *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 621 (N.D.Tex.1998); *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992).

B. Section 10(b)(5) and Rule 10b-5

Plaintiffs allege violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, as amended by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1). Section 10(b) makes it unlawful for a person to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of the rules promulgated by the Securities and Exchange Commission ("SEC") as necessary or appropriate in the public interest or for the protection of the investors. *See* 15 U.S.C. § 78j(b). Rule 10b-5, promulgated pursuant to section 10(b), makes it unlawful for any person, either directly or indirectly, to make any untrue statement of material fact or to omit a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security. *See* 17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, the following: (1) a misstatement or an omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff relied; (5) which proximately caused injury to the plaintiff. *See ABC Arbitrage v. Tchuruk,* 291 F.Supp.2d 336, 348 (5th Cir.2002).

C. Rule 9(b) and the PSLRA

*6 Claims brought under section 10(b) are fraud claims. Accordingly, the pleading requirements of the PSLRA incorporate the standard for pleading fraud under Rule 9(b). Rule 9(b) requires a plaintiff "to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *ABC Arbitrage,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 5

291 F.3d at 349. The PSLRA requires a plaintiff's complaint to specify (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed. *See* 15 U.S.C. § 78u-4(b)(1). Therefore, a plaintiff alleging securities fraud must not only allege the time, place, identity of the speaker, and content of the alleged misrepresentation, but also explain why the challenged statement or omission is false or misleading. *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.1997). To satisfy Rule 9(b) and the PSLRA, a plaintiff must plead facts and avoid reliance on conclusory allegations. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994). If a complaint fails to satisfy the pleading requirements of the PSLRA or Rule 9(b), the Court must dismiss the complaint. *See ABC Arbitrage*, 291 F.3d at 350.

D. Scienter Requirement

Additionally, in order to survive a motion to dismiss, a plaintiff alleging securities fraud claims must plead specific facts which give rise to a strong inference of scienter. *See Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 407 (5 th Cir.2001). Scienter is a mental state which embraces the intent to deceive, manipulate, or defraud. *See In re Capstead Mortgage Corp. Sec. Lit.*, 258 F.Supp .2d 533, 548 (N.D.Tex.2003) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). A plaintiff may satisfy the scienter requirement by alleging either intentional misconduct or "severe recklessness." *See Capstead*, 258 F.Supp.2d at 548 (internal citations omitted). The Fifth Circuit defines "severe recklessness" as

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Nathenson*, 267 F.3d at 408. Circumstantial evidence of conscious behavior or severe recklessness can be sufficient to support a strong inference of scienter. *See id.* at 410. The court considers the totality of the facts and circumstances alleged by a plaintiff in determining whether they raise the requisite strong inference of scienter. *See id.* at 425. While allegations of motive and opportunity standing alone are insufficient to plead a strong inference of scienter, motive and opportunity may enhance the strength of the inference of scienter where the totality of the allegations demonstrates conscious behavior or severe recklessness. *See id.* at 412. A complaint's failure to adequately plead scienter requires dismissal of that complaint. *See* 15 U.S.C. § 78u-4(b)(3)(A); *see also Capstead*, 258 F.Supp.2d at 548.

*7 The Officer Defendants and Deloitte move separately to dismiss Plaintiffs' Second Amended Complaint, contending that it fails to state a claim upon which relief can be granted, fails to satisfy the particularity requirements of Rule 9(b) and the PSLRA, and fails to allege sufficient facts necessary to demonstrate scienter.

IV. Officer Defendants' Motions to Dismiss

Plaintiffs allege that the Officer Defendants, Brown, Blackwell, Kirkland, and Pettee, violated section 10(b) and rule 10b-5 by making several material misrepresentations and omissions. Additionally, Plaintiffs allege that the Officer Defendants are liable as control persons under Section 20(a) of the 1934 Act.

A. Group Pleading

In their motions to dismiss, the Officer Defendants argue that Plaintiffs' Second Amended Complaint improperly uses "group pleading" to make its allegations. Plaintiffs respond that "if more than one Defendant is attributed to one statement, it is because each Defendant named signed the document, or attended the meeting in which the misrepresentation was made, or was responsible for reviewing that statement and correcting any misrepresentations before approving its release."

As an initial matter, the Court notes that in *Southland Securities v. Inspire Ins. Solutions*, 365 F.3d 353 (5th Cir.2004), the Fifth Circuit Court of Appeals for the first time officially stated that the PSLRA abolished the doctrine of "group pleading."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 6

This doctrine allowed plaintiffs to rely on the presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information are collectively the work of the individuals directly involved in the everyday business of the company. *See id.* at 363. By abolishing the group pleading doctrine, the Fifth Circuit explicitly held that the PSLRA requires that a plaintiff must " 'distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud.' As such, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded." *Id.* at 365.

The court in *Southland* went on the say that statements made in corporate documents may be charged to individual officers provided that specific factual allegations link the individual to the statement at issue. *See id.* Acceptable factual allegations include the officer's signature on the document or particular factual allegations which explain the individual officer's involvement in the formulation of either the entire document or the specific portion of the document which contains the statement at issue. *See id.* Thus, the court held that allegations against "defendants" as a group cannot be properly imputed to particular individual defendants "unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Id.*

*8 Accordingly, at the very least, Plaintiffs may attribute statements made in AMRESCO's filings to the officer defendants that signed the filings. However, *Southland* renders some of the alleged misrepresentations of the Officer Defendants insufficiently plead.

1. Misrepresentations at the May 10, 2001 Shareholders' Meeting

Plaintiffs' Second Amended Complaint alleges that on May 10, 2001, Defendants Brown, Pettee, and Blackwell met with AMRESCO shareholders in order to solicit support for the May 2001 proxy issues. *See* Plaintiffs' Second Amended Complaint ¶ 50. Plaintiffs argue that misrepresentations were made at the meeting when "Defendants Brown, Pettee and Blackwell all assured the shareholders that it was not a question of AMRESCO being able to obtain warehouse lines of credit, but how much AMRESCO would have to give up in fees or profit sharing to get the best terms." *Id.*

The *Southland* rationale rejects the Officer Defendants' argument that individual defendants cannot be held liable based on statements made in or omitted from publicly filed documents "even when the defendant signs the public filing at issue." Nevertheless, the PSLRA and Fed.R.Civ.P. 9(b) require a plaintiff to identify the particular individual who makes a misstatement or omission. *See In re Capstead Mortgage Corp. Securities Litigation,* 258 F.Supp.2d 533, 562 (N.D.Tex.2003). In ¶ 50, Plaintiffs do not identify any statements or omissions attributable specifically to either Brown, Pettee, or Blackwell. This failure renders the allegation inadequate to satisfy the heightened pleading standards applicable to securities fraud cases. *See id.* (holding that securities fraud plaintiffs' failure to specifically identify which officer made which allegedly fraudulent statement or omission in meetings and conference calls with shareholders failed to satisfy the heightened requirements of the PSLRA and Rule 9(b)). Therefore, the Court concludes that Plaintiffs' allegations with regards to the May 10, 2001 shareholder meeting fail to satisfy the heightened pleading requirements of the PSLRA and Rule 9(b).

2. AMRESCO's Business Filings Not Signed by Officer Defendants

Plaintiffs' Second Amended Complaint also complains of alleged misstatements and omissions contained in several of AMRESCO's SEC filings and a proxy statement filed in connection with a fight over AMRESCO's control and management. Specifically, Plaintiffs contend that (1) AMRESCO's 10-Q forms for the first, second, and third quarter of Fiscal Year 2000, which were signed by Defendant Pettee; (2) AMRESCO's 10-K for Fiscal Year 2000, filed on March 29, 2001, which was signed by Defendants Brown, Pettee, and Kirkland; (3) AMRESCO's 10-Q for the first quarter of Fiscal Year 2001, which was signed by Defendant Pettee; and (4) a proxy statement issued by AMRESCO's board of directors on May 8, 2001 each contain material misrepresentations and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 7

omissions.

Plaintiffs allege that while each Officer Defendant did not sign each of the SEC filings, Plaintiffs believe that each filing was "approved by the Individual Defendants." *See* Complaint ¶¶ 46--48, 51. Similarly, with regards to the proxy statement of May 8, 2001, Plaintiffs complain that the phrase "your current board of directors has extensive involvement in the industry and is enacting a decisive strategic plan to revive AMRESCO" was "believed to have been approved by each of the Individual Defendants." *Id.* at ¶ 42.

*9 While Plaintiffs argue that "[a]s for approval by non-signatory officers, that should be determined by viewing the Complaint as a whole," *Southland* clearly states that when an officer's signature is not present, a plaintiff must plead "particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement." *Southland*, 365 F.3d at 365. As Plaintiffs fail to plead specific facts explaining how the non-signatory Officer Defendants were involved in formulating the information contained in the filings, Plaintiffs' conclusory allegations that the non-signatory officers are believed to have approved the SEC filings are insufficient to attribute those statements to those officers. *See id.* (allegation which stated that individual officer defendants "each controlled the contents of and participated in making corporations SEC filings, reports, and released" was a conclusory allegation insufficient to attribute the documents to each individual defendant).

Accordingly, the statements made in the SEC filings at issue cannot be attributed to the officer defendants that did not sign the filings at issue, and Plaintiffs have not adequately attributed the representations included in the May 8, 2001 proxy statement to any Officer Defendant.

Having determined which alleged material misrepresentations are not actionable based on Plaintiffs' group pleading, the next question addressed by this court is whether Plaintiffs have met the heightened pleading standards of the PSLRA and Rule 9(b) on their remaining allegations against the Officer Defendants.

B. Alleged Material Misstatements and Omissions

Plaintiffs allege that the Officer Defendants made several material misrepresentations and omissions which were fraudulent. The Court will analyze each allegation in turn.

1. Overstatement of Assets

a. Particularity

Plaintiffs allege that through AMRESCO's SEC filings, the Officer Defendants fraudulently misrepresented the value of the Company's assets to its shareholders. Specifically, Plaintiffs allege that "AMRESCO's March 2001, 10-K and the audited financial statements submitted in connection with its March 2001, 10-K for the year ending December 31, 2000, were false and misleading for the reason that is (sic) assets were significantly overstated, including the fair market value assigned to the Company's retained interests in securitizations as further alleged and explained below therein." Plaintiffs' Second Amended Complaint, ¶ 48. In addition to this language, the Complaint several more times summarily alleges that AMRESCO's filings overstated its assets. *See id.* ¶¶ 56-57, 60, 70(e). In their respective motions to dismiss, the Officer Defendants argue that Plaintiffs do not allege any facts which support their allegation that any of the reported asset values were inaccurate at the time those values were disclosed.

*10 Plaintiffs allege that AMRESCO's 10-K for the year ending December 31, 1999 "significantly overstated the Company's assets, including its interests in retained earnings." *Id.*, ¶ 45. Plaintiffs also allege that AMRESCO's 10-K for the year ending December 31, 2000 significantly overstated the Company's assets "including the fair market value assigned to the Company's retained interests in securitizations." *Id.*, ¶ 46. Plaintiffs base their claims that the Officer Defendants misrepresented the value of AMRESCO's assets on two interrelated factors: (1) the discount rate used by AMRESCO to value the future cash flow of its retained interests in securitizations, and (2) the past-due rate of loans within AMRESCO's conventional lending portfolio.

Plaintiffs' first step in pleading fraud with regards to misrepresentations concerning the value of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 8

AMRESCO's assets is to provide a general understanding of how AMRESCO's conventional lending business worked. To do this, Plaintiffs give the following synopsis of how AMRESCO's conventional lending business operated:

> Amresco's core business included originating loans secured by mortgages and collateral. Amresco would then package the loans and sell them to third parties. Using hypothetical dollar amounts and loan quantities, Amresco's business can be explained in basic terms as follows: Amresco originates twelve (12) $100,000 loans secured by mortgages. Amresco then packages (securitizes) ten (10) of these loans and sells them to third parties. In order to reduce market risk, the third parties require the securitizations to be over-collateralized. Thus, Amresco is required to pledge all twelve (12) loans as security for the ten (10) loans that have been securitized and sold. Amresco retained a subordinate interest in the two (2) loans that were pledged as collateral but not sold. Amresco then recognized these two (2) loans as assets on its balance sheet, based on the projected discounted cash flow of these two (2) loans over their terms. If the ten (10) loans which were sold in the securitization package perform, Amresco will receive full payment for the two (2) loans in which it retained a subordinated interest as payments become due. However, if the loans do not perform, and the buyer of the ten (10) loans incurs losses which are not sufficiently collateralized by the other ten (10) securitized loans and their mortgages, the two (2) loans which Amresco retained are required to be used to offset those losses, thereby diminishing Amresco's cash flow and assets.

Against this backdrop, Plaintiffs contend that, in light of the high number of conventional lending loans which were past due, the discount rate used by AMRESCO to determine the value of the assets necessarily overvalued the Company's assets.

At the outset, it is significant to note that Plaintiffs base their allegation that AMRESCO's assets were materially overstated on the affidavit of Victor C. Moore, Plaintiffs' proffered accounting expert. As stated previously, the Court will not entertain Mr. Moore's opinions, as such testimony is not admissible at the motion to dismiss stage and the Court has granted Deloitte's motion to strike these portions of Mr. Moore's affidavit. However, to the extent Plaintiffs focus only on facts relied on by Mr. Moore which they include in the Complaint, they are nevertheless insufficient to plead fraud against the Officer Defendants with the necessary particularity.

*11 Plaintiffs allege that AMRESCO's valuation of those loans in which it had a subordinated interest played a significant part in allegedly overvaluing AMRESCO's retained interests in securitizations for the year ending December 31, 2000. AMRESCO's 10-K for the year ending December 31, 2000 used a 15% discount rate to determine the cash flow for conventional business loans contained in its retained interests in securitizations. In their Second Amended Complaint, Plaintiffs point out that "discount rates are determined by the estimated risk of holding an asset over time. The greater the risk the higher the discount rate." Plaintiffs' Second Amended Complaint, ¶ 82(27). Plaintiffs allege that although AMRESCO calculated the value of its retained interest in securitizations assuming a very low amount of risk, thus causing it to use a favorable discount rate, the percentage of past due loans in the Company's conventional lending portfolio should have caused it to use a higher discount rate, thus reducing the value of its retained interest in securitizations.

AMRESCO's SEC filings reveal that for the year ending December 31, 2000, the past due percentage for the Company's conventional lending portfolio was 8.98%, rising to 12.31% by February 28, 2001. Id. ¶ 82(23)-(24). Despite this rate, the 10-K stated that "for the purpose of estimating future cash flow, AMRESCO assumed that the expected credit losses on AMRESCO's loan portfolio were zero." Id. ¶ 82(26). Plaintiffs allege that in light of the high rate of past due payments, AMRESCO would not be able to enjoy the full value of its subordinated interests in the retained interests in securitizations, meaning that its cash flow would be reduced, thus reducing the value of its assets.

However, AMRESCO's SEC filings clearly stated the following points: (1) "[t]he discounted present value of [retained interests in securitizations] is computed using management's assumptions of market discount rates, prepayment rates, default rates, credit losses, and other costs;" (2) "[t]he use of different market assumptions and/or estimation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 9

methodologies may have a material effect on the estimated fair value amounts;" and (3) "[t]he Company structures its conventional business loans ... such that the borrowers within a defined pool of loans absorb the first 5%--10% of net losses. At the present time, the Company considers it unlikely that net losses on such loan portfolios will exceed the 5%--10% range. Accordingly, for initial valuation purposes, losses are assumed at zero." Defendants' Joint App. pp. 103, 108, 120. Apart from using Mr. Moore's inadmissible opinions to allege that AMRESCO should have used a discount rate of at least 20% instead of 15%, Plaintiffs' allege no facts which attack the underlying assumptions used by AMRESCO to calculate the value of its retained interests in securitizations. Indeed, Plaintiffs' own Complaint acknowledges that AMRESCO's conventional lending business was designed in such a way as to cause the borrowers, and not AMRESCO, to absorb the losses on the first 5%--10% of loans which were past due. *See* Plaintiffs' Second Amended Complaint, ¶¶ 31-33.

*12 Although Plaintiffs allege that AMRESCO's assets were materially and fraudulently overstated, the factors on which Plaintiffs rely to support their claim were expressly disclosed in AMRESCO's SEC filings. Plaintiffs themselves acknowledge that AMRESCO's 10-K for the year ending December 31, 2000 "[warned] readers of the financial statements that if the delinquencies increased (and they did through February 28, 2001) that cash flow from the securities would be reduced or delayed; therefore, causing the $182 million of retained interests to be inflated and require further write-downs." *Id.* ¶ 82(20). Essentially, then, Plaintiffs are merely complaining of the fact that what AMRESCO warned investors could happen actually happened. Such an allegation is not sufficient to adequately plead fraud.

Plaintiffs' Second Amended Complaint fails to specifically plead facts supporting the allegation that the Officer Defendants which signed the SEC filings knew the value of the retained interests in securitizations was materially overstated at the time filings were released, or that the discount rate and/or credit loss assumption employed were done fraudulently. Plaintiffs fail to plead facts sufficient to support their allegation that the Officer Defendants fraudulently misrepresented the value of AMRESCO's assets.

2. The Duke & Long Loan

Plaintiffs' Second Amended Complaint alleges that the Officer Defendants fraudulently omitted from AMRESCO's SEC filings material information regarding a $50 million loan made by AMRESCO to Duke & Long Distributing Company, Inc. ("Duke & Long"). *See* Plaintiffs' Second Amended Complaint, ¶ 64. Specifically, Plaintiffs state that Devon Convenience Holdings, L.L.C. ("Devon"), which allegedly acquired Duke & Long after AMRESCO had made the $50 million loan, went bankrupt, causing AMRESCO to "charge-off" the loan. *See id.* Plaintiffs allege that "the charge-off was clearly material and should have been made and disclosed to the public on or about November 20, 2000," the date Devon filed for bankruptcy. *Id.*

Plaintiffs' Second Amended Complaint goes on to state that "[a]s further discussed herein, Defendants knew payments from Duke & Long or Devon were highly questionable when Devon filed for bankruptcy protection." *Id.,* ¶ 67. Plaintiffs in their Complaint fail to follow through on their promise of pleading specific facts showing that payments on the Duke & Long loan were indeed questionable. After ¶ 67, The only specific references Plaintiffs make to Devon's bankruptcy and the loan are included in ¶ 80, which regards whether Deloitte had knowledge of Devon's financial troubles.

Plaintiffs do not plead specific facts which show that the act of not disclosing information regarding the Duke & Long loan was fraudulent. First, Plaintiffs' statement that they "learned" about a $50 million charge-off indicates that the allegations are not based on their personal knowledge, meaning that their allegations are pleaded upon information and belief. *See ABC Arbitrage,* 291 F.3d at 351 (allegations not based upon a plaintiff's personal knowledge are necessarily pleaded on "information and belief"). Thus, under the PSLRA, Plaintiffs are required to provide "documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs." *Id.* at 352. Plaintiffs do not provide the facts necessary to give credence to their "information and belief" pleadings, instead they level allegations about the Duke & Long loan at the Officer Defendants

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 10

without stating how Plaintiffs formed their beliefs regarding the Officer Defendants' alleged knowledge of the loan. In the few facts they do allege, Plaintiffs fail to discuss how Devon's bankruptcy affected the loan to Duke & Long, how the loan was treated in the bankruptcy, how the loan was treated within the securitization package to which it belonged, if the other loans in the securitization package could not compensate for a default on the Duke & Long loan, how the loan affected AMRESCO's cash flow, or any other facts showing that the Officer Defendants acted fraudulently.

*13 By failing to plead facts with the necessary particularity, Plaintiffs' do not satisfy the requirements of the PSLRA and Rule 9(b) with respect to the Duke & Long loan.

3. Retention of Greenhill & Co.

Plaintiffs' Second Amended Complaint also alleges that the Officer Defendants failed to timely disclose that AMRESCO had retained a corporate restructuring firm, Greenhill & Co. ("Greenhill"). See Plaintiffs' Second Amended Complaint, ¶¶ 52-55. Specifically, Plaintiffs state that AMRESCO's retention of Greenhill on March 12, 2001 was "material information which should have been immediately disclosed to the public; however, it was not disclosed until after the filing of the bankruptcy." Id. ¶ 54. Plaintiffs go on to allege that AMRESCO's failure to disclose the purpose of Greenhill's retention until AMRESCO filed for bankruptcy on July 2, 2001 "made the other statements ... concerning the financial condition of the Company and the 'significant progress' it had made in connection with the execution of its recovery plan false and misleading." Id.

Plaintiffs rely on *Arnlund v. Smith*, 210 F.Supp.2d 755 (E.D.Va.2002) to support their claim that the Officer Defendants' omission of AMRESCO's retention of Greenhill & Co. was fraudulent. The discrepancy between the factual allegations included in Plaintiffs' Second Amended Complaint and those analyzed by the court in *Arnlund v. Smith* is quite significant. In that case, the plaintiffs sued directors of a company for securities fraud based on the defendants' allegedly fraudulent failure to disclose in the company's annual report that the company was heading for bankruptcy. The Plaintiffs' Second Amended Complaint in that case alleged specific facts referring to the minutes of the company's board meetings in which the possibility of filing for bankruptcy was discussed in the presence of two attorneys with a law firm which handled bankruptcies. *See id.* at 764. At one of those meetings, the defendants agreed that if the company could not convince its lenders to extend the company's credit facility, the company should position itself for the possibility of filing for bankruptcy. *See id.* at 758. Despite those meetings, the company's 10-K, which was filed less than two weeks later, stated that there were no significant factors which affected the business of the company and that the company had no significant concentration of credit risk. *See id.* The court held that in light of the minutes of the defendants own meetings, the plaintiffs adequately pled facts which could lead a reasonable juror to believe that the defendants' failure to disclose the possibility of the company's bankruptcy was fraudulent.

Here, however, Plaintiffs do not allege comparable facts. Plaintiffs merely allege that by retaining Greenhill, the Officer Defendants had a duty to disclose this information to the public. Plaintiffs fail to plead this claim with particularity for multiple reasons. First, Plaintiffs fail to state with particularity which Officer Defendant had a duty to disclose this information. While the statements of some of the Officer Defendants may be attributed to them by virtue of their signature on AMRESCO's SEC filings, Plaintiffs allege that this information should have been disclosed to the public immediately. Without stating which Officer Defendants should have disclosed the information, and why that defendant should have done so, Plaintiffs are attempting to hold the Officer Defendants liable based on their status as officers. The group pleading prohibition prevents such pleading. *See Southland*, 365 F.3d at 363.

*14 Additionally, unlike in *Arnlund v. Smith*, Plaintiffs do not plead with particularity specific facts showing that, based on AMRESCO's retention of Greenhill, any of the Officer Defendants believed any of AMRESCO's assets were in a "liquidity crisis" or that the company was headed towards bankruptcy. Plaintiffs' own Complaint states that the letter agreement between AMRESCO and Greenhill

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
**(Cite as: 2004 WL 2203253 (N.D.Tex.))**

Page 11

explained that AMRESCO explicitly retained Greenhill in order to explore numerous restructuring options:

'Restructuring' was defined by the agreement as follows:

[A]ny recapitalization or restructuring (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement ... and/or material modification or amendment to the terms, conditions, or covenants thereof) of the Company's equity and/or debt securities including pursuant to an exchange transaction, a Plan or solicitation of consent, waivers, acceptances or authorizations or an acquisition related transaction including any of the above within a proceeding under the Bankruptcy Code subject to the approval of the Bankruptcy Court.

Thus, while the possibility existed that AMRESCO's retention of Greenhill meant that Greenhill could represent AMRESCO in bankruptcy proceedings at some point in the future, Plaintiffs have not pled facts demonstrating which AMRESCO Officer Defendant knew AMRESCO had even hired Greenhill, much less was aware that AMRESCO was positioning itself for an impending declaration of bankruptcy.

In *Arnlund v. Smith,* the plaintiffs pled facts indicating the defendants were acutely aware that filing for bankruptcy was a very real possibility. Here, Plaintiffs have not pled facts which show that the mere retention of a corporate restructuring firm should have been immediately disclosed to the public, or automatically rendered AMRESCO's statements regarding the value of its assets or the Company's direction misleading. Accordingly, Plaintiffs' do not satisfy the requirements of the PSLRA and Rule 9(b) with regard to AMRESCO's retention of Greenhill.

4. Executive Compensation

Plaintiffs' Second Amended Complaint also alleges that in April of 2000, several executive compensation agreements were executed in favor of certain of AMRESCO's officers, including the Officer Defendants. *See* Plaintiffs' Second Amended Complaint, ¶ 49, 73, 89-90. Plaintiffs allege that "[a]lthough these material transactions occurred in April, 2000, they were not revealed until March of 2001. During this period, AMRESCO had issued three quarterly Form 10-Q's each signed by Petee (sic) and believed to have been approved by the Individual Defendants and numerous press released with no mention of this material event." *Id.,* ¶ 49.

Plaintiffs' claim relating to the Officer Defendants' failure to disclose the executive compensation agreements fails for several reasons. First, as was the case with Plaintiffs' claims concerning the retention of Greenhill, Plaintiffs fail to specifically plead which officer defendant had a duty to disclose the existence of the executive compensation agreements, or, more importantly, why the Officer Defendants had a duty to so disclose. However, to the extent Plaintiffs state that it was Officer Defendant Pettee, as a signatory to AMRESCO's 10-Q forms filed in the period between the execution of the agreements and the disclosure of the agreements, Plaintiffs fail to specifically plead why Officer Defendant Pettee should have disclosed the compensation plans.

*15 Although Plaintiffs allege that one of the agreements which the Officer Defendants failed to disclose "was an Incentive Bonus Agreement ... which provided the officers a potential bonus in excess of the entire market capitalization of AMRESCO," they plead no facts to support this allegation. *Id,* ¶ 49. However, Plaintiffs' own conduct in this case is even more devastating to their claims than the lack of particularity in the Complaint. Despite their allegations that AMRESCO's disclosure of the executive compensation plans was unlawfully belated, and that the compensation plans were material information which would have adversely affected the decisions of investors, Plaintiff Financial Acquisition Partners purchased all of its shares of AMRESCO stock *after* AMRESCO disclosed the compensation plans in its 10-K for the year ending December 31, 2000. This fact alone rebuts the contention that Plaintiffs would not have purchased the stock had they known of the agreements.

Accordingly, Plaintiffs fail to plead with particularity facts demonstrating that each of the Officer Defendants' failure to disclose the terms of certain executive compensation agreements was an actionable omission under section 10(b) and rule 10b-5.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 12

5. Other Alleged Omissions

In addition to the alleged misrepresentations and omissions already discussed by the Court, Plaintiffs' Second Amended Complaint also complains that Form 10-Q's filed for the second and third quarters of Fiscal Year 2000 failed to disclose: (1) the need for a special reserve for taxes due in connection with AMRESCO's business in the UK; (2) the difficulties of the market environment for a small specialty finance company such as AMRESCO; and (3) that the number of providers of the warehouse loan facilities and lines of credit on which AMRESCO relied was dwindling. *See* Plaintiffs' Second Amended Complaint, ¶ 46. Plaintiffs plead no facts regarding why the Officer Defendants should have made the disclosures, how the failure to make the disclosures was fraudulent, and how the Officer Defendants which did not sign the 10-Q's were involved in the failure to disclose. In Plaintiffs' response to the Officer Defendants motions to dismiss, they do not pursue these issues. To the extent Plaintiffs base a claim on these failures to disclose, that claim fails. *See In re MCI Worldcom, Inc. Securities Litig.*, 191 F.Supp.2d 778, 788-89 (S.D.Miss.2002) (holding that where the plaintiffs in a securities fraud case did not address all of the defendants' assertions that the plaintiffs' claims should be dismissed, those claims which the plaintiffs failed to respond to were abandoned).

C. Scienter

Even if the Plaintiffs' Second Amended Complaint does state with particularity facts supporting some or all of Plaintiffs' allegations that the Officer Defendants made material misstatements and omissions in connection with the sale of AMRESCO stock, Plaintiffs fail to plead facts which give rise to a strong inference that the Officer Defendants acted with the requisite state of mind in so doing. The scienter requirement of PSLRA requires Plaintiffs to allege facts which demonstrate that the misrepresentation of AMRESCO's asset values was the result of conscious behavior or an extreme departure from the ordinary standard of care. *See Capstead*, 258 F.Supp.2d at 556. The Court considers "all the facts and circumstances alleged to determine whether they ... raise a requisite strong inference of scienter." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir.2003).

*16 Plaintiffs' allegations of scienter in the Complaint are insufficient. First, Plaintiffs do not recite specific facts alleging how each Officer Defendant possessed the requisite state of mind. In ¶ 91 of the Complaint, Plaintiffs state the following:
> Defendants knew and/or were reckless in not knowing that the public documents and statements issued or disseminated in the name of AMRESCO were materially false and misleading; knew or were reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents; and knew and/or were reckless in failing to disclose the adverse material facts as specified herein.

Such general and conclusory statements are not sufficient to provide the specific facts upon which a strong inference of scienter may be based. *See Capstead*, 258 F.Supp.2d at 564. Nowhere in Plaintiffs' response to the Officer Defendants' motions to dismiss do they point to a paragraph of the Complaint supporting their allegations that the Officer Defendants acted with scienter. Instead, Plaintiffs merely respond that the Officer Defendants' motives to artificially inflate AMRESCO's stock price and to not disclose the Company's dire financial condition in its proxy or public filings were to "maintain their position[s] in Amresco, which they could not have done had the proxy contest been lost, so that they could obtain millions of dollars in payments and/or loans immediately prior to bankruptcy." However, as the court stated in *Capstead*, the Fifth Circuit has determined that while allegations of motive and opportunity may enhance evidence of scienter, the law is clear that a defendant's motive to raise capital, the desire for enhanced incentive compensation and the desire to sell stock at inflated prices are all insufficient to support an inference of scienter. *See Capstead*, 258 F.Supp.2d at 564 ( citing *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir.1994)).

In *Capstead*, the court found that the plaintiffs insufficiently pled scienter when they argued that the individual defendants were motivated to commit fraud by the possibility of reaping $10 million in salaries and bonuses. *See id.* Additionally, in *Lain v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
**(Cite as: 2004 WL 2203253 (N.D.Tex.))**

Page 13

*Evans,* 123 F.Supp.2d 344, 350 (N.D.Tex.2000), the court found that the plaintiff's allegations that the defendants were motivated to commit fraud by the desire to create the impression that the company was stable, to " 'keep the game going' and gloss over allegations of mismanagement," and to defend their own personal interests. The court ruled that such motives were insufficient to establish scienter.

> The court in *Capstead* put it best when it stated that Pleading scienter is not an insurmountable task if the facts exist to support it. The approach is to state with particularity what each Defendant did and why the conduct rises to the level of scienter, rather than taking a shotgun approach in what Plaintiffs attempt to overwhelm the court with conclusory, speculative, and esoteric allegations.... The court finds Plaintiffs' method of pleading more telling about what does not exist in the complaint, rather than what does exist.

*17 *Capstead,* 258 F.Supp.2d at 565. Like that case, Plaintiffs' Second Amended Complaint here is filled with plenty of generalizations but few facts. Therefore, considering all the facts and circumstances alleged, Plaintiffs have not alleged facts giving rise to a strong inference that each Officer Defendant acted with the necessary state of mind.

D. Plaintiffs' Section 20(a) Claim

In addition to primary violations of the Exchange Act under section 10(b) and rule 10b-5, Plaintiffs also allege that the Officer Defendants are liable for violations of Section 20(a) of the Exchange Act. Section 20(a) deals with "controlling person liability," and provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person...." 15 U.S.C. § 78t(a).

When a plaintiff fails to properly plead a violation under Section 10(b) and Rule 10b-5, the Court must also dismiss the plaintiff's Section 20(a) claim. *See Capstead,* 258 F.Supp.2d at 566 ("Where a primary violation by the 'controlled person' has not been adequately pleaded, the court should also dismiss a section 20(a) claim"). Because Plaintiffs have failed to properly plead a primary violation under Section 10(b) and Rule 10b-5, Plaintiffs' Section 20(a) claim must also be dismissed.

V. Deloitte's Motion to Dismiss

In addition to its claims against the Officer Defendants, Plaintiffs also sue Deloitte for violations of section 10(b) and rule 10b-5. Plaintiffs' claims against Deloitte are based upon: (1) Deloitte's alleged misrepresentations to the public that AMRESCO's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP") and generally accepted auditing standards ("GAAS"); (2) Deloitte's failure to issue a going concern qualification in its audit opinion of AMRESCO; and (3) various allegedly false and misleading statements or omissions made by Defendants.

A. Alleged Misrepresentations and Omissions

1. Deloitte's Statements That it Followed GAAP and GAAS

The first category of misrepresentations on which Plaintiffs rely relate to Deloitte's alleged violation of GAAP and GAAS. Specifically, Plaintiffs allege that Deloitte had a duty to Plaintiffs and the investing public to provide accurate accounting information and to perform its audits of AMRESCO's financial statements for fiscal year 2000 and 2001 and its other accounting functions "in accordance with industry professional standards." Plaintiffs go on to allege that Deloitte breached its duty to Plaintiffs and violated accounting industry professional standards by, among other things, (1) preparing the unqualified audit opinions that AMRESCO's 2000 and 2001 financial statements were in compliance with GAAP when Deloitte knew or should have known the financial statements did not comply with GAAP; and (2) failing to properly audit AMRESCO's financial statements in compliance with GAAP. *See* Plaintiffs' Second Amended Complaint, ¶ 120. Deloitte argues that Plaintiffs' have not specifically pled how it violated GAAP, and that even if its conduct did violate GAAP, Plaintiffs have not sufficiently pled facts which establish that it did so with scienter.

*18 Plaintiffs' Second Amended Complaint alleges

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 14

that Deloitte violated GAAP by using improper methods to determine the value of AMRESCO's retained interests in securitizations. Through the affidavit of their expert, Mr. Moore, which the Court only considers to the extent that Plaintiffs included factual assertions by Mr. Moore within the text of the Complaint, Plaintiffs allege that Deloitte violated Financial Accounting Standards Board ("FASB"), Statement of Financial Accounting Standards ("FAS") No. 125, ¶¶ 44. That provision provides in pertinent part:

> estimates of expected future cash flows, if used to estimate fair value, shall be the best estimate based on reasonable and supportable assumptions and projections. All available evidence shall be considered in developing estimates of expected future cash flows. The weight given to the evidence shall be commensurate with the extent to which the evidence can be verified objectively....

FASB No. 125, ¶ 44. Plaintiffs' Second Amended Complaint also alleges that Deloitte violated several principles set out in the FASB Statement of Concepts, including (1) the principal that financial reporting should provide information that is useful; (2) the principal that financial reporting should provide information about an enterprise's performance; (3) the principle that financial reporting should be reliable; (4) the principle that nothing is left out of the information reported which may be necessary to ensure that it validly represents actual events and conditions; and (5) the principle that conservatism should be used in reaction to uncertainties. *See* Plaintiffs' Second Amended Complaint, ¶ 121 (*citing* FASB Statement of Concepts No. 1, ¶¶ 34, 42; No. 2 ¶¶ 58-59, 79, 95, 97).

Plaintiffs attempt to allege facts showing that AMRESCO's valuation of its retained interests in securitizations violated FASB No. 125, ¶ 44. To do so, Plaintiffs point out that AMRESCO's 10-K for the year ending December 31, 2000 estimated that the value of the Company's retained interest in securitizations was $182 million, where that figure was calculated using a discount rate of 15% and assuming that the expected credit losses on AMRESCO's loan portfolio were zero. *See id.,* ¶ 82(26-27). Noting that AMRESCO's 10-K for the year ending December 31, 2000 stated that the past due rate of the loans in its conventional lending portfolio was 8.98%, compared to 2.07% the year before, Plaintiffs contend that using a rate of zero to calculate the value of the retained interests in securitizations likely was not the "best estimate based on reasonable and supportable assumptions and projections."

The language included within AMRESCO's 10-K and the notes to the financial statements accompanying the 10-K show that no violations of GAAP took occurred. Within the text of the very same documents Plaintiffs base their allegations on, AMRESCO made the following statements: (1) "[t]he discounted present value of [retained interests in securitizations] is computed using management's assumptions of market discount rates, prepayment rates, default rates, credit losses, and other costs;" (2) "[t]he use of different market assumptions and/or estimation methodologies may have a material effect on the estimated fair value amounts;" (3) "[t]he Company structures its conventional business loans ... such that the borrowers within a defined pool of loans absorb the first 5%--10% of net losses. At the present time, the Company considers it unlikely that net losses on such loan portfolios will exceed the 5%--10% range. Accordingly, for initial valuation purposes, losses are assumed at zero;" and (4) "[i]n the event the delinquencies remain at current levels or increase, additional write downs of such retained interests will most likely be necessary." Defendants' Joint App. pp. 82, 103, 108, 120.

*19 Plaintiffs do not allege any facts which would demonstrate that the assumptions used by AMRESCO were not the "best estimate based on reasonable and supportable assumptions and projections." Thus, Plaintiffs' allegations that AMRESCO's public filings violated GAAP is not a fact, but a conclusion masked as a fact. *See Capstead,* 258 F.Supp.2d at 549 (merely alleging that "Defendants violated GAAP" is a conclusion, not a fact).

The filings disclosed in detail how and why AMRESCO valued its assets in the manner that it did, and alerted the public that write-downs of its asset values could be necessary if the current trends remained in place. Accordingly, Plaintiffs have not alleged that AMRESCO violated FASB No. 125, ¶ 44 by not using "reasonable and supportable

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 15

assumptions and projections."

2. Deloitte's Failure to Issue a "Going Concern" Qualification

In addition to its allegations based on the determinations of the value of AMRESCO's retained interests in securitizations, Plaintiffs contend that information which was publicly disclosed in the financial statements attached to the 10-K for the year ending December 31, 2000 gave rise to substantial doubt as to the company's ability to continue as a going concern. Accordingly, Plaintiffs argue that Deloitte should have issued a going concern qualification in its 2000 audit opinion, disclosing the possibility that AMRESCO was in danger of not being able to continue as ongoing entity.

According to the American Institute of Certified Public Accountants' ("AICPA") Code of Professional Standards AU § 341, an auditor has an obligation to evaluate an entity's ability to continue as a going concern. *See* Plaintiffs' Second Amended Complaint, ¶ 82(10). Under AU § 341.06, an auditor should issue a going concern qualification if, considered in the aggregate, one or all of the following conditions is present: (1) negative trends, such as recurring operating losses; (2) other indications of potential financial difficulties, such as the need to seek new sources of outside funding; (3) internal matters; and (4) external matters, such as legal issues that might jeopardize the company's ability to operate. *See id.*

Plaintiffs again rely on the opinion of their purported expert, Mr. Moore, to support their allegation that, given AMRESCO's situation as of the filing of its 10-K for the year ending December 31, 2000, Deloitte should have issued a going concern qualification in its audit. However, Mr. Moore's opinion is inadmissable at this time because an expert's opinions cannot be considered at the motion to dismiss stage of a case. While the Court can consider verifiable facts raised by his affidavit which are included in Plaintiffs' Second Amended Complaint, it cannot evaluate his opinion at the motion to dismiss stage.

Plaintiffs allege that because AMRESCO had suffered large operating losses for three consecutive years, had been selling off its assets to raise capital, and had violated its loan covenants and was actively seeking new sources of funding, three of these conditions were present, thus requiring Deloitte to issue a going concern qualification in its audit opinion of AMRESCO. Plaintiffs do not allege specific facts demonstrating that these factors would likely prevent AMRESCO from continuing as a viable company. This pleading deficiency alone defeats their claim.

*20 To the extent Plaintiffs allege facts to support those allegations, AMRESCO's public disclosure of the very facts Plaintiffs indicate should have led Deloitte to issue a going concern qualification means that Plaintiffs' claim fails. In *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194 (11th Cir.2001), the court analyzed whether an accountant's failure to issue a going concern qualification amounted to a material omission under Section 10(b). In dismissing the plaintiffs' case for failure to state a claim, the court held that the public disclosure of the "red flags" which might otherwise give rise to an inference of fraud defeated the plaintiffs' claim. *See id.* at 1211. The court held that, at most, the auditor was grossly negligent in failing to issue a going concern qualification when the company publicly disclosed its operating losses and proclaimed its dependency " 'upon its ability to substantially achieve its plan of reorganization." ' *Id.* The court noted that negligence, even gross negligence, is not sufficient to maintain a claim under section 10(b) or rule 10b-5.

Similarly, AMRESCO did not hide its operating losses and it acknowledged that it needed to secure warehouse funding. Plaintiffs do not plead specific facts alleging that these disclosures were false or misleading in any way. While Deloitte's failure to issue a going concern qualification in its audit opinion of AMRESCO may have been negligent, Plaintiffs allege no specific facts supporting their allegation that Deloitte's failure to do so was fraudulent. Thus, Plaintiffs fail to plead with particularity facts giving rise to a claim based on Deloitte's failure to issue a going concern qualification.

3. Other Alleged Material Misstatements and Omissions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
**(Cite as: 2004 WL 2203253 (N.D.Tex.))**

Page 16

In addition to Deloitte's alleged violations of section 10(b) based on GAAP and GAAS and Deloitte's failure to issue a going concern qualification as to AMRESCO's viability, Plaintiffs' Second Amended Complaint also references other ways in which Deloitte made fraudulent misrepresentations and omissions regarding AMRESCO's status. Specifically, Plaintiffs' allege that Deloitte fraudulently permitted AMRESCO to omit that (1) AMRESCO's SEC filings materially overstated the value of its assets, specifically the value of its retained interests in securitizations (2) it had entered into materially excessive, unnecessary, and exorbitant incentive compensation arrangements with certain officers and/or directors; (3) a loan representing a material asset was significantly impaired due to the bankruptcy of the obligor; and (4) AMRESCO had no alternate sources of warehouse funding. See Plaintiffs' Second Amended Complaint, ¶¶ 45, 56-57, 82, 120.

The Complaint fails to sufficiently plead specific facts demonstrating the allegedly fraudulent nature of these omissions. With the exception of Deloitte's alleged awareness of Devon's bankruptcy and the bankruptcy's alleged affect on the $50 million loan to Duke & Long, Plaintiffs do not plead additional specific facts regarding Deloitte's knowledge of or role in these alleged material omissions above and beyond that of the Officer Defendants. Indeed, Plaintiffs' Second Amended Complaint merely alleges that "[e]ach Defendant" or "the Defendants" possessed "actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them." Plaintiffs' Second Amended Complaint, ¶¶ 102-03, 105. Plaintiffs' failure to plead specific facts regarding Deloitte's role in these alleged omissions dooms these claims against Deloitte to the same fate as Plaintiffs' claims against the Officer Defendants.

*21 While Plaintiffs allege that Deloitte carried out an active role in the Devon bankruptcy, they fail to state the basis for their belief that "a $50 million charge-off by AMRESCO was attributable to" the Duke & Long loan. Also, as stated above, the Plaintiffs fail to allege facts telling the Court why and how the Duke & Long loan or the Devon bankruptcy specifically affected AMRESCO, or how Deloitte knew or was severely reckless in not knowing that the bankruptcy would materially affect AMRESCO's bottom line. Plaintiffs' conclusory allegations that Deloitte fraudulently failed to disclose this information, without corresponding facts to support the claims, are insufficient as a matter of law.

B. Scienter

Even if Plaintiffs have pled facts tending to show that Deloitte violated GAAP, Plaintiffs concede that the law is well-settled that the failure to follow GAAP, without more, is insufficient to establish a securities fraud claim. See Capstead, 258 F.Supp.2d at 551. To show scienter, not only must Plaintiffs properly plead violations of GAAP, but they must also allege specific facts which show that Deloitte knowingly published materially false information or was severely reckless in so doing. See Coates v. Heartland Wireless Communications, Inc., 100 F.Supp.2d 417, 430 (N.D.Tex.2000). To meet this threshold requirement, Plaintiffs must plead facts which give rise to a strong inference that no reasonable accountant, facing the same facts, would have made the same decisions as Deloitte. See DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir.2002).

Plaintiffs argue that Deloitte (1) was aware of several "red flags" on the face of the 10-K for the year ending December 31, 2000; (2) had particular specific knowledge of the Duke & Long loan default; and (3) had "a very close working relationship with management of AMRESCO and with the Individual Defendants." Plaintiffs' Second Amended Complaint, ¶¶ 75, 79, 82(25). Considering all of the facts and circumstances alleged regarding Deloitte's alleged fraudulent intent in not following GAAP, Plaintiffs' allegations fail to demonstrate that Deloitte acted with scienter.

Plaintiffs only point to two "red flags" that allegedly caused AMRESCO's valuation of its retained interests in securitizations to not be calculated in accordance with GAAP. First, Plaintiffs claim that the 8.98% past due rate on the loans in AMRESCO's conventional lending portfolio should have alerted Deloitte to the fact

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 17

that use of a zero credit loss assumption violated FASB No. 125, ¶ 44. As discussed above, AMRESCO publicly disclosed that it used a zero credit loss assumption in calculating the value of its retained interests in securitizations, because the borrowers generally absorbed the losses on the first 5%--10% of loans in a pool. Plaintiffs also allege that AMRESCO's disclosure that "its current warehouse lender would be terminating [its] warehouse financing facility, the mechanism by which AMRESCO financed the purchases of loan portfolios that were the source of its income," should have alerted Deloitte that the auditor needed to issue a going concern qualification as to AMRESCO because AMRESCO would no longer have this line of credit. Plaintiffs' Second Amended Complaint, ¶ 82(5). AMRESCO used warehouse financing, a large line of credit, to finance its purchases of loan portfolios. What Plaintiffs fail to acknowledge regarding the issue of warehouse financing is that AMRESCO's 10-K for the year ending December 31, 2000 specifically made mention of the fact that

*22 [t]he Company is currently negotiating with lenders to provide warehouse financing for conventional loans. The Company anticipates that prior to May 31, 2001, it will obtain warehouse financing necessary to finance its existing portfolio of conventional loans and fund additional loans; however, no assurances can be given that such warehouse financing can be obtained. Until any such new warehouse financing is obtained, the Company's ability to fund additional loans will be substantially limited, which will have an adverse effect upon its operations and prospects. In the event that the Company cannot obtain new warehouse financing or obtain an additional extension of the Prudential warehouse facilities prior to May 31, 2001, it would be required to change its operations, which would have a material and adverse effect upon the operations and financial conditions of the Company.

Defendants' Joint App. p. 121. Accordingly, AMRESCO not only disclosed that its current warehouse lender would be terminating its warehouse lending facility, but it also stated that it was attempting to either extend its current plan or obtain a new one. Most importantly, AMRESCO disclosed the potentially harmful effect that losing its warehouse facilities would have on its business.

These disclosures undermine the existence of any inference of an intent to deceive, let alone a strong inference.

While Plaintiffs allege that the increasing past due rate of the loans in AMRESCO's conventional loan portfolio and the potential loss of warehouse financing should have caused Deloitte to value AMRESCO's assets differently and issue a going concern qualification in its audit opinion, it does not allege why that is the case. Also absent from the Plaintiffs' Second Amended Complaint are any specific factual allegations showing either that Deloitte knew the accounting methods used by AMRESCO were either intentionally false or extremely reckless in their optimism, or that AMRESCO had no chance to obtain the warehouse financing facility AMRESCO acknowledge that it needed to operate. Plaintiffs' Second Amended Complaint only alleges that what AMRESCO said could happen actually happened: the percentage of past-due loans continued to increase and it was unable to obtain warehouse financing, thus causing the value of its retained interests in securitizations to decrease. Such allegations are not sufficient to support an inference of scienter. *See Capstead*, 258 F.Supp.2d at 555 (holding that where the company warned of the very risks the plaintiffs contend were not disclosed, the plaintiffs' claim of securities fraud failed).

Plaintiffs also allege that Deloitte "had particular specific knowledge of the Duke & Long default and the severe financial distress under which its parent corporation, Devon, was operating from at least November 20, 2000." Plaintiffs' Second Amended Complaint, ¶ 79. To support their claim, Plaintiffs allege that Deloitte filed a motion in the Devon bankruptcy proceedings by which it attempted to be employed as auditors and accountants in the proceeding. *See id.* Having alleged that fact, Plaintiffs conclude that Deloitte knew that an asset of AMRESCO's worth over $50 million was impaired, yet failed to demand that the information be included in AMRESCO's SEC filings and fraudulently failed to issue a going concern qualification in its audit of AMRESCO. Plaintiffs do not provide the necessary information to answer the highly relevant questions of how the loan was impaired, how the loan was being treated in the bankruptcy, how the impairment of the loan

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
(Cite as: 2004 WL 2203253 (N.D.Tex.))

Page 18

affected AMRESCO's assets, whether AMRESCO knew it would have to write-off the loan, and, most importantly, whether Deloitte knew the answers to these hypothetical questions, or was severely reckless in not knowing their answers. Plaintiffs' failure to allege facts showing that Deloitte was aware or was severely reckless in not being aware of the specific circumstances, if any, surrounding the $50 million loan which directly or indirectly affected AMRESCO prevents Plaintiffs from raising a strong inference that Deloitte acted with the requisite state of mind in representing that AMRESCO's filings were audited in conformance with GAAP or failing to issue a going concern qualification in its audit.

*23 Additionally, Plaintiffs attempt to prove Deloitte's knowledge of the difficulties AMRESCO was facing by stating that not only did Deloitte perform auditing work for AMRESCO, but it also took part in "substantial consulting and non-audit work at AMRESCO." Plaintiffs' Resp. p. 17. This access, Plaintiffs' allege, must have allowed Deloitte to know that AMRESCO hired Greenhill with the intention of exploring several strategic alternatives to better position AMRESCO for the future.

Although Plaintiffs' Second Amended Complaint states that "[i]t is believed that Deloitte & Touche was also aware that AMRESCO was looking to retain restructuring and bankruptcy consultants prior to March 12, 2001," Plaintiffs fail to state how they formed this belief. *See* Plaintiffs' Second Amended Complaint, ¶ 84. This failure to show the Court how Plaintiffs made this discovery violates the PSLRA's requirement that a plaintiff who makes allegations on information and belief must disclose how that belief was formed. *See ABC Arbitrage,* 291 F.3d at 352. Even if Plaintiffs alleged specific facts which demonstrated that Deloitte was aware of AMRESCO's retention of Greenhill, that fact alone does not show that it knew or was severely reckless in not knowing that AMRESCO was in danger of not being able to continue as a going concern.

While Plaintiffs attempt to compare their situation to that of the plaintiffs in *Arnlund v. Deloitte & Touche,* 199 F.Supp.2d 461 (E.D.Va.2002), the cases are not the same. In that case, the court found that the plaintiffs had adequately pled scienter against Deloitte by alleging facts supporting their claims that not only did Deloitte enjoy wide-ranging access to the company's finances, but Deloitte played a key role in assisting the company in its preparations for bankruptcy, knew that discussions regarding the departure of the company's CEO had occurred, and knew about a "liquidity crisis" surrounding the company. *See id.* at 478-79. There, the court held that the plaintiffs alleged specific facts asserting that Deloitte (1) knew the company's CEO might be terminated, thus resulting in the company being required to pay huge sums as part of a severance package; (2) affirmatively participated in the positioning of the company for bankruptcy; and (3) knew that the company was in ongoing negotiations with lenders and banks in an attempt to secure lines of credit to solve some of the company's "liquidity issues." *See id.* at 479-82. The court held that by disregarding these facts in issuing its audit opinion of the company, it was inferrable that Deloitte knew that the company's financial statements which were the subject of the suit were inaccurate, or was deliberately reckless in not knowing that the financial statements were inaccurate. *See id.* at 484.

The facts alleged against Deloitte in this case do not rise to that specific level. Without specific facts supporting their allegations that Deloitte knew about AMRESCO's retention of Greenhill, that Deloitte was aware of the implications of the $50 million Duke & Long loan, whatever those implications were, or that AMRESCO's valuation of its assets was materially false and misleading, Plaintiffs' sole allegation in support of their contention that Deloitte knew or was severely reckless in not knowing that AMRESCO could not continue as a going concern is that Deloitte had a very close working relationship with AMRESCO's management, which gave it access to "information, documents, financial consultants and financial information from AMRESCO." Plaintiffs' Complaint, ¶ 75. Merely pleading that an auditor has access to the company's personal and business records does not adequately allege scienter. *See Arnlund v. Deloitte & Touche,* 199 F.Supp.2d at 477

*24 Plaintiffs allege that Deloitte had no genuine belief as to the truth of its representations that it had conducted the audits of AMRESCO in accordance

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008
**(Cite as: 2004 WL 2203253 (N.D.Tex.))**

Page 19

with GAAS and that the financial statements fairly represented AMRESCO's financial condition as of the date of the financial statements in conformity with GAAP. Considering all the facts and circumstances alleged, Plaintiffs have not pled sufficient facts giving rise to a strong inference that Deloitte acted with the necessary state of mind in making its alleged material misrepresentations and omissions to Plaintiffs and the investing public. Thus, the PSLRA requires the Court to dismiss their claims.

VI. Conclusion

Plaintiffs' third attempt to adequately plead violations of section 10(b) and rule 10b-5 against the Officer Defendants and Deloitte fails. Plaintiffs do not plead facts sufficient to state a claim for securities fraud against any of the Defendants under the PSLRA or Rule 9(b). Even if Plaintiffs have alleged specific facts necessary to state a securities fraud claim, they fail to allege sufficient facts which show that, taking all of the facts and circumstances alleged together, the Defendants acted with scienter. The Defendants' motions to dismiss Plaintiffs' Complaint are GRANTED, and Plaintiffs' claims are dismissed. Plaintiffs' motion to file a surreply in support of its opposition to Defendants' motion to dismiss is GRANTED.

In its July 27, 2003 order granting Plaintiffs' motion to file their Complaint, the Court stated that "the Court cautions Plaintiffs that further leave to amend their complaint will not be granted absent extraordinary circumstances." While Plaintiffs request leave to amend their Complaint, they have not shown the Court any extraordinary circumstances which warrant the filing of a fourth complaint in this case. Therefore, the Court Grants the Defendants' motions to dismiss this case, and dismiss the action with prejudice by judgment filed today.

SO ORDERED

2004 WL 2203253 (N.D.Tex.), Fed. Sec. L. Rep. P 93,008

**Motions, Pleadings and Filings (Back to top)**
- 3:02CV01586 (Docket)
        (Jul. 26, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.