# SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C.  20549

## FORM 10-K

**[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 1995

**OR**

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period from            to
Commission file number 0-15246 ___

# ORGANOGENESIS INC.

(Exact name of registrant as specified in its charter)

| **DELAWARE** | **04-2871690** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification number) |

| **150 DAN ROAD, CANTON, MA** | **02021** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE:  (617) 575-0775**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(B) OF THE ACT:**

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $.01 value | American Stock Exchange |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:    NONE**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ( X ) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

As of March 1, 1996, the approximate aggregate market value of voting stock held by non-affiliates of the registrant was $214,652,097, based on the last reported sale price of the Company's Common Stock on the American Stock Exchange as the close of business on March 1, 1996.  There were 13,961,112 shares of Common Stock outstanding as of March 1, 1996.

**DOCUMENTS INCORPORATED BY REFERENCE**

| DOCUMENT | PART OF FORM 10-K INTO WHICH INCORPORATED |
|---|---|
| Portions of the Registrant's Proxy Statement for the 1996 Annual Meeting of Stockholders | III |

**PART I**

ITEM 1.                BUSINESS

Organogenesis Inc. (the "Company" or "Organogenesis") designs, develops and manufactures innovative medical therapeutics using living human cells and natural connective tissue components. The Company's cell therapies, matrix scaffold, and other tissue engineered products are designed to promote the establishment and growth of the human body's natural healing process by promoting the growth of new tissues that maintain, restore or improve biological function. The Company was organized as a Delaware corporation in 1985. Its principal executive offices are located at 150 Dan Road, Canton, Massachusetts 02021, and its telephone number is (617) 575-0775.

**CORE TECHNOLOGIES**

Organogenesis was the first company founded to develop and commercialize therapies based on innovations in tissue engineering. Tissue engineering is a relatively new discipline focused on developing specialized biomaterials and cellular constructs to assist, repair, regenerate, or replace diseased or damaged organs. An understanding of the biology of cells and the structure and function of the extracellular matrix, and the critical interactions between the two, is needed to fully exploit the potential of tissue engineering. Because of this, Organogenesis continually strives to broaden, develop, and utilize its expertise in cell and connective tissue sciences.

CELL SCIENCE.  The ability to work with and manipulate cells is central to fully realizing the potential of tissue engineering. Cells are the building blocks of life. They make up the organs of the body, serving physical, metabolic, and other specialized functions. Organogenesis' emphasis on the significance of cell science to tissue engineering has led not only to Graftskin/TM/, but also has provided valuable experience for the future in such areas as:

|   |   |   |   |
|---|---|---|---|
| - | Cell sourcing | - | Transplantation immunology |
| - | Specialized culture systems and media | - | Cell delivery and therapy design |
| - | Human cell bank production complex tissues | - | Cryopreservation of |
| - | Cell safety screening and functional testing | | |

Organogenesis has established significant expertise in the areas of cell biology, cryopreservation technology, and immunology.

Cell Biology.        Organogenesis has significant expertise in the science

of three-dimensional organotypic cell culture -- the ability to produce living cultures of cells with the properties and functions typical of the organ from which they were derived. For example, Graftskin/TM/ is a three-dimensional, organotypic skin product. This and other models (cornea) have provided important scientific findings on cell-to-cell interaction, cell and matrix interaction, and extracellular matrix production.

By employing its cell growth and organotypic culture technologies, Organogenesis has gained important knowledge of cell regulatory mechanisms and factors controlling cell growth and tissue formation which will be broadly applicable to many cell types. This expertise in cell biology should enable Organogenesis to expand further into other cell therapy product opportunities.

2

Cryopreservation Technology.  Organogenesis also has a leadership
position in the field of cryopreservation -  the ability to freeze complex living cell systems and then restore them to original temperature without significant loss of cell viability or functionality.  Organogenesis' cryopreservation technology will facilitate worldwide distribution of Graftskin/TM/. It will also enable Organogenesis to fully exploit opportunities in the cell therapy arena.  The Company is aggressively protecting all aspects of its proprietary cryopreservation technology through a comprehensive patenting program, and currently has four separate cryopreservation patents allowed or pending in the U.S. alone.

Immunology.  Immunology plays a critical role in tissue engineering
both in determining the body's reaction to a biomaterial and assisting in the transfer of human cells between individuals (allogeneic cells). Organogenesis has a strong in-house immunology department which supports both safety evaluation of its products and new product development.

The ability to transplant cells from one individual to another is particularly critical to the development and commercialization of "off-the- shelf" tissues. For example, the cells used in Graftskin/TM/ are derived from infant foreskin tissue that would normally be discarded. Using proprietary cell culture technology, one postage stamp-sized piece of foreskin can yield approximately four acres of Graftskin/TM/ tissue.

Immunological screening of Graftskin/TM/ recipients also shows no evidence of immune response to the cell types used, indicating that allogeneic keratinocyte and fibroblast cells can be used safely and effectively. These findings represent an important step for the clinical validation of the Graftskin/TM/ technology. Such studies also provide critical evidence to support the general concept of the immune compatibility of allogeneic cells and will positively impact the future of cell therapy, transplantation, and other areas of tissue engineering.

To ensure it remains a leader in immunobiology, Organogenesis has established relationships with opinion leaders in the field.  One of these is its collaboration with Children's Hospital in Boston to further advance understanding of graft acceptance.  This expertise positions Organogenesis well to expand its leadership position in tissue equivalents, cell therapies, and other areas of tissue engineering.

CONNECTIVE TISSUE SCIENCES.  Recognizing the importance of the extracellular matrix to cell growth and differentiation, the Connective Tissue Sciences group was also established to develop cell- compatible collagen for the living tissue equivalent program.

Through this group, Organogenesis has developed proprietary technology relating to the extracellular matrix, including technology enabling it to produce an array of cell-compatible collagen products. Organogenesis' collagen has been shown to support cell growth and interaction in two different types of settings:

o       When cells are added to Organogenesis' collagen during product manufacturing, the collagen supports cell growth, differentiation and interaction. This allows Organogenesis to develop products such as living tissue equivalents and other types of cell therapies. Graftskin/TM/ is an example of this use of Organogenesis' collagen.

o       When used as an implant by itself, Organogenesis' collagen helps foster and direct the ingrowth of the patient's cells and blood vessels. Over time, the recipient's body gradually replaces the implant's collagen with its own tissue to form a fully functional analog of the missing tissue using the implant as a guide.

3

Additionally, Organogenesis can produce cell-compatible collagen in a range of forms suitable for a variety of tissue engineering applications. For applications requiring strong, cell-compatible constructs, Organogenesis has developed dense fibrillar collagen (DFC), which can be made in a variety of forms, including sheets, tubes and threads. Possible uses of the DFC constructs range from cell therapy applications, to use as a matrix scaffold for host cell ingrowth and replacement, to being a component of a medical device or implant.

Augmenting this flexibility, in October 1995, the Company was issued a patent (U.S. patent No.5,460,962) on its proprietary method for cold chemical sterilization.  This process enables Organogenesis to sterilize collagen while maintaining its cell compatibility.  Also in 1995, Organogenesis was issued patents in both Japan and pan-Europe relating to its manipulation of collagen into different forms.

Organogenesis is capitalizing on its connective tissue expertise through a number of internal and external programs.

## PRODUCTS

The Company is using its cell science and connective tissue science technologies and expertise in a number of areas including wound care, urology, cardiovascular medicine, and general surgery. It is also exploring additional opportunities in the areas of plastic surgery, orthopedics, ophthalmalogy, and oral cavity medicine. The Company seeks to design, develop and manufacture products, derived from proprietary technology and manufacturing processes, to be used as treatments in these areas.

### CELL THERAPIES

#### GRAFTSKIN/TM/

The Company's most advanced product, Graftskin/TM/, is a Living Skin Equivalent (LSE/TM/) for the treatment of skin wounds. These include wounds traditionally treated with skin, such as burn wounds and wounds due to dermatological surgery, as well as the broader market of wounds which would benefit from a biologically active cell therapy, such as chronic wounds (e.g. venous stasis ulcers, diabetic ulcers and decubitus ulcers).

As is discussed under Item 7, Management's Discussion and Analysis, on January 17, 1996, Organogenesis and Sandoz Ltd. jointly announced that Sandoz has been granted exclusive worldwide marketing rights for Graftskin/TM/, while Organogenesis has exclusive global manufacturing rights. This agreement is structured to leverage the potential of Graftskin/TM/ and the strength of Sandoz to provide Organogenesis with two on-going revenue streams. Organogenesis will receive royalties on all Graftskin/TM/ sales, benefiting from Sandoz's strong sales and marketing capabilities and its support for new uses for Graftskin/TM/. Additionally, Organogenesis will supply Sandoz's global requirements for Graftskin/TM/ and receive payment for each unit, again capitalizing on Sandoz's strength in marketing the product.  In addition, Organogenesis will receive from Sandoz equity payments, research support payments and milestone payments potentially totaling $37.5 million.

Product Description.

Graftskin/TM/ was developed to be a Living Skin Equivalent.  Like human skin, Graftskin/TM/ has both an upper epidermal layer and a lower dermal layer.  The dermal layer of Graftskin/TM/ is comprised of living human fibroblasts - the most common cell type of the human dermis - interacting in a collagen matrix as they would in human skin.  The epidermal layer is comprised of living human keratinocytes - the most common cell type of the human epidermis - - that have organized themselves as

4

they would in human skin. One structure formed by the keratinocytes is the outer stratum corneum layer, the primary protective layer of skin. To achieve this high level of organization, Graftskin/TM/ is made using patented three dimensional cell culture technology (organotypic culture) which produces tissue with properties reflective of the native organ. Graftskin/TM/ looks, feels and handles like human skin.

Like human skin, Graftskin/TM/ is multi-functional.  Its different components - the stratum corneum, the keratinocytes, the fibroblasts, and the collagen matrix - can affect the wound healing process in different, but related, ways.  Most importantly, these components can interact synergistically as they would in human skin.  Graftskin/TM/ interacts with the wound bed in a way that provides flexibility of response and maximizes the chance for successful healing.

<u>Regulatory and Clinical Status</u>
Regulatory Status.
In 1995, the Company submitted to the United States Food and Drug Administration ("FDA"), and the FDA accepted for filing, the Graftskin/TM/ Premarket Approval Application ("PMA") for use in the treatment of venous ulcers.  The official filing date for this PMA was October 4, 1995. The basis for this submission was the Graftskin/TM/ venous ulcer pivotal trial discussed below.

The FDA has granted expedited review status to this PMA, which means it receives priority in review over other pending device regulatory applications.  PMA applications under expedited review status are still subject to all other controls and requirements applicable to PMAs in the standard review process.

There can be no assurance that the Company will obtain the approvals needed to market Graftskin/TM/ or that Graftskin/TM/ will be successfully commercialized.

Chronic wounds
Today, an estimated 4 million people in the U.S. alone suffer from chronic wounds, including venous ulcers, diabetic ulcers and decubitus ulcers. An estimated 900,000-1.5 million of these patients suffer from venous ulcers. These are generally considered to be the most difficult to heal of the chronic wounds, as they are associated with the greatest compromise of the patient's own wound healing ability.  In the Graftskin/TM/ venous ulcer pivotal trial, approximately half of the patients enrolled had their ulcer for a year or longer, which is reflective of the venous ulcer patient population in the community. The Graftskin/TM/ venous ulcer pivotal trial, conducted under an Investigational Device Exemption ("IDE") Supplement from the FDA, was a prospective, randomized, controlled multi-center study performed at fifteen centers. It is the largest study of this type ever to be presented on the treatment of venous ulcers. The IDE Supplement allowed the participation of up to 300 patients in this clinical trial. Patient enrollment in this study was completed in 1994 with 293 patients, and the efficacy evaluation phase and data analysis were completed in 1995. The primary endpoints of this study were: (1) frequency of 100% wound closure and (2) time to 100% wound closure.

This study showed that Graftskin/TM/ achieved 100% wound closure in more patients, and achieved it faster, than standard compression therapy, the current standard of care.  Both of these primary endpoints were highly statistically significant.  Graftskin/TM/ was found to be highly effective even in difficult-to-heal ulcers, such as ulcers of extended duration and deep dermal ulcers.  Graftskin/TM/ was also found to have an excellent safety profile, with no sign of tissue rejection.

5

Traditional wound healing products must rely on the patient's own wound healing ability to try to close the wound.  In this study, Graftskin/TM/ was found to provide biologic wound closure, and was thus able to contribute directly to the wound healing process.  This is believed to be why Graftskin/TM/ can heal wounds that have remained open for long periods of time.

The Company is currently initiating a pivotal clinical trial to study Graftskin/TM/ in the treatment of diabetic ulcers. Organogenesis also expects to initiate a pivotal clinical trial to study Graftskin/TM/ on the treatment of decubitus ulcers within the next twelve months.

Burn Wounds.
Another clinical indication for Graftskin/TM/ is for the use in the treatment of burn wounds.  Each year, about 100,000 people in the U.S. alone are hospitalized for the treatment of burns.

The Company has completed the patient enrollment and efficacy evaluation phase of this trial, and is currently doing safety follow-up and data analysis. Over 75 patients were enrolled at six clinical centers.  Available data from this study suggests that meshed Graftskin/TM/ placed over meshed autograft may function as a skin replacement. Graftskin/TM/ may be able to reduce the number of autograft procedures required - thus reducing hospitalization costs - and improve cosmetic and functional properties of the damaged areas.

Dermatological Surgery.
Graftskin/TM/ is also being developed for use in the treatment of wounds created by dermatological surgery, such as for removal of skin cancers, birthmarks and tattoos. These wounds are sometimes treated using the patient's skin as a graft, necessitating a second wound site and thus increasing procedure cost and morbidity. Approximately one million dermatological procedures are performed annually on a global basis.

The Company has completed enrollment for a pivotal trial in this indication, involving more than 100 patients at eight centers throughout the United States.  The efficacy and safety evaluation phase of this study has been completed and the data are being analyzed.  While the data from this study is currently being analyzed, interim results suggest that Graftskin/TM/ treatment provides immediate closure, resurfacing of the wound with epithelium, rapid healing and good cosmetic results.


## NEW CELL SYSTEMS

To further leverage its cell therapy technologies, in early 1996 Organogenesis established a New Cell Systems group.  This group will define, and then spearhead, the development of Organogenesis' next cell therapy products. To head this group, Organogenesis is building a team which includes individuals with expertise in the fields of living cell encapsulation and organ assist devices - - skills which are highly complementary to Organogenesis' established technological strengths (e.g. in cell culture, immunology, cryopreservation).

### CONNECTIVE TISSUE PRODUCTS

Organogenesis is capitalizing on its connective tissue expertise through a number of internal and external programs, including Matrix Scaffold products, ECM Pharma/TM/, and Biomaterials.

6

Matrix Scaffold Products

The cell compatibility and strength of Organogenesis' collagen products make them well-suited for applications requiring an implant which can serve not only the immediate physical function, but also can foster and direct the ingrowth of host cells and blood vessels -- the process that enables the host to form a fully functional replacement for the original tissue using the implant as a scaffold. Currently, many surgical procedures require obtaining patient tissue from elsewhere in the body (autologous material) for use as the repair material (e.g., a graft or a patch). Harvesting autologous material creates the need for an additional invasive procedure, thereby increasing procedure cost, duration, and morbidity. Synthetic implants, primarily plastics, have been developed by other companies to provide an "off-the-shelf" alternative; however, synthetics are incapable of achieving host integration and perform poorly in many applications.

Organogenesis' cell-compatible collagen can be developed into "off- the-shelf" implants which are intended to remodel into host tissue at least as well as autologous material. Organogenesis has several "matrix scaffold" implant products in development for the urological, cardiovascular medicine, and general surgery market, and is also exploring additional opportunities in the plastic surgery, ophthalmic and oral cavity (e.g. periodontal) markets.

Urology Products

Urinary Incontinence Products About 25 million women worldwide suffer from urinary incontinence, a number which is increasing as the population ages.  Nearly fifteen percent of these women have intrinsic sphincter deficiency. Current treatment for this condition includes injecting material to support the sphincter.  One drawback to the products available today is that they tend to disperse, limiting their support of the sphincter.

To address this need, Organogenesis is utilizing its expertise in tissue engineering to design an injectable product intended to offer improved performance. The Company's product is being designed to provide retention of position, so that it can provide the necessary support to the sphincter. It is also being designed to allow population by the patient's own cells, and the gradual replacement of the Organogenesis collagen by collagen produced by the patient's own cells. Thus, the Company is designing its product to provide permanence of benefit without permanence of product. Among the 25 million women with urinary incontinence, for some the only option is surgery. Currently about 100,000 surgical procedures are performed annually in the U.S. for this condition. A major limitation of the current procedure is that it requires harvesting autologous material -- patient fascia -- for use as a sling for the bladder.  For these patients, the Company is also developing a bladder sling. This would serve as an "off-the-shelf" alternative to use of autologous material, thus reducing procedure cost and morbidity, and broadening its appeal to both physicians and patients.

Other

To further strengthen its program in urology, Organogenesis has a research relationship with faculty of Dartmouth Hitchcock Medical Center on treatment options for common urological conditions. Therapies being explored include not only matrix scaffold products, but also opportunities exploiting Organogenesis' cell culture capabilities.

7

Cardiovascular Products

The Company is developing products for use in interventional cardiovascular procedures, such as the procedures performed to reopen or bypass small diameter arteries that have been narrowed by atherosclerosis. An estimated 5 million people in the U.S. alone have ischemic heart disease, resulting in nearly 800,000 direct revascularization procedures per year. The two most common of these are coronary artery bypass grafting (CABG) and percutaneous transluminal coronary angioplasty (PTCA). Organogenesis is developing Graftartery for use in CABG and other small diameter grafting procedures, and stent coating technology for use in PTCA procedures.

Graftartery

Nearly 300,000 CABG procedures and 175,000 surgical revascularizations for peripheral vascular disease are performed annually in the U.S. alone. An average of 3.5 grafts are required per CABG procedure.

Despite the size of this market and the number of major companies which have tried to develop small diameter arterial grafts, the principal graft material used for CABG remains patient (autologous) saphenous vein (ASV). Use of ASV creates a second wound site, with associated pain and complications. It also greatly increases the duration, and thus the cost, of the CABG procedure. However, ASV offers a feature not obtainable with synthetics - the ability to foster the ingrowth of patient cells and sustain a smooth, open juncture between the graft and the neighboring blood vessel.

To address this need, Organogenesis is developing Graftartery. Graftartery is being engineered to provide the flexibility, host-integration and handling characteristics of ASV with the advantage of being off-the-shelf. Graftartery has shown encouraging findings in preclinical studies, and its development is continuing.

Stent Coating

In 1995, an estimated 460,000 PTCA procedures were performed to re-open narrowed coronary arteries in the U.S. alone. In this procedure, arteries narrowed by atherosclerosis are re-opened by inflating a small balloon at the point of narrowing. While some patients are better treated with CABG than PTCA, for many patients PTCA offers appropriate therapy and has the advantage over CABG of being minimally invasive. A prime disadvantage of PTCA is that, historically, approximately 20-40% of arteries opened via PTCA re-narrow within a year due to a process called restenosis. To reduce the incidence of restenosis, small structures (stents) are now available for insertion at the point of the balloon inflation to help keep the artery open. It has been projected that stents will be used in half of PTCA procedures within the next few years. Stents reduce the incidence of restenosis by about 25-30%; thus, it still remains a common problem post-PTCA.

To address this need, Organogenesis is also developing a collagen-coating for endovascular stents. This coating could be applied by a stent manufacturer to improve stent performance. The ability of the Company's collagen to foster the ingrowth of host cells is felt to provide an important benefit by helping to shield the stent from the artery wall, while also providing a smooth flow surface for the blood stream.

General Surgical Products

The Company believes that the properties of Organogenesis' collagen fits well with the surgical need for patches, fillers, supports, connectors and replacements. The Company is currently developing a surgical repair patch for use in soft tissue procedures. These include use in the reinforcement of weakened soft tissue, and in the repair of body wall defects such as those associated with hernias, trauma and surgery. There are over 600,000 hernia repair procedures performed each year in the U.S.

8

alone, and over 400,000 procedures associated with opening the pericardial sack surrounding the heart. Preliminary evaluation of the surgical repair patch has shown that it integrated into the body and that "patched" surgically-created defects healed in a manner which resulted in a mechanically stable body wall.

### Other

Organogenesis' product development focus also includes plastic surgery and orthopedic applications. Therapeutic approaches in these applications suggest benefit from Organogenesis technologies in cell science and in connective tissue science, and may be cell-based, matrix scaffold-based, or both technologies in combination. Through its collaborations with Schepens Eye Research Institute and with Brigham and Women's Hospital, Organogenesis is also exploring additional opportunities in the areas of ophthalmology and oral medicine (e.g. periodontal and esophageal procedures), respectively.

### ECM Pharma/TM/

In 1994, the Company established ECM Pharma/TM/ to conduct research on the discovery and development of human therapeutics based on, or targeted to, the extracellular matrix. This matrix, which includes collagen, is the biologically active complex surrounding the cells.

In 1995, ECM Pharma/TM/ licensed from Harvard University a compound which has the potential to regulate the breakdown of extracellular matrix and thus to modify tissue remodeling. ECM Pharma/TM/ has also entered into a research collaboration with Harvard Medical School related to the discovery of extracellular matrix-related therapeutics. One such program relates to keloids, a condition characterized by abnormal scarring in response to injury. This condition can cause considerable cosmetic and symptomatic problems in young adults, particularly in non-white populations.

### Biomaterials

Based on interest expressed in its collagen, in 1994 Organogenesis established a Biomaterials division, and is now selling its cell-compatible collagen to industrial and academic researchers through a laboratory supply business. Future revenues from this business line are not expected to be significant.

## COMPETITION

The Company is engaged in the rapidly evolving and competitive field of tissue engineering. Many major pharmaceutical, biotechnology and medical product companies in the United States and abroad are seeking to develop competitive products for the treatment of skin wounds and organ equivalent products. Competition from these companies and others is intense and is expected to increase. Many of these companies have substantially greater capital resources, research and development staffs and facilities and experience in the marketing and distribution of products than the Company. In addition, competitive companies are working on alternate approaches to many of the diseases targeted by the Company.

The Company is currently aware of other companies which have or are planning to commercialize products intended to serve as skin replacements, in addition to several companies that concentrate on skin repair devices. The Company's principal competitors in the wound care products market include Johnson & Johnson, Kendall, Smith & Nephew, Advanced Tissue Sciences, Bristol- Myers Squibb and Genzyme Tissue Repair. The Company believes that its competitive position will be based on its ability to create and maintain scientifically advanced technology and proprietary products and processes, attract and retain qualified scientific personnel, obtain patent or other protection for its products and processes, obtain required government approvals on a timely basis, manufacture its products on a cost-effective basis and successfully market its products.

**RETENTION OF KEY PERSONNEL**

Because of the specialized nature of the Company's business, the Company's success will depend, in large part, on its continued ability to attract and retain highly qualified scientific and business personnel and on its ability to develop and maintain relationships with leading research institutions. The competition for those relationships and for experienced scientists and management personnel that exists among the numerous biotechnology, pharmaceutical and healthcare companies, universities and nonprofit research institutions is intense.

**PATENTS AND PROPRIETARY TECHNOLOGY**

Organogenesis has a proprietary portfolio of patent rights and applications, and exclusive licenses to patents and patent applications relating to tissue equivalents, cell therapies, and other aspects of tissue engineering. These patent applications include patents relating to tissue sourcing, methods of preparation, cell culture technologies, sterilization technologies, manufacturing methods, and cryopreservation of living tissue. The Company intends to continue to attempt to aggressively patent its technologies.

In the U.S. alone, the Company has twelve issued patents plus two patents which have reached notice of allowance status. The Company also has six pan-European patents issued plus one which has achieved intent to grant status, while in Asia the Company has eight issued patents plus one patent which has achieved notice of allowance status.

Some of the Company's technologies are licensed under an exclusive patent license agreement with the Massachusetts Institute of Technology ("MIT"). The agreement with MIT (as amended, the "MIT Agreement") covers certain U.S. patents and corresponding patents in European and Far East countries. Pursuant to the MIT Agreement, the Company has been granted an exclusive, worldwide license to make, use and sell the products covered by the patents and to practice the procedures covered by the patents. The MIT Agreement requires the Company to pay to MIT a royalty on the cumulative net sales of licensed products ranging from 3% to 4.5% of annual sales.

The Company's other U.S. issued patents relate to: the Company's test system incorporating skin tissue equivalents and other organ equivalents; its proprietary collagen extraction process; the invention and methods of making DFC constructs; the production of an organ equivalent for the cornea and its method of production using tissue culturing systems; a method of making collagen thread; and a method of cold chemical sterilization which maintains the cell- compatibility of the Company's collagen. As part of the continuing interest in protecting its intellectual property rights, the Company has also filed, and is prosecuting, over ten other patent applications in the United States alone. The Company also aggressively attempts to achieve comparable patents in the major international markets for its products, particularly in Europe and Japan.

There can be no assurance that any patents will be issued as a result of the Company's patent applications, or that issued patents will provide the Company with significant protection against competitors. Moreover, there can be no assurance that any patents issued to or licensed by the Company will not be infringed, or that third parties will not independently develop either the same or similar technology.

A portion of the Company's know-how and technology are trade secrets. To protect its rights, the Company requires key employees and consultants to maintain the confidentiality of the Company's proprietary information, and the Company intends to require any corporate sponsor with which the Company enters into collaborative research and development agreement to do so as well. There can be

10

no assurance, however, that these agreements will provide meaningful protection for the Company's trade secrets, know-how or other proprietary information in the event of any unauthorized use or disclosure.

## GOVERNMENT REGULATION

The Company's present and proposed activities are subject to government regulation in the United States and other countries. In order to clinically test, produce and market medical devices for human use, the Company must satisfy mandatory procedures and safety and efficacy requirements established by the FDA and comparable state and foreign regulatory agencies. Typically, such rules require that products be approved by the government agency as safe and effective for their intended use prior to being marketed. The approval process is expensive, time-consuming and subject to unanticipated delays, and no assurance can be given that any agency will grant its approval.

Testing is necessary to determine safety and efficacy before a submission may be filed with the FDA to obtain authorization to market regulated products. In addition, the FDA imposes various requirements on manufacturers and sellers of products under its jurisdiction, such as labeling, good manufacturing practices, record keeping and reporting requirements. The FDA also may require post-marketing testing and surveillance programs to monitor a product's effects.

As the Company develops products to the point where FDA authorization becomes required, there can be no assurance that the appropriate authorization will be granted, that the process to obtain such authorization will not be excessively expensive or lengthy, or that the Company will have sufficient funds to pursue such approvals. Moreover, the failure to receive requisite authorization for the Company's products or processes, when and if developed, or significant delays in obtaining such authorization, would prevent the Company from commercializing its products as anticipated and may have a materially adverse effect on the business of the Company.

The regulatory status of Graftskin/TM/ is as follows: In 1989, the FDA granted the Company an IDE for clinical testing of Graftskin/TM/ on burn patients. In 1992, the FDA granted the Company IDE Supplements for clinical testing of Graftskin/TM/ for the treatment of chronic skin ulcers and clean excision wounds. In late March 1995, the Company held its pre-PMA meeting with the FDA. The Graftskin/TM/ venous ulcer PMA was later submitted, and has been officially filed by the FDA with a filing date of October 4, 1995. The FDA has granted expedited review status to this PMA, which means it receives priority review over other pending device regulatory applications.

## PRODUCT LIABILITY AND AVAILABILITY OF INSURANCE

The Company's business exposes it to potential liability risks that are inherent in the testing, manufacturing and marketing of medical products. The use of the Company's product candidates in clinical trials may expose the Company to product liability claims and possible adverse publicity. These risks also exist with respect to the Company's product candidate, if any, that receive regulatory approval for commercial sale. The Company currently has limited product liability coverage for the clinical research use of its product candidates. The Company does not have product liability insurance for the commercial sale of its product candidates but intends to obtain such coverage if and when its products are commercialized. However, there can be no assurance that the Company will be able to obtain additional insurance coverage at acceptable costs, if at all, or that a product liability claim would not materially have an adverse affect on the business or financial condition of the Company.

11

**MANUFACTURING AND SOURCES OF SUPPLY**

The Company manufactures Graftskin/TM/ for use in its clinical trials at its Canton, Massachusetts facility and intends to manufacture Graftskin/TM/ for commercial sale at the facility. See "Item 2 -- PROPERTIES."

Among the fundamental raw materials needed to fabricate Graftskin/TM/ is a small number of keratinocyte and fibroblast cells. In order for products of the Company made with these initial cells to be used as a replacement for human skin, it is critical that the cells be disease-free. The Company has experienced no difficulty obtaining cells, and has established a mechanism for obtaining screened cells from donors certified by blood testing to be free of the HIV or "AIDS" virus and other pathogens.

The major additional material required to produce the Company's products is collagen, a protein ordinarily obtained from cows or pigs by commercial suppliers. The Company determined that the collagen provided by the usual commercial sources is not suitable for the Company's purposes. Accordingly, the Company has developed a proprietary method of producing its own collagen. This process yields collagen which the Company believes is superior in quality and strength to collagen available from commercial sources and which provides the Company with a continuous, high-quality source of supply.

The other raw materials required in the production of the Company's products are primarily chemical nutrients, which are readily available from a number of commercial sources.

**COLLABORATIVE AGREEMENTS**

In July 1993, the Company announced its collaboration with Eli Lilly and Company ("Lilly") to develop, manufacture and market Graftartery, a product intended for use as a replacement for human arteries, had ended. The Company intends to complete the development effort of the Graftartery project either with its own funds or through a potential collaboration with another party.

In July 1993, the Company entered into a research agreement with Biomet, Inc. ("Biomet") for the development of orthopedic implants using the Company's proprietary dense fibrillar collagen. The Company and Biomet have mutually agreed to change the research agreement to a supply arrangement under which the Company will provide Biomet with Collagen.

**RESEARCH AND OTHER AGREEMENTS**

In March 1995, ECM Pharma/TM/ signed a research agreement, with an option to negotiate a license, with Harvard Medical School to supplement research related to the discovery of extracellular matrix-related therapeutics.

In December 1995, the Company signed a research agreement with the Brigham and Women's Hospital to focus on additional opportunities in the areas of oral medicine (specifically esophageal procedures).

In 1995, the Company agreed to fund certain work performed at the Connective Tissue Research Laboratory at Hebrew University. The Company would negotiate any additional terms if this research leads to a product.

The Company also has agreements with thirty-one clinical sites, to conduct human clinical trials of Graftskin/TM/. Clinical trials are used to test Graftskin/TM/ safety and effectiveness as a treatment for chronic ulcers, wounds resulting from dermatological surgery and burns.

12

**RESEARCH AND DEVELOPMENT**

The Company plans to continue to focus its product development effort on developing high quality cell therapy , matrix scaffold, and other types of tissue engineered products in such areas as wound care, urology, cardiovascular medicine, and general surgery.

The Company's research and development staff consists of scientists and laboratory assistants with technical backgrounds in cell biology, matrix biology, cell culture, immunology, cryopreservation, molecular biology and clinical medicine.

For 1995, 1994 and 1993, the Company's research and development expenses were $9,679,000, $8,573,000, and $8,117,000, respectively.

**EXECUTIVE OFFICERS OF THE COMPANY**

The following table sets forth the name, age, and current position of each officer of the Company who was an executive officer on December 31, 1995:

| NAME | AGE | POSITION | |
|------|-----|----------|---|
| Herbert M. Stein | 67 | Chairman, Chief Executive Officer and Director | |
| Dr. David T. Rovee | 56 | President, Chief Operating Officer and Director | |
| Dr. Robert Buehler | 48 | Vice President - Operations | |
| Joel T. Cademartori | 53 | Vice President -- Regulatory Affairs, Quality Assurance and | Quality Control |
| Dr. Paul Kemp | 39 | Vice President -- Matrix Research | |
| Dr. Nancy L. Parenteau | 42 | Senior Vice President and Chief Scientific Officer | |
| Dr. Michael L. Sabolinski | 40 | Senior Vice President -- Corporate Development and Medical | Affairs |

Mr. Stein became Chairman of the Board of Directors in February 1991. He has been a Director of the Company since October 1986 and the Chief Executive Officer of the Company since January 1987. Mr. Stein was the Vice Chairman of the Board of Directors of the Company from January 1987 to February 1991. Mr. Stein is also a director of EKCO Group, Inc.

Dr. Rovee became President, Chief Operating Officer in February 1994. He became a Director of the Company in March 1994. Dr. Rovee joined the Company in September 1991 as a consultant and was elected Vice President -- Research and Development of the Company in November 1991. Prior to joining the Company, Dr. Rovee had been with Johnson & Johnson for 25 years, most recently as Vice President of Research and Development for J&J Patient Care, Inc.

Dr. Buehler was elected as Vice President -- Operations in November 1995. Dr Buehler was Director, Process Development from August 1994 to November 1995, Director, Quality Assurance from June 1993 to August 1994,  Director, Operations from June 1988 to June 1993.

Mr. Cademartori was elected as Vice President -- Regulatory Affairs, Quality Assurance and Quality Control in August 1995. Mr Cademartori joined the Company in October 1994 as Director of Quality Assurance. Prior to joining the Company, Mr. Cademartori was an independent consultant of medical products and quality assurance for various companies from December 1990 to October 1994. Mr Cademartori was in General Management for Johnson & Johnson Medical Products from June 1972 to December 1990.

Dr. Kemp was elected as Vice President -- Matrix Research in August 1995. Dr. Kemp was Vice President -- Connective Tissue Science from February 1994 to August 1995, Director, Matrix Engineering from 1990 to 1994, Director, Collagen Production from 1990 to 1992, Group Leader, Matrix Biochemistry from 1988 to 1990 and Staff Scientist, Matrix Biochemistry from 1987 to 1988.

Dr. Parenteau was elected as Senior Vice President and Chief Scientific Officer in August 1995. Dr. Parenteau was Vice President -- Cell and Tissue Science from February 1994 to August 1995, Director -- Cell Biology Research from 1989 to 1994, Project Director -- Living Skin Equivalent and Co-Director of Research from 1987 to 1989 and Group Leader -- Cell Biology from 1986 to 1987.

Dr. Sabolinski was elected as Senior Vice President -- Corporate Development and Medical Affairs in August 1995. Dr Sabolinski was Vice President -- Medical and Regulatory Affairs of the Company from February 1994 to August 1995. Dr. Sabolinski joined the Company in April 1992 as Director of Clinical and Regulatory Affairs. Prior to joining the Company, Dr. Sabolinski was Vice President of Clinical Affairs at Advanced Tissue Sciences from November 1991 to March 1992. From 1989 to November 1991, Dr. Sabolinski was Director of Cardiovascular Products at Sandoz Pharmaceuticals Corp.

Ms. Donna L. Abelli was elected as Vice President -- Finance and Administration, Chief Financial Officer, Treasurer and Secretary in March 1996. Prior to joining the Company, Ms. Abelli had been with the Big Six accounting firm of Coopers & Lybrand L.L.P. for 15 years, most recently as a partner since 1992.

## EMPLOYEES

As of March 1, 1996, the Company has 99 full-time employees.  The Company has 56 employees devoted to research and development and 28 employees devoted to production and support of Graftskin/TM/ and other products. The Company has established a stock option plan providing equity incentives to all key employees, an employee stock purchase plan and a 401 (k) plan for all of its full-time employees. The Company believes that through equity participation, attractive fringe benefit programs and the opportunity to contribute to the development of new products using technology, the Company will continue to be able to attract highly qualified personnel.

## SCIENTIFIC ADVISORY BOARD

The Company has a Scientific Advisory Board ("SAB") composed of five physicians, professors and scientists in various fields of medicine and science. The SAB meets from time to time to advise and consult with management and the Company's scientific staff.  Each member of the SAB is expected to devote only a portion of his time to the Company and may have consulting or other advisory arrangements with other entities which may conflict or compete with his obligations to the Company.  Members of the SAB have no formal duties, authority or management obligations.

## ITEM 2.   PROPERTIES

The Company currently leases 45,000 square feet of space in Canton, Massachusetts, at an annual average base rent of $386,000, plus operating expenses.  The lease expires in 1999.  The Company believes that its facility is adequate for its current needs.

## ITEM 3.   LEGAL PROCEEDINGS

In December 1995, the Company announced that an alleged class action lawsuit had been filed against it alleging federal securities law violations. On March 14, 1996, the Company announced that this lawsuit was dismissed without prejudice. No payment or compensation of any kind was made to the plaintiff or his counsel in connection with this dismissal.

## ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None

PART II

**ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS**

The Company's Common Stock is traded on the American Stock Exchange under the symbol ORG. On March 1, 1996, there were 592 shareholders of record of the Company's Common Stock. The table below lists the high and low quarterly range of reported closing prices of the Company's Common Stock during the past two years.

|  | 1995 | | 1994 | |
|---|---|---|---|---|
|  | High | Low | High | Low |
| First Quarter | $15 5/8 | $9 1/4 | $10 1/2 | $6 7/8 |
| Second Quarter | 13 1/4 | 8 1/2 | 11 3/4 | 7 1/4 |
| Third Quarter | 19 5/8 | 11 1/8 | 10 5/8 | 8 5/8 |
| Fourth Quarter | 21 5/8 | 14 | 16 | 9 3/4 |

No cash dividends have been paid to date on the Company's Common Stock. Adjusted to reflect 25% stock dividend distributed to stockholders of record on September 1, 1995.

ITEM 6.          SELECTED FINANCIAL DATA

For the Years Ended December 31,

|  | 1995 | 1994 | 1993 | 1992 | 1991 |
|---|---|---|---|---|---|
| Revenues | $626,917 | $996,211 | $1,592,871 | $4,972,280 | $4,180,376 |
| Net Loss | (12,737,206) | (10,441,300) | (9,936,112) | (6,229,905) | (5,818,113) |
| Per Share | (1.02) | (0.91) | (0.87) | (0.55) | (0.62) |
| Working Capital | 12,885,818 | 8,407,300 | 11,356,490 | 13,809,299 | 16,643,884 |
| Capital Expenditures | 318,500 | 462,680 | 95,028 | 6,138,507 | 318,419 |
| Total Assets | 19,303,900 | 15,126,767 | 23,954,620 | 34,507,238 | 40,153,119 |
| Stockholders' Equity | 17,797,582 | 13,949,311 | 22,814,111 | 32,598,839 | 38,465,334 |
| Number of Employees | 97 | 94 | 73 | 89 | 83 |

16

**ITEM 7    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

The following discussion contains forward-looking statements which involve risks and uncertainties. The Company's actual results may differ significantly from the results discussed in the forward-looking statements. Factors that might cause such a difference include, but are not limited to, those discussed under "Liquidity and Capital Resources".

Results of Operations

1995 Compared to 1994

Contract revenues during 1995 were $19,000, compared to $336,000 in 1994. The contract revenue was realized by the Company under a research agreement with Biomet, Inc. ("Biomet") for the development of orthopedic implants using the Company's proprietary dense fibrillar collagen. The Company and Biomet have mutually agreed to replace the research agreement with a supply arrangement under which the Company will sell collagen to Biomet. Interest income in 1995 was $608,000, compared to $660,000 in 1994.

Research and development expenses increased to $9,679,000 from $8,573,000 in 1994. The increase was primarily due to the Company's regulatory filing and preparation for commercialization of Graftskin/TM/ and related increases in resources in clinical research, cryobiology, quality assurance, and process scale-up. The increase was also due in part to the Company establishing research collaborations with leading academic institutions, including Harvard Medical School and Hebrew University, to further enhance its product portfolio. General and administrative expenses increased to $3,685,000 in 1995 from $2,865,000 in 1994, primarily due to higher legal, consulting and other professional services resulting mainly from the 1995 public offering, the collaborative agreement with Sandoz, and supporting the activity in research and development. The Company's net loss for 1995 was $12,737,000, or $1.02 per share, as compared with a net loss for 1994 of $10,441,000, or $.91 per share.

1994 Compared to 1993

Contract revenues during 1994 were $336,000, compared to $375,000 in 1993. Contract revenues in 1994 were realized by the Company under an agreement with Biomet for the development of orthopedic implants using the Company's proprietary dense fibrillar collagen. Contract revenues in 1993 were realized under agreements with Eli Lilly and Company ("Lilly") relating to the development of the Company's Graftartery product and with Biomet. The Company's collaboration with Lilly ended in July 1993. No sale of product occurred in 1994, as compared to $72,000 in 1993. This was due to the Company's discontinuance of the manufacturing and selling of its Testskin products. Interest income in 1994 was $660,000 compared to $1,146,000 in 1993. The decrease in 1994 resulted from less cash available for investment.

Research and development expenses increased to $8,573,000 from $8,117,000 in 1993. The increase was primarily due to higher employment-related costs resulting from staff additions and data management and statistical services related to human clinical trials for Graftskin/TM/. General and administrative expenses decreased to $2,865,000 in 1994 from $3,347,000 in 1993, primarily as a result of lower outside services rendered to the Company. The Company's net loss for 1994 was $10,441,000, or $.91 per share, as compared with a net loss for 1993 of $9,936,000, or $.87 per share.

Liquidity and Capital Resources

From inception, the Company has financed its operations substantially through private and public placements of equity securities, as well as receipt of contract revenues, interest income from investments and, to a lesser extent, sale of products. At December 31, 1995 and 1994, respectively, the Company had cash, cash equivalents and investments in the aggregate of $13,721,000 and $8,871,000. The increase was primarily due to the completion of a public offering in July 1995 in which the Company received net proceeds of $14,773,000 from the sale of 1,150,000 shares of Common Stock and 230,000 Unit Warrants.

In January 1996, the Company and Sandoz Ltd. ("Sandoz") entered into an agreement that grants Sandoz exclusive worldwide marketing rights to Graftskin/TM/. The Company will supply Sandoz's global requirements for the product and receive payment for each unit. The Company will also receive royalty revenues on all Graftskin/TM/ sales. In addition, Sandoz will provide the Company with up to $37,500,000 in equity investments, milestone payments, and research support payments, including an initial $5,000,000 equity investment at $23.37 per share and additional equity investments of $10,500,000 upon achievement of specified milestones. Subsequent to December 31, 1995, the Company received proceeds from Sandoz of $5,000,000 representing the first equity investment in the Company and $4,000,000 representing the first contribution to the Company's research and development costs for Graftskin/TM/. As a result of this initial equity investment, Sandoz holds approximately 1.6% of the outstanding shares of Organogenesis.

The Company will continue to utilize working capital in 1996 related to ongoing product research and development activities, conducting preclinical and clinical trials, enhancement of proprietary manufacturing technologies and expansion of business development, general and administrative resources. These activities will require substantial additional financial resources before the Company can expect to realize revenue from product sales. While management believes that additional financing composed of equity investments and funding provided under collaborative agreements will be available to fund future operations, and are being pursued, there can be no assurances that additional funds will be available when required on terms acceptable to the Company.

Based upon its current plans, the Company believes that the future equity and research contributions from Sandoz, together with existing working capital, will be sufficient to fund its operations at least through the second quarter of 1997. However, the Company's capital requirements may vary depending on numerous factors, including: progress of the Company's research and development programs; time required to obtain regulatory approvals; resources the Company devotes to self-funded projects, proprietary manufacturing methods and advanced technologies; and the demand for the Company's products, if and when, approved.

The Company is subject to risks common to companies in the biotechnology industry including, but not limited to, development by the Company or its competitors of new technological innovations, risks of failure of clinical trials, dependence on key personnel, protection of proprietary technology, compliance with United States Food and Drug Administration regulations and ability to transition from pilot-scale manufacturing to large-scale production of products.

In October 1995, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS 123), which is effective for transactions entered into in fiscal years that begin after December 15, 1995. SFAS 123 establishes a fair value based method of accounting for stock-based compensation plans. The Company plans to adopt the disclosure method in 1996. The Company has not determined the effect on a proforma basis to 1995 net income and earnings per share, of applying fair value accounting rules to grants of stock-based awards in 1995.

18

**ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**ORGANOGENESIS INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**CONSOLIDATED FINANCIAL STATEMENTS INCLUDED IN ITEM 8:**

| | |
|---|---|
| Report of Independent Accountants | 20 |
| Consolidated Balance Sheets as of December 31, 1995 and 1994 | 21 |
| Consolidated Statements of Operations for the years ended December 31, 1995, 1994 and 1993 | 22 |
| Consolidated Statements of Cash Flows for the years ended December 31, 1995, 1994 and 1993 | 23 |
| Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 1995, 1994 and 1993 | 24 |
| Notes to Consolidated Financial Statements | 25 |

**REPORT OF INDEPENDENT ACCOUNTANTS**

To the Board of Directors and Stockholders of Organogenesis Inc.:

We have audited the accompanying consolidated balance sheets of Organogenesis Inc. and its wholly owned subsidiaries as of December 31, 1995 and 1994, and the related consolidated statements of operations, cash flows, and changes in stockholders' equity for each of the three years in the period ended December 31, 1995. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Organogenesis Inc. and its wholly owned subsidiaries as of December 31, 1995 and 1994, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 1995, in conformity with generally accepted accounting principles.

Coopers & Lybrand L.L.P.

Boston, Massachusetts
February 16, 1996

**ORGANOGENESIS INC.**

**CONSOLIDATED BALANCE SHEETS**

December 31,

|  | 1995 | 1994 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $2,569,256 | $3,187,286 |
| Investments | 11,151,564 | 5,684,127 |
| Other current assets | 557,067 | 541,252 |
|  | 14,277,887 | 9,412,665 |
| Property and equipment, net | 4,941,991 | 5,634,627 |
| Other assets | 84,022 | 79,475 |
|  | $19,303,900 | $15,126,767 |
| **LIABILITIES** | | |
| Current liabilities: | | |
| Accounts payable | $648,627 | $445,125 |
| Accrued expenses | 743,442 | 547,189 |
| Deferred revenue | - | 13,051 |
|  | 1,392,069 | 1,005,365 |
| Deferred rent payable | 114,249 | 157,091 |
| Other liabilities | - | 15,000 |
| Commitments | | |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred Stock, par value $1.00; authorized 1,000,000 shares; issued and converted 250,000 Series A Convertible Preferred shares (liquidation preference - $2,000,000) | - | 250,000 |
| Preferred Stock, Series B Junior Participating, par value $1.00; authorized 50,000 shares; no shares issued and outstanding | - | - |
| Common Stock, par value $.01; authorized 20,000,000 shares; issued and outstanding 13,732,437 and 11,707,748 shares as of December 31, 1995 and 1994, respectively | 137,324 | 117,077 |
| Additional paid-in capital | 77,340,739 | 60,525,509 |
| Accumulated deficit | (59,680,481) | (46,943,275) |
| Total stockholders' equity | 17,797,582 | 13,949,311 |
|  | $19,303,900 | $15,126,767 |

The accompanying notes are an integral part of the consolidated financial statements.

**ORGANOGENESIS INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
For the Years Ended December 31,

| | 1995 | 1994 | 1993 |
|---|---|---|---|
| Revenues: | | | |
| Contract revenues | $18,730 | $336,123 | $374,825 |
| Product sales | - | - | 72,381 |
| Interest income | 608,187 | 660,088 | 1,145,665 |
| | 626,917 | 996,211 | 1,592,871 |
| Costs and Expenses: | | | |
| Research and development | 9,679,044 | 8,572,725 | 8,117,128 |
| Cost of product sales | - | - | 65,338 |
| General and administrative | 3,685,079 | 2,864,786 | 3,346,517 |
| Net loss | $(12,737,206) | $(10,441,300) | $(9,936,112) |
| Net loss per common share | $(1.02) | $(.91) | $(.87) |
| Weighted average number of common shares outstanding | 12,521,488 | 11,487,669 | 11,397,111 |

The accompanying notes are an integral part of the consolidated financial statements.

**ORGANOGENESIS INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
For the Years Ended December 31,

|  | 1995 | 1994 | 1993 |
|---|---|---|---|
| Cash used in operating activities: |  |  |  |
| Net loss | $(12,737,206) | $(10,441,300) | $(9,936,112) |
| Adjustment to reconcile net loss to |  |  |  |
| cash used in operating activities: |  |  |  |
| Depreciation | 1,011,136 | 953,603 | 975,695 |
| Changes in assets and liabilities: |  |  |  |
| Accounts receivable | - | - | 93,399 |
| Other current assets | (15,815) | 128,848 | 55,579 |
| Other assets | (4,547) | (2,281) | (3,802) |
| Accounts payable | 203,502 | (1,567) | (399,452) |
| Accrued expenses | 196,253 | 69,930 | (121,436) |
| Deferred revenue | (13,051) | 11,429 | (248,199) |
| Deferred rent payable | (42,842) | (42,845) | 1,197 |
| Other liabilities | (15,000) | - | - |
| Cash used in operating activities | (11,417,570) | (9,324,183) | (9,583,131) |
| Cash flows from investing activities: |  |  |  |
| Capital expenditures | (318,500) | (462,680) | (95,028) |
| Purchases of investments | (12,500,000) | (98,000) | (1,188,000) |
| Sales/maturities of investments | 7,032,563 | 7,999,172 | 8,974,721 |
| Cash provided by (used in) investing activities | (5,785,937) | 7,438,492 | 7,691,693 |
| Cash flows from financing activities: |  |  |  |
| Sale of common stock | 16,585,477 | 1,576,500 | 151,384 |
| Decrease in cash and cash equivalents | (618,030) | (309,191) | (1,740,054) |
| Cash and cash equivalents, beginning of period | 3,187,286 | 3,496,477 | 5,236,531 |
| Cash and cash equivalents, end of period | $2,569,256 | $3,187,286 | $3,496,477 |

The accompanying notes are an integral part of the consolidated financial
statements.

23

**ORGANOGENESIS INC.**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

For the Years Ended December 31, 1995, 1994 and 1993

| | Series A Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance as of December 31, 1992 | 250,000 | $250,000 | 9,096,686 | $90,967 | $58,823,735 | $(26,565,863) | $32,598,839 |
| Issuance of Common Stock upon exercise of stock options and in connection with employee stock purchase plan | | | 30,917 | 309 | 151,075 | | 151,384 |
| Net loss | | | | | | (9,936,112) | (9,936,112) |
| Balance as of December 31, 1993 | 250,000 | $250,000 | 9,127,603 | $91,276 | $58,974,810 | $(36,501,975) | $22,814,111 |
| Issuance of Common Stock upon exercise of stock options and in connection with employee stock purchase plan | | | 238,595 | 2,386 | 1,574,114 | | 1,576,500 |
| Net loss | | | | | | (10,441,300) | (10,441,300) |
| Balance as of December 31, 1994 | 250,000 | $250,000 | 9,366,198 | $93,662 | $60,548,924 | $(46,943,275) | $13,949,311 |
| Issuance of Common Stock upon exercise of stock options and in connection with employee stock purchase plan | | | 249,892 | 2,499 | 1,809,894 | | 1,812,393 |
| Sale of common stock | | | 1,150,000 | 11,500 | 14,761,584 | | 14,773,084 |
| Net loss | | | | | | (12,737,206) | (12,737,206) |
| One for four common stock dividend | | | 2,653,847 | 26,538 | (26,538) | | - |
| Conversion of Preferred A to common stock | (250,000) | (250,000) | 312,500 | 3,125 | 246,875 | | - |
| Balance as of December 31, 1995 | - | $- | 13,732,437 | $137,324 | $77,340,739 | $(59,680,481) | $17,797,582 |

The accompanying notes are an integral part of the consolidated financial statements.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**ORGANOGENESIS INC.**

Nature of Business:

Organogenesis Inc. (the "Company") designs, develops and manufactures innovative medical therapeutics using living human cells and natural connective tissue components. The Company's cell therapies, matrix scaffold and other tissue engineered products are designed to promote the establishment and growth of the human body's natural healing process by promoting the growth of new tissues that maintain, restore or improve biological function.

The Company has formed a wholly owned subsidiary, ECM Pharma/TM/, Inc. ("ECM Pharma/TM/"). ECM Pharma/TM/ was established to discover, develop and commercialize human therapeutics based on the extracellular matrix. The Company has also formed a wholly owned investment subsidiary, Dan Capital Corporation, which holds a substantial portion of the Company's cash, cash equivalents and investments.

The ultimate success of the Company is dependent upon its ability to raise capital through equity placement, royalty and manufacturing payments, receipt of contract revenue, sale of product, research and development funding under licensing agreements and interest income on invested capital. However, the Company's capital requirements may change depending upon numerous factors, including progress of the Company's research and development programs; time required to obtain regulatory approvals; resources the Company devotes to self- funded projects, proprietary manufacturing methods and advanced technologies; and the demand for the Company's products, if and when, approved.

While management believes that additional financing composed of equity investments and funding provided under collaborative agreements will be available to fund future operations, and are being pursued, there can be no assurances that additional funds will be available when required on terms acceptable to the Company.

The Company is subject to risks common to companies in the biotechnology industry including, but not limited to, development by the Company or its competitors of new technological innovations, risks of failure of clinical trials, dependence on key personnel, protection of proprietary technology, compliance with United States Food and Drug Administration regulations and ability to transition from pilot-scale manufacturing to large-scale production of products.
.
Summary of Significant Accounting Policies:

Principles of Consolidation

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All intercompany activity has been eliminated.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

25

Revenue Recognition

Contract revenues under research and development agreements are recognized as the related efforts are performed. Product sales are recognized as products are shipped. Deferred revenue arises from differences between cash received and revenue recognized under the research and development agreement.

Research and Development Costs

All research and development costs are expensed as incurred.

Income Taxes

Research and development and other tax credits are recognized for financial reporting purposes when they are realized. Deferred taxes are determined based on the difference between the financial reporting and the tax bases of assets and liabilities using enacted income tax rates in effect in the years in which the differences are expected to reverse. Tax credits will be recorded as a reduction in income taxes when utilized.

Net Loss Per Common Share

Net loss per common share is based on the weighted average number of common shares outstanding during each period. Common share equivalents have not been included because the effect would be antidilutive.

Cash and Cash Equivalents

Cash and cash equivalents consists of cash and money market funds, which are convertible into a known amount of cash and carry an insignificant risk of change in value.

Property and Equipment

Equipment, furniture and fixtures and leasehold improvements are stated at cost. Depreciation is provided using the straight-line method over five to ten years. Leasehold improvements are being amortized using the straight-line method over the term of the lease.

Maintenance and repairs are charged to expense as incurred and betterments are capitalized. Upon retirement or sale, the cost of assets disposed of and their related accumulated depreciation are removed from the accounts. Any resulting gain or loss is credited or charged to operations.

New Accounting Pronouncement

In October 1995, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS 123), which is effective for transactions entered into in fiscal years that begin after December 15, 1995. SFAS 123 established a fair value based method of accounting for stock-based compensation plans. The Company plans to adopt the disclosure method in 1996. The Company has not determined its effect on a proforma basis to 1995 net income and earnings per share of applying fair value accounting rules to grants of stock-based awards in 1995.

26

Investments:

At December 31, 1995, the Company has the following securities available-for-sale which the Company expects to utilize for working capital purposes. Investments are carried at cost, plus accrued interest, which approximates fair market value.

| | |
|---|---:|
| U.S. Government and Agency bonds, due from September 1996 to October 1997, 4.50% - 5.875% | $2,572,611 |
| Time Deposits, due from January 1996 to April 1996, 5.80% - 6.03% | 1,311,434 |
| Corporate Notes, due from January 1996 to May 1996, 5.52% - 5.78% | 5,581,678 |
| Discount Notes, due from January 1996 to March 1996, 5.40% - 6.00% | 696,841 |
| Certificates of deposit, due from March 1997 to December 1998, 4.60% - 5.15% | 989,000 |
| | $11,151,564 |

Property and Equipment:

Property and equipment consisted of the following as of December 31,

| | 1995 | 1994 |
|---|---:|---:|
| Equipment | $7,381,816 | $7,205,691 |
| Furniture and fixtures | 1,265,247 | 1,128,553 |
| Leasehold improvements | 1,452,454 | 1,446,773 |
| | 10,099,517 | 9,781,017 |
| Less accumulated depreciation | 5,157,526 | 4,146,390 |
| | $4,941,991 | $5,634,627 |

Accrued Expenses:

Accrued expenses consisted of the following as of December 31,

| | 1995 | 1994 |
|---|---:|---:|
| Compensation and employee benefits | $506,766 | $441,969 |
| Legal and audit | 170,354 | 56,377 |
| Other | 66,322 | 48,843 |
| | $743,442 | $547,189 |

Lease Obligations:

The Company occupies its current premises under a lease which expires on October 1, 1999. The Company is responsible for taxes, insurance and operating expenses under the terms of the lease. Future minimum rental payments required under the lease are approximately as follows:

| | |
|---|---:|
| 1996 | $386,000 |
| 1997 | 386,000 |
| 1998 | 386,000 |
| 1999 | 290,000 |
| | $1,448,000 |

Rent of approximately $386,000, $361,000 and $353,000 was charged to expense during the years ended December 31, 1995, 1994 and 1993, respectively.

27

Income Taxes:

The Company has made no provision for income taxes due to its continued operating losses. The Company has a net operating loss tax carryforward of approximately $64,000,000, and research and development tax credits of approximately $2,200,000, expiring at various dates through 2009. Ownership changes may result in future limitations on the utilization of net operating losses and research and development tax credit carryforwards.

The approximate tax effect of each type of temporary difference and carryforward is reflected in the following table. The effective tax rate is expected to be 40% combined federal and state.

|  | December 31, | |
|---|---|---|
|  | 1995 | 1994 |
| Deferred tax assets and (liabilities): |  |  |
| Net operating loss carryforwards | $25,520,000 | $20,000,000 |
| Research and development credits | 2,200,000 | 1,800,000 |
| Depreciation | (720,000) | (775,000) |
| Net deferred tax asset before valuation allowance | 27,000,000 | 21,025,000 |
| Valuation allowance | (27,000,000) | (21,025,000) |
| Net deferred asset after valuation allowance | $0 | $0 |

Due to the uncertainty surrounding the timing of realizing the benefits of its favorable tax attributes in future tax returns, the Company has placed a 100% valuation allowance against its otherwise recognizable net deferred tax assets.

Collaborative Agreements:

In July 1993, the Company announced its collaboration with Eli Lilly and Company ("Lilly") to develop, manufacture and market Graftartery, a product intended for use as a replacement for human arteries, had ended. The Company intends to complete the development effort of the Graftartery project either with its own funds or through a potential collaboration with another party.

In July 1993, the Company entered into a research agreement with Biomet, Inc. ("Biomet") for the development of orthopedic implants using the Company's proprietary dense fibrillar collagen. The Company and Biomet have mutually agreed to replace the research agreement with a supply arrangement under which the Company will sell collagen to Biomet.

The Company has recognized revenues under these agreements of $18,730, $336,123, and $374,825 for the years ended December 31, 1995, 1994 and 1993, respectively.

In January 1993, the Company discontinued the manufacture and sale of its Testskin products. In 1994, the Company signed a license agreement with Toyobo Ltd. ("Toyobo"), granting Toyobo a license to manufacture and market Testskin in Japan, in exchange for royalty payments to the Company. During 1995, the Company did not realize significant royalty revenues from this agreement.

Research and Other Agreements:

In March 1995, ECM Pharma/TM/ signed a research agreement, with an option to negotiate a license, with Harvard Medical School to supplement research related to the discovery of extracellular matrix related therapeutics.

In December 1995, the Company signed a research agreement with the Brigham and Women's Hospital to focus on additional opportunities in the areas of oral medicine (specifically esophageal procedures).

In 1995, the Company agreed to fund certain work performed at the Connective Tissue Research Laboratory at Hebrew University. The Company would negotiate any additional terms if this research leads to a product.

License Agreement:

Some of the Company's technologies are licensed under an exclusive patent license agreement with the Massachusetts Institute of Technology ("MIT"). The agreement with MIT (as amended, the "MIT Agreement") covers certain U.S. patents and corresponding patents in European and Far East countries. Pursuant to the MIT Agreement, the Company has been granted an exclusive, worldwide license to make, use and sell the products covered by the patents and to practice the procedures covered by the patents. The MIT Agreement requires the Company to pay to MIT a royalty on the cumulative net sales of licensed products ranging from 3% to 4.5% of annual sales.

Stockholders' Equity:

Preferred Stock

The Company has authorized 1,000,000 shares of Preferred Stock at December 31, 1995, of which 250,000 and 50,000 shares have been designated as Series A Convertible Preferred Stock and Series B Junior Participating Preferred Stock, respectively.  There were 250,000 shares of Series A Convertible Preferred Stock issued and outstanding as of December 31, 1994. There were no shares issued of the Series B Junior Participating Preferred Stock as of December 31, 1995.

In May 1991, the Company received net proceeds of $1,978,510 from the sale of 250,000 shares of Series A Convertible Preferred Stock in a privately placed equity financing. These shares were converted into 312,500 shares of Common Stock on October 23, 1995.

Common Stock

The Company has authorized 20,000,000 shares of Common Stock at December 31, 1995.  There were 13,732,437 and 11,707,748 shares of Common Stock issued and outstanding as of December 31, 1995 and 1994, respectively.

In July 1995, the Company completed a Public Offering of 230,000 Units, at a Unit Price of $66.25, resulting in the Company receiving net proceeds of $14,773,084.  Each unit in the Offering consisted of five shares of Common Stock and one Unit Warrant to purchase one share of Common Stock at an exercise price of $15.90 per share. The Unit Warrants are exercisable from October 14, 1996 through October 14, 2001 when the Unit Warrants expire. At December 31, 1995, there were 287,500 Unit Warrants outstanding.

In August 1995, the Board of Directors declared a 25% stock dividend for stockholders of record on September 1, 1995.  The stock dividend was payable on September 8, 1995 and resulted in the issuance of 2,653,847 additional shares of Common Stock. All related data in the consolidated financial statements reflect the stock dividend for all periods presented.

In November 1991, the Company completed a public offering of 1,650,000 shares of its Common Stock. This offering resulted in the Company receiving net proceeds of $36,144,336. In connection with this offering, the underwriter was issued a warrant to purchase 187,500 shares of Common Stock, exercisable at any time during a four-year period, at a per share price of $10.60 (adjusted for the dilution provisions in the warrant).

In April 1991, the Company received net proceeds of $924,017 from the sale of 125,000 shares of Common Stock, and warrants to purchase Common Stock exercisable at any time during a five-year period. The warrants allow for the purchase of 31,250 shares of Common Stock at $9.60 per share and 15,625 shares at $12.00 per share.

Stockholder Rights Plan:

In August 1995, the Board of Directors adopted a Stockholder Rights Plan and declared a dividend of one Right for each outstanding share of Common Stock to stockholders of record on September 1, 1995.  Each Right only becomes exercisable and transferable apart from the Common Stock, at the earlier of (i) 10 days after a person or group acquires beneficial ownership of 15% or more of the Company's outstanding Common Stock (the "Stock Acquisition Date") or (ii) 10 business days following an announcement of a tender or exchange offer of 30% or more of the Company's outstanding stock.

Initially, each Right, upon becoming exercisable, would entitle the holder to purchase one-thousandth of a share of Series B Junior Participating Preferred Stock at an exercise price of $85, subject to adjustment.  If a person or group acquires beneficial ownership of 15% or more of the outstanding shares of Common Stock, then each holder of a Right (other than Rights held by the acquiring person or group) would have the right to receive that number of shares of Common Stock which equals the exercise price of the Right divided by one-half of the current market price of the Common Stock.

The Rights may be redeemed by the Company for $0.01 per Right at any time until the tenth day following the stock acquisition date.  The Rights will expire on September 1, 2005.

Stock Options:

The Company has reserved an aggregate of 2,500,000 shares of Common Stock for issuance under its 1986 Stock Option Plan (the "1986 Plan"). The 1986 Plan was established to provide for the granting of incentive and non-qualified stock options to enable the Company to attract and retain key employees and consultants. The 1986 Plan is administered by the Board of Directors or its delegated Committee which selects the recipients of options and determines (i) the type of option to be granted, (ii) the number of shares included in each option, (iii) when the option becomes exercisable or, if the option is immediately exercisable, the Company's repurchase rights with respect to shares purchased upon the exercise of the option, (iv) the exercise price, which cannot be less than the fair market value of the Company's stock on the date of grant in the case of incentive stock options or less than 90% of the fair market value of the Company's stock on the date of grant in the case of the non-qualified stock options, and (v) the duration of the option, which cannot exceed ten years for incentive stock options or ten years and thirty days for non-qualified options. Vesting occurs over a five-year period beginning one year from the date of grant. Activity under the 1986 Plan is summarized as follows:

| Option shares: | At December 31, | | |
|---|---|---|---|
| | 1995 | 1994 | 1993 |
| Outstanding at beginning of period | 1,579,413 | 1,647,550 | 1,512,238 |
| Issued during period | 406,512 | 626,875 | 308,250 |
| Exercised during period | (234,384) | (295,600) | (35,663) |
| Canceled during period | (226,601) | (399,412) | (137,275) |
| Outstanding at end of period | 1,524,940 | 1,579,413 | 1,647,550 |
| Exercisable at end of period | 768,462 | 625,238 | 685,028 |
| Shares available for granting of options at end of period | 101,382 | 281,294 | 508,756 |
| Price range per share of outstanding options at end of period | $1.20-21.38 | $1.20-16.70 | $1.20-17.90 |
| Price range per share of options granted during the period | $9.50-21.38 | $6.90-13.10 | $4.30- 7.10 |
| Price range per share of exercised options during the period | $1.20-15.10 | $4.00-10.80 | $1.20- 4.80 |

In May 1995, a stock option plan was approved by the Company's shareholders ( the "1995 Plan") providing for the issuance of up to 1,500,000 shares of Common Stock. Under the 1995 Plan , the Company may grant incentive and non-qualified stock options to officers, employees, consultants and advisors to the Company. The 1995 Plan will be administered by the Board of Directors or its delegated Committee which will select the individuals to whom options are granted and determine (i) the type of option to be granted, (ii) the number of shares of Common Stock covered by the option, (iii) when the option becomes exercisable, and (iv) the duration of the option which, in the case of incentive stock options, may not exceed ten years. No one person may be issued options to purchase more than 500,000 shares of Common Stock in any one calendar year. Stock options granted under the 1995 Plan may not be granted at an exercise price less than 100% of the fair market value of the Common Stock on the date of grant (or 110% of fair market value in the case of incentive stock options granted to employees holding 10% or more of the voting stock of the Company). The aggregate fair market value (determined at the time of grant) of shares issuable pursuant to incentive stock options which first become exercisable in any calendar year by an employee of the Company may not exceed $100,000. At December 31, 1995, there were no options outstanding under the 1995 Plan.

In 1994, a stock option plan for non-employee directors was approved by the Company's shareholders (the "1994 Director Plan"). Under the 1994 Director Plan, stock options to purchase up to 250,000 shares of the Company's Common Stock may be granted to non-employee directors of the Company. The 1994 Director Plan provides that the option price per share be at fair market value and vest ratably over a five-year period beginning one year from the date of grant. The Company granted options to purchase 75,000 shares of Common Stock at an exercise price of $8.20 per share and 18,750 shares of Common Stock at an exercise price of $10.10 per share in 1994. During 1994, 18,750 options were canceled. The Company granted 31,250 shares of Common Stock at an exercise price of $14.90 during 1995. At December 31, 1995, there were options outstanding under the 1994 Director Plan to purchase 106,250 shares of Common Stock of which 15,000 are fully vested and exercisable.

The 1991 Director Stock Option Plan (the "1991 Director Plan") provides for the purchase of 125,000 shares of Common Stock by non-employee directors. The Company has reserved an aggregate of 125,000 shares of Common Stock for issuance under the 1991 Director Plan. The options were granted at fair market value and vest ratably over a five-year period beginning one year from the date of grant. The Company granted options to purchase 18,750 shares of Common Stock at an exercise price of $7.20 per share and 56,250 shares of Common Stock at an exercise price of $5.70 per share in 1992 and 1991, respectively. The 18,750 options granted in 1992 were canceled in 1994. At December 31, 1995, there were options outstanding under the 1991 Director Plan to purchase 56,250 shares of Common Stock, of which 45,000 shares were fully vested and exercisable.

31

In 1987, the Company granted to an Officer of the Company an option to purchase 375,000 shares of Common Stock at an exercise price of $6.00 per share. The shares have been reserved for issuance and are fully vested and exercisable.

The 1991 Employee Stock Purchase Plan:

Under the 1991 Employee Stock Purchase Plan (the "Purchase Plan"), a total of 187,500 shares of Common Stock are reserved for issuance (up to 31,250 shares may be issued each year). The Purchase Plan allows all employees, as defined in the plan, the option to purchase Common Stock (total purchases may not exceed 5% of an employee's compensation) at 85% of the lower of the fair market value of the Common Stock at the time the option is granted or is exercised. During 1995 and 1994, the Company issued a total of 795 and 2,115 shares of Common Stock, respectively, under this Purchase Plan.

Employee Savings Plan:

In 1992, the Company instituted an employee savings plan under Section 401(k) of the Internal Revenue Code. All full-time employees with six months of service are eligible to participate. During 1995 and 1994, the Company contributed $36,128 and $9,571, respectively, under this Savings Plan.

Subsequent Event:

On January 17, 1996, the Company and Sandoz Ltd. ("Sandoz") entered into an agreement that grants Sandoz exclusive worldwide marketing rights to Graftskin/TM/.  The Company  will supply Sandoz's global requirements for the product and receive payment for each unit.  The Company will also receive royalty revenues on all  Graftskin/TM/ sales.  In addition, Sandoz will provide the Company  with up to $37,500,000 in equity investments, milestone payments and research support payments, including an initial $5,000,000 equity investment at $23.37 per share and additional equity investments of $10,500,000 upon achievement of specified milestones. Subsequent to December 31, 1995, the Company received proceeds from Sandoz of $5,000,000 representing the first equity investment in the Company and $4,000,000 representing the first contribution to the Company's research and development costs for Graftskin/TM/. As a result of this initial equity investment, Sandoz holds approximately 1.6% of the outstanding shares of Organogenesis.

### ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

**PART III**

## ITEM 10.  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The information required by this item is contained in part under the caption "Executive Officers of the Company" in PART I hereof, and the remainder is contained in the Company's Proxy Statement for the Company's Annual Meeting of Stockholders to be held on May 15, 1996 (the "1996" Proxy Statement) under the caption "ELECTION OF DIRECTORS" and is incorporated herein by reference.

## ITEM 11.  EXECUTIVE COMPENSATION

The information required by this item is contained under the caption "ELECTION OF DIRECTORS -Executive Compensation" in the Company's 1996 Proxy Statement, and is incorporated herein by reference. Information relating to delinquent filing of reports required by Section 16(a) of the Securities Exchange Act of 1934 is contained in the Company's 1996 Proxy Statement under the caption "Executive Compensation - Section 16 Reports" and is incorporated herein by reference.

## ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The information required by this item is contained in the Company's 1996 Proxy Statement under the captions "Principal Stockholders" "ELECTION OF DIRECTORS - Executive Compensation; Compensation Arrangements; and Compensation of Directors" in the Company's 1996 Proxy Statement, and is incorporated herein by reference.

## ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The information required by this item is contained under the caption "Certain Transactions" in Part I of the Company's 1996 Proxy Statement and is incorporated herein by reference.

**PART IV**

**ITEM 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K**

(a)  3. Exhibits:

The exhibits filed as a part of this Annual Report on Form 10-K are listed in the Exhibit Index immediately preceding the exhibits.  The Registrant has identified in the Exhibit Index each management contract and compensatory plan filed as an exhibit to this Form 10-K in response to Item 14(c) of Form 10- K.

(b)  Reports on Form 8-K:

(i) A current report on Form 8-K dated July 17, 1995 was filed by the Registrant reporting that the Company had completed a public offering of 1,150,000 shares of Common Stock, raising almost $15 million, net of expenses.

(ii) A current report on Form 8-K dated August 29, 1995 was filed by the Registrant reporting the adoption of a Stockholder Rights Plan and the declaration of a 25% Common Stock dividend.

(iii) A current report on Form 8-K dated January 17, 1996 was filed by the Registrant reporting that it had entered into an agreement with Sandoz Ltd. ("Sandoz") which grants Sandoz worldwide marketing rights to Graftskin/TM/.

34

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities
Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ORGANOGENESIS**

BY:    /s/ HERBERT M. STEIN

Herbert M. Stein
Chairman and Chief Executive Officer

Date:     March 29, 1996

Pursuant to the requirements of the Securities Exchange Act of 1934, this

report has been signed by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ HERBERT M. STEIN<br>----------------------<br>Herbert M. Stein | Chairman, Chief Executive<br>Officer and Director<br>(Principal executive officer) | March 29, 1996 |
| /s/ DAVID T. ROVEE<br>- ------------------------<br>David T. Rovee | President, Chief Operating<br>Officer and Director | March 29, 1996 |
| /s/ RICHARD S. CRESSE<br><br>Richard S. Cresse | Director | March 29, 1996 |
| /s/ WILLIAM J. HOPKE<br><br>William J. Hopke | Director | March 29, 1996 |
| /s/ ANTON E. SCHRAFL<br><br>Anton E. Schrafl | Director | March 29, 1996 |
| /s/ BJORN OLSEN<br><br>Bjorn Olsen | Director | March 29, 1996 |
| /s/ MARGUERITE A. PIRET<br><br>Marguerite A. Piret | Director | March 29, 1996 |
| /s/ DONNA L. ABELLI<br>- ------------------------<br>Donna L. Abelli | Vice President, Chief<br>Financial Officer<br>Treasurer and Secretary | March 29, 1996 |

35

## EXHIBIT INDEX

Exhibit No.                                    Description of Exhibit

      (3)(a)    --    Restated Certificate of Incorporation of the Company.(1)

(b)    --    Certificate of Amendment to the Restated Certificate of Incorporation of the Company.(10)

(c)    --    Certificate of Stock Designation, Number, Voting Powers, Preferences and Rights of the Series of the Preferred Stock of Organogenesis Inc. to be Designated Series A Convertible Preferred Stock.(11)

(d)    --    Certificate of Designation, filed with the Secretary of State of the State of Delaware on August 29, 1995. (18)

(e)    --    By-Laws of the Company, as amended.(2)

(f)    --    Rights Agreement, dated as of September 1, 1995, between the Company and American Stock Transfer & Trust Company. (18)

(g)    --    Form of Unit Warrant Agreement.(19)

(h)    --    Form of Investment Agreement.(19)

(4)(a)    --    Form of Warrant Agreement with respect to Warrants included as part of the Units of the Company's securities.(1)

(b)    --    Notice of Redemption of the Company's Redeemable Common Stock Purchase Warrants.(3)

(c)    --    Form of Unit Purchase Option, dated December 18, 1986, issued to each of the Company's Unit Purchase Option holders.(4)

(d)    --    Form of Stock Registration Rights Agreement, dated February 23, 1990, between the Company and certain security holders.(4)

(e)    --    Form of Common Stock Purchase Warrant, dated February 23, 1990, issued to certain security holders.(9)
    (10)(a)    --    1986 Stock Option Plan of the Company, as amended.*(14)

    (b)    --    1991 Director Stock Option Plan of the Company.*(14)

(c)    --    1991 Employee Stock Purchase Plan of the Company.*(14)

(d)    --    1994 Director Stock Option Plan of the Company.(17)*

(e)    --    License Agreement among the Company, Eugene Bell and Massachusetts Institute of Technology dated December 16, 1985 ("MIT License Agreement").(1)

(f)    --    Amendment to MIT License Agreement, dated October 22, 1986.(1)

(g)    --    Second Amendment to MIT License Agreement, dated as of March 31, 1988.(8)

(h)    --    Clinical Trial Agreement between the Company and the Western Pennsylvania Hospital dated August 1, 1986, as amended by an amendment dated September 8, 1986.(1)

(i)    --    Research and Supply Agreement between the Company and Eli Lilly and Company dated July 1, 1987.(6)

(j)    --    Research and Supply Agreement between the Company and Eli Lilly and Company dated July 1, 1991.(12)

(k)    --    Subscription Agreement between the Company and a purchaser of the Series A Convertible Preferred Stock and 10% Subordinated Promissory Notes dated as of July 3, 1986, with a schedule of additional purchasers.(1)

(l)    --    Indenture of Lease between Canton Commerce Center Limited Partnership and the Company, dated as of July 10, 1989.(9)

    (m)    --    Agreement between the Company and Symmes, Maini & McKee Associates, Inc., dated as of July 10, 1989.(9) 36

## EXHIBIT INDEX

Exhibit No.                                    Description of Exhibit

| | | |
|---|---|---|
| (n) | -- | Settlement Agreement and Release between the Company and Eugene L. Mainen dated October 2, 1986.(1) |
| (o) | -- | Invention, Non-Disclosure and Non-Competition Agreement between the Company and Dr. Crispin B. Weinberg dated as of May 31, 1985.(1) |
| (p) | -- | Invention, Non-Disclosure and Non-Competition Agreement between the Company and Dr. Eugene Bell dated as of September 30, 1986.(1) |
| (q) | -- | Non-Statutory Stock Option Agreement between the Company and Herbert M. Stein dated April 7, 1987.(7) |
| (r) | -- | Letter Agreement between the Company and Dr. Harold B. Reisman dated January 17, 1989.(5) |
| (s) | -- | Letter Agreement between the Company and Dr. David T. Rovee dated September 23, 1991.(14) |
| (t) | -- | Agreement between Biomet, Inc. and Organogenesis Inc. dated July 27, 1993.(15) |
| (u) | -- | 1995 Stock Option Plan.*(20) |
| (v) | -- | The License and Supply Agreement between the Company and Sandoz Pharma Ltd., dated as of January 17, 1996. ** |
| (w) | -- | The Stock Purchase Agreement between the Company and Sandoz Pharma Ltd., dated as of January 17, 1996. ** |
| (21) | -- | Subsidiaries of the Company, filed herewith. |
| (23) | -- | Consent of Coopers & Lybrand L.L.P., filed herewith. |

(1) Incorporated herein by reference to the exhibits to the Company's Registration Statement on Form S-1 (File No. 33-9832). (2) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 31, 1987. (3) Incorporated herein by reference to the exhibits to the Company's Current Report on Form 8-K, filed February 18, 1987. (4) Incorporated herein by reference to the exhibits to the Company's Registration Statement on Form S-3 (File No. 33-33914). (5) Incorporated herein by reference to the exhibits to the Company's Registration Statement on Form S-8 (File No. 33-12761). (6) Incorporated herein by reference to the exhibits to the Company's Quarterly Report on Form 10-Q, filed August 14, 1987. (7) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 30, 1988. (8) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 31, 1989. (9) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed April 2, 1990. (10) Incorporated herein by reference to Exhibit 3(a) to the Company's Form 10-K, filed April 1, 1991.

(11) Incorporated by reference to Exhibit 4 to the Company's Quarterly Report on Form 10-Q, filed August 13, 1991. (12) Incorporated herein by reference to Exhibit 10 to the Company's Quarterly Report on Form 10-Q, filed November 5, 1991. (13) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 30, 1992.

**EXHIBIT INDEX**

(14) Incorporated herein by reference to the exhibits to the Company's Annual Report Form 10-K, filed March 31, 1993. (15) Incorporated herein by reference to the Company's Quarterly Report on Form 10-Q, filed August 13, 1993.

(16) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 31, 1994. (17) Incorporated herein by reference to Appendix A of the Company's Definitive Proxy Statement filed April 19, 1994. (18) Incorporated herein by reference to the exhibits to the Company's Current Report on Form 8-K, filed August 29, 1995 (19) Incorporated herein by reference to the exhibits to the Company's Amended Registration Statement on Form S-3, filed July 5, 1995. (20) Incorporated herein by reference to Appendix A of the Company's Definitive Proxy Statement filed April 14, 1995.

\* Management contract or compensatory plan identified pursuant to Item 14(a)3.

\*\*Confidential Treatment requested.

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

EXHIBIT 10(w)

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

## STOCK PURCHASE AGREEMENT

THIS AGREEMENT, dated as of January 17, 1996, is entered into by and between ORGANOGENESIS INC., a Delaware corporation (the "Corporation"), and SANDOZ PHARMA LTD., a Switzerland corporation (the "Investor").

The Corporation and the Investor wish to provide for issuance of common stock, par value $.01 per share, of the Corporation ("Common Stock"), as more specifically set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereby agree as follows:

SECTION 1. Sale of Shares.

1.1. Initial Investment. Subject to the terms and conditions of this
Agreement, the Corporation shall sell and issue to the Investor, and the Investor shall purchase and receive from the Corporation, at the Initial Closing (as hereinafter defined), 213,975 shares of Common Stock at $23.367 per share, for an aggregate investment of $5,000,000 (the "Initial Investment"). Shares of Common Stock issued pursuant to Sections 1.1, 1.2 or 1.3 are referred to herein as "Shares."

1.2. First Contingent Investment. If the Corporation submits to the
United States Food and Drug Administration (the "FDA") , on or before *************, the ************** ********* ** *** ********** ********** ******** **** ******, then subject to the terms and conditions of this Agreement the Corporation shall sell and issue to the Investor, and the Investor shall purchase and receive from the Corporation, at the First Contingent Closing (as hereinafter defined), ****************** ******* *********, for an aggregate investment of $********* (the "First Contingent Investment").

1.3. Second Contingent Investment. If the FDA ****** ***** *** ********
(as defined in ******* **** of the Licence and Supply Agreement of even date herewith between the Corporation and the Investor) in the United States, on or before **** *** ****, for the ****** ****** ***** **********, then subject to the terms and conditions of this Agreement the Corporation shall sell and issue to the Investor, and the Investor shall purchase and receive from the Corporation, at the Second Contingent Closing (as hereinafter defined), the number of Shares, priced at a *** ******* above the average mean trading price
per share of Common Stock, as quoted in The Wall Street Journal, during the
30-day period ending on the day before the earlier of (i) ******* ** ** ********** ****** **** ******* ** *** *** ******** and (ii) ******* ** ***** *** ********, to which the Investor is entitled for an aggregate investment of $********* (the "Second Contingent Investment").

1

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

1.4. Registration of Shares. Shares issued pursuant to Sections 1.1,
1.2 and 1.3 shall be issued pursuant to an exemption from the registration requirements under the Securities Act of 1933, as amended (the "Securities Act"). At the request of the Investor (subject to the time restrictions described below), the Corporation shall (a) file one or more registration statements under the Securities Act covering the Shares, (b) pay all filing fees and related registration expenses relating thereto, (c) use its best efforts to cause the registration statements(s) to be declared effective under the Securities Act, and (d) cause each registration statement to remain effective under the Securities Act until the earlier of (i) the sale by the Investor of all Shares registered under such registration statement, (ii) two (2) years after the effective date thereof, or (iii) the date upon which the Investor has the right to sell all Shares registered under such registration statement without restriction as to quantity under Rule 144 (k) promulgated under the Securities Act. The Investor may request registration of the Shares constituting the Initial Investment at any time after ****************** and may request registration of the Shares constituting the First Contingent Investment or the Second Contingent Investment, as the case may be, at any time after six (6) months following the issuance of such Shares; provided, however, that if, after the date hereof but before the dates on which the Investor would be entitled to request registration of the Shares pursuant to the preceding portion of this sentence, the Corporation proposes to register any of its stock or other securities under the Securities Act in connection with a public offering of such securities, the Investor shall be entitled to have the Corporation include the Shares in such proposed registration, or in a contemporaneously filed registration statement, on the terms provided in this Section 1.4.

1.5. Reservation of Shares. Prior to the Initial Closing, the
Corporation shall have reserved for issuance the number of Shares required for issuance pursuant to Sections 1.2 and 1.3.

SECTION 2. Closing.

2.1. Date of Initial Closing. The closing of the Initial Investment
(the "Initial Closing") shall take place on January 17, 1996, or on such other date as is mutually agreeable to the Corporation and the Investor.

2.2. Date of First Contingent Closing. The closing of the First
Contingent Investment (the "First Contingent Closing") shall take place within 45 days after ****************************** ********** referred to in Section 1.2 (provided such ********** occurs on or before *************), on a date agreed to by the Corporation and the Investor, or on such later date as is mutually agreeable to the Corporation and the Investor.

2

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

2.3. Date of Second Contingent Closing. The closing of the Second

Contingent Investment (the "Second Contingent Closing") shall take place within 45 days after **************** (provided *********************** on or before *************), on a date agreed to by the Corporation and the Investor, or on such later date as is mutually agreeable to the Corporation and the Investor.

2.4. Place and Method of Closing. The closings provided for in Sections

2.1, 2.2 and 2.3 shall take place by facsimile transmission of executed copies of the documents contemplated hereby delivered at the offices of Hale and Dorr, 60 State Street, Boston, Massachusetts 02109, and confirmed by overnight delivery of originally executed copies of such documents, or at such other place or by such other method as is mutually agreeable to the Corporation and the Investor.

2.5. Deliveries at Closing. At each of the closings provided for in

Sections 2.1, 2.2 and 2.3, the Corporation shall deliver to the Investor a stock certificate, registered in the name of the Investor, representing the Shares to be issued at such closing. The Investor shall receive such stock certificate upon the receipt by the Corporation of the aggregate consideration of ********** in the case of the Initial Investment, ********** in the case of the First Contingent Investment, and ********** in the case of the Second Contingent Investment, in each case by a certified or bank check payable to the order of the Corporation or by wire transfer of funds to the account of the Corporation.

SECTION 3. Representations and Warranties of the

Corporation to the Investor.

The Corporation hereby represents and warrants to the Investor as follows:

3.1. Organization. The Corporation and each of its wholly-owned

subsidiaries (each a "Subsidiary" and, collectively, the "Subsidiaries") is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own and lease its property and to carry on its business as presently conducted. The Corporation and each of the Subsidiaries is duly qualified to do business as a foreign corporation in the Commonwealth of Massachusetts. Neither the Corporation nor any Subsidiary owns or leases property or engages in any activity in any other jurisdiction which would require its qualification in such jurisdiction and in which the failure to be so qualified would have an adverse effect on the financial or any other business condition of the Corporation or the Subsidiary, as the case may be.

3.2. Capitalization.

(a) The authorized capital stock of the Corporation

3

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

consists of:

(i) 20,000,000 shares of Common Stock, of which:

(A) 13,638,962 shares are duly authorized, validly issued and outstanding, fully paid and nonassessable;

(B) 4,170,278 shares are duly authorized and reserved for issuance to officers, employees or directors of, or consultants to, the Corporation pursuant to options, warrants or other rights to acquire such shares approved or to be approved by the Board of Directors or a committee thereof pursuant to the Corporation's stock option and employee stock purchase plans;

(C) 521,875 shares are duly authorized and reserved for issuance upon the exercise of warrants; and

(ii) 1,000,000 shares of Preferred Stock, $1.00 par value per share, of which:

(A) 250, 000 shares have been designated as Series A Preferred Stock, all of which shares of Series A Preferred Stock have been issued and converted into Common Stock; and

(B) 50,000 shares have been designated as Series B Preferred Stock, all of which are duly authorized and unissued.

(b) Except as set forth in this Section 3.2 or in Schedule 3.2 attached hereto, there are: (i) no outstanding warrants, options, agreements, convertible securities or other commitments or instruments pursuant to which the Corporation or any Subsidiary is or may become obligated to issue, sell, repurchase or redeem any shares of capital stock or other securities of the Corporation or any Subsidiary; (ii) no preemptive, contractual or similar rights to purchase or otherwise acquire shares of capital stock of the Corporation or any Subsidiary pursuant to any provision of law, the Certificate of Incorporation or By-laws of the Corporation or any Subsidiary or any agreement to which the Corporation or any Subsidiary is a party, or otherwise; (iii) no restrictions on the transfer of capital stock of the Corporation imposed by the Certificate of Incorporation or By-laws of the Corporation, any agreement to which the Corporation is a party, any order of any court or any governmental agency to which the Corporation is subject, or any statute other than those imposed by relevant state and federal securities laws, (iv) no cumulative voting rights for any of the Corporation's capital stock; (v) no registration rights under the Securities Act with respect to shares of the Corporation's capital stock; (vi) to the best of the Corporation's knowledge and belief, no options or other rights to

4

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

purchase shares of capital stock from stockholders of the Corporation or any Subsidiary granted by such stockholders; and (vii) no agreements, written or oral, between the Corporation or any Subsidiary and any holder of its securities, or, to the best of the Corporation's knowledge and belief, among holders of its securities, relating to the acquisition, disposition or voting of the securities of the Corporation or any Subsidiary.

(c) All of the outstanding capital stock of each Subsidiary is owned by the Corporation.

3.3. Authorization of this Agreement.

The execution, delivery and performance by the Corporation of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of the Corporation. This Agreement has been duly executed and delivered by the Corporation and constitutes a valid and binding obligation of the Corporation, enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and compliance with the provisions hereof by the Corporation, will not:

(a) violate any provision of law, statute, ordinance, rule or regulation or any ruling, writ, injunction, order, judgment or decree of any court, administrative agency or other governmental body;

(b) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under (i) any agreement, document, instrument, contract, understanding, arrangement, note, indenture, mortgage or lease to which the Corporation or any Subsidiary is a party or under which the Corporation or any Subsidiary or any of its assets is bound or affected, (ii) the Corporation's (or any Subsidiary's) Certificate of Incorporation, or (iii) the By-laws of the Corporation or any Subsidiary; or

(c) result in the creation of any lien, security interest, charge or encumbrance upon any of the properties or assets of the Corporation or any Subsidiary.

3.4. Authorization of the Shares. The issuance, sale and delivery of

the Shares have been duly authorized by all requisite action of the Corporation, and, when issued, sold and delivered in accordance with this Agreement, the Shares will be validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or any other similar rights of the stockholders of the Corporation or others.

5

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

3.5. Consents and Approvals

No authorization, consent, approval or other order of, or declaration to or filing with, any governmental agency or body (other than filings required to be made under applicable federal and state securities laws) is required for: (a) the valid authorization, execution, delivery and performance by the Corporation of this Agreement; or (b) the valid authorization, reservation, issuance, sale and delivery of the Shares. The Corporation will have obtained all other consents that are necessary to permit the consummation of the transactions contemplated hereby prior to the Initial Closing.

3.6. Business of Corporation

(a) Except as disclosed in Schedule 3.6(a) attached hereto:

(i) neither the Corporation nor any Subsidiary is a party to any material agreements or commitments that are directly related to equity or debt financings undertaken by the Corporation or any Subsidiary. All of the agreements and contracts disclosed in Schedule 3.6(a) are valid, binding and in full force and effect; and

(ii) neither the Corporation nor any Subsidiary is a party to, or, directly or indirectly, bound by, any indenture, mortgage, deed of trust or other agreement or instrument relating to the borrowing of money, the guarantee of indebtedness or the granting of any security interest, negative pledge or other encumbrance on the assets of the Corporation or any Subsidiary.

(b) The financial statements described in Section 3.6(i), including any notes thereto, reflect all material liabilities of the Corporation and the Subsidiaries as of the date of such financial statements required to be reflected thereon in accordance with generally accepted accounting principles. Since the date of such financial statements, the Corporation and the Subsidiaries have not incurred any obligation (or series of related obligations) or liability, contingent or otherwise, in excess of $25,000 except as set forth in Schedule 3.6(b).

(c) Except as provided in Schedule 3.6(c) attached hereto: (i) there are no actions, suits, arbitrations, claims, investigations or legal or administrative proceedings pending or, to the best of the Corporation's knowledge and belief, threatened, against the Corporation or any Subsidiary, whether at law or in equity, before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign; (ii) there are no judgments, decrees, injunctions or orders of any court, government department, commission, agency, instrumentality or arbitrator entered or

6

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

existing against the Corporation or any Subsidiary or any of its assets or properties for any of the foregoing or otherwise; and (iii) neither the Corporation nor any Subsidiary has admitted in writing its inability to pay its debts generally as they become due, filed or consented to the filing against it of a petition in bankruptcy or a petition to take advantage of any insolvency act, made an assignment for the benefit of creditors, consented to the appointment of a receiver for itself or for the whole or any substantial part of its property, or had a petition in bankruptcy filed against it, been adjudicated a bankrupt, or filed a petition or answer seeking reorganization or arrangement under the federal bankruptcy laws or any other laws or of the United States or any other jurisdiction.

(d) The Corporation and the Subsidiaries are in compliance with all obligations, agreements and conditions contained in any evidence of indebtedness or any loan agreement or other contract or agreement (whether or not relating to indebtedness) to which the Corporation or any Subsidiary is a party or is subject (collectively, the "Obligations") , the lack of compliance with which could afford to any person the right to accelerate any indebtedness or terminate any right or agreement of the Corporation or any Subsidiary. To the best of the Corporation's knowledge and belief, all other parties to such Obligations are in compliance with the terms and conditions of such Obligations.

(e) Each current employee of or consultant to the Corporation or any Subsidiary who has or is proposed to have access to confidential or proprietary information of the Corporation is a signatory to, and is bound by, an agreement with the Corporation relating to noncompetition, nondisclosure, proprietary information and assignment of patent, copyright and other intellectual property rights.

(f) No employee of or consultant to the Corporation or any Subsidiary is in violation of any term of any employment contract, patent disclosure agreement or any other contract or agreement including, but not limited to, those matters relating to (i) the relationship of any such employee with the Corporation or to any other party as a result of the nature of the Corporation's business as currently conducted, or (ii) unfair competition, trade secrets or proprietary information.

(g) Neither the Corporation nor any Subsidiary has any collective bargaining agreements covering any of its employees or any employee benefit plans, except as disclosed in Schedule 3.6(g) attached hereto.

(h) Neither the Corporation nor any Subsidiary is in violation of or default under any provision of its By-Laws or its Certificate of Incorporation, or any contract, instrument,

7

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

judgment, order, writ or decree to which it is a party or by which it is bound, and neither the Corporation nor any Subsidiary is in violation of any provision of any federal or state statute, rule or regulation applicable to the Corporation or any Subsidiary, which violation would have a material adverse effect on the business of the Corporation and the Subsidiaries, taken as a whole.

(i) Included in Schedule 3.6(i) attached hereto are the following consolidated financial statements of the Corporation and the Subsidiaries, all of which have been prepared in accordance with generally accepted accounting principles consistently applied and fairly present the consolidated financial position of the Corporation and the Subsidiaries as of the dates of such financial statements and the results of its operations and cash flows for the periods covered thereby, subject only to the matters described in the accountant's report attached thereto:

(i) Consolidated Balance Sheet dated December 31, 1994 and Consolidated Statements of Operation, Stockholders' Equity and Cash Flows for the year ended December 31, 1994, certified by Coopers and Lybrand L.L.P., independent public accountant to the Corporation; and

(ii) Unaudited Consolidated Balance Sheet as of September 30, 1995, and Consolidated Statements of Operation and Cash Flows for the period from January 1, 1995 through September 30, 1995 (the "Unaudited Financial Statements") . The Unaudited Financial Statements are complete and correct, are in accordance with the books and records of the Corporation and the Subsidiaries and present fairly, in all material respects, the consolidated financial condition and results of operations and cash flows of the Corporation and the Subsidiaries, as at the dates and for the periods indicated, and have been prepared in accordance with generally accepted accounting principles consistently applied, except that the Unaudited Financial Statements have been prepared for the internal use of management and may not be in accordance with generally accepted accounting principles because of the absence of footnotes normally contained therein and are subject to normal year-end audit adjustments which in the aggregate will not be material.

(j) Since December 31, 1994, the Corporation and the Subsidiaries have conducted their respective businesses in the ordinary course, and there has not been any material adverse change in the financial condition or operations of the Corporation , or of the Corporation and the Subsidiaries taken as a whole.

3.7. Payment of Taxes.

Except as disclosed in Schedule 3.7 attached hereto, the Corporation has accurately prepared and filed within the time prescribed by law all federal, state and local income, excise or

8

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

franchise tax returns, real estate and personal property tax returns, sales and use tax returns, payroll tax returns and other tax returns required to be filed by it and the Subsidiaries, and has paid or made provision for the payment of all accrued and unpaid taxes and other charges to which the Corporation is subject and which are not currently due and payable. The federal income tax returns of the Corporation have never been audited by the Internal Revenue Service. Neither the Internal Revenue Service nor any other taxing authority is now asserting nor is threatening to assert against the Corporation any deficiency or claim for additional taxes or interest thereon or penalties in connection therewith, and the Corporation does not know of any such deficiency or basis for such a deficiency or claim.

3.8. Securities Laws.

Neither the Corporation nor anyone acting on its behalf has offered securities of the Corporation for sale to, or solicited any offers to buy the same from, or sold securities of the Corporation to, any person or organization, in any case so as to subject the Corporation, its promoters, directors or officers to any liability under the Securities Act, the Securities Exchange Act of 1934, as amended, or any state securities or "blue sky" law (collectively, the "Securities Laws"). The offer, sale and issuance of the Shares will be exempt from the registration requirements of the Securities Act.

3.9. Title to Properties.

The Corporation and each Subsidiary has good, legal and merchantable title to all of its assets, including all properties and assets reflected on the December 31, 1994 Consolidated Balance Sheet, free and clear of all liens, claims, restrictions or encumbrances, except those assets disposed of since the date of such Balance Sheet in the ordinary course of business, none of which either alone or in the aggregate are material, either in nature or amount, to the business of the Corporation and the Subsidiaries taken as a whole. All machinery and equipment included in such properties which are material to the business of the Corporation and the Subsidiaries taken as a whole are in good condition and repair, and each lease of real or personal property to which the Corporation is a party is fully effective, affords the Corporation or the Subsidiary, as the case may be, peaceful and undisturbed possession of the subject matter of the lease, and such lease is free of any liens, claims, restrictions or encumbrances. Each such lease constitutes a valid and binding obligation of, and is enforceable in accordance with its terms against, the respective parties thereto. The Corporation or the Subsidiary, as the case may be, has in all respects performed the obligations required to be performed by it to date under such leases and is not in default thereunder in any respect, and there has not occurred any event which (whether with or without the passage of time or the giving of

9

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

notice) would constitute such a default.


3.10. Investments in Other Persons.

Except as disclosed in Schedule 3.10 attached hereto, (a) neither the Corporation nor any Subsidiary has made any loan or advance to any person or entity which is outstanding on the date hereof, nor is it committed or obligated to make any such loan or advance, and (b) neither the Corporation nor any Subsidiary has owned or controlled and does not currently own or control, directly or indirectly, any subsidiaries and has never owned or controlled and does not currently own or control any capital stock or other ownership interest, directly or indirectly, in any corporation, association, partnership, trust, joint venture or other entity.


### 3.11. ERISA.

Except as disclosed in Schedule 3.11 attached hereto, neither the Corporation nor any Subsidiary has made, nor been required by law or contract to make, contributions to any pension, defined benefit or defined contribution plans for its employees which are subject to the Federal Employee Retirement Income Security Act of 1974, as amended.


3.12. Licenses and Other Rights; Compliance with Laws.

The Corporation and the Subsidiaries have all franchises, permits, licenses and other rights and privileges necessary to permit them to own their respective properties and to conduct business as presently conducted. The Corporation or the Subsidiary, as the case may be, is in compliance in all material respects under each, and the transactions contemplated by this Agreement will not cause a violation under any of such franchises, permits, licenses and other rights and privileges. The Corporation and the Subsidiaries are in compliance in all material respects with all laws and governmental rules and regulations applicable to their respective businesses, properties and assets, and to the products and services sold by it, including, without limitation, all such rules, laws and regulations relating to fair employment practices and public or employee safety. The Corporation and the Subsidiaries are in compliance with the applicable provisions of the Clinical Laboratories Improvement Act of 1967, as amended.


3.13. Board of Directors.

Except as provided in Section 6(b) (i), the Corporation has not extended any offer or promise or entered into any agreement, arrangement, understanding or otherwise, whether written or oral, with any person or entity by which the Corporation has agreed to allow such person or entity to participate, in any way, in the affairs of the Board of Directors of the Corporation, including without limitation, appointment or nomination as a

10

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

member, or right to appear at, or receive the minutes of, a meeting of the Board of Directors of the Corporation.

3.14. Environmental Matters.

(a) Neither the Corporation nor any Subsidiary has used, generated, manufactured, refined, treated, transported, stored, handled, disposed, transferred, produced, processed or released (together defined as "Release") any Hazardous Materials (as herein after defined) on, from or affecting any Property (as hereinafter defined) in any manner or by any means in violation of any Environmental Laws (as hereinafter defined) and to the best of the Corporation's knowledge and belief after due investigation, there is no threat of such Release. As used herein, the term "Property" shall include, without limitation, land, buildings and laboratory facilities owned or leased by the Corporation or any Subsidiary or as to which the Corporation or any Subsidiary now has any duties, responsibilities (for cleanup, remedy or otherwise) or liabilities under any Environmental Laws, or as to which the Corporation or any Subsidiary may have such duties, responsibilities or liabilities because of past acts or omissions of the Corporation or any Subsidiary or their predecessors, or because the Corporation or any Subsidiary or their predecessors in the past was such an owner or operator of, or bore some other relationship with, such land, buildings or laboratory facilities, all as more fully described in Schedule 3.14(a) attached hereto. The term "Hazardous Materials" shall include without limitation, any flammable explosives, petroleum products, petroleum by-products, radioactive materials, hazardous wastes, hazardous substances, toxic substances or related materials as defined by Environmental Laws.

(b) Neither the Corporation nor any Subsidiary has received written notice that the Corporation or any Subsidiary is a party potentially responsible for costs incurred at a cleanup site or corrective action under any Environmental Laws. Neither the Corporation nor any Subsidiary has received any written requests for information in connection with any inquiry by any Governmental Authority (as hereinafter defined) concerning disposal sites or other environmental matters. As used herein, "Governmental Authority" shall mean any nation or government, any federal, state, municipal, local, provincial, regional or other political subdivision thereof, and any entity or person exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, government. As used herein, "Environmental Laws" shall mean all applicable federal, state and local laws, ordinances, rules and regulations that regulate, fix liability for, or otherwise relate to, the handling, use (including use in industrial processes, in construction, as building materials, or otherwise), storage and disposal of hazardous and toxic wastes and substances, and to the discharge, leakage, presence, migration, actual Release or threatened Release (whether by disposal, a

11

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

discharge into any water source or system or into the air, or otherwise) of any pollutant or effluent.

(c) The stockholders of the Corporation have had no control over, or authority with respect to, the waste disposal operations of the Corporation.

3.15. Reliance; "Knowledge".

The Corporation understands that the foregoing representations and warranties shall be deemed material and to have been relied upon by the Investor. No representation or warranty by the Corporation in this Agreement, and no written statement contained in any document, certificate or other writing delivered by the Corporation to the Investor contains any untrue statement of material fact or omits to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading. As used herein, the term "to the best of the Corporation's knowledge and belief" shall mean and include, (a) with respect to matters relating directly to the Corporation or any Subsidiary and its operations, actual knowledge or that knowledge which a prudent business person should have obtained in the management of his or her business affairs after making due inquiry and exercising due diligence with respect thereto, and (b) with respect to external events or conditions, actual knowledge.

SECTION 4. Representations and Warranties of the Investor to the

Corporation.

The Investor represents and warranty to the Corporation as follows:

(a) The execution, delivery and performance by the Investor of this Agreement has been duly authorized by all requisite corporate action by the Investor.

(b) The Investor has full power and authority to enter into and perform this Agreement in accordance with its terms. It is duly organized and validly existing and has not been organized, reorganized or recapitalized specifically for the purpose of investing in the Corporation.

(c) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation of, or a default under, or conflict with, any term or provision of its organizational documents, or any material contract, commitment, indenture, lease or other agreement to which it is a party or to which it is bound.

(d) It is acquiring the Shares for its own account, for investment and not with a view to the distribution thereof

12

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

within the meaning of the Securities Act.

(e) It is an "accredited investor" as such term is defined in Rule 501(a) promulgated under the Securities Act.

(f) It agrees that the Corporation may place a legend on the certificates delivered hereunder stating that the Shares have not been registered under the Securities Act and, therefore, cannot be offered, sold or transferred unless they are registered under the Securities Act or an exemption from such registration is available.

(g) It has (i) such knowledge and experience in business and financial matters so as to enable it to understand and evaluate the risks of the Investor's investment in the Shares and form an investment decision with respect thereto, and (ii) no need for liquidity in its investment in the Corporation and is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof. It has been afforded the opportunity during the course of negotiating the transactions contemplated by this Agreement to ask questions of, and to secure such information from, the Corporation and its officers and directors as it deems necessary to evaluate the merits of entering into such transactions.

SECTION 5. Closing Conditions.

5.1. Conditions to Obligations of the Investor.

(a) It shall be a condition precedent to the obligations of the Investor hereunder that:

(i) The representations and warranties of the Corporation contained herein shall be true and correct on and as of the date of the Initial Closing, the First Contingent Closing and the Second Contingent Closing with the same force and effect as though such representations and warranties had been made on and as of each such date, except that:

(A) there shall be delivered at the First Contingent Closing and at the Second Contingent Closing a certificate, signed by an officer of the Corporation, which contains the representation and warranty set forth in Section 3.2, but substituting the then-current numbers of shares for the numbers of shares set forth in Section 3.2;

(B) there shall be delivered at the First Contingent Closing and at the Second Contingent Closing a certificate, signed by an officer of the Corporation, which contains the representation and warranty set forth in section 3.6(i), but substituting the most recent financial statements then available (which shall have been delivered to the Investor at least

13

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

three business days prior to such closing) for the financial statements referred to in Section 3.6(i); and

(C) there shall have been delivered at least 10 business days before the First Contingent Closing and the Second Contingent Closing amendments to the Schedules provided for in Section 3, containing such information concerning developments or occurrences since the date of the most recently delivered Schedules (or amendment thereto) as is necessary to cause the representations and warranties contained in Section 3 to be true and correct, and no development or occurrence reflected in any such amendment, either alone or in the aggregate, shall constitute a material adverse change in the business or prospects of the Corporation, or of the Corporation and the Subsidiaries taken as a whole.

(ii) All proceedings to have been taken and all waivers and consents to be obtained in connection with the transactions contemplated by this Agreement shall have been taken or obtained, and all documents incidental thereto shall be satisfactory to the Investor and its counsel, and the Investor and its counsel shall have received copies (executed or certified, as may be appropriate) of all documents which the Investor or its counsel may reasonably have requested in connection with such transactions.

(iii) All legal matters incident to the purchase of the Shares shall be satisfactory to the Investor's counsel and the Investor shall have received from Hale and Dorr, counsel for the Corporation, such firm's opinion addressed to the Investor and dated the date of the Initial Closing, the First Contingent Closing and the Second Contingent Closing, as the case may be, in the form of Exhibit A hereto.

(iv) The Corporation shall have delivered to the Investor a certificate or certificates, dated the date of the Initial Closing, of the Secretary of the Corporation certifying as to (i) the resolutions of the Corporation's Board of Directors (and the vote of the stockholders, if necessary) authorizing the execution and delivery of this Agreement, the issuance to the Investor of the Shares, the execution and delivery of such other documents and instruments as may be required by this Agreement, and the consummation of the transactions contemplated hereby, and certifying that such resolutions were duly adopted and have not been rescinded or amended as of said date, and (ii) the name and the signature of the officers of the Corporation authorized to sign, as appropriate, this Agreement and the other documents and certificates to be delivered pursuant to this Agreement by either the Corporation or any of its officers.

(v) The Corporation shall have delivered to the Investor certificates, dated the date of the Initial Closing,

14

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

the First Contingent Closing and the Second Contingent Closing, of the President of the Corporation certifying as to the accuracy of the representations and warranties made by the Corporation pursuant to this Agreement.

(vi) The Corporation shall have delivered to the Investor certificates, dated the date of the Initial Closing, the First Contingent Closing and the Second Contingent Closing, of the Treasurer of the Corporation certifying that since December 31, 1994, (or, in the case of certificates delivered at the First Contingent Closing and the Second Contingent Closing, since the date of the most recent audited consolidated financial statements delivered to the Investor pursuant to Section 5.1(a)(i)(B)) there has not been any material adverse change in the consolidated financial condition or operations of the Corporation and the Subsidiaries, and that except as to the extent reflected in the financial statements referred to in Section 3.6(i) (or in such later audited financial statements, as the case may be), and except for liabilities arising in the ordinary course of business (none of which liabilities either alone or in the aggregate are material either in nature or amount to the business of the Corporation, or the Corporation and the Subsidiaries taken as a whole), the Corporation and the Subsidiaries have no material accrued or contingent liabilities which are not specifically described in such financial statements.

(vii) All consents, permits, approvals, qualifications and registrations (including, without limitation, registration of the Shares) required to be obtained or effected under the Securities Laws and any applicable "blue sky" or other laws of any jurisdiction shall have been obtained or effected.

5.2. Conditions to Obligations of the Corporation.

It shall be a condition precedent to the obligations of the Corporation hereunder that the representations and warranties of the Investor contained herein shall be true and correct as of the date of the Initial Closing with the same force and effect as though such representations and warranties had been made on and as of such date.

SECTION 6. Covenants of the Investor and the Corporation.

(a) The Investor covenants as follows:

(i) The Investor will keep confidential and will not disclose, divulge or use any confidential, proprietary or secret information which such Investor may obtain from the Corporation pursuant to financial statements, reports and other materials submitted by the Corporation to the Investor pursuant to this Agreement; provided, however, that the Investor may disclose

15

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

such information to its attorneys, accountants, and other professionals to the extent necessary to obtain their services in connection with its investment in the Corporation; and provided, further, that the Investor's obligations under this Section 6(a)(i) shall not apply to information which (A) at the time of disclosure is in the public domain; (B) after disclosure becomes part of the public domain by disclosure or otherwise, except by breach of this Section 6(a) (i) by the Investor; (C) the Investor can establish by competent proof was in its possession at the time of disclosure and was not acquired, directly or indirectly, from the Corporation; or (D) the Investor receives from a third party which was not obtained by such third party, directly or indirectly, from the Corporation.

(ii) For the period beginning on the date hereof and ending three (3) years thereafter (the "Standstill Period"), unless it has obtained the prior written consent of the Corporation, the Investor will not

(A) acquire, directly or indirectly, by purchase or otherwise, of record or beneficially, any voting securities of the Corporation, or rights or options to acquire voting securities of the Corporation, if after such acquisition (and giving effect to the exercise of any such rights or options) the Investor would own of record or beneficially in the aggregate more than twenty percent (20%) of the voting securities of the Corporation (assuming the exercise of all outstanding rights or options to acquire voting securities) (the "20 Percent Limit"); provided that notwithstanding the provisions of this clause (A), if the number of shares of outstanding voting securities is reduced or if the aggregate ownership of the Investor is increased as a result of a recapitalization of the Corporation or as a result of any other action taken by the Corporation, the Investor will not be required to dispose of any of its holdings of voting securities even though such action resulted in the Investors' ownership exceeding the percentage of voting securities which the Investor would then be permitted to own. Except as otherwise provided above, if the Investor shall at any time during the Standstill Period own in the aggregate in excess of the maximum percentage of the voting securities at the time permitted by this clause (A), (x) the Investor shall sell as promptly as practicable under the circumstances sufficient voting securities so that after such sale the Investor shall not own in the aggregate more than the applicable maximum permitted percentage of voting securities, and (y) the Investor shall refrain from voting on any matter as to which the holders of voting securities shall have the right to vote with respect to any voting securities held by the Investor in excess of the 20 Percent Limit (provided, however, that the foregoing paragraph shall not be deemed to limit the Corporation's remedies in the event that the excess voting securities were acquired in violation of this Section);

(B) "solicit" proxies with respect to voting securities under any circumstances or become a "participant"

16

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

in any "election contest" relating to the election of directors of the Corporation, as such terms are defined in Regulation 14a under the Securities Exchange Act of 1934, as amended; deposit any voting securities in a voting trust or subject them to a voting agreement or other agreement of similar effect;

(C) initiate, propose or otherwise    solicit stockholders for the approval of one or more stockholder proposals at any time, or induce or attempt to induce any other person to initiate any stockholder proposal; or

(D) take any action individually or jointly with any partnership, limited partnership, syndicate, or other group or assist any other person, corporation, entity or group in taking any action it could not take individually under the terms of this Agreement;

provided, however, that the restrictions contained in this Section 6 (a) (ii) shall not apply if (x) any third party or group makes a tender offer or exchange offer for 20% or more of the voting securities of the Corporation or acquires 20% or more of the voting securities of the Corporation, (y) the Corporation enters into negotiations with any third party or group concerning acquisition of the Corporation, or (z) during the period in which the Investor has the right to designate a member of the Corporation's Board of Directors, the Investor's designee (if any) for election to the Corporation's Board of Directors (provided for in Section 6(b)(i)) is not elected by the stockholders of the Corporation.

(b) The Corporation covenants as follows:

(i) The Investor shall have the right to designate one individual for membership on the Corporation's Board of Directors, and the Corporation shall use reasonable efforts to secure the election of such designee to such Board by causing such individual to be nominated as a director and presented to the Corporation's stockholders for election; provided, however, that such right, and the Corporation's corresponding obligation, shall terminate upon the transfer of 50% or more of the Investor's voting power of the Shares. A transferee of shares shall not be entitled to the rights granted to the Investor under this Section 6(b)(i).

(ii) The Corporation will consult with the Investor before issuing any public announcement of the transactions contemplated by this Agreement. In the event that the Corporation is required to provide a copy of this Agreement or any related document to any third party, the Corporation shall ensure that such document is redacted, to the extent permitted by law, to eliminate all confidential information. The Investor shall have the right to review and approve each such document prior to its submission to a third party. A period of ten business days will be required for such review.

17

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

(iii) The Corporation shall permit the Investor, at the Investor's expense, to visit and inspect the Corporation's properties, to examine its books of account and records and to discuss the Corporation's affairs, finances and accounts with its officers, all at such reasonable times as may be requested by the Investor; provided, however, that the Corporation shall not be obligated pursuant to this Section 6(b)(iii) to provide access to any information which it reasonably considers to be a trade secret or similar confidential information; and provided, further, that such right shall terminate upon the transfer of 50% or more of the Investor's voting power of the Shares. A transferee of Shares shall not be entitled to the right granted to the Investor under this Section 6(b)(iii).

(iv) The net proceeds received by the Corporation from the Initial Investment shall be used by the Corporation solely for the continuing development of GRAFTSKIN skin and tissue equivalents in accordance with development plans agreed upon by the Joint Development Committee established pursuant to that certain License and Supply Agreement of even date herewith between the Corporation and the Investor, including investments in U.S. manufacturing facilities for GRAFTSKIN skin and tissue equivalents.

SECTION 7. Expenses.

The Investor and the Corporation shall each pay its own expenses in connection with the Agreement and the transactions contemplated hereby.

SECTION 8. Brokers or Finders.

The Corporation and the Investor each (i) represent and warrant to the other that it has retained no finder or broker in connection with the transactions contemplated by this Agreement and (ii) will indemnify and save the other harmless from and against any and all claims, liabilities or obligations with respect to brokerage or finders' fees or commissions, or consulting fees in connection with the transactions contemplated by this Agreement asserted by any person on the basis of any statement or representation alleged to have been made by such indemnifying party.

SECTION 9. Exchanges; Lost, Stolen or Mutilated

Certificates.

Upon surrender by the Investor to the Corporation of a stock certificate representing Shares, the Corporation, at its expense, will issue in exchange therefor, and deliver to the Investor, a new certificate or certificates representing such shares in such denominations as may be requested by the Investor. Upon receipt of evidence satisfactory to the Corporation of the loss, theft,

18

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

destruction or mutilation of any certificate representing any Shares and, in case of any such loss, theft or destruction, upon delivery of any indemnity agreement satisfactory to the Corporation, or in case of any such mutilation, upon surrender and cancellation of such certificate, the Corporation at its expense will issue and deliver to the Investor a new certificate for such Shares, of like tenor, in lieu of such lost, stolen or mutilated certificate.

SECTION 10. Survival of Representations and Warranties.

The representations and warranties of the Corporation (except for those contained in Section 3.14) shall survive the Closing, for the longer of two years or the expiration of the respective statute of limitations governing claims brought with respect to matters pertaining thereto. The representations and warranties of the Corporation set forth in Section 3.14 shall survive indefinitely until, by their respective terms, they are no longer operative. All statements contained in any certificate or other instrument delivered by the Corporation pursuant to this Agreement or in connection with the transactions contemplated by this Agreement shall constitute representations and warranties by the Corporation under this Agreement and shall survive for the longer of two years or the expiration of the respective statute of limitations governing claims brought with respect to matters pertaining thereto.

SECTION 11. Indemnification.

The Corporation shall indemnify, defend and hold the Investor harmless against any and all liabilities, loss, cost or damage, together with all reasonable costs and expenses related thereto (including legal and accounting fees and expenses), arising from, relating to, or connected with the untruth, inaccuracy or breach of any statements, representations, warranties or covenants of the Corporation contained herein, including, but not limited to, all statements, representations, warranties or covenants concerning environmental matters.

SECTION 12. Remedies.

In case any one or more of the covenants or agreements set forth in this Agreement shall have been breached by any party hereto, the party or parties entitled to the benefit of such covenants or agreements may proceed to protect and enforce their rights either by suit in equity or action at law, including, but not limited to, an action for damages as a result of any such breach or an action for specific performance of any such covenant or agreement contained in this Agreement. The rights, powers and remedies of the parties under this Agreement are cumulative and not exclusive of any other right, power or remedy which such parties may have under any other agreement or law. No single or partial

19

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

assertion or exercise of any right, power or remedy of a party hereunder shall preclude any other or further assertion or exercise thereof.

SECTION 13.  Successors and Assigns.

Except as otherwise expressly provided herein, this Agreement shall bind and inure to the benefit of the Corporation and of the Investor and the respective permitted successors and assigns of the Investor and the permitted successors and assigns of the Corporation. Subject to the provisions of Sections 6(b)(i) and 6(b)(iii), this Agreement and the rights and duties of the Investor set forth herein may be freely assigned, in whole or in part, by the Investor. Neither this Agreement nor any of the rights or duties of the Corporation set forth herein shall be assigned by the Corporation, in whole or in part, without having first received the written consent of the Investor. Notwithstanding the foregoing sentence, the Corporation may assign this Agreement and the rights and the duties of the Corporation set forth herein to an entity or person which purchases all or substantially all of its assets or voting securities, so long as the successor agrees in writing to be bound by all the terms of this Agreement.

SECTION 14.  Entire Agreement.

This Agreement and the other writings referred to herein or delivered pursuant hereto which form a part hereof contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or understandings, whether written or oral, with respect thereto; provided, however, that this Agreement is not intended to supercede the Licence and Supply Agreement of even date herewith between the Corporation and the Investor.

SECTION 15.  Notices.

All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if contained in a written instrument delivered in person or duly sent by first class registered or certified mail, postage prepaid, or telecopied with a confirmation copy by regular mail, addressed or telecopied, as the case may be, to such party at the address or telecopier number, as the case may be, set forth below or such other address or telecopier number, as the case may be, as may hereafter be designated in writing by the addressee to the addressor listing all parties:

        (i)    if to the Corporation, to:

        Organogenesis Inc. 150 Dan Road

20

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

Canton, MA 02021 Attention: President Telecopier: (617) 575-0440

with a copy to:

Steven D. Singer, Esq. Hale and Dorr 60 State Street Boston, MA 02109 Telecopier: (617) 526-5000

(ii)    if to Investor, to:

Sandoz Pharma Ltd Lichtstrasse 35 CH-4002 Basel, Switzerland

Attention:  Legal Department Telecopier:  011-41-61-324-2544

with a copy to:

Robert L. Thompson, Jr., Esq. Vice President, General Counsel and Secretary Sandoz Corporation 608 Fifth Avenue

New York, NY 10020 Telecopier:  (212) 957-8367

All such notices, requests, consents and other communications shall be deemed to have been received: (a) in the case of personal delivery, on the date of such delivery; (b) in the case of mailing, on the seventh business day following the date of such mailing; and (c) in the case of facsimile transmission, when confirmed by facsimile machine report.

SECTION 16.  Changes.
The terms and provisions of this Agreement may not be modified or amended, or any of the provisions hereof waived, temporarily or permanently, except pursuant to a writing executed by a duly authorized representative of the Corporation and the Investor.

SECTION 17.  Counterparts.
This Agreement may be executed in counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

21

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

SECTION 18.  Headings.
The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

SECTION 19.  Nouns and Pronouns.
Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms and the singular form of names and pronouns shall include the plural and vice-versa.

SECTION 20.  Severability.
Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 21.  Governing Law.
This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

<div align="center">

**CORPORATION:**
**ORGANOGENESIS INC.**

</div>

By:     /s/ David T. Rovee

        David T. Rovee, President

INVESTOR:
SANDOZ PHARMA LTD.

By:     /s/ D. Vasella

        D. VASELLA, CEO Sandoz

By:     /s/ R. Brandli

        R. Brandli, AVP Sandoz

<div align="center">22</div>

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

EXHIBIT 10(v)

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

## LICENCE AND SUPPLY AGREEMENT

This Agreement made as of 17 January 1996, between ORGANOGENESIS INC., a company organized under the laws of the State of Delaware, of 150 Dan Road, Canton, Massachusetts 02021, USA (hereinafter "Organogenesis") and SANDOZ PHARMA LTD., a corporation organized under the laws of Switzerland, of Lichtstrasse 35, Basle, Switzerland (hereinafter "Sandoz").

## W I T N E S S E T H

WHEREAS, Organogenesis has certain patents, patent applications and technical information relating to the use and manufacture of GRAFTSKIN skin and tissue equivalents as described in Schedule A (hereinafter "Product"); and

WHEREAS, Sandoz desires to obtain a licence from Organogenesis to use and sell, and under specified conditions, manufacture Product under such patents, patent applications and technical information; and

WHEREAS, Sandoz desires to make an equity investment in Organogenesis;

NOW, THEREFORE, the parties hereto hereby agree as follows:

## ARTICLE 1.  DEFINITIONS

The following terms shall have the following meanings:

1.1 "Affiliate" means any corporation or other entity which controls,
is controlled by, or is under common control with, a party to this Agreement. A corporation or other entity shall be regarded as in control of another corporation or entity if it owns or directly or indirectly controls more than forty percent (40%) of the voting stock or other ownership interest of the other corporation or entity, or if it possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation or other entity.

1.2 "Core Dossier"  means the single common core database  described in
Art. 4.1., which refers to the indications listed in Art. 5.2

1.3 "CPMP"  means the  European  Committee  for  Proprietary  Medicinal
Products.

1.4 "Development Phase" means the period from the Effective Date to the
date of First Commercial Sale in the last Primary Country to have a First Commercial Sale.

1.5 "Effective Date" means the date first written above.

1.6 "E.U. Countries" means Austria, Belgium, Denmark, Finland, France,
Germany, United Kingdom, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden and such other countries as may in the future join the European Union, in each case for so long as such country remains a member of the European Union.

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

2

1.7 "FDA" means the United States Food and Drug Administration.

1.8 "First Commercial Sale" of Product shall mean the first bona fide
sale for use or consumption by the general public of Product in a country after required marketing and pricing approval has been granted by the governing health authority of such country.

1.9 "IDE" means a request or approval, as the case may be, in a country
in the Territory to initiate human clinical trials of Product in that country; said request or approval intended to correspond to that of an Investigational Device Exemption or an Investigational New Drug in the United States.

1.10 "JDC" means the Joint Development Committee set up according to
Art. 4.2.

1.11 "Net Sales" means the gross invoice price of the Product, sold to
independent, third-party customers in bona fide, arms-length transactions, less (i) quantity and/or cash discounts actually allowed or taken; (ii) freight postage and insurance (allocated in accordance with Sandoz' standard allocation procedure, which is in accordance with generally acceptable accountancy principles {GAAP }); (iii) amounts repaid or credited by reasons of rejections or return of goods or because of retroactive price reductions specifically identifiable to Product; (iv) amounts payable resulting from Governmental (or agency thereof) mandated rebate programs; (v) third-party rebates to the extent actually allowed; vi) custom duties and taxes (excluding income, value-added and similar taxes), if any, directly related to the sale; and (vii) any other specifically identifiable amounts included in Product's gross sales that will be credited for reasons substantially equivalent to those listed hereinabove.

1.12 "Patent Rights" means the patents and patent applications relating
to Product set out in Schedule B, any divisions, continuations, continuations-in-part, reissues, reexaminations, extensions, supplemental protection certificates or other governmental actions which extend the subject matter or the term of the patent applications or patents above, and any confirmations, registrations or revalidations of any of the foregoing in any additional countries.

1.13 "PMA" means an application for registration and/or approval to
manufacture and sell Product in a country in the Territory.

1.14 "PMA Approval" means approval by the health authorities to
manufacture and sell Product in a country in the Territory; such approval intended to correspond to a Pre-Marketing Approval of a device or a New Drug Approval by the FDA. In the EU countries, the approval process includes the setting of a reimbursement price.

1.15 "Primary Country" means the United States, Germany, France, Italy
and Japan.

1.16 "Supply Price" means the price charged to Sandoz for a three (3)
inch diameter circular unit of Product intended for commercial sale.

1.17 "Technical Information" means any or all results and technical
information, including preclinical, manufacturing, clinical or regulatory information relating to Product that is (i) owned or controlled by Organogenesis on the Effective Date; or (ii) hereinafter developed or acquired by Sandoz or Organogenesis during the term hereof.

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

3

1.18 "Territory" means all countries in the world.

1.19 "Valid Patent Claim" means either (a) a claim of an issued and
unexpired patent included within the Patent Rights, which has not been held permanently revoked, unenforceable or invalid by a decision of a court or other governmental agency of competent jurisdiction, unappealable or unappealed within the time allowed for appeal, and which has not been admitted to be invalid or unenforceable through reissue or disclaimer or otherwise; or (b) a claim of a pending patent application included within the Patent Rights, which claim was filed in good faith and has not been abandoned or finally disallowed.

1.20 "**************************" means Sandoz's ********* based on the ***** ***********, ***** ****, ********and ************ of Product in the ***************** as calculated in accordance with **********.


## ARTICLE 2.  LICENCE GRANT

2.1 Scope of Grant: Organogenesis hereby grants to Sandoz an exclusive
licence, or, where applicable, an exclusive sublicence, under Patent Rights and Technical Information to use, import, sell and offer to sell Product in the Territory and, under the circumstances set forth in Art. 12, to make and have made Product in the Territory. The licence so granted includes the right to sublicense. Sandoz shall provide written notice to Organogenesis concerning each sublicence granted hereunder, other than those to Affiliates, together with a copy of each sublicence agreement, within fifteen (15) days after execution thereof. During the Development Phase, Sandoz will review through the JDC its licensing strategy relating to Product, including the names of potential sublicensees. Organogenesis shall have the right to request that Sandoz sublicense Product in any country in which Sandoz has no plans to commercialize Product, and Sandoz shall consider any such request in good faith.

2.2 Exclusivity Term in E.U.: Respecting E.U. Countries, the
exclusivity provided by Organogenesis shall be limited to a period of ten (10) years from the Effective Date, provided, however, that in the E.U. Countries in which Patents remain valid after expiration of the ten-year period, the exclusivity will continue until expiration of Patents. For avoidance of doubt, Sandoz acknowledges that termination of exclusivity in E.U. Countries pursuant to the preceding sentence shall not reduce, impair or otherwise affect Sandoz' obligation to continue to pay royalties provided in Article 6, hereof, in such countries.

2.3 MIT Licence: Organogenesis is the exclusive licensee of
Massachusetts Institute of Technology (MIT) to US Patent 4,485,096, and equivalents which are included in the Patent Rights set out in Schedule B of this Agreement. Organogenesis' licence will end when patent USP 4,485,096 expires.


## ARTICLE 3.  TECHNICAL INFORMATION
Organogenesis shall disclose to Sandoz the Technical Information within thirty (30) days of the Effective Date. Organogenesis and Sandoz shall further disclose to one another all Technical Information hereinafter developed or acquired by either party during the term of this Agreement. The parties shall also disclose to one another reimbursement studies, market research

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

4

and manufacture and distribution plans developed or acquired by either party prior to the Effective Date or during the term of this Agreement. Organogenesis warrants that preclinical testing, including safety testing, within the Technical Information has been carried out according to Good Laboratory Practice, and that clinical testing within the Technical Information has been carried out according to Good Clinical Practice.

## ARTICLE 4.  DEVELOPMENT OF PRODUCT

4.1 Responsibilities: Organogenesis will execute the development and

registration activities in the U.S.; Sandoz will plan and execute the development and registration activities outside the U.S. Nevertheless, all information, data and study results shall be shared between the parties, and the parties shall develop a single common core database in respect of all clinical studies (the "Core Dossier"). The studies in the Core Dossier shall be performed to CPMP and FDA standards. Organogenesis shall own the PMA and all other regulatory approvals relating to Product in the U.S.; and Sandoz shall own the PMA and all other regulatory approvals relating to Product outside the U.S.. Each party shall upon request provide the other with copies of the regulatory approval documents certified by an appropriate officer of such party.

4.2 Joint Development Committee: Sandoz and Organogenesis will, within

fifteen (15) days after the Effective Date, establish a Joint Development Committee ("JDC") to oversee the global development activities, having the objective of achieving global registration of Product in the most expeditious fashion. The JDC shall agree on the strategy for performing the studies to be included in the Core Dossier.

4.3 Membership: The JDC shall be comprised of three (3) representatives

from each of Sandoz and Organogenesis. Each party may replace its JDC representatives at any time, after discussion with the other party, with subsequent written notice to the other party. Organogenesis and Sandoz shall each appoint one of their JDC representatives to be responsible for coordinating communications between Organogenesis and Sandoz (the "Primary Contact Person"). The JDC shall be chaired by the Sandoz Primary Contact Person.

4.4 Decision Making: Decisions of the JDC shall be made by majority

approval. In the event the parties are unable to agree on an issue concerning the Core Dossier that has no financial impact on Organogenesis, Sandoz shall make the final decision. In the event the parties are unable to agree on any other issue, the dispute will be referred to Organogenesis's President (or designee of similar rank) and Sandoz's Head of Business Development (or designee of similar rank), who shall promptly meet in person or by means of telephone or video conference and endeavor to resolve the dispute in a timely manner. In the event such individuals are unable to resolve the dispute, it shall be settled by binding arbitration pursuant to Art. 18.11 below, or as otherwise agreed.

4.5 JDC Meetings: During the Development Phase, the JDC shall meet at

least quarterly at regular intervals, or more often as agreed by the parties, in person at such locations as the parties agree, or by means of telephone or video conference. With the consent of the parties, other representatives of Organogenesis or Sandoz or its Affiliates or Sublicensees may attend JDC meetings as nonvoting observers. The party hosting a particular JDC meeting shall promptly prepare and deliver to the members of the JDC, within thirty (30) days after the date of each meeting, minutes of such meeting setting forth, inter alia, all decisions of the JDC. In case of telephone and video conferences, this responsibility will alternate between the parties.

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

5

**4.6 Funding:  Sandoz shall make the following payments to Organogenesis**
as a contribution to Organogenesis'  research and development  costs,  including clinical trial and registration costs, in the U.S.:

| Due Date | Amount |
|---|---|
| ************* | ********* *********************** |
| ************* | ********* *********************** |
| ************* | ********* *********************** |

The initial equity investment of *********** ************************* referred to in Art. 8.1 shall also be applied to Organogenesis' research and development costs including clinical trial and registration costs in the U.S. associated with studies agreed upon by the JDC and described in the Core Dossier, making a total contribution from Sandoz of *********** ***************************.

(i) All additional  research and  development,  and registration costs required for the  Core Dossier in the  U.S. will be borne by Organogenesis.

(ii) All additional clinical trial costs related to the Core Dossier in the U.S. determined by the FDA to be necessary or appropriate shall be borne by Organogenesis.

(iii) All additional clinical trial costs unrelated to the Core Dossier in the U.S. determined by the JDC to be necessary or appropriate shall be borne by Sandoz (including, for example, post market surveillance studies and trials for additional indications not listed in Art. 5.2).

(iv) Research and development unrelated to the Core Dossier but directed towards registration in additional indications and determined by the JDC to be appropriate for action will be funded by Sandoz.

An annual budget for U.S. research and development and clinical activities will be prepared by Organogenesis and approved by the JDC at least ninety (90) days before the end of each calendar year. All clinical trial and registration costs incurred outside the U.S. will be borne by Sandoz. An annual plan and budget for European development activities will be prepared by Sandoz and submitted to the JDC at least ninety (90) days before the end of each calendar year.

**4.7 Cooperation: Upon request of Sandoz, Organogenesis shall file with**
the health authorities in the Territory and permit Sandoz to cross-refer to such file, or provide to Sandoz and allow Sandoz to file with the authorities, information concerning the manufacturing process and quality control of Product required under local laws to support the registration of Product, including any necessary validation of additional master cell banks. Subject to the above provisions, Sandoz and its Affiliates shall commence marketing of Product in each Primary Country promptly upon receiving necessary PMA Approval (including approval for pricing, where applicable) and shall promptly notify Organogenesis, through the JDC, of commencement of such marketing. Each party agrees to disclose to the other party data from clinical studies, as well as data from marketing and medical support activities relevant to future product development activities.

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

6

4.8 Reasonable Commercial Efforts and Excused Performance:

4.8.1 Reasonable Commercial Efforts: Sandoz agrees to use reasonable
commercial efforts to obtain PMA approval in each Primary Country other than the US and to market and sell Product in all Primary Countries as promptly as is reasonably practicable. Organogenesis agrees to use reasonable commercial efforts to obtain PMA approval in the U.S. as promptly as is reasonably practicable.

4.8.2 Excused Performance: Sandoz's obligations with respect to Product
under Art. 4.8.1 are expressly conditioned upon the continuing absence of any adverse conditions relating to the safety, quality or efficacy of Product, price or other restrictions imposed by governmental authorities under which the sale of Product would not produce a reasonable profit, the reasonable likelihood of the infringement of a patent or other proprietary rights of third parties or other condition or event beyond Sandoz's control that would reasonably justify Sandoz, after consulting with Organogenesis, in exercising prudent and justifiable business judgement, concluding that development or marketing of Product should be delayed, suspended or stopped altogether, and Sandoz's obligation to develop or market Product shall be delayed or suspended so long as any such condition or event exists.

4.9 Improvements: Organogenesis agrees to disclose and furnish to
Sandoz, without charge, information on any inventions and/or improvements for Product obtained by Organogenesis during the term of this Agreement, regardless of whether such inventions and/or improvements are patentable. Sandoz shall have the right and option, at its sole election, to obtain an exclusive licence to any such invention by providing written notice to Organogenesis of such election within ninety (90) days after Organogenesis notifies Sandoz in writing that it has filed a patent application for such invention. Upon any such election, such invention shall be deemed to be part of the Patent Rights, and the licence provisions of Art. 2 and the royalty provisions of Articles 6 and 7 together with all other applicable provisions, shall apply to such invention.

**ARTICLE 5.  MILESTONE PAYMENTS**

5.1 Europe: Upon receiving the first PMA Approval to be granted for one
of the European Primary Countries, that is, for Germany, Italy or France, Sandoz shall make to Organogenesis a single non-refundable payment of $********** ************************. Subsequent PMA approvals in the same country or in the other European Primary Countries shall not trigger additional milestone payments.

5.2 U.S.: Upon supply by Organogenesis to Sandoz of sufficient Product
to support Sandoz' introduction of Product following PMA Approval in the U.S. for each of the listed indications, Sandoz shall pay Organogenesis non-refundable milestone payments in accordance with the following schedule:

| Indication | Amount |
|---|---|
| Venous stasis ulcers | ********************************** |
| Dermatologic surgery | ********************************** |
| Diabetic ulcers | ********************************** |
| Burn therapy | ********************************** |
| Decubitis ulcers | ********************************** |

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

<div align="center">7</div>

**ARTICLE 6.  ROYALTIES**

6.1 Royalty levels and term: As further consideration for the licence
granted and Technical Information provided hereunder, Sandoz shall pay Organogenesis the following royalties as a percentage of Net Sales of Product made by Sandoz, its Affiliates and sublicensees:

>(i)    in a country in which sale of Product would, but for the licence granted hereunder, infringe a Valid Patent Claim, a patent royalty of ************** ******payable until the expiration of the last of the Patent Rights which would be so infringed in that country.

(ii)    in a country where sale of Product would not infringe a Valid Patent Claim, a know-how royalty of ************** ***** payable until *************** from the First Commercial Sale in that country.

>(iii)    in a country [covered by Art. 6.1(i) above] in which the term of the patent royalty is less than ************** from the Effective Date, a know-how royalty of ****************** for the period beginning at expiration of patent royalties and ending ******** ***** from the First Commercial Sale in that country.

For the purposes of this Art. 6.1, Net Sales by Sandoz to an Affiliate or sublicensee shall not be counted for royalty purposes (unless the Affiliate or sublicensee is the end user of the Product); instead, the Net Sales of such Affiliate or sublicensee to an unrelated third party shall be considered Net Sales for royalty purposes.

6.2 Increased Royalties on Incremental Sales: Subject to adjustment
according to Art. 6.4, if, in any calendar year, in any of the three following areas: (a) the U.S., (b) Japan, and (c) the E.U. Countries taken together, the Net Sales of Product which would, but for the licence granted hereunder, infringe a Valid Patent Claim should exceed ************** ************* ***************, then the patent royalty payable on such Net Sales shall be *************** ****** on the first ************** ******************************** of Net Sales in such calendar year, and ********************* ****** on all incremental Net Sales above this amount.

6.3 Third Party Royalties: If Sandoz is required to pay royalties to
any third party in order to exercise its rights to sell Product, then ************** ***** of the royalties payable to such third party shall be deductible from the royalties paid to Organogenesis under this Agreement, provided that

>(i) in no event shall any royalty payment under Art. 7.2 be reduced by more than ***** ******* ******, with the non-deducted amounts carried forward for future deduction, and

>(ii) in no case shall the patent royalty rate be less than ************** ****** in countries in which sale of Product would, but for the licence granted hereunder, infringe a Valid Patent Claim,

(iii) nor shall the know-how royalty rate be less than ************************ ******.

6.4 Royalty Adjustment: If in any country in which sale of Product
falls under a Valid Patent Claim, a third party markets a competing skin equivalent product which prima facie infringes a Valid Patent Claim, then if the competing product achieves in any calendar year unit

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

8

sales of at least *************** ****** of Sandoz' unit sales of Product in such country, the royalty rates payable by Sandoz on Net Sales of Product in the following calendar year according to Articles 6.1 and 6.2 shall be reduced by ************* ******, provided that if the country is other than the United States, such royalty reduction shall apply only if Sandoz has taken appropriate legal action to abate the infringement and is diligently pursuing such action. If as a result of such legal action the competing product is removed from the market, the reduction in royalty rate shall cease to apply with immediate effect.

6.5 ******* ********: For each country, ****************************************************** ************* ************, Sandoz shall have a *********************************************************** under any remaining know-how or other rights of Organogenesis, to use and sell Product in that country. After expiration of this Agreement according to Art. 16.1, and subject to any Supply Agreement as contemplated in Art. 12.1, Sandoz shall have a ************************************************* ************, under any remaining know-how or other rights of Organogenesis, to make or have made Product.


## ARTICLE 7.  RECORDS AND PAYMENTS

7.1 Development Funding and Milestone Payments: Payments to be made
under Articles 4.6 and 5.2 shall be paid by Sandoz upon presentation of an invoice by Organogenesis. Payment shall be made no later than (a) the due date or (b) thirty (30) days after receipt of the corresponding invoice, whichever is the later.


7.2 Royalties: Royalties as provided in Article 6 shall be calculated
************ on the last day of each calendar ********** during the term of this Agreement and shall be paid to Organogenesis within ********** (**) **** after said last day with an accounting report showing the amount of Product sold by Sandoz and its Affiliates and sublicensees during each ********* period.


7.3 Currency Exchange: Royalties provided to Organogenesis shall be
made in US Dollars, and shall be determined on the basis of Sandoz' monthly standard account of sales which represents the conversion of all local currency sales to Swiss Francs at the average monthly exchange rate of sales. The average exchange rate between the Swiss Franc and US Dollar shall be the rate published
in the London Times at the close of business in London on the *********** ****
***************************** for which the royalties are being paid.


7.4 Method of Payment: Royalties and payments provided to Organogenesis
shall be made by telegraphic transfer to Organogenesis's bank account at the following address:

State Street Bank & Trust Company 225 Franklin Street Boston, MA 02110

ABA: 011-0000-28 Account 5182-768-1


7.5 Records: Sandoz shall keep accurate records and books of accounts
in accordance with generally accepted accounting principles consistently applied and containing all the data reasonably required for calculation and verification of payments made. During the term of this

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

9

Agreement and two (2) years thereafter, Sandoz shall retain accounting records of the previous three (3) years. At Organogenesis's request, Sandoz shall make records available, no more than twice per year, during reasonable working hours for review by an independent accounting firm acceptable to both parties, at Organogenesis's expense, for the sole purpose of verifying their accuracy. In the event that any such review indicates an underpayment of royalties by Sandoz in excess of five percent (5%), Sandoz shall pay the cost of such review.

7.6 Taxes: All royalty amounts required to be paid to Organogenesis

pursuant to this Agreement shall be paid with deduction for withholding for or on account of any taxes (other than taxes imposed on or measured by net income) or similar governmental charge imposed by a jurisdiction other than the U.S. ("Withholding Taxes"). Sandoz shall provide Organogenesis a certificate evidencing payment of any Withholding Taxes hereunder and provide reasonable assistance to recover such taxes.

**ARTICLE 8.  EQUITY INVESTMENT**

Sandoz shall make one or more equity investments in Organogenesis according to the terms and conditions set out in the Stock Purchase Agreement between them of even date herewith.

**ARTICLE 9.  PATENT PROSECUTION AND MAINTENANCE**

9.1 Responsibility: Within ninety (90) days of the Effective Date,

Sandoz shall assume cost and responsibility for prosecution and maintenance of the Patent Rights outside the U.S. Organogenesis shall continue to bear cost and responsibility for prosecution and maintenance of the Patent Rights in the U.S. Each party shall provide the other with copies of substantive communications to and from the applicable patent offices.

9.2 Discontinuation: Sandoz may elect upon sixty (60) days prior notice

to discontinue prosecution or maintenance of any of the Patent Rights in any or all countries for which Sandoz is responsible. In such case, Organogenesis shall have the right to prosecute and maintain such patent applications and patents in such countries it deems appropriate, at its sole expense. Any such patent application or patent in such country which Organogenesis prosecutes or maintains shall no longer be part of the Patent Rights and shall be excluded from the licence granted to Sandoz under this Agreement.

9.3 Foreign Filing Decisions: If after the end of the ninety (90) day

period referred to in Art. 9.1 there exists any U.S. patent application which is part of the Patent Rights as of the Effective Date or which becomes part of the Patent Rights by the provisions of Art. 4.9 and for which no corresponding foreign applications have yet been filed, the parties shall consult at an appropriate time as to whether, and if so in which countries, such foreign filing should be carried out by Sandoz and at Sandoz' expense. If in any one of the following countries: Australia, Canada, Israel, Japan, Korea, Mexico, Taiwan and the countries of the European Patent Convention, Sandoz decides not to file a corresponding application, Organogenesis shall have the right to file a corresponding application in such country, at its sole expense. Any such patent application or patent granted thereon in such country which Organogenesis prosecutes or maintains shall no longer be part of the Patent Rights and shall be excluded from the licence granted to Sandoz under this Agreement.

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

10

## ARTICLE 10.  PATENT INFRINGEMENT

10.1 Warranty: Organogenesis represents and warrants that, to its

knowledge, there exists no publication or other reason that would adversely affect the patentability of the subject- matter of or the validity of the Patent Rights and that it has no information as of the Effective Date to indicate that Sandoz would not be free to make, use and sell Product in the Territory without infringing any third party patent.

10.2 Enforcement: Each party shall promptly notify the other of its

knowledge of any potential infringement of the Patent Rights by a third party. Organogenesis has the right, but not the obligation, to take reasonable legal action necessary to enforce the Patent Rights in the United States against infringements by third parties. If within six (6) months following receipt of such notice from Sandoz, Organogenesis fails to take such action to halt a commercially significant infringement, Sandoz shall, in its sole discretion, have the right, at its expense, to take such action in its own name or in the name of Organogenesis or jointly. Sandoz shall have the right to enforce the Patent Rights in countries other than the United States in its discretion. If within six (6) months following receipt of notice from Organogenesis, Sandoz fails to take such action to halt a commercially significant infringement, Organogenesis shall, in its sole discretion, have the right, at its expense, to take such action in its own name or in the name of Sandoz or jointly. Each party agrees to render such reasonable assistance as the prosecuting party may request. Costs of maintaining any such action and damages recovered therefrom shall be paid by and belong to the party bringing the action. Sandoz shall not enter into any settlement which admits or concedes that any aspect of the Patent Rights is invalid or unenforceable without the prior written consent of Organogenesis.

10.3 Infringement Claims: If the manufacture, sale or use of Product

pursuant to this Agreement results in any claim, suit or proceeding lodged by a third party alleging patent infringement by Organogenesis or Sandoz (or its Affiliates or Sublicensees), such party shall promptly notify the other party hereto in writing. The party subject to such claim shall have the exclusive right to defend and control the defense of any such claim, suit or proceeding, at its own expense, using counsel of its own choice; provided, however, that Sandoz shall not enter into any settlement which admits or concedes that any aspect of the Patent Rights is invalid or unenforceable without the prior written consent of Organogenesis. The party subject to the claim shall keep the other party hereto reasonably informed of all material developments in connection with any such claim, suit or proceeding.

## ARTICLE 11.  TRADEMARKS

Sandoz and its Affiliates shall be free to use and to register in any trademark office any trademark for use with Product they desire in their sole discretion. Sandoz shall own all right, title and interest in and to any trademark in its own name or that of its Affiliates during and after the term of this Agreement. At Sandoz' request, Organogenesis agrees to exclusively license to Sandoz free of charge all rights in the trademark GRAFTSKIN.

## ARTICLE 12.  MANUFACTURING AND SUPPLY

12.1 Supply by Organogenesis: Subject to Art. 12.3 below, Sandoz agrees

to purchase exclusively from Organogenesis, and Organogenesis agrees to sell exclusively to Sandoz during

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

11

the term of the Agreement, Sandoz' total worldwide requirements for Product. No later than three (3) months after the Effective Date, the parties shall enter into a separate Manufacturing and Supply Agreement which shall provide, among other matters, for the setting up of a Joint Manufacturing Committee to ensure adequate supplies of Product including setting strategies for the European Manufacturing Facility described in Art. 12.3 below; for a system of advance ordering of requirements by Sandoz; and for quality control of Product. Such Manufacturing and Supply Agreement shall terminate no later than the expiry of the present Agreement in all countries under Art. 16.1. No later than six (6) months before such date, Sandoz shall notify Organogenesis whether it wishes to extend the supply period for all or part of Sandoz's worldwide requirements for Product for a further period, in which case a further Supply Agreement will be negotiated in good faith and entered into by the parties. If no such further Supply Agreement is concluded between the parties, then Sandoz shall have the right to manufacture Product itself or have Product manufactured by a third party of its choice, based on full technical assistance and know-how, including full documentation, relating to Product and Improvements to be supplied free of charge by Organogenesis.

## 12.2 U.S. Manufacturing Facility: Organogenesis will assume full cost

and responsibility for constructing, operating and maintaining a U.S. manufacturing facility capable, in conjunction with any European manufacturing facility as provided for in Art. 12.3 below, of supplying the expected commercial requirements of Sandoz worldwide in accordance with the supply provisions of Art. 12.1 above, and with the provisions of the Manufacturing and Supply Agreement to be entered into by the parties. Such Manufacturing and Supply Agreement shall provide that if Organogenesis is unable to supply more than a certain percentage, to be negotiated, of Sandoz' duly forecasted requirements of Product meeting the agreed specifications, then Sandoz shall thereafter have the right to manufacture Product itself or to have Product manufactured by a third party of its choice, based on full technical assistance and know-how, including full documentation, relating to Product and Improvements to be supplied free of charge by Organogenesis. In the event that such inability to supply is proved to be due to negligence on the part of Organogenesis, then no royalties shall be payable on Net Sales of Product during a time sufficient for Sandoz to recover out of the royalties that would otherwise by paid to Organogenesis such lost profits as it may have sustained as a result of Organogenesis' inability to supply; thereafter royalties shall be payable as before.

## 12.3 European Distribution Center and Manufacturing Facility: Sandoz

agrees to invest up to ****************************** in the construction of a new facility at one of Sandoz' existing manufacturing sites in Europe, said facility to consist of a) a Distribution Centre for the thawing of cryopreserved Product and distribution of Product to end users in Europe, and b) "shell" premises (building and basic utilities) capable of being equipped as a manufacturing facility for Product. Upon Sandoz' receipt of building permission for such facility or by **************, whichever is later, Organogenesis shall have the option of leasing and operating such facility under the terms of a separate Leasing Agreement to be entered into between the parties, which Agreement shall provide, among other matters, for repayment of Sandoz's investment plus reasonable interest over a period of not more than ten (10) years. If Organogenesis exercises such option, Organogenesis shall fund all additional costs of said facility, including equipment and operating costs. If Organogenesis does not exercise such option, or if Organogenesis, having exercised such option, does not within one (1) month of the date on which the option was exercised begin site planning and place orders for the purchase of all necessary equipment, then Sandoz shall have the right within Europe to manufacture Product itself or have Product

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

12

manufactured by a third party of its choice, based on full technical assistance and know-how, including full documentation, relating to Product and Improvements to be supplied free of charge by Organogenesis.

12.4 Supply Price: For a period of eighteen (18) months from the First

Commercial Sale of Product in the first Primary Country in the Territory, the Supply Price shall be *************** ******. Within three (3) months from the end of said period the Supply Price shall be reviewed by the parties in good faith, and shall ********* ***************** ****** unless the *************** ******************** on sales of Product is ***************************** ******, in which case the Supply Price shall be ****** so as to ***************************************** **** ***************. Thereafter, if in any June or December in a calendar year within the term of this Agreement, Sandoz can demonstrate to Organogenesis that its **************** ******************** sales of Product in the last six (6) month period for which Sandoz has sales records was ********* ****, then Organogenesis agrees ********* the Supply Price and/or the royalty level, effective from the beginning of the following half year, so as to assure Sandoz that ************************* in the following half year. Any figures relied upon by Sandoz to support its ****************************************** shall be open to review by an independent accounting firm acceptable to both parties, at Organogenesis's expense, for the sole purpose of verifying their accuracy. The price charged to Sandoz for a four by eight (4 x 8) inch rectangular unit of Product shall be negotiated in good faith by the parties at such time as Sandoz is able to provide sales volume projections for units of this size. The ********* Supply Price of ****** ******* ***** per unit shall be subject to annual adjustment to reflect changes in Sandoz' average selling price in the Primary Countries, starting two (2) years after the First Commercial Sale of Product in the first Primary Country in the Territory.

12.5 Non-Commercial Supply: All quantities of Product reasonably

required by Sandoz for commercial samples and clinical trials shall be supplied by Organogenesis at a price of ****** ******* ***** per unit in the first year following the Effective Date, ******************** ***** per unit in the second year, and ****************** ****** per unit thereafter, subject to annual adjustment to reflect changes in the U.S. Consumer Price Index, starting from 1 January 2000.

## ARTICLE 13.  DISTRIBUTION

Sandoz will assume cost and responsibility for shipping Product from the manufacturing facility in the United States to the end user in the United States. Organogenesis will assume cost and responsibility for shipping Product in bulk to a designated distribution center in Europe for sale of Product in Europe and for the packaging of Product within said distribution center (including any necessary thawing step), and Sandoz will assume cost and responsibility for delivering Product from said distribution center to the end user in Europe.

## ARTICLE 14.  PRODUCT LIABILITY

14.1 Negligence: Organogenesis shall indemnify and hold Sandoz harmless

from all losses, costs or damages which Sandoz may be held liable to pay as a result of claims or suits arising out of any injuries to persons and/or damage to property arising from Organogenesis's negligence with respect to the subject matter of this Agreement. Sandoz shall indemnify and hold Organogenesis harmless from all losses, costs or damages which Organogenesis may be held liable to pay as a result of claims or suits arising out of any injuries to persons and/or damage to

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

13

property arising from Sandoz' negligence with respect to the subject matter of this Agreement.

14.2 Other Claims: Third party claims not related to negligence of

either party shall be handled as agreed by the insurance companies of the parties (both parties agree to have sufficient third party liability insurance and/or self coverage) or in accordance with the laws of the country or countries in which a claim is submitted.

14.3 Tissue Donor Release: Organogenesis warrants that any donor of

tissue used to generate the cell bank used in the manufacture of Product, or his parent or guardian, has signed or shall sign a release giving informed consent to the use of the tissue for commercial purposes.

14.4 Reporting: Each party hereto agrees to report promptly to the

other party any information concerning serious or unexpected side effects, injury, toxicity, reactions or any unexpected event associated with clinical, investigational or commercial use whether or not finally attributable to Product. Such information shall also include pre-existing diseases, syndromes, or abnormal diagnostic tests results which re-appear or are exacerbated by use of Product. Upon receipt of such information by either party hereto, both parties shall promptly consult each other and use best efforts to arrive at a mutually acceptable procedure for taking the appropriate actions under the circumstances; provided, however, that nothing contained herein shall restrict the right of either party to make a submission to a regulatory authority or take other actions it deems to be appropriate or necessary. This Article shall survive termination of this Agreement.

**ARTICLE 15.  SECRECY**

15.1 Confidential Information: Except as contemplated by this

Agreement, any information supplied by one party to the other pursuant to, or in contemplation of, this Agreement shall be retained in confidence and not used or disclosed by the recipient during the term of this Agreement and for five (5) years thereafter. The confidentiality obligations provided herein shall not apply to information which

(i)  is or becomes known publicly through no fault of the receiving party;

(ii) is obtained by the receiving party without duty of non-disclosure from a third party entitled to disclose it;

(iii) was already known by the receiving party at the time of disclosure hereunder as shown by prior written records of the receiving party; or

(iv) is developed by the receiving party independently of information obtained or disclosed hereunder.

15.2 Permitted use: Notwithstanding the provisions of the above, each

party shall have a right to use such information for development, production and marketing of Product as provided in this Agreement and further has a right to disclose such information to a governmental agency or other competent body as and when required by law and regulation.

15.3 Nondisclosure of terms: Each of the parties agrees not to disclose

to any third

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

14

party the terms of this Agreement without the prior written consent of the other party, except to such party's attorneys, advisors, investors and others on a need to know basis under circumstances that reasonably ensure the confidentiality thereof, or to the extent required by law (including, but not limited to, disclosure required by U.S. securities laws). Notwithstanding the foregoing, the parties shall agree upon a press release to announce the execution of this Agreement, thereafter, Organogenesis and Sandoz may each disclose to third parties the information contained in such press release without the need for further approval by the other. Other than the above, Organogenesis, its officers and employees shall not make any public statements relating to Product or to this Agreement without the prior written consent of Sandoz.

## ARTICLE 16.  TERM AND TERMINATION

16.1 Term: Except as set forth below, the term of this Agreement shall

begin as of the Effective Date and continue in full force and effect, on a country-by-country basis, unless terminated earlier as provided in this Article 16, until Sandoz, its Affiliates and Sublicensees have no remaining royalty payment obligations in any country.

16.2 Termination for Cause: Either party to this Agreement may

terminate this Agreement in the event that the other party shall have materially breached or defaulted in the performance of any of its material obligations hereunder, and such default shall have continued for sixty (60) days after written notice thereof was provided to the breaching party by the non- breaching party. Any termination shall become effective at the end of such sixty (60) day period unless the breaching party has cured any such breach or default prior to the expiration of the sixty (60) day period.

16.3 Termination for Insolvency: If voluntary or involuntary

proceedings by or against a party are instituted in bankruptcy under any insolvency law, or a receiver or custodian is appointed for such party, or proceedings are instituted by or against such party for corporate reorganization or the dissolution of such party, which proceedings, if involuntary, shall not have been dismissed within sixty (60) days after the date of filing, or if such party makes an assignment for the benefit of creditors, or substantially all of the assets of such party are seized or attached and not released within sixty (60) days thereafter, the other party may immediately terminate this Agreement effective upon notice of such termination.

16.4 Permissive Termination: At any time after eighteen (18) months

after the Effective Date, Sandoz may terminate this Agreement upon ninety (90) days written notice in the event it discontinues development of Product for reasons in Sandoz' reasonable judgement related to safety or efficacy of the Product, or in the event it judges unforeseen competitive developments as having a substantial and irreversible negative impact on Product's chances for commercial success, or if even after agreed adjustments to royalties and supply price as provided in Articles 6.4.2 and 12.4, it proves impossible for Sandoz to achieve ****************************************************** in at least ****** of the Primary Countries.

16.5 Termination Due to Acquisition: If any Third Party which is a

competitor of Sandoz shall purchase substantially all the assets of Organogenesis or if there is a change of control of Organogenesis, Sandoz may terminate this Agreement upon ninety (90) days written notice. As used herein, change of control shall mean the acquisition by a third party which is a competitor of Sandoz of forty percent (40%) or more of the voting stock of Organogenesis.

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

15

16.6        Effect of Termination:

16.6.1 Upon termination of this Agreement by Organogenesis in accordance with Article 16.2 or 16.3, or by Sandoz in accordance with 16.4 or 16.5, the licences granted to Sandoz hereunder shall be forthwith terminated, and Sandoz shall cease to develop and market Product and discontinue the use of, and return to Organogenesis within sixty (60) days after termination, all Technical Information (including IDEs and PMAs, if any) and shall assign, free of charge, to Organogenesis, any governmental approvals to assure an orderly transfer of rights and transition of responsibility for such documentation. Notwithstanding the above, Sandoz may sell existing inventory of Product for up to six (6) months after the date of termination, provided royalties are paid thereon.

16.6.2 Upon termination of this Agreement by Sandoz in accordance with Article 16.2, or 16.3, Sandoz shall be assigned free of charge the ownership of the PMA and all other regulatory approvals relating to Product in the U.S., and shall be entitled to maintain the licences granted hereunder after said termination under the same conditions as set forth in this Agreement including the right to manufacture Product or have Product manufactured by a third party based on full technical assistance and know-how, including full documentation, relating to Product and Improvements to be supplied free of charge by Organogenesis; provided, however, in the event of a termination pursuant to Art. 16.2, all payments set forth therein to be made by Sandoz following said termination shall be reduced by one-half without prejudice to any damages to which Sandoz may be entitled.

16.6.3 Termination of this Agreement for any reason shall not release any party hereto from any liability which, at the time of such termination, has already accrued to the other party or which is attributable to a period prior to such termination nor preclude either party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement.

16.7 Survival: Articles 14, 15, 16 & 18 of this Agreement shall survive
the expiration or termination of this Agreement for any reason.

**ARTICLE 17.  NOTICES**

Any notices required or provided for by the terms of this Agreement shall be in writing and any notices, statements, and payments provided hereunder shall be sent by registered or certified mail, postage prepaid, addressed to:

In case of Organogenesis:                Organogenesis Inc.
                                         150 Dan Road
                                         Canton, MA 02021
                                         USA
                                         Attention:        President

In case of Sandoz:                       Sandoz Pharma Ltd.
                                         Lichtstrasse 35
                                         CH-4002 Basle, Switzerland
                                         Attention:        Legal Department

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

16

Such notices, statements and payments shall be deemed to have been given or made on the date upon which said letter was registered or certified, but any presumption of actual notice or payment shall be subject to rebuttal by the party alleged to have received such notice or payment to show that such notice or payment has not actually been received.

## ARTICLE 18.  MISCELLANEOUS; PROVISIONS

18.1 Governing Laws: This Agreement and any dispute arising from the
construction, performance or breach hereof shall be governed by and construed and enforced in accordance with, the laws of the state of New Jersey.

18.2 No Implied Licences: Only the licences granted pursuant to the
express terms of this Agreement shall be of any legal force or effect. No licence rights shall be created by implication, estoppel or otherwise.

18.3 Waiver: It is agreed that no waiver by any party hereto of any
breach or default of any of the covenants or agreements herein set forth shall be deemed a waiver as to any subsequent and/or similar breach or default.

18.4 Assignment: This Agreement shall not be assignable by either party
to any third party hereto without the written consent of the other party hereto except in the case of Sandoz to its designated Affiliate(s), except that, subject to Section 16.5, either party may assign this Agreement, without such consent, to an entity that acquires all or substantially all of the business or assets of such party, whether by merger, reorganization, acquisition, sale, or otherwise. This Agreement shall be binding upon and inure to the benefit of any permitted assignee, and any such assignee shall agree to perform the obligations of the assignor. Sandoz may, without assignment of the entire Agreement, assign any of its rights and obligations under this Agreement to a designated Sandoz Affiliate.

18.5 Independent Contractors: The relationship of the parties hereto is
that of independent contractors. The parties hereto are not deemed to be agents, partners or joint venturers of the others for any purpose as a result of this Agreement or the transactions contemplated thereby.

18.6 Compliance with Laws: In exercising their rights under this
licence, the parties shall fully comply in all material respects with the requirements of any and all applicable laws, regulations, rules and orders of any governmental body having jurisdiction over the exercise of rights under this licence including, without limitation, those applicable to the discovery, development, manufacture, distribution, import and export and sale of medical products pursuant to this Agreement.

18.7 Severability: In the event that any provision of this Agreement
becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision, and the parties shall amend the Agreement to the extent feasible to lawfully include the substance of the excluded term to as fully as possible realize the intent of the parties and their commercial bargain, unless the invalid provision is of such essential importance to this Agreement that it is to be reasonably assumed that the parties would not have entered into this Agreement without the invalid provision.

18.8 Force Majeure: Nonperformance of any party (except for payment
obligations) shall

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

17

be excused to the extent that performance is rendered impossible by strike, fire, earthquake, flood, governmental acts or orders or restrictions, failure of suppliers, or any other reason where failure to perform is beyond the reasonable control and not caused by the negligence, intentional conduct or misconduct of the nonperforming party, provided such party uses its best efforts to resume performance as promptly as possible.

18.9 No Consequential Damages: In no event shall any party to this
Agreement have any liability to the other for any special, consequential or incidental damages arising under this Agreement under any theory of liability.

18.10 Complete Agreement: This Agreement with its Schedules,
constitutes the entire agreement between the parties with respect to the subject matter hereof, and all prior agreements respecting the subject matter hereof, either written or oral, expressed or implied, shall be null and void and of no effect. No amendment or addition hereto shall be effective or binding on either of the parties unless reduced to writing and executed by the respective duly authorized representatives of Organogenesis and Sandoz.

18.11 Dispute Resolution: Any dispute under this Agreement which is not
settled by mutual consent shall be finally settled by binding arbitration, conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association by three arbitrators appointed in accordance with said rules. The arbitration shall be held in New York, New York and at least one of the arbitrators shall be an independent expert in pharmaceutical product development (including clinical development and regulatory affairs). The costs of the arbitration, including administrative and arbitrators' fees, shall be shared equally by the parties. Each party shall bear its own costs and attorneys' and witness' fees. A disputed performance or suspended performances pending the resolution of the arbitration must be completed within thirty (30) days following the final decision of the arbitrators or such other reasonable period as the arbitrators determine in a written opinion. Any arbitration subject to this Section 18.11 shall be completed within one (1) year from the filing of notice of a request for such arbitration.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives and delivered in duplicate originals as of the Effective Date.

SANDOZ PHARMA LTD.                              ORGANOGENESIS INC.

By:      /s/ D. Vasella          /s/ U. Oppikofer        By: /s/ David T. Rovee

Name:      D. VASELLA          U. OPPIKOFER        Name:    David T. Rovee

Title:      CEO Sandoz          Exec. VP Sandoz        Title:        President

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

18

**SCHEDULE A**

**DEFINITION OF PRODUCT**

Graftskin is a manufactured skin equivalent product, designed to mimic the structure and function of human skin. Graftskin consists of two layers-- the upper layer contains human keratinocytes and the lower layer contains Type I collagen with human fibroblasts that make the same matrix proteins found in human dermis.

Graftskin is in the size of a small disk with a diameter of approximately 25 mm to 75 mm. The thickness of the device is between 0.5 and 0.75 mm. Fresh Graftskin can be stored at room temperature for three days, in a 37 degree incubator for seven days or at liquid nitrogen temperatures indefinitely.

Graftskin is intended for use in the following conditions:

      venous stasis ulcers
      dermatological surgery
      burns
      diabetic ulcers
      decubitis ulcers

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

19

**SCHEDULE B**

**PATENT RIGHTS**

A)      *************************************************************

*******      *************      *********      **********      **************

*******                                         **********      ***************
*******                          *********      **********      ***************
*******

B)      *********************************************************************

*******      ***************      *********      ********      ************

*******             *****                 *****

*******             *****                 *****
*******             *****                 *****
*******
*******
*******
*******                                         *******      ************
*******             *****                 *****

C)      *****************************************************************************

              *********************

*******      ************      **********      **********      **********

*******                                         **********      **********
*******                                         **********      **********
*******             *****            *********
*******                        *********      **********      **********
*******
*******
*******
*******            *****            *****
*******            *****            *****
*******            *****            *****

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

20

| ******** | ************ | ********** | ********* | ********** |
|---|---|---|---|---|
| ******** |  |  | ******** | ************ |
| ******** | ***** | ***** |  | ************ |
| ******** |  |  | ********* | ************ |

D) ***************************************************************

| ******** | ************ | ********** | ********* | **************** |
|---|---|---|---|---|
| ****** | ***** | ***** |  |  |
| ****** | ***** | ***** |  |  |
| ****** |  | ******* | ********* | ************ |
| ******* |  |  |  |  |
| ******* |  |  |  |  |
| ******* |  |  |  |  |
| ****** | ***** | ***** |  |  |
| ****** | ***** | ***** |  |  |
| ****** |  |  | ********** | ************ |
| ****** |  |  | ********** | ************ |
| ****** | ***** | ***** |  |  |

E) ****************************************************************

| ******** | ************ | ********** | ********* | ********** |
|---|---|---|---|---|
| ******** | ***** | ***** |  |  |
| ******** | ***** | ***** |  |  |

F) ******************************************************************
****************

| ******** | ************ | ********** | ********* | ************ |
|---|---|---|---|---|
| ******** | ***** | ***** |  |  |

G) ****************************************************************

| ******** | ************ | ********** | ********* | ************ |
|---|---|---|---|---|

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

21

********       *****       *****
SCHEDULE C

**************************************************************************

              ************

**********     *********     *************     *********     **********
***************   *       *      ***      *
***************   *       *      ***      **
***************   *       *      ***      **
***************   *       *      ***      **
***************   *       *      ***      **
********                    ***      *

*      *********     *************************************************     ************************
***********************

*********************** ******** *********************** ************************** ******** ***********************

* ********** ******************************************************************** ********

************************************** ***

***********************************************

*********************** * *******

***            ****************************************************************************
**********************************************************************
**********************************************************************
******************************************************************** ****

      ************** ******** ***** ******** * ************* ******
                  ***

Confidential Materials omitted and filed separately with the Securities and Exchange Commission. Asterisks denote omissions.

22

**SCHEDULE D**

**CRYOPRESERVED AMENDMENT**

This amendment to the original PMA filing (for approval in venous stasis ulcers) will contain all appropriate data required for the FDA for review and approval of the cryopreserved Graftskin. Organogenesis will ensure that this amendment is based on discussions with the FDA and meets their requirements. This submission will also serve to establish the clinical data on safety and efficacy of the fresh product as being applicable to the cryopreserved product.

<div align="center">**EXHIBIT 21**</div>

**LIST OF SUBSIDIARIES**

Dan Capital Corp. (Del.)
ECM Pharma/TM/, Inc. (Del.)

**EXHIBIT 23**

**CONSENT OF INDEPENDENT ACCOUNTANTS**

We consent to the incorporation by reference in the registration statement of Organogenesis Inc. and its wholly owned subsidiaries on all Forms S-8 and on all Forms S-3, in effect on the filing date of Organogenesis Inc.'s Annual Report on the Form 10-K for the year end December 31, 1995, of our report dated February 16, 1996, on our audits of the consolidated financial statements of Organogenesis Inc. and its wholly owned subsidiaries as of December 31, 1995 and 1994, and for the years ended December 31, 1995, 1994, and 1993, which report is included or incorporated by reference in this Annual Report on Form 10-K.

Coopers & Lybrand L.L.P.

Boston, Massachusetts
March 22, 1996