```
<DOCUMENT>
<TYPE>S-3
<SEQUENCE>1
<DESCRIPTION>FORM S-3
<TEXT>

<PAGE>
```

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON MAY 14, 1999

REGISTRATION NO. 333-

-------

SECURITIES AND EXCHANGE COMMISSION

FORM S-3
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933
------------------------

ORGANOGENESIS INC.
(Exact name of registrant as specified in its charter)

DELAWARE                                04-2871690
(State or other jurisdiction of         (I.R.S. Employer
incorporation or organization)          Identification No.)

HERBERT M. STEIN, CHIEF EXECUTIVE OFFICER
ORGANOGENESIS INC.
150 DAN ROAD
CANTON, MASSACHUSETTS 02021
(781) 575-0775
(Address, including zip code, and telephone, including area code, of
registrant's principal executive offices)

COPY TO:

NEIL H. ARONSON, ESQUIRE
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
ONE FINANCIAL CENTER
BOSTON, MASSACHUSETTS  02111
(617) 542-6000
------------------------

Approximate date of commencement of proposed sale to the public:  As soon as
practical after this Registration Statement becomes effective.

     If the only securities being registered on this Form are being offered
pursuant to dividend or interest reinvestment plans, please check the following
box. [_]

     If any of the securities being registered on this Form are to be offered on
a delayed or continuous basis pursuant to Rule 415 under the Securities Act of
1933 other than securities offered only in connection with dividend or interest
reinvestment, check the following box. [X]

     If this Form is filed to register additional securities for an offering
pursuant to Rule 462(b) under the Securities Act, please check the following box
and list the Securities Act registration statement number of the earlier
effective registration statement for the same offering. [_]

     If this Form is a post-effective amendment filed pursuant to Rule 462(c)
under the Securities Act, check the following box and list the Securities Act
registration statement number of the earlier effective registration statement

for the same offering. [_]

    If delivery of the prospectus is expected to be made pursuant to Rule 434,
please check the following box. [_]

_____

Calculation of Registration Fee

<TABLE>
<CAPTION>

| Title of each class of securities to be registered | Amount to be registered | Proposed maximum offering price per share | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Common Stock, $.01 par value per share | 2,096,333 (1) | $ 11.375(2) | $23,845,788(2) | $6,629.13(2) |
| Warrants | 400,000(1) | | | |
| Total Registration Fee | | | | $6,629.13(2) |

</TABLE>

(1) Includes (1) 1,646,333 shares of common stock which may become issuable by
    reason of the conversion of five year convertible notes or the payment of
    interest on the convertible notes in common stock in lieu of cash,
    (2) 400,000 shares which may become issuable upon the exercise of warrants
    to purchase common stock and (3) 50,000 shares issued in connection with an
    asset purchase transaction. Pursuant to Rule 416, there also are being
    registered an indeterminate number of additional shares of common stock
    that may become issuable according to the terms of the convertible notes
    and warrants to prevent dilution resulting from stock splits, stock
    dividends or similar transactions. We are also registering the 400,000
    common stock purchase warrants pursuant to which the common stock described
    in clause (2) above would be offered.

(2) Estimated solely for the purpose of calculating the amount of the
    registration fee. Pursuant to Rule 457(c) of the Securities Act, the
    proposed maximum offering price has been calculated based upon the average
    of the high and low sale prices of our common stock as reported by the
    American Stock Exchange on May 11, 1999. Pursuant to Rule 457(g) of the
    Securities Act of 1933, no separate registration fee is required for the
    registration of the warrants where the warrants are to be registered for
    distribution in the same registration statement as the common stock to be
    offered pursuant to the exercise of the warrants.


    The registrant hereby amends this registration statement on such date or
dates as may be necessary to delay its effective date until the registrant shall
file a further amendment which specifically states that this registration
statement shall thereafter become effective in accordance with section 8(a) of
the Securities Act of 1933 or until the registration statement shall become
effective on such date as the commission, acting pursuant to said section 8(a),
shall determine.
<PAGE>


+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
+  THE INFORMATION IN THIS PROSPECTUS IS NOT COMPLETE AND MAY BE CHANGED. WE  +
+  MAY NOT SELL THESE SECURITIES UNTIL THE REGISTRATION STATEMENT FILED WITH  +
+  THE SECURITIES AND EXCHANGE COMMISSION IS EFFECTIVE. THIS PROSPECTUS IS NOT +
+  AN OFFER TO SELL THESE SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY  +
+  THESE SECURITIES IN ANY STATE WHERE THE OFFER OR SALE IS NOT PERMITTED.  +
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

PROSPECTUS

Subject to Completion, dated _____

ORGANOGENESIS INC.

2,096,333 SHARES OF COMMON STOCK AND 400,000 WARRANTS

. We are registering a total of 2,096,333 shares
  of our common stock and 400,000 warrants to
  purchase shares of our common stock for sale
  by the securityholders identified in this
  prospectus as the selling stockholders.

. The selling stockholders may sell the common
  stock and warrants at prices and on terms
  determined by the market, in negotiated
  transactions or through underwriters. The
  selling stockholders may also sell the
  securities under Rule 144 of the Securities
  Act of 1933. The selling stockholders are
  identified and information with respect to
  them is provided under the caption "Selling
  Stockholders" in this prospectus.

. We will not receive any of the proceeds from
  the sale of the common stock being registered.

. Our common stock trades on the American Stock
  Exchange under the symbol "ORG."

------------------------
This Investment Involves
A High Degree of Risk.
You Should Purchase
Shares Only If
You Can Afford
A Complete Loss.


See "Risk Factors"
Beginning on Page 4.
------------------------

On May 12, 1999, the closing sale price of one share of our common stock
as quoted on the American Stock Exchange was $11.6875.

Neither the Securities and Exchange Commission nor any state securities
commission has approved or disapproved of these securities or determined if this
prospectus is truthful or complete.  It is illegal for any person to tell you
otherwise.

The information in this prospectus is not complete and may be changed.
A registration statement relating to these securities has been filed with the
Securities and Exchange commission. No one may sell these securities nor may
offers to buy be accepted until the registration statement filed with the
Securities and Exchange Commission is effective. This prospectus is not an offer
to sell these securities and is not soliciting an offer to buy these securities
in any state where the offer, solicitation or sale is not permitted.


THE DATE OF THIS PROSPECTUS IS MAY 14, 1999

<PAGE>

WHERE YOU CAN FIND MORE INFORMATION

    We are a public company and file annual, quarterly and special reports,
proxy statements and other information with the Securities and Exchange
Commission.  You may read and copy any document we file at the SEC's Public
Reference Room at 450 Fifth Street, N.W., Washington, D.C. 20549.  You can
request copies of these documents by writing to the SEC and paying a fee for
the copying cost.  Please call the SEC at 1-800-SEC-0330 for more information
about the operation of the public reference room.  Our SEC filings are also
available to the public at the SEC's web site at "http://www.sec.gov."
In addition, our stock is listed for trading on the American Stock Exchange.
You can read and copy reports and other information concerning us at the
offices of the American Stock Exchange located at 86 Trinity Place, New York,
New York 10006-1881.

    This prospectus is only part of a Registration Statement on Form S-3 that
we have filed with the SEC under the Securities Act of 1933 and therefore
omits certain information contained in the Registration Statement.  We have
also filed exhibits and schedules with the Registration Statement that are

excluded from this prospectus, and you should refer to the applicable exhibit
or schedule for a complete description of any statement referring to any
contract or other document.  You may:

    .  inspect a copy of the Registration Statement, including the exhibits
      and schedules, without charge at the public reference room or
    .  obtain a copy from the SEC upon payment of the fees prescribed by
      the SEC.

### INCORPORATION OF DOCUMENTS BY REFERENCE

The SEC allows us to  "incorporate by reference" the information we file
with it, which means that we can disclose important information to you by
referring you to those documents. The information incorporated by reference is
considered to be a part of this prospectus and information that we file later
with the SEC will automatically update and supersede this information.  We
incorporate by reference the documents listed below and any future filings
made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities
Exchange Act of 1934 until all of the shares of common stock are sold.  The
documents we are incorporating by reference are:

    .  Our Annual Report on Form 10-K for the fiscal year ended
      December 31, 1998, filed on March 31, 1999 (File No. 1-09898);
    .  Our Quarterly Report on Form 10-Q for the quarter ended March 31,
      1999, filed on May 14, 1999;
    .  Our Proxy Statement, filed on April 21, 1999; and
    .  The description of our capital stock contained in our registration
      statement on Form 8-A under the 1934 Act (File No. 1-09898),
      including amendments or reports filed for the purpose of updating
      that description.

You may request a copy of these filings at no cost by writing or
telephoning our Director of Investor and Public Relations at the following
address and phone number:

    Organogenesis Inc.
    50 Dan Road
    Canton, Massachusetts   02021
    (781) 575-0775

This prospectus is part of a Registration Statement that we filed with
the SEC.  You should rely only on the information incorporated by reference in
or provided in this prospectus and the Registration Statement.  We have not
authorized any other person to provide you with different information.  We are
not making an offer of these securities in any state where the offer is not
permitted.  You should not assume that the information in this prospectus is
accurate as of any date other than the date on the front of this document.

<div align="center">2</div>

&lt;PAGE&gt;

### PROSPECTUS SUMMARY

This summary highlights information incorporated by reference or contained
elsewhere in this prospectus. It is not complete and may not contain all of the
information that you should consider before investing in our securities. You
should read the entire prospectus carefully, including the "Risk Factors"
section, and you must consult the more detailed financial statements, and notes
to financial statements, incorporated by reference in this prospectus.

This prospectus and the documents incorporated by reference contain
forward-looking statements. These statements can be identified by the use of
forward-looking terminology such as "may," "will," "could," "expect,"
"anticipate," "estimate," "continue" or other similar words. These statements
discuss future expectations, contain projections of results of operations or of
financial condition or state other forward-looking information. Examples of
forward-looking statements can be found in the discussion set forth under
"Management's Discussion and Analysis of Financial Condition and Results of
Operations" in the Company's Annual Report on Form 10-K for the fiscal year

ended December 31, 1998 and under "Business" in the Form 10-K, incorporated in this prospectus by reference. Such statements are based on current expectations that involve a number of uncertainties including those set forth in the risk factors below. When considering forward-looking statements, you should keep in mind that the risk factors noted below and other factors noted throughout this prospectus or incorporated by reference could cause our actual results to differ significantly from those contained in any forward-looking statement.

## THE COMPANY

Organogenesis Inc. designs, develops and manufactures medical therapeutics containing living cells and/or natural connective tissue.  We were formed to advance and apply the emerging field of tissue engineering to major medical needs.  We were organized as a Delaware corporation in 1985, with principal executive offices located at 150 Dan Road, Canton, Massachusetts 02021. Our telephone number is 781-575-0775.

Tissue-engineered products typically include living cells and/or natural connective tissue material such as collagen.  Living cells can produce or remove substances in response to their environment; connective tissue can provide physical function while being converted to living tissue through the ingrowth of a patient's cells and blood vessels. We have established expertise with both mammalian (e.g., human) cells and natural connective tissue and select our product development approach based upon medical applications in which our products have the potential to provide significant benefits over traditional approaches and the ability to achieve the necessary economies of scale for cost-effectiveness.  Our product development program includes living tissue replacements (such as Vitrix), cell-based organ assist devices (such as our Bioartificial Liver) and other tissue-engineered products (such as GraftPatch and our Vascular Graft).  Our product pipeline includes both products which include living cells, and purely acellular, connective tissue-based products. We are also exploring additional opportunities relating to cell and gene therapy applications and to its cryopreservation technology.

We have established expertise in procuring, culturing and optimizing human cells to provide cell function in tissue-engineered products.  Our lead product, Apligraf(R)*, was launched in the United States -- the world's largest healthcare market -- in June 1998. Apligraf is the only mass-manufactured product containing living human cells to show efficacy in a controlled study and to gain FDA PMA approval.

We have a U.S. Food and Drug Administration-inspected, Good Manufacturing Practices-compliant facility. We have experience manufacturing living, cellular products and make Apligraf for commercial sale.

Our strategy is to commercialize products either by ourselves or through partners with an established marketing presence. For example, Novartis Pharma AG has global marketing rights to Apligraf and is responsible for sales and marketing costs. We have an active business development program related to products and technologies in our pipeline.

* Apligraf(R) is a registered mark of Novartis Pharma AG.

3

<PAGE>

## Risk Factors

Before you purchase our securities, you should be aware that there are risks, including those described below.  You should consider carefully these risk factors together with all of the other information contained elsewhere in this prospectus or incorporated by reference before you decide to purchase our securities.

Our Company Has a History of Losses

Organogenesis Inc. was founded in 1985. We have incurred operating losses in every year of our existence.  We incurred net losses of $7,499,000 for the year ended December 31, 1996, $19,807,000 for the year ended December 31, 1997,

and $14,031,000 for the year ended December 31, 1998, which losses are
continuing.  As of December 31, 1998, we have an accumulated deficit of
$101,017,000. We have not achieved profitability and expect to continue to incur
net losses.  The extent of future losses and the time required to achieve
profitability is highly uncertain.  Moreover, although our business is not
seasonal in nature, our revenues tend to vary significantly from fiscal quarter
to fiscal quarter.

In Order to Achieve Commercial Success, Our Products Must Gain Market Acceptance

     We manufacture and market one principal product: Apligraf.  We have only
recently begun to market Apligraf through Novartis and to generate revenues from
the commercialization of this product.  Products under development will require
additional research and development efforts, including clinical testing and
regulatory approval, prior to commercial use.  Our potential products are
subject to the risks of failure inherent in the development of medical products
based on new technologies.  These risks include the possibilities that:

.  Our approach will not be successful;
.  Our potential products will be found to be unsafe, ineffective or otherwise
   will fail to meet applicable regulatory standards or receive necessary
   regulatory clearances;
.  The potential products, if safe and effective, will be difficult to develop
   into commercially-viable products, will be difficult to manufacture on a
   large scale, will be uneconomical to market, or will fail to obtain
   acceptance by the medical community;
.  Proprietary rights of third parties will preclude us from marketing such
   products; or
.  Third parties will market superior or equivalent products.

     Our business results would be hurt if were unable to demonstrate to the
medical community the efficacy, relative safety and cost effectiveness of
treating patients with our products or if our products were not accepted as
alternatives to other existing or new therapies.

Our Markets Are Competitive

     We are engaged in the rapidly evolving and competitive field of tissue
engineering for the treatment of skin wounds and other medical needs. Our
competitors include tissue engineering companies, xenotransplant companies,
wound care divisions of major pharmaceutical companies and other pharmaceutical,
biotechnology and medical products companies using traditional technologies to
develop products for wound care. Some of these companies have much greater
resources, research and development staffs and facilities, experience in
conducting clinical trials and obtaining regulatory approvals and experience in
the manufacturing, marketing and distribution of products than we do. Our
competitive position is based upon our ability to (1) create and maintain
scientifically-advanced technology and proprietary products and processes,
(2) attract and retain qualified personnel, (3) obtain patent or other
protection for our products and processes, (4) obtain required government
approvals on a timely basis, (5) manufacture products on a cost-effective basis
and (6) successfully market products. If we are not successful in meeting these
goals, our business could be hurt. Similarly, our competitors may succeed in
developing technologies, products or procedures that are more effective than any
that we are developing or that would render our technology and products
obsolete, noncompetitive or uneconomical.

We Depend Upon Strategic Relationships to Market Our Products

     We have limited experience in sales, marketing and distribution. We will
need to develop long-term strategic relationships with partners, such as
Novartis, that have marketing and sales forces with technical expertise

                                        4

<PAGE>

and distribution capability. To the extent that we enter into such
relationships, our revenues will depend upon the efforts of third parties who
may or may not be successful. We may not be able to establish or maintain long-
term strategic relationships, and if we do, our collaborators may not be
successful in gaining market acceptance for our products. To the extent that we

choose not to or are unable to negotiate or maintain collaborations, we will
need more capital and resources to undertake a commercialization program at our
own expense. In addition, we may encounter significant delays in introducing our
products into certain markets or find that the commercialization of products in
such markets may be adversely affected by the absence of collaborative
agreements. We are dependent on Novartis for the successful marketing and
selling of Apligraf worldwide. If Novartis does not succeed in marketing and
selling Apligraf or gaining international approvals for the product or if we are
unable to meet the production demand of global commercialization, our operating
results will suffer.

Our Ability to Commercialize Our Products Depends Upon Our Compliance with
Government Regulations

     Our present and proposed activities are subject to extensive and rigorous
regulation by governmental authorities in the US and other countries.  To
clinically test, produce and market medical devices for human use, we must
satisfy mandatory procedural and safety and efficacy requirements established by
the FDA and comparable state and foreign regulatory agencies.  Typically, such
rules require that products be approved by the government agency as safe and
effective for their intended use prior to being marketed.  The approval process
is expensive, time consuming and subject to unanticipated delays. Our product
candidates may not be approved. In addition, our product approvals could be
withdrawn for failure to comply with regulatory standards or due to unforeseen
problems after the product's marketing approval.

     Testing is necessary to determine safety and efficacy before a submission
may be filed with the FDA to obtain authorization to market regulated products.
In addition, the FDA imposes various requirements on manufacturers and sellers
of products under its jurisdiction, such as labeling, Good Manufacturing
Practices, record keeping and reporting requirements. The FDA also may require
post-marketing testing and surveillance programs to monitor a product's effects.
Furthermore, changes in existing regulations or the adoption of new regulations
could prevent us from obtaining, or affect the timing of, future regulatory
approvals or could negatively affect the marketing of our existing products.
If (1) the regulatory agencies find our testing protocols to be inadequate,
(2) the appropriate authorizations are not granted on a timely basis, or at all,
(3) the process to obtain authorization takes longer than expected or we have
insufficient funds to pursue such approvals, (4) we lose previously-received
authorizations or (5) we do not comply with regulatory requirements, we would
not be able to commercialize our products as planned and our operating results
would be hurt.

     Medical and biopharmaceutical research and development involves the
controlled use of hazardous materials, such as radioactive compounds and
chemical solvents.  We are subject to federal, state and local laws and
regulations governing the use, manufacture, storage, handling and disposal of
such materials and waste products. In addition, we handle and dispose of human
tissue. Although we believe that our safety procedures for handling these
materials are adequate, if accidental contamination or injury were to occur, we
could be liable for damages.

We Rely Heavily Upon Our Patents and Proprietary Technology

     We rely upon our portfolio of patent rights, patent applications and
exclusive licenses to patents and patent applications relating to living tissue
products, organ assist treatments and other aspects of tissue engineering.  We
currently have twenty patents issued or allowed in the US, nine pan-European
patents issued and six patents issued in Japan. As part of our continuing
interest in protecting intellectual property rights, we have filed and are
prosecuting fourteen other patent applications in the US. We also license some
of our technologies under an exclusive patent license agreement with the
Massachusetts Institute of Technology. The agreement with MIT covers certain US
patents and corresponding patents in European and Far East countries.  Pursuant
to the MIT agreement, we have been granted an exclusive, worldwide license to
make, use and sell the products covered by the patents and to practice the
procedures covered by the patents.

     We expect to aggressively patent and protect our proprietary
technologies.  However, we cannot be sure that any additional patents will be
issued to us as a result of our domestic or foreign patent applications or that

any of our patents will withstand challenges by others. Patents issued to or
licensed by us may be infringed or third parties may independently develop
either the same or similar technology. Similarly, our patents may not provide
us with meaningful protection from competitors, including those who may pursue
patents which may prevent, limit or interfere with our products or will require
licensing and the payment of significant fees or royalties by us to such

<div align="center">5</div>

<PAGE>

third parties in order to enable us to conduct our business. We may sue or be
sued by third parties regarding patents and other intellectual property rights.
These suits are costly and would divert funds and management and technical
resources from our operations.

     We also rely upon unpatented proprietary technology, know-how and trade
secrets and seek to protect them through confidentiality agreements with
employees, consultants and advisors. We request that any corporate sponsor with
which we enter into a collaborative agreement do so as well. If these
confidentiality agreements are breached, we may not have adequate remedies for
the breach. In addition, others may independently develop or otherwise acquire
substantially the same proprietary technology as our technology and trade
secrets.

     We have relationships with a number of academic consultants who are not
employed by us. Accordingly, we have limited control over their activities and
can expect only limited amounts of their time to be dedicated to our activities.
These persons may have consulting, employment or advisory arrangements with
other entities that may conflict with or compete with their obligations to us.
Our consultants typically sign agreements that provide for confidentiality of
our proprietary information and results of studies. However, in connection with
every relationship, we may not be able to maintain the confidentiality of our
technology, the dissemination of which could hurt our competitive position and
results of operations. To the extent that our scientific consultants develop
inventions or processes independently that may be applicable to our proposed
products, disputes may arise as to the ownership of the proprietary rights to
such information, and we may not win those disputes.

We Must Be Able to Manufacture Our Products Successfully and Obtain Adequate
Sources of Supply

     The process of manufacturing our products is complex, requiring strict
adherence to manufacturing protocols. We have been producing our lead product,
Apligraf, for commercial sale since the second half of 1997 in adherence with
these manufacturing protocols. However, with increasing demand for Apligraf, we
must further transition from small-scale to full-scale production of our
products. If we do not make the full transition successfully, we will not be
able to satisfy the demands for our products and our results of operations will
be hurt.

     We are required to maintain a manufacturing facility in compliance with
Good Manufacturing Practices. Manufacturing facilities and processes pass an
inspection before the FDA issues any product licenses necessary to market
medical therapeutics and are subject to continual review and periodic
inspection. We may not be able to maintain the necessary regulatory approvals
for our manufacturing operations or manufacture our products in a cost-effective
manner. If we were unable to manufacture potential products independently or
obtain or retain third party manufacturing on commercially-acceptable terms, the
submission of products for final regulatory approval and initiation of marketing
would be delayed. This, in turn, may cause us to be unable to commercialize
product candidates as planned, on a timely basis or on a profitable basis.

     We manufacture Apligraf for commercial sale, as well as for use in clinical
trials, at our Canton, Massachusetts facility. Among the fundamental raw
materials needed to manufacture Apligraf are keratinocyte and fibroblast cells.
Because these cells are derived from donated infant foreskin, they may contain
human-borne pathogens. We perform extensive testing of the cells for pathogens,
including the HIV or "AIDS" virus. Our inability to obtain cells of adequate
purity, or cells that are pathogen-free, would limit our ability to manufacture
sufficient quantities of our products.

Another major material required to produce our products is collagen, a protein obtained from animal source tissue. We have developed a proprietary method of procuring our own collagen that we believe is superior in quality and strength to collagen available from commercial sources. We currently obtain animal source tissue from US suppliers only. We may not be able to obtain adequate supplies of animal source tissue to meet our future needs or on a cost-effective basis. The thermo-formed tray assembly that used in the manufacturing process of Apligraf is available to us under a supply arrangement with only one manufacturing source. Because the FDA approval process requires manufacturers to specify their proposed materials of certain components in their applications, FDA approval of a new material would be required if a currently-approved material became unavailable from a supplier. If we are unable to obtain adequate supplies of thermo-formed tray assemblies to meet future Apligraf manufacturing needs or if we cannot obtain such assemblies on a cost-effective basis, our operations would be hurt.

Interruptions in our supply of materials may occur in the future or we may have to obtain substitute vendors for these materials. Any significant supply interruption would adversely affect the production of Apligraf. In addition, an uncorrected impurity or a supplier's variation in a raw material, either unknown to us or incompatible with our manufacturing process, could hurt our ability to manufacture products.

<div align="center">6</div>

&lt;PAGE&gt;

The Retention of Key Personnel Is Important to Our Competitive Position

Because of the specialized nature of our business, our success will depend upon our ability to attract and retain highly-qualified personnel and to develop and maintain relationships with leading research institutions. The competition for those relationships and for experienced personnel amongst the biotechnology, pharmaceutical and healthcare companies, universities and non-profit research institutions is intense. If we are unable to continue to attract and retain such personnel or relationships, our competitive position could be hurt.

We May Be Subject to Product Liability Suits; Our Insurance May Not Be Sufficient to Cover Damages

Our business exposes us to potential liability risks that are inherent in the testing, manufacturing, marketing and sale of medical products. The use of our products and product candidates, whether for clinical trials or commercial sale, may expose us to product liability claims or product recall and possible adverse publicity. Although we have product liability insurance coverage, the level or breadth of our coverage may not be adequate to fully cover potential liability claims. In addition, we may not be able to obtain additional product liability coverage in the future at an acceptable cost. A successful claim or series of claims brought against us in excess of our insurance coverage and the effect of product liability litigation upon the reputation and marketability of our technology and products, together with the diversion of the attention of key personnel, could negatively affect our business.

Our Business Is Subject to the Uncertainty of Third-Party Reimbursement and Health Care Reform Measures Which May Limit Market Acceptance

In both domestic and foreign markets, our ability to commercialize our product candidates will depend, in part, upon the availability of reimbursement from third-party payors, such as government health administration authorities, private health insurers and other organizations.  Third-party payors are increasingly challenging the price and cost-effectiveness of medical products. If our products are not considered cost-effective, third-party payors may limit reimbursement. Government and other third-party payors are increasingly attempting to contain healthcare costs by limiting both coverage and the level of reimbursement for new therapeutic products approved for marketing by the FDA and by refusing, in some cases, to provide any coverage for uses of approved products for disease indications for which the FDA has not granted marketing approval.  If government and third-party payors do not provide adequate coverage and reimbursement levels for uses of our products, the market acceptance of our products would be limited.

There have been a number of federal and state proposals during the last few

years to subject the pricing of pharmaceuticals to government control and to make other changes to the health care system of the US.  It is uncertain what legislative proposals will be adopted or what actions federal, state or private payors for health care goods and services may take in response to any health care reform proposals or legislation.  We cannot predict the effect health care reforms may have on our business.

Our Stock Price Is Volatile

    The biotechnology sector seems particularly vulnerable to abrupt changes in investor sentiment. Stock prices of companies in the biotechnology industry, including ours, can swing dramatically, with little relationship to operating performance.  Our stock price may be affected by a number of factors including, but not limited to, (1) clinical trial results and other product development events, (2) the outcome of litigation, (3) decisions relating to intellectual property rights, (4) the entrance of competitive products into our market, (5) changes in reimbursement policies or other practices related to the pharmaceutical industry or (6) other industry and market changes or trends.

If We Are Unable to Raise Needed Funds, Your Investment Could Be Adversely Affected

    We will require additional financial resources before we expect to realize net profits from product sales. Based upon our projections, we believe that the funds from the March 1999 debt financing, together with existing working capital and future funds from Novartis, including product and royalty revenue, will be sufficient to finance operations into 2000.  However, this statement is forward-looking and changes may occur that would significantly decrease available cash before such time.  Factors that may change our cash requirements include:

.  Delays in obtaining regulatory approvals for our products in different
   countries and the subsequent timing of product launches;

                                    7
<PAGE>

.  Delays in commercial acceptance and reimbursement when product launches
   occur;
.  Changes in the progress of our research and development programs;
.  Changes in the resources that we devote to outside research collaborations or
   projects, self-funded projects, or the development of proprietary
   manufacturing methods and advanced technologies; and
.  The acquisition of a second manufacturing plant.

    Any of these events could adversely impact our capital resources, requiring us to raise additional funds. Additional funds may not be available when required on acceptable terms.  If adequate funds are not available when needed, we would need to delay, scale back or eliminate certain research and development programs or license to third parties certain products or technologies that we would otherwise undertake ourselves.

Our Anti-Takeover Measures May Affect the Value of Our Stock

    We, as a Delaware corporation, are subject to the General Corporation Law of the State of Delaware, including Section 203, an anti-takeover law enacted in 1988. In general, Section 203 restricts the ability of a public Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder. As a result of the application of Section 203 and certain provisions in our certificate of incorporation and bylaws, potential acquirors may be discouraged from attempting to acquire us, thereby possibly depriving our stockholders of acquisition opportunities to sell or otherwise dispose our stock at above-market prices typical of such acquisitions.

    We have also adopted a shareholder rights plan which gives holders of common stock the right to purchase shares of our Series B Junior Participating Preferred Stock if a potential acquiror purchases or plans to make a tender offer to purchase 15% or more of our outstanding common stock. The existence of this plan may make it more difficult for a third party to acquire control of us.

We are authorized to issue up to 1,000,000 shares of preferred stock, $.01 par value per share and to determine the price, privileges and other terms of such shares. The issuance of any preferred stock with superior rights to the common stocks could reduce the value of the common stock. In particular, specific rights granted to future holders of preferred stock could be used to restrict our ability to merge with or sell our assets to a third party, thereby preserving control of Organogenesis by present owners and management and preventing our holders of common stock from realizing a premium on their shares.

The Value Of Your Securities May Decrease If Other Security Holders Exercise Their Options and Warrants or Convert Their Debt Into Common Stock or If Other Stockholders Sell Their Stock

As of March 19, 1999, 30,454,300 shares of our common stock are outstanding (excluding 40,000 treasury shares). We have reserved an additional 7,346,709 shares of common stock for future issuance upon exercise or conversion of options, warrants and the Series C convertible preferred stock. We plan to issue additional options and warrants in the future.  If any of these securities are exercised or converted, you may experience significant dilution in the market value and earnings per share of the common stock into which your securities are convertible.

In March 1998, we completed a $20 million convertible preferred stock and warrant financing with two institutional investors. The Series C preferred stock pay no dividends, have no voting rights, and are convertible into common stock on a scheduled basis over two years based on market price at time of conversion (up to $28.80 per share). We may call for conversion of all or part of the shares of Series C preferred stock under certain conditions based on continued improvement in the price of our common stock. Conversions by the investors are subject to certain limits; no limits exist for conversions on redemption or upon a major transaction. Mandatory conversion is March 26, 2000, at which time we have the option to redeem any outstanding Series C preferred shares in cash or by issuing common stock. In addition, the investors received three-year warrants to purchase an aggregate of 200,000 shares of common stock at $31.20 per share. The warrants may be exercised at any time prior to April 2001. In July 1998, the investors exercised their right to receive additional warrants to purchase 150,000 shares of common stock at $17.45 per share with an expiration date of March 26, 2001. We also issued a warrant to purchase an aggregate of 50,000 shares of common stock at $28.80 per share to the placement agent that expires March 25, 2001. No further warrants may be issued under the Series C preferred stock placement. In April 1998, we filed a registration statement for 1,800,000 shares of common stock, the maximum number of shares that may be acquired relating to this transaction; except for mandatory conversion where the common share limit does not apply. All shares have been reserved for issuance. The SEC declared this registration statement effective in May 1998. In May, September and November 1998, an aggregate of $13,800,000 face amount of the Series C preferred stock was converted into common stock resulting in the issuance of approximately 1,136,000 shares of common stock.

8

<PAGE>

We closed a $20 million convertible debt and warrant financing at the end of March, 1999. The convertible debt accrues interest at 7% annually and is convertible into common stock at a fixed price of $14.50 per share at any time after March 30, 2000 and through March 29, 2004. Subject to meeting specified conditions, at our option, any time on or after March 30, 2002, we may prepay all of the outstanding principal by converting the outstanding principal to common stock at $14.50 per share and we may pay accrued interest on the debt by paying cash or by converting the outstanding interest into shares of common stock (at the average trading price for our common stock for the twenty trading days preceding the interest payment date). In addition, the purchasers of the convertible debt received five-year warrants to purchase up to 400,000 shares of common stock at $21.75 per share. The warrants may be exercised upon 75 days' prior written notice at any time prior to March 29, 2004.

If our stockholders sell substantial amounts of our common stock in the public market following this offering, the market price of our common stock could fall. Such sales also might make it more difficult for us to sell equity or equity-related securities in the future at a price we deem appropriate.

We Have No Intention to Pay Dividends

    We have never paid any cash dividends on our common stock.  We currently
intend to retain all future earnings, if any, for use in our business and do not
expect to pay any dividends in the foreseeable future.

Our Business Is Exposed to the Risk of System Failure from the Year 2000
Problem

    The Year 2000 issue ("Y2K") refers to potential problems with computer
systems or any equipment with computer chips or software that use dates where
the year has been stored as just two digits (e. g., 98 for 1998). On January 1,
2000, any clock or date recording mechanism incorporating date sensitive
software which uses two digits to represent the year may recognize a date using
00 as the year 1900 rather than the year 2000.  This could result in a system
failure or miscalculations causing disruption of operations, including, among
other things, a temporary inability to manufacture product or process
transactions, send invoices or engage in similar business activities.

    In order to address this situation, we conducted an assessment to identify
and determine the Y2K readiness of our systems.  This assessment program focused
on three main functional areas, including:

    .   Information technology which addresses data, phone and administrative
        systems;

    .   Embedded chip technology which addresses manufacturing systems,
        laboratory instruments and plant maintenance systems with programmable
        logic controllers with date functions; and

    .   Material suppliers, vendors and other third parties that address areas
        that are critical to the manufacturing process, distribution of product
        or other business processes.

    The task of assessment from a Y2K readiness perspective is 100% complete.
Some of our systems are Y2K compliant, whereas other systems have been
identified as not being Y2K compliant and remedial action is underway.  Remedial
plans have been developed for the remaining software and systems to bring them
into Y2K compliance in time to minimize any detrimental effects on operations.
In addition to the assessment of systems, key vendors, suppliers and other third
parties were identified and a survey form was sent to each of these business
entities to determine if their systems are Y2K compliant. We are monitoring
responses as they are received. Y2K issues with our  vendors, suppliers or other
third parties could delay the shipment and receipt of critical supplies,
potentially impacting production and operations. We are proactively addressing
the Y2K issue with vendors, suppliers and other third parties to minimize risk
from these external factors.

    While our Y2K project is not yet complete, we currently estimate that costs
associated with the Y2K issue will be no more than $250,000, which includes the
use of internal resources.  Working capital will be used to fund these costs.
To date, costs consist primarily of payroll costs for existing employees,
including the information technology group, which are not separately tracked, as
well as certain software upgrade and training costs.  However, certain aspects
of the Y2K assessment are still ongoing.  If we or key third parties such as
suppliers and customers are not Y2K ready, there could be an adverse effect on
our business, results of operations and financial condition. We believe that
with the implementation of the Y2K program the risk of significant interruptions
of normal operations is reduced.  We are developing a contingency plan to
address a situation in which Y2K problems do cause an interruption in normal
business activities. Once developed, contingency plans and related cost
estimates will be continually refined as additional information becomes
available.

                                    9
<PAGE>

                              USE OF PROCEEDS

    The Company will not receive any of the proceeds from the sale of the

common stock or warrants by the selling stockholders.

DESCRIPTION OF SECURITIES

AUTHORIZED AND OUTSTANDING CAPITAL STOCK

Pursuant to our Certificate of Incorporation, as amended, we are authorized to issue up to 40,000,000 shares of our common stock, $.01 par value per share. The authorization for issuance of up to an additional 40,000,000 shares of common stock is subject to shareholder approval at our 1999 annual meeting of stockholders to be held on May 14, 1999. The Company is authorized to issue up to 1,000,000 shares of preferred stock, $1.00 par value per share.

As of March 31, 1999, there were issued and outstanding 30,460,904 shares of our common stock (excluding 40,000 treasury shares). The table below sets forth for each of our stock option plans, as of March 31, 1999, (a) the number of shares of common stock reserved for issuance under each option plan and (b) of the shares of common stock reserved for issuance, (1) the number of shares issued pursuant to the exercise of granted options, (2) the number of shares still available for issuance and (3) the number of shares available for issuance or no longer available for issuance.

| | Shares Reserved For Issuance | Subject to Outstanding Option Grants | Issued Pursuant to Exercised Options | Available for Future Issuance | No Longer Available for Future Issuance |
|---|---|---|---|---|---|
| 1986 Stock Option Plan | 4,882,811 | 2,351,017 | 2,299,340 | – | 232,454 |
| 1995 Stock Option Plan | 2,929,688 | 2,636,195 | 159,478 | 134,015 | – |
| 1991 Directors' Stock Option Plan | 244,141 | 73,246 | 36,623 | – | 134,272 |
| 1994 Directors' Stock Option Plan | 488,281 | 277,546 | 46,388 | 164,347 | – |
| 1999 Non-Qualified Stock Option Plan | 1,000,000 | 450,000 | – | 550,000 | – |
| Officer Stock Option Agreement | 732,423 | – | – | 732,423 | – |

In addition, 366,211 shares of our common stock are reserved for issuance under our 1991 Employee Stock Purchase Plan (45,876 of which have been issued and 320,335 of which are still available for future issuance).

In addition, 1,800,000 shares have been reserved for issuance upon conversion of the Series C Preferred Stock and exercise of the Warrants issued in a private placement of our securities in March 1998 and 50,000 shares have been reserved for issuance upon the exercise of warrants issued to Reedland Capital Partners. Pursuant to our issuance of convertible notes and warrants in March 1999, an additional 2,046,333 shares of our common stock have been reserved for issuance upon (i) the conversion of convertible notes into common stock, (ii) the payment of accrued interest on the convertible notes in common stock and the exercise of warrants. Pursuant to an asset purchase transaction with Baxter Healthcare Corporation, an additional 50,000 shares of our common stock have been reserved for issuance and were issued as of April 30, 1999.

COMMON STOCK

The holders of Common Stock are entitled to one vote per share for each share held of record on all matters submitted to a vote of stockholders and are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefor. In the event of a liquidation, dissolution or winding up of the Company, holders of Common Stock have the right to a ratable portion of assets remaining after payment of liabilities and the liquidation preferences of any outstanding Preferred Stock. The holders of Common Stock have no preemptive rights or rights to convert their Common Stock into any other securities and are not subject to future calls or assessments by the Company. All outstanding shares of Common Stock are fully paid and non-assessable.

10

<PAGE>

PREFERRED STOCK

    The Board of Directors may, without further action of our stockholders,
issue preferred stock in one or more series and fix the rights and preferences
thereof, including dividend rights, dividend rates, conversion rights, voting
rights, terms of redemption (including sinking fund provisions), redemption
price or prices, liquidation preferences and the number of shares constituting
any series or the designation of such series.

    We have authorized 1,000,000 shares of preferred stock at December 31,
1998, of which 250,000 shares are designated as Series A convertible preferred
stock, 50,000 shares are designated as Series B junior participating preferred
stock and 200 shares are designated as Series C convertible preferred stock. The
250,000 shares of Series A convertible preferred stock that were previously
issued were subsequently converted into 312,500 shares of common stock in
October 1995.   No shares of Series A or Series B  preferred stock were issued
and outstanding as of December 31, 1996, 1997 and 1998.

    In March 1998, we completed a placement of 200 shares of Series C
convertible preferred stock and warrant financing with two institutional
investors. The Series C preferred stock pay no dividends, have no voting rights,
and are convertible into common stock on a scheduled basis over two years based
on market price at time of conversion. The conversion price per share is to be
the lower of (a) $28.80 and (b) the average of the closing bid prices of our
common stock for any three trading days selected by the investors during the 20
consecutive trading days immediately prior to the date of conversion, in each
case, subject to adjustment for subsequent dilutive financings or if we declare
a dividend or make a distribution in shares of common stock, subdivide or
reclassify the outstanding shares of common stock into a greater number of
shares, or combine or reclassify our outstanding common stock into a smaller
number of shares. The investors, in the aggregate, may not convert preferred
stock into common stock in excess of 1,136,364 shares. However, no limits exist
for conversions upon redemption or upon a major transaction, such as a
consolidation or merger, the sale or transfer of substantially all of our
assets, or a purchase, tender or exchange offer for more than 50% of our
outstanding shares of common stock that is accepted by the holders of common
stock.   In addition, the investors are not entitled to convert Series C
preferred stock in excess of that number of Series C preferred stock shares
that, upon giving effect to the conversion, would cause the aggregate number of
shares of common stock beneficially owned by that investor and its affiliates to
exceed 4.9% of our outstanding shares of common stock following the conversion.
We may call for conversion of all or part of the shares of Series C preferred
stock under certain conditions based on continued improvement in the price of
our common stock. If any Series C preferred stock remains outstanding on the
mandatory conversion date of March 26, 2000, we have the option of redeeming any
such outstanding Series C preferred stock by: (1) paying cash equal to the
product of the number of Series C preferred stock outstanding multiplied by the
stated value of $100,000 per share; (2) issuing common stock equal to 1.15 of
the stated value divided by the average of the closing bid prices for the
20 consecutive trading days prior to the mandatory conversion date; or (3) any
combination of these methods. In addition, the investors received three-year
warrants to purchase an aggregate of 200,000 shares of common stock at $31.20
per share. The warrants may be exercised at any time prior to April 2001. In
July 1998, the investors exercised their right to receive additional warrants to
purchase 150,000 shares of common stock at $17.45 per share with an expiration
date of March 26, 2001. We also issued a warrant to purchase an aggregate of
50,000 shares of common stock at $28.80 per share to the placement agent that
expires March 25, 2001. No further warrants may be issued under the Series C
preferred stock placement.

    In April 1998, we filed a registration statement for 1,800,000 shares of
common stock, the maximum number of shares that may be acquired relating to this
transaction; except for mandatory conversion where the common share limit does
not apply. All shares have been reserved for issuance. The SEC declared this
registration statement effective in May 1998. In May, September and November
1998, an aggregate of $13,800,000 face amount of the Series C preferred stock
was converted into common stock resulting in the issuance of approximately

1,136,000 shares of common stock.  At December 31, 1998, we had approximately 62 shares of Series C convertible preferred stock outstanding.

In the event of any liquidation, dissolution or winding up of the company, the holders of the Series C preferred stock will be entitled to receive an amount per Series C preferred stock share equal to the stated value, before any amount shall be paid to the holders of any of our capital stock of any class junior in rank to the Series C preferred stock. As long as the initially issued shares of Series C preferred stock remain outstanding, then without the prior express written consent of the holders of not less than two-thirds (2/3) of the then outstanding Series C preferred stock, we may not authorize or issue additional or other capital stock that is of senior rank to the Series C preferred stock in respect of the preferences as to distributions and payments upon the liquidation, dissolution and winding up of the company.  Until all of the Series C preferred stock has been converted or redeemed, we may not redeem or declare or pay any cash dividend or distribution on our common stock or any other series of our preferred

<div align="center">11</div>

<PAGE>

stock without the prior express written consent of the holders of not less than two-thirds (2/3) of the then outstanding Series C preferred stock.

Additional shares of authorized preferred stock may be issued without stockholder approval, subject to the rights of any holders of outstanding Series C preferred stock.  The Board of Directors is authorized to issue such shares in one or more series and to fix the rights, preferences, privileges, qualifications, limitations and restrictions thereof, including dividend rights and rates, conversion rights, voting rights, terms of redemption, redemption prices, liquidation preferences and the number of shares constituting any series or the designation of such series, without any vote or action by the holders of common stock. Any preferred stock to be issued could rank prior to the common stock with respect to dividend rights and rights on liquidation. The Board of Directors, without approval of the holders of common stock, may issue preferred stock with voting and conversion rights that could adversely affect the voting power of holders of common stock or create impediments to persons seeking to gain control of the company.

The rights of the holders of common stock as described above will be subject to, and may be adversely affected by, the rights of holders of the Series C preferred stock and any preferred stock that may be issued in the future. Issuance of preferred stock, while providing desirable flexibility in connection with possible acquisitions, and other corporate purposes, could have the effect of making it more difficult for a third party to acquire, or of discouraging a third party from acquiring, a majority of the outstanding voting stock of the Company.  See "Description of Securities"--Shareholder Rights."

TREASURY STOCK

In September 1998, the Board of Directors authorized a common stock repurchase program.  Repurchases are allowed through open-market transactions for up to 500,000 shares that will provide us with treasury shares for general corporate purposes. At December 31, 1998, we had repurchased 40,000 shares of common stock for an aggregate purchase price of $391,000. The stock repurchase program may be discontinued at any time.

SHAREHOLDER RIGHTS

In August 1995, the Board of Directors adopted a Stockholder Rights Plan and declared a dividend of one right for each outstanding share of common stock to stockholders of record on September 1, 1995. After adjusting for two one-for-four stock dividends distributed during 1997 and one one-for-four stock dividend distributed during 1998, there is approximately .51 of a right for each outstanding share of common stock. Each right only becomes exercisable and transferable apart from the common stock at the earlier of: (1) ten days after a person or group acquires beneficial ownership of 15% or more of outstanding common stock; or (2) ten business days following an announcement of a tender or exchange offer of 30% or more of outstanding stock.

Initially, each right, upon becoming exercisable, would entitle the holder

to purchase one-thousandth of a share of Series B Junior participating preferred stock at an exercise price of $85, subject to adjustment. If a person or group acquires beneficial ownership of 15% or more of the outstanding shares of common stock, then each holder of a right (other than rights held by the acquiring person or group) would have the right to receive that number of shares of common stock which equals the exercise price of the right divided by one-half of the current market price of the common stock.

The rights may be redeemed for $0.01 per right at any time until the tenth day following the stock acquisition date. The rights will expire on September 1, 2005.

CONVERTIBLE DEBT

On March 30, 1999, we closed a financing of $20,000,000 through the private placement of five year convertible debentures and 400,000 warrants to purchase common stock. The debentures are convertible at a fixed price of $14.50 per share any time on or after March 30, 2000. Interest on the debentures accrues at 7% annually, payable in cash, common stock (at the average trading price for the twenty trading days preceding the due date) or any combination thereof, at our option, semi-annually on September 30 and March 31 or on the date any of the principal outstanding under the notes has been converted into common stock. At our option, at any time on or after March 30, 2002, the debentures may be prepaid by conversion of the principal into common stock at the conversion price of $14.50, cash or any combination thereof and payment of any accrued interest as described above, provided that the average per share market value for the twenty consecutive trading days immediately preceding the date of

                                    12
<PAGE>

prepayment equals or exceeds $38.67 per share. The debentures mature on March 29, 2004 and are payable in cash upon maturity.

WARRANTS

In connection with our issuance of $20 million of 7% convertible debt in March 1999, each purchaser of the convertible debt received one warrant for each $50.00 in face value of the convertible debt purchased, for an aggregate issuance of 400,000 warrants. Each warrant grants the right to purchase one share of common stock at an exercise price of $21.75 at any time on or before March 29, 2004. The warrants are exercisable upon 75 days' prior written notice by the registered holder of the warrant, except upon certain conditions. The exercise price and the number of shares of common stock issuable upon exercise of each warrant are subject to adjustment from time to time upon any stock dividend or other distribution upon shares of capital stock, stock split, subdivision, combination or reclassification of the outstanding shares of common stock and consolidation, merger or transfer of all or substantially all of our assets.

                        TRANSFER AGENT AND REGISTRAR

The transfer agent and registrar for our common stock is American Stock Transfer & Trust Company.

                            SELLING STOCKHOLDERS

The securities offered in this prospectus by the selling stockholders named in the tables below consist of:

.   Up to 1,646,333 shares of our common stock which may be issued upon (a) and (b) below:

    (a)  Upon the conversion of convertible debt in the aggregate amount of $20,000,000 that we issued to the selling stockholders in March 1999, convertible by the selling stockholders any time on or after March 30, 2000 until March 29, 2004 at the conversion price of $14.50 per share or prepayable by us, at our option, at any time on or after March 30, 2002, by conversion of the principal into common stock at

the conversion price of $14.50 per share, cash or any combination of common stock or cash, and payment of any accrued interest as described immediately below, provided that the average per share market value for the twenty consecutive trading days immediately preceding the date of prepayment equals or exceeds $38.67 per share. If the convertible debt remains outstanding and unconverted on the maturity date of March 29, 2004, then the outstanding principal of the debt is payable by us only in cash.

(b)  Upon our election to distribute common stock to the selling stockholders for the payment of interest on the convertible debt. Interest on the debt accrues at 7% annually, payable by us in cash, common stock (at the average trading price for the twenty trading days preceding the due date) or any combination of cash or common stock, at our option, semi-annually on September 30 and March 31 or on the date any of the principal outstanding under the notes has been converted into common stock.

.    Up to 400,000 warrants to purchase an aggregate of up to 400,000 shares of common stock which were issued to the selling stockholders in March 1999. The warrants grant the right to purchase one share of common stock at the exercise price of $21.75 for each $50.00 in face value of the convertible debt held by a selling stockholder. The warrants are exerciseable at any time before March 30, 2004 upon 75 days' prior written notice.

.    Up to 400,000 shares of common stock which may be issued to the selling stockholders upon the exercise of the warrants to purchase our common stock issued to the selling stockholders in March 1999.

.    Up to 50,000 shares of common stock issued to Baxter Healthcare Corporation.

The number of shares registered on the registration statement of which this prospectus is a part and the number of shares offered in this prospectus have been determined by agreement between us and the selling stockholders.  The number of shares of common stock that will ultimately be issued to the selling stockholders cannot be determined at this time because it depends upon whether (1) the holders of convertible debt elect to convert the debt into shares of common stock; (2) we elect to prepay the debt through conversion into shares of

13

<PAGE>

common stock; (3) we elect to pay accrued interest on the debt in the form of common stock; and (4) the holders of warrants exercise their warrants.

The following table lists the selling stockholders and provides information regarding the beneficial ownership of our common stock by each selling stockholder as of May 1, 1999 (unless otherwise noted). The information provided in the table has been obtained from the selling stockholders.  The selling stockholders may sell all, some or none of their securities in this offering. See "Plan of Distribution" on page 16 of this prospectus.

<TABLE>
<CAPTION>

| Names of Selling Stockholders | Number of Shares Beneficially Owned Prior to Offering(1) | Maximum Number of Shares Being Offered(2) | Shares Beneficially Owned After Offering(10) | |
| --- | --- | --- | --- | --- |
| | | | Number | Percent |
| ------------ | ----------- | ----------- | ------ | --------- |
| <S> | <C> | <C> | <C> | <C> |
| Alan Ades(3) | 1,005,025 | 409,267 | 1,005,025 | 3.3% |
| Albert Erani(4) | 1,362,508 | 255,792 | 1,362,508 | 4.5% |
| Dennis Erani(5) | 190,000 | 255,792 | 190,000 | * |
| David Gardner | 428,000 | 204,633 | 428,000 | 1.4% |

| | | | |
|---|---|---|---|
| Bernard Marden(6) | 670,190 | 153,475 | 670,190 | 2.2% |
| Deerwood Corporation | 0 | 102,316 | 0 | * |
| North American Management Corp.(7) | 2,882,224 | 127,896 | 2,882,224 | 9.5% |
| New England Aquarium | 103,000 | 25,579 | 103,000 | * |
| Brown Simpson Strategic Growth Fund, L.P.(8) | 36,000 | 184,170 | 0 | * |
| Brown Simpson Strategic Growth Fund, Ltd.(9) | 64,000 | 327,413 | 0 | * |
| Baxter Healthcare Corporation | 50,000 | 50,000 | 0 | * |

_____

</TABLE>

*    Less than one percent of the outstanding shares of common stock.

(1)  Beneficial ownership of common stock is determined in accordance with the
     rules of the SEC and generally includes voting or investment power with
     respect to securities. Shares of common stock subject to options, warrants
     and convertible securities currently exercisable or convertible, or
     exercisable or convertible within 60 days, are considered to be outstanding
     for purposes of computing the percentage ownership of the persons holding
     such option, warrant or convertible security, but not for purposes of
     computing the percentage of any other holder. Unless otherwise noted,
     beneficial ownership is as of May 1, 1999.

(2)  Assumes (a) the conversion of warrants held by each selling stockholder
     (except Baxter Healthcare Corporation) into an aggregate of 400,000 shares
     of common stock and (b) the conversion of the 7% convertible notes to
     common stock and the payment of interest on the notes in common stock, on a
     pro rata basis amongst the selling stockholders (except Baxter Healthcare
     Corporation), up to the 2,046,333 shares of common stock being offered in
     this prospectus for such purposes.

(3)  Does not include 72,187 shares of common stock owned by Mr. Ades' wife and
     children. From January 22, 1997 until November 10, 1998, Mr. Ades was
     required to report his holdings of our common stock on Schedule 13D under
     the Securities Exchange Act of 1934 by virtue of his participation in a
     group which beneficially owned greater than 5% of our outstanding shares of
     common stock.

                              14
<PAGE>

(4)  Based upon a Form 4 filed with the SEC as of January 11, 1999. From January
     22, 1997 until November 10, 1998, Mr. Erani was required to report his
     holdings of our common stock on Schedule 13D under the Securities Exchange
     Act of 1934 by virtue of his participation in a group which beneficially
     owned greater than 5% of our outstanding shares of common stock. Mr. Erani
     currently serves as a member of our Board of Directors.

(5)  From January 22, 1997 until November 10, 1998, Mr. Erani was required to
     report his holdings of our common stock on Schedule 13D under the
     Securities Exchange Act of 1934 by virtue of his participation in a group
     which beneficially owned greater than 5% of our outstanding shares of
     common stock.

(6)  Includes 668,097 shares of common stock owned directly and 2,093 shares of
     common stock held by Mr. Marden's wife.

(7)  North American Management Corp. is a principal stockholder by virtue of its
     ownership of greater than 5% of our outstanding shares of common stock. The
     information reported is based solely upon information provided by North
     American Management Corp. Under common forms of discretionary account
     agreements between investment advisor and client, an investment advisor is

vested with authority to dispose of shares. North American is an investment
advisor and is thus considered under SEC rules to be a beneficial owner. An
investment advisor need not have any pecuniary interest to be considered a
beneficial owner.

(8)  Includes 36,000 shares of common stock issuable upon the exercise of
     warrants issued in March 1999.

(9)  Includes 64,000 shares of common stock issuable upon the exercise of
     warrants issued in March 1999.

(10) Based upon 30,460,904 shares of our common stock issued and outstanding
     (excluding 40,000 shares held in treasury) as of March 31, 1999. Assumes
     the conversion of the 7% convertible notes, the payment of interest on the
     notes in common stock and the exercise of the warrants to the extent of the
     2,046,333 shares of common stock being offered in this prospectus.

                                    15
<PAGE>

     The following table lists the selling stockholders and provides information
regarding the beneficial ownership of the warrants that are being offered in
this prospectus by each selling stockholder as of May 1, 1999. The information
provided in the table has been obtained from the selling stockholders.   The
selling stockholders may sell all, some or none of their warrants in this
offering.  See "Plan of Distribution" on page 16 of this prospectus.

<TABLE>
<CAPTION>

| Names of Selling Stockholders | Number of Warrants Beneficially Owned Prior to Offering | Maximum Number of Warrants Being Offered | Warrants Beneficially Owned After Offering | |
| --- | --- | --- | --- | --- |
| | | | Number | Percent |
| <S> | <C> | <C> | <C> | <C> |
| Alan Ades | 80,000 | 80,000 | 0 | * |
| Albert Erani | 50,000 | 50,000 | 0 | * |
| Dennis Erani | 50,000 | 50,000 | 0 | * |
| David Gardner | 40,000 | 40,000 | 0 | * |
| Bernard Marden | 30,000 | 30,000 | 0 | * |
| Deerwood Corporation | 20,000 | 20,000 | 0 | * |
| North American Management Corp. | 25,000 | 25,000 | 0 | * |
| New England Aquarium | 5,000 | 5,000 | 0 | * |
| Brown Simpson Strategic Growth Fund, L.P. | 36,000 | 36,000 | 0 | * |
| Brown Simpson Strategic Growth Fund, Ltd. | 64,000 | 64,000 | 0 | * |

_____
</TABLE>

*    Less than one percent of the outstanding warrants.


                            PLAN OF DISTRIBUTION

     Each of Alan Ades, Albert Erani, Dennis Erani, David Gardner, Bernard
Marden, the Deerwood Corporation, North American Management Corp., the
New England Aquarium, Brown Simpson Strategic Growth Fund, L.P. and Brown
Simpson Strategic Growth Fund, Ltd. is offering shares of our common stock,
$.01 par value per share, which may be issuable to each upon (1) the conversion

of the 7% convertible debentures issued in accordance with a Securities Purchase
Agreement dated as of March 30, 1999, (2) our election to pay accrued interest
on the 7% convertible debentures in common stock or (3) the exercise of the
common stock purchase warrants issued to each on March 30, 1999 This prospectus
covers the resale of up to an aggregate of 2,046,333 of shares of such common
stock issuable upon the conversion of the debt, the payment of the interest in
common stock or the exercise of the warrants.

Each of Alan Ades, Albert Erani, Dennis Erani, David Gardner, Bernard
Marden, the Deerwood Corporation, North American Management Corp., the
New England Aquarium, Brown Simpson Strategic Growth Fund, L.P. and Brown
Simpson Strategic Growth Fund, Ltd. is offering common stock purchase warrants
issued to each on March 30, 1999. This prospectus covers the resale of up to an
aggregate of 400,000 of such common stock purchase warrants.

Baxter Healthcare Corporation is offering 50,000 shares of our common stock
issued by us in connection with an Asset Purchase Agreement dated as of
April 30, 1999.

                                    16
<PAGE>

In addition to covering the resale of the above mentioned shares of common
stock and warrants, this prospectus covers an indeterminate number of additional
shares of common stock as may from time to time become issuable as a result of
any stock split, stock dividend, recapitalization, combination, merger,
consolidation, distribution or other similar transactions with respect to the
2,096,333 shares of common stock discussed above.

The common stock and the warrants were originally issued to the selling
stockholders pursuant to exemptions from the registration requirements under
Sections 4(2) or 3(a)(9) of the Securities Act or otherwise. In accordance with
registration rights granted to each selling stockholder, we have filed a
Registration Statement on Form S-3 with the SEC in order to register the
securities under the Securities Act of 1933. The Registration Statement covers
the resale of the 2,096,333 shares of common stock from time to time on the
American Stock Exchange or in privately-negotiated transactions and the resale
of the 400,000 warrants from time to time.  This prospectus forms a part of the
Registration Statement.  We have also agreed to prepare and file such amendments
and supplements to the Registration Statement as may be necessary to keep the
Registration Statement effective until the later of one year after the date that
the Registration Statement is declared effective and the date when the
securities covered by the Registration Statement have been sold or may be sold
under SEC Rule 144(k) without volume restrictions. We have agreed to pay all
reasonable fees and expenses for the registration of the common stock and the
warrants. We have agreed to indemnify the selling stockholders against certain
losses, claims, damages and liabilities, including liabilities under the
Securities Act, that could arise in connection with the selling stockholders'
sales of their securities.

The 2,096,333 shares of our common stock and 400,000 common stock purchase
warrants offered in this prospectus may be offered and sold from time to time by
the selling stockholders, or by pledgees, donees, transferees or other
successors in interest.  Such offers and sales may be made from time to time on
a stock exchange, market or trading facility on which the securities are traded
or in private negotiated transactions. These sales may be at prices and on terms
prevailing in the market, at prices related to the market price of our common
stock or at negotiated prices.  The selling stockholders may use any one or more
of the following methods when selling the securities:

.    ordinary brokerage transactions and transactions in which the broker-dealer
     solicits purchasers;
.    block trades in which the broker-dealer will attempt to sell the shares as
     agent but may position and resell a portion of the block as principal to
     facilitate the transaction;
.    purchases by a broker-dealer as principal and resale by the broker-dealer
     for its account,
.    an exchange distribution in accordance with the rules of the relevant
     exchange;
.    privately negotiated transactions;
.    short sales;

.    broker-dealers may agree with the selling stockholders to sell a specified
     number of such shares at a stipulated price per share;
.    a combination of any such methods of sale; and
.    any other method permitted by law.

     The selling stockholders may also sell shares under Rule 144 under the
Securities Act of 1933, if available, rather than under this prospectus.

     From time to time the selling stockholders may engage in short sales, short
sales against the box, puts and calls and other transactions in our securities,
and may sell and deliver the securities in connection with those transactions.
The selling stockholders may pledge their shares to their brokers under the
margin provisions of their customer agreements. If a selling stockholder
defaults on a margin loan, the broker may offer and sell the pledged securities
from time to time.

     Broker-dealers engaged by the selling stockholders may arrange for other
brokers-dealers to participate in sales. Broker-dealers may receive commissions
or discounts from the selling stockholders (or, if any broker-dealer acts as
agent for the purchaser of shares, from the purchaser) in amounts to be
negotiated. The selling stockholders do not expect these commissions and
discounts to exceed what is customary in the types of transactions involved.

     The selling stockholders and any broker-dealers or agents that are involved
in selling the securities may be considered to be "underwriters" within the
meaning of the Securities Act of 1933 in connection with such sales. If so, any
commissions received by such broker-dealers or agents and any profit on the
resale of the securities purchased by them may be considered to be underwriting
commissions or discounts under the Securities Act.

<div align="center">17</div>

&lt;PAGE&gt;

     In order to comply with the securities laws of some states, the securities
must be offered or sold only through registered or licensed  brokers or dealers.
In addition, in some states, the securities may not be offered or sold unless
they have been registered or qualified for sale in that particular state or
unless an exemption from the registration or qualification requirement is
available and is complied with.

     Under the Securities Exchange Act of 1934, any person engaged in the
distribution of the securities may not at the same time engage in market-making
activities with respect to the common stock or warrants for five business days
prior to the start of the distribution. In addition, each selling stockholder
and any other person participating in a distribution will be subject to the
Exchange Act, which may limit the timing of purchases and sales of securities by
the selling stockholder or any other person. These factors may affect the
marketability of the securities and the ability of brokers or dealers to engage
in market-making activities.

     All proceeds from sales of the 2,096,333 shares of common stock and the
400,000 warrants offered in the prospectus will be the property of the selling
stockholders, each of whom will bear the expense of underwriting discounts and
selling commissions, if any, and their own legal fees.

<div align="center">LEGALITY OF COMMON STOCK AND WARRANTS</div>

     The validity of the securities offered in this prospectus is being passed
upon for us by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston,
Massachusetts.

<div align="center">EXPERTS</div>

     The financial statements incorporated in this prospectus by reference to
the Company's Annual Report on Form 10-K for the fiscal year ended December 31,
1998 have been so incorporated in reliance on the report of
PricewaterhouseCoopers LLP, independent accountants, given on the authority of
said firm as experts in auditing and accounting.

<div align="center">INTERESTS OF NAMED EXPERTS AND COUNSEL</div>

Kenneth J. Novack, who is Of Counsel to Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., has served on the Board of Directors of the Company since March 1998. Mr. Novack owns 5,976 shares of our common stock and an additional 3,750 shares of common stock subject to outstanding options exercisable within 60 days following March 19, 1999.

INDEMNIFICATION

Section 145 of the General Corporation Law of the State of Delaware provides that we have the power to indemnify our directors, officers, employees or agents and certain other persons serving at our request in related capacities against amounts paid and expenses incurred in connection with an action or proceeding to which he or she is or is threatened to be made a party by reason of such position, if such person shall have acted in good faith and in a manner he reasonably believed to be in or not opposed to our best interests, and, in any criminal proceeding, if such person had no reasonable cause to believe his conduct was unlawful, provided that, in the case of actions brought by or on behalf of us, no indemnification shall be made with respect to any matter as to which such person shall have been adjudged to be liable to us unless and only to the extent that the adjudicating court determines that such indemnification is proper under the circumstances.

Section 102(b)(7) of the Delaware General Corporation Law permits us to provide in our certificate of incorporation that our directors shall not be personally liable to us or our stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

Our Restated Certificate of Incorporation provides for indemnification to the fullest extent permitted by law and that we may advance litigation expenses to an officer or director prior to the final disposition of an action.

Our Restated Certificate of Incorporation also provides, as permitted by Delaware law, that directors shall not be personally liable to us or our stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of a director's duty of loyalty to the Company or its stockholders, (ii) for acts

18

<PAGE>

or omissions not in good faith or which involve intentional misconduct or knowing violations of law, (iii) under Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit.

We have a Directors and Officers liability insurance policy that insures our officers and directors against certain liabilities.

Commission Policy

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

19

<PAGE>

===============================================================================

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus. The selling stockholders are offering to sell and seeking offers to buy shares of our common stock and warrants only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of May 14, 1999. You should not assume

that this prospectus is accurate as of any other date.

-------------------------------

TABLE OF CONTENTS

|  | Page |
|---|---|
| Available Information | 2 |
| Incorporation of Certain Information by Reference | 2 |
| The Company | 3 |
| Risk Factors | 4 |
| Use of Proceeds | 10 |
| Description of Securities | 10 |
| Transfer Agent and Registrar | 13 |
| Selling Stockholders | 13 |
| Plan of Distribution | 16 |
| Legality of Common Stock and Warrants | 18 |
| Experts | 18 |
| Interests of Named Experts and Counsel | 18 |
| Indemnification | 18 |

===============================================================================

===============================================================================

2,096,333 Shares of Common Stock,
$.01 par value per share
and
400,000 Common Stock Purchase Warrants

ORGANOGENESIS INC.

```
                     ------------------------------

                               PROSPECTUS

                     ------------------------------




                               May 14, 1999
```

===========================================================================
<PAGE>

         PART II.  INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 14.  OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION.

   The table sets forth our estimates (other than the SEC and AMEX Filing Fees)
of our expenses in connection with the issuance and distribution of the common
stock and warrants being registered. None of the following expenses are being
paid by the selling stockholders.

<TABLE>
<CAPTION>
Item                                              Amount
----                                              ------
<S>                                               <C>
 SEC registration fee                           $    6,629.13
 AMEX listing fee.................................   17,500.00
 Legal fees and expenses.........................  220,000.00
 Accounting fees and expenses....................   10,000.00
 Miscellaneous fees and expenses.................  305,870.87
                                                  -------------
 Total...........................................$  560,000.00
                                                  -------------
</TABLE>

     The selling stockholders will bear the expense of their own legal counsel
for the registration of the securities being registered and miscellaneous fees
and expenses, if any.

ITEM 15.   INDEMNIFICATION OF DIRECTORS AND OFFICERS.

     See "Indemnification" contained in Part I hereof, which is incorporated
herein by reference.

     We shall indemnify and hold harmless persons who serve at our express
written request as directors or officers of another organization in which we own
shares or of which we are a creditor.

     In addition, the Registration Rights Agreements, filed as Exhibit 99c and
99d hereto, contain provisions for indemnification by the parties to those
agreements and their officers, directors, and controlling persons against
certain liabilities under the Securities Act of 1933.

ITEM 16.   EXHIBITS.

&lt;TABLE&gt;
&lt;CAPTION&gt;
EXHIBIT
NUMBER     DESCRIPTION
_____     -----------
&lt;C&gt;        &lt;S&gt;
 4.1       The Restated Certificate of Incorporation of the Registrant
           (previously filed as Exhibit 3a to the Registrant's Registration
           Statement on Form S-1, File No. 33-48340, and incorporated herein by
           reference).

 4.2       Form of Common Stock Certificate (previously filed as Exhibit No. 4c
           to the Registrant's Registration Statement on Form S-1, File No. 33-
           48340, and incorporated herein by reference).

 4.3       Form of Non-Redeemable Warrant dated as of March 30, 1999 (previously
           filed as Exhibit No. 4(f) to the Registrant's Quarterly Report on Form
           10-Q for the quarter ended March 31, 1999, and incorporated herein by
           reference).

 5         Opinion of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., with
           respect to the legality of the securities being registered.

 23.1      Consent of PricewaterhouseCoopers LLP (to be filed by amendment).

 23.2      Consent of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
           (included in Exhibit 5).

 24        Power of Attorney (filed in Part II of this Registration Statement).

 99a.      Securities Purchase Agreement between the Registrant and the
           Purchasers dated as of March 30, 1999 (previously filed as Exhibit No.
           4(h) to the Registrant's Quarterly Report on Form 10-Q for the quarter
           ended March 31, 1999, and incorporated herein by reference).
&lt;/TABLE&gt;
&lt;PAGE&gt;

&lt;TABLE&gt;
&lt;CAPTION&gt;
EXHIBIT
NUMBER     DESCRIPTION
_____     -----------
&lt;C&gt;        &lt;S&gt;
 99b.      Form of 7% Convertible Subordinated Note dated as of March 30, 1999
           (previously filed as Exhibit No. 4(g) to the Registrant's Quarterly
           Report on Form 10-Q for the quarter ended March 31, 1999, and
           incorporated herein by reference).

 99c.      Form of Registration Rights Agreement between the Company and the
           Purchasers dated as of March 30, 1999 (previously filed as Exhibit No.
           4(i) to the Registrant's Quarterly Report on Form 10-Q for the quarter
           ended March 31, 1999, and incorporated herein by reference).

 99d.      Form of Registration Rights Agreement between the Company and Baxter
           Healthcare Corporation dated as of April 30, 1999.

```
</TABLE>

ITEM 17.  UNDERTAKINGS.

A.       Rule 415 Offering

         The undersigned registrant hereby undertakes:

         (1)   To file, during any period in which offers or sales are being
made, a post-effective amendment to this registration statement:

         (i)   To include any prospectus required by Section 10(a)(3) of the
Securities Act;

         (ii)  To reflect in the prospectus any facts or events arising after
the effective date of the registration statement (or the most recent post-
effective amendment thereof) which, individually or in the aggregate, represent
a fundamental change in the information set forth in the registration statement.
Notwithstanding the foregoing, any increase or decrease in volume of securities
offered (if the total dollar value of securities offered would not exceed that
which was registered) and any deviation from the low or high end of the
estimated maximum offering range may be reflected in the form of prospectus
filed with the Commission pursuant to Rule 424(b)(sec.230.424(b) of this
chapter) if, in the aggregate, the changes in volume and price represent no more
than a 20% change in the maximum aggregate offering price set forth in the
"Calculation of Registration Fee" table in the effective registration statement.

         (iii) To include any material information with respect to the plan of
distribution not previously disclosed in the registration statement or any
material change to such information in the registration statement;
Provided, however, that paragraphs (A)(1)(i) and (A)(1)(ii) do not apply if the
registration statement is on Form S-3 or Form S-8, and the information required
to be included in a post-effective amendment by those paragraphs is contained in
periodic reports filed by the Registrant pursuant to Section 13 or Section 15(d)
of the 1934 Act that are incorporated by reference in the registration
statement.

         (2)   That, for the purpose of determining any liability under the
Securities Act, each such post-effective amendment shall be deemed to be a new
registration statement relating to the securities offered therein, and the
offering of such securities at that time shall be deemed to be the initial bona
fide offering thereof.

         (3)   To remove from registration by means of a post-effective
amendment any of the securities being registered which remain unsold at the
termination of the offering.

B.       Filings Incorporating Subsequent Exchange Act Documents by Reference

         The undersigned registrant hereby undertakes that, for purposes of
determining any liability under the Securities Act of 1933, each filing of the
registrant's annual report pursuant to section 13(a) or section 15(d) of the
Securities Exchange Act of 1934 (and, where applicable, each filing of an
employee benefit plan's annual report pursuant to section 15(d) of the
Securities Exchange Act of 1934) that is incorporated by reference in the
registration statement shall be deemed to be a new registration statement
relating to the securities offered therein, and the offering of such securities
at that time shall be deemed to be the initial bona fide offering thereof.
<PAGE>

C.       Incorporated Annual and Quarterly Reports.

         The undersigned registrant hereby undertakes to deliver or cause to be
delivered with the prospectus, to each person to whom the prospectus is sent or
given, the latest annual report to security holders that is incorporated by
reference in the prospectus and furnished pursuant to and meeting the
requirements of Rule 14a-3 or Rule 14c-3 under the Securities Exchange Act of
1934; and, where interim financial information required to be presented by
Article 3 of Regulation S-X is not set forth in the prospectus, to deliver, or
cause to be delivered to each person to whom the prospectus is sent or given,
the latest quarterly report that is specifically incorporated by reference in
```

the prospectus to provide such interim financial information.

D.        Request for Acceleration of Effective Date or Filing of Registration
Statement on Form S-8

        Insofar as indemnification for liabilities arising under the
Securities Act of 1933 may be permitted to directors, officers and controlling
persons of the registrant pursuant to the foregoing provisions, or otherwise,
the registrant has been advised that in the opinion of the Securities and
Exchange Commission such indemnification is against public policy as expressed
in the Securities Act of 1933 and is, therefore, unenforceable. In the event
that a claim for indemnification against such liabilities (other than the
payment by the registrant of expenses incurred or paid by a director, officer or
controlling person of the registrant in the successful defense of any action,
suit or proceeding) is asserted by such director, officer or controlling person
in connection with the securities being registered, the registrant will, unless
in the opinion of its counsel the matter has been settled by controlling
precedent, submit to a court of appropriate jurisdiction the question whether
such indemnification by it is against public policy as expressed in the
Securities Act and will be governed by the final adjudication of such issue.


                            SIGNATURES

    Pursuant to the requirements of the Securities Act of 1933, the registrant
certifies that it has reasonable grounds to believe that it meets all of the
requirements for filing on Form S-3 and has duly caused this registration
statement to be signed on its behalf by the undersigned, thereunto duly
authorized, in the Town of Canton, Commonwealth of Massachusetts, on May 14,
1999.

                        ORGANOGENESIS INC.

                        By: /s/ Herbert M. Stein
                            ------------------------------------------
                            Herbert M. Stein, Chief Executive Officer
<PAGE>

                    POWER OF ATTORNEY
                    -----------------

    KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears
below constitutes and appoints Herbert M. Stein and Donna L. Abelli, or any of
them, his attorney-in-fact, each with the power of substitution, for him in any
and all capacities, to sign any and all amendments (including post-effective
amendments) to this registration statement, (or any other registration statement
for the same offering that is to be effective upon filing pursuant to Rule
462(b) under the Securities Act) and to file the same, with all exhibits thereto
and other documents in connection therewith, with the Securities and Exchange
Commission, hereby granting unto said attorneys-in-fact and agents, and each of
them, full power and authority to do and perform each and every act and thing
requisite or necessary to be done in and about the premises, as full to all
intents and purposes as he might or could do in person, hereby ratifying and
confirming all that said attorneys-in-fact and agents or any of them or their or
his substitutes may lawfully do or cause to be done by virtue hereof.

    Pursuant to the requirements of the Securities Act of 1933, this
registration statement has been signed by the following persons in the
capacities and on the dates indicated.

<TABLE>
<CAPTION>
SIGNATURE                              TITLE                    DATE
<S>                        <C>                           <C>

/s/ Herbert M. Stein       Chief Executive Officer       May 14, 1999
--------------------------  and Chairman of the Board
Herbert M. Stein           (principal executive officer)

```
/s/ David T. Rovee            President, Chief Operating      May 14, 199
----------------------------  Officer and Director
David T. Rovee


/s/ Donna Abelli Lopolito     Vice President,                May 14, 1999
----------------------------  Chief Financial Officer,
Donna Abelli Lopolito         Treasurer  and Secretary
                              (principal financial officer
                              and principal  accounting officer)


/s/ Richard S. Cresse         Director                       May 14, 1999
----------------------------
Richard S. Cresse


/s/ Albert Erani              Director                        May  14, 1999
----------------------------
Albert Erani

/s/ Bjorn R. Olsen            Director                        May  14, 1999
----------------------------
Bjorn R. Olsen

/s/ Marguerite A. Piret       Director                        May  14, 1999
----------------------------
Marguerite A. Piret

/s/ Anton E. Schrafl          Director                        May  14, 1999
----------------------------
Anton E. Schrafl
</TABLE>
<PAGE>
```

ORGANOGENESIS INC.

INDEX TO EXHIBITS FILED WITH
FORM S-3 REGISTRATION STATEMENT

EXHIBIT
NUMBER    DESCRIPTION
------    -----------

4.1    The Certificate of Incorporation of the Registrant (previously filed
       as Exhibit 3a to the Registrant's Registration Statement on Form S-1,
       File No. 33-48340, and incorporated herein by reference).

4.2    Form of Common Stock Certificate (previously filed as Exhibit No. 4c
       to the Registrant's Registration Statement on Form S-1, File No. 33-
       48340, and incorporated herein by reference).

4.3    Form of Non-Redeemable Warrant dated as of March 30, 1999 (previously
       filed as Exhibit No. 4(f) to the Registrant's Quarterly Report on
       Form 10-Q for the quarter ended March 31, 1999, and incorporated
       herein by reference).

5      Opinion of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., with
       respect to the legality of the securities being registered.

23.1   Consent of PricewaterhouseCoopers LLP (to be filed by amendment).

23.2   Consent of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
       (included in Exhibit 5)

24     Power of Attorney (filed in Part II of this Registration Statement).

99a.   Securities Purchase Agreement between the Registrant and the
       Purchasers dated as of March 30, 1999 (previously filed as Exhibit
       No. 4(h) to the Registrant's Quarterly Report on Form 10-Q for the
       quarter ended March 31, 1999, and incorporated herein by reference).

99b.     Form of 7% Convertible Subordinated Note dated as of March 30, 1999
         (previously filed as Exhibit No. 4(g) to the Registrant's Quarterly
         Report on Form 10-Q for the quarter ended March 31, 1999, and
         incorporated herein by reference).

99c.     Form of Registration Rights Agreement between the Company and the
         Purchasers dated as of March 30, 1999 (previously filed as Exhibit
         No. 4(i) to the Registrant's Quarterly Report on Form 10-Q for the
         quarter ended March 31, 1999, and incorporated herein by reference).

99d.     Form of Registration Rights Agreement between the Company and Baxter
         Healthcare Corporation dated as of April 30, 1999.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-5
<SEQUENCE>2
<DESCRIPTION>OPINION OF MINTZ LEVIN COHN FERRIS GLOVSKY & POPE
<TEXT>

<PAGE>

                                                        EXHIBIT 5


            Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
                            One Financial Center
                      Boston, Massachusetts 02111

701 Pennsylvania Avenue, N.W.                    Telephone: 617/542-6000
Washington, D.C. 20004                           Fax: 617/542-2241
Telephone: 202/434-7300
Fax: 202/434-7400

                          May 14, 1999
     Organogenesis Inc.
     150 Dan Road
     Canton, Massachusetts  02021

     Ladies and Gentlemen:

         We have acted as counsel to Organogenesis Inc., a Delaware corporation
     (the "Company"), in connection with the preparation and filing with the
     Securities and Exchange Commission of a Registration Statement on Form S-3
     (the "Registration Statement"), pursuant to which the Company is registering
     under the Securities Act of 1933, as amended, a total of 2,096,333 shares
     (the "Shares") of its common stock, $.01 par value per share (the "Common
     Stock") and 400,000 common stock purchase warrants (the "Warrants"; and
     together with the Shares, the "Securities"), for resale to the public.
     The Securities are to be sold by the selling stockholders identified in the
     Registration Statement. This opinion is being rendered in connection with
     the filing of the Registration Statement.

         In connection with this opinion, we have examined the Company's
     Certificate of Incorporation and By-Laws, both as currently in effect; such
     other records of the corporate proceedings of the Company and certificates
     of the Company's officers as we have deemed relevant; and the Registration
     Statement and the exhibits thereto.

         In our examination, we have assumed the genuineness of all signatures,
     the legal capacity of natural persons, the authenticity of all documents
     submitted to us as originals, the conformity to original documents of all
     documents submitted to us as certified or photostatic copies and the
     authenticity of the originals of such copies.

         Based upon the foregoing, we are of the opinion that (i) the Securities
     have been duly and validly authorized by the Company and (ii) the
     Securities, when sold, will have been duly and validly issued, fully paid
     and non-assessable, free of preemptive rights.

         Our opinion is limited to the federal securities laws of the United

States, the laws of the Commonwealth of Massachusetts and the corporate laws of the State of Delaware, and we express no opinion with respect to the laws of any other jurisdiction.  No opinion is expressed herein with respect to the qualification of the Shares under the securities or blue sky laws of any state or any foreign jurisdiction.

        We understand that you wish to file this opinion as an exhibit to the Registration Statement, and we hereby consent thereto.  We hereby further consent to the reference to us under the caption "Legality of Common Stock and Warrants" in the prospectus included in the Registration Statement.

                              Very truly yours,

                              /s/ Mintz, Levin, Cohn, Ferris,
                              Glovsky And Popeo, P.C

                              MINTZ, LEVIN, COHN, FERRIS,
    cc: Board of Directors     GLOVSKY and POPEO, P.C.
```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.D
<SEQUENCE>3
<DESCRIPTION>FORM OF REGISTRATION RIGHTS AGREEMENT
<TEXT>

<PAGE>
```

                                                    EXHIBIT 99d

                      REGISTRATION RIGHTS AGREEMENT

        REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of April 30, 1999, by and among Organogenesis Inc., a Delaware corporation, with headquarters located at 150 Dan Road, Canton, MA  02021 (the "Company"), and Baxter Healthcare Corporation, a Delaware corporation with headquarters located at One Baxter Parkway, Deerfield, IL 60015 (the "Purchaser").

    WHEREAS:

    A.  In connection with the Asset Purchase Agreement by and among the parties dated April 30, 1999 (the "Asset Purchase Agreement"), the Company has agreed, upon the terms and subject to the conditions of the Asset Purchase Agreement, to issue and sell to the Purchaser shares of the Company's common stock, $.01 par value per share (the "Common Stock"); and

    B.  To induce the Purchaser to execute and deliver the Asset Purchase Agreement, the Company has agreed to provide certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar successor statute (collectively, the "1933 Act"), and applicable state securities laws.

    NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Purchaser hereby agree as follows:

    1.    DEFINITIONS.
          -----------

        As used in this Agreement, the following terms shall have the following meanings:

        a.  "Person" means a corporation, a limited liability company, an association, a partnership, an organization, a business, an individual, a governmental or political subdivision thereof or a governmental agency.

        b.  "Register," "registered," and "registration" refer to a registration effected by preparing and filing one or more Registration Statements in compliance with the 1933 Act and pursuant to Rule 415 under the 1933 Act or any successor rule providing for the offering securities on a

continuous basis ("Rule 415"), and the declaration or ordering of effectiveness of such Registration Statement(s) by the United States Securities and Exchange Commission (the "SEC").

<PAGE>

c.  "Registrable Securities" means the 50,000 shares of Common Stock issued by the Company to the Purchaser on the date hereof in connection with and subject to the terms and conditions of the Asset Purchase Agreement.

d.  "Registration Statement" means a registration statement of the Company filed under the 1933 Act.

Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Asset Purchase Agreement.

2.  REGISTRATION.
    ------------

a.  Subject to Sections 2(b) and (c), on or before May 14, 1999, the Company shall prepare and file with the SEC a Registration Statement or Registration Statements (as is necessary) on Form S-3 (or, if such form is unavailable for such a registration, on such other form as is available for such a registration, subject to the consent of the Purchaser and the provisions of Section 2(b), which consent will not be unreasonably withheld), covering the resale of all of the Registrable Securities.  The Company shall use its best efforts to have the Registration Statement declared effective by the SEC within ninety (90) days after the filing of the Registration Statement with the SEC. In the event that the SEC shall be closed for business for any period greater than ten consecutive days, the time periods set forth in this Section 2(a) shall be extended by the same number of days.

b.  The Company covenants that it will use its best efforts to meet the requirements for the use of Form S-3 for registration of the sale by the Purchaser of the Registrable Securities on and after May 14, 1999 and the Company has filed and shall file all reports required to be filed by the Company with the SEC in a timely manner so as to obtain and maintain such eligibility for the use of Form S-3.  In the event that Form S-3 is not available for sale by the Purchaser of the Registrable Securities, then the Company (i) with the consent of the Purchaser pursuant to Section 2(a), shall register the sale of the Registrable Securities on another appropriate form and (ii) the Company shall undertake to register the Registrable Securities on Form S-3 as soon as such form is available, provided that the Company shall maintain the effectiveness of the Registration Statement then in effect until such time as a Registration Statement on Form S-3 covering the Registrable Securities has been declared effective by the SEC.

c.  Notwithstanding the foregoing, the parties agree that if (i) in the good faith judgment of the Board of Directors of the Company such registration would be seriously detrimental to the Company, and the Board of Directors of the Company concludes, as a result, that it is essential to defer the filing of such Registration Statement or Registration Statement(s), and (ii) the Company shall furnish to the Purchaser a certificate signed by the Chief Executive Officer of the Company stating that in the good faith judgment of the Board of Directors of the Company, it would be seriously detrimental to the Company for such Registration Statement or Registration Statement(s) to be filed in the near future, then the Company shall have the right to defer such filing for a period of ninety (90) days.

-2-

<PAGE>

d.  Notwithstanding any provision of this Agreement to the contrary, upon the sale of any of the Registrable Securities to the Company pursuant to Section 6.03 of the Asset Purchase Agreement, the Company shall have no further obligations hereunder with respect to any such Registrable Securities.

3.  RELATED OBLIGATIONS.
    -------------------

At such time as the Company is obligated to file a Registration Statement with the SEC pursuant to Section 2(a), the Company will use its best efforts to

effect the registration of the Registrable Securities in accordance with the intended method of disposition thereof and, pursuant thereto, the Company shall have the following obligations:

a.  Subject to Section 2(c), the Company shall promptly prepare and file with the SEC a Registration Statement with respect to the Registrable Securities on or before May 14, 1999 and use its best efforts to cause such Registration Statement(s) relating to Registrable Securities to become effective as soon as practicable (but no later than ninety (90) days) after the filing of the Registration Statement with the SEC, and keep the Registration Statement(s) effective pursuant to Rule 415 at all times until the earlier of (i) the date as of which the Purchaser may sell all of the Registrable Securities without restriction pursuant to Rule 144(k) promulgated under the 1933 Act (or successor thereto) or (ii) the date on which the Purchaser shall have sold all the Registrable Securities (the "Registration Period"), which Registration Statement(s) (including any amendments or supplements thereto and prospectuses contained therein) shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

b.  The Company shall prepare and file with the SEC such amendments (including post-effective amendments) and supplements to the Registration Statement(s) and the prospectus(es) used in connection with the Registration Statement(s), which prospectus(es) are to be filed pursuant to Rule 424 promulgated under the 1933 Act, as may be necessary to keep the Registration Statement(s) effective at all times during the Registration Period, and, during such period, comply with the provisions of the 1933 Act with respect to the disposition of all Registrable Securities of the Company covered by the Registration Statement(s) until such time as all of such Registrable Securities shall have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof as set forth in the Registration Statement(s).

c.  The Company shall furnish to the Purchaser and the Purchaser's legal counsel without charge (i) promptly after the same is prepared and filed with the SEC at least one copy of the Registration Statement and any amendment thereto, including financial statements and schedules, all documents incorporated therein by reference and all exhibits, the prospectus(es) included in such Registration Statement(s) (including each preliminary prospectus) and, with regards to the Registration Statement, any correspondence by or on behalf of the Company to the SEC or the staff of the SEC and any correspondence from the SEC or the staff of the SEC to the Company or its representatives, (ii) upon the effectiveness of any

-3-

<PAGE>

Registration Statement, five (5) copies of the prospectus included in such Registration Statement and all amendments and supplements thereto and (iii) such other documents, including any preliminary prospectus, as the Purchaser may reasonably request in order to facilitate the disposition of the Registrable Securities.

d.  The Company shall use reasonable efforts to (i) register and qualify the Registrable Securities covered by the Registration Statement under such other securities or "blue sky" laws of such jurisdictions in the United States as the Purchaser reasonably requests, (ii) prepare and file in those jurisdictions, such amendments (including post-effective amendments) and supplements to such registrations and qualifications as may be necessary to maintain the effectiveness thereof during the Registration Period, (iii) take such other actions as may be necessary to maintain such registrations and qualifications in effect at all times during the Registration Period, and (iv) take all other actions reasonably necessary or advisable to qualify the Registrable Securities for sale in such jurisdictions; provided, however, that the Company shall not be required in connection therewith or as a condition thereto to (x) qualify to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(d), (y) subject itself to general taxation in any such jurisdiction, or (z) file a general consent to service of process in any such jurisdiction. The Company shall promptly notify the Purchaser of the receipt by the Company of any notification with respect to

the suspension of the registration or qualification of any of the Registrable Securities for sale under the securities or "blue sky" laws of any jurisdiction in the United States or its receipt of actual notice of the initiation or threatening of any proceeding for such purpose.

     e.  As promptly as practicable after becoming aware of such event, the Company shall notify the Purchaser in writing of the happening of any event as a result of which the prospectus included in a Registration Statement, as then in effect, includes an untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and promptly prepare a supplement or amendment to the Registration Statement to correct such untrue statement or omission, and deliver five (5) copies of such supplement or amendment to the Purchaser.  The Company shall also promptly notify the Purchaser in writing (i) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and when a Registration Statement or any post-effective amendment has become effective, (ii) of any request by the SEC for amendments or supplements to a Registration Statement or related prospectus or related information, and (iii) of the Company's reasonable determination that a post-effective amendment to a Registration Statement would be appropriate.

     f.  The Company shall use its best efforts to prevent the issuance of any stop order or other suspension of effectiveness of a Registration Statement, or the suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension at the earliest possible moment and to notify the Purchaser of the issuance of such order and the resolution thereof or its receipt of actual notice of the initiation or threat of any proceeding for such purpose.

<div align="center">-4-</div>

<PAGE>

     g.  The Company shall permit the Purchaser and a single firm of counsel, initially Sidley & Austin, or such other counsel as thereafter designated as the Purchaser's counsel to review and comment upon the Registration Statement(s) and all amendments and supplements thereto at least seven (7) days prior to their filing with the SEC, and not file any document in a form to which such counsel reasonably objects.  The Company shall not submit a request for acceleration of the effectiveness of a Registration Statement(s) or any amendment or supplement thereto without the prior approval of such counsel, which consent shall not be unreasonably withheld.

     h.  The Company shall hold in confidence and not make any disclosure of information concerning the Purchaser provided to the Company unless (i) disclosure of such information is necessary to comply with federal or state securities laws, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in any Registration Statement, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this or any other agreement. The Company agrees that it shall, upon learning that disclosure of such information concerning the Purchaser is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to the Purchaser and allow the Purchaser, at the Purchaser's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

     i.  The Company shall use its best efforts either to (i) cause all the Registrable Securities covered by a Registration Statement to be listed on each securities exchange on which securities of the same class or series issued by the Company are then listed, if any, if the listing of such Registrable Securities is then permitted under the rules of such exchange, or (ii) if the securities of the same class or series issued by the Company as the Registrable Securities are not then listed on any securities exchange, secure designation and quotation of all the Registrable Securities covered by the Registration Statement on the Nasdaq National Market System or, if, despite the Company's best efforts to satisfy the preceding clause (i) or (ii), the Company is unsuccessful in satisfying the preceding clause (i) or (ii), to secure the

inclusion for quotation on the Nasdaq SmallCap Market for such Registrable Securities and, without limiting the generality of the foregoing, to arrange for at least two market makers to register with the National Association of Securities Dealers, Inc. ("NASD") as such with respect to such Registrable Securities.  The Company shall pay all fees and expenses in connection with satisfying its obligation under this Section 3(i).

        j.  The Company shall cooperate with the Purchaser to facilitate the timely preparation and delivery of certificates representing the Registrable Securities to be offered pursuant to a Registration Statement, which certificate shall not bear any restrictive legend other than the lock-up legend referenced in the Asset Purchase Agreement, if applicable, and enable such certificates to be in such denominations or amounts, as the case may be, as the Purchaser may reasonably request and registered in such names as the Purchaser may request. As soon as practicable after the date on which any Registration Statement registering the resale of Registrable Securities is declared effective, the Company shall deliver to its transfer agent

                                    -5-

<PAGE>

instructions, accompanied by any reasonably required opinion of counsel, that permit sales of unlegended securities in a timely fashion that complies with then mandated securities settlement procedures for regular way market transactions.

        k.  The Company shall take all other reasonable actions necessary to expedite and facilitate disposition by the Purchaser of Registrable Securities pursuant to a Registration Statement.

        l.  The Company shall use its best efforts to cause the Registrable Securities covered by the applicable Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to consummate the disposition of such Registrable Securities.

        m.  The Company shall otherwise use its best efforts to comply with all applicable rules and regulations of the SEC in connection with any registration hereunder.

    4.    OBLIGATIONS OF THE PURCHASER.
          ----------------------------

        a.  At least seven (7) business days prior to the anticipated filing date of the Registration Statement, the Company shall notify the Purchaser in writing of the information the Company requires from the Purchaser if the Purchaser elects to have any of the Purchaser's Registrable Securities included in the Registration Statement.  It shall be a condition precedent to the obligations of the Company to complete the registration pursuant to this Agreement with respect to the Registrable Securities that the Purchaser shall furnish to the Company such information regarding itself, the Registrable Securities held by it and the intended method of disposition of the Registrable Securities held by it as shall be reasonably required to effect the registration of such Registrable Securities and shall execute such documents in connection with such registration as the Company may reasonably request.

        b.  The Purchaser agrees to cooperate with the Company as reasonably requested by the Company in connection with the preparation and filing of the Registration Statement hereunder.

        c.  The Purchaser agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(f) or the first sentence of 3(e), the Purchaser will immediately discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until the Purchaser's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(f) or the first sentence of 3(e) and, if so directed by the Company, the Purchaser shall deliver to the Company (at the expense of the Company) or destroy all copies in the Purchaser's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice.

    5.    EXPENSES OF REGISTRATION.

------------------------

     All reasonable expenses incurred in connection with the filing of the
Registration Statement contemplated hereby, including, without limitation, all
registration, listing and

                              -6-
<PAGE>

qualifications fees, printers and accounting fees, shall be paid by the Company.
Notwithstanding the foregoing, in the event that the Purchaser requests the use
of a form other than Form S-3 for registration, then the Company shall not be
obligated to pay for any expenses in excess of those set forth in the prior
sentence.

     6.    INDEMNIFICATION.
           ---------------

     In the event any Registrable Securities are included in a Registration
Statement under this Agreement:

     a.    To the fullest extent permitted by law, the Company will, and
hereby does, indemnify, hold harmless and defend the Purchaser, the directors,
officers, partners, employees, agents and each Person, if any, who controls the
Purchaser  within the meaning of the 1933 Act or the Securities Exchange Act of
1934, as amended (the "1934 Act")(each an "Indemnified Person"), against any
losses, claims, damages, liabilities, judgments, fines, penalties, charges,
costs, reasonable attorneys' fees or  expenses (collectively, "Claims"),
incurred in investigating, preparing or defending any action, claim, suit,
inquiry, proceeding, investigation or appeal taken from the foregoing by or
before any court or governmental, administrative or other regulatory agency,
body or the SEC, whether pending or threatened, whether or not an indemnified
party is or may be a party thereto ("Indemnified Damages"), to which any of them
may become subject insofar as such Claims (or actions or proceedings, whether
commenced or threatened, in respect thereof) arise out of or are based upon:
(i) any untrue statement or alleged untrue statement of a material fact in a
Registration Statement or any post-effective amendment thereto or in any filing
made in connection with the qualification of the offering under the securities
or other "blue sky" laws of any jurisdiction in which Registrable Securities are
offered ("Blue Sky Filing"), or the omission or alleged omission to state a
material fact required to be stated therein or necessary to make the statements
therein, in light of the circumstances under which the statements therein were
made, not misleading, (ii) any untrue statement or alleged untrue statement of a
material fact contained in any preliminary prospectus if used prior to the
effective date of such Registration Statement, or contained in the final
prospectus (as amended or supplemented, if the Company files any amendment
thereof or supplement thereto with the SEC) or the omission or alleged omission
to state therein any material fact necessary to make the statements made
therein, in light of the circumstances under which the statements therein were
made, not misleading, or (iii) any violation or alleged violation by the Company
of the 1933 Act, the 1934 Act, any other law, including, without limitation,
any state securities law, or any rule or regulation thereunder relating to the
offer or sale of the Registrable Securities pursuant to a Registration Statement
(the matters in the foregoing clauses (i) through (iii) being, collectively,
"Violations"). Subject to the restrictions set forth in Section 6(d) with
respect to the number of legal counsel, the Company shall reimburse the
Purchaser, promptly as such expenses are incurred and are due and payable, for
any reasonable legal fees or expenses incurred by it in connection with
investigating or defending any such Claim. Notwithstanding anything to the
contrary contained herein, the indemnification agreement contained in this
Section 6(a): (i) shall not apply to a Claim arising out of or based upon a
Violation which occurs in reliance upon and in conformity with information
furnished in writing to the Company by any Indemnified Person expressly for use
in connection with the preparation of the Registration Statement or any such

                              -7-
<PAGE>

amendment thereof or supplement thereto, if such prospectus was timely made
available by the Company pursuant to Section 3(c); (ii) with respect to any
preliminary prospectus, shall not inure to the benefit of any such person from

whom the person asserting any such Claim purchased the Registrable Securities
that are the subject thereof (or to the benefit of any person controlling such
person) if the untrue statement or omission of material fact contained in the
preliminary prospectus was corrected in the prospectus, as then amended or
supplemented, if such prospectus was timely made available by the Company
pursuant to Section 3(c), and the Indemnified Person was promptly advised in
writing not to use the incorrect prospectus prior to the use giving rise to a
Violation and such Indemnified Person, notwithstanding such advice, used it;
(iii) shall not be available to the extent such Claim is based on a failure of
the Purchaser to deliver or to cause to be delivered the prospectus made
available by the Company; and (iv) shall not apply to amounts paid in settlement
of any Claim if such settlement is effected without the prior written consent of
the Company, which consent shall not be unreasonably withheld.  Such indemnity
shall remain in full force and effect regardless of any investigation made by or
on behalf of the Indemnified Person and shall survive the transfer of the
Registrable Securities by the Purchaser pursuant to Section 9.

        b.  In connection with the Registration Statement, the Purchaser
agrees to indemnify, hold harmless and defend, to the same extent and in the
same manner as is set forth in Section 6(a), the Company, each of its directors,
officers and each Person, if any, who controls the Company within the meaning of
the 1933 Act or the 1934 Act (collectively and together with an Indemnified
Person, an "Indemnified Party"), against any Claim or Indemnified Damages to
which any of them may become subject, under the 1933 Act, the 1934 Act or
otherwise, insofar as such Claim or Indemnified Damages arise out of or are
based upon any Violation, in each case to the extent, and only to the extent,
that such Violation occurs in reliance upon and in conformity with written
information furnished to the Company by the Purchaser expressly for use in
connection with such Registration Statement; and, subject to Section 6(d), the
Purchaser will reimburse any legal or other expenses reasonably incurred by them
in connection with investigating or defending any such Claim; provided, however,
that the indemnity agreement contained in this Section 6(b) and the agreement
with respect to contribution contained in Section 7 shall not apply to amounts
paid in settlement of any Claim if such settlement is effected without the prior
written consent of the Purchaser, which consent shall not be unreasonably
withheld; provided, further, however, that the Purchaser shall be liable under
this Section 6(b) for only that amount of a Claim or Indemnified Damages as does
not exceed the gross proceeds to the Purchaser as a result of the sale of
Registrable Securities pursuant to such Registration Statement.  Such indemnity
shall remain in full force and effect regardless of any investigation made by or
on behalf of such Indemnified Party and shall survive the transfer of the
Registrable Securities by the Purchaser pursuant to Section 9.  Notwithstanding
anything to the contrary contained herein, the indemnification agreement
contained in this Section 6(b) with respect to any preliminary prospectus shall
not inure to the benefit of any Indemnified Party if the untrue statement or
omission of material fact contained in the preliminary prospectus was corrected
on a timely basis in the prospectus, as then amended or supplemented.

        c.  The Company shall be entitled to receive indemnities from
underwriters, selling brokers, dealer managers and similar securities industry
professionals participating in any

                                -8-

<PAGE>

distribution, to the same extent as provided above, with respect to information
such persons so furnished in writing expressly for inclusion in the Registration
Statement.

        d.  Promptly after receipt by an Indemnified Person or Indemnified
Party under this Section 6 of notice of the commencement of any action or
proceeding (including any governmental action or proceeding) involving a Claim,
such Indemnified Person or Indemnified Party shall, if a Claim in respect
thereof is to be made against any indemnifying party under this Section 6,
deliver to the indemnifying party a written notice of the commencement thereof,
and the indemnifying party shall have the right to participate in, and, to the
extent the indemnifying party so desires, jointly with any other indemnifying
party similarly noticed, to assume control of the defense thereof with counsel
mutually satisfactory to the indemnifying party and the Indemnified Person or
the Indemnified Party, as the case may be; provided, however, that an
Indemnified Person or Indemnified Party shall have the right to retain its own

counsel with the fees and expenses to be paid by the indemnifying party, if, in the reasonable opinion of counsel retained by the indemnifying party, the representation by such counsel of the Indemnified Person or Indemnified Party and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person or Indemnified Party and any other party represented by such counsel in such proceeding.  The Indemnified Party or Indemnified Person shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party or Indemnified Person which relates to such action or claim.  The indemnifying party shall keep the Indemnified Party or Indemnified Person fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. No indemnifying party shall be liable for any settlement of any action, claim or proceeding effected without its written consent, provided, however, that the indemnifying party shall not unreasonably withhold, delay or condition its consent. No indemnifying party shall, without the consent of the Indemnified Party or Indemnified Person, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party or Indemnified Person of a release from all liability in respect to such claim or litigation. Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnified Party or Indemnified Person with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability to the Indemnified Person or Indemnified Party under this Section 6, except to the extent that the indemnifying party is prejudiced in its ability to defend such action.

        e.  The indemnification required by this Section 6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Damages are incurred.

        f.  The indemnity agreements contained herein shall be in addition to (i) any cause of action or similar right of the Indemnified Party or Indemnified Person against the

                                -9-

<PAGE>

indemnifying party or others, and (ii) any liabilities the indemnifying party may be subject to pursuant to the law.

    7.  CONTRIBUTION.
        ------------

    If any Claim or Indemnified Damages under Section 6(a) or 6(b) is unavailable to an Indemnified Party because of a failure or refusal of a governmental authority to enforce such indemnification in accordance with its terms (by reason of public policy or otherwise), then each indemnifying party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Claims or Indemnified Damages, in such proportion as is appropriate to reflect the relative fault of the indemnifying party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Claims or Indemnified Damages as well as any other relevant equitable considerations. The relative fault of such indemnifying party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such indemnifying party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Claims or Indemnified Damages shall be deemed to include, subject to the limitations set forth in Section 6(d), any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification was available to such party in accordance with its terms.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation

--- ----

or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 7, the Purchaser shall not be required to contribute, in the aggregate, any amount in excess of the amount by which the proceeds actually received by the Purchaser from the sale of such Registrable Securities subject to the proceeding exceeds the amount of any damages that the Purchaser has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

The indemnity and contribution agreements contained in Section 6 and this Section 7 are in addition to any liability that the indemnifying parties may have to the Indemnified Parties.

-10-

<PAGE>

8.  REPORTS UNDER THE 1934 ACT.
    --------------------------

With a view to making available to the Purchaser the benefits of Rule 144 promulgated under the 1933 Act or any other similar rule or regulation of the SEC that may at any time permit the Purchaser to sell securities of the Company to the public without registration ("Rule 144"), the Company agrees to:

a.  make and keep public information available, as those terms are understood and defined in Rule 144;

b.  file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act so long as the Company remains subject to such requirements and the filing of such reports and other documents is required for the applicable provisions of Rule 144; and

c.  furnish to the Purchaser so long as the Purchaser owns Registrable Securities, promptly upon request, (i) a written statement by the Company that it has complied with the reporting requirements of Rule 144, the 1933 Act and the 1934 Act, (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested to permit the Purchaser to sell such securities pursuant to Rule 144 without registration.

9.  AMENDMENT OF REGISTRATION RIGHTS.
    --------------------------------

Provisions of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Purchaser.  Any amendment or waiver effected in accordance with this Section 9 shall be binding upon the Purchaser and the Company.

10.  MISCELLANEOUS.
     -------------

a.  A person or entity is deemed to be a holder of Registrable Securities whenever such person or entity owns of record such Registrable Securities.  If the Company receives conflicting instructions, notices or elections from two or more persons or entities with respect to the same Registrable Securities, the Company shall act upon the basis of instructions, notice or election received from the registered owner of such Registrable Securities.

b.  Any notices consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile, provided a copy is mailed

by U.S. certified mail, return receipt requested; (iii) three (3) days after
being sent by U.S. certified mail, return receipt requested; or (iv) one (1) day
after deposit with a nationally recognized overnight delivery service, in each
case properly addressed to the party to receive the same.  The addresses and
facsimile numbers for such communications shall be:

-11-

<PAGE>

        if to the Company:

                Organogenesis Inc.
                150 Dan Road
                Canton, MA  02021

                Telephone:  (781) 575-0775
                Facsimile:  (781) 575-1570

        with a copy to:

                Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
                One Financial Center
                Boston, MA 02111

                Telephone:  (617) 542-6000
                Facsimile:  (617) 542-2241
                Attention:  Jeffrey M. Wiesen, Esq.

        if to the Purchaser,

                Baxter Healthcare Corporation
                One Baxter Parkway
                Deerfield, IL 60015
                Attn:  Lee Blumenfeld, M.D.
                Fax:  (847) 270-5660

        with a copy to:

                Baxter Healthcare Corporation
                One Baxter Parkway
                Deerfield, IL 60015
                Attn:  Joseph B. Barrett, Esq.
                Fax:  (847) 270-5660

    Each party shall provide five (5) days prior notice to the other party of
any change in address, phone number or facsimile number.

        c.  Failure of any party to exercise any right or remedy under this
Agreement or otherwise, or delay by a party in exercising such right or remedy,
shall not operate as a waiver thereof.

        d.  This Agreement shall be governed by and interpreted in accordance
with the laws of the Commonwealth of Massachusetts without regard to the
principles of conflict of laws.  If any provision of this Agreement shall be
invalid or unenforceable in any jurisdiction, such invalidity or
unenforceability shall not affect the validity or enforceability of the
remainder

-12-

<PAGE>

of this Agreement in that jurisdiction or the validity or enforceability of any
provision of this Agreement in any other jurisdiction.

        e.  This Agreement and the Asset Purchase Agreement (including all
schedules and exhibits thereto) constitute the entire agreement among the
parties hereto with respect to the subject matter hereof and thereof.  There are
no restrictions, promises, warranties or undertakings, other than those set
forth or referred to herein and therein.  The aforementioned documents supersede
all prior agreements and understandings among the parties hereto with respect to

the subject matter hereof and thereof.

f.  This Agreement shall inure to the benefit of and be binding upon the permitted successors and assigns of each of the parties hereto.

g.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

h.  This Agreement may be executed in two or more identical counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement.  This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

i.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

IN WITNESS WHEREOF, the parties have caused this Registration Rights Agreement to be duly executed as of day and year first above written.

COMPANY:                              PURCHASER:

ORGANOGENESIS INC.                    BAXTER HEALTHCARE   CORPORATION

By:                                   By:
   ------------------------------        ------------------------------

Name:                                 Name:
   ------------------------------        ------------------------------

Its:                                  Its:
   ------------------------------        ------------------------------

                          -13-

</TEXT>
</DOCUMENT>
</SUBMISSION>