# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-Q

**[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended September 30, 1999

**OR**

**[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period from _____ to _____

Commission file number 1-9898

# ORGANOGENESIS INC.

(Exact name of registrant as specified in its charter)

| Delaware | 04-2871690 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification number) |

| 150 Dan Road, Canton, MA | 02021 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (781) 575-0775

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes (X) No ( )

The number of shares outstanding of registrant's Common Stock, par value $.01 per share, at November 2, 1999 was 30,466,491 shares (excluding treasury shares).

**ORGANOGENESIS INC.**

Index

| PART I - FINANCIAL INFORMATION | Page Number |
|---|---|
| Item 1 - Financial Statements | |
| Consolidated Balance Sheets at December 31, 1998 and September 30, 1999 | 3 |
| Consolidated Statements of Operations for the three and nine months ended September 30, 1998 and 1999 | 4 |
| Consolidated Statements of Cash Flows for the nine months ended September 30, 1998 and 1999 | 5 |
| Notes to Consolidated Financial Statements | 6 |
| Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations. | 10 |
| PART II - OTHER INFORMATION | |
| Item 1 - Legal Proceedings. | * |
| Item 2 - Changes in Securities. | * |
| Item 3 - Defaults upon Senior Securities. | * |
| Item 4 - Submission of Matters to a Vote of Security Holders. | * |
| Item 5 - Other Information. | * |
| Item 6 - Exhibits and Reports on Form 8-K | 16 |
| Signatures. | 17 |

In this report, "Organogenesis" "we" "us" and "our" refer to Organogenesis Inc.

* No information provided due to inapplicability of item

**PART I - FINANCIAL INFORMATION**
Item 1 - Financial Statements

**ORGANOGENESIS INC.**

Consolidated Balance Sheets
(In thousands, except share data)

| | December 31, 1998 | September 30, 1999 |
|---|---|---|
| | | (unaudited) |
| Assets | | |
| Current assets: | | |
| Cash and cash equivalents | $5,052 | $755 |
| Investments | 12,789 | 13,255 |
| Inventory | 730 | 795 |
| Other current assets | 441 | 853 |
| | 19,012 | 15,658 |
| Property and equipment - | | |
| Less accumulated depreciation of $9,339 and $10,650 | 7,605 | 11,163 |
| Other assets | 93 | 624 |
| | $26,710 | $27,445 |
| Liabilities | | |
| Current liabilities: | | |
| Accounts payable | $1,036 | $454 |
| Accrued expenses | 2,435 | 3,123 |
| | 3,471 | 3,577 |
| Long-term debt | - | 17,863 |
| Commitments (see notes) | | |
| Stockholders' Equity | | |
| Preferred stock, par value $1.00; authorized 1,000,000 shares: | | |
| Series C convertible preferred; designated 200 shares; 62 shares issued and outstanding as of December 31, 1998 and September 30, 1999, respectively | - | - |
| Common stock, par value $.01; authorized 80,000,000 shares: issued and outstanding 30,479,719 and 30,551,491 shares as of December 31, 1998 and September 30, 1999, respectively | 305 | 306 |
| Additional paid-in capital | 124,342 | 127,516 |
| Accumulated deficit | (101,017) | (121,013) |
| Treasury stock at cost, 40,000 and 85,000 shares as of December 31, 1998 and September 30, 1999, respectively | (391) | (804) |
| Total stockholders' equity | 23,239 | 6,005 |
| | $26,710 | $27,445 |

The accompanying notes are an integral part of the consolidated financial statements.

**ORGANOGENESIS INC.**

Consolidated Statements of Operations
(Unaudited, in thousands, except share data)

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 1998 | 1999 | 1998 | 1999 |
| Revenues: | | | | |
| Research and development support from related party | $- | $- | $6,750 | $- |
| Product sales to related party, royalties and other income | 352 | 708 | 854 | 1,819 |
| Interest income | 392 | 238 | 785 | 745 |
| Total revenues | 744 | 946 | 8,389 | 2,564 |
| Costs and Expenses: | | | | |
| Research, development and operations | 4,913 | 5,412 | 12,698 | 16,073 |
| General and administrative | 1,521 | 1,607 | 3,933 | 4,775 |
| Non-recurring, non-cash purchase of incomplete technology | - | - | - | 900 |
| Interest expense, net | - | 407 | - | 812 |
| Total costs and expenses | 6,434 | 7,426 | 16,631 | 22,560 |
| Net loss | $(5,690) | $(6,480) | $(8,242) | $(19,996) |
| Net loss per common share - basic and diluted | $(.19) | $(.21) | $(.28) | $(.66) |
| Weighted average number of common shares outstanding - basic and diluted | 29,521,312 | 30,478,115 | 29,255,956 | 30,466,603 |

The accompanying notes are an integral part of the consolidated financial statements.

**ORGANOGENESIS INC.**

Consolidated Statements of Cash Flows
(Unaudited, in thousands)

| | For the Nine Months Ended September 30, | |
|---|---|---|
| | 1998 | 1999 |
| Cash flows from operating activities: | | |
| Net loss | $(8,242) | $(19,996) |
| Adjustments to reconcile net loss to cash used in operating activities: | | |
| Depreciation | 1,077 | 1,311 |
| Issuance of stock options | - | 21 |
| Amortization of warrants and deferred debt issuance costs relating to long-term debt | - | 226 |
| Issuance of treasury stock for purchase of technology | - | 900 |
| Changes in assets and liabilities: | | |
| Inventory | (219) | (65) |
| Other current assets | (303) | (412) |
| Accounts payable | (178) | (582) |
| Accrued expenses | 673 | 688 |
| Deferred rent payable | (28) | - |
| Cash used in operating activities | (7,220) | (17,909) |
| Cash flows from investing activities: | | |
| Capital expenditures | (992) | (4,769) |
| Purchases of investments | (15,224) | (19,000) |
| Sales/maturities of investments | 6,612 | 18,534 |
| Cash used in investing activities | (9,604) | (5,235) |
| Cash flows from financing activities: | | |
| Proceeds from issuance of long-term debt | - | 20,000 |
| Deferred debt issuance costs | - | (575) |
| Proceeds from sale of preferred stock, net | 19,117 | - |
| Proceeds from sale of common stock | 6,000 | - |
| Proceeds from exercise of stock options | 981 | 373 |
| Purchase of treasury stock | (247) | (951) |
| Cash provided by financing activities | 25,851 | 18,847 |
| Increase (decrease) in cash and cash equivalents | 9,027 | (4,297) |
| Cash and cash equivalents, beginning of period | 333 | 5,052 |
| Cash and cash equivalents, end of period | $9,360 | $755 |

The accompanying notes are an integral part of the consolidated financial statements.

**ORGANOGENESIS INC.**

Notes to Consolidated Financial Statements
(Unaudited)

1. Basis of Presentation:
The accompanying unaudited consolidated financial statements of Organogenesis Inc., have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented. The results of operations for the nine months ended September 30, 1999 are not necessarily indicative of the results to be expected for the year ending December 31, 1999.

These financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 1998 as filed with the Securities and Exchange Commission.

Certain reclassifications have been made to the prior period financial statements to conform to the current presentation.

2. Inventory:
Inventory is stated at the lower of cost or market, cost being determined using the first-in, first-out method of accounting. Inventory consisted of the following (in thousands):

| | December 31, 1998 | September 30, 1999 |
|---|---|---|
| | | (unaudited) |
| Raw Materials | $300 | $284 |
| Work in Process | 430 | 511 |
| | $730 | $795 |

3. Other Current Assets:
Included in other current assets is a net receivable due from Novartis of approximately $213,000 at December 31, 1998 and $274,000 at September 30, 1999. Cash payments were collected subsequent to September 30, 1999.

4.  Convertible Debt:

On March 31, 1999, we completed a financing of $20,000,000 through the private placement of five-year convertible debentures and 400,000 warrants to purchase common stock. The debentures are convertible at a fixed price of $14.50 per share at any time on or after March 30, 2000. Interest on the debentures accrues at 7% annually, payable in cash, common stock (at the average trading price for the twenty trading days preceding the due date) or any combination thereof, at our option, semi-annually on September 30 and March 31 or on the date any of the principal outstanding under the notes has been converted into common stock. At our option, at any time on or after March 30, 2002, the debentures may be prepaid by conversion of the principal into common stock at the conversion price of $14.50, cash or any combination thereof and payment of any accrued interest as described above, provided that the average per share market value for the twenty consecutive trading days immediately preceding the date of prepayment equals or exceeds $38.67 per share. The notes mature on March 29, 2004 and are payable in cash. The warrants grant the right to purchase one share of common stock at the exercise price of $21.75 for each $50.00 in face value of the convertible notes at any time before March 30, 2004. Approximately $2,318,000 of the $20,000,000 financing is allocated to the estimated fair value of the warrants and is included in additional paid in capital. This amount is amortized as a non-cash charge to interest expense over the life of the debentures using the effective interest rate method.

In May 1999, we filed a registration statement for 2,096,333 shares of common stock, of which 2,046,333 relates to the conversion of the debentures, payment of interest and exercise of the warrants. All shares have been reserved for issuance. The Securities and Exchange Commission declared this registration statement effective on May 27, 1999.

Debt issuance costs are included in other assets and are amortized to interest expense over the life of the debentures using the effective interest rate method.

5.  Commitments:

Lease Obligations

We occupy our current premises under a facility lease for approximately three-quarters of the building that expires on September 30, 2004. This lease has three options to extend the term for an additional five years per option. Starting November 1, 1999, we are leasing all of the remaining space at this primary facility. Taxes, insurance and operating expenses are our responsibility under the terms of the lease. We also have a second facility lease for warehouse and office space that expires on December 31, 1999. In January 1999, we entered into a noncancelable operating lease for certain office equipment.

In May 1999, we entered into another facility lease for approximately 62,500 square feet of additional office and warehouse space in Canton, Massachusetts at an annual average base rent of approximately $421,875, plus operating expenses. This lease has three options to extend the term for an additional five years per option.

Future minimum lease payments are as follows (in thousands):

| | |
|---|---|
| 1999 | $791 |
| 2000 | 1,220 |
| 2001 | 1,240 |
| 2002 | 1,260 |
| 2003 | 1,246 |
| Thereafter | 1,019 |
| | $6,776 |

Construction-in-Progress

At September 30, 1999, we had approximately $3,821,000 in construction in progress relating to expansion of our main facility. Additionally, we have committed approximately $1.9 million for this build-out. The total project cost is estimated at about $5.9 million.

Interest cost incurred during the period of construction in progress relating to expansion of our main facility is capitalized. The interest cost capitalized for the nine months ended September 30, 1999 was $113,000. No interest was capitalized in 1998.

Series C Preferred Stock Commitment

At September 30, 1999, we had approximately 62 shares of Series C convertible preferred stock outstanding. In the event that any Series C preferred stock are outstanding on the mandatory conversion date of March 26, 2000, we have the option of redeeming any such outstanding Series C preferred stock by: (1) paying cash equal to the product of the number of Series C preferred stock outstanding multiplied by the stated value of $100,000 per share; (2) issuing common stock equal to 1.15 of the stated value divided by the average of the closing bid prices for the 20 consecutive trading days prior to the mandatory conversion date; or (3) any combination of these methods.

Purchase of Technology

In April 1999, we purchased certain equipment and intellectual property of Baxter Healthcare Corporation relating to the research and development for the design and manufacturing of key mechanical components of an extracorporeal bioartificial liver device. The purchase price consists of the reissuance of 50,000 shares of common stock held in treasury. In May 1999, we filed a registration statement registering all 50,000 of these shares, 25,000 of which are subject to a one-year lock-up agreement. Additionally, we may be required to make a future cash payment that is contingent on the average closing price of our common stock over the twenty consecutive trading days immediately prior to the earlier of the date we receive FDA approval of an Investigational Device Exemption for a liver assist device or January 1, 2003. We will have no obligation to make such future cash payment if at any time during the period between April 2000 and the date such cash payment is otherwise payable by us, the value of the shares of common stock issued to Baxter is equal to or greater than $1,000,000. Total consideration is $1,000,000 of which $900,000 is a one- time, non-cash charge for the purchase of incomplete technology during the nine months ended September 30, 1999, with the remainder of this purchase capitalized to property and equipment.

6. Treasury Stock:

In September 1998, the Board of Directors authorized a common stock repurchase program. Repurchases are allowed through open-market transactions for up to 500,000 shares that will provide us with treasury shares for general corporate purposes. For the three and nine months ended September 30, 1999, we repurchased 25,000 and 95,000 shares of common stock for an aggregate purchase price of approximately $203,000 and $951,000, respectively. In April 1999, we reissued 50,000 shares of common stock held in treasury related to the purchase of technology (see "Purchase of Technology" note). We had in treasury 40,000 shares of common stock at a cost of $391,000 and 85,000 shares of common stock at a cost of $804,000, at December 31, 1998 and September 30, 1999, respectively. The stock repurchase program may be discontinued at any time.

7. Other Revenues:

During the first quarter of 1999, Novartis agreed to provide funding for certain programs to be conducted by Organogenesis. We have recorded other income from Novartis of $206,000 and $438,000 for the three and nine months ended September 30, 1999 relating to our initiation of these programs. This amount is included in "Product sales to related party, royalties and other income".

8. Research, Development and Operations:

In addition to research and development, this cost category includes expenses of our manufacturing and related operating support departments and costs to manufacture products for research and for sale as we continue our expansion.

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 1998 | 1999 | 1998 | 1999 |
| Research and development | $2,828 | $2,659 | $7,279 | $8,325 |
| Operations and production | 2,085 | 2,753 | 5,419 | 7,748 |
| Total Research, development and operations | $4,913 | $5,412 | $12,698 | $16,073 |

9. Subsequent Event:

Subsequent to September 30, 1999, we received notice of grants to support two research projects: (1) $2,000,000 grant under the Advanced Technology Program of the National Institute for Standards and Technology to support development of an effective bioartificial liver prototype for our bioartificial liver device program. We expect this funding to be received over the next two years; and (2) $100,000 grant under the Small Business Innovation Research Program of the National Institutes of Health to support development of our tissue engineered vascular graft. We expect this funding to be received over the next six months.

In addition, we received notice from the Commonwealth of Massachusetts that we were selected to receive a workforce training grant for approximately $162,000 to support employee training. We expect this funding to be received over the next six months.

On November 12, 1999, we closed on a credit facility providing for the extension by a bank of one or more term loans aggregating up to $5,000,000 for the purpose of financing the purchase of certain equipment, leasehold improvements and other items. Borrowings under the credit facility are collateralized by a security interest in the items financed.

Borrowings are permitted through September 29, 2000 and are payable beginning December 29, 2000 in 12 equal quarterly installments with final payment due on September 30, 2003. Interest only is payable during the draw period. The interest rate is a fluctuating rate per annum that is equal to the prime rate in effect from time to time, or we may elect that all or any portion of any term loan be made as a LIBOR loan with an interest period of one month, two months, three months or six months with the interest rate being equal to LIBOR plus an applicable margin (175 to 225 basis points). We are required to comply with certain covenants, including limitations on future indebtedness, dividends and investments, and to maintain certain financial ratios pertaining to minimum liquidity, tangible capital base, and debt service coverage (or, alternatively, minimum cash balance).

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

This Form 10-Q contains forward-looking statements that involve risks and uncertainties. Forward-looking statements include information on:

. Our business outlook and future financial performance; . Anticipated profitability, revenues, expenses and capital expenditures; . Future funding and expectations as to any future events; and . Other statements that are not historical fact and are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 that involve risks and uncertainties.

Although we believe that our plans, intentions and expectations reflected in or suggested by such forward-looking statements are reasonable, we can give no assurance that such plans, intentions or expectations will be achieved. When considering such forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Form 10-Q and in other publicly available filings with the SEC, such as our Annual Report on Form 10-K for the year ended December 31, 1998. The risk and other factors noted throughout this Form 10-Q could cause our actual results to differ materially from the results contained in any forward-looking statements.

In Management's Discussion and Analysis, we explain the general financial condition and results of operations for Organogenesis Inc. As you read this MD&A, referring to our consolidated financial statements contained in Item 1 of this Form 10-Q may be helpful. Results of operations may vary significantly from quarter to quarter depending on, among other factors, the progress of our research and development efforts, the receipt of milestone and research and development support payments, if any, from Novartis, product revenues, manufacturing costs, the timing of certain expenses and the establishment of additional collaborative agreements, if any.

Overview of Organogenesis Inc.

Organogenesis designs, develops and manufactures medical therapeutics containing living cells and/or natural connective tissue. The company was formed to advance and apply the emerging field of tissue engineering to major medical needs. Our product development focus includes living tissue replacements, cell- based organ assist devices and other tissue-engineered products.

Our Lead Product, Apligraf(R)

On May 22, 1998, our lead product, Apligraf(R) living skin construct, was approved for marketing in the US for the treatment of venous leg ulcers, a type of chronic wound. Apligraf is the only manufactured product containing living human cells to be approved for marketing through the FDA PMA process. Novartis Pharma AG has global Apligraf marketing rights. Novartis Pharmaceuticals Corporation launched Apligraf in the US in June 1998. Novartis also markets Apligraf in Canada and is beginning the introduction of Apligraf among key physicians in select European countries.

Apligraf(R) is a registered trademark of Novartis.

The next large potential market for Apligraf is expected to be diabetic foot ulcers. The Apligraf pivotal trial in diabetic foot ulcers has been completed. We plan to submit a PMA supplement for diabetic foot ulcers to the FDA within the next three months. An eighteen-patient study of Apligraf in the treatment of epidermolysis bullosa, a genetic skin disease, has been completed under an investigator-sponsored investigational device exemption. The data from this study have been forwarded to the FDA. Data have also been presented and/or published with Apligraf in the treatment of burns, wounds due to dermatologic surgery and donor site wounds. A pivotal trial to assess the effect of Apligraf on the cosmetic outcome of wounds due to skin cancer removal is underway.

Our Pipeline

Our research pipeline includes Vitrix(TM) a living soft tissue replacement product now in initial human clinical study and our bioartificial liver and by-pass graft programs now in animal studies. We market an in-vitro testing product, TestSkin II, and also have GraftPatch(TM) and engineered collagen fibril technology as potential out-licensing opportunities. We have an active and expanding business development program related to our products and technologies.

Results of Operations:

Revenues

Total revenues were $946,000 and $2,564,000 for the three and nine months ended September 30, 1999 compared to $744,000 and $8,389,000, for the same periods in 1998. Research and development support under the collaborative agreement with Novartis was $6,750,000 for the nine months ended September 30, 1998. Product sales to related party, royalties and other income increased to $708,000 and $1,819,000 for the three and nine months ended September 30, 1999, compared to $352,000 and $854,000, for the same periods in 1998 due to increased sales of product to Novartis and Novartis funding of certain programs. We expect Apligraf commercial sales to increase. Interest income was $238,000 and $745,000 for the three and nine months ended September 30, 1999, compared to $392,000 and $785,000 for the same periods in 1998. The three and nine month decrease was primarily due to the difference in funds available for investment.

Costs and Expenses

Research, development and operations expenses: Our R&D and operations expenses were $5,412,000 and $16,073,000 for the three and nine months ended September 30, 1999, compared to $4,913,000 and $12,698,000 for the same periods in 1998. The increase is primarily due to personnel additions in the research, development and clinical groups, as well as personnel additions in manufacturing and quality systems. Activities for this period that account for the increased costs also include expansion of Apligraf operations, the Apligraf diabetic ulcer and cosmetic outcome pivotal trials, the Vitrix(TM) soft tissue replacement preclinical program, and the liver assist device research program. Production costs exceeded product sales due to the start-up costs of new product introduction and the high costs associated with low volume production. We expect production volume to increase and our margins to improve. We expect to continue to expand manufacturing operations and advance the product pipeline during the remainder of 1999 and into 2000.

General and administrative expenses: Our G&A expenses increased to
$1,607,000 and $4,775,000 for the three and nine months ended September 30, 1999, compared to $1,521,000 and $3,933,000 for the same period in 1998. The increase was primarily due to personnel additions and increased professional fees.

Other costs and expenses: Included in costs and expenses for the nine-
months ended September 30, 1999 is a one-time, non-cash charge of $900,000 relating to the purchase of technology. Interest expense was $407,000 and $812,000 for the three and nine months ended September 30, 1999 due to the issuance of convertible debentures in March 1999.

As a result of the net effect described, we incurred a net loss of $6,480,000, or $.21 per share (basic and diluted), and $19,996,000, or $.66 per share (basic and diluted), for the three and nine months ended September 30, 1999, respectively, compared to a net loss of $5,690,000, or $.19 per share (basic and diluted), and $8,242,000, or $.28 per share (basic and diluted), for the comparable 1998 periods. We may incur additional losses as expenditures continue to increase due to continued expansion of operations and research programs.

Capital Resources and Liquidity:
  Funds Used in Operations

  At September 30, 1999, we had cash, cash equivalents and investments in the aggregate amount of $14,010,000 and working capital of $12,081,000, compared to $17,841,000 and $15,541,000, respectively, at December 31, 1998. Cash equivalents consist of money market funds, which are highly liquid and have original maturities of less than three months. Investments consist of securities that have an A or A1 rating or better with a maximum maturity of two years. Cash used in operating activities during the nine months ended September 30, 1999 was $17,909,000, compared to $7,220,000 for the nine months ended September 30, 1998, primarily for financing our ongoing research, development and manufacturing operations.

  Capital Spending

  Capital expenditures were $4,769,000 and $992,000 during the nine months ended September 30, 1999 and 1998, respectively, primarily related to further build-out of the current facilities to support Apligraf manufacturing and the acquisition of laboratory equipment for expanded research and development programs. We have committed approximately $1.2 million to expand our current facility in the areas of Apligraf manufacturing, quality systems labs, and packaging. We also plan to add a second facility in the future to enable further expansion.

Financing

From inception, we have financed our operations substantially through private and public placements of equity securities, as well as receipt of research support and contract revenues, interest income from investments, sale of products and receipt of royalties. During the nine months ended September 30, 1999, financing activities provided additional cash and working capital of $18,847,000 primarily from the sale of five-year convertible debentures and warrants to purchase common stock that generated net proceeds of $19,425,000 and the exercise of stock options of $373,000. Financing activities provided cash of approximately $25,851,000 for the nine months ended September 30, 1998 from: the sale of 200 shares of Series C convertible preferred stock that generated net proceeds of approximately $19,117,000; an equity investment of $6,000,000 from Novartis; and the exercise of stock options of $981,000.

At September 30, 1999, we had approximately 62 shares of Series C convertible preferred stock outstanding. In the event that any Series C preferred stock are outstanding on the mandatory conversion date of March 26, 2000, we have the option of redeeming any such outstanding Series C preferred stock by: (1) paying cash equal to the product of the number of Series C preferred stock outstanding multiplied by the stated value of $100,000 per share; (2) issuing common stock equal to 1.15 of the stated value divided by the average of the closing bid prices for the 20 consecutive trading days prior to the mandatory conversion date; or (3) any combination of these methods.

Subsequent to September 30, 1999, we received notice of grants to support two research projects: (1) $2,000,000 grant under the Advanced Technology Program of the National Institute for Standards and Technology to support development of an effective bioartificial liver prototype for our bioartificial liver device program. We expect this funding to be received over the next two years; and (2) $100,000 grant under the Small Business Innovation Research Program of the National Institutes of Health to support development of our tissue engineered vascular graft. We expect this funding to be received over the next six months.

In addition, we received notice from the Commonwealth of Massachusetts that we were selected to receive a workforce training grant for approximately $162,000 to support employee training. We expect this funding to be received over the next six months.

Liquidity and Other Risk Factors

Based upon our current plans, we believe that existing working capital and future funds from Novartis, including product and royalty revenue, will be sufficient to finance operations into 2000. We will need additional capital within the next year to continue under the current plan. However, this statement is forward-looking and changes may occur that would significantly decrease available cash before such time. Factors that may change our cash requirements include:

. Delays in obtaining regulatory approvals of products in different countries, if needed, and subsequent timing of product launches; . Delays in commercial acceptance and reimbursement when product launches occur; . Changes in the progress of research and development programs; . Changes in the resources devoted to outside research collaborations or projects, self-funded projects, proprietary manufacturing methods and advanced technologies; and . Acquisition of a second manufacturing plant.

Any of these events could adversely impact our capital resources, requiring us to raise additional funds. Management believes that additional funds may be available through equity or debt financing, strategic alliances with corporate partners, capital lease arrangements, or other sources of financing in the future. There can be no assurances that these funds will be available when required on terms acceptable to the Company, if at all. If adequate funds are not available when needed, we would need to delay, scale back or eliminate certain research and development programs or license to third parties certain products or technologies that we would otherwise undertake ourselves, resulting in a potential material adverse effect on our financial condition and results of operations.

Year 2000

The Year 2000 issue ("Y2K") refers to potential problems with computer systems or any equipment with computer chips or software that use dates where the year has been stored as just two digits (e. g., 98 for 1998). On January 1, 2000, any clock or date recording mechanism incorporating date sensitive software which uses two digits to represent the year may recognize a date using 00 as the year 1900 rather than the year 2000. This could result in a system failure or miscalculations causing disruption of operations, including, among other things, a temporary inability to manufacture product or process transactions, send invoices or engage in similar business activities.

To address this situation, we conducted an assessment to identify and determine the Y2K readiness of our systems. This assessment program focused on three main functional areas, including:

. Information technology which addresses data, phone and administrative systems; . Embedded chip technology which addresses manufacturing systems, laboratory instruments and plant maintenance systems with programmable logic controllers with date functions; and . Material suppliers, vendors and other third parties that address areas that are critical to the manufacturing process, distribution of product or other business processes.

The task of assessment from a Y2K readiness perspective is 100% complete and remedial action for noncompliant systems is substantially complete and will be 100% complete before year end. In addition to the assessment of systems, key vendors, suppliers and other third parties were identified and a survey form was sent to each of these business entities to determine if their systems are Y2K compliant. We have received responses from substantially all of our critical vendors, suppliers, and other third parties. Y2K issues with our vendors, suppliers or other third parties could delay the shipment and receipt of critical supplies, potentially impacting production and operations. We proactively addressed the Y2K issue with vendors, suppliers and other third parties to minimize risk from these external factors.

Our Y2K project is substantially complete and the costs associated with the Y2K issue is about $250,000, which includes the use of internal resources. Working capital was used to fund these costs. Costs consisted primarily of payroll costs for existing employees, including the information technology group, which are not separately tracked, as well as certain hardware and software upgrades and training costs. If we or key third parties such as suppliers and customers are not Y2K ready, there could be an adverse effect on our business, results of operations and financial condition. We believe that with the implementation of the Y2K program the risk of significant interruptions of normal operations is reduced. We have developed certain contingency plan to address a situation in which Y2K problems do cause an interruption in normal business activities.

<u>Additional Cautionary Considerations:</u>
We are subject to risks common to entities in the biotechnology industry, including, but not limited to, the following uncertainties:

. Market acceptance of our products, if and when approved, and successful marketing and selling of Apligraf by Novartis; . FDA approval of Apligraf for other indications and successful registrations of Apligraf outside the US; . Risk of failure of clinical trials for future indications of Apligraf and other products; . Compliance with FDA regulations and similar foreign regulatory bodies; . Risk of manufacturing disruptions or production failures; . Manufacture and sale of products in sufficient volume to realize a satisfactory margin; . Continued availability of raw material for products; . Availability of sufficient product liability insurance; . Ability to recover the investment in property and equipment; . Protection of proprietary technology through patents; . Development by competitors of new technologies or products that are more effective than ours; . Adequate third-party reimbursement for products; . Dependence on and retention of key personnel; . Year 2000 issues; and . Availability of additional capital on acceptable terms, if at all.

**PART II - OTHER INFORMATION**

Item 6. Exhibits and Reports on Form 8-K

(a) Exhibits

| | |
|---|---|
| 10(c) | 1991 Employee Stock Purchase Plan, as amended |
| 10(u) | 1995 Stock Option Plan, as amended |
| 27 | Financial Data Schedule (filed with electronic submission only) |

(b) No current reports on Form 8-K were filed during the quarter ended September 30, 1999.

**ORGANOGENESIS INC.**

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Organogenesis Inc.
(Registrant)

Date: November 15, 1999

/S/ Herbert M. Stein

Herbert M. Stein, Chairman
and Chief Executive Officer
(Principal Executive Officer)

Date: November 15, 1999

/S/ Donna Abelli Lopolito

Donna Abelli Lopolito, Vice President
Finance and Administration, Chief
Financial Officer, Treasurer and
Secretary (Principal Financial and
Accounting Officer)

**ORGANOGENESIS INC.**

**EXHIBIT INDEX**

| Exhibit No. | Description of Exhibit |
|---|---|
| 10(c) | 1991 Employee Stock Purchase Plan, as amended |
| 10(u) | 1995 Stock Option Plan, as amended |
| 27 | Financial Data Schedule (filed with electronic submission only) |

Exhibit 10(c)

**ORGANOGENESIS INC.**

**AMENDED AND RESTATED 1991 EMPLOYEE STOCK PURCHASE PLAN**

1.  Purposes.

The Amended and Restated 1991 Employee Stock Purchase Plan of Organogenesis Inc. (the "Plan") is intended to provide a method whereby employees of Organogenesis Inc. and any subsidiary corporation thereof (hereinafter referred to, unless the context otherwise requires, as the "Company"), will have an opportunity to acquire a proprietary interest in the Company through the purchase of shares of common stock of the Company, $.0l par value (the "Common Stock"). It is the intention of the Company to have the Plan qualify as an "employee stock purchase plan" under Section 423 of the Internal Revenue Code of 1986, as amended (the "Code"). The provisions of the Plan shall, accordingly, be construed so as to extend and limit participation in a manner consistent with the requirements of Section 423 of the Code.

2.  Definitions.

(a)  "employee" means any person who is customarily employed for 20 or more hours per week and more than five months in a calendar year by (i) the Company or (ii) any subsidiary corporation.

(b)  "monetary compensation" means regular straight-time earnings, payments for overtime, and sales commissions, all prior to deduction of taxes and other withholding charges, but excludes incentive compensation, bonuses and other special payments.

(c)  "month of service" means a calendar month in which an employee has completed an hour of service.

(d)  "Offering Commencement Date" means the applicable date on which an Offering under the Plan commences pursuant to Paragraph 4.

(e)  "Offering Termination Date" means the applicable date on which an Offering under the Plan terminates pursuant to Paragraph 4.

(f)  "Plan Administrator" means the Treasurer of the Company.

(g)  "subsidiary" means any corporation which (i) would be a "subsidiary corporation" as that term is defined in Section 424 of the Code and (ii) is designated as a participant in the Plan by the Board of Directors or the Committee described in Paragraph 13.

3.  Eligibility.

(a)  Any employee who shall have completed six months of service and shall be employed by the Company or any subsidiary on the date his or her participation in the Plan is to become effective shall be eligible to participate in the Plan.

(b) Any provision of the Plan to the contrary notwithstanding, no employee shall be granted an option to participate in the Plan:

    (i) if, immediately after the grant, such employee would own stock, and/or hold outstanding options to purchase stock, possessing 5% or more of the total combined voting power or value of all classes of stock of the Company or of any subsidiary of the Company (for purposes of this paragraph the rules of Section 424(d) of the Code shall apply in determining stock ownership of any employee); or

    (ii) which permits his or her rights to purchase stock under all employee stock purchase plans of the Company and its subsidiaries to accrue at a rate which exceeds $25,000 of the fair market value of the stock (determined at the time such option is granted) for each calendar year in which such option is outstanding at any time.

4.   Offering Dates.

The Plan will be implemented by twenty-six offerings (referred to herein collectively as "Offerings" and individually as an "Offering") of a maximum of 30,000 shares each (subject to adjustment as provided in Paragraphs 12(a) and 17) of Common Stock, as follows:

(a) Offering I shall commence on January 1, 1992 and terminate on June 30, 1992.

(b) Offering II shall commence on July 1, 1992 and terminate on December 31, 1992.

(c) Offering III shall commence on January 1, 1993 and terminate on June 30, 1993.

(d) Offering IV shall commence on July 1, 1993 and terminate on December 31, 1993.

(e) Offering V shall commence on January 1, 1994 and terminate on June 30, 1994.

(f) Offering VI shall commence on July 1, 1994 and terminate on December 31, 1994.

(g) Offering VII shall commence on January 1, 1995 and terminate on June 30, 1995.

(h) Offering VIII shall commence on July 1, 1995 and terminate on December 31, 1995.

(i) Offering IX shall commence on January 1, 1996 and terminate on June 30, 1996.

(j) Offering X shall commence on July 1, 1996 and terminate on December 31, 1996.

(k) Offering XI shall commence on January 1, 1997 and terminate on June 30, 1997.

(1) Offering XII shall commence on July 1, 1997 and terminate on December 31, 1997.

(m) Offering XIII shall commence on January 1, 1998 and terminate on June 30, 1998.

(n) Offering XIV shall commence on July 1, 1998 and terminate on December 31, 1998.

(o) Offering XV shall commence on January 1, 1999 and terminate on June 30, 1999.

(p) Offering XVI shall commence on July 1, 1999 and terminate on December 31, 1999.

(q) Offering XVII shall commence on January 1, 2000 and terminate on June 30, 2000.

(r) Offering XVIII shall commence on July 1, 2000 and terminate on December 31, 2000.

(s) Offering XVIIII shall commence on January 1, 2001 and terminate on June 30, 2001.

(t) Offering XX shall commence on July 1, 2001 and terminate on December 31, 2001.

(u) Offering XXI shall commence on January 1, 2002 and terminate on June 30, 2002.

(v) Offering XXII shall commence on July 1, 2002 and terminate on December 31, 2002.

(w) Offering XXIII shall commence on January 1, 2003 and terminate on June 30, 2003.

(x) Offering XXIV shall commence on July 1, 2003 and terminate on December 31, 2003.

(y) Offering XXV shall commence on January 1, 2004 and terminate on June 30, 2004.

(z) Offering XXVI shall commence on July 1, 2004 and terminate on December 31, 2004.

Participation in any one or more of the twenty-six Offerings under the Plan shall neither limit, nor require, participation in any other Offering.

5. Participation.

(a) An eligible employee may become a participant in an Offering by completing an authorization for a payroll deduction ("Authorization") on the form provided by the Company and filing it with the office of the Plan Administrator at least 15 days and no more than 30 days prior to the applicable Offering Commencement Date.

(b) Payroll deductions for a participant shall commence on the applicable Offering Commencement Date of the Offering for which such participant's Authorization is filed and shall end on the Offering Termination Date of such Offering, unless sooner terminated pursuant to Paragraph 10.

6. Payroll Deductions.

(a) At the time a participant files his or her Authorization for a payroll deduction, the participant shall elect to have deductions made from his or her compensation on each payday during the time he or she is a participant in an Offering at the rate of 1, 2, 3, 4 or 5% of his or her monetary compensation for each pay period.

(b) All payroll deductions made for a participant shall be credited to his or her account under the Plan. A participant may not make any separate cash payment into such account.

(c) Except as provided in Paragraph 8(b) or 10, a participant may not make any changes to his or her participation during an Offering and, specifically, a participant may not during an Offering alter the amount of his or her payroll deductions for such Offering.

7. Granting of Options.
(a) For each of the Offerings, a participating employee shall be deemed to have been granted an option (the "Option") to purchase, on the applicable Offering Commencement Date, a maximum number of shares of Common Stock equal to an amount determined as follows: 85% of the market value of a share of Common Stock on the applicable Offering Commencement Date shall be divided into an amount equal to (x) that percentage of the employee's monetary compensation which he or she has elected to have withheld (but not in any case in excess of 5%), multiplied by (y) the employee's monetary compensation paid or withheld during such Offering. The market value of Common Stock shall be determined as provided in clauses (i) and (ii) of subparagraph (b) below. An employee's annualized base pay shall be determined as follows: (i) in the case of a full-time employee normally paid on an hourly rate, by multiplying his or her normal hourly rate by 2080, (ii) in the case of a part-time employee normally paid on an hourly rate, by multiplying his or her normal hourly rate by the product of 52 times the number of hours in his or her normal work week, (iii) in the case of an employee normally paid at a bi-weekly rate, by multiplying his or her normal bi-weekly rate by 26, (iv) in the case of an employee normally paid at a weekly rate, by multiplying his or her normal weekly rate by 52; (v) in the case of an employee normally paid at a monthly rate, by multiplying his or her normal monthly rate by 12; and (vi) in the case of an employee normally paid at a semimonthly rate, by multiplying his or her normal semimonthly rate by 24.

(b) The purchase price of a share of Common Stock purchased with payroll deductions made during each Offering (the "Option Exercise Price") shall be the lower of:

(i) 85% of the closing price of the Common Stock on the American Stock Exchange, as published in The Wall Street Journal, on the Offering Commencement Date applicable to such Offering (or on the next regular business date on which shares of Common Stock shall be traded in the event that no shares of Common Stock shall have been traded on the Offering Commencement Date); or

(ii) 85% of the closing price of the Common Stock on the American Stock Exchange, as published in The Wall Street Journal, on the Offering Termination Date applicable to such Offering (or on the next regular business date on which shares of the common stock of the Company shall be traded in the event that no shares of the Common Stock of the Company shall have been traded on the Offering Termination Date).

8. Exercise of Option.
With respect to each Offering during the term of the Plan:

(a) Unless a participant gives written notice of withdrawal to the Company as hereinafter provided, his or her Option will be deemed to have been exercised automatically on the Offering Termination Date applicable to such Offering, for the purchase of the number of full shares of Common Stock which the accumulated payroll deductions in his or her account at that time will purchase at the applicable Option Exercise Price (but not in excess of the number of shares for which options have been granted the employee pursuant to Paragraph 7 (a)), and any excess in his or her account at that time will be returned to him or her.

(b) By written notice to the Plan Administrator at any time prior to the Offering Termination Date applicable to any such Offering, a participant may elect to withdraw all the accumulated payroll deductions in his or her account at such time.

(c) Fractional shares will not be issued under the Plan and any accumulated payroll deductions which would have been used to purchase fractional shares or which are in excess of the limitations of Paragraph 7(a) shall be returned to an employee promptly following the termination of an Offering.

9. Delivery.

As promptly as practicable after the Offering Termination Date of each Offering, the Company will deliver to each participant, as appropriate, the certificate or certificates representing the shares of Common Stock purchased upon the exercise of such participant's Option.

10. Withdrawal.

(a) As provided in Paragraph 8(b), a participant may withdraw payroll deductions credited to his or her account under any Offering at any time prior to the applicable Offering Termination Date by giving written notice of withdrawal to the Plan Administrator of the Company. All of the participant's payroll deductions credited to his or her account will be paid to the participant promptly after receipt of such notice of withdrawal and no further deductions will be made from his or her pay during such Offering. The Company may, at its option, treat an attempt by an employee to borrow on the security of accumulated payroll deductions as an election, under Paragraph 8(b), to withdraw such deductions.

(b) A participant's withdrawal from an Offering will not have any effect upon his or her eligibility to participate in any succeeding Offering or in any similar plan which may hereafter be adopted by the Company.

(c) Upon termination of the participant's employment for any reason, including retirement but excluding death or disability while in the employ of the Company or a subsidiary, the payroll deductions credited to his or her account will be returned to the participant, or, in the case of his or her death subsequent to the termination of employment, to the person or persons entitled thereto under Paragraph 14.

(d) Upon termination of the participant's employment because of disability or death, the participant or his or her beneficiary (as defined in Paragraph 14) shall have the right to elect, by written notice given to the Plan Administrator prior to the expiration of the period of 30 days commencing with the date of the termination of the participant's employment because of disability or death of the participant, either:

(i) to withdraw all of the payroll deductions credited to the participant's account under the Plan; or

(ii) to exercise the participant's option for the purchase of Common Stock on the Offering Termination Date next following the date of the participant's disability or death for the purchase of the number of full shares of Common Stock which the accumulated payroll deductions in the participant's account at the date of the participant's disability or death will purchase at the applicable option price, and any excess in such account will be returned to the participant or said beneficiary.

In the event that no such written notice of election shall be duly received by the office of the Plan Administrator, the participant or beneficiary shall automatically be deemed to have elected to withdraw the payroll deductions credited to the participant's account at the date of the participant's disability or death and the same will be paid promptly to the participant or said beneficiary.

11. Interest.
No interest will be paid or allowed on any money paid into the Plan or credited to the account of any participant employee.

12. Stock.
(a) The maximum number of shares of Common Stock which shall be made available for sale under the Plan is 366,211 shares. As of June 30, 1999, 51,597 shares have been issued pursuant to the Plan, leaving 314,614 shares available for sale in future Offerings. The maximum number of shares available during any Offering under the Plan commencing on or after January 1, 2000 shall be 30,000 shares (subject to further adjustment upon changes in capitalization of the Company as provided in Paragraph 17) plus any shares available but not issued in any prior Offering. If the total number of shares for which Options are exercised on any Offering Termination Date in accordance with Paragraph 8 exceeds 30,000 (plus any shares available but not issued in a prior Offering), the Company shall make a pro rata allocation of the shares available for delivery and distribution in as nearly a uniform manner as shall be practicable and as it shall determine to be equitable, and the balance of payroll deductions credited to the account of each participant under the Plan shall be returned to him or her as promptly as possible. If fewer than 30,000 shares are purchased during an Offering commencing on or after January 1, 2000, the amount not purchased may be carried over to and made available during any subsequent Offering or Offerings. The Company may purchase shares on the open market in order to have shares available for purchase by participants in each Offering.

(b) The participant will have no interest in Common Stock covered by his or her Option until such Option has been exercised.

(c) Common Stock to be delivered to a participant under the Plan will be registered in the name of the participant, or, if the participant so directs, by written notice to the Plan Administrator prior to the Offering Termination Date applicable thereto, in the names of the participant and one such other person as may be designated by the participant, as joint tenants with rights of survivorship, to the extent permitted by applicable law.

(d) The Board of Directors of the Company may, in its discretion, require as conditions to the commencement of any Offering or the exercise of any Option that the shares of Common Stock reserved for issuance in such Offering or upon the exercise of such Option shall have been duly authorized for trading on the American Stock Exchange and that either:

(i) a Registration Statement under the Securities Act of 1933, as amended, with respect to said shares shall be effective; or

(ii) the participant shall have represented in form and substance satisfactory to the Company that it is the participant's intention to purchase such shares for investment.

13. Administration.

The Plan shall be administered by the Compensation Committee appointed by the Board of Directors of the Company (the "Committee"). The officer of the Company charged with day-to-day administration of the Plan shall, for matters involving the Plan, be an ex-officio member of that Committee. The interpretation and construction of any provision of the Plan and the adoption of rules and regulations for administering the Plan shall be made by the Committee, subject, however, at all times to the final jurisdiction which shall rest in the Board of Directors of the Company. Determinations made by the Committee and approved by the Board of Directors with respect to any matter or provision contained in the Plan shall be final, conclusive and binding upon the Company and upon all participants, their heirs or legal representatives. Any rule or regulation adopted by the Committee shall remain in full force and effect unless and until altered, amended, or repealed by the Committee or the Board of Directors of the Company. The Company shall indemnify Committee members, to the fullest extent permitted by applicable statute, for any expenses incurred in defending a civil or criminal action or proceeding, arising out of such member's actions with respect to administration of the Plan, in advance of the final disposition of such action or proceeding, upon receipt of an undertaking by the person indemnified to repay such payment if such member shall be adjudicated not to have acted in good faith in the reasonable belief that such member's action was in the best interest of the Company.

14. Designation of Beneficiary.

A participant may file a written designation of a beneficiary who is to receive any shares of Common Stock and/or cash in the event of the death of the participant prior to the delivery of such shares or cash to the participant. Such designation of beneficiary may be changed by the participant at any time by written notice to the Plan Administrator. Within 30 days after the participant's death, the beneficiary may, as provided in Paragraph 10(d), elect to exercise the participant's Option when it becomes exercisable on the Offering Termination Date of the then current Offering. Upon the death of a participant and upon receipt by the Company of proof of the identity and existence at the participant's death of a beneficiary validly designated by the participant under the Plan, and notice of election of the beneficiary to exercise the Option, the Company shall deliver such stock and/or cash to such beneficiary. In the event of the death of a participant and in the absence of a beneficiary validly designated under the Plan who is living at the time of such participant's death, the Company shall deliver such stock and/or cash to the executor or administrator of the estate of the participant, or if no such executor or administrator has been appointed (to the knowledge of the Company) the Company, in its discretion, may deliver such stock and/or cash to the spouse or to any one or more dependents of the participant as the Company may designate. No beneficiary shall prior to the death of the participant by whom he has been designated acquire any interest in the stock or cash credited to the participant under the Plan.

15. Transferability.

Neither payroll deductions credited to a participant's account nor any rights with regard to the exercise of an Option or to receive stock under the Plan may be assigned, transferred, pledged, or otherwise disposed of in any way by the participant otherwise than by will or the laws of descent and distribution. Any such attempted assignment, transfer, pledge, or other disposition shall be without effect, except that the Company may treat such act as an election to withdraw funds in accordance with Paragraph 8(b).

16. Use of Funds.
All payroll deductions received or held by the Company under this Plan may be used by the Company for any corporate purpose and the Company shall not be obligated to segregate such payroll deductions.

17. Effect of Changes of Common Stock.
In the event of any changes of outstanding shares of the Common Stock by reason of stock dividends, subdivisions, combinations and exchanges of shares, recapitalizations or mergers in which the Company is the surviving corporation, the aggregate number and class of shares available under this Plan and the Option Exercise Price per share shall be appropriately adjusted by the Board of Directors of the Company, whose determination shall be conclusive. Any such adjustments may provide for the elimination of any fractional shares which would otherwise become subject to any Options.

18. Amendment or Termination.
The Board of Directors of the Company may at any time terminate or amend the Plan. Except as hereinafter provided, no such termination can affect Options previously granted, nor may an amendment make any change in any Option theretofore granted which would adversely affect the rights of any participant nor may an amendment be made without the approval of the stockholders of the Company within twelve months of such amendment if such amendment would (a) materially increase the benefits accruing to participants under the Plan, (b) materially increase the number of shares which may be issued under the Plan, or (c) materially modify the requirements as to eligibility for participation under the Plan.

19. Notices.
All notices or other communications by a participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received by the Plan Administrator.

20. Merger or Consolidation.
If the Company shall at any time merge into or consolidate with another corporation and the Company is the surviving entity, the holder of each Option then outstanding will thereafter be entitled to receive at the next Offering Termination Date upon the exercise of such Option for each share as to which such Option shall be exercised the securities or property which a holder of one share of the Common Stock was entitled to upon and at the time of such merger or consolidation, and the Board of Directors of the Company shall take such steps in connection with such merger or consolidation as the Board of Directors shall deem necessary to assure that the provisions of Paragraph 17 shall thereafter be applicable, as nearly as reasonably may be, in relation to the said securities or property as to which such holder of such option might thereafter be entitled to receive thereunder. In the event of a merger or consolidation in which the Company is not the surviving entity, or of a sale of assets in which the Company is not the surviving entity, the Plan shall terminate, and all payroll deductions credited to participants' accounts shall be returned to them;
Provided, however, that the Board of Directors may, in the event of such merger,
consolidation or sale, accelerate the Offering Termination Date of the Offering then in effect and permit participants to purchase shares under the Plan at such accelerated Offering Termination Date.

21. Restrictions on Sale of Shares.

No shares of Common Stock acquired upon the exercise of an Option shall be assignable or transferable either voluntarily or by operation of law, except by will or the laws of descent or distribution, within the first year following such acquisition of shares of Common Stock. Each stock certificate representing shares of Common Stock acquired upon the exercise of Options shall bear a legend setting forth the foregoing stock transfer restriction.

22. Approval of Stockholders.

The Plan has been adopted and amended by the Board of Directors of the Company, but is subject to the approval of the stockholders of the Company within twelve months of the date of adoption of the Plan by the Board of Directors. Notwithstanding any other provision of the Plan, no Option shall be exercised unless and until the stockholders of the Company approve the Plan.

23. Registration and Qualification of the Plan Under Applicable Securities

Laws.

No Option shall be exercised under the Plan until such time as the Company has qualified or registered the shares which are subject to the options under the applicable federal securities laws to the extent required by such laws.

Plan Adopted by the Board of Directors on August 13, 1991.

Plan Approved by the Stockholders on May 19, 1992.

Plan Amended by the Board of Directors on March 9, 1994.

Plan as Amended Approved by the Stockholders on May 17, 1994.

Plan Amended by the Board of Directors on March 19, 1999.

Plan as Amended Approved by the Stockholders on May 14, 1999.

Exhibit 10(u)

**ORGANOGENESIS INC.**

**1995 STOCK OPTION PLAN**

March 15, 1995

1. Purpose.

The purpose of this plan (the "Plan") is to secure for Organogenesis Inc. (the "Company") and its shareholders the benefits arising from capital stock ownership by employees, officers and directors of, and consultants or advisors to, the Company and its parent and subsidiary corporations who are expected to contribute to the Company's future growth and success. Except where the context otherwise requires, the term "Company" shall include the parent and all present and future subsidiaries of the Company as defined in Sections 424(e) and 424(f) of the Internal Revenue Code of 1986, as amended or replaced from time to time (the "Code"). Those provisions of the Plan which make express reference to Section 422 shall apply only to Incentive Stock Options (as that term is defined in the Plan).

2. Type of Options and Administration.

(a) Types of Options. Options granted pursuant to the Plan may be either incentive stock options ("Incentive Stock Options") meeting the requirements of Section 422 of the Code or Non-Statutory Options which are not intended to meet the requirements of Section 422 of the Code ("Non-Statutory Options").

(b) Administration.

(i) The Plan will be administered by the Board of Directors of the Company, whose construction and interpretation of the terms and provisions of the Plan shall be final and conclusive. The Board of Directors may in its sole discretion grant options to purchase shares of the Company's Common Stock ("Common Stock") and issue shares upon exercise of such options as provided in the Plan. The Board shall have authority, subject to the express provisions of the Plan, to construe the respective option agreements and the Plan, to prescribe, amend and rescind rules and regulations relating to the Plan, to determine the terms and provisions of the respective option agreements, which need not be identical, and to make all other determinations which are, in the judgment of the Board of Directors, necessary or desirable for the administration of the Plan. The Board of Directors may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any option agreement in the manner and to the extent it shall deem expedient to carry the Plan into effect and it shall be the sole and final judge of such expediency. No director or person acting pursuant to authority delegated by the Board of Directors shall be liable for any action or determination under the Plan made in good faith.

(ii) The Board of Directors may, to the full extent permitted by or consistent with applicable laws or regulations and Section 3(b) of this Plan delegate any or all of its powers under the Plan to a committee (the "Committee") appointed by the Board of Directors, and if the Committee is so appointed all references to the Board of Directors in the Plan shall mean and relate to such Committee.

(c) Applicability of Rule 16b-3. Those provisions of the Plan which make express reference to Rule 16b-3 promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), or any successor rule ("Rule 16b-3"), or which are required in order for certain option transactions to qualify for exemption under Rule 16b-3, shall apply only to such persons as are required to file reports under Section 16(a) of the Exchange Act (a "Reporting Person").

3. Eligibility.

(a) General. Options may be granted to persons who are, at the time of grant, employees, officers or directors of, or consultants or advisors to, the Company; Provided, that the class of employees to whom Incentive Stock Options may be granted shall be limited to all employees of the Company. A person who has been granted an option may, if he or she is otherwise eligible, be granted additional options if the Board of Directors shall so determine. Subject to adjustment as provided in Section 15 below, the maximum number of shares with respect to which options may be granted to any employee under the Plan shall not exceed 5,000,000 shares of common stock during any one calendar year. For the purpose of calculating such maximum number, (a) an option shall continue to be treated as outstanding notwithstanding its repricing, cancellation or expiration and (b) the repricing of an outstanding option or the issuance of a new option in substitution for a cancelled option shall be deemed to constitute the grant of a new additional option separate from the original grant of the option that is repriced or cancelled.

(b) Grant of Options to Directors and Officers. From and after the registration of the Common Stock of the Company under the Exchange Act, the selection of a director or an officer (as the terms "director" and "officer" are defined for purposes of Rule 16b-3) as a recipient of an option, the timing of the option grant, the exercise price of the option and the number of shares subject to the option shall be determined either (i) by the Board of Directors, of which all members shall be "disinterested persons' (as hereinafter defined), or (ii) by two or more directors having full authority to act in the matter, each of whom shall be a "disinterested person." For the purposes of the Plan, a director shall be deemed to be a "disinterested person" only if such person qualifies as a "disinterested person" within the meaning of Rule 16b-3, as such term is interpreted from time to time.

4. Stock Subject to Plan.

Subject to adjustment as provided in Section 15 below, the maximum number of shares of Common Stock which may be issued and sold under the Plan is 5,000,000 shares. If an option granted under the Plan shall expire or terminate for any reason without having been exercised in full, the unpurchased shares subject to such option shall again be available for subsequent option grants under the Plan. If shares issued upon exercise of an option under the Plan are tendered to the Company in payment of the exercise price of an option granted under the Plan, such tendered shares shall again be available for subsequent option grants under the Plan; provided, that in no event shall such shares be made available for issuance to Reporting Persons or pursuant to exercise of Incentive Stock Options.

5. Forms of Option Agreements.

As a condition to the grant of an option under the Plan, each recipient of an option shall execute an option agreement in such form not inconsistent with the Plan as may be approved by the Board of Directors. Such option agreements may differ among recipients.

6. Purchase Price.

(a) General. Subject to Section 3(b), the purchase price per share of stock deliverable upon the exercise of an option shall not be less than 100% of the fair market value of such stock, as determined by the Board of Directors, at the time of grant of such option, or less than 110% of such fair market value in the case of options described in Section 11(b).

(b) Payment of Purchase Price. Options granted under the Plan may provide for the payment of the exercise price by delivery of cash or a check to the order of the Company in an amount equal to the exercise price of such options, or, to the extent provided in the applicable option agreement, (i) by delivery to the Company of shares of Common Stock of the Company already owned by the optionee having a fair market value equal in amount to the exercise price of the options being exercised or (ii) by any other means (including, without limitation, by delivery of a promissory note of the optionee payable on such terms as are specified by the Board of Directors) which the Board of Directors determines are consistent with the purpose of the Plan and with applicable laws and regulations (including, without limitation, the provisions of Regulation T promulgated by the Federal Reserve Board). The fair market value of any shares of the Company's Common Stock or other non-cash consideration which may be delivered upon exercise of an option shall be determined by the Board of Directors.

7. Option Period.

Each option and all rights thereunder shall expire on such date as shall be set forth in the applicable option agreement, except that, in the case of an Incentive Stock Option, such date shall not be later than ten years after the date on which the option is granted and, in all cases, options shall be subject to earlier termination as provided in the Plan.

8. Exercise of Options.

Each option granted under the Plan shall be exercisable either in full or in installments at such time or times and during such period as shall be set forth in the agreement evidencing such option, subject to the provisions of the Plan.

9. Transferability of Options.

Options shall not be assignable or transferable by the person to whom they are granted, either voluntarily or by operation of law except (i) by will or the laws of descent and distribution, (ii) pursuant to a qualified domestic relations order (as defined by the Code or Title 1 of the Employee Retirement Income Security Act or the rules thereunder) in the case of a Non-Statutory Option, or (iii) as otherwise determined by the Board of Directors and set forth in the applicable option agreement. Except as provided above, during the life of the Optionee, options shall be exercisable only by the Optionee.

10. Effect of Termination of Employment or Other Relationship.

Except as provided in Section 11(d) with respect to Incentive Stock Options, and subject to the provisions of the Plan, the Board of Directors shall determine the period of time during which an optionee may exercise an option following (i) the termination of the optionee's employment or other relationship with the Company or (ii) the death or disability of the optionee. Such periods shall be set forth in the agreement evidencing such option.

11. Incentive Stock Options.

Options granted under the Plan which are intended to be Incentive Stock Options shall be subject to the following additional terms and conditions:

(a) Express Designation. All Incentive Stock Options granted under the Plan shall, at the time of grant, be specifically designated as such in the option agreement covering such Incentive Stock Options.

(b) 10% Shareholder. If any employee to whom an Incentive Stock Option is to be granted under the Plan is, at the time of the grant of such option, the owner of stock possessing more than 10% of the total combined voting power of all classes of stock of the Company (after taking into account the attribution of stock ownership rules of Section 424(d) of the Code), then the following special provisions shall be applicable to the Incentive Stock Option granted to such individual:

(i) The purchase price per share of the Common Stock subject to such Incentive Stock Option shall not be less than 110% of the fair market value of one share of Common Stock at the time of grant; and

(ii) the option exercise period shall not exceed five years from the date of grant.

(c) Dollar Limitation. For so long as the Code shall so provide, options granted to any employee under the Plan (and any other incentive stock option plans of the Company) which are intended to constitute Incentive Stock Options shall not constitute Incentive Stock Options to the extent that such options, in the aggregate, become exercisable for the first time in any one calendar year for shares of Common Stock with an aggregate fair market value (determined as of the respective date or dates of grant) of more than $100,000.

(d) Termination of Employment Death or Disability. No Incentive Stock Option may be exercised unless, at the time of such exercise, the optionee is, and has been continuously since the date of grant of his or her option, employed by the Company, except that:

(i) an Incentive Stock Option may be exercised within the period of three months after the date the optionee ceases to be an employee of the Company (or within such lesser period as may be specified in the applicable option agreement), provided, that the agreement with respect to such option may designate a longer exercise period and that the exercise after such three-month period shall be treated as the exercise of a Non-Statutory Option under the Plan;

(ii) if the optionee dies while in the employ of the Company, or within three months after the optionee ceases to be such an employee, the Incentive Stock Option may be exercised by the person to whom it is transferred by will or the laws of descent and distribution within the period of one year after the date of death (or within such lesser period as may be specified in the applicable option agreement); and

(iii) if the optionee becomes disabled (within the meaning of Section 22(e) (3) of the Code or any successor provision thereto) while in the employ of the Company, the Incentive Stock Option may be exercised within the period of one year after the date the optionee ceases to be such an employee because of such disability (or within such lesser period as may be specified in the applicable option agreement). For all purposes of the Plan and any option granted hereunder, "employment" shall be defined in accordance with the provisions of Section 1.421-7(h) of the Income Tax Regulations (or any successor regulations). Notwithstanding the foregoing provisions, no Incentive Stock Option may be exercised after its expiration date.

12. Additional Provisions.

(a) Additional Option Provisions. The Board of Directors may, in its sole discretion, include additional provisions in option agreements covering options granted under the Plan, including without limitation restrictions on transfer, repurchase rights, commitments to pay cash bonuses, to make, arrange for or guaranty loans or to transfer other property to optionees upon exercise of options, or such other provisions as shall be determined by the Board of Directors; provided that such additional provisions shall not be inconsistent with any other term or condition of the Plan and such additional provisions shall not cause any Incentive Stock Option granted under the Plan to fail to qualify as an Incentive Stock Option within the meaning of Section 422 of the Code.

(b) Acceleration, Extension, Etc. The Board of Directors may, in its sole discretion, (i) accelerate the date or dates on which all or any particular option or options granted under the Plan may be exercised or (ii) extend the dates during which all, or any particular, option or options granted under the Plan may be exercised.

13. General Restrictions.

(a) Investment Representations. The Company may require any person to whom an option is granted, as a condition of exercising such option, to give written assurances in substance and form satisfactory to the Company to the effect that such person is acquiring the Common Stock subject to the option for his or her own account for investment and not with any present intention of selling or otherwise distributing the same, and to such other effects as the Company deems necessary or appropriate in order to comply with federal and applicable state securities laws, or with covenants or representations made by the Company in connection with any public offering of its Common Stock.

(b) Compliance With Securities Laws. Each option shall be subject to the requirement that if, at any time, counsel to the Company shall determine that the listing, registration or qualification of the shares subject to such option upon any securities exchange or under any state or federal law, or the consent or approval of any governmental or regulatory body, or that the disclosure of non-public information or the satisfaction of any other condition is necessary as a condition of, or in connection with, the issuance or purchase of shares thereunder, such option may not be exercised, in whole or in part, unless such listing, registration, qualification, consent or approval, or satisfaction of such condition shall have been effected or obtained on conditions acceptable to the Board of Directors. Nothing herein shall be deemed to require the Company to apply for or to obtain such listing, registration or qualification, or to satisfy such condition.

14. Rights as a Shareholder.

The holder of an option shall have no rights as a shareholder with respect to any shares covered by the option (including, without limitation, any rights to receive dividends or non-cash distributions with respect to such shares) until the date of issue of a stock certificate to him or her for such shares. No adjustment shall be made for dividends or other rights for which the record date is prior to the date such stock certificate is issued.

15. Adjustment Provisions for Recapitalizations and Related Transactions.

(a) General. If, through or as a result of any merger, consolidation, sale of all or substantially all of the assets of the Company, reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split or other similar transaction, (i) the outstanding shares of Common Stock are increased, decreased or exchanged for a different number or kind of shares or other securities of the Company, or (ii) additional shares or new or different shares or other securities of the Company or other non-cash assets are distributed with respect to such shares of Common Stock or other securities, an appropriate and proportionate adjustment may be made in (x) the maximum number and kind of shares reserved for issuance under the Plan, (y) the number and kind of shares or other securities subject to any then outstanding options under the Plan, and (z) the price for each share subject to any then outstanding options under the Plan, without changing the aggregate purchase price as to which such options remain exercisable. Notwithstanding the foregoing, no adjustment shall be made pursuant to this Section 15 if such adjustment would cause the Plan to fail to comply with Section 422 of the Code.

(b) Board Authority to Make Adjustments. Any adjustments under this Section 15 will be made by the Board of Directors, whose determination as to what adjustments, if any, will be made and the extent thereof will be final, binding and conclusive. No fractional shares will be issued under the Plan on account of any such adjustments.

16.  Merger, Consolidation, Asset Sale, Liquidation, etc.

(a)  General. Except as set forth in subparagraph (b) below, in the event of a
consolidation, merger or other reorganization in which all of the outstanding shares of Common Stock are exchanged for securities, cash or other property of any other corporation or business entity (an "Acquisition") or in the event of a liquidation of the Company, the Board of Directors of the Company, or the board of directors of any corporation assuming the obligations of the Company, may, in its discretion, take any one or more of the following actions as to outstanding Awards: (i) provide that such Awards shall be assumed, or substantially equivalent Awards shall be substituted, by the acquiring or succeeding corporation (or an affiliate thereof) on such terms as the Board determines to be appropriate, (ii) upon written notice to Participants, provide that all unexercised Options or Stock Appreciation Rights will terminate immediately prior to the consummation of such transaction unless exercised by the Participant within a specified period following the date of such notice, (iii) in the event of an Acquisition under the terms of which holders of the Common Stock of the Company will receive upon consummation thereof a cash payment for each share surrendered in the Acquisition (the "Acquisition Price"), make or provide for a cash payment to Participants equal to the difference between (A) the Acquisition Price times the number of shares of Common Stock subject to outstanding Options or Stock Appreciation Rights (to the extent then exercisable at prices not in excess of the Acquisition Price) and (B) the aggregate exercise price of all such outstanding Options or Stock Appreciation Rights in exchange for the termination of such Options and Stock Appreciation Rights, and (iv) provide that all or any outstanding Awards shall become exercisable or realizable in full prior to the effective date of such Acquisition.

(b)  Notwithstanding any other provision to the contrary in this Plan, in the event of a Change of Control (as defined below), all Awards outstanding as of the date such Change in Control occurs shall become exercisable in full, whether or not exercisable in accordance with their terms. A "Change in Control" shall occur or be deemed to have occurred only if any of the following events occur: (i) any "person, " as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") (other than the Company, any trustee or other fiduciary holding securities under an employee benefit plan of the Company, or any corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportion as their ownership of stock of the Company) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 30% or more of the combined voting power of the Company's then outstanding securities; (ii) individuals who, as of the date this Plan is adopted, constitute the Board of Directors of the Company (as of the date thereof, the "Incumbent Board") cease for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to the date thereof whose election, or nomination for election by the company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the directors of the Company, as such terms are used in Rule 14a-ll of Regulation 14A under the Exchange Act) shall be, for purposes of this Agreement, considered as though such person were a member of the Incumbent Board; (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than (A) a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 30% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation or (B) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no "person" (as hereinabove defined) acquires more than 30% of the combined voting power of the Company's then outstanding securities; or (iv) the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets.

17.  No Special Employment Rights.
Nothing contained in the Plan or in any option shall confer upon any optionee any right with respect to the continuation of his or her employment by the Company or interfere in any way with the right of the Company at any time to terminate such employment or to increase or decrease the compensation of the optionee.

18. Other Employee Benefits.
Except as to plans which by their terms include such amounts as compensation, the amount of any compensation deemed to be received by an employee as a result of the exercise of an option or the sale of shares received upon such exercise will not constitute compensation with respect to which any other employee benefits of such employee are determined, including, without limitation, benefits under any bonus, pension, profit-sharing, life insurance or salary continuation plan, except as otherwise specifically determined by the Board of Directors.

19. Amendment of the Plan.
(a) The Board of Directors may at any time, and from time to time, modify or amend the Plan in any respect, except that if at any time the approval of the shareholders of the Company is required under Section 422 of the Code or any successor provision with respect to Incentive Stock Options, or under Rule 16b- 3, the Board of Directors may not effect such modification or amendment without such approval.

(b) Any modification or amendment of the Plan shall not, without the consent of an Optionee, adversely affect his or her rights under an option previously granted to him or her. With the consent of the Optionee affected, the Board of Directors may amend outstanding option agreements in a manner which may be adverse to the Optionee but which is not inconsistent with the plan. The Board of Directors shall have the right to amend or modify (i) the terms and provisions of the Plan and of any outstanding Incentive Stock Options granted under the Plan to the extent necessary to qualify any or all such options for such favorable federal income tax treatment (including deferral of taxation upon exercise) as may be afforded incentive stock options under Section 422 of the Code and (ii) the terms and provisions of the Plan and of any outstanding option to the extent necessary to ensure the qualification of the Plan under Rule 16b-3.

20. Withholding.
(a) The Company shall have the right to deduct from payments of any kind otherwise due to the optionee any federal, state or local taxes of any kind required by law to be withheld with respect to any shares issued upon exercise of options under the Plan. Subject to the prior approval of the Company, which may be withheld by the Company in its sole discretion, the optionee may elect to satisfy such obligations, in whole or in part, (i) by causing the Company to withhold shares of Common Stock otherwise issuable pursuant to the exercise of an option or (ii) by delivering to the Company shares of Common Stock already owned by the optionee. The shares so delivered or withheld shall have a fair market value equal to such withholding obligation. The fair market value of the shares used to satisfy such withholding obligation shall be determined by the Company as of the date that the amount of tax to be withheld is to be determined. An optionee who has made an election pursuant to this Section 20(a) may only satisfy his or her withholding obligation with shares of Common Stock which are not subject to any repurchase, forfeiture, unfulfilled vesting or other similar requirements.

(b) Notwithstanding the foregoing, in the case of a Reporting Person, no election to use shares for the payment of withholding taxes shall be effective unless made in compliance with any applicable requirements of Rule 16b-3 (unless it is intended that the transaction not qualify for exemption under Rule 16b-3).

21. Cancellation and New Grant of Options, Etc.
The Board of Directors shall have the authority to effect, at any time and from time to time, with the consent of the affected optionees, (i) the cancellation of any or all outstanding options under the Plan and the grant in substitution therefor of new options under the Plan covering the same or different numbers of shares of Common Stock and having an option exercise price per share which may be lower or higher than the exercise price per share of the cancelled options or (ii) the amendment of the terms of any and all outstanding options under the Plan to provide an option exercise price per share which is higher or lower than the then-current exercise price per share of such outstanding options.

22. Effective Date and Duration of the Plan.

(a) Effective Date. The Plan shall become effective when adopted by the Board of Directors, but no option granted under the Plan shall become exercisable unless and until the Plan shall have been approved by the Company's shareholders. If such shareholder approval is not obtained within twelve months after the date of the Board's adoption of the Plan, options previously granted under the Plan shall not vest and shall terminate and no options shall be granted thereafter. Amendments to the Plan not requiring shareholder approval shall become effective when adopted by the Board of Directors; amendments requiring shareholder approval (as provided in Section 19) shall become effective when adopted by the Board of Directors, but no option granted after the date of such amendment shall become exercisable (to the extent that such amendment to the Plan was required to enable the Company to grant such option to a particular person) unless and until such amendment shall have been approved by the Company's shareholders. If such shareholder approval is not obtained within twelve months of the Board's adoption of such amendment, any options granted on or after the date of such amendment shall terminate to the extent that such amendment was required to enable the Company to grant such option to a particular optionee. Subject to this limitation, options may be granted under the Plan at any time after the effective date and before the date fixed for termination of the Plan.

(b) Termination. Unless sooner terminated in accordance with Section 16, the Plan shall terminate upon the close of business on the day next preceding the tenth anniversary of the date of its adoption by the Board of Directors. Options outstanding on such date shall continue to have force and effect in accordance with the provisions of the instruments evidencing such options.

23. Provision for Foreign Participants.

The Board of Directors may, without amending the Plan, modify awards or options granted to participants who are foreign nationals or employed outside the United States to recognize differences in laws, rules, regulations or customs of such foreign jurisdictions with respect to tax, securities, currency, employee benefit or other matters.

Plan Adopted by the Board of Directors on March 15, 1995.

Plan Amended by the Board of Directors on March 19, 1999.

Plan as Amended Approved by the Stockholders on May 14, 1999.

<ARTICLE> 5
<LEGEND>
**THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM FORM 10Q AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH FINANCIAL STATEMENTS.**
</LEGEND>
<MULTIPLIER> 1,000

| | | |
|---|---|---|
| <PERIOD-TYPE> | 9-MOS | |
| <FISCAL-YEAR-END> | | DEC-31-1999 |
| <PERIOD-START> | | JAN-01-1999 |
| <PERIOD-END> | | SEP-30-1999 |
| <CASH> | | 755 |
| <SECURITIES> | | 13,255 |
| <RECEIVABLES> | | 0 |
| <ALLOWANCES> | | 0 |
| <INVENTORY> | | 795 |
| <CURRENT-ASSETS> | | 15,658 |
| <PP&E> | | 21,813 |
| <DEPRECIATION> | | 10,650 |
| <TOTAL-ASSETS> | | 27,445 |
| <CURRENT-LIABILITIES> | | 3,577 |
| <BONDS> | | 0 |
| <PREFERRED-MANDATORY> | | 0 |
| <PREFERRED> | | 0 |
| <COMMON> | | 306 |
| <OTHER-SE> | | 5,699 |
| <TOTAL-LIABILITY-AND-EQUITY> | | 27,445 |
| <SALES> | | 0 |
| <TOTAL-REVENUES> | | 2,564 |
| <CGS> | | 0 |
| <TOTAL-COSTS> | | 0 |
| <OTHER-EXPENSES> | | 22,560 |
| <LOSS-PROVISION> | | 0 |
| <INTEREST-EXPENSE> | | 0 |
| <INCOME-PRETAX> | | (19,996) |
| <INCOME-TAX> | | 0 |
| <INCOME-CONTINUING> | | 0 |
| <DISCONTINUED> | | 0 |
| <EXTRAORDINARY> | | 0 |
| <CHANGES> | | 0 |
| <NET-INCOME> | | (19,996) |
| <EPS-BASIC> | | (.66) |
| <EPS-DILUTED> | | (.66) |