UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re Organogenesis Sec. Litig. | No. 04-10027-JLT |

## MEMORANDUM OF DEFENDANTS ALAN ADES, JOHN ARCARI, ALBERT ERANI, PHILIP LAUGHLIN, DONNA LOPOLITO, MICHAEL SABOLINSKI, AND ALAN TUCK IN SUPPORT OF THEIR MOTION TO DISMISS THE CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Jeffrey B. Rudman (BBO #433380)
Jonathan A. Shapiro (BBO #567838)
Daniel H. Gold (BBO #654909)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000

January 14, 2005

## CONTENTS

I.      PLAINTIFFS FAIL TO DIFFERENTIATE BETWEEN DEFENDANTS ........................7

II.     ORGANOGENESIS FULLY DISCLOSED THAT IT HAD ALWAYS LOST
        MONEY AND ITS FUTURE WAS "HIGHLY UNCERTAIN."....................................10

        A.      Organogenesis Fully Disclosed Chronic Losses and its Need for
                Financing. ........................................................................................................10

        B.      Organogenesis' Statements Regarding Its Liquidity Were Accurate. ...................13

        C.      Plaintiffs Cannot State A Claim Based On The "Novartis Put Option." ...............14

III.    THE STATEMENTS ABOUT PAST AND PRESENT BUSINESS
        PERFORMANCE ARE NOT ACTIONABLE. ...............................................................17

        A.      Plaintiffs Cannot Litigate Accurate Financial Reports. .........................................17

        B.      Defendants Did Not Misrepresent The Apligraf Business. ....................................19

                1.      Apligraf Was In Fact Successful. ............................................................19

                2.      Defendants Never Misrepresented the Novartis Marketing
                        Relationship ..............................................................................................21

                3.      Defendants Never Misrepresented The Ability To Manufacture
                        Apligraf......................................................................................................25

IV.     DEFENDANTS HAD NO DUTY TO – AND DID NOT – PREDICT THE
        FUTURE. ........................................................................................................................27

        A.      Defendants Did Not Violate Any Duty To Disclose. ............................................27

        B.      Plaintiffs Have Not Alleged An Actionable Projection..........................................28

        C.      In The Alternative, The Forward-Looking Statements Are Protected By
                The Safe Harbor.....................................................................................................30

V.      ORGANOGENESIS' ALLEGED "LACK OF LEADERSHIP" WASN'T
        FRAUD............................................................................................................................31

VI.     PLAINTIFFS DO NOT STATE A CLAIM BASED ON THE "CONFIDENTIAL
        ARCARI DOCUMENT."................................................................................................32

VII.    PLAINTIFFS FAIL TO PLEAD SCIENTER. ................................................................33

        A.      Plaintiffs Have Failed to Allege Conscious Wrongdoing.......................................33

        B.      Plaintiffs Plead No Cognizable "Motive" For Fraud.............................................35

VIII.   PLAINTIFFS FAIL TO STATE A CLAIM FOR "CONTROL PERSON"
        LIABILITY...........................................................................................................................38

# TABLE OF AUTHORITIES

## Federal Cases

Aldridge v. A.T. Cross Corp.,
   284 F.3d 72 (1st Cir. 2002).........................................................................33, 37, 38

Baron v. Smith,
   380 F.3d 49 (1st Cir. 2004).................................................................................16, 29

Basic Inc. v. Levison,
   485 U.S. 224 (1988)..................................................................................................26

Berger v. Beletic,
   248 F. Supp. 2d 597 (N.D. Tex. 2003) ....................................................................31

In re Boston Tech. Inc. Sec. Lit.,
   8 F. Supp. 2d 43 (D. Mass. 1998)...................................................................... passim

Brogren v. Pohlad, 933 F. Supp. 793 (D. Minn. 1995) ................................................12

In re Cabletron Sys.,
   311 F.3d 11 (1st Cir. 2002)........................................................................................7

Carney v. Cambridge Tech. Partners,
   135 F. Supp. 2d 235 (D. Mass. 2001).................................................8, 13, 33, 35

In re Ciena Corp. Sec. Litig.,
   99 F. Supp. 2d 650 (D. Md. 2000)..........................................................................35

City of Monroe Employees Retirement Sys. v. Bridgestone Corp.,
   387 F.3d 468 (6th Cir. 2004) ....................................................................................8

Colby v. Hologic, Inc.,
   817 F. Supp. 204 (D. Mass. 1993)..........................................................................28

Communications Inc. Sec. Litig.,
   127 F. Supp. 2d 734 (D. Mass. 2001)....................................................................37

In re Copley Pharm., Inc.,
   Civ. A. No. 94-11897, 1995 WL 169215 (D. Mass. Mar. 16, 1995)...................23, 24

Craftmatic Sec. Litig. v. Kraftsow,
   890 F.2d 628 (3d Cir. 1990) ....................................................................................31

Data Probe Acquisition Corp. v. Datatab, Inc.,
   722 F.2d 1 (2d Cir. 1983) ........................................................................................12

- iii -

Decker v. Massey-Ferguson, Ltd.,
    681 F.2d 111 (2d Cir. 1982) ....................................................................................24

In re Duke Energy Corp. Sec. Litig.,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003) ......................................................................18

Fitzer v. Security Dynamics Techs.,
    119 F. Supp. 2d 12 (D. Mass. 2000)..................................................................passim

In re Galileo Corp. S'holders Litig.,
    127 F. Supp. 2d 251 (D. Mass. 2001)..................................................................28, 34

Gavish v. Revlon,
    No. 00 Civ. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)..................23

Glickman v. Alexander & Alexander Svcs.,
    No. 93 Civ. 7594 (LAP), 1996 WL 88570 (S.D.N.Y.  Feb. 29, 1996)......................36

Greebel v. FTP Software,
    194 F.3d 185 (1st Cir. 1999)..............................................................................passim

Griffin v. PaineWebber Inc.,
    84 F. Supp. 2d 508 (S.D.N.Y. 2000) ........................................................................38

Gross v. Summa Four, Inc.,
    93 F.3d 987 (1st Cir. 1996)..........................................................................6, 26, 27

Hillson Partners Ltd. Partnership v. Adage, Inc.,
    42 F.3d 204 (4th Cir. 1994) ........................................................................16, 18, 28

Karacand v. Edwards,
    53 F. Supp. 2d 1236 (D. Utah 1999).........................................................................33

Lirette v. Shiva Corp.,
    27 F. Supp. 2d 268 (D. Mass. 1998)..............................................................9, 15, 34

Loan v. FDIC,
    717 F. Supp. 964 (D. Mass. 1989).......................................................................7, 25

Maldonado v. Dominguez,
    137 F.3d 1 (1st Cir. 1998)..........................................................................................34

Marra v. Tel-Save Holdings,
    No. 98-3145, 1999 WL 317103 (E.D. Pa. May 18, 1999)...........................................9

McNamara v. Bre-X Minerals, Ltd.,
    57 F. Supp. 2d 396 (E.D. Tex. 1999).........................................................................36

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000) ................................................................................36

In re Numerex Corp. Sec. Litig.,
    913 F. Supp. 391 (E.D. Pa. 1996)........................................................................13

Orton v. Parametric Tech. Corp.,
    344 F. Supp. 2d 290 (D. Mass. 2004).............................................................. passim

In re Parametric Technology Corp. Sec. Litig.,
    300 F. Supp. 2d 206 (D. Mass. 2001)..................................................................18

Parnes v. Gateway
    2000, Inc., 122 F.3d 539 (8th Cir. 1997) ...........................................................18

In re PEC Solutions Sec. Litig.,
    No 03-Civ-331, 2004 WL 1854202 (E.D.Va. May 25, 2004)..................................16

In re Peritus Software Servs., Inc. Sec. Litig.,
    52 F. Supp. 2d 211 (D. Mass. 1999).....................................................................22

Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.,
    940 F. Supp. 1101 (W.D. Mich. 1996) .................................................................38

Romani v. Shearson Lehman Hutton,
    929 F.2d 875 (1st Cir. 1991)................................................................................24

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)............................................................14

In re S1 Corp. Sec. Litig.,
    173 F. Supp. 2d 1334 (N.D. Ga. 2001).................................................................20

San Leandro Emergency Med. Grp. v. Philip Morris Co.,
    75 F.3d 801 (2d Cir. 1996) .................................................................................28

In re Seachange Int'l, Inc. Sec. Litig.,
    No. Civ.A. 02-12116-DPW, 2004 WL 240317 (D. Mass. Feb. 6, 2004) ...................30

In re Segue Software, Inc. Sec. Litig.,
    106 F. Supp. 2d 161 (D. Mass. 2000)...................................................................16

Serabian v. Amoskeag Bank Shares, Inc.,
    24 F.3d 357 (1st Cir. 1994)...............................................................................8, 24

Sheinkopf v. Stone,
    927 F.2d 1259 (1st Cir. 1991)..............................................................................38

Simon v. Am. Power Conversion Corp.,
    945 F. Supp. 416 (D.R.I. 1996) ...........................................................................18

Southland Securities Corp. v. Inspire Insur. Solutions,
   365 F.3d 353 (5th Cir. 2004) ............................................................................7, 8, 18

In re Splash Tech. Holdings, Inc. Sec. Litig.,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001).................................................................18

In re Splash Tech. Holdings, Inc. Secs. Litig.,
   No. 99-109, 2000 WL 1727405 (N.D. Cal. Sept. 29, 2000)......................................7

In re Stone & Webster, Inc., Sec. Litig.,
   253 F. Supp. 2d 102 (D. Mass. 2003)..............................................................12, 13

Suna v. Bailey Corp.,
   107 F.3d 64 (1st Cir. 1997).............................................................................27, 37

Tuchman v. DSC Communications Corp.,
   14 F.3d 1061 (5th Cir. 1994) ................................................................................26

In re U.S. Interactive, Inc.,
   No. 01-CV-522, 2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) ................................30

In re Ultrafem Inc. Sec. Litig.,
   91 F. Supp. 2d 678 (S.D.N.Y. 2000) .....................................................................14

Van Ormer v. Aspen Tech., Inc.,
   145 F.Supp.2d 101 (D. Mass. 2000)......................................................................18

In re Vantive Corp. Sec. Lit.,
   283 F.3d 1079 (9th Cir. 2002) ..............................................................................31

Watterson v. Page,
   987 F.2d 1 (1st Cir.1993).........................................................................................4

Wells v. Monarch Capital Corp.,
   No. 91-10575-MA, 1991 WL 354938 (D. Mass. Aug. 23, 1991) ............................38

Wenger v. Lumisys, Inc.,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998).....................................................................22

Winer Family Trust v. Queen,
   No. Civ.A. 03-4318, 2004 WL 2203709 (E.D. Pa. Sept. 27, 2004) .........................13

In re Worlds of Wonder Sec. Litig.,
   35 F.3d 1407 (9th Cir. 1994) ................................................................................13

Zouras v. Hallman,
   No. Civ. 03-240-SM, 2004 WL 2191034 (D. N.H. Sept. 30, 2004).........................27

## Federal Statutes

15 U.S.C. § 78u-4(b)(1) ................................................................................................................6

15 U.S.C. § 78u-4(b)(2) .......................................................................................................6, 7, 32

15 U.S.C. §§ 77z-2(i)(1) ...............................................................................................................29

15 U.S.C. §§ 78j(b) .........................................................................................................................6

## Federal Rules

Federal Rules of Civil Procedure 9(b) ............................................................................................1

## Federal Regulations

17 C.F.R. § 240.10b-5 .....................................................................................................................6

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA" or "Reform Act"), defendants Alan Ades, John J. Arcari, Albert Erani, Donna Abelli Lopolito, Philip Laughlin, Michael Sabolinski and Alan Tuck submit this memorandum in support of their Motion to Dismiss plaintiffs' Corrected Consolidated Amended Class Action Complaint ("Complaint" or "Compl."), which asserts securities fraud claims against them under Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder and for "control person" liability under Section 20(a) of the Exchange Act.

### *Introduction*

Plaintiffs filed this lawsuit to recover losses from investments made in Organogenesis, Inc. ("Organogenesis" or the "Company") from November 15, 1999, through February 7, 2002 ("Class Period"). They allege that Organogenesis inflated its stock price by concealing its "true financial and operational condition" in 39 public filings, press releases and published interviews ("Challenged Statements"), and that it was not until January 2002 that the Company first revealed that it was "running out of money." See Compl. ¶¶ 148-149. That theory collapses under the weight of the Complaint, which fails to state a securities fraud claim for several reasons.

First, plaintiffs impermissibly "presume" that all eight individual defendants are liable for all 39 Challenged Statements, which ignores their obligation under the Reform Act, Rule 9(b) and First Circuit precedent to plead *each* defendant's role in those statements. As a result, the individual defendants are now forced to defend fraud claims based on statements that they are not alleged to have made or even read. Worse still, plaintiffs have sued individuals for statements they could not possibly have made – such as Alan Ades, who the Complaint admits did not join Organogenesis until *months after* the Class Period and thus was not even at the Company when the Challenged Statements were made.

- 1 -

Second, the theory that anyone concealed Organogenesis' "dismal and ever-deteriorating" finances is demonstrably false according to the documents incorporated into the Complaint. In its filings with the U.S. Securities and Exchange Commission ("SEC"), Organogenesis was explicit that since its founding in 1985 it had *never* been profitable and, in fact, reported increasing losses during the Class Period, totaling over $58 million in 2000 and 2001 alone. See *infra* § II.A. Nor can plaintiffs litigate their supposed misimpression that Organogenesis would be profitable in the "near-term" because, to the contrary, the Company said it was "highly uncertain" when it could turn a profit and warned that without additional financing it may need to cease operations. Simply put, although plaintiffs repeatedly complain that Organogenesis' financial condition was "misrepresented," they *do not identify a single accounting error* in any of the ten quarterly and annual reports issued during the Class Period.

Third, plaintiffs do no better by challenging Organogenesis' reports of increasing sales of its leading product Apligraf, which is the "first and only" living skin therapy ever approved by the U.S. Food and Drug Administration. Plaintiffs do not deny that Apligraf *sales increased nearly 400%* during the Class Period, and thus defendants had every reason to say they were "pleased," "delighted" and "optimistic" that the sales trend would continue (which it did throughout the Class Period). These claims fail for the additional reason that such loosely optimistic statements are the immaterial "corporate puffery" that is inactionable under well-settled First Circuit law.

Fourth, First Circuit courts routinely reject plaintiffs' attempt to manufacture a fraud claim by alleging mismanagement, such as by criticizing Organogenesis for a "lack of leadership" and complaining that it negotiated a "disadvantageous" deal with Novartis. Here the management theory is particularly deficient because it is not alleged with Reform Act and Rule

9(b) particularity. Plaintiffs repeatedly assert, for example, that there was "no way" Organogenesis could "mass-produce" Apligraf and that Novartis had "no idea" how to market it, but never plead specific facts to support those conclusions, much less allege that the business was impaired in any material amount. These bald assertions of incompetent manufacturing and marketing are contradicted their allegations that Apligraf production increased to 40,000 units/year (which is mass-production for the "first and only" living skin therapy) and sales nearly quadrupled during the Class Period.

Finally, the Complaint must be dismissed because plaintiffs have not alleged that each (or any) defendant acted with an intent to deceive, or scienter. Plaintiffs have not alleged "classic" scienter, which requires a particularized pleading that each defendant knew that a Challenged Statement was false or misleading at the time he or she made it. Instead of pleading the "strong inference" of scienter required by the Reform Act, Rule 9(b) and the First Circuit, plaintiffs take the long discredited must-have-known approach by, for example, contending the "whole company" knew statements were false, without ever attempting to specify what information was known, when, by whom, and how it was communicated.

Ultimately, the Complaint degenerates into name-calling and invented allegations of insider trading. They contend that all "defendants" were motivated by "corporate greed" and fraudulently inflated the stock price to "get back" their investment, even though *six of the eight individuals are not alleged to have sold a single share* during the 26-month Class Period. In reality, the great majority of "trading" alleged in the Complaint were stock sales by the Company, which courts have ruled does not support a fraud claim against an individual defendant who did not sell. Instead, defendants held their positions in Organogenesis and thereby lost millions of dollars (which evidences good faith, not "greed").

- 3 -

Accordingly, the Complaint should be dismissed with prejudice.

### Allegations of the Complaint

Organogenesis was founded in 1985 as a tissue engineering company that researched and developed Apligraf, "a unique skin replacement therapy" for skin wounds. See Compl. ¶¶ 2, 46, 54. Apligraf is the "first and only" product containing living human cells to be approved by the U.S. Food and Drug Administration ("FDA"), and has been recognized as a "revolutionary" product and a "major medical breakthrough." Compl. ¶¶ 22, 49.

In 1996, Organogenesis entered into a License and Supply Agreement with Sandoz Pharma Ltd. (which later was acquired by Novartis Pharma AG.) whereby Novartis received an exclusive license to sell Apligraf and assumed responsibility to market and distribute the product, with the companies sharing the revenue from those sales. The original Agreement with Novartis was filed with the SEC in 1996, with subsequent amendments also filed. See App. Tabs 4, 51.[1]

Apligraf sales increased by almost 400% -- from 1,817 to 7,102 units/quarter -- during the Class Period (November 15, 1999 – February 7, 2002). Press Release, Dec. 2, 1999, App. Tab 3, p. 22; Press Release, April 3, 2002, App. Tab 43, p. 413. During this period, Apligraf obtained approval by the FDA for treatment of diabetic foot ulcers (which lead to amputations and a high mortality rate) and for Medicare reimbursement. Compl. ¶¶ 93, 97, 137; App. Tab 12, p.147.

The cost of bringing Apligraf to market was exceptionally high, and Organogenesis consistently lost money from the day it was founded. See Compl. ¶ 148. Unlike traditional

---

[1]    For the purposes of this Motion only, defendants recite the factual allegations as set forth in the Complaint and the documents that plaintiffs have elected to incorporate into their Complaint, such as press releases and public filings. See Fed. R. Civ. P. 12(b)(6); Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir.1993) (documents referred to in complaint treated "as part of the pleadings" for purposes of motion to dismiss). In so doing, Defendants admit neither the veracity of plaintiffs' allegations, nor their relevance, and dispute that those allegations have been alleged with the particularity required by the Reform Act and Rule 9(b). The documents cited herein are assembled in defendants' Appendix ("App.").

treatments (such as oral medicine), the process of growing human skin requires "very specialized manufacturing procedures and techniques." Compl. ¶ 47. Indeed, Organogenesis' net losses increased throughout the Class Period as it ramped up production to meet ever-increasing demand. All told, Organogenesis told investors that Apligraf was not profitable, and during the Class Period the Company reported losses of nearly $80 million. Compl. ¶ 148 ("We incurred net losses of $28,350,000 for the year ended December 31, 1999, $28,605,000 for the year ended December 31, 2000 and $22,561,000 for the nine months ended September 30, 2001.") Although Organogenesis had reason for optimism that Apligraf sales would continue to increase to the point where the product (and therefore the Company) could be profitable, it warned in *every* annual report that it was "highly uncertain" of when it would be profitable.

Organogenesis also warned that, as a highly unprofitable business, it depended on financing and stock sales to fund operations, and during the Class Period announced nearly $50 million in financing. See infra § II.C. In every public filing it also disclosed that without additional funding it would need to cease operations.

On January 30, 2002, the Company announced, as it had in the past, that it was running out of money and would cease operations if it could not obtain new financing. Compl. ¶ 148. This eventually proved to be the case, and Organogenesis filed for bankruptcy protection on September 25, 2002. Compl. ¶ 161.

Plaintiffs contend that they learned the truth about Organogenesis' fragile financial condition in January 2002 (although according to the documents cited in the Complaint, it actually was disclosed years earlier), but they never sought to sue Organogenesis before it filed for bankruptcy in late September 2002. Nor did plaintiffs sue during the protracted proceedings before Judge Hillman. Instead, plaintiffs waited years to do so, and did not claim that

Organogenesis' fully-disclosed business failure was a "fraud" until they filed their original Complaint in 2004. In the Complaint, plaintiffs contend that 8 individual defendants (and to a lesser extent, an outside auditor) are liable for 39 Challenged Statements that allegedly concealed that Organogenesis was "running out of money." The claims fail as a matter of law because Organogenesis "uncertain" financial condition was fully disclosed, and for several other reasons as well.

### Argument

To state a claim under Sections 10(b) or 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), or Rule 10b-5, 17 C.F.R. § 240.10b-5, plaintiffs must allege that defendants (1) made a false or misleading statement of material fact; (2) with <u>scienter</u> (fraudulent intent); (3) upon which plaintiffs justifiably relied; and that (4) proximately caused plaintiffs' investment losses. <u>See</u> <u>Gross v. Summa Four, Inc.</u>, 93 F.3d 987, 992 (1st Cir. 1996).

Plaintiffs must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act, which requires that the complaint specify "each statement alleged to have been misleading" and also "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); <u>see also</u> <u>Greebel v. FTP Software</u>, 194 F.3d 185, 193-94 (1st Cir. 1999). Plaintiffs must also, "with respect to *each* act or omission . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis supplied); <u>Greebel</u>, 194 F.3d at 196-97 (merely reasonable inferences of fraud are insufficient). Plaintiffs similarly are required to plead a particularized factual basis for all allegations made on information and belief, including their sources. <u>See</u> <u>Fitzer v. Security Dynamics Techs.</u>, 119 F. Supp. 2d 12, 20 (D. Mass. 2000).

Plaintiffs fail to plead each element of their fraud claims, and certainly have not done so with the requisite specificity.[2]

I.    PLAINTIFFS FAIL TO DIFFERENTIATE BETWEEN DEFENDANTS

Plaintiffs incorrectly claim that somehow "[i]t is appropriate" to "presume" that all eight individual "defendants" committed fraud by making the 39 Challenged Statements. See Exhibit A; Compl. ¶ 35.[3] The "all defendants" approach fails as a matter of law because the Complaint does not allege with Rule 9(b) and Reform Act particularity *each* defendant's role in the vast majority of the allegedly fraudulent statements, much less facts that each individual made the statements with <u>scienter</u>. See 15 U.S.C. § 78u-4(b)(2). First Circuit courts routinely dismiss "fraud" claims where, as here, the "complaint fails to connect" the defendants "specifically to any of the materially misleading statements that . . . survive the PSLRA pleading requirements." See <u>In re Cabletron Sys.</u>, 311 F.3d 11, 41 (1st Cir. 2002); see <u>Southland Securities Corp. v. Inspire Insur. Solutions</u>, 365 F.3d 353, 365 (5th Cir. 2004) (plaintiffs must "'distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud'") (emphasis in original). Indeed, even before the Reform Act, this Court required that where, as here, "multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy Rule 9(b)." <u>Loan v. FDIC</u>, 717 F. Supp. 964, 968 (D. Mass. 1989).

---

[2]    Instead, plaintiffs seek to obscure their failure to plead actionable allegations against each individual with a 116-page complaint that is hopelessly redundant. See <u>In re Splash Tech. Holdings, Inc. Secs. Litig.</u>, No. 99-109, 2000 WL 1727405, at *19 (N.D. Cal. Sept. 29, 2000) (stating that the "particularity" requirement is not a license to file "unwieldy puzzle-style complaints").
[3]    Consistent with the First Circuit's statement-by-statement analysis of securities fraud complaints, defendants attach hereto as <u>Exhibit A</u> a chart of the 39 documents that plaintiffs contend misled them during the Class Period. Because plaintiffs also are obligated to identify each defendant's role in the purported fraud, defendants also attach hereto as <u>Exhibits B-H</u> short supplements addressing the specific allegations against each individual.

The requirement that "[s]pecific and fraudulent statements must be identified" is not flexible. <u>Fitzer</u>, 119 F. Supp. 2d at 22, 26 (plaintiffs must allege that each defendant "knowingly made fraudulent misrepresentations in order to mislead the securities market"). It therefore is never "appropriate" for plaintiffs to "presume" that all defendants were somehow responsible for the statements that plaintiffs contend caused their investment losses. <u>Compare</u> Compl. ¶ 35 <u>with</u> <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 368, 368 n.19 (1st Cir. 1994) (no liability for statements by others even where, unlike here, plaintiff alleged generally defendant's authorization of or acquiescence in challenged statements); <u>Carney v. Cambridge Tech. Partners</u>, 135 F. Supp. 2d 235, 254 (D. Mass. 2001) (dismissing claims where plaintiffs did not identify which of "defendants" made allegedly fraudulent statements).

Plaintiffs' failure to differentiate between defendants is particularly conspicuous. They never sued Organogenesis, which was the issuer of the securities that plaintiffs claim they purchased at inflated prices. Virtually all of the Challenged Statements (35 of the 39) are Organogenesis' press releases or reports filed with the SEC (10-Ks, 10-Qs).[4] Instead of particularizing the "connection" between each individual defendant and those statements, *plaintiffs have sued individuals for statements that were made at times when those individuals were not even working at Organogenesis*. There is, for example, no basis in fact or law to sue Alan Ades for anything during the 26-month Class Period because *the Complaint admits he did not join Organogenesis until October 2002 -- more than six months after the putative Class*

---

[4]    Although companies may be liable for the conduct of their employees, there is no basis to simply "presume" the converse that "all" individuals are responsible for their employer -- unless plaintiffs specify "the connection between the individual defendant and the allegedly fraudulent statement." <u>Southland Securities Corp.</u>, 365 F.3d at 365. <u>See also</u> <u>City of Monroe Employees Retirement Sys. v. Bridgestone Corp.</u>, 387 F.3d 468, 508 (6th Cir. 2004) (refusing to impute company's misstatement to individual defendant); <u>Serabian</u>, 24 F.3d at 368 (declining to attribute statements in company press release to an individual defendant based solely on his job title and attendance at meetings).

*Period ended*.  See Compl. ¶ 28 (Ades first "appointed" officer and director "*following the end of the Class Period*").

Plaintiffs' disregard of their obligation to plead with specificity *each* claim against *each* defendant also is laid bare by their improper lawsuit against Donna Lopolito.  ***Plaintiffs admit Ms Lopolito resigned from Organogenesis on April 30, 2000 -- or before 30 of the 39 Statements that these plaintiffs now sue her and everyone else for making.***  See Compl. ¶ 30. Plaintiffs also overreach by suing Ms. Lopolito for the nine statements that Organogenesis made before she left.  She is not alleged to have had any involvement whatsoever with six of them. See Stmts. 1, 3-5, 7, 8.  Nor can plaintiffs sustain a fraud claim against Ms. Lopolito simply because she signed three SEC filings on behalf of Organogenesis in her role as its Chief Financial Officer.  See Stmts. 2, 6, & 9.  Virtually every SEC filing is "signed by" the company's CFO, which is not a particularized allegation that the CFO knew the filing was misleading at the time she signed, much less that she did so intending to deceive investors. See, e.g. Marra v. Tel-Save Holdings, No. 98-3145, 1999 WL 317103 at *6 (E.D. Pa. May 18, 1999) ("only mention of the individual defendants' involvement with the communication of the allegedly fraudulent statements are three averments that the individual defendants signed various annual reports.  Asserting such facts alone will not prevent dismissal").

Plaintiffs' strategy of suing "all" individuals for literally dozens of statements made by others is not limited to Mr. Ades and Ms. Lopolito.  The problem is epidemic.  The Complaint identifies only one or two individuals as the speaker or signatory of 37 of the 39 Challenged Statements -- meaning that with respect to each of those statements, plaintiffs have accused at least six individuals of perpetrating a fraud by making statements that they are not alleged to have had any particular role in preparing, or even have read.  See Exhibit A.  Compare Lirette v.

- 9 -

Shiva Corp., 27 F. Supp. 2d 268, 277 n.7 (D. Mass. 1998) ("complaint does not sufficiently identify the speaker of an allegedly misleading statement if it refers to a defendant in an 'and/or' manner"). For this reason alone the Complaint should be dismissed.

II.    ORGANOGENESIS FULLY DISCLOSED THAT IT HAD ALWAYS LOST MONEY AND ITS FUTURE WAS "HIGHLY UNCERTAIN."

Plaintiffs' theory is that during the 26-month Class Period defendants concealed Organogenesis' "true financial and operational condition," and in particular that the Company lacked the financial wherewithal to stay in business. According to plaintiffs, the alleged "truth" about Organogenesis was revealed – and therefore the price of the stock fell – when, in a January 30, 2002 SEC filing, the Company disclosed that it might run out of money. See Compl. ¶¶ 14, 148-151. Nonsense. In the very public filings cited in the Complaint, Organogenesis repeatedly disclosed (not concealed) that it was losing an extraordinary amount of money.

A.    **Organogenesis Fully Disclosed Chronic Losses and its Need for Financing.**

Plaintiffs should not have filed a fraud lawsuit alleging that defendants "belatedly disclosed" Organogenesis' liquidity problems because the *Complaint admits* that, from the "inception" of the Class Period, *"it was fully disclosed* that the Company would need to raise additional funding at some point in the future." Compare Compl. ¶ 148 with Compl. ¶ 4. Plaintiffs' claim that January 2002 was the "first time" that Organogenesis revealed the magnitude of its liquidity problems, Compl. ¶ 148, is flat-out contradicted by the public filings identified in their Complaint. Organogenesis disclosed in the plainest of terms that it (*i*) had suffered chronic operating losses; (*ii*) had *never* been profitable; (*iii*) may *never be* profitable; (*iv*) was only able to fund operations through ongoing financing; and (*v*) would have to curtail operations if it could not obtain more financing.

- 10 -

First, Organogenesis disclosed that it consistently lost money during its entire 15-year history:

> *Organogenesis Inc. was founded in 1985. We have incurred <u>operating losses in every year of our existence.</u>*

<u>See</u> Form 10-K for 1999, App. Tab 9, p. 83 (emphasis added). Indeed, in *every* one of the nine public filings identified in the Complaint, Organogenesis publicly reported how much money it had lost that period and, in fact, those losses generally were increasing as time went on. <u>See</u> App. Tab 2, p.16 (*$6.48 million loss* in Q-3 1999); App. Tab 9, p. 96 *($28.3 million loss* in 1999); App. Tab 11, p. 141 (*$6.68 million loss* in Q-1 2000); App. Tab 15, p. 166 (*$2.05 million loss* in Q-2 2000); App. Tab 18, p. 188 (*$6.95 million loss* in Q-3 2000); App. Tab 25, p. 224 (*$28.6 million loss* in 2000); App. Tab 27, p. 269 (*$6.5 million loss* in Q-1 2001); App. Tab 32, p. 295 (*$8.6 million loss* in Q-2 2001); App. Tab 39, p. 327 (*$7.5 million loss* in Q-3 2001); App. Tab 52, p. 638 (*$30.1 million loss* in 2001). All told, Organogenesis announced *aggregate losses of $87 million* from 1999-2001, thereby rendering absurd the claim that during that Period anyone concealed the Company's "dismal and ever-deteriorating financial condition." <u>Compare</u> Compl. ¶ 8 <u>with</u> App. Tab 9, p. 96; App. Tab 25, p. 224; App. Tab 52, p. 638.

Second, although plaintiffs claim to have been misled that Organogenesis would "achieve profitability in the foreseeable near-term," Compl. ¶ 5, their Complaint cites documents in which the Company expressly warned investors:

> *We have not achieved profitability and expect to continue to incur net losses. The extent of future losses and the time required to achieve profitability is <u>highly uncertain</u>.*

<u>See</u> App. Tab 9, p. 83 (10-K for 1999) (emphasis added); App. Tab 25, p. 211 (10-K for 2000) (similar).

- 11 -

<u>Third</u>, Organogenesis publicly warned that, because it always lost money and might never be profitable, it would curtail or even cease operations if it could not raise additional funds:

> There can be no assurances that [additional] funds will be available when required on terms acceptable to us, <u>if at all</u>. If adequate funds are not available when needed, we would need to delay, scale back or eliminate certain research and development programs ... resulting in a potential material adverse effect on our financial condition and results of operations.

<u>See</u> App. Tab 9, p. 89 (10-K for 99) (emphasis added); App. Tab 25, p. 217 (10-K for 2000) (similar).

Given these disclosures, no reasonable investor could have possibly believed anything other than that Organogenesis had always lost money and chronically faced liquidity and financing issues since the day it was founded in 1985. Although "issuers are not obliged to disclose the obvious," <u>In re Boston Tech. Inc. Sec. Lit.</u>, 8 F. Supp. 2d 43, 61 (D. Mass. 1998), it is hard to conceive of how Organogenesis could have been more explicit that its financial position was precarious and its ability to become profitable was "highly uncertain." <u>See generally</u> <u>Data Probe Acquisition Corp. v. Datatab, Inc.</u>, 722 F.2d 1, 5 (2d Cir. 1983) (public company's disclosure should not be subject to "nit-picking judicial scrutiny" where "conclusion is obvious"). It was equally obvious from the public disclosures that a never-profitable company that always needed financing to operate was "running out of money" and without new financing could be "forced into insolvency." <u>Compare</u> Compl. ¶ 14 <u>with</u> <u>Brogren v. Pohlad</u>, 933 F. Supp. 793, 801-802 (D. Minn. 1995) (company that disclosed poor financial condition had no duty to state obvious fact that it could not continue as a going concern without increased capital).

This court recently dismissed a similar challenge to a company's allegedly misleading statements about its liquidity because, just as here, the relevant facts were adequately disclosed to the market. <u>See</u> <u>In re Stone & Webster, Inc., Sec. Litig.</u>, 253 F. Supp. 2d 102, 125-26 (D.

- 12 -

Mass. 2003). In <u>Stone & Webster</u>, as here, defendants accurately reported the company's weak

financial condition (expenses, losses), and having fulfilled their disclosure obligations were not

required to say anything else. <u>Id.</u> at 126. For the same reason, Organogenesis shareholders did

not need to be told that $60 million in losses in 2000 and 2001 was "dismal." <u>See</u> App. Tab 25,

p. 224; App. Tab 52, p. 638; <u>Stone &Webster</u>, 253 F. Supp. 2d at 125-26 ("the securities laws do

not impose on reporting companies an obligation to characterize their results -- even if their

results are very poor -- in pejorative fashion. Such characterization has been held to add nothing

to the total mix of information available"); <u>In re Numerex Corp. Sec. Litig.</u>, 913 F. Supp. 391,

400 (E.D. Pa. 1996) ("federal securities laws were intended to protect the average, reasonable

investor, not the most unworldly naif. They do not require a company to state the obvious").[5]

## B.    Organogenesis' Statements Regarding Its Liquidity Were Accurate.

The theory that Organogenesis concealed it was "running out of money" also ignores the

indisputable truth of the only two Challenged Statements addressing when it might run out.

Plaintiffs challenge Statement 9, in which the Company said on March 31, 2000 that it

"believe[d]" it had resources "sufficient to finance operations into 2001 . . . .," and Statement 25,

in which it said on March 30, 2001 that it "believe[d]" it had resources "sufficient to finance

operations through at least the first quarter of 2002." <u>See</u> Compl. ¶¶ 85, 113. Plaintiffs do not

and cannot dispute that both statements were true. According to their own Complaint,

Organogenesis was solvent and operational throughout 2001 and well past the first quarter of

---

[5]    Courts in several jurisdictions have considered -- and rejected – similar claims that defendants concealed adverse financial information where, as here, there were extensive public disclosures regarding the company's financial situation. <u>See, e.g.</u>, <u>In re Worlds of Wonder Sec. Litig.</u>, 35 F.3d 1407, 1415-16 (9th Cir. 1994) (statements that company "expected to have sufficient cash to operate through March 31, 1988" not misleading in light of disclosure regarding risks); <u>The Winer Family Trust v. Queen</u>, No. Civ.A. 03-4318, 2004 WL 2203709, at *20 (E.D. Pa. Sept. 27, 2004) (dismissing claims based on alleged omission regarding liquidity where, as here, company disclosed liquidity issues); <u>Berger v. Beletic</u>, 248 F. Supp. 2d 597, 604 (N.D. Tex. 2003) ("no legal obligation to disclose that [the company] might be subject to a going concern modification . . . Several public filings before and during the Class Period indicated [the company] was operating at a loss, and it was in need of additional capital that it may not be able to secure. Companies do not have a duty to disclose obvious possibilities").

2002 -- and it was not until September 2002 that it was forced to halt shipments of Apligraf due to insufficient cash flow. <u>Compare</u> Compl. ¶ 159 <u>with</u> Stmts. 9, 25. A claim based on a prediction is "moot" where it "in fact was not off the mark." <u>Carney</u>, 135 F. Supp. 2d at 245.

In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678 (S.D.N.Y. 2000), is directly on point. There, the court dismissed plaintiffs' challenge to the strikingly similar statement that "[m]anagement believes that the financial resources available to it . . . will satisfy the Company's working capital needs for at least 12 months." <u>Id</u>. at 687, 700. As a matter of law, the statement was not actionable because, "Plaintiffs concede[d] that Ultrafem had working capital for almost fifteen months." <u>Id</u>. at 700. For the same reason, because Organogenesis was in fact able to finance operations through the first quarter of 2002 (which is what it said in Statement 25), the statement did not become misleading because after that quarter it was unable to raise additional funds and -- more than *seven months after the Class Period* -- eventually filed for bankruptcy. <u>Compare</u> Compl. ¶ 161 <u>with</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 174 n. 8 (2d Cir. 2004) (fact that company "did not seek bankruptcy protection" until *nine months after Class Period* "belies the urgency of any 'liquidity crisis' during the Class Period").[6]

## C.    Plaintiffs Cannot State A Claim Based On The "Novartis Put Option."

Plaintiffs claim that defendants misrepresented the terms of a supposedly "critical" financing arrangement that Organogenesis negotiated with Novartis on February 27, 2001, or 15 months after the Class Period began. Compl. ¶ 107. Under the terms of this so-called "put option," Organogenesis was allowed, but not required, to sell up to $20 million of securities to

---

[6]    Plaintiffs' other claims regarding Organogenesis' financing make no sense. For example, plaintiffs challenge the Company's announcement that a stock offering was oversubscribed due to "strong interest in our Company," Stmt. 7, but nowhere allege that the offering was not oversubscribed. Plaintiffs also challenge the Company's announcement of a stock-buyback because the Board "view[ed] current market conditions as an opportunity to purchase shares that the Company considers to be undervalued in view of our prospects," Stmt. 20, but do not allege that the Company re-purchased its stock for any other reason. Finally, plaintiffs challenge Statement 37, in which the Company announced it had raised another $20.25 million in financing, but do not dispute that the money was raised.

- 14 -

Novartis in $10 million increments, in accordance with a Securities Purchase Agreement that was publicly filed with the SEC. See id. ¶¶ 5, 57; App. Tab 40.

The "put option" theory is deficient for several reasons. For starters, plaintiffs never make clear why or how Organogenesis' ability to exercise the put option mattered during the Class Period. There is no dispute that Organogenesis did, in fact, exercise the first $10 million option. See Compl. ¶ 129. Plaintiffs allege that Organogenesis misrepresented its "right" to exercise the second option, see Comp. ¶ 133, *but nowhere allege* that it even tried to exercise it during the Class Period. Nor is there any allegation that during the Class Period the business suffered for any reason related to the $10 million option that it did not try to exercise. See Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 300 (D. Mass. 2004) (dismissing claim where plaintiffs do not specify impact of allegedly concealed data). As noted, the Company only said it would, and did, have sufficient financing through the first quarter of 2002. See supra § II.A.

In any event, there is no pleaded basis that any defendant (much less all defendants) ever misrepresented the Novartis put option as a "critical part of Organogenesis' financing." See Compl. ¶ 57; see generally, Lirette, 27 F. Supp. 2d at 280 dismissing fraud claim where, as here, "the Complaint fails to identify the time, place and speaker of the statements" To the contrary, the notion that financing through Novartis was "critical" to Organogenesis' solvency ignores that it told investors it "may or may not" even exercise the option. See Stmt. 22. The documents cited in the Complaint also make clear that Organogenesis relied on a variety of financing options other than the Novartis put option, including: (*i*) existing working capital; (*ii*) product and other revenues; and (*iii*) stock sales to an underwriter. See Stmts. 25, 27. In fact, from the third quarter of 1999 through the end of 2001, Organogenesis announced that it had raised $50 million from other sources, far more than the second $10 million put option that it is not alleged

- 15 -

to have ever tried to exercise. <u>See</u> App. Tab 2, p. 17; App. Tab 9, p. 97; App. Tab 25, p. 225; App. Tab 52, p. 640.

The claim that anyone misrepresented the terms governing the put option also fails as a matter of law because they were set forth in the Securities Purchase Agreement that Organogenesis filed with the SEC. <u>See</u> Form 8-KA, Ex. 10.2, App. Tab 40. Where a company discloses the relevant facts about a contract, investors obviously cannot state a fraud claim based on non-disclosure of those facts. <u>In re Segue Software, Inc. Sec. Litig.</u>, 106 F. Supp. 2d 161, 168 (D. Mass. 2000) (press release announcing new contract not misleading because "the relevant Form 10-K made no secret of the fact that the company selectively permitted returns"); <u>see generally Hillson Partners Ltd. Partnership v. Adage, Inc.</u>, 42 F.3d 204, 212 (4th Cir. 1994) (securities laws do not require disclosure of information that is already in the public domain).[7]

Specifically, by publicly filing the Securities Agreement, Organogenesis allowed the open market to evaluate for itself the "conditions" and business wisdom of the financing option. The claim that there were "certain undisclosed conditions precedent" is unfounded because the published document contains those terms in sections captioned "Conditions to Closing of Investor," "Conditions to Closings of the Company," and "Mutual Conditions of Closings." <u>Compare</u> Compl. ¶ 8 <u>with</u> Securities and Purchase Agreement, App. Tab 40, pp. 337, 355-360 (§ 5.1, <u>et seq.</u>). Because the existence and nature of the "conditions" were known to the market, plaintiffs do not state a claim based on characterizations of the contract. <u>See, e.g., Baron v. Smith</u>, 380 F.3d 49, 57 (1st Cir. 2004) (affirming dismissal to challenge of disclosure of joint

---

[7]    Plaintiffs' "put option" claim highlights the risks of their obfuscatory pleading. Although obscured by the overweight Complaint, there is no basis to claim that anyone misrepresented the option for most of the Class Period -- because the option was not negotiated until February 2001. <u>See</u> Compl. ¶ 107. The unfortunate result: plaintiffs have sued all defendants for defrauding investors about the option, even though only 4 of those 8 individuals had any role at the Company during the time, and thus the other *four have unjustifiably been sued for misrepresenting the details of an agreement that did not yet exist.* <u>See In Re PEC Solutions Sec. Litig.</u>, No 03-Civ-331, 2004 WL 1854202, at *6 (E.D.Va. May 25, 2004) (dismissing fraud claim when, as here, plaintiffs alleged failure to disclose facts that did not exist until months later).

venture because the company disclosed the material facts in its Form 10-K); City of Monroe
Employees Retirement System, 387 F.3d at 493 ("claim based on the alleged withholding from
the public of information that contradicts information publicly stated is defeated by a
demonstration that the allegedly withheld information was in fact disclosed to the public").

III.    THE STATEMENTS ABOUT PAST AND PRESENT BUSINESS PERFORMANCE
        ARE NOT ACTIONABLE.

A.    **Plaintiffs Cannot Litigate Accurate Financial Reports.**

        Plaintiffs claim that defendants withheld from investors the "true facts" about
Organogenesis' financial condition, see Compl. ¶ 8, and challenge 19 SEC filings and press
releases announcing the Company's quarterly and annual financial results. See Stmts. 2, 6, 8-11,
14, 15, 17, 18, 24-27, 31, 32, 38, 39. Nowhere, however, do plaintiffs identify a single number
reported in any of these 19 statements -- revenue, expense, margins, or earnings -- that they
claim was incorrect. See Boston Tech., 8 F. Supp. 2d at 69 ("None of the financial reporting
here . . . is alleged to have been false. Accurate accounts of past financial results without more
are not actionable.").

        Thus, it was not fraud for the Company to have announced that "[c]ost of product sales
for the quarter ended September 30, 2001 increased 110% to $3,268,000, from $1,557,000 for
the comparable quarter last year." See Stmt. 39. Similarly, defendants cannot be liable for
saying on August 13, 2001 that the Company's "year-to-date revenue from product sales is
nearly triple that of the same period last year," see Stmt. 31, because such revenue did nearly
triple (from $1.33 to $3.57 million). See App. Tab 32, p. 286. Plaintiffs' failure to identify any
particular accounting error is also fatal to their oft-repeated claim that the financial statements
did not fairly present the Company's position in accordance with generally accepted accounting
principles ("GAAP"). See Stmts. 6, 11, 15, 18, 27, 32, 39. They nowhere allege that any

- 17 -

particular financial statement did not comply with GAAP, much less why it did not comply and

that the never-alleged error was intended to deceive, as opposed to an innocent mistake. These

pleading deficiencies are fatal because they deprive the Court of a basis to assess materiality and

scienter.[8]

Ultimately, plaintiffs are reduced to quibbling with the soft commentary that

accompanied the indisputably accurate hard financial results. Plaintiffs, however, cannot state a

claim against defendants for saying, "[w]e're optimistic" that Organogenesis could become

profitable or for obviously upbeat opinions, such as "we're not concerned that we won't

ultimately be successful." Compare Stmts. 5, 12 with Shaw v. Digital Equipment Corp., 82 F.3d

1194, 1219 (1st Cir. 1996), ("confident that DEC was pursuing the right strategy" immaterial).

These are *precisely* the "loosely optimistic statements that are so vague, so lacking in specificity,

or so clearly constituting the opinions of the speaker, that no reasonable investor could find them

---

[8]    Even in cases where plaintiffs correctly specify the GAAP violations for which they sue, courts dismiss claims if the violations were immaterial or unintentional. See, e.g., Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) (overstatement of approximately 2% of total assets not material); In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 161, (S.D.N.Y. 2003) (alleged $217 million misstatement over two years immaterial as matter of law); Orton v. Parametric, 344 F. Supp. 2d 290, 308 (D. Mass. 2004) (dismissing claims despite financial restatement where scienter not adequately pleaded).

important to the total mix of information available." Id. at 1217.[9] See Fitzer, 119 F. Supp. 2d at

23 ("corporate puffery applies to loose optimism about both a company's current state of affairs

and its future prospects"). Nor would a reasonable investor been misled when the Company said

that its results were "consistent with the transition in progress from a research-focused company

to a research-based operating company with a novel medical product in introduction phase."

Compare Stmts. 8, 10, 14, and 17 with Shaw, 82 F.3d at 1219 (mere puffing to say that "the

company's transition to selling its Alpha chip products was 'going reasonably well'").

## B.   Defendants Did Not Misrepresent The Apligraf Business.

### 1.   Apligraf Was In Fact Successful.

Plaintiffs cannot state a claim based on the reports of increasing sales and demand for

Apligraf during the Class Period. See Stmts. 3, 13, 16, 19, 21, 23, 28, 29, 31, 33, 34, 36. These

claims make no sense because plaintiffs do not and cannot allege that any of the reported data

---

[9]     Compare Stmt. 7 ("strong interest in our Company") with In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) ("strong" demand for products mere puffery); Compare Stmt. 13 (July 2000 "held notable achievements significant to future sales development") with In re Parametric Technology Corp. Sec. Litig., 300 F. Supp. 2d 206, 220 (D. Mass. 2001) (statement that company is now "well positioned for growth" is non-actionable puffing) and Hillson Partners, 42 F.3d at 212-214 ("Significant sales gains should be seen as the year progresses" held to be immaterial general prediction); Compare Stmt. 14 (Company "further strengthened our manufacturing and management team") with Fitzer, 119 F. Supp. at 23 ("strong and experienced management team that is well positioned in dealing in this space" is non-actionable puffery); Compare Stmt. 16 ("[t]hird quarter Apligraf achievements ... laid an important foundation for future sales development") with In re Chipcom Corp. Sec. Litig., No. CV-95-11114, 1996 U.S. Dist. LEXIS 22257 at *39 (D. Mass. 1996) ("excellent foundation" is a "general, positive statement" that is inactionable); Compare Stmt. 20 ("the decision to authorize a stock buyback program demonstrates the confidence our Board has in the Company's future") with In re Parametric Tech. Corp. Sec. Litig., 300 F.Supp.2d at 217-18 ("we continue to have confidence in the fundamental strength of our business and in our strong competitive position" inactionable puffery) and Van Ormer v. Aspen Tech., Inc., 145 F.Supp.2d 101, 107 (D. Mass. 2000) ("management indicated confidence" ruled inactionable puffery); Compare Stmt. 34 ("I am pleased that the manufacturing ramp-up I committed to when I became CEO in May is on track") with Shaw, 82 F.3d at 1219 (Statement that the company was "basically on track" is inactionable, immaterial puffery) and Simon v. Am. Power Conversion Corp., 945 F. Supp. 416, 428 (D.R.I. 1996) (statements about "improving manufacturing efficiencies" were mere puffery); Compare Stmt. 36 ("[t]his has been a very significant quarter for the Company") with Southland Securities Corp., 365 F.3d at 377 (statement that "[t]he first quarter of 1998 was extremely significant for [defendant company]" is mere puffery); Compare Stmt. 35 ("[w]e look forward to these products contributing to the overall profitability of the Company") with Greebel, 194 F.3d at 189, 207 (company statement that new products "should help us achieve our revenue objective" ruled inactionable puffery).