# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>)<br>IN RE ORGANOGENESIS SECURITIES   )<br>LITIGATION   )<br>)<br>)<br>)<br>) | **MASTER FILE NO. 04-10027 JLT** |

## LEAD PLAINTIFFS' CONSOLIDATED OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS

| **MOULTON & GANS, P.C.** | **MILBERG WEISS BERSHAD** |
|---|---|
| Nancy Freeman Gans |   **& SCHULMAN LLP** |
| 33 Broad Street | Steven G. Schulman |
| Suite 1100 | Elaine S. Kusel |
| Boston, MA 02109 | Peter Sloane |
| (617) 369-7979 | One Pennsylvania Plaza |
|  | 49th Floor |
|  | New York, New York 10019 |
|  | (212) 594-5300 |

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

ALLEGATIONS OF THE COMPLAINT ......................................................................... 4

    A.  The Company ......................................................................................... 4

    B.  The Undisclosed Material Factors Adversely Affecting The Company ..................... 5

    C.  The Fraudulent Scheme To "Manipulate The Market For The Company's Stock" ..................................................................................................... 7

    D.  The Individual Defendants' Misrepresentations And Omissions In Furtherance Of The Fraudulent Scheme ....................................................... 7

    E.  The Truth Emerges ................................................................................ 12

ARGUMENT ..................................................................................................... 13

I.    THE APPLICABLE PLEADING STANDARDS IN A SECURITIES FRAUD ACTION ....................................................................................................... 13

    A.  The Pleading Standard Under Rule 12(b)(6) ................................................ 13

    B.  The Requirements Of Pleading Fraud Under Rule 9(b) And The PSLRA ................. 14

        1.  Plaintiffs Are Not Required To Plead Evidence .................................... 14

        2.  Pleading the "Who, What, When, Where and How" ............................... 15

II.   THE COMPLAINT AMPLY PLEADS FRAUD WITH PARTICULARITY WITH RESPECT TO EACH INDIVIDUAL DEFENDANT ........................................... 16

III.  THE COMPLAINT MORE THAN ADEQUATELY PLEADS WITH PARTICULARITY NUMEROUS MATERIALLY FALSE AND MISLEADING STATEMENTS BY THE INDIVIDUAL DEFENDANTS ........................................... 20

    A.  The Individual Defendants Never Disclosed That The Company Could Not Achieve Profitability Because Of The Terms Of The Novartis Marketing Agreement And Other Undisclosed Material Adverse Factors Affecting The Company ................................................................................................ 21

    B.  The Individual Defendants Never Told The Truth About The Inaccessibility Of The Novartis Put Option Funds ............................................................. 26

IV.  THE INDIVIDUAL DEFENDANTS MISREPRESENTED, AND FAILED TO DISCLOSE MATERIAL ADVERSE FACTORS AFFECTING THE COMPANY'S PAST AND CURRENT BUSINESS PERFORMANCE ......................... 29

    A.  The Individual Defendants Failed To Disclose The Crucial Fact That, Under The Novartis Marketing Agreement, The Company Was Losing Money On Every Unit Of Apligraf Produced ............................................................. 30

    B.  The Company's Undisclosed Manufacturing And Distribution Problems ................. 32

i

    C. The Company's Undisclosed Marketing Problems ...................................................... 34

V.    THE COMPLAINT DOES NOT SEEK TO HOLD THE INDIVIDUAL
      DEFENDANTS LIABLE FOR FAILING TO "PREDICT THE FUTURE" ..................36

    A. The Individual Defendants' Misrepresentations Were False, And Known To
      Be False, At The Time They Were Made ............................................................ 36

    B. None Of The Individual Defendants' Misrepresentations Are Protected
      Under The PSLRA's "Safe Harbor" .................................................................. 39

VI.   THE COMPLAINT IS NOT PREDICATED ON ALLEGATIONS OF
      CORPORATE MISMANAGEMENT ..............................................................................40

VII.  THE COMPLAINT MORE THAN ADEQUATELY PLEADS FACTS
      ESTABLISHING A STRONG INFERENCE OF SCIENTER AGAINST EACH
      INDIVIDUAL DEFENDANT ........................................................................................42

    A. The Standard For Pleading Scienter Under The PSLRA ............................................ 42

    B. Plaintiffs Plead Direct Evidence of Deliberate Securities Fraud ................................ 43

    C. Plaintiffs Allege Facts Constituting Strong Circumstantial Evidence Of The
      Individual Defendants' Reckless Or Conscious Behavior .......................................... 44

    D. Plaintiffs Adequately Allege Facts Demonstrating The Individual Defendants'
      Motive And Opportunity ........................................................................................... 48

VIII.  THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON
      LIABILITY AS TO EACH OF THE INDIVIDUAL DEFENDANTS ...........................51

IX.   THE COMPLAINT ADEQUATELY PLEADS FRAUD AGAINST
      DEFENDANT STEIN ...................................................................................................53

CONCLUSION ...............................................................................................................57

## TABLE OF AUTHORITIES

*Cases*                                                                     *Page(s)*

In re Aetna Inc. Sec. Litig.,
    34 F. Supp. 2d 935 (E.D. Pa. 1999) ...................................................................20

Aldridge v. A.T. Cross Corp.,
    284 F.3d 72 (1st Cir. 2002) .......................................................................*passim*

In re Allaire Corp. Sec. Litig.,
    224 F. Supp. 2d 319 (D. Mass. 2002) ..........................................................17, 39

In re Ancor Communs.,
    22 F. Supp. 2d 999 (D. Minn. 1998) ...............................................................20

In re Anicom Inc. Sec. Litig.,
    No. 00C 4391, 2001 U.S. Dist. LEXIS 6607 (N.D. Ill. May 15, 2001) ...............36

In re Ann Taylor Stores Sec. Litig.,
    807 F. Supp. 990 (S.D.N.Y. 1992) ..................................................................34

Backman v. Polaroid Corp.,
    910 F.2d 10 (1st Cir. 1990) .............................................................................21

Basic Inc. v. Levinson,
    485 U.S. 224 (1988) ........................................................................................20

Bay v. Palmisano,
    Nos. 01-0949, 01-1509, 01-1510, 01-1801,
    2002 U.S. Dist. LEXIS 20848 (E.D. La. Oct. 25, 2002).....................................57

Blatt v. Muse Technologies, Inc.,
    No. Civ. A. 01-11010-DPW, 2002 WL 31107537 (D. Mass. Aug. 27, 2002).......20

In re Boston Tech., Inc. Sec. Litig.,
    8 F. Supp. 2d 43 (D. Mass. 1998)....................................................................37

Briggs v. Sterner,
    529 F. Supp. 1155 (S.D. Iowa 1981) ...............................................................53

In re Cabletron Sys., Inc.,
    311 F.3d 11 (1st Cir. 2002) ......................................................................*passim*

Caiola v. Citibank, N.A.,
    295 F.3d 312 (2d Cir. 2002) ......................................................................26, 37

In re Campbell Soup Co. Sec. Litig.,
    145 F. Supp. 2d 574 (D.N.J. 2001).............................................................26, 34

Chalverus v. Pegasystems, Inc.,
    59 F. Supp. 2d 226 (D. Mass. 1999)................................................................20

In re CitiSource, Inc. Sec. Litig.,
    694 F. Supp. 1069 (S.D.N.Y. 1988) ................................................................52

*Federal Cases*                                                                 ***Page(s)***

In re Compaq Sec. Litig.,
   848 F. Supp. 1307 (S.D. Tex. 1993) ...................................................................49

In re Complete Mgmt. Inc. Sec. Litig.,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) ...........................................................46, 48

In re Computer Assocs. Class Action Sec. Litig.,
   75 F. Supp. 2d 68 (E.D.N.Y. 1999) ...............................................................34

Conley v. Gibson,
   355 U.S. 41 (1957) ...........................................................................................14

Cooper v. Pickett,
   137 F.3d 616 (9th Cir. 1997) ...........................................................................36

Cosmas v. Hassett,
   886 F.2d 8 (2d Cir. 1989) ...............................................................................20

Crowell v. Ionics, Inc.,
   343 F. Supp. 2d 1 (D. Mass. 2004) ...........................................................51, 57

First Virginia Bankshares v. Benson,
   559 F.2d 1307 (5th Cir. 1977) .........................................................................26

Freedman v. Value Health, Inc.,
   958 F. Supp. 745 (D. Conn. 1997) ..................................................................52

Geffon v. Micrion Corp.,
   249 F.3d 29 (1st Cir. 2001) .............................................................................42

Giarraputo v. Unumprovident Corp.,
   No. 99-301-P-C, 2000 U.S. Dist. LEXIS 19138 (D. Me. Nov. 8, 2000) .............48

Gross v. Summa Four,
   93 F.3d 987 (1st Cir. 1996) .............................................................................37

Haft v. Eastland Fin. Corp.,
   772 F. Supp. 1315 (D.R.I. 1991) .....................................................................21

Helwig v. Vencor Inc.,
   251 F.3d 540 (6th Cir. 2001) ...........................................................................30

Hershfang v. Citicorp,
   767 F. Supp. 1251 (S.D.N.Y. 1991) ................................................................21

Hurley v. FDIC,
   719 F. Supp. 27 (D. Mass. 1989) ....................................................................41

In re Initial Pub. Offering Sec. Litig.,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) .........................................................51, 52

Kafenbaum v. GTECH Holdings Corp.,
   217 F. Supp. 2d 238 (D.R.I. 2002) ...........................................................20, 41, 46

Kemmerer v. Weaver,
   445 F.2d 76 (7th Cir. 1971) .............................................................................52

*Federal Cases*                                                                    ***Page(s)***

In re Lernout & Hauspie Sec. Litig.,
    208 F. Supp. 2d 74 (D. Mass. 2002)................................................................19, 54

Mallozzi v. Zoll Med. Corp.,
    No. 94-11579-N 1996 WL 392146 (D. Mass. Mar. 5, 1996)...............................15

Marksman Partners, L.P. v. Chantal Pharm. Corp.,
    927 F. Supp. 1297 (C.D. Cal. 1996).............................................................*passim*

McCarthy v. Barnett Bank,
    750 F. Supp. 1119 (M.D. Fla. 1990) ..................................................................53

In re NTL Inc. Sec. Litig.,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) ....................................................19, 40, 47

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2002) ..........................................................................37, 40

In re Number Nine Visual Tech. Corp. Sec. Litig.,
    51 F. Supp. 2d 1 (D. Mass. 1999).......................................................................36

In re Peritus Software Servs., Inc. Sec. Lit.,
    52 F. Supp. 2d 211 (D. Mass. 1999)...................................................................42

In re Peoplesoft, Inc.,
    No. C 99-00472 WHA, 2000 WL 1737936 (N.D. Cal. May 25, 2000) ...............20

Primavera Familienstiftung v. Askin,
    No. 95-civ-8905, 1996 U.S. Dist. LEXIS 14845 (S.D.N.Y. 1996).....................53

In re Raytheon Sec. Litig.,
    157 F. Supp. 2d 131 (D. Mass. 2001)..................................................................19

In re Regeneron Pharms., Inc. Sec. Litig.,
    No. 03-CV-3111, 2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 1, 2005) ....................22, 39

In re Resource America Sec. Litig., No. 98-5446,
    2000 U.S. Dist. LEXIS 10640, at *18-19 (E.D. Pa. July 26, 2000) .....................51

Roeder v. Alpha Indus. Inc.,
    814 F.2d 22 (1st Cir. 1987) ..........................................................................14, 26

Rubinstein v. Collins,
    20 F.3d 160 (5th Cir. 1994)...........................................................................26, 50

SEC v. Feminella,
    947 F. Supp. 722 (S.D.N.Y. 1996) .....................................................................36

SEC v. Rana Research,
    8 F.3d 1358 (9th Cir. 1993).................................................................................29

SEC v. Savoy Industries, Inc.,
    587 F.2d 1149 (D.C. Cir. 1978)..........................................................................52

SEC v. Tex. Gulf Sulphur Co.,
    401 F.2d 833 (2d Cir. 1968) ...............................................................................26

*Federal Cases*                                                    *Page(s)*

STI Classic Fund v. Bollinger Indus.,
    No. 3-96-CV-823-R, 1996 U.S. Dist. LEXIS 21553 (N.D. Tex. Oct. 25, 2996) .................49

Schaffer v. Timberland Co.,
    924 F. Supp. 1298 (D.N.H. 1996) ...............................................................................14, 15

Scheuer v. Rhodes,
    416 U.S. 232 (1974) reversed on other grounds,
    Davis v. Scherer, 468 U.S. 183 (1984) ...............................................................................14

In re Scholastic Corp. Sec. Litig.,
    252 F.3d 63 (2d Cir. 2001) .................................................................................................51

In re Sears, Roebuck & Co. Sec. Litig.,
    291 F. Supp. 2d 722 (N.D. Ill. 2003) .................................................................................47

In re Sepracor, Inc. Sec. Litig.,
    308 F. Supp. 2d  20 (D. Mass. 2004) ..................................................................................37

Serabian v. Amoskeag Bank Shares, Inc.,
    24 F.3d 357 (1st Cir. 1994) ...........................................................................................15, 18

Shaw v. Digital Equip. Corp.,
    82 F.3d 1194 (1st Cir. 1996) ...............................................................................................15

Slavin v. Morgan Stanley & Co., Inc.,
    791 F. Supp. 327 (D. Mass. 1992) ......................................................................................41

Smith v. Network Equip. Techs. Inc.,
    No. C-90-1138, 1990 U.S. Dist. LEXIS 18391 (N.D. Cal. Oct. 19, 1990) ..........................46

Time Warner Inc. Sec. Litig.,
    9 F.3d 259 (2d Cir. 1993) ...................................................................................................48

In re Tyco Int'l, Ltd. Multidistrict Litig.,
    No. 02-1335-B, 2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004)..................19, 40, 54

Virginia Bankshares, Inc. v. Sandberg,
    111 S. Ct. 2749 (1991) ........................................................................................................29

In re Vivendi Universal, S.A. Sec. Litig.,
    Nos. 02 Civ. 5571, 03 Civ. 2175, 2004 U.S. Dist. LEXIS 7015
    (S.D.N.Y. Apr. 21, 2004) ....................................................................................................23

Wellcare Mgmt. Group. Inc.,
    964 F. Supp. 632 (N.D.N.Y. 1997) .....................................................................................49

In re Williams Sec. Litig.,
    339 F. Supp. 2d 1242 (N.D. Okla. 2003) ............................................................................47

Wright v. Ernst & Young LLP,
    152 F.3d 169 (2d Cir. 1998) ...............................................................................................37

*Federal Cases*                                                          *Page(s)*

### *Federal Statutes and Rules*

15 U.S.C. § 78j(b) ........................................................................................52

15 U.S.C. § 78u-4(b)(1) ...............................................................................16

15 U.S.C. § 78u-4(b)(2) ...............................................................................42

17 C.F.R. § 240.10b-5 ...........................................................................*passim*

Fed. R. Civ. P. 9(b)

Lead Plaintiffs Bruno Hofmann, John H. Bowie, Richard Madigan, and Richard Conen (collectively, "Plaintiffs"), by their counsel, respectfully submit this memorandum of law as a consolidated opposition to the motions to dismiss filed by defendants Alan Ades ("Ades"), John Arcari ("Arcari"), Albert Erani ("Erani"), Philip Laughlin ("Laughlin"), Donna Lopolito ("Lopolito"), Michael Sabolinski ("Sabolinski") and Alan Tuck ("Tuck") and by defendant Herbert Stein ("Stein") (collectively, the "Individual Defendants").

## INTRODUCTION

This is a securities fraud class action against certain former officers and directors of Organogenesis, Inc. ("Organogenesis" or the "Company") and against its auditor, defendant PricewaterhouseCoopers LLP ("PwC"). In their complaint, Plaintiffs set forth particularized allegations of extensive misrepresentations and omissions made by the Individual Defendants and have presented evidence — a confidential document created by the Company's then-Chief Financial Officer, defendant Arcari, (the "Confidential Arcari Document") — demonstrating that defendant Erani, the then-Chairman of Organogenesis, embarked on a scheme to "***manipulate the market for the Company's stock***" and "encouraged the Company to prepare ***overly optimistic financial projections*** to existing and potential service providers." ¶ 59.[1]

Remarkably, however, despite this smoking gun evidence of classic securities fraud, and the Complaint's detailed and particularized allegations of misrepresentations and omissions by the Individual Defendants in furtherance of this fraud — which are supported by numerous accounts of knowledgeable former employees of Organogenesis — the Individual Defendants assert that the Complaint lacks the necessary specificity to state a claim for securities fraud and fails to sufficiently allege facts creating a strong inference that the Individual Defendants acted

---

[1] References to "¶ __" are to a paragraph in Plaintiffs' Corrected Consolidated Amended Class Action Complaint For Violations Of Federal Securities Laws (the "Complaint").

with the requisite scienter.  The Individual Defendants raise a host of scattershot, ineffective arguments — including, for example, that the Company disclosed certain material adverse factors or risks, that some of the Individual Defendants' optimistic statements were puffery, that their forward-looking statements are protected by the "safe harbor" provisions of the Private Securities Litigation Reform Act's ("PSLRA"), that Plaintiffs' allegations are not true, that some of Plaintiffs' allegations plead mere "mismanagement," etc. —   none of which has merit, and all of which, even if meritorious, would not warrant dismissal of the Complaint in its entirety.

    In detailing dozens of false and misleading public statements and omissions, the Complaint plainly alleges the "*who*, *what*, *when*, and *where*" of the fraud perpetrated by each of the Individual Defendants, explains *why* each alleged misrepresentation was misleading, and specifies which particular Individual Defendant made the alleged misrepresentation.  Even though Plaintiffs are not required to plead evidence at the pleading stage, the Complaint is buttressed by direct evidence of fraud in the form of the Confidential Arcari Document, which demonstrates the Company's involvement in securities fraud led by the Company's Chairman, defendant Erani, and of which the Company's Chief Financial Officer, defendant Arcari, was aware.  The Complaint's allegations are further supported by the accounts of several knowledgeable former employees of the Company.  The chart attached as Exhibit 1 hereto sets forth each of the Complaint's allegations of the Individual Defendants' misrepresentations and omissions, which belie the Individual Defendants' assertions that the element of misrepresentation in plaintiffs' fraud claims has not been pled with particularity.  The Complaint does not, of course, plead every detail of defendants' fraudulent scheme, but neither need it do so — that kind of evidence pleading is reserved for trial, not a complaint.

The Individual Defendants' scienter arguments are equally meritless. First, although Plaintiffs are only required to plead facts creating a "strong inference" that the Individual Defendants' conduct was conscious or reckless, the Complaint here pleads direct evidence of intent to deceive. In the Confidential Arcari Document, defendant Arcari himself points to an attempt to "manipulate the market for the Company's stock" and to encourage the Company to prepare overly optimistic financial projections to the Company's service providers. On the basis of the Confidential Arcari Document alone, the Complaint more than adequately pleads scienter.

The Complaint, however, goes even further in alleging scienter by pleading specific facts demonstrating the Individual Defendants' conscious or reckless disregard of the truth in making the alleged misrepresentations, as well as their motive and opportunity to commit the fraud — allegations that have been held amply sufficient to raise the requisite strong inference of scienter under the PSLRA and Rule 9(b). In particular, the Complaint alleges that the Individual Defendants maintained leadership positions within the Company through which they were privy to the undisclosed material adverse factors affecting the Company; signed SEC filings or other Company reports and press releases; and engaged in, or caused the Company to engage in the sale, or registration for sale, of millions of dollars of Company stock during the Class Period — factors that courts, including the First Circuit, have held suffice to adequately plead scienter.

Notwithstanding the specific examples of fraud alleged in the Complaint and discussed below, the Individual Defendants still attempt to hold Plaintiffs to a trial level evidentiary standard rather than the requisite pleading standard under Rules 12(b)(6) and 9(b). Taking Plaintiffs' specific and well-pled allegations of fact as true, the Individual Defendants' motions to dismiss should be denied.

## ALLEGATIONS OF THE COMPLAINT

### A.    The Company

Organogenesis marketed itself as a company with a single, revolutionary product —

Apligraf, a unique skin replacement therapy used to treat skin ulcers and other epidermal

injuries.  ¶ 2.  During the Class Period, the Individual Defendants occupied senior management

and Board positions at Organogenesis.[2]  The Individual Defendants at all times were well aware

that the Company's business model was dependent on its ability to effectively mass-produce

Apligraf and market it to physicians.  ¶ 3.

Throughout the Class Period, the Company touted the fact that it maintained a marketing

agreement with an experienced partner, non-party Novartis Pharma AG ("Novartis"), which,

according to the Individual Defendants, would allow Organogenesis to obtain the marketing and

sales support necessary to sell sufficient quantities of Apligraf.  ¶ 3(b).  Indeed, during the Class

Period, the Company's marketing agreement with Novartis was consistently touted by the

Individual Defendants as a key to the Company's profitability.  ¶¶ 55; 57; 69; 85; 97; 107; 113.

Significantly, the Individual Defendants led investors to believe that the Novartis marketing

agreement provided Organogenesis enough of the revenue split generated from Apligraf sales to

allow the Company to grow operations and achieve profitable growth in the foreseeable near-

term.  ¶¶ 3(b); 55.  That impression was substantially reinforced when the Novartis marketing

agreement was amended in February 2001, in a deal that defendants represented would provide

even more revenue to the Company.  ¶¶ 55; 107.

---

[2] As discussed below, defendant Ades joined the Company as Chairman, President and Chief
Executive Officer after the end of the Class Period in October 2002 as part of the fraudulent
scheme with Erani to acquire the Company for themselves at a steep discount while leaving
shareholders with nothing.  See ¶¶ 164-67.

The Individual Defendants also were aware that the Company's viability and prospects for future profitability further depended on its access to financing from outside sources, including an all-important "put option" from Novartis (the "Novartis Put Option"), which purportedly allowed Organogenesis to access *at least $20 million* from Novartis through the exercise of a "put" option.[3]  ¶ 5.  The Individual Defendants represented to investors that the Novartis Put Option allowed the Company to raise this money at "any time," "at [the Company's] discretion and at [the Company's] option," and thereby constituted a large mega-million dollar "safety net" for the Company.  ¶¶ 107; 113.  The Novartis Put Option was, therefore, during the Class Period, a critical part of the Individual Defendants' announced plan to achieve profitability and to avoid bankruptcy.  ¶ 5.

### B.    The Undisclosed Material Factors Adversely Affecting The Company

As confirmed by the accounts of knowledgeable former employees of the Company, however, Organogenesis was suffering from a host of undisclosed material adverse factors that were impeding its ability to produce, market and sell Apligraf, to achieve profitability from the sale of Apligraf, and to access the all-important Novartis Put Option and other sources of funding.  In the words of one former employee who worked at Organogenesis during the Class Period, "it was always a series of smoke and mirrors."  ¶ 60.  These material adverse factors, which were known to each of the Individual Defendants throughout the Class Period, included, inter alia, the following:

    (i)    Organogenesis could not possibly achieve profitability through the sale of Apligraf given the terms of the Novartis marketing agreement.  ¶¶ 60; 65.  That agreement (both before and after its amendment in February 2001) did not provide Organogenesis with enough of the revenues or profits from Apligraf sales to offset

---

[3] A "put" option is an option contract that gives the holder (here, Organogenesis) the right to sell a certain quantity of an underlying security to the writer of the option (here, Novartis), at a specified price up to a specified date.

the extremely high cost of production or to offset other undisclosed manufacturing problems that Organogenesis was experiencing, such as contaminated and defective products and product recalls. ¶¶ 60; 62. Indeed, as the Individual Defendants were well aware but did not publicly disclose, throughout the Class Period the Company was actually ***losing money on every unit of Apligraf sold***. ¶ 65. According to a knowledgeable former employee of Organogenesis, this fact was known by "the whole company." Id. Further, under the Novartis marketing agreement, Organogenesis was not being reimbursed by Novartis for any units of Apligraf that were manufactured by Organogenesis pursuant to Novartis' sales forecasts, but that ultimately were not sold by Novartis. Thus, according to a former employee of Organogenesis, the Company took a "huge loss" every time that Novartis was unable to sell units of the product that Organogenesis had manufactured. ¶ 66. The damage to the Company's bottom line caused by this failure to receive compensation for Apligraf units manufactured but not sold was compounded by the fact that, as alleged above, Novartis' sales forecasts were "***always inflated***." Id.

(ii) The Company could not access the full complement of financing from the Novartis Put Option as the Individual Defendants had consistently represented, given that certain undisclosed conditions precedent existed to that financing. ¶ 60. Organogenesis could not meet these conditions precedent to Novartis' requirement to provide at least $10 million of its purported commitment to Organogenesis, thus making the Company's  purported "safety net" an illusion. ¶¶ 150; 154.

(iii) Organogenesis was underfunded and there was no reasonable basis to report that the Company could foreseeably fund operations based on product sales, available sources of loans, debt and/or equity sales. ¶¶ 60; 148. Indeed, defendants knew but did not disclose that, as reported by defendant Arcari in the Confidential Arcari Document, ***the Company's own auditor — defendant PwC — had in 2001 "refused to grant any consents or additional comfort letters***" for future financing initiatives and that the Company had lost credibility with PwC. ¶¶ 60; 174(c).

(iv) Undisclosed problems related to the manufacture, distribution and marketing of Apligraf were leading to even higher costs and further reducing profitability. Manufacturing problems and delays were retarding production scale, and issues relating to Novartis' marketing efforts were reducing sales and damaging future sales development prospects. ¶¶ 60-62. As investors would only learn following the Class Period, Novartis' inexperienced and inadequately trained sales force was encountering resistance throughout the Class Period because of the high cost and complexity of Apligraf and the actual and/or perceived difficulties in physician reimbursement for the product. ¶¶ 60-61.

(v) According to a former senior manager of Organogenesis during the Class Period, ***a culture of "corporate greed" prevailed among the senior management of the Company***, who were primarily interested in "taking care of themselves at the top." ¶ 67.

6

### C.    The Fraudulent Scheme To "Manipulate The Market For The Company's Stock"

Unbeknownst to investors, however, the Individual Defendants beginning in November 1999 engaged in, and caused Organogenesis to engage in, a fraudulent scheme to defraud investors. According to the Confidential Arcari Document, which was prepared by Arcari in October 2001, the Company was informed by stock brokers during 2001 that defendant Erani, then Chairman of Organogenesis' Board of Directors, sought to have the stock brokers "*manipulate the market for the Company's stock*." ¶ 59. According to this document, defendant Erani also "encouraged the Company to prepare *overly optimistic financial projections* to existing and potential service providers." Id. The existence of this scheme was never disclosed to the public during the Class Period.

### D.    The Individual Defendants' Misrepresentations And Omissions In Furtherance Of The Fraudulent Scheme

In furtherance of this fraudulent scheme, the Individual Defendants made, and caused the Company to make, a series of false and misleading public statements and omissions during the Class Period which were designed to conceal the Company's deteriorating condition and prospects and thus artificially inflate the Company's stock price. By the Individual Defendants' own reckoning, see Exhibit A to MID Mem.,[4] the Complaint alleges no fewer than 39 misleading public statements that defendants made in various Company financial statements, SEC filings, press releases and communications with the media. For example:[5]

---

[4] References to "MID Mem." are to the Memorandum Of Defendants Alan Ades, John Arcari, Albert Erani, Philip Laughlin, Donna Lopolito, Michael Sabolinski, And Alan Tuck In Support Of Their Motion To Dismiss The Corrected Consolidated Amended Class Action Complaint.

[5] The Complaint's allegations concerning each of the defendants' numerous misrepresentations and omissions during the Class Period are described in detail in the chart attached as Exhibit 1 hereto, which demonstrates that the Complaint more than adequately alleges the "who, what, when, where and why" of the Individual Defendants' fraud.

(a)    The Individual Defendants represented that Organogenesis could achieve profitability through sales of Apligraf alone.  For example, in a June 25, 2000 television interview on CNBC PowerLunch, Laughlin stated that the Company "can become profitable and will become profitable with Apligraf alone."  ¶ 94. Contrary to these representations, Laughlin and the Individual Defendants were well aware at the time these representations were made that there was no way the Company could become profitable through the sale of Apligraf, given that under the terms of the Novartis marketing agreement, Organogenesis was losing, and would continue to lose, money on every unit of Apligraf it produced.

(b)    The Individual Defendants represented that Organogenesis had unfettered and unconditional access to $20 million in financing under the Novartis Put Option, which would purportedly act as a financial "safety net" for the Company.  For example, in a February 27, 2001 television interview, Laughlin stated:  "[At] any time during the next three years we are able *at our discretion and our option* to sell Novartis $20 million of shares. . . . *[I]t is [a] wonderful safety net to have in our pocket*."  ¶ 107 (emphasis added); see also ¶ 130 ("We retain the right to sell Novartis an additional $10 million in equity").  Contrary to these representations, Laughlin and the Individual Defendants knew that there existed significant conditions precedent to the exercise of the Novartis Put Option which prevented the Company from accessing the funds at "any time" and "at [the Company's] discretion," thus making the notion that the Novartis Put Option was the Company's "safety net" an illusion.  ¶ 150; 154.

(c)    The Individual Defendants represented that the amendment of the Novartis marketing agreement represented a "turning point" for the Company and a "major improvement in [the Company's] economic situation" because it would result in a "substantial increase in the percentage of the revenue" from Apligraf sales that the Company would receive.  ¶ 107.  For example, in a March 5, 2001 press release, Arcari touted the "significantly higher payments for Apligraf" that the Company was purportedly receiving under the amended Novartis marketing agreement.  ¶ 110.  In fact, however, these representations were materially incomplete and misleading given that the Individual Defendants knew that even under the terms of the revised Novartis marketing agreement, the revenue split from Apligraf sales meant that the Company was still losing, and would continue to lose, money on every unit of Apligraf that it produced.  ¶ 60; 65.  Thus, far from being a "turning point" for the Company, the revised Novartis marketing agreement left Organogenesis on the same road to insolvency that it had been on under the original Novartis marketing agreement.

(d)    The Individual Defendants represented that the Company had sufficient capital to finance operations through the first quarter of 2002 and could and would achieve soon profitability.  For example, in a February 2001 television interview, Laughlin stated that the Company was "targeting to pass through break even and reach profitability in the . . . third quarter of [2002]."  In another example, the Company's 2000 Form 10-K, which was issued on March 30, 2001 and signed by

Laughlin, Erani and Arcari, stated that: "existing working capital at December 31, 2000, together with the proceeds of product and other revenues in 2001 and proceeds available from exercising a portion or all of a $20,000,000 equity put with Novartis, which is at our discretion, will be sufficient to finance operations ***through at least the first quarter of 2002.***" ¶ 113 (emphasis added). Defendants Laughlin and Arcari repeated this representation again on April 27, 2001. ¶ 118. Contrary to these representations, the Individual Defendants knew that because of the adverse terms of the Novartis marketing agreement, the undisclosed problems relating to the manufacturing, distribution and marketing of Apligraf, the unavailability of the funds represented by the chimerical Novartis Put Option, the Company could not achieve "break even," much less profitability by the third quarter of 2002 or adequately finance operations through the first quarter of 2002. ¶ 119(b). In fact, it was well before the end of the first quarter of 2002 — in January 2002 — that the Company announced that it was running out of money, ¶ 148, and it was in the third quarter of 2002 that the Company became insolvent, ¶ 161.

(e)   The Individual Defendants represented that the costs of Apligraf production exceeded sales revenue due to such factors as "start-up costs" and the "the high costs associated with low volume production," and that margins would improve as Apligraf production increased. For example, the Individual Defendants, including Stein, Arcari, Laughlin, Erani, and Lopolito, repeatedly represented: "Cost of product sales exceeded product sales due to the start-up costs of new product introduction and the high costs associated with low volume production. We expect production to increase and our margins to improve. We expect to continue to expand production operations during 2000." See ¶¶ 85; 90; 98; 102; 118. In November 14, 2000, Laughlin represented that "[w]hile unit volumes are still small, which adversely affects our cost of production, the trend is encouraging." ¶101. Contrary to these representations, the Individual Defendants knew that Apligraf was unprofitable not because of "start-up costs" or "the high costs associated with low volume production," but rather because of the disadvantageous terms of the Novartis marketing agreement and Novartis' inflated sales forecasts, which together virtually guaranteed that Organogenesis would continue to lose money on every unit of Apligraf that it produced. ¶¶ 60; 65. Further, the Individual Defendants knew that, for this same reason, margins would not improve as production volume increased — in fact, margins, if anything, would worsen, given that the more units of Apligraf that the Company produced, the greater its losses would be. Id.

(f)   The Individual Defendants represented that Organogenesis was experiencing strong demand for its product. They touted "record" monthly sales of Apligraf, which were often accompanied by statements attributing these "record" sales to "new Apligraf marketing and sales initiatives by Novartis." See ¶¶ 69; 103. They also represented that the prospects for increased Apligraf sales were strong and improving. For example, in a October 3, 2000 press release, Laughlin stated that "Apligraf achievements" in the third quarter of 2000 had "laid an important

foundation for future sales development." ¶ 99. The Individual Defendants also made representations about future sales prospects for Apligraf, such as stating that the Company was anticipating "increasing demand," ¶ 128, and touting "strong sales forecast," ¶ 130. For example, on September 7, 2001, Sabolinski represented that "[w]e anticipate increasing [the] production rate in the near term to meet forecasted demand." ¶136. The Individual Defendants also represented that the Company's sales efforts would succeed in helping the Company achieve profitability because they were based on the superior marketing skill and advanced training of Novartis' sales personnel. For example, defendants touted the "technical expertise and distribution capability" of Novartis, ¶85, and "expanded Novartis sales and marketing support." ¶ 113. However, the Individual Defendants knew that these representations were incomplete and misleading. Although they painted a rosy picture of the Company's and Novartis' sales and marketing efforts, the Individual Defendants failed to disclose severe problems related to the marketing of Apligraf, which damaged the reputation of Apligraf and Organogenesis among purchasers and severely limited the Company's sales prospects. ¶ 61. The Individual Defendants' representations also misled investors into believing that Novartis' "new . . . marketing and sales initiatives" and "expanded" marketing support were succeeding, when in fact, as confirmed by several former employees of Organogenesis and Novartis, Novartis' marketing team did not have the proper training, experience or expertise necessary to marketing a living product, such as Apligraf, and in fact "had no idea what they were doing" when it came to marketing a product like Apligraf. ¶ 61(a).

(g)    The Individual Defendants touted the Company's plans to expand manufacturing capability and to do so in order to meet sales forecasts. For example, they represented that they planned "accelerating growth in Apligraf production to meet the increasing demand anticipated," ¶ 128, and to "ramp up production to meet the strong sales forecast." ¶ 130. They also represented that they expected "to continue to expand manufacturing operations," ¶ 70, and "production volume to increase." Id. Through these and similar statements, the Individual Defendants misled investors into believing that Organogenesis would achieve increased production scale, decreased manufacturing costs, and more efficient production methods, which led investors to believe that the Company could thereby achieve profitability from sales of Apligraf. See, e.g., ¶ 84 ("[O]ur focus must include driving down per unit manufacturing costs through the development and implementation of more efficient methods of production."). In reality, however, the Individual Defendants knew, as confirmed by several knowledgeable former Organogenesis employees, that the Company was experiencing severe manufacturing- and distribution-related problems with Apligraf that led to limited and delayed production, poor quality control — including at times shipping batches of Apligraf to physicians without first reviewing vital laboratory results — and, in some cases, contamination and recall of the product. ¶ 62. In fact, according to one former Organogenesis employee, Sabolinski often directed the Company to ship units of Apligraf for distribution to purchasers before

10

obtaining the results of vital laboratory testing on those units and at times signed the paperwork authorizing the release of those units because the Company's Quality Assurance personnel refused to do so. ¶ 62(a). As a result of these undisclosed manufacturing and distribution problems, there was "no way" the Company could feasibly mass-produce Apligraf and the purchasers of the Company's product were steadily becoming less and less willing to order, or re-order Apligraf, thus damaging future sales prospects and adversely impacting the Company's purported attempt to achieve profitability. ¶ 62. Further, as the Individual Defendants knew but did not disclose, the "increasing demand anticipated" and "strong sales forecast" were likely to be unrealized, given the fact that, as confirmed by a former Organogenesis employee, Novartis' sales forecasts were "always inflated." ¶ 64.

(h)     Rather than disclose the marketing and manufacturing problems that were plaguing the Company's sales and ruining the prospects for future sales development, or reveal that because of the Novartis marketing agreement, no amount of sales could allow the Company to achieve profitability, the Individual Defendants tried to misdirect investors by claiming that "key" factors in the Company's sales efforts were factors that were secondary at most. For example, in a May 11, 2000 press release, Laughlin stated that the two "key" factors with respect to Apligraf sales development were "obtaining approval for diabetic foot ulcers and gaining standardized Apligraf reimbursement." ¶ 89. Similarly, in a June 25, 2000 television interview, Laughlin stated that "[t]he two main drivers of [the Company's future achievement of profitability through Apligraf alone] are diabetic foot ulcer approval which happened last week and getting that standardized Medicare reimbursement, which has been slow going. We're optimistic . . . ." ¶ 94; see also ¶ 97 ("[T]wo important drivers of Apligraf sales [are] FDA approval for diabetic foot ulcers and Medicare reimbursement for the product's cost. We now have tangible achievements in both areas.") The Individual Defendants also concealed the true reasons for declining Apligraf sales — the Company's marketing and manufacturing problems — by attributing them to factors such as the "summer vacation period." ¶ 95.

(i)     The Individual Defendants represented that capital from "product sales, research and development support payments and debt equity financings" would be sufficient to fund future operations, see ¶ 85, even though defendants knew that product sales were actually causing the Company to lose money, rather than make money, and that the Novartis Put Option that the Individual Defendants touted as a financing "safety net" was a chimera. See ¶ 87(e).

(i)     The Individual Defendants caused the Company to engage in purchases and sales of the Company's stock and represented that these transactions reflected increased confidence in the Company's prospects. For example, on December 6, 2000, the Individual Defendants issued a press release in which Laughlin stated that the Company's Board of Directors "view[ed] current market conditions as an opportunity to purchase shares that the Company considers to be undervalued in

view of our prospects" and that the Company's decision to authorize a stock buyback program demonstrated "the confidence our Board has in the Company's future." ¶ 105.  Similarly, in October 2001, Sabolinski announced that the Company had raised over $20 million, including over $10 million through equity placements, describing it as "an important step in achieving key corporate milestones including *realizing profitability sooner*." ¶ 141.  The Individual Defendants also caused the Company to engage in other stock transactions in 2001, including a $13.5 million share offering, ¶ 123, and a $1.44 million private placement, ¶ 127.  The Individual Defendants caused the Company to engage in these transactions in Organogenesis stock despite the existence of a scheme to "manipulate the market for the Company's stock." ¶ 59.

Defendants engaged in this scheme to "manipulate the market for the Company's stock," to conceal the true operational and financial condition of Organogenesis, and to materially misrepresent and fail to disclose the conditions that were adversely affecting Organogenesis throughout the Class Period, because it enabled the Company and Company insiders, including certain defendants, to register for sale and/or sell over 6 million shares of Company stock and/or securities valued at over $68 million, prior to any proper disclosure to the market.  ¶¶ 188-89.

E.    **The Truth Emerges**

It was only beginning on January 30, 2002 that the truth about Organogenesis began to emerge.  On that day, without any prior warning to investors, and despite their previous representations touting the Company's solid condition and rosy prospects, the Individual Defendants suddenly announced that the Company was running out of money and would be forced into insolvency unless it could raise at least $15 million in the immediate near term.  Significantly, the Company also disclosed that, contrary to the Individual Defendants' previous assurances that it could count on the Novartis Put Option as a "safety net" which was available "at our discretion," it would not be able to access the remaining $10 million tranche of the Novartis Put Option because of significant conditions precedent to that funding — conditions that the Individual Defendants had never before disclosed.  ¶¶14; 150.  In other words, the very funds that the Individual Defendants had led investors to believe could be relied upon to save the

Company from financial ruin were revealed to be a complete illusion at the very moment that the Company needed those funds the most.

On the same day, the Company also revealed for the first time that, contrary to the Individual Defendants' previous representations that the Company could remain properly funded, was on track to profitability in the foreseeable future, and had sufficient funds, or access to funds, to "finance operations through at least the first quarter of 2002," ¶ 113, the Company was in dire financial straits. The Company stated that the "extent of future losses and the time required to achieve profitability are highly uncertain, and we may never achieve a profitable level of operations or, even if we achieve profitability, we may not be able to sustain it on an ongoing basis." ¶¶ 14; 148. The Company also announced that, because of its inability to raise necessary funds, it might be forced to "curtail or discontinue our activities." ¶¶ 14; 149.

In the days following these announcements, shares of Organogenesis declined precipitously, falling to as low as $1.32 on February 7, 2002 — a decline of almost 95% compared to the Class Period high of over $22.00 per share reached on March 7, 2000. ¶ 15. In September 2002, the Company filed for bankruptcy protection — from which it later emerged under a plan that allowed defendants Erani and Ades to buy the Company at a steep bargain while liquidating the Company's stock — thus leaving the Company's shareholders with nothing. ¶ 16.

## ARGUMENT

## I. THE APPLICABLE PLEADING STANDARDS IN A SECURITIES FRAUD ACTION

### A. The Pleading Standard Under Rule 12(b)(6)

Rule 12(b)(6) requires a court to sustain a complaint alleging a claim under Section 10(b) and Rule 10b-5 "unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46

(1957).  As courts in the First Circuit have noted, a motion to dismiss "is one of limited inquiry,

focusing not on 'whether a plaintiff will ultimately prevail but whether the claimant is entitled to

offer evidence to support the claims." <u>Schaffer v. Timberland Co.</u>, 924 F. Supp. 1298, 1305

(D.N.H. 1996) (citation omitted).  In assessing the adequacy of the complaint, the plaintiff's

allegations must be taken as true; in addition, the complaint must be liberally construed as a

whole and in the light most favorable to the plaintiff.  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236-37

(1974), <u>overruled on other grounds by</u> <u>Davis v. Scherer</u>, 468 U.S. 183 (1984); <u>Roeder v. Alpha</u>

<u>Indus. Inc.</u>, 814 F.2d 22, 25 (1st Cir. 1987).  Particularly relevant here is the <u>Timberland</u> court's

guidance concerning complaints alleging securities law violations, such as this:

> In the securities law context, the court will not render any decision
> as to whether a particular statement is rendered misleading by a
> particular omission.  It will merely determine whether Plaintiffs
> have sufficiently alleged circumstances under which Plaintiffs
> could conceivably prove their claim.

<u>Timberland</u>, 924 F. Supp. at 1305 (citation omitted).

### B.    The Requirements Of Pleading Fraud Under Rule 9(b) And The PSLRA

#### 1.    Plaintiffs Are Not Required To Plead Evidence

At the core of the Individual Defendants' argument is their mistaken notion that this

Court and the First Circuit require that a complaint plead evidence, or better yet, conclusive

proof of defendants' fraud.  The Individual Defendants assert that the Complaint should be

dismissed because it does not identify every person, every document, and quite literally every

fact relating to the Individual Defendants' fraud that might need to be proffered at trial to prove

Plaintiffs' case.  Of course, this notion is not supported by law.  <u>See</u> <u>In re Cabletron Sys.</u>, 311

F.3d 11, 33 (1st Cir. 2002) ("[T]his court has said repeatedly that the rigorous standards for

pleading securities fraud do not require a plaintiff to plead evidence."). Indeed, as the First

Circuit has recently stated:

> We have no intention here of diluting the stringent mandate of
> Rule 9(b). But in determining the adequacy of a complaint under
> that rule, we cannot hold plaintiffs to a standard that would
> effectively require them, pre-discovery, to plead evidence. Rule
> 9(b) proscribes the pleading of "fraud by hindsight," but neither
> can plaintiffs be expected to plead fraud with complete insight.

Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1225 (1st Cir. 1996) (citation omitted); see Mallozzi

v. Zoll Med. Corp., No. 94-11579-NG, 1996 WL 392146, at *6 (D. Mass. Mar. 5, 1996) ("The

purposes of Rule 9(b) are not met by a talmudic analysis of the complaint, requiring a degree of

precision that cannot be expected of plaintiffs before discovery, much less before trial.").

Similarly, in Timberland this Court rejected defendants' proposed "evidentiary standard":

> The court has not undertaken the fact-intensive, fastidious review
> of the fifty-one page amended complaint sought by the defendants'
> motion to dismiss. This is because the defendants have apparently
> confused what must be alleged by plaintiffs with what plaintiffs
> will be required to prove to withstand a summary judgment motion
> or to prevail at trial. To avoid dismissal, plaintiffs need only meet
> a sufficiency standard.

924 F. Supp. at 1322 (internal citation and quotation omitted).

  2.  Pleading the "Who, What, When, Where and How"

Rule 9(b) provides that "in all averments of fraud. . . the circumstances constituting fraud

shall be stated with particularity." Fed. R. Civ. P. 9(b). In addition, under Rule 9(b), a complaint

alleging Section 10(b) claims must "set forth specific facts" that make it reasonable to believe

that the defendant acted with scienter. Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357,

361 (1st Cir. 1994). This standard is met where the "times, dates, places, or other details of the

alleged fraudulent involvement" of the defendants are alleged. Id.

Similarly, the PSLRA requires that a Section 10(b) complaint "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). As the following discussion shows, these requirements — as well as the PSLRA's requirement of pleading with particularity facts giving rise to a "strong inference" that defendants acted with scienter — are amply met by the detailed and particularized allegations of the Complaint.

## II.    THE COMPLAINT AMPLY PLEADS FRAUD WITH PARTICULARITY WITH RESPECT TO EACH INDIVIDUAL DEFENDANT

The Individual Defendants incorrectly assert that the Complaint fails to plead with particularity each particular defendants' role in the fraud. This assertion ignores the myriad specific and particularized allegations concerning each defendant that are pled in the Complaint.[6] With the exception of defendant Ades — who is discussed below — each of the Individual Defendants is alleged to have made untrue and/or misleading public statements, which the Complaint clearly attributes to each such defendant. See ¶¶ 70, 74, 75, 85 (Lopolito); ¶ 77 (Tuck); ¶¶ 73, 74, 75, 84, 85, 89, 90, 94, 95, 96, 97, 98, 99, 101, 102, 103, 105, 107, 112, 113,

---

[6] The Individual Defendants' argument that Plaintiffs' purported failure to differentiate between defendants is "particularly conspicuous" because Plaintiffs have not sued Organogenesis, MID Mem. at 8, or that most of the Individual Defendants' misleading public statements were made in Company press releases or SEC filings is a non-sequitur, and only highlights the bankruptcy of the Individual Defendants' assertions about the purported inadequacy of Plaintiffs' Complaint. As the Individual Defendants are well aware, Organogenesis was re-organized as a new and separate corporate entity after it was driven to bankruptcy in 2002 and later emerged from bankruptcy as a private company under the control of defendants Erani and Ades. ¶¶ 164-67. Accordingly, the company known as Organogenesis, Inc. that engaged in the fraud alleged in the Complaint has ceased to exist and cannot be sued. Further, even if Organogenesis could be sued in this action, nothing requires Plaintiffs to sue the issuer of the securities in question in order to hold liable individual defendants who participated in the securities fraud relating to that issuer. As for the Individual Defendants' argument concerning the medium of their misleading public statements, press releases and SEC filings are precisely the kind of public reports that typically form the basis of securities fraud actions, and have been upheld as proper bases on which to plead fraud against securities fraud defendants in cases too numerous to mention.

118 (Laughlin); ¶¶ 68, 70 (Stein); ¶¶ 90, 98, 102, 106, 110, 113, 117, 118, 129, 130, 131, 132,

144 (Arcari); ¶¶ 85, 113 (Erani); ¶¶ 125, 128, 131, 132, 135, 136, 138, 139, 141, 143, 144

(Sabolinski). The chart attached as Exhibit 1 hereto further demonstrates that the Complaint

identifies clearly the specific fraudulent statements that were made and particularizes each

separate Individual Defendant's role in the fraud. Indeed, even the chart attached as Exhibit A to

the Individual Defendants' own motion to dismiss contradicts their assertion that the Complaint

fails to differentiate among the defendants: it clearly demonstrates that the Complaint's

numerous allegations of fraudulent statements are attributed to the specific individuals making

them rather than to all the defendants as a whole.[7] See chart attached as Exhibit A to the MID

Mem. Thus, the Individual Defendants' assertion that the "'complaint fails to connect' the

defendants 'specifically to any of the materially misleading statements . . . ,'" MID Mem. at 7, is

patently untrue.

    The Individual Defendants' assertion that the allegations pled against Lopolito illustrate

the Complaint's failure to differentiate between the defendants, MID Mem. at 9-10, is

misguided; if anything, the allegations with respect to Lopolito serve to illustrate the bankruptcy

of the Individual Defendants' argument. First, the Individual Defendants' suggestion that the

Complaint alleges only three misrepresentations against Lopolito is simply incorrect. As the

accompanying chart attached as Exhibit 1 hereto demonstrates, the Complaint alleges that

Lopolito was directly responsible for no less than ten affirmative misrepresentations — all made

---

[7] The fact that certain of the misrepresentations alleged in the Complaint were made in Company press releases, and thus cannot be attributed solely to any one defendant, does not diminish the liability of each of the Individual Defendants for those misrepresentations. See In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319, 341 (D. Mass. 2002) ("To permit the individual defendants to cause false communications to issue to investors, yet escape liability because investors, prior to discovery, cannot identify who generated the press release, would be inconsistent with the intent and functions of the securities laws.")

while she was Chief Financial Officer and a Vice President of Organogenesis. ¶¶ 70, 74, 75, 85. For example, Lopolito (along with Stein) signed the Company's November 15, 1999 Form 10-Q for the third quarter of 1999 (Form 10-Q), which misleadingly stated that the Company expected "margins to improve" as Apligraf production volume increased. ¶ 70. Lopolito (as well as Stein) was aware, however, that this was not true. In reality, the Company was losing money on each unit of Apligraf sold, which meant that far from lowering costs, the more units of Apligraf that Organogenesis sold, the **worse** its margins would be. ¶¶ 65; 76(b). Further, contrary to the Individual Defendants' suggestion that a defendant should not be held liable for statements made in SEC filings that that defendant signed, public statements issued by a company that are officially signed, and thus personally approved by a defendant (such as signed SEC filings), are precisely the kind of statements that are properly attributed to a defendant in a Section 10(b) action, and are routinely upheld as such by courts in securities fraud cases.[8] See Cabletron, 311 F.3d at 41 (by signing company's Form 10-K, directors "accepted responsibility for its contents").

The "group pleading doctrine" provides that in cases of corporate fraud where the false or misleading information is conveyed in annual reports or other "group-published information," it is reasonable to attribute the statements to the Company's officers as a group. Serabian, 24 F.3d at 368 (explaining the doctrine); see also In re Lernout & Hauspie Sec. Litig., 208 F. Supp. 2d 74, 84 (D. Mass. 2002) ("Each of the four individual defendants also may be held responsible for

---

[8] As for Alan Ades, the Complaint alleges that he became Chairman, President and Chief Executive Officer of the Company in October 2002 and actively participated in the fraud by engaging in a scheme with his cousin (and co-defendant in this action), Erani, to drive the Company into bankruptcy after the end of the Class Period in order to reacquire the Company for himself and Erani. ¶¶ 28, 164-67. Specifically, Ades was part of a group of investors, including Erani, who took measures to ensure that other interested parties were not able to successfully participate in the ultimate sale of the Company, allowing him and Erani to acquire the Company for a lower price, further depriving investors of a return on their investment in Organogenesis.

the false and misleading information contained in group-published information."); In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 152 (D. Mass. 2001) ("Under the group-published information doctrine, the plaintiff may impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers."); In re Tyco Int'l, Ltd. Multidistrict Litig., No. 02-1335-B, 2004 U.S. Dist. LEXIS 20733, at *6 (D.N.H. Oct. 14, 2004) ("Insofar as the group pleading doctrine merely permits a plaintiff to rely on a presumption that statements contained in corporate press releases, SEC filings, and other similar company documents are the collective work of the company's executive officers, the doctrine does not appear to be inconsistent with either the PSLRA or Rule 9(b)."); In re NTL Inc. Sec. Litig., 347 F. Supp. 2d 15, 22 n. 26 (S.D.N.Y. 2004). The Individual Defendants erroneously suggest that the doctrine is not recognized in the First Circuit. In fact, however, the First Circuit has affirmed the continuing vitality of the "group pleading" doctrine since the passage of the PSLRA. See Cabletron, 311 F.3d at 40; In re Raytheon, 157 F. Supp. 2d at 153 ("[T]his Court agrees with the majority of courts that have held that the rationale behind the group pleading doctrine remains sound in the wake of the passage of the PSLRA.").

The Complaint alleges that each of the Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the contents of the various quarterly and annual financial reports, press-releases, and communications with the media pertaining to the Company. ¶¶ 35; 187. Plaintiffs also allege that each of these defendants was provided with copies of Organogenesis' SEC filings, press releases and other disseminations alleged to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. ¶ 38. As a result, each

of the Individual Defendants was responsible for the accuracy of the public reports and releases

detailed herein, and hence liable for the representations contained therein.

Moreover, it is not necessary, as the Individual Defendants' imply, see MID Mem. at 9,

that the public filings, press releases and other media through which the statements were made

demonstrate on their face that the Individual Defendants were aware of, or recklessly disregarded

the falsity of, those statements.  See Blatt v. Muse Techs., Inc., Nos. CIV.A.01-11010-DPW &

CIV.A.01-12173-DPW, 2002 WL 31107537 at *9 (D. Mass. Aug. 27, 2002); Chalverus v.

Pegasystems, Inc., 59 F. Supp. 2d 226, 234 (D. Mass. 1999) ("certain information, particularly

'facts critical to . . . an important transaction generally are so apparent that their knowledge may

be attributed to the company and its key officers.'"); Kafenbaum v. GTECH Holdings Corp., 217

F. Supp. 2d 238, 250-51 (D.R.I. 2002) (due to their position in the company and likelihood of

day-to-day control, statements could be attributed to company officers under group published

information doctrine).  Courts thus hold that misrepresentations about matters going to a

company's core create a strong inference that the company and its senior officers knew the truth

when the misstatements were made.  See, e.g., In re Peoplesoft, Inc., No. C 99-00472 WHA,

2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000); In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d

935, 954 (E.D. Pa. 1999); In re Ancor Communs., 22 F. Supp. 2d 999, 1005 (D. Minn. 1998);

Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989).  As discussed below, the Complaint

adequately pleads facts sufficient to create a strong inference of the requisite scienter with

respect to each of the Individual Defendants, including Lopolito and Ades.

## III.   THE COMPLAINT MORE THAN ADEQUATELY PLEADS WITH PARTICULARITY NUMEROUS MATERIALLY FALSE AND MISLEADING STATEMENTS BY THE INDIVIDUAL DEFENDANTS

The fundamental philosophy underlying the federal securities laws is one of complete and

accurate disclosure.  See, e.g., Basic Inc. v. Levinson, 485 U.S. 224, 230 (1988).  "[E]ven a

voluntary disclosure of information that a reasonable investor would consider material must be 'complete and accurate.'" Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990). As one court in the First Circuit has stated: "the fundamental purpose of the securities laws is . . . 'to substitute a philosophy of full disclosure for the policy of caveat emptor' and thus to achieve a high standard of business ethics in the securities industry." Haft v. Eastland Fin. Corp., 772 F. Supp. 1315, 1321 (D.R.I. 1991) (quoting Hershfang v. Citicorp, 767 F. Supp. 1251, 1256 (S.D.N.Y. 1991)).

Ignoring their duty as officers of Organogenesis to provide full and accurate disclosures whenever they spoke, the Individual Defendants contend that the entire case should be dismissed as a matter of law because, among other things, according to the Individual Defendants: (1) the Company purportedly disclosed that it was losing money, see MID Mem. at 10-13; Stein Mem. at 11-12,[9] and its representations about its liquidity purportedly were accurate, see MID Mem. at 13-14, and (2) Plaintiffs cannot state a claim based on the Novartis Put Option, see MID Mem. at 14-17. Each of the Individual Defendants' arguments is meritless for the reasons discussed in detail below.

**A.     The Individual Defendants Never Disclosed That The Company Could Not Achieve Profitability Because Of The Terms Of The Novartis Marketing Agreement And Other Undisclosed Material Adverse Factors Affecting The Company**

The Individual Defendants argue that because the Company purportedly disclosed that it had in the past suffered operating losses and had never been profitable, nothing the Individual Defendants said, or failed to say, on the subject of profitability to investors can be actionable. However, the accuracy of the Individual Defendants' statements about past profitability cannot

_____

[9] References to "Stein Mem." are to Defendant Herbert M. Stein's Motion To Dismiss The Corrected Consolidated Amended Class Action Complaint.

insulate them from liability for their Class Period misrepresentations about the then-current and future ability of the Company to earn a profit.

The Individual Defendants' argument ignores the Complaint's allegations that the Individual Defendants knew, but did not disclose, that the Company was losing money on every unit of Apligraf — its only marketable product — that it produced due to the terms and effects of the Novartis marketing agreement. ¶¶ 60; 61(b); 65. As such, it was virtually impossible for the Company to achieve profitability. ¶¶ 62; 100(b); 108(f); Whether investors were somehow warned that the Company had incurred losses and that it might incur losses in the future — even if true — in no way alters the fact that the Individual Defendants misled investors into believing that the Company could, and would, achieve profitability in the near-term despite their knowledge that this was practically impossible. "[D]iscussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized." In re Regeneron Pharms., Inc. Sec. Litig., No. 03CIV311, 2005 U.S. Dist. LEXIS 1350, at *54 (S.D.N.Y. Feb. 1, 2005).

Further, the Complaint alleges facts demonstrating that the Individual Defendants represented much more than simply that the Company *could* be profitable and withheld material information that proved otherwise; they made affirmative representations that the Company would achieve profitability. For example, in a June 25, 2000 television interview on CNBC PowerLunch, Laughlin represented that the Company "can become profitable and will become profitable with Apligraf alone." ¶ 94 (emphasis added). Similarly, in a February 2001 television interview, Laughlin told investors: "What we now feel with the increased revenue, with the funding support that we will get, *we are now targeting to pass through break even and reach profitability* in the . . . third quarter of [2002].") (emphasis added). ¶ 107. On the same day,

Laughlin reinforced the misleading impression that Organogenesis would "reach break even" and could do so based on sales of Apligraf alone, stating "we are targeting to reach break even with or without [the] approvals [of additional products]." Id.

Contrary to these representations, however, Laughlin knew that there was no way that Organogenesis could ever reach "break even" much less reach profitability, even under the revised Novartis marketing agreement, given that Organogenesis was losing, and would continue to lose, money on every unit of Apligraf produced under that agreement. Additionally, Laughlin failed to disclose that Organogenesis did not have the ability to access the full amount of the $20 Novartis Put Option. Nevertheless, Laughlin was telling investors — less than 11 months before the Company announced that it was running out of money — that the Company would not only emerge from the red, but would be in the black by the third quarter of 2002 — the quarter when, in fact, the Company announced that it was insolvent and could no longer continue operations. ¶ 107. See In re Vivendi Universal, S.A. Sec. Litig., Nos. 02 Civ 5571 & 03 Civ. 2175, 2004 U.S. Dist. LEXIS 7015, at *23 (S.D.N.Y. Apr. 21, 2004) (affirmative representations wherein defendant reported "very strong results" and expressed confidence that it was "on track" to achieve earnings targets were deemed to be actionable because speaker did not reasonably believe statement when made).

The Individual Defendants do not address the numerous other misleading statements that the Complaint alleges they made concerning the effects on the Company's liquidity of the revised Novartis marketing agreement. For example, in a March 5, 2001 press release, Arcari touted the "significantly higher payments" that the Company was purportedly receiving under the revised Novartis marketing agreement. Arcari stated: "We are particularly pleased with this acceleration [in Apligraf sales], because under the recently amended agreement with Novartis,

***Organogenesis now receives significantly higher payments for Apligraf.***" ¶ 110.  In truth, however, as confirmed by former Organogenesis employees, even under the revised Novartis agreement, Organogenesis' share of revenue from Apligraf sales remained well below Organogenesis' manufacturing costs.  This ensured that, regardless of whether the Company received "significantly higher payments" under the revised agreement than it had been receiving under the original agreement, the Company's liquidity was on a collision course with financial ruin. ¶ 65.[10]

Further, any statement by the Individual Defendants to the effect that Organogenesis had consistently lost money in the past and might continue to lose money in the near-term, see MID Mem. at 11-12; Stein Mem. at 12, has little, if any, force as a caution to Organogenesis investors given the Company's circumstances and the heralded promise of its only product. Organogenesis touted Apligraf as a revolutionary product,  which caused analysts to believe Apligraf had "breakthrough" potential.  ¶ 49.  For example, one analyst that covered Apligraf described Apligraf in April 1999 as a "revolutionary" product and a "major medical breakthrough" for which "it's simply a matter of time before it wins wide acceptance."  Id. Investors reasonably believed, based on the Individual Defendants' representations, that although the Company would struggle initially while it developed and refined the product and the

---

[10] Contrary to the Individual Defendants' suggestion that Plaintiffs' claims concerning the Company's stock offerings and representations about the oversubscription of, and investors' "strong interest" in, those offerings, "make no sense," MID Mem. at 14 n. 6, the Complaint makes clear that, when considered in the context of the state of the Company's financial condition and the Individual Defendants' knowledge of the adverse material factors affecting the Company, these statements were materially misleading and incomplete.  Given the Individual Defendants' defendants failure to disclose the obstacles that existed in accessing essential funding, these representations misleadingly conditioned investors to believe that the Company would be able to raise the additional equity and debt financing necessary to keep the Company operational and achieve profitability.  ¶¶ 87(f); 108(b); 145(b).  As later revealed, the Company in fact did not have access to such funding.  ¶ 150.

Company's manufacturing and marketing capabilities, the Company would in the foreseeable near term reap the benefits of a potentially blockbuster product.[11]

Accordingly, the answer to the Individual Defendants' question of "how Organogenesis could have been more explicit that its financial position was precarious and its ability to become profitable was 'highly uncertain,'" MID Mem. at 12, is clear: Rather than tell investors that the Company could become profitable, and that they expected it to become profitable based on sales of Apligraf alone, the Individual Defendants could have informed — and were required to inform — investors that the revenue split from the Novartis marketing agreement was costing the Company money on every unit of Apligraf that Organogenesis produced, thus bleeding the Company of its cash and ensuring that it would never become profitable. ¶¶ 65-66.

The Individual Defendants also incorrectly argue that their statements regarding liquidity were accurate because, according to the Individual Defendants, the Company issued two statements about its liquidity that were true. See MID Mem. at 13. Even if those statements were technically true, they were not complete, and thus were misleading because the Individual Defendants failed to disclose the material adverse factors affecting the Company discussed above, including the impossibility of achieving profitability through Apligraf sales, the Company's manufacturing, marketing and management problems, and its inability to access the

---

[11] The cases the Individual Defendants cite for the proposition that they were not required to "state the obvious" or to "characterize their results . . . in pejorative fashion" have no application here. See MID Mem. at 13. The fact that the Company's marketing agreement with Novartis combined with its manufacturing problems were causing the Company to lose money on every sale of Apligraf was far from obvious. Investors could hardly have expected the Company to have entered into a marketing agreement that, even as revised to purportedly increase revenue to Organogenesis, would ensure that the Company would lose money on every unit of Apligraf produced. Nor would the disclosure of the effects of the Novartis marketing agreement have required the Individual Defendants to engage in "pejorative" characterizations — it merely would have required a truthful characterization.

funds through the Novartis Put Option, which the Individual Defendants had touted as the

Company's salvation in the event of a major liquidity crisis. Statements such as these that

disclose some facts, but create a false or erroneous impression by omitting other facts necessary

for a true and complete understanding, are indeed actionable. See Caiola v. Citibank, N.A., 295

F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about

material issues."); Roeder, 814 F.2d 22, 26 (1st Cir. 1987) (citing SEC v. Texas Gulf Sulphur

Co., 401 F.2d 833, 860-61 (2d Cir. 1968)) ("When a corporation does make a disclosure —

whether it be voluntary or required — there is a duty to make it complete and accurate."); In re

Campbell Soup Co. Sec. Litig.,145 F. Supp. 2d 574, 583 (D.N.J. 2001) ("[O]nce a disclosure is

made, the disclosing party has an obligation to ensure that the representations are accurate.").

Tellingly, the Individual Defendants do not address the half-truths and omissions plaguing the

statements they made, much less explain why they are not actionable. See also Rubinstein v.

Collins, 20 F.3d 160, 170 (5th Cir. 1994) ("'[A] duty to speak the full truth arises when a

defendant undertakes a duty to say anything.'") (citation omitted).

### B.   The Individual Defendants Never Told The Truth About The Inaccessibility Of The Novartis Put Option Funds

The Complaint specifically alleges that the Individual Defendants made affirmative

misstatements concerning the Company's liquidity. See, e.g., ¶¶ 73; 77; 85; 94; 157. The

Complaint also alleges with specificity how the Individual Defendants misrepresented the

Novartis Put Option as a source of funds that would sustain the Company in a liquidity crisis.

For example, in a February 27, 2001 television interview, Laughlin told investors that at "*any

time* during the next three years we are able *at our discretion and our option* to sell Novartis $20

million of shares. . . . [I]t is [a] wonderful *safety net* to have in our pocket." ¶ 107 (emphasis

added). Similarly, in its 2000 Form 10-K, which was issued on March 30, 2001 and signed by

Laughlin, Erani and Arcari, the Company, in discussing the sources of funding available to the Company that it deemed sufficient to continue financing operations into the future, touted the $20 million Novartis Put Option as available "***at our discretion***." ¶ 113 (emphasis added). Contrary to these representations, the Individual Defendants were well aware that, in reality, Organogenesis did not have the ability to raise the full amount of that funding at its discretion. ¶ 150. As discussed above, the Individual Defendants failed to disclose significant conditions precedent to the exercise of the option, which prevented the Company from accessing $10 million of the funding in 2002, when the Company needed the funds most. ¶¶ 149-50. Accordingly, far from being a "safety net" upon which the Company could rely to fund operations and keep the Company solvent, the Novartis Put Option was nothing more than an illusion designed to bolster investor confidence in the Company's continuing viability.

Thus, the Individual Defendants' assertion that the Complaint fails to allege "why or how Organogenesis' ability to exercise the put option mattered," MID Mem. at 15, is plainly contradicted by the allegations of the Complaint. See, e.g., ¶ 57 ("The supposed ability of the Company to be able to sell stock to Novartis was also purportedly a critical part of Organogenesis' financing, because it should have allowed defendants to raise money whenever necessary — up to $20 million in equity financing in addition to any other sources of debt or equity financing available to the Company . . . [and] because it provided a purported 'safety net' for Organogenesis — a reserve of cash which defendants could allegedly access as a last resort."). The Complaint alleges that the Company announced on January 30, 2002 that it was running out of money and that it would be forced into insolvency unless it could raise at least $15 million in the immediate near term. ¶¶ 148-49. In fact, the Individual Defendants themselves acknowledged at that time that a failure to access the Novartis Put Option funds

could result in the Company's receiving a "going concern" opinion from PwC — which is precisely what eventually happened.  See ¶ 150 ("Although we have a contractual put option to sell an additional $10 million of our securities to Novartis, we must satisfy a number of conditions in order to exercise that option. . . . The failure to have adequate liquidity could result in our receiving a 'going concern' opinion from our auditors.").  Third, even without these allegations, it is obvious that the issue of whether a Company in dire financial straits and in need of $15 million in cash can access millions of dollars in funds obviously "matters."

The Individual Defendants' assertion that the Complaint fails to allege that the Company "even tried to exercise" the Novartis Put Option fares no better.  See MID Mem. at 15.  The Complaint alleges that on January 30, 2002, the Individual Defendants announced that they had no way of satisfying the newly-revealed significant conditions precedent to the exercise of the Novartis Put Option, thus clearly implying that there was no point in even attempting to exercise the option.[12]  ¶ 150.

The Individual Defendants also incorrectly assert that they should be absolved of all liability for any misrepresentations they made about the Novartis Put Option because the Company filed with the SEC the Securities Purchase Agreement underlying the Novartis Put Option.  See MID Mem. at 16.  However, contrary to the Individual Defendants' suggestion, a defendant is not entitled to affirmatively misrepresent an agreement and its effect on the

---

[12] The Individual Defendants' assertion that they did not misrepresent the Novartis Put Option because they never used the words "'critical part of Organogenesis' financing'" in describing it is unavailing.  See MID Mem. at 15.  The Individual Defendants nowhere explain how this fact absolves the Individual Defendants of liability for the clearly false representations about the Novartis Put Option that they did make, including their representations that it was available at the Company's "discretion" and at the Company's "option" and that it was the Company's "safety net" — representations that the Individual Defendants do not dispute were false and misleading.

Company simply because it has made the text of the agreement available to investors by filing it with the SEC.  See Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1306-7 (C.D. Cal. 1996) ("The Court is unpersuaded that defendants' appendix of the marketing agreement to the Form 10-K constituted a disclosure of adverse information sufficient to neutralize the allegedly misleading effect of defendants' [misrepresentations]. . . .  The Court cannot agree with defendants that the release of an inconspicuous addendum renders misleading financial and other public statements presumptively consistent with the strictures of Section 10(b) and Rule 10b-5 . . . ."); SEC v. Rana Research, 8 F.3d 1358, 1363 (9th Cir. 1993) ("Not every mixture with the true will neutralize the deceptive.") (quoting Virginia Bankshares, Inc. v. Sandberg, 111 S. Ct. 2749, 2760 (1991)).

## IV.    THE INDIVIDUAL DEFENDANTS MISREPRESENTED, AND FAILED TO DISCLOSE MATERIAL ADVERSE FACTORS AFFECTING THE COMPANY'S PAST AND CURRENT BUSINESS PERFORMANCE

Unable to effectively address the myriad misrepresentations that the Complaint alleges they made concerning the Company's business performance, the Individual Defendants fall back on the unavailing assertion that the Complaint does not identify any incorrect "numbers" or accounting errors in the Company's financial reports.  MID Mem. at 17-19.  However, the First Circuit has made clear that where the Complaint otherwise pleads actionable misrepresentations and omissions on the part of the defendants, as the Complaint here does (see discussion above, and chart attached as Exhibit 1 hereto) a plaintiff is not required to allege that the "hard numbers" in the Company's financial reports are incorrect or that the Company engaged in accounting errors in order to support a Section 10(b) claim.  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002).

Even if the **numbers** in the Company's financial reports were technically accurate (a question that Plaintiffs cannot answer until they engage in discovery from the Company and its

29

auditor, defendant PwC), this fact (if true) would do nothing to cure the Individual Defendants'

numerous misrepresentations and omissions in those reports, much less affect in any way their

misrepresentations in other media, such as press releases and television interviews.  See Helwig

v. Vencor, Inc., 251 F.3d 540, 562 (6th Cir. 2001) ("If a company chooses to speak on an

uncertain subject . . . it cannot duck liability by pointing to the 'soft' nature of the information it

volunteered.").

A.    **The Individual Defendants Failed To Disclose The Crucial Fact That, Under The Novartis Marketing Agreement,  The Company Was Losing Money On Every Unit Of Apligraf Produced**

The Complaint alleges that the Individual Defendants consistently made statements about

increasing Apligraf sales and the salutary effect of these sales on the Company, while failing to

disclose that under the terms of the Novartis Marketing Agreement, the Company was actually

losing money on each unit of Apligraf that it produced.  ¶¶ 60; 65.  Further, the Individual

Defendants never disclosed that Organogenesis would not be reimbursed by Novartis for any

units of Apligraf that were manufactured by Organogenesis pursuant to Novartis' sales forecasts,

but that ultimately were not sold by Novartis.  ¶ 66.  Thus, as confirmed by former employees of

Organogenesis, the Company took a "huge loss" every time that Novartis was unable to sell units

of the product that Organogenesis had manufactured.  Id.  Further, the damage to the Company's

bottom line caused by this failure to receive compensation for Apligraf units manufactured but

not sold was compounded by the fact that, as confirmed by a former employee of Organogenesis,

Novartis' sales forecasts were "always inflated."  Id.  In sum, far from having a salutary effect on

the Company, sales of Apligraf only compounded the Company's liquidity problems and

exacerbated its diminishing prospects for profitability.

Contrary to the Individual Defendants' assertion, these allegations do not complain of the

fact that the Individual Defendants "negotiated a poor contract with Novartis" MID Mem. at 24.

Instead, these allegations hold the Individual Defendants liable for failing to disclose the crucial effect of that contract on the Company's basic performance and prospects for profitability—that is, for failing to disclose that far from improving the Company's bottom line, sales of Apligraf, and increased sales forecasts for Apligraf demand, were driving the Company ever closer to insolvency.

Further, the Company's disclosure that "production costs exceeded product sales," MID Mem. at 24; see also Stein Memo at 11-12, in no way alerted investors to the essential fact that the Company was losing money on each unit of Apligraf that was sold. First, the Individual Defendants represented that cost of sales exceeded sales "*due to the start-up costs of new product introduction and the high costs associated with low volume production*," see, e.g., ¶ 90 — a statement that was patently untrue. The Individual Defendants were well aware that the reasons Apligraf costs exceeded revenue from sales was the Novartis Marketing Agreement. ¶ 91(c). Further, far from constituting adequate disclosure of this fact, the statement that costs exceeded sales misled investors into believing that Apligraf would be profitable if only the Company could increase product sales or production volume. In this vein, the Individual Defendants repeatedly represented to investors that "we *expect production volume to increase and our margins to improve.*" See ¶¶ 70; 75; 85; 90; 98; 102. The Individual Defendant knew, however, that these representations were false. Because the Company was losing money on each unit of Apligraf sold, far from lowering costs, the more units of Apligraf that Organogenesis produced, the worse its margins would be. ¶¶ 76(b); 87(e); 91(c); 100(g); 104(c). The Company's margins were further squeezed by the undisclosed fact that the Company was not

reimbursed for units of Apligraf that it manufactured pursuant to Novartis' "always inflated" sales forecasts but that Novartis was unable to sell. ¶ 66.[13]

**B.    The Company's Undisclosed Manufacturing And Distribution Problems**

The Individual Defendants' attempt to downplay the Company's undisclosed manufacturing problems, MID Mem. at 25-27; Stein Mem at 14-15, also fails.  Again, although Plaintiffs are not required to plead evidence at the pleading stage, the Complaint contains the accounts of knowledgeable former employees of Organogenesis who were privy to the Company's undisclosed manufacturing- and distribution-related problems that led to limited and delayed production, poor quality control — including shipping batches of Apligraf to physicians without first reviewing vital laboratory results — and contamination and recall of the product. See ¶ 62(a)-(d).  For example, contrary to the Individual Defendants' representations that the Company could mass-produce Apligraf, according to a former Senior Manager of Quality Systems Compliance for Organogenesis, **there was "no way" that the Company could commercially mass-produce Apligraf** given the Company's inadequate production infrastructure and processes. ¶ 62(a).  As reported by another former Organogenesis employee, the Company, at the direction of defendant Sabolinski, often shipped units of Apligraf for distribution to purchasers before obtaining the results of vital laboratory testing on those units. ¶ 62(a). According to another former employee, laboratory results for a particular batch of Apligraf that were received after the product had already been shipped to doctors — and in some cases, after patients had already been treated with it — indicated that the shipped units had failed chemistry testing, requiring the Company to recall the shipped units. ¶ 62(b).  According to a former

---

[13] As discussed below, none of the purported "disclosures" Stein claims the Company made about its sales, including the purported disclosure that sales revenues were lower than manufacturing costs, alerted investors to these facts.  Cf. Stein Mem. at 12.

employee of Novartis, and a former employee of a company that worked with Novartis, physicians who had ordered Apligraf grew frustrated and disappointed with the product because contamination of the product frequently resulted in physicians not receiving the product when necessary. ¶ 62(c) and (d). Notwithstanding the Individual Defendants' awareness of these problems, they repeatedly misled investors about the condition of the Company's manufacturing and distribution processes and the deleterious effect they were having on the Company's efforts to produce and market Apligraf by falsely stating that the Company could "mass-produce," and was mass-producing, Apligraf, see, e.g., ¶ 113, that it was "available to physicians on demand," see, e.g., id., and that they expected production volume and demand for Apligraf to increase, see, e.g., ¶¶ 70, 128, 130, 136.

Despite these detailed allegations, corroborated by the supporting accounts of knowledgeable former employees, the Individual Defendants contend that the Complaint "lack[s] the factual detail necessary to survive." MID Mem. at 26; see also Stein Mem. at 8, 13. The Individual Defendants, however, attempt to hold Plaintiffs to an impossibly high pleading standard. Having alleged with specificity the manufacturing and distribution problems that the Company was suffering from, and the effects of those problems in the form of, inter alia, product contamination, recalls, delayed shipments, and decreased physician demand, see ¶¶ 60-62, Plaintiffs need not allege "marginal cost data" and "internal reports on production costs," Stein Mem. at 13, or facts such as "what percentage of shipments [were] recalled," "by how much [production] volume fell short," or that the Company lost a "particular level of sales," MID Mem. at 25-26; see also Stein Mem. at 10. See Aldridge, 284 F.3d at 81 (amount of overstatement of revenues and earnings need not be alleged to state claim that undisclosed scheme was fraudulent); In re Computer Assocs. Class Action Sec. Litig., 75 F. Supp. 2d 68, 73

33

(E.D.N.Y. 1999) (citing In re Ann Taylor Stores Sec. Litig., 807 F. Supp. 990, 1004 (S.D.N.Y. 1992)) ("Plaintiffs supply 'as much detail of the alleged fraud as can be expected before discovery commences'"); In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d at 593 (on motion to dismiss, plaintiffs were not required to specify how widespread alleged practice was, length of shipment delays, level of returns and how returns were accounted for; "Plaintiffs cite a host of cases supporting the proposition that Plaintiffs need not allege with numerical specificity the extent or impact of Defendant's allegedly improper accounting practices").

Nor can the Individual Defendants avoid liability for their failure to disclose these problems on the grounds that they never "told investors that [the Company's] production process was error-free" or that investors "didn't need to be told" of these problems. MID Mem. at 26. Manufacturing and distribution problems such as the Company's inability to mass-produce its only product, its failure to perform necessary chemistry testing on products and shipment of batches of that product that failed such testing, and product contaminations so severe that they required numerous product recalls are hardly the kinds of obvious or usual problems that a reasonable investor would expect to occur.

### C.    The Company's Undisclosed Marketing Problems

The Complaint alleges numerous statements by the Individual Defendants that were misleading because they failed to disclose information concerning the Company's and Novartis' marketing efforts that was necessary in order to make those statements not misleading. For example, the Company's repeated announcements of "record" sales of Apligraf, see, e.g., ¶¶ 69; 99; 103, and "increasing demand" for Apligraf, see ¶ 128, gave investors the misleading impression that the Company's sales efforts were succeeding, when, in fact, Novartis' marketing team did not have the proper training, experience, or expertise in selling Apligraf — which resulted in significant sales and marketing problems — and future sales development prospects

were being adversely affected by the Company's serious problems relating to the manufacturing of Apligraf.  See ¶¶ 60-62.  In particular, as witnessed by several former employees of the Company, Novartis' inexperience and insufficient training in marketing a product such as Apligraf hindered Novartis' ability to sell Apligraf, damaged the reputation of Apligraf and Organogenesis among purchasers and severely limited the Company's sales prospects.  ¶ 61.  Further, because of Novartis' marketing ineptitude, Organogenesis was required to pay for the high cost of manufacturing many more units of Apligraf than Novartis could sell, thus resulting in a huge loss every time that Novartis was unable to sell units of the product that Organogenesis had manufactured.  ¶ 61(b).

Despite the Individual Defendants' assertions, these undisclosed problems were far from "obvious."  Cf.  MID Mem. at 22; Stein Mem. at 9.  The fact that Apligraf was the first product made of living tissue, MID Mem. at 21, or the statement that Novartis is "one of the world's most experienced and successful pharmaceutical companies," id., hardly alerted investors to the severe undisclosed marketing problems that Novartis and the Company were suffering from.

Again, the Individual Defendants attempt to hold Plaintiffs to an impossibly high pleading standard — a standard that is far higher than that required by the PSLRA and Rule 9(b) — by asserting that Plaintiffs are required to plead such minutiae as: "*What* type of training did Novartis personnel have?  *What* more training did they need?  *When and how many* sales were lost as a result?"  MID Mem. at 23 (emphasis in original); see also Stein Mem. at 10.  As the chart attached as Exhibit 1 hereto demonstrates, the Complaint meets, and indeed exceeds, the pleading standards of the PSLRA and Rule 9(b) by alleging with specificity the "who, what, when, where, why and how" of the Individual Defendants' fraud, and by supporting those allegations with specific facts.  See In Re Number Nine Visual Tech. Corp. Sec. Litig., 51 F.

Supp. 2d 1, 26-27 (D. Mass. 1999)  (complaint survives PSLRA scrutiny despite failure of

complaint to document precise amount of overstatement of inventory or to tie knowledge of

inventory problems to specific defendants); Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)

(detail concerning specific transaction, by customer, amount, and precise method, not required;

specific number or a precise time frame of transactions not required);  SEC v. Feminella, 947 F.

Supp. 722, 733 (S.D.N.Y. 1996) ("[R]equiring plaintiff to list each securities transaction or

alleged kickback payment by date, amount and markup would contravene the requirements of

Rule 8(a) while not furthering the purposes behind Rule 9(b)."); In re Anicom Inc. Sec. Litig.,

No. 00C 4391, 2001 U.S. Dist. LEXIS 6607, at *13 (N.D. Ill. May 15, 2001) (plaintiffs

specifically identified only some transactions; court refused to dismiss unidentified transactions).

Indeed, Plaintiffs have exceeded these standards.  Although Plaintiffs are not required to

plead evidence at the pleading stage in order to satisfy the PSLRA and Rule 9(b), the Complaint

does just that:  it pleads evidence in the form of eyewitness accounts of knowledgeable former

employees of Organogenesis that corroborates its allegations.  See ¶¶ 61-67.

## V.    THE COMPLAINT DOES NOT SEEK TO HOLD THE INDIVIDUAL DEFENDANTS LIABLE FOR FAILING TO "PREDICT THE FUTURE"

### A.    The Individual Defendants' Misrepresentations Were False, And Known To Be False, At The Time They Were Made

The Individual Defendants mischaracterize the Complaint as seeking to impose on them a

duty to "predict the future."  MID Mem. at 27.  On the contrary, the Complaint merely holds the

Individual Defendants liable for misrepresenting the current state of Organogenesis' business

and for failing to disclose material adverse factors that the Individual Defendants were aware of

when making those representations.  See, e.g., Novak v. Kasaks, 216 F.3d 300, 304, 315 (2d Cir.

2000) (statements that company's inventory was "under control," "in good shape," and at

"reasonable" or "expected" levels and stating that "no major or unusual markdowns were

anticipated" are actionable where plaintiffs alleged defendants knew that inventory was in fact unsaleable and nearly worthless); Wright v. Ernst & Young LLP, 152 F.3d 169, 177 (2d Cir. 1998) ("Silence where there is a duty to disclose can constitute a false or misleading statement within the meaning of § 10(b) and Rule 10b-5."). As the Individual Defendants admit, they had a duty to disclose additional information where needed "'so that what was revealed would not be so incomplete as to mislead.'"  MID Mem. at 27 (internal quotations omitted) (quoting Gross v. Summa Four, 93 F.3d 987, 992 (1st Cir. 1996)) ("[W]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate.").  Here, as discussed above, and set forth in the chart attached as Exhibit 1 hereto, the Complaint amply pleads numerous statements made by the Individual Defendants that were materially incomplete and misleading at the time they were made.

For example, contrary to the Individual Defendants' assertion, MID Mem. at 28-29, Laughlin's representation to investors in February 2001 that "we are now targeting to pass through break even and reach profitability in the . . . third quarter of [2002]," ¶ 107, is not a "'vague prediction[] about the prospects for a new product . . . or for a company in general,'" MID Mem. at 29 (quoting In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 54 (D. Mass. 1998)).  Rather, it is actionable as a misrepresentation of current facts because Laughlin knew at the time he made the statement that it was untrue.  See In re Sepracor, Inc. Sec. Litig., 308 F. Supp. 2d 20, 28 (D. Mass. 2004) (defendant's statements could not be protected under the PSLRA's "safe harbor" because the statements "were a matter of fact rather than conjecture by the time the statements were made"); see also Caiola v. Citibank, N.A., 295 F.3d 312, 323 (2d Cir. 2002) (where an allegation is subject to two interpretations, "Rule 12(b)(6) obligates us at this point to draw all reasonable inferences in [plaintiff's] favor . . . [w]e thus need not and do

not decide whether Rule 10b-5 standing would be satisfied under the second theory" because the

first theory "incontrovertibly . . . give[s] rise to standing").  Laughlin knew at the time he made

that statement that there was no way Organogenesis could break even, much less become

profitable, in the third quarter of 2002, or at any time for that matter, while Organogenesis was

operating under the Novartis marketing agreement.  ¶ 108(f).  Laughlin was fully aware but

failed to disclose that, even under the revised — and purportedly more favorable — Novartis

marketing agreement, Organogenesis was losing, and would continue to lose, money on every

unit of Apligraf produced.  Id.  Similarly, the Individual Defendants' representations about the

Company's ability in the future to access the funds represented by the Novartis Put Option "at

[Organogenesis'] discretion" and that Novartis Put Option would be a "safety net" in time of

crisis, see ¶¶ 107; 113, are actionable as misrepresentations of the Novartis Put Option as it

existed at the time it was made.  The Individual Defendants knew at the time they made these

statements that Organogenesis did not have the unfettered access to the Novartis Put Option that

they claimed, and that the Company could not rely on that put option as a "safety net" at any

point in the future.[14]  See ¶ 60.

    Similar misrepresentations have been upheld as actionable by courts in this Circuit.  For

example, in In re Allaire Corp., the Court held that a statement by a company's CEO that its

product was "fueling growth" was an actionable misrepresentation — and not mere puffery —

given the plaintiffs' allegations that the product did not work.  In re Allaire Corp., 224 F. Supp.

2d at 331-32.  Specifically noting that the court was required to "make all inferences in the

Plaintiffs' direction," the court held that if the plaintiffs' allegations about the product's inability

---

[14] The cases cited by the Individual Defendants do not suggest otherwise.  See MID Mem. at 28-
29.  Unlike the instant case, those cases involved representations about expected future
performance without facts demonstrating that the defendants knew them to be false when made.

to operate were true, the CEO could not have believed his statement was true. Id. The court also held that another public statement attributing growth to "impressive win rates for [the product]," which referred to substantial numbers of former clients converting to the product, was actionable because the speaker "already knew that the win rates had dramatically slowed, and thus the statement omitted the current truth." Id. at 334.

**B.    None Of The Individual Defendants' Misrepresentations Are Protected Under The PSLRA's "Safe Harbor"**

Nor are any of the Individual Defendants' statements about Organogenesis' future prospects protected by the "safe harbor" provisions of the PSLRA. Cf. MID Mem. at 30-31. The "safe harbor" disclosures in the Company's SEC filings and press releases that the Individual Defendants describe as "extensive," MID Mem. at 31, are unavailing because these disclosures were boilerplate cautionary statements not sufficiently tailored to the specific circumstances. In re Regeneron, 2005 U.S. Dist. LEXIS 1350, at *54 ("[D]iscussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized."). For example, the Individual Defendants quote a generic statement by the Company that the availability of certain funds was not assured, and that if not available when needed could result in a "potential material adverse effect on [the Company's] financial condition and results of operations." MID Mem. at 31 (quoting Organogenesis' 1999 Form 10-K). Nothing in this statement alerted investors to the specific material adverse factors affecting the Company at the time that made it highly likely that future sources of funding would in fact not be available. Nor does this statement have any effect at all on the Individual Defendants' liability for failing to disclose the onerous conditions precedent to the Novartis Put Option, given that the option was acquired approximately one year after this statement was made. Compare ¶ 85 (Form 10-K issued in March 2000) with ¶ 107 (Novartis Put Option

acquired in February 2001).  Even similar language in the Company's Form 10K for 2000,

however, does not disclose to investors the fact — known to the Individual Defendants at the

time — that the exercise of the Novartis Put Option was highly unlikely given the conditions

precedent to that put option, and that it certainly was not exercisable, as the Individual

Defendants represented to investors, at "any time" and "at [the Company's] discretion." See In

re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004) (if it can be established that the

defendants had actual knowledge that their statements and projections are without basis, there is

no puffery or forward-looking defense); Novak, 216 F.3d at 304 (statements that company's

inventory was "under control," "in good shape," and at "reasonable" or "expected" levels and

stating that "no major or unusual markdowns were anticipated" are actionable where plaintiffs

alleged defendants knew that inventory was in fact unsaleable and nearly worthless); see also In

re Tyco, 2004 U.S. Dist. LEXIS 20733, at *44 (declining to consider merits of defendants'

arguments that misleading statements were not actionable because they qualified as mere puffery

or were protected forward-looking statements "because they would not produce a complete

dismissal of any of the charges even if they prove to be valid").

## VI.     THE COMPLAINT IS NOT PREDICATED ON ALLEGATIONS OF CORPORATE MISMANAGEMENT

The Individual Defendants' contention that Plaintiffs attempt to "manufacture a fraud

claim by alleging mismanagement," MID Mem. at 2, misses the mark.  The Complaint alleges a

series of material misrepresentations and omissions by the Individual Defendants that do not rely

at all on a critique of their corporate judgment or their negligence in running the Company.  For

example, although the Individual Defendants assert that allegations concerning the Novartis

marketing agreement plead nothing more than mere "mismanagement," MID Mem. at 2, the

Complaint makes clear that the Individual Defendants' liability is premised on such

40

misrepresentations as their statement that Organogenesis could become profitable "with Apligraf alone," ¶ 94, and their failure to disclose the fact that under the terms of that agreement, Organogenesis received a revenue split on sales of Organogenesis that made it almost certain that the Company would never be profitable.  See ¶¶ 60; 65.

Further, the Complaint alleges that the Individual Defendants' statements about sales of Apligraf and increased demand and production capability were incomplete and misleading given that they conditioned investors to believe that these were positive developments for the Company, when in fact the Company was losing, and would continue to lose, money on every unit of Apligraf produced, resulting in greater — rather than lesser — losses for the Company as sales and production volume increased.  See ¶¶ 61(b); 66; 65; 76(b); 86(e); 91(c); 100(g); 104(c); 119(h); 133(e); 145(f).  Thus, the Complaint seeks to hold the Individual Defendants to account for their failure to disclose the adverse effects that the Novartis marketing agreement was causing, and would continue to cause, rather than the fact that the Individual Defendants made the mistake of entering into that agreement.  See, e.g., Kafenbaum v. GTECH Holdings Corp., 217 F. Supp. 2d 238, 246 (D.R.I. 2002) (complaint alleging failure to disclose specific information and material misrepresentations in statements issued to the public alleges actionable conduct and not simple mismanagement); Slavin v. Morgan Stanley & Co., Inc., 791 F. Supp. 327, 333 (D. Mass. 1992) ("allegations constitute adequate claims under federal securities law because their essence lies in a failure of full and fair disclosure, not in a failure to manage the company well"); Hurley v. FDIC, 719 F. Supp. 27, 30 (D. Mass. 1989) ("The prohibition on individual shareholders bringing a 10b-5 claim based on corporate mismanagement is inapplicable where . . . there are allegations of material misrepresentations and omissions.").

VII.    **THE COMPLAINT MORE THAN ADEQUATELY PLEADS FACTS ESTABLISHING A STRONG INFERENCE OF SCIENTER AGAINST EACH INDIVIDUAL DEFENDANT**

A.    <u>**The Standard For Pleading Scienter Under The PSLRA**</u>

Under federal securities law, "scienter" is a state of mind meaning "either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." <u>Aldridge</u>, 284 F.3d at 82. This includes "knowing misconduct." <u>Geffon v. Micron Corp.</u>, 249 F.3d 29, 35 (1st Cir. 2001); <u>In re Peritus Software Servs., Inc. Sec. Lit.</u>, 52 F. Supp. 2d 211, 229 (D. Mass. 1999). The PSLRA requires plaintiffs to plead specific facts that raise a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). "The statute was designed to erect barriers to frivolous strike suits, but not to make meritorious claims impossible to bring." <u>Cabletron</u>, 311 F.3d at 30. Accordingly, to assess scienter, the First Circuit has adopted a "'fact-specific approach' that proceeds case by case." <u>Id.</u> at 38 (citing <u>Aldridge</u>, 284 F.3d at 82). Further, the plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter. <u>Aldridge</u>, 284 F.3d at 82. "Because a categorical approach is not appropriate, courts will allow private securities fraud complaints to advance past the pleadings stage when some questions remain unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA." <u>Cabletron</u>, 311 F.3d at 40.

Moreover, since discovery is initially stayed under the PSLRA, the First Circuit has also cautioned district courts to keep in mind when ruling on a motion to dismiss that no discovery has occurred at this stage. The lack of discovery "is relevant to a court's evaluation of sufficient particularity." <u>Cabletron</u>, 311 F.3d at 33. Accordingly, "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence." <u>Id.</u>

### B.    Plaintiffs Plead Direct Evidence of Deliberate Securities Fraud

The Individual Defendants' assertions that the Complaint fails to allege facts showing that the Individual Defendants acted with the requisite state of mind is patently incorrect. The Complaint does far more than allege facts giving rise to a "strong inference" of scienter — all that is required under the PSLRA; it pleads direct evidence of securities fraud. The Confidential Arcari Document, written in October 2001 by the Company's then-CFO, Arcari, states that in 2001 the then-Chairman of Organogenesis — Erani — attempted to "manipulate the market for the Company's stock." ¶ 59. Further, according to the Confidential Arcari Document, Erani also "encouraged the Company to prepare overly optimistic financial projections to existing and potential service providers." Id. These allegations plead direct evidence of classic securities fraud, and more than suffice to establish that the Individual Defendants acted with requisite scienter.

The Individual Defendants make only a half-hearted attempt to confront the Confidential Arcari Document, claiming that it should be ignored with respect to the Individual Defendants other than Erani and Arcari because the Complaint fails to allege that these other Individual Defendants saw the document or are mentioned in it, and should be ignored with respect to Erani and Arcari because it was written in October 2001, after many of the Individual Defendants' misrepresentations had already been made. See MID Mem. at 33 & n.19, 34. Tellingly, the Individual Defendants do not dispute that the Confidential Arcari Document constitutes direct evidence of securities fraud. Further, they do not dispute — nor could they — that by showing that Erani attempted to manipulate the market for the Company's stock and encouraged the Company to prepare overly optimistic financial projections, the Confidential Arcari Document supports plaintiffs' claims that Erani acted with "intent to deceive."

43

Further, because the document was written by Arcari, it shows that he was fully aware of these deliberate and unlawful actions on the part of the Company's Chairman — none of which he disclosed to the market.  Contrary to the Individual Defendants' suggestion, the fact that the document was apparently written in October 2001 does not mean that Arcari, or the Individual Defendants were not aware of these actions much earlier.

Finally, it begs credulity to suggest that actions taken by the Chairman of the Company, including "manipulating the market for the Company's stock" and encouraging "***the Company***" to prepare overly optimistic financial projections, would be unknown in any respect by other members of the senior management of the Company, including the other Individual Defendants. The fact that Arcari was well aware of these actions, and thought them so important to memorialize them, belies any such assertion.  On the basis of the Confidential Arcari Document alone, Plaintiffs have more than adequately pled scienter.

C.    **Plaintiffs Allege Facts Constituting Strong Circumstantial Evidence Of The Individual Defendants' Reckless Or Conscious Behavior**

Even putting aside the clear evidence of scienter provided by the Confidential Arcari Document, the Complaint adequately alleges facts constituting strong circumstantial evidence that the Individual Defendants acted knowingly or, at the very least, recklessly.  The requisite "strong inference of scienter" is supported by numerous facts of the type that the First Circuit and this Court have already found to be persuasive.  First, the Complaint directly alleges that many of the events and circumstances that made the Individual Statements false or misleading were known to the Individual Defendants.  For example, the fact that the Company was losing money on each unit of Apligraf that it produced was, according to a knowledgeable former employee of Organogenesis, known by "the whole Company." ¶ 65.  This crucial fact, which belies many of the misrepresentations and incomplete statements alleged in the Complaint,

44

shows that the Individual Defendants knew at the time they made statements concerning the Company's ability to achieve profitability from Apligraf that such statements were false or so incomplete as to be misleading.  Similarly, for example, with respect to the Company's Apligraf contamination problems, the Complaint alleges that Sabolinski directed the Company to ship units of Apligraf for distribution to purchasers before obtaining the results of vital laboratory testing on those units, and even in some cases, signed the paperwork himself authorizing the release of those untested units.  ¶ 62(a).  The fact that the Individual Defendants "published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."  See Aldridge, 284 F.3d at 83; see also Cabletron, 311 F.3d at 36-37.  Thus, the Individual Defendants' assertion that scienter is inadequately pled because the Complaint fails to "point to facts demonstrating that at the time the statements were made the identified individual knew the negative information that he or she allegedly suppressed," MID Mem. at 34; see also Stein Mem. at 17, is patently incorrect.

Moreover, the Individual Defendants' fraud involved the performance and profitability of the Company's only marketable product — Apligraf — on which the fate of the Company depended, making it highly likely that the problems concerning the profitability, manufacturing and marketing of Apligraf, as well as the terms and effects of the Novartis marketing agreement, were well-known by these senior officers and directors of the Company.  See Aldridge, 284 F.3d at 84; Kafenbaum, 217 F.Supp.2d at 247.  Controlling precedent has recently and repeatedly found scienter to be supported by corporate officers' understanding that a product was "important to their own survival and that of the company."  Cabletron, 311 F.3d at 39 (quoting Aldridge, 284 F.3d at 83).  Likewise, the fraud here involved the Individual Defendants' failure to disclose the significant obstacles to the exercise of the Novartis Put Option, the material

45

importance of which is demonstrated by the Individual Defendants' representations of it as the Company's "safety net," ¶¶ 107; 113.  It strains credulity to assert that the Individual Defendants were unaware of those obstacles.  See In re Complete Mgmt., Inc. Sec. Litig., 153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001) ("[O]n a motion to dismiss, making all reasonable assumptions in favor of the plaintiff includes assuming that principal managers of a corporation are aware of matters central to that business's operation.").

Further, as discussed in detail above, each of the Individual Defendants made incomplete or misleading statements to further the fraud, by misrepresenting the significant problems affecting the Company or concealing the magnitude of those problems.  See Cabletron, 311 F.3d at 35; Aldridge, 284 F.3d at 76-80; Kafenbaum, 217 F.Supp.2d at 247.  Even if the Complaint pled only the underlying fraud and the Individual Defendants' status, allegations of financial fraud by public companies have been found to raise the requisite strong inference of scienter. See Smith v. Network Equip. Techs. Inc., No. C-90-1138, 1990 U.S. Dist. LEXIS 18391, at *8-9 (N.D. Cal. Oct. 19, 1990).

Here, however, contrary to the Individual Defendants' assertion that Plaintiffs fail "to particularize the link between defendants and the Challenged Statements," MID Mem. at 33, as demonstrated in the chart attached as Exhibit 1 hereto, the Complaint clearly specifies which misrepresentations were made by which Individual Defendant.  Additionally, where, as here, plaintiffs identify a narrow group of senior corporate officials who had direct responsibility for the company's financial performance, it is entirely reasonable to conclude that these defendants had the requisite scienter based on their positions within the Company and their undisputed access to pertinent information.  In re NTL., 347 F. Supp. 2d at 22 n.26 (applying group pleading doctrine to hold individual defendants liable as primary violators of the Securities Exchange Act,

46

as plaintiffs had alleged that "each individual defendant was an insider with direct involvement in the daily affairs of the company" and each of these defendants may properly be held responsible "for statements in press releases, SEC filings and annual reports even where the statement at issue was made by another"); In re Sears, Roebuck & Co. Sec. Litig., 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance.") (internal quotations omitted); In re Williams Sec. Litig., 339 F. Supp. 2d 1242, 1259 (N.D. Okla. 2003) (adopting First Circuit's scienter analysis and finding recklessness satisfied because plaintiffs alleged that defendants "were in a position to know this information, understand its materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors"); Marksman, 927 F. Supp. at 1314 (finding requisite strong inference of scienter where defendants "controlled and approved the issuance of accounting and financial statements for [the company] during the relevant periods, and had direct access to information concerning [the company's] financial conditions and operations").

This Court need look no further than the First Circuit's holding in Cabletron to conclude that the Individual Defendants made materially false and misleading statements with scienter.  In Cabletron, the First Circuit concluded that securities fraud was sufficiently pled against three outside directors because by signing the company's Form 10-K, as alleged in the complaint, they had accepted responsibility for its contents.  Cabletron, 311 F.3d at 41.  The First Circuit further concluded that evidence of insider stock sales during the class period contributed to a strong inference of scienter.  Cabletron, 311 F.3d at 39-40 ("Stock sales by insiders can supply evidence of scienter.").  Here, as in Cabletron, the Complaint clearly alleges that each of the Individual

Defendants (with the exception of Ades, who is addressed <u>supra</u>, Part II) signed a plethora of SEC documents that Plaintiffs allege are false and misleading, including 10-Ks and 10-Qs.  <u>See</u> ¶¶ 37-38; 70; 85; 90; 98; 113; 131.  The Complaint also details the insider stock selling, and registration of stock for sale, by three insiders (Stein, Sabolinski and Nancy Parenteu) and the Company during the Class Period.  <u>See</u> ¶ 188-89 & discussion, <u>infra</u>, Part VII.D.  Thus, contrary to the Individual Defendants assertion, MID Mem. at 34, the Complaint need not specify which "'internal reports' or 'conversations'" each Individual Defendant was privy to.

Finally, pursuant to the "group pleading" doctrine, the pleading requirements of Rule 9(b) and the PSLRA can be met without specifically pleading the fraudulent intent of corporate officers, other than outside directors, where, as here, "the allegedly false and misleading group published information complained of is the collective action of officers and directors." <u>Giarraputo v. Unumprovident Corp.</u>, No. 99-301-P-C, 2000 U.S. Dist. LEXIS 19138, at *69 (D. Me. Nov. 8, 2000); <u>see also</u> <u>Complete Mgmt.</u>, 153 F. Supp. 2d at 326 n.7 ("[A]fter resolving all ambiguity in favor of the plaintiff, and taking into account defendants' operational and financial leadership roles . . . plaintiffs may establish through group pleading the inference that defendants were aware of the alleged fraud.").

### D.    Plaintiffs Adequately Allege Facts Demonstrating The Individual Defendants' Motive And Opportunity

As a separate independent basis supporting a strong inference of scienter, the Complaint also alleges that the Individual Defendants had the requisite motive and opportunity to commit the fraud.  There can be no serious dispute that the Individual Defendants, as Organogenesis' executive officers and directors, had the opportunity to implement the fraud alleged.  <u>In re Time Warner, Inc. Sec. Litig.</u>, 9 F.3d 259, 269 (2d Cir. 1993) (when a corporation and its management have allegedly perpetrated a fraud on the market, "no one doubts that the defendants had the

48

opportunity, if they wished, to manipulate the price of [the company's] stock."); Wellcare Mgmt.
Group. Inc., 964 F. Supp. 632, 640 (N.D.N.Y. 1997) (accepting as true allegations that corporate
executive "had knowledge of, condoned, and/or encouraged . . . the deliberate overstatement of
earnings by a number of means" sufficient to plead intent); Marksman, 927 F. Supp. at 1314.

      The Complaint also clearly alleges that the Individual Defendants had a sufficient motive
to commit fraud.  Motive simply entails "concrete benefits that could be realized by one or more
of the false statements and wrongful nondisclosures alleged."  Wellcare, 964 F. Supp. at 638.
Insider trading of stock is not required to establish motive.  STI Classic Fund v. Bollinger Indus.,
1996 U.S. Dist. LEXIS 21553, at *5-*6 (N.D. Tex. Oct. 25, 1996) (motive established in post-
PSLRA case despite absence of any insider trading).  Thus, allegations that the Individual
Defendants engaged in a scheme to inflate the price of Organogenesis stock to enrich themselves
(see ¶ 188) are sufficient, even if no insider trading has occurred.  In re Compaq Sec. Litig., 848
F. Supp. 1307, 1311 (S.D. Tex. 1993).

      Here, however, Plaintiffs' allegations of motive are overwhelming and compelling, as the
Complaint alleges that Company insiders, including Stein and Sabolinski, sold or registered for
sale over 700,000 shares of Organogenesis stock during the Class Period in the amount of over
$7 million.  ¶ 188.  Further, the Complaint alleges that the Individual Defendants also caused the
Company to engage in the sale of over $60 million in other sales of Organogenesis securities
pursuant to stock offerings, private equity offerings and other equity sales during the Class
Period.  ¶ 189.  In total, the Individual Defendants' fraud enabled the Company and Company
insiders, including certain defendants, to register for sale and/or sell over 6 million shares of
Company stock valued at over $68 million, prior to any proper disclosure to the market.  By any
measure, these stock sales, and registrations of stock for sale, are significant enough to raise a

strong inference of scienter.  Rubinstein v. Collins, 20 F.3d 160, 169 (5th Cir. 1994) (profits of $760,599 supports strong inference of scienter); Marksman, 927 F. Supp. at 1313 (20% of holdings sold for over $6.3 million supports strong inference of scienter).

Supporting these allegations of the Individual Defendants' pecuniary motive to commit the fraud are the allegations based on the account of a senior manager of the Company that several members of Organogenesis' senior management were more concerned with recouping their own personal investments in the Company than in pursuing the interests of shareholders. According to this senior manager, a culture of "corporate greed" prevailed among the senior management of the Company, who were primarily interested in "taking care of themselves at the top." ¶ 67.  This former director personally attended a meeting of the members of the Company's Board of Directors that occurred after defendant Stein had left the Company, at which defendant Erani, as well as other members of the Board, said that "they needed to get back their investments" and that, in the words of these Board members, they "'were not going to have been taken by Herb Stein.'"  Id.  Despite the Individual Defendants' attempt to dismiss these allegations as "ad hominem attacks," MID Mem. at 36, they are inescapable facts evidencing motive to commit fraud.

Although the Individual Defendants attempt to downplay the Complaint's allegations of insider trading by calling them "disingenuous," MID Mem. at 36, they do not assert that they are untrue in any way.  Nor does the fact that many of the Individual Defendants are not alleged to have traded in Organogenesis stock during the Class Period, see MID Mem. at 36-37, diminish the force of Plaintiffs' scienter allegations.  The scienter requirement may be satisfied even if some insiders sell little or none of their holdings.  See Freedman v. Value Health, Inc., 958 F. Supp. 745, 755 (D. Conn. 1997) (sales by only three of nine named defendants prior to disclosure

satisfied scienter requirement"); <u>In re Initial Pub. Offering Sec. Litig.</u>, 241 F. Supp. 2d 281, 368

(S.D.N.Y. 2003) ("The Court of Appeals has stressed that 'none of [its] cases establishes a per se

rule that the sale by one officer of corporate stock for a relatively small sum can never amount to

unusual trading.  Rather, each case [must be] decided on its own facts.'") (quoting <u>In re</u>

<u>Scholastic Corp. Sec. Litig.</u>, 252 F.3d 63, 75 (2d Cir. 2001)).  For example, in <u>Cabletron</u>, the

court found that scienter was adequately pled even though in that case only one defendant made

the "overwhelming majority of the sales." <u>Cabletron</u>, 311 F.3d at 40.  Further, stock sales by the

Company contribute to the strong inference of motive with respect to the Individual Defendants.

<u>See</u> <u>In re Resource America Sec. Litig.</u>, No. 98-5446, 2000 U.S. Dist. LEXIS 10640, at *18-19

(E.D. Pa. July 26, 2000) ("the desire to raise capital by means of a secondary public offering —

gives rise to a 'strong inference' of scienter" with respect to individual defendants as well as

issuer); <u>Crowell v. Ionics, Inc.</u>, 343 F. Supp. 2d 1, 15 (D. Mass. 2004) ("Each element of the

scheme potentially increases [the company's] profits, stock price, or both.  Anything that benefits

[the company] in turn benefits Goldstein and Kuzmak; presumably their continued employment,

and probably to some extent their compensation, is largely tied to the company's performance, as

measured by profits, stock price, and other indicia.").

        In addition to pleading direct evidence of fraud, Plaintiffs have also set forth the facts

constituting circumstantial evidence of conscious or reckless behavior and satisfied the motive

and opportunity test.  Thus, Plaintiffs have fulfilled their obligation to plead facts that give rise to

a strong inference of scienter.

## VIII.   THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY AS TO EACH OF THE INDIVIDUAL DEFENDANTS

        The Individual Defendants argue that they are not subject to control person liability under

Section 20(a) of the Exchange Act because Plaintiffs have not pled that the Individual

Defendants had control over a "primary violator" of Section 10(b) that is named as a defendant in this action.  See MID Mem. at 39; Stein Mem. at 19-20.  The Individual Defendants' argument is baseless.  First, the same allegations that adequately plead Section 10(b) violations against the Individual Defendants more than suffice to allege a primary violation of Section 10(b) against the Company.  In re Initial Pub. Offering, 241 F. Supp. 2d at 396-97 (fact that a Section 20(a) claim is premised on an underlying Rule 10b-5 fraud claim does **not** require that the Section 20(a) claim be pleaded with particularity).  The Individual Defendants do not dispute that the Complaint adequately alleges each of the Individual Defendants' control of Organogenesis.

Further, it is not true, as the Individual Defendants suggest, that the primary violator who acts as the "controlled" person or entity for purposes of Section 20(a) must be named as a defendant.  SEC v. Savoy Industries, Inc., 587 F.2d 1149, 1170 (D.C. Cir. 1978) ("It is established that the plaintiff need not proceed against the principal perpetrator, nor need the principal perpetrator be identified in the complaint."); Kemmerer v. Weaver, 445 F.2d 76, 78 (7th Cir. 1971) (defendant control person may be held liable even if plaintiff fails to proceed against the principal violator; "there is nothing in the statutes or regulations which prohibits the suing of the principal controlling party or parties under 15 U.S.C. § 78j(b) or Rule 10B-5 if the facts in the case so present themselves"); Primavera Familienstiftung v. Askin, No. 95CIV8905, 1996 U.S. Dist. LEXIS 14845, at *6 (S.D.N.Y. Oct. 8, 1996) ("[A] plaintiff need not make a claim against the 'controlled person' in order to maintain a 'derivative' Section 20(a) claim against the 'controlling person.'"); McCarthy v. Barnett Bank, 750 F. Supp. 1119, 1126 (M.D. Fla. 1990) ("Plaintiffs need not identify the principal perpetrator of the securities violations who is subject to the named Defendants' control."); In re CitiSource, Inc. Sec. Litig., 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988) ("there is nothing in the language of section 20(a) which compels

the joinder of the controlled person, and 'nothing in familiar and conceptually related attribution

principles such as conspiracy membership, agency, or aider and abettor, demands a visiting of

actual liability upon an active wrongdoer as a condition to an attribution of that liability .' . . .

[T]he liability of the primary violator is simply an element of proof of a section 20(a) claim, and

that liability need not be actually visited upon the primary violator before a controlling person

may be held liable for the primary violator's wrong.") (citations and internal quotations

omitted).[15]

Because Plaintiffs have adequately pled a primary violation of Section 10(b) by the

Company, and each Individual Defendant's control of the Company, the Complaint states a valid

Section 20(a) claim against each of the Individual Defendants.

## IX. THE COMPLAINT ADEQUATELY PLEADS FRAUD AGAINST DEFENDANT STEIN

Most of defendants Stein's arguments are duplicative of the baseless arguments raised by

the Individual Defendants and should be rejected for the same reasons discussed above.  Stein

was the Company's Chairman of the Board and Chief Executive Officer from the beginning of

the Class Period until January 1, 2000, and served as a member of the Board and Chairman

Emeritus until March 2000.  ¶31.  Stein's contention that he is alleged to have made only two

materially false statements during the Class Period, and that "the only statements attributed [to

him] that plaintiffs attack were both allegedly made on  . . . the very first day of the Class

Period," Stein Mem. at 1 (original emphasis), is — in addition to being irrelevant as a matter of

law — not true.  Stein made several false and misleading statements in the Form 10-Q alone,

---

[15]  Indeed, a contrary rule would run afoul of the "broad remedial purpose of the securities laws"
and improperly "permit officers and directors of a bankrupt corporation whose actions are
alleged to have contributed to that condition to avoid the possible imposition of liability under
such laws by asserting the lack of a prior adjudication against the controlled person as a basis for
dismissal."  Briggs v. Sterner, 529 F. Supp. 1155, 1171 (S.D. Iowa 1981).

which Stein signed.  These misrepresentations were repeated in the Company's filings in

connection with a $50 million shelf registration on December 27, 1999,  February 3, 2000 and

February 14, 2000, each of which incorporated by reference the Form 10-Q.  ¶ 72.  Further, as

the then-Chairman and CEO of the Company, Stein is liable for all the false and misleading

statements and omissions that the Company and the other Individual Defendants disseminated in

group-published information, such as Company filings and press releases, during his tenure at

the Company.  See, e.g., Cabletron, 311 F.3d at 40; In re Lernout & Hauspie Sec. Litig., 208 F.

Supp. 2d at 84;  In re Raytheon Sec. Litig., 157 F. Supp. 2d at 152; In re Tyco Int'l, Ltd.

Multidistrict Litig., 2004 U.S. Dist. LEXIS 20733, at *6.  Thus, in addition to Stein's

misrepresentations in the Form 10-Q, the materially false and misleading statements in the

Company's December 2, 1999 press release (¶¶ 69; 76(d)), its February 14, 2000 amended Form

10-Q for the third quarter of 1999 (the "Amended 10-Q") (¶¶ 74; 76(f)) and its February 24,

2000 press release (¶¶ 77; 87(f)), are all properly attributable to Stein.  As the chart attached as

Exhibit 1 hereto makes clear, the Complaint amply alleges the "who, what, where and when"

with respect to each of Stein's misrepresentations (including the ones in the Form 10-Q),

explains why each statement was false and misleading, and alleges specific facts — supported by

the accounts of knowledgeable former employees — that support those allegations.

Stein makes the same misguided argument with respect to the purported disclosure of the

Novartis marketing agreement as the other Individual Defendants do with respect to the

purported disclosure of the Novartis Put Option.  See Stein Mem. at 11-12.  Stein's argument

fails for similar reasons.  Stein was not entitled to mislead investors about the Company's

inability to achieve profitability based on Apligraf sales simply because the Company attached

the Novartis marketing agreement to one of its filings.  See Marksman Partners, L.P. v. Chantal

Pharm. Corp., 927 F. Supp. at 1306-7. Further, neither that agreement nor the Company's filings ever disclosed that the Company took a "huge loss" every time that Novartis was unable to sell units of Apligraf because Organogenesis would not be reimbursed by Novartis for any units that were manufactured by Organogenesis pursuant to Novartis' sales forecasts but that ultimately were not sold. ¶ 66. Nor did they disclose that the damage to the Company's bottom line caused by this lack of reimbursement was compounded by the fact that Novartis' sales forecasts were "*always inflated*." ¶ 66. In sum, nothing in the Novartis marketing agreement or the Company's filings revealed the crucial fact known by the Individual Defendants but hidden from investors: that it was a virtual certainty that the Company would lose money on Apligraf under the Novartis marketing agreement.

Stein incorrectly asserts that his misrepresentations about such circumstances as Apligraf sales, the ability of production volume to improve margins, and the Company's ability to expand manufacturing operations, see ¶ 70, were cured because they were couched as "expectations" rather than certainties; they were puffery; or they were accompanied by generic "cautionary statements." See Stein Mem. at 14-15. To the contrary, the Complaint alleges that his statements about those circumstances were false and that he knew them to be false when he made them; not simply that subsequent events proved his "optimistic projections," Stein Mem. at 14, insufficiently prescient. For example, Stein' statement in the Form 10-Q that "[p]roduction costs exceeded product sales *due to the start-up costs of new product introduction and the high costs associated with low volume production*" and that he "*expect[ed] production volume to increase and our margins to improve*," ¶ 70, were flatly false representations of fact at the time he made them. See ¶ 76(b); see also Parts II and IV(A), supra. Thus, any purported disclosure by the Company of "factors that could cause its actual results regarding sales, production volume,

margins, and manufacturing expansion to differ from the stated expectations," Stein Mem. at 14, is irrelevant.

Stein's attempt to defeat the Complaint's strong inference of scienter also fails.  In addition to the reasons discussed above, see Part VII, the allegations establishing his motive and opportunity to commit the fraud are especially strong.  On April 21, 2000, shortly after the price of Organogenesis' stock reached its Class Period high of $22.37 per share on March 7, 2000, Stein registered for sale over 700,000 shares of Organogenesis stock — by Stein's own admission, approximately 35%[16] of all the Company stock he owned — for a total proposed value of almost $7 million.  ¶ 188.  Courts have held that insider stock sales of lesser amounts and lesser percentages of the insider's total holdings strongly contribute to a finding of scienter.  See, e.g., Marksman, 927 F. Supp. at 1313 (20% of holdings sold for over $6.3 million supports strong inference of scienter).  In addition to registering stock for sale, Stein also sold Organogenesis stock during the Class Period.  ¶ 188.

Stein erroneously argues that these well-pled allegations of motive do not support scienter because he registered the approximately 700,000 shares for sale rather than sold them, and he purportedly lost money on a later sale of stock.[17]  See Stein Mem. at 18-19.  Neither point negates the inference of scienter.  Crowell, 343 F. Supp. 2d at 15.

---

[16] Stein inappropriately characterizes the Complaint's allegation concerning the percentage of his holdings that he registered for sale as "misleading[]."  Stein Mem. at 18.  As Stein's counsel is well aware, nothing could be further from the truth.  In fact, in an abundance of candor that went beyond any duty, Plaintiffs included in the Complaint the unsupported assertion of Stein's counsel that Stein incurred stock losses "in excess of $7,000,000."  ¶ 188.  Plaintiffs included this assertion in the Complaint even though it is irrelevant and Stein's counsel did not provide Plaintiffs any documentation to support it.  Far from misleading, the Complaint's allegations concerning Stein's stock registration and sales are a model of probity.

[17] Stein's only purported authority for the argument that a stock registration does not support motive is a footnote from an inapposite Eastern District of Louisiana opinion, Bay v. Palmisano, Nos. 01-0949, 01-1509, 01-1510, 01-1801, 2002 U.S. Dist. LEXIS 20848 (E.D. La. Oct. 25,

Chief Judge Young of this District recently rejected the argument that an absence of stock sales by defendants defeats a strong inference of scienter, stating that "the absence of stock trading profit does not establish the absence of a scheme to profit through insider trading. It only establishes the absence of a successful scheme." Crowell, 343 F. Supp. 2d at 15. The court explained the persuasive reasoning behind this conclusion:

> The [] Defendants could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell, such that by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability. Second, the alleged fraudulent scheme could well produce numerous benefits for each of the [] Defendants.

Id. at 15-16.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions to dismiss filed by the Individual Defendants.

Dated: New York, New York
      April 8, 2005

              Respectfully Submitted,

              **MOULTON & GANS, P.C.**

              By:/s/ Nancy Freeman Gans
                  Nancy Freeman Gans, BBO #184540
                  33 Broad Street, Suite 1100
                  Boston, MA  02109-4216
                  Telephone:  (617) 369-7979
                  Facsimile:  (617) 369-7980

---

2002). See Stein Mem. at 18. In Bay, the court noted that no inference of scienter was raised where two defendants registered stock for sale *but later withdrew the registration*. Id. at *10 n. 16. Here, the Complaint does not allege that Stein withdrew the registration of his stock, and in fact alleges that Stein later sold stock.

*Liaison Counsel and Local Counsel
for Plaintiffs and the Class*

**MILBERG WEISS BERSHAD
   & SCHULMAN LLP**
Steven G. Schulman
Elaine S. Kusel
Peter Sloane
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Lead Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I, Nancy Freeman Gans, hereby certify that a true copy of the above document was served upon the attorney of record for each party.

/s/ Nancy Freeman Gans
Nancy Freeman Gans