## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE ORGANOGENESIS SECURITIES LITIGATION | ) ) ) ) ) ) ) ) **MASTER FILE NO. 04-10027 JLT** |

## LEAD PLAINTIFFS' OPPOSITION TO DEFENDANT
## PRICEWATERHOUSECOOPERS LLP'S MOTION TO DISMISS

| **MOULTON & GANS, P.C.** | **MILBERG WEISS BERSHAD** |
|---|---|
| Nancy Freeman Gans | **& SCHULMAN LLP** |
| 33 Broad Street | Steven G. Schulman |
| Suite 1100 | Elaine S. Kusel |
| Boston, MA 02109 | Peter Sloane |
| (617) 369-7979 | One Pennsylvania Plaza |
|  | 49th Floor |
|  | New York, New York 10019 |
|  | (212) 594-5300 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

THE ALLEGATIONS AGAINST PWC...................................................................4

    A.    PwC ........................................................................................4

    B.    PwC's Familiarity With The Company's Key Marketing And
        Financing Agreements ...........................................................4

    C.    PwC's Loss Of Confidence In The Integrity Of Organogenesis'
        Officers And Directors...........................................................5

    D.    PwC's Audit Opinion.............................................................6

    E.    The Further Erosion Of PwC's Confidence In The Company's
        Officers And Directors...........................................................7

    F.    PwC's Belated "Going Concern" Opinion .................................8

ARGUMENT...........................................................................................................8

    I.    PWC'S RESPONSIBILITIES TO INVESTORS .................................8

    II.    THE COMPLAINT'S ALLEGATIONS AGAINST PWC PLEAD
        FRAUD WITH PARTICULARITY ..................................................10

    A.    The Complaint Alleges That PwC's Audit Opinion Was
        Materially False And Misleading............................................10

    B.    The Complaint Pleads Facts Showing Why And How
        PwC's Audit Opinion Was Materially False And Misleading..................11

        1.    Organogenesis' 2000 Form 10-K Did Not Fairly Present,
            In All Material Respects, The True Financial Condition
            Of The Company........................................................ 12

        2.    PwC Ignored Multiple "Red Flags" Indicating That The
            Company's Officers And Directors Could Not Be Trusted
            And That The Company's Financial Statements Were
            Inherently Unreliable ................................................. 15

        3.    PwC's Audit Violated GAAS ...................................... 19

C.  Courts In The First Circuit Have Held That Similarly-Pled
Section 10(b) Claims Against Auditors Satisfy The Pleading
Standards Of The PSLRA And Rule 9(B) ................................................21

III.  THE COMPLAINT ALLEGES FACTS THAT AMPLY SUPPORT A
STRONG INFERENCE OF SCIENTER ............................................................23

A.  The Confidential Arcari Document Is Direct Evidence That
PwC Acted With At Least A High Degree Of Recklessness ....................23

B.  The Complaint Alleges Additional "Red Flags" and Circumstances
That Provide Still Further Grounds for Inferring That PwC's Conduct
Was Reckless ............................................................................................24

CONCLUSION ....................................................................................................................27

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

Aldridge v. A.T. Cross Corp.,
    284 F.3d 72 (1st Cir. 2002) ............................................................................................14, 24

In re Cabletron Sys.,
    311 F.3d 11 (1st Cir 2002) ...................................................................................................16

CMNY Capital, L.P. v. Deloitte & Touche,
    821 F. Supp. 152 (S.D.N.Y. 1993) .....................................................................................19

Conley v. Gibson,
    355 U.S. 41 (1957) ..............................................................................................................21

In re Eagle Bldg. Techs., Inc. Sec. Litig.,
    319 F. Supp. 2d 1318 (S.D. Fla. 2004) ..........................................................................14, 15

In re Enron Corp. Secs., Derivative & ERISA Litig.,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ..............................................................................8, 9

Financial Acquisition Partners, LP v. Blackwell,
    No. Civ. A. 3:02-CV-1586-K, 2004 WL. 2203253 (N.D. Tex. Sept. 29, 2004) ....................26

Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,
    378 F. Supp. 112 (S.D.N.Y. 1974) rev'd in part on other grounds,
    540 F.2d 27 (2d Cir. 1976) ..................................................................................................15

In re IKON Office Solutions, Inc.,
    277 F.3d 658 (3d Cir. 2002) ................................................................................................10

Jacobs v. Coopers & Lybrand, L.L.P.,
    No. 97-3374, 1999 U.S. Dist. LEXIS 2102 (S.D.N.Y. Feb. 26, 1999) ...........................25, 26

In re K-Tel Int'l Sec. Litig.,
    300 F.3d 881 (8th Cir. 2002) ...............................................................................................14

In re Kendall Square Research Corp. Sec. Litig.,
    868 F. Supp.26 (D. Mass. 1994) .........................................................................................25

Kinney v. Metro Global Media Inc.,
    170 F. Supp. 2d 173 (D.R.I. 2001) ...........................................................................22, 23, 25

In re Leslie Fay Cos. Sec. Litig.,
    871 F. Supp. 686 (S.D.N.Y. 1995) .....................................................................................26

**Page**

Malone v. Microdyne Corp.,
  26 F.3d 471 (4th Cir. 1994) ......................................................................14

Manavazian v. ATEC Group, Inc.,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) .......................................................21

Mishkin v. Peat Marwick, Mitchell, & Co.,
  658 F Supp. 217 (S.D.N.Y. 1987).............................................................19

In re Oxford Health Plans, Inc. Sec. Litig.,
  51 F. Supp. 2d 290 (S.D.N.Y. 1999).........................................................19

In re Philip Servs. Corp. Secs. Litig.,
  No. 98 Civ. 0835, 2004 U.S. Dist. LEXIS 9261 (S.D.N.Y. May 19, 2004) .....................16, 21

In re Royal Ahold N.V. Sec. & ERISA Litig.,
  351 F. Supp. 2d 334 (D. Md. 2004) ..........................................................25

SEC v. Price Waterhouse,
  797 F. Supp. 1217 (S.D.N.Y. 1992).........................................................19

In re Sunbeam Sec. Litig.,
  89 F. Supp. 2d 1326 (S.D. Fla. 1999) .......................................................25

Teachers' Ret. Sys. v. A.C.L.N., Ltd.,
  No. 01 Civ. 11814, 2003 U.S. Dist. LEXIS 7869 (S.D.N.Y. May 12, 2003) .........................25

In re Tyco Int'l, Ltd. Multidistrict Litig.,
  No. 02-1335-B, 2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004) ..............11, 21, 22, 23

United States v. Arthur Young & Co.,
  465 U.S. 805 (1984) ..............................................................................9, 18

## OTHER AUTHORITIES

Certification of Disclosure in Companies Quarterly and Annual Reports,
  Release Nos. 33-8124, 34-46427, IC-25722, Fed. Sec. L. Rep. (CCH)
  ¶ 86,720, at 86, 131 n.55 (Aug. 28, 2002) ................................................15

Codification of Accounting Standards and Procedures, Statement on Auditing
  Standards and Procedures Statement on Auditing Standards No 1. § 150
  (American Inst. Of Certified Public Accountants 1995) ..............................11, 19, 20

Corporate  and Auditing Accountability, Responsibility and Transparency
  Act of 2002..........................................................................................18

**Page**

H.R. Conf. Rep. No. 104-369, 104 Cong., 1st Sess. (1995) ............................................8

H.R. Rep. No. 107-414, (Apr. 22, 2002) .....................................................................18

Report of the Committee on Financial Services to Accompany H.R. 3763 ..................18

Lead Plaintiffs Bruno Hofmann, John H. Bowie, Richard Madigan, and Richard Conen (collectively, "Plaintiffs"), by their counsel, respectfully submit this memorandum of law in opposition to the motion to dismiss filed by defendant PricewaterhouseCoopers LLP ("PwC").

## **INTRODUCTION**

This is a securities fraud class action against certain former officers and directors (the "Individual Defendants") of Organogenesis, Inc. ("Organogenesis" or the "Company") and against defendant PwC. PwC was the Company's auditor throughout the Class Period and certified the accuracy of the Company's financial statements. The Complaint pleads evidence — in the form of a confidential document created by the Company's then-Chief Financial Officer (the "Confidential Arcari Document") — demonstrating that defendant Albert Erani ("Erani"), the then-Chairman of Organogenesis, embarked on a scheme to "*manipulate the market for the Company's stock*" and "encouraged the Company to prepare *overly optimistic financial projections* to existing and potential service providers." ¶59.[1] The Complaint also sets forth particularized allegations of extensive misrepresentations and omissions made by the Individual Defendants[2] in order to artificially inflate the Company's stock price. The Individual Defendants' scheme, however, could not have been perpetrated without the imprimatur of trustworthiness provided by PwC's unqualified audit opinion of the Company's financial statements.

The Confidential Arcari Document demonstrates that by March 2001 PwC became aware of suspicious activity by Erani that "*eroded PricewaterhouseCoopers [sic] confidence in*

---

[1] References to "¶ __" are to a paragraph in Plaintiffs' Corrected Consolidated Amended Class Action Complaint For Violations Of Federal Securities Laws (the "Complaint").

[2] The term "Individual Defendants" refers to Erani, Alan Ades ("Ades"), John Arcari, Philip Laughlin, Donna Lopolito, Michael Sabolinski, Alan Tuck, and Herbert Stein.

*managements [sic] and the Boards [sic] representations*." ¶ 111.  According to the Confidential Arcari Document, Erani had failed to provide PwC with standard audit confirmations relating to his holdings of the Company's convertible debt.  Other actions by Erani led to a "*loss of the Company's credibility with [PwC]*." Id.  Moreover, in May 2001, PwC further lost confidence in the Company's officers and directors when Organogenesis violated its commitment to PwC to exercise a key put option (the "Novartis Put Option") granted by the Company's marketing partner, non-party Novartis AG ("Novartis").  PwC apparently was so alarmed by the violation of this commitment that, according to the Confidential Arcari Document, it refused to support the Company's future financing initiatives by withholding further consents and comfort letters.[3]

Despite Erani's suspicious activity, the violation of the Novartis Put Option commitment and PwC's belief that the Company's management and Board could not be trusted, in March 2001 PwC certified the Company's year-end 2000 financial statements by issuing an unqualified or "clean" audit opinion.  This unqualified audit opinion— which was disseminated to the Company's shareholders in the Company's Form 10-K for the year 2000 ("2000 Form 10-K") — provided the Company's financial statements with the imprimatur of trustworthiness that allowed the Individual Defendants to carry out their fraudulent scheme.  PwC's audit opinion represented that its audit of the Company's financial statements was conducted in accordance with Generally Accepted Auditing Standards ("GAAS")[4] and that the Company's financial statements presented

---

[3] A "comfort letter" is a statement provided by an auditor to a company preparing for a public offering that confirms that unaudited financial data in the prospectus related to the offering conforms to GAAP.

[4] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA") relate to the conduct of audit engagements.  Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as the interpretation of GAAS.

"fairly, in all material respects, the financial position of Organogenesis," ¶ 114, and complied with Generally Accepted Accounting Principles ("GAAP"). The Complaint alleges that these representations were materially false and misleading because PwC's audit violated GAAS in numerous respects, the section of the 2000 Form 10-K entitled "Management's Discussion & Analysis of Financial Condition and Results of Operations" (the "MD&A") materially misrepresented the Company's financial condition, and PwC failed to disclose the "red flags" that had caused it to lose confidence in the integrity of Organogenesis' management and Board.

The Complaint also sets forth specific facts sufficient to create a strong inference that PwC acted consciously, or at least with a high degree of recklessness, in issuing its audit opinion. The Confidential Arcari Document provides direct evidence of PwC's state of mind at the time it issued the audit opinion, which alone would suffice to meet the Private Securities Litigation Reform Act's ("PSLRA") standard for pleading scienter. The Complaint, however, goes even further by pleading additional facts supporting the strong inference that PwC acted recklessly, including PwC's awareness, or reckless disregard of the material misstatements in the Company's 2000 Form 10-K, numerous red flag warnings, and PwC's GAAS violations in conducting the audit.

Contrary to PwC's contention, these allegations detail the "who, what, when, where and why" of PwC's participation in the fraud, set forth specific facts supporting those allegations, and (although not required to do so) plead evidence that raises a strong inference of scienter. Accordingly, PwC's motion to dismiss should be denied in its entirety.

## THE ALLEGATIONS AGAINST PWC[5]

### A.    PwC

PwC holds itself out to the public as "the world's leading professional services organization," and "the auditors of the largest share of the world's leading pharmaceutical companies." ¶171.  Throughout the Class Period, PwC acted as Organogenesis' purported independent auditor and accountant.  ¶24.  As the Company's auditor, PwC had access to Organogenesis' confidential internal corporate, financial, operating and business information and had intimate knowledge of Organogenesis' financial reporting practices.  ¶172.

### B.    PwC's Familiarity With The Company's Key Marketing And Financing Agreements

By virtue of PwC's relationship with Organogenesis and the nature of the auditing and consulting services rendered to the Company, including its access to the Company's confidential business information, PwC was aware of the terms of the Company's key marketing agreement with Novartis, including a February 2001 revision to that agreement which purportedly amended the revenue split on Apligraf sales in Organogenesis' favor.  ¶174(d).  PwC thus was aware that the Novartis marketing agreement, including the revised agreement, was, rather than favorable for Organogenesis, economically unsustainable given that the Company was losing money on every unit of Apligraf that it produced and that, accordingly, the Company lacked the ability to fund operations through product sales.  ¶174(d).

The Company had also entered into another key agreement with Novartis — the Novartis Put Option — which the Individual Defendants claimed would allow Organogenesis to access at

---

[5] For a discussion of the allegations of the Complaint generally, including the allegations against the Individual Defendants, see Plaintiffs' Consolidated Opposition to the Individual Defendants' Motions to Dismiss, filed concurrently herewith.

least $20 million from Novartis through the exercise of a "put" option.[6]  ¶107.  The Individual

Defendants represented to investors that the agreement allowed the Company to raise this money

at "any time" during the Class Period, "at [the Company's] discretion and at [the Company's]

option," and thereby maintain a large mega-million dollar "safety net" for the Company — a

reserve of cash which the Company purportedly could access as a last resort.  ¶¶107; 113.  In

truth, however, significant conditions precedent to the Novartis Put Option meant that the $20

million in funds were not available "at any time" or "at the Company's discretion," and that it

was highly unlikely that the Company would ever be able to access the full complement of the

$20 million in funds.  ¶108(d).  As discussed below, according to the Confidential Arcari

Document, PwC was intimately involved in the Company's efforts to access the funds

represented by the Novartis Put Option, and thus can be presumed to have known the terms of

the Novartis Put Option, including the significant conditions precedent to the Novartis Put

Option which made it virtually certain that the Company could not access those funds.

### C.    PwC's Loss Of Confidence In The Integrity Of Organogenesis' Officers And Directors

During the Class Period, PwC became aware of disturbing signs pointing to a lack of

integrity and suspicious behavior among Organogenesis' officers and directors, especially

defendant Erani, the Company's then-Chairman.  According to the Confidential Arcari

Document, in March 2001 Erani ***"[r]efused to sign standard audit confirmations sent to him by***

***PricewaterhouseCoopers, the Company's auditors***, relating to his holdings of the Company's

convertible debt." ¶ 111.  According to the Confidential Arcari Document, '***this eroded***

***PricewaterhouseCoopers [sic] confidence in managements [sic] and the Boards [sic]***

---

[6] A "put" option is an option contract that gives the holder (here, Organogenesis) the right to sell a certain quantity of an underlying security to the writer of the option (here, Novartis), at a specified price up to a specified date.

*representations*." Id.  The Confidential Arcari Document further states that other actions by

Erani led to a "*loss of the Company's credibility with the Company's service providers

including . . . independent accountants*." Id.  PwC never disclosed these developments or the

fact that it had lost confidence in the integrity of the Company's management.

On March 30, 2001, the Company issued its 2000 Form 10-K, setting forth the

Company's year-end 2000 financial results.  ¶113.  In the MD&A the Individual Defendants

touted the purported benefits of a recent amendment to the Novartis marketing agreement, stating

that the amendment "significantly increases payments we receive for Apligraf units." Id.  The

MD&A also touted the Company's purported ability to access funding from Novartis and other

sources of capital, stating that:

> Based upon our current plans, *we believe existing working capital at
> December 31, 2000, together with the proceeds of product and other
> revenues in 2001 and proceeds available from exercising a portion or all
> of a $20,000,000 equity security put with Novartis, which is at our
> discretion*, will be sufficient to finance operations through at least the first
> quarter of 2002. We expect to raise additional funds in 2001 through equity
> financing.

Id.  (emphasis added)  As discussed at length in Plaintiffs' Opposition to the Individual

Defendants' motions to dismiss, the representations in the MD&A were materially false and

misleading.

### D.    PwC's Audit Opinion

Despite the erosion of PwC's confidence in the representations of the officers and

directors of Organogenesis and PwC's knowledge of the material adverse factors affecting the

Company's access to necessary financing and almost certain bankruptcy given the onerous terms

of the Novartis marketing agreement, PwC issued an audit opinion certifying the accuracy of the

Company's financial statements.  ¶114.  PwC consented to the issuance to the Company's

shareholders of a "Report of Independent Accountants" (the "Audit Opinion") declaring that

PwC had performed its audit of Organogenesis in conformity with GAAS and that the

Company's financial statements presented "fairly, in all material respects, the financial position

of Organogenesis" and complied with GAAP.  ¶114.  PwC's Audit Opinion, in relevant part,

stated:

> In our opinion, the accompanying consolidated financial statements listed in
> the accompanying index present fairly, in all material respects, the financial
> position of Organogenesis, Inc. and its subsidiaries at December 31, 2000
> and 1999, and the results of their operations and their cash flows for each of
> the three years in the period ended December 31, 2000 in conformity with
> accounting principles generally accepted in the United States of America. . .
> .  We conducted our audits of these statements in accordance  with auditing
> standards generally accepted in the United States of America, which require
> that we plan and perform the audit to obtain reasonable assurance about
> whether the financial statements are free from material misstatement.

¶114.

### E.    The Further Erosion Of PwC's Confidence In The Company's Officers And Directors

Only a few weeks after issuing the Audit Opinion, PwC became aware of additional

suspicious activity by Erani.  According to the Confidential Arcari Document, in May 2001

Erani *"[h]indered the process for gaining approval to exercise the Novartis put option by May*

*31, 2001, a commitment which was made to PricewaterhouseCoopers (PWC), our independent*

*auditors*."  ¶124.  According to the Confidential Arcari Document, the Company had made this

commitment to PwC to exercise the put option in order to "gain [sic] necessary comfort letter

from PWC to allow us to sell common shares" pursuant to an equity offering.  Id.  The

Confidential Arcari Document goes on to state that "[s]ince then ***PWC has refused to grant any***

***consents or comfort letters because we violated our commitment***."  Id.  In other words, PwC

apparently was sufficiently alarmed by the Company's hindrance of the process for gaining

approval to exercise the Novartis Put Option, and the Company's violation of its commitment

concerning that process, that it refused to support the Company's future financing initiatives.

¶124. PwC, however, never publicly disclosed the Company's "hindering" of the process for obtaining this critical funding or its own refusal to support the Company's future financing initiatives. ¶ 12(c). Nor did PwC retract or modify its unqualified Audit Opinion. ¶186.

## F. PwC's Belated "Going Concern" Opinion

On January 30, 2002, the Company announced for the first time that it was running out of money and that it would be forced to "curtail or discontinue all operations" if it could not raise $15 million by the end of the first quarter of 2002. ¶¶148-49. The Company also revealed for the first time that it would not be able to access the remaining $10 million portion of the Novartis Put Option because of previously undisclosed conditions to the exercise of that option, which the Company could not satisfy. ¶¶150; 154.

Over two months later, on April 16, 2002, PwC issued a "going concern" opinion concerning Organogenesis, which stated that PwC had "substantial doubt" about Organogenesis' ability to continue as a going concern. ¶ 155. According to PwC, "the Company has suffered recurring losses from operations, has a working capital deficiency, a stockholder's deficit, and has long-term debt that may become immediately due upon an event of default." Id.

In September 2002, the Company filed for bankruptcy protection — from which it later emerged under a plan that allowed defendants Erani and Ades to buy the Company at a steep bargain while liquidating the Company's stock — thus leaving the Company's shareholders with nothing. ¶ 16.

## ARGUMENT

## I. PWC'S RESPONSIBILITIES TO INVESTORS

Congress recognizes that "[p]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely upon governmental action. Such private lawsuits promote public and global confidence in our capital markets and

help to deter wrongdoing and to guarantee that corporate officers, *auditors*, directors, lawyers and others properly perform their jobs." H.R. Conf. Rep. No. 104-369, 104 Cong., 1st Sess. (1995) at 31 (emphasis added).

As set forth in a decision denying auditor Arthur Andersen's motion to dismiss in the Enron case, the former chairman of the SEC, Harvey Pitt, has explained that the PSLRA actually "*expanded*" the role that independent auditors play in reviewing a corporation's publicly disseminated financial statements:

> [A]lthough a major goal of the PSLRA was to limit the exposure of corporations to frivolous strike suits targeting "deep-pocket" defendants by heightening pleading standards and imposing procedural hoops, in contrast *Congress expanded independent public accountants' watchdog duties*. Harvey L. Pitt, et al., "Promises Made, Promises Kept: The Practical Implications of the Private Securities Litigation Reform of 1995," 33 San Diego L. Rev. 845, 848-51 (1996). Under 15 U.S.C. § 78j-1(a)(1), every audit must have "procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts[.]" If the accountant discovers a possibly illegal act, he must decide whether if it is likely to have occurred and determine its potential effect. 15 U.S.C. 78j-1(b)(1)(A). If he finds an illegal act has taken place and that it is of consequence, he must as soon as "practicable" inform the appropriate management personnel of the issuer and "assure" its audit committee or, if there is no audit committee, its board of directors of its conclusions. 15 U.S.C. § 78j-1(b)(1)(B). That committee or board must notify the SEC within one day and send a copy of the notice to the accountant. 15 U.S.C. § 78j-1(b)(2). If the accountant does not receive that notice, he must resign and report to the SEC. 15 U.S.C. § 78j-(b)(3). The report must be submitted to the SEC within one day, regardless.

In re Enron Corp. Secs., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 611 (S.D. Tex. 2002).

Indeed, as a unanimous Supreme Court held nearly twenty years ago, "[b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The

9

independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust." United States v. Arthur Young & Co., 465 U.S. 805, 817-18 (1984).

## II.    THE COMPLAINT'S ALLEGATIONS AGAINST PWC PLEAD FRAUD WITH PARTICULARITY[7]

### A.    The Complaint Alleges That PwC's Audit Opinion Was Materially False And Misleading

The Complaint specifically identifies materially false and misleading statements made by PwC in its March 2001 Audit Opinion. In that opinion, PwC falsely stated that its audit of Organogenesis' financial statements was conducted in accordance with GAAS. ¶¶114; 174. PwC's Audit Opinion also falsely stated that Organogenesis' financial statements reflected the Company's true financial condition. The Audit Opinion, in relevant part, stated:

> In our opinion, the accompanying consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Organogenesis, Inc. and its subsidiaries at December 31, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2000 in conformity with accounting principles generally accepted in the United States of America. . . . We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

¶ 114. PwC's Audit Opinion was included, with PwC's explicit consent, in Organogenesis' 2000 Form 10-K, which was disseminated to shareholders. PwC certified Organogenesis' financial statements with an "unqualified" or "clean" audit opinion, which is the "highest level of

---

[7] For a discussion of the pleading standards applicable to securities fraud class actions under Rule 12(b)(6), Rule 9(b) and the PSLRA, see Part I of Plaintiffs' Consolidated Opposition to the Individual Defendants' Motion to Dismiss.

assurance that an auditor can give on an organization's financial statements," In re IKON Office Solutions, Inc., 277 F.3d 658, 664 (3d Cir. 2002).

Thus, with respect to Plaintiffs' fraud claim against PwC, the Complaint identifies *what* was said (the statements quoted above), *who* said it (PwC), *when* it was said (March 2001) and *where* it was said (PwC's Audit Opinion). These allegations are sufficient to identify the misstatements on which Plaintiffs' frauds claims are based with the particularity required by the PSLRA. See, e.g., In re Tyco Int'l, Ltd. Multidistrict Litig., No. 02-1335-B, 2004 U.S. Dist. LEXIS 20733, at **27-28 (D.N.H. Oct. 14, 2004) ("PwC charges that plaintiffs have failed to identify any misstatements that it made on Tyco's behalf, but a careful review of the consolidated complaint reveals that plaintiffs base their claims against PwC on its allegedly false statements in audit letters, dated October 21, 1999, October 24, 2000, and October 18, 2001, that Tyco's financial statements had been prepared in accordance with GAAP and that PwC's audits of Tyco had been conducted in accordance with Generally Accepted Accounting Standards ("GAAS"). These allegations identify the misstatements on which plaintiffs' claims are based with the partiality [sic] required by the PSLRA.") (citation omitted). Thus, PwC's contention that Plaintiffs have "failed to allege with the requisite particularity any false statements *attributable to PwC*," PwC Mem. at 5 (original emphasis), is incorrect.[8]

**B.    The Complaint Pleads Facts Showing Why And How PwC's Audit Opinion Was Materially False And Misleading**

The Complaint also specifies why, and in what respects, PwC's Audit Opinion was materially false or misleading. First, PwC knew, or recklessly disregarded, the fact that the MD&A did not reflect the true financial condition of the Company. Second, PwC failed to

---

[8] References to "PwC Mem." are to the Memorandum Of Law In Support Of Defendant PricewaterhouseCoopers LLP's Motion To Dismiss.

disclose the "red flags" that had caused it to lose confidence in the integrity of Organogenesis'

management and Board and to refuse to issue further consents or comfort letters to the Company,

and that suggested that the SEC filings issued by the Organogenesis could not be trusted.  Third,

PwC did not conduct its audit in accordance with GAAS.  ¶ 173.

    1.    <u>Organogenesis' 2000 Form 10-K Did Not Fairly Present, In All Material Respects, The True Financial Condition Of The Company</u>

The Complaint alleges that the 2000 Form 10-K was materially false and misleading in

the following respects, among others:

(a) Contrary to the 2000 Form 10-K's representation that the $20 million put option with Novartis was available "at any time" and "at [Organogenesis'] discretion," significant conditions precedent to the exercise of the Novartis Put Option — which were known to PwC and the Individual Defendants at the time the 2000 Form 10-K was issued — meant that the Company did not have the ability to raise the full amount of that funding at the discretion of the Company.  ¶116(b). Indeed, because of these conditions precedent the Company in fact was not able to access the Novartis Put Option funds when it announced it was running out of money in January 2002, which ultimately led to the Company's insolvency.  ¶149-150.

(b) The 2000 Form 10-K's representation that it had, or had access to, sufficient funds to finance operations through "at least the first quarter of 2002" based in part on "proceeds of product" and proceeds available from the $20 million put option was untrue. ¶116(m). As the Individual Defendants and PwC were well aware but did not disclose, the "proceeds of product" that Organogenesis received on Apligraf sales under the revised Novartis marketing agreement were well below cost. ¶¶65-66.  This meant that, far from helping Organogenesis to continue to fund operations, sales of Apligraf were actually draining the Company's cash, and hindering its ability to continue to fund operations.  <u>Id.</u>  Further, as noted above, the Individual Defendants and PwC knew, or recklessly disregarded the significant conditions precedent to the exercise of the Novartis Put Option.  ¶116(b). Given these conditions, the Company did not have the ability to raise the full amount of that funding at the Company's discretion, and thus could not rely on those funds to finance future operations.  <u>Id.</u>  Indeed, well before the end of the first quarter of 2002, the Company revealed that it "would have to curtail or discontinue" all operations if it could not raise additional funding.  ¶149.

     (c)  The 2000 Form 10-K's representation that "under the recently amended agreement with Novartis, Organogenesis now receives significantly higher payments for Apligraf" was materially incomplete. The Individual Defendants and PwC knew that even under the amended Novartis marketing agreement Organogenesis would still receive revenue payments that were well below the product's manufacturing cost and that Organogenesis would continue losing money on every unit of Apligraf.  ¶116(e) and (f).

Given these materially false and misleading statements, the 2000 Form 10-K did not portray accurately the Company's financial condition.  Organogenesis shareholders were misled into believing that the Company had sufficient sources of funding, or access to funding — such as proceeds from Apligraf sales and the exercise of the Novartis Put Option — that would be sufficient to fund operations through the first quarter of 2002.  In reality, however, the Company was on a collision course with insolvency.  Under the terms of the Novartis marketing agreement, each unit of Apligraf manufactured and/or sold was hastening the insolvency of the Company rather than providing it with funds to continue operations.  ¶¶65; 87(c); 108(g).  Likewise, given the significant conditions precedent to the Novartis Put Option, the funds from that put option were not available at the Company's discretion and thus were equally illusory as a basis for funding future operations.  ¶108(d).

PwC's contention that Plaintiffs have failed to allege "<u>facts</u> . . . showing PwC's awareness of this information, <u>when</u> or <u>how</u> it allegedly became aware of it, or <u>why</u> this information, if known, would have made the audit opinions issued by PwC misleading at the time," PwC Mem. at 6, is incorrect.  Plaintiffs have alleged facts showing that PwC was knowledgeable with respect to, and intimately involved in the exercise of the Novartis Put Option.  The Confidential Arcari Document suggests that the Company had made a commitment to PwC to gain approval to exercise the Novartis Put Option by a date certain in order to secure a PwC comfort letter in connection with an equity offering.  ¶124.  Indeed, PwC was so concerned

about the Company's violation of this commitment concerning the Novartis Put Option that it refused to provide additional consents or comfort letters to the Company.  Id.  These facts plainly support the inference that PwC was aware of the terms of Novartis Put Option and the conditions precedent thereto, and was aware that the Company could not access the Novartis Put Option funds "at any time" and "at [the Company's] discretion."

PwC's assertion that Plaintiffs have not sufficiently alleged that PwC was unaware that Organogenesis "lacked the ability to fund operations through product sales, or that Organogenesis was actually losing money on each sale of Apligraf due to the [] terms . . . of the Novartis marketing agreement," PwC Mem. at 6 (brackets in original)(quoting ¶ 12(d)), is equally unavailing.  See ¶ 174(d).  Given PwC's auditor relationship with Organogenesis, and its access to the Company's confidential business, operating and financial information, PwC can be presumed to have known, or recklessly disregarded, the terms, and revised terms, of the Novartis marketing agreement, and the serious adverse effect that that agreement had, and would continue to have, on the Company's bottom line and continued viability.  See In re Eagle Bldg. Techs., Inc. Sec. Litig., 319 F. Supp. 2d 1318, 1330 (S.D. Fla. 2004) ("If [the auditor] did not view the Purchase Order for [the audited company's] single largest contract, the audit could not amount to any audit at all.").  This presumption is especially applicable with respect to the Novartis marketing agreement, which governed the Company's only marketable product, and was thus of crucial importance to Organogenesis and its ability to continue as a going concern.   Indeed, any suggestion by PwC that such a presumption is incorrect would be an admission that PwC's audit of the Company's 2000 financial statements "could not amount to any audit at all."  Id.

Finally, contrary to PwC's assertion, see PwC Mem. at 5, Plaintiffs need not plead an accounting error or restatement of the Company's financial statements in order to state a Section

10(b) claim against PwC. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002);

Malone v. Microdyne Corp., 26 F.3d 471, 478 (4th Cir. 1994) ("courts have found defendants

liable for securities fraud under Rule 10b-5 despite having complied with GAAP"); In re K-Tel

Int'l Sec. Litig., 300 F.3d 881, 906 (8th Cir. 2002) ("[c]ompliance with GAAP does not provide

immunity from 10b-5 liability") (Murphy, J., dissenting); Herzfeld v. Laventhol, Krekstein,

Horwath & Horwath, 378 F. Supp. 112, 122 (S.D.N.Y. 1974), rev'd in part on other grounds, 540

F.2d 27 (2d Cir. 1976) ("The policy underlying the securities laws of providing investors with all

the facts needed to make intelligent investment decisions can only be accomplished if financial

statements fully and fairly portray the actual financial condition of the company. . . . [I]f

application of accounting principles alone will not adequately inform investors, accountants, as

well as insiders, must take pains to lay bare all the facts needed by investors to interpret the

financial statements accurately."); see also Certification of Disclosure in Companies Quarterly

and Annual Reports, Release Nos. 33-8124, 34-46427, IC-25722, Fed. Sec. L. Rep. (CCH)

¶ 86,720, at 86, 131 n.55 (Aug. 28, 2002) ("Presenting financial information in conformity with

generally accepted accounting principles may not necessarily satisfy obligations under the

antifraud provisions of the federal securities laws.").

> 2.  PwC Ignored Multiple "Red Flags" Indicating That The Company's
>     Officers And Directors Could Not Be Trusted And That The Company's
>     Financial Statements Were Inherently Unreliable

The Complaint amply alleges specific facts showing that PwC ignored multiple warning

signs, or "red flags" demonstrating that the Company's officers and directors could not be trusted

and that the Company's financial reporting was inherently corruptible, subject to manipulation,

and unreliable.[9]  Further, although not required to do so in order to adequately plead their fraud

---

[9] PwC's argument that this allegation amounts to "fraud by hindsight," PwC Mem. at 9, is
misguided.  The Complaint does not allege that information later disclosed would have been

claim against PwC, see In re Cabletron Sys., 311 F.3d 11, 33 (1st Cir. 2002), the Complaint

pleads evidence, in the form of the Confidential Arcari Document, that supports these

allegations.  These "red flags" included the following:

- According to the Confidential Arcari Document, by March 2001, the same month that PwC issued its Audit Opinion, PwC's "confidence in managements [sic] and the Boards [sic] representations" had been "eroded."  ¶174(a).[10]

---

discovered earlier, but rather that information that PwC knew of, or was reckless in not knowing — including, for example, the information that made PwC lose confidence in the integrity of the Company's management and Board, the "red flags" known to PwC, and the fact that the Company could not possibly fund operations from product sales or the proceeds of the Novartis Put Option — should have been investigated.  See In re Eagle Bldg. Techs., Inc. Sec. Litig., 319 F. Supp. 2d at 1329 (rejecting "fraud by hindsight" argument where plaintiff was "not pleading that 'later disclosed information' would have been discovered earlier, but that information actually disclosed should have been investigated").

[10] PwC erroneously contends that this red flag is "vague and conclusory" because it "does not identify what management or board representations in what year as to what audit were involved . . . [or] that any of these purported representations were ever improperly relied upon, or what audit procedures were not implemented."  PwC Mem. at 9.  Leaving aside the fact this level of detail goes far beyond the requirements of the PSLRA, see In re Philip Servs. Corp. Secs. Litig., No. 98 Civ. 0835, 2004 U.S. Dist. LEXIS 9261, at **32-33 (S.D.N.Y. 2004) (information such as "what audit procedures [the auditors] used, why the procedures were inadequate, and what audit procedures [the auditor] should have used in response to the alleged 'red flags,'" were "peculiarly within [the auditor's] knowledge, and thus are not required at the pleading stage"), none of it is relevant.  Such information would not affect the salient conclusion of the Confidential Arcari Document that, by no later than March 2001, PwC believed it could longer trust the Individual Defendants' representations.  Accordingly, PwC never should have issued an unqualified audit opinion with respect to the Company's 2000 financial results.  PwC's argument that the Complaint alleges no facts indicating that the 2000 financial results "were in question at the time PwC signed off on them — or even after PwC signed off on them," PwC Mem. at 9-10, also ignores the aforementioned conclusion of the Confidential Arcari Document.  In addition to the other information that PwC was aware of in March 2001 when it signed off on the Company's 2000 results, PwC knew that it could not trust the representations of the Company's officers and directors — thus directly putting "in question" the integrity and reliability of the Company's 2000 results, which (like every company's financial results) were based on information provided by the Company.  For this same reason, contrary to PwC's assertion, PwC Mem. at 10, PwC knew or recklessly disregarded in March 2001, when it issued its Audit Opinion, that this purported red flag "could or would affect the financial results upon which PwC opined."  Id.

- According to the Confidential Arcari Document, Erani failed to sign standard audit confirmations sent to him by PwC, causing a "loss of the Company's credibility" with PwC.  ¶174(b).

- According to the Confidential Arcari Document, the Company violated a commitment to PwC in connection with the exercise of the first tranche of the Novartis put option in May 2001, which apparently so alarmed PwC that it to "refused to grant any consents or comfort letters because [the Company] violated [its] commitment."  ¶174(c).[11]

- PwC knew of, or recklessly disregarded, the terms of the Novartis marketing agreement, which was economically unsustainable for Organogenesis given that the Company was losing money on every unit of Apligraf that it produced, and that thus the Company lacked the ability to fund operations through product sales. ¶174(d).[12]

---

[11] PwC's argument that the court should ignore the Complaint's evidence of this red flag because it post-dates the Audit Opinion and is purportedly contradicted by the Company's SEC filings. PwC Mem. at 10-11, is misguided.  The assertion that this event occurred some weeks after the March 2001 Audit Opinion supports the Complaint's allegation that PwC was aware of facts that called into question the integrity and reliability of the Company's management and Board and that should have prompted PwC to retract or modify its Audit Opinion.  See ¶¶ 174-76; 186. Further, the fact that PwC "*refused*" to grant further consents or comfort letters to the Company in May 2001 is not at all contradicted by any subsequent decision by PwC to grant such consents. The relevant fact remains that PwC was so alarmed by the Company's violation of its commitment to PwC that it decided in May 2001 that it would no longer support the Company's financing initiatives.  Finally, PwC's argument that the Complaint fails to plead "any reason why or how" the difference between the Company's failure to exercise the option in May as opposed to June 2001 would have impacted PwC's audit opinion, PwC Mem. at 13, is a classic of misdirection.  The relevant inquiry is not whether, why or to what degree the Company violated its commitment, but rather whether the violation of that commitment sufficiently alarmed PwC that it decided to take steps to disassociate itself from the Company.  The Confidential Arcari Document makes clear that PwC did take those steps.  The facts that caused PwC to do so — i.e., the Company's May 2001 violation of its commitment combined, presumably, with the previous red flags it was aware of — are the same ones that should have caused it to reevaluate, and retract or modify, the audit opinion it had issued only weeks before.

[12] PwC's argument that this red flag is "wholly conclusory" and contradicted by the Company's SEC filings, PwC Mem. at 11-12, is self-contradictory.  In one breath, PwC asserts that Plaintiffs allege "no facts suggesting that the terms of the [Novartis marketing] agreement were economically unsustainable" (an assertion that betrays a fundamental misreading of the Complaint, see, e.g., ¶¶ 60; 65; 66; 108(f); 174(d)), yet in the next breath it claims that the economic unsustainability of the Novartis marketing agreement was disclosed in certain SEC filings (an assertion that is entirely unsupported by the language from the SEC filing quoted by PwC, see PwC Mem. at 12).

- Given the above "red flags," PwC knew or recklessly disregarded the fact that the Company suffered from a chronic and systemic lack of internal controls. ¶174(e).

Without a good faith basis to trust the integrity of a company' management and directors, and indeed with affirmative evidence of their lack of reliability and trustworthiness, PwC could not in good faith have issued an unqualified or "clean" audit opinion. Here, by March 2001, PwC was aware of activity that was so suspicious it had caused PwC to lose faith in the integrity of the Company's management and directors. Erani's failure to provide "standard audit confirmations" and the Company's violation of its commitment to PwC had demonstrated to PwC that the representations of the Company's management and directors could not be relied upon. By issuing an unqualified or "clean" audit opinion, PwC improperly gave the Company's financial statements and it 2000 Form-10K the imprimatur of trustworthiness and reliability that PwC had already found to be lacking in the individuals — the Company's officers and directors — who had prepared them and whose representations to PwC formed the basis of PwC's Audit Opinion. In doing so, PwC ignored its basic responsibilities as an auditor, including its ethical obligations to Organogenesis' shareholders and the public. See United States v. Arthur Young & Co., 465 U.S. 805, 817-18 (1984) ("[b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public."). Recent corporate financial scandals have demonstrated the crucial role that auditors should play in refusing to certify a company's financial statements where they have reason to suspect possible fraud. See Report of the Committee on Financial Services to accompany H.R. 3763, Corporate and Auditing Accountability, Responsibility and Transparency Act of 2002 Report, H.R. Rep. No. 107-414

18

(Apr. 22, 2002) ("Following the bankruptcies of Enron Corporation and Global Crossing LLC, and restatements of earnings by several prominent market participants, regulators, investors and others expressed concern about the adequacy of the current disclosure regime for public companies. Additionally, they expressed concerns about the role of auditors in approving corporate financial statements.").

To adequately allege a Section 10(b) claim, "[i]n the context of an audit, it is sufficient to show 'that the accounting practices were so deficient that the audit amounted to no audit at all, or to an egregious refusal to see the obvious, or [to] investigate the doubtful.'" In re Oxford Health Plans, Inc. Sec. Litig., 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999), quoting SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). "One charged with the specific responsibility of a competent professional audit cannot relieve himself of liability by shutting his eyes to what was plainly to be seen." CMNY Capital, L.P. v. Deloitte & Touche, 821 F. Supp. 152, 166 (S.D.N.Y. 1993), quoting Mishkin v. Peat, Marwick, Mitchell & Co., 658 F. Supp. 271, 273 (S.D.N.Y. 1987). In this case, there is ample evidence that PwC, at the very least, recklessly shut its eyes to questionable practices by Organogenesis and disregarded its own lack of faith in the representations of the Individual Defendants, but then nevertheless issued clean audit opinions on PwC's financial statements.

### 3.    PwC's Audit Violated GAAS

The Complaint alleges that PwC violated GAAS, identifies which auditing standards were violated, alleges how PwC's actions, and failures to act, violated GAAS, and pleads facts supporting these allegations. PwC violated GAAS in the following respects:

- PwC ignored the multiple "red flags" discussed above. ¶174.

- PwC failed to re-evaluate its risk assessments. GAAS requires that "risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors." AU § 316.12, 316.14. The

19

auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is "***management's characteristics and influence over the control environment***." AU § 316.16 (emphasis added). Those factors pertain to, among other things, management's "attitude relating to internal control and the financial reporting process." Id. n. 27 (emphasis added). However, in contrast to the requirements of GAAS, PwC conducted the financial statement audit for Organogenesis' year-end 2000, under an assessment of risk that remained unchanged by facts and events that called into question the character and integrity of Organogenesis' most senior management, as discussed above. ¶176.

- PwC violated GAAS Standard of Reporting No. 4, which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. PwC should have stated that no opinion could be issued by it on Organogenesis' year-end 2000 financial statement or issued an adverse opinion stating that the 2000 financial statement was not fairly presented. ¶178.

- PwC violated GAAS General Standard No. 2 which requires that an independence in mental attitude is to be maintained by the auditor in all matters related to the assignment. ¶179. PwC issued a clean audit opinion despite the "red flags" discussed above and despite the fact that it had lost faith in the representations of the Company's management and directors at the time it issued the audit. Despite learning of additional suspicious activity by the Company's Chairman in May 2001 — after the issuance of the Audit Opinion — PwC failed to modify or retract that opinion after issuance. Far from suggesting that PwC maintained the requisite independence of mental attitude, these facts strongly indicate that PwC failed entirely to exercise professional skepticism and acted merely as a "rubber stamp" in conducting its audit and issuing its Audit Opinion.

- PwC failed to adequately consider the risk that the Company's year 2000 financial statements were not free from material misstatement, whether caused by errors or fraud, in violation of Statement on Auditing Standards No. 82. ¶180. PwC knew or recklessly disregarded numerous risks relevant to financial reporting, including events and circumstances that occurred or existed at Organogenesis during the Class period, which adversely affected Organogenesis' ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements. These risks included the risk that the Company's financial reporting was inherently corruptible, manipulable and unreliable. ¶174(e).

- PwC failed to take appropriate action relating to material misstatements and omissions of fact contained in the MD&A of the 2000 Form 10-K, in violation of Statement on Auditing Standards No. 8. As discussed above, PwC was aware of the materially false and misleading statements in the MD&A when it issued its Audit Opinion in March 2001.

20

- PwC violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon is justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. Organogenesis suffered from a chronic and systemic lack of internal controls, ¶ 174, and PwC's concerns with management's character and integrity should, in turn, have caused it to scrutinize the sufficiency of Organogenesis' internal controls, ¶ 175, and determine that those internal controls were inherently unreliable.

Thus, PwC's assertion that the Complaint fails to "particularize how PwC's conducted deviated from GAAS," PwC Mem. at 8, is simply incorrect. That PwC does not agree that it violated GAAS does not alter the fact that the Complaint sufficiently sets forth facts supporting the allegations that it did.[13]

### C. Courts In The First Circuit Have Held That Similarly-Pled Section 10(b) Claims Against Auditors Satisfy The Pleading Standards Of The PSLRA And Rule 9(B)

Ignoring these detailed allegations, PwC baselessly argues that the Complaint fails to allege "specific facts indicating why or how specific statements are misleading." PwC Mem. at 4. This same argument was rejected in two recent decisions in the First Circuit that considered

---

[13] PwC's "side by side chart" attached as Tab A to its memorandum ignores the relevant facts alleged in the Complaint and discussed above. It also truncates the GAAS allegations pled in the Complaint. Compare "Alleged GAAS Violation" for ¶ 183 in PwC's chart with ¶ 183 in the Complaint. Further, the chart takes a deliberately obtuse reading of the Complaint. In contravention of the bedrock standard for considering a motion to dismiss, PwC apparently believes that each paragraph of the Complaint must reiterate each and every fact that supports that allegation, even though alleged elsewhere (and at times in the immediately preceding paragraph) in the Complaint. Clearly, PwC is mistaken. See Manavazian v. ATEC Group, Inc., 160 F. Supp. 2d 468, 479-80 (E.D.N.Y. 2001) (rejecting "with dispatch" argument whereby "defendants simply [found] fault with paragraphs of the complaint that purport to do no more than summarize more specific allegations found elsewhere"). The complaint must be read as a whole, rather than in isolated paragraphs, see In re Philip Servs. Corp. Secs. Litig., 2004 U.S. Dist. LEXIS 9261, at *32 (S.D.N.Y. May 19, 2004), and may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). As discussed above, and contrary to PwC's assertions in its chart, Plaintiffs have more than adequately pled sufficient facts to support their GAAS allegations.

claims against auditors that were pled with the same specificity as Plaintiffs' claims against PwC

here. In <u>In re Tyco Int'l, Ltd. Multidistrict Litig.</u>, the court upheld the plaintiffs' Section 10(b)

claims against a company's auditor where the plaintiffs (1) "charge[d] the company's

independent accountant with issuing unqualified audit reports certifying the company's financial

statements for specific years and claiming that the audits were performed in conformity with

GAAS"; (2) "list[ed] a number of auditing standards and principles allegedly violated by [the

auditor] which, taken as a whole, render[ed] the certified financial statements materially

misleading;" (3) specified the statements that they claimed to be misleading by pointing to the

auditor's audit statements of the company's financial statements, and the registration statements

and prospectuses filed during the class period that incorporated the auditor's reports with the

auditor's consent; and (4) "specified the reasons why the statements were allegedly misleading

[(violations of GAAP, violations of GAAS, failure to report inadequate internal controls at [the

company], failure to report looting behavior, etc.)]. . . ." <u>Tyco</u>, 2004 U.S. Dist. LEXIS 20733, at

**31-32.  The court concluded that these allegations against the auditor were "sufficient to

survive a motion to dismiss even under the heightened pleading standards of the PSLRA." <u>Id.</u> at

*32.  Likewise, in <u>Kinney v. Metro Global Media Inc.</u>, 170 F. Supp. 2d 173 (D.R.I. 2001) the

court sustained a Section 10(b) claim against a company's auditor based on similar allegations.

<u>Id.</u> at 178-79.

Plaintiffs' allegations against PwC are of the same type, and contain the same level of

detail as the allegations that were sustained against the auditors in <u>Tyco</u> and <u>Kinney</u>.  Here, the

Complaint (1) alleges that PwC issued an unqualified audit opinion certifying Organogenesis'

financial statements for 2000 and claimed that the audits were performed in conformity with

GAAS, ¶114; (2) lists numerous auditing standards and principles that PwC violated which,

taken as a whole, render the Company's certified financial statements materially misleading, ¶¶ 173-183; (3) specifies PwC's misleading statements by pointing to the Audit Opinion, ¶¶ 114; 116(n); 186; and (4) specifies the reasons why the statements were allegedly misleading by pointing to PwC's violations of GAAS, the facts demonstrating that the 2000 Form 10-K did not fairly represent the Company's true financial condition and "red flags" alerting PwC to the fraud that PwC ignored and failed to disclose to investors. ¶¶ 116; 173-183. As in Tyco and Kinney, these allegations adequately plead a Section 10(b) violation by PwC.

PwC's assertions to the contrary are, in effect, nothing more than an attempt to litigate the issue of whether the alleged misleading statements attributed to it were in fact false. The Kinney court, however, made clear that such attempts by auditors should be rejected: "It is not for this Court to evaluate the veracity of each allegedly false statement Plaintiffs attribute to [the company's auditor]. The question of whether or not the statements actually were materially false and misleading is one for a jury." Kinney, 170 F. Supp. 2d at 179.

## III.    THE COMPLAINT ALLEGES FACTS THAT AMPLY SUPPORT A STRONG INFERENCE OF SCIENTER[14]

### A.    The Confidential Arcari Document Is Direct Evidence That PwC Acted With At Least A High Degree Of Recklessness

The Complaint pleads direct evidence of PwC's scienter at the time it issued the Audit Opinion. According to the Confidential Arcari Document, PwC had lost confidence in the representations of the Company's management and directors at the time it issued the Audit Opinion. Thus, PwC knew, or recklessly disregarded facts indicating that its audit and Audit Opinion did not comply with GAAS, that it had no basis for issuing an unqualified audit opinion given its lack of faith in the integrity of the Company's officers and directors, and that the 2000

---

[14] For a discussion of the applicable standard for pleading scienter, see Plaintiffs' Consolidated Opposition to the Individual Defendants' Motions to Dismiss, filed concurrently herewith.

23

Form 10-K did not fairly represent the true condition of the Company.   Evidence that by March

2001 PwC's "*confidence in managements [sic] and the Boards [sic] representations"* had been

"eroded" and that, as far as PwC was concerned, the Company had lost "credibility" bears

directly on PwC's state of mind at the time it signed off on the Company's financial statements

in March 2001.[15]

    **B.**    **The Complaint Alleges Additional "Red Flags" and Circumstances That Provide Still Further Grounds for Inferring That PwC's Conduct Was Reckless**

Based on the Confidential Arcari Document alone, Plaintiffs have met the standard for

pleading scienter.  The Complaint, however, goes even further, by alleging additional facts that,

when taken together, amply allege that PwC acted consciously or recklessly in issuing the Audit

Opinion and failing to disclose the material adverse factors and red flags affecting the Company.

PwC, however, erroneously seeks to isolate each fact supporting the inference of scienter in

order to argue that none alone pleads scienter sufficiently.  However, in considering whether

scienter is adequately pled, the Court is required to consider the Complaint's allegations in the

aggregate and to determine whether, in their totality, they plead sufficient facts supporting a

strong inference that PwC acted consciously or recklessly.  See Aldridge, 284 F.3d at 82

("plaintiff may combine various facts and circumstances indicating fraudulent intent to show a

strong inference of scienter.")

First, by virtue of its relationship with Organogenesis and its complete access to the

Company's confidential business, operating and financial information, PwC knew or recklessly

disregarded the material misstatements in the Company's 2000 Form 10-K discussed above.  See

---

[15] PwC's only arguments in response to this evidence of scienter are an almost verbatim re-hashing of its arguments in response to the red flags, compare PwC Mem. at 16-19 with id. at 9-13.  Its arguments fare no better in attempting to defeat scienter than they do in attempting to have this Court ignore the red flags, and should be rejected for the reasons discussed above.

Part II(B)(1), supra. Despite PwC's assertion, an auditor's relationship with an audited company and its access to the company's confidential information, although not sufficient to create a strong inference of scienter by itself, does support that inference when combined, as here, with several additional facts supporting scienter. See In re Kendall Square Research Corp. Sec. Litig., 868 F. Supp. 26, 27 (D. Mass 1994) (facts that auditor had served as Company's auditor for five years and that it "had access to all of the Company's financial documents and records in connection with its audits" supported allegations of fraud); In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1346 (S.D. Fla. 1999) ("allegations that [the auditor] had knowledge of [the company's] internal workings and had a history with the company, taken together, support a claim that the failures to observe GAAS in this particular audit amount to a level of recklessness high enough to maintain an action under § 10(b).")

Second, PwC ignored numerous red flags, as discussed above, which alerted PwC to the inherent unreliability of the Company's financial statements, including the facts that Erani had refused to provide standard audit confirmations and that the Company had violated its commitment with respect to the Novartis Put Option. See Part II(B)(2), supra. PwC's failure to even investigate the red flags contributes to a strong inference of severe recklessness, at the very least. In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 386 (D. Md. 2004) ("Violations that would contribute to a finding of scienter may include the auditor's reckless disregard of 'red flags,' or known risk factors that the auditor should have heeded and in response modified its audit process or opinion."); Kinney, 170 F. Supp. 2d at 180 (auditor's "failure to 'investigate the doubtful'" gave rise to strong inference of scienter); Teachers' Ret. Sys. v. A.C.L.N., Ltd., No. 01 Civ. 11814, 2003 U.S. Dist. LEXIS 7869, at *35 (S.D.N.Y. May 12, 2003) ("Allegations that multiple red flags were ignored in performing the audits can

reasonably support an inference of intent."); In re Leslie Fay Cos. Sec. Litig., 871 F. Supp. 686, 699 (S.D.N.Y. 1995) ("Because [the accountant] was immersed in [the company's] operations while performing its audit, and because the 'red flags' would clearly be evident to any auditor performing its duties, one could reasonably conclude that [the accountant] must have noticed the "red flags," but deliberately chose to disregard them to avoid antagonizing [the company] . . ..").

Third, the Complaint alleges that PwC engaged in myriad GAAS violations in conducting its audit. See Part II(B)(3), supra.

Together, PwC's knowledge of material misstatements in the Company's 2000 Form 10-K, the numerous red flags, and PwC's GAAS violations create a strong inference that PwC acted, at the very least, with a high degree of recklessness in conducting the audit, issuing the unqualified Audit Opinion, and failing to retract or modify that opinion.[16] See Jacobs v. Coopers & Lybrand, No. 97-3374, 1999 U.S. Dist. LEXIS 2102, at *40 (S.D.N.Y. Feb. 26, 1999) ("Indeed, the [p]laintiffs more than just allege that Coopers failed to adhere to GAAS in its audit . . . [they] put this failure in a broader context with allegations that, taken together, paint a portrait of an audit so reckless that a jury could infer intent to defraud.").

---

[16] PwC attempts to excuse its severe recklessness in "auditing" Organogenesis' financials by pointing to the Northern District of Texas' inapposite decision in Financial Acquisition Partners, LP v. Blackwell, No. Civ. A. 3:02-CV-1586-K, 2004 WL 2203253 (N.D. Tex. Sept. 29, 2004). PwC Mem. at 19-20. In Financial Acquisition Partners, the plaintiffs' scienter allegations did not include — as Plaintiffs' do here, in the form of the Confidential Arcari Document — direct evidence that the auditor acted with the requisite state of mind.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny PwC's motion to dismiss in its entirety.

DATED:  April 8, 2005

Respectfully Submitted,

MOULTON & GANS, P.C.

By:    /s/ Nancy Freeman Gans
       Nancy Freeman Gans, BBO #184540
       33 Broad Street, Suite 1100
       Boston, MA  02109-4216
       Telephone:  (617) 369-7979
       Facsimile:  (617) 369-7980

**Liaison Counsel and Local Counsel for Plaintiffs and the Class**

**MILBERG WEISS BERSHAD
   & SCHULMAN LLP**
Steven G. Schulman
Elaine S. Kusel
Peter Sloane
One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300

**Lead Counsel for Plaintiffs and the Class**

## CERTIFICATE OF SERVICE

I, Nancy Freeman Gans, hereby certify that a true copy of the above document was served upon the attorney of record for each party.

/s/ Nancy Freeman Gans
Nancy Freeman Gans

27