UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
IN RE ORGANOGENESIS SECURITIES LITIGATION   :   MASTER FILE
:   NO. 04-10027-JLT
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MOTION TO DISMISS</u>**

|  |  |
|---|---|
|  | James R. Carroll |
|  | Matthew J. Matule |
|  | SKADDEN, ARPS, SLATE, |
|  |     MEAGHER & FLOM LLP |
|  | One Beacon Street |
|  | Boston, Massachusetts  02108 |
|  | (617) 573-4800 |
| Dated: May 31, 2005 | Counsel for Defendant |
|      Boston, Massachusetts | PricewaterhouseCoopers LLP |

**TABLE OF CONTENTS**

Table of Authorities ................................................................................................................ ii

Preliminary Statement.............................................................................................................1

Argument ................................................................................................................................2

I.   PLAINTIFFS' SO-CALLED "RED FLAGS" FAIL AS A MATTER OF LAW
     BECAUSE EACH POST-DATES PWC'S 2000 AUDIT OPINION ...............................2

     A.   The Speculation And Innuendo Of The So-Called Confidential Arcari
          Document Do Not Support A Claim That PwC's 2000 Audit Opinion Was
          Inaccurate ...................................................................................................................2

          1.   Plaintiffs' Section 10(b) Claim *Against PwC* Must -- But
               Does Not -- Allege Something More Than Conclusory
               Accounting Errors ...................................................................................4

     B.   Organogenesis' Purported Failure To Exercise The $10 Million Novartis
          Put Option Also Is Irrelevant To Organogenesis' 2000 Financials.......................5

          1.   There Is No Support For Plaintiffs' Argument That PwC
               Should Have Retracted Or Modified Its March 2001 Audit
               Opinion ...................................................................................................6

     C.   Plaintiffs' Assertion That PwC Disregarded The Terms Of The Novartis
          Marketing Agreement Is Plainly Contradicted By Organogenesis' Express
          Disclosures In Its SEC Filings .............................................................................7

II.  PLAINTIFFS FAIL TO MAKE THE REQUISITE SHOWING THAT PWC
     ACTED WITH SCIENTER................................................................................................8

Conclusion .............................................................................................................................11

# TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGE(S)**

Aldridge v. A.T. Cross Corp.,
    284 F.3d 72 (1st Cir. 2002)...............................................................................................4

Fidel v. Farley,
    392 F.3d 220 (6th Cir. 2004) ............................................................................................5

Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,
    378 F. Supp. 112 (S.D.N.Y. 1974),
    rev'd in part, 540 F.2d 27 (2d Cir. 1976) .........................................................................4

In re Eagle Bldg. Techs. Inc. Sec. Litig.,
    319 F. Supp. 2d 1318  (S.D. Fla. 2004) ...........................................................................8

In re Enron Corp. Sec., Derivative & ERISA Litig.,
    235 F. Supp. 2d 549 (S.D. Tex. 2002)  .........................................................................3, 4

In re IKON Office Solutions, Inc.,
    277 F.3d 658 (3d Cir. 2002)..............................................................................................3

In re K-Tel. Int'l Sec. Litig.,
    300 F.3d 881 (8th Cir. 2002) ............................................................................................4

In re Priceline.com, Inc. Sec. Litig.,
    342 F. Supp. 2d 33, 57-58 (D. Conn. 2004) ...............................................................9, 10

In re Stone & Webster, Inc. Sec. Litig.,
    253  F. Supp. 2d 102 (D. Mass. 2003) .........................................................................5, 9

In re Tyco Int'l, Ltd. Multidistrict Litig.,
    Civ. A. No. 2004 DNH 154,
    2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004) .....................................................2

Malone v. Microdyne Corp.,
    26 F.3d 471 (4th Cir. 1994) ..............................................................................................4

U.S. v. Arthur Young & Co.,
    465 U.S. 805 (1984)..........................................................................................................4

Ziemba v. Cascade Int'l, Inc.,
    256 F.3d 1194 (11th Cir. 2001) ........................................................................................6

| **FEDERAL RULES** | **PAGE(S)** |
|---|---|
| Fed. R. Civ. P. 9(b) | 2 |

## Preliminary Statement[1]

Plaintiffs concede that they do not base their claims -- because they cannot -- on faulty financials for fiscal year 2000 (there has been no restatement). (Plaintiffs' Opp. at 14.) Nor do Plaintiffs dispute the going concern opinion included in PwC's report on Organogenesis' fiscal year 2001 financial statements. (Id.) Rather, Plaintiffs identify four so-called "red flags" to support their conclusory assertions (¶ 174),[2] but those "flags" are nothing more than inactionable speculation and impermissible fraud by hindsight:

- The so-called "Confidential Arcari Document" is inapposite to the 2000 financials because its assertions post-date PwC's work on the 2000 financials;

- The Novartis financing put was exercised just one month after May 2001, and had zero effect upon the 2000 financials; and

- The Novartis marketing agreement was filed with the SEC -- and its terms were readily available to the public at any time -- but also has no impact on the 2000 financials.

Further, Plaintiffs fail to adequately address -- and certainly cannot reconcile -- the numerous consents issued by PwC in 2001 and included in Organogenesis' SEC filings subsequent to the Form 10-K for 2000. Plaintiffs' wishful supposition and muddled chronology are no substitute for the orderly application of Rule 9(b) and the PSLRA standards -- heightened pleading standards which the Complaint is unable to overcome.

---

[1] All capitalized terms referenced herein have the meaning ascribed to them in PwC's previously submitted memorandum in support of its motion to dismiss. Exhibits referenced herein are included in PricewaterhouseCoopers LLP's Appendix Of Exhibits In Support Of Its Motion To Dismiss, previously submitted, and are cited as "Ex. __."

[2] Two of Plaintiffs' four purported "red flags" (¶¶ 174 (a) and (b)) are nearly identical in substance and are considered together for purposes of PwC's motion.

## Argument

I. **PLAINTIFFS' SO-CALLED "RED FLAGS" FAIL AS A MATTER OF LAW BECAUSE EACH POST-DATES PWC'S 2000 AUDIT OPINION**

   A. **The Speculation And Innuendo Of The So-Called Confidential Arcari Document Do Not Support A Claim That PwC's 2000 Audit Opinion Was Inaccurate**

Plaintiffs' near exclusive reliance on the purported "Confidential Arcari Document" is misplaced because (i) an examination of the events described therein between the filing of the Form 10-Ks for 2000 and 2001 -- even if taken as true for purposes of this motion -- are irrelevant because they post-date PwC's work on the 2000 financials and, at any rate (ii) defendant Erani's alleged failure to sign audit confirmations in March 2001 "'relating to his holdings of the Company's convertible debt'" was not relevant to PwC's certification.  (¶ 111; see also ¶¶ 174(a) and (b).)  There is nothing in the Plaintiffs' characterizations of the Arcari Document that overcomes the requirement that PwC's role in the alleged fraud be pled with the particularity required by Fed. R. Civ. P. 9(b) and the PSLRA.

Indeed, Plaintiffs' reliance on In re Tyco Int'l, Ltd. Multidistrict Litig., Civ. No. 2004 DNH 154, 2004 U.S. Dist. LEXIS 20733 at * 26 (D.N.H. Oct. 14, 2004) underscores the inadequacies in the Complaint.  The Tyco plaintiffs satisfied the particularity requirement by "identifying hundreds of specific statements in press releases, quarterly (Form 10-Q) and annual (Form 10-K) reports, other SEC forms including 8-K's, S-8's and S-4's, proxy statements, statements made by several of the individual defendants during conference calls with the media, and statements from third parties that identify individual defendants as the source of their

2

information" including, for example, a "2000 Proxy Statement falsely list[ing] Kozlowski and Swartz as having no outstanding loans from Tyco."[3] (Id. at * 26.)

PwC certified Organogenesis' 2000 financials in March 2001, but the unattached Confidential Arcari Document was purportedly created more than six months later in October 2001. Further, all of the "facts" contained in the Confidential Arcari Document relate to the period after PwC had completed its field audit work on Organogenesis' 2000 financials. Even if the Confidential Arcari Document is taken as true for purposes of this motion, the only conclusion to be drawn is that PwC may issue a warning on the 2001 financials. Of course, PwC did just that -- by issuing a going concern opinion in connection with the 2001 financials on April 16, 2002.

Plaintiffs do not point to any facts indicating that this purported "red flag" had any connection to the accuracy of the 2000 financial statements. Nor can they, because no such facts have been alleged. Plaintiffs' reliance on In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549 (S.D. Tex. 2002), is therefore wholly misplaced. The independent auditors in Enron "perpetrat[ed] a massive accounting fraud" including "permit[ing] Enron to falsify its financial results . . . certified the fraudulent figures, and actively engaged and participated in structuring the transactions . . . to participate in falsifying Enron's financial results." In re Enron

---

[3] In re IKON Office Solutions, Inc., 277 F.3d 658, 664 (3d Cir. 2002) is also inapposite. In IKON Office Solutions, Inc., the court affirmed the district court's grant of summary judgment in favor of the independent auditors because allegations that the independent auditors "failed to investigate sufficiently evidence of fraud by IKON or take into account conspicuous risk factors or 'red flags' that would have alerted [the auditors] to the fallacious computations; and [] that [the auditors] impermissibly relied on IKON's internal controls in preparing its audit calculations . . . and other violations of GAAS" were not enough to show scienter. Id. at 667-68.

3

Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d at 673-74.[4]  There are no such allegations here.  Indeed, nothing contained in what Plaintiffs allege about the Confidential Arcari Document indicates that Organogenesis' 2000 financials were in question at the time PwC certified those financials or at any time thereafter.

> **1.  Plaintiffs' Section 10(b) Claim *Against PwC* Must -- But Does Not -- Allege Something More Than Conclusory Accounting Errors**

Plaintiffs' reliance (Plaintiffs' Opp. at 15) on Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002); Malone v. Microdyne Corp., 26 F.3d 471 (4th Cir. 1994); In re K-Tel Int'l Sec. Litig., 300 F.3d 881 (8th Cir. 2002) and Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 378 F. Supp. 112 (S.D.N.Y. 1974, rev'd in part, 540 F.2d 27 (2d Cir. 1976) for the proposition that "Plaintiffs need not plead an accounting error or restatement of [Organogenesis'] financial statements in order to state a Section 10(b) claim against PwC" is misplaced as all four cases are inapposite:

- Aldridge did not involve any claims against the independent auditors.

- In In re K-Tel. Int'l, the Eighth Circuit affirmed dismissal of plaintiffs' complaint and noted that "[a]llegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter.  Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient" and "[W]e cannot countenance pleading fraud by hindsight . . . [m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  In re K-Tel. Int'l Sec. Litig., 300 F.3d at 890-91 (internal citations omitted.)

- Malone also did not involve any claims against the independent auditors and, at any rate, both Malone and Herzfeld pre-date the PSLRA's heightened pleading standards.

---

[4]   Plaintiffs' citation to U.S. v. Arthur Young & Co., 465 U.S. 805 (1984) is also inapplicable as that case involved the United States Supreme Court's determination that tax accrual work papers were relevant in that action and that no accountant's work-product privilege exists.  No such issues exist in this case.

4

### B. Organogenesis' Purported Failure To Exercise The $10 Million Novartis Put Option Also Is Irrelevant To Organogenesis' 2000 Financials

Plaintiffs point to Organogenesis' failure to exercise the $10 Million Novartis Put Option as a "red flag" that led to PwC refusing to "provide additional consents or comfort letters to [Organogenesis]." (Plaintiffs' Opp. at 14.) Not only is this so-called "red flag" inapposite to the 2000 financials, Plaintiffs' suggestion of PwC's refusal to issue further consents on those financials is demonstrably false -- a point raised in PwC's opening brief and ignored in Plaintiffs' opposition.

Again Plaintiffs' theory crumples when examined chronologically. Plaintiffs' argue that the Novartis put option should have been exercised by May 2001. That's two months after PwC issued its audit opinion on Organogenesis' 2000 financials.[5] At any rate, Organogenesis did exercise the "first tranche of the Novartis put option" (or $10,000,000 security option) on June 29, 2001 and there are no allegations -- because there can be no allegations -- that the one month delay in exercising the Novartis put option had any bearing on those earlier reviewed and certified financials. (¶ 174(c); 2001 10-K.)

Instead, Plaintiffs respond by arguing that as a result of Organogenesis' failure to exercise the Novartis put option, PwC refused to "provided additional consent or comfort letters to [Organogenesis]." (Plaintiffs' Opp. at 14.) Plaintiffs further argue that with respect to the one month delay in exercising the Novartis put option, "[t]he relevant inquiry is not whether, who or to what degree [Organogenesis] violated its commitment, but rather whether the violation of that

---

[5] Of course, information that is not available at the time of an audit opinion is irrelevant to the validity of that audit opinion. See In re Stone & Webster, Inc. Sec. Litig., 253 F. Supp. 2d 102, 134 (D. Mass. 2003) (red flags limited to the latter time frame of the Class Period are irrelevant to the audit reports concerning earlier periods); Fidel v. Farley, 392 F.3d 220, 229 (6th Cir. 2004) (a red flag that "occurred well after the audit report had been issue" . . . "do[es] not create an inference of scienter with regard to Ernst & Young's audit of 1998 financial data.")

5

commitment sufficiently alarmed PwC that it decided to take steps to disassociate itself from [Organogenesis]."  (Plaintiffs' Opp. at 17, n.11.)   However, that assertion is belied by Organogenesis' many subsequent SEC filings, which included the PwC consents.  (Excerpts of Form S-3 filed 10/31/01, Form S-3/A filed 11/20/01, Form S-3/A filed 1/30/02 (¶ 148), Form S-3/A filed 2/7/02, and 2001 Form 10-K filed 4/16/02 (¶ 155).)

### 1. There Is No Support For Plaintiffs' Argument That PwC Should Have Retracted Or Modified Its March 2001 Audit Opinion

Plaintiffs' argument that PwC should have "retract[ed] or modif[ied] its Audit Opinion" is misplaced.  In Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194 (11th Cir. 2001), the Eleventh Circuit affirmed the dismissal of a similar 10(b) claim based, in part, upon allegations that an auditor's failure to subsequently withdraw a previous unqualified audit report constituted a false or misleading omission.  In Ziemba, Plaintiffs alleged that Coopers & Lybrand [C&L]'s audit reports of two subsidiaries of Cascade were materially misleading "because C&L 'knowingly or recklessly' omitted 'going concern' qualifications for these Cascade subsidiaries." Id. at 1208.  The plaintiffs further alleged that C&L knew that the subsidiaries were "'in dire financial condition' and would need 'significant, immediate funds' from Cascade in order to continue as going concerns during fiscal year 1992" and that, had C&L properly conducted its audits, it would have issued "going concern" opinions in connection with both of these subsidiaries' financial statements.  Id.

Specifically, the plaintiffs alleged that C&L should have noticed errors with respect to the parent company's 10-K -- e.g., that one subsidiary's financial statements still had not been consolidated with Cascade's; and that the 10-K erroneously indicated that there were 126 subsidiary stores when C&L should have known that there were only 70-80 -- and that C&L had a duty to disclose these errors by withdrawing its previous audit reports for both subsidiaries.

Id. at 1211. (There, unlike the instant case, C&L did subsequently withdraw its audit opinion in each case shortly after Cascade announced on November 20, 1991, that Cascade's financial statements might be inaccurate.)

The Eleventh Circuit disagreed, and found that the plaintiffs failed to allege fraud with the requisite particularity: "We . . . do not understand that the alleged errors in Cascade's 1991 10-K somehow rendered C&L's previous audit reports of [the subsidiaries] untrue or misleading.  Plaintiffs do not allege that, nor do they explain why that might be the case." Id. at 1212 (emphasis added).  The same pleading deficiencies are fatal to Plaintiffs' claims here: Plaintiffs list alleged GAAS violations and purported red flags, but fail to allege with the requisite specificity how or why any of these alleged facts should have caused PwC to modify or withdraw its March 2001 opinion on Organogenesis' 2000 financial statements.  Indeed, Plaintiffs do not even allege that those financial statements are incorrect.

> **C.     Plaintiffs' Assertion That PwC Disregarded The Terms Of
>           The Novartis Marketing Agreement Is Plainly Contradicted
>           By Organogenesis' Express Disclosures In Its SEC Filings**

Plaintiffs' wholly conclusory third purported "red flag" (i.e., that PwC "knew, or recklessly disregarded" the terms of the Novartis marketing agreement) fails because the terms of that agreement were plainly disclosed in Organogenesis' 2000 Form 10-K, including that the Company "ha[s] incurred operating losses in every year of [its] existence" and "will need to raise additional funds."  (Excerpt of 2000 10-K at Ex. E at 5, 10)  In addition, the Form 10-K plainly disclosed that product sales alone were not and would not be enough to fund operations:

> . . . we believe existing working capital at December 31, 2000, together
> with the proceeds of product and other revenues in 2001 and proceeds
> available from exercising a portion or all of a $20,000,000 equity security
> put with Novartis, which is at our discretion, will be sufficient to finance
> operations through at least the first quarter of 2002.  (Ex. E at 10.)

7

In the face of the plain disclosure above, Plaintiffs' allegations should be rejected. Additionally, Plaintiffs' reliance on <u>In re Eagle Bldg. Techs. Inc. Sec. Litig.</u>, 319 F. Supp. 2d 1318 (S.D. Fla. 2004) is misplaced as the facts in that case are wholly inapposite. Unlike this action, <u>In re Eagle Bldg. Techs.</u> involved "massive financial fraud and misleading statements regarding <u>non-existent revenue</u>" as a result of "forged bank statements and purchase orders" that accounted for $2.5 million of that company's $3.35 million purported revenue. <u>Id.</u> at 1321-22 (emphasis added). There are <u>no allegations</u> in this action that the Novartis marketing agreement was not real or that revenue booked pursuant to that agreement was non-existent.

## II. PLAINTIFFS FAIL TO MAKE THE REQUISITE SHOWING THAT PWC ACTED WITH SCIENTER

PwC ought to be dismissed for the independent reason that Plaintiffs fail to point to <u>any</u> facts sufficient to raise a strong inference of scienter. In their opposition, Plaintiffs argue that the Confidential Arcari Document, the three "red flags" and PwC's access to Organogenesis' confidential business documents in its role as independent auditor give rise to a "strong inference" of scienter. Each ground fails to support a strong inference of scienter.

Plaintiffs state that "[b]ased on the Confidential Arcari Document alone, Plaintiffs have met the standard for scienter." (Plaintiffs' Opp. at 24.) Plaintiffs' argument that a collection of certain events as purportedly set forth in the Confidential Arcari Document caused PwC's confidence to be "eroded," is pure speculation. Indeed, Plaintiffs go so far as to state that "[t]he Confidential Arcari Document provides direct evidence of <u>PwC's state of mind</u> at the time it issued the audit opinion." (Plaintiffs' Opp. at 3) (emphasis added). Of course, Arcari, an Organogenesis employee, cannot attest to the state of mind of PwC or any of its employees -- and therefore cannot form the basis for a showing of scienter vis-à-vis PwC.

Plaintiffs also attempt to make out a scienter argument by alleging that "by virtue of its relationship with Organogenesis and its complete access to the Company's confidential business, operating and financial information, PwC knew or recklessly disregarded the material misstatements in [Organogenesis'] 2000 Form 10-K." (Plaintiffs' Opp. at 24.) However, Plaintiffs go on to acknowledge -- as they must -- that an auditor's relationship with an audited company and its access to the company's confidential information is "<u>not sufficient to create a strong inference of scienter by itself</u>." (Plaintiffs' Opp. at 25.) <u>See</u> <u>also</u> <u>In re Priceline.com, Inc. Sec. Litig.</u>, 342 F. Supp. 2d 33, 57-58 (D. Conn. 2004) (dismissing claims against outside auditor because plaintiffs failed to allege scienter of auditor where the "alleged scheme depends not only upon hard data . . . but also upon events that would not necessarily be reflected in data or other sources relevant to an audit").

Courts have repeatedly agreed that allegations based on nothing more than an outside auditor's role as the company's auditor do not satisfy the strict "strong inference" requirement that an independent auditor acted with scienter. <u>See</u> <u>In re Stone & Webster</u>, 253 F. Supp. 2d at 133-34 (dismissing Section 10(b) claim against auditor where allegation that auditor "'had continual access to and knowledge of . . . private and confidential corporate financial and business information'" was insufficient because "'it might make every auditor liable in cases of securities fraud'") (quoting <u>Kennilworth Partners L.P. v. Cendant Corp.</u>, 59 F. Supp. 2d 417, 429 (D.N.J. 1999)).[6]

---

[6] While acknowledging the insufficiency of pleading that access to confidential documents raises the requisite strong inference of scienter, Plaintiffs attempt to salvage their argument by arguing that such an inference is raised "when combined, as here, with several additional facts supporting scienter." (Plaintiffs' Opp. at 25.) Yet Plaintiffs never identify those "additional facts."

9

For example, in Priceline.com, the underlying premise of plaintiffs' allegations was that Priceline held WebHouse -- a related company of Priceline and licensee of Priceline's business model -- "out to be a success despite the fact that defendants [allegedly] had information in their possession indicating that WebHouse would not be able to continue to operate." Priceline.com, 342 F. Supp. 2d at 40. There, as here, the plaintiffs alleged -- in a securities fraud suit that followed on the heels of  that the company's announcement that it would be winding down WebHouse's affairs -- claims that Priceline's independent outside auditor overlooked "red flag" warning signs rendering it a complicit participant in the company's scheme to defraud the investing public. Id. at 57.

The court held that "even if the court could infer that Deloitte was aware of the red flags set forth herein, which is no small leap, the red flags are not so egregious as to render Deloitte's audit a farce." Id. Indeed, the complaint did not pass muster under any scienter test:

> the nature of the accounting irregularities themselves do not give rise to a strong inference of scienter. Plaintiffs allege that "it should have been obvious to Deloitte as of March of 2000 that WebHouse was worthless because it could not become a viable business." Although there may have been indications to that effect in Priceline's financial and operational data, the determination plaintiffs allege Deloitte should have made is far too complex for the court to conclude that Deloitte's failure to do so rendered its audit a farce . . . This is not a case where a company casts aside GAAP in order to inflate its own revenue stream with fictional income. . . . the alleged fraud here is that Priceline carried on the illusion that WebHouse could be a successful entity while knowing that it would collapse under the weight of its own expansion at some point in time. There is simply nothing the complaint to indicate that Deloitte should have been able to case aside this illusion and the independent valuation accompanying it, and render an opinion that the WebHouse warrants were worthless.

Id. at 57-58 (citations omitted).

Plaintiffs' theory in this case is even more extreme -- but no less deficient. Indeed, whereas Deloitte was sued in Priceline.com for not disclosing the alleged financial

10

instability of WebHouse, Plaintiffs here criticize PwC for <u>disclosing</u> its concern about Organogenesis' ability to continue as a going concern after 2001. But Plaintiffs "must supply some factual basis for the allegation that [PwC] had reached this [going concern] conclusion at some point . . ." prior to its inclusion in the opinion on the 2001 financial statements. <u>Id.</u> at 58 (internal quotations and citations omitted). Because they do not, their scienter allegations must fail as a matter of law.

## Conclusion

For the foregoing reasons, Plaintiffs' claims against PwC should be dismissed with prejudice and without leave to further amend.[7]

| | |
|---|---|
| Dated: May 31, 2005<br>Boston, Massachusetts | Respectfully submitted,<br><br> /s/ James R. Carroll<br>James R. Carroll (BBO #554426)<br>Matthew J. Matule (BBO #632075)<br>SKADDEN, ARPS, SLATE,<br>   MEAGHER & FLOM LLP<br>One Beacon Street<br>Boston, Massachusetts  02108<br>(617) 573-4800<br><br>Counsel for Defendant<br>PricewaterhouseCoopers LLP |

---

[7] Plaintiffs' Section 10(b) claim against PwC also fails for the reasons set forth in the Individual Defendants' Motions To Dismiss as well as any reply briefs in further support thereof, which are expressly incorporated herein by reference.