UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

In re Organogenesis Sec. Litig.

No. 04-10027-JLT

---

**REPLY MEMORANDUM OF DEFENDANTS ALAN ADES, JOHN ARCARI,
ALBERT ERANI, PHILIP LAUGHLIN, DONNA LOPOLITO,
MICHAEL SABOLINSKI AND ALAN TUCK
IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS
THE CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Jeffrey B. Rudman (BBO #433380)
Jonathan A. Shapiro (BBO #567838)
Daniel H. Gold (BBO #654909)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000

May 31, 2005

## CONTENTS

I.     "GROUP PLEADING" DOES NOT ALLOW PLAINTIFFS TO SUE INDIVIDUALS FOR STATEMENTS MADE WHEN THEY WERE NOT EVEN AT ORGANOGENESIS ................................................................................................ 1

II.    PLAINTIFFS ADMIT THAT THE STATEMENTS REGARDING THE COMPANY'S FINANCIAL CONDITION WERE TRUE, AND CANNOT SUE FOR IMPRESSIONS ........................................................................................ 3

       A.    Plaintiffs Concede The Truth Of Organogenesis' Two Statements About Liquidity. ..................................................................................... 4

       B.    Plaintiffs Abandon Their Theory Of GAAP Violations. ........................................ 6

       C.    Plaintiffs Cannot Base A Claim On Non-Projections That Are Safe Harbored. ...... 7

             1.    There Is No Actionable Projection. ........................................... 8

             2.    Plaintiffs Fail To Show That The Safe Harbor Is Inapplicable. ................ 10

III.   THE ALLEGATIONS ABOUT THE NOVARTIS RELATIONSHIP STATE NO CLAIM ....................................................................................... 11

       A.    Organogenesis Disclosed -- Not "Concealed" -- The Put Option Agreement. ..... 11

       B.    Plaintiffs Do Not State A Claim That Apligraf Could Never Be Profitable. ........ 13

       C.    Plaintiffs Cannot Sue for Alleged Production Problems or Marketing "Ineptitude." ....................................................................... 16

             1.    The "Mass-Production" and "Quality Control" Claims Fail. ................... 17

             2.    The Marketing "Ineptitude" Claims Fail. .................................. 19

IV.    THE "CONFIDENTIAL ARCARI DOCUMENT" ....................................................... 21

       A.    The "Confidential" Document Is Irrelevant To Virtually Every Defendant. ............................................................ 21

       B.    The "Confidential" Document States No Claim Against Messrs. Erani and Arcari. ................................................... 22

V.     PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER ................ 24

       A.    Plaintiffs Cannot "Group Plead" Scienter. ............................................... 25

       B.    Status Pleading And Merely Reasonable Inferences Are Not Scienter. .............. 25

       C.    Plaintiffs' Motive Allegations Fail. ...................................................... 28

VI.    CONCLUSION ........................................................................................ 29

# TABLE OF AUTHORITIES

## Federal Cases

Acito v. IMCERA Group, Inc.,
    47 F.3d 47 (2d Cir. 1995) .......................................................................... 28

In re Advanta Corp. Sec. Litig.,
    180 F.3d 525 (3d Cir. 1999) ...................................................................... 28

Aldridge v. A.T. Cross Corp.,
    284 F.3d 72 (1st Cir. 2002) .................................................................... 7, 27

In re Allaire Corp. Sec. Litig.,
    224 F. Supp. 2d 319 (D. Mass. 2002) ........................................................ 9

In re Allscripts, Inc. Sec. Litig.,
    No. 00 C 6796, 2001 WL 743411 (June 29, 2001) ................................... 18

In re Anicom Inc. Sec. Litig., ,
    No. 00C 4391, 2001 U.S. Dist. LEXIS 6607 (N.D. Ill. May 15, 2001) ........ 20

In re AOL Time Warner, Inc. Sec. and "Erisa" Litig.,
    No. 1500, 02 Civ. 5575, 2004 WL 992991 (S.D.N.Y. May 5, 2004) ............ 2

In re Autodesk, Inc. Sec. Litig.,
    132 F. Supp. 2d 833 (N.D. Cal. 2000) ........................................................ 2

Backman v. Polaroid Corp.,
    910 F.2d 10 (1st Cir. 1990)(en banc) .............................................. 6, 15, 17

Baron v. Smith,
    380 F.3d 49 (1st. Cir. 2004) ................................................................. 4, 14

Basic Inc. v. Levinson,
    485 U.S. 224 (1988) ......................................................................... 4, 6, 14

In re Boston Tech. Inc. Sec. Litig.,
    8 F. Supp. 2d 43 (D. Mass. 1998) ........................................... 5, 6, 8, 9, 10

Bull HN Info. Sys., Inc. v. Hutson,
    184 F.R.D. 19 (D. Mass. 1999) .................................................................. 1

In re Burlington Coat Factory Sec. Litig.,
    114 F.3d 1410 (3d Cir. 1997) ............................................................. 10, 28

In re Cabletron Sys., Inc.,
    311 F.3d 11 (1st Cir. 2002) ...................................................... 2, 16, 27, 28

Capri Optics Profit Sharing v. Digital Equip. Corp.,
  950 F.2d 5 (1st Cir. 1991) ................................................................................. 12

In re Capstead Mortgage Corp. Sec. Litig.,
  258 F. Supp. 2d 533 (N.D. Tex. 2003) ............................................................... 29

Carney v. Cambridge Tech. Partners, Inc.,
  135 F. Supp. 2d 235 (D. Mass. 2001) ................................................. 5, 10, 17, 18

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
  511 U.S. 164 (1994) .......................................................................................... 24

Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,
  394 F.3d 126 (3d Cir. 2004) .............................................................................. 16

In re Computervision Corp. Sec. Litig.,
  869 F. Supp. 56 (D. Mass. 1994) ......................................................................... 5

Cooper v. Pickett,
  137 F.3d 616 (9th Cir. 1977).............................................................................. 20

In re Copley Pharm., Inc. Sec. Litig.,
  Civ. A. No. 494-11897-WGY, 1995 WL 169215 (D. Mass. Mar. 16, 1995) ................. 5

Copperstone v. TCSI Corp.,
  No. C 97-3495, 1999 WL 33295869 (N.D. Cal. Jan. 19, 1999) ................................ 5

Crowell v. Ionics, Inc.,
  343 F. Supp. 2d 1 (D. Mass. 2004) ..................................................................... 28

In re Cytyc Corp. Sec. Litig.,
  Civ. No. 02-12399 (D. Mass. Mar. 1, 2005) ................................................... 19, 27

D.E. & J Ltd. Partnership v. Conaway,
  284 F. Supp. 2d 719 (E.D. Mich. 2003) ................................................................ 3

Ellison v. Am. Image Motor Co., Inc.,
  36 F. Supp. 2d 628 (S.D.N.Y. 1999) .................................................................. 24

Fezzani v. Bear, Stearns & Co., Inc.,
  No. 99 Civ. 0793, 2004 WL 744594 (S.D.N.Y. Apr. 6, 2004) ................................ 23

Fitzer v. Security Dynamics Tech., Inc.,
  119 F. Supp. 2d 12 (D. Mass. 2000) ........................................................ 7, 22, 26

Garvey v. Arkoosh,
  354 F. Supp. 2d 73 (D. Mass. 2005) ................................................................... 13

Greebel v. FTP Software, Inc.,
  194 F.3d 185 (1st Cir. 1999) ...................................................................... passim

Gross v. Summa Four, Inc.,
  93 F.3d 987 (1st Cir. 1996) ........................................................................... 7

Guerra v. Teradyne Inc.,
  No. Civ.A. 01-11789, 2004 WL 1467065 (D. Mass. Jan. 16, 2004) ...................................... 18, 28

Haft v. Eastland Fin. Corp.,
  755 F. Supp. 1123 (D. R.I. 1991) ..................................................................... 5

Harris v. Ivax,
  182 F.3d 799 (11th Cir. 1999) ....................................................................... 11

Helwig v. Vencor, Inc.,
  251 F.3d 540 (6th Cir. 2001) ........................................................................ 7

In re Homestore.com, Inc. Sec. Litig.,
  252 F. Supp. 2d 1018 (C.D. Cal. 2003) ............................................................... 1

Hurley v. F.D.I.C.,
  719 F. Supp. 27 (D. Mass. 1989) .................................................................... 17

Johnson v. Tellabs, Inc.,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) ............................................................... 10

Kafenbaum v. GTECH Holdings Corp.,
  217 F. Supp. 2d 238 (D. R.I. 2002) ................................................................. 27

Kane v. Madge Networks N.V.,
  No. C-96-20652-RMW, 2000 WL 33208116 (N.D. Cal. May 26, 2000) ...................................... 8

Lentell v. Merrill Lynch & Co., Inc.,
  396 F.3d 161 (2d Cir. 2005) ........................................................................ 23

In re Lernout & Hauspie Sec. Litig.,
  208 F. Supp. 2d 74 (D. Mass. 2002) ................................................................. 25

In re Lernout & Hauspie Sec. Litig.,
  214 F. Supp. 2d 100 (D. Mass. 2002) ................................................................. 7

In re Lernout & Hauspie Sec. Litig.,
  236 F. Supp. 2d 161 (D. Mass. 2003) ................................................................ 23

Loan v. FDIC, 717 F. Supp. 964 (D. Mass. 1989) ....................................................... 15

In re The Loewen Group Inc. Sec. Litig.,
  No. Civ.A. 98-6740, 2003 WL 22436233 (E.D. Pa. July 16, 2003) ...................................... 5

Maldonado v. Dominguez,
  137 F.3d 1 (1st Cir. 1998 ........................................................................ 22, 26

Marksman Partners, L.P. v. Chantal Pharm. Corp.,
    927 F. Supp. 1297 (C.D. Cal. 1996) ....................................................................... 12, 29

In re Metricom Sec. Litig.,
    No. C 01-4085, 2004 WL 966291 (N.D. Cal. Apr 29, 2004) ........................................ 29

In re Nice Systems, Ltd. Sec. Litig.,
    135 F. Supp. 2d 551 (D. N.J. 2001) ........................................................................... 18

In re NTL, Inc. Sec. Litig.,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) ..................................................................... 11, 17

In re Number Nine Visual Tech. Corp. Sec. Litig.,
    51 F. Supp. 2d 1 (D. Mass. 1999) ......................................................................... 19, 20

In re Numerex Corp. Sec. Litig.,
    913 F. Supp. 391 (E.D. Pa. 1996) .............................................................................. 13

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000) ...................................................................................... 11

Orton v. Parametric Tech. Corp.,
    344 F. Supp. 2d 290 (D. Mass. 2004) ..................................................................... 15, 26

Pacheco v. Cambridge Tech. Partners (Massachusetts), Inc.,
    85 F. Supp. 2d 69 (D. Mass. 2000) .............................................................................. 9

In re PEC Solutions, Inc. Sec. Litig.,
    No. 04-1257, 2005 WL 646070 (4th Cir. Mar. 18, 2005) .......................................... 28

In re Peritus Software Servs., Inc. Sec. Litig.,
    52 F. Supp. 2d 211 (D. Mass. 1999) ..................................................................... 22, 28

Phillips v. Scientific-Atlanta, Inc.,
    374 F.3d 1015 (11th Cir. 2004) ............................................................................ 22, 26

In re Raytheon Sec. Litig.,
    157 F. Supp. 2d 131 (D. Mass. 2001) ................................................................ 1, 21, 25

In re Regeneron Pharms, Inc. Sec. Litig.,
    No. 03 Civ. 3111, 2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 1, 2005) .............. 10, 29

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004) ...................................................................................... 29

Salinger v. Projectavision,
    972 F. Supp. 222 (S.D.N.Y. 1997) ............................................................................. 29

Santa Fe Indus., Inc. v. Green,
  430 U.S. 462 (1977) ........................................................................................................ 24

SEC v. Feminella,
  947 F. Supp. 722 (S.D.N.Y. 1996) ................................................................................. 20

SEC v. Rana Research, Inc.,
  8 F.3d 1358 (9th Cir. 1993) ............................................................................................ 13

In re Segue Software, Inc. Sec. Litig.,
  106 F. Supp. 2d 161 (D. Mass. 2000) ......................................................................... 1, 4

In re Sepracor, Inc. Sec. Litig.,
  308 F. Supp. 2d 20 (D. Mass. 2004) ................................................................................ 9

Serabian v. Amoskeag Bank Shares, Inc.,
  24 F.3d 357 (1st Cir. 1994) .......................................................................................... 3, 17

Shaw v. Digital Equip. Corp.,
  82 F.3d 1194 (1st Cir. 1996) ........................................................................................ 7, 23

In re Smith Gardner, Sec. Litig.,
  214 F. Supp. 2d 1291 (S.D. Fla. 2002) ........................................................................... 10

Southland Sec. Corp. v. Inspire Insur. Solutions, Inc.,
  365 F.3d 353 (5th Cir. 2004) ........................................................................................... 25

Suna v. Bailey Corp.,
  107 F.3d 64 (1st Cir. 1997) ........................................................................................... 8, 9

In re Tyco Int'l, Ltd. Multidistrict Litig.,
  No. MDL 02-1335-B, 2004 WL 2348315 (D. N.H. Oct. 14, 2004) ............................. 25

Van Ormer v. Aspen Tech., Inc.,
  145 F. Supp. 2d 101 (D. Mass. 2000) ...................................................................... 3, 17, 18

In re Vertex Pharms. Inc., Sec. Litig.,
  357 F. Supp. 2d 343 (D. Mass. 2005) ........................................................................ 16, 26

In re Vivendi Universal S.A. Sec. Litig.,
  No 02 Civ 5571, 2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. Apr. 21, 2004) ..................... 9

In re Vivendi Universal, S.A. Sec. Litig.,
  No. 02 Civ. 5571, 2003 WL 22489764 (S.D.N.Y. Nov. 3, 2003) ................................... 2

Wenger v. Lumisys, Inc.,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) .............................................................................. 19

<u>Federal Statutes</u>

15 U.S.C. § 78u-4(b)(2) ................................................................. 3, 22, 24, 23, 28

15 U.S.C. § 78u-5(c) ................................................................................ 11

<u>Other Authorities</u>

H.R. Conf. Rep. No. 104-369.................................................................................................... 11

I.    "GROUP PLEADING" DOES NOT ALLOW PLAINTIFFS TO SUE INDIVIDUALS FOR STATEMENTS MADE WHEN THEY WERE NOT EVEN AT ORGANOGENESIS.

The Opposition cannot whitewash plaintiffs' attempt to sue all eight individuals for all 39 Challenged Statements without regard to whether those individuals had any involvement in those statements or were even working for Organogenesis at the time. See Mem. at 7-10.[1]  The lawsuit against Alan Ades is frivolous:  *Plaintiffs admit he did not make any of the 39 statements* for which they sued him (and "all defendants") and that *he did not join Organogenesis until more than six months after the Class Period*.  See Opp. at 16, 18 n.8.[2]  The "group pleading" doctrine does not entitle plaintiffs to sue people for statements made by their employer before those people joined the Company, or after they left.  Compare Opp. at 18-20 (citing no cases so holding) with In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 153 (D. Mass. 2001) (group pleading inapplicable to defendant who did not work for company when statements made).[3]

Plaintiffs similarly admit that Donna Lopolito left Organogenesis early in the Class Period (on April 30, 2000), but do not attempt to explain why they sued her for the 30 (of 39) statements made thereafter.  See Mem. at 9.  With respect to the brief period Ms. Lopolito did work at Organogenesis, plaintiffs still have not pointed to any particularized allegations in the Complaint to backstop their assertion (in the brief) that she was "directly responsible" for Organogenesis' statements, much less that she "was aware" they were "not true."  Compare Opp. at 17-18 with Bull HN Info. Sys., Inc. v. Hutson, 184 F.R.D. 19, 22 n.5 (D. Mass. 1999) ("court examines the viability

---

[1]    "Mem." refers to Memorandum of Defendants Alan Ades, John Arcari, Albert Erani, Philip Laughlin, Donna Lopolito, Michael Sabolinski and Alan Tuck In Support Of Their Motion To Dismiss The Corrected Consolidated Amended Class Action Complaint (Docket no. 68).  "Opposition" or "Opp." refers to Lead Plaintiffs' Consolidated Opposition To The Individual Defendants' Motions To Dismiss (Docket no. 75).

[2]    Apparently, Mr. Ades was sued for being the *cousin* of another defendant, which is the *only* Class Period allegation that mentions him.  See Compl. ¶ 28.  Mr. Ades' alleged *post*-Class Period participation in acquiring the assets of Organogenesis (with the approval of Judge Hillman of the Bankruptcy Court) is irrelevant because it occurred *more than six months after* the alleged misconduct was "revealed."  Compare Mem. at Ex. B with Opp. at 18 n.8.

[3]    Plaintiffs also ignore In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 169 n. 17 (D. Mass. 2000) (dismissing claim against individual defendant who only joined company *after* alleged GAAP violations) and  In re Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d 1018, 1036 (C.D. Cal. 2003) ("group published doctrine does not save" claims against individual who for "vast majority" of class period "was not even an officer of the company" and thus "could not possibly have been involved in the day-to-day affairs of the company").

of a claim as pleaded within the four corners of the complaint, not as amplified in a footnote in a legal brief"). In fact, the *only* allegations in the 116-page Complaint that say anything in particular about Ms. Lopolito are *(i)* that she is a defendant who was Organogenesis' CFO (¶ 29); *(ii)* that upon her resignation another defendant became CFO (¶ 30); and *(iii)* that she signed four public filings, which is what every CFO does (¶¶ 70, 74, 85, 88). So although plaintiffs claim to have supplied "specific and well-pled allegations of fraud" against each defendant, none appear anywhere in the Complaint. Compare Opp. at 3.[4]

Plaintiffs also overreach by arguing that the "group pleading" doctrine allows them to automatically attribute every statement made by Organogenesis to every defendant who worked there on the day it was made. Plaintiffs mis-cite Cabletron as having "affirmed the continuing vitality" of the group-pleading approach, Opp. at 19, because all the Court of Appeals did was acknowledge the "great debate" over whether the doctrine survived passage of the Reform Act, and then declined to resolve the debate by deciding the case on other grounds. In re Cabletron Sys. Inc., 311 F.3d 11, 40 (1st Cir. 2002). What the First Circuit did affirm, however, is the settled law that claims against a defendant are properly dismissed where a "complaint fails to connect him specifically to any of the materially misleading statements that [are] found [to] survive the PSLRA pleading requirements." Id. at 41. These plaintiffs fail that standard because, even assuming the group pleading doctrine survived the Reform Act, it remains subject to "the First Circuit's

---

[4]    Ms. Lopolito is only alleged to have signed three public filings (Statements 2, 6, 9) and is not alleged to have had any particular role in the press releases issued by the Company during her employment (Statements 1, 3, 7 and 8), which is not enough to make out a fraud claim. See Mem at 9. She (and the other defendants) certainly cannot be held responsible for what another defendant said in an interview (Statements 4, 5, 12 and 22) because even under the most generous application of the group pleading doctrine *plaintiffs cannot attribute one defendant's oral statements to other defendants.* See, e.g., In re AOL Time Warner, Inc. Sec. and "Erisa" Litig., No. 1500, 02 Civ. 5575, 2004 WL 992991, at *17 (S.D.N.Y. May 5, 2004) ("with respect to the oral statements of individuals, group pleading is impermissible"); In re Vivendi Universal, S.A. Sec. Litig., No. 02 Civ. 5571, 2003 WL 22489764, at *26 (S.D.N.Y. Nov. 3, 2003) ("oral statements made by other individual defendants do not fall within the ambit of the group pleading doctrine"); In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 845 (N.D. Cal. 2000) ("By definition, [the group pleading doctrine] does not apply to . . . transcripts of interviews with company officers or directors; or reports of oral representations made by officers or directors").

admonition in *Serabian* that all group pleading allegations must be sufficiently particularized."

Raytheon, 157 F. Supp. 2d at 153.[5]

Simply put, the Court should not sustain this Complaint just because plaintiffs say in a brief

that they have supplied "myriad specific and particularized allegations" against "each defendant."

Opp. at 16.  The Complaint should be dismissed against all individuals to the extent based on the

myriad of statements made when they were not at the Company.[6]  With respect to those statements

that remain and are attributable to one or more of the defendants, defendants respectfully request

that the Court undertake the statement-by-statement analysis called for by First Circuit precedent,

asking with respect to each statement *(i)* whether the statement is material (not puffing, etc.); *(ii)* if

plaintiffs have alleged particularized facts showing that the statement was *false at the time* it was

made; and *(iii)* if plaintiffs have pleaded with "particularity facts giving rise to a strong inference"

that each defendant -- not "all defendants" -- acted with <u>scienter</u> in making the statement.  See 15

U.S.C. § 78u-4(b)(2); <u>Van Ormer v. Aspen Tech., Inc.</u>, 145 F. Supp. 2d 101, 106-08 (D. Mass.

2000); Mem. at 6-7.

II.     PLAINTIFFS ADMIT THAT THE STATEMENTS REGARDING THE COMPANY'S
        <u>FINANCIAL CONDITION WERE TRUE, AND CANNOT SUE FOR IMPRESSIONS.</u>

The Complaint is built on the decidedly false claim that during the Class Period (November

15, 1999 – February 7, 2002) Organogenesis misrepresented its precarious financial position.  <u>See</u>

---

[5]     There is no such "group pleading" particularity in this Complaint.  Instead, plaintiffs purport to tie individual defendants to statements in which they are not named with the never-acceptable boilerplate that "defendants were involved in drafting, producing, reviewing and/or disseminating" the challenged statements.  <u>See</u> Compl. ¶ 35.  This is *precisely the same generic pleading the First Circuit and other courts rejected years ago.*  <u>See</u> <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 368 (1st Cir. 1994) (allegations that defendants authorized or acquiesced in press releases held insufficient to establish liability for press releases under group pleading doctrine); <u>D.E. & J Ltd. Partnership v. Conaway</u>, 284 F. Supp. 2d 719, 732 (E.D. Mich. 2003) ("boilerplate conclusions that the 'Individual Defendants participated in the drafting, preparation and/or approval of the various... reports and other communications'" held "insufficient to invoke the group pleading doctrine").

[6]     Mr. Ades and Ms. Lopolito are not alone -- nearly every individual defendant has been improperly sued for statements made when they did not even work at Organogenesis.  <u>See</u> Mem. at 7-10.  For this reason, plaintiffs cannot state a claim against *Mr. Arcari* based on any statements made before he joined the Company on April 30, 2000; against *Mr. Laughlin* for any statements made after he left the Company on May 16, 2001; against *Dr. Sabolinski* for any statements made before he became CEO on May 16, 2001; and against *Mr. Tuck* for any statements made after he left the Company in June 2000.  <u>See</u> Mem. at 7-10 and Exs. C, E, G and H.

Mem at 10; Compl. ¶¶ 14, 148-51.  Plaintiffs claim their stock dropped on January 30, 2002, when "without any prior warning to investors" Organogenesis "suddenly announced" that it "was running out of money."  Opp. at 12.  That theory of concealed financial condition is nonsense.  The Company repeatedly and explicitly disclosed that:

- It had "incurred *operating losses in every year* of [its 15-year] existence" and reported losses totaling *$87 million* for 1999-2001

- "The extent of future losses and the time required to achieve profitability is highly uncertain"

- Unless it could raise more money it would "need to delay, scale back or eliminate" operations – and "[t]here can be no assurances that [additional] funds will be available."

See Mem. at 10-13.  Plaintiffs do not attempt to address the controlling First Circuit precedent: *defendants cannot be liable for concealing information that was, in fact, disclosed*.  See Baron v. Smith, 380 F.3d 49, 55 (1st. Cir. 2004) ("Plaintiffs' claim fails because [defendant] disclosed the material facts that would lead a reasonable investor to make an informed decision regarding the purchase of stock"); In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 168 (D. Mass. 2000) (no liability where "relevant Form 10-K made no secret of the fact that the company selectively permitted returns").[7]

**A.**    **Plaintiffs Concede The Truth Of Organogenesis' Two Statements About Liquidity.**

Plaintiffs now acknowledge that the only two challenged statements that addressed the Company's liquidity were in fact "technically true."  Opp. at 25; see also Mem. at 13-14.  In those statements, the Company stated its "belie[f]" that it would have sufficient funds to "finance

---

[7]      Plaintiffs ignore more black letter law by suggesting that the Court can ignore the Company's disclosures of its obviously weak financial position when considering whether plaintiffs state a claim that such matters were concealed. Compare Opp. at 22.  The materiality of a purported omission – or whether there even was an omission -- must be evaluated in light of the "'total mix' of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  The "total mix" included Organogenesis' crimson red statements of its financial problems, and also the 19 financial statements and press releases announcing its losses.  Id.  Because that information was disclosed, plaintiffs cannot say it was concealed and/or save the deficient claim by saying that those warnings "ha[d] little, if any force as a caution to Organogenesis investors" because Apligraf was a breakthrough product with significant up-side potential. See Opp. at 24-25.

operations" into 2001 (Statement 9) and later through the first quarter of 2002, or March 31, 2002 (Statement 25).  Organogenesis indisputably did have sufficient funds during both periods; it was able to "finance operations" until September 2002.  <u>See</u> Mem. at  13-14.  Plaintiffs have no way around this Court's prior ruling that a claim based on a prediction is "moot" where it "in fact was not off the mark."  <u>Carney v. Cambridge Tech. Partners, Inc.</u>, 135 F. Supp. 2d 235, 245 (D. Mass. 2001).  Thus, Organogenesis never "concealed" that it was "running out of money," nor misled any investors as to how soon that might happen.  <u>Compare</u> Opp. at 12 <u>with</u> <u>In re The Loewen Group Inc. Sec. Litig.</u>, No. Civ.A. 98-6740, 2003 WL 22436233, at *13 (E.D. Pa. July 16, 2003) ("Obviously, there can be no securities fraud liability for a true statement").

Plaintiffs now suppose that the true statements about when Organogenesis might run out of money were misleading because plaintiffs were under the "impression" that Organogenesis was not only doing better but would "achieve profitable growth."  Opp. at 4.  Plaintiffs cannot, however, litigate their own impressions.  The securities laws are about "actual statements, whether or not they are true or false, and, if false, whether or not the utterer knew at the time the statements were made that they were false."  <u>In re Copley Pharm., Inc. Sec. Litig.</u>, Civ. A. No. 494-11897-WGY, 1995 WL 169215, at *2 n.5 (D. Mass. Mar. 16, 1995).  Plaintiffs can only litigate defendants' actual words, not the "general flavor" or "misleading impressions" they suppose are left behind.[8]  Here plaintiffs' impressions were not even reasonable.  Plaintiffs do not explain how Organogenesis' stated belief that it had enough money to stay in business for another 12 months, <u>see</u> Statement 9, could possibly have fostered the "impression" that it would achieve profitability.  That impression is downright irrational in the "total mix" of Organogenesis' other statements, <u>i.e.</u>, that over the last 15

---

[8]    <u>See</u> <u>In re Boston Tech. Inc. Sec. Litig.</u>, 8 F. Supp. 2d 43, 56 (D. Mass. 1998) (no "*general flavor*"); <u>In re Computervision Corp. Sec. Litig.</u>, 869 F. Supp. 56, 60 (D. Mass. 1994) ("*misleading impression*" not actionable) (quoting <u>Haft v. Eastland Fin. Corp.</u>, 755 F. Supp. 1123, 1128 (D.R.I. 1991); <u>Copperstone v. TCSI Corp.</u>, No. C 97-3495, 1999 WL 33295869, at *9 (N.D. Cal. Jan. 19, 1999) (statements "repackage[d]" by plaintiffs "in vague and impressionistic terms" not actionable).

years it had never been profitable and it was "uncertain" when or if it ever would be profitable.  See Mem. at 10-13; Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).

Finally, plaintiffs are simply wrong that the accurate statements about liquidity somehow triggered a duty to disclose whatever else may have been wrong with the business.  See Opp. at 20-21, 26.  It is not true that the securities laws require "full disclosure" in the sense that a Company, every time it speaks, must disclose every fact that an investor might want to know.  See generally Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990)(en banc).  To the contrary, the only duty is to disclose additional information that is "needed so that what was revealed would not be 'so incomplete as to mislead.'"  Id.  Thus, plaintiffs cannot litigate Organogenesis' stated belief that it had sufficient resources to operate through a particular date by complaining that Organogenesis did not also comment on the Company's revenue split with Novartis, manufacturing or marketing issues or even the put option.  Compare Opp. at 25-26.  None of those allegedly concealed facts undermine the veracity of what actually was said (that there was enough money to get through March 31, 2002), and thus didn't require any defendant to say any more.  See In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 59 (D. Mass. 1998) (statement not actionable for failing to disclose development problems because statement "neither inherently concerned, nor implicitly referred to the quality or condition of the product line").

**B.      Plaintiffs Abandon Their Theory Of GAAP Violations.**

Plaintiffs have abandoned their claim that 19 SEC filings and press releases announcing Organogenesis' quarterly and annual financial results were not fairly presented in accordance with GAAP.  See Opp. at 29-30; Mem. at 17-18 (Statements 2, 6, 8-11, 14, 15, 17, 18, 24-27, 31, 32, 38, 39).  Plaintiffs acknowledge they have no basis to challenge the correctness of the "hard numbers" in those financial reports.  Opp. at 29-30.  Their claimed need to "engage in discovery" to determine

the accuracy of the financial statements, Opp. at 29-30, is the reason that Congress enacted the Reform Act, i.e., to ensure that plaintiffs have a basis to sue *before* they come to Court.[9]

Plaintiffs who do not challenge any hard numbers in those 19 financial statements and earnings releases cannot avoid dismissal with vague allusions to other, never-identified "misrepresentations and omissions" in those documents. Compare Opp. at 30 with Fitzer v. Security Dynamics Tech., Inc., 119 F. Supp. 2d 12, 26 (D. Mass. 2000) ("[s]pecific and fraudulent statements must be identified"). Plaintiffs' reliance on Aldridge is inapposite because there, unlike here, the complaint alleged that the financial statements were inaccurate and supplied specific factual allegations (related to undisclosed price protection) from which the court could infer that plaintiffs were right. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 79-81 (1st Cir. 2002).[10] Because plaintiffs do not challenge the reported financial results and do not identify anything else in those documents that was material, false, and made with scienter, plaintiffs cannot sue on the theory that the documents failed to disclose further information. See Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996). Accordingly, statements 2, 6, 8-11, 14, 15, 17, 18, 24-27, 31, 32, 38, and 39 should be dismissed.

**C.    Plaintiffs Cannot Base A Claim On Non-Projections That Are Safe Harbored.**

Plaintiffs argue that the Motion to Dismiss should be denied because they were under the "impression" that Organogenesis would "achieve profitability in the near term" and/or "would be in the black" by September 2002. See Opp. at 22, 23. As noted, plaintiffs' "impressions" are not actionable. See supra at 5-6. And despite having cast much of their Complaint as a projections

---

[9]    In re Lernout & Hauspie Sec. Litig., 214 F. Supp. 2d 100, 105-06 (D. Mass. 2002) (PSLRA prohibits plaintiffs from "fil[ing] frivolous lawsuits in order to conduct discovery in hopes of finding a sustainable claim") (quoting Private Securities Litigation Reform Act, S. Rep. No. 104-98, at 14 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 693).

[10]    Nor can plaintiffs rely on a Sixth Circuit decision on liability for soft information, see Opp. at 30 (citing Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001)), when the First Circuit has long "demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace--loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996).

case, plaintiffs' Opposition essentially ignores defendants' arguments as to why they fail to state

such a claim based on what Organogenesis *actually* said, and makes no attempt whatsoever to

explain how 11 of the statements could possibly be actionable "projections" under First Circuit law.

<u>Compare</u> Mem. at 28-30 (arguing why Statements 2, 6, 9, 11, 15, 18, 25, 27, 32, 35 and 39 are not

actionable projections) <u>with</u> Opp. at 36-39.[11]  The projection theory must be dismissed because the

few statements plaintiffs do address (and those they do not address): (*i*) are not sufficiently specific

to be actionable under First Circuit law; and (*ii*) in any event are protected by the Reform Act "safe

harbor" for forward-looking statements.  <u>See</u> Mem. at 28-31.

### 1.        There Is No Actionable Projection.

Plaintiffs are incorrect that they have stated a claim based on Mr. Laughlin's statement

during a February 27, 2001 interview that "we are now targeting to pass through break even and

reach profitability in the . . . third quarter of [2002]."  <u>See</u> Statement 22.[12]  They offer no response

to <u>Suna v. Bailey</u>, where the First Circuit was explicit that *only* "promises about future

performance" and "project[ions of] specific numbers that the company will certainly attain" are

actionable.  <u>Compare</u> <u>Suna v. Bailey Corp.</u>, 107 F.3d 64, 70 (1st Cir. 1997) <u>with</u> Opp. at 36-39.  By

contrast, Statement 22 must be dismissed because on its face it only expresses a goal -- or, as Mr.

Laughlin put it, a "target[]" -- that no reasonable investor would taken to have been a guarantee.

<u>See</u> <u>Kane v. Madge Networks N.V.</u>, No. C-96-20652-RMW, 2000 WL 33208116, at *9 (N.D. Cal.

May 26, 2000) ("'target[]'for the first quarter of 1996 . . . too vague to be actionable").  Plaintiffs

---

[11]        Plaintiffs reference to categories of other, unidentified "misrepresentations" and "statements," Opp. at 36-37, obstructs the requisite "statement-by-statement analysis," <u>In re Boston Tech.</u>, 8 F. Supp. 2d at 55.  It also doesn't respond to defendants' argument, as they have not claimed that every challenged statement is inactionably vague or protected by the safe harbor; many are, but others fail to state a claim for different reasons.  Plaintiffs also point to Statements 22 and 25 regarding the Novartis Put Option, which are not statements about the future and were not argued to be immaterial as a matter of law, but fail because the Put Option Agreement was disclosed.  <u>See</u> <u>infra</u> at 11-13.

[12]        Even if that were actionable, it would only be a basis to sue Mr. Laughlin because the other defendants didn't say it and group pleading does not extend to oral statements.  <u>See</u> <u>supra</u> at n.4.

offer no response to the cases from this district, such as <u>Galileo Corp.</u>, holding substantially similar statements inactionable.  <u>See</u> Mem. at 28-29.

Plaintiffs fare no better with Mr. Laughlin's optimism on CNBC's "Power Lunch" program that in the never-stated future Organogenesis "can become profitable and will become profitable with Apligraf alone."  <u>See</u> Statement 12.  That statement was immediately followed by the qualifier "[w]e're optimistic," so in context it also wasn't a guarantee that Organogenesis would obtain "specific numbers" (much less when).  <u>Compare</u> <u>Suna</u>, 107 F.3d at 70.  Indeed, this Court has rejected "projection" claims based on far more concrete predictions.  <u>Compare</u> <u>Pacheco v. Cambridge Tech. Partners (Massachusetts), Inc.</u>, 85 F. Supp. 2d 69, 81 (D. Mass. 2000) (dismissing statement that company "would" meet analyst estimates for specific quarter).

Plaintiffs cannot repair an inadequate challenge to vague statements about the future with misplaced reliance on cases sustaining statements about *the past*.   <u>See</u> <u>In re Sepracor, Inc. Sec. Litig.</u>, 308 F. Supp. 2d 20, 28 (D. Mass. 2004) (sustaining complaint alleging falsity of reported results of already completed animal research studies); <u>In re Allaire Corp. Sec. Litig</u>,  224 F. Supp. 2d 319, 331-32, 334 (D. Mass. 2002) (sustaining claim alleging falsity of statements attributing profit growth to software that defendant allegedly knew could not even be installed); <u>In re Vivendi Universal, S.A. Sec. Litig.</u>, No. 02 Civ. 5571, 2004 U.S. Dist. LEXIS 7015, at *23 (S.D.N.Y. Apr. 21, 2004) (statements regarding past results and present position) (cited by Opp. at 23, 38-39).[13]

Of course, even if Mr. Laughlin had guaranteed profitability, plaintiffs have never pleaded *facts* sufficient for a strong inference that he knew the prediction was based on an unreasonable methodology *at the time it was made on June 26, 2000 (*before the post- September 11 economic downturn).  <u>See</u> <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 195-96 (1st Cir. 1999) (requiring

---

[13]    Plaintiffs are also wrong to the extent they argue that the materiality of a statement has anything to do with its falsity.  <u>See</u> <u>In re Boston Tech.</u>, 8 F. Supp. 2d at 67 (where challenged statement is puffery, "[t]he specifics of the charged omissions" are "irrelevant").

"strong," not merely reasonable, inference of conscious disregard for known risk); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997) (citing Glassman v. Computervision Corp., 90 F.3d 617, 628-29 (1st Cir. 1996)) (plaintiffs must plead factual basis that defendants inadequately considered available data or used unsound methodology); In re Boston Tech., 8 F. Supp. 2d at 64.

## 2.    Plaintiffs Fail To Show That The Safe Harbor Is Inapplicable.

Plaintiffs do not contest that the statements identified by defendants in their memorandum are forward-looking and were identified as such. See Opp. at 39-40. Plaintiffs are simply wrong that Organogenesis' cautionary language was not sufficiently meaningful to qualify for the Reform Act safe harbor. Compare Mem. at 30-31 with Opp. at 39-40. Organogenesis' warnings were hardly "boilerplate." Opp. at 38. They set forth, in detail, the risks of inadequate funding, lack of product acceptance by customers, unsuccessful marketing, and the other dangers that could cause results to vary. See Mem. at 31 and App Tab 9.[14] These warnings were more than adequate to alert investors to the risks of buying Organogenesis stock; far less-detailed warnings have been held adequate to trigger application of the safe harbor.[15]

Plaintiffs misconstrue the safe harbor by arguing that the cautionary language was inadequate because it omitted "specific material adverse factors" that allegedly existed and were known to the defendants. See Opp. at 39-40. That mixes apples and oranges because the statute

---

[14]    Plaintiffs' citation to In re Regeneron is unavailing. See Opp. at 39. There, the court concluded that the statements in question (about the efficacy of a drug) were not forward looking, and therefore had no occasion to determine whether the safe harbor applied. See In re Regeneron Pharms., Inc. Sec. Litig., No. 03 Civ 3111, 2005 U.S. Dist. LEXIS 1350, *39 (S.D.N.Y. Feb. 1, 2005). Moreover, the court's analysis under the "bespeaks caution" doctrine is inapposite because cautionary language must be far more explicit to negate a false statement of historical fact (in Regeneron, a statement about the efficacy of a drug) than to protect a forward looking statement (here that someday Apligraf will be profitable), which the First Circuit has long held are less material to investors. See Carney, 135 F. Supp. 2d at 245 ("courts in the First Circuit generally have declined to impose liability for so-called 'forward looking statements' . . . because these courts regard such statements as unlikely, as a matter of law, to be material to a reasonable investor.") (emphasis added).

[15]    See, e.g., In re Smith Gardner, Sec. Litig., 214 F. Supp. 2d 1291, 1307 (S.D. Fla. 2002) ("warnings at issue perhaps constitute little more than generic, boilerplate language but still meet the requirements of meaningful cautionary language"); Johnson v. Tellabs, Inc., 262 F. Supp. 2d 937, 953-954 (N.D. Ill. 2003) (warnings concerning "risks associated with introducing new products, entering new markets, availability of resources, competitive response, and a downturn in the telecommunications industry," were not vague or boilerplate and clearly fell within the safe harbor).

provides safe harbor protection under two "alternative inlets" -- where there is *either* meaningful cautionary language *or* a failure to plead actual knowledge.  See 15 U.S.C. §78u-5(c); Greebel, 194 F.3d at 201.  Application of the cautionary language prong turns only on whether the risk factors fairly addressed the sort of business risks that could cause results to vary; it is contrary to the statute to assess the sufficiency of those factors by considering the state of mind of the speaker.  See Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999) (if forward-looking statement accompanied by meaningful cautionary language, "defendants' state of mind is irrelevant"); H.R. Conf. Rep. No. 104-369, at 44, reprinted in 1995 U.S.C.C.A.N. 730, 743 ("first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.").[16]

III.    THE ALLEGATIONS ABOUT THE NOVARTIS RELATIONSHIP STATE NO CLAIM.

A.    **Organogenesis Disclosed -- Not "Concealed" -- The Put Option Agreement.**

There is nothing left of plaintiffs' theory that Organogenesis concealed the "conditions precedent" to a $20 million financing under the Novartis Put Option.  Mem. at 14-17.  The Opposition acknowledges that Organogenesis publicly disclosed -- by filing on the SEC's public website -- the Novartis agreement containing the very Put Option terms they accuse defendants of concealing.  See Opp. at 28; Mem. at 16-17 and App. Tab 40.  Plaintiffs do not even attempt to address the substantial authority -- including the First Circuit's decision in Baron v. Smith and this Court's decision in Segue Software -- that there can be no securities fraud claim where, as here, the allegedly undisclosed facts were disclosed.  Compare Opp. at 28-29 with Mem. at 16-17.

---

[16]    Plaintiffs' own citation to In re NTL confirms the disjunctive nature of the two prongs of the safe harbor.  See Opp. at 40.  There, the court properly recognized that the "actual knowledge" prong of the safe harbor required a separate analysis from the "meaningful cautionary language prong."  See In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004).  The court found that plaintiffs adequately pleaded knowledge of falsity as to one statement, and separately determined that the cautionary language accompanying the statement was insufficient because it generically warned only that "actual results may be 'materially different' than the projections."  Id. at 35 & n.119. Plaintiffs' citation to Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) does not even mention the safe harbor, and therefore has no bearing on its application.

Having ignored the First Circuit precedent, plaintiffs cannot save their Put Option claim by relying on a California District Court's decision in <u>Marksman Partners</u>.  Opp. at 29.  In <u>Marksman Partners</u>, plaintiffs alleged that the financial statements were false because they recognized revenue on consignment sales in violation of GAAP, which is very different from this case because plaintiffs acknowledge they have no basis to challenge Organogenesis' compliance with GAAP.  <u>Compare supra</u> at 7-8 <u>with</u> <u>Marksman Partners, L.P. v. Chantal Pharm. Corp.</u>, 927 F. Supp. 1297, 1301-02 (C.D. Cal. 1996).  Nor can plaintiffs draw sustenance from the <u>Marksman Partners</u> court's ruling that the false accounting was not counterbalanced by the defendants' disclosure of the marketing agreement in question, which was buried as part of a larger disclosure.  <u>See</u> <u>Marksman Partners</u>, 927 F. Supp. at 1302, 1306-07 (disclosure inadequate where inconspicuously attached as one of 22 exhibits to filing that did not "discuss or refer to the marketing agreement").  By contrast, Organogenesis attached the Novartis Agreement as one of two exhibits to a public filing made for the "sole purpose" of adding those two exhibits.  <u>See</u> App. Tab 40.  Perhaps most significantly, the Novartis Agreement directly revealed the "conditions" that these plaintiffs say were concealed, which is not at all like <u>Marksman Partners</u>, where it was "unclear" that the disclosed document "directly address[ed] the allegedly misleading information."  <u>Compare</u> <u>id.</u> and Mem. at 16 <u>with</u> <u>Marksman Partners</u>, 972 F. Supp. at 1307.

Plaintiffs cannot avoid dismissal by selectively quoting from a February 27, 2001 television interview during which Mr. Laughlin said that under the Novartis Agreement Organogenesis could exercise the put option at its "discretion."  Opp. at 26.  There is no basis to claim Mr. Laughlin concealed the existence of  "conditions precedent" because he prefaced his remarks by saying -- in the immediately prior portion of the transcript that plaintiffs omit -- that he "can't give you the precise details" of the Novartis Agreement but instead was summarizing the "major elements."  <u>Compare</u> Statement 22 <u>with</u> <u>Capri Optics Profit Sharing v. Digital Equip. Corp.</u>, 950 F.2d 5, 11 (1st

Cir. 1991) ("statements must be understood in the context in which they are made"). Of course, it was not "fraud" for Mr. Laughlin to have not recited every "precise detail" of the option during the brief cable TV interview because, as plaintiffs acknowledge, the contract would be on file with the SEC and available to the open market.[17]

Plaintiffs' argument is inconsistent with their own efficient market theory, i.e. that the market "promptly digested current information regarding Organogenesis from all publicly available sources and reflected such information in Organogenesis stock price." Compl. ¶ 191. By arguing that they can state a claim despite disclosure of the Novartis Agreement, plaintiffs are in effect claiming that the market only digests some public SEC filings -- and ignores whatever disclosures contradict plaintiffs' "concealment" claim. As Judge Stearns recently recognized in a securities fraud case in which the plaintiffs asked him to ignore an article published in the New York Post, this "argument lacks legs to the extent that plaintiffs rely on a fraud-on-the-market theory. '[U]nfortunately for them, the presumption that the market price has internalized all publicly available information cuts both ways.'" Garvey v. Arkoosh, 354 F. Supp. 2d 73, 82 n.12 (D. Mass. 2005) (quoting Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993)).[18]

**B.    Plaintiffs Do Not State A Claim That Apligraf Could Never Be Profitable.**

Plaintiffs repeatedly argue that the Motion to Dismiss should be denied because Organogenesis purportedly failed to disclose that the "revenue split from the Novartis marketing agreement" meant that Organogenesis was "bleeding" cash and "would never become profitable."

---

[17]    Even if Mr. Laughlin had not told TV viewers that he wasn't going to get into the "precise details," no reasonable investor would have interpreted his use of the word "discretion" to have meant there were "no conditions" whatsoever. It would be irrational to conclude that these two public companies entered into stock agreements without any conditions. Nor would a reasonable investor have interpreted the phrase "wonderful safety net" to mean that Novartis would give Organogenesis $20 million with no strings attached or conditions. See In re Numerex Corp. Sec. Litig., 913 F. Supp. 391, 400 (E.D. Pa. 1996) ("federal securities laws were intended to protect the average, reasonable investor, not the most unworldly naif. They do not require a company to state the obvious").

[18]    Plaintiffs' reliance on the fraud-on-the-market presumption also distinguishes this case from their other cited authority, where the court held that the "SEC need not prove reliance in its action for injunctive relief on the basis of violations of section 10(b) and Rule 10b-5." SEC v. Rana Research Inc., 8 F.3d 1358, 1364 (9th Cir. 1993).

Opp. at 25. The theory that Organogenesis "in no way alerted investors to the essential fact that [it] was losing money on each unit of Apligraf," Opp. at 31, *ignores that the Company repeatedly said just that*. In *every quarter* Organogenesis reported staggering losses (for a total of $87 million for 1999-2001), which obviously meant that Apligraf was unprofitable because plaintiffs acknowledge it was the Company's only product. See Mem. at 11; Compl. ¶ 2.[19] And although a "reasonable investor" knows that an unprofitable company is one that spends more than it makes, Organogenesis also explicitly told investors that "[p]roduction costs" and "cost of product sales" for Apligraf "exceeded product sales." See Statements 2, 6, 9, 11, 15, 18, 25, 27, 32 and 39. Again, plaintiffs cannot sue defendants for supposedly concealing the facts that were disclosed. See Baron, 380 F.3d at 55.

Plaintiffs do no better by contending that Organogenesis falsely attributed the prominently-disclosed Apligraf losses to "high costs associated with low volume production." Statements 2, 6, 9, 11, 15, 18, 25, 27, 32 and 39. Plaintiffs do not dispute that production costs are higher for lower volume products. Instead, plaintiffs claim that financial truism was misleading because they say the "revenue split" with Novartis was so disadvantageous that no volume of production would allow Apligraf to become profitable. Opp. at 25, 31. This alternative theory fails for two reasons. First, because plaintiffs have never identified any profitability projection that was actionable and false (as opposed to inactionable "targets" or optimism), supra at 8-11, Organogenesis was under no duty to say what impact production volume would have on profitability in any future period. See Basic, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading"). In this respect plaintiffs' theory is what the First Circuit found "dead on arrival" in Backman. There, plaintiffs sued Polariod, claiming that it failed to disclose unfavorable facts about its Polavision product. See

---

[19]     It also was hardly a secret that Organogenesis was "bleeding" cash. Every quarter it reported its deteriorating cash position and that its ability to continue operations depended on obtaining additional financing. Compare Opp. at 25 with Mem. at 11-12 and supra at 4.

<u>Backman</u>, 910 F.2d at 11-12.   Reversing the denial of defendants' motion for judgment

notwithstanding the verdict, the First Circuit flatly rejected the argument because "[d]isclosing that

Polavision was being sold below cost was not misleading by reason of not saying how much below.

Nor was it misleading not to report the number of sales, or that they were below expectations." <u>Id.</u>

at 16.[20]

     <u>Second</u>, to state such a claim plaintiffs would need to -- but did not -- plead "falsity" with

Reform Act and Rule 9(b) particularity, <u>i.e.</u>, that as of the date of any particular statement, the terms

of the Novartis Agreement were such that Apligraf would "never" be profitable and/or that it would

be "virtually impossible." <u>Compare</u> Opp. at 22, 25 <u>with</u> <u>Orton v. Parametric Tech. Corp.</u>, 344 F.

Supp. 2d 290, 298-99 (D. Mass. 2004) (even if material, statement actionable only if

contemporaneous falsity alleged with specificity).   Nowhere do Plaintiffs identify a particularized

pleading probative of falsity, such as: (<i>i</i>) factual details regarding the contract; (<i>ii</i>) facts regarding

the costs; (<i>iii</i>) contemporaneous internal reports that the revenue-split with Novartis precluded

profitability; or (<i>iv</i>) a contemporaneous statement by any defendant acknowledging that Apligraf

would always lose money.   <u>See</u> <u>Greebel</u>, 194 F.3d at 193-94 (requiring pleaded basis "that adverse

circumstances existed at the time" statement made).[21]

     Instead of a particularized pleading of falsity, plaintiffs simply insist "it was not true that

costs exceeded sales due to start-up costs and the high costs of low volume production." <u>Compare</u>

Compl. ¶ 65 <u>with</u> <u>Loan v. FDIC</u>, 717 F. Supp. 964, 967 (D. Mass. 1989) (plaintiff cannot "merely

---

[20]    Weaker still is the challenge to Statement 23, because plaintiffs do not dispute that the terms of the new Novartis Contract (announced on February 28, 2001) were "significantly better" than its predecessor.  A "significant" improvement is hardly a guarantee of profitability, nor did it require Organogenesis to say why that significant improvement may not have been significant enough.  <u>See</u> <u>Backman</u>, 910 F.2d at 16.

[21]    Here, the failure to plead any details is striking in view of what is before the Court.  Although plaintiffs say Apligraf would never be profitable, during the Class Period per-unit losses decreased as volume increased.  <u>See</u> Statement 26 (reporting that "product margin[s] improved significantly"); Statement 39, App. Ex. 39 (reporting cost of product sales for the nine months ended September 30, 2001 that exceeded product revenue by 43.17%, a marked improvement over the 123% reported for the nine months ended September 30, 2000).  Nor do Plaintiffs bother to distinguish the terms of the original Novartis contract in existence at the beginning of the Class Period from the "significantly improved" terms under the revised contract that Organogenesis announced on February 27, 2001 that gave it an increased percentage of Apligraf revenue.

quote a statement and assert that it is untrue"). Even if that "trust me" approach were acceptable, it still would not state a claim because plaintiffs plead no basis to trust the anonymous former employees to whom that conclusion is attributed ("former Project Engineer" and "former Maintenance Supervisor"). See Cabletron, 311 F.3d at 28-29; Compl. ¶ 65. These people are not described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Cabletron, 311 F.3d at 29. There is no pleaded basis that an "engineer" or someone in "maintenance" had any finance responsibilities, much less had personal knowledge of Organogenesis' costs and margins under the Novartis Agreement from which to conclude that it was "practically impossible" for Apligraf to be profitable in the "near-term" and/or that it would "never" be profitable. Compare Compl. ¶ 65 with Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 152 (3d Cir. 2004) (rejecting "attempt to substantiate claims of accounting fraud" with "former employees who held positions that would not appear to render them privy to the company's bookkeeping practices, let alone the specific accounting" at issue). Plaintiffs do not even allege *when* during the two-plus year Class Period these "sources" supposedly worked at Organogenesis, or whether they actually had contact with any particular defendant(s) to make them a legitimate source about what was supposedly known by all "upper management." Compare Compl. ¶ 65 with In re Vertex Pharms. Inc., Sec. Litig., 357 F. Supp. 2d 343, 353-54 (D. Mass. 2005) (rejecting allegations based on confidential sources not alleged to have worked at company during class period nor to have personal knowledge of facts attributed to them).

**C.    Plaintiffs Cannot Sue for Alleged Production Problems or Marketing "Ineptitude."**

Plaintiffs attempt to disavow their "corporate mismanagement" lawsuit by insisting they "do not rely at all" on "negligence" allegations and disclaiming any "critique" of "corporate judgment." See Opp. at 40. That ignores the Complaint, which squarely takes aim at the business judgment of

Organogenesis (allegedly "poor quality control") and its marketing partner Novartis (allegedly "had no idea what they were doing"). See Compl. ¶¶ 61-62.

No matter how plaintiffs characterize it, they have not saved their mismanagement theory by ignoring the First Circuit authority that requires its dismissal. See Mem. at 23, 26, 31-32. The law is clear and plaintiffs don't address it: there is no abstract duty to disclose mismanagement or anything else, even if investors might want to know about it. See Backman, 910 F.2d at 16; Van Ormer, 145 F. Supp. 2d at 105-06. Instead, allegations of subpar business judgment are *only* actionable if (*i*) they are alleged with particularity and (*ii*) they rendered an actionable statement false. See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994) ("plaintiffs must plead more than that defendants acted irresponsibly and unwisely").[22] They have done neither.

### 1.    The "Mass-Production" and "Quality Control" Claims Fail.

Plaintiffs claim that Organogenesis' manufacturing and production problems were "so severe," yet do not satisfy the very first requirement for *any* fraud claim. They never explain how any such problem rendered any statement materially false. See Carney, 135 F. Supp. 2d at 244 ("First, and most important, there is no indication that the statements . . . were false or misleading at the time that he made them"); Compare Mem. at 24-25 with Opp. at 32-34. Plaintiffs cannot base a claim on Organogenesis' statement that Apligraf was "mass-produced" because there is "no factual support for why [it was] fraudulent." Van Ormer, 145 F. Supp. 2d at 104. Plaintiffs' blithe assertion that there was "no way" to mass-produce Apligraf falls far short of Reform Act particularity, even under the law plaintiffs cite. Compare Opp. at 32 with In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004) ("conclusory allegation that the opposite of a statement ... is true, without

---

[22]    This Court's decision in Hurley v. F.D.I.C., on which plaintiffs rely in disclaiming any mismanagement claim, see Opp. at 41, is fully consistent with Serabian and defendants' argument. There, the Court sustained claims that went well beyond mismanagement because plaintiffs alleged that the bank's financial statements were fraudulently and improperly accounted for certain, specified bad loans. See Hurley v. F.D.I.C., 719 F. Supp. 27, 30-31 (D. Mass. 1989). By contrast, here the purportedly undisclosed marketing and production problems do not render any of Organogenesis' statements false or misleading, and thus are no more than hindsight criticism that the Company was mismanaged.

further factual elaboration, is insufficient") (citation omitted).  Indeed, plaintiffs do not attempt to

say why annual production of 40,000 units of artificial skin (which is a complicated product; it

needs to be grown) is not "mass production."  Compare Guerra v. Teradyne Inc., No. Civ.A. 01-

11789, 2004 WL 1467065, at *9 (D. Mass. Jan. 16, 2004) ("there is no explanation as to what was

meant by 'unit demand' and, therefore, it is impossible to determine whether demand was, in fact,

down").

        Here, plaintiffs' empty rhetoric about the "deleterious effect" of the manufacturing problems

(whatever that means) is particularly unfounded – they do not dispute that sales (and therefore

production) increased almost 400% during the Class Period to the point where the Company was

producing 40,000 units every year.  See Carney, 135 F. Supp. 2d at 244-45 (dismissing claim for

nondisclosure of adverse facts where, as here, "facts alleged in the complaint actually undermine

the drawing of any inference that adverse circumstances existed").  Having ignored that the only

hard data before the Court indicates a dramatic increase in Apligraf volume, plaintiffs cannot state a

claim with allegations that, according to anonymous "former employees," a "batch" had to be

recalled at some unspecified time because a lab report came in late.  Compare Opp. at 32 with In re

Allscripts, Inc. Sec. Litig., No. 00 C 6796, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001)

(dismissing complaint even where, unlike here, plaintiffs identified specific customer problems;

court "cannot reasonably infer" from anecdotes about some problems that product suffered

"widespread problems").[23]  Worse still, plaintiffs have never alleged when (or if) during the 26-

month Class Period the alleged quality control mistakes and recall(s) occurred, depriving the Court

of any basis to consider whether those problems even existed at the time of any challenged

statement.  See Mem. at 26, n.14; Greebel, 194 F.3d at 202 (dismissing complaint where no

---

[23]        Similarly deficient are allegations of "numerous product recalls" that do not identify a single one.  Compare
Opp. at 34 with In re Nice Systems, Ltd. Sec. Litig., 135 F. Supp. 2d 551, 577 (D. N.J. 2001) (dismissing complaint
even where, unlike here, plaintiffs did identify customers who "experienced problems with a new and highly technical
product").

pleading of when allegedly undisclosed "warehousing" and "no specifics about why the practice is thought to have occurred during the Class Period").[24]

Plaintiffs are correct that they do not need to plead evidence. But they must plead *something* substantial to satisfy the particularity requirements of the Reform Act and Rule 9(b), and have not done so by declaring that never-specified problems had "deleterious" effects without any quantification whatsoever. Compare Opp. at 33 with In re Cytyc Corp. Sec. Litig., Civ. No. 02-12399, slip op. at 47 (D. Mass. Mar. 1, 2005) (dismissing claim that revenue improperly recognized for unordered products where complaint "provide[d] few particulars about the when, where, amount and nature of the transactions of unordered product and the relationship between the amount of unordered product shipped and the company's total revenues"); Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1247 (N.D. Cal. 1998) (Reform Act and Rule 9(b) not satisfied by "amorphous and conclusory allegations" of mismanagement that do not "quantify the ensuing" problem).

### 2.    The Marketing "Ineptitude" Claims Fail.

The Opposition does not save plaintiffs' complaints that Novartis "lacked the proper training," had "no idea" how to sell Apligraf, etc. See Mem. at 21-23. Plaintiffs never identified a statement that would be rendered misleading even if those problems existed. See Mem. at 21-22. The announcements of "record" sales and "increasing demand" neither mention Novartis nor "tout" the Company's marketing efforts, see Statements 3, 13, 16, 19, 21, 23, 28, 29, 31, 33, 34, 36, and thus could not be rendered misleading by any supposed failure to disclose whatever Novartis-related shortcomings plaintiffs think existed. Compare In re Number Nine Visual Tech. Corp. Sec. Litig.,

---

[24]    Plaintiffs' failure to specify *when* these incidents purportedly occurred is particularly important here because the Complaint itself references fully-disclosed recalls *before* the start of the Class Period. See Compl. ¶47.

51 F. Supp. 2d 1, 27 (D. Mass. 1999) (statement not rendered misleading by allegedly undisclosed facts where it did "not in any way address, let alone negate, those facts") <u>with</u> Opp. at 34-36.[25]

Plaintiffs also cannot excuse their failure to plead the existence of marketing problems with the requisite particularity by saying that would be "an impossibly high pleading standard." Opp. at 35. Regardless of how plaintiffs characterize their burden under the Reform Act and Rule 9(b), it is not enough to simply assert that, according to confidential sources, Novartis' "inexperience and insufficient training . . . damaged the reputation of Apligraf . . . and severely limited the Company's sales prospects" or that "physicians . . . grew frustrated." <u>See</u> Opp. at 33, 35.[26]  Plaintiffs' failure to plead specific facts to support those conclusions is particularly striking because they say it was the purported "sever[ity]" of those marketing problems that required disclosure.  <u>See</u> Opp. at 35.  As one of the cases that plaintiffs held, plaintiffs must support claims of "substantial" or "severe" problems with something more than those adjectives:

> The complaint, apart from largely rhetorical flourishes of indeterminate meaning, contains little or no hard information concerning the extent or prevalence of the subsidiary "facts" relied upon.  Claims of "frequent" failures to complete service appointments, for example, are meaningless unless one knows what "frequent" means. . . . Nor is any indication of what is normal in the operation of customer service call-in facilities.  In the main, therefore, the Class Complaint fails adequately to allege facts that support their assertion, on information and belief, that substantial problems existed….

---

[25]     It also makes no sense for plaintiffs to claim that these indisputably accurate sales reports left a "misleading impression" that the "sales efforts were succeeding."  Opp. at 34.  Such impression could not have been misleading; it was *true*.  Plaintiffs do not contest that Apligraf sales increased 400% during the class period.  Nor do plaintiffs dispute that the demand for the product was increasing, which is why sales increased every quarter (making them "record" sales).  <u>See</u> Mem. at 19-21.

[26]     The cases relied on by plaintiffs each sustained claims alleged with far greater factual detail than the vague, conclusory marketing problems alleged here.  <u>See</u> <u>Number Nine</u>, 51 F. Supp. 2d at 26-27  (sustaining claim that company overstated inventory based on later announcement of $8 million charge for obsolete inventory and contemporaneous trade publications prominently noting that company's products were becoming obsolete); <u>Cooper v. Pickett</u>, 137 F.3d 616, 627 (9th Cir. 1997) (sustaining claim of improper revenue recognition where "complaint identified who (eight of Merisel's customers), what (four types of improper revenue recognition), when (last two quarters of 1993 and first quarter of 1994), and where (reported in financial statements).  The complaint alleged that Merisel misled by inflating its revenues by specific amounts"); <u>SEC v. Feminella</u>, 947 F. Supp. 722, 732-33 (S.D.N.Y. 1996) (sustaining claim that broker engaged in kickback scheme where complaint identified the number (33) of kickback transactions, "range of the size of the transactions and the range of the size of the markups thereon"); <u>In re Anicom Inc. Sec. Litig.</u>, No. 00 C 4391, 2001 U.S. Dist. LEXIS 6607, at *8-*9, *13  (N.D. Ill. May 15, 2001) (sustaining claim defendants overstated revenue on financial statements where complaint identified 14 specific transactions and company admitted that it had "overstated its gross revenue by approximately $ 39.6 million and its net income by approximately $ 34.4 million").

In re NTL, 347 F. Supp. 2d at 24-25.

Finally, even assuming that were marketing problems, Organogenesis was very upfront that this was the world's first living-skin product (meaning that no one in the world had ever marketed it) and that "Novartis [] may or may not be successful in marketing and selling Apligraf."  See Mem. at 22.

IV.    THE "CONFIDENTIAL ARCARI DOCUMENT"

Plaintiffs say the "smoking gun" in this case is a "confidential" document allegedly written by Mr. Arcari about Mr. Erani late in the Class Period, in October 2001.  Opp. at 1.  Defendants most assuredly do dispute that the document is "direct evidence" of fraud.  Opp. at 43.  It states no claim against any defendant.  See Mem. at 32-33.

**A.    The "Confidential" Document Is Irrelevant To Virtually Every Defendant.**

The "Confidential Arcari Document" could not possibly be "direct evidence" of fraud against Ms. Lopolito and Messrs. Tuck, Laughlin, Sabolinski, or Ades because *none* of those five defendants are alleged to have ever seen the document, heard about it, been involved with it, or to have known about whatever misconduct plaintiffs say it evidences.  See Mem. at 32-33; Raytheon, 157 F. Supp. 2d at 153-54 (no inference of scienter as to two individual defendants from "smoking gun" document where no allegations they saw it or were told about it).

Having failed to connect the document to anyone other than Messrs. Arcari and Erani, plaintiffs contend that the Court should *assume* it establishes the scienter of everyone else in "senior management" simply because plaintiffs say the document is "so important."  Opp. at 44.  That "must-have-known" strategy turns the Reform Act on its head.  Compare 15 U.S.C. § 78u-4(b)(2) (complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").  Even before the Reform Act, the First Circuit courts required plaintiffs to plead specific facts for each defendant's scienter, and have never tolerated

attempts to dilute that requirement with assumptions that "senior management" harbored fraudulent intent by virtue of their status with the company.  See In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 229 (D. Mass. 1999) ("scienter may not rest on a bare inference that a defendant must have had knowledge of the facts.") (quoting Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998)).  At most it is "plausible" (perhaps) that others were aware of whatever Mr. Arcari put in a "confidential" memo.  But "plausibility is not the standard here – [plaintiff] must present facts that give rise to a strong inference of scienter." Fitzer, 119 F. Supp. 2d at 25 ("Court cannot speculate" that because some former employees knew allegedly undisclosed information that "the corporate executives must also have known").

**B.      The "Confidential" Document States No Claim Against Messrs. Erani and Arcari.**

The document also does not give rise to a strong inference of scienter on the part of Messrs. Erani or Arcari.  See Mem. at Exs. C and D.   Plaintiffs allege that Organogenesis inflated its stock price by misrepresenting its "true financial and operational condition," and claim their stock dropped when the truth that it was "running out of money" was revealed.  See Compl ¶¶ 148-49. The Reform Act requires that plaintiffs plead scienter with particularity and "with respect to each act or omission." 15 U.S.C. § 78u-4(b)(2).  Thus, to plead scienter as to Messrs. Erani or Arcari, plaintiffs must plead that they personally misrepresented the financial position of the Company, and did so with fraudulent intent in disregard of the adverse and undisclosed truth (again, "running out of money").  See Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1018 (11th Cir. 2004) ("statutory language compels the conclusion that scienter must be alleged *with respect to each alleged violation* of the statute") (emphasis added).

The document does not help plaintiffs meet that high pleading standard.  It is in no way connected to any of the 39 challenged statements (35 of which were made prior to the date of the document), nor does it support any inference that either gentleman knew and intentionally

concealed Organogenesis' financial condition.  That is, the document is not alleged to say anything about Organogenesis' liquidity or Apligraf's current or future costs, or current or potential profitability.  Nor is the document alleged to say anything about Novartis, its marketing acumen, or the "revenue-split" and "put option" terms set forth in either the original or amended Novartis Agreement.  Thus, no matter how frequently plaintiffs refer to the document as "evidence" of an attempt at "market manipulation," those assertions add no substance to a lawsuit that is so explicitly tied to the theory that the stock price was inflated by allegedly false statements (and deflated when the "truth" came out thereafter).  Compare Mem at Ex. D; see Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 177 (2d Cir. 2005) (where plaintiffs allege market was inflated by publicly-disseminated "misrepresentations or omissions, plaintiffs have not made out a market manipulation claim").[27]

Even if plaintiffs had brought their lawsuit on an alternative theory that the stock was inflated by "market manipulation" (as opposed to false statements), what they say about the document is a far cry from a particularized pleading that anyone actually committed a manipulative act in violation of Section 10(b). 15 U.S.C. § 78u-4(b)(2).[28]  That is, according to plaintiffs, Mr. Arcari's document says that at some point in 2001 the Company "was informed" by unidentified "stock brokers" that Mr. Erani "sought to have them" (i.e., the "stock brokers") manipulate a stock market.  Compl. ¶ 7.  That states no claim because plaintiffs have *never alleged* that whatever was

---

[27]     Nor are plaintiffs entitled to infer from an October 2001 document that anyone was "aware of these actions much earlier."  Compare Opp. at 44 with, e.g., Shaw, 82 F.3d at 1223 (plaintiff cannot plead that defendants "knew earlier what later" happened) (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992)).

[28]     There is *nothing in the Complaint that comes remotely close to alleging a market manipulation*, or any deceptive device other than allegedly false statements and omissions.   "Manipulation is 'virtually a term of art when used in connection with securities markets,'" and "refers generally to practices such as wash sales, matched orders, or rigged prices" that manipulate pricing on securities markets.  See In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161, 170  (D. Mass. 2003) (quoting Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977).  It certainly is not enough for plaintiffs to parrot the words "manipulation" because Reform Act and Rule 9(b) particularity is required of *all* Section 10(b) cases, regardless of how plaintiffs label them.  See, e.g., Fezzani v. Bear, Stearns & Co., Inc., No. 99 Civ.0793, 2004 WL 744594, at *14 (S.D.N.Y. Apr. 6, 2004) ("Plaintiffs must plead with particularity the manipulative scheme itself").

contemplated (or "sought") *actually happened* - much less by whom, when, how, and whether any investor purchased stock at an artificial price.  See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994) (Section 10(b) *"prohibits only the making* of a material misstatement (or omission) or the *commission* of a manipulative act") (emphasis added); Ellison v. Am. Image Motor Co., Inc., 36 F. Supp. 2d 628, 640 (S.D.N.Y. 1999) (dismissing market manipulation claim where complaint "lack[ed] specificity as to any 'manipulative act' that the [defendants] [we]re alleged to have effectuated").[29]

V.    PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER.

Plaintiffs waste little time trying to establish that their Complaint contains particularized allegations supporting a strong inference of scienter as to *each* defendant, even though scienter is the "most salient" feature of the Reform Act.  Compare Mem. at 33-38 with Opp. at 44-48 and Greebel, 194 F.3d at 196.  They instead seek to dilute that standard by claiming to "group plead" scienter (even though at least three First Circuit courts have flat-out rejected that approach); by relying on status and job-title pleading (which the Court of Appeals rejected even before the Reform Act); and by asking the Court to credit merely reasonable inferences of fraudulent intent (which disregards the plain text of the Reform Act and its interpretative caselaw).  The bottom line is that even if any investor had been misled by Organogenesis (they were not), this fraud lawsuit still must be dismissed because plaintiffs have never alleged that any of (or "all") defendants set out to deceive them.

---

[29]    Plaintiffs also cite to the Confidential Document for the proposition that Mr. Erani "encouraged the Company to prepare overly optimistic financial projections" for "service providers."  Compl. ¶ 4.  That does not state a claim because plaintiffs nowhere allege that Organogenesis made any such financial projection to the market as opposed to employees or "service providers" (which is necessary in a class action brought on a fraud-on-the-market theory) nor identify any projection that actually was prepared and circulated that crossed the line from optimism (which is not actionable) to fraud (which could only be actionable if alleged, and here it is not).

**A.    Plaintiffs Cannot "Group Plead" <u>Scienter</u>.**

Plaintiffs have no basis to argue that "pursuant to the 'group pleading' doctrine, the pleading

requirements of Rule 9(b) and the PSLRA can be met without specifically pleading the fraudulent

intent of corporate officers."  Opp. at 48.  That is <u>*not*</u> the law.  The group pleading doctrine has no

bearing on the issue of <u>scienter</u>.  <u>See</u> <u>In re Lernout & Hauspie Sec. Litig.</u>, 208 F. Supp. 2d 74, 84

(D. Mass. 2002) (group pleading "doctrine does not, however, obviate the requirement that a court

evaluate separately the allegations concerning the scienter of each of the individual defendants");

<u>Raytheon</u>, 157 F. Supp. 2d at 152  (even when group pleading doctrine is applied, complaint must

contain "sufficiently particularized allegations that the individual officer knew about the fraud"); <u>In

re Tyco Int'l, Ltd. Multidistrict Litig.</u>, No. MDL 02-1335-B, 2004 WL 2348315, at *2 (D. N.H. Oct.

14, 2004) (group pleading "does not relieve a plaintiff of the duty to plead sufficient facts as to each

defendant to support a strong inference that the defendant acted with scienter").[30]

**B.    Status Pleading And Merely Reasonable Inferences Are Not <u>Scienter</u>.**

The Opposition does identify any particularized allegation in the Complaint as to *when* any

defendant allegedly learned of any particular concealed fact or *how* they learned them (<u>i.e.</u>, from

*whom* or from *what* document).  <u>See</u> Mem at 33-35.  Plaintiffs spotlight the deficiency by saying

they have "directly" alleged that "many" (but apparently not all) of the adverse facts "were known

to the Individual Defendants" (as an undifferentiated group) because, according to a former

employee, it was known to "the whole Company" that Organogenesis was losing money on each

unit of Apligraf it produced.  <u>See</u> Opp. at 44.  This "common feeling" allegation does not plead

<u>scienter</u> on the part of any defendant because the former employee is not alleged to have any

---

[30]    Nor could a judicially-created "group" pleading theory trump the language of the Reform Act, which requires that plaintiffs "must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations." <u>Phillips</u>, 374 F.3d at 1018; <u>see also</u> <u>Southland Sec. Corp. v. Inspire Insur. Solutions, Inc.</u>, 365 F.3d 353, 364-65 (5th Cir. 2004) ("PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases").

personal knowledge regarding what any defendant knew or learned. <u>See</u> <u>In re Vertex</u>, 357 F. Supp. 2d at 347, 353-54 (rejecting allegation of "a common feeling among co-workers that the Company rushed compounds through the testing process" because not based on the sources' "own observations"); <u>Fitzer</u>, 119 F. Supp. 2d at 25 (refusing to "speculate that because former employees in the corporation knew of [adverse facts], the corporate executives must also have known").[31]

Similarly deficient is plaintiffs' argument that they need allege "only the underlying fraud and the Individual Defendants' status." Opp. at 46. That <u>scienter</u>-by-status argument (based on California, Oklahoma and Illinois cases) is precisely the "must have known" type-argument that *this* Circuit "on numerous occasions, has determined to be inadequate." <u>Compare</u> Opp. at 46 (plaintiffs arguing that "defendants had the requisite scienter based on their positions" with the Company and "access to" never-specified "pertinent information") <u>with, e.g.</u>, <u>Maldonado</u>, 137 F.3d at 10; <u>Orton</u>, 344 F. Supp. 2d at 306 (insufficient to assert "that a defendant must have known about the fraud by virtue of his position of authority").

Plaintiffs' argument that "it is highly likely" that defendants knew of the purported adverse facts because they were important to the business is another variation on this deficient theme. <u>See</u> Opp. at 45-46. The "must have known" pleading tactic does not become legitimate simply because plaintiffs proffer that the undisclosed facts relate to important topics; presumably all securities fraud plaintiffs claim to sue over important (<u>i.e.</u>, material) topics. Nor does plaintiffs' authority support

---

[31]    The only other allegations relied on in the Opposition as pleading conscious or reckless conduct are those related to Mr. Sabolinski's purported involvement with contamination issues at some unspecified time. <u>See</u> Opp. at 45. Those allegations are too vague to establish falsity or <u>scienter</u>, <u>see</u> <u>supra</u> at 17-20, and plaintiffs do not point to any allegations suggesting that any other defendant knew of these issues.

their argument that the Court can take it on faith that defendants had knowledge of important facts absent the required particularized pleading that they did.[32]

Plaintiffs' suggestion that the "Court need look no further" than <u>Cabletron</u> disregards any reasonable reading of that decision. <u>See</u> Opp. at 47. The <u>scienter</u> pleading sustained in <u>Cabletron</u> illustrates precisely what is missing from this Complaint. In <u>Cabletron</u>, plaintiffs

- Alleged the "name and address of one employee" who "accepted [fictitiously sold] goods 'at the behest of' defendant Craig Benson, the chairman of the board and chief operating officer." <u>Compare</u> <u>Cabletron</u>, 311 F.3d at 25 <u>with</u> Organogenesis Compl. ¶ 65 (alleging unnamed maintenance worker as a source for what was "known by whole company");

- Alleged that problems with new product were "described in two internal Cabletron databases that were routinely circulated in hard copy to managers, including to defendants Levine, Benson, and Oliver." <u>Compare</u> <u>Cabletron</u>, 311 F.3d at 27 <u>with</u> Organogenesis Compl. ¶ 61 (alleging that everyone knew Novartis "had no idea" how to market product, without specifying the problem, quantifying its impact, or alleging how or when the "everyone" knew);

- Alleged that the Chairman of the Board and COO "directed" that reports about product problems "not be provided to salespersons 'in order to insulate them (and the Company's customers) from knowledge of problems relating to [the product].'" <u>Compare</u> <u>Cabletron</u>, 311 F.3d at 27 <u>with</u> Organogenesis Compl. ¶ 67 (alleging that defendants said "they needed to get their investments back").

Finally, plaintiffs abandon any pretense of complying with the Reform Act -- which tolerates only "strong" inferences of <u>scienter</u> -- by asking the Court to indulge inferences that they claim are merely reasonable. <u>Compare</u> 15 U.S.C. § 78u-4(b)(2) <u>with</u> Opp. at 46 ("it is entirely reasonable to conclude that these defendants had the requisite scienter …"). That runs afoul of <u>Greebel</u>, which is the "seminal case" in the First Circuit on pleading <u>scienter</u>, <u>Cytyc</u>, Civ. No. 02-12399, slip op. at 37-38, but is conspicuously absent from plaintiffs' Opposition. <u>Compare</u> Opp. at 46 (citing New York case) <u>with</u> <u>Greebel</u>, 194 F.3d at 195-96 ("mere reasonable inference [of scienter] insufficient to survive a motion to dismiss").

---

[32]     In <u>Aldridge</u>, the First Circuit merely found that a particular factual allegation (the CEO's admission that he would lose his job if he could not turn the company around within a year) gave rise to an inference that the defendants had an unusual incentive to maximize profits. <u>See</u> <u>Aldridge</u>, 284 F.3d at 83-84. In <u>Kafenbaum</u>, the court sustained the complaint because it "adequately identified a number of facts that, taken together, create a strong inference of scienter," not because it assumed that defendants must have known the allegedly undisclosed facts. <u>See</u> <u>Kafenbaum v. GTECH Holdings Corp.</u>, 217 F. Supp. 2d 238, 247 (D. R.I. 2002). Plaintiffs' other authority is from outside this circuit and cannot displace the First Circuit's long-standing prohibition against merely presuming <u>scienter</u>. <u>See</u> Opp. at 20.

**C.    Plaintiffs' Motive Allegations Fail.**

Plaintiffs do not dispute that *six of the eight individual defendants did not sell a single share of Organogenesis stock during the class period*.  Mem. at 36-37.[33]  Scienter as to these six defendants cannot be inferred from insider trading by the other two.[34]  Here, even the trading by those two individuals is neither unusual nor suspicious.  See In re Peritus, 52 F. Supp. 2d at 224-25.  Dr. Sabolinski (the *only* defendant represented by undersigned counsel who traded) exercised only 3.3% of his stock options (for a net gain of under $90,000), a percentage that as a matter of law cannot be considered suspicious – and if anything seems trivial given that he lost $9 million by holding onto the rest.  See Mem. at 38 and Ex. G.

Plaintiffs make no attempt to reconcile their inflammatory accusations of "greed" and defendants' "desire to get their investments back" with the undisputed fact that defendants *lost millions* by holding on to their Organogenesis stock.  See Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 15 (D. Mass. 2004) (defendants' substantial losses "make the case for scienter even more difficult").  Mr. Erani, for example, *lost roughly $31.5 million* by holding onto his stock instead of selling at the Class Period high.  See Mem. Ex. D.  "If these facts gives rise to a 'strong inference' of anything, it is that no scienter exists."  In re PEC Solutions, Inc. Sec. Litig., 125 Fed. Appx. 490, 499, No. 04-1257, 2005 WL 646070, at *7 (4th Cir. Mar. 18, 2005).

---

[33]    Although insider trading is not required to establish motive, "the absence of insider trading does weaken a case for scienter."  Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 15 (D. Mass. 2004); Guerra, 2004 WL 1467065, at *28 (lack of insider selling and decline in value of insider's holdings "weighs against an inference of scienter").

[34]    See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999) ("three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported"); In re Burlington Coat, 114 F.3d at 1423 (no scienter because only three of the five defendants sold stock); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (holding that lack of sales by several defendants "undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit").  Plaintiffs' reliance on Cabletron is once again misplaced.  See Opp. at 50-51.  In Cabletron, the complaint contained particularized factual allegation regarding defendants' conscious wrongdoing, see supra at 28, and the First Circuit merely found that the insider trading allegations "add[ed] some weight to the other evidence of scienter," without "determine[ing] whether alone they would suffice."  Cabletron, 311 F.3d at 40.

- 28 -

Plaintiffs do not plead <u>scienter</u> by claiming that defendants were motivated to inflate the stock price so Organogenesis the Company could raise capital.  As even plaintiffs' own authority teaches, allegations that defendants caused their employer to sell securities "amount to no more than an allegation of 'a generic motive of increasing capital,' which is insufficient as a matter of law." See <u>Regeneron</u>, 2005 U.S. Dist. LEXIS 1350 at *68; <u>Marksman Partners</u>, 927 F. Supp. at 1310.[35]

VI.    <u>CONCLUSION</u>

For the reasons set forth above and in the Defendants' opening memoranda, the Corrected Amended Consolidated Class Action Complaint should be dismissed with prejudice.[36]

Respectfully Submitted,

ALAN ADES
JOHN J. ARCARI
ALBERT ERANI
PHILIP LAUGHLIN
DONNA ABELLI LOPOLITO
MICHAEL SABOLINSKI
ALAN W. TUCK

By their attorneys,

/s/ Daniel H. Gold
Jeffrey B. Rudman (BBO #433380)
Jonathan A. Shapiro (BBO #567838)
Daniel H. Gold (BBO #654909)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
(617) 526-5000 (facsimile)

Dated:  May 31, 2005

---

[35]    See also Mem. at 36-37; Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004) (rejecting allegations that secondary public offering showed motive absent personal gain to defendants); In re Capstead Mortgage Corp. Sec. Litig., 258 F. Supp. 2d 533, 564 (N.D. Tex. 2003) ("motive to raise capital . . . insufficient to support an inference of scienter"); In re Metricom Sec. Litig., No. C 01-4085, 2004 WL 966291, at *35 (N.D. Cal. Apr 29, 2004) ("[a]s numerous courts have recognized, the desire to raise capital is a generic motive held by all companies, and is therefore insufficient to establish scienter"); Salinger v. Projectavision, Inc., 972 F. Supp. 222, 233 (S.D.N.Y. 1997) ("It is not sufficient ... to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising of additional capital.").

[36]    Plaintiffs' "control person" claims fail for the reasons previously briefed.  See Mem. at 38-39.

<u>CERTIFICATE OF SERVICE</u>

I, Daniel H. Gold, hereby certify that I caused a copy of the within document to be served on

the following counsel:


Nancy Freeman Gans, Esq.
Moulton & Gans, P.C.
33 Broad Street, Suite 1100
Boston, MA  02109-4216

Steven G. Schulman, Esq.
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza - 49th Floor
New York, NY  10119


Peter M. Saparoff, Esq.
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC
One Financial Center
Boston, MA 02111

James R. Carroll, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA  02108


                    <u>/s/ Daniel H. Gold</u>
                    Daniel H. Gold


Dated:  May 31, 2005