**EXHIBIT A**

# EXHIBIT A

# Issued by the
# UNITED STATES DISTRICT COURT

| SOUTHERN | DISTRICT OF | NEW YORK |
|---|---|---|

IN RE ORGANOGENESIS SECURITIES LITIGATION

## SUBPOENA IN A CIVIL CASE

To: PRICEWATERHOUSECOOPERS LLP
Attn: Office of the General Counsel
300 Madison Avenue
New York, New York 10017

Case Number: 1:04 CV-10027-JLT

[Action Pending in the United States District
Court for the District of Massachusetts]

---

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

---

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

---

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (List documents or objects)

SEE ATTACHED SCHEDULE "A"

| PLACE | DATE AND TIME |
|---|---|
| Moulton & Gans, P.C.<br>c/o Nancy Freeman Gans, Esq.,<br>55 Cleveland Road<br>Wellesley, MA 02481 | 21 DAYS FROM DATE OF<br>SUBPOENA |

---

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

---

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which a person will testify. Federal Rules of Civil Procedure. 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| ATTORNEY FOR PLAINTIFFS | |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Peter Sloane, Esq.
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119

(See Rule 45. Federal Rules of Civil Procedure. Parts C & D on Reverse)

## PROOF OF SERVICE

| SERVED | Date | Place |
|---|---|---|
| | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

| Executed on | | |
|---|---|---|
| | DATE | SIGNATURE OF SERVER |
| | | |
| | | ADDRESS OF SERVER |
| | | |
| | | |

Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

## SCHEDULE A

## INSTRUCTIONS

1.      In responding to these requests, you shall produce all responsive documents (including those documents stored electronically) which are in your possession, custody, or control, including (by way of illustration only and not limited to) documents in the possession, custody, or control of your affiliates or subsidiaries, and your present or former attorneys, accountants, directors, officers, partners, employees, and other representatives and agents, as well as your present or former independent contractors over which or whom you have had control, and any other persons acting on your behalf.  A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

2.      Where a claim of privilege is asserted in objecting to any request, identify the nature of the privilege (including work product) which is being claimed and the privilege rule being invoked, and for each answer, or portion thereof that is withheld, provide the following information:

    a.      For documents:  (i) the type of document; (ii) the date of the document; (iii) the author(s), addressee(s), and recipient(s) of the document (including, without limitation, any indicated or blind copy recipients, and all persons to whom the document was distributed, shown or explained) and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to one another; (iv) the number of pages; (v) the identity of any enclosure(s) or attachment(s); and (vi) the general subject matter of the document; and

    b.      For oral communications:  (i) the name of the person making the communication and the names of the persons present while the communication was made and, where not apparent, the relationship of the persons present, to the person making the

communication; (ii) the date and place of the communication; and (iii) the general subject matter of the communication.

3.      Documents produced in response to any of these discovery requests must be produced as they are kept in the ordinary course of business and must be labeled in such a way as to show which files they came from.

4.      In the event that any document called for by any of these discovery requests has been destroyed or discarded, that document is to be identified by stating: (i) any addresser and addressee; (ii) any indicated or blind copy recipients; (iii) the document's date, subject matter, number of pages, and attachments, enclosures or appendices; (iv) all persons to whom the document was distributed, shown or explained; (v) the date of destruction or discard and the reason for destruction or discard; and (vi) the persons authorizing and carrying out such destruction or discard.

5.      If any information or data is withheld because such information or data is stored only electronically, it is to be identified by the subject matter of the information or data, the storage mode, and the place or places where such information is maintained.

## RELEVANT TIME PERIOD

Unless otherwise indicated, these Requests seek Documents created, used during, or concerning the time period between and including May 15, 1999 through December 31, 2002 ("Relevant Time Period"), including all Documents concerning, in whole or in part, such period, or events or circumstances during such period, *even though dated, prepared, generated, or received prior or subsequent to that period.*

## DEFINITIONS

1.      The term "Action" shall mean the case entitled *In re Organogenesis Securities Litigation.*, No. 04-10027-JLT, pending in the United States District Court for the District of Massachusetts.

2.      The term "Ades" refers to Alan Ades.

3.      The term "Class Period" means the time period between November 15, 1999 and February 7, 2002, inclusive.

4.      The term "Complaint" refers to the Corrected Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws filed by Plaintiffs in the Action on November 22, 2004.

5.      The term "Defendants" means and includes Defendants Philip Laughlin, Michael Sabolinski, Albert Erani, Donna Abelli Lopolito, John J. Arcari, Herbert M. Stein, Bernard A. Marden and Alan W. Tuck, and any of their agents, employees, representatives and attorneys.

6.      The term "Erani" refers to Defendant Albert Erani.

7.      The term "Laughlin" refers to Defendant Philip Laughlin.

8.      The term "Novartis" refers to Novartis Pharmaceuticals Corporation and/or Novartis Pharma AG, and any of its divisions, subdivisions, offices, subsidiaries, affiliates, predecessors, successors, joint ventures, parents, partners, present or former officers, directors, agents, representatives, employees (including, but not limited to, its attorneys, accountants, auditors and advisors), and all other persons or entities acting or purporting to act on its behalf.

9.      The term "PwC" refers to PricewaterhouseCoopers LLP, and any of its members (as defined by ET 92.06, 92.09 and .16 of the American Institute of Certified Public Accountants Code of Professional Conduct as of June 1, 2002) and any of PwC's predecessors, successors, parents, subsidiaries, divisions, partnerships and branches; its international, foreign, national,

regional and local offices; all present or former officers, directors, principals, partners, members, employees, agents, attorneys, advisors, accountants, consultants, assigns and all other persons acting or purporting to act on its behalf.

10.    The terms "Organogenesis" and/or "Company" refers to Organogenesis, Inc., and its predecessor, and any of Organogenesis, Inc.'s or its predecessor's divisions, subdivisions, offices, subsidiaries, affiliates, predecessors, successors, joint ventures, parents, partners, present or former officers, directors, agents, representatives, employees (including, but not limited to, its attorneys, accountants, auditors and advisors), and all other persons or entities acting or purporting to act on its behalf.

11.    The term "Sabolinski" refers to Defendant Michael Sabolinski.

12.    The term "SEC" refers to the U.S. Securities and Exchange Commission.

13.    The term "Stein" refers to Defendant Herbert M. Stein.

14.    The term "and" shall include the term "or," and the term "or" shall include the term "and," such that each document request calls for the production of the greatest number of documents.

15.    The term "any" is understood to include and encompass "all." The word "all" also includes "each" and vice versa.

16.    The terms "Audit Engagement" or "Engagement" refer to auditing work or procedures employed or conducted by PwC with respect to internal controls, accounting records, and financial statements of Organogenesis, whether or not resulting in the expression by PwC of an opinion on the fairness of financial statements. Audit Engagement also includes any work performed concerning any potential or consummated acquisition by Organogenesis of another company; work performed in connection with any public offering or registration of securities;

work performed in connection with any public filings by Organogenesis, other than in connection with any public offering or registration of securities; and any consulting work, special projects, or due diligence review. Audit Engagement also includes any in-process or incomplete engagement with respect to Organogenesis, including those from which you were formally terminated or otherwise resigned, including but not limited to, any audit, investigation or review you conducted for Organogenesis with respect to the possible restatement of prior financial statements.

17.    The term "Audit Program" means all documents setting forth the expected conduct and scope of the audit engagement or used for the purpose of detailing the audit procedures necessary to accomplish the objectives of the audit engagement in accordance with the requirements set forth in AICPA Professional Standards, §§311.03O5, and encompasses PwC's proprietary materials utilized to document performance of audit procedures on audit engagements.

18.    The term "comfort letter" means an auditor's statement provided to a company preparing for a public offering, confirming that unaudited financial data in the prospectus follows Generally Accepted Accounting Principles.

19.    The terms "Communication" and "Communications" are used in a comprehensive sense, and shall mean and include every conceivable manner or means of disclosure, transfer or exchange of oral or written information (in the form of facts, ideas, inquiries or otherwise) between one or more persons or entities including, but not limited to, writings, documents, inter- and infra-office memoranda, correspondence, meetings, conferences, conversations, and/or agreements, whether face-to-face, by telephone, by mail, by telecopier, by telex, by computer or otherwise.

20.     The term "concerning" means pertaining to, referring to, relating to, describing, regarding, evidencing, constituting, reflecting, mentioning, discussing or of interest to and/or of importance to.

21.     The term "correspondence" means any letter, memorandum, e-mail, or other writing transmitted between persons.

22.     The term "Document(s)" has the same meaning as "writings," which is defined in Fed. R. Civ. P. 34(a) and Fed. R. Evid. 1001, and is used herein in the broadest possible sense and includes, but are not limited to, data, metadata, videotape and motion pictures, and electronic, mechanical or electric records or representations, including e-mail, whether "accessible" or "inaccessible" as those two terms are defined in *Zubulake v. UBS Warburg et al.*, 217 F.R.D. 309 (S.D.N.Y. 2003). "Document(s)" include, but are not limited to, internal memoranda or any internal documents, correspondence, letters, contracts, agreements, memoranda, statements, bills, schedules, receipts, invoices, records of purchases or sale, brochures, projections, budgets, calendars, reports, studies, minutes, resolutions, due diligence files, promissory notes, loan documents, letters of credit, notes (handwritten or otherwise), messages, analyses, plans, evaluations, diaries, agendas, announcements, manuals, telephone message slips, telephone bills, telephone logs, telephone toll records, press releases, transcripts, scripts, graphs, charts, computer directories, computer disks, computer tapes, databases, database records, electronic workpapers, or any other written, printed, typed, taped, filmed, or graphic matter however produced or reproduced. "Document(s)" further includes non-identical copies, including, but not limited to, drafts, revisions, alterations, modifications, changes, markups, amendments of the foregoing or comments or notations appearing on the foregoing, which are not part of the original text, including any electronic metadata associated therewith, database

formulas, database relational information, and database replicas. "Document(s)" also include the file, folder tabs, and labels appended to or containing any documents.

23.     The term "employee(s)" means any person who at any time during the period covered by this demand (whether the person is a current or former employee) acted or purported to act on behalf of another person or persons, including, but not limited to, all past and present directors, officers, executives, agents, representatives, attorneys, accountants, independent contractors, advisors, analysts, and consultants of such other person or persons.

24.     The term "Financial Statements" includes without limitation, balance sheets, and statements of income, earnings, retained earnings, sources and applications of funds, operations and deficit, profit and loss, changes in financial position, and cash flows, and also includes all notes to each of the foregoing, and any other notes that pertain to the past, present, or future financial condition of Organogenesis.  Any of the foregoing documents constitutes a financial statement whether it is audited or unaudited, or final, interim, yearly, monthly, pro forma, complete or partial, consolidated or non consolidated or otherwise.

25.     The term "GAAP" means Generally Accepted Accounting Principles as applied by Certified Public Accountants in the United States.

26.     The term "GAAS" means Generally Accepted Auditing Standards as applied by Certified Public Accountants conducting audits in the United States.

27.     The terms "identify" or "identity" when used in reference to any document means to give, to the extent known, the: (a) type of document; (b) general subject matter; (c) date of the document; (d) author(s), addressee(s) and recipient(s); and (e) Bates-stamp number, if any.

28.    The terms "identify" or "identity," when used in reference to any entity, means the following should be stated: (a) full name; (b) place and date of incorporation or creation; (c) main office address; and (d) telephone numbers for any addresses identified.

29.    The terms "identify" or "identity" when used in reference to a natural person means the following should be stated: (a) full name; (b) present or last known home and business addresses; (c) telephone number at home and business; and (d) employer and position or job title.

30.    The term "including" means "including, but not limited to," and does not impose any limitations on the types of Documents requested.

31.    The term "meeting" means the contemporaneous presence of any natural persons for any purpose, whether or not such presence was by chance or prearranged, and whether or not the meeting was formal or informal or occurred in connection with some other activity, and includes telephone and video conferences when, whichever the means employed, participants can hear or otherwise communicate with each other.

32.    The terms "person" or "persons" refers to natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and all other entities.

33.    The term "policy" means any rule, procedure, practice, guideline or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed by the person or entity responding to the requests.

34.    The term "refer" or "relate" or "referring" or "relating" means all documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including,

without limitation, all documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

35.    The term "reflecting" means expressing, showing, demonstrating, exhibiting, identifying, mentioning, evidencing and/or manifesting.

36.    The terms "Work Papers" or "Working Papers" mean all documents, including data stored on tapes, films, or other media, concerning the procedures applied, work performed, evidence obtained and conclusions reached in the audit engagement by any auditor, practitioner, consultant or any other person working on your behalf.  Additionally, the work papers for any audit or attestation include, but are not limited to, those documents defined by Generally Accepted Auditing and Attestation Standards in AU § 339 as follows: records kept by the auditor (or practitioner) of the procedures applied, the tests performed, the information obtained, and the pertinent conclusions reached in the engagement, i.e., working papers are audit programs, analyses, memoranda, letters of confirmation and representation, abstracts of company documents, and schedules or commentaries prepared or obtained by the auditor.

37.    The terms "You" and "Your" means the recipient hereof, You, Your parents, subsidiaries, affiliates, and divisions; Your predecessor and successor entities; and any of the foregoing entities' former or present officers, directors, owners, partners, employees, attorneys, agents, representatives, all other persons occupying similar positions or performing similar functions or acting or purporting to act on their behalf and the immediate family members of any individual specified above.

38.    The use of the singular form of any word includes the plural and vice versa.

## DOCUMENT REQUESTS

1.      All Documents and Communications concerning the Confidential Arcari

Document (attached hereto as Exhibit 1 and Bates Stamped LP 000001-000003), or any of the

matters, subjects, events or Communications described therein, including without limitation:

        a.      All Documents and Communications concerning PwC's alleged refusal in

2001 to grant any consents or additional comfort letters to Organogenesis, including PwC's

reasons for such refusal and any communications between PwC and Organogenesis relating to

such refusal. *See* Exhibit 1 hereto.

        b.      All Documents and Communications reflecting PwC's credibility and/or

confidence in Organogenesis' officers and directors during the Relevant Period, including

credibility and/or confidence in the Individual Defendants.

        c.      All Documents and Communications concerning PwC's certification of

the Company's financial statements and cash position, including all Documents and

Communications reflecting the due diligence, if any, that PwC performed in assuring that the

financial statements and cash position of the Company were true and accurate.

        d.      All Documents and Communications concerning Erani's alleged refusal to

sign standard audit confirmations sent to him by PWC relating to his holdings of the Company's

convertible debt, including all Documents and Communications reflecting PwC's response to

such refusal.

2.      All Documents and Communications concerning Organogenesis' commitment to

PwC in or about May 2001 concerning the first tranche of the Novartis "put option," or option

contracts that gave Organogenesis the right to sell a certain quantity of an underlying security to

Novartis at a specified price up to a specified date, including all Documents and

Communications concerning the alleged violation this commitment by Organogenesis. *See* Confidential Document (attached as Exhibit 1).

3.      All Documents and Communications reflecting PwC's knowledge of the negotiations, terms, conditions, and communications relating to any agreements between Organogenesis and Novartis concerning Apligraf.

4.      All Documents and Communications concerning the actual or perceived effect of any Novartis Agreement(s) on the Organogenesis's operations, finances, or ability or inability to achieve profitability, including any actual or perceived advantages or disadvantages to the Organogenesis of any Novartis Agreement(s) or the manner in which any Novartis Agreement(s) was performed.

5.      All Documents and Communications concerning the Company's ability or inability to fund operations and/or achieve profitability through sales of Apligraf, including actual, expected or projected per-unit profitability or lack thereof of Apligraf.

6.      All Documents and Communications concerning PwC's March 31, 2001 Report of Independent Accountants certifying Organogenesis' financial statements in the Company's 2000 Form 10-K, including all Documents and Communications reflecting the basis for this opinion.

7.      All Documents and Communications concerning PwC's going concern opinion issued on or about April 16, 2002, the reasons therefor, the reasons for the timing thereof, and any statement, suggestion, or belief that such disclosures should have been made earlier in time..

8.      All Documents and Communications concerning the Company's September 2002 bankruptcy, including all Documents and Communications reflecting the reasons for the bankruptcy and any efforts to avoid bankruptcy or to sell the Company.

- 11 -

9.      All Documents and Communications concerning any leveraged buyout or acquisition of Organogenesis, including all Documents and Communications reflecting PwC's knowledge of, and opinion concerning the buyout or acquisition.

10.     All Documents and Communications concerning Organogenesis' actual or perceived compliance or non-compliance with GAAP or GAAS.

11.     All Documents and Communications reflecting PwC's risk assessments and reevaluation of risk assessments of Organogenesis management during the Relevant Time Period.

12.     All Documents and Communications concerning any proposed, contemplated, or implemented change in Organogenesis' accounting practices, policies or procedures, whether or not recommended by PwC or Organogenesis.

13.     All Documents concerning any responses, reactions, or follow up Communications relating to the final conclusion reached by PwC as a result of PwC's audit of Organogenesis' Financial Statements.

14.     All Documents and Communications concerning any potential, actual, initial or ultimate disagreements between PwC and Organogenesis (including any of their directors, officers, Boards or committees thereof, or attorneys, accountants and consultants) concerning any aspect of any professional services performed by PwC for Organogenesis.

15.     All Documents and Communications concerning the actual, potential or perceived adequacy or inadequacy of Organogenesis' internal controls (as that term is used in Codification of Statements of Auditing Standards AU §319).

16.     All Documents and Communications concerning meetings of the Board of Directors of Organogenesis, including meetings of the Board of Directors of any subsidiary of

Organogenesis, or any committees thereto and including the Audit Committee, including

minutes, notes, memoranda, agendas, presentation items, resolutions, draft minutes or

resolutions, slides, handouts, information packages, video or audio recordings, or any

memorialization whatsoever of those meetings.

17.    All general client or permanent files concerning any Organogenesis engagement,

including correspondence, intra-office and inter-office memoranda, and memoranda of any

conversations, meetings, or conferences concerning such engagements.

18.    All Documents concerning all Communications between PwC and any of the

Individual Defendants, including all correspondence files, drafts and notes relating thereto.

19.    All management letters and/or letters of recommendation concerning

Organogenesis.

20.    Documents, reports, charts, and schedules relating to the preparation or review of

Organogenesis' press releases.

21.    All Documents and Communications relating to any "fraud," "fraudulent financial

reporting," "accounting irregularities," or "illegal acts by clients," as those terms are used in

Statement of Auditing Standards No. 82, Statement of Auditing Standards No. 54, and/or the

former Statement of Auditing Standards No. 53 (issued April 1998), and/or Codification of

Auditing Standards § 316 and 317, occurring at, or with respect to, Organogenesis.

22.    To the extent not encompassed by previous requests, all Documents concerning

Communications and/or meetings concerning Organogenesis, or the Individual Defendants,

whether or not made prior to, concurrent with, and/or subsequent to any Audit Engagement,

including correspondence files, email and instant messages.

23.     To the extent not encompassed by previous requests, all Documents and Communications concerning any reviews, studies, calculations, and/or analysis conducted by PWC concerning Organogenesis' revenue recognition, operations, ability or lack theoreof to fund operations, profitability or lack thereof, projected profitability, or ability to continue as a going concern.

24.     To the extent not encompassed by previous requests, all Documents and Communications concerning the disclosures made by the Company on or around January 30, 2002 and described in detail in paragraphs 148-150 of the Complaint, the reasons therefor, the reasons for the timing thereof, and any statement, suggestion, or belief that such disclosures should have been made earlier in time.

25.     To the extent not encompassed by previous requests, all Documents and Communications concerning the actual, potential or perceived accuracy or adequacy (or lack thereof) of disclosure in all or any part of Organogenesis' annual, quarterly, or other report, release, Financial Statement, or public statement concerning Organogenesis.

26.     All Audit Programs (including any additions, deletions, substitutions, or amendments thereto and any documents reflecting the reason for any such event) used, implemented, or relied upon with respect to any professional services performed by PwC for Organogenesis.

27.     Documents and Communications sufficient to identify the names, titles, and last known addresses of all PwC personnel associated with any professional services performed by PwC for Organogenesis.

28.    All Documents and Communications relating to the "Independence" of PwC with respect to Organogenesis, as that term is used in SEC Rule 201(b) of Regulation S-X or the AICPA Code of Professional Conduct Rule 101.

29.    A copy of all drafts and final reports issued in connection with PwC's audit of Organogenesis.

30.    Documents concerning the preservation, search for, collection, maintenance, destruction or alteration of any and all documents (including e-mail and other electronic data) concerning Organogenesis that were undertaken with respect to this action, including, without limitation, all such action taken after this action was filed but prior to this request.

31.    A log, in accordance with the instructions above, of all Documents responsive to this Schedule A that You have withheld from production in response to these Requests.

**EXHIBIT 1**

# EXHIBIT 1

*To Brad Cook 3 pgs*

**CONFIDENTIAL**

10/18/01

**ALBERT ERANI ISSUES**

**March 2000**  Drove Board to approve $6.2 million cash redemption of Series C convertible preferred stock at a time when the Company had little cash. Could have redeemed for stock but was dilution phobic.

**March 2000**  Did not sell stock off the shelf when opportunity existed to sell more shares at $14.50 per share.

**January 2001**  Took control of stock buyback program and initiated transactions on his own on behalf of the company without checking with committee established to execute the stock buyback program.

**January/ October 2001**  Forces the use of his service providers onto the Company. Most egregious is causing the law firm of Kramer, Levin, Naftalis & Frankel LLP to not only represent the Company but on many occasions to have them represent parties the Company deals with including UBS Warburg and Berkshire Bank. The Board has never approved the use of Kramer, Levin as the Company's law firm. Requires signing of numerous conflicts of interest letters with Kramer, Levin and their involvement severely interferes with Miutz, Levin providing the Company legal services in their capacity as the Company's legal counsel.

**February/ March 2001**  Prevented management from proceeding with sale of 1 million shares of Company stock from its shelf registration at about $12 per share. Authorization for sale was approved in the February 21, 2001 Board meeting. Engagement letters received from Tucker Anthony and Gruntal. Gruntal had almost concluded its due diligence when Mr. Erani stopped their process.

**March 2001**  Mr. Erani spoke with Jeff Kraws, our Gruntal analyst, and infuriated him. Mr Kraws comments were extensive and included the following: Albert shouldn't be a Chairman; didn't understand why Albert refused to raise funds when the Company needed them; Albert is financially inept; Albert highly irrational about dilution. Gruntal eventually lowered their rating on the Company and eventually withdrew coverage on the Company.

LP 000001

CONFIDENTIAL

March 2001    Refused to sign standard audit confirmations sent to him by
PricewaterhouseCoopers, the Company's auditors, relating to his
holdings of the Company's convertible debt. This eroded
PricewaterhouseCoopers confidence in managements and the Boards
representations.

April 2001    Committed to Fleet that they would be paid out by July 31, 2001 at a
time when such payment would be imprudent, as the Company did
not have sufficient cash to pay the bank. Did not have to make this
commitment, as it was a term loan payable over the next 2 ½ years.
This put further pressure on the Company due to its lack of cash at
the time.

May 2001    Hindered the process for gaining approval to exercise the Novartis put
by May 31, 2001, a commitment, which was made to Pricewaterhouse
Coopers (PWC), our independent auditors. Commitment was made to
gain necessary comfort letter from PWC to allow us to sell common
shares under the UBS Warburg shelf program. Since then PWC has
refused to grant any consents or additional comfort letters because we
violated our commitment.

June 2001    Refused to sign annual Compensation Committee Authorization for
the issuance of stock options to new hires during 2001 putting the
Company at compliance risk and potentially the risk of a P&L hit at
the end of the fiscal year when our independent auditors perform
their audit.

August 2001    Met with and severely upset management team from Glenborough
Properties, our Dan Road landlord. They eventually sent us a default
notice with penalty payments in September 2001 and expressly stated
it was motivated by Albert's mistreatment of their management in
their Canton meeting.

August 2001    Used employees from his own Company to seek quotes from building
contractors in competition with the Company's efforts to seek quotes
from the same contractors causing significant confusion and loss of
Company credibility with selected contractors.

On a number of occasions has encouraged the Company to prepare
overly optimistic financial projections to existing and potential service

LP 000002

CONFIDENTIAL

providers including: Fleet bank, PricewaterhouseCoopers and GMAC.

Albert continuously contacts outside service providers without informing Company management thereby causing confusion with Company management and the providers and loss of the Company's credibility with the Company's service providers including: commercial banks, investment bankers, the landlord, independent accountants and lawyers. He essentially usurps management authority by using his Chairmanship title.

Mr. Erani's request of information from the Company's management has been excessive and a drain on their time. Particularly efforts relating to relocating the Company to Rhode Island. He threatened an employee with termination if he didn't follow his requests relating to a Rhode Island facility.

Signed commitment for land in Rhode Island on behalf of the Company, which resulted in cash loss to the Company of $25,000. Land deemed to be unbuildable due to contamination.

1998 Directors and Officers insurance coverage bound without Company officer approval. 1999 Property and Product liability insurance coverage negotiated without Company involvement.

Put Company at risk with regard to SEC regulations by continuously delaying the 2001 Annual meeting of Shareholders until June 21, 2001.

Signed GMAC commitment letter and lost the Company a $15,000 deposit.

The Company has received a number of complaints from shareholders that Albert has interfered with the running of the Company and the Company has suffered as a result of the interference.

Brokers have called the Company to say that Albert has requested them to manipulate the market for the Company's stock (i.e. Karelitz).

LP 000003