# EXHIBIT 3

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re Subpoena Issued to PRICEWATERHOUSECOOPERS LLP,** <br><br> for the Action Entitled *In re Organogenesis, Inc. Securities Litigation*, Civil Action No. 1:04 CV 10027-JLT, Pending in the United States District Court for the District of Massachusetts. | Miscellaneous Action No: M8-85 |



### PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL THIRD PARTY PRICEWATERHOUSECOOPERS LLP TO COMPLY WITH *SUBPOENA DUCES TECUM*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

NATURE OF THE UNDERLYING ACTION .................................................................. 4

NATURE OF THE DISCOVERY DISPUTE ................................................................... 7

ARGUMENT .................................................................................................................. 11

I.      PWC'S DEMAND THAT PETITIONERS AGREE TO PAY OVER ONE
HUNDRED THOUSAND DOLLARS OF "EXPENSES," INCLUDING
ALL OF ITS ATTORNEYS' FEES, BEFORE IT COMPLIES WITH
THE SUBPOENA IS UNJUSTIFIED, ESPECIALLY WHERE THERE
ARE PRACTICAL ALTERNATIVES THAT WOULD REASONABLY
ADDRESS PWC'S STATED CONCERNS AT MINIMAL EXPENSE ............. 11

II.     PWC SHOULD BE ORDERED TO IMMEDIATELY PRODUCE
DEPOSITION TRANSCRIPTS AND DOCUMENTS IT PREVIOUSLY
PRODUCED IN THE *BRICOLEUR* ACTION, WHICH WOULD
ENTAIL VIRTUALLY NO BURDEN TO PWC .............................................. 14

III.    EVEN IF THE COURT WERE TO CONCLUDE THAT PWC'S COST
INTENSIVE, $120,000-PLUS APPROACH TO RESPONDING TO THE
SUBPOENA IS REASONABLE, THE COURT SHOULD NOT SHIFT
TO PETITIONERS ANY OF THE COSTS OF COMPLIANCE OTHER
THAN DUPLICATING AND SHIPPING COSTS. .......................................... 15

      A.    PwC Is Not A Typical "Disinterested Bystander," And Could Have
Foreseen Being Drawn Into, And In Fact Was Drawn Into, This
Litigation ................................................................................................ 16

      B.    PwC Is Better Able To Bear The Costs Of Production. ........................... 17

      C.    This Action Is Of Significant Public Importance. .................................. 18

CONCLUSION ............................................................................................................... 19

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page**

*In re Exxon Valdez,*
142 F.R.D. 380 (D.D.C. 1992)............................................................................................15, 18

*First Am. Corp. v. Price Waterhouse LLP,*
184 F.R.D. 234 (S.D.N.Y. 1998)....................................................................... 15-16, 17

*Flatow v. Islamic Republic of Iran,*
196 F.R.D. 203 (D.D.C. 2000)............................................................................................13

*In re Healthsouth Corp. Sec. Litig.,*
213 F.R.D. 447 (N.D. Ala. 2003)........................................................................................18

*In re Honeywell Int'l Sec. Litig.,*
230 F.R.D 293 (S.D.N.Y. 2003) ........................................................................12, 16, 18

*In re Propulsid Prods. Liab. Litig.,*
MDL No. 1355 Section "L", 2003 U.S. Dist. LEXIS 16477
(E.D. La. Sept. 9, 2003) ..............................................................................................13, 15, 18

*Wetta v. Templeton Asset Mgmt.,*
No. M-8-85, 1998 U.S. Dist. LEXIS 13321 (S.D.N.Y. Aug. 25, 1998)............................12

*Zubulake v. UBS Warburg LLC,*
216 F.R.D. 280 (S.D.N.Y. 2003) ......................................................................................13

### FEDERAL STATUTES

Fed. R. Civ. P. 1 ........................................................................................................................11

Fed. R. Civ. P. 45(c)(2)(B) .......................................................................................................11

Petitioners respectfully submit this Memorandum of Law and the accompanying Declaration of Peter Sloane, Esq., executed on February 16, 2007 (the "Sloane Declaration" or "Sloane Decl."), in support of their motion to compel PricewaterhouseCoopers LLP ("PwC") to comply with Petitioners' *subpoena duces tecum*, dated June 16, 2006 (the "Subpoena") issued from this Court.[1]

## PRELIMINARY STATEMENT

Petitioners herein are plaintiffs in *In re Organogenesis, Inc. Securities Litigation*, Civil Action No. 1:04 CV 10027-JLT (the "*Organogenesis* Action"), a putative class action for securities fraud violations that is pending in the District of Massachusetts against former officers and directors of Organogenesis, Inc. ("Organogenesis" or the "Company").[2] Petitioners bring this miscellaneous action to enforce the Subpoena issued to PwC.

PwC served as Organogenesis' auditor during the relevant time period and is a former defendant in, and current non-party to the *Organogenesis* Action. PwC's relevance to this case stems from more than simply the fact that it was Organogenesis' auditor. Petitioners have obtained a confidential document that was created by the Company's then-Chief Financial Officer, John Arcari (the "Confidential Arcari Document"),[3] which details PwC's awareness of suspicious activity by the Company's then-CEO and Chairman and its lack of confidence in the representations of the Company's management. Although PwC was dismissed from the *Organogenesis* Action, PwC does not suggest that it does not maintain documents relevant to the allegations of the Amended Complaint.

---

[1] The Subpoena and affidavit of service on PwC are attached as Exhibit A to the Sloane Declaration.

[2] The Corrected Consolidated Amended Class Action Complaint For Violations Of Federal Securities Laws, dated December 22, 2004 ("Amended Complaint"), the operative complaint in the *Organogenesis* Action, is attached as Exhibit B to the Sloane Declaration.

[3] The Confidential Arcari Document is attached as Exhibit C to the Sloane Declaration.

After being granted leave to subpoena PwC by the court in the *Organogenesis* Action, Petitioners issued the Subpoena to PwC requesting the production of documents relevant to the Amended Complaint's allegations, including the matters raised in the Confidential Arcari Document (which Petitioners attached to the Subpoena). PwC responded with a litany of boilerplate objections and has refused to produce a single document unless and until Petitioners agree in advance to pay PwC at least $120,000 to $125,000, and possibly more, as payment for all of PwC's purported expenses in responding to the Subpoena. According to PwC, these expenses include not only the costs of duplicating and shipping the documents, but all of PwC's attorneys' fees in connection with the Subpoena, such as the time counsel has purportedly spent "responding to" the Subpoena (*see* PwC's objections to the Subpoena, dated July 11, 2006, at 2 (Sloane Decl., Ex. D)) and drafting its boilerplate objections to the Subpoena. PwC makes this exorbitant demand despite the fact that many of its responsive documents are maintained together in discrete files that are readily identifiable, and thus do not require any exhaustive search for potentially responsive documents. Indeed, all of the requested documents relate to one PwC client — Organogenesis — for which, as auditor, PwC is expected to maintain its audit files for inspection.

As part of their efforts to resolve this dispute without court intervention, Petitioners made a number of cost- and time-saving proposals to PwC to minimize, if not eliminate, the cost of complying with the Subpoena, while still protecting PwC's rights. Petitioners offered to: pay for any costs of copying and shipping the document to Petitioners; to have their counsel inspect and review PwC's potentially responsive documents at a location chosen by PwC to spare PwC the burden of determining which documents are responsive to the Subpoena; to enter into a "clawback" agreement, which would give PwC the right to recover copies of any privileged documents in the event that any such documents are inadvertently produced; to agree that any

inadvertently produced documents would not waive any of PwC's privileges; and to consider any narrowing of the Subpoena requests that PwC might propose.

As an easily-met starting point for compliance, Petitioners also proposed that PwC produce one category of responsive documents whose production would entail virtually no burden to PwC at all: the transcripts of depositions and documents produced by PwC in a separate action for fraud brought against Organogenesis in 2003 — *Bricoleur Capital Management, et al., v. Organogenesis, Inc., et al.*, Case No. GIC 792828 (Cal. Super. Ct.) (the "*Bricoleur* Action") — in which PwC was subpoenaed, produced documents and provided deposition testimony. Given that the *Bricoleur* documents consist of deposition transcripts and documents already produced in the *Bricoleur* Action — copies of which are presumably maintained by PwC's counsel — PwC could easily produce them without the need to search for them or to review them for privilege or responsiveness. PwC's only "burden" in producing these documents would be the costs of photocopying and shipping them to Petitioners — costs that Petitioners have offered to pay.

Although many similar proposals have been adopted by courts in other complex, document-intensive litigations, PwC has summarily rejected all of them, has not advanced any alternative proposals for compromise, and continues to refuse to produce any documents without Petitioners' agreement, in advance, to pay at least $120,000. PwC's demand for this exorbitant payment is patently unreasonable, especially given the small volume of documents at issue (approximately ten boxes of documents) and Petitioners' proposed far less costly approach to compliance. Nor is PwC willing to provide Petitioners any documentation — *e.g.*, in the form of legal bills — of the costs it purports to have incurred already in complying with the Subpoena. Apparently, PwC not only believes it has the right to hold the responsive documents ransom, but also believes that Petitioners should blindly agree to pay the exorbitant sum it demands (and

3

some indefinite additional sum to be determined by PwC after it completes its production of the documents) without being provided any documented basis for that sum. Although some or all of the costs of a non-party's compliance with a subpoena may be shared with the requesting party in certain circumstances, as discussed below, none of the factors used by courts to determine whether, and to what extent, to order such cost-sharing support PwC's demand here.

Accordingly, Petitioners respectfully request that the Court issue an order: (a) compelling PwC to produce all documents responsive to the Subpoena within seven days at PwC's offices in New York City (or such other location as the parties may mutually agree); (b) compelling PwC to produce immediately all documents related to the *Bricoleur* Action; and (c) directing that Petitioners shall pay the reasonable costs of copying and shipping the responsive documents to Petitioners, but shall otherwise not be responsible for paying PwC's costs or expenses in complying with the Subpoena.

## NATURE OF THE UNDERLYING ACTION

Petitioners filed their Amended Complaint in the *Organogenesis* Action on December 22, 2004, naming PwC as a Defendant. The Amended Complaint alleges that between November 15, 1999 through February 7, 2002 (the "Class Period"), Defendants, officers and directors of Organogenesis, Inc. ("Organogenesis" or the "Company"), misled investors about the financial condition of the company and the prospective profitability of Organogenesis' only commercially available product — Apligraf, a unique skin replacement therapy used for severe skin wounds. To this end, Defendants consistently reported that Organogenesis had the necessary funding in place, or had access to sources of funding, that would allow it to achieve the Company's near-

4

term objectives and that the Company would be able to achieve profitability in the foreseeable near-term. ¶¶ 4, 5, 51, 53 and 58.[4]

The Amended Complaint contains specific allegations that PwC was aware of, or recklessly disregarded, indications of the fraudulent scheme conducted by Defendants. *See* ¶¶ 8, 12-13, 60, 111, 114, 116, 124, 155, 157, 171-186. Among other allegations of PwC's relevance to this case, the Confidential Arcari Document suggests that Defendant Albert Erani ("Erani"), the then-Chairman of Organogenesis, embarked on a scheme to "manipulate the market for the Company's stock" and "encouraged the Company to prepare overly optimistic financial projections to existing and potential service providers including: . . . *PricewaterhouseCoopers*." ¶59 (emphasis added). According to the Confidential Arcari Document, PwC became aware of Erani's suspicious activity, which "*eroded PricewaterhouseCoopers [sic] confidence in managements [sic] and the Boards [sic] representations*." ¶111 (emphasis added). For example, Erani had failed to provide PwC with standard audit confirmations relating to his holdings of the Company's convertible debt. *Id.* The Confidential Arcari Document states that other actions by Erani led to a "*loss of the Company's credibility with [PwC]*." *Id.* (emphasis added). PwC further lost confidence in the Company's officers and directors when Organogenesis violated its commitment to PwC to exercise a key put option (the "Novartis Put Option") granted by the Company's marketing partner, Novartis AG ("Novartis"). ¶¶ 8, 12, 60, 124. PwC was apparently so alarmed by the violation of this commitment that, according to the Confidential Arcari Document, it refused to support the Company's future financing initiatives by withholding further consents and comfort letters. *Id.*

---

[4] Unless otherwise noted, all paragraph citations refer to Petitioners' Amended Complaint. Sloane Decl., Ex. B.

At no time during the Class Period did PwC ever disclose this erosion of confidence and loss of credibility to the investing public, nor did PwC ever disclose the Company's encumbrance of the process for obtaining funding or its own refusal to support the Company's future financing initiatives. ¶¶ 12, 124. To the contrary, despite Erani's suspicious activity, the violation of the Novartis Put Option commitment, and the lack of confidence in the Company's representations, PwC continued to act as the Company's auditor and continued to certify the Company's year-end financial statements and its cash position. ¶¶ 12, 114. In addition to the Confidential Arcari Document, the transcript of the deposition of one of PwC's Senior Managers in the *Bricoleur* Action (a copy of which Petitioners obtained independently of PwC) further suggests that PwC has information and documents that are relevant to the claims and defenses at issue in this action, including issues such as the "going concern" opinion issued by PwC. *See* ¶¶ 13, 150, 155, 159.

On January 30, 2002, shortly before the end of the Class Period, the Company announced for the first time that it was running out of money and that it would be forced to "curtail or discontinue all operations" unless it could raise $15 million by the end of the first quarter of 2002. ¶¶ 148-149. The Company also revealed, for the first time, that it would not be able to access $10 million of the Novartis Put Option because of previously undisclosed conditions to the exercise of that option, which the Company could not satisfy. ¶¶ 150, 154. On April 16, 2002, PwC issued a "going concern" opinion concerning Organogenesis, which stated that PwC had "substantial doubt" about Organogenesis' ability to continue as a going concern. ¶155. According to PwC, "the Company has suffered recurring losses from operations, has a working capital deficiency, a stockholder's deficit, and has long-term debt that may become immediately due upon an event of default." *Id.* Thereafter, on August 21, 2002, the Company's common stock was suspended from trading on the American Stock Exchange, and on September 13, 2002,

6

Defendants revealed that a Chapter 11 bankruptcy filing was a possibility. ¶159. The Company was ultimately forced into bankruptcy on June 23, 2003, and emerged on August 13, 2004 as a private company partially controlled by Defendant Erani, leaving the shareholders who acquired shares of the Company during the Class Period with nothing. ¶¶ 164, 166-167.

Defendants, including PwC, moved to dismiss the Amended Complaint on January 14, 2005. On July 20, 2005, the Court denied the motion to dismiss as to all but one of the individual defendants but granted PwC's motion to dismiss. The *Organogenesis* Action is now in the discovery phase, which is scheduled to be completed by April 25, 2007.[5]

## NATURE OF THE DISCOVERY DISPUTE

On June 9, 2006, Petitioners moved the *Organogenesis* court for leave to subpoena PwC, which the court granted on June 13, 2006.[6] On June 16, 2006, Petitioners issued the Subpoena to PwC from this Court.

PwC served Petitioners with its objections to the Subpoena on July 11, 2006. *See* Sloane Decl., Ex. D. In its objections, PwC refused to produce any documents until Petitioners provided it with a written agreement that Petitioners would "reimburse PwC for the costs and expenses it will incur in responding to the Subpoena, including all copying costs and reasonable compensation for professional and administrative time spent gathering, reviewing and producing the information." *See id.* at 2. PwC also demanded that Petitioners' "written agreement must acknowledge that your client shall reimburse PwC for all the subpoena related compliance expenses," and included a laundry list of purported expenses, including attorneys' fees. *Id.*

---

[5] *See* Discovery Order in the *Organogenesis* Action, dated April 26, 2006 (Sloane Decl., Ex. E).

[6] Petitioners' motion to serve a third party subpoena upon PwC and the corresponding docket entry reflecting Judge Joseph L. Tauro's electronic Order granting the motion for leave are attached as Exhibit F to the Sloane Declaration.

By letter to PwC dated December 28, 2006 (the "December Letter"),[7] Petitioners offered to discuss PwC's objections concerning the Subpoena in order to attempt to work out a procedure for minimizing any compliance burden to PwC, and requested that the parties engage in a discovery conference for that purpose. *See* Sloane Decl., Ex. G.

In response to the December Letter, PwC stated that it "will not produce <u>any</u> documents absent an agreement by plaintiffs for the complete reimbursement of all costs incurred by non-party PwC to respond to the subpoena." *See* January 10, 2007 Letter from PwC's Counsel to Petitioners' Counsel (Sloane Decl., Ex. H) (emphasis in original).  PwC estimated such costs to be "$120,000 to $125,000." *Id.*

In an attempt to resolve this dispute without court intervention, Petitioners' counsel conducted a discovery conference with PwC's counsel on January 18, 2007, and followed up with a letter to PwC's counsel on January 19, 2007.[8]  During the discovery conference, PwC reiterated its demand that Petitioners immediately agree to pay all of PwC's as-yet-undetermined compliance expenses, including its attorneys' fees, before PwC would produce a single document. *See* Sloane Decl., Ex. I.  PwC further stated that, even assuming Petitioners agreed to pay the exorbitant sum it demanded, PwC would only produce its quarterly and annual audit workpapers relating to Organogenesis, to the exclusion of any additional documents in PwC's possession that are responsive to the Subpoena. *Id.*  PwC specifically refused to produce any documents related to the Confidential Arcari Document, a document that constitutes "smoking gun" evidence of Defendants' fraudulent scheme and which specifically refers to PwC. *Id.*

---

[7] The December Letter is attached as Exhibit G to the Sloane Declaration.

[8] The January 19, 2007 Letter from Petitioners' Counsel to PwC's Counsel is attached as Exhibit I to the Sloane Declaration.

During the January 18, 2007 conference, Petitioners' counsel advanced a number of proposals to minimize, if not eliminate, any burden to PwC in complying with the Subpoena. *Id.* Specifically, instead of having PwC's counsel and employees conduct an extensive pre-production review of documents, Petitioners offered to have their counsel travel to a location of PwC's choosing for an inspection and initial review of PwC's documents for responsiveness. *Id.* Petitioners further offered to reimburse PwC for all reasonable copying and shipping charges with respect to any documents produced to Petitioners, whether such documents were to be made available for inspection or shipped directly to Petitioners by PwC. *Id.* With respect to electronic documents, Petitioners offered to have an information technology specialist — paid for by Petitioners — conduct an electronic search of PwC's computer systems to identify any responsive documents that are not part of the readily-available documents that PwC had already located. *Id.* Petitioners were also willing to make an information technology specialist available — again, at Petitioners' expense — to work with PwC to conduct systems searches using inexpensive electronic search programs or other low cost methods. *Id.*

Petitioners also addressed any concerns PwC might have about inadvertently producing confidential or privileged documents. *Id.* Petitioners noted that the comprehensive confidentiality order entered in the *Organogenesis* Action applies to third party productions, and offered to provide blanket confidential treatment to all documents produced by PwC under that order. *Id.* Petitioners also offered to enter into a "clawback" agreement, whereby PwC's counsel would have the opportunity to review for privilege any subset of documents selected by Petitioners and to withhold from production any privileged documents, thus eliminating the need for PwC to review a larger set of potentially responsive document for responsiveness or privilege. Finally, Petitioners offered to consider narrowing the Subpoena's requests in order to further minimize PwC's compliance burden. *Id.*

In a February 1, 2007 letter from PwC's counsel to Petitioners' counsel,[9] PwC rejected Petitioners' proposals as "inadequate" and reaffirmed its demand that Petitioners provide reimbursement for its laundry list of costs and expenses before producing any documents. *See* Sloane Decl., Exs. D and J. PwC also asserted that many of Petitioners' proposals were "meaningless" because, despite its previously-stated intention not to produce any documents without Petitioners' prior agreement to pay all of its compliance costs, PwC — without informing Petitioners at any time before the January 18, 2007 discovery conference — had "already taken the necessary steps to respond to the Subpoena," including purportedly incurring approximately 200 hours of attorney time. *See* Sloane Decl., Ex. J.

Discovery in the *Organogenesis* Action is scheduled to close on April 25, 2007. *See* Sloane Decl., Ex. E. PwC is aware of this quickly-approaching cut-off date. *See* Sloane Decl., Ex. H. Nevertheless, despite Petitioners' good faith attempts to obtain discovery without Court intervention (*see* Sloane Decl., Ex. I; February 8, 2007 Letter from Petitioners' Counsel to PwC's Counsel (Sloane Decl., Ex. K)), PwC maintains its unreasonable position of refusing to produce any documents until Petitioners "reimburse" it for its fees, amounting to at least $120,000. *See* February 12, 2007 Letter from PwC's Counsel to Petitioners' Counsel (Sloane Decl., Ex. L). Petitioners are in immediate need of documents responsive to the Subpoena in order to complete discovery before April 25, 2007, and in order to have sufficient time to review and analyze the documents and use them in the course of taking party and non-party depositions before the discovery cut-off date.

---

[9] The February 1, 2007 Letter from PwC's Counsel to Petitioners' Counsel is attached as Exhibit J to the Sloane Declaration.

## ARGUMENT

**I.    PWC'S DEMAND THAT PETITIONERS AGREE TO PAY OVER ONE HUNDRED THOUSAND DOLLARS OF "EXPENSES," INCLUDING ALL OF ITS ATTORNEYS' FEES, BEFORE IT COMPLIES WITH THE SUBPOENA IS UNJUSTIFIED, ESPECIALLY WHERE THERE ARE PRACTICAL ALTERNATIVES THAT WOULD REASONABLY ADDRESS PWC'S STATED CONCERNS AT MINIMAL EXPENSE.**

Although a non-party subject to a subpoena under Rule 45 may be "protect[ed from] significant expense resulting from the inspection and copying commanded," Fed. R. Civ. P. 45(c)(2)(B), non-parties are plainly not entitled to insist on the most expensive and inefficient method of complying with a subpoena and then demand that the requesting party pay the resulting exorbitant costs. Petitioners here have repeatedly offered to address PwC's concerns through vastly less expensive means, and accordingly those less expensive proposals should be adopted. *See, e.g.,* Fed. R. Civ. P. 1 ("[The Federal Rules] shall be construed and administered to secure the just, speedy and *inexpensive* determination of every action") (emphasis added). Alternatively, if PwC insists on using the most costly approach to address its concerns about responding to the Subpoena — which it estimates will result in at least $120,000 in "expenses" — PwC should absorb such exorbitant costs itself.

None of PwC's concerns regarding the purported burden and cost of identifying and reviewing documents for responsiveness, privilege or confidentiality justifies the condition that PwC demands as a pre-requisite to its compliance with the Subpoena, nor does its assertion that it has "already taken the necessary steps to respond to the Subpoena" (Sloane Decl., Ex. J). Although the Subpoena seeks a range of documents relating to PwC's activities in connection with Organogenesis, Defendants, Apligraf, and Organogenesis' marketing partnership with Novartis, ultimately the Subpoena seeks PwC's documents concerning only one particular client: Organogenesis. Why the task of collecting such documents should be so difficult for PwC is something that it has never explained. Indeed, PwC has acknowledged that its quarterly and

11

annual workpapers concerning Organogenesis consist of a discrete set of materials that are maintained together and are easily identifiable. *See* Sloane Decl., Ex. I. Further, as an auditor, PwC is expected to retain its workpapers relating to audit work performed on behalf of its clients, and should reasonably expect to bear its own costs where, as here, its clients' financial statements are challenged. *See In re Honeywell Int'l Sec. Litig.*, 230 F.R.D. 293, 303 (S.D.N.Y. 2003) (refusing to order plaintiffs in securities fraud action to pay costs incurred by non-party accounting firm in responding to subpoena); *Wetta v. Templeton Asset Mgmt.*, No. M-8-85, 1998 U.S. Dist. LEXIS 13321 (S.D.N.Y. Aug. 25, 1998) (granting motion to compel third party auditor to produce all accountant workpapers and documents responsive to subpoena *duces tecum*). Because PwC is required to maintain such documents as part of its ordinary course of business as a independent public accountant, PwC should surely be able to provide Petitioners with similar access to its records without undue burden or expense.[10]

Petitioners have also devised proposals to minimize whatever slight burden of compliance remains. By offering to travel to wherever the documents are located and to review the documents to determine which ones are sought by the Subpoena, Petitioners would eliminate any need for PwC's counsel or employees to conduct their own detailed review for responsiveness.[11] Further, Petitioners' proposed "clawback" arrangement and agreement that the

---

[10] Indeed, PwC asserts that it will only produce quarterly and annual audit workpapers, and will exclude any additional documents in PwC's possession that are responsive to the specific Subpoena requests. *See* Sloane Decl., Ex. I at 2. It is unreasonable for PwC to contend that it must be compensated over $120,000 for producing this limited universe of documents — workpapers that it is required to maintain and that are readily identifiable and accessible — and at the same time refuse to search for, or produce, documents specifically called for by the Subpoena.

[11] Even as to any stray documents that PwC does not maintain together with its Organogenesis client files, the burden of producing them under this proposal would be minimal. Any cursory review of these document that PwC would conduct to ensure that, for example, the documents are potentially responsive, could be done by a paralegal and should take only a few hours at most, rather than tens of thousands of dollars worth of attorney time.

inadvertent production of privileged documents would not constitute a waiver of any privilege would protect PwC's rights under the attorney client privilege and attorney work product doctrine. And Petitioners' proposal to treat all documents that PwC produces as if they had been designated "confidential" under the existing Joint Protective Order[12] would obviate any concerns about the disclosure of PwC's or Organogenesis' confidential or proprietary information, and would further serve to minimize the extent of disclosure of any privileged information.

Significantly, courts in this District and elsewhere have found that arrangements similar to those proposed by Petitioners here can offer an entirely workable approach to discovery that would otherwise be more expensive. *See, e.g., Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290 (S.D.N.Y. 2003) (costs in "document-intensive litigation" may be minimized through use of clawback arrangements); *In re Propulsid Prods. Liab. Litig.*, MDL No. 1355 Section "L", 2003 U.S. Dist. LEXIS 16477, at *6 (E.D. La. Sept. 9, 2003) (ordering that documents be produced at non-party's offices, that requesting party review them for responsiveness, and that non-party be given the opportunity to withhold selected documents for privilege); *Flatow v. Islamic Republic of Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000) (any burden to non-party could be avoided by permitting plaintiff to conduct its own search for responsive documents, and noting that confidentiality concerns may be alleviated by an appropriate protective order), *vacated on other grounds*, 353 U.S. App. D.C. 275 (D.C. Cir. 2002). Given such precedents and the strong preference of the Federal Rules of Civil Procedure for cheaper (rather than more expensive) methods of obtaining discovery, Petitioners respectfully submit that their document production proposals should be adopted.

---

[12] The Joint Protective Order entered in the *Organogenesis* Action provides, *inter alia*, that documents designated "confidential" may be disseminated only to a limited number of designated persons and can, in any event, be used only in connection with the prosecution or defense of this action. *See* Joint Protective Order, dated July 26, 2006 (Sloane Decl., Ex. M).

To the extent that PwC has already engaged in its own more costly compliance efforts, as it claims, *see* Sloane Decl., Ex. J, it should be estopped from seeking retroactively to saddle Petitioners with costs of its more inefficient and expensive approach. PwC's response to the Subpoena conditioned its compliance with the Subpoena upon Petitioners' agreement — in advance — to pay all of its compliance costs. *See* Sloane Decl., Ex. D at 2, ¶2. Petitioners never agreed to that condition. In the seven months since the Subpoena was issued, PwC never indicated that it would take, or was taking, "the necessary steps to respond to the Subpoena." Indeed, to this day, despite Petitioners' counsel's discovery conference and correspondence with PwC's counsel, PwC has never informed Petitioners precisely what "steps" have been taken to comply with the Subpoena (other than preparing its boilerplate objections to the Subpoena), what the status of its "response" to the Subpoena is, or whether PwC has completed it compliance preparation efforts and is prepared to produce responsive documents. PwC cannot be permitted to first state its intention to refuse to produce documents because of its purported costs concerns unless a reimbursement condition is agreed to in advance, and then months later seek to hold Petitioners responsible for paying for purported compliance efforts even though Petitioners never agreed to that condition.

In sum, whether PwC has already employed its own drastically more expensive (and time-consuming) compliance procedures using its own lawyers and its own personnel, or has not done so yet but intends to, it may do so — but its efforts to pass such unnecessary costs on to Petitioners should be denied.

## II.   PWC SHOULD BE ORDERED TO IMMEDIATELY PRODUCE DEPOSITION TRANSCRIPTS AND DOCUMENTS IT PREVIOUSLY PRODUCED IN THE *BRICOLEUR* ACTION, WHICH WOULD ENTAIL VIRTUALLY NO BURDEN TO PWC.

PwC also should be ordered to immediately produce all documents related to the

*Bricoleur* Action. The *Bricoleur* Action was brought by a group of investors against

14

Organogenesis for fraud stemming from allegedly materially false and misleading statements that Organogenesis, its officers and directors made to the *Bricoleur* investors in connection with a private placement of Organogenesis stock. The *Bricoleur* Action involved issues that are common to the *Organogenesis* Action, such as the de-listing of Organogenesis stock from the American Stock Exchange and PwC's issuance of a "going concern" opinion, ¶¶ 13, 150, 155, 159, and that are responsive the Subpoena's document requests. *See* Subpoena Requests Nos. 1, 7 (Sloane Decl., Ex. A). Moreover, PwC was a witness in the *Bricoleur* Action, in which at least one its representatives was deposed.

As an easily-satisfied starting point, Petitioners have requested that PwC produce any deposition transcripts that were created, or documents that PwC previously produced in connection with the *Bricoleur* Action. *See* Sloane Decl., Exs. I and K. Producing these documents would entail virtually no burden at all to PwC. Copies of these documents are presumably sitting in the files of PwC's counsel in the *Bricoleur* Action and, because they have already been produced, need not be reviewed for responsiveness or privilege. The only costs of production would be the costs of copying and shipping the documents to Petitioners — costs that Petitioners have agreed to pay. Accordingly, there is no legitimate reason for PwC's refusal to produce these documents immediately and without any reimbursement condition other than reimbursement for reasonable costs of duplication and shipment.

## III.    EVEN IF THE COURT WERE TO CONCLUDE THAT PWC'S COST INTENSIVE, $120,000-PLUS APPROACH TO RESPONDING TO THE SUBPOENA IS REASONABLE, THE COURT SHOULD NOT SHIFT TO PETITIONERS ANY OF THE COSTS OF COMPLIANCE OTHER THAN DUPLICATING AND SHIPPING COSTS.

Under well-established law, "a non-party can be required to bear some or all of its expenses where the equities of a particular case demand it." *In re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C. 1992); *see also Propulsid*, 2003 U.S. Dist. LEXIS 16477, at *7; *First Am. Corp. v.*

*Price Waterhouse LLP*, 184 F.R.D. 234, 241 (S.D.N.Y. 1998) ("Protection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance."). For all of the reasons set forth above, Petitioners respectfully submit that PwC should not be permitted to adopt the most costly approach to compliance in the face of much less expensive alternatives proposed by Petitioners. However, to the extent that PwC has already pursued, or insists on pursuing, the most expensive approach to compliance, none of its costs — other than reasonable copying and shipping charges — should be shifted to Petitioners.

In determining whether, and to what extent, to apportion compliance costs among requesting and responding parties to a subpoena, courts have considered three factors: (1) whether the non-party has an interest in the outcome of the case; (2) whether the non-party can more readily bear the costs than the requesting party; and (3) whether the litigation is of public importance. *See, e.g.*, *Honeywell*, 230 F.R.D. at 303. Each of these factors weigh in favor of PwC bearing the costs of its compliance here.

### A.     PwC Is Not A Typical "Disinterested Bystander," And Could Have Foreseen Being Drawn Into, And In Fact Was Drawn Into, This Litigation

As an outside auditor who signed off on Organogenesis' allegedly false and misleading public financial statements, PwC is hardly the "classic disinterested party" that is typically entitled to have its costs reimbursed. *Cf. Honeywell*, 230 F.R.D. at 303 (refusing to order that plaintiffs in securities fraud action pay costs incurred by nonparty accounting firm in responding to subpoena). PwC's involvement in this action stems from its activities as the auditor of a public company — activities for which it was presumably well-compensated. Auditors are well aware that their audit work for public companies are often challenged in securities fraud and other types of litigation. In addition, in this particular case, PwC was named as a defendant in the *Organogenesis* Action. The foreseeability of PwC's involvement in this case is further substantiated by the Confidential Arcari Document, the existence and pertinent allegations of

16

which have been known to PwC since the filing of the Amended Complaint, over two years ago.
Thus, PwC has a greater interest in the *Organogenesis* Action than the typical auditor of a
company that is embroiled in a securities fraud action, where auditors routinely are subpoenaed
for documentary and testimonial evidence. Further, a case involving alleged fraud at
Organogenesis — the *Bricoleur* Action — has already drawn PwC into litigation involving the
Company and has required PwC to respond to a subpoena for documents and testimony. As the
court found in *First Am. Corp.*, "[w]here a nonparty was substantially involved in the underlying
transaction and could have anticipated that the failed transaction would reasonably spawn some
litigation, expenses should not be awarded." *First Am. Corp.*, 184 F.R.D. at 242 (citations
omitted).

**B.      PwC Is Better Able To Bear The Costs Of Production**

According to its website, PwC has more than 140,000 employees in offices in 149
countries. *See* http://www.pwc.com. As one of the four largest auditing firms in the world, PwC
should be able to bear the costs of complying with a subpoena for documents relating to its work
for one particular client (Organogenesis), especially given the relatively small volume of such
documents (less than 10 boxes). Further, PwC is under independent regulatory obligations to
make available for inspection to government agencies many of the requested documents.
Presumably, PwC has in place procedures for efficiently making available its client files in
response to audits and requests for information, as opposed to incurring over $120,000 every
time one of its client's files are audited. Moreover, the expense of complying with a request for
inspection of client files is a cost of doing business anticipated by any auditor of a public
company.

By contrast, Petitioners consist of a class of Organogenesis shareholders, including many
individual investors, who already have lost considerable sums of money due to Defendants'

17

fraud. Any recovery that Petitioners ultimately may receive in this litigation will be decreased by the amount of Petitioners' expenses in prosecuting the action, including any amounts paid to PwC. Given PwC's financial position relative to the class members and its independent record-maintenance obligations, PwC is better able to, and should, bear the costs of compliance with the Subpoena.

### C.    This Action Is Of Significant Public Importance

Courts have held that non-parties should bear more of the costs of production where the litigation is of public importance. *See, e.g., Honeywell*, 230 F.R.D. at 303. Securities fraud class actions have been held to serve important public purposes. *See, e.g., In re Healthsouth Corp. Sec. Litig.*, 213 F.R.D. 447, 456 (N.D. Ala. 2003) ("Securities class actions benefit both the public interest in maintaining the integrity of the market and the private interest of investors whose redress of grievances is not limited to a multitude of small individual claims."). Here, Organogenesis was a publicly-traded company and the alleged fraud resulted in substantial damages to possibly thousands of investors. As a putative class action on behalf of all purchasers of Organogenesis securities during the Class Period, this action serves the important public purpose of seeking class-wide relief for possibly thousands of victims of securities fraud. *See Exxon*, 142 F.R.D. at 384 (non-party should bear some of the costs for litigation "of great public importance").

A party seeking documents pursuant to Rule 45 is, at most, responsible for reimbursing those expenses reasonably incurred by the third party. *See, e.g., Propulsid*, 2003 U.S. Dist. LEXIS 16477, at *8. PwC's exorbitant demands and insistence on the most expensive procedures possible are plainly contrary to common sense and Rule 1's fundamental directive to promote the efficient and, where possible, inexpensive resolution of litigation.

18

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that their Motion to Compel be granted and that the Court enter an order:

(a) compelling PwC to produce all documents responsive to the Subpoena within 7 days at PwC's offices in New York City (or such other location as the parties may mutually agree);

(b) compelling PwC to produce immediately all transcripts of depositions and documents previously produced in the *Bricoleur* Action that are in PwC's possession; and

(c) directing that Petitioners shall pay the reasonable costs of copying and shipping the responsive documents to Petitioners, but shall otherwise not be responsible for paying for PwC's costs or expenses in complying with the Subpoena.

Dated:  February 16, 2007                    **MILBERG WEISS & BERSHAD LLP**

By:_____
Peter Sloane (PS-4672)
Peter E. Seidman (PS-8769)
One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I, Peter Sloane, certify that on February 16, 2007, I caused a copy of Petitioners' Notice

of Motion and Motion to Compel Third Party PricewaterhouseCoopers LLP to Comply with

*Subpoena Duces Tecum*, Petitioners' Memorandum of Law in Support of their Motion to Compel

Third Party PricewaterhouseCoopers LLP to Comply with *Subpoena Duces Tecum*, and

Declaration of Peter Sloane in Support of Petitioners' Motion to Compel Third Party

PricewaterhouseCoopers LLP to Comply with *Subpoena Duces Tecum*, to be served via First

Class Mail upon:

Matthew J. Matule, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA 02108

***Counsel for PricewaterhouseCoopers LLP***

Jonathan A. Shapiro, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

**Counsel for Albert Erani, Donna Abelli Lopolito, Philip Laughlin, Michael Sabolinski, and Alan W. Tuck (Defendants in *In re Organogenesis, Inc. Securities Litigation*, Civil Action No. 1:04 CV 10027-JLT, pending in the United States District Court for the District of Massachusetts)**

Peter M. Saparoff, Esq.
Mintz Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
One Financial Center
Boston, MA 02111

**Counsel for Herbert M. Stein (Defendant in *In re Organogenesis, Inc. Securities Litigation*, Civil Action No. 1:04 CV 10027-JLT, pending in the United States District Court for the District of Massachusetts)**

Sara Jane Shanahan, Esq.
Griesinger, Tighe & Maffie, LLP
176 Federal Street
Boston, MA 02110

**Counsel for John J. Arcari (Defendant in *In re Organogenesis, Inc. Securities Litigation*, Civil Action No. 1:04 CV 10027-JLT, pending in the United States District Court for the District of Massachusetts)**

Peter Sloane