# EXHIBIT 4
# (Pt. 1)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

**In re Subpoena Issued to**
**PRICEWATERHOUSECOOPERS LLP,**

for the Action Entitled *In re Organogenesis, Inc.*
*Securities Litigation*, Civil Action No. 1:04CV10027-
JLT, Pending in the United States District Court for the
District of Massachusetts.

</td><td>

Miscellaneous Action No:
**M8-85**



</td></tr>
</table>

## DECLARATION OF PETER SLOANE IN SUPPORT OF PETITIONERS' MOTION TO COMPEL THIRD PARTY PRICEWATERHOUSECOOPERS LLP TO COMPLY WITH *SUBPOENA DUCES TECUM*

I, PETER SLOANE, hereby declare as follows:

1.      I am a member of Milberg Weiss & Bershad LLP, counsel for Petitioners in this miscellaneous action and Lead Counsel for plaintiffs and the proposed class in *In re Organogenesis, Inc. Securities Litigation*, Civil Action No. 1:04 CV 10027-JLT (the "*Organogenesis* Action"), a putative class action for securities fraud violations that is pending in the District of Massachusetts.  I submit this declaration in support of Petitioners' Motion to Compel Third Party PricewaterhouseCoopers LLP to Comply with *Subpoena Duces Tecum* (the "Motion to Compel").

2.      I conferred telephonically with Matthew J. Matule, Esq., counsel for PricewaterhouseCoopers LLP ("PwC") on January 18, 2007, and engaged in written correspondence with counsel for PwC, in a good faith attempt to resolve the discovery dispute at issue in this Motion to Compel.  Despite these efforts, the parties have been unable to resolve this dispute without the intervention of the Court.

3.      Attached hereto as Exhibit A is a copy of Petitioners' *subpoena duces tecum*, dated June 16, 2006, issued from this Court to PwC (the "Subpoena").

4.      Attached hereto as Exhibit B is a copy of the Corrected Consolidated Amended Class Action Complaint For Violations Of Federal Securities Laws, dated December 22, 2004, the operative complaint in the *Organogenesis* Action.

5.      Attached hereto as Exhibit C is a copy of a document obtained by Petitioners that Petitioners allege was created by Organogenesis' then-Chief Financial Officer, John Arcari (the "Confidential Arcari Document").

6.      Attached hereto as Exhibit D is a copy of PwC's objections to the Subpoena, dated July 11, 2006.

7.      Attached hereto as Exhibit E is a copy of the Discovery Order in the *Organogenesis* Action, dated April 26, 2006, which sets a discovery cut-off date of April 25, 2007.

8.      Attached hereto as Exhibit F is a copy of Petitioners' motion for leave to serve a third party subpoena upon PwC, dated June 9, 2006, and the corresponding docket entry reflecting Judge Joseph L. Tauro's electronic Order granting the motion for leave, dated June 13, 2006.

9.      Attached hereto as Exhibit G is a copy of a December 28, 2006 letter from Petitioners' Counsel to PwC's Counsel.

10.     Attached hereto as Exhibit H is a copy of a January 10, 2007 letter from PwC's Counsel to Petitioners' Counsel.

11.     Attached hereto as Exhibit I is a copy of a January 19, 2007 letter from Petitioners' Counsel to PwC's Counsel.

12.    Attached hereto as Exhibit J is a copy of a February 1, 2007 letter from PwC's Counsel to Petitioners' Counsel.

13.    Attached hereto as Exhibit K is a copy of a February 8, 2007 letter from Petitioners' Counsel to PwC's Counsel.

14.    Attached hereto as Exhibit L is a copy of a February 12, 2007 letter from PwC's Counsel to Petitioners' Counsel.

15.    Attached hereto as Exhibit M is a copy of the Joint Protective Order entered in the *Organogenesis* Action, dated July 26, 2006.

I declare under penalty of perjury that the foregoing is true.

DATED:  February 16, 2007

_____
Peter Sloane

3

## CERTIFICATE OF SERVICE

I, Peter Sloane, certify that on February 16, 2007, I caused a copy of Petitioners' Notice

of Motion and Motion to Compel Third Party PricewaterhouseCoopers LLP to Comply with

*Subpoena Duces Tecum*, Petitioners' Memorandum of Law in Support of their Motion to Compel

Third Party PricewaterhouseCoopers LLP to Comply with *Subpoena Duces Tecum*, and

Declaration of Peter Sloane in Support of Petitioners' Motion to Compel Third Party

PricewaterhouseCoopers LLP to Comply with *Subpoena Duces Tecum*, to be served via First

Class Mail upon:

Matthew J. Matule, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA 02108

**Counsel for PricewaterhouseCoopers LLP**

Jonathan A. Shapiro, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

**Counsel for Albert Erani, Donna Abelli Lopolito, Philip Laughlin, Michael Sabolinski, and Alan W. Tuck (Defendants in *In re Organogenesis, Inc. Securities Litigation*, Civil Action No. 1:04 CV 10027-JLT, pending in the United States District Court for the District of Massachusetts)**

Peter M. Saparoff, Esq.
Mintz Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
One Financial Center
Boston, MA 02111

**Counsel for Herbert M. Stein (Defendant in *In re Organogenesis, Inc. Securities Litigation*, Civil Action No. 1:04 CV 10027-JLT, pending in the United States District Court for the District of Massachusetts)**

Sara Jane Shanahan, Esq.
Griesinger, Tighe & Maffie, LLP
176 Federal Street
Boston, MA 02110

**Counsel for John J. Arcari (Defendant in *In re Organogenesis, Inc. Securities
Litigation*, Civil Action No. 1:04 CV 10027-JLT, pending in the United States
District Court for the District of Massachusetts)**

Peter Sloane

2

# EXHIBIT A

**ORIGINAL**

## Issued by the
## UNITED STATES DISTRICT COURT

| SOUTHERN | **DISTRICT OF** | NEW YORK |
|---|---|---|

IN RE ORGANOGENESIS SECURITIES LITIGATION

### SUBPOENA IN A CIVIL CASE

To: PRICEWATERHOUSECOOPERS LLP
   Attn: Office of the General Counsel
   300 Madison Avenue
   New York, New York 10017

Case Number: 1:04 CV-10027-JLT

[Action Pending in the United States District
Court for the District of Massachusetts]

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (List documents or objects)

SEE ATTACHED SCHEDULE "A"

| PLACE | DATE AND TIME |
|---|---|
| Milberg Weiss Bershad & Schulman LLP<br>c/o Peter Sloane, Esq.<br>One Pennsylvania Plaza<br>48th Floor<br>New York, NY 10119 | July 7, 2006 |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which a person will testify. Federal Rules of Civil Procedure. 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| ATTORNEY FOR PLAINTIFFS | June 16, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Peter Sloane, Esq.
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
48th Floor
New York, NY 10119

(See Rule 45. Federal Rules of Civil Procedure. Parts C & D on Reverse)

## PROOF OF SERVICE

| SERVED | Date | Place | |
|---|---|---|---|
| | | | |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE | |
| | | | |
| SERVED BY (PRINT NAME) | | TITLE | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

| Executed on | | | |
|---|---|---|---|
| | DATE | | SIGNATURE OF SERVER |
| | | | |
| | | | ADDRESS OF SERVER |
| | | | |
| | | | |
| | | | |

Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

# AFFIDAVIT OF SERVICE

## UNITED STATES DISTRICT COURT
### Southern District of New York

Index Number: 1:04-CV-10027-JLT                                            Date Filed: _____

.:

**IN RE: ORGANOGENESIS SECURITIES LITIGATION**

vs.

.:

For:
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
New York, NY 10119

Received these papers to be served on **PRICEWATERHOUSECOOPERS LLP, located at 300 Madison Avenue, New York, New York 10017 ATT: Office of the General Counsel.**

I, Melissa Egebo, being duly sworn, depose and say that on the **19th day of June, 2006** at **9:39 am, I:**

personally served **Subpoena in a Civil Case for Production and Inspection of Documents** to Patricia Edmonds, Paralegal, as authorized to accept on behalf of the above named Entity.

**Additional Information pertaining to this Service:**
THE INITIAL SERVICE ATTEMPT WAS ON FRIDAY 6/16/2006. DEPONENT WAS DENIED ACCESS TO THE UPSTAIRS AREA AND THREATENED BY SECURITY WITH EJECTION BY THE NYPD. DEPONDENT DID PRODUCE NEW YORK STATE PROCESS SERVER ID CARD. DEPONENT WAS TOLD THAT ONLY 4 PEOPLE CAN TAKE THE PAPERS, AND DESPITE SEVERAL ATTEMPTS TO REACH THEM BY PHONE THEY DID NOT ANSWER. SECURITY ALSO TOLD THE DEPONENT THAT IF AN ATTEMPT WAS MADE TO SERVE UPON HIM, HE WOULD THROW THE DOCUMENT IN THE TRASH.

**Description** of Person Served: Age: 40, Sex: F, Race/Skin Color: Caucasian, Height: 5'9", Weight: 150, Hair: Brown, Glasses: N

I am over the age of 18, am not a party in the above action, and am a Certified Process Server, in good standing, in the jurisdiction in which the process was served.

Subscribed and sworn to before me on the 20th day
of June, 2006 by the affiant who is personally known
to me.

_____
Tina A. McCarthy
Notary Public, State of New York
No. 01MC6115830
Qualified in Bronx County
Commission Expires 09/13/2008

**Melissa Egebo**
1220233

Our Job Serial Number: 2006002947
Ref: 030360-00001

Copyright © 1992-2005 Database Services, Inc. - Process Server's Toolbox V5.5j

## <u>SCHEDULE A</u>

## <u>INSTRUCTIONS</u>

1.      In responding to these requests, you shall produce all responsive documents (including those documents stored electronically) which are in your possession, custody, or control, including (by way of illustration only and not limited to) documents in the possession, custody, or control of your affiliates or subsidiaries, and your present or former attorneys, accountants, directors, officers, partners, employees, and other representatives and agents, as well as your present or former independent contractors over which or whom you have had control, and any other persons acting on your behalf.  A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

2.      Where a claim of privilege is asserted in objecting to any request, identify the nature of the privilege (including work product) which is being claimed and the privilege rule being invoked, and for each answer, or portion thereof that is withheld, provide the following information:

    a.      <u>For documents</u>:  (i) the type of document; (ii) the date of the document; (iii) the author(s), addressee(s), and recipient(s) of the document (including, without limitation, any indicated or blind copy recipients, and all persons to whom the document was distributed, shown or explained) and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to one another; (iv) the number of pages; (v) the identity of any enclosure(s) or attachment(s); and (vi) the general subject matter of the document; and

    b.      <u>For oral communications</u>:  (i) the name of the person making the communication and the names of the persons present while the communication was made and, where not apparent, the relationship of the persons present, to the person making the

- 1 -

communication; (ii) the date and place of the communication; and (iii) the general subject matter of the communication.

3.    Documents produced in response to any of these discovery requests must be produced as they are kept in the ordinary course of business and must be labeled in such a way as to show which files they came from.

4.    In the event that any document called for by any of these discovery requests has been destroyed or discarded, that document is to be identified by stating: (i) any addresser and addressee; (ii) any indicated or blind copy recipients; (iii) the document's date, subject matter, number of pages, and attachments, enclosures or appendices; (iv) all persons to whom the document was distributed, shown or explained; (v) the date of destruction or discard and the reason for destruction or discard; and (vi) the persons authorizing and carrying out such destruction or discard.

5.    If any information or data is withheld because such information or data is stored only electronically, it is to be identified by the subject matter of the information or data, the storage mode, and the place or places where such information is maintained.

## RELEVANT TIME PERIOD

Unless otherwise indicated, these Requests seek Documents created, used during, or concerning the time period between and including May 15, 1999 through December 31, 2002 ("Relevant Time Period"), including all Documents concerning, in whole or in part, such period, or events or circumstances during such period, *even though dated, prepared, generated, or received prior or subsequent to that period.*

## DEFINITIONS

1.      The term "Action" shall mean the case entitled *In re Organogenesis Securities Litigation.*, No. 04-10027-JLT, pending in the United States District Court for the District of Massachusetts.

2.      The term "Ades" refers to Alan Ades.

3.      The term "Class Period" means the time period between November 15, 1999 and February 7, 2002, inclusive.

4.      The term "Complaint" refers to the Corrected Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws filed by Plaintiffs in the Action on November 22, 2004.

5.      The term "Defendants" means and includes Defendants Philip Laughlin, Michael Sabolinski, Albert Erani, Donna Abelli Lopolito, John J. Arcari, Herbert M. Stein, Bernard A. Marden and Alan W. Tuck, and any of their agents, employees, representatives and attorneys.

6.      The term "Erani" refers to Defendant Albert Erani.

7.      The term "Laughlin" refers to Defendant Philip Laughlin.

8.      The term "Novartis" refers to Novartis Pharmaceuticals Corporation and/or Novartis Pharma AG, and any of its divisions, subdivisions, offices, subsidiaries, affiliates, predecessors, successors, joint ventures, parents, partners, present or former officers, directors, agents, representatives, employees (including, but not limited to, its attorneys, accountants, auditors and advisors), and all other persons or entities acting or purporting to act on its behalf.

9.      The term "PwC" refers to PricewaterhouseCoopers LLP, and any of its members (as defined by ET 92.06, 92.09 and .16 of the American Institute of Certified Public Accountants Code of Professional Conduct as of June 1, 2002) and any of PwC's predecessors, successors, parents, subsidiaries, divisions, partnerships and branches; its international, foreign, national,

- 3 -

regional and local offices; all present or former officers, directors, principals, partners, members, employees, agents, attorneys, advisors, accountants, consultants, assigns and all other persons acting or purporting to act on its behalf.

10.    The terms "Organogenesis" and/or "Company" refers to Organogenesis, Inc., and its predecessor, and any of Organogenesis, Inc.'s or its predecessor's divisions, subdivisions, offices, subsidiaries, affiliates, predecessors, successors, joint ventures, parents, partners, present or former officers, directors, agents, representatives, employees (including, but not limited to, its attorneys, accountants, auditors and advisors), and all other persons or entities acting or purporting to act on its behalf.

11.    The term "Sabolinski" refers to Defendant Michael Sabolinski.

12.    The term "SEC" refers to the U.S. Securities and Exchange Commission.

13.    The term "Stein" refers to Defendant Herbert M. Stein.

14.    The term "and" shall include the term "or," and the term "or" shall include the term "and," such that each document request calls for the production of the greatest number of documents.

15.    The term "any" is understood to include and encompass "all." The word "all" also includes "each" and vice versa.

16.    The terms "Audit Engagement" or "Engagement" refer to auditing work or procedures employed or conducted by PwC with respect to internal controls, accounting records, and financial statements of Organogenesis, whether or not resulting in the expression by PwC of an opinion on the fairness of financial statements. Audit Engagement also includes any work performed concerning any potential or consummated acquisition by Organogenesis of another company; work performed in connection with any public offering or registration of securities;

- 4 -

work performed in connection with any public filings by Organogenesis, other than in connection with any public offering or registration of securities; and any consulting work, special projects, or due diligence review. Audit Engagement also includes any in-process or incomplete engagement with respect to Organogenesis, including those from which you were formally terminated or otherwise resigned, including but not limited to, any audit, investigation or review you conducted for Organogenesis with respect to the possible restatement of prior financial statements.

17.    The term "Audit Program" means all documents setting forth the expected conduct and scope of the audit engagement or used for the purpose of detailing the audit procedures necessary to accomplish the objectives of the audit engagement in accordance with the requirements set forth in AICPA Professional Standards, §§311.03O5, and encompasses PwC's proprietary materials utilized to document performance of audit procedures on audit engagements.

18.    The term "comfort letter" means an auditor's statement provided to a company preparing for a public offering, confirming that unaudited financial data in the prospectus follows Generally Accepted Accounting Principles.

19.    The terms "Communication" and "Communications" are used in a comprehensive sense, and shall mean and include every conceivable manner or means of disclosure, transfer or exchange of oral or written information (in the form of facts, ideas, inquiries or otherwise) between one or more persons or entities including, but not limited to, writings, documents, inter- and infra-office memoranda, correspondence, meetings, conferences, conversations, and/or agreements, whether face-to-face, by telephone, by mail, by telecopier, by telex, by computer or otherwise.

20.    The term "concerning" means pertaining to, referring to, relating to, describing, regarding, evidencing, constituting, reflecting, mentioning, discussing or of interest to and/or of importance to.

21.    The term "correspondence" means any letter, memorandum, e-mail, or other writing transmitted between persons.

22.    The term "Document(s)" has the same meaning as "writings," which is defined in Fed. R. Civ. P. 34(a) and Fed. R. Evid. 1001, and is used herein in the broadest possible sense and includes, but are not limited to, data, metadata, videotape and motion pictures, and electronic, mechanical or electric records or representations, including e-mail, whether "accessible" or "inaccessible" as those two terms are defined in *Zubulake v. UBS Warburg et al.*, 217 F.R.D. 309 (S.D.N.Y. 2003). "Document(s)" include, but are not limited to, internal memoranda or any internal documents, correspondence, letters, contracts, agreements, memoranda, statements, bills, schedules, receipts, invoices, records of purchases or sale, brochures, projections, budgets, calendars, reports, studies, minutes, resolutions, due diligence files, promissory notes, loan documents, letters of credit, notes (handwritten or otherwise), messages, analyses, plans, evaluations, diaries, agendas, announcements, manuals, telephone message slips, telephone bills, telephone logs, telephone toll records, press releases, transcripts, scripts, graphs, charts, computer directories, computer disks, computer tapes, databases, database records, electronic workpapers, or any other written, printed, typed, taped, filmed, or graphic matter however produced or reproduced. "Document(s)" further includes non-identical copies, including, but not limited to, drafts, revisions, alterations, modifications, changes, markups, amendments of the foregoing or comments or notations appearing on the foregoing, which are not part of the original text, including any electronic metadata associated therewith, database

formulas, database relational information, and database replicas. "Document(s)" also include the file, folder tabs, and labels appended to or containing any documents.

23.     The term "employee(s)" means any person who at any time during the period covered by this demand (whether the person is a current or former employee) acted or purported to act on behalf of another person or persons, including, but not limited to, all past and present directors, officers, executives, agents, representatives, attorneys, accountants, independent contractors, advisors, analysts, and consultants of such other person or persons.

24.     The term "Financial Statements" includes without limitation, balance sheets, and statements of income, earnings, retained earnings, sources and applications of funds, operations and deficit, profit and loss, changes in financial position, and cash flows, and also includes all notes to each of the foregoing, and any other notes that pertain to the past, present, or future financial condition of Organogenesis. Any of the foregoing documents constitutes a financial statement whether it is audited or unaudited, or final, interim, yearly, monthly, pro forma, complete or partial, consolidated or non consolidated or otherwise.

25.     The term "GAAP" means Generally Accepted Accounting Principles as applied by Certified Public Accountants in the United States.

26.     The term "GAAS" means Generally Accepted Auditing Standards as applied by Certified Public Accountants conducting audits in the United States.

27.     The terms "identify" or "identity" when used in reference to any document means to give, to the extent known, the: (a) type of document; (b) general subject matter; (c) date of the document; (d) author(s), addressee(s) and recipient(s); and (e) Bates-stamp number, if any.

28.    The terms "identify" or "identity," when used in reference to any entity, means the following should be stated: (a) full name; (b) place and date of incorporation or creation; (c) main office address; and (d) telephone numbers for any addresses identified.

29.    The terms "identify" or "identity" when used in reference to a natural person means the following should be stated: (a) full name; (b) present or last known home and business addresses; (c) telephone number at home and business; and (d) employer and position or job title.

30.    The term "including" means "including, but not limited to," and does not impose any limitations on the types of Documents requested.

31.    The term "meeting" means the contemporaneous presence of any natural persons for any purpose, whether or not such presence was by chance or prearranged, and whether or not the meeting was formal or informal or occurred in connection with some other activity, and includes telephone and video conferences when, whichever the means employed, participants can hear or otherwise communicate with each other.

32.    The terms "person" or "persons" refers to natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and all other entities.

33.    The term "policy" means any rule, procedure, practice, guideline or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed by the person or entity responding to the requests.

34.    The term "refer" or "relate" or "referring" or "relating" means all documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including,

- 8 -

without limitation, all documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

35.    The term "reflecting" means expressing, showing, demonstrating, exhibiting, identifying, mentioning, evidencing and/or manifesting.

36.    The terms "Work Papers" or "Working Papers" mean all documents, including data stored on tapes, films, or other media, concerning the procedures applied, work performed, evidence obtained and conclusions reached in the audit engagement by any auditor, practitioner, consultant or any other person working on your behalf.  Additionally, the work papers for any audit or attestation include, but are not limited to, those documents defined by Generally Accepted Auditing and Attestation Standards in AU § 339 as follows: records kept by the auditor (or practitioner) of the procedures applied, the tests performed, the information obtained, and the pertinent conclusions reached in the engagement, i.e., working papers are audit programs, analyses, memoranda, letters of confirmation and representation, abstracts of company documents, and schedules or commentaries prepared or obtained by the auditor.

37.    The terms "You" and "Your" means the recipient hereof, You, Your parents, subsidiaries, affiliates, and divisions; Your predecessor and successor entities; and any of the foregoing entities' former or present officers, directors, owners, partners, employees, attorneys, agents, representatives, all other persons occupying similar positions or performing similar functions or acting or purporting to act on their behalf and the immediate family members of any individual specified above.

38.    The use of the singular form of any word includes the plural and vice versa.

## DOCUMENT REQUESTS

1.    All Documents and Communications concerning the Confidential Arcari Document (attached hereto as Exhibit 1 and Bates Stamped LP 000001-000003), or any of the matters, subjects, events or Communications described therein, including without limitation:

    a.    All Documents and Communications concerning PwC's alleged refusal in 2001 to grant any consents or additional comfort letters to Organogenesis, including PwC's reasons for such refusal and any communications between PwC and Organogenesis relating to such refusal.

    b.    All Documents and Communications reflecting PwC's credibility and/or confidence in Organogenesis' officers and directors during the Relevant Period, including credibility and/or confidence in the Individual Defendants.

    c.    All Documents and Communications concerning PwC's certification of the Company's financial statements and cash position, including all Documents and Communications reflecting the due diligence, if any, that PwC performed in assuring that the financial statements and cash position of the Company were true and accurate.

    d.    All Documents and Communications concerning Erani's alleged refusal to sign standard audit confirmations sent to him by PWC relating to his holdings of the Company's convertible debt, including all Documents and Communications reflecting PwC's response to such refusal.

2.    All Documents and Communications concerning Organogenesis' commitment to PwC in or about May 2001 concerning the first tranche of the Novartis "put option," or option contracts that gave Organogenesis the right to sell a certain quantity of an underlying security to Novartis at a specified price up to a specified date, including all Documents and

Communications concerning the alleged violation this commitment by Organogenesis. *See* Confidential Arcari Document (attached as Exhibit 1 hereto).

      3.      All Documents and Communications reflecting PwC's knowledge of the negotiations, terms, conditions, and communications relating to any agreements between Organogenesis and Novartis concerning Apligraf.

      4.      All Documents and Communications concerning the actual or perceived effect of any Novartis Agreement(s) on the Organogenesis's operations, finances, or ability or inability to achieve profitability, including any actual or perceived advantages or disadvantages to the Organogenesis of any Novartis Agreement(s) or the manner in which any Novartis Agreement(s) was performed.

      5.      All Documents and Communications concerning the Company's ability or inability to fund operations and/or achieve profitability through sales of Apligraf, including actual, expected or projected per-unit profitability or lack thereof of Apligraf.

      6.      All Documents and Communications concerning PwC's March 31, 2001 Report of Independent Accountants certifying Organogenesis' financial statements in the Company's 2000 Form 10-K, including all Documents and Communications reflecting the basis for this opinion.

      7.      All Documents and Communications concerning PwC's going concern opinion issued on or about April 16, 2002, the reasons therefor, the reasons for the timing thereof, and any statement, suggestion, or belief that such disclosures should have been made earlier in time..

      8.      All Documents and Communications concerning the Company's September 2002 bankruptcy, including all Documents and Communications reflecting the reasons for the bankruptcy and any efforts to avoid bankruptcy or to sell the Company.

9.    All Documents and Communications concerning any leveraged buyout or acquisition of Organogenesis, including all Documents and Communications reflecting PwC's knowledge of, and opinion concerning the buyout or acquisition.

10.    All Documents and Communications concerning Organogenesis' actual or perceived compliance or non-compliance with GAAP or GAAS.

11.    All Documents and Communications reflecting PwC's risk assessments and reevaluation of risk assessments of Organogenesis management during the Relevant Time Period.

12.    All Documents and Communications concerning any proposed, contemplated, or implemented change in Organogenesis' accounting practices, policies or procedures, whether or not recommended by PwC or Organogenesis.

13.    All Documents concerning any responses, reactions, or follow up Communications relating to the final conclusion reached by PwC as a result of PwC's audit of Organogenesis' Financial Statements.

14.    All Documents and Communications concerning any potential, actual, initial or ultimate disagreements between PwC and Organogenesis (including any of their directors, officers, Boards or committees thereof, or attorneys, accountants and consultants) concerning any aspect of any professional services performed by PwC for Organogenesis.

15.    All Documents and Communications concerning the actual, potential or perceived adequacy or inadequacy of Organogenesis' internal controls (as that term is used in Codification of Statements of Auditing Standards AU §319).

16.    All Documents and Communications concerning meetings of the Board of Directors of Organogenesis, including meetings of the Board of Directors of any subsidiary of

- 12 -

Organogenesis, or any committees thereto and including the Audit Committee, including minutes, notes, memoranda, agendas, presentation items, resolutions, draft minutes or resolutions, slides, handouts, information packages, video or audio recordings, or any memorialization whatsoever of those meetings.

17.    All general client or permanent files concerning any Organogenesis engagement, including correspondence, intra-office and inter-office memoranda, and memoranda of any conversations, meetings, or conferences concerning such engagements.

18.    All Documents concerning all Communications between PwC and any of the Individual Defendants, including all correspondence files, drafts and notes relating thereto.

19.    All management letters and/or letters of recommendation concerning Organogenesis.

20.    Documents, reports, charts, and schedules relating to the preparation or review of Organogenesis' press releases.

21.    All Documents and Communications relating to any "fraud," "fraudulent financial reporting," "accounting irregularities," or "illegal acts by clients," as those terms are used in Statement of Auditing Standards No. 82, Statement of Auditing Standards No. 54, and/or the former Statement of Auditing Standards No. 53 (issued April 1998), and/or Codification of Auditing Standards § 316 and 317, occurring at, or with respect to, Organogenesis.

22.    To the extent not encompassed by previous requests, all Documents concerning Communications and/or meetings concerning Organogenesis, or the Individual Defendants, whether or not made prior to, concurrent with, and/or subsequent to any Audit Engagement, including correspondence files, email and instant messages.

23.    To the extent not encompassed by previous requests, all Documents and Communications concerning any reviews, studies, calculations, and/or analysis conducted by PWC concerning Organogenesis' revenue recognition, operations, ability or lack theoreof to fund operations, profitability or lack thereof, projected profitability, or ability to continue as a going concern.

24.    To the extent not encompassed by previous requests, all Documents and Communications concerning the disclosures made by the Company on or around January 30, 2002 and described in detail in paragraphs 148-150 of the Complaint, the reasons therefor, the reasons for the timing thereof, and any statement, suggestion, or belief that such disclosures should have been made earlier in time.

25.    To the extent not encompassed by previous requests, all Documents and Communications concerning the actual, potential or perceived accuracy or adequacy (or lack thereof) of disclosure in all or any part of Organogenesis' annual, quarterly, or other report, release, Financial Statement, or public statement concerning Organogenesis.

26.    All Audit Programs (including any additions, deletions, substitutions, or amendments thereto and any documents reflecting the reason for any such event) used, implemented, or relied upon with respect to any professional services performed by PwC for Organogenesis.

27.    Documents and Communications sufficient to identify the names, titles, and last known addresses of all PwC personnel associated with any professional services performed by PwC for Organogenesis.

28.    All Documents and Communications relating to the "Independence" of PwC with respect to Organogenesis, as that term is used in SEC Rule 201(b) of Regulation S-X or the AICPA Code of Professional Conduct Rule 101.

29.    A copy of all drafts and final reports issued in connection with PwC's audit of Organogenesis.

30.    Documents concerning the preservation, search for, collection, maintenance, destruction or alteration of any and all documents (including e-mail and other electronic data) concerning Organogenesis that were undertaken with respect to this action, including, without limitation, all such action taken after this action was filed but prior to this request.

31.    A log, in accordance with the instructions above, of all Documents responsive to this Schedule A that You have withheld from production in response to these Requests.

**EXHIBIT 1**

# EXHIBIT 1

*To Brad Cook 3 pgs*

**CONFIDENTIAL**

10/18/01

**ALBERT ERANI ISSUES**

March 2000   Drove Board to approve $6.2 million cash redemption of Series C convertible preferred stock at a time when the Company had little cash. Could have redeemed for stock but was dilution phobic.

March 2000   Did not sell stock off the shelf when opportunity existed to sell more shares at $14.50 per share.

January 2001  Took control of stock buyback program and initiated transactions on his own on behalf of the company without checking with committee established to execute the stock buyback program.

January/
October 2001  Forces the use of his service providers onto the Company. Most egregious is causing the law firm of Kramer, Levin, Naftalis & Frankel LLP to not only represent the Company but on many occasions to have them represent parties the Company deals with including UBS Warburg and Berkshire Bank. The Board has never approved the use of Kramer, Levin as the Company's law firm. Requires signing of numerous conflicts of interest letters with Kramer, Levin and their involvement severely interferes with Mintz, Levin providing the Company legal services in their capacity as the Company's legal counsel.

February/
March 2001  Prevented management from proceeding with sale of 1 million shares of Company stock from its shelf registration at about $12 per share. Authorization for sale was approved in the February 21, 2001 Board meeting. Engagement letters received from Tucker Anthony and Gruntal. Gruntal had almost concluded its due diligence when Mr. Erani stopped their process.

March 2001  Mr. Erani spoke with Jeff Kraws, our Gruntal analyst, and infuriated him. Mr Kraws comments were extensive and included the following: Albert shouldn't be a Chairman; didn't understand why Albert refused to raise funds when the Company needed them; Albert is financially inept; Albert highly irrational about dilution. Gruntal eventually lowered their rating on the Company and eventually withdrew coverage on the Company.

LP 000001

CONFIDENTIAL

**March 2001**    Refused to sign standard audit confirmations sent to him by PricewaterhouseCoopers, the Company's auditors, relating to his holdings of the Company's convertible debt. This eroded PricewaterhouseCoopers confidence in managements and the Boards representations.

**April 2001**    Committed to Fleet that they would be paid out by July 31, 2001 at a time when such payment would be imprudent, as the Company did not have sufficient cash to pay the bank. Did not have to make this commitment, as it was a term loan payable over the next 2 ½ years. This put further pressure on the Company due to its lack of cash at the time.

**May 2001**    Hindered the process for gaining approval to exercise the Novartis put by May 31, 2001, a commitment, which was made to Pricewaterhouse Coopers (PWC), our independent auditors. Commitment was made to gain necessary comfort letter from PWC to allow us to sell common shares under the UBS Warburg shelf program. Since then PWC has refused to grant any consents or additional comfort letters because we violated our commitment.

**June 2001**    Refused to sign annual Compensation Committee Authorization for the issuance of stock options to new hires during 2001 putting the Company at compliance risk and potentially the risk of a P&L hit at the end of the fiscal year when our independent auditors perform their audit.

**August 2001**    Met with and severely upset management team from Glenborough Properties, our Dam Road landlord. They eventually sent us a default notice with penalty payments in September 2001 and expressly stated it was motivated by Albert's mistreatment of their management in their Canton meeting.

**August 2001**    Used employees from his own Company to seek quotes from building contractors in competition with the Company's efforts to seek quotes from the same contractors causing significant confusion and loss of Company credibility with selected contractors.

On a number of occasions has encouraged the Company to prepare overly optimistic financial projections to existing and potential service

LP 000002

CONFIDENTIAL

providers including: Fleet bank, PricewaterhouseCoopers and
GMAC.

Albert continuously contacts outside service providers without
informing Company management thereby causing confusion with
Company management and the providers and loss of the Company's
credibility with the Company's service providers including:
commercial banks, investment bankers, the landlord, independent
accountants and lawyers. He essentially usurps management
authority by using his Chairmanship title.

Mr. Erani's request of information from the Company's management
has been excessive and a drain on their time. Particularly efforts
relating to relocating the Company to Rhode Island. He threatened an
employee with termination if he didn't follow his requests relating to a
Rhode Island facility.

Signed commitment for land in Rhode Island on behalf of the
Company, which resulted in cash loss to the Company of $25,000.
Land deemed to be unbuildable due to contamination.

1998 Directors and Officers insurance coverage bound without
Company officer approval. 1999 Property and Product liability
insurance coverage negotiated without Company involvement.

Put Company at risk with regard to SEC regulations by continuously
delaying the 2001 Annual meeting of Shareholders until June 21,
2001.

Signed GMAC commitment letter and lost the Company a $15,000
deposit.

The Company has received a number of complaints from
shareholders that Albert has interfered with the running of the
Company and the Company has suffered as a result of the
interference.

Brokers have called the Company to say that Albert has requested
them to manipulate the market for the Company's stock (i.e.
Karelitz).

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE ORGANOGENESIS SECURITIES LITIGATION | **MASTER FILE NO. 04-10027 JLT**<br><br>**CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, through their attorneys, bring this action on behalf of themselves and all others similarly situated, on personal knowledge as to themselves and their activities, and on all other matters based upon the investigation of counsel, including, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Organogenesis, Inc. ("Organogenesis" or the "Company"), securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, newspaper articles and media reports about the Company, and interviews with former employees of the Company and other companies who are knowledgeable about the businesses of those companies. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF THE COMPLAINT

1.    This is a federal class action on behalf of purchasers of the securities of Organogenesis between November 15, 1999 and February 7, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Throughout the Class Period, Organogenesis was a Company with only one
commercially available product — Apligraf, a unique skin replacement therapy used for severe
skin wounds.  Thus, most if not all of the Company's revenues were generated from the sale of
Apligraf.  Organogenesis describes Apligraf as having a structure similar to human skin and as
being a "skin construct," composed of living cells.  The product's human skin-like properties
allow this product to be used by doctors to aid in the healing of certain types of skin ulcers, and
other epidermal injuries.

3.      At all times throughout the Class Period, defendants were well aware that the
Company's business model was entirely dependent upon their ability to mass-produce Apligraf
and market it to physicians as an "off-the-shelf," cost-effective product that doctors could use on
patients absent hospitalization.    While the Company encountered some difficulties in
manufacturing and marketing Apligraf during the first half of 1999, by the inception of the Class
Period, defendants assured investors:

(a)      that Organogenesis maintained the expertise and ability to manufacture
sufficient quantities of Apligraf so that it was foreseeable that the Company could achieve
economies of scale and achieve profitability through the sales of only this product;

(b)      that  the Company maintained marketing agreements with experienced
partners such as defendant Novartis Pharma AG ("Novartis"), which would allow Organogenesis
to obtain the marketing support necessary to sell sufficient quantities of Apligraf, while at the
same time retaining enough of the revenue split in these deals to fund operations and achieve
profitability; and

2

(c)    that between the Company's marketing agreements with Novartis and others, and through other foreseeable sources of available debt and equity, Organogenesis could foreseeably achieve profitability and commercial self-sufficiency.

4.    Thus, by the inception of the Class Period, while it was fully disclosed that the Company would need to raise additional funding at some point in the future to increase production and distribution, throughout the Class Period, defendants consistently reported that Organogenesis had the necessary funding in place to allow it to achieve the Company's stated, foreseeable near-term objectives. In fact, according to the Company's 1999 Form 10-K, filed with the SEC on or about March 29, 2000, Organogenesis stated that, *"future capital comprised of product sales, research and development support payments and debt and equity financings will be sufficient to fund future operations into 2001 . . ."*

5.    Accordingly, throughout the Class Period, plaintiffs and other members of the Class were led to believe that Organogenesis was able to manufacture Apligraf in sufficient quantities and that other sources of funding were available such that the Company would be able to achieve profitability in the foreseeable near-term. Defendants repeatedly stated that Organogenesis' results were *"consistent with the transition in progress from a research focused company to a research based operating company with a novel medical product in introduction phase,"* and that the Company was operating according to defendants' plan for sufficiency. Central to defendants' plan was a key agreement with Novartis, Organogenesis' Apligraf marketing partner, which purportedly allowed Organogenesis to access *at least $20 million* from Novartis through the exercise of a "put" option.[1] Defendants represented to investors that this

---

[1] A "put" option is an option contract that gives the holder (here, Organogenesis) the right to sell a certain quantity of an underlying security to the writer of the option (here, Novartis), at a specified price up to a specified date.

agreement allowed the Company to raise this money at "any time" during the Class Period, "at [the Company's] discretion and at [the Company's] option," and thereby maintain a large mega-million dollar "safety net" for the Company. The Novartis put option agreement was, therefore, during the Class Period, a critical part of the Individual Defendants' announced plan to achieve profitability and to avoid bankruptcy.

6.      At all times during the Class Period, therefore, Organogenesis represented that it was able to make Apligraf commercially available in a cost-effective manner which — even if the Company were forced to incur losses at the early stages of development — would allow Organogenesis to ramp up production and soon be able to fund operations from sales. Both prior to and during the Class Period, defendants consistently represented that the Company was sufficiently well funded, or had access to sufficient funding to carry out defendants' business plan.

7.      Unbeknownst to investors, however, the reality was far different than defendants' representations. In the words of one former employee who worked at Organogenesis during the Class Period, "*it was always a series of smoke and mirrors*." According to a confidential document created in October 2001 by defendant Arcari, then the Company's Chief Financial Officer (the "Confidential Arcari Document") — which has since been obtained by Plaintiffs' counsel in the course of their investigation of this action — the Company was informed by stock brokers in 2001 that defendant Erani, then Chairman of the Company's board of directors, sought to have them "*manipulate the market for the Company's stock*." According to the Confidential Arcari Document, defendant Erani also "encouraged the Company to prepare *overly optimistic financial projections* to existing and potential service providers." Neither defendant Arcari, the

4

other defendants, nor the Company ever disclosed this scheme to manipulate the Company's

stock to the public and overstate the Company's financial projections.

       8.     In furtherance of this scheme defendants withheld from investors the true facts

about the Company's dismal and ever-deteriorating financial condition and business prospects.

Throughout the Class Period, the Company was suffering from a host of undisclosed adverse

factors that were negatively impacting its business and that would cause it to report declining

financial results — materially less than the market expectations defendants had caused and

cultivated — and eventually to file for bankruptcy. In particular:

- At all times during the Class Period, *it was not true that defendants could achieve profitability through the sale of Apligraf under the terms, or even the revised terms, of the Novartis marketing agreement,* which did not provide Organogenesis with enough of the revenues or profits provided through such Apligraf sales to offset the extremely high cost of production or to offset other undisclosed manufacturing problems such as defective products and recalls. Indeed, as defendants were well aware but did not publicly disclose, throughout the Class Period the Company was actually *losing money on every unit of Apligraf sold due to the adverse terms of the marketing agreement with Novartis.*

- Throughout the Class Period, undisclosed problems related to the manufacture and marketing of Apligraf were leading to even higher costs and further reducing profitability. Manufacturing problems and delays were retarding production scale, and marketing issues were reducing sales and damaging future sales development prospects. As plaintiffs would only learn following the Class Period, Novartis' inexperienced and inadequately trained sales force was encountering resistance throughout that time concerning the cost and complexity of its products and the actual and/or perceived difficulties in physician reimbursement for Apligraf.

- Throughout the Class Period, Organogenesis was underfunded and there was no reasonable basis to report that the Company could foreseeably fund operations throughout the Class Period, based on product sales, available sources of loans, debt and/or equity sales. Indeed, defendants knew but did not disclose that, as reported by defendant Arcari in the Confidential Arcari Document, *the Company's own auditors — defendant PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") — had in 2001 "refused to grant any consents or additional comfort letters"* for future financing initiatives and that the Company had lost credibility in the eyes of PricewaterhouseCoopers. Moreover, as defendants were well aware but failed to disclose to investors, it was not true that the Company could access the full complement of funding from Novartis as defendants consistently represented, given that certain undisclosed conditions precedent existed. *Organogenesis could not meet conditions*

*precedent to Novartis' requirement to provide at least $10 million of its purported commitment to Organogenesis.* It also was not true that other sources of funding remained available so that the Company could preserve corporate viability.

•        Throughout the Class Period, defendants failed to disclose that high management turn-over at the Company and in-fighting among its senior officers and directors was having, and would continue to have, a disruptive effect on the operations and oversight of Organogenesis, such that it was also not foreseeable at any time during the Class Period that Organogenesis would be able to achieve profitability in the near-term or to attain the guidance sponsored and/or endorsed by defendants.

•        As a result of the aforementioned adverse conditions that defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Organogenesis was operating according to plan, that sufficient sources of funding were achieved and/or available to Organogenesis or that the Company could maintain profitability or even remain a viable entity in the foreseeable near-term.

9.        Defendants were motivated to and did embark on this scheme to "manipulate the market for the Company's stock," to conceal the true operational and financial condition of Organogenesis, and to materially misrepresent and fail to disclose the conditions that were adversely affecting Organogenesis throughout the Class Period, because *it enabled the Company and Company insiders, including certain defendants, to register for sale and/or sell over 6 million shares of Company stock and/or securities valued at over $68 million, prior to any proper disclosure to the market.*

10.        Defendants' scheme also, ultimately, allowed defendants Erani and Ades and their family members to improperly acquire the remaining assets of Organogenesis through a leveraged buyout during bankruptcy — after defendants' actions drove the Company into bankruptcy and after they sufficiently interfered with these proceedings so as to guarantee that Erani and Ades and their family members acquired total domination and control over what was left of Organogenesis.

11.        Thus, through their illegal and improper actions which ultimately forced the Company into bankruptcy, defendants not only were able to wipe out the equity interest of all of

the Company's outside shareholders, but they were also able to renegotiate their agreement with Novartis — *which, as defendants knew, throughout the Class Period was causing the Company to lose money on every unit of Apligraf.*

12.    During the Class Period, defendant PricewaterhouseCoopers, the Company's purported independent auditors, participated in this scheme in the following ways:

(a)    PricewaterhouseCoopers recklessly disregarded suspicious behavior by the Company's Chairman, which impugned his integrity and caused PricewaterhouseCoopers to lose faith in the credibility of the Company's officers and directors and failed to disclose the truth about PricewaterhouseCoopers' true opinion of the Company's officers and directors. According to the Confidential Arcari Document, by March 2001 *PricewaterhouseCoopers' "confidence in managements [sic] and the Boards [sic] representations" had been "eroded."* Further, other actions by Erani caused a "loss of the Company's credibility" with PricewaterhouseCoopers. At no time during the Class Period did PricewaterhouseCoopers ever disclose this erosion of its confidence in the Company's management and Board or the loss of the Company's credibility in the eyes of PricewaterhouseCoopers.

(b)    Despite this lack of confidence in the integrity of the Company's representations, PricewaterhouseCoopers continued to certify the Company's year-end financial statements and its cash position;

(c)    PricewaterhouseCoopers failed to disclose that, as a result of Company's violation of a commitment to PricewaterhouseCoopers in connection with the exercise of the first tranche of the Novartis put option in May 2001, PricewaterhouseCoopers informed defendants that it refused to support any future financing initiatives by the Company. According to the Confidential Arcari Document, defendant Erani "[h]indered the process for gaining approval to

7

exercise the Novartis put option by May 31, 2001, a commitment, which was made to PricewaterhouseCoopers (PWC), our independent auditors." The Company had made this commitment to exercise the put option to PricewaterhouseCoopers in order to "gain [sic] necessary comfort letter from PWC to allow us to sell common shares" under an equity offering with UBS Warburg. The Confidential Arcari Document states that "*[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment.*"[2] PricewaterhouseCoopers, however, never publicly disclosed the Company's "hindering" of the process for obtaining critical funding or its own refusal to support the Company's future financing initiatives; and

> (d)    PricewaterhouseCoopers consistently failed to alert investors to the fact that, throughout the Class Period, the Company lacked the ability to fund operations through product sales, or that Organogenesis was actually losing money on each sale of Apligraf due to the disadvantageous terms, or revised terms, of the Novartis marketing agreement.

13.    It was only after the end of the Class Period, after the Company had finally disclosed that it was impossible to fund operations with product sales that PricewaterhouseCoopers belatedly issued a "going concern opinion" on the Company — an opinion that should have been in place at least since the inception of the Class Period.

14.    It was only beginning on January 30, 2002 that the truth about Organogenesis began to emerge. On that day, defendants announced that the Company was running out of money and would be forced into insolvency unless it could raise at least $15 million in the immediate near term. At the same time, the Company also disclosed that it would not be able to

---

[2] A "comfort letter" is an auditor's statement provided to a company preparing for a public offering, confirming that unaudited financial data in the prospectus follows Generally Accepted Accounting Principles.

access the $10 million funding commitment from Novartis that they had previously touted as a "safety net" because of significant conditions precedent to that funding — conditions that defendants had never before disclosed. Defendants also revealed that, contrary to their previous representations that the Company could remain properly funded and could achieve profitability, the "*extent of future losses and the time required to achieve profitability are highly uncertain, and we may never achieve a profitable level of operations or, even if we achieve profitability, we may not be able to sustain it on an ongoing basis.*" Defendants also announced that because of the Company's inability to raise necessary funds it might be forced to "*curtail or discontinue our activities.*"

15.    In the wake of these disclosures, shares of Organogenesis fell to as low as $1.32 on February 7, 2002 — a decline of almost 95% compared to the Class Period high of over $22.00 per share reached on March 7, 2000.

16.    In September 2002, the Company filed for bankruptcy protection — from which it later emerged under a plan that allowed defendants Erani and Ades to buy the Company at a steep bargain while liquidating the Company's stock — thus leaving the Company's shareholders with *nothing*.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under, and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and

28 U.S.C. § 1391(b).   Organogenesis maintains its principal place of business in this District and

many of the acts and practices complained of herein occurred in substantial part in this District.

20.     In connection with the acts alleged in this complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## PARTIES

21.     Court-appointed lead plaintiffs Bruno Hofmann, John Bowie, Richard Madigan

and Richard Conen purchased the common stock of Organogenesis at artificially inflated prices

during the Class Period and have been damaged thereby.  The certifications of the lead plaintiffs

in this action previously have been filed with the Court.

22.     Non-party Organogenesis is a Delaware corporation with its principal place of

business at 150 Dan Road, Canton, MA 02021.  Organogenesis designs, manufactures and sells

medical products containing living cells and/or natural connective tissue, including living tissue

replacements, cell-based organ asset devices and other tissue-engineered products.     The

Company's lead product, Apligraf living skin construct, is promoted as being the only product

containing living human cells to gain Food and Drug Administration ("FDA") marketing

approval in the United States.

23.     Non-party Novartis Pharma Ag is a Swiss-based pharmaceutical and drug

company with substantial operations in the United States, which throughout the Class Period was

the purported marketing partner of the Company and a principal shareholder in Organogenesis,

10

holding as many as 2.88 million shares, or more than 6% of the Company's shares issued and outstanding during that time.

24.    Defendant **PRICEWATERHOUSECOOPERS LLP** was, throughout the Class Period, the purported independent auditor of the Company.

25.    Defendant **PHILIP LAUGHLIN** ("Laughlin") was during the relevant period, President and a Director and member of the Company's Executive Committee of Organogenesis. Defendant Laughlin assumed these positions immediately prior to the inception of the Class Period, on or about, October 5, 1999 and later, on or about January 1, 2000, also assumed the role of Chief Executive Officer.  Defendant Laughlin retained these positions of power and control over the Company until his sudden and unexpected departure, which was announced on or about May 16, 2001.  During the Class Period, defendant Laughlin, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

26.    Defendant **MICHAEL SABOLINSKI** ("Sabolinski") was during the Class Period, President, Chief Executive Officer and a member of the Board of the Company, having assumed those positions on or about May 16, 2001, upon the resignation of defendant Laughlin. Prior to assuming the aforementioned positions and also during the Class Period, defendant Sabolinski also served as the Company's Senior Vice President, Medical and Regulatory Affairs. Defendant Sabolinski abandoned his position at the Company on or about April 5, 2002, less than one year after assuming the leadership of Organogenesis.  During the Class Period, defendant Sabolinski, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

27.    Defendant **ALBERT ERANI** ("Erani") was during the relevant period, a member of the Board of the Company and on or about January 1, 2000 assumed the role of Chairman of

11

the Board of Organogenesis. Defendant Erani served as Chairman of the Board of the Company until his sudden and unexpected departure on or about January 4, 2002. During the Class Period, defendant Erani, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

28.    Defendant **ALAN ADES** ("Ades") was nominated and appointed Chairman, President and Chie Executive Officer of the Company following the end of the Class Period on or about October 2002. Defendant Ades is the cousin of defendant Erani, and was also a member of the group of investors who took the Company private through a leveraged acquisition in bankruptcy. Defendant Ades was an active participant in the fraud alleged herein. It has been reported that defendant Ades, with the aid and complicity of other defendants named herein, acted to assure that other interested parties were not able to successfully participate in the ultimate sale of the Company and that defendant Ades, with the aid and complicity of other insiders, was then able to acquire the Company for a lower price, further depriving investors of a return on their investment in Organogenesis.

29.    Defendant **DONNA ABELLI LOPOLITO** ("Lopolito") was during the relevant period, Chief Financial Officer and Vice President, Finance and Administration of Organogenesis. During the Class Period, defendant Lopolito, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

30.    Defendant **JOHN J. ARCARI** ("Arcari") was during the relevant period, Chief Financial Officer and Vice President - Finance and Administration of Organogenesis, having replaced defendant Lopolito on or about April 30, 2000. Defendant Arcari served in the aforementioned positions until his sudden and unexpected departure on or about May 14, 2002.

12

During the Class Period, defendant Arcari, *inter alia*, signed the Company's materially false and misleading SEC filings, as set forth herein.

31.    Defendant **HERBERT M. STEIN** ("Stein") was at the inception of the Class Period, Chairman of the Board and Chief Executive Officer, until his resignation on or about January 1, 2000.    Upon his retirement from the aforementioned positions, defendant Stein remained at the Company as a member of the Board and Chairman Emeritus until March 2000. During the Class Period defendant Stein made materially false and misleading statements about the Company and/or failed to disclose material information necessary to make such statements not false.    During the Class Period, defendant Stein also signed the Company's SEC filings, including, but not limited to, Organogenesis' Form 10-Q for the third quarter of 1999 and the materially false and misleading Registration Statements (including the Company's Registration Statements filed on December 27, 1999, the amended Registration Statement filed on February 3, 2000, and the second amended Registration Statement, filed on February 14, 2000) issued in connection with the sale and offering of stock by the Company.

32.    Defendant **ALAN W. TUCK** ("Tuck") was during the Class Period, Chief Strategic Officer of the Company.    During the Class Period, defendant Tuck also made materially false and misleading statements during the Class Period, as set forth herein.

33.    The defendants referenced above in paragraphs 25-32 are referred to herein as the "Individual Defendants."

34.    Because of the Individual Defendants' positions with the Company, or relations with Company insiders, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's

13

operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith and/or otherwise actively participated in the fraudulent scheme alleged herein.

35.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of these defendants, by virtue of their high-level positions with the Company and/or relations with company insiders, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein and/or otherwise actively participated in the fraudulent scheme alleged herein. These defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

36.    As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the American Stock Exchange (the "AMEX"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information

14

with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

37.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature and/or otherwise actively participated in the fraudulent scheme alleged herein. Because of their Board membership and/or executive and managerial positions with Organogenesis, each of the Individual Defendants had access to the adverse undisclosed information about Organogenesis' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Organogenesis and its business, or adopted by the Company, materially false and misleading and/or otherwise actively participated in the fraudulent scheme alleged herein.

38.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, or relations with officers and/or directors, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be

15

corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein and/or otherwise actively participated in the fraudulent scheme alleged herein.

39.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Organogenesis common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.    The scheme:    (i) deceived the investing public concerning defendants' attempt to manipulate the market for the Company's stock; (ii) deceived the investing public regarding Organogenesis' business, operations, management and the intrinsic value of Organogenesis common stock; and (iii) enabled the defendants and Company insiders to sell and/or register for sale over $68 million worth of Company stock to investors during the Class Period — of this amount defendants sold over 5 million shares of the Company's securities in a series of public stock offerings, private equity offerings and other debt and/or equity sales of Organogenesis stock; and (iv) caused plaintiffs and other members of the Class to purchase Organogenesis securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Organogenesis between November 15, 1999 and February 7, 2002 inclusive (the "Class") and who were damaged thereby.    Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16

41.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Organogenesis common shares were actively traded on the American Stock Exchange. As of November 2, 2001, the Company had over 37.0 million shares issued and outstanding. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Organogenesis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

44.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Organogenesis; and

17

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

45.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

46.    **The Company**. Organogenesis was organized as a Delaware corporation in 1985. Throughout the Class Period, Organogenesis described itself as a "tissue engineering firm" that designs, develops and manufactures medical products containing living cells and/or natural connective tissue.    For Organogenesis, tissue engineering involves developing and manufacturing medical products containing actual living human cells.

47.    **Operations**.    Prior to the inception of the Class Period, Organogenesis appeared to be a Company with a very unique product, but a Company that was research-centric and which had little product manufacturing experience. Complicating matters, the Company's main product, Apligraf a "tissue replacement" therapy, discussed in more detail below, was difficult to manufacture and required very specialized manufacturing procedures and techniques. As evidence of the difficulties associated with Apligraf production during mid-1999, the Company was even forced to recall several lots of Apligraf — accounting for more than 10% of monthly production at that time — for contamination reasons. In addition to manufacturing issues, the marketing of Apligraf was also difficult because, until early in the Class Period, Apligraf had *not*

18

been approved for Medicare or Medicaid reimbursement — leaving doctors with a vast array of red tape to get reimbursed for the product.

48.     The manufacture and marketing of Apligraf proved so difficult that in the year prior to the inception of the Class Period, sales of Apligraf were well below expectations. In fact, when the Company reported fiscal year 1998 results in March 1999, Organogenesis reported Apligraf sales of only $335,000 — well below product sales of $1.3 million that defendants had guided the market to expect. The result of these lower-than-expected sales was larger losses, and by the end of the fourth quarter of 1998 the Company had posted a loss of $0.19 per share.

49.     Although during 1999 defendants reported less than consistent sales of Apligraf, the trend overall, bolstered by defendants' guidance, appeared bullish. For example, in April 1999, the Boston Business Journal reported the view of an investment analyst for Moors & Cabot, Inc. that Apligraf was a "revolutionary" product and a "major medical breakthrough" for which "it's simply a matter of time before it wins wide acceptance."

50.     The manufacturing and marketing problems which limited the sale of Apligraf also raised issues concerning the funding of the Company and its ability to remain in operation long enough to achieve profitability. In this regard, while the Company initially had issued very aggressive predictions, forecasting operational break-even by the fourth quarter of 1999 and full funding by that time, by the inception of the Class Period, defendants had already revised these expectations and had taken a relatively longer-term view towards profitability. By the inception of the Class Period, and at all times thereafter, however, defendants consistently reported that sufficient sources of funding were available, that Organogenesis received or would receive

19

sufficient profits from sales of Apligraf and that the Company still expected to achieve profitability in the foreseeable near-term.

51.    **Funding Representations.**  Thus, by the inception of the Class Period, while it was fully disclosed that the Company would need to raise additional funding at some point in the future to increase production and distribution, by this time and consistently thereafter, defendants reported that Organogenesis had the necessary funding in place to allow it to achieve the Company's stated, foreseeable near-term objectives.  In fact, according to the Company's 1999 Form 10-K, filed with the SEC on or about March 29, 2000, Organogenesis stated that, *"future capital comprised of product sales, research and development support payments and debt and equity financings will be sufficient to fund future operations into 2001,"* and additional sources could be relied on to fund operations thereafter.

52.    Moreover, according to statements made by defendants and filed with the SEC, while there could be "no assurance" that additional funding might not be required, Organogenesis' funding already was in place and sufficient.  According to defendants, by the inception of the Class Period, the Company was sufficiently funded barring only unforeseen circumstances, unplanned contingencies, "delays," or unexpected "changes," such as the following:

•    Delays in obtaining regulatory approvals of products, and timing of product launches;

•    Delays in commercial acceptance and reimbursement when product launches occur;

•    Changes in the progress of research and development programs; and

•    Changes in the resources devoted to outside research collaborations or projects, self-funded projects, proprietary manufacturing methods and advanced technologies.

20