# EXHIBIT 4
# (Pt. 3)

revenue" were untrue and materially misleading.  As confirmed by former employees of the Company, even under the revised terms of the marketing agreement, Organogenesis' share of revenue from Apligraf sales remained well below Organogenesis' manufacturing costs and could not lead to profitability.  Further, even under the revised terms of the marketing agreement, Organogenesis was still required to manufacture Apligraf in conformity with Novartis sales forecasts, which, according to a former employee of Organogenesis, were "always inflated."

        (f)    Contrary to defendant Laughlin's representation that "the increased revenue" and "the funding support that we will get" put the Company in the position to "pass through break even and reach profitability" by the third quarter of 2002, defendants knew that there was no way the Company could ever achieve profitability — much less achieve it by the third quarter of 2002 — based on the increased revenue from the revised Novartis marketing agreement and the $20 million put option with Novartis.  Defendants were aware under the revised agreement Organogenesis would continue to lose money on every unit of Apligraf produced.  Further, as defendants knew but did not disclose at the time, the Company did not have the ability to raise the full amount of the $20 million put option.

        (g)    Contrary to defendant Laughlin's representation that the Company expected to "break even with or without" approvals of additional products, defendants knew that given the Company's loss of money on every unit of Apligraf under the revised Novartis marketing agreement and the restrictions on the exercise of the $20 million put option there was no way that the Company could break even based on sales of Apligraf alone.

        109.   **Needham Report.**  Following defendant Laughlin's well received CNBC appearance, analysts at Needham & Co. issued a report on Organogenesis, initiating a "Buy"

rating and a near term price target of $16-$18 per share on Organogenesis stock, and stating in part the following:

> INVESTMENT OPINION
>
> We are initiating coverage of Organogenesis Inc. with a *Buy rating and a 12-month target price range of $16-$18.* Management of skin disorders requiring tissue replacement represents a major unmet need. A leader in its segment of the $400 billion healthcare arena of regenerative medicine, ORG has developed Apligraf, currently approved for two of the most common chronic wounds (venous stasis ulcers and diabetic foot ulcers).
>
> *   *   *
>
> *We believe ORG is currently undervalued compared to its peers.* Applying two methods of valuation (market capitalization to revenue ratio of 11x as well as P/E ratio of 35x) to our 2004 estimates and discounting back at 10% annually, *we arrive at a 12-month target range of $16-$18.* [Emphasis added.]

110.    **Apligraf Sales 2/01.** On March 5, 2001, Organogenesis announced that sales of Apligraf had reached another monthly record, with 1729 units sold in February 2001. In addition, this release again quoted defendant Arcari who stated that, *"Apligraf sales are showing sustained growth acceleration.* Average daily sales in February surpassed those in January, and both are ahead of the level seen in our record fourth quarter. *We are particularly pleased with this acceleration, because under the recently amended agreement with Novartis, Organogenesis now receives significantly higher payments for Apligraf."* [Emphasis added.]

111.    **Erani's Refusal To Provide Standard Audit Confirmations to PricewaterhouseCoopers.** Unbeknownst to the public, as stated by defendant Arcari — then the Company's CFO — in the Confidential Arcari Document obtained by plaintiffs' counsel, in March 2001 defendant Erani, then Chairman of the Board of Organogenesis, "[r]efused to sign standard audit confirmations sent to him by PricewaterhouseCoopers, the Company's auditors, relating to his holdings of the Company's convertible debt." According to the Confidential Arcari Document, "this eroded PricewaterhouseCoopers [sic] confidence in managements [sic]

61

and the Boards [sic] representations." The Confidential Arcari document further states that other

actions by Erani led to a "loss of the Company's credibility with the Company's service

providers including . . . independent accountants."

    112.   **4Q and FY:00 Results.**  On March 30, 2001, Organogenesis issued a release

published on *Business Wire* which purported to announce financial results for the fourth quarter

and full year 2000, as follows:

> For the three months ended December 31, 2000, total revenues were $1.5 million compared with $0.9 million for the same quarter in 1999.... Total operating costs and expenses were $8.5 million during the fourth quarter of 2000 compared with $8.9 million for the same quarter in 1999.... Net loss was $7.4 million ($0.21 per share) for the fourth quarter of 2000 compared with a net loss of $8.4 million ($0.27 per share) for the same quarter in 1999.

> For the year ended December 31, 2000, total revenues were $10.2 million compared with $2.7 million in 1999.... The 2000 full-year revenues include a $5 million milestone payment from Novartis for our achievement of FDA approval of Apligraf for diabetic foot ulcers. Full-year revenues also include $1.1 million in research and development support from Novartis recognized in 2000 under SAB 101. Total operating costs and expenses were $31.6 million in 2000 compared with $30.6 million in 1999.... Net loss was $22.3 million ($0.66 per share) in 2000 compared with a net loss of $28.4 million ($0.93 per share) in 1999. When the one-time cumulative effect charge against income due to adoption of SAB 101 is included, the 2000 net loss becomes $28.6 million ($0.85 per share).

In addition to the foregoing, defendant Laughlin also stated that defendants were also keeping a

tight control over expenses and costs and that Apligraf sales were driving revenues, as follows:

> Our increased product revenue in the fourth quarter reflects a significant increase in our unit sales growth rate, compared to the prior quarter. Our first quarter 2001 financials will show an *important increase in revenue due to a continuation of this higher unit growth rate* as well as the *significantly higher revenue per unit* which we now receive from Novartis. *We are keeping a tight control on our corporate expenses while implementing programs to reduce our manufacturing costs.* [Emphasis added.]

    113.   **2000 Form 10-K.**  The same day, March 30, 2001, Organogenesis also filed with

the SEC its financial results for full year 2000, pursuant to Form 10-K, signed by defendants

Laughlin, Erani and Arcari, among others.   In addition to repeating many of the same misrepresentations made in the Company's release, the 2000 Form 10-K also stated that Apligraf was "**mass-produced**" and "**available to physicians on demand.**"   In the section of the Form 10-K entitled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") defendants also touted the purported benefits of the recent amendment to the Novartis marketing agreement, stating that the amendment "**significantly increases payments we receive for Apligraf units.**"   The MD&A section of the Form 10-K further stated that although Organogenesis had "limited experience in sales, marketing and distribution" the Company had "developed a **long-term strategic relationship with Novartis, who has marketing and sales forces with technical expertise and distribution capability.**"   The MD&A section of the Form 10-K also stated that "**[w]e expect  Apligraf  commercial sales to continue to increase**" and that "**[w]e expect production volume to increase due to recent Medicare progress with coverage for Apligraf,** FDA approval of Apligraf for use in diabetic foot ulcers and **expanded Novartis sales and marketing support.**"   The MD&A section of Form 10-K also touted the Company's purported ability to access funding from Novartis and other sources of capital, stating that:

> Based upon our current plans, **we believe existing working capital at December 31, 2000, together with the proceeds of product and other revenues in 2001 and proceeds available from exercising a portion or all of a $20,000,000 equity security put with Novartis, which is at our discretion, will be sufficient to finance operations through at least the first quarter of 2002.** We expect to raise additional funds in 2001 through equity financing. [Emphasis added.]

114.     Despite the erosion of PricewaterhouseCoopers' confidence in the representations of the senior officers and directors of Organogenesis and the "loss of the Company's credibility" with the Company's "independent accountants," as alleged above,

PricewaterhouseCoopers on March 31, 2001 issued to the Company's shareholders a "Report of

Independent    Accountants"    certifying    Organogenesis'    financial    statements.

PricewaterhouseCoopers' report, which was included in Organogenesis' 2000 Form 10-K, stated:

> In our opinion, the accompanying consolidated financial statements listed
> in the accompanying index present fairly, in all material respects, the
> financial position of Organogenesis, Inc. and its subsidiaries at December
> 31, 2000 and 1999, and the results of their operations and their cash flows
> for each of the three years in the period ended December 31, 2000 in
> conformity with accounting principles generally accepted in the United
> States of America. . . . We conducted our audits of these statements in
> accordance  with auditing standards generally accepted in the United
> States of America, which require that we plan and perform the audit to
> obtain reasonable assurance about whether the financial statements are
> free from material misstatement.

115.    During April 2001, Organogenesis also hosted presentations at additional analyst

conferences, including, but not limited to, the Tucker Anthony Sutro Capital Markets 2001

Health Care Conference, held at the Ritz Carlton in Laguna Niguel, CA, and the Fifth Annual

American Stock Exchange Emerging Growth Conference, held at the Grand Hyatt Hotel in New

York City.  On or about April 17, 2001 analysts at Needham & Co. reiterated their prior "BUY"

rating and continued to encourage investors to expect a near-term price target of $16-$18 per

share.

116.    The statements made by defendants and contained in the Company's March 5,

2001 and March 30, 2001 releases and those statements contained in Organogenesis 2000 Form

10-K, reproduced herein, *supra*, including the MD&A section of that Form 10-K were each

materially false and misleading and were known by defendants to be false at that time, or were

recklessly disregarded as such for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the

Company alleged in paragraphs 59-67, *supra*.

(b)    Contrary to defendants' representation that the $20 million put option with Novartis was available "at [Organogenesis'] discretion," the Company did not have the ability to raise the full amount of that funding option at the discretion of the Company. As defendants knew but failed to disclose at the time, significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(c)    Contrary to defendants' representation that Apligraf could be, and was being "mass-produced," according to a former Senior Manager of Quality Systems Compliance for Organogenesis during the Class Period, there was "no way" that the Company could commercially mass-produce Apligraf given the Company's inadequate production infrastructure and processes.

(d)    Contrary to defendants' representation that the Company made Apligraf "available to physicians on demand," according to a former Tissue Engineering Specialist with Novartis during the Class Period, contamination of the product frequently resulted in physicians not receiving the product when necessary, resulting in increased frustration and disappointment with the product among physicians.

(e)    Defendants' representation that "under the recently amended agreement with Novartis, Organogenesis now receives significantly higher payments for Apligraf" was materially misleading and incomplete given that even under the amended agreement Organogenesis would still receive revenue payments that were well below the product's manufacturing cost and that Organogenesis would continue losing money on every unit of Apligraf.

65

(f)      Defendants' representations touting  the "important increase in revenue," the "significantly higher revenue per unit" and the "significant[] increases" in "payments the Company receive[d] for Apligraf units" were materially misleading and incomplete for the same reasons stated in subparagraph (e) above.

(g)      Defendants' representation that they expected Apligraf "commercial sales to increase" was untrue given the marketing problems that Novartis was experiencing and would continue to experience because of inadequate marketing support and the problems with the manufacturing and distribution of Apligraf that were causing frustration among purchasers, leading to reluctance among physicians to order or re-order Apligraf and damaging Apligraf's future sales development prospects.

(h)      Defendants' representations touting "record" sales for the month of February 2001 and "sustained growth acceleration" were materially misleading and incomplete given that, as confirmed by several former employees of Organogenesis, the Company was experiencing serious manufacturing and marketing problems that were inhibiting sales and damaging future sales development prospects.  Further, as defendants knew, Novartis' marketing team did not have the proper training or experience in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly.

(i)      Contrary to defendants' representation that they were "implementing programs to reduce [the Company's] manufacturing costs," the Company was incurring significant manufacturing costs due to the fact that under the revised Novartis marketing agreement, Organogenesis was required to produce Apligraf in sufficient quantities to meet Novartis' "always inflated" sales forecasts.  According to former employees of Organogenesis, for every unit of Apligraf manufactured pursuant to Novartis' sales forecasts but not sold,

66

Organogenesis was required to bear an even greater share of the manufacturing costs than for units that were sold.

(j)    Contrary to defendants' representation that Novartis had "marketing and sales forces with technical expertise and distribution capability," Novartis' marketing team did not have the proper training, experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly. In fact, as alleged above, according to former employees of Novartis and Organogenesis, Novartis *"had no idea what they were doing"* when it came to marketing a living-tissue product like Apligraf.

(k)    Contrary to defendants' representation that they "expect[ed] production volume to increase due to recent Medicare progress with coverage for Apligraf," defendants were encountering significant physician resistance to the product due to difficulties in obtaining Medicare and Medicaid reimbursement for Apligraf.

(l)    Defendants' representation heralding "expanded Novartis sales and marketing support" was materially materially misleading and incomplete given that defendants failed to disclose that Novartis' marketing team did not have the proper training, experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf were suffering significantly. In fact, as alleged above, according to former employees of Novartis and Organogenesis, Novartis *"had no idea what they were doing"* when it came to marketing a living-tissue product like Apligraf.

(m)    Defendants' representation that it had, or had access to, sufficient funds to finance operations through "at least the first quarter of 2002" based in part on "proceeds of product," and proceeds available from the $20 million put option was untrue. As defendants were well aware but did not disclose (i) revenues from sales of Apligraf were well below costs of

production and thus the product was actually causing the Company to lose money; and (ii) significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002. Indeed, well before the end of the first quarter of 2002, the Company revealed that it *"would have to curtail or discontinue"* all operations if it could not raise additional funding.

(n)    Defendant PricewaterhouseCoopers' certification of the Company's financial statements was materially misleading and incomplete because it failed to disclose that, according to the Confidential Arcari Document, PricewaterhouseCoopers' confidence in the representations of the senior officers and directors of Organogenesis had been eroded and that the Company had lost credibility in the eyes of PricewaterhouseCoopers.

117.    **1Q:01 Results.** On April 27, 2001, defendants announced more purported good news. That day, the Company published a release, announcing results for first quarter of 2001, with product revenues "nearly triple over prior year period." This release also stated that the Company had made another amendment to its marketing agreement with Novartis which purportedly gave Organogenesis "significantly higher payments" on sales of Apligraf as well as additional funding support. In addition, this release also stated that:

> For the three months ended March 31, 2001, total revenues were $2.5 million compared with $1.2 million for the same quarter in 2000. Product sales to related party were $1.8 million in the first quarter of 2001, compared with $0.6 million for the same period in 2000, *due to increased sales of Apligraf and the higher payments Organogenesis now receives from Novartis for each unit of Apligraf.*
>
> Total operating costs and expenses were $8.6 million during the first quarter of 2001 compared with $7.3 million for the same quarter in 2000. The first quarter of 2001 cost of product sales increased by $0.7 million due to increased sales of Apligraf. During the same period, research and development costs increased by $0.6 million due to increased clinical, process development and product development expenses. General and

administrative expenses decreased slightly. Net loss was $6.5 million ($0.19 per share) for the first quarter of 2001 compared with a net loss of $6.4 million ($0.21 per share) for the same quarter in 2000. When the one-time cumulative effect in change in accounting principle charge due to the adoption of SEC Staff Accounting Bulletin No. 101 - "Revenue Recognition in Financial Statements" is included, the first quarter of 2000 net loss becomes $12.8 million ($0.41 per share).

This release also quoted defendant Arcari, as follows:

Our product margin improved significantly over last year. *Not only did product revenue increase, but per unit costs decreased as a result of process improvements. We tightly controlled our corporate expenses while increasing our investment in process development to further reduce manufacturing costs.* Under our amended agreement with Novartis, we received nearly $1.0 million in the first quarter of 2001 for manufacturing facility improvements. [Emphasis added.]

118.    **1Q:01 Form 10-Q.** On or about April 27, 2001, defendants also filed with the SEC the Company's financial results for the first quarter of 2001, the period ended March 31, 2001, pursuant to a Form 10-Q signed by defendants Laughlin and Arcari. The Company's Form 10-Q for the first quarter of 2001 contained the same materially false and misleading financial information as had been announced previously, in addition to reporting, in part, the following:

Basis of Presentation

- - - - - - - - - - - - - - - - - - - - -

The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented....*

\*   \*   \*

Costs and Expenses

69

Cost of product sales: Cost of product sales increased 50% to $2,196,000 in the first quarter of fiscal 2001, from $1,467,000 for the comparable quarter last year, due to increased unit sales of Apligraf to Novartis. *Cost of product sales includes the direct costs to manufacture and package Apligraf and an allocation of our production related indirect costs. Cost of product sales continues to exceed product sales due to the high costs associated with low volume production. We expect production volume to increase and our margins to continue to improve during 2001.* [Emphasis added.]

*       *       *

[W]e believe existing working capital at December 31, 2000, together with the proceeds of product and other revenues in 2001 and proceeds available from sales of shares to the underwriter and/or *exercising a portion or all of a $20,000,000 equity security put with Novartis, which is at our discretion, will be sufficient to finance operations through at least the first quarter of 2002.* We expect to raise additional funds in 2001 through equity financing. [Emphasis added.]

119.    The statements made by defendants and contained in the Company's April 27, 2001 release and in the Form 10-Q for the first quarter of 2001, reproduced herein, *supra*, were each materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

(b)    Defendants' representation that it had, or had access to, sufficient funds to finance operations through "at least the first quarter of 2002" based in part on "proceeds of product," and proceeds available from the $20 million put option was untrue. As defendants were well aware but did not disclose (i) revenues from sales of Apligraf were well below costs of production and thus the product was actually causing the Company to lose money; and (ii) significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

70

(c)    Contrary to defendants' representation that the $20 million put option with Novartis was available "at [Organogenesis'] discretion," the Company did not have the ability to raise the full amount of that funding option at the discretion of the Company. As defendants knew but failed to disclose at the time, significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(d)    Defendants' representations touting  the "important increase in revenue," the "significantly higher revenue per unit" and the "significant[] increases" in "payments the Company receive[d] for Apligraf units" were materially misleading and incomplete because defendants failed to disclose that even under the amended agreement Organogenesis would still receive revenue payments that were well below the product's manufacturing cost and that Organogenesis would continue losing money on every unit of Apligraf.

(e)    Defendants' representations touting a "product revenue increase," the decrease of per unit costs and its investment "to further reduce manufacturing costs" were materially misleading and incomplete given that defendants knew but failed to disclose that the Company was incurring significant manufacturing costs due to the fact that under the revised Novartis marketing agreement, Organogenesis was required to produce Apligraf in sufficient quantities to meet Novartis' "always inflated" sales forecasts. According to former employees of Organogenesis, for every unit of Apligraf manufactured pursuant to Novartis' sales forecasts but not sold, Organogenesis was required to bear an even greater share of the manufacturing costs than for units that were sold.

(f)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as

71

confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.*

(g)    Contrary to defendants' representations, the Company's Form 10-Q for the first quarter of 2001 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (f) above and in paragraphs 59-67, *supra*.

120.    **1.9 Million Share Offering**. Later the same day, April 27, 2001, Organogenesis also announced that it had filed a post-effective amendment to its registration statement covering the offering of an additional 1.9 million shares of common stock. Days later on May 8, 2001, Organogenesis published a release on *Business Wire* which announced that the Company had entered into an underwriting agreement with UBS Warburg LLC, as underwriter, providing that on any trading day during the next two years the Company could elect to issue and sell to the underwriter a number of shares of common stock that is not less than 5% and not more than 25%

72

of the average trading volume of the common stock on the American Stock Exchange for the previous five days, up to an aggregate of 1,900,000 shares.[4]

121.    Following the announcement and report of results for the first quarter of 2001, analysts at Needham & Co. again reiterated a "Buy" rating on shares of Organogenesis and continued to advise investors to expect a near-term trading price of $16-$18 per share for the Company.

122.    **Laughlin Quits.**  On May 16, 2001, the Company issued a release announcing that defendant Laughlin had suddenly resigned from Organogenesis and that Michael Sabolinski, former Senior Vice President Medical and Regulatory Affairs, would become President, Chief Executive Officer and a member of the Board of the Company.  According to the Company's release, defendant Sabolinski was primarily responsible for the development of Apligraf.  In addition, the release also noted that, "this transition occurs at an important time for Organogenesis as the Company focuses on increasing market penetration with Apligraf and leveraging core technologies to commercialize new products."  While no reason was given for defendant Laughlin's departure, defendant Sabolinski was quoted in this release as thanking defendant Laughlin for "all he achieved for Organogenesis."

123.    **$13.5 Million Equity Offering.**  On or about May 17, 2001, defendants again capitalized on the artificial inflation in the price of Organogenesis shares that their false and misleading representations had caused, and filed a Prospectus with the SEC in connection with the sale of 1.9 million shares of Organogenesis common stock priced at $7.75 per share.  Gross proceeds from the sales of these shares was estimated, at that time, at over $13.5 million.

---

[4]    The sale price of the shares to the underwriter was to be the volume-weighted average price per share at which shares of the common stock traded on the American Stock Exchange during regular trading hours on each purchase date less underwriter's commissions.

According to the Prospectus, this offering was part of the Company's previously filed, 3.0 million share Shelf Registration Statement.

124. **PricewaterhouseCoopers' Refusal to Support Additional Funding Initiatives.** Unbeknownst to the public, as reported by defendant Arcari — then the Company's CFO — in the Confidential Arcari Document obtained by plaintiffs' counsel, in May 2001 defendant Erani, then Chairman of the Board of Organogenesis, "[h]indered the process for gaining approval to exercise the Novartis put option by May 31, 2001, a commitment which was made to PricewaterhouseCoopers (PWC), our independent auditors." The Company had made this commitment to exercise the put option to PricewaterhouseCoopers in order to "gain [sic] necessary comfort letter from PWC to allow us to sell common shares" under an equity offering with UBS Warburg. The Confidential Arcari Document goes on to state that *"[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment."* PricewaterhouseCoopers apparently was sufficiently alarmed by the Company's hindrance of this process, and the violation of the Company's aforementioned commitment, that, according to the Confidential Arcari Document, it refused to issue any further "comfort letters" to the Company. PricewaterhouseCoopers, however, never publicly disclosed the Company's "hindering" of the process for obtaining this critical funding or its own refusal to support the Company's future financing initiatives.

125. **Apligraf Sales 5/01.** On June 5, 2001, Organogenesis announced that sales of Apligraf had again reached above 1750 units, for May 2001. According to defendant Sabolinski, who was quoted in the Company's release, *"[t]he May sales figures show sustained support for Apligraf use, and we have accelerated our plans to ramp up production to meet the strong growth forecast for the second half of this year."* [Emphasis added.]

126.    While sales for May 2001 were actually less than April sales (1758 units vs. 1813

units), defendants did not revise guidance in any way, and continued to advise analysts and

investors that the Company was still on track to register sequential growth in unit sales and

achieve profitability.   As evidence of defendants' further representations, on June 6, 2001,

analysts at Needham & Co. reiterated a "Buy" rating on shares of the Company, and continued to

maintain a near-term price target of $16-$18 per share.

127.    **$1.44 Million Private Placement.**   On June 18, 2001, Organogenesis raised

another $1.44 million through the sale of shares of stock through the UBS Warburg underwriting

previously announced. Pursuant to this agreement, between May 21, 2001 and June 18, 2001,

defendants caused the Company to sell over 186,000 shares of stock for at least $1.44 million.

128.    **Apligraf Sales 7/01.**   On August 2, 2001, Organogenesis announced that sales of

Apligraf reached another monthly record sales level: 2015 units sold in July 2001.  This release

also quoted defendant Sabolinski, as stating that, *"[w]e are delighted with the growth in sales*

*seen between June and July.*  Apligraf unit sales have multiple drivers in place . . . *We are*

*planning accelerating growth in Apligraf production to meet the increasing demand*

*anticipated."* [Emphasis added.]

129.    **$10 Million Equity Sale to Novartis.**   On August 7, 2001, Organogenesis issued

a release announcing that it had elected to sell $10 million in equity to Novartis, pursuant to the

terms of its amended, $20 million stock sales agreement.

130.    **2Q:01 Results.**   On August 13, 2001, defendants published a release on *Business*

*Wire*, which purported to announce financial results for the second quarter 2001, the period

ended June 30, 2001, which stated that there was "sustained market demand for Apligraf and the

75

Company *accelerated its plans to ramp up production to meet the strong sales forecast for the*

*second half of this year*," in addition to stating the following:

> Reflecting the growth in product sales and the 2001 amendment to the
> agreement with Novartis, for the three months ended June 30, 2001, product
> sales to related party were $1.7 million in 2001 compared with $0.7 million
> for the same period in 2000. Total operating revenues were $2.1 million in
> the second quarter of 2001 compared with $1.3 million for the same quarter
> in 2000, excluding a $5 million milestone payment from Novartis for the
> approval of Apligraf for diabetic foot ulcers. Total operating costs and
> expenses were $ 9.1million during the second quarter of 2001 compared
> with $8.0 million for the same quarter in 2000, excluding a $1.2 million
> ($0.04 per share) one-time severance expense in 2001 for a former
> executive officer. Cost of product sales increased by $1.3 million due to
> increased sales of Apligraf and ramping up production to meet anticipated
> increased demand; research and development as well as general and
> administrative costs slightly decreased. Net loss was $8.6 million ($0.25 per
> share) for the second quarter of 2001 compared with a net loss of $1.8
> million ($0.05 per share) for the same quarter in 2000.
>
> *    *    *
>
> [Defendant] Arcari said, *"Our year-to-date revenue from product sales is*
> *nearly triple that of the same period last year. Our cost of goods per unit*
> *compares favorably with the same period last year*, but is up moderately
> from the previous quarter due to accelerating our plans to ramp up
> production. To strengthen our cash position, we have exercised our right to
> sell Novartis $10 million in equity. *We retain the right to sell Novartis an*
> *additional $10 million in equity.*" [Emphasis added.]

131.   **2Q:01 Form 10-Q.** The following day, August 14, 2001, the Company also filed

with the SEC the Company's financial results for the second quarter of 2001, the period ended

June 30, 2001, pursuant to a Form 10-Q signed by defendants Sabolinski and Arcari.   The

Company's Form 10-Q for the second quarter of 2001 contained the same materially false and

misleading financial information as had previously been announced, in addition to reporting, in

part, the following:

> Basis of Presentation
>
> - - - - - - - - - - - - - - - - - - - - - -

76

The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X.... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented....*

*    *    *

COSTS AND EXPENSES

Cost of product sales: Cost of product sales for the quarter ended June 30, 2001 increased 82% to $2,837,000, from $1,557,000 for the comparable quarter last year. Cost of product sales for the six-month period ended June 30, 2001 increased 66% to 5,033,000, from $3,024,000 for the comparable period last year. These increases were due to increased unit sales of Apligraf to Novartis, additional scrap costs and higher allocations of depreciation and occupancy costs. Cost of product sales includes the direct costs to manufacture, quality inspect and package Apligraf and an allocation of our production-related indirect costs. Cost of product sales continues to exceed product sales due to the high costs associated with low volume production. *We expect production volume to increase and our margins to continue to improve during 2001. We expect that we will have to revise standard costs and the allocation of costs to product sales in the future as we continue to modify our manufacturing processes.* [Emphasis added.]

132.    In addition to the foregoing, the Form 10-Q for the second quarter of 2001 also reported that the Company paid severance to a retiring senior executive, as follows:

Severance Agreement:

- - - - - - - - - - - - - - - - - - - -

In May 2001, we entered into a separation of employment agreement with a former executive officer, which resulted in the recording of a one-time severance expense of $1,233,000 during the quarter ended June 30, 2001. The separation of employment agreement provides for amounts to be paid over two years and supercedes the previous employment agreement. It has been filed as exhibit 10(ff) to this Form 10Q.

77

Attached to the Form 10-Q for the second quarter of 2001 was a copy of defendant Laughlin's May 2001 Severance Agreement which reported that the vast majority of the Company's $1.233 million charge was to cover the cost of payments made by Organogenesis directly to Laughlin.

133.    The statements made by defendants on June 5, 2001 and contained in the Company's August 2, 2001 and August 13, 2001 releases and in the Company's Form 10-Q for the second quarter of 2001, reproduced herein, *supra*, were each materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such for the following reasons:

(a)    Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

(b)    Defendants' announcement that the Company had elected to sell $10 million in equity to Novartis, pursuant to the terms of its amended $20 million stock sales agreement was materially misleading and incomplete given that defendants knew but failed to disclose that the Company was informed that defendant Erani had sought to have stock brokers "*manipulate the market for the Company's stock*."

(c)    Contrary to defendants' representation that Organogenesis "retain[s] the right to sell Novartis an additional $10 million in equity," the Company did not have the ability to raise the full amount of that funding option at the discretion of the Company. As defendants knew but failed to disclose at the time, significant conditions precedent to the exercise of the put option prevented the Company from accessing $10 million of the put option funding, which ultimately led to the Company's inability to fund operations in 2002.

(d)    Defendants' representations touting "sustained support for Apligraf use," "sustained market demand for Apligraf," the acceleration of a plan to "ramp up production to

78

meet the strong growth forecast for [the] second half of this year" and the "increasing demand anticipated" were materially misleading and incomplete given that defendants knew but failed to disclose that significant manufacturing and distribution problems, contamination issues, inadequate marketing support, and difficulties in obtaining reimbursement for Apligraf were causing increasing frustration among physicians, who were becoming less willing to order or re-order Apligraf for their patients. Further, defendants knew but failed to disclose that the purported "strong growth forecast" and "increasing demand anticipated" for Apligraf were illusory, given that, as confirmed by a former employee of Organogenesis, Novartis' sales forecasts were "always inflated."

        (e)     Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.*

(f)     Contrary to defendants' representations, the Company's Form 10-Q for the second quarter of 2001 did not reflect the true financial condition of the Company because it failed to disclose the adverse factors affecting the Company's operations and future viability alleged in subparagraphs (a) through (e) above and in paragraphs 59-67, *supra*.

134.     **Needham Report.**  The materially false and misleading statements issued by defendants had their intended effect.  Following the publication of Organogenesis' second quarter 2001 results, on August 14, 2001, Needham issued another report on the Company which again reiterated a "Buy" rating and issued a near-term price target of $16-$18 per share, and stating the following:

> We reiterate our BUY rating and 12-month target range of $16-$18. We used two methods to reach this valuation target.  In the first instance, we applied a market capitalization to revenues ratio of 11x for the year 2004. In the second instance, we applied a 35x multiple to the 2004 estimates.  To both these calculations, we used a 10% discount per year, given the fact that Apligraf is already on the market thereby less product uncertainty exists. Using these metrics, we arrived at a target price range of $16-18.

135.     **Apligraf Sales August 2001.**  On September 6, 2001, Organogenesis issued a release which announced that sales of Apligraf reached another monthly record sales level, with 2150 units sold in August 2001.  This release also quoted defendant Sabolinski, who stated that, *"We are pleased with the sustained strength in Apligraf sales that has been seen through the summer months.  We are on track for the third quarter of 2001 to have substantially higher sales than our record second quarter."* [Emphasis added.]

136.     On September 7, 2001, defendants published a release which purported to announce that Organogenesis had increased its capacity to manufacture Apligraf.  Accordingly, the Company's release quoted defendant Sabolinski, who stated the following:

> Our Company is now producing Apligraf at a rate of over 40,000 units per year. I am pleased that the manufacturing ramp-up I committed to when I became CEO in May is on track. *We anticipate increasing this production*

80

*rate in the near term to meet forecasted demand.* The demand has been driven by an increase in sales and marketing activity, the diabetic foot ulcer supplement approval, and favorable reimbursement policies in the hospital and physician's office. [Emphasis added.]

137.    On or about September 21, 2001, *Dow Jones* news service reported that Apligraf had received Medicare reimbursement in all 50 states.

138.    **3 New Products.**  On September 24, 2001, Organogenesis issued a release announcing that its experiences selling Apligraf had been so successful that defendants would begin commercializing three additional new proprietary products during the fourth quarter of 2001. According to the release, these products would be marketed directly by Organogenesis using its own marketing personnel and this purportedly would "*advanc[e] the Company from a research, clinical/regulatory, manufacturing Company to a fully integrated medical products Company.*" [Emphasis added.]  This release also quoted defendant Sabolinski, as follows:

> Commercializing our own products, with our own sales and marketing team, brings Organogenesis to *a new stage.* We receive the full revenue from the products we commercialize ourselves, which will add to our revenue stream beginning in October. *We look forward to these products contributing to the overall profitability of the Company.* Having our own sales force also paves the way for Organogenesis commercializing additional products in the future. [Emphasis added.]

139.    **Apligraf Sales 3Q:01.**  On October 4, 2001, Organogenesis issued a release which purported to announce strong sales of Apligraf during the third quarter of 2001, with 6606 Apligraf units sold during the quarter.  In addition to the foregoing, this release also quoted defendant Sabolinski, who stated that, "*[t]his has been a very significant quarter for the Company. Apligraf sales continue to increase* and the product is now reimbursed by Medicare in all fifty states. . . . In addition, we received marketing clearance for the third FortaFlex(TM)-based product, FortaGen(TM), and plan to launch four new products in October by an Organogenesis Institutional sales force." [Emphasis added.]

140.    On or about October 9, 2001, Organogenesis presented at the UBS Warburg Global Life Sciences Conference in New York City. Later on October 24, 2001, Organogenesis also presented at the Techvest Emerging Healthcare Forum, also held in New York City.

141.    **$20.25 Million Additional Funding.**  On October 16, 2001, Organogenesis issued a release announcing that defendants had raised another $20.25 million from several financing activities, including another $10 million from Novartis and an additional $10.25 million from two equity placements to institutional investors and/or Company directors. One of the placements was made *via* the sale of the 1.67 million registered common shares remaining under the Company's existing shelf registration, and the other placement was for 503,876 unregistered shares of common stock and attached warrants. This release also quoted defendant Sabolinski who stated that, *"[w]e are pleased to have completed this round of financing, an important step in achieving key corporate milestones including realizing profitability sooner. Furthermore, these proceeds will enable us to accelerate additional key programs for our lead product, Apligraf, and other notable products in our development pipeline."*

142.    On November 1, 2001, *Dow Jones* news service reported that defendants had registered at least 2.7 million shares of common stock on behalf of certain shareholders. According to this report, of the shares registered 2.18 million were issuable to Novartis upon conversion of a $10 million 7% convertible subordinated promissory note that would mature on March 29, 2004. In addition, at this time, Organogenesis also registered at least 503,876 shares issued to two of the Company's directors and an investor in a private equity transaction on September 5, 2001. According to this report, Organogenesis would receive no proceeds from the sale of the shares by the stockholders.

82

143.    **3Q:01 Results.**  On November 13, 2001, defendants published a release on *Business Wire*, which purported to announce financial results for the third quarter of 2001, the period ended September 30, 2001, which stated that:

> Organogenesis Inc. (AMEX: ORG) today reported its financial results for the third quarter and nine months ended September 30, 2001. Product sales to related party were $2.2 million in the third quarter of 2001, representing a 211% increase over $0.7 million for the same period in 2000. This increase reflects the growth in Apligraf(R) unit sales and the new pricing in the 2001 amended agreement with Novartis. Total revenues increased 124% to $3.0 million in the third quarter of 2001 compared with $1.3 million for the same quarter in 2000. Total operating costs and expenses were $9.8 million during the third quarter of 2001 compared with $7.7 million for the same quarter in 2000. Cost of product sales increased by $1.7 million due to increased sales of Apligraf and costs related to ramping up production to meet anticipated future increased Apligraf demand.

> Research and development costs decreased slightly to $4.1 million compared to $4.4 million in 2000. Selling, general and administrative costs increased by $0.7 million primarily due to selling expenses related to preparations for the commercial launches of the Company's FortaPerm(TM), FortaGen(TM) and Revitix(TM) products. Net loss was $7.4 million or $0.21 per share for the third quarter of 2001 compared with a net loss of $6.7 million or $0.19 per share for the same quarter in 2000.

Again, defendant Sabolinski was quoted in the Company's release as follows:

> Our latest financial results reflect our strategy of implementing programs to support the success of Apligraf, while embarking on initiatives that will position us to capitalize on additional opportunities in the emerging tissue engineering sector.

144.    **3Q:01 Form 10-Q.**  The following day, November 14, 2001, defendants also filed with the SEC the Company's financial results for the third quarter of 2001, the period ended September 30, 2000,  pursuant to a Form 10-Q signed by defendants Sabolinski and Arcari. The Company's Form 10-Q for the third quarter of 2001 contained the same materially false and misleading financial information as had previously been announced, in addition to reporting, in part, the following:

> Basis of Presentation

- - - - - - - - - - - - - - - - - - - - -

The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented....*

*          *          *

COSTS AND EXPENSES

Cost of product sales:  Cost of product sales for the quarter ended September 30, 2001 increased 110% to $3,268,000, from $1,557,000 for the comparable quarter last year.  Cost of product sales for the nine-month period ended September 30, 2001 increased 81% to $8,301,000, from $4,581,000 for the comparable period last year.  These increases were due to increased unit sales of Apligraf to Novartis, higher allocation of depreciation and occupancy costs, and increased scrap charges during the month of September due to the suspension of commercial sales of Apligraf following the September 11, 2001 terrorist attack.  Cost of product sales includes the direct costs to manufacture, quality inspect and package Apligraf and an allocation of our production-related indirect costs.  Cost of product sales continues to exceed product sales due to the high costs associated with low volume production.  *We expect production volume to increase and our margins to continue to improve during the remainder of 2001.  We expect that we will have to revise standard costs and the allocation of costs to product sales in the future as we continue to modify our manufacturing processes.* [Emphasis added.]

145.    The statements made by defendants and contained in the Company's releases on September 6, September 7, September 24, October 16, and November 13, 2001 and those statements contained in the Company's Form 10-Q for the third quarter of 2001, reproduced herein, *supra*, were each materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such for the following reasons:

(a)      Defendants failed to disclose the material adverse factors affecting the Company alleged in paragraphs 59-67, *supra*.

84

(b)    Defendants' October 16, 2001 release announcing the Company's equity placements and defendant Sabolinski's representation that the Company's financing activities were "an important step in achieving key corporate milestones including realizing profitability sooner" were materially misleading and incomplete given that defendants knew but failed to disclose that the Company had been informed that defendant Erani had sought to have stock brokers "*manipulate the market for the Company's stock.*"

(c)    Contrary to defendants' representations that they were expecting new initiatives to help the Company achieve "overall profitability of the Company," defendants knew that the Company's ultimate prospects for achieving profitability were severely compromised by the problems alleged in paragraphs 59-67, *supra*, including the Company's serious manufacturing and marketing problems, its inability to access adequate funding to keep the Company viable, the difficulties in achieving reimbursement for Apligraf, and the disruptive effect on operations that high turnover and infighting among the Company's senior management was having, and would continue to have for the foreseeable future.

(d)    Defendants' representations touting "sustained strength in Apligraf sales," and "substantially higher sales" in the third quarter of 2001 were materially misleading and incomplete given that defendants knew but failed to disclose that manufacturing and distribution problems, contamination issues, inadequate marketing support, and difficulties in obtaining reimbursement for Apligraf were causing increasing frustration among physicians, who were becoming less willing to order or re-order Apligraf for their patients.  Further defendants knew but failed to disclose that the purported "strong growth forecast" and "increasing demand anticipated" for Apligraf were illusory, given that, as confirmed by a former employee of Organogenesis, Novartis' sales forecasts were "always inflated."

85

(e)    Defendant Sabolinski's representation anticipating increasing the Apligraf "production rate in the near term to meet forecasted demand" were materially misleading and incomplete given that the Company was experiencing continuing significant manufacturing and marketing problems which were hampering manufacturing and which made it unfeasible to sufficiently increase production scale. Further defendants knew but failed to disclose that the purported "forecasted demand" for Apligraf was illusory, given that, as confirmed by a former employee of Organogenesis, Novartis' sales forecasts were "always inflated."

(f)    Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve, as confirmed by former employees of Organogenesis, the Company was experiencing serious problems in manufacturing Apligraf and there was "no way" the Company could feasibly mass-produce Apligraf. Further, it was not true that costs exceeded sales due to start-up costs and the high costs of low volume production, and that the Company's margins would improve as production volume increased. As confirmed by former employees of Organogenesis, it was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement — under which Novartis shared revenue from Apligraf sales that were well below the product's manufacturing cost. Given the revised terms of the Novartis marketing agreement — which caused Organogenesis to lose money on every unit of Apligraf that it produced — *far from lowering costs, the more units of Apligraf that Organogenesis produced, the greater its losses would be.*

(g)    Contrary to defendants' representations, the Company's Form 10-Q for the third quarter of 2001 did not reflect the true financial condition of the Company because it failed

86

to disclose the adverse factors affecting the Company's operations and future viability alleged in

subparagraphs (a) through (h) above and in paragraphs 59-67, *supra*.

146.    **Needham Report.**  On November 16, 2001, with shares of the Company now

trading at just above $4.00 per share, analysts at Needham & Co. were finally forced to adjust

downward their near-term Organogenesis price target to $9.00-$11.00 per share from $16.00-

$18.00 per share.  At this time, however, Needham did not reduce its "Buy" rating on the

Company, and also stated that, at current trading levels shares of Organogenesis were *"currently*

*undervalued,"* as follows:

> We believe that Organogenesis is *currently undervalued,* given that
> Apligraf is the first and only product containing living human cells to prove
> efficacy and gain FDA PMA marketing approval and now having qualified
> nationally for reimbursement under Medicare for outpatient use.  *ORG's*
> *enhanced management team and Novartis agreement is a further*
> *indicator of ORG's potential.*  In addition, we believe there will be a
> number of key events over the next several quarters that will serve to
> significantly increase the visibility of Organogenesis and its products and
> further attract substantial investor interest in the company and its products,
> such as continued growth in Apligraf sales and postmarketing research as
> well as progression of VITRIX clinical trials. [Emphasis added.]

147.    On January, 4, 2002, only days before the end of the Class Period, defendant

Erani announced his sudden and unexpected departure from Organogenesis.  According to the

Company's release, defendant Erani resigned to "pursue personal business interests."

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION
## OF ORGANOGENESIS IS BELATEDLY DISCLOSED

148.    **No Money to Fund Operations.**  On or about January 30, 2002, defendants filed

with the SEC a report pursuant to Form 8-K, signed by defendant Arcari, which stated for the

first time that the Company was running out of money and that it would be forced into

insolvency unless it could raise at least $15 million in the immediate near term. The Form 8-K

stated, in part, the following:

On January 30, 2002, the Registrant filed a Registration Statement on Form S-3 to register the resale of shares held by certain of its selling security holders. As a part of that document, the Registrant included an updated set of risk factors relating to its business. The Registrant intends, by filing such updated risk factors with this Current Report on Form 8-K, to provide such risk factors as part of its documents filed pursuant to the Securities Exchange Act of 1934.

*   *   *

We have incurred significant operating losses in funding the research, development, testing and marketing of our products in every year of our existence. We incurred net losses of $14,031,000 for the year ended December 31, 1998, $28,350,000 for the year ended December 31, 1999, $28,605,000 for the year ended December 31, 2000 and $22,561,000 for the nine months ended September 30, 2001. *The extent of future losses and the time required to achieve profitability are highly uncertain, and we may never achieve a profitable level of operations or, even if we achieve profitability, we may not be able to sustain it on an ongoing basis.* [Emphasis added.]

149.    In addition to the foregoing, the January 30, 2002 Form 8-K also revealed for the first time that the Company would need to raise additional funds by the end of the first quarter of 2002, but that Organogenesis might be unable to raise such necessary funds, in which case it would then be forced to *curtail or discontinue all operations*. In this regard, the Form 8-K also stated, in part, the following:

We will need to raise additional funds by the end of the first quarter of 2002, but may be unable to raise the funds, in which case *we would have to curtail or discontinue our activities.* [Emphasis added.]

We will seek to raise $15 million from the sale of equity securities that have not been registered under the Securities Act of 1933; such securities may not be sold in the United States absent registration or an exemption from registration. Based upon our current forecasts, we believe that proceeds from proposed equity financings of approximately $15 million, together with our existing cash, cash equivalents and credit line and product and other revenues, will be sufficient to finance operations through at least the next twelve months. This projection is based on assumptions regarding our operating cash requirements and revenues from sales of Apligraf and other products, any of which could prove to be incorrect. We are currently seeking additional funding but our research, development, manufacturing and other activities may require that we raise substantial additional funds. We may not be able to obtain the proposed $15 million in new financing or

88

any additional funding on terms favorable to us or our stockholders, if at all. Equity financings would dilute your ownership in us.

150.    In answer to the question as to why the Company could not access the $10 million that defendants had previously reported would be available, the Form 8-K suddenly revealed that the Novartis commitment was subject to certain conditions — ones the Company had no way of satisfying — such that this money was also not available, as follows:

> *Although we have a contractual put option to sell an additional $10 million of our securities to Novartis, we must satisfy a number of conditions in order to exercise that option.* If we do not satisfy these conditions and Novartis is unwilling to waive any unsatisfied conditions, we will be unable to sell additional securities to Novartis pursuant to the put option. In addition, even if we satisfied the conditions, the closing would occur no sooner than 90 days following the day we send the put option exercise notice. If adequate funds are not available to us when needed, we will be required to delay, scale back or eliminate our research and development programs or license to third parties products or technologies that we would otherwise undertake to develop ourselves and otherwise reduce our level of operations. *The failure to have adequate liquidity could result in our receiving a "going concern" opinion from our auditors.* [Emphasis added.]

151.    While shares of the Company made virtually no move on the day the Company's Form 8-K was filed, in the days immediately before its filing, shares of the Company dropped precipitously — falling over 40% due to leakage in the three days prior to its filing with the SEC. Prior to this sudden and inexplicable decline, which occurred on volume abnormally above the stock's daily average, shares of Organogenesis traded at approximately $3.70 per share, on January 28, 2002. The day the Form 8-K was filed, Organogenesis shares traded down to $2.44 per share. Within days, as investors digested the implications of the Company's SEC filing, shares of Organogenesis fell to as low as $1.32 on February 7, 2002 — a decline of almost 95% compared to the Class Period high of over $22.00 per share reached on March 7, 2000.

152.    Later, on February 25, 2002, *Dow Jones* news service reported that Organogenesis had declared that it would engage in a "restructuring" and would lay-off at least

16% of its workforce in order to cut overhead by at least $5 million. Also, according to *Dow Jones* and a Company press release, on March 21, 2002, the Company raised $16 million by issuing "convertible preferred shares," convertible into shares of common stock of the Company at a fixed conversion price of $1.45 per share, and by selling 7.2 million unregistered shares of Company stock. The "vulture capitalists" who arranged for these "toxic convertibles"[5] as well as the purchase of an additional 7.2 million shares for payments of only $10 million, were identified by the Company only as "institutional shareholders."

153.    On April 3, 2002, Organogenesis announced sales of Apligraf for the first quarter of 2002 which, at 7,100 units, was well below forecast sales for 2002 of 40,000 units. Following the release of results for the first quarter of 2002, on April 11, 2002, defendants hosted a conference call, the transcript of which was subsequently published. During the question and answer, call-in section of this call, the following statements were also made:

> BRUCE BREWSTER (ph), BREWSTER ASSET MANAGEMENT: Over the last number of years it seems to be that you have been very successful from a medical point of view. And from the point of view of sales of Apligraf. *I don't think we can say the same thing about the business results.*
>
> *It seems to me that the underlying reason for your lack of success in — from a business point of view, is your original deals with Sandos (ph) and Novartis and the amount of revenue that you get from the sale of Apligraf.*
>
> You're entering into — you did adjust that recently. You're entering into new transactions with other partners. Are these transactions organized in such a way that you'll have more possibility of overall profitability and therefore business success?
>
> *    *    *

---

[5]    "Toxic," because the greater Organogenesis' share price declined, the more stock the Company would have to issue to meet this obligation, the greater shareholder dilution, the lower the price of the Stock, the more stock that would be required to be issued to meet this obligation...

RICHARD CARAFF (ph), OPPENHEIMER:  Yes, I certainly am pleased to hear of approval by the 50 states and hope that that word gets out to the doctors, many of whom at least in our limited experience in Boston are not completely aware.

But the other part which is a question, *some doctors that I've spoken to are very happy and satisfied with using Apligraf on complex cases. But they complain on less complex cases Apligraf is a rather expensive procedure to use compared to other procedures.* Do we have any way of broadening the market by means of price?  Could you comment upon that please?

STEVEN BERNITZ:  *I think the major — if it in looking at the cost of the product should be in looking at the pharmo-economics of the product rather than the price of the product.*

If you look at the complications associated with diabetic foot ulcers in terms of bone infections and amputations and actually mortality associated with the complications from these wounds, while I would like to say that we have done rigorous studies.  And to show that I think one that there's an opportunity to do so, and I think that's an important area for both companies going forward.

There have been some studies with venous leg ulcers that show that Apligraf can be a very cost effective treatment for those.  And actually given that, one would expect that data for diabetic foot ulcers to be more compelling.

And I think that you also touched on another important point which is the knowledge and confidence in the reimbursement process.  Which is that a doctor may have tried the product, a year or so ago and or heard from a doctor that tried the product a year or more ago and had some difficulty.  Or had to go through a rigorous approval process to get it the product reimbursed. [Emphasis added.]

154.    In addition to the foregoing, when asked about the why the Company could not

access the second $10 million tranche of the aforementioned Novartis commitment, defendants

stated the following:

JOHN BERGER (ph):  Could you also go over briefly the encumbrances on the second traunch of capital from — that's available from Novartis? And when that traunch would be available to be utilized since this latest financing.

JOHN ARCARI:  Well the second put is equal in amount to the first. It's 10 million.  The time period between exercising a put and receiving money is a minimum of 90 days. *But the thing that really distinguishes the second put from the first is the hurdles you have to get through on the second put.*

*And they're inherently more difficult. There are more hoops to jump through. So it's much more difficult to access that money than was the first traunch.*

STEVEN BERNITZ: So we look at that as an upside. If it is available *there's no where in our plans that we are counting on that money.* And we don't anticipate exercising that put. [Emphasis added.]

155.    **Going Concern Opinion.** On April 16, 2002, when the Company filed its year end financial statement with the SEC, pursuant to Form 10-K, its outside auditor PricewaterhouseCoopers LLP issued a "going concern" opinion, which stated that the *auditors had "substantial doubt" about Organogenesis' ability to continue as a going concern.* According to PricewaterhouseCoopers, "the Company has suffered recurring losses from operations, has a working capital deficiency, a stockholder's deficit, and has long-term debt that may become immediately due upon an event of default." [Emphasis added.]

156.    Following this announcement, shares of Organogenesis fell to as low as $0.60 per share on April 17, 2002. In the days that followed, shares of the Company traded even lower, to as low as $0.41 per share by May 1, 2002.

157.    Remarkably, in response to this statement by PricewaterhouseCoopers, the same day, April 16, 2002, defendants issued a release on *Business Wire* which stated that, although Organogenesis had received the aforementioned report, "we believe that, based on our current forecasts, the Company has sufficient liquidity to finance operations and *achieve break even by year-end 2002."* [Emphasis added.] This post-Class Period statement was as far from the truth as defendants' other statements made within the Class Period. Despite this absurd claim, on August 16, 2002, defendants revealed that the Company would delay filing its quarterly report for the second quarter of 2002 and that Organogenesis was reviewing a possible material "asset impairment" charge. According to a statement made by the Company at this time, "management

is unable to conclude the amount of such impairment or that the financial statements . . . are

probably presented on a 'going concern' basis rather than on a 'liquidation of assets' basis."

158.    **Needham Rating Suspended.**    It was not until July 12, 2002, with shares of the

Company now trading below $0.20 per share, however, that analysts at Needham & Co. finally

placed the Company's stock rating "Under Review."    With Organogenesis on life-support,

Needham analysts reported the following:

* Recent events leave *future uncertain.*

* *Disappointing sales figures/ higher than expected burn rate.* Organogenesis announced that Apligraf sales decreased approximately 7-10% for 2Q02, compared with our estimates for an increase in sales of 25%.

* Additionally, the company stated that the burn rate for the quarter was $7.5MM, versus our estimates of $4.3MM, resulting in $3.7MM of cash at the end of 2Q02. Additional cost cutting measures have been initiated to lower the burn rate from $2.5MM/month to $1.1MM/month.  Using the revised burn rate, Organogenesis will be able to fund operations for 3Q02 before seeking additional capital.

* Challenging management strategy.  Organogenesis announced that it has entered into discussions with Novartis Pharma AG to reacquire commercialization rights to Apligraf.  However, in order to complete negotiations, *Organogenesis must raise sufficient capital necessary to reacquire [rights to] Apligraf and build the necessary infrastructure necessary to market and distribute the product.*

* Additionally, Organogenesis stated that it would seek a corporate partner for the marketing of the Fortagen, Fortaperm, and Revitix product lines.  While this decision will result in a reduction of costs related to the sales and marketing infrastructure set up by the company, the partnership will also result decreased revenues, as revenues become royalty based.

* Our conclusions.  Despite the efforts of management, *Apligraf sales continue to grow at a slower than anticipated rate.  The lower than expected sales  growth and higher than anticipated burn rate results in approximately 3 months of cash ($3.7MM) for on going operations, which leaves the company below budgeted forecasts.* While major initiatives are being discussed including the reacquiring of rights to Apligraf and raising of funds for continued operations, we believe that *multiple challenges exist for Organogenesis.* Therefore, given the lack of Apligraf sales growth, the higher than expected burn

rate, the challenging business strategy undertaken by management, and sub-optimal cash position, we are placing our rating under review. We are currently evaluating the company's options and will continue to monitor events going forward. [Emphasis added.]

159.    **Never Achieve Profitability.    Huge Layoffs.    Halt Apligraf Production.** On August 21, 2002, with Organogenesis shares trading at $0.09 per share, *the Company's common stock was suspended from trading on the American Stock Exchange.* On September 13, 2002, the Company announced that it had temporarily halted shipments of Apligraf and had furloughed over 110 of its employees, as a result of the Company's "current lack of cash flow." Defendants also blamed the current crisis upon its inability to renegotiate its marketing agreement with Novartis, which was described as "not sustainable." On September 13, 2002, defendants also revealed that a Chapter 11 bankruptcy filing was a possibility.

160.    **Product Recalls.** In addition to the foregoing, by mid-September 2002, production quality at Organogenesis had deteriorated so substantially that an entire batch of Apligraf had been recalled. Alarmingly, because Apligraf has such a short shelf life, at the time of this "recall," of the 193 affected units at least 72 had already been applied to patients. In total, this was at least the fourth time since 1999 that the Company had been forced to recall Apligraf because of contamination.

161.    **Post Class Period Scheme to Leverage Buyout.** Having reduced the value of the Company's stock to mere pennies per share, and having lost the ability to sell more stock or offer debt, or raise money through private or public offerings, defendants next sought to take what was left of Organogenesis for themselves. Thus, on or about September 25, 2002, defendants caused the Company to file for Chapter 11 protection from creditors in United States Bankruptcy Court for the Eastern District of Massachusetts.

162.    As defendants knew throughout the Class Period, Organogenesis could not produce enough cash flow from operations to support its operations under the terms of its agreement with Novartis given that it was losing money on each sale under the Novartis agreement. Thus, on November 20, 2002, immediately after defendants placed the Company into bankruptcy, defendants forced Novartis to agree to transfer back to them the worldwide marketing and distribution rights for Apligraf. Novartis acquiesced to defendants' demand, rather than risk losing its entire investment in the Company — including at least $10 million in unsecured debt which Novartis still hoped to collect.

163.    The following day, November 21, 2002, the *Boston Globe* reported that, pursuant to the terms of the proposed, revised deal between Novartis and defendants:

* The two companies had agreed to work together for another seven months, during which Novartis would continue to market and distribute Apligraf.

* When the Company emerges from Chapter 11 bankruptcy protection, marketing and distribution rights will return to defendants. Two years later, Novartis will earn royalties on sales of Apligraf, lasting for five years.

* Novartis also agreed to purchase at least 200 units of the product each week from defendants.

* Novartis also agreed to loan $3 million to Organogenesis, to be repaid 18 months after the company emerges from bankruptcy.

* Novartis agreed to have a $10 million investment it made in the company last year treated as a general claim, to be repaid with other unsecured creditors of Organogenesis.

* The pact also provides hope for dozens of employees who were laid off in September, when Organogenesis abruptly shut down, with a minimum of 75 people anticipated to return to work within several weeks of this announcement.

Although the precise payment terms were sealed by the Bankruptcy Court, at that time Organogenesis' vice president and general counsel, Jeffrey L. Dow, stated that, "[t]he prices are

95

considerably more favorable than the $350 a unit we were getting under the old payments. It's clear we are getting the great bulk of the revenue from Novartis' sales . . . ."

164.    By June 23, 2003, defendants announced that they had caused the Company to file an Amended Plan of Reorganization with the United States Bankruptcy Court. According to defendants, the Plan incorporated "a funding proposal from a group of unsecured creditors — including current and former officers and directors of the Company," and put in motion a timeline for emerging from Chapter 11 protection in August 2003. The Plan also anticipated a cash distribution of 35% to be made to the holders of allowed general unsecured claims, *but that no distribution would be made on shares of the Company's outstanding preferred and common stock, which would be cancelled on the Plan's effective date*. Under the Plan, all shares of new common stock of the Company, as reorganized, would be distributed to the members of the plan funding group and the holder(s) of the $10.35 million allowed claim of Novartis.

165.    Days later, however, on June 26, 2003, the *Boston Globe* reported more disturbing news regarding defendants' continued interference with the bankruptcy proceeding, and documented their continued attempts to place their own interests over and above the interests of the outside shareholders of the Company, as follows:

> If all goes as expected at a hearing in U.S. Bankruptcy Court in Boston today, creditors could be solicited next week for their approval of a reorganization plan turning ownership of the life sciences company and its sophisticated medical technology to a group led by two cousins who operate chains of clothing stores like Strawberry and Pay-Half.
>
> Did recently installed chief executive Alan Ades, also a leader of the group in line to buy the company, impede other potential bidders, a tactic that could have protected his own financial interests? Did the previous CEO, seemingly ousted last fall, try to use his own inside connections seeking proprietary information for a bid with private investors that could have put him back in charge?

*    *    *

*Ades, his cousin Albert Erani, and a small group of others that includes their relatives would end up with the company at a seemingly modest price,* though their total cost is hard to calculate....

*    *    *

Steven Bernitz, the company's chief executive at the time of the bankruptcy filing, quit as he was about to be fired in October and Ades took charge, according to the company. A short time later, the company tracked cellphone calls between Bernitz and another executive still employed at Organogenesis, Jeffrey Dow, and fired him. Company lawyers questioned whether confidential information was being leaked.

Soon, it became clear Bernitz was formally advising a private equity firm circling to make a bid on company assets. *His lawyer claimed the company was harassing Bernitz because Ades "wants to end up with the company."*

*"He has been very successful at chilling the sale," the lawyer, Stephen Gordon, said in a transcript of a bankruptcy court hearing.* [Emphasis added.]

166.    Despite defendants' actions, on August 14, 2003, Judge William Hillman in U.S. Bankruptcy Court for the Eastern District of Massachusetts in Boston cleared the way for the Company to emerge from bankruptcy under the full dominance and control of the Individual Defendants by or about August 26.    The insider group led by interim CEO Alan Ades and his partner and cousin, Albert Erani, would buy a $10.5 million unsecured claim in the form of a bond held by pharmaceutical giant Novartis.  Ades, who co-founded A&E Stores with Erani, would be the interim CEO, president and chairman of the new company.  Novartis agreed to convert the $3 million in debtor-in-possession financing it provided into a $3 million exit loan. According to John Hutchins, Boston counsel for Novartis at Kirkpatrick & Lockhart LLP, who was quoted at this time, the final terms of this bankruptcy restructuring actually amounted to a

"leveraged acquisition" by the insider group because they had bought up the $10.5 million Novartis unsecured claim and were investing additional funding.

167.    Thus, in less than one year, not only were defendants successful in thwarting other interested bidders and in facilitating defendants Erani and Ades and their family members' gaining total control over the Company but, within that time, defendants were also able to cause Organogenesis to emerge from bankruptcy having completed its restructuring plan.  As a result of this restructuring, new shares were issued to defendant Erani and Ades and their family members — the new owners of the Company — and the shareholders who purchased and/or otherwise acquired shares of the Company during the Class Period received *nothing* for their Organogenesis shares.

168.    The market for Organogenesis securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Organogenesis common stock traded at artificially inflated prices during the Class Period.    Plaintiffs and other members of the Class purchased or otherwise acquired Organogenesis securities relying upon the integrity of the market price of Organogenesis securities and market information relating to Organogenesis, and have been damaged thereby.

169.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Organogenesis common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

170.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Organogenesis' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Organogenesis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL ALLEGATIONS AGAINST PRICEWATERHOUSECOOPERS

171.    Defendant PricewaterhouseCoopers is a worldwide firm of certified public accountants, auditors, and consultants. According to its website, www.pwc.com, PricewaterhouseCoopers "is the world's leading professional services organization." PricewaterhouseCoopers touts its expertise pertaining to the pharmaceutical and healthcare industries, such as, Organogenesis, stating that PricewaterhouseCoopers is "the professional services firm of choice among the world's leading pharmaceutical and healthcare products companies" and  "the auditors of the largest share of the world's leading pharmaceutical companies and provide tax and business advisory services to many of the industry's other major players."

172.    Through its Boston, Massachusetts office, PricewaterhouseCoopers served as Organogenesis' auditor and principal accounting firm prior to and during the Class Period. By