# EXHIBIT 4
# (Pt. 4)

virtue of its relationship with Organogenesis and the nature of the auditing and consulting services rendered to the Company, defendant PricewaterhouseCoopers and its personnel were regularly present at Organogenesis and had intimate knowledge of Organogenesis' financial reporting practices based on its access to confidential internal corporate, financial, operating and business information.

173.    PricewaterhouseCoopers was required to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS"),[6] and to report the audit results to Organogenesis, the board of directors, the audit committee, and the members of the investing public, including plaintiffs and other members of the Class. With knowledge of Organogenesis' true financial condition, or in reckless disregard thereof, PricewaterhouseCoopers certified the materially false and misleading financial statements of Organogenesis, described below, and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements. Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

174.    In acting as the Company's independent auditors and certifying the Company's year-end financial statements, PricewaterhouseCoopers ignored multiple "red flags," which caused PricewaterhouseCoopers to lose faith in the credibility of the Company and eroded PricewaterhouseCoopers' confidence in the representations of the senior officers and directors of the Company, despite the fact that auditors are required to exercise professional skepticism when

---

[6] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA")' relate to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as the interpretation of GAAS.

performing audit procedures. In doing so, PricewaterhouseCoopers violated Generally Accepted Auditing Standards ("GAAS"). For example:

(a)    According to the Confidential Arcari Document, by March 2001 **PricewaterhouseCoopers' "confidence in management [sic] and the Boards [sic] representations" had been "eroded."**

(b)    According to the Confidential Arcari Document, defendant Erani's failure to sign standard audit confirmations sent to him by PricewaterhouseCoopers, then the Company's Chairman of the Board, caused a "loss of the Company's credibility" with PricewaterhouseCoopers.

(c)    According to the Confidential Arcari Document, as a result of the Company's violation of a commitment to PricewaterhouseCoopers in connection with the exercise of the first tranche of the Novartis put option in May 2001, PricewaterhouseCoopers informed defendants that it refused to support any future financing initiatives by the Company. According to the Confidential Arcari Document, defendant Erani "[h]indered the process for gaining approval to exercise the Novartis put option by May 31, 2001, a commitment, which was made to PricewaterhouseCoopers (PWC), our independent auditors." The Confidential Arcari Document states that "*[s]ince then PWC has refused to grant any consents or comfort letters because we violated our commitment*."

(d)    PricewaterhouseCoopers knew of, or recklessly disregarded, the terms of the Novartis marketing agreement, which was economically unsustainable for Organogenesis given that Organogenesis was losing money on every unit of Apligraf that it produced and that this the Company lacked the ability to fund operations through product sales.

(e)    Given these "red flags," PricewaterhouseCoopers knew or recklessly disregarded the fact that the Company suffered from a chronic and systemic lack of internal controls such that its financial reporting was inherently corruptible, subject to manipulation, and unreliable, resulting in materially false and misleading financial statements during the Class Period.

175.    These "red flags" alerted PricewaterhouseCoopers that there were serious concerns with management's character and integrity.    These concerns with management's character and integrity should, in turn, have caused PricewaterhouseCoopers to scrutinize the sufficiency of Organogenesis' internal controls. The internal control deficiencies include a lack of a stated and demonstrable commitment by senior management to set appropriate standards of ethics, integrity, accounting, and corporate governance.

176.    PricewaterhouseCoopers' concerns with management's character and integrity also should have caused PricewaterhouseCoopers to re-evaluate its risk assessments.  GAAS requires that "risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors." AU § 316.12, 316.14.  The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25.  One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is *"management's characteristics and influence over the control environment."* AU § 316.16 (emphasis added).    Those factors pertain to, among other things, management's *"attitude relating to internal control and the financial reporting process." Id.* n. 27 (emphasis added). However, in contrast to the requirements of GAAS, PricewaterhouseCoopers conducted the financial statement audit for Organogenesis' year-end 2000, under an assessment of risk that

102

remained unchanged by facts and events that called into question the character and integrity of Organogenesis' most senior management, in contravention of GAAS.

177.    PricewaterhouseCoopers did not exercise due professional care in performing the audit and preparing the audit report, as it was required to do, because it failed to: (i) obtain sufficient competent evidential matter to support the assertions in the financial statements; (ii) maintain an attitude of professional skepticism; and (iii) render an accurate audit report on behalf of Organogenesis.

178.    PricewaterhouseCoopers violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. PricewaterhouseCoopers should have stated that no opinion could be issued by it on Organogenesis' year-end 2000 financial statement or issued an adverse opinion stating that the 2000 financial statement was not fairly presented.

179.    PricewaterhouseCoopers violated GAAS General Standard No.2 which requires that an independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

180.    PricewaterhouseCoopers violated Statement on Auditing Standards No. 82 in that it failed to adequately consider the risk that the audit financial statements of Organogenesis were free from material misstatement, whether caused by errors or fraud. PricewaterhouseCoopers knew or recklessly disregarded numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Organogenesis during the Class period, which adversely affected Organogenesis' ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.

181.    PricewaterhouseCoopers violated GAAS and the standards set forth in Statement on Auditing Standards Nos. 1 and 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

182.    PricewaterhouseCoopers violated GAAS and the standards set forth in Statement on Auditing Standards No. 8, by failing to take appropriate action relating to material misstatements and omissions of fact contained in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of Organogenesis' 2000 Form 10-K.

183.    PricewaterhouseCoopers violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  This standard required PricewaterhouseCoopers to obtain a sufficient understanding of Organogenesis' internal control structure to adequately plan the audit and to determine the nature, timing and extent of tests to be performed.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure: the control environment, the accounting system, and control procedures.  For example, "[t]he auditor's understanding of internal control over revenue transactions ordinarily will include the client's policies and procedures for . . . shipping goods, relieving inventory, billing and recording sales transactions, receiving and recording sales returns, and authorizing and

issuing credit memos." AICPA Audit Guide: Auditing Revenue in Certain Industries ("AAG-REV") 1.112.

184.    As a result of its failure to accurately report on Organogenesis' 2000 financial statement, PricewaterhouseCoopers utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. Accordingly, *the audit function must be meaningfully performed and the accountants' independence not compromised. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.* [Emphasis added.]

185.    As a result, PricewaterhouseCoopers' opinions, which represented that Organogenesis' 2000 year-end financial statement was presented in conformity with GAAP, were materially false and misleading because PricewaterhouseCoopers knew that it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. PricewaterhouseCoopers, in issuing its unqualified opinions, knew or recklessly disregarded the fact that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

186.    PricewaterhouseCoopers knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Organogenesis' 2000 year-end

financial statements; or (b) withdrawn, corrected or modified its opinion for the year ended December 31, 2000.

## ADDITIONAL SCIENTER ALLEGATIONS

187.    As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Organogenesis, their control over, and/or receipt and/or modification of Organogenesis' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Organogenesis, participated in the fraudulent scheme alleged herein.

188.    In addition, throughout the Class Period, while in possession of material adverse non-public information, defendants caused the Company to issue and/or register for sale millions of shares of Company stock. Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to raise *over $68 million* in total proceeds from the sales of Organogenesis securities through public stock offerings, private equity offerings and other debt and/or equity sales, which defendants failed to utilize in avoiding Organogenesis' bankruptcy. Moreover, as further evidence of defendants' motivation to engage in the illegal scheme described herein, on or about April 21, 2000 defendant Stein registered for sale over $6.9 million of his privately held Organogenesis stock — approximately half of the

106

Company shares he personally owned and controlled while in possession of material adverse non-public information. In addition to registering for sale over $6.9 million of his privately held Organogenesis stock on April 21, 2000, defendant Stein — according to defendant Stein's counsel — also sold a certain amount of stock in 2001 (during the Class Period) and 2002. According to defendant Stein's counsel, defendant Stein incurred losses on sales of Organogenesis stock "in excess of $7,000,000." Even if true, the representation by defendant Stein's counsel that defendant Stein did not profit from these stock sales does not negate the strong inference of scienter and motive created by his registration of stock for sale — a clear indication of his *intent* to sell the Company's stock and profit therefrom. Other company insiders, including Defendant Michael Sabolinski, took advantage of the artificially inflated prices of the Company's stock during the Class Period by selling shares of the Company's stock and reaping over $400,000 in proceeds therefrom. Company insiders, including defendants Stein and Sabolinski, registered for sale and/or sold Organogenesis shares while in possession of material adverse non-public information, as follows:

## SHARES REGISTERED FOR SALE

| INSIDER | DATE OF TRANSACTION | PROPOSED NO. OF SHARES | PROPOSED PRICE PER SHARE | TOTAL VALUE OF SECURITIES REGISTERED |
|---|---|---|---|---|
| Herbert Stein | 4/21/2000 | 732,423.00 | $9.44 | $6,912,242.10 |
| TOTAL | | 732,423.00 | | $6,912,242.10 |

**SHARES SOLD**

| INSIDER | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | $10.39 | $126,841.12 |
| Nancy L. Parenteu | 5/10/2001 | 15,000.00 | $8.18 | $122,640.00 |
| Nancy L. Parenteu | 5/9/2001 | 5,000.00 | $8.56 | $42,813.00 |
| Nancy L. Parenteu | 5/7/2001 | 10,000.00 | $9.00 | $90,000.00 |
| Nancy L. Parenteu | 5/7/2001 | 5,000.00 | $8.97 | $44,850.00 |
| **TOTAL** | | **47,208** | | **$427,144.12** |

189.    The registration and/or sales of millions of shares of Company stock during the

Class Period, which sales were designed and/or permitted by the Individual Defendants as well

as numerous other high-level senior executives of Organogenesis further evidences defendants'

motive to perpetrate the fraudulent scheme detailed herein.  In addition, defendants also caused

the Company to engage in the sale of tens of millions of dollars in other sales of Organogenesis

securities pursuant to stock offerings, private equity offerings and other debt and/or equity sales

during the Class Period, including the following:

| TRANSACTION | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| $9.4M Equity Sale | 2/24/2000 | 688,000 | | $9,400,000.00 |
| $1.4M Equity Sale | 2/25/2000 | 100,000 | | $1,400,000.00 |
| $5.27M Equity Sale | 3/09/2000 | 300,000 | | $5,270,000.00 |
| $1.9M Share Offering | 4/27/2001 | 1,900,000 | $7.75 | $13,500,000.00 |
| $1.44M  Private Placement | 6/18/2001 | 186,000 | | $1,440,000.00 |
| $10M Equity Sale to Novartis | 8/07/2001 | | | $10,000,000.00 |
| $20.25M  additional Funding | 10/16/2001 | 2,173,876 | | $20,250,000.00 |
| **TOTAL** | | | | **$61,260,000** |

108

**TOTAL ALL DEBT AND EQUITY REGISTERED FOR SALE AND/OR SOLD BY THE COMPANY, DEFENDANTS AND INSIDERS DURING THE CLASS PERIOD = $68,599,386.22**

## APPLICABILITY OF PRESUMPTION OF RELIANCE: <br> FRAUD-ON-THE-MARKET DOCTRINE

190.    At all relevant times, the market for Organogenesis' securities was an efficient market for the following reasons, among others:

(a)    Organogenesis stock met the requirements for listing, and was listed and actively traded on the American Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Organogenesis filed periodic public reports with the SEC and the American Stock Exchange;

(c)    Organogenesis regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Organogenesis was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

191.    As a result of the foregoing, the market for Organogenesis securities promptly digested current information regarding Organogenesis from all publicly available sources and reflected such information in Organogenesis stock price. Under these circumstances, all purchasers of Organogenesis securities during the Class Period suffered similar injury through

their purchase of Organogenesis securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

192.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Organogenesis who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

193.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

194.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) enable the Individual

110

Defendants and other Organogenesis insiders to register for sale and/or sell more than $68 million of the Company's and/or their personally-held Organogenesis common stock to the unsuspecting public; and (iii) cause plaintiff and other members of the Class to purchase Organogenesis securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them), took the actions set forth herein.

195.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Organogenesis securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

196.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Organogenesis as specified herein.

197.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Organogenesis' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Organogenesis and its business

111

operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Organogenesis securities during the Class Period.

198.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

199.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Organogenesis' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings

throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

200.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Organogenesis securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Organogenesis' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Organogenesis securities during the Class Period at artificially high prices and were damaged thereby.

201.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Organogenesis was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Organogenesis securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

202.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

113

203.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against The Individual Defendants

204.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

205.    The Individual Defendants acted as controlling persons of Organogenesis within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

206.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

114

207.    As set forth above, Organogenesis and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

208.    As a direct and proximate result of the Individual Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 22, 2004

**MOULTON & GANS, P.C.**

By: /s/ Nancy Freeman Gans
Nancy Freeman Gans, BBO #184540
33 Broad Street, Suite 1100
Boston, MA  02109-4216
Telephone:  (617) 369-7979
Facsimile:  (617) 369-7980

**Liaison Counsel and Local Counsel for
Plaintiffs and the Class**

**MILBERG WEISS BERSHAD
  & SCHULMAN LLP**
Steven G. Schulman
Elaine S. Kusel
Peter Sloane
One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300

**Lead Counsel for Plaintiffs and the Class**

**LAW OFFICES OF MICHAEL A.
  SWICK PLLC**
Michael A. Swick
One William Street, Suite 900
New York, NY 10004
(212) 584-0770

**Attorney for Plaintiffs and the Class**

# EXHIBIT C

*To*
*Brad Cook*
*3 pgs*

**CONFIDENTIAL**

10/18/01

**ALBERT ERANI ISSUES**

March 2000    Drove Board to approve $6.2 million cash redemption of Series C convertible preferred stock at a time when the Company had little cash. Could have redeemed for stock but was dilution phobic.

March 2000    Did not sell stock off the shelf when opportunity existed to sell more shares at $14.50 per share.

January 2001  Took control of stock buyback program and initiated transactions on his own on behalf of the company without checking with committee established to execute the stock buyback program.

January/
October 2001  Forces the use of his service providers onto the Company. Most egregious is causing the law firm of Kramer, Levin, Naftalis & Frankel LLP to not only represent the Company but on many occasions to have them represent parties the Company deals with including UBS Warburg and Berkshire Bank. The Board has never approved the use of Kramer, Levin as the Company's law firm. Requires signing of numerous conflicts of interest letters with Kramer, Levin and their involvement severely interferes with Mintz, Levin providing the Company legal services in their capacity as the Company's legal counsel.

February/
March 2001    Prevented management from proceeding with sale of 1 million shares of Company stock from its shelf registration at about $12 per share. Authorization for sale was approved in the February 21, 2001 Board meeting. Engagement letters received from Tucker Anthony and Gruntal. Gruntal had almost concluded its due diligence when Mr. Erani stopped their process.

March 2001    Mr. Erani spoke with Jeff Kraws, our Gruntal analyst, and infuriated him. Mr Kraws comments were extensive and included the following: Albert shouldn't be a Chairman; didn't understand why Albert refused to raise funds when the Company needed them; Albert is financially inept; Albert highly irrational about dilution. Gruntal eventually lowered their rating on the Company and eventually withdrew coverage on the Company.

**LP 000001**

CONFIDENTIAL

**March 2001**  Refused to sign standard audit confirmations sent to him by PricewaterhouseCoopers, the Company's auditors, relating to his holdings of the Company's convertible debt. This eroded PricewaterhouseCoopers confidence in managements and the Boards representations.

**April 2001**  Committed to Fleet that they would be paid out by July 31, 2001 at a time when such payment would be imprudent, as the Company did not have sufficient cash to pay the bank. Did not have to make this commitment, as it was a term loan payable over the next 2 ½ years. This put further pressure on the Company due to its lack of cash at the time.

**May 2001**  Hindered the process for gaining approval to exercise the Novartis put by May 31, 2001, a commitment, which was made to Pricewaterhouse Coopers (PWC), our independent auditors. Commitment was made to gain necessary comfort letter from PWC to allow us to sell common shares under the UBS Warburg shelf program. Since then PWC has refused to grant any consents or additional comfort letters because we violated our commitment.

**June 2001**  Refused to sign annual Compensation Committee Authorization for the issuance of stock options to new hires during 2001 putting the Company at compliance risk and potentially the risk of a P&L hit at the end of the fiscal year when our independent auditors perform their audit.

**August 2001**  Met with and severely upset management team from Glenborough Properties, our Dan Reed landlord. They eventually sent us a default notice with penalty payments in September 2001 and expressly stated it was motivated by Albert's mistreatment of their management in their Canton meeting.

**August 2001**  Used employees from his own Company to seek quotes from building contractors in competition with the Company's efforts to seek quotes from the same contractors causing significant confusion and loss of Company credibility with selected contractors.

On a number of occasions has encouraged the Company to prepare overly optimistic financial projections to existing and potential service

LP 000002

CONFIDENTIAL

providers including: Fleet bank, PricewaterhouseCoopers and GMAC.

Albert continuously contacts outside service providers without informing Company management thereby causing confusion with Company management and the providers and loss of the Company's credibility with the Company's service providers including: commercial banks, investment bankers, the landlord, independent accountants and lawyers. He essentially usurps management authority by using his Chairmanship title.

Mr. Erani's request of information from the Company's management has been excessive and a drain on their time. Particularly efforts relating to relocating the Company to Rhode Island. He threatened an employee with termination if he didn't follow his requests relating to a Rhode Island facility.

Signed commitment for land in Rhode Island on behalf of the Company, which resulted in cash loss to the Company of $25,000. Land deemed to be unbuildable due to contamination.

1998 Directors and Officers insurance coverage bound without Company officer approval. 1999 Property and Product liability insurance coverage negotiated without Company involvement.

Put Company at risk with regard to SEC regulations by continuously delaying the 2001 Annual meeting of Shareholders until June 21, 2001.

Signed GMAC commitment letter and lost the Company a $15,000 deposit.

The Company has received a number of complaints from shareholders that Albert has interfered with the running of the Company and the Company has suffered as a result of the interference.

Brokers have called the Company to say that Albert has requested them to manipulate the market for the Company's stock (i.e. Kuralitz).

LP 000003

# EXHIBIT D

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE BEACON STREET

BOSTON, MASSACHUSETTS 02108-3194

———

TEL: (617) 573-4800

FAX: (617) 573-4822

www.skadden.com

FIRM/AFFILIATE OFFICES

CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

July 11, 2006

**BY E-MAIL AND**
**BY FIRST CLASS MAIL**

Peter Sloane
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza, 48th Floor
New York, New York 10119

RE:    In Re Organogenesis Securities Litigation,
       <u>Subpoena Served on PricewaterhouseCoopers LLP</u>

Dear Mr. Sloane:

Thank you for your assent in extending to July 11, 2006 the time for PricewaterhouseCoopers LLP ("PwC") to provide its objections and responses to the subpoena for documents dated June 16, 2006 (the "Subpoena") and served on June 19, 2006 in the above-referenced matter. A copy of the Subpoena is attached hereto as Tab A.

Pursuant to Fed. R. Civ. P. 45 and the Local Rules of the United States District Court for the District of Massachusetts and the Southern District of New York, PwC, which is not a party to the above-captioned action, hereby objects and responds to the Subpoena as follows:

## GENERAL OBJECTIONS

1.     PwC objects generally to the Subpoena to the extent that it seeks to impose obligations and duties beyond those required under the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the District of Massachusetts and/or the Southern District of New York.

Peter Sloane
July 11, 2006
Page 2

2.      The Subpoena makes no provision for reimbursement by you or your client of the substantial expense that PwC would incur in complying with the Subpoena; therefore, we object to producing any documents or further information without your written agreement to reimburse PwC for the costs and expenses it will incur in responding to the Subpoena, including all copying costs and reasonable compensation for professional and administrative time spent gathering, reviewing and producing the information. Such written agreement must acknowledge that your client shall reimburse PwC for all the Subpoena related compliance expenses, including, but not limited to: 1) attorney fees for a review of PwC's client files related to Organogenesis, Inc. ("Organogenesis") for responsiveness and privilege purposes; 2) attorney fees for professional services rendered responding to the Subpoena, including legal research, drafting objections and responses, and correspondence related to the objections and responses and the production documents; 3) photocopy fees for review and production purposes; 4) electronic and database related fees for review and production purposes; 5) professional fees for administrative, support and vendor service fees associated with the review and production of paper and electronic documents; and 6) postage and other delivery fees. PwC will submit an itemized invoice of the fees it reasonably expects to incur and will make its production, subject to the objections herein, available to you and your client upon an express written agreement to provide payment in full.

3.      PwC objects generally to the Subpoena to the extent that it seeks documents that would be of little or no relevance to the issues raised in this action and/or would subject PwC to unreasonable and undue burden, oppression or expense. The scope of the Subpoena is overbroad and vague, and may require information not relevant to any of the claims or defenses in the underlying litigation or that is not reasonably calculated to lead to the discovery of admissible evidence. Asking for "all documents and communications" related to Organogenesis is plainly overbroad and abusive.

4.      PwC objects generally to the Subpoena on the grounds that it is unduly burdensome to the extent it calls for the provision of publicly available documents or documents available from other sources, such as a party-in-interest.

Peter Sloane
July 11, 2006
Page 3

       5.     PwC objects generally to the Subpoena to the extent that it seeks documents subject to the attorney-client privilege, the attorney work product doctrine, the accountant-client privilege, or any other privilege recognized by law, or which are otherwise not subject to discovery under any applicable law or rule. To the extent that any document which is properly the subject of the attorney-client privilege, the work product doctrine, the accountant-client privilege or any other privilege is inadvertently made available for copying and inspection, such provision is not to be construed as a waiver of the applicable privilege or protection, and such document(s) and all copies thereof should be returned promptly to the undersigned counsel for PwC.

       6.     PwC objects generally to the Subpoena to the extent that its definitions are overly broad, ambiguous or misleading.

       7.     PwC objects generally to the Subpoena to the extent that it purports to seek documents or information which are not within its possession, custody or control.

       8.     PwC objects generally to the Subpoena to the extent it seeks confidential proprietary material and/or sensitive non-public information. No documents will be provided in response to the Subpoena until a mutually acceptable form of protective order is agreed upon.

       9.     PwC objects generally to the Subpoena to the extent it seeks documents beyond the purported class period, i.e., between November 15, 1999 and February 7, 2002. Accordingly, PwC will limit its production to its quarterly reviews and annual audits covering Organogenesis' fiscal years 1999 through 2001.

       10.     PwC has included the objections herein because the requests in the Subpoena, as phrased, are subject to those objections. However, it should not be assumed, merely because PwC has asserted a particular objection, that documents exist that PwC would have provided in the absence of that objection. Similarly, PwC's willingness to provide documents responsive to the Subpoena is not a concession (i) that the subject matter of the particular request is relevant to this action, (ii) that certain assumed or characterized facts are true and accurate or (iii) that they are responsive to a particular request.

       11.     The undersigned, as counsel for PwC in its capacity as a non-party, will be prepared to discuss the objections presented herein with plaintiffs' counsel for the purpose of resolving any disputes which may arise without the need for intervention by the Court.

Peter Sloane
July 11, 2006
Page 4

## SPECIFIC OBJECTIONS AND RESPONSES

Subject to the General Objections stated herein and without waiving them, including but not limited to an express written agreement for reimbursement of costs and fees identified in General Objection #2, and further without conceding that any documents are properly discoverable in or relevant to the claims or defenses of any party in connection with the subject matter of this action, or are admissible as evidence, PwC responds as follows:

REQUEST NO. 1:

All Documents and Communications concerning the Confidential Arcari Document (attached [to the Subpoena] as Exhibit 1 and Bates Stamped LP 000001-000003), or any of the matters subjects, events or Communications described therein, including without limitation:

(a)    All Documents and Communications concerning PwC's alleged refusal in 2001 to grant any consents or additional comfort letters to Organogenesis, including PwC's reasons for such refusal and any communications between PwC and Organogenesis relating to such refusal.

(b)    All Documents and Communications reflecting PwC's credibility and/or confidence in Organogenesis' officers and directors during the Relevant Period, including credibility and or confidence in the Individual Defendants.

(c)    All Documents and Communications concerning PwC's certification of the Company's financial statements and cash position, including all Documents and Communications reflecting the due diligence, if any, that PwC performed in assuring that the financial statements and cash position of the Company were true and accurate.

(d)    All documents and Communications concerning Erani's alleged refusal to sign standard audit confirmations sent to him by PWC [sic] relating to his holdings of the Company's convertible debt, including all Documents and Communications reflecting PwC's response to such refusal.

RESPONSE TO REQUEST NO. 1:

See General Objections, which are incorporated by reference herein. PwC further objects to this request on the grounds that the use of the term "credibility" in subpart (b) is confusing in the context of this request. PwC further objects to this request on the grounds that the term "due diligence" in subpart (c) is

Peter Sloane
July 11, 2006
Page 5

vague and ambiguous in the context of the assurances sought by this request and the
quarterly review and annual audits performed by PwC during Organogenesis' fiscal
years 1999 through 2001. PwC also objects to the so-called "Confidential Acari
Document" and the assertions therein as unauthenticated and unreliable. Subject to
the foregoing objections, and without waiving them, all responsive, non-privileged
documents comprising the quarterly review and annual audit workpapers for fiscal
years 1999 through 2001 in the possession, custody or control of PwC located after a
diligent search, if any, will be produced.

REQUEST NO. 2:

All Documents and Communications concerning Organogenesis'
commitment to PwC in or about May 2001 concerning the first tranche of the
Novartis "put option," or option contracts that gave Organogenesis the right to sell a
certain quantity of an underlying security to Novartis at a specified price up to a
specific date, including all Documents and Communications concerning the alleged
violation this commitment by Organogenesis. *See* Confidential Arcari Document
(Attached as Exhibit 1 [to the Subpoena]).

RESPONSE TO REQUEST NO. 2:

See General Objections, which are incorporated by reference herein.
PwC further objects to use of the term "commitment" as vague and imprecise in the
context of this request. Subject to the foregoing objections, and without waiving
them, all responsive, non-privileged documents comprising the quarterly review and
annual audit workpapers for fiscal years 1999 through 2001 in the possession,
custody or control of PwC located after a diligent search, if any, will be produced.

REQUEST NO. 3:

All Documents and Communications reflecting PwC's knowledge of
the negotiations, terms, conditions, and communications relating to any agreements
between Organogenesis and Novartis concerning Apligraf.

RESPONSE TO REQUEST NO. 3:

See General Objections, which are incorporated by reference herein.
Subject to the foregoing objections, and without waiving them, all responsive, non-
privileged documents comprising the quarterly review and annual audit workpapers
for fiscal years 1999 through 2001 in the possession, custody or control of PwC
located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 6

REQUEST NO. 4:

All Documents and Communications concerning the actual or
perceived effect of any Novartis Agreement(s) on the Organogenesis' operations,
finances, or ability or inability to achieve profitability, including any actual or
perceived advantages or disadvantages to the [sic] Organogenesis of any Novartis
Agreement(s) or the manner in which any Novartis Agreement(s) was performed.

RESPONSE TO REQUEST NO. 4:

See General Objections, which are incorporated by reference herein.
PwC further objects to the use of the term "perceived" as vague and imprecise in the
context of this request. Subject to the foregoing objections, and without waiving
them, all responsive, non-privileged documents comprising the quarterly review and
annual audit workpapers for fiscal years 1999 through 2001 in the possession,
custody or control of PwC located after a diligent search, if any, will be produced.

REQUEST NO. 5:

All Documents and Communications concerning the Company's
ability or inability to fund operations and/or achieve profitability through sales of
Apligraf, including actual, expected or projected per-unit profitability or lack thereof
of Apligraf.

RESPONSE TO REQUEST NO. 5:

See General Objections, which are incorporated by reference herein.
Subject to the foregoing objections, and without waiving them, all responsive, non-
privileged documents comprising the quarterly review and annual audit workpapers
for fiscal years 1999 through 2001 in the possession, custody or control of PwC
located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 7

<u>REQUEST NO. 6</u>:

       All Documents and Communications concerning PwC's March 31, 2001 Report of Independent Accountants certifying Organogenesis' financial statements in the Company's 2000 Form 10-K, including all Documents and Communications reflecting the basis for this opinion.

<u>RESPONSE TO REQUEST NO. 6</u>:

       <u>See</u> General Objections, which are incorporated by reference herein. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the annual audit workpapers for fiscal year 2000 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

<u>REQUEST NO. 7</u>:

       All Documents and Communications concerning PwC's going concern opinion issued in or about April 16, 2002, the reasons therefore, the reasons for the timing thereof, and any statements, suggestions, or belief that such disclosures should have been made earlier in time.

<u>RESPONSE TO REQUEST NO. 7</u>:

       <u>See</u> General Objections, which are incorporated by reference herein. PwC further objects to this request on the grounds that the terms "suggestions" and "belief" are vague and ambiguous in the context of this request. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal year 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 8

REQUEST NO. 8:

All Documents and Communications concerning the Company's
September 2002 bankruptcy, including all Documents and Communications
reflecting the reasons for the bankruptcy and any efforts to avoid bankruptcy or to
sell the Company.

RESPONSE TO REQUEST NO. 8:

See General Objections, which are incorporated by reference herein.
Subject to the foregoing objections, and without waiving them, all responsive, non-
privileged documents comprising the quarterly review workpapers for fiscal year
2003 in the possession, custody or control of PwC located after a diligent search, if
any, will be produced.

REQUEST NO. 9:

All Documents and Communications concerning any leveraged
buyout or acquisition of Organogenesis, including all Documents and
Communications reflecting PwC's knowledge of, and opinion concerning the buyout
or acquisition.

RESPONSE TO REQUEST NO. 9:

See General Objections, which are incorporated by reference herein.
PwC further objects to the use of the term "opinion" as vague and imprecise in the
context of this request. Subject to the foregoing objections, and without waiving
them, all responsive, non-privileged documents comprising the quarterly review and
annual audit workpapers for fiscal years 1999 through 2001 in the possession,
custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 9


REQUEST NO. 10:

All Documents and Communications concerning Organogenesis'
actual or perceived compliance or non-compliance with GAAP or GAAS.

RESPONSE TO REQUEST NO. 10:

See General Objections, which are incorporated by reference herein.
PwC further objects to this request on the grounds that the term "perceived" is vague
and ambiguous in the context of this request. Subject to the foregoing objections,
and without waiving them, all responsive, non-privileged documents comprising the
quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in
the possession, custody or control of PwC located after a diligent search, if any, will
be produced.

REQUEST NO. 11:

All Documents and Communications reflecting PwC's risk
assessments and reevaluation of risk assessments of Organogenesis management
during the Relevant Time Period.

RESPONSE TO REQUEST NO. 11:

See General Objections, which are incorporated by reference herein.
Subject to the foregoing objections, and without waiving them, all responsive, non-
privileged documents comprising the quarterly review and annual audit workpapers
for fiscal years 1999 through 2001 in the possession, custody or control of PwC
located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 10

REQUEST NO. 12:

All Documents and Communications concerning any proposed, contemplated, or implemented change in Organogenesis' accounting practices, policies or procedures, whether or not recommended by PwC or Organogenesis.

RESPONSE TO REQUEST NO. 12:

See General Objections, which are incorporated by reference herein. PwC further objects to this request on the grounds that the terms "proposed" and "contemplated" are vague and ambiguous in the context of this request. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

REQUEST NO. 13:

All Documents concerning any responses, reactions, or follow up Communications relating to the final conclusion reached by PwC as a result of PwC's audit of Organogenesis' Financial Statements.

RESPONSE TO REQUEST NO. 13:

See General Objections, which are incorporated by reference herein. PwC also objects to the vague nature of the request due to a lack of a specific time period. PwC further objects to the use of the phrase "final conclusion" as vague and ambiguous in the context of this request. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 11

REQUEST NO. 14:

      All Documents and Communications concerning any potential, actual, initial or ultimate disagreements between PwC and Organogenesis (including any of their directors, officers, Boards or committees thereof, or attorneys, accountants and consultants) concerning any aspect of any professional services performed by PwC for Organogenesis.

RESPONSE TO REQUEST NO. 14:

      See General Objections, which are incorporated by reference herein. PwC further objects to this request on the grounds that the terms "potential," "initial" and "ultimate" are vague and ambiguous in the context of the purported "disagreements" about which information is sought in this request. PwC also objects to the use of the phrase "any professional services performed by PwC" and limits the request only to audit services performed during the fiscal years 1999 through 2001. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

REQUEST NO. 15:

      All Documents and Communications concerning the actual, potential or perceived adequacy or inadequacy of Organogenesis' internal controls (as that term is used in Codification of Statements of Auditing Standards AU §319).

RESPONSE TO REQUEST NO. 15:

      See General Objections, which are incorporated by reference herein. PwC further objects to this request on the grounds that the terms "potential" and "perceived" are vague and ambiguous in the context of the internal controls information sought by this request. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 12

REQUEST NO. 16:

All Documents and Communications concerning meeting of the
Board of Directors of Organogenesis, including meetings of the Board of Directors
of any subsidiary of Organogenesis, or any committees thereto and including the
Audit Committee, including minutes, notes, memoranda, agendas, presentation
items, resolutions, draft minutes or resolutions, slides handouts, information
packages, video or audio recordings, or any memorialization whatsoever of those
meetings.

RESPONSE TO REQUEST NO. 16:

See General Objections, which are incorporated by reference herein.
Subject to the foregoing objections, and without waiving them, all responsive, non-
privileged documents comprising the quarterly review and annual audit workpapers
for fiscal years 1999 through 2001 in the possession, custody or control of PwC
located after a diligent search, if any, will be produced.

REQUEST NO. 17:

All general client or permanent files concerning any Organogenesis
engagement, including correspondence, intra-office and inter-office memoranda, and
memoranda of any conversations, meetings, or conferences concerning such
engagements.

RESPONSE TO REQUEST NO. 17:

See General Objections, which are incorporated by reference herein.
PwC further objects to this request on the grounds that "any Organogeneis
engagement" is overbroad and limits the request only to audit services performed
during the fiscal years 1999 through 2001. Subject to the foregoing objections, and
without waiving them, all responsive, non-privileged documents comprising the
quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in
the possession, custody or control of PwC located after a diligent search, if any, will
be produced.

Peter Sloane
July 11, 2006
Page 13

REQUEST NO. 18:

All Documents concerning all Communication between PwC and any of the Individual Defendants, including all correspondence files, drafts and notes relating thereto.

RESPONSE TO REQUEST NO. 18:

See General Objections, which are incorporated by reference herein. PwC further objects to this request to the extent that it calls for publicly available documents or document more readily available from other sources, such as a party-in-interest. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

REQUEST NO. 19:

All management letters and/or letters of recommendation concerning Organogenesis.

RESPONSE TO REQUEST NO. 19:

See General Objections, which are incorporated by reference herein. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 14

## REQUEST NO. 20:

Documents, reports, charts, and schedules relating to the preparation or review of Organogenesis' press releases.

## RESPONSE TO REQUEST NO. 20:

See General Objections, which are incorporated by reference herein. PwC further objects to the use of the phrase "relating to" as overbroad, vague and imprecise in the context of this request. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

## REQUEST NO. 21:

All Documents and Communications relating to any "fraud," "fraudulent financial reporting," "accounting irregularities," or "illegal acts by clients," as these terms are used in Statement of Auditing Standards No. 82, Statements of Auditing Standards No. 54 and/or the former Statement of Auditing Standards No. 53 (issued April 1998), and/or Codification of Auditing Standards § 316 and 317, occurring at, or with respect to, Organogenesis.

## RESPONSE TO REQUEST NO. 21:

See General Objections, which are incorporated by reference herein. PwC further objects to the use of the phrases "relating to" and "with respect to" as overbroad, vague and imprecise in the context of this request. PwC further objects to this request on the grounds that the request assumes but does not identify with specificity any "fraud," "fraudulent financial reporting," "accounting irregularities" or "illegal acts by clients" as those terms are used in this request. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 15

REQUEST NO. 22:

To the extent not encompassed by previous requests, all Documents concerning Communications and/or meetings concerning Organogenesis, or the Individual Defendants, whether or not made prior to, concurrent with, and/or subsequent to any Audit Engagement, including correspondence files, e-mail and instant messages.

RESPONSE TO REQUEST NO. 22:

See General Objections, which are incorporated by reference herein. PwC also objects to the extent this request is duplicative of previous Subpoena requests. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

REQUEST NO. 23:

To the extent not encompassed by previous requests, all Documents and Communications concerning any reviews, studies, calculations, and/or analysis conducted by PWC concerning Organogenesis' revenue recognition, operations, ability or lack thereof to fund operations, profitability or lack thereof, projected profitability, or ability to continue as a going concern.

RESPONSE TO REQUEST NO. 23:

See General Objections, which are incorporated by reference herein. PwC also objects to the extent this request is duplicative of previous Subpoena requests. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 16

REQUEST NO. 24:

        To the extent not encompassed by previous requests, all Documents and Communications concerning the disclosures made by the Company on or around January 30, 2002 and described in detail in paragraphs 148-150 of the Complaint, the reasons therefore, the reasons for the timing thereof, and any statement, suggestion, or belief that such disclosures should have been made earlier in time.

RESPONSE TO REQUEST NO. 24:

        See General Objections, which are incorporated by reference herein. PwC also objects to the extent this request is duplicative of previous Subpoena requests. PwC further objects to the use of the terms "suggestion" and "belief" as vague and imprecise in the context of this request. PwC further objects to this request to the extent it calls for documents more readily available from other sources, such as a party-in-interest. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal year 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

REQUEST NO. 25:

        To the extent not encompassed by previous requests, all Documents and Communications concerning the actual, potential or perceived accuracy or adequacy (or lack thereof) of disclosure in all or any part of Organogenesis' annual, quarterly, or other report, release, Financial Statement, or public statement concerning Organogenesis.

RESPONSE TO REQUEST NO. 25:

        See General Objections, which are incorporated by reference herein. PwC also objects to the extent this request is duplicative of previous Subpoena requests. PwC further objects to this request on the grounds that the terms "potential" and "perceived" are vague and ambiguous in the context of the "accuracy or adequacy" information sought by this request. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 17

## REQUEST NO. 26:

All Audit Programs (including any additions, deletion, substitutions, or amendments thereto and any documents reflecting the reason for any such event) used, implemented, or relied upon with respect to any professional services performed by PwC for Organogenesis.

## RESPONSE TO REQUEST NO. 26:

See General Objections, which are incorporated by reference herein. PwC also objects to the use of the phrase "any professional services performed by PwC" as overbroad and limits the request only to audit services performed during the fiscal years 1999 through 2001. PwC further objects to this request to the extent that it seeks production of documents containing trade secrets or other confidential research, development, or commercial information within the meaning of Rule 45(c)(3)(B)(i) of the Federal Rules of Civil Procedure. Subject to the foregoing objections, and without waiving them, all responsive, non-privileged documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

## REQUEST NO. 27:

Documents and Communications sufficient to identify the names, titles, and last known addresses of all PwC personnel associated with any professional services performed by PwC for Organogenesis.

## RESPONSE TO REQUEST NO. 27:

See General Objections, which are incorporated by reference herein. PwC also objects to the use of the phrase "any professional services performed by PwC" as overbroad and limits the request only to audit services performed during the fiscal years 1999 through 2001. PwC further objects to providing any "last known addresses" information on the grounds that it constitutes private non-public and confidential personnel information; any engagement personnel identified in PwC's workpapers are to be contacted through undersigned counsel. Subject to the foregoing objections, and without waiving them, PwC will produce documents comprising the quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in the possession, custody or control of PwC located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 18

REQUEST NO. 28:

All Documents and Communications relating to the "Independence"
of PwC with respect to Organogenesis, as that term is used in SEC Rule 201(b) of
Regulation S-X or the AICPA Code of Professional Conduct Rule 101.

RESPONSE TO REQUEST NO. 28:

See General Objections, which are incorporated by reference herein.
PwC further objects to the use of the phrase "relating to" as overbroad, vague and
imprecise in the context of this request. Subject to the foregoing objections, and
without waiving them, all responsive, non-privileged documents comprising the
quarterly review and annual audit workpapers for fiscal years 1999 through 2001 in
the possession, custody or control of PwC located after a diligent search, if any, will
be produced.

REQUEST NO. 29:

A copy of all drafts and final reports issued in connection with PwC's
audit of Organogenesis.

RESPONSE TO REQUEST NO. 29:

See General Objections, which are incorporated by reference herein.
PwC further objects to this request to the extent that the "final reports" are publicly
available documents and, consequently, equally available to plaintiffs without undue
burden upon PwC. Subject to the foregoing objections, and without waiving them,
all responsive, non-privileged documents comprising the annual audit workpapers
for fiscal years 1999 through 2001 in the possession, custody or control of PwC
located after a diligent search, if any, will be produced.

Peter Sloane
July 11, 2006
Page 19

REQUEST NO. 30:

Documents concerning the preservation, search for, collection, maintenance, destruction or alteration of any and all documents (including e-mail and other electronic data) concerning Organogenesis that were undertaken with respect to this action, including without limitation, all such action taken after this action was filed but prior to this request.

RESPONSE TO REQUEST NO. 30:

See General Objections, which are incorporated by reference herein. PwC further objects to this request to the extent it calls for documents that predate the filing of the initial complaint or are protected by the attorney-client and/or work product privilege. Any documents responsive to this request as modified herein will be identified on the privilege log PwC will be preparing and producing pursuant to its Response To Request No. 31.

REQUEST NO. 31:

A log, in accordance with the instructions above, of all Documents responsive to this Schedule A that You have withheld from production in response to these Requests.

RESPONSE TO REQUEST NO. 31:

See General Objections, which are incorporated by reference herein. Subject to the foregoing objections, and within a reasonable time following any production by PwC in response to the Subpoena, PwC will provide a log of documents withheld from any production.

\*            \*            \*

Peter Sloane
July 11, 2006
Page 20


         Although PwC is prepared to work cooperatively with plaintiffs'
counsel in an effort to promptly make copies of the documents identified in its
response to the Subpoena available for production, subject to the objections herein
and plaintiffs' agreement regarding costs of compliance with the Subpoena, the
protection(s) of a mutually agreeable protective order addressing issues of
confidentiality and access may be necessary prior to the disclosure of some or all of
those documents.  I understand that defendants in the underlying litigation have
moved for the entry of a protective order, and plaintiffs have sought an extension of
time to July 25, 2006 to respond to such motion.  Because multiple forms of
protective orders could be unworkable and defendants' form of protective order
expressly provides for the application of same to non-parties, we look forward to the
resolution of this issue by the Court.  If you would like to discuss any of the
foregoing, please contact me.

                              Very truly yours,

                              Matthew J. Matule