# EXHIBIT 6
# (Pt. 2)

# Exhibit 6

2-5-07organogenesis.txt

1

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2
      * * * * * * * * * * * * * *
 3    BRUNO HOFFMANN, et al       *
              Plaintiffs,         *
 4                                *
              vs.                 *        CIVIL ACTION
 5                                *        No. 04-10027-JLT
      PHILIP LAUGHLIN, et al      *
 6           Defendants.          *
      * * * * * * * * * * * * * *
 7
                    BEFORE THE HONORABLE JOSEPH L. TAURO
 8                   UNITED STATES DISTRICT JUDGE
                            MOTION HEARING
 9
      A P P E A R A N C E S
10
              MILBERG WEISS BERSHAD & SCHULMAN, LLP
11            One Pennsylvania Plaza
              New York, New York 10119
12            for the plaintiffs
              By:  Peter Sloane, Esq.
13                 Robert A. Wallner, Esq.

14

15            MOULTON & GANS, PC
              55 Cleveland Road
16            Wellesley, Massachusetts 02481
              for the plaintiffs
17            By:  Nancy Freeman Gans, Esq.

18

19

20                                     Courtroom No. 20
                                       John J. Moakley Courthouse
21                                     1 Courthouse Way
                                       Boston, Massachusetts 02210
22                                     February 5, 2007
                                       11:05 a.m.
23

24

25
```

2

```
 1    APPEARANCES, CONTINUED
```

2-5-07organogenesis.txt

2

3

4    MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.
     One Financial Center
     Boston, Massachusetts 02111
5    for the defendants
     By: Peter M. Saparoff, Esq.
6        Breton Leone-Quick, Esq.

7    GRIESINGER, TIGHE & MAFFEI, LLP
     176 Federal Street
8    Boston, Massachusetts 02110-2214
     for the defendants
9    By: Sara Jane Shanahan, Esq.

10
     WILMER CUTLER PICKERING HALE and DORR LLP
11   60 State Street
     Boston, Massachusetts 02109
12   for the defendants
     By: Jonathan A. Shapiro, Esq.
13       Jeffrey B. Rudman, Esq.

14

15

16

17

18

19

20                   CAROL LYNN SCOTT, CSR, RMR
                        Official Court Reporter
21                    One Courthouse Way, Suite 7204
                       Boston, Massachusetts 02210
22                         (617) 330-1377

23

24

25

0

                                                              3

1                         I N D E X

2

3

4                      COURT EXHIBITS

                         Page 2

2-5-07organogenesis.txt

5

6      No. 1   Document                         61

7      No. 2   Color Chart with citations       61
               submitted by Mr. Shapiro
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

□

4

1                    P R O C E E D I N G S
2                    THE CLERK:  All rise for the Honorable Court.
3                    THE COURT:  Good morning everybody.
4                    THE CLERK:  This is civil action No. 04-10027,
5       In Re: Organogenesis Securities Litigation.
6                    Counsel please identify themselves for the record.
7                    MS. GANS:  Nancy Freeman Gans, Moulton & Gans,

2-5-07organogenesis.txt
8    for the plaintiffs.

9                    MR. SLOANE:  Peter Sloane of Milberg Weiss for

10    the plaintiffs.

11                    THE COURT:  Okay.

12                    MR. WALLNER:  Good morning.  Robert Wallner,

13    Milberg Weiss, for the plaintiffs.

14                    MS. SHANAHAN:  Good morning, Your Honor.  I am

15    Sara Shanahan from Griesinger, Tighe & Maffei for defendant

16    John Arcari.

17                    THE COURT:  Okay.

18                    MR. SHAPIRO:  Good morning, Judge.  Jonathan

19    Shapiro and with me is Jeffrey Rudman from Wilmer Hale for

20    the following defendants:  Donna Lopolito, Philip Laughlin,

21    Albert Erani, Michael Sabolinski and Alan Tuck.

22                    THE COURT:  Okay.

23                    MR. SAPAROFF:  Good morning, Your Honor.

24    Peter Saparoff from Mintz Levin for Herbert Stein,

25    defendant.

                                                          5

1                    THE COURT:  Okay.

2                    MR. LEONE-QUICK:  Good morning.  Breton

3    Leone-Quick, also from Mintz Levin for defendant Herbert

4    Stein.

5                    THE COURT:  All right.  It is nice to have all

6    of you here.

7            I have read I think just about everything and I

8    think I have some grasp of the underlying issues.

9            I guess a place to start is the Milberg Weiss

10    situation.  It sort of permeates everything here.

                              Page 4

2-5-07organogenesis.txt
11          The argument is made that there is a probable cause
12   situation that invites further scrutiny or scrutiny beyond
13   what you would normally have in a case like this.  And then
14   on the other side we have a presumption of innocence and the
15   process, the process that is involved in these cases anyway
16   where the truth comes out.
17          And so I guess what I want to hear from the
18   defendants is where we are on that.  And maybe you disagree
19   with me.  It seems to me that it runs through everything.
20          MR. SHAPIRO:  Yes, Your Honor.  In fact, there
21   are essentially two themes that bear on the Milberg Weiss
22   situation.
23          One certainly is the indictment itself and what
24   that means and what it doesn't mean.  And then there is also
25   simply the performance in this case to the extent you can

☐

6

1    actually extract it or disaggregate it.
2           THE COURT:  Well, the performance, as I read
3    it, there are a lot of things to say.  I am not saying
4    nitpicky things but there are a lot of things to say which
5    we wouldn't be spending, you know, if that is all it was, we
6    wouldn't be spending twenty minutes on it if it weren't for
7    the indictment.
8           Do you -- at least that is my experience over the
9    last 35 years.
10          MR. SHAPIRO:  As a general matter, yes, Your
11   Honor.  And there is a certain aggregate effect here.
12          If I may propose, simply just to not to try your
13   and everyone else's patience and to motor along, what we
                          Page 5

2-5-07organogenesis.txt
14    have done is we have come up with just a time line of some

15    of these issues so you can place them in time.  That way we

16    don't have to talk about all of them unless Your Honor is

17    interested.

18                    THE COURT:  Go ahead.  But, I mean, you are

19    the one that is interested ideally in knocking Milberg Weiss

20    out and knocking out some of these people that --

21                    MR. SHAPIRO:  Certainly.  That is absolutely

22    correct.

23                    THE COURT:  So why don't you go for the

24    knockout and see if you make it.

25                    MR. SHAPIRO:  Okay.  Well, in terms of

☐

7

1    knocking them out, the way we would look at is they have the

2    burden of proof in the first instance to demonstrate the

3    adequacy not just of the law firm, of course, but the

4    plaintiffs and every one of the other elements that's

5    required under 23(a) and 23(b)(3) and also 23(g).

6                    If I could just approach, I'll pass out this time

7    line.  I have a bunch of them.

8                    THE COURT:  Give one to Steve.

9                    MR. SHAPIRO:  Sure.  Hopefully they're all the

10    same.

11                    (Pause in proceedings.)

12                    MR. SHAPIRO:  These are all events, Your

13    Honor, that are in the record.  And we can give you the

14    cites for all of them but --

15                    THE COURT:  If you want to use this

16    (indicating) podium --

Page 6

2-5-07organogenesis.txt

| | |
|---|---|
| 17 | MR. SHAPIRO:  That actually would be great. |
| 18 | THE COURT:  Just bring it back to where you |
| 19 | are and do whatever you want to do with it. |
| 20 | MR. SHAPIRO:  Now, in terms of the indictment, |
| 21 | there is one thing that we want to be very, very clear about |
| 22 | from the get-go. |
| 23 | Defendants are a defendant in a securities case. |
| 24 | This is a securities case as well.  You know, we have no |
| 25 | issue whatsoever with the presumption of innocence. |

□

8

1        It is important and it attaches to new counsel and
2    it attaches to the partners at the Milberg Weiss firm or the
3    former partners who have been indicted.  So we are not
4    suggesting in any way, shape or form that the simple fact
5    that this law firm has been indicted, that a grand jury
6    found probable cause is a reason to deny the motion.
7            But on the other hand, it --
8                    THE COURT:  Is a reason to deny the motion?
9                    MR. SHAPIRO:  For certification.
10                   THE COURT:  For certification.
11                   MR. SHAPIRO:  Right.  It's a bit more complex
12   than that.
13           And I think that fairly read the plaintiffs have
14   taken the position that, well, until we're tried -- and I
15   guess the trial is later this year or January next year --
16   it's irrelevant.
17           Well, it's not irrelevant because the presumption
18   of innocence attaches to the law firm.  But here the
19   plaintiffs are the movant and the question is is this law

Page 7

2-5-07organogenesis.txt
20     firm fit to serve in a fiduciary role. Does it matter to

21     Your Honor under Rule 24, under the precedent, whether the

22     indictment and all the other things that have gone wrong in

23     this case, does that matter in determining whether they are

24     fit to serve in this case as sole lead counsel?

25               We say it matters and I will give you a couple of

0

9

1     examples.

2               One, when Milberg Weiss came forward back in '04,

3     and, again, when they filed their motion for class

4     certification in '06, this was back in May of '06, they said

5     one of the reasons they were qualified is because they're

6     the best law firm in the business in this area. And then

7     they told you that they have a lot of very noteworthy

8     clients.

9               Two of those noteworthy clients were very large

10    pension plans, pension funds. One for the state of New

11    York, one for the state of Ohio.

12               Well, after the indictment the Attorney General of

13    Ohio said you're not our lawyer anymore. And the

14    comptroller of New York said you're not our lawyer anymore.

15               The way --

16               THE COURT: I think I misheard you. I thought

17    you said you are not a lawyer.

18               MR. SHAPIRO: You are not our lawyer anymore.

19               THE COURT: Okay.

20               MR. SHAPIRO: No, they certainly are a lawyer.

21               THE COURT: I mean, there has been no

22    disbarment or anything?

Page 8

2-5-07organogenesis.txt
 23                    MR. SHAPIRO:  Not that I'm aware of.  The only
 24    thing I've heard is that there is some inquiry in Delaware.
 25    And beyond that I can't speak to that.


☐

                                                                    10


  1                    THE COURT:  Okay.  Go ahead.
  2                    MR. SHAPIRO:  But the reason that these top
  3    officials, the AG and the comptroller, discharged the law
  4    firm was not because they had assumed that the grand jury
 ·5    was right but because when it comes to selecting a fiduciary
  6    to represent those public pension plans, and in this case to
  7    represent the sole lead counsel, a class of absent
  8    investors, the fact that a law firm has been indicted for
  9    lying to courts does matter.  It doesn't mean they did it
 10    but it matters.

 11                    And I think that's the reason why a number of
 12    courts have grappled with this very issue that Your Honor
 13    posed.  We have the presumption of innocence that attaches
 14    to them but does that, is that the answer to the adequacy
 15    question.

 16                    Judge Hornby, District of Maine, very late in
 17    December addressed that issue head on in the In Re: Motor
 18    Vehicles case.  That was not unlike this case at the class
 19    certification stage.  There the judge on sort of an interim
 20    basis saw this issue, looked at it, respected the
 21    presumption of innocence, but said this firm under these
 22    circumstances is not fit to continue as a fiduciary.

 23                    This case is actually different because there
 24    Milberg Weiss wasn't alone.  There was co-counsel.  The same
 25    in the Medtronics case.  That's in Minnesota.  There a

                              Page 9

2-5-07organogenesis.txt

☐

11

1    federal district judge came to the conclusion that under the
2    circumstances Milberg Weiss could not continue as one of a
3    handful of firms working jointly on a steering committee.
4              Here, again, they're alone.
5              The Chancery Court days before the indictment was
6    unsealed -- it was all, of course, all in the papers.  The
7    Chancery Court said reading just what I'm reading in the
8    paper I wouldn't be comfortable appointing them sole lead
9    counsel.  And there have been other courts as well.
10             Now, Milberg Weiss and the plaintiffs in this case
11   have provided Your Honor with a list, a fairly long list of
12   other courts that plaintiffs say stand for the proposition
13   that they are as fit and ready to go today as they were a
14   year ago.
15             If you look at each of those decisions, not one of
16   them as we read them -- and they haven't identified any --
17   appointed Milberg Weiss as sole class counsel on a contested
18   motion.  In a number of them there were stipulations.  It
19   wasn't litigated.  I think in virtually all of them they had
20   co-counsel.  And, in fact, in a number of those cases,
21   including one that plaintiffs brought to Your Honor's
22   attention, I don't know, sometime last week, Milberg Weiss
23   affirmatively said, Judge, don't worry, we have co-counsel
24   who is not indicted and that provides a safety net.
25             So there is no safety net here.  They're alone.

☐

12

2-5-07organogenesis.txt

1          Now, just taking it one step further, I think that
2     the inadequacy of counsel and the inadequacy of their
3     clients, of the lead plaintiffs, is laid bare by how they
4     reacted to the indictment.

5          They sent Your Honor a letter.  They said, Judge,
6     none of the attorneys litigating the case have been accused
7     of misconduct.

8          Well, the law firm that's been litigating the case
9     is indicted.  The lead Milberg Weiss partner who showed up
10    on fourteen odd pleadings in court papers on this docket in
11    this case has been indicted.  He also signed the engagement
12    letters.

13         And, in fact, just a couple of weeks ago the
14    Eastern District of Michigan in the Florida ERISA case
15    looked at the same boilerplate no lawyer litigating this
16    case accused of misconduct and said that it raises questions
17    about candor and for that reason and others, declined to
18    appoint Milberg Weiss lead counsel.

19         Now, turning to the plaintiffs, I have already told
20    Your Honor that sophisticated pension plans, the ones that
21    Milberg Weiss holds out as their blue chip clients, let them
22    go.  Here these plaintiffs made a decision or did not make a
23    decision to keep the lawyers.  And that at least raises a
24    question as to what --

25              THE COURT:  When you say "these plaintiffs,"

□

13

1     help me.  who are we talking about?
2              MR. SHAPIRO:  Sure.  There were four lead
3     plaintiffs.
                         Page 11

2-5-07organogenesis.txt

4               THE COURT:  You are talking about in this
5       case?
6               MR. SHAPIRO:  Absolutely in this case.
7               THE COURT:  You are not talking about the
8       other case?
9               MR. SHAPIRO:  No, I'm talking about in this
10      case.
11              THE COURT:  All right.
12              MR. SHAPIRO:  The question is serious enough
13      that we would suggest that any adequate lead plaintiff,
14      anybody who wants to serve as a fiduciary demands a very
15      high standard of care and diligence and focus -- there are
16      lots of cases for that -- would have at least looked hard at
17      this issue before deciding to keep Milberg Weiss as the sole
18      lead counsel.  He says they haven't done anything in that
19      regard.
20              At his deposition Mr. Madigan, one of the two
21      remaining lead plaintiffs, heard something about -- heard
22      something about an indictment but testified that he did not
23      know that the law firm was indicted.  He did not know that
24      Steve Schulman who signed his engagement letter had been
25      indicted.  He had never seen the indictment because lead

D

14

1       plaintiff -- lead counsel never showed it to him.  So the
2       first time he saw the indictment was at his deposition.
3               Similar story for Mr. Hoffman.  Doesn't know much
4       about the indictment.  Trusts the lawyers.  He's satisfied,
5       you know, someone else will make a judgment in the long run.
6       Maybe that's a rational decision or maybe it's not.  But
                                Page 12

2-5-07organogenesis.txt

7    here there has been no effort whatsoever to go through what
8    one would expect to be a deliberative process.

9            So you look at the indictment.  You look at the
10   five cases or so that we have put in front of you in which
11   this law firm has been found ill fit to serve even with
12   co-counsel.  You consider the fact that they don't have any
13   court that has found them on a litigated motion to be fit to
14   serve as sole lead counsel.

15           And then you overlay that into what has been a
16   rather extraordinary set of issues that have come up over
17   the last several months since Your Honor ordered the
18   production of documents.

19           And I think if you look at that series of issues,
20   even if this wasn't an indicted law firm with all those
21   problems, they wouldn't be adequate even looking at it sort
22   of on a standalone basis, not the plaintiffs and not the
23   lawyers.

24           There have been multiple false affidavits filed in
25   this case.  I'm not suggesting it was intentionally false.

15

1    Maybe it was inexcusably negligent.  It doesn't matter.
2    Fiduciaries are supposed to get these things right.

3            We have lost two lead plaintiffs.

4            Four plaintiffs and the law firm put in front of
5    Your Honor affidavits in 2004 when they asked you to appoint
6    them to be lead plaintiffs.  Your Honor appointed them.
7    Your Honor had no reason to doubt the truthfulness of those
8    affidavits, the ones filed in '04.  They were signed under
9    oath.  Rule 11, PSLRA and so forth.  You appointed them to

2-5-07organogenesis.txt

10    those fiduciary roles.

11              Then they filed papers last May.  They said they
12    now want to also serve a fiduciary role as class
13    representative and class counsel.  If you look at the papers
14    that were filed in May, May of '06, they told Your Honor
15    that this is an ideal class action.  Obvious slam dunk.

16              They specifically represented that there can be no
17    doubt that the four lead plaintiffs and Milberg Weiss are up
18    to the task.

19              Then Your Honor set a discovery deadline.  You said
20    all of you have to produce your stuff and you've got to do
21    it by June 30th.  And no messing around and I am not going
22    to give you an extension.

23              On June 29th, the day before Your Honor's deadline,
24    another letter was sent to the court.  This letter June 29th
25    said there may be some problems.  And that was a real

□

16

1     understatement.

2               Almost immediately after that letter two of the
3     four supposedly ideal lead plaintiffs don't show.  The first
4     to go was Dr. Conen, Richard Conen.  He resigned because he
5     said he had to under the Supreme Court Dura case.  Dura, of
6     course, says that Dr. Conen can't sue the defendants unless
7     he can show that the defendants caused him a loss.  So that
8     took care of Dr. Conen.

9               THE COURT:  He had no loss.

10              MR. SHAPIRO:  I don't know whether he had a
11    loss or not.  All I know is because we haven't been able
12    to --

Page 14

2-5-07organogenesis.txt

13              THE COURT:  He said he had no loss; isn't that
14      right?
15              MR. SLOANE:  Excuse me, Your Honor?
16              THE COURT:  He said he had no loss; isn't that
17      right?
18              MR. SLOANE:  No, he moved to withdraw --
19      excuse me, Your Honor.
20          He moved to withdraw because he, after considering
21      the impact of Dura, we didn't feel he was an appropriate
22      class representative.
23              MR. SHAPIRO:  That is the same explanation we
24      got.  We can't depose him because they say he is no longer
25      up for a deposition.

                                                        17

1               THE COURT:  All right.
2               MR. SHAPIRO:  So for whatever reason.  They
3       cite the Supreme Court case which says you have got to show
4       a connection between damages and what you're suing about.
5       And they cite that case and he is gone.
6           And we are happy to let him go because it is
7       necessary, we don't want to waste time and money and
8       everything.
9           The second to go was Richard -- excuse me -- was
10      John Bowie.  John Bowie is a stock broker who filed a very
11      false affidavit about his trading in stock.
12          Back in '04 when he wanted to be lead plaintiff, he
13      told Your Honor that he had four transactions during the
14      class period, precisely four.  He somehow forgot to mention
15      83 more.
                            Page 15

2-5-07organogenesis.txt

16          So after Your Honor sets the discovery deadline,
17     they come clean and say we've got these problems.  Mr. Bowie
18     puts in another affidavit in which he says I am deeply
19     sorry, I apologize and I'm embarrassed.  He puts that
20     affidavit in in July and promises to correct his affidavit.
21          He never corrects his affidavit.  Six days later
22     guess what?  He's gone too.  Personal reasons.
23          The reason all these affidavits are false -- and we
24     still haven't gotten to the most false -- the reason they're
25     all false is because we also learned on June 29th that

0

18

1     Milberg weiss never corrected the trading documents.  They
2     never corrected the trading documents before they put in
3     four plaintiffs' affidavits and one attorney affidavit and
4     like a dozen plus pleadings and court papers all based on
5     trading.  They never collected the documents.

6          The case was filed in January '04.  And they came
7     clean with not having the documents in June of '06.  That's
8     not how fiduciaries behave, Your Honor.  And that was just
9     the beginning.

10          So we went from the four ideal plaintiffs very
11     quickly within weeks down to two.  The two that remain are
12     Richard Madigan and Bruno Hoffman.  We have briefed this
13     extensively.  It's in this fancy little chart we pulled
14     together so I won't go through it all.  But they're no
15     better than the two that are left.

16          Starting briefly, Your Honor, with Richard Madigan.
17     You appointed him at the same time as you appointed
18     Mr. Bowie lead plaintiff.  Mr. Madigan told you about nine
                              Page 16

2-5-07organogenesis.txt

19   trades, all in which he said he lost money, losing trades.

20        In truth there were 55 more that didn't make it

21   onto the page. So Mr. Bowie's affidavit was 95 percent

22   wrong and Mr. Madigan's was 85 percent wrong. And things

23   got worse.

24        Mr. Madigan, like Mr. Bowie, put in another

25   affidavit apologizing, deeply embarrassed. He says he

1    doesn't have any memory of how it happened. It's all very

2    vague. But no worries, Your Honor, I'm going to fix it.

3    And he tells Your Honor he is working to collect the

4    documents and he will file a new affidavit.

5         Well, he didn't file a new affidavit all that fast.

6    The promise came in July, you know. It took him until after

7    Labor Day for you to get Madigan affidavit No. two.

8         Madigan affidavit No. two shows up conveniently

9    some forty hours before his deposition. So it's late. And

10   guess what? Madigan affidavit No. two is also false.

11        At his deposition Mr. Madigan realized immediately

12   that affidavit No. two was false. It included his son's

13   trades and his daughter-in-law's trades.

14        So when asked how affidavit No. two becomes false,

15   the testimony was, well, I didn't check the trading records

16   before I signed affidavit No. two.

17        All right. Well, who prepared affidavit No. two

18   for you, Mr. Madigan? I don't know. I think it was an

19   analyst but I don't know his or her name. But it was

20   someone working with Milberg Weiss.

21        So affidavit No. one is false. Affidavit No. two,

Page 17

2-5-07organogenesis.txt

22    unread, unchecked, signed, that's false.  Less false but
23    still false.
24            What else did we learn at the deposition?
25    Mr. Madigan, have you ever seen this document, the

0

20

1    complaint, the operative complaint?  I don't think I ever
2    have.  Have you ever read the complaint, sir, the operative
3    complaint?  My best guess is I haven't.  Mr. Madigan, how
4    much money have you lost?  He can't really ballpark it.  He
5    thinks it might be around ten thousand but really just
6    doesn't know.
7            So he never read the complaint.  He doesn't know
8    how much money he is seeking to recover from the never read
9    complaint.  And he is one of the two remaining supposedly
10    ideal plaintiffs.
11            Judge Tauro, one would think that after the second
12    false affidavit that Mr. Madigan and his counsel Milberg
13    Weiss would have moved very quickly to correct it.  No.
14            Ten more weeks go by.  It was not until
15    Thanksgiving or the week before Thanksgiving 2006 that
16    Mr. Madigan finally put on file a trading certification that
17    the PSLRA required to have been on file before this all
18    started back in January of '04.
19            There are other reasons why he is not fit.  Those
20    bear on technicalities.  We've been through adequacy.  It
21    all bleeds together.
22            When Mr. Madigan finally got around to disclosing
23    the 55 odd trades left out before, it turned out that they
24    were sales.  They were class period sales.  Those class
                                Page 18

2-5-07organogenesis.txt

25    period sales, when we had to hire an expert to help us

☐

21

1     figure it all out because they didn't do the job, it turned
2     out that he was net up. He made money. He lost some money
3     on some sales, made more money on other sales, was net up, I
4     don't know, $15,000.

5            Your Honor, in a case in which the plaintiff is
6.    suing defendants for harm because they supposedly
7     manipulated the stock, if the plaintiff makes more from the
8     supposedly inflated stock than he lost, he is not a
9     plaintiff. He doesn't have standing. Standing comes first.
10    That's Judge Saris' AWP case, the Enron case, Allen, Lewis,
11    some Supreme Court cases.

12            He's better off. And none of this was disclosed
13    until -- well, the problem was disclosed in June '06. The
14    truthful affidavit or what seems to be the truthful
15    affidavit took until Thanksgiving '06. We never filed a
16    motion to dismiss based on a lack of standing because we
17    never knew because we were trusting the affidavits
18    presumably just like the Court was.

19            Plaintiffs' response to this is, well, it all goes
20    to damages. We will deal with that later. It's just a
21    measure of damages. It doesn't blow up the case.

22            Your Honor, we think that's legally wrong. The
23    vast majority of cases, certainly since Dura but in the last
24    four or five years, have all held that the, you know,
25    LIFO -- that's the analysis our experts use -- that the LIFO

2-5-07organogenesis.txt

⬚

22

1    methodology is right.

2         We're not aware of any case after the Supreme Court
3    Dura decision that's held that their FIFO is right.  And in
4    some sense, Your Honor, it doesn't matter for class
5    certification because there is a bona fide substantive
6    dispute.  They've got some cases in the '30s in the tax
7    court.  We have got, you know, four or five cases and Dura,
8    you know, more recently.

9         Even if one were to credit their cases as being
10   smarter or still binding, you still have a very substantive
11   dispute and now we have a battle of the experts.  We have
12   got dueling affidavits on file.

13        So whether you look at it as standing, you know, a
14   plaintiff with standing can't represent himself much less a
15   class he is on, or whether you view it as a unique defense,
16   a real defense, he is certainly not typical and can't serve
17   as a class representative.

18        And finally with Mr. Madigan, he is not typical
19   because he didn't buy on the open market information in a
20   typical way.  Mr. Madigan testified at his deposition that
21   he met two or three times with the top management of
22   Organogenesis initially.  He met them at the company's
23   headquarters.

24        And he testified that having a chance to meet the
25   top management gave him some comfort about his investment

⬚

- 23

1    decision.  That makes him atypical of the open market

Page 20

2-5-07organogenesis.txt
2   investor who reads Yahoo or Wall Street Journal but doesn't
3   get comfort by spending time in the executive suite.  He is
4   not adequate.  And he's not typical.
5           Turning to Mr. Hoffman.  Mr. Hoffman is the only
6   plaintiff that's before Your Honor who near as we know did
7   not file a false affidavit.  But the absence of false
8   affidavits doesn't make him adequate and doesn't make him
9   typical.
10          He is certainly not a typical investor who makes an
11  investment decision in reliance on open market information.
12  In fact, Mr. Hoffman never decided to invest in
13  Organogenesis at all.  He wound up a shareholder because he
14  gave his money and full discretionary trading authority to a
15  broker or investment advisor.
16          The investment advisor without even talking to
17  Mr. Hoffman knew some folks at Organogenesis and spent
18  Mr. Hoffman's money on Organogenesis stock.
19          Mr. Hoffman testified that he had never even heard
20  of Organogenesis until he saw that strange name on a
21  brokerage statement.  And at some point thereafter he fired
22  the broker.
23          He is also not typical because the class period is
24  28 months and he stopped buying stock after six of them.
25  This is a purchaser class.  The allegation, the complaint

0

24

1   that Your Honor sustained was sustained on the basis that
2   investors purchased based on misleading statements.  And
3   plaintiff alleged 39 of the statements.  He stopped buying
4   after nine of the statements.  So he doesn't have standing

Page 21

2-5-07organogenesis.txt
5    to sue anybody for the truth or falsity of the back thirty,
6    the statements made during the twenty odd months that he
7    wasn't buying.

8              Co-counsel Ms. Shanahan for defendant Arcari now
9    has a motion for summary judgment because one of the
10   defendants, her client Arcari, didn't join the company until
11   he stopped buying. So he doesn't even have standing to sue
12   one of the defendants.

13             And he's also not adequate, Your Honor, because he
14   didn't do his job, under Carematrix, under Critical Path,
15   under the long string of cases that say that a class
16   representative needs to exercise diligence and care as a
17   fiduciary of the highest order.

18             He may have been honest on his affidavit but he has
19   no idea why all his co-plaintiffs are dropping off and why
20   there are all these false filings in the case.

21             An adequate plaintiff at some point says what's
22   going wrong with this case on my watch.

23             At his deposition Mr. Hoffman wanted nothing of
24   that.  It's not me.  I don't know.  It the lawyers' job.
25   Abdication, your problem.  That's not consistent with Rule

0

25

1    23 or the case law.

2              Mr. Hoffman also testified that he never spoke to
3    his co-lead plaintiffs for more than two years after this
4    case was filed.  The Carematrix decision says co-lead
5    plaintiffs need to run the show.  Sonus says the same thing.
6    They need to run the show.  They need to exercise control,
7    be on top of things, not let the lawyers, you know, run

Page 22

2-5-07organogenesis.txt

8      wild.

9            They never spoke until sometime in '06 before his
10     deposition.  And that was a ten-minute call.

11            Parenthetically Mr. Madigan didn't remember
12     speaking to him ever.  But a ten-minute call after all
13     that's happened in this case two and a half years down the
14     pike is not adequate.

15            And finally, Your Honor, looking at the false
16     affidavits in the context not only of this case but of other
17     cases, there is still a false attorney affidavit that's on
18     file with this case.  It's been on file since like March of
19     '04.  It says plaintiffs have losses of some number more
20     than two hundred thousand.

21            It includes losses of, you know, two plaintiffs who
22     have fled and it includes apparently losses of Mr. Madigan
23     who certainly didn't lose as much as they said he did and we
24     think he didn't lose anything.  That's still on file.

25            And then you look at the Sonus decision.  In Sonus

D

26

1      Judge Wolf said this should never happen again.  And what
2      happened in Sonus pales in comparison.  That was one wrong
3      affidavit.  It omitted post class period sales.

4            Here between Mr. Bowie and Mr. Madigan they
5      disclosed thirteen and left out 138.  And Mr. Madigan filed
6      another false one.  And lead plaintiffs still -- excuse
7      me -- counsel still has a false affidavit on file from '04.

8            The response to that was, "People are human."  And
9      also that is inevitable.  It's happened before and it will
10     happen again.

Page 23

2-5-07organogenesis.txt

11      That is not care and that's not diligence. There
12  is no way these affidavits could possibly have been right
13  because a lawsuit based on investment losses was filed and
14  affidavits claiming investment losses were signed under oath
15  and filed without anyone checking the trading records so
16  that's inadequate as well.

17      The law, we would say, Your Honor, the law is on
18  our side for the defendants because it puts the burden on
19  the plaintiffs' side of the V.  They have to show every
20  element under Rule 23.  That's the Tardiff decision, First
21  Circuit '04.  Polymedica, you know, emphasizes the
22  importance in '05 of, you know, needing to check every box.
23      Just last year the Second Circuit -- I'm not
24  suggesting it's binding on you -- but the Second Circuit
25  says it's not even enough to show every element but you

0

                                                           27

1   can't do, quote, some showing.  It's got to be robust.
2       They bear the burden on every element.  It needs to
3   be rigorous because you're looking at a set of defendants
4   who need to defend themselves, that's our job, but we're
5   spending hundreds of thousands of dollars chasing records
6   they never collected.

7       And it may be in a case where two plaintiffs are
8   gone, a third may not have standing at all and one may only
9   have standing for six out of 28 months.  They need to
10  affirmatively show every single element under Rule 23.

11      And they haven't shown typicality for either
12  plaintiff.  They haven't shown adequacy for either of the
13  two remaining plaintiffs.  And their sole lead counsel just

                      Page 24

2-5-07organogenesis.txt
14    isn't adequate.

15            Thank you, Your Honor.

16            THE COURT:  Now, what will you have me do?

17    You are very eloquent.  You have made a very good argument.

18            Now, what is the bottom line?  What would you have

19    me do?  Dismiss the case?  What do you have in mind?

20            MR. SHAPIRO:  I believe sort of under the law

21    in the cases that we've looked at the appropriate course is

22    you have to deny the motion.  They still have individual

23    cases on file.  They brought cases in their own name and on

24    behalf of a putative class.  But Your Honor I believe has to

25    deny the motion for certification because they haven't shown

☐

28

1    each element.

2            THE COURT:  Then what happens to the case?

3            MR. SHAPIRO:  Then we still have pending

4    individual complaints.

5            Mr. Bowie who fled still has a lawsuit against my

6    client.  I mean, it's a different lawsuit.  But then it

7    would be -- presumably the parties would confer and see how

8    are we going to go about dealing with these individual

9    lawsuits.

10            THE COURT:  Okay.

11            MR. SHAPIRO:  One final note, Your Honor.

12            THE COURT:  Yes.

13            MR. SHAPIRO:  They don't have another new

14    plaintiff.  They said back in July that there are, quote,

15    hundreds or perhaps thousands of plaintiffs who could be

16    adequate here but they have never come forward with any of

Page 25

2-5-07organogenesis.txt
17    them.    That's docket No. 143 on page 14.

18                   They filed a motion.  They haven't proved it up.

19    Half of it is gone already.  It needs to be denied.

20                   THE COURT:  Did you want to be heard now or do

21    you want to wait?  Or do you want to be heard at all?

22                   MS. SHANAHAN:  I can be very brief, Your

23    Honor, or we can move on to plaintiffs.

24                   THE COURT:  Well, I want to give plaintiffs a

25    chance to respond to everything, so go ahead.

□

                                                                    29

1                   MS. SHANAHAN:  Okay.  Well, just -- I'll defer

2    to the plaintiffs now and go at the end, if that's better

3    for the Court.

4                   THE COURT:  All right.

5                   MR. SHAPIRO:  Thank you, Judge Tauro.

6                   THE COURT:  Thank you.

7                   MR. WALLNER:  Thank you, Your Honor.  May I

8    address the Court here or would you rather me go --

9                   THE COURT:  Any place that you feel

10    comfortable.

11                   MR. WALLNER:  Thank you, Your Honor.

12                   May it please the Court, my name is Robert Wallner

13    and I'm representing the plaintiffs in connection with the

14    Rule 23 motion for class certification.

15                   Counsel for the defendants has made a number of

16    points and a number of important points that I'd like to

17    address.

18                   The Milberg Weiss firm has been indicted, Your

19    Honor.  And we take these charges very seriously.

Page 26

2-5-07organogenesis.txt
20      Mr. Schulman who was on the original papers has

21      resigned from the firm. Prior to that he took a leave of

22      absence. Mr. Bershad likewise has taken a leave of absence.

23              The counsel who have been litigating this case on a

24      day-by-day basis in the current time frame after

25      Mr. Schulman took his leave of absence are not implicated in

▯

30

1       the indictment. Indeed, the U.S. Attorney presumably

2       recognizing a presumption of innocence that applies to these

3       cases stated in the transcript that is before Your Honor

4       that you would hope that other persons at the firm would

5       step forward to litigate. And that's exactly what has

6       happened.

7               The trial in the Milberg Weiss case is presently

8       scheduled for January of 2008. There is some motion

9       practice that is scheduled or may be scheduled to take place

10      before that aimed at the allegations but the trial itself is

11      now set for January 2008.

12              And that is important, Your Honor, because under

13      the schedule that Your Honor has established, discovery in

14      this case, in the Organogenesis case, is set to conclude in

15      April of 2007. And assuming that that schedule is met, even

16      assuming some modest amendment to that schedule, it is

17      highly likely that summary judgment proceedings or even a

18      trial in this action will conclude prior to the scheduled

19      trial in the Milberg Weiss case now set for January 2008.

20              Indeed, at one of the pretrial hearings Your Honor

21      had set April of 2007 as the date for filing of summary

22      judgment motions. And, therefore, the prospect that Milberg

Page 27

2-5-07organogenesis.txt
23    Weiss will be unable to prosecute this case because of the

24    case against it is highly remote.

25              I believe, Your Honor, that the record shows -- and


□

                                                              31

1     I want to deal with what he calls "false certifications" in

2     a moment.  But I would submit, Your Honor, that the record

3     shows that the firm has prosecuted this case effectively and

4     successfully from the time of the case through today, the

5     day that brings us here today.

6              We survived a very aggressive and rigorous motion

7     to dismiss, that Your Honor had dismissed some defendants

8     but for the principal part the complaint is intact.

9              We have been engaged in document discovery.  Our

10    proposed class representatives Mr. Madigan and Mr. Hoffman

11    have been deposed.

12             And incidentally, Your Honor, Mr. Hoffman and

13    Mr. Madigan are in the court today.  And they're sitting

14    behind the bar.  And certainly if the Court has any

15    questions, they're available.

16             So I think the record in this case is quite good in

17    terms of how the firm, consistent with its reputation in the

18    past, has prosecuted this case.

19             Counsel points out that Mr. Madigan filed what

20    counsel called false certifications.  We take that very

21    seriously.  Mr. Madigan did file a certification at the

22    beginning of the case that for the most part had problems

23    because he did not include the sale transactions.  And,

24    indeed, as we pointed out in our papers, the word "sale" was

25    crossed out so there was a misunderstanding.

2-5-07organogenesis.txt

□

32

1           In the second certification he corrected for the
2      most part those problems but based upon the work of an
3      expert Mr. Marek, who himself has put in a report, there
4      were a couple -- there were some transactions of Mr. Richard
5      Madigan's son who is also named Richard but I think it's
6      Richard, Jr. who has the same street name and that was in
7      error.  And these errors do happen.  There is no suggestion
8      that the current extant list of transactions is accurate.
9           As for Mr. Hoffman, there is no suggestion that
10     anything about his certification is wrong, improper or
11     otherwise misleading in any way.
12          With respect to Mr. Madigan, Your Honor, there is a
13     dispute as to whether his transactions show damages or loss
14     under applicable law.  And the dispute here, Your Honor, is
15     very similar to the dispute that Your Honor heard in another
16     case before this court where my firm was involved.  It's
17     called the CVS case.  And it's a dispute between FIFO,
18     F-I-F-O, and LIFO, L-I-F-O.  And these are different ways of
19     an accounting for transactions.  First in first out or last
20     in first out.
21          And it goes to the issue of whether the sale that
22     you match is matched to the most recent purchase or some
23     other purchase.  We have briefed the issue and have showed
24     the Court I submit that LIFO is plainly an adequate and
25     appropriate manner of calculating damages.  And Your Honor

□

33

2-5-07organogenesis.txt

1    accepted that in the CVS case. And the IRS uses that and
2    numerous courts have also used that.

3         Perhaps the jury at some juncture down the road or
4    perhaps in some motion in limine or summary judgment
5    proceeding the Court will have an opportunity to address
6    that issue, or the jury will. But at this stage there is no
7    question that Mr. Madigan has standing. Indeed, Mr. Marek
8    showed that his losses are about a hundred thousand dollars.

9         So we have a good faith basis to show that
10   Mr. Madigan has been damaged and that he has losses that are
11   substantial and clearly has standing.

12        They also, defendants also make the argument that
13   Mr. Hoffman had a financial advisor and that it was a
14   discretionary account with Mr. Hoffman's financial advisor
15   making decisions to purchase the stock in Organogenesis.
16   But that is a rather typical type of arrangement.

17        These class representatives are businessmen.
18   They're not lawyers. They're not professionals in the stock
19   market. And it's rather typical and no doubt many members
20   of the class have financial advisors upon whom they rely.

21        What the defendants would have to show, Your Honor,
22   and which they haven't shown, is that there is something
23   about the purchases in this case such as the receipt of
24   inside information of a material nature that renders
25   nugatory the statements that we say and the omissions that

1    we say inflated the market price of Organogenesis stock
2    during the class.

3         For example, in their papers the defendants say
                              Page 30

2-5-07organogenesis.txt

4    that one of the plaintiffs, either directly or through his
5    financial advisor, was told about a crossover, that the
6    company at some point would become profitable. Yet that is
7    very similar to what we are complaining about in this
8    lawsuit.

9          The defendants stated that at some point in time in
10    the future the company would become profitable. We
11    challenged that statement.

12          What they didn't disclose, Your Honor, is that each
13    time they sold the product at issue -- and it's a skin
14    therapy product -- the company was losing money.

15          What the defendants did not disclose, Judge Tauro,
16    is that the financial condition of the company was quite
17    weak.  They told us that they have some financial
18    arrangements with Novartis, a marketing partner, but did not
19    disclose the difficulties that the company would have in
20    exercising those financial options called the put option.

21          So they didn't disclose the truth about what was
22    happening.  And, therefore, whether Mr. Hoffman had a
23    financial advisor who was duped or whether Mr. Hoffman
24    individually would have made the purchase decision, the fact
25    of the matter is that what was being told to Mr. Hoffman's

0

35

1    advisor is quite similar to what the market was being told.
2          They also challenged Mr. Hoffman because they say
3    that he purchased towards the beginning part of the class
4    period rather than at the end.  And any time, Your Honor,
5    there is a class period that spans several years, as it does
6    here, invariably we are going to have situations where
                                    Page 31

2-5-07organogenesis.txt

7      people who bought towards the beginning did not buy at a
8      time when each of the offending statements was made.

9           But what the law teaches us, and one of the leading
10     cases is Blackie v. Barrett, is that when there is a course
11     of conduct where the defendants like they're alleged to have
12     done here make misrepresentations and omissions about the
13     financial condition of the company and about the marketing
14     and manufacturing problems, we don't have to have a
15     plaintiff who purchased on each day during the class period.

16           If that were the law, we would wipe out class
17     certification.  That would be the end of Rule 23.

18           I wanted to briefly address their statements about,
19     the defendants say it was about the defendants -- the
20     defendants say it was that the plaintiffs don't know enough
21     about this case or cares enough about the indictment.

22           They're not lawyers.  They have put in declarations
23     stating that they have confidence in Milberg Weiss.  There
24     is a presumption of innocence that we urge this Court to
25     apply because, Your Honor, what I'm concerned about is

0

36

1      notwithstanding the U.S. Attorney's statement that
2      individuals at the firm should step up to the plate and
3      litigate these cases, I am concerned that the rule that the
4      defendants urge upon this Court is in effect a rule that
5      says if the firm has been challenged by the U.S. Attorney,
6      even if there is probable cause, if it's not proven, it
7      doesn't matter, Milberg Weiss, you must close down.

8           And I don't believe that that is the law that
9      applies here.  Counsel --
                          Page 32

2-5-07organogenesis.txt

10                    THE COURT:  In this type of case.

11                    MR. WALLNER:  Pardon me?

12                    THE COURT:  In this type of case.  I think

13      that, that is what I gather.  Not that anybody is ready to

14      turn their back on the presumption of innocence, the fact

15      that you have to prove a case beyond a reasonable doubt.

16              I think what he was suggesting to me -- and he can

17      speak for himself in a moment -- is that in this type of

18      case where a few people are given so much trust and

19      authority to litigate the financial problems of hundreds of

20      others, that there is a heightened standard that we should

21      look at when a situation, an unfortunate situation like has

22      this happened, a law firm being indicted.

23                    MR. WALLNER:  Your Honor, even accepting --

24                    THE COURT:  Not to demean the personal injury

25      part; but, I mean, it isn't an intersection case where one


d

                                                                    37

1       of your skilled lawyers, and some of them were very, very

2       skilled, and tried those cases, of course, is going to try a

3       case.  Here you have much more at stake.  And I don't mean

4       to sound pedantic.

5                     MR. WALLNER:  I appreciate that.

6                     THE COURT:  I am telling you what you know

7       anyway.

8                     MR. WALLNER:  Sure.

9               The fact of the matter is, Your Honor, that while I

10      can appreciate the distinction between the so-called

11      personal injury case and the case here, I think this Court

12      should be guided by what many other courts have done.  Not

2-5-07organogenesis.txt

13    every court to be sure, which is to say there is a
14    presumption of innocence.

15        Milberg Weiss has been able to litigate the case.
16    We overcame the motion to dismiss. And the trial in the
17    Milberg Weiss case is set for next year at a time when this
18    case, assuming Your Honor's schedule sticks, even with some
19    modifications, may well be over.

20        I think, Your Honor, that the issue of class
21    certification in terms of who the representatives are, who
22    the counsel is, how they're performing, can be assessed
23    throughout the course of the litigation.

24        THE COURT: Who is going to be the class
25    representative? Who is going to be the class plaintiffs?

▯                                                        38

1        MR. WALLNER: Mr. Madigan and Mr. Hoffman.
2        THE COURT: Just two?
3        MR. WALLNER: Yes. The representatives. And
4    that's not unusual. In many cases there is one proposed
5    class representative and in others there are multiple.

6        So we have what I believe to be highly adequate
7    class representatives. They don't challenge anything about
8    Mr. Hoffman's certification. And we have a case which
9    likely can be concluded at least through trial prior to the
10   time of the Milberg Weiss case.

11       If moving down the road the Court is concerned --
12       THE COURT: Now, the defendants are asking to
13   have -- who are you asking to have deposed? Forgive me
14   for --
15       MR. SHAPIRO: Your Honor, we have pending
                        Page 34

2-5-07organogenesis.txt

16    motions to depose Mr. Conen, Dr. Conen who is one of the
17    plaintiffs, and Mr. Bowie.

18         And I would say the bigger point here, the problem
19    with the wait and see approach is what happens, even if
20    standing were a jury question, what happens if he doesn't
21    have standing?  What happens to the rest of case post
22    judgment?  What if after a January trial Milberg Weiss
23    pleads guilty or gets convicted?

24         I mean, we have a pretrial before Your Honor in
25    April.  We've been making time and we're ten weeks out and

0

39

1    they still don't have a good plaintiff and they have a law
2    firm that's representing them that no court has appointed to
3    a fiduciary duty -- a fiduciary role as sole counsel.

4         THE COURT:  Okay.  I am going to give you an
5    opportunity to speak in a minute.  I just wanted an answer
6    to my question.

7         Go ahead.

8         MR. WALLNER:  Yes.  They are seeking to take
9    depositions of people who are not proposed class
10    representatives.

11         Mr. Hoffman's certification they don't challenge.
12    He is highly adequate.  We believe Mr. Madigan is highly
13    adequate too.

14         What Mr. Shapiro's statement to Your Honor focuses
15    on is the prospect that at the Milberg Weiss trial in
16    January 2008, well after this case may be over, something
17    will happen that will affect this case.  But this case will
18    be over.

## 2-5-07organogenesis.txt

19          If, for example, Your Honor, we go to trial in the

20     summer and we win and we win all the damages and then next

21     year in 2008 there is a trial against Milberg Weiss which

22     turns out hypothetically adversely to Milberg Weiss, that

23     judgment is still sacrosanct. We will have recovered on

24     behalf of the class.

25          Let's flip it. Let's suppose we go to trial, Your

0

40

1     Honor, and we lose the trial. Or let's suppose there is a

2     summary judgment motion made by the defendants and they get

3     summary judgment in their favor. Then the case is over.

4          So the prospect that something horrific could

5     happen to Milberg Weiss next year I submit should not inform

6     the Court about the propriety of moving forward at this

7     time, particularly where I submit my firm has prosecuted

8     this case effectively to the ultimate benefit of the class

9     members. We have sustained --

10          THE COURT: What about the assertions that

11     your law firm hasn't complied with the discovery orders? I

12     don't have it at my fingertips, but substantial discovery is

13     alleged not to have been timely produced, produced in a

14     timely fashion.

15          MR. WALLNER: Your Honor, I would ask Mister

16     --

17          THE COURT: Going right up through today as I

18     take it.

19          MR. WALLNER: Mr. Sloane in the context of the

20     discovery motions is certainly prepared to discuss that.

21     But I don't think that the challenge --
                         Page 36

2-5-07organogenesis.txt

| | |
|---|---|
| 22 | THE COURT: That is all part of the |
| 23 | qualifications of the firm to go forward. I mean, if you |
| 24 | have got a close case, if you have got a close case, you |
| 25 | know, given the indictment and the presumptions and all |

☐

41

| | |
|---|---|
| 1 | that, and my sensitivity to it. I mean, I have had your |
| 2 | firm before me many times over the years. Always very |
| 3 | satisfactory. Never anything but a good experience. |
| 4 | But a different ball game today. And if on top of |
| 5 | that load that you have to carry, because it is your burden |
| 6 | to reach the top, we have, for whatever reason, the failure |
| 7 | to do the routine discovery things that have to go on in |
| 8 | every case. Maybe it is overload because of the |
| 9 | circumstances. I could understand if it were. |
| 10 | But if it exists, maybe they should not be in the |
| 11 | case. |
| 12 | MR. SLOANE: Your Honor, may I respond to that |
| 13 | particular point? |
| 14 | THE COURT: You will have -- I want to give |
| 15 | him an opportunity to finish. |
| 16 | MR. WALLNER: Yes. |
| 17 | THE COURT: You can have all the time you |
| 18 | want. |
| 19 | MR. WALLNER: Yes. Mr. Sloane is familiar |
| 20 | with the discovery issue. And may I defer to my partner |
| 21 | Mr. Sloane? |
| 22 | THE COURT: Do you want to stop -- you don't |
| 23 | have to answer my question now. If you want to go on with |
| 24 | the rest of your argument -- |

Page 37

2-5-07organogenesis.txt

25                    MR. WALLNER:  Yes, sure.


☐

                                                              42

1                        THE COURT:  If you want to pause, you may
2       pause.
3                        MR. WALLNER:  May I pause?  Mr. Sloane will
4       address that.  Thank you.
5                        MR. SLOANE:  I just wanted to point out, Your
6       Honor, that the plaintiffs have complied with all of their
7       discovery obligations in this case.  And I am not aware of
8       any motion that the defendants have made that we haven't
9       complied with that or that there is any discovery
10      outstanding --
11                       THE COURT:  There is no motion to compel.
12                       MR. SLOANE:  We haven't -- or that there is
13      any suggestion that there is discovery that they are
14      entitled to that we have not provided.
15                       THE COURT:  Well, let's get an answer to that.
16                       MR. SHAPIRO:  Actually, Your Honor, there is
17      very much a suggestion.
18             On June 30th they were supposed to give us trading
19      records.  Rule 11 required them to have those trading
20      records in January '04.  They sent a letter saying they were
21      just collecting them.
22             We sent about $100,000 or more going to collect
23      their trading records from third parties and then having to
24      hire someone to figure all this out.
25             And that is not effective and successful

                              Page 38

2-5-07organogenesis.txt

43

1    prosecution of this case.

2                    MR. SLOANE:  Excuse me, Your Honor.

3                    The plaintiffs, all of the plaintiffs produced the

4    documents that were in their possession, including documents

5    relating to their trading in the stock by January -- June

6    30th, excuse me.

7                    There were records that were records regarding

8    their trading that were not in their possession and that we

9    sought from their brokers.  And defendants also subpoenaed

10   their brokers.  We also subpoenaed some of their brokers.

11   And those documents were provided after June 30th but that

12   was because they were provided by the brokers, not because

13   we did not live up to our obligations under the discovery

14   order.

15                   And I would like to point out that defendants, the

16   defendants did not produce eight boxes of documents that

17   they should have produced under the discovery order till

18   months after June 30th.  So the suggestion that we have not

19   been complying with our discovery obligation is not a fair

20   one, Your Honor.

21                   MR. SHAPIRO:  Judge, it absolutely --

22                   THE COURT:  I am going to give you a chance to

23   respond.

24                   MR. SHAPIRO:  Fair enough.

25                   THE COURT:  Go ahead.

44

1                    MR. WALLNER:  I just wanted to conclude --

Page 39

2-5-07organogenesis.txt
2    thank you, Your Honor.  Robert Wallner.  I just wanted to
3    conclude with the attack on the due diligence and care of
4    the plaintiffs.  They are laymen.  They are not lawyers.
5         In cases like this it is --
6              THE COURT:  But the law has changed.  They are
7    supposed to have more than a passive interest.  I mean,
8    there is a burden to get yourself involved.  I thought that
9    was the spirit of this action.
10             MR. WALLNER:  They have been involved, Your
11   Honor, understanding that they are laymen.  They are not
12   lawyers.  And they have produced discovery --
13             THE COURT:  Well, presumably they are very
14   successful businessmen who know how to read and know better
15   than to get snookered by anybody.  And so if there is going
16   to be a presumption, I will give them that presumption.
17        Those are the two gentlemen seated in the back?
18             MR. WALLNER:  Behind the bar (indicating),
19   yes.
20             THE COURT:  They even look smart just sitting
21   there.
22             (Laughter.)
23             UNIDENTIFIED SPEAKER:  I am smart.
24             (Laughter.)
25             MR. WALLNER:  And they have taken this case

▯

                                                        45

1    very seriously.  They confer with plaintiffs' counsel.  They
2    sat for depositions.  They answered lots of questions.
3         Mr. Hoffman came up today from the New York area.
4    Mr. Madigan is more local.  And they are prepared to
                        Page 40

2-5-07organogenesis.txt
5   continue to prosecute effectively in this case.

6           The issue I submit, Your Honor, at the end of the
7   day is where you have a case where there has been massive
8   fraud alleged against the company and its individuals where
9   the action has been sustained on a motion to dismiss and
10  where the shareholders have sustained substantial financial
11  losses.  This company as we know went into bankruptcy.
12  Whether there is any remedy left for the class --

13          THE COURT:  But you keep tapping on the motion
14  to dismiss.  That is not a victory, denial of a motion to
15  dismiss.  I have to look at what is alleged and take it to
16  be true.

17          MR. WALLNER:  That's correct.

18          THE COURT:  As long as somebody can articulate
19  some language that passes minimum muster, then you survive
20  the motion to dismiss.

21          A motion for summary judgment is a different ball
22  game.

23          MR. WALLNER:  That's correct.  That's correct.

24          But I submit, Your Honor, that they have a
25  sufficient understanding of the case.  They conferred with

☐

46

1   counsel.  And Mr. Madigan did make some mistakes.  There is
2   no suggestion that Mr. Hoffman made any mistakes.

3           And in the absence of a Rule 23 certification, from
4   a practical perspective the ability of class members to
5   vindicate their rights in this case will be eliminated.

6           And we request that Your Honor grant the Rule 23
7   motion.  Thank you.

Page 41

2-5-07organogenesis.txt

8          THE COURT: Okay. Do you want to be heard

9   again? Go ahead.

10          MR. SHAPIRO: Judge Tauro, the answer to every

11  mistake that's made on the plaintiffs' side can't be that an

12  investor has lost money.

13          The rule requires them to show each and every

14  prong, not to say it is not proper, not plead, but something

15  substantial. More than a mere showing.

16          At every turn this has been the response to a

17  misstatement. An investor has lost money. The defendants

18  are liars and we'll fix it all later on. That's not how it

19  works.

20          They started this case accusing others of fraud

21  with false affidavits, still one on file. They can't now

22  just say, well, they're laymen.

23          Well, Mr. Bowie wasn't a layman. He was a stock

24  broker who got it 95 percent wrong. Oh, by the way, he was

25  Mr. Madigan's stock broker.


                                                        47


1          It's not enough to say that they're here in the

2   court today and showed up for a deposition. They never

3   spoke according to Mr. Madigan before his deposition. And

4   they only spoke for ten minutes once on a call according to

5   Mr. Hoffman. This may be the first time they ever laid eyes

6   on each other.

7          They are not controlling the lawyers. Your point,

8   Your Honor.

9          The whole idea was that the statute is going to

10  come up with some sort of protections to put the litigants

                        Page 42

2-5-07organogenesis.txt
11    in charge of the lawsuit like it is in other cases.

12          Here no one is minding what the lawyers are doing.

13    Mr. Hoffman who is inadequate because he says it's all

14    counsel's job, not my problem.

15          Mr. Madigan said he didn't read the complaint.

16    That's not minimal knowledge of what's going on in the case.

17          Now, with respect to the presumption of the

18    innocence, and we will see where all this goes, it's exactly

19    right. It is a higher standard. The question isn't whether

20    this law firm will some day be convicted. We only have the

21    facts that are in front of us now.

22          We have the benefit of hindsight. We never have

23    foresight. There is a trial that's scheduled, a criminal

24    trial I gather, for ten, twelve, eleven months from today.

25    It's very serious. The allegations of that, people in

0

48

1    courts were lied to. One hundred fifty class action

2    lawsuits. Legal fees in excess of, I don't know, a hundred

3    million dollars.

4          Two clients have pled guilty accounting for more

5    than, you know, seventy of these cases. I don't know why

6    they pled guilty. But this is serious.

7          There is not a single case that has been brought to

8    the fore where this law firm has been affirmatively

9    appointed by any court as sole counsel in any case under

10    Rule 23. And the standard is higher. It's not whether you

11    have been convicted.

12          Surely whatever Rule 23(g) means and whatever

13    Rule 23(a)(4) means, it doesn't mean that anybody is

Page 43

2-5-07organogenesis.txt

14    qualified if they haven't yet, you know, been convicted,

15    sentenced and, you know, and filed and had denied their

16    posttrial motions.

17          With respect to the standing, it's sort of the same

18    issue.   Oh, Mr. Madigan, we'll figure out FIFO or LIFO later

19    on.

20          Well, first, with great respect, they are just

21    wrong that LIFO is not like an appropriate methodology.

22    There have been five cases within the last two or three

23    years, most of which post Dura which say LIFO is what you do

24    and FIFO is, you know, what the IRS does under different

25    circumstances.

0

49

1          Nothing like as I read your CVS opinion.   Your

2    Honor knows what you meant in CVS.   I am not going to --

3              THE COURT:   I didn't really decide the issue.

4              MR. SHAPIRO:   I don't think you -- well,

5    whatever you said in CVS, I could not read that to say that

6    you now say it's open season for lead plaintiffs who don't

7    read complaints, repeatedly file false affidavits and don't

8    know each other.   And it didn't seem to displace anything

9    about standing.   And it came before Dura.

10          When I read the transcript that Your Honor did in

11    CVS, you seemed to focus on the common liability and the

12    allegation of the inflated stock.

13          The Dura decision they don't deal with in their

14    papers.

15          The Dura decision 2005 says that common themes and

16    liability and inflated stock alone isn't enough.   To be a

Page 44

2-5-07organogenesis.txt
17    plaintiff, you have to plead and later on you have got to
18    prove that you bought the stock at the inflated price
19    because of the statement and then you lost money. You've
20    got to tie it all up. It's kind of like Prosser, you know,
21    proximate cause.

22              So to say it's all going to be worked out later
23    isn't acceptable. And with respect to the different
24    scenarios that Milberg Weiss will win millions of dollars
25    and it will all be great or Milberg Weiss will lose and it

□

50

1     will all be great, well, what if we win and we get a
2     judgment in our favor and then it's collaterally attacked.
3     That's not trivial. That's what Judge Hornby was focused on
4     in part when he didn't want to, even as one handful of
5     counsel in the Maine case motor vehicles. Medtronics said
6     that. I believe that the Key v. Gillette case from years
7     back from the First Circuit said that. There are other
8     cases as well.

9              We have an interest in finality also. You can't
10    even settle a case under these circumstances, Andrews and so
11    forth, I mean, you can't buy the peace.

12             And I think that's why Milberg Weiss, including in
13    the cases it cites to you, it's telling courts, told Judge
14    O'Toole in one of our cases, no worries, we've got
15    co-counsel. They're all alone here.

16             Finally, Your Honor, we rest on our papers with
17    respect to this inside trading issue. We very clearly put
18    in an evidentiary record to show that this broker that
19    Mr. Hoffman relied on is precisely the problem. He breaks

Page 45

2-5-07organogenesis.txt

20      the chain.  He's at least subject to atypical, you know,

21      defense as an atypical plaintiff.

22              That broker by the way has the distinction of being

23      subject to cease and desist fraud orders from both the SEC

24      and the Federal Reserve for not being truthful to clients.

25      That same broker was making written promises that contrast

0

51

1       starkly with the public statements.  We've briefed that

2       including why this case is not like Swack.

3               And I guess I would just close by saying they have

4       to prove every one of these elements.  They haven't done it.

5       Saying that somebody who is absent and not here is going to

6       lose out is not the answer.  That's the reason why they

7       should have gotten it right back in 2004 when the PSLRA and

8       your very early Greebel decision under it said they needed

9       to get it right and file something honest at the outset.

10              THE COURT:  Okay.  Anybody else scheduled to

11      speak or not scheduled?

12              MR. WALLNER:  Your Honor, I just wanted to

13      spend thirty seconds responding to Mr. Shapiro's point --

14              THE COURT:  Go ahead.

15              MR. WALLNER:  -- about the Swack case.  The

16      Swack case which is a decision in the District of

17      Massachusetts that we cite in our papers, the Transkaryotic

18      decision also of this court, support the proposition that

19      even if a financial advisor or a purchaser has access to

20      information outside the public documents, unless that

21      information is so different and is going to become the focus

22      of a trial, it doesn't matter.

Page 46

2-5-07organogenesis.txt
23        In the real world it's not surprising that

24   investors would have sources of information.  They speak to

25   their friend.  They speak to their broker.  Maybe the broker

0

52

1    knows someone inside the company.  They also have prices.

2    They have documents that are publicly filed.

3             It may be a whole confluence of issues.  But as

4    long as the price of the stock is affected by what is

5    happening in the marketplace, and they haven't been able to

6    break that chain, then it matters not that the broker may

7    have spoken to some people inside the company.

8             Thank you.

9                 MS. SHANAHAN:  Your Honor, may I address my

10   summary judgment motion briefly?

11                THE COURT:  Go ahead.

12                MS. SHANAHAN:  We largely rest on the papers;

13   but as the Court is aware, the chronology goes that

14   Mr. Hoffman purchased his last set of Organogenesis stock on

15   April 13, 2000.  Mr. Arcari did not join the company until

16   May 1st, 2000.  And in the complaint the court sustained the

17   motion to dismiss does not describe any statements by

18   Mr. Arcari during the time frame in which Mr. Hoffman was

19   purchasing his stock.

20             And it's for that very reason that we submit that

21   under both the Constitution, Article III, and rulings of the

22   First Circuit and other courts, there is no standing for

23   Mr. Hoffman to sue Mr. Arcari because there is no connection

24   between any statements in the market at the time that

25   Mr. Hoffman purchased and anything done by Mr. Arcari.

Page 47

2-5-07organogenesis.txt

53

1          Now, there is a suggestion in the plaintiffs'
2   response, which is a Rule 56(f) response, that this is an
3   issue that should be decided at a later date, perhaps on the
4   eve of trial after there is discovery. And I would submit
5   to the Court that that is incorrect really for three
6   reasons.

7          First, this motion does need to be decided now and
8   really in advance of certification motions. The law of the
9   circuit is clear that standing is a threshold issue. It has
10  to be decided before certification. And lead plaintiff
11  cannot bootstrap himself into class representative position
12  based on the class standing. He has to have standing in his
13  own right.

14         Secondly, as the Court pointed out, this case had a
15  motion to dismiss sustained based on certain described
16  statements allegedly made by the defendants.

17         Now, in their papers in opposition to summary
18  judgment plaintiffs seek to do additional discovery of
19  Mr. Arcari and of all the other defendants and numerous
20  third parties.

21         And I would submit that any discovery they do in
22  that case is essentially a fishing expedition in order to
23  find evidence that may or may not be a claim about what
24  Mr. Arcari had done very abstractly with the company before
25  he joined.

54

2-5-07organogenesis.txt

1       But the papers that we submitted in support of the
2    motion demonstrate that Mr. Arcari joined the company
3    May 1st, was not involved with the company before April 13th
4    and so that is not a warranted fishing expedition.
5       More importantly, as a matter of law, anything that
6    they seek to describe as potential evidence that they will
7    find doesn't rise above the level of what has been described
8    as aiding and abetting evidence.
9       And the Supreme Court decision in Central Bank has
10   held quite clearly that there is no liability for aiding and
11   abetting a 10(b) violation.  There has to be an actual
12   statement made by the defendant that is the crux of his
13   liability.
14      Mr. Arcari didn't say or do anything at
15   Organogenesis prior to Mr. Hoffman's final purchase of
16   stock; and, therefore, the summary judgment motion is not an
17   academic exercise.  It does need to be decided in advance of
18   the certification motion.
19      And it's particularly important in this case given
20   what Mr. Shapiro laid out in great detail with the problems
21   of Mr. Madigan's both standing and adequacy to prosecute
22   this case.
23      In the event that Mr. Hoffman remains as the sole
24   lead plaintiff, he cannot be a sole lead plaintiff in a
25   class with Mr. Arcari as the defendant.

0

55

1           THE COURT:  Do you want to be heard?
2           MR. SLOANE:  Thank you, Your Honor.
3           The defense counsel said that the defendant Arcari
                         Page 49

2-5-07organogenesis.txt

4      didn't say or do anything before he joined the company on
5      May 1st.
6                  Now, it is important to understand that he formally
7      became employed with the company on May 1st and we
8      understand it as the chief financial officer but we don't
9      know what the defendant Arcari did before then.
10                 The time period that we are talking about --
11                 THE COURT:  Does that help you that you don't
12     know?  I mean, don't you have to know?  You are bringing the
13     case.
14                 MR. SLOANE:  Well, Your Honor, we've alleged a
15     common course of conduct among the defendants to participate
16     in --
17                 THE COURT:  Do you have some good faith basis
18     for making that as an assertion?
19                 MR. SLOANE:  Yes, Your Honor.  We have a
20     document that we have -- that we obtained that was, we
21     allege was created by the defendant Arcari, and that he has
22     not denied, that lists a number of actions by one of the
23     other defendants, defendant Albert Erani which would be
24     described charitably as suspicious activity.  And that
25     activity goes back to March of 2000 which is the month

0

56

1      before Mr. Hoffman made his last purchase of stock and two
2      months before --
3                  THE COURT:  What does that have to do with
4      Arcari?
5                  MR. SLOANE:  It was the defendant Arcari who
6      created this document.  He wrote it.
                                   Page 50

2-5-07organogenesis.txt

7            THE COURT:  What do you say about that?

8            MS. SHANAHAN:  Your Honor, the document that

9    they're referencing has a date of October 2001 on it.  It's

10   a long list of chronology issues.

11           The two that Mr. Sloane is identifying that --

12   again, it's dated March 2000 -- relate to essentially

13   publicly available information.  It doesn't indicate any

14   insider information or activity by Mr. Arcari in the March

15   2000 time frame.  This is a document dated October 2001.

16           More importantly, the vast picture that the

17   plaintiffs can paint with these inference that there might

18   have been some, I don't know, meeting or whatnot that

19   Mr. Arcari attended at the company, which I don't believe

20   there is any basis for alleging, they have to allege that

21   Mr. Arcari made a statement, a public statement giving rise

22   to liability under securities laws.

23           There is no statement here.  And given that there

24   is nothing in the complaint and there is nothing identified

25   that they say, oh, well, by the way, there is this other

□

57

1    statement that was out there made by Mr. Arcari, he simply

2    cannot be a defendant.

3            The courts have recently held in the Eighth Circuit

4    in the In Re: Turner Communications case and in other cases

5    that it's not enough for a third party to be sort of around

6    the periphery while the main defendants were making

7    statements.  They have to have actually made statements

8    themselves in order to be liable under 10(b).

9                 So even if this phantom evidence that I don't
                                 Page 51

2-5-07organogenesis.txt

10    believe there is any basis for expecting it would be found,

11    even if such phantom evidence were found, it's just at best

12    aiding and abetting evidence.

13            And under the Central Bank decision out of the

14    Supreme Court, there is no liability for aiders and

15    abettors.  That's not a pendent claim.

16            THE COURT:  All right.

17            MR. SLOANE:  May I briefly respond, Your

18    Honor?

19            THE COURT:  Please.

20            MR. SLOANE:  I'll first address the law and

21    then briefly address the facts.

22            With respect to the law, we're not trying to state

23    a claim for aiding and abetting liability.

24            There is primary -- excuse me -- primary liability

25    can be found, and I'm quoting now from the Swack case, I


□

58

1    mean, some cases found where a person substantially

2    participates in a manipulative or deceptive scheme even if a

3    material misstatement by another person creates the nexus

4    between the scheme and the securities market.

5            So we don't believe that it is necessary for the

6    defendant, for defendant Arcari to have made a public

7    statement in order to be held liable.

8            There are also other cases to that effect, Your

9    Honor, which we cite in our brief, including the Fezzani

10    case.

11            With respect to the facts that give rise to the

12    inference that he was involved in this scheme before he
                        Page 52

2-5-07organogenesis.txt

13    joined the company, the document that I was referring to is
14    dated October of 2001. But we don't know when Mr. Arcari
15    possessed this knowledge or first came to possess this
16    knowledge about the company. We don't know what it says
17    about when he first came to be involved in this scheme or
18    this conspiracy.

19         Defense counsel says that this document says
20    nothing other than what was already publicly disclosed.

21         I'd like to read to Your Honor the two entries,
22    they're very brief, from March of 2000. And I submit that
23    these are not in any public filing.

24         This is an entry speaking about Albert Erani.  It
25    says, "Drove board to approve 6.2 million dollar cash

□

59

1    redemption in Series C convertible preferred stock at a time
2    when the company had little cash. Could have redeemed for
3    stock but was dilution phobic."

4         The other entry says, "Did not sell stock off the
5    shelf when opportunity existed to sell more shares at $14.50
6    per share."

7         The other issues in this document, Your Honor --
8              THE COURT:  What is the significance of that,
9    in terms of anything other than to say it is historic
10    treatment of something that happened?

11              MR. SLOANE:  Well, we don't know, Your Honor,
12    when -- this document doesn't say when, No. one,
13    defendant --

14              THE COURT:  Well, it didn't say that
15    Mr. Arcari did anything. It is just a summary of some
                              Page 53

2-5-07organogenesis.txt

16    information.  We don't know where he got it.

17              MR. SLOANE:  That's right, Your Honor.  But I
18    submit that we should have the opportunity to find out what
19    he does know about it, when he became involved, if he was
20    involved in any of this suspicious activity that's listed
21    here, including the manipulation or the attempted
22    manipulation of the market for the company's stock, and when
23    he became involved, if at all, in this scheme.

24              THE COURT:  Well, to make it clear, then what
25    you are saying to me is that piece of paper which, for want

☐

60

1     of a -- I don't know how we can identify it except to take
2     it and call it a court exhibit.

3               MR. SLOANE:  Your Honor, if I may, this has
4     been submitted to the Court on a previous motion.

5               THE COURT:  Well, I am sure it has.  I want to
6     make sure that we are talking about the same piece of paper.
7     we will call it Court Exhibit 1 for the purposes of this
8     hearing.  Okay.  So we are literally on the same page.

9               Now, are you telling me that is all you have got?
10    If that isn't it, there is nothing else?  With respect to
11    Acari.

12              MR. SLOANE:  Well, what we're saying is that
13    on the basis --

14              THE COURT:  That is a simple question.  And I
15    don't want to press you but --

16              MR. SLOANE:  At this point, yes, Your Honor.

17              THE COURT:  That is a good, honest answer.

18    But this is the ball game for you at this point.

2-5-07organogenesis.txt

| | | |
|---|---|---|
| 19 | MR. SLOANE: Yes, Your Honor. | |
| 20 | THE COURT: Okay. | |
| 21 | MR. SLOANE: Before the conclusion of | |
| 22 | discovery, yes. | |
| 23 | THE COURT: Okay. Anything else? | |
| 24 | Anything from anybody? | |
| 25 | MR. SHAPIRO: Judge, I'm just reminded, if I | |

⬜

61

1    could just drop these (indicating) off with Ms. Lovett.  We
2    have, for our chart we have our citations for everything
3    that's sort of on the box, that's in the boxes for the time
4    line.  If I can just leave this off?
5                    THE COURT:  Okay.  You can give those to her.
6    Thank you.
7                    MR. SHAPIRO:  Thank you, Judge.
8                    THE COURT:  Thank you very much.
9            Very well presented by everybody.  You can't all
10   win unless you are smart and you go outside and settle the
11   case.  That would be smart.
12           But short of that, then I just thank you very much
13   for helping me and I will do the best I can with it.  All
14   right.
15                   COUNSEL:  Thank you, Your Honor.
16                   MR. SLOANE:  Your Honor, would you like me to
17   submit this (indicating)?
18                   THE CLERK:  Yes.
19                   THE COURT:  Yes.  Just so we can have it.  I
20   don't want everybody wondering what piece of paper we were
21   talking about.

Page 55

2-5-07organogenesis.txt

22        (Court Exhibit No. 1 received in evidence.)

23        (Court Exhibit No. 2 received in evidence.)

24        (WHEREUPON, the proceedings were recessed at 12:20

25        p.m.)

❑

62

C E R T I F I C A T E

I, Carol Lynn Scott, Official Court Reporter for
the United States District Court for the District of
Massachusetts, do hereby certify that the foregoing pages
are a true and accurate transcription of my shorthand notes
taken in the aforementioned matter to the best of my skill
and ability.

_____
CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377

2-5-07organogenesis.txt

D