UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                         *
IN RE ORGANOGENESIS                  *
SECURITIES LITIGATION               *         Civil Action No. 04-10027-JLT
_____*

MEMORANDUM

March 15, 2007

TAURO, J.

**Background**

      In this case of alleged securities fraud, court-appointed Lead Plaintiffs Bruno Hofmann,

John Bowie, Richard Madigan, and Richard Conen seek to recover damages on behalf of a class

of investors. These investors allegedly lost money after purchasing the common stock of

Organogenesis during the proposed class period of November 15, 1999 through February 7,

2002. John Bowie and Richard Conen have withdrawn as Lead Plaintiffs. Before the court are a

number of motions pertaining to the remaining Lead Plaintiffs' attempt to certify a securities class

action against the Defendants–directors and officers of Organogenesis.[1]

     *Allegations of Securities Fraud*

      Lead Plaintiffs largely survived a motion to dismiss their Amended Complaint, which

---

[1] Defendant Philip Laughlin was the President and a director and member of
Organogenesis's Executive Committee. Defendant Michael Sabolinski was President, Chief
Executive Officer, and a member of the Board. Defendant Albert Erani was a member of the
Board and on or about January 1, 2000, assumed the role of Chairman of the Board. Defendant
Donna Abelli Lopolito was Chief Financial Officer and Vice President, Finance and
Administration of Organogenesis. Defendant John J. Arcari replaced Defendant Lopolito as Chief
Financial Officer and Vice President, Finance and Administration of Organogenesis on May 1,
2000. Defendant Herbert M. Stein was Chairman of the Board and Chief Executive Officer until
January 1, 2000. Defendant Alan Tuck was Chief Strategic Officer.

alleges the following:[2] Organogenesis is a Delaware corporation based in Massachusetts that designs and sells medical products. Throughout the class period, Organogenesis had only one commercially available product–Apligraf, a skin replacement therapy–from which most if not all of its revenues were generated.

Defendants were aware that Organogenesis's business model was entirely dependent on its ability to mass-produce Apligraf and market it to physicians. When Organogenesis encountered difficulties in manufacturing and marketing Apligraf in 1999, Defendants assured the market that the company maintained the ability to produce sufficient quantities of Apligraf such that it could achieve profitability solely through sales of that product.

Defendants further assured investors that Organogenesis maintained marketing agreements with Novartis Pharma AG ("Novartis") that would allow it to sell sufficient quantities of Apligraf. Specifically, Defendants told the public that Novartis had committed a $20 million put investment option to Organogenesis.[3] Defendants did not tell the public about conditions precedent to the triggering of that put option. Organogenesis eventually failed to meet these conditions.

Plaintiffs further allege that Defendants assured investors that Organogenesis could foreseeably achieve profitability and commercial self-sufficiency and could achieve its stated,

---

[2] At the class certification stage, courts typically accept the plaintiff's allegations regarding the underlying fraud as true, but conduct a more searching inquiry that considers Defendants' submissions, to decide if the requirements of Rule 23 are met. See Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 257 (D. Mass. 2005); Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 24 (D. Mass. 2003). This court will perform a more detailed inquiry regarding specific aspects of the question of class certification. At this point, though, the Lead Plaintiffs' allegations regarding the underlying fraud will be taken as true.

[3] A put option grants its holder the right to sell its stock at a specific price to the grantor of the option. By exercising this right, Organogenesis would have increased its capital reserves.

foreseeable near-term objectives.  Defendants withheld from investors the facts about

Organogenesis's deteriorating financial condition and prospects.  During the Class Period, the

company suffered from undisclosed adverse factors that negatively affected its business, causing it

to report declining financial results and eventually file for bankruptcy. These factors included a

marketing agreement with Novartis that caused Organogenesis to lose money on sales of Apligraf.

Other factors included higher manufacturing costs, insufficient funding, and high management

turnover that disrupted operations.  Defendants lacked any reasonable basis for its claims that

Organogenesis could maintain profitability and viability, and concealed and materially

misrepresented the true condition of the company to enable insiders to sell stock.

In January 2002, Defendants announced the truth about Organogenesis's difficulties and

the prospect that it might never achieve profitability.  As a result of this announcement, shares of

Organogenesis fell considerably.  In September 2002, the company filed for bankruptcy

protection, the end result of which was that former Defendant Ades and Defendant Erani bought

Organogenesis and the stock was liquidated, leaving the former shareholders with nothing.

*Procedural Posture*

Lead Plaintiffs advance two counts: (1) Defendants engaged in fraud, misleading

statements, and acts, practices and a course of business which operated as a fraud and deceit upon

the purchasers of Organogenesis's securities in an effort to maintain artificially high market prices

in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5; and (2) Defendants

are liable under Section 20(a) of the Securities Exchange Act by virtue of their positions as

controlling persons of Organogenesis.

On July 20, 2005, this court dismissed Lead Plaintiff's claims against one director and

against PricewaterhouseCoopers, but refused to dismiss all remaining claims.[4]  The remaining

parties began discovery, and on May 15, 2006, Lead Plaintiffs moved to certify the class.  Three

days later, on May 18, 2006, a federal grand jury indicted Lead Counsel for the Lead Plaintiffs,

the law firm then called Milberg, Weiss, Bershad, and Schulman LLP[5] ("Lead Counsel" or

"Milberg Weiss"), along with the partners David Bershad and Steven Schulman.  On June 16,

2006, Lead Counsel informed the court of the indictment, assuring the court that "the attorneys

litigating this matter–which include the undersigned and my associate attorneys–have not been

accused of any wrongdoing."[6]  Although none of the attorneys currently litigating the matter have

been accused, Steven Schulman's name is on the Amended Complaint and he signed the

engagement letters of the remaining Lead Plaintiffs.[7]

On June 29, 2006, one day before the court imposed deadline for exchanging all relevant

documents,[8] Lead Counsel informed the court that Lead Plaintiffs Madigan and Bowie may have

filed incorrect certifications of their stock trading records.  Lead Counsel also informed the court

that Lead Plaintiff Conen was withdrawing in light of the 2005 Supreme Court decision in Dura

Pharmaceuticals.[9]  On July 10, 2006, Defendants moved to strike the inaccurately filed

---

[4] Order, Paper #84.

[5] The firm is now called Milberg, Weiss & Bershad LLP.  Notice of Change of Law Firm Name, Paper # 193.

[6] Letter, Paper # 126.

[7] Am. Compl., Paper #56; Milberg Weiss Engagement Letters, Aff. of Kimberly Friday in Supp. of Opp. to Pls.' Mot. for Class Cert., Paper # 169, Ex. E.

[8] Rule 26 Disc. Order, Paper #122.

[9] See Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) (finding an allegation of inflation of purchase price insufficient to support a securities claim).

certifications and preclude reliance on any certifications by Lead Plaintiffs Madigan or Bowie.
That motion is presently before the court.

One month later, Lead Plaintiff Bowie also withdrew, citing a family problem.  The
remaining Lead Plaintiffs Hofmann and Madigan seek a protective order precluding the
depositions of the former Lead Plaintiffs.  Finally, on November 26, 2006, Defendant Arcari filed
a Motion for Summary Judgment against Lead Plaintiff Hofmann, arguing that Arcari did not start
working at Organogenesis until after Hofmann made his final stock purchase.  These four motions
are now fully briefed, and the court heard oral arguments on them on February 5, 2007.

**Discussion**

> I.    <u>Motion for Class Certification</u>

To certify a class, a plaintiff must establish that the four requirements of Fed. R. Civ. P.
23(a) are met and that the case fits into one of the categories in Rule 23(b).[10]  In analyzing these
requirements, the court is to perform a "searching inquiry" to "'test disputed premises early on if
and when the class action would be proper on one premise but not another.'"[11]

> A.    *Requirements under Rule 23(a)(1), Rule 23(a)(2), and Rule 23(b) are met*

The first requirement is that the class must be so numerous that joinder is impracticable.
As Organogenesis was a publicly traded company with millions of shares outstanding, there is no
dispute that this requirement is met.  Secondly, Fed. R. Civ. P. 23(a)(2) requires the existence of
common questions of law or fact.  It is also undisputed that common questions exist regarding
misstatements allegedly made by Defendants, including whether the statements were material,

---

[10] <u>Swack</u>, 230 F.R.D. at 257.

[11] <u>Id.</u> (quoting <u>Tardiff v. Knox County</u>, 365 F.3d 1, 4-5 (1st Cir. 2004)).

misleading, and made with scienter. Plaintiffs also intend to prove reliance through the "fraud on the market" theory. Thus, there will also be a common question as to the efficiency of the market.[12]

Rule 23(b) further requires that these common questions predominate over individual questions. Although the Defendants note the presence of individual questions, they do so to attack the typicality of the Lead Plaintiffs. Defendants have not mounted an effective challenge to the conclusion that common questions predominate.

Additionally, Rule 23(b) requires that the class action form be superior to any alternative forms of litigation. Courts recognize "[t]here is little question that suits on behalf of shareholders alleging violations of federal securities laws are prime candidates for class action treatment and that Rule 23 of the Federal Rules of Civil Procedure has been liberally construed to effectuate that end."[13] The class action is superior for the reason that there would otherwise be a "very real risk that potential class members with relatively small claims would not have the financial incentives or wherewithal to seek legal redress for their injuries."[14] In this case, there is a specifically pled allegation of protracted securities fraud that calls out for a remedy that can only be provided by the vehicle of the class action lawsuit. For this reason, Rule 23(b)(3)'s superiority requirement is met.

Although a class action may be the superior and necessary mechanism for litigating

---

[12] See Grace v. Perception Tech. Corp., 128 F.R.D. 165, 171 (D. Mass. 1989).

[13] John Hancock Life Ins. Co. v. Goldman, Sachs & Co., No. 01-10729, 2004 U.S. Dist. LEXIS 3701, at *5 (D. Mass. Mar. 9, 2004) (quoting Grace, 128 F.R.D. at 167).

[14] In re Transkaryotic Therapies, Inc. Sec. Litig., No. 03-10165, 2005 U.S. Dist. LEXIS 29656, at *10 (D. Mass. Nov. 28, 2005) (quoting Swack, 230 F.R.D. at 273).

securities fraud, a court cannot certify a class in this case unless Lead Plaintiffs are typical and both Lead Plaintiffs and Lead Counsel are adequate.

### B.   Rule 23(a)(3)'s typicality requirement

To show typicality, the Lead Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."[15]  The claims need not be identical, but they must constitute the same legal claims that "arise from the same events or course of conduct as do the injuries that form the basis of the class claims."[16]  The operative question is whether a lead plaintiff will necessarily present the absent class members' claim in presenting his own.[17]  Lead Plaintiffs Hofmann and Madigan assert that their claims are typical as they arise from the same underlying misrepresentations.  Defendants attack this assertion on a number of grounds.

### 1.   Using the preferred accounting method, Madigan did not suffer actual loss

Traditionally, individual questions regarding damages would not hinder class certification where a common question exists regarding liability.[18]  But the Supreme Court recently made clear that a securities fraud plaintiff must properly allege actual monetary loss–not merely harm related to purchasing at an increased price–in order to state a claim for securities fraud.[19]

---

[15] Fed. R. Civ. P. 23(a)(3).

[16] Swack, 230 F.R.D. at 260 (Guckenberger v. Boston Univ., 957 F. Supp. 306, 325 (D. Mass. 1997)).

[17] Randle v. Spectran, 129 F.R.D. 386,3 91 (D. Mass. 1988).

[18] Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 40 (1st Cir. 2003).

[19] Dura Pharm, 544 U.S. at 347.

Plaintiff Madigan initially disclosed only nine of his thirteen Organogenesis stock purchases during the class period and none of his forty-seven sales.[20]  His second certification also had errors (see Section I.C.1 for more on these certifications).  His third and final certification reveals that during the Class Period he sold almost six times as many shares as he purchased.[21]

Where Class Period sales exceed purchases, there is a very real possibility that Lead Plaintiff Madigan actually benefitted from the allegedly inflated price during the Class Period.  If this is the case, Madigan would not be a typical representative.[22]  As noted above, it is the court's duty to resolve these issues now, testing the disputed premises, and deciding whether class certification is appropriate in this case.

In order to determine, then, if Lead Plaintiff Madigan suffered actual monetary loss, as required by Dura, some accounting must be made to assess the aggregate effect of Madigan's many transactions.  No controlling precedent answers the difficult question of how to make such an accounting.  The IRS typically uses a method known as First-in First-out ("FIFO"), whereby

---

[20] Compare Cert. of Proposed Lead Pl. Richard Madigan, dated Mar. 18, 2004, Aff. of Kimberly Friday in Supp. of Opp. to Pls.' Mot. for Class Cert., Paper # 169, Ex. F, with Second Revised Cert. of Richard J. Madigan, Sr., dated Nov. 15, 2006, App. in Sup. of Pls.' Reply Mem. of Law In Sup. of Class Cert., Paper # 178, Ex. G.

[21] Id.

[22] See Swack, 230 F.R.D. at 260 ("While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation. . . . There is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d. Cir. 1990))).
Additionally, Lead Plaintiffs have effectively acknowledged that the lack of an actual loss would preclude typicality by withdrawing Conen on these very grounds.

gain or loss on a given share is computed by comparing that share's sale price to the purchase price of the first share acquired.[23]  The IRS uses FIFO to assess gain or loss for tax purposes as this method generally increases the amount of gain reported.[24]  Plaintiff's expert contends that FIFO is the appropriate method to use, and explains that under this method gains or losses from shares sold during the Class Period that are paired (for accounting purposes) with shares purchased before the Class Period are not considered when computing total loss over the Class Period.[25]

Such an approach is incongruent with the goal of understanding Madigan's actual loss caused by the alleged fraud occurring during the Class Period.  By ignoring some substantial percentage of his sales that are paired with purchases outside the Class Period, this approach entirely fails to consider that Madigan may have gained some money from the alleged securities fraud.  Imagine an investor who 1) buys a share of stock before a fraud for $10, 2) buys a share after a fraud drives up the price to $20, 3) shortly thereafter, sells a share at the same elevated price, 4) holds his remaining share until after the fraud becomes known, and 5) sells his remaining share for $10.  Using Plaintiffs' FIFO method, the sale of the stock during the class period would constitute a gain over the first purchase (pairing transactions 3 and 1) which is not considered for the purpose of computing gain or loss during the Class Period.  A Class Period computation that does not include this gain would be unrealistic because this sale was at an elevated price due to

---

[23] Treas. Reg. §1.1012-1(c) (2007).

[24] See In re Comdisco Secs. Litig., No. 01 C 2110, 2004 U.S. Dist. LEXIS 7230 at *5-6 (N.D. Ill. Apr. 26, 2004).

[25] Decl. of Michael A. Marek, App. in Sup. of Pls.' Reply Memorandum of Law In Sup. of Class Cert., Paper # 178, Ex. H, ¶ 18.

the fraud.  It is even more troubling that the investor would then be able to report a loss of $10 on

the purchase of the share at $20 made during the class period (by pairing transactions 5 and 2).

And so, even though the investor would have bought and sold a share at $20 and bought and sold

a share at $10, Plaintiffs' proposed methodology would lead to the conclusion that the investor

lost $10 as a result of the fraud.

Recognizing the inappropriateness of using FIFO in this context, a number of courts

compute gains and losses using the Last-in First-out methodology ("LIFO") when choosing a

Lead Plaintiff.[26]  Under LIFO, the hypothetical investors first sale (transaction 3) would pair with

the most recent purchase (transaction 2) and would count as a wash.  The final transaction

(number 5) would pair with the first transaction, and the investor would have no gains or losses

reportable during the class period.  One leading advocate of this approach has explained that

LIFO is a superior accounting method because, unlike FIFO, it more consistently reports profits

or losses for investors who make identical trades during the class period, but who had different

initial holdings.[27]

---

[26] See Johnson v. Dana Corp., 236 F.R.D. 349, 353 (N.D. Ohio 2006); Hill v. Tribune Co., No. 05-C-2602, 2005 U.S. Dist. LEXIS 23931, at *10 (N.D. Ill. Oct. 13, 2005) (citing In re eSpeed, Inc. Sec. Litig., 232 F.R.D. 95 (S.D.N.Y. 2005)).  See also In re CIGNA Corp. Sec. Litig., 459 F. Supp. 2d 338, 357 (E.D. Pa. 2006) (analyzing the effect of Dura on damage calculations, concluding that the Supreme Court did not decide that issue, expressing hesitance to conclude that Dura changed the standard of using FIFO, then deciding to use a transaction based approach instead of an investment model, but not deciding between FIFO or LIFO).  But see In re Sepracor Inc., 233 F.R.D. 52, 54 (D. Mass. 2005) ("To the contrary, I find a transaction-based methodology, which allows claims for unprofitable transactions without offsetting that recoverable loss with gains from profitable transactions, to be more consistent with the provisions of the statute and rule.").

[27] In re Comdisco Sec. Litig., 2004 U.S. Dist. LEXIS 7230, at *7.

Plaintiffs argue that this court has faced the FIFO versus LIFO question before.  In another securities case, this court granted a motion for class certification despite this very objection.[28]  Plaintiffs in the present case argue that this court's ruling there demonstrated a conclusion that FIFO is the preferred method of accounting.  A review of the transcript of the hearing in that case, however, reveals that this court allowed the motion because it felt that the question of damages was not one that would preclude class certification.[29]  Since the Supreme Court decision in Dura makes the presence of some economic damage an element of a claim, this reasoning no longer controls, and this court's earlier decision is effectively superceded.

Similarly, Lead Plaintiffs point to a host of decisions in this circuit where a class action settlement has been approved using the FIFO method.  That courts have previously approved parties' choice to use FIFO does not mean this court should adopt this problematic approach in the context of this opposed motion for class certification.  Like other courts that have examined the issue, this court concludes as a matter of law that LIFO is the preferred approach for assessing class period damage.[30]

Using this accounting method, Lead Plaintiff Madigan actually made a profit of $15,566

---

[28] In re CVS Corp. Sec. Litig., No. 01-11464, Docket Entry #72 (D. Mass. Oct. 16, 2003) (Tauro, J.).

[29] Tr. of Hrg., App. in Sup. of Pls.' Reply Mem. of Law In Supp. of Class Cert., Paper # 178, Ex. I.

[30] In allowing a motion for summary judgment, at least one other court has similarly decided as a matter of law to use LIFO .  See Arenson v. Broadcom Corp., No. SA CV 02-301, 2004 U.S. Dist. LEXIS 27522, at *5-6 (C.D. Cal. Dec. 6, 2004).

during the class period.[31]  As he has not suffered a loss, his claim fails, and he is not a typical

representative of the class.

>    2.    Hofmann's transactions were prior to any misrepresentation of
>
>    Defendant Arcari, so he lacks standing

Defendants argue that Hofmann is atypical because he made his final stock purchase early

in the period, on April 13, 2000, before thirty of the thirty-nine alleged misrepresentations.

Although a plaintiff who purchases before any misrepresentation is atypical,[32] it is clear from the

case law that where a plaintiff purchases early in the period and also "'claims a continuing course

of conduct and points to specific and identified documents which are alleged to contain

interrelated and cumulative misrepresentations, class certification is proper.'"[33] Because Lead

Plaintiffs adequately allege a fraudulent course of conduct by the Organogenesis directors, the fact

that Hofmann purchased before thirty of the alleged misrepresentations occurred does not render

him atypical to represent a class prosecuting all the misrepresentations.

---

[31] Aff. of John F. Gould, Ph.D., Aff. of Kimberly Friday in Supp. of Opp. to Pls.' Motion for Class Cert., Paper # 169, Ex. A.

[32] Gross v. Summa Four, 93 F.3d 987, 993 (1st Cir. 1996) ("In other words, because Summa Four issued the letter after Gross had purchased his stock, the statements in the letter could not possibly have inflated the market price that he paid for those shares.  Moreover, although Gross purports to bring a class action on behalf of all individuals who purchased Summa Four shares during the class period, he cannot maintain an action on behalf of class members to redress an injury for which he has no standing in his own right." (Citations omitted)).  This holding has been read as being limited to cases where the last purchase occurred before all transactions.  Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 13 (D. Mass. 2004).

[33] Kirby v. Cullinet Software, Inc., 116 F.R.D. 303, 312 (D. Mass. 1987) (quoting Weiss v. Drew Nat'l Corp., 71 F.R.D. 429, 430 (S.D.N.Y. 1976)).  But see Crowell, 343 F. Supp. 2d at 14 (applying the common course of conduct theory to the question of standing but questioning the propriety of its application in the class certification context by citing Abato v. Marcam Corp., 162 F.R.D. 8, 10-11 (D. Mass. 1995)).

Defendant John Arcari advances a more complicated argument that Hofmann has no standing against him because he did not join Organogenesis until after Hofmann's last purchase. Accordingly, Arcari moves for Summary Judgment against Hofmann. The remaining Defendants argue that this inability to prosecute Arcari should render Hofmann atypical. Despite the parties' cross-contentions, the First Circuit cases discussing this question do not address how to handle the situation where a new defendant has made alleged misstatements later in the class period while also acting in a common course of conduct with other defendants who made earlier statements.

As stated above, a plaintiff has standing to act as a typical class representative to litigate statements made by the same defendant after his purchase. Courts allow this representation because in proving reliance on the common course of misrepresentation, the plaintiff would necessarily prove the absent class members case as well as his own.[34] That a subsequent misstatement was made by someone else is functionally irrelevant. In explaining the alleged common course of conduct to the jury, sole Lead Plaintiff Hofmann would necessarily present the actions of Arcari. In this way, Hofmann could still be a typical class representative.

Defendants insist that reaching such a conclusion would be improper because it fails to put the question of standing before the question of class certification. The Supreme Court has concluded, "[t]hat a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they

---

[34] <u>Priest v. Zayre Corp.</u>, 118 F.R.D. 552, 557 (D. Mass. 1988).

13

belong and which they purport to represent.'"[35] The quoted language stands for the proposition

that a plaintiff can not gain standing simply by alleging he is a member of a class that was harmed.

That is not what Hofmann is trying to do. He alleges he was harmed by the fraudulent course of

conduct of all Defendants, but he cannot show he was harmed by the actions of Arcari

individually as he purchased his last share before Arcari joined the company.[36]

The issue for the court, then, is whether this court should analyze Hofmann's standing

Defendant by Defendant or, instead, in the same manner as it analyzed typicality, i.e.: considering

the question on the whole with respect to the entire alleged course of conduct. To deal with this

problem, some courts in other circuits have developed the doctrine of juridical links:

> There is an exception to [the requirement that representative plaintiffs must have
> individual standing to assert colorable claims against all members of the defendant
> class] where the defendant members are related by a concerted scheme,
> conspiracy, or juridical link, that is some legal relationship which relates all

---

[35] Lewis v. Casey, 518 U.S. 343, 357 (2006). See also In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 79 (D. Mass. 2005) ("'It is well settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.'" (quoting Prado-Steiman v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000))).

[36] Plaintiffs respond to Defendant Arcari's motion by requesting further discovery under Fed. R. Civ. P. 56(f), alleging that Arcari might have been involved with statements made before he arrived. But as Plaintiff's counsel conceded at oral argument, the only asserted evidence to justify such a belief is a document prepared by Arcari after his arrival where he describes events that occur before his arrival. Tr. of Mot. Hrg. held on February 5, 2007, Paper #200, p. 58:11-60:19. Plaintiffs assert this raises an inference that he was involved in those events, but the court concludes that though the document shows Arcari became aware of the earlier events, it does not suggest his involvement in those events. In short, it does not "set forth a plausible basis for believing that the necessary facts probably exist and can be learned in a reasonable time." Adorno v. Crowley Towing & Transp. Co., 443 F.3d 122, 127 (1st Cir. 2006). Plaintiffs request for more discovery is denied, therefore, and the court will consider the Motion for Summary Judgment under the factual assumption that there is no reason to believe Hofmann could have relied on any actions taken by Arcari.

14

> defendants in a way such single resolution of the dispute is preferred to a multiplicity of similar actions. A juridical link sufficient to confer standing generally must stem from an independent legal relationship. It must be some form of activity or association on the part of the defendants that warrants imposition of joint liability against the group even though the plaintiff may have dealt primarily with a single member. This link may be a conspiracy, partnership, joint enterprise, agreement, contract, or aiding and abetting, which acts to standardize the factual underpinnings of the claims and to insure the assertion of defenses common to the class.[37]

While some courts have used this doctrine to tie defendants into a class, doing so here would run afoul of the Supreme Court's directive against giving class actions special treatment on the standing question.[38]  Assuming this class was not certified, Hofmann could still proceed with his individual claim, and it would be undisputed that Arcari could not be liable on this individual claim as Hofmann could not have relied on Arcari's subsequent misrepresentations.  If Hofmann would have no standing to proceed against Arcari individually, he should not gain standing by virtue of casting his claim as a class action.

Regardless of the functional advantage of linking Defendants together in a class action, Hofmann as sole Lead Plaintiff does not have standing to proceed against Arcari.  Arcari would have to be dismissed now from a case proceeding with only Hofmann as Lead Plaintiff.  As noted above, a typical representative is one who has the same claim as the absent class members. Though Hofmann's claim does arise from the same course of conduct as the absent class

---

[37] In re Enron Corp. Sec., Derivative & "ERISA" Litig., No. H-01-3624, 2004 U.S. Dist. LEXIS 8158, at *107-08 (S.D. Tex. Feb. 24, 2004) (brackets in original) (quoting 6A Federal Procedure, Lawyers Ed. § 12:44 (Database updated Oct. 2003)).

[38] See Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100, 119 (D. Mass. 2006) ("However, this doctrine [of juridical links], developed in the context of class certification analysis under Fed. R. Civ. P. 23, should properly remain in the analysis of adequacy and typicality of plaintiffs for which it was originally conceived. In the separate and distinct inquiry into a plaintiff's standing undertaken here, the juridical links doctrine is not relevant.").

members, his claim itself is different by virtue of his lack of standing to proceed against one of the

Defendants.   Although Hofmann may have suffered a loss typical of the class, he can not

represent the proposed class because of his lack of standing to proceed against Arcari.[39]

### 3.    Reliance on brokers does not render Lead Plaintiffs atypical

Defendants further assert that Lead Plaintiffs Hofmann and Madigan did not rely on the

market, but instead relied on their brokers to chose their stock.  As a matter of law, relying on

brokers does not make a plaintiff atypical, as the advice of brokers is usually based on the same

market conditions affected by the fraud.[40]

Defendants also allege that Lead Plaintiffs' brokers had access to non-market data.

Although these allegations are short on detail, Defendants assert that Hofmann's broker had

private meetings with Organogenesis's management who made various assurances regarding

profitability and alternative markets for the products.  Plaintiffs counter that Defendants provide

no real evidence that Hofmann and Madigan did not rely on the market, and that any assertions

made to the brokers at these meetings were duplicative of the misrepresentations made to the

market about profitability.  Plaintiffs then argue that Hofmann and Madigan still have a strong

interest in establishing the fraud on the market theory, and that possible additional

misrepresentations made to them are irrelevant to their typicality.

Some uncertainty regarding which information a plaintiff relied on is not fatal to typicality

---

[39] See Prado-Steiman, 221 F.3d at 1279("It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class.").

[40] Swack, 230 F.R.D. at 261.

if the plaintiff is still able to show that he relied on the integrity of the market.[41]  While certification is inappropriate if the lead plaintiff is subject to unique defenses which threaten to become the focus of the litigation,[42] being exposed to "variegated sources of information" does not preclude a conclusion of market reliance.[43]  It is true that relying on non-market information would preclude a plaintiff from using a fraud on the market theory.[44]  But where a lead plaintiff may have relied on both kinds of information, the class can be certified as the lead plaintiff would still have an interest in proving fraud on the market.[45]  To deal with this same problem, some courts adopt the approach of bifurcating a trial to allow the lead plaintiff to first establish a fraud on the market theory.[46]  Then, in a separate trial, defendant could attack this theory as to the lead plaintiff himself and thereby limit that plaintiff's damages.[47]

In this case, while Defendants raise some concerns about Lead Plaintiffs' typicality, there is no reason to believe that Lead Plaintiffs and their brokers did not rely to some substantial extent on the integrity of the market in their trading decisions.   While they may have also consulted with insiders, these limited contacts would not become the focus of the litigation and could be dealt with in a bifurcated trial.  The court rejects this argument as a rationale for refusing to certify the

---

[41] In re Sepracor Inc., 233 F.R.D. at, 55-56.

[42]  Swack, 230 F.R.D. at 264.

[43] Id. at 261.

[44] Id. at 261-62.

[45] Id. at 263.

[46] Id.

[47] Id.

class.

Additionally, this court agrees with Lead Plaintiffs that post-class period purchases do not render a plaintiff atypical.[48]

C.    *Rule 23(a)(4)'s adequacy requirement*

Under Fed. R. Civ. P. 23(a)(4), a class can only exist where "the representative parties will fairly and adequately protect the interests of the class."  In light of the goals of the Private Securities Litigation Reform Act ("PSLRA") that plaintiffs, not attorneys, oversee securities litigation, some courts, including the Fifth Circuit, have read into the adequacy requirement a mandate that class representatives be active, well-informed, and demonstrate an ability to direct the litigation.[49]  The First Circuit has not adopted such a test, and the controlling test still requires only that "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation."[50]  In assessing the adequacy of counsel, many courts do look to the performance of counsel in the present litigation.[51]

1.    <u>Madigan's problems with stock certifications</u>

As part of the process of being appointed Lead Plaintiffs under the PSLRA, Lead Plaintiff Madigan was required to submit a sworn certification detailing his transactions in the class period.

---

[48] <u>See</u> <u>In re Sepracor Inc.</u>, 233 F.R.D. at 56.

[49] <u>Feder v. Elec. Data Sys. Corp.</u>, 429 F.3d 125, 129-30 (5th Cir. 2005).

[50] <u>Andrews v. Bechtel Power Corp.</u>, 780 F.2d 124, 130 (1st Cir. 1985).

[51] <u>See, e.g.,</u> <u>Ballan v. Upjohn Co.</u>, 159 F.R.D. 473, 487 (D. Mich. 1994).

18

Madigan submitted a sworn certificate listing nine purchases of Organogenesis stock. Two days before the deadline for written discovery, Lead Counsel alerted Defense Counsel and the court that "there may exist certain inadvertent errors in the lead plaintiff certifications of two of the four Lead Plaintiffs in this action."[52]  More than two months later, Madigan submitted a second certification which turned out to include transactions performed by Madigan's son and daughter-in-law. Defendants subpoenaed Madigan's trading records. Defendants' analysis, and Madigan's second revised certification, now agree that Madigan made thirteen purchases and forty-seven sales of the stock.[53]  These facts are material as they could impact Madigan's standing (see above, Section I.B.1). Lead Counsel does not rationalize these errors other than to assert that Madigan thought he only needed to include the purchases. This excuse does not explain these mistakes, as Madigan's initial disclosure did not include all of his purchases.

Next, Lead Counsel argues that any mistakes were inadvertent and non-prejudicial. Defendants point to a recent opinion by another judge in this district admonishing Milberg Weiss for allowing an incorrect certification to be submitted where a lead plaintiff signed the affidavit without reviewing the underlying trading data.[54] There, Chief Judge Wolf noted that he was "profoundly disturbed" by the error and instructed Milberg Weiss that he did not want to "see

---

[52]  Letter from Peter Sloane, Paper #128 (June 29, 2006).

[53]  Second Revised Cert. of Richard J. Madigan, Sr., dated Nov. 15, 2006, App. in Supp. of Pls.' Reply Mem. of Law In Supp. of Class Cert., Paper # 178, Ex. G;  Aff. of John F. Gould, Ph.D., Aff. of Kimberly Friday in Supp. of Opp. to Pls.' Motion for Class Cert., Paper # 169, Ex. A. (note that Defendants tally lists the final three purchases (which all occurred for the same price on the same day), as one transaction, thereby totaling 11 purchases).

[54]  In re Sonus Networks., 229 F.R.D. 339, 343 (D. Mass. 2005).

anything else like that in this or other cases."[55]  This problem, along with several others, ultimately led Chief Judge Wolf to decertify the class.[56]

Despite this disturbing coincidence, other precedent indicates that an incorrect certification is not grounds for refusing to certify a class.  Where a plaintiff subsequently corrected his certification in response to discovery requests, one court noted, "[q]uestions of credibility which do not affect a plaintiff's ability to represent the class or to pursue the merits of the cause of action routinely fail to defeat certification."[57]  In another case, the lead plaintiff inaccurately described how she obtained her stock, and listed a date that was off by one day.[58]  The court found such "quibbles" did not to raise an inference of a lack of credibility.[59]  Of course, in the present case, the corrected certification, analyzed using the LIFO accounting method, actually proved fatal to Lead Plaintiff Madigan's ability to represent the class.  While the court is concerned by the  lack of adequate explanation for the potentially prejudicial error, it is important to note that Lead Counsel did disclose the error.  Considering the evidence, the court is not convinced that Madigan lied or otherwise acted in a non-credible manner.

At the same time, Milberg Weiss did allow these faulty certifications to slip through, even after being reprimanded for this sort of mistake in another case where the class was ultimately decertified.  In a letter to the court explaining the errors, Lead Counsel effectively acknowledged

---

[55] Id.

[56] Id. at 348.

[57] In re Sepracor Inc., 233 F.R.D. at 57.

[58] Swack, 230 F.R.D. at 266.

[59] Id. at 267.

that it prepared the initial certifications in this case without reviewing the Lead Plaintiffs' actual

brokerage records.[60]  While the court does not conclude the erroneous certifications were

intentional, and does not accept them as grounds to find Madigan inadequate, the failure to

adequately check the records and properly oversee the process is evidence that the court will

consider while assessing the adequacy of Milberg Weiss's performance in the present litigation.

<u>2.</u>    <u>The Lead Plaintiffs are adequate representatives</u>

Defendants charge that a number of facts indicate that Lead Plaintiff will not actively

control the litigation as required by the PSLRA: 1) Madigan admits he has not read the Amended

Complaint; 2) Hofmann and Madigan have rarely conferred directly while the PSLRA requires

that they manage the litigation in concert; 3) Madigan did not discuss with Lead Counsel whether

or not to appeal the partial dismissal of the Amended Complaint; 4) Hofmann and Madigan's

engagement letter with Milberg Weiss contained terms favorable to Milberg Weiss;[61] 5) Lead

Plaintiffs, primarily Madigan, do not understand some aspects of the case involving various

theories of liability; and 6) Madigan was aware of the indictment, but he did not know that the

firm itself was indicted or that a leading partner formerly assigned to the case, Schulman, had been

---

[60] <u>Letter from Peter Sloane</u>, Paper #128 (June 29, 2006) ("We are diligently looking into this issue and, in addition to reviewing the records that are in the Lead Plaintiffs' possession, have requested that their broker provide us on an expedited basis documents concerning their Organogenesis transactions so that we can ensure that if any correction needs to be made it is complete and accurate.").  Despite this assurance, Madigan's second affidavit was not accurate. Adequate lead counsel would have examined the records so that their first filing could be "complete and accurate."

[61] These terms included a 25%-40% fee, a provision allowing Lead Counsel to hire sub-contracting law firms at will, and a provision that Lead Counsel owns all the documents generated in the case.  Defendants argue these terms indicate a lack of negotiation between Lead Plaintiffs and Lead Counsel and a lack of control exerted over Lead Counsel.

indicted.

Lead Counsel responds that Hofmann and Madigan are experienced at managing large organizations and are devoted to the case. Lead Plaintiffs note that Hofmann and Madigan confer extensively with Lead Counsel, and thereby indirectly confer with each other. Lead Counsel insists that the terms of the engagement letter are perfectly routine and normal. Moreover, Lead Counsel asserts that it fully discussed the indictment with Lead Plaintiffs, and that Lead Plaintiffs, acting in their capacity as supervisors of the suit, made an informed decision to continue employing Milberg Weiss as Lead Counsel. Lead Counsel declares that Madigan does understand the securities fraud allegations in the case, that he interviewed Milberg Weiss prior to hiring it, and that he has considered the effect of the indictment.

The law does not require Lead Plaintiffs to have specific knowledge of the technical aspects of the case, but rather to understand their duties and intend to carry them out.[62] One court has struck a Lead Plaintiff for extreme lack of knowledge about the case where he could not even name the Defendant.[63] This case does not rise to that level. Defendants ask this court to second-guess Lead Plaintiffs' decisions and test their knowledge of the case beyond the level that is required of a class representative. The court is satisfied that no conflicts exist between Hofmann and Madigan and the class they seek to represent, and this court does not adopt Defendant's objections as grounds for refusing to certify the class.

<u>3.</u>        <u>In this case, Milberg Weiss is not adequate Lead Counsel</u>

---

[62] <u>In re Transkaryotic Therapies, Inc. Sec. Litig.</u>, 2005 U.S. Dist. LEXIS 29656, at *15-17.

[63] <u>In re Sepracor,</u> 233 F.R.D. at 55.

To meet the requirements of Fed. R. Civ. P. 23(a)(4), Lead Plaintiffs have the burden of showing adequacy of Class Counsel.[64]  To decide whether class counsel will "fairly and adequately represent the interests of the class," the court is to consider "the work counsel has done in identifying or investigating potential claims in the action, counsel's experience . . ., counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class."[65]  Additionally, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."[66]

Milberg Weiss and two leading partners were indicted in May 2006 by a federal grand jury.[67]  The charges include fraud and obstruction of justice on allegations that Milberg Weiss paid millions of dollars in illegal kickbacks to lead plaintiffs in other class actions.  The indictment does not charge wrongdoing in this case.

Milberg Weiss took a month to inform this court of the indictment.  In its letter, Milberg Weiss assured the court that none of the attorneys litigating this matter were indicted.  But Schulman, one of the indicted lead partners, signed the Amended Complaint in this case and signed the engagement letter with all four Lead Plaintiffs.  Lead Counsel asserts that it was not dishonest as Schulman had withdrawn from the firm prior the date of the letter and therefore he was not an attorney litigating (in the present tense) the case.  This court is not the first court to

---

[64] See Smilow, 323 F.3d at 38; In re Carbon Black Antitrust Litig., No. 03-10191, 2005 U.S. Dist. LEXIS 660, at *42 (D. Mass. Jan. 18, 2005).

[65] Fed. R. Civ. P.  23(g)(1)(B)-(C)(i).

[66] Fed. R. Civ. P. 23(g)(1)(C)(ii).

[67] First Superceding Indictment, United States v. Milberg Weiss Bershad & Schulman LLP, No. 05-587 (C.D. Cal. 2006).

analyze the terms of this letter from Milberg Weiss and to find "such fine shading of words" disturbing.[68]  Milberg Weiss asserts it would be unreasonable to conclude it was trying to misrepresent anything, as Schulman's name is clearly visible on the Amended Complaint for all to see.  This argument is unconvincing.  Because of constraints of time, the court cannot be as familiar as the parties with the details of who signed what document.  Instead, to understand the facts and issues presented to it in any case, including a class action, the court must employ and to some extent rely on representations made to it by counsel.[69] The carefully worded, arguably true, representation made by Lead Counsel "can erode confidence of the court and opposing counsel in the lawyer making such statements, and this reduced trust can, in turn, impede the efficient progress of a complex case."[70]  This erosion along with the repeated failure to oversee Madigan's certification process must be added to the court's list of concerns regarding Lead Counsel's performance in this case.[71]

---

[68] Nowak v. Ford Motor Co., No. 06-11718, 2006 U.S. Dist. LEXIS 92780, at *24 (D. Mich. Dec. 22, 2006).

[69] Lead Counsel's representation in open court was much clearer: "The counsel who have been litigating this case on a day-by-day basis in the current time frame after Mr. Schulman took his leave of absence are not implicated in the indictment."  Tr. of Mot. Hrg. held on Feb. 5, 2007, Paper #200, p. 29:23-30:1.

[70] Nowak, 2006 U.S. Dist. LEXIS 92780, at *24.

[71] Defendants also argue a further basis of inadequacy in that Former Lead Plaintiff Conen did not withdraw until approximately one year after the Supreme Court case of Dura disqualified him.  The court rejects this complaint as a basis for finding Lead Counsel inadequate.   It is not reasonable to demand that Lead Counsel immediately react to detailed ramifications of changes in a complex law.  When Milberg Weiss noticed the problem, it disclosed it.  Defendants also assert that Lead Counsel is inadequate as it failed to meet certain discovery deadlines.  This is a complex case with substantial discovery.  Defendants have filed no motions to compel and, with the exception of the certification problems, Lead Plaintiffs are in substantial compliance with discovery orders. Accordingly, the claims of discovery misconduct are irrelevant to the court's adequacy determination.

Moving beyond the letter explaining the indictment to the court, the court must consider the weight of the indictment itself. Milberg Weiss asserts that the indictment is unrelated to this case, and that considering the presumption of innocence, they should not be found inadequate. Milberg Weiss is a large, successful securities firm that is familiar with this case and has already defeated a complicated Motion to Dismiss. But since then, a number of prominent clients and attorneys have parted ways with the firm.[72] Though Milberg Weiss has a respectable record and reputation for litigating securities class actions, the court cannot ignore the fact that by virtue of the indictment, Milberg Weiss is a different firm than it once was.

Both sides cite opinions and transcripts of hearings where various judges have come down on different sides of the issue of how to handle the Milberg Weiss indictment. The court has reviewed how judges across the country have approached this issue. Some judges agree that the presumption of innocence should control.[73] Other judges feel that an indictment is relevant in that

---

[72] This fact is adduced by the Defendants in their Opposition Memorandum on page 45, is supported by citations to a number of newspaper articles, and has not been disputed by Lead Counsel. As such, the court considers it proper evidence at this stage of the litigation. Another court has also noticed the attrition. Nowak, 2006 U.S. Dist. LEXIS 92780, at *23 n.11.

[73] In re Novastar Fin. Sec. Litig., No. 04-0330, 2007 U.S. Dist. LEXIS 9039, at *21 (W.D. Mo. Feb. 8, 2007) (Smith, J.)(certifying a class with Milberg Weiss as co-lead counsel and finding "removal of Milberg Weiss as co-lead counsel would not only harm the class, but prematurely punish the firm for unproven allegations" and that the court should not consider "disqualification of the firm unless and until the claims have been substantiated."); In re Merck & Co. Inc. Sec. Litig., No. 05-2367, Docket Entry #196 (D. N.J. Jan. 25, 2007) (full transcript filed in present case as Paper #197-2) (Chesler, J.) (appointing Milberg Weiss as co-lead counsel and finding that Milberg Weiss had prosecuted the case diligently and deciding that viewing the indictment as anything other than an accusation would "be a total abdication of our criminal justice system."); In re Lord Abbett Mutual Funds Fee Litig., No. 04-0559, Docket Entry #127 (D.N.J. Dec. 1, 2006) (Martini, J.) (after ordering briefing on the issue, finding "insufficient reasons at the present time to relieve Milberg Weiss as counsel to Plaintiffs in this matter," but also dismissing action three days later); In re Williams Sec. Litig., No. 02-72, Docket Entry #1423 (N.D. Okla. July 19, 2006) (Friot, J.) (declining to appoint a special master to investigate the appropriateness of keeping Milberg Weiss as co-lead counsel); In re WRT Sec. Litig., No. 96-

it shows probable cause to believe the firm has engaged in fraud.[74]  This court has found no case

_____

3610, 2006 U.S. Dist. LEXIS 47483, at *9 n.2 (S.D.N.Y. July 13, 2006) (Keenan, J.) (certifying a class with Milberg Weiss as lead counsel and another firm as associate lead counsel after accepting Milberg Weiss's representations that "it remains ready and able to vigorously prosecute" and that "the indictment does not bear on the 'pending' litigation in this case."); Schoenbaum v. E.I. Dupont de Nemours & Co., No. 05-1108, Docket Entry #135 (E.D. Mo. May 24, 2006) (Webber, J.) (in an as-yet uncertified class action with multiple interim class counsel, declining to address the issue at oral arguments as "[t]here's a presumption of innocence that rings soundly around here."); Sollins v. Alexander, No. 601272/2006, 2006 N.Y. Misc. LEXIS 2889, at *10 n.2 (N.Y. Sup. Ct. July 13, 2006) (granting a motion to consolidate, appointing Milberg Weiss co-lead counsel and noting "that unless and until Milberg Weiss is found guilty for the actions upon which it has been indicted, the presumption of innocence is binding here.").

Since the indictment, many other courts have entered orders appointing Milberg Weiss to a non-exclusive leadership role without considering the indictment.  Milberg Weiss has pointed out many such cases, but it is often clear the court simply signed off on a proposed order or rubber-stamped a settlement.  These orders are of little help to this court in deciding how to weigh the indictment.

[74] In re New Motor Vehicles Canadian Exp. Antitrust Litig., 466 F. Supp. 2d 364, MDL. No. 1532, 2006 U.S. Dist. LEXIS 91360, at *9 (D. Me. Dec. 18, 2006) (Hornby, J.) (removing Milberg Weiss from a leadership role and noting that the "leadership challenge does not raise the constitutional presumption of innocence" and that Milberg Weiss would have the "benefit of that presumption in their criminal case. What I should do in this multidistrict civil case is a separate and distinct question."); Nowak, 2006 U.S. Dist. LEXIS 92780, at *23 (Pepe, J.) (choosing another plaintiffs' group to lead the litigation and acknowledging "the presumption of innocence and the vigorous denials of wrongdoing by Milberg Weiss and by counsel for the lawyers individually charged . . . cannot erase the obvious -- that this indictment of a major law firm for alleged bribery, perjury and fraud by its named partners, could significantly harm the commitment of long term, unaltered legal personnel resources from the Milberg Weiss frm [sic]."); In re General Electric ERISA Litigation, No. 06-315, Docket Entry #33 (N.D.N.Y. Aug. 3, 2006) (Homer, M.J.) (delaying a decision on appointment of lead counsel but noting that "while recognizing Milberg Weiss's presumptive innocence, the Court must also consider on behalf of the putative class that a grand jury found probable cause to believe that Milberg Weiss committed egregious wrongs in other class actions."); In re Medtronic, Inc., 434 F. Supp. 2d 729, 732 (D. Minn. 2006) (Rosenbaum, J.) (finding that as part of its duty owed to transferee plaintiffs, the court should disqualify Milberg Weiss from the Plaintiffs' Steering Committee and noting "a Grand Jury's indictment means that it found probable cause to believe a criminal act has taken place.").  See also Mauldin v. Wal-Mart Stores, Inc., No. 01-2755, 2006 U.S. Dist. LEXIS 85189, at *11 (N.D. Ga. Nov. 22, 2006) (Carnes, J.) ("Given the evidence of suspicious payments to Mauldin, and the recent indictment of Milberg Weiss for recruiting plaintiffs to participate in class action lawsuits, discovery is warranted to ensure that Mauldin's EEOC charge was not fraudulently procured.").

where a court has allowed Milberg Weiss to proceed as sole Lead Counsel as is the case here.

This court finds that in a civil class action, where Lead Counsel has the burden of showing adequacy, the indictment's determination of probable cause that criminal conduct has occurred should be considered as a pertinent matter under Rule 23(g)(1)(C)(ii).  Considering Milberg Weiss's demonstrated capability in other cases, the presumption of innocence, but also the finding of probable cause, the court finds the scales of adequacy in equipoise.  The indictment alone is not enough to cancel out the firm's respected history, but it is enough to make this court look carefully at Lead Counsel's adequacy in this case.

As noted above, Milberg Weiss's performance in this case has not been ideal.  Although it has defeated a Motion to Dismiss, it has also given the court reason to question its ability to adequately present truthful factual information to the court.  At oral arguments, Lead Counsel argued that the indictment would not present a problem as any criminal trial would not commence until January 2008, after this case is scheduled to conclude.[75]  Such reassurances are not consoling.  During the pendency of trial in this case, the ultimate fate of Milberg Weiss would remain undetermined.  A court concerned with ensuring competent representation for an absent class must worry about the possibility of distraction as the firm and its partners struggle to defeat the criminal charges. Envision a future where the class is certified, then Milberg Weiss loses this case and is then convicted under the indictment.  Looking back, this court would not be able to say that it met its obligations to the class if it ignored the effect of the indictment and the mounting questions in this case about Milberg Weiss's credibility and diligence.  Conducting such a thought experiment is somewhat inconsistent with the presumption of innocence.  But that

_____

[75] <u>Tr. of Mot. Hrg. held on Feb. 5, 2007</u>, Paper #200, p. 37:15-19, 39:14-40:9.

presumption applies only to Milberg Weiss's criminal case. In this civil action, Lead Counsel must meet its burden of showing adequacy and this court must perform its obligation to responsibly oversee the certification process. Considering all of the evidence in this case, including the problem of the erroneous certifications, the finely shaded letter, and the indictment, Milberg Weiss has not met this burden of showing adequacy, and this court cannot certify the proposed class.

**Conclusion**

The court is aware that Defendants are playing the role of the proverbial fox guarding the henhouse.[76] Courts have recognized that defendants often seek to cast aspersions on the adequacy of class representatives and counsel while truly seeking to have no class certified at all.[77] Despite this conflict, "the special supervisory role that a court plays in class actions requires this court to scrutinize carefully the ability of named representatives to mount typical claims and to represent the interests of the class adequately and fairly; 'it is an essential prerequisite to the right to maintain an action under Rule 23 that the court be certain the representatives will adequately protect the interests of all class members.'"[78] In exercising this duty, in this case, the court has

---

[76] See In re Diasonics Sec. Litig., 599 F. Supp. 447, 451 (N.D. Cal. 1984) (quoting Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 895 (7th Cir. 1981)).

[77] See, e.g., Kline v. Wolf, 702 F.2d 400, 402 (2d Cir. 1983) ("[A] court must be wary of a defendant's efforts to defeat representation of a class on grounds of inadequacy when the effect may be to eliminate any class representation."); Abelson v. Strong, No. 85-0592, 1987 U.S. Dist. LEXIS 7515, at *6 (D. Mass. July 30, 1987) ("A court, recognizing this irony, must be suspicious of defendants' efforts to protect unnamed plaintiffs when that protection will, as a practical matter, leave them without a remedy."); Umbriac v. American Snacks, Inc., 388 F. Supp. 265, 275 (E.D. Pa. 1975).

[78] In re Diasonics Sec. Litig., 599 F. Supp. at 452 (quoting 7 C Wright & A. Miller, Federal Practice and Procedure § 1764 at 620 (1972)).

concluded that neither Lead Plaintiff is typical and that Milberg Weiss is not adequate as sole Lead Counsel. The court realizes that refusing to certify a class will make it more difficult to prosecute the fraud alleged in this case. But the allegation of fraud is not alone enough to merit class certification. The additional requirements exist for the important reason of ensuring that the named plaintiffs effectively represent the claims of the absent parties. It is the job of the court to analyze the motion for class certification presently before the court in light of Rule 23's requirements. Accordingly, because of the failures of typicality of representatives and adequacy of counsel, the Motion for Class Certification presented by these Lead Plaintiffs is DENIED.

      II.    Other Motions

As stated in Section I.B.2, Lead Plaintiff Hofmann is without standing to press a claim against Defendant Arcari. Defendant Arcari's Motion for Summary Judgment is ALLOWED.

Because the class certification motion has been denied, Defendants have no need to depose the former Lead Plaintiffs. Plaintiffs' Motion for Protective Order is ALLOWED.

Similarly, because of the courts adoption of LIFO, plaintiff Madigan's claim fails. Defendants' Motion To Strike Lead Plaintiffs' Sworn Certifications and Preclude Reliance on Their Stock Transactions is now irrelevant and DENIED AS MOOT.

AN ORDER WILL ISSUE.

              /s/ Joseph L. Tauro
            United States District Judge