Splash Tech., 160 F. Supp. 2d at 1076-77 ("strong" demand for products mere puffery); In re Southland Securities, 365 F.3d at 377 (statement that "[t]he first quarter of 1998 was extremely significant" mere puffery).

Accordingly, summary judgment is warranted on Hofmann's claim that the February 24, 2000 press release was misleading.[10]

### H. Challenged Statement No. 8 Was Not Fraudulent.

| *Statement Source* | *Challenged Statement* | *Attributed To Defendant(s)* |
|---|---|---|
| Statement 8<br><br>Press Release<br>Mar. 31, 2000<br>(Compl. ¶ 84) | "Organogenesis Inc. [] today reported financial results for the fourth quarter and year ended December 31, 1999. The results are consistent with the transition in progress from a research-focused company to a research-based operating company with a novel medical product in introduction phase."<br><br>"For the year ended December 31, 1999, revenue from product sales to related party and others was $1.8 million, compared with $1.1 million in 1998. Total revenues were $3.6 million for 1999, compared with $9.0 million in 1998, which included $6.8 million in milestone payments from Novartis Pharma AG. Total expenses (including manufacturing, research and development, and general and administrative costs) were $31.9 million in 1999, compared with $23.0 million in 1998. Net loss was $0.93 per share (or $28.4 million) for 1999 compared with a net loss of $0.48 per share (or $14.0 million) for 1998."<br><br>"The increase in expenses was primarily due to: strengthening our employee base through additions to our production, research and support teams; costs to support publication studies and other sponsored programs, as well as increased activities in our corporate communication and business development functions; interest expense on the convertible debt issued last March; expanding our production and warehouse capacity while consolidating our administrative space; and the acquisition of intellectual property and assets from Baxter Healthcare Corporation." | Laughlin |

---

[10] To the extent Hofmann alleges that this statement "conditioned investors to believe that the Company would be able to raise the additional equity and debt financing necessary to keep the Company operational and achieve profitability," Compl. ¶ 87(g), this should be rejected. It is undisputed that the Company warned investors that it might not be able to raise additional funding: "Additional funds may not be available when required on acceptable terms." SMF ¶ 21 (Form 10-K for 1998); see also id. (Form 10-K for 1999) (similar). Defendants cannot be liable for concealing information that was, in fact, disclosed. See Baron, 380 F.3d at 55; In re Segue Software, 106 F. Supp. 2d at 168, In re World of Wonder, 35 F.3d at 1415-16. It also is undisputed that the Company raised necessary funds to operate through September 2002, long after the challenged press release issued on February 24, 2000. Finally, "conditioning" investors is not an actionable theory. In re Copley Pharm., 1995 WL 169215, at *2 n.5 ("Securities law is not about fostering senses; it is about actual statements, whether or not they are true or false, and, if false, whether or not the utterer knew at the time the statements were made that they were false.").

|  | "'Prior to the US commercialization of Apligraf, our corporate focus needed to be on supporting the validity of the product concept through solid research, clinical trials and manufacturing consistency,' said Philip M. Laughlin, President and Chief Executive Officer.  'Now, as sales of Apligraf begin to develop, our focus must include driving down per unit manufacturing costs through the development and implementation of more efficient methods of production.  At the same time, we are continuing to support other programs in our pipeline – the VITRIX(TM) living soft tissue replacement product, the vascular graft, the liver assist device – important to our longer term growth.'" |  |
|---|---|---|

Hoffman contends that Organogenesis' press release dated March 30, 2000 was "false and misleading when made" because:

> "Contrary to defendants' suggestion, the Company's planned focus on 'driving down per unit manufacturing costs' and implementing 'more efficient methods of production' would not achieve profitability for the Company.  As defendants were well aware at the time but failed to disclose, and as confirmed by former employees of Organogenesis, Organogenesis was losing money on every unit of Apligraf that it produced because of the terms of the disadvantageous terms of the Novartis marketing agreement - under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis and reimbursed Organogenesis for production costs in connection with unsold units only at a fraction of the actual costs of production."  Compl. ¶ 87(c).

This claim fails for numerous reasons.   First, the Company's statement that its "focus" was on "driving down per unit manufacturing costs" and "implementation of more efficient methods of production" merely expresses a goal or a target – and, thus, is not a promise or a guarantee of the sort that could ever be actionable.  See, e.g., Kane v. Made Networks N.V., No. C-96-20652-RMW, 2000 WL 33208116, at *9 (N.D. Cal. May 26, 2000) ("*targeted* for the first quarter of 1996 . . . too vague to be actionable") (emphasis added); Hillson Partners, 42 F.3d at 212 (statement that company was "*on target* toward achieving the most profitable year in its history" inactionable) (emphasis added); Galileo Corp., 127 F. Supp. 2d at 267 (statement of "substantial revenue goals" that company "*hoped* to achieve" inactionable as a matter of law) (emphasis added).  Second, as explained above, it was obvious that Organogenesis was losing

money on each sale of Apligraf and, in any event, the License and Supply Agreement with Novartis was publicly disclosed so investors could evaluate the terms for themselves.  See supra § III.A.  Third, the Company disclosed that it had always lost money and expressly warned investors that it expected to "continue to incur losses."  See id.

### I. Challenged Statement No. 9 Was Not Fraudulent.

| *Statement Source* | *Challenged Statement* | **Attributed To Defendant(s)** |
|---|---|---|
| Statement 9<br><br>10-K for 1999<br>Mar. 31, 2000<br>(Compl. ¶ 85) | "Based upon our current plans, we believe that common stock issued subsequent to December 31, 1999, together with existing working capital and future funds from Novartis, including product and royalty revenue, will be sufficient to finance operations into 2001.  However, this statement is forward-looking and changes may occur that would significantly decrease available cash before such time.  Factors that may change our cash requirements include:  delays in obtaining regulatory approvals of products in different countries, if needed, and subsequent timing of product launches; delays in commercial acceptance and reimbursement when product launches occur; changes in the progress of research and development programs; and changes in the resources devoted to outside research collaborations or projects, self-funded projects, proprietary manufacturing methods and advanced technologies."<br><br>"We currently have limited experience in sales, marketing and distribution and may need to develop long-term strategic relationships with partners, such as Novartis, that have marketing and sales forces with technical expertise and distribution capability.  To the extent that we enter into such relationships, our revenues will depend upon the efforts of third parties who may or may not be successful.  We may or may not be able to establish or maintain long-term strategic relationships, and if we do, our collaborators may not be successful in gaining market acceptance for our products….We are dependent on Novartis for the successful marketing and selling of Apligraf worldwide.  If Novartis does not succeed in marketing and selling Apligraf or gaining international approvals for the product or if we are unable to meet the production demand of global commercialization, our operating results will suffer."<br><br>"We expect Apligraf commercial sales to continue to increase."<br><br>"Cost of product sales exceeded product sales due to the start-up costs of new product introduction and the high costs associated with low volume production.  We expect production volume to increase and our margins to improve.  We expect to continue top expand production operations during the next 12 months."<br><br>"We are seeing, as expected, a gradual ramp-up in sales.  We expect production costs to exceed product sales for the near term due to | Erani<br>Laughlin<br>Lopolito |

|  | start-up expenses and the high costs associated with low volume production. However, we expect production volume to increase." |  |
|---|---|---|

Hofmann claims that the Company's Form 10-K for 1999 was misleading for the same reasons that the prior 8 challenged statements were misleading, namely:

- "Contrary to defendants' representation that Novartis had '**a marketing and sales force[] with technical expertise and distribution capability**,' Novartis' marketing team did not have the proper training, experience or expertise in selling a product like Apligraf, with the result that Novartis' efforts to market Apligraf suffered significantly. In fact, as alleged above, according to former employees of Novartis and Organogenesis, Novartis '**had no idea what they were doing**' when it came to marketing a living-tissue product like Apligraf." Compl. ¶ 87(c) (emphasis in original).

- "Defendants' representation that they expected Apligraf 'commercial sales to increase' was untrue given that the marketing problems that Novartis was experiencing because of inadequate marketing support and the significant problems with the manufacturing and distribution of Apligraf that were causing frustration among purchasers, leading to reluctance among physicians to order or re-order Apligraf and damaging Apligraf's future sales development prospects." Compl. ¶ 87(d).

- "Contrary to defendants' representations that production volume would increase and that as a consequence of that increase the Company's margins would improve…the Company was experiencing serious problems in manufacturing Apligraf and there was 'no way' the Company could feasibly mass-produce Apligraf.… [I]t was well known by the upper management of the Company that, throughout the Class Period, Organogenesis was losing money on every sale of Apligraf because of the disadvantageous terms of the Novartis marketing agreement - under which Novartis shared revenue from Apligraf sales that was well below the product's manufacturing cost to Organogenesis." Compl. ¶ 87(e) (emphasis in original).

- Contrary to defendants' representations that they expected to 'continue to expand production operations'…Organogenesis was experiencing serious problems in manufacturing Apligraf and there was 'no way' the Company could feasibly mass-produce Apligraf given the Company's inadequate production infrastructure and processes." Compl. ¶ 87(g).

The claim based on the statements in Organogenesis' Form 10-K for 1999 fails for the same reasons all of Hofmann's other claims fail:

- 23 -

First, there was nothing fraudulent about the statement that Novartis had "a marketing and sales force with technical expertise." It is undisputed that Novartis was one of the largest pharmaceutical companies in the world in 2000 with revenue of $21.7 billion and net income of $4.5 billion in 1999, revenue of $21.3 billion and net income of $4.3 billion in 2000, and revenue of $18.9 billion and $4.2 billion in 2001. See SMF ¶ 8. In addition, it is undisputed that the Company warned investors that Novartis might not be successful in marketing Apligraf. See supra § III.A. Moreover, it was obvious that Novartis did not have experience marketing a "living tissue product like Apligraf" because Apligraf was the first living tissue product ever approved by the FDA. See id. Accordingly, defendants had not duty to disclose that "Novartis had no idea what it was doing."

Second, as explained earlier, the statement that Organogenesis "expected Apligraf commercial sales to increase" turned out to be true. See supra § III.A. Therefore, there can be no liability based on this statement.

Third, any claim based on the Company's statements of expectation that manufacturing volume would increase or expand fail as a matter of law. See supra § III.A.

Fourth, as set forth above, any claim based on the statement that Organogenesis "expect[ed] . . . margins to improve" fails because the Company's public filings demonstrate that this prediction came true. See supra §§ III.B., F.[11]

## IV.    THERE IS NO EVIDENCE OF LOSS CAUSATION.

Under Section 10(b), a plaintiff must establish that the defendant's misrepresentations "caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u-4(b)(4). In Dura

---

[11]    Summary judgment also must enter for all defendants with respect to each Challenged Statement 1-9 *other* than the alleged speaker. Central Bank v. First Interstate Bank, 511 U.S. 164, 191-92 (1994) (holding district court's grant of summary judgment proper; to bring a defendant within the ambit of Rule 10b-5, plaintiffs must allege a misleading or manipulative representation or omission attributable to that defendant).

Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), the Supreme Court held that a plaintiff must show that a subsequent revelation of the "relevant truth" following an alleged misrepresentation caused the economic loss (*i.e.*, a decline in share price) for which he seeks to recover.  See id. at 344 (quoting the Restatement of Torts § 548A, Comment b, at 107 with approval: "a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains '*when the facts…become generally known*' and '*as a result*' share value '*depreciates.*'") (emphasis added); id. at 347 (affirming dismissal of complaint that "fail[ed] to claim that Dura's share price fell significantly after the truth became known"); see also In re Tyco Int'l, Ltd. Multidistrict Litig., 236 F.R.D. 62, 70 (D.N.H. 2006) (citing Dura and holding that "loss causation cannot be proved merely by establishing that the defendants' misconduct artificially inflated the price of the target company's stock on the date of purchase.  Instead, as other courts have recognized, *a plaintiff must also prove that the company's stock price later declined because the misconduct was disclosed to the market.*") (emphasis added and internal citations omitted).

In this case, there are two irrefutable facts that foreclose any finding of loss causation as a matter of law:  (1) the price of Organogenesis stock had collapsed before the alleged revelation of the truth; and (2) when the alleged truth was supposedly revealed, the Company's stock price barely moved.  Courts enter summary judgment for defendants under such circumstances.  See, e.g., In re Biogen Sec. Litig., 179 F.R.D. 25, 39 (D. Mass. 1997) (granting summary judgment because plaintiffs failed to introduce "any evidence that omissions in the abstract and press release were the proximate cause of the drop in the price of [the company's] stock [several months later]"); In re Ikon Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680, 687-89 (E.D. Pa. 2001) (granting summary judgment because, *inter alia*, stock price drops were caused by

company's problems integrating acquisitions, tough competition, and weak sales, not alleged fraudulent income inflation several years prior).

It is well-settled that where a company's stock price already has collapsed *before* the alleged "truth" is "revealed," plaintiffs cannot establish loss causation. See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005) (affirming dismissal on loss causation grounds of claims that analysts issued false "buy" recommendations because the stock price had declined before the disclosure that analysts had been misrepresenting their recommendations); In re Daou Sys., Inc., 411 F.3d 1006, 1027 (9th Cir. 2005) ("any loss suffered . . . cannot be considered causally related to Daou's allegedly fraudulent accounting methods because the true nature of Daou's financial condition had not yet been disclosed"); Payne v. DeLuca, No. 02-927, U.S. Dist. LEXIS 25621, at *176 (W.D. Pa. May 2, 2006) (plaintiffs' claims "fail because the loss they sustained occurred before the details of the alleged reckless behavior became generally known"); Schleicher v. Wendt, No. 1:03 CV 1332 DFHTAB, 2005 WL 1656871 (S.D. Ind. July 14, 2005) (no loss causation where "[t]he stock had long since hit bottom before the alleged misrepresentations became known"); Powell v. Idacorp, Inc., No. CV04-249-S-EJL, 2006 U.S. Dist. LEXIS 21831 (D. Id. Mar 29, 2006) (losses predating curative disclosure "cannot be causally related" to a misrepresentation).

Moreover, plaintiffs similarly cannot show loss causation where the stock price *does not actually decline* after the alleged misrepresentation. See, e.g., In re Cybershop.com Sec. Litig., 189 F.Supp. 2d 214, 233 (D.N.J. 2000) (granting motion to dismiss where stock price did not drop after disclosure and, in fact, increased throughout the day of disclosure, declining only the following day); Semerenko v. Cendant Corp., 223 F.3d 165, 185 (2d Cir. 2000) ("Where the

value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation").

Here, there is no connection between the alleged corrective disclosure and any loss suffered by Mr. Hofmann.  According to the Complaint, the alleged "truth" about Organogenesis' financial and operational condition was revealed when the Company disclosed that it might run out of money in a January 30, 2002 SEC filing.  See Compl. ¶¶ 14, 148-151.  However, the behavior of Organogenesis' stock price in the days before and immediately after the supposed disclosure of the truth on January 30, 2002 demonstrates unequivocally that the alleged fraud did not cause *any* loss:

- On January 24, 2002 (Thursday), Organogenesis' stock price closed at $3.85.

- The next day on January 25, 2002 (Friday), Organogenesis' stock price dropped to close at $3.53, a *decrease* of *8.31%* from the prior day.  There was no news announced on this day.

- On the next business day – January 28, 2002 (Monday) – Organogenesis' stock price again dropped to $3.09, a *decrease* of *12.46%* from the prior business day.  Once again, there was no news announced on this day.

- On January 29, 2002 (Tuesday) – the day *before* the supposed revelation of the "truth," see Compl. ¶¶ 14, 148-51 – Organogenesis' stock price once again dropped to close at $2.35, a *decrease* of *23.95%* from the prior day.  The only news announced on this day was the promotion of Steven Bernitz to Executive Vice President and Chief Operating Officer.  This news had nothing to do with the alleged fraud.

- Thus, from January 24 to 29, 2002, Organogenesis' stock price fell from $3.85 to $2.35, a total *decrease* of *39%*, and the only news announced during these days had no connection to the alleged fraud.

- By contrast, on January 30, 2002 (Wednesday), the day the alleged fraud was supposedly revealed, Organogenesis' stock price closed up at $2.66, an *increase* of *$.31* or *13.19%* from the prior day.  The announcement on Form 8-K that plaintiffs contend revealed the truth of defendants' alleged scheme to defraud the market was released at 3:38 p.m., 22 minutes before the close of trading – which allowed the market plenty of time to react to the news.

- On January 31, 2002 (Thursday), the day after the supposed fraud was revealed, Organogenesis' stock price closed at $2.60, a decrease of *only $.06* or *2.26%* from the prior day.

See SMF ¶ 29.

The behavior of Organogenesis' stock price completely forecloses Hofmann's stated theory of loss causation. On each of the three days preceding the alleged revelation of the truth on January 30, 2002, the Company's stock price dropped significantly by 8.31%, 12.46%, and 23.95%, respectively. On two of these days, no news was announced. On the third day, some news was announced, but it had nothing to do with the alleged fraud. Thus, the Company's stock price collapsed *before* the supposed truth was revealed and for reasons unrelated to the alleged fraud.

On the other hand, the Company's stock price *increased by 13.19%* on the day the alleged fraud was revealed. This increase occurred even though the announcement that allegedly revealed the truth occurred at 3:38 p.m. – 22 minutes before the close of trading – which allowed the market plenty of time to react to that news. SMF ¶ 29. Moreover, on the day after the alleged fraud was supposedly revealed (January 31, 2002), Organogenesis' stock price *barely moved*, dropping only $.06 (from $2.66 to $2.60). In other words, the Company's press release on January 30, 2002 did not cause a significant drop in the Company's stock price. If anything, the Company's stock price experienced an *overall increase* on these two days. This is hardly the sort of reaction one would expect from investors who learned material information concerning a company's financial and operational condition that had been concealed from them previously.

Hofmann thus cannot establish loss causation as a matter of law.

## V. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND II OF THE COMPLAINT.

As set forth above, Mr. Hofmann cannot maintain claims based on Challenged Statements Nos. 10-39 because they occurred after his last purchase of Organogenesis stock. See supra § II. Summary judgment also is warranted on any claims based on Challenged Statements Nos. 1-9 because no material facts are in dispute and a reasonable jury could not find that Mr. Hofmann has established a material misrepresentation or loss causation – two essential elements of his Section 10(b) claim. Accordingly, summary judgment should be granted on Count I of the Complaint.

In order to establish control person liability under Section 20(a), Mr. Hofmann must prove an "underlying violation" of Section 10(b). Suna, 107 F.3d at 72. He has not done so, and thus summary judgment should be granted on Count II of the Complaint.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment of Albert Erani, Philip Laughlin, Donna Abelli Lopolito, Michael Sabolinski, Alan Tuck, and Herbert Stein should be granted.

ALBERT ERANI, PHILIP LAUGHLIN, DONNA ABELLI LOPOLITO, MICHAEL SABOLINSKI, and ALAN W. TUCK

By their attorneys,

/s/ Eric D. Levin
Jeffrey B. Rudman (BBO #433380)
Jonathan A. Shapiro (BBO #567838)
Peter A. Spaeth (BBO #545202)
Eric D. Levin (BBO #639717)
Sherry Hartel Haus (BBO #663777)
Kimberly I. Friday (BBO #660544)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000


HERBERT STEIN

By his attorneys,

/s/ Peter M. Saparoff
Peter M. Saparoff (BBO #441740)
Breton T. Leone-Quick (BBO #655571)
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo PC
One Financial Center
Boston, MA 02109
(617) 542-6000

Dated:  April 18, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of this document was filed through the ECF system on April 18, 2007, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

        /s/ Eric D. Levin
        Eric D. Levin