**ORGANOGENESIS INC.**

**CONSOLIDATED BALANCE SHEETS**
(In thousands, except share data)

| | At December 31, 1997 | At December 31, 1998 |
|---|---|---|
| ASSETS | | |
| Current assets: | | |
|     Cash and cash equivalents | $ 333 | $ 5,052 |
|     Investments | 5,812 | 12,789 |
|     Other current assets | 927 | 1,171 |
| | 7,072 | 19,012 |
| Property and equipment, net | 6,615 | 7,605 |
| Other assets | 93 | 93 |
| | $ 13,780 | $ 26,710 |
| | ======= | ========= |
| Liabilities | | |
| Current liabilities: | | |
|     Accounts payable | $ 643 | $ 1,036 |
|     Accrued expenses | 1,586 | 2,435 |
| | 2,229 | 3,471 |
| Deferred rent payable | 28 | - |
| Commitments (see Notes) | | |
| Stockholders' Equity | | |
| Preferred stock, par value $1.00; authorized 1,000,000 shares: Series C convertible preferred; designated 200 shares; 62 shares issued and outstanding as of December 31, 1998 | | |
| Common stock, par value $.01; authorized 40,000,000 shares: issued and outstanding 28,950,400 and 30,479,719 shares as of December 31, 1997 and 1998, respectively | 290 | 305 |
| Additional paid-in capital | 98,219 | 124,342 |
| Accumulated deficit | (86,986) | (101,017) |
| Treasury stock at cost, 40,000 shares at December 31, 1998 | - | (391) |
|     Total stockholders' equity | 11,523 | 23,239 |
| | $ 13,780 | $ 26,710 |
| | ======= | ========= |

The accompanying notes are an integral part of the consolidated financial statements.

24

**ORGANOGENESIS INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
(In thousands, except share data)

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 1996 | 1997 | 1998 |
| **Revenues:** | | | |
| Research and development support from related party | $ 6,500 | $ 2,500 | $ 6,750 |
| Product sales to related party, royalties and other income | 42 | 529 | 1,189 |
| Interest income | 985 | 502 | 1,058 |
| Total revenues | 7,527 | 3,531 | 8,997 |
| | | | |
| **Costs and Expenses:** | | | |
| Research and development | 10,647 | 13,854 | 17,542 |
| General and administrative | 4,379 | 3,929 | 5,486 |
| Non-cash charge for stock option extension | - | 5,555 | - |
| Total costs and expenses | 15,026 | 23,338 | 23,028 |
| | | | |
| Net loss | $ (7,499) | $ (19,807) | $ (14,031) |
| | | | |
| Net loss per common share - basic and diluted | $ (.27) | $ (.70) | $ (.48) |
| | | | |
| Weighted average number of common shares outstanding - basic and diluted | 27,513,069 | 28,360,485 | 29,453,104 |

The accompanying notes are an integral part of the consolidated financial statements.

25

## ORGANOGENESIS INC.

### CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 1996 | 1997 | 1998 |
| Cash flows from operating activities: | | | |
| Net loss | $ (7,499) | $ (19,807) | $ (14,031) |
| Adjustments to reconcile net loss to cash flows used in operating activities: | | | |
| Depreciation | 1,049 | 1,658 | 1,474 |
| Issuance of stock options | 62 | 50 | – |
| Non-cash charge for stock option extension | – | 5,555 | – |
| Changes in assets and liabilities: | | | |
| Other current assets | (146) | (224) | (244) |
| Other assets | (5) | (4) | – |
| Accounts payable | 615 | (577) | 393 |
| Accrued expenses | 1,880 | (1,081) | 849 |
| Deferred rent payable | (43) | (43) | (28) |
| Cash used in operating activities | (4,087) | (14,473) | (11,587) |
| | | | |
| Cash flows from investing activities: | | | |
| Capital expenditures | (3,311) | (1,069) | (2,464) |
| Purchases of investments | (13,870) | (5,000) | (16,224) |
| Sales/maturities of investments | 10,981 | 13,229 | 9,247 |
| Cash provided by (used in) investing activities | (6,200) | 7,160 | (9,441) |
| | | | |
| Cash flows from financing activities: | | | |
| Proceeds from sale of preferred stock - net | – | – | 19,117 |
| Proceeds from sale of common stock - net | 5,000 | – | 6,000 |
| Proceeds from exercise of warrants | 2,316 | 4,571 | – |
| Proceeds from exercise of stock options | 801 | 2,676 | 1,021 |
| Purchase of treasury stock | – | – | (391) |
| Cash provided by financing activities | 8,117 | 7,247 | 25,747 |
| | | | |
| Increase (decrease) in cash and cash equivalents | (2,170) | (66) | 4,719 |
| Cash and cash equivalents, beginning of year | 2,569 | 399 | 333 |
| Cash and cash equivalents, end of year | $ 399 | $ 333 | $ 5,052 |

The accompanying notes are an integral part of the consolidated financial statements.

ORGANOGENESIS INC.

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY
(In thousands)

For the Years Ended December 31, 1996, 1997 and 1998

| | Series C Convertible Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Treasury Stock | | Total Stockholders' |
| | Shares | Amount | Shares | Amount | Capital | Deficit | Shares | Amount | Equity |
|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 1995 | - | - | 13,732 | $ 137 | $ 77,341 | $ (59,680) | - | - | $ 17,798 |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | | | 112 | 1 | 800 | | | | 801 |
| Issuance of common stock upon exercise of warrants | | | 234 | 3 | 2,313 | | | | 2,316 |
| Sale of common stock to related party | | | 214 | 2 | 4,998 | | | | 5,000 |
| Issuance of stock options | | | | | 62 | | | | 62 |
| Net loss | | | | | | (7,499) | | | (7,499) |
| Balance, December 31, 1996 | - | - | 14,292 | 143 | 85,514 | (67,179) | - | - | 18,478 |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | | | 297 | 3 | 2,673 | | | | 2,676 |
| Issuance of common stock upon exercise of warrants | | | 357 | 4 | 4,567 | | | | 4,571 |
| Two, one-for-four common stock dividends | | | 8,214 | 82 | (82) | | | | - |
| Issuance of stock options | | | | | 50 | | | | 50 |
| Non-cash charge for stock option extension | | | | | 5,555 | | | | 5,555 |
| Net loss | | | | | | (19,807) | | | (19,807) |
| Balance, December 31, 1997 | - | - | 23,160 | 232 | 98,277 | (86,986) | - | - | 11,523 |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | | | 146 | 2 | 1,019 | | | | 1,021 |
| One-for-four common stock dividend | | | 5,826 | 58 | (58) | | | | - |
| Sale of preferred stock - net | - | - | | | 19,117 | | | | 19,117 |
| Conversion of preferred stock | - | - | 1,136 | 11 | (11) | | | | - |
| Sale of common stock to related party | | | 212 | 2 | 5,998 | | | | 6,000 |
| Purchase of treasury stock | | | | | | | 40 | (391) | (391) |
| Net loss | | | | | | (14,031) | | | (14,031) |
| Balance, December 31, 1998 | - | - | 30,480 | $ 305 | $ 124,342 | $(101,017) | 40 | $ (391) | $ 23,239 |

The accompanying notes are an integral part of the consolidated financial statements.

27

ORGANOGENESIS INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NATURE OF BUSINESS

Organogenesis designs, develops and manufactures medical therapeutics containing living cells and/or natural connective tissue. The company was formed to advance and apply the emerging field of tissue engineering to major medical needs. Our product development focus includes living tissue replacements, cell- based organ assist devices and other tissue-engineered products.

On May 22, 1998, our lead product, Apligraf living skin construct, was approved for marketing in the US. Apligraf is the only mass-manufactured product containing living human cells to be approved for marketing through the FDA PMA process. Novartis Pharmaceuticals Corporation launched Apligraf in the US in June 1998. Novartis Pharma AG has global Apligraf marketing rights and also markets Apligraf in Canada.

We have a wholly owned subsidiary, ECM Pharma/TM/, Inc. ECM Pharma was established to discover, develop and commercialize human therapeutics based on the extracellular matrix. We also have a wholly owned investment subsidiary, Dan Capital Corporation, which holds a substantial portion of our cash, cash equivalents and investments.

We are subject to risks common to entities in the biotechnology industry, including, but not limited to, the following uncertainties:

. Market acceptance of our products, if and when approved, and successful marketing and selling of Apligraf by Novartis;
. FDA approval of Apligraf for other indications and successful registrations of Apligraf outside the US;
. Risk of failure of clinical trials for future indications of Apligraf and other products;
. Compliance with FDA regulations and similar foreign regulatory bodies;
. Manufacture and sale of products in sufficient volume to realize a satisfactory margin;
. Continued availability of raw material for products;
. Availability of sufficient product liability insurance;
. Ability to recover the investment in property and equipment;
. Protection of proprietary technology through patents;
. Development by competitors of new technologies or products that are more effective than ours;
. Adequate third-party reimbursement for products;
. Dependence on and retention of key personnel;
. Year 2000 issues; and
. Availability of additional capital on acceptable terms, if at all.

28

Our ultimate success is dependent upon sale of products, research and development funding under licensing agreements, our ability to raise capital and interest income on invested capital. However, our funding requirements may change depending upon numerous factors, including:

. Time required to obtain regulatory approvals of products in different countries, if needed, and subsequent timing of product launches;
. Commercial acceptance and reimbursement when product launches occur;
. Progress of research and development programs;
. Resources devoted to outside research collaborations or projects, self- funded projects, proprietary manufacturing methods and advanced technologies; and
. Acquisition of a second manufacturing plant.

While we believe that future capital composed of manufacturing payments and royalty revenue, research and development support payments and debt and equity financings will be sufficient to fund future operations, there can be no assurance that these or any additional funds will be available when required on acceptable terms. Refer to "Convertible Debt" note for debt financing subsequent to year-end.

## SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### PRINCIPLES OF CONSOLIDATION AND USE OF ESTIMATES

The consolidated financial statements include the accounts of the company and its wholly owned subsidiaries. All intercompany activity has been eliminated. We prepare our financial statements under generally accepted accounting principles that require us to make estimates and assumptions that affect amounts reported and the related disclosures. Actual results could differ from those estimates.

### REVENUE RECOGNITION

Research and development support revenue under the collaborative agreement with Novartis is recognized as related expenses are incurred or contractual obligations are met. Revenue from Apligraf sales is recognized upon shipment or, in certain cases, after fulfillment of firm purchase orders in accordance with the Manufacturing and Supply Agreement with Novartis. Other product revenues are recognized upon shipment. Royalty revenue is recorded as earned. Deferred revenue arises from the difference between cash received and revenue recognized in accordance with these policies.

### RESEARCH AND DEVELOPMENT COSTS

All research and development costs are expensed as incurred and currently include costs of production.

### PATENTS

As a result of our research and development programs, we have a proprietary portfolio of patent rights and patent applications for a number of patents in the US and abroad. Such patent rights are of significant importance to protect our products and processes. For financial reporting purposes, all costs in connection with patent rights and patent applications have been expensed as incurred.

### INCOME TAXES

Research and development and other tax credits are recognized for financial reporting purposes when they are realized. Deferred taxes are determined based on the difference between the financial reporting and the tax bases of assets and liabilities using enacted income tax rates in effect in the years in which the differences are expected to reverse. However, the realizability of these deferred tax assets is not assured as it depends upon future taxable income. Accordingly, we have recorded a 100% valuation allowance against these assets. Tax credits will be recorded as a reduction in income taxes when utilized.

## NET LOSS PER COMMON SHARE

Net loss per common share - basic and diluted is based on the weighted average number of common shares outstanding during each period. Potentially dilutive securities at December 31, 1998 include stock options outstanding to purchase 6,006,138 common shares, warrants to purchase 400,000 common shares and approximately 62 shares of convertible preferred stock; however, such securities have not been included in the net loss per common share calculation because their effect would be antidilutive. For 1997 and 1996, the net loss per common share - basic and diluted and weighted average number of common shares outstanding were adjusted for a one-for-four stock split accounted for as a stock dividend distributed on April 29, 1998.

## CASH AND CASH EQUIVALENTS

Cash and cash equivalents consist of cash and money market funds that are convertible into a known amount of cash and carry an insignificant risk of change in value. These investments are highly liquid and have original maturities of less than three months.

## PROPERTY AND EQUIPMENT

Equipment, furniture and fixtures, office equipment and leasehold improvements are stated at cost. Depreciation is provided using the straight-line method over three to ten years. Leasehold improvements are being amortized using the straight-line method over the term of the lease.

Maintenance and repairs are charged to expense as incurred and betterments are capitalized. Upon retirement or sale, the cost of assets disposed of and their related accumulated depreciation are removed from the accounts. Any resulting gain or loss is credited or charged to operations.

## CONSTRUCTION-IN-PROGRESS

At December 31, 1996, construction-in-progress was approximately $1,902,000 due to the expansion of our facilities that was put into service during 1997. As of December 31, 1998, construction-in-progress was approximately $933,000 relating to further build-out of our facilities for manufacturing, quality systems labs and packaging.

## STOCK-BASED COMPENSATION

Statement of Financial Accounting Standards No. 123, "Accounting for Stock- Based Compensation," allows us to continue to account for stock-based compensation arrangements under the provisions of Accounting Principles Board No. 25, "Accounting for Stock Issued to Employees," and disclose in a footnote the pro forma effects to net loss and net loss per share assuming the fair value accounting method of SFAS 123 was adopted. Accordingly, no compensation cost has been recognized in income from stock-based employee awards.

## ACCOUNTING PRONOUNCEMENTS

In March of 1998, the American Institute of Certified Public Accountants issued Statement of Position 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." SOP 98-1 requires computer software costs associated with internal use software to be charged to operations as incurred until certain capitalization criteria are met. SOP 98-1 is effective beginning January 1, 1999. We do not expect adoption of this statement to have a material effect on consolidated financial position or results of operations.

In June of 1998, the FASB issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." SFAS No. 133 establishes accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts and for hedging activities. SFAS No. 133 is effective for fiscal years beginning December 15, 1999. We do not expect adoption of this statement to have a material impact on consolidated financial position or results of operations.

### RECLASSIFICATIONS

Certain reclassifications have been made to the 1996 and 1997 financial statements to conform to the 1998 classifications. These reclassifications have no impact on financial position or results of operations.

### INVESTMENTS

We determine the appropriate classifications of debt securities at the time of purchase. The investments held are classified as available-for-sale and are carried at cost plus accrued interest, which approximates fair market value and, accordingly, there was no adjustment to stockholders' equity. We also classify investments in accordance with their intended use. At December 31, 1998, the intended use of all investments is to fund working capital and plant expansion. We invest excess cash in securities that have an A or A1 rating or better with a maximum maturity of two years.

The aggregate cost and fair market value of investments are as follows (in thousands):

| Maturity | December 31, 1997 | | December 31, 1998 | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Market Value | Amortized Cost | Market Value |
| Less than one year: | | | | |
| US Government and Agency bonds | $ 1,307 | $ 1,310 | $ 1,034 | $ 1,036 |
| Time deposits | 304 | 304 | - | - |
| Corporate and other debt securities | 3,754 | 3,761 | 5,019 | 5,019 |
| Certificates of deposit | 197 | 197 | 693 | 693 |
| Between one and two years: | | | | |
| US Government and Agency bonds | 250 | 251 | 3,106 | 3,110 |
| Corporate and other debt securities | - | - | 2,937 | 2,957 |
| Total Investments | $ 5,812 | $ 5,823 | $ 12,789 | $ 12,815 |

### Other Current Assets

Included in other current assets is a net receivable due from Novartis of approximately $170,000 and $213,000 as of December 31, 1997 and 1998, respectively.

### PROPERTY AND EQUIPMENT

Property and equipment consisted of the following (in thousands):

| | Estimated Useful Life (years) | December 31, 1997 | December 31, 1998 |
| --- | --- | --- | --- |
| Equipment | 5-10 | $ 9,110 | $ 10,235 |
| Furniture, fixtures and office equipment | 3-5 | 1,624 | 1,954 |
| Leasehold improvements | Lease term | 3,746 | 3,822 |
| Construction-in-progress | | - | 933 |
| | | 14,480 | 16,944 |
| Less accumulated depreciation | | (7,865) | (9,339) |
| | | $ 6,615 | $ 7,605 |

## ACCRUED EXPENSES

Accrued expenses consisted of the following (in thousands):

|                                    | December 31, 1997 | December 31, 1998 |
|------------------------------------|-------------------|-------------------|
| Compensation and employee benefits | $     880         | $   1,121         |
| Professional services              | 226               | 535               |
| Other                              | 480               | 779               |
|                                    | $   1,586         | $   2,435         |

## COMMITMENTS

Lease Obligations

We occupy our current premises under a lease that expires on September 30, 2004. This lease has three options to extend the term for an additional five years each option. We have provided written notice to the landlord of our intent to lease all of the remaining space at this primary facility starting November 1, 1999. Taxes, insurance and operating expenses are our responsibility under the terms of the lease. We also have a second lease for warehouse and office space that expires on October 31, 1999. Additionally, in January 1999, we entered into a noncancelable operating lease for certain office equipment.

Future minimum lease payments are as follows (in thousands):

|            |           |
|------------|-----------|
| 1999       | $     642 |
| 2000       | 798       |
| 2001       | 818       |
| 2002       | 838       |
| 2003       | 824       |
| Thereafter | 627       |
|            | $   4,547 |

Rent of approximately $394,000, $491,000 and $562,000 was charged to expense during the years ended December 31, 1996, 1997 and 1998, respectively.

### CONSTRUCTION-IN-PROGRESS

At December 31, 1998, we had approximately $933,000 in construction in progress relating to expansion of our main facility. Additionally, we have committed approximately $4.1 million for this build-out. The total project cost is estimated at about $5.9 million.

### SERIES C PREFERRED STOCK COMMITMENT

At December 31, 1998, we had approximately 62 shares of Series C convertible preferred stock outstanding. In the event that any Series C preferred stock are outstanding on the mandatory conversion date of March 26, 2000, we have the option of redeeming any such outstanding Series C preferred stock by: (1) paying cash equal to the product of the number of Series C preferred stock outstanding multiplied by the stated value of $100,000 per share; (2) issuing common stock equal to 1.15 of the stated value divided by the average of the closing bid prices for the 20 consecutive trading days prior to the mandatory conversion date; or (3) any combination of these methods.

32

## INCOME TAXES

At December 31, 1998, we had federal and state net operating loss carryforwards of approximately $101,500,000 and $74,127,000, respectively, of which $5,577,000 relate to disqualifying dispositions of qualified incentive stock options and exercise of nonqualified stock options. The tax benefit of $2,231,000 related to the stock options will be credited to equity when realized. At December 31, 1998, we had federal and state tax credit carryforwards of approximately $2,668,000 and $1,676,000, respectively. The federal and state net operating loss carryforwards expire beginning in 2000 and 1999, respectively. The federal and state research and development tax credits expire beginning in 2001 and 2006, respectively.

The approximate tax effect of each type of temporary difference and carryforward is reflected in the following table. The effective tax rate is expected to be 40% combined federal and state (in thousands):

|  | December 31, | |
|  | 1997 | 1998 |
| --- | --- | --- |
| Deferred tax assets and (liabilities): | | |
| Net operating loss carryforwards | $ 34,975 | $ 37,062 |
| Research and development credits and other credits | 3,373 | 3,774 |
| Depreciation | (529) | (349) |
| Other | 2,237 | 2,455 |
| Net deferred tax assets before valuation allowance | 40,056 | 42,942 |
| Valuation allowance | (40,056) | (42,942) |
| Net deferred assets after valuation allowance | $ 0 | $ 0 |

These losses and tax credits are available to reduce federal and state taxable income and income taxes, respectively, in future years, if any. The realizability of deferred tax assets is not assured as it depends upon future taxable income. Accordingly, we have recorded a 100% valuation allowance against these assets. We are required to recognize all or a portion of net deferred tax assets, with corresponding increases to net income, when we believe, given the weight of all available evidence, that it is more likely than not that all or a portion of the benefits of net operating loss carryforwards and other credits will be realized. However, there can be no assurance that we will ever realize any future cash flows or benefits from these losses and tax credits. Ownership changes may result in future limitations on the utilization of net operating losses and research and development tax credit carryforwards.

## COLLABORATIVE AND OTHER AGREEMENTS

In January 1996, we entered into an agreement with Novartis Pharma AG granting them exclusive global marketing rights to Apligraf. Under the agreement, Novartis is responsible for Apligraf sales and marketing costs worldwide, as well as all clinical trials, registrations and patent costs outside the US. The agreement provides us with up to $40,000,000 in equity investments, research support and milestone payments, of which $12,750,000 was received during 1998, $2,500,000 in 1997 and $11,500,000 in 1996. The remaining payments are based upon achievement of specified events. Under the agreement, we supply Novartis' global requirements for Apligraf and receive revenue consisting of a per unit manufacturing payment and royalties on product sales.

In late 1998, we entered into research collaborations with Estee Lauder Companies Inc. and with Novavax, Inc.

In 1995, we entered into a supply arrangement with Biomet, Inc. under which Biomet may, but is not obligated to, purchase collagen from us. Revenues under this agreement are included in other income.

33

In 1994, we signed a license agreement with Toyobo Ltd. granting Toyobo a license to manufacture and market Testskin in Japan in exchange for royalty payments. Additionally, Toyobo may, but is not obligated to, purchase collagen and other products from us. Revenues under this arrangement are included in other income.

## RESEARCH AGREEMENTS

The research agreements summarized below generally are funded over a one or two-year period. Each agreement is reviewed at least annually and the amounts to be funded for the next period are then determined. Either party may cancel the agreement upon advance written notice. Total payments under these agreements were $648,000, $571,000 and $438,000 for 1998, 1997 and 1996, respectively. Information regarding the date entered into, the entity that the agreement is with and the area of research or development are summarized as follows:

. April 1998, Medvet Science Pty. Ltd., stem cells;
. September 1996, Children's Hospital (Boston), graft acceptance;
. June 1996, Massachusetts General Hospital, bioartificial liver;
. December 1995, Brigham and Women's Hospital, biology of surface tissues (e.g., oral mucosa, skin appendages);
. March 1995 (contract expired without renewal in 1998), Harvard Medical School, extracellular matrix related therapeutics; and
. 1995, Hebrew University, connective tissue.

## LICENSE AGREEMENT

Certain of our technologies are licensed under an exclusive patent license agreement with the Massachusetts Institute of Technology. The agreement with MIT covers certain US patents and corresponding patents in European and Far East countries. Pursuant to the MIT agreement, we have been granted an exclusive, worldwide license to make, use and sell the products covered by the patents and to practice the procedures covered by the patents. The MIT agreement requires us to pay to MIT a royalty on the cumulative net sales of licensed products ranging from 3% to 4.5% of annual sales.

Additionally, we entered into an agreement effective January 1999 with the University of British Columbia that grants us an exclusive, worldwide license to use and sublicense certain UBC technology and to manufacture, distribute and sell products based on that technology.

## CONVERTIBLE DEBT

On March 30, 1999, we closed a financing of $15,000,000 through the private placement of five year convertible debentures and 300,000 warrants to purchase common stock. We may raise up to approximately $5,000,000 additional under this placement. The debentures are convertible at a fixed price of $15.00 per share any any time on or after March 30, 2000. Interest on the debentures accrues at 7% annually, payable in cash, common stock (at the average trading price for the twenty trading days preceding the due date) or any combination thereof, at our option, semi-annually on September 30 and March 31 or on the date any of the principal outstanding under the notes has been converted into common stock. At our option, at any time on or after March 30, 2002, the debentures may be prepaid by conversion of the principal into common stock at the conversion price of $15, cash or any combination thereof and payment of any accrued interest as described above, provided that the average per share market value for the twenty consecutive trading days immediately preceding the date of prepayment equals or exceeds $40 per share. The notes mature on March 29, 2004 and are payable in cash. The warrants grant the right to purchase one share of common stock at the exercise price of $22.50 for each $50.00 in face value of the convertible notes at any time before March 30, 2004. We expect to register the warrants and underlying common stock for conversion of the debentures, payment of interest and exercise of the warrants.

34

**STOCKHOLDERS' EQUITY**

## PREFERRED STOCK

We have authorized 1,000,000 shares of preferred stock at December 31, 1998, comprised of the following designations:

. 250,000 shares Series A convertible preferred stock;
. 50,000 shares Series B Junior participating preferred stock;
. 200 shares Series C convertible preferred stock; and
. 699,800 shares authorized and unissued.

The Series A convertible preferred stock that was previously issued was subsequently converted into 312,500 shares of common stock in October 1995. No shares of Series A or Series B preferred stock were issued and outstanding as of December 31, 1996, 1997 and 1998.

In March 1998, we completed a placement of 200 shares of Series C convertible preferred stock and warrant financing with two institutional investors at a price of $100,000 per share. Proceeds from the offering, net of placement agent fees and expenses, were approximately $19,117,000. The Series C preferred stock pay no dividends, have no voting rights, and are convertible into common stock on a scheduled basis over two years based on market price at time of conversion (up to $28.80 per share). We may call for conversion of all or part of the shares of Series C preferred stock under certain conditions based on continued improvement in the price of our common stock. Conversions by the investors are subject to certain limits; no limits exist for conversions on redemption or upon a major transaction. Mandatory conversion is March 26, 2000, at which time we have the option to redeem any outstanding Series C preferred shares in cash or by issuing common stock. In addition, the investors received three-year warrants to purchase an aggregate of 200,000 shares of common stock at $31.20 per share. The warrants may be exercised at any time prior to April 2001. In July 1998, the investors exercised their right to receive additional warrants to purchase 150,000 shares of common stock at $17.45 per share with an expiration date of March 26, 2001. We also issued a warrant to purchase an aggregate of 50,000 shares of common stock at $28.80 per share to the placement agent that expires March 25, 2001. The total fair value of all warrants was estimated to be approximately $2,509,000 and is included in additional paid-in capital. No further warrants may be issued under the Series C preferred stock placement.

In April 1998, we filed a registration statement for 1,800,000 shares of common stock, the maximum number of shares that may be acquired relating to this transaction; except for mandatory conversion where the common share limit does not apply. All shares have been reserved for issuance. The SEC declared this registration statement effective in May 1998.

In May, September and November 1998, an aggregate of $13,800,000 face amount of the Series C preferred stock was converted into common stock resulting in the issuance of approximately 1,136,000 shares of common stock. These conversions are non-cash transactions.

## COMMON STOCK

We have authorized 40,000,000 shares of common stock, of which there were 28,950,400 and 30,479,719 shares issued and outstanding as of December 31, 1997 and 1998, respectively.

35

The following one-for-four stock splits accounted for as stock dividends were declared by the Board of Directors during the past three years:

| Stock Dividend | Record Date | Payable Date | Common Shares Issued |
|---|---|---|---|
| 25% | April 22, 1998 | April 29, 1998 | 5,826,000 |
| 25% | November 21, 1997 | November 28, 1997 | 4,618,000 |
| 25% | April 25, 1997 | May 2, 1997 | 3,596,000 |

All related share and per share data in the consolidated financial statements reflect all stock dividends for all periods presented, except for the Statements of Changes in Stockholders' Equity.

We received $6,000,000 from Novartis in 1998 relating to milestone equity investments for approximately 212,000 shares of common stock. As a result of these equity investments and a prior equity investment of $5,000,000 made in January 1996, Novartis holds approximately 2.2% of outstanding shares as of December 31, 1998.

In July 1995, we completed a public offering of 230,000 units, at a unit price of $66.25, resulting in net proceeds of approximately $14,774,000. Each unit in the offering consisted of five shares of common stock and one common stock purchase warrant to purchase one share of common stock. On July 21, 1997, we gave notice of redemption with respect to all outstanding common stock purchase warrants issued. All common stock purchase warrants were exercised during 1997 for 357,000 shares of common stock, resulting in proceeds of approximately $4,571,000.

In November 1991, we completed a public offering of 1,650,000 shares of common stock. This offering resulted in net proceeds of approximately $36,144,000. In connection with this offering, the underwriter was issued a warrant to purchase 187,500 shares of common stock, exercisable at any time during a four-year period. During 1996, these warrants were exercised for 187,500 shares of common stock resulting in proceeds of approximately $1,828,000.

In April 1991, we received net proceeds of approximately $924,000 from the sale of 125,000 shares of common stock and warrants to purchase common stock exercisable at any time during a five-year period. The warrants allowed for the purchase of 31,250 shares of common stock at $9.60 per share and 15,625 shares at $12.00 per share. During 1996, these warrants were exercised for 46,875 shares of common stock, resulting in proceeds of $488,000.

## TREASURY STOCK

In September 1998, the Board of Directors authorized a common stock repurchase program. Repurchases are allowed through open-market transactions for up to 500,000 shares that will provide us with treasury shares for general corporate purposes. At December 31, 1998, we had repurchased 40,000 shares of common stock for an aggregate purchase price of $391,000. The stock repurchase program may be discontinued at any time.

**STOCKHOLDER RIGHTS PLAN**

In August 1995, the Board of Directors adopted a Stockholder Rights Plan and declared a dividend of one right for each outstanding share of common stock to stockholders of record on September 1, 1995. After adjusting for two one- for-four stock dividends distributed during 1997 and one one-for-four stock dividend distributed during 1998, there is approximately .51 of a right for each outstanding share of common stock. Each right only becomes exercisable and transferable apart from the common stock at the earlier of: (1) ten days after a person or group acquires beneficial ownership of 15% or more of outstanding common stock; or (2) ten business days following an announcement of a tender or exchange offer of 30% or more of outstanding stock.

Initially, each right, upon becoming exercisable, would entitle the holder to purchase one-thousandth of a share of Series B Junior participating preferred stock at an exercise price of $85, subject to adjustment. If a person or group acquires beneficial ownership of 15% or more of the outstanding shares of common stock, then each holder of a right (other than rights held by the acquiring person or group) would have the right to receive that number of shares of common stock which equals the exercise price of the right divided by one-half of the current market price of the common stock.

The rights may be redeemed for $0.01 per right at any time until the tenth day following the stock acquisition date. The rights will expire on September 1, 2005.

**STOCK-BASED COMPENSATION**

At December 31, 1998, we had four stock-based compensation plans (collectively, Stock Option Plans), as described below. Consistent with the optional disclosure method prescribed by SFAS 123, the following are the pro forma net loss and net loss per common share - basic and diluted for the years ended December 31, 1996, 1997 and 1998, respectively, had compensation cost for the Stock Option Plans been determined based on the fair value at the grant date for grants made in 1996, 1997 and 1998 (in thousands, except share data):

|  | 1996 | | 1997 | | 1998 | |
|---|---|---|---|---|---|---|
|  | As Reported | Pro Forma | As Reported | Pro Forma | As Reported | Pro Forma |
| Net loss | $ (7,499) | $ (8,696) | $ (19,807) | $ (18,686) | $ (14,031) | $ (17,985) |
| Net loss per common share - basic and diluted | $ (0.27) | $ (0.32) | $ (0.70) | $ (0.66) | $ (0.48) | $ (0.61) |

The effects on 1996, 1997 and 1998 pro forma net loss and net loss per common share - basic and diluted of expensing the estimated fair value of stock options may not be representative of the effects on reporting pro forma results for future years as the periods presented include only two, three and four years, respectively, of fair value expense for options granted under the Stock Option Plans because the method prescribed by SFAS 123 has not been applied to options granted prior to January 1, 1995.

The weighted average fair value of options granted under the Stock Option Plans was estimated using the Black-Scholes option-pricing model. The Black- Scholes option-pricing model was developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, option-pricing models require the input of highly subjective assumptions, including expected stock price volatility. Because our employee stock options have characteristics significantly different from those of traded options and changes in the subjective input assumptions may materially affect the fair value estimate, in our opinion, the existing models do not necessarily provide a reliable single measure of the fair value of employee stock options.

37

The assumptions used to calculate the weighted average fair value of options granted during 1996, 1997 and 1998 are as follows:

```
                                                                    1996      1997      1998
-------------------------------------------------------------------------------------------
Assumed life for options issued to employees (years)                 6.2       5.0       5.0
Assumed life for options issued to directors and officers (years)    7.7       7.0       7.0
Risk-free interest rate                                             6.2%      6.3%      5.3%
Volatility                                                         61.0%     61.0%     65.0%
Dividend yield                                                         -         -         -
Weighted average fair value per common share of options granted during the year  $ 5.36   $ 7.85   $ 14.48
```

In May 1997, the Board of Directors voted to extend the term of an option granted to an officer in 1987 for an additional five years. The option allows for the purchase of 732,423 shares of common stock at an exercise price of $3.072. The extension of this option requires a new measurement date for valuing the option, resulting in a non-cash compensation charge of $5,555,000 recorded in the second quarter of 1997. The option is fully exercisable and the shares have been reserved for issuance.

## THE STOCK OPTION PLANS

In May 1995, a stock option plan was approved by shareholders providing for the issuance of up to 2,929,688 shares of common stock options to enable us to attract and retain key employees and consultants. Under the 1995 Plan, we may grant incentive and non-qualified stock options to officers, employees, consultants and advisors. The 1995 Plan, which took effect upon the expiration of the 1986 Stock Option Plan in August 1996, is administered by a committee of the Board of Directors. This committee selects the individuals to whom options are granted and determines: (1) the type of option to be granted; (2) the number of shares of common stock covered by the option; (3) when the option becomes exercisable; and (4) the duration of the option which, in the case of incentive stock options, may not exceed ten years. Vesting generally occurs ratably over a five-year period beginning one year from the date of grant. No one person may be issued options to purchase more than 500,000 shares of common stock in any one calendar year. Stock options granted under the 1995 Plan may not be granted at an exercise price less than 100% of the fair market value of the common stock on the date of grant (or 110% of fair market value in the case of incentive stock options granted to employees holding 10% or more of voting stock). The aggregate fair market value (determined at the time of grant) of shares issuable pursuant to incentive stock options which first become exercisable in any calendar year by an employee may not exceed $100,000.

Our 1986 Stock Option Plan provided for the issuance of an aggregate of 4,882,812 shares of common stock for the granting of incentive and non-qualified stock. The 1986 Plan was also administered by a committee of the Board of Directors and had substantially the same terms and conditions as described under the 1995 Plan. In August 1996, the 1986 Plan expired and no further grants were made. All options outstanding on the expiration date remain in effect.

In 1994, a stock option plan for non-employee directors was approved by shareholders. Under the 1994 Director Plan, stock options to purchase up to 488,281 shares of common stock may be granted to non-employee directors. The 1994 Director Plan provides that the option price per share be at fair market value and vest ratably over a five-year period beginning one year from the date of grant, with a duration not to exceed ten years.

The 1991 Director Stock Option Plan provided for the granting of options to purchase 244,141 shares of common stock by non-employee directors and terminated upon the adoption of the 1994 Director Plan. The options were granted at fair market value and were immediately exercisable, subject to repurchase, at the option price, in the event the optionee ceased to be a director. This repurchase right terminates and the shares vest ratably over a five-year period beginning one year from the date of grant. All options outstanding on the termination date remain in effect.

In 1987, we granted to an officer an option to purchase 732,423 shares of common stock at an exercise price of $3.072 per share. The shares have been reserved for issuance and are fully vested and exercisable.

The following table presents the combined activity of all Stock Option Plans for the years ended December 31, 1996, 1997 and 1998:

|  | 1996 | | 1997 | | 1998 | |
|---|---|---|---|---|---|---|
|  | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price |
| Outstanding at beginning of period | 4,028,204 | $ 4.42 | 5,019,005 | $ 5.56 | 5,320,206 | $ 6.83 |
| Granted | 1,360,010 | 8.60 | 1,041,795 | 12.47 | 954,889 | 22.00 |
| Exercised | (210,836) | 3.60 | (467,666) | 5.60 | (148,413) | 6.39 |
| Canceled | (158,373) | 5.39 | (272,928) | 7.51 | (120,544) | 12.56 |
| Outstanding at end of period | 5,019,005 | 5.56 | 5,320,206 | 6.83 | 6,006,138 | 9.10 |
| Exercisable at year end | 2,476,371 | 4.09 | 2,729,631 | 4.47 | 3,297,005 | 5.18 |
| Shares available for granting of options at end of period | 2,144,873 | | 1,234,883 | | 371,105 | |

The following table presents weighted average price and life information about significant option groups outstanding at December 31, 1998 for the Stock Option Plans:

| | | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contractual Life (Years) | Weighted Average Exercise Price | | Number Exercisable | Weighted Average Exercise Price |
| $ 2.457 - 3.738 | 1,706,661 | 3.8 | $ 3.15 | | 1,638,298 | $ 3.13 |
| 3.891 - 6.144 | 825,968 | 4.9 | 5.05 | | 635,748 | 4.95 |
| 6.604 - 9.92 | 1,484,104 | 6.3 | 7.96 | | 799,108 | 7.65 |
| 10.00 - 14.84 | 1,145,861 | 8.4 | 11.56 | | 208,946 | 11.44 |
| 15.06 - 21.28 | 172,105 | 9.2 | 19.29 | | 13,343 | 20.34 |
| 24.00 - 31.00 | 671,439 | 9.2 | 24.92 | | 1,562 | 24.64 |
| | 6,006,138 | 6.2 | 9.10 | | 3,297,005 | 5.18 |

## THE 1991 EMPLOYEE STOCK PURCHASE PLAN

Under the 1991 Employee Stock Purchase Plan, a total of 366,211 shares of common stock are reserved for issuance (up to 25,000 shares may be issued in any one year). The purchase plan allows eligible employees the option to purchase common stock during two six-month periods of each year at 85% of the lower of the fair market value of the shares at the time the option is granted or is exercised. The term of this plan ends December 31, 1999. During 1996, 1997 and 1998, we issued a total of 6,986, 6,507 and 5,046 shares of common stock, respectively, under this purchase plan. Remaining shares available under this purchase plan were 320,335 as of December 31, 1998.

39

**EMPLOYEE SAVINGS PLAN**

We have a 401(k) savings plan covering full-time employees who are eligible to participate upon hire. Under this savings plan, we may match employee contributions at management's discretion. Contributions made under the savings plan were approximately $41,000, $53,000 and $62,000 as of December 31, 1996, 1997 and 1998, respectively.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**
None.

**PART III**

### ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The information required by this item is contained in our Proxy Statement for the 1999 Annual Meeting of Stockholders under the captions "Information About the Board of Directors", "Information About Executive Officers" and "Election of Directors" and is incorporated herein by reference.

### ITEM 11. EXECUTIVE COMPENSATION

The information required by this item is contained under the caption "Information About Executive Officers" in our 1999 Proxy Statement and is incorporated herein by reference.

### ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The information required by this item is contained in our 1999 Proxy Statement under the captions, "Information About Principal Stockholders" and "Information About Executive Officers" and is incorporated herein by reference.

### ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The information required by this item is contained under the caption "Certain Transactions" in our 1999 Proxy Statement and is incorporated herein by reference.

41

**PART IV**

**ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K**

(A) 3. EXHIBITS

The exhibits filed as a part of this Annual Report on Form 10-K are listed in the Exhibit Index immediately preceding the exhibits. The Registrant has identified in the Exhibit Index each management contract and compensatory plan filed as an exhibit to this Form 10-K in response to Item 14(c) of Form 10-K.

(B) REPORTS ON FORM 8-K

None

42

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

### ORGANOGENESIS INC.

```
BY: /s/ HERBERT M. STEIN
    -------------------------------
       HERBERT M. STEIN

Chairman and Chief Executive Officer

Date:  March 30, 1999
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ HERBERT M. STEIN<br>-------------------------------------<br>Herbert M. Stein | Chairman, Chief Executive<br>Officer and Director<br>(Principal executive officer) | March 30, 1999 |
| /s/ DAVID T. ROVEE<br>-------------------------------------<br>David T. Rovee | President, Chief Operating<br>Officer and Director | March 30, 1999 |
| /s/ RICHARD S. CRESSE<br>-------------------------------------<br>Richard S. Cresse | Director | March 30, 1999 |
| /s/ ALBERT ERANI<br>-------------------------------------<br>Albert Erani | Director | March 30, 1999 |
| /s/ KENNETH J. NOVACK<br>-------------------------------------<br>Kenneth J. Novack | Director | March 30, 1999 |
| /s/ BJORN R. OLSEN<br>-------------------------------------<br>Bjorn R. Olsen | Director | March 30, 1999 |
| /s/ MARGUERITE A. PIRET<br>-------------------------------------<br>Marguerite A. Piret | Director | March 30, 1999 |
| /s/ ANTON E. SCHRAFL<br>-------------------------------------<br>Anton E. Schrafl | Director | March 30, 1999 |
| /s/ DONNA ABELLI LOPOLITO<br>-------------------------------------<br>Donna Abelli Lopolito | Vice President, Chief<br>Financial Officer,<br>Treasurer and Secretary | March 30, 1999 |

43

## EXHIBIT INDEX

| Exhibit No. | Description of Exhibit |
| --- | --- |
| (3)(a) | Restated Certificate of Incorporation of the Company.(1) |
| (b) | Certificate of Amendment to the Restated Certificate of Incorporation of the Company.(8) |
| (c) | Certificate of Stock Designation, Number, Voting Powers, Preferences and Rights of the Series of the Preferred Stock of Organogenesis Inc. to be Designated Series A Convertible Preferred Stock.(9) |
| (d) | Certificate of Designation, filed with the Secretary of State of the State of Delaware on August 29, 1995. (12) |
| (e) | Bylaws of the Company, as amended.(2) |
| (f) | Rights Agreement, dated as of September 1, 1995, between the Company and American Stock Transfer & Trust Company. (12) |
| (g) | Form of Unit Warrant Agreement.(13) |
| (h) | Form of Investment Agreement.(13) |
| (4)(a) | Form of Warrant Agreement with respect to Warrants included as part of the Units of the Company's securities.(1) |
| (b) | Notice of Redemption of the Company's Redeemable Common Stock Purchase Warrants.(3) |
| (c) | Form of Unit Purchase Option, dated December 18, 1986, issued to each of the Company's Unit Purchase Option holders.(4) |
| (d) | Form of Stock Registration Rights Agreement, dated February 23, 1990, between the Company and certain security holders.(4) |
| (e) | Form of Common Stock Purchase Warrant, dated February 23, 1990, issued to certain security holders.(9) |
| (10)(a) | 1986 Stock Option Plan of the Company, as amended.*(10) |
| (b) | 1991 Director Stock Option Plan of the Company, as amended.*(10) |
| (c) | 1991 Employee Stock Purchase Plan of the Company, as amended.*(10) |
| (d) | 1994 Director Stock Option Plan of the Company, as amended.*(11) |
| (e) | License Agreement among the Company, Eugene Bell and Massachusetts Institute of Technology dated December 16, 1985 ("MIT License Agreement").(1) |
| (f) | Amendment to MIT License Agreement, dated October 22, 1986.(1) |
| (g) | Second Amendment to MIT License Agreement, dated as of March 31, 1988.(6) |
| (k) | Subscription Agreement between the Company and a purchaser of the Series A Convertible Preferred Stock and 10% Subordinated Promissory Notes dated as of July 3, 1986, with a schedule of additional purchasers.(1) |
| (l) | Indenture of Lease between Canton Commerce Center Limited Partnership and the Company, dated as of July 10, 1989, as amended.(7) |
| (q) | Non-Statutory Stock Option Agreement between the Company and Herbert M. Stein dated April 7, 1987.*(5) |
| (r) | Manufacturing and Supply Agreement between the Company and Novartis Pharma AG, dated as of August 11, 1997**(15) |
| (s) | Letter Agreement between the Company and Dr. David T. Rovee dated September 23, 1991.*(14) |
| (u) | 1995 Stock Option Plan, as amended.*(14) |
| (v) | The License and Supply Agreement between the Company and Sandoz Pharma Ltd., dated as of January 17, 1996. **(16) |
| (w) | The Stock Purchase Agreement between the Company and Sandoz Pharma Ltd., dated as of January 17, 1996. **(16) |
| (x) | 1999 Non-qualified Stock Option Plan. |

44

# EXHIBIT INDEX

| Exhibit No. | Description of Exhibit |
| --- | --- |
| (21) | Subsidiaries of the Company, filed herewith. |
| (23) | Consent of PricewaterhouseCoopers L.L.P., filed herewith. |

(1) Incorporated herein by reference to the exhibits to the Company's Registration Statement on Form S-1 (File No. 33-9832).
(2) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 31, 1987.
(3) Incorporated herein by reference to the exhibits to the Company's Current Report on Form 8-K, filed February 18, 1987.
(4) Incorporated herein by reference to the exhibits to the Company's Registration Statement on Form S-3 (File No. 33-33914).
(5) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 30, 1988.
(6) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 31, 1989.
(7) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed April 2, 1990.
(8) Incorporated herein by reference to Exhibit 3(a) to the Company's Form 10-K, filed April 1, 1991.
(9) Incorporated by reference to Exhibit 4 to the Company's Quarterly Report on Form 10-Q, filed August 13, 1991.
(10) Incorporated herein by reference to the exhibits to the Company's Annual Report Form 10-K, filed March 31, 1993.
(11) Incorporated herein by reference to Appendix A of the Company's Definitive Proxy Statement filed April 19, 1994.
(12) Incorporated herein by reference to the exhibits to the Company's Current Report on Form 8-K, filed August 29, 1995
(13) Incorporated herein by reference to the exhibits to the Company's Amended Registration Statement on Form S-3, filed July 5, 1995.
(14) Incorporated herein by reference to Appendix A of the Company's Definitive Proxy Statement filed April 14, 1995.
(15) Incorporated herein by reference to the exhibits to the Company's Annual Report Form 10-K, filed March 30, 1998.
(16) Incorporated herein by reference to the exhibits to the Company's Annual Report on Form 10-K, filed March 29, 1996.
* Management contract or compensatory plan identified pursuant to Item 14(a)3. **Confidential Treatment requested.

**EXHIBIT 10 (x)**

**ORGANOGENESIS INC.**
**1999 NONQUALIFIED STOCK OPTION PLAN**

1. Purpose. This non-qualified stock option plan, to be known as the 1999 Nonqualified Stock Option Plan (hereinafter, this "Plan"), is intended to promote the interests of ORGANOGENESIS INC. (hereinafter, the "Company") by providing an inducement to obtain and retain the services of qualified persons who are officers, directors, and consultants of the Company.

2. Available Shares. The total number of shares of Common Stock, par value $0.01, of the Company ("Common Stock"), for which options may be granted under this Plan shall not exceed 1,000,000 (one million) shares, subject to adjustment in accordance with Section 8 of this Plan. Shares subject to this Plan are authorized but unissued shares or shares that were once issued and subsequently reacquired by the Company. If any options granted under this Plan are surrendered before exercise or lapse without exercise, in whole or in part, the shares reserved therefor shall continue to be available under this Plan.

3. Administration. This Plan shall be administered by the Board of Directors of the Company. The Board of Directors shall, subject to the provisions of this Plan, have the power to construe this Plan, to determine all questions hereunder, and to adopt and amend such rules and regulations for the administration of this Plan as it may deem desirable.

4. Option Price. The purchase price of the stock covered by an option granted pursuant to this Plan shall be no less than 100% of the fair market value of such shares on the day the option is granted. The option price will be subject to adjustment in accordance with the provisions of Section 8 of this Plan. For purposes of this Plan, the fair market value of a share of Common Stock on any day shall be the last reported sales price of such share on the last trading day preceding the date of option grant as reported by American Stock Exchange or any other recognized trading system if the Company's shares are not traded on the American Stock Exchange.

5. Period of Option. Options granted hereunder shall expire on a date which is ten (10) years after the date of grant of the options.

6. Vesting of Shares. Options granted under this Plan shall not be exercisable until they become vested. The number of shares as to which options may be exercised shall be cumulative, so that once the option shall become exercisable as to any shares it shall continue to be exercisable as to said shares, until expiration or termination of the option as provided in this Plan.

7. Exercise of Option. Subject to the terms and conditions of this plan and the option agreements, an option granted hereunder shall, to the extent then exercisable, be exercisable in whole or in part by giving written notice to the Company by mail or in person addressed to Treasurer, Organogenesis Inc., at its principal executive offices, stating the number of shares with respect to which the option is being exercised, accompanied by payment in full for such shares. The Company or its transfer agent shall, on behalf of the Company, prepare a certificate or certificates representing such shares acquired pursuant to exercise of the option, shall register the optionee as the owner of such shares on the books of the Company and shall cause the fully executed certificate(s) representing such shares to be delivered to the optionee as soon as practicable after payment of the option price in full. The holder of an option shall not have any rights of a shareholder with respect to the shares covered by the option, except to the extent that one or more certificates for such shares shall be delivered to him upon the due exercise of the option.

8. Adjustments Upon Changes in Capitalization and Other Matters. Upon the occurrence of any of the following events, an optionee's rights with respect to options granted to him hereunder shall be adjusted as hereinafter provided:

(a) Stock Dividends and Stock Splits. If the shares of Common Stock shall be subdivided or combined into a greater or smaller number of shares or if the Company shall issue any shares of Common Stock as a stock dividend on its outstanding Common Stock, the number of shares of Common Stock deliverable upon the exercise of options shall be appropriately increased or decreased proportionately, and appropriate adjustments shall be made in the purchase price per share to reflect such subdivision, combination or stock dividend.

(b) General. Except as set forth in subparagraph (b) below, in the event of a consolidation, merger or other reorganization in which all of the outstanding shares of Common Stock are exchanged for securities, cash or other property of any other corporation or business entity (an "Acquisition") or in the event of a liquidation of the Company, the Board of Directors of the Company, or the board of directors of any corporation assuming the obligations of the Company, may, in its discretion, take any one or more of the following actions as to outstanding Awards: (i) provide that such Awards shall be assumed, or substantially equivalent Awards shall be substituted, by the acquiring or succeeding corporation (or an affiliate thereof) on such terms as the Board determines to be appropriate, (ii) upon written notice to Participants, provide that all unexercised Options or Stock Appreciation Rights will terminate immediately prior to the consummation of such transaction unless exercised by the Participant within a specified period following the date of such notice, (iii) in the event of an Acquisition under the terms of which holders of the Common Stock of the Company will receive upon consummation thereof a cash payment for each share surrendered in the Acquisition (the "Acquisition Price"), make or provide for a cash payment to Participants equal to the difference between (A) the Acquisition Price times the number of shares of Common Stock subject to outstanding Options or Stock Appreciation Rights (to the extent then exercisable at prices not in excess of the Acquisition Price) and (B) the aggregate exercise price of all such outstanding Options or Stock Appreciation Rights in exchange for the termination of such Options and Stock Appreciation Rights, and (iv) provide that all or any outstanding Awards shall become exercisable or realizable in full prior to the effective date of such Acquisition.

(c) Notwithstanding any other provision to the contrary in this Plan, in the event of a Change of Control (as defined below), all Awards outstanding as of the date such Change in Control occurs shall become exercisable in full, whether or not exercisable in accordance with their terms. A "Change in Control" shall occur or be deemed to have occurred only if any of the following events occur: (i) any "person," as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") (other than the Company, any trustee or other fiduciary holding securities under an employee benefit plan of the Company, or any corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportion as their ownership of stock of the Company) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 30% or more of the combined voting power of the Company's then outstanding securities; (ii) individuals who, as of the date this Plan is adopted, constitute the Board of Directors of the Company (as of the date thereof, the "Incumbent Board") cease for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to the date thereof whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the directors of the Company, as such terms are used in Rule 14a-11 of Regulation 14A under the Exchange Act) shall be, for purposes of this Agreement, considered as though such person were a member of the Incumbent Board; (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than (A) a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 30% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation or (B) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no "person" (as hereinabove defined) acquires more than 30% of the combined voting power of the Company's then outstanding securities; or (iv) the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets.

(d) Issuances of Securities. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares subject to options. No adjustments shall be made for dividends paid in cash or in property other than securities of the company.

(e) Adjustments. Upon the happening of any of the foregoing events, the class and aggregate number of shares set forth in paragraph 2 hereof that are subject to options which previously have been or subsequently may be granted under this Plan shall also be appropriately adjusted to reflect such events. The Board of Directors or the Successor Board shall determine the specific adjustments to be made under this paragraph 10 and its determination shall be conclusive.

9. Restrictions on Issuances of Shares. Notwithstanding the provisions of this Plan, the Company shall have no obligation to deliver any certificate or certificates upon exercise of an option until one of the following conditions shall be satisfied:

(i) The shares with respect to which the option has been exercised are at the time of the issue of such shares effectively registered under applicable Federal and state securities laws as now in force or hereafter amended; or

(ii) Counsel for the Company shall have given an opinion that such shares are exempt from registration under Federal and state securities laws as now in force or hereafter amended; and the Company has complied with all applicable laws and regulations with respect thereto, including without limitation all regulations required by any stock exchange upon which the Company's outstanding Common Stock is then listed.

10. Representation of Optionee. The Company shall require the optionee to deliver written warranties and representations upon exercise of the option that are necessary to show compliance with Federal and state securities laws including to the effect that a purchase of shares under the option is made for investment and not with a view to their distribution (as that term is used in the Securities Act of 1933).

11. Option Agreement. Each option granted under the provisions of this Plan shall be evidenced by an option agreement in such form as may be approved by the Board of Directors, which agreement shall be duly executed and delivered on behalf of the Company and by the optionee to whom such option is granted. The option agreement shall contain such terms, provisions and conditions not inconsistent with this Plan as may be determined by the Board of Directors.

12. Termination and Amendment of Plan. Options may no longer be granted under this Plan ten years from its effective date and this Plan shall terminate when all options granted or to be granted hereunder are no longer outstanding. The Board may at any time terminate this Plan or make such modification or amendment thereof as it deems advisable. Termination or any modification or amendment of the Plan shall not, without consent of a participant, affect his

rights under an option previously granted to him.

**EXHIBIT 21**

**LIST OF SUBSIDIARIES**

Dan Capital Corp. (Del.)

ECM Pharma(TM), Inc. (Del.)

**EXHIBIT 23**

**CONSENT OF INDEPENDENT ACCOUNTANTS**

We consent to the incorporation by reference in the registration statements of Organogenesis Inc. and its wholly owned subsidiaries on Forms S-8 (File Nos. 33-12761, 33-41862, 33-48888, 33-49236, 33-49248, 33-48890, 33-86506, 33-86508, 33-48892 and 33-64319) and on Forms S-3 (File Nos. 33-33914, 33-40287, 33-43648, 33-60381, 33-63393, 33-63397,333-3995 and 333-50755) in effect on the filing date of Organogenesis Inc.'s Annual Report on the Form 10-K for the year end December 31, 1998, of our report dated March 30, 1999, on our audits of the consolidated financial statements of Organogenesis Inc. and its wholly owned subsidiaries as of December 31, 1997 and 1998, and for the years ended December 31, 1996, 1997, and 1998, which report is included or incorporated by reference in this Annual Report on Form 10-K.

**PricewaterhouseCoopers LLP**

Boston, Massachusetts

March 30, 1999

**ARTICLE 5**

CIK: 0000779733
NAME: ORGANOGENESIS
MULTIPLIER: 1,000

| | |
|---|---:|
| PERIOD TYPE | 12 MOS |
| FISCAL YEAR END | DEC 31 1998 |
| PERIOD START | JAN 01 1998 |
| PERIOD END | DEC 31 1998 |
| CASH | 5,052 |
| SECURITIES | 12,789 |
| RECEIVABLES | 0 |
| ALLOWANCES | 0 |
| INVENTORY | 0 |
| CURRENT ASSETS | 19,012 |
| PP&E | 16,944 |
| DEPRECIATION | 9,339 |
| TOTAL ASSETS | 26,710 |
| CURRENT LIABILITIES | 3,471 |
| BONDS | 0 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 305 |
| OTHER SE | 22,934 |
| TOTAL LIABILITY AND EQUITY | 26,710 |
| SALES | 0 |
| TOTAL REVENUES | 8,997 |
| CGS | 0 |
| TOTAL COSTS | 0 |
| OTHER EXPENSES | 23,028 |
| LOSS PROVISION | 0 |
| INTEREST EXPENSE | 0 |
| INCOME PRETAX | (14,031) |
| INCOME TAX | 0 |
| INCOME CONTINUING | 0 |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | (14,031) |
| EPS PRIMARY | (.48) |
| EPS DILUTED | (.48) |

**End of Filing**

Powered By 

© 2005 | EDGAR Online, Inc.