# Exhibit 5

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C.  20549

---

AMENDMENT NO. 1 TO FORM 8-K
ON
FORM 8-K/A

CURRENT REPORT

Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

---

Date of Report (Date of earliest event reported):  JANUARY 2, 2001


ORGANOGENESIS, INC.
(Exact name of registrant as specified in its charter)


| DELAWARE | 1-9898 | 04-2871690 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |


150 DAN ROAD, CANTON. MA 02021
------------------------------------------------
(Address of principal executive offices) (ZipCode)


Registrant's telephone number, including area code: (781) 575-0775
                                                      --------------

1

The sole purpose of this amendment is to add two exhibits to the current Report on Form 8-K filed by Organogenesis, Inc. on March 8, 2001.

ITEM 7.   FINANCIAL STATEMENTS AND EXHIBITS.

* 10.1   Amendment V as of January 2, 2001 to the License and Supply Agreement, by and between Organogenesis, Inc. and Novartis Pharma AG., formerly Sandoz Pharma Ltd:

* 10.2   Securities Purchase Agreement, dated February 23, 2001 by and between Organogenesis, Inc. and Novartis Pharma AG., formerly Sandoz Pharma Ltd.

**99.1   The Registrant's Press Release dated February 8, 2001 entitled "HCFA Establishes National Level of Reimbursement for Apligraf Applied in a Doctor's Office."

**99.2   The Registrant's Press Release dated February 26, 2001 entitled "Organogenesis Inc. and Novartis Pharma AG Broaden Relationship in the Field of Living Wound-Healing Products."

* Confidential treatment requested as to certain portions of the document, which portions have been omitted and filed separately with the Securities and Exchange Commission.

** Previously filed.

2

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Amendment No. 1 to Form 8-K on Form 8-K/A to be signed on its behalf by the undersigned hereunto duly authorized.

ORGANOGENESIS
-------------
(Registrant)

Date: April 24, 2001             By: /s/ John J. Arcari
                                 ----------------------------------
                                 Name:  John J. Arcari
                                 Title: Vice President, Finance and
                                        Administration, Chief Financial
                                        Principal financial and Accounting
                                        Officer

3

026

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

Exhibit 10.1

## AMENDMENT V TO LICENSE AND SUPPLY AGREEMENT

This AMENDMENT V TO THE LICENSE AND SUPPLY AGREEMENT (this
"Amendment"), dated as of January 2, 2001, by and between Organogenesis Inc., a
company organized under the laws of the State of Delaware with its principal
place of business located at 150 Dan Road, Canton, Massachusetts 02021, U.S.A.
("Organogenesis"), and Novartis Pharma AG (formerly Sandoz Pharma Ltd.), a
corporation organized under the laws of Switzerland with its principal place of
business located at Lichtstrasse 35, CH - 4002 Basel, Switzerland ("Novartis").

Capitalized terms used herein that are not otherwise defined shall have the
meanings ascribed to them in the License and Supply Agreement, dated as of
January 17, 1996 (the "LSA"), by and between Organogenesis and Novartis.

WHEREAS, pursuant to the LSA, Organogenesis has granted Novartis,
among other things, an exclusive license under the Product Patent Rights and
Product Technical Information to use, import, sell and offer to sell Product in
all countries in the world as further set forth in Schedule A of the LSA; and

WHEREAS, the parties executed amendments to the LSA as follows: (a)
Amendment to the License and Supply Agreement, dated January 22/February 4, 1998
(the "First Amendment"); (b) Addendum to the License and Supply Agreement, dated
March 23, 1998; (c) Addendum II to the License and Supply Agreement, dated
September 4, 1998 (the "Third Amendment"); and (d) Addendum, dated March 15,
2000, to the License and Supply Agreement (the "Fourth Amendment")
(collectively, with the LSA and this Amendment, the "Amended LSA"); and

WHEREAS, Novartis agreed, under the Amended LSA to make certain
payments to Organogenesis including funding for research and development and
royalty payments in exchange for the exclusive license; and

WHEREAS, Novartis wishes to obtain from Organogenesis, and
Organogenesis wishes to grant to Novartis, the right to purchase exclusive
options to license exclusively from Organogenesis certain rights with respect to
Vitrix(TM) (as hereinafter defined) and Vercutis Matrix(TM) (as hereinafter
defined), without prejudicing Novartis' or Organogenesis' legal position as to
their respective rights to Vitrix and Vercutis Matrix under the LSA as
heretofore amended; and

WHEREAS, Novartis and Organogenesis wish to further amend the LSA to
include, among other things, enhanced payments for Product under Article 6.

NOW, THEREFORE, in consideration of the following mutual promises and
obligations, the parties hereby agree as follows:

1.    Article 1 of the Amended LSA is hereby amended to include the following
      additional definitions:

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

"Amended Contract Year" means the one (1) year period commencing on the
--------------------
Effective Date of this Amendment and each succeeding one (1) year period
thereafter.

"Drawdown Account" shall have the meaning set forth in Article 12.6.
----------------

"Effective Date of this Amendment" means January 2, 2001.
---------------------------------

"Field of Use" means all uses except (a) implantation below the surface of
------------
the skin (unless such implantation has the primary purpose of repair,
bulking, filling, replacement, reconstruction or cosmetic or functional
improvement of the skin, including the immediately underlying soft tissue
and including skin wounds which extend to the bone), and (b) all
applications of genetic modifications and drug delivery (unless primarily
intended for use in connection with repair, bulking, filling, replacement,
reconstruction or cosmetic or functional improvement of the skin, including
the immediately underlying soft tissue and including skin wounds which
extend to the bone).

"GAAP" means generally accepted accounting principles in the U.S. in effect
----
from time to time.

"Performance Measures" means the conditions set forth in Schedule B
--------------------                                     ----------
attached hereto.

"Option Period" shall have the meaning set forth in Article 3.1.1.
-------------

"Product Development Payment" shall have the meaning set forth in Article
---------------------------
4.10.

"Product Payment" shall have the meaning set forth in Article 6.1.
---------------

"Product Patent Rights" means Patent Rights with respect to Product.
---------------------

"Product Technical Information" means Technical Information with respect to
-----------------------------
Product.

"Vitrix" or "Vitrix(TM)" means a single layer, living, dermal matrix
------       ----------
principally composed of normal allogeneic human dermal fibroblasts and
bovine Type I collagen, whereby the fibroblasts compact the bovine Type I
collagen gel and produce human matrix proteins during manufacture.

"Vitrix Consideration" shall have the meaning set forth in Article 3.1.2.
--------------------

"Vitrix Patent Rights" means Patent Rights with respect to Vitrix.
--------------------

"Vitrix Technical Information" means Technical Information with respect to
----------------------------
Vitrix.

"Vercutis Matrix" or "Vercutis Matrix(TM)"***
---------------       -------------------
                              2

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

"Vercutis Matrix Consideration" shall have the meaning set forth in Article
------------------------------
3.2.2.

"Vercutis Matrix Patent Rights" means Patent Rights with respect to
------------------------------
Vercutis Matrix.

"Vercutis Matrix Technical Information" means Technical Information with
--------------------------------------
respect to Vercutis Matrix.

2.   Article 1 of the Amended LSA is hereby further amended as follows:

     (a)  Article 1.11 is hereby deleted in its entirety and replaced with the
          following:

          "Net Sales" means the gross invoice price of the Product
          ---------
          sold to independent third party customers in bona fide, arms
          length transactions, less (a) quantity and/or cash discounts
          actually allowed or taken; (b) freight postage and insurance
          (allocated in accordance with Novartis' standard allocation
          procedure, which is in accordance with GAAP); (c) amounts
          repaid or credited by reasons of rejections or return of
          goods or because of retroactive price reductions
          specifically identifiable to Product; (d) amounts payable
          resulting from governmental (or agency thereof) mandated
          rebate programs; (e) third party rebates to the extent
          actually allowed; (f) custom duties and taxes (excluding
          income, value-added and similar taxes), if any, directly
          related to the sale; and (g) any other specifically
          identifiable amounts included in Product's gross sales that
          will be credited for reasons substantially equivalent to
          those listed hereinabove.

     (b)  Article 1.12 is hereby deleted in its entirety and replaced with the
          following:

          "Patent Rights", with respect to Product, means the patents
          -------------
          and patent applications relating to Product set forth in
          Schedule B of the LSA, any divisions, continuations,
          --------------
          continuations-in-part, reissues, re-examinations,
          extensions, supplemental protection certificates or other
          governmental actions which extend the subject matter or the
          term of such patent applications or patents, and any
          confirmations, registrations or re-validations of any of the
          foregoing in any additional countries. "Patent Rights", with
          respect to Vitrix means the patents and patent applications
          relating to Vitrix set forth in Schedule A1 and, with
                                          -----------
          respect to Vercutis Matrix, means the patents and patent
          applications relating to Vercutis Matrix set forth in
          Schedule A2, respectively, of this Amendment, and, in each
          -----------
          case, any divisions, continuations, continuations-in-part,
          reissues, re-examinations, extensions, supplemental
          protection certificates or other governmental actions which
          extend the subject matter or the term of such respective
          patent applications or patents, and any confirmations,
          registrations

                                   3

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

or re-validations of any of the foregoing in any additional countries.

(c)  Article 1.17 is hereby deleted in its entirety and replaced with the following:

"Technical Information" shall mean, with respect to Product,
--------------------
or with respect to Vitrix or Vercutis Matrix, respectively, any or all results and technical information, including preclinical, manufacturing, clinical or regulatory information relating to Product or Vitrix or Vercutis Matrix that is (i) owned or controlled by Organogenesis on the Effective Date with respect to Product, or on the Vitrix Option Notice Date with respect to Vitrix, or on the Vercutis Matrix Option Notice Date with respect to Vercutis Matrix, as the case may be; and (ii) thereafter developed or acquired by Organogenesis or Novartis during the term hereof.

3.  Without limitation to Section 20 of this Amendment, the parties hereby expressly reaffirm the right to sublicense granted to Novartis under Article 2.1 of the Amended LSA.

4.  The following shall be inserted as Article 2.4:

2.4  Right of First Refusal for Sublicenses. In the event
----------------------------------------
Novartis seeks to enter into an agreement to sublicense to any non-Affiliate third party any of the rights under the Product Patent Rights or Product Technical Information granted to Novartis hereunder, Novartis shall offer in writing to Organogenesis (the "Sublicense Offer") the right
----------------
to match the terms and conditions of the sublicense proposed to be entered into with such non-Affiliate third party (the "Proposed Sublicense"). The Sublicense Offer shall include a
-------------------
copy of the letter of intent or equivalent document executed by Novartis and the applicable non-Affiliate third party setting forth a summary of the material terms of the Proposed Sublicense. In the event Organogenesis (a) declines the Sublicense Offer or (b) fails to accept the Sublicense Offer within thirty (30) days after Organogenesis' receipt thereof, in the cases of either (a) or (b), the Sublicense Offer shall terminate and Novartis shall be permitted to enter into a sublicense agreement with the applicable non-Affiliate third party on terms and conditions which, taken as a whole, are no more favorable to such non-Affiliate third party than those contained in the Sublicense Offer.

5.  The following shall be inserted as Article 2.5:

4

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

2.5  Technical Information: Organogenesis shall disclose to
     ---------------------
Novartis the Product Technical Information within thirty
(30) days of the Effective Date. Organogenesis and Novartis
shall further disclose to one another all Product Technical
Information hereafter developed or acquired by either party
during the term of this Agreement. The parties shall also
disclose to one another reimbursement studies, market
research and manufacture and distribution plans developed or
acquired by either party with respect to Product prior to
the Effective Date or during the term of this Agreement.
Organogenesis warrants that preclinical testing, including
safety testing, within the Product Technical Information has
been carried out according to Good Laboratory Practice, and
that clinical testing within the Product Technical
Information has been carried out according to Good Clinical
Practice. If Novartis purchases the Vitrix Option or the
Vercutis Matrix Option, as the case may be: (a)
Organogenesis shall disclose to Novartis the Vitrix
Technical Information and/or the Vercutis Matrix Technical
Information, as applicable, within thirty (30) days of the
respective Vitrix Option Notice Date or the Vercutis Matrix
Option Notice Date; and (b) Organogenesis and Novartis shall
further disclose to one another all Vitrix Technical
Information or Vercutis Matrix Technical Information
developed or acquired by either party from and after the
applicable Vitrix Option Notice Date or Vercutis Matrix
Option Notice Date through the expiration of the applicable
Vitrix Option Period (or Vitrix Option Extension Period, if
applicable) or Vercutis Matrix Option Period (or Vercutis
Matrix Option Extension Period, if applicable); and (c)
Organogenesis shall warrant to Novartis, as of the Vitrix
Option Notice Date or Vercutis Matrix Option Notice Date, as
the case may be, that the preclinical testing, including
safety testing, within the Vitrix Technical Information or
Vercutis Matrix Technical Information, as the case may be,
required to be disclosed to Novartis pursuant to clauses (a)
and (b) above has been carried out according to Good
Laboratory Practice, and that clinical testing within the
Vitrix Technical Information or Vercutis Matrix Technical
Information, as the case may be, required to be disclosed to
Novartis pursuant to said clauses (a) and (b) has been
carried out according to Good Clinical Practice.

6.  Article 3 of the Amended LSA is deleted in its entirety and is replaced
    with the following:

ARTICLE 3. OPTIONS FOR VITRIX AND VERCUTIS MATRIX
-------------------------------------------------

3.1  Vitrix Option.
     -------------

5

031

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

3.1.1    Right to Purchase Vitrix Option. During the
        -------------------------------
period commencing on the Effective Date of this Amendment
and continuing up to and including *** (the "Purchase
                                            --------
Period"), Novartis shall have the right to purchase from
------
Organogenesis, and, upon exercise of such right by Novartis
by providing written notice thereof to Organogenesis,
Organogenesis shall grant to Novartis, upon the terms and
subject to the conditions set forth herein, an option (the
"Vitrix Option") to negotiate with Organogenesis for an
 -------------
exclusive license, within the Field of Use, of Vitrix under
the Vitrix Patent Rights and Vitrix Technical Information
(the "Vitrix License"). The exercise of the Vitrix Option
      --------------
and the scope, terms and conditions of any such Vitrix
License shall be subject to negotiation by the parties in
accordance with Article 3.1.3. Notwithstanding anything
contained herein to the contrary, neither Organogenesis nor
any Affiliate thereof shall, during the Purchase Period and,
if and only if Novartis timely exercises its right to
purchase the Vitrix Option, prior to the expiration of the
*** period (the "Vitrix Option Period") commencing on the
                 --------------------
date Organogenesis receives from Novartis written notice of
Novartis' election to purchase the Vitrix Option (the
"Vitrix Option Notice Date"), (a) enter into any agreement
 ------------------------
with any third party with respect to a license of Vitrix
within the Field of Use under any of the Vitrix Patent
Rights or Vitrix Technical Information (other than any grant
of rights under the Vitrix Patent Rights or Vitrix Technical
Information by Organogenesis to any such third party solely
for research and development, clinical trials or other non-
commercial purposes), or (b) engage, directly or indirectly,
in the sale or marketing of Vitrix within the Field of Use;
provided, that in no event shall Organogenesis initiate,
--------
continue or otherwise engage in any discussions or
negotiations with respect to a license of Vitrix within the
Field of Use under the Vitrix Patent Rights or Vitrix
Technical Information during the *** day period prior to the
expiration of the Vitrix Option Period or any applicable
Vitrix Option Extension Period (as hereinafter defined).

3.1.2    Vitrix Consideration.  In the event Novartis
        --------------------
elects to purchase the Vitrix Option, Novartis shall pay to
Organogenesis, as full consideration for the Vitrix Option,
an amount equal to *** of the Vitrix Costs (as hereinafter
defined) incurred during the period commencing on the
Effective Date of this Amendment and continuing up to and
including the date of expiration of the Vitrix Option Period
(or, if Novartis exercises its right to extend the Vitrix
Option Period, then up to and including the date of the
expiration of the Vitrix Option Extension Period), up to ***
(the "Vitrix Consideration"). The "Vitrix Costs" shall mean
      --------------------         ------------
the research and development and clinical trial costs
incurred in good

6

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

faith by Organogenesis with respect to Vitrix (other than costs relating solely to applications of Vitrix outside of the Field of Use), based on schedules to be prepared by Organogenesis in accordance with GAAP and certified by Organogenesis' Chief Financial Officer as having been prepared in good faith. With respect to the period commencing on the Vitrix Option Notice Date and ending on the last day of the calendar quarter in which the Vitrix Option Notice Date falls and with respect to each succeeding calendar quarter until the expiration of the Vitrix Option Period (or, if Novartis exercises its right to extend the Vitrix Option Period, then up to and including the date of expiration of the Vitrix Option Extension Period), Organogenesis shall submit to Novartis on a quarterly basis and within thirty (30) days after the end of each such quarter (each, a "Vitrix Submission Period") such invoices,
                        ------------------------
receipts and other written documentation reasonably requested by Novartis (and which is in Organogenesis' possession or Organogenesis can obtain without unreasonable effort or expense), including without limitation the schedules referred to above (collectively, the "Vitrix
                                                ------
Documentation"), setting forth in reasonable detail the
-------------
Vitrix Costs incurred during such just-ended Vitrix Submission Period (or, with respect to the first such Vitrix Submission Period, such Vitrix Costs incurred during the period from the Effective Date of this Amendment up to the expiration of such first Vitrix Submission Period). Novartis shall pay to Organogenesis an amount equal to such Vitrix Costs within thirty (30) days after Novartis' receipt of the Vitrix Documentation corresponding to each Vitrix Submission Period.

    3.1.3    Negotiation of Vitrix License. Commencing
             ------------------------------
***, Novartis may exercise the Vitrix Option by providing written notice thereof to Organogenesis. Promptly thereafter, the parties shall negotiate in good faith and on an exclusive basis to enter into a Vitrix License, the terms of which may include any one or more of a license fee, guaranteed minimum payments and/or a percentage split of sales, as well as such other terms and conditions of a license agreement as the parties may agree; provided, that a failure of the parties to execute and deliver a license agreement for Vitrix shall not in and of itself constitute a failure to negotiate in good faith. In the event the parties are unable to execute and deliver a license agreement for Vitrix (a "Vitrix License Agreement") prior to the
                        ------------------------
expiration of the Vitrix Option Period, Novartis may, by providing written notice thereof to Organogenesis prior to such expiration, extend the Vitrix Option Period at no additional cost for an additional *** days after such expiration or until the parties execute and deliver a Vitrix License Agreement, whichever occurs first (the "Vitrix
                                                       ------
Option Extension
----------------

7

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

Period"). In the event the parties are unable to execute and
------
deliver a Vitrix License Agreement prior to the expiration
of the Vitrix Option Extension Period, the Vitrix Option
shall terminate and Organogenesis may thereafter negotiate
and enter into an agreement to license rights to Vitrix
under the Vitrix Patent Rights and Vitrix Technical
Information to one or more third parties. If, following the
termination of the Vitrix Option, Organogenesis seeks to
enter into such an agreement with respect to a license of
Vitrix within the Field of Use with one or more third
parties during the term of this Agreement, Organogenesis
shall offer in writing to Novartis the right to match the
terms of the Vitrix License Agreement proposed to be entered
into with each such third party (the "Third Party Vitrix
                                     ------------------
Offer"). Such offer to Novartis shall include a copy of the
-----
letter of intent or equivalent document executed by
Organogenesis and the applicable third party setting forth a
summary of the material terms of the Third Party Vitrix
Offer (the "Vitrix Letter of Intent"). In the event Novartis
            -----------------------
declines such offer or otherwise fails to accept such offer
within sixty (60) days after Novartis' receipt thereof (in
each case, a "Vitrix Non-Acceptance"), Organogenesis shall
              ---------------------
be permitted to enter into a license agreement for Vitrix
with the applicable third party in accordance with the terms
and conditions of the Third Party Vitrix Offer. In the event
of a Vitrix Non-Acceptance, if the terms and conditions of
the final license agreement for Vitrix between Organogenesis
and the applicable third party are amended or otherwise
altered so that they differ materially from those set forth
in the Vitrix Letter of Intent, prior to executing and
delivering such final license agreement Organogenesis shall
offer to Novartis in writing the right to license Vitrix on
the same terms and conditions as set forth in such final
license agreement. In the event Novartis declines such offer
or otherwise fails to accept such offer within ten (10) days
after Novartis' receipt thereof, Organogenesis shall be
permitted to execute and deliver such final license
agreement.

    3.1.4    Right to Reimbursement. Without limitation to
             ----------------------
Novartis' rights under Article 3.1.3, in the event the
parties do not execute and deliver a Vitrix License
Agreement pursuant to Article 3.1.3, Organogenesis shall
return to Novartis (a) *** if, during the *** period
commencing on the day after expiration of the Vitrix Option
Period or applicable Vitrix Option Extension Period,
Organogenesis or an Affiliate thereof directly sells or
markets Vitrix commercially within the Field of Use anywhere
in the Territory; or (b) *** if, during the *** period
commencing on the day after expiration of the Vitrix Option
Period or applicable Vitrix Option Extension Period,
Organogenesis enters into one or more license agreements for
Vitrix within the Field of Use with any third

8

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

party or parties (other than any license solely for research and development, clinical trials or other non-commercial purposes); provided, however, that (x) in the event
        --------  -------
Organogenesis is required to return to Novartis *** under clause (b) above subsequent to Organogenesis having been required to return to Novartis the amount required under clause (a) above (and having actually made the entirety of such payment), Organogenesis shall only be required to return to Novartis ***, and (y) in no event shall Organogenesis be required under this Article 3.1.4 to return to Novartis an aggregate of more than ***. Organogenesis shall pay to Novartis any amounts required to be paid by Organogenesis under this Article 3.1.4 on or before thirty (30) days after the date of the relevant sale or marketing of Vitrix under clause (a) above (the "Vitrix Sale/Marketing Date") or on or
                                 ----------------------------
before *** days after the effective date of the first such license agreement for Vitrix under clause (b) above. Notwithstanding the foregoing, Organogenesis may pay to Novartis any amount required to be paid by Organogenesis with respect to clause (a) above subsequent to the expiration of *** days after the Vitrix Sale/Marketing Date, but in any event shall pay all such amounts prior to the expiration of *** days after the Vitrix Sale/Marketing Date ***.

3.2  Vercutis Matrix Option.
     ----------------------

     3.2.1  Right to Purchase Vercutis Matrix Option.
            ------------------------------------------
During the Purchase Period, Novartis shall have the right to purchase from Organogenesis, and, upon exercise of such right by Novartis by providing written notice thereof to Organogenesis, Organogenesis shall grant to Novartis, upon the terms and subject to the conditions set forth herein, an option (the "Vercutis Matrix Option") to negotiate with
                      ----------------------
Organogenesis for an exclusive license, within the Field of Use, of Vercutis Matrix under the Vercutis Matrix Patent Rights and Vercutis Matrix Technical Information (the "Vercutis Matrix License"). The exercise of the Vercutis
 -----------------------
Matrix Option and the scope, terms and conditions of any such Vercutis Matrix License shall be subject to negotiation by the parties in accordance with Article 3.2.3. Notwithstanding anything contained herein to the contrary, neither Organogenesis nor any Affiliate thereof shall, during the Purchase Period and, if and only if Novartis timely exercises its right to purchase the Vercutis Matrix Option, prior to the expiration of the *** period (the "Vercutis Matrix Option Period") commencing on the date
 -----------------------------
Organogenesis receives from Novartis written notice of Novartis' election to purchase the Vercutis Matrix Option (the "Vercutis Matrix Option Notice Date"), (a) enter into
 ----------------------------------
any agreement with any third party with respect to a license of Vercutis Matrix within

9

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

the Field of Use under any of the Vercutis Matrix Patent
Rights or Vercutis Matrix Technical Information (other than
any grant of rights under the Vercutis Matrix Patent Rights
or Vercutis Matrix Technical Information by Organogenesis to
any such third party solely for research and development,
clinical trials or other non-commercial purposes), or (b)
engage, directly or indirectly, in the sale or marketing of
Vercutis Matrix within the Field of Use; provided, that in
no event shall Organogenesis initiate, continue or otherwise
engage in any discussions or negotiations with respect to a
license of Vercutis Matrix within the Field of Use under the
Vercutis Matrix Patent Rights or Vercutis Matrix Technical
Information during the *** day period prior to the
expiration of the Vercutis Matrix Option Period or any
applicable Vercutis Matrix Option Extension Period (as
hereinafter defined).

        3.2.2    Vercutis Matrix Consideration.  In the event
        ---------------------------
Novartis elects to purchase the Vercutis Matrix Option,
Novartis shall pay to Organogenesis, as full consideration
for the Vercutis Matrix Option, an amount equal to *** of
the Vercutis Matrix Costs (as hereinafter defined) incurred
during the period commencing on the Effective Date of this
Amendment and continuing up to and including the date of
expiration of the Vercutis Matrix Option Period (or, if
Novartis exercises its right to extend the Vercutis Matrix
Option Period, then up to and including the date of the
expiration of the Vercutis Matrix Option Extension Period),
up to *** (the "Vercutis Matrix Consideration"). In the
        -----------------------------
event Organogenesis receives from the FDA or the CPMP,
within *** after the Vercutis Matrix Option Notice Date, PMA
Approval for any indications within the Field of Use sought
by Organogenesis with respect to Vercutis Matrix (the
"Vercutis Matrix Approval"), the maximum amount payable by
        -----------------------
Novartis to Organogenesis as Vercutis Matrix Consideration
shall be increased to *** (the "Increased Maximum") and,
        -----------------
subject to the Increased Maximum, Novartis shall be
responsible for *** of the Vercutis Matrix Costs. The
"Vercutis Matrix Costs" shall mean the research and
        ---------------------
development and clinical trial costs incurred in good faith
by Organogenesis with respect to Vercutis Matrix (other than
costs relating solely to applications of Vercutis Matrix
outside of the Field of Use), based on schedules to be
prepared by Organogenesis in accordance with GAAP and
certified by Organogenesis' Chief Financial Officer as
having been prepared in good faith. With respect to the
period commencing on the Vercutis Matrix Option Notice Date
and ending on the last day of the calendar quarter in which
the Vercutis Matrix Option Notice Date falls and with
respect to each succeeding calendar quarter until the
expiration of the Vercutis Matrix Option Period (or, if
Novartis

                                10

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

exercises its right to extend the Vercutis Matrix Option Period, then up to and including the date of expiration of the Vercutis Matrix Option Extension Period), Organogenesis shall submit to Novartis on a quarterly basis and within thirty (30) days after the end of each such quarter (each, a "Vercutis Matrix
                                      ---------------
Submission Period") such invoices, receipts and other
------------------
written documentation reasonably requested by Novartis (and which is in Organogenesis' possession or Organogenesis can obtain without unreasonable effort or expense), including without limitation the schedules referred to above (collectively, the "Vercutis Matrix
                                               ---------------
Documentation"), setting forth in reasonable detail the
-------------
Vercutis Matrix Costs incurred during such just-ended Vercutis Matrix Submission Period (or, with respect to the first such Vercutis Matrix Submission Period, such Vercutis Matrix Costs incurred during the period from the Effective Date of this Amendment up to the expiration of such first Vercutis Matrix Submission Period). Novartis shall pay to Organogenesis an amount equal to such Vercutis Matrix Costs within thirty (30) days after Novartis' receipt of the Vercutis Matrix Documentation corresponding to each Vercutis Matrix Submission Period. In addition, if Organogenesis receives Vercutis Matrix Approval, Novartis shall pay to Organogenesis, within thirty (30) days after receipt of notice thereof from Organogenesis, an amount equal to ***.

      3.2.3    Negotiation of Vercutis Matrix License.
               ----------------------------------------
Commencing ***, Novartis may exercise the Vercutis Matrix Option by providing written notice thereof to Organogenesis. Promptly thereafter, the parties shall negotiate in good faith and on an exclusive basis to enter into a Vercutis Matrix License, the terms of which may include any one or more of a license fee, guaranteed minimum payments and/or a percentage split of sales, as well as such other terms and conditions of a license agreement as the parties may agree; provided, that a failure of the parties to execute and deliver a license agreement for Vercutis Matrix shall not in and of itself constitute a failure to negotiate in good faith. In the event the parties are unable to execute and deliver a license agreement for Vercutis Matrix (a "Vercutis Matrix License Agreement") prior to the
----------------------------------
expiration of the Vercutis Matrix Option Period, Novartis may, by providing written notice thereof to Organogenesis prior to such expiration, extend the Vercutis Matrix Option Period at no additional cost for an additional *** days after such expiration or until the parties execute and deliver a Vercutis Matrix License Agreement, whichever occurs first (the "Vercutis Matrix Option Extension Period"). In the
------------------------------------
event the parties are unable to execute and deliver a Vercutis Matrix License Agreement prior to the expiration of the Vercutis Matrix Option

11

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

Extension Period, the Vercutis Matrix Option shall terminate and Organogenesis may thereafter negotiate and enter into an agreement to license rights to Vercutis Matrix under the Vercutis Matrix Patent Rights and Vercutis Matrix Technical Information to one or more third parties. If, following the termination of the Vercutis Matrix Option, Organogenesis seeks to enter into such an agreement within the Field of Use with one or more third parties during the term of this Agreement, Organogenesis shall offer in writing to Novartis the right to match the terms of the Vercutis Matrix License Agreement proposed to be entered into with each such third party (the "Third Party Vercutis
                                             --------------------
Matix Offer"). Such offer to Novartis shall include a
-----------
copy of the letter of intent or equivalent document executed by Organogenesis and the applicable third party setting forth a summary of the material terms of the Third Party Vercutis Matrix Offer (the "Vercutis
                                                      --------
Matrix Letter of Intent"). In the event Novartis
-----------------------
declines such offer or otherwise fails to accept such offer within sixty (60) days after Novartis' receipt thereof (in each case, a "Vercutis Matrix Non-
                                    --------------------
Acceptance"), Organogenesis shall be permitted to enter
----------
into a license agreement for Vercutis Matrix with the applicable third party in accordance with the terms and conditions of the Third Party Vercutis Matrix Offer. In the event of a Vercutis Matrix Non-Acceptance, if the terms and conditions of the final license agreement for Vercutis Matrix between Organogenesis and the applicable third party are amended or otherwise altered so that they differ materially from those set forth in the Vercutis Matrix Letter of Intent, prior to executing and delivering such final license agreement Organogenesis shall offer to Novartis in writing the right to license Vercutis Matrix on the same terms and conditions as set forth in such final license agreement. In the event Novartis declines such offer or otherwise fails to accept such offer within ten (10) days after Novartis' receipt thereof, Organogenesis shall be permitted to execute and deliver such final license agreement.

3.2.4    Right to Reimbursement. Without limitation
         ----------------------
to Novartis' rights under Article 3.2.3, in the event the parties do not execute and deliver a Vercutis Matrix License Agreement pursuant to Article 3.2.3, Organogenesis shall return to Novartis (a) *** if, during the *** period commencing on the day after expiration of the Vercutis Matrix Option Period or applicable Vercutis Matrix Option Extension Period, Organogenesis or an Affiliate thereof directly sells or markets Vercutis Matrix commercially within the Field of Use anywhere in the Territory; or (b) *** if, during the *** period commencing on the day after expiration of the Vercutis Matrix Option Period or applicable Vercutis Matrix Option Extension Period, Organogenesis enters into one or more license

12

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

agreements for Vercutis Matrix within the Field of Use
with any third party or parties (other than any license
solely for research and development, clinical trials or
other non-commercial purposes); provided, however, that

(x) in the event Organogenesis is required to return to
Novartis *** under clause (b) above subsequent to
Organogenesis having been required to return to
Novartis the amount required under clause (a) above
(and having actually made the entirety of such
payment), Organogenesis shall only be required to
return to Novartis ***, and (y) in no event shall
Organogenesis be required under this Article 3.2.4 to
return to Novartis ***. Organogenesis shall pay to
Novartis any amounts required to be paid by
Organogenesis under this Article 3.2.4 on or before ***
days after the date of the relevant sale or marketing
of Vercutis Matrix under clause (a) above (the
"Vercutis Matrix Sale/Marketing Date") or on or before

thirty (30) days after the effective date of the first
such license agreement for Vercutis Matrix under clause
(b) above. Notwithstanding the foregoing, Organogenesis
may pay to Novartis any amount required to be paid by
Organogenesis with respect to clause (a) above
subsequent to the expiration of *** days after the
Vercutis Matrix Sale/Marketing Date, but in any event
shall pay all such amounts prior to the expiration of
*** days after the Vercutis Matrix Sale/Marketing Date
***.

7.   Article 4 of the Amended LSA is hereby amended as follows:

(a)   In the second sentence of Article 4.4, (i) the words "Organogenesis's
President" shall be deleted and replaced by "Organogenesis' Chief
Executive Officer", and (ii) the words "Sandoz' Head of Business
Development" shall be deleted and replaced by "Novartis' Head of
Transplant, Tissue Engineering and Immunology Business Unit."

(b)   A new Article 4.8.3 shall be inserted as follows:

4.8.3   Product Quality.   Organogenesis agrees

that it shall comply with all applicable laws and
regulations in connection with the manufacture and
packaging of Product, including, without limitation,
current Good Manufacturing Practices.

(c)   A new Article 4.10 shall be inserted as follows:

4.10 Product Development Payment.   Novartis shall

pay to Organogenesis, in accordance with Article 7.1,
an amount equal to *** of the research and development
and clinical trial costs incurred in good faith by
Organogenesis during the term of this Agreement, based
on schedules to be prepared by Organogenesis

13

039

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

in accordance with GAAP and certified by Organogenesis' Chief Financial Officer as having been prepared in good faith, up to a maximum payment by Novartis of \*\*\* (the "Product Development Payment"), with respect to the

following indications for Product: (a) dermatologic (cosmetic) surgery; (b) decubitis ulcers; (c) burn therapy; (d) cryopreserved Apligraf; and (e) such other indications as are agreed upon unanimously by the JDC or its successor committee. The JDC or such successor committee shall allocate resources and expenditures among such indications; provided, that any expenditures

shall be subject to the unanimous prior consent of the members of the JDC or such successor committee (it being agreed that any such consent by the JDC shall cover the aggregate amount of expenditures covered by such consent and shall not be revoked without the unanimous consent of the JDC). Novartis shall have the right to review and audit all research and development and clinical trials conducted by or on behalf of Organogenesis with respect to such indications for Product.

8.   Article 5 of the Amended LSA, including Articles 5.2.1 and 5.2.2 as set forth in the First Amendment and as further revised, with respect to Article 5.2.2, by the Third Amendment, is hereby deleted in its entirety and shall be of no further force or effect; provided, that the heading

"ARTICLE 5. [DELIBERATELY LEFT BLANK]" shall be retained for section

numbering purposes.

9.   Article 6 of the Amended LSA is deleted in its entirety and is replaced with the following:

ARTICLE 6. PRODUCT PAYMENT
--------------------------

6.1   Product Payment. Subject to Article 6.2,

Novartis shall pay to Organogenesis, in accordance with Article 7.2, an amount (the "Product Payment") equal to

(a) \*\*\* of Net Sales in the Territory by Novartis and its Affiliates and sublicensees with respect to sales during each Amended Contract Year of up to and including \*\*\* units of Product, plus (b) \*\*\* of Net Sales in the Territory by Novartis and its Affiliates and sublicensees with respect to incremental sales, if any, during each such Amended Contract Year \*\*\* units of Product; provided, however, that the percentages in

both clauses (a) and (b) shall be decreased by up to \*\*\* in the event Organogenesis fails to achieve the Performance Measures, in accordance with and as further set forth in Schedule B attached hereto. Organogenesis

shall provide to Novartis, within thirty (30) days after the end of each calendar quarter during the term of the Amended LSA, a reasonably detailed summary of Organogenesis' performance and achievements with respect to the Performance Measures during the corresponding just-ended calendar quarter.

14

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

6.2  Paid-Up License.  For each country in the Territory, following expiration of the last to expire of the Product Patent Rights in each such country or ten (10) years following the First Commercial Sale of Product in that country, whichever is later (the "Expiration Date"), Novartis shall have a perpetual, non-exclusive, paid-up and royalty-free license, under any remaining know-how or other rights of Organogenesis, to use and sell Product in that country, it being understood that, from and after the Expiration Date with respect to any country, Organogenesis shall not be obligated to supply Novartis with Product for sales in that country unless the parties have executed and delivered a supply agreement setting forth the terms and conditions upon which Organogenesis will supply such Product. After expiration of this Agreement according to Article 16.1, and subject to any Supply Agreement as contemplated in Article 12.1, Novartis shall have a perpetual, non-exclusive, paid-up and royalty-free license, under any remaining know-how or other rights of Organogenesis, to make or have made Product.

6.3  Unsold Units. In addition to the Product Payments referred to in Article 6.1, Novartis shall pay Organogenesis *** per unit for each unit of Product ordered by Novartis or its Affiliates or sublicensees but not sold for commercial use (each such unit, an "Unsold Unit"). However, if in any Amended Contract Year, the number of Unsold Units ordered by Novartis and its Affiliates and sublicensees exceeds the Annual Limit (as defined below), then Novartis shall pay Organogenesis *** per unit (rather than *** per unit) for each Unsold Unit in excess of the Annual Limit. As used herein, "Annual Limit", for any Amended Contract Year, means the greater of (1) *** units or (2) *** of the aggregate number of units of Product ordered by Novartis and its Affiliates and sublicensees in such Amended Contract Year for commercial and non-commercial use. For clarification purposes, Unsold Units shall not include units provided at no additional cost and units provided at a rate of *** per unit in accordance with Article 12.5, but shall include returns of units originally shipped for commercial use other than returns of defective units. Payments for Unsold Units pursuant to this Article 6.3, as well as any payment for units provided for non-commercial use pursuant to Article 12.5, shall be made monthly within thirty (30) days after the end of each applicable month.

10.  Article 7 of the Amended LSA is hereby amended as follows:

(a)  Article 7.1 shall be deleted in its entirety and replaced with the following:

15

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

    7.1  Product Development Payment. With respect to
    ---------------------------
the period commencing on the Effective Date of this
Amendment and ending on the last day of the calendar
quarter in which the Effective Date of this Amendment
falls and with respect to each succeeding calendar
quarter during the term of the Amended LSA,
Organogenesis shall submit to Novartis, on a quarterly
basis and within thirty (30) days after the end of each
just-ended quarter (each, a "Product Submission
                             ------------------
Period"), the invoices, receipts and other written
------
documentation reasonably requested by Novartis (and
which is in Organogenesis' possession or Organogenesis
can obtain without unreasonable effort or expense),
including without limitation the schedules referred to
in Article 4.10, setting forth in reasonable detail
Organogenesis' research and development and clinical
trial costs approved unanimously by the JDC pursuant to
Article 4.10 and incurred in good faith during such
just-ended Product Submission Period. Novartis shall
pay to Organogenesis the Product Development Payment in
amounts equal to such costs within thirty (30) days
after the end of each Product Submission Period.

(b)  Article 7.2 shall be deleted in its entirety and replaced with the
     following:

    7.2  Product Payment. With respect to the calendar
    ---------------
month in which the Effective Date of this Amendment
falls and with respect to each succeeding calendar
month during the term of the Amended LSA, Novartis
shall pay to Organogenesis, within *** days after the
end of each such month, the Product Payment with
respect to each such month, together with an accounting
report showing the quantity of Product sold by Novartis
and its Affiliates or sublicensees in the Territory.
Novartis may adjust each such monthly payment
immediately following a calendar quarter during the
term of the Amended LSA to reflect any reductions
attributable to the failure by Organogenesis to achieve
the applicable Performance Measures for such calendar
quarter or any previous calendar quarter (to the extent
such adjustment has not already been made) or for any
other applicable adjustments to the calculation of Net
Sales for any prior sales of Product (and an accounting
report showing the calculation of any such deductions
and/or adjustments shall accompany such payments(s)).

(c)  Article 7.3 shall be deleted in its entirety and replaced with the
     following:

    7.4  Currency Exchange. The Product Payments provided
    ----------------
to Organogenesis shall be made in U.S. Dollars, and for
Product Payments in respect of Net Sales of Product
invoiced in currency other than U.S. Dollars, shall be
determined on the basis of Novartis' monthly standard
account of sales which represents the

16

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

conversion of all local currency sales to Swiss Francs
at the average monthly exchange rate of sales. The
average exchange rate between the Swiss Franc and U.S.
Dollar shall be the rate published in the London Times
at the close of business in London on the last ten (10)
days of the month for which the Product Payments are
being paid.

(d)   Article 7.5 shall be deleted in its entirety and replaced with the
following:

7.5   Records and Audit.   Each party shall keep accurate
      ----------------
records and books of accounts in accordance with GAAP
consistently applied and containing all the data
reasonably required for calculation and verification of
any payment to be made or received hereunder,
including, without limitation, with respect to the
Vitrix Consideration, the Vercutis Matrix
Consideration, the Product Development Payment, the
Product Payment and any funds disbursed from the
Drawdown Account. During the term of this Agreement and
for a period of two (2) years thereafter, each party
shall retain accounting records of the previous three
(3) years. At the request of either party (an "Auditing
                                                --------
Party"), the other party shall make records available,
-----
no more than *** a year, during reasonable working
hours for review by an independent accounting firm
acceptable to both parties, at the expense of the
Auditing Party, for the sole purpose of verifying their
accuracy. In the event that any such review indicates
an underpayment of the Product Payment or an
overpayment of any of the Vitrix Consideration, the
Vercutis Matrix Consideration, the Product Development
Payment or the funds disbursed from the Drawdown
Account (in relation to the use of such funds as set
forth in documentation provided by Organogenesis to
Novartis in connection with obtaining Novartis'
approval of the disbursement thereof) in excess of five
percent (5%), the expense of the audit shall be paid by
the non-Auditing Party and the non-Auditing Party shall
promptly pay to the Auditing Party the amount of such
underpayment or return to the Auditing Party the amount
of such overpayment.

(e)   Article 7.6 shall be deleted in its entirety and replaced with
the following:

7.6   Taxes.   All Product Payments required to be paid
      -----
to Organogenesis pursuant to this Agreement shall be
paid with deduction for withholding for or on account
of any taxes (other than taxes imposed on or measured
by net income) or similar governmental charge imposed
by a jurisdiction other than the U.S. ("Withholding
                                         -----------
Taxes"). Novartis shall provide Organogenesis a
-----
certificate evidencing payment of any Withholding Taxes
hereunder and provide reasonable assistance to recover
such taxes.

17

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

11.  Article 12 of the Amended LSA is hereby amended as follows:

    (a)  Article 12.4 of the Amended LSA is hereby deleted in its entirety and
        replaced with the following:

            12.4  Payment for Product.  All payments by
            -------------------
        Novartis to Organogenesis relating to the supply of
        Product to Novartis shall be covered under Article 6
        or, with respect to non-commercial supply, under
        Article 12.5.

    (b)  Article 12.5 of the Amended LSA is hereby deleted in its entirety and
        replaced with the following:

            12.5  Non-Commercial Supply.  During each of the
            ---------------------
        first *** Amended Contract Years commencing on the
        Effective Date of this Agreement, Organogenesis shall
        provide Novartis, at no additional cost and as Novartis
        may request from time to time, an annual supply of ***
        units of Product for Novartis' non-commercial use. In
        the event Novartis requires units of Product for non-
        commercial use in excess of such annual amount in any
        of the first *** Amended Contract Years or any units of
        Product for non-commercial use at any time subsequent
        to the first *** Amended Contract Years, Organogenesis
        shall provide Novartis with such units of Product at a
        rate equal to *** per unit.

    (c)  A new Article 12.6 shall be inserted as follows:

            12.6  Drawdown Account.  Promptly after the
            -----------------
        Effective Date of this Amendment, Novartis shall make
        available to Organogenesis an amount of up to *** (the
        "Drawdown Account"), in order to facilitate
        -----------------
        Organogenesis' performance of its manufacturing
        obligations and for the benefit of Novartis, (a) to
        purchase machinery and equipment to upgrade
        Organogenesis' existing U.S. manufacturing facility and
        related manufacturing processes in connection with
        improving the quality of Product manufactured thereby,
        (b) to develop the European manufacturing suite, (c) to
        upgrade Organogenesis' manufacturing facilities or
        construct a new such facility, and (d) to construct
        laboratories and related premises displaced by the
        European manufacturing suite. Organogenesis agrees to
        use commercially practicable efforts to implement such
        upgrades and pursue such development, provided that
        Novartis makes the required funds available pursuant to
        this Article 12.6. In the event Organogenesis seeks any
        disbursement of funds from the Drawdown Account,
        Organogenesis shall provide Novartis with written
        notice thereof, together with schedules to be prepared
        by Organogenesis in accordance with

18

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

GAAP and certified by Organogenesis' Chief Financial Officer as having been prepared in good faith setting and forth the particulars and details of how such funds shall be used, and any other documentation reasonably requested by Novartis. Any disbursement of funds shall be subject to the prior written consent of Novartis, such consent not to be unreasonably withheld, conditioned or delayed. The parties agree that consent by Novartis pursuant to this Article 12.6 to any upgrade or development project shall cover the disbursement of the aggregate amount of funding to which Novartis has given its consent, whether Organogenesis seeks disbursement of such funding in a single installment or in multiple installments.

12. Article 13 of the Amended LSA is hereby amended as follows:

    (a) The existing text of Article 13 shall be renumbered under the heading: "13.1 Distribution."
        ------------

    (b) A new Article 13.2 shall be added as follows:

        13.2  Direct Billing Costs:  In the event Novartis
        --------------------
        or any Affiliate thereof alters the distribution or billing arrangements for Product, including, without limitation, the establishment and operation of a direct billing operation, in a manner which results in an increase in the per unit sales price invoiced by Novartis or any Affiliate thereof for Product (a "Revised Distribution Arrangement"), Organogenesis
        ---------------------------------
        shall pay to Novartis an amount equal to *** of the start-up costs incurred in good faith by Novartis or its applicable Affiliate in connection with such Revised Distribution Arrangement during the period commencing on the Effective Date of this Amendment and ending on ***, up to *** of any increase in Net Sales attributable to the Revised Distribution Arrangement (such amount to be paid by Organogenesis to be hereinafter referred to as the "Organogenesis Direct
                                                  --------------------
        Billing Costs"). In the event of a Revised Distribution
        -------------
        Arrangement with respect to the period commencing on the Effective Date of this Amendment and ending on the last day of the calendar quarter in which the Effective Date of this Amendment falls and with respect to each succeeding calendar quarter until ***, Novartis shall submit to Organogenesis on a quarterly basis and within thirty (30) days after the end of each such quarter such invoices, receipts and other documentation reasonably requested by Organogenesis and which is in Novartis' possession or which Novartis can obtain without unreasonable effort or expense (the "Distribution Cost Documentation") setting forth in
        -------------------------------
        reasonable detail the Organogenesis Direct Billing Costs incurred during such just-ended three (3) month period. Organogenesis shall pay to Novartis

19

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS.

an amount equal to such Organogenesis Direct Billing
Costs within \*\*\* days after Organogenesis' receipt of
the Distribution Cost Documentation corresponding to
each such three (3) month period.

13. Without limitation to Section 20 of this Amendment, the parties hereby
expressly reaffirm the confidentiality obligations set forth in Article 15
of the LSA.  In addition, the parties hereby agree that neither party shall
be permitted to issue any press release or announcement relating to this
Amendment without having provided the other party with a copy of the
proposed press release or announcement and without the prior written
consent of the other party, such consent not to be unreasonably withheld,
conditioned or delayed.  Notwithstanding the foregoing, the parties agree
that Organogenesis may issue the press release attached hereto as Schedule

C and that Organogenesis may disclose to third parties the information
contained in such press release without the need for further approval by
Novartis.

14. Article 16.4 of the Amended LSA and Schedule C thereto are hereby deleted
in their entirety and replaced with the following:

16.4.  Permissive Termination: Novartis may terminate
this Agreement upon ninety (90) days written notice in
the event it discontinues development of Product for
reasons in Novartis' reasonable judgment related to
safety or efficacy of the Product, or in the event \*\*\*.

15. Article 18.4 of the Amended LSA is hereby deleted in its entirety and
replaced with the following:

18.4  Assignment.

18.4.1  General.  This Agreement, including
any rights under or relating to this Agreement,
shall not be assignable in whole or in part by
either party to any third party without the
written consent of the other party hereto except
that (a) Novartis may assign any or all of its
rights and obligations under this Agreement,
without the consent of Organogenesis, to a
designated Affiliate of Novartis or as provided in
Article 18.4.2, and (b) either party may assign
all of its rights and obligations under this
Agreement to an entity that acquires all or
substantially all of the business or assets of
such party, whether by merger, reorganization,
acquisition, sale or otherwise, without the
consent of the other party hereto, provided,
however that if Novartis assigns its rights and
obligations to an Affiliate pursuant to clause (a)
above, any further assignment by such Affiliate to
an acquiring entity shall be permitted under
clause (b) only if such entity acquires all or
substantially all of the business or assets of
Novartis and such Affiliate. For purposes of this
Article 18, the sale to a non-Affiliate third
party of the stock of an Affiliate to which any

20

CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE OMISSIONS

rights or obligations under this Agreement have been assigned shall
constitute an assignment of such Affiliate's rights and obligations
under this Agreement to such non-Affiliate third party, if the sale of
such stock shall cause such Affiliate to cease to be an Affiliate
immediately after the effectiveness of such sale. This Agreement shall
be binding upon and inure to the benefit of any permitted assignee,
and any such assignee shall agree to perform the obligations of the
assignor. In the event Novartis assigns its rights under this
Agreement, including in accordance with Article 18.4.2: (x) if such
assignment includes rights to market and sell Product in the U.S.,
Novartis shall include as part of the terms and conditions of such
assignment the assignment of all of Novartis' right, title and
interest in and to U.S. Trademark Reg. No. 2,164,413, including any
goodwill symbolized thereby; and (y) if such assignment includes
rights to market and sell Product in any country or countries other
than the U.S., Novartis shall include as part of the terms and
conditions of such assignment, the assignment of all of Novartis'
right, title and interest in and to any trademarks used by Novartis
solely in connection with the sale of Product in such country or
countries and any goodwill symbolized thereby.

18.4.2  Assignment by Novartis.  Except as provided in
clause (b) of Article 18.4.1, Novartis shall not assign any or all of
its rights and obligations under this Agreement to a non-Affiliate
third party prior to ***. In the event Novartis seeks to assign any or
all of its rights and obligations under this Agreement to a non-
Affiliate third party on *** or at any time thereafter, Novartis shall
offer to Organogenesis in writing (the "Organogenesis Offer") the
right to acquire and assume such rights and obligations *** (the
"Third Party Assignment Offer") ***. If Organogenesis accepts the
Organogenesis Offer, Organogenesis shall pay Novartis all of the
consideration payable to Novartis in connection therewith in cash;
provided, that Organogenesis shall not be required to pay any of such
consideration prior to the later of (a) sixty (60) days following the
date of such acceptance, or (b) the date on which the non-Affiliate
third party would have been required to make such payment pursuant to
the Third Party Assignment Offer. Notwithstanding the foregoing, in
the event the consideration to be paid by such non-Affiliate third
party pursuant to the Third Party Assignment Offer includes any non-
cash consideration (the "Non-Cash Consideration"), Novartis shall
determine on a good faith basis the cash value of the Non-Cash
Consideration in order to determine the cash consideration to be paid
by Organogenesis pursuant to the corresponding Organogenesis Offer.
The Organogenesis Offer shall include a

21