As of December 31, 2001, we held 438,336,420 shares in our treasury, calculated in accordance with US GAAP. When calculated in accordance with IAS, the number of treasury shares was 337,024,420. These numbers differ because of varying rules regarding whether shares held by certain foundations, which are independent from Novartis under Swiss company law, must be consolidated with shares held by the Group as treasury shares. US GAAP requires that we consolidate shares held by the employee share participation foundation. This is not required under IAS. See "—Repurchase of shares."

In May 2001 we made available to US investors a direct share purchase and dividend reinvestment program for ADRs through our depositary bank, J.P. Morgan Chase & Co. See "Item 5. Operating and Financial Review and Prospects—5.B. Liquidity and Capital Resources."

### Share Register and Voting Restrictions

Shares represented by a certificate and individually held are transferred by an endorsement. Shares not represented by a certificate and shares represented by a certificate in a common deposit are transferred by assignment. The transfer of such shares not represented by a certificate or represented by a certificate in a common deposit is effected by corresponding entries in the books of a bank or depositary institution following an agreement in writing by the selling shareholder and notification of such assignment to us by the bank or the depositary institution.

Each share is entitled to one vote at the shareholders' meeting. A shareholder may exercise its right to vote its shares only after the shareholder has been recorded in the share register as being entitled to such rights. In order to do so, the shareholder must file a share registration form with us, setting forth the shareholder's name, address and citizenship (or, in the case of a legal entity, its registered office). If the shareholder has not filed the form, then the shareholder may not vote at, or participate in, shareholders' meetings.

To vote its shares, the shareholder must also explicitly declare that it has acquired the shares in its own name and for its own account. If the shareholder refuses to make such a declaration, the shares may not be voted unless the Board of Directors grants voting rights to a nominee for those shares. The Board of Directors may grant such nominees the right to vote up to 0.5% of the total number of registered shares. We have agreed with J.P. Morgan Chase & Co., as Depositary, however, pursuant to the Deposit Agreement, to register the Depositary or its nominee or the custodian or its nominee (but no individual holders), as the case may be, in our share register as holding voting rights with respect to shares deposited with the Depositary or the custodian up to a limit of 5% of our registered shares, for the benefit of the holders of ADSs.

No shareholder or group of shareholders may vote more than 2% of the registered shares. If a shareholder holds more than 2% of Novartis' shares, that shareholder will be entitled to register the excess shares, but not to cast votes based upon them. For purposes of this 2% rule, groups of companies and groups of shareholders acting in concert are considered to be one shareholder.

The Board of Directors may, on a case by case basis, allow exceptions from both the 2% rule for shareholders and the 0.5% rule for nominees. The Board may delegate this power.

There are no limitations under Swiss law or our Articles on the right of non-Swiss residents or nationals to own or vote shares other than the restrictions applicable to all shareholders.

### Shareholders' Meetings

Under Swiss law, we must hold an annual ordinary shareholders' meeting within six months after the end of our financial year. Shareholders' meetings may be convened by the Board of Directors or, if necessary, by the statutory auditors. The Board is further required to convene an extraordinary shareholders' meeting if so resolved by a shareholders meeting, or if so requested by shareholders holding an aggregate of at least 10% of the registered shares. Shareholders holding shares with a nominal value of at least CHF 1,000,000 (*i.e.*, 2,000,000 Novartis shares) have the right to request that a specific proposal be

put on the agenda and voted upon at the next shareholders meeting. A shareholders' meeting is convened by publishing a notice in the Swiss Official Commercial Gazette (*Schweizerisches Handelsamtsblatt*) at least 20 days prior to such meeting. Shareholders may also be informed by mail.

There is no provision in the Articles requiring a quorum for the holding of a shareholders' meeting.

Shareholders' resolutions generally require the approval of a majority of the votes present at a shareholders' meeting. As a result, abstentions have the effect of votes against the resolution. Shareholders' resolutions requiring a vote by such "absolute majority" include (1) amendments to the Articles; (2) elections of directors and statutory auditors; (3) approval of the annual report and the annual accounts; (4) setting the annual dividend; (5) decisions to discharge directors and management from liability for matters disclosed to the shareholders' meeting; and (6) the ordering of an independent investigation into specific matters proposed to the shareholders' meeting.

The following types of shareholders' resolutions require the approval of a "supermajority" of at least two-thirds of the votes present at a shareholders' meeting: (1) an alteration of our corporate purpose; (2) the creation of shares with increased voting powers; (3) an implementation of restrictions on the transfer of registered shares and the removal of such restrictions; (4) an authorized or conditional increase of the share capital; (5) an increase of the share capital by conversion of equity, by contribution in kind, or for the purpose of an acquisition of property or the grant of special rights; (6) a restriction or an elimination of shareholders' preemptive rights; (7) a change of our domicile; (8) our dissolution without liquidation (*e.g.*, by a merger); or (9) any amendment to the Articles which would create or eliminate a supermajority requirement.

At shareholders' meetings, shareholders can be represented by proxy. However, a proxy must either be the shareholder's legal representative, another shareholder with the right to vote, a proxy appointed by us, an independent representative nominated by us, or a depositary. Votes are taken by a show of hands unless the shareholders' meeting resolves to have a ballot or where a ballot is ordered by the chairman of the meeting. We intend to propose at our next shareholders' meeting a resolution to allow electronic voting at future shareholder's meetings.

### Net Profit and Dividends

Swiss law requires that at least 5% of our annual net profits be retained as general reserves, so long as these reserves amount to less than 20% of our registered share capital. The law permits a corporation's articles to require additional mandatory reserves, but our Articles do not.

Under Swiss law, we may only pay dividends if we have sufficient distributable retained earnings from previous business years, or if our reserves are sufficient to allow distribution of a dividend. In either event, while the Board of Directors may propose that a dividend be paid, we may only pay dividends upon shareholder approval at a shareholders' meeting. Our auditors must confirm that the dividend proposal of the Board conforms with the Swiss Code of Obligations and the Articles. Our Board of Directors intends to propose a dividend once each year. See "Item 3. Key Information—3.A. Selected Financial Data—Cash Dividends per Share."

Dividends are usually due and payable immediately after the shareholders have passed a resolution approving the payment. Under Swiss law, the statute of limitations in respect of dividend payments is five years. For information about deduction of the withholding tax, see "Item 10. Additional Information— 10.E Taxation."

### Preemptive Rights

Under Swiss law, we may not issue new shares without the prior approval of the shareholders. If a new issue is approved, then our shareholders would have certain preemptive rights to obtain newly issued shares in an amount proportional to the nominal value of the shares they already hold. These preemptive

97

rights could be modified in certain limited circumstances with the approval of a resolution adopted at a shareholders' meeting by a supermajority of shares.

### Borrowing Power

Neither Swiss law nor the Articles restrict in any way our power to borrow or raise funds. The decision to borrow funds is made by, or under the direction of, our Board of Directors and no shareholders' resolution is required.

### Conflict of Interests

Swiss law does not have a general provision on conflicts of interests. However, the Swiss Code of Obligations requires directors and members of senior management to safeguard the interests of the corporation and, in this connection, imposes a duty of care and a duty of loyalty on such persons. This rule is generally interpreted to mean that directors and members of senior management are disqualified from participating in decisions which affect them personally. Directors and officers are personally liable to the corporation for any breach of these provisions. In addition, Swiss law contains a provision under which a shareholder or a director, or any other persons associated with them, must refund to the corporation any payments made to them by the corporation, other than payments made at arm's length.

### Repurchase of shares

Swiss law limits a corporation's ability to hold or repurchase its own shares. We and our subsidiaries may only repurchase shares if we have free reserves equal to the purchase price to be paid for the shares. The aggregate nominal value of all Novartis shares held by us and our subsidiaries may not exceed 10% of the nominal value of our share capital. In addition, we are required to create a special reserve on our balance sheet in the amount of the purchase price of the acquired shares. Repurchased shares held by us or our subsidiaries do not carry any rights to vote at the shareholders' meeting, but are entitled to the economic benefits generally connected with the shares. It should be noted that the definition of what constitutes subsidiaries, and therefore, treasury shares, for purposes of the above described reserves requirement and voting restrictions differs from the definition included in the consolidated financial statements. The definition in the consolidated financial statements requires consolidation for financial reporting purposes of special purpose entities, irrespective of their legal structure, in instances where we have the power to govern the financial and operating policies of the entity so as to obtain benefits from its activities.

We may also repurchase shares for the purpose of capital reduction, which can only take place if the shareholders pass a resolution approving such reduction. We intend to propose to the next shareholders' meeting a capital reduction of CHF 30,527,340.

### Notices

Under Swiss law, notices to shareholders are validly made by publication in the Swiss Official Commercial Gazette. However, the law permits the corporation's Board of Directors to designate additional means of communication for publishing notices to the shareholders.

Notices required under the listing rules of the Swiss Stock Exchange ("SWX") will be published in two Swiss newspapers. We, the SWX or the virt-x, may also disseminate the relevant information on the virt-x online exchange information system.

### Purpose, Duration, Liquidation, Merger

Our business purpose, as stated in the Articles, is to hold interests in enterprises in the area of health care or nutrition. We may also hold interests in enterprises in the areas of biology, chemistry, physics,

information technology or related areas. We may acquire, mortgage, liquidate or sell real estate and intellectual property rights in Switzerland or abroad.

The duration of our company is unlimited. We may be dissolved at any time by a shareholders' resolution. In the case of a dissolution by way of liquidation, such resolution would require the approval of the majority of votes present at the shareholders' meeting. In the case of a dissolution without liquidation, at least two-thirds of the votes present at the meeting would have to vote their shares in favor of such resolution. Dissolution is also possible by adjudication of bankruptcy or by decision of a judge, if shareholders holding at least 10% of the registered share capital requested dissolution for valid reasons. Under Swiss law, any surplus arising out of a liquidation (i.e., after the settlement of all claims of all creditors) would be distributed to the shareholders in proportion to the paid-in nominal value of their shares.

Shareholders may pass a resolution to merge with another corporation at any time. Such a resolution would require the consent of at least two-thirds of all votes present at the necessary shareholders' meeting.

### Disclosure of Principal Shareholders

Under the Swiss Stock Exchange Act, holders of our voting shares would be required to notify us and the SWX of the level of their holdings whenever such holdings reach or exceed, or in some cases, fall short of, certain thresholds—5%, 10%, 20%, 33⅓%, 50% and 66⅔%—of our registered share capital, whether or not the shareholder has the right to cast votes based on the shares. Following receipt of such notification we would be required to inform the public by publishing the information in the Swiss Official Commercial Gazette and in at least one of the principal electronic media that disseminate stock exchange information.

### Mandatory Tender Offer

Under the Swiss Stock Exchange Act, shareholders and groups of shareholders acting in concert who acquire more than 33⅓% of the voting rights of Novartis shares would be required to submit a takeover bid to all remaining shareholders. This mandatory bid obligation may be waived by the Swiss Takeover Board or the Swiss Federal Banking Commission under certain circumstances, in particular if another shareholder owns a higher percentage of voting rights than the acquirer. If no waiver is granted, the mandatory takeover bid would have to be made pursuant to the procedural rules set forth in the Swiss Stock Exchange Act and the ordinances enacted thereunder.

### Board of Directors

Pursuant to Swiss law, each member of our Board must hold at least one of our shares. Directors must retire when they reach age 71, although the General Meeting may grant an exemption from this rule. We have no mandatory retirement age for executive officers.

### American Depositary Shares

We incorporate by reference the disclosure regarding our ADS program included in the registration statement on Form 20-F/A (File No. I-15024), as filed with the Commission on May 9, 2000, in the section entitled "Part II—Item 14. Description of Securities to be Registered—American Depositary Receipts."

On May 3, 2001, we filed an Amendment No. 2 to the Amended and Restated Deposit Agreement, dated as of May 7, 2001, pursuant to the Registration Statement on Form F-6 (File No. 333-13446). The Amendment No. 2 changed the ADS-to-share ratio from 40-to-1 to 1-to-1.

On January 31, 2002, we filed a Restricted Issuance Agreement dated as of January 11, 2002, supplementing Amendment No. 2 to the Amended and Restated Deposit Agreement dated as of May 3, 2001, as an exhibit to the Registration Statement on Form F-3 (File No. 333-81862). The Restricted Issuance Agreement supplemented the Deposit Agreement to permit the deposit of restricted ADSs into a parallel facility to the ADR facility established in the Deposit Agreement.

**10.C Material contracts**

On December 2, 1999, we signed a Master Agreement with AstraZeneca to spin-off and merge our Crop Protection and Seeds businesses with AstraZeneca's Zeneca Agrochemicals business to create Syngenta. This agreement was amended and restated on September 7, 2000, and the transaction closed in November 2000. Our Agribusiness sector, which was made up of Crop Protection and Seeds, is accordingly shown as a discontinued activity. There are no other material contracts other than those entered into in the ordinary course of business.

**10.D Exchange controls**

There are no Swiss governmental laws, decrees or regulations that restrict the export or import of capital, including any foreign exchange controls, or that affect the remittance of dividends or other payments to non-residents or non-citizens of Switzerland who hold Novartis' shares.

**10.E Taxation**

The taxation discussion set forth below is intended only as a descriptive summary and does not purport to be a complete analysis or listing of all potential tax effects relevant to the acquisition, ownership, exercise or disposition of our shares or ADSs. The statements of US and Swiss tax laws set forth below are based on the laws and regulations in force as of the date of this 20-F, including the current Convention Between the United States and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income, entered into force on December 19, 1997 (the "Treaty"), and the US Internal Revenue Code of 1986, as amended (the "Code"), and may be subject to any changes in US and Swiss law, and in any double taxation convention or treaty between the United States and Switzerland occurring after that date, which changes may have retroactive effect.

**Swiss Taxation**

*Swiss Residents*

*Withholding Tax on Dividends and Distributions.*   Dividends which we pay and similar cash or in-kind distributions which we may make to a holder of shares or ADSs (including distributions of liquidation proceeds in excess of the nominal value, stock dividends and, under certain circumstances, proceeds from repurchases of shares by us in excess of the nominal value) are subject to a Swiss federal withholding tax (the "Withholding Tax") at a current rate of 35%. We are required to withhold this Withholding Tax from the gross distribution and to pay the Tax to the Swiss Federal Tax Administration. The Withholding Tax is refundable in full to Swiss residents who are the beneficial owners of the taxable distribution at the time it is resolved and duly report the gross distribution received on their personal tax return or in their financial statements for tax purposes, as the case may be.

*Income Tax on Dividends.*   A Swiss resident who receives dividends and similar distributions (including stock dividends and liquidation surplus) on shares or ADSs is required to include such amounts in the shareholder's personal income tax return. A corporate shareholder may claim substantial relief from taxation of dividends and similar distributions received if the shares held represent a fair market value of at least CHF 2 million.

*Capital Gains Tax upon Disposal of shares.*   Under current Swiss tax law, the gain realized on shares held by a Swiss resident who holds shares or ADSs as part of his private property is generally not subject to any federal, cantonal or municipal income taxation on gains realized on the sale or other disposal of shares or ADSs. However, gains realized upon a repurchase of shares by us may be characterized as taxable dividend income if certain conditions are met. Book gains realized on shares or ADSs held by a Swiss

100

corporate entity or by a Swiss resident individual as part of the shareholder's business property are included in the taxable income of such person.

*Residents of Other Countries*

Recipients of dividends and similar distributions on the shares who are neither residents of Switzerland for tax purposes nor holding shares as part of a business conducted through a permanent establishment situated in Switzerland ("Non-resident Holders") are not subject to Swiss income taxes in respect of such distributions. Moreover, gains realized by such recipients upon the disposal of shares are not subject to Swiss income taxes.

Non-resident Holders of shares are, however, subject to the Withholding Tax on dividends and similar distributions mentioned above and under certain circumstances to the Stamp Duty described below. Such Non-resident Holders may be entitled to a partial refund of the Withholding Tax if the country in which they reside has entered into a bilateral treaty for the avoidance of double taxation with Switzerland. Non-resident Holders should be aware that the procedures for claiming treaty refunds (and the time frame required for obtaining a refund) may differ from country to country. Non-resident Holders should consult their own tax advisors regarding receipt, ownership, purchase, sale or other dispositions of shares or ADSs and the procedures for claiming a refund of the Withholding Tax.

As of January 1, 2001, Switzerland has entered into bilateral treaties for the avoidance of double taxation with respect to income taxes with the following countries, whereby a part of the above-mentioned Withholding Tax may be refunded (subject to the limitations set forth in such treaties):

| | | | |
|---|---|---|---|
| Albania | Germany | Luxembourg | Slovak Republic |
| Australia | Greece | Macedonia | Slovenia |
| Austria | Hungary | Malaysia | South Africa |
| Belarus | Iceland | Mexico | Spain |
| Belgium | India | Moldavia | Sri Lanka |
| Bulgaria | Indonesia | Morocco | Sweden |
| Canada | Italy | Netherlands | Thailand |
| China | Ivory Coast | New Zealand | Trinidad and Tobago |
| Croatia | Republic of Ireland | Norway | Tunisia |
| Czech Republic | Jamaica | Pakistan | United Kingdom |
| Denmark | Japan | Poland | United States of America |
| Ecuador | Kazakhstan | Portugal | Venezuela |
| Egypt | Republic of Korea | Romania | Vietnam |
| Finland | (South Korea) | Russia | Commonwealth of |
| France | Kuwait | Singapore | Independent States[1] |

---

[1]   Excluding Estonia, Latvia, Lithuania and Russia.

Tax treaty negotiations are under way, or have been concluded, with Armenia, Chile, Ethiopia, Estonia, Georgia, Israel, Kyrgyzstan, Latvia, Lithuania, Turkey, Turkmenistan, Uzbekistan, and Zimbabwe.

A Non-resident Holder of shares or ADSs will not be liable for any Swiss taxes other than the Withholding Tax described above and the Stamp Duty described below if the transfer occurs through or with a Swiss bank or other Swiss securities dealer. If, however, the shares or ADSs of Non-resident Holders can be attributed to a permanent establishment or a fixed place of business maintained by such person within Switzerland during the relevant tax year, the shares or ADSs may be subject to Swiss income taxes in respect of income and gains realized on the shares or ADSs and such person may qualify for a full refund of the Withholding Tax based on Swiss tax law.

*Residents of the United States.*  A Non-resident Holder who is a resident of the United States for purposes of the Treaty is eligible for a reduced rate of tax on dividends equal to 15% of the dividend, provided that such holder (i) qualifies for benefits under the Treaty, (ii) holds, directly and indirectly, less than 10% of our voting stock, and (iii) does not conduct business through a permanent establishment or fixed base in Switzerland to which the shares or ADSs are attributable. Such an eligible holder must apply for a refund of the amount of the Withholding Tax in excess of the 15% Treaty rate. The claim for refund must be filed on Swiss Tax Form 82 (82C for corporations; 82I for individuals; 82E for other entities), which may be obtained from any Swiss Consulate General in the United States or from the Federal Tax Administration of Switzerland at the address below, together with an instruction form. Four copies of the form must be duly completed, signed before a notary public of the United States, and sent to the Federal Tax Administration of Switzerland, Eigerstrasse 65, CH-3003 Berne, Switzerland. The form must be accompanied by suitable evidence of deduction of Swiss tax withheld at source, such as certificates of deduction, signed bank vouchers or credit slips. The form may be filed on or after July 1 or January 1 following the date the dividend was payable, but no later than December 31 of the third year following the calendar year in which the dividend became payable. For US resident holders of ADSs, J.P. Morgan Chase & Co. as Depositary, will comply with these Swiss procedures on behalf of the holders, and will remit the net amount to the holders.

*Stamp Duty upon Transfer of Securities.*  The sale of shares, whether by Swiss residents or Non-resident Holders, may be subject to federal securities transfer Stamp Duty of 0.15%, calculated on the sale proceeds, if the sale occurs through or with a Swiss bank or other Swiss securities dealer, as defined in the Swiss Federal Stamp Duty Act. The Stamp Duty has to be paid by the securities dealer and may be charged to the parties in a taxable transaction who are not securities dealers. Stamp Duty may also be due if a sale of shares occurs with or through a non-Swiss bank or securities dealer, provided (i) such bank or dealer is a member of the SWX, and (ii) the sale takes place on the SWX. In addition to this Stamp Duty, the sale of shares by or through a member of the SWX may be subject to a minor stock exchange levy.

## United States Federal Income Taxation

The following is a general discussion of certain US federal income tax consequences of the ownership and disposition of our shares or ADSs that may be relevant to you if you are a US Holder (as defined below). Because this discussion does not consider any specific circumstances of any particular holder of our shares or ADSs, persons who are subject to US taxation are strongly urged to consult their own tax advisers as to the overall US federal, state and local tax consequences, as well as to the overall Swiss and other foreign tax consequences, of the ownership and disposition of our shares or ADSs. In particular, additional rules may apply to dealers in securities, tax-exempt entities, certain insurance companies, broker-dealers, investors liable for alternative minimum tax, holders that hold shares or ADSs as part of a straddle or a hedging or conversion transaction, holders whose functional currency is not the US dollar, and holders of 10% or more of our voting stock. This discussion generally applies only to US Holders who qualify for benefits under the Treaty, who hold the shares as a capital asset, and whose functional currency is the US dollar.

For purposes of this discussion, a "US Holder" is a beneficial owner of Novartis shares or ADSs who is (i) an individual citizen or resident of the United States for US federal income tax purposes, (ii) a corporation created or organized under the laws of the United States or a state thereof, (iii) an estate the income of which is subject to US federal income taxation regardless of its source, or (iv) a trust subject to the primary supervision of a US court and the control of one or more US persons.

This discussion assumes that each obligation in the Deposit Agreement and any related agreement will be performed in accordance with its terms. For purposes of this discussion, US Holders of ADRs will be treated as owners of the ADSs evidenced by such ADRs and the shares represented by such ADSs.

*Dividends.*  For US federal income tax purposes, US Holders will be required to include the full amount (unreduced by any Withholding Tax) of a dividend paid with respect to our shares or ADSs as

102

ordinary income. For this purpose, a "dividend" will include any distribution paid by us with respect to our shares or ADSs (other than certain distributions of our capital stock or rights to subscribe for shares of our capital stock), as the case may be, but only to the extent such distribution is not in excess of our current and accumulated earnings and profits, as defined for US federal income tax purposes. Such dividend will constitute income from sources outside the United States. Subject to the limitations and conditions provided in the Code, US Holders may deduct from their US federal taxable income, or claim as a credit against their US federal income tax liability, the 15% withholding tax withheld pursuant to the Treaty. Under the Code, dividend payments by us on the shares or ADSs are not eligible for the dividends received deduction generally allowed to corporate shareholders. Any distribution that exceeds our earnings and profits will be treated as a nontaxable return of capital to the extent of the US Holder's tax basis in the shares or ADSs and thereafter as capital gain.

In general, a US Holder will be required to determine the amount of any dividend paid in Swiss francs by translating the Swiss francs into US dollars at the spot rate on the date of receipt. The tax basis of Swiss francs received by a US Holder generally will equal the US dollar equivalent of such Swiss francs at the spot rate on the date such Swiss francs are received. Upon subsequent exchange of such Swiss francs for US dollars, or upon the use of such Swiss francs to purchase property, you will generally recognize exchange gain or loss equal to the difference between your tax basis for the Swiss francs and the US dollars received or, if property is received, the fair value of the property on the date of the exchange.

*Sale or Other Disposition.*   Upon a sale or exchange of shares or ADSs, US Holders generally will recognize capital gain or loss in an amount equal to the difference between the amount realized on the disposition and the US Holder's tax basis in the shares or ADSs. This capital gain or loss will be long-term capital gain or loss if the holding period in the shares or ADSs exceeds one year. The deductibility of capital losses is subject to limitations. If the US Holder is an individual, any capital gain generally will be subject to US federal income tax at preferential rates if the US Holder meets the specified minimum holding periods. Such gain or loss, if any, generally will be US source gain or loss.

*United States Information Reporting and Backup Withholding.*   Dividend payments with respect to shares or ADSs and proceeds from the sale, exchange or redemption of shares or ADSs may be subject to information reporting to the Internal Revenue Service ("IRS") and possible US backup withholding at a current rate of 30%. Certain exempt recipients (such as corporations) are not subject to these information reporting requirements. Backup withholding will not apply, however, to a US Holder who furnishes a correct taxpayer identification number or certificate of foreign status and makes any other required certification or who is otherwise exempt from backup withholding. Any US Holders required to establish their exempt status generally must file IRS Form W-9 ("Request for Taxpayer Identification Number and Certification"). Non-US holders are generally not subject to US information or backup withholding. However, such holders may be required to provide certification of non-US status in connection with payments received in the United States or through US-related financial intermediaries. Amounts withheld as backup withholding may be credited against a US Holder's federal income tax liability, and a US Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing the appropriate claim for refund with the IRS and furnishing any required information. Finalized Treasury regulations have generally expanded the circumstances under which US information reporting and backup withholding may apply. US Holders should consult their own tax advisors regarding the application of the US information reporting and backup withholding rules, including the finalized Treasury regulations.

**10.F Dividends and paying agents**

Not applicable.

**10.G Statement by experts**

Not applicable.

**10.H Documents on display**

The documents that are exhibits to or incorporated by reference in this annual report can be read at the US Securities and Exchange Commission's public reference facilities at Room 1024, 450 Fifth Street, N.W., Washington, D.C. 20549.

**10.I Subsidiary Information**

Not applicable.

**Item 11. Quantitative and Qualitative Disclosures about Non-Product-Related Market Risk**

| | Local Currencies | CHF |
|---|---|---|
| **Growth 2001 and currency contribution (continuing activities):** | | |
| Sales ........................................... | 14% | 10% |
| Operating income ................................ | 9% | 8% |
| Net income ..................................... | 8% | 8% |

| | Sales | Costs |
|---|---|---|
| **Sales and operating costs by currencies:** | | |
| $ ............................................. | 45% | 31% |
| Euro .......................................... | 23% | 22% |
| CHF .......................................... | 5% | 26% |
| Yen ........................................... | 8% | 5% |
| Other ......................................... | 19% | 16% |
| | 100% | 100% |

| | Liquid Funds | Financial Debt |
|---|---|---|
| **Liquid funds and financial debt by currencies:** | | |
| $ ............................................. | 8% | 46% |
| Euro .......................................... | 35% | 4% |
| CHF .......................................... | 55% | 21% |
| Yen ........................................... | | 24% |
| Other ......................................... | 2% | 5% |
| | 100% | 100% |

| | Local Currencies | CHF |
|---|---|---|
| **Growth 2000 and currency contribution (continuing activities):** | | |
| Sales ........................................... | 8% | 15% |
| Operating income ................................ | 2% | 6% |
| Net income ..................................... | 5% | 8% |

104

|  | Sales | Costs |
|---|---|---|
| **Sales and operating costs by currencies:** | | |
| $ ........................................... | 44% | 33% |
| Euro ........................................ | 24% | 23% |
| CHF ........................................ | 6% | 26% |
| Yen ......................................... | 8% | 5% |
| Other ....................................... | 18% | 13% |
| | 100% | 100% |

|  | Liquid funds | Financial debt |
|---|---|---|
| **Liquid funds and financial debt by currencies:** | | |
| $ ........................................... | 27% | 45% |
| Euro ........................................ | 31% | 15% |
| CHF ........................................ | 41% | 30% |
| Yen ......................................... | | 7% |
| Other ....................................... | 1% | 3% |
| | 100% | 100% |

**Market Risk**

In addition to market risk regarding our products, we are exposed to market risk regarding our liquid assets and investments, primarily related to foreign exchange, interest rates and market value of the investments of liquid funds. We actively monitor these exposures. To manage the volatility relating to these exposures, we enter into a variety of derivative financial instruments. Our objective is to reduce, where it is deemed appropriate to do so, fluctuations in earnings and cash flows associated with changes in interest rates, foreign currency rates and market rates of investments of liquid funds. It is our policy and practice to use derivative financial instruments to manage exposures and to enhance the yield on the investment of liquid funds. We do not enter any financial transactions containing a risk that cannot be quantified at the time the transaction is concluded; *i.e.*, we do not sell short. We only sell existing assets in transactions and future transactions (in the case of anticipatory hedges) which we confidently expect we will have in the future based on past experience. In the case of liquid funds, we write call options on assets we have or we write put options on positions we want to acquire and have the liquidity to acquire. We expect that any loss in value for those instruments generally would be offset by increases in the value of the underlying transactions.

*Foreign exchange rates:*   We use the Swiss franc as our reporting currency and we are therefore exposed to foreign exchange movements, primarily in US, European, Japanese, other Asian and Latin American currencies. On December 31, 2001, we had long and short forward exchange/option contracts with equivalent values of CHF 7.1 billion and CHF 13.3 billion, respectively. At December 31, 2000, we had long and short forward exchange/option contracts with equivalent values of CHF 8.2 billion and CHF 13.8 billion, respectively.

Net investments in foreign countries are long-term investments. Their fair value changes through movements of the currency exchange rates. In the very long term, however, the difference in the inflation rate should match the exchange rate movement, so that the market value of the real assets abroad should compensate the change due to currency movements. For this reason, we only hedge the net investments in foreign subsidiaries in exceptional cases.

*Commodities:*   We have only a very limited exposure to price risk related to anticipated purchases of certain commodities used as raw materials by our businesses. A change in those prices may alter the gross margin of a specific business, but generally by not more than 10% of the margin and thus below materiality levels. Accordingly, we do not enter into significant commodity future, forward and option contracts to manage fluctuations in prices of anticipated purchases.

*Interest rates:*   We manage our net exposure to interest rate risk through the proportion of fixed rate debt and variable rate debt in our total debt portfolio. To manage this mix, we may enter into interest rate swap agreements, in which we exchange the periodic payments, based on a notional amount and agreed-upon fixed and variable interest rates. Our percentage of fixed rate debt to total financial debt was 46%, 34% and 28% at December 31, 2001, 2000 and 1999, respectively.

*Equity risk:*   We purchase equities as investments of our liquid funds. As a policy, we limit our holdings in an unrelated company to less than 5% of our liquid funds. Potential investments are thoroughly analyzed in respect of their past financial track record (mainly cash flow return on investment), their market potential, their management and their competitors. Call options are written on equities which we have and put options are written on equities which we want to buy and for which cash has been reserved.

*Management summary:*   Use of the above-mentioned derivative financial instruments has not had a material impact on our financial position at December 31, 2001 and 2000 or on the results of our operations for the years ended December 31, 2001, 2000 and 1999.

*Value at risk:*   We use a value at risk ("VAR") computation to estimate the potential ten-day loss in the fair value of our interest rate-sensitive financial instruments, the loss in pre-tax earnings of our foreign currency price-sensitive derivative financial instruments, and the potential ten-day loss of our equity holdings. We use a ten-day period because it is assumed that not all positions could be undone in a single day, given the size of the positions. The VAR computation includes our debt; short-term and long-term investments; foreign currency forwards, swaps and options and anticipated transactions. Foreign currency trade payables and receivables, and net investments in foreign subsidiaries are excluded from the computation.

The VAR estimates are made assuming normal market conditions, using a 95% confidence interval. We use a "Delta Normal" model to determine the observed inter-relationships between movements in interest rates, stock markets and various currencies. These inter-relationships are determined by observing interest rate, stock market movements and forward currency rate movements over a 60-day period for the calculation of VAR amounts.

The estimated potential ten-day loss in fair value of our interest rate-sensitive instruments, primarily debt and investments of liquid funds under normal market conditions, the estimated potential ten-day loss in pre-tax earnings from foreign currency instruments under normal market conditions, and the estimated potential ten-day loss on our equity holdings, as calculated in the VAR model, follow:

|  | At December 31, | |
|---|---|---|
|  | **2001** | **2000** |
|  | (CHF millions) | |
| Instruments sensitive to foreign currency rates . . . . . . . . . . . | 226 | 34 |
| Instruments sensitive to equity market movements . . . . . . . . | 224 | 164 |
| Instruments sensitive to interest rates . . . . . . . . . . . . . . . . . | 64 | 18 |
| Total all instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 324 | 241 |

106

The average, high, and low VAR amounts for 2001 are as follows:

| | Average | High | Low |
|---|---|---|---|
| | (CHF millions) | | |
| Instruments sensitive to foreign currency rates . . . . . . . . . . . | 235 | 548 | 94 |
| Instruments sensitive to equity market movements . . . . . . . . | 396 | 642 | 234 |
| Instruments sensitive to interest rates . . . . . . . . . . . . . . . . . | 39 | 71 | 23 |
| Total all instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 515 | 817 | 266 |

The VAR computation is a risk analysis tool designed to statistically estimate the maximum probable ten-days loss from adverse movements in interest rates, foreign currency rates and equity prices under normal market conditions. The computation does not purport to represent actual losses in fair value or earnings to be incurred by us, nor does it consider the effect of favorable changes in market rates. We cannot predict actual future movements in such market rates and do not present these VAR results to be indicative of future movements in such market rates or to be representative of any actual impact that future changes in market rates may have on our future results of operations or financial position.

In addition to these VAR analyses, we use stress-testing techniques. Such stress-testing is aimed at reflecting a worst case scenario. For these calculations, we use the worst movements during a period of six months over the past 20 years in each category. For 2001 and 2000, the worst case loss scenario was configured as follows:

| | At December 31, | |
|---|---|---|
| | 2001 | 2000 |
| | (CHF millions) | |
| Bond portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 895 | 96 |
| Money market and linked financial instruments . . . . . . . . . . | 457 | 760 |
| Equities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 817 | 1,539 |
| Foreign exchange risks . . . . . . . . . . . . . . . . . . . . . . . . . . . | 151 | 449 |
| **Total** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2,320** | **2,844** |

In our risk analysis, we consider this worst case scenario acceptable inasmuch as it could reduce the income, but would not endanger the solvency and/or the investment grade credit standing of the Group. While it is highly unlikely that all worst case fluctuations would happen simultaneously, as shown in the model, the actual market can, of course, produce bigger movements in the future.

The major financial risks are managed centrally by our Group Treasury. Only residual risks and some currency risks are managed by our affiliates. The collective amount of the residual risks is, however, below 10% of the global risks.

We have a written Treasury Policy, have implemented a strict segregation of front office and back office controls, and do random checks of our positions with the counter parties. In addition, internal audits on the information management of the Treasury function are performed at regular intervals.

### Item 12. Description of Securities other than Equity Securities

Not applicable.

## Part II

**Item 13. Defaults, Dividend Arrearages and Delinquencies**

None.

**Item 14. Material Modifications to the Rights of Security Holders and use of Proceeds**

None.

**Item 15. [Reserved]**

**Item 16. [Reserved]**

## Part III

**Item 17. Financial Statements**

Not applicable.

**Item 18. Financial Statements**

The following financial statements are filed as part of this annual report on Form 20-F.

|  | Page |
|---|---|
| Index to consolidated financial statements | F-1 |
| Report of PricewaterhouseCoopers AG | F-2 |
| Consolidated income statements | F-3 |
| Consolidated balance sheets | F-4 |
| Consolidated cash flow statements | F-5 |
| Consolidated statement of changes in equity | F-6 |
| Notes to the consolidated financial statements | F-7 |
| Report of PricewaterhouseCoopers AG on financial statement schedule | F-83 |
| Schedule II—valuation and qualifying accounts | F-84 |

**Item 19. Exhibits**

1.1   Articles of Association, as amended March 22, 2001 (in English translation).

2.1   Amended and Restated Deposit Agreement dated as of May 11, 2000 among Novartis AG, J.P. Morgan Chase & Co., as depositary, and all holders from time to time of ADR's issued thereunder (incorporated by reference from the Registration Statement on Form F-6, File No. 333-11758, as filed with the Commission on March 30, 2000).

2.2   Amendment No. 1 to the Amended and Restated Deposit Agreement (incorporated by reference from Post-Effective Amendment No. 1 to the Registration Statement on Form F-6, File No. 333-11758, as filed with the Commission on September 8, 2000).

2.3   Amendment No. 2 to the Amended and Restated Deposit Agreement dated as of May 7, 2001 (incorporated by reference from the Registration Statement on Form F-6, File No. 333-13446, as filed with the Commission on May 3, 2001).

2.4   Fiscal Agency Agreement related to the issuance by Novartis Securities Investment Ltd. of €900,000,000 aggregate principal amount of 4% guaranteed notes, guaranteed by Novartis AG, among Novartis Securities Investment Ltd., Novartis AG, Citibank N.A., and Banque Générale dù Luxembourg S.A.

2.5   Restricted Issuance Agreement dated as of January 11, 2002 among Novartis AG, J.P. Morgan Chase & Co., as depositary, and all holders from time to time of ADRs issued thereunder (incorporated by reference from the Registration Statement on Form F-3, File No. 333-81862, as filed with the Commission on January 31, 2002).

4.1   Master Agreement dated December 2, 1999 between Novartis AG and AstraZeneca PLC, as amended and restated on September 7, 2000 (incorporated by reference from Syngenta AG's Registration Statement on Form F-1, File No. 333-12640, as filed with the Commission on September 29, 2000).

6.    For Earnings per share calculation, see note 7 to our consolidated financial statements.

8.1   For a list of all of our subsidiaries, see note 32 to our consolidated financial statements.

10.1  Consent of PricewaterhouseCoopers AG to the incorporation by reference of the audit report contained in this Form 20-F into Novartis AG's Registration Statement on Form F-3 (File No. 333-81862) as filed with the SEC on January 31, 2002, the Form F-3 filed on May 11, 2002 (File No. 333-60712) and the Form S-8 filed on May 14, 2001 (File No. 333-13506).

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

NOVARTIS AG

By: _____ /s/ DR. RAYMUND BREU _____

Name: Dr. Raymund Breu

Title: *Chief Financial Officer, Novartis Group*

By: _____ /s/ DR. URS BÄRLOCHER _____

Name: Dr. Urs Bärlocher

Title: *Head of Legal and General Affairs, Novartis Group*

Date March 18, 2002

110

## NOVARTIS GROUP
## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Report of PricewaterhouseCoopers AG | F-2 |
| Consolidated income statements | F-3 |
| Consolidated balance sheets | F-4 |
| Consolidated cash flow statements | F-5 |
| Consolidated statement of changes in equity | F-6 |
| Notes to the consolidated financial statements | F-7 |
| Report of PricewaterhouseCoopers AG on financial statement schedule | F-83 |
| Schedule II—valuation and qualifying accounts | F-84 |

## Report of Independent Accountants

**To the Shareholders and Board of Directors
of the Novartis Group, Basel**

We have audited the consolidated financial statements (balance sheet, income statement, cash flow statement, statement of changes in equity and notes) of the Novartis Group as of December 31, 2001 and 2000 and for each of the three years in the period ended December 31, 2001, all expressed in Swiss francs.

These consolidated financial statements are the responsibility of the Board of Directors. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We confirm that we meet the Swiss legal requirements concerning professional qualification and independence.

Our audits were conducted in accordance with auditing standards promulgated by the profession and with International Standards on Auditing issued by the International Federation of Accountants (IFAC) and auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement. We have examined on a test basis evidence supporting the amounts and disclosures in the consolidated financial statements. We have also assessed the accounting principles used, significant estimates made and the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements give a true and fair view of the financial position, of the Novartis Group as of December 31, 2001 and 2000 and the results of operations and the cash flows for each of the three years in the period ended December 31, 2001 in accordance with International Accounting Standards and comply with Swiss law.

International Accounting Standards vary in certain respects from accounting principles generally accepted in the United States of America. The application of the latter would have affected the determination of the net income of the Group expressed in Swiss francs for each of the three years in the period ended December 31, 2001 and the determination of equity of the Novartis Group also expressed in Swiss francs at December 31, 2001 and 2000 to the extent summarized in note 33 to the consolidated financial statements.


PricewaterhouseCoopers AG




S.A.J. Bachmann            J. P. Herron


Basel, January 31, 2002

F-2

## NOVARTIS GROUP CONSOLIDATED FINANCIAL STATEMENTS
## CONSOLIDATED INCOME STATEMENTS
### (for the years ended December 31, 2001, 2000 and 1999)

| | Notes | 2001[1]<br>($ millions) | 2001<br>(CHF millions) | 2000<br>(CHF millions) | 1999<br>(CHF millions) |
|---|---|---|---|---|---|
| **Sales** . . . . . . . . . . . . . . . | 3/4 | **19,070** | **32,038** | **35,805** | **32,465** |
| Cost of goods sold . . . . . . | | (4,694) | (7,886) | (10,242) | (9,822) |
| **Gross profit** . . . . . . . . . . . | | **14,376** | **24,152** | **25,563** | **22,643** |
| Marketing & distribution . | | (6,606) | (11,098) | (10,945) | (9,561) |
| Research & development . | 3 | (2,494) | (4,189) | (4,657) | (4,246) |
| Administration & general<br>overheads . . . . . . . . . . . | | (945) | (1,588) | (2,078) | (1,493) |
| **Operating income** . . . . . . . | 3/4 | **4,331** | **7,277** | **7,883** | **7,343** |
| Income from associated<br>companies . . . . . . . . . . | 11 | 83 | 139 | 98 | 383 |
| Financial income, net . . . . | 5 | 635 | 1,067 | 1,091 | 793 |
| **Income before taxes and<br>minority interests** . . . . . | | **5,049** | **8,483** | **9,072** | **8,519** |
| Taxes . . . . . . . . . . . . . . . . | 6 | (857) | (1,440) | (1,820) | (1,833) |
| **Income before minority<br>interests** . . . . . . . . . . . . | | **4,192** | **7,043** | **7,252** | **6,686** |
| Minority interests . . . . . . . | | (11) | (19) | (42) | (27) |
| **NET INCOME** . . . . . . . . . | | **4,181** | **7,024** | **7,210** | **6,659** |
| Earnings per share . . . . . . | 7 | 1.63 | 2.73 | 2.75 | 2.50 |
| Diluted earnings per share | 7 | 1.62 | 2.72 | 2.75 | 2.50 |

[1]  The Swiss franc amounts have been translated into United States dollars at the rate of 1.68 to the dollar. Such translations should not be construed as representations that the Swiss franc amounts represent, or have been or could be converted into, United States dollars at that or any other rate.

The accompanying notes form an integral part of the consolidated financial statements.

**NOVARTIS GROUP CONSOLIDATED FINANCIAL STATEMENTS**
**CONSOLIDATED BALANCE SHEETS**
**(at December 31, 2001 and 2000)**

| | Notes | 2001[1] | 2001 | 2000 |
|---|---|---|---|---|
| | | ($ millions) | (CHF millions) | (CHF millions) |
| **ASSETS** | | | | |
| **Long-term assets** | | | | |
| Tangible fixed assets | 8 | 5,393 | 9,060 | 9,030 |
| Intangible assets | 9 | 3,898 | 6,548 | 5,830 |
| Investments in associated companies | 11 | 3,997 | 6,715 | 1,531 |
| Deferred taxes | 12 | 1,926 | 3,235 | 3,265 |
| Other financial assets | 13 | 4,182 | 7,027 | 5,601 |
| **Total long-term assets** | | **19,396** | **32,585** | **25,257** |
| **Current assets** | | | | |
| Inventories | 14 | 2,448 | 4,112 | 4,122 |
| Trade accounts receivable | 15 | 3,184 | 5,349 | 5,283 |
| Other current assets | 16 | 1,723 | 2,895 | 3,011 |
| Marketable securities | 10 | 6,367 | 10,697 | 11,720 |
| Cash and cash equivalents | | 6,635 | 11,147 | 8,803 |
| **Total current assets** | | **20,357** | **34,200** | **32,939** |
| **TOTAL ASSETS** | | **39,753** | **66,785** | **58,196** |
| **EQUITY AND LIABILITIES** | | | | |
| **Equity** | 17 | | | |
| Share capital | | 859 | 1,443 | 1,443 |
| Treasury shares | | (100) | (169) | (139) |
| Reserves | | 24,387 | 40,971 | 35,558 |
| **Total equity** | | **25,146** | **42,245** | **36,862** |
| **Minority interests** | | **62** | **104** | **78** |
| **Liabilities** | | | | |
| **Long-term liabilities** | | | | |
| Financial debts | 18 | 1,483 | 2,492 | 2,283 |
| Deferred taxes | 12 | 2,312 | 3,885 | 3,488 |
| Other long-term liabilities | 19 | 2,280 | 3,830 | 3,845 |
| **Total long-term liabilities** | | **6,075** | **10,207** | **9,616** |
| **Short-term liabilities** | | | | |
| Trade accounts payable | | 1,077 | 1,809 | 1,591 |
| Financial debts | 21 | 3,020 | 5,074 | 3,779 |
| Other short-term liabilities | 22 | 4,373 | 7,346 | 6,270 |
| **Total short-term liabilities** | | **8,470** | **14,229** | **11,640** |
| **Total liabilities** | | **14,545** | **24,436** | **21,256** |
| **TOTAL EQUITY AND LIABILITIES** | | **39,753** | **66,785** | **58,196** |

[1] The Swiss franc amounts have been translated into United States dollars at the rate of 1.68 to the dollar. Such translations should not be construed as representations that the Swiss franc amounts represent, or have been or could be converted into, United States dollars at that or any other rate.

The accompanying notes form an integral part of the consolidated financial statements.

F-4

### NOVARTIS GROUP CONSOLIDATED FINANCIAL STATEMENTS
### CONSOLIDATED CASH FLOW STATEMENTS
#### (for the years ended December 31, 2001, 2000 and 1999)

| | Notes | 2001[1] | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| | | ($ millions) | (CHF millions) | (CHF millions) | (CHF millions) |
| Net income | | 4,181 | 7,024 | 7,210 | 6,659 |
| Reversal of non-cash items | | | | | |
| Minority interests | | 11 | 19 | 42 | 27 |
| Taxes | | 857 | 1,440 | 1,820 | 1,833 |
| Depreciation and amortization on tangible fixed assets | | 577 | 969 | 1,196 | 1,261 |
| Intangible assets | | 464 | 780 | 309 | 248 |
| Financial assets | | 18 | 31 | | |
| Income from associated companies | | (83) | (139) | (98) | (383) |
| Gains on disposal of tangible and intangible assets | | (303) | (510) | (1) | (288) |
| Net financial income | | (635) | (1,067) | (1,091) | (793) |
| Interest and other financial receipts | | 464 | 779 | 1,944 | 1,816 |
| Interest and other financial payments | | (232) | (391) | (1,211) | (815) |
| Taxes paid | | (820) | (1,377) | (2,176) | (1,690) |
| **Cash flow before working capital changes** | | **4,499** | **7,558** | **7,944** | **7,875** |
| Restructuring payments | | (251) | (421) | (439) | (488) |
| Change in net current assets and other operating cash flow items | 23 | 122 | 205 | 107 | (494) |
| **Cash flow from operating activities** | | **4,370** | **7,342** | **7,612** | **6,893** |
| Investment in tangible fixed assets | | (804) | (1,351) | (1,353) | (1,371) |
| Proceeds from disposals of tangible fixed assets | | 164 | 275 | 347 | 286 |
| Purchase of intangible and financial assets | | (4,495) | (7,552) | (3,149) | (733) |
| Proceeds from disposals of intangible and financial assets | | 923 | 1,550 | 471 | 385 |
| Acquisition/divestment of subsidiaries | 24 | (101) | (169) | (1,371) | 239 |
| Acquisition of minorities | | (1) | (1) | | (68) |
| Proceeds from disposals of marketable securities | | 1,531 | 2,573 | 4,839 | (1,755) |
| **Cash flow used for investing activities** | | **(2,783)** | **(4,675)** | **(216)** | **(3,017)** |
| Acquisition of treasury shares | | (2,290) | (3,848) | (1,165) | (1,919) |
| Proceeds from issue of options on Novartis shares | | 2,414 | 4,056 | | |
| Change in long-term financial debts | | 749 | 1,258 | (124) | (336) |
| Change in short-term financial debts | | 222 | 374 | (1,402) | (130) |
| Dividends paid | | (1,306) | (2,194) | (2,064) | (1,935) |
| **Cash flow used for financing activities** | | **(211)** | **(354)** | **(4,755)** | **(4,320)** |
| Net effect of currency translation on cash and cash equivalents | | 19 | 31 | (119) | 74 |
| **Net change in cash and cash equivalents** | | **1,395** | **2,344** | **2,522** | **(370)** |
| **Cash and cash equivalents at the beginning of the year** | | **5,240** | **8,803** | **6,281** | **6,651** |
| **Cash and cash equivalents at end of the year** | | **6,635** | **11,147** | **8,803** | **6,281** |

---

[1] The Swiss franc amounts have been translated into United States dollars at the rate of 1.68 to the dollar. Such translations should not be construed as representations that the Swiss franc amounts represent, or have been or could be converted into, United States dollars at that or any other rate.

The accompanying notes form an integral part of the consolidated financial statements.

F-5

NOVARTIS GROUP CONSOLIDATED FINANCIAL STATEMENTS

CONSOLIDATED STATEMENT OF CHANGES IN EQUITY

(for the years ended December 31, 2001, 2000 and 1999)

| | Notes | Share premium | Retained earnings | Cumulative translation differences | Fair value of deferred cash flow hedges | Total reserves | Share capital | Treasury shares | Total equity |
|---|---|---|---|---|---|---|---|---|---|
| | | | | (in CHF millions) | | | | | |
| **January 1, 1999** . . . . . . . . | | **4,379** | **27,660** | **(1,971)** | | **30,068** | **1,443** | **(115)** | **31,396** |
| Change in accounting policy on employee benefits . . . . | 25a | | 1,071 | | | 1,071 | | | 1,071 |
| Dividends to third parties . . . | 25b | | (1,935) | | | (1,935) | | | (1,935) |
| Acquisition of treasury shares | | (1,904) | | | | (1,904) | | (15) | (1,919) |
| Translation effects . . . . . . . . | | | | 1,944 | | 1,944 | | | 1,944 |
| Net income . . . . . . . . . . . | | | 6,659 | | | 6,659 | | | 6,659 |
| **December 31, 1999** . . . . . . | | **2,475** | **33,455** | **(27)** | | **35,903** | **1,443** | **(130)** | **37,216** |
| Dividends to third parties . . . | 25b | | (2,064) | | | (2,064) | | | (2,064) |
| Transfer of share premium . . | 25c | (2,186) | 2,186 | | | | | | |
| Acquisition of treasury shares | | | (1,156) | | | (1,156) | | (9) | (1,165) |
| Effect of Agribusiness spin-off . . . . . . . . . . . . . . . . . | 25d | | (3,655) | (109) | | (3,764) | | | (3,764) |
| Translation effects . . . . . . . . | 25e | | | (571) | | (571) | | | (571) |
| Net income . . . . . . . . . . . | | | 7,210 | | | 7,210 | | | 7,210 |
| **December 31, 2000** . . . . . . | | **289** | **35,976** | **(707)** | | **35,558** | **1,443** | **(139)** | **36,862** |
| Fair value adjustments on financial instruments . . . . | 25f | | 1,054 | | (20) | 1,034 | | | 1,034 |
| Dividends to third parties . . . | 25b | | (2,194) | | | (2,194) | | | (2,194) |
| Acquisition of treasury shares | 25g | | (3,825) | | | (3,825) | | (30) | (3,855) |
| Issue of call options on Novartis shares . . . . . . . . | 25h | 3,102 | | | | 3,102 | | | 3,102 |
| Issue of put options on Novartis shares . . . . . . . . | 25i | 909 | | | | 909 | | | 909 |
| Translation effects . . . . . . . . | 25e | | | (637) | | (637) | | | (637) |
| Net income . . . . . . . . . . . | | | 7,024 | | | 7,024 | | | 7,024 |
| **December 31, 2001** . . . . . . . | | **4,300** | **38,035** | **(1,344)** | **(20)** | **40,971** | **1,443** | **(169)** | **42,245** |

The accompanying notes form an integral part of the consolidated financial statements.

## NOTES TO THE NOVARTIS GROUP
## CONSOLIDATED FINANCIAL STATEMENTS

### 1.  Accounting policies

The Novartis Group ("Group" or "Novartis") consolidated financial statements are prepared in accordance with the historical cost convention and comply with the standards formulated by the International Accounting Standards Board (IASB) and its predecessor organization the International Accounting Standards Committee (IASC) and the following significant accounting policies.

The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual outcomes could differ from those estimates.

**Changes in accounting principles:**    IASB and IASC have issued a number of new standards in recent years. The following are the most significant for the Novartis Group.

With effect from January 1, 1999, the Group has adopted revised IAS 19 relating to employee benefits. The most significant change is that the discount rate used to value the defined benefit obligation is now the current long-term rate at the balance sheet date instead of a long-term average interest rate. The transitional provisions of this Standard require that any unrecognized surpluses in the funded plans, using the appropriately revised actuarial assumptions, are recognized immediately. Furthermore, the new actuarial assumptions produced deficits in certain funds, which have also been recognized immediately.

As permitted by IAS, the Group has chosen to record the impact of this change in accounting policy, net of any deferred tax consequences, as a net credit to Group equity at January 1, 1999. For practicality reasons no restatement of prior year amounts has been made.

The following are the significant standards, which were adopted by the Novartis Group from January 1, 2000:

- IAS 36 "Impairment of Assets"

- IAS 37 "Provisions, Contingent Liabilities and Contingent Assets"

- IAS 38 "Intangible Assets"

The adoption of these standards did not have any significant impact on the comparability of the 2000 consolidated financial statements with those of 1999.

The Group adopted IAS 39 "Financial Instruments: Recognition and Measurement" from January 1, 2001. This involved the recording in the balance sheet of the unrealized gains on the available-for-sale marketable securities and derivatives portfolios.

**Scope of consolidation:**    The financial statements include all companies which Novartis AG, Basel, directly or indirectly controls (generally over 50% of voting interest).

Special purpose entities, irrespective of their legal structure, are consolidated in instances where the Group has the power to govern the financial and operating policies of an entity so as to obtain benefits from its activities. As permitted by IAS, equity compensation and post-employment plans are not consolidated.

Investments in associated companies, (generally investments of between 20% and 50% in a company's voting shares) and joint ventures are accounted for by using the equity method.

F-7

## NOTES TO THE NOVARTIS GROUP
## CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### 1.  Accounting policies (Continued)

**Principles of consolidation:**  The annual closing date of the individual financial statements is December 31. The financial statements of consolidated companies operating in highly inflationary economies are adjusted to eliminate the impact of high inflation.

The purchase method of accounting is used for acquired businesses. Companies acquired or disposed of during the year are included in the consolidated financial statements from the date of acquisition or up to the date of disposal.

The Group was formed on December 20, 1996 when all assets and liabilities of Sandoz AG and Ciba-Geigy AG were transferred by universal succession to Novartis AG. The transaction was structured as a merger of equals based on an exchange of shares, providing former Sandoz AG shareholders with 55% and former Ciba-Geigy AG shareholders with 45% of the new company. The uniting of interests method was used for this transaction. The merger was consummated before the effective date of Interpretation 9 of the SIC on accounting for business combinations; if it were undertaken today, it might require a different accounting treatment.

Significant intercompany income and expenses, including unrealized gross profits from internal Novartis transactions, and intercompany receivables and payables have been eliminated.

**Revenue and expense recognition:**  Sales are recognized on delivery or on providing services to third parties and are reported net of sales taxes and rebates. Provisions for rebates to customers are recognized in the same period that the related sales are recorded based on the contract terms. Expenses of research and service contracts in progress are recognized based on their percentage of completion.

**Foreign currencies:**  The consolidated financial statements of Novartis are expressed in Swiss francs ("CHF" or "Swiss francs"). The local currency has primarily been used as the reporting currency throughout the world.

The Group accounts for foreign currency in accordance with IAS 21 (revised) and IAS 29.

In the respective subsidiary financial statements, monetary assets and liabilities denominated in foreign currencies are translated at the rate prevailing at the balance sheet date. Transactions are recorded using the approximate exchange rate at the time of the transaction. All resulting foreign exchange transaction gains and losses are recognized in the subsidiary's income statement.

Income, expense and cash flows of the consolidated companies have been translated into Swiss francs using average exchange rates. The balance sheets are translated using the year end exchange rates. Translation differences arising from movements in the exchange rates used to translate equity and long-term internal financing and net income are allocated to reserves.

**Derivative financial instruments:**  The Group adopted IAS 39—*Financial Instruments: Recognition and Measurement* from January 1, 2001. Under IAS 39 derivative financial instruments are initially recognized in the balance sheet at cost and subsequently remeasured to their fair value.

The method of recognizing the resulting gain or loss is dependent on whether the derivative contract is designed to hedge a specific risk and qualifies for hedge accounting. On the date a derivative contract is entered into, the Group designates certain derivatives as either a) a hedge of the fair value of a recognized asset or liability (fair value hedge), or b) a hedge of a forecasted transaction (cash flow hedge) or firm commitment or c) a hedge of a net investment in a foreign entity.

## NOTES TO THE NOVARTIS GROUP
## CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**1.   Accounting policies (Continued)**

Changes in the fair value of derivatives which are fair value hedges and that are highly effective are recognized in the income statement, along with any changes in the fair value of the hedged asset or liability that is attributable to the hedged risk. Changes in the fair value of derivatives in cash flow hedges are recognized in equity. Where the forecasted transaction or firm commitment results in the recognition of an asset or liability, the gains and losses previously included in equity are included in the initial measurement of the asset or liability. Otherwise, amounts recorded in equity are transferred to the income statement and classified as revenue or expense in the same period in which the forecasted transaction affects the income statement.

Hedges of net investments in foreign entities are accounted for similarly to cash flow hedges. The Group hedges certain net investments in foreign entities with foreign currency borrowings. All foreign exchange gains and losses arising on translation are recognized in equity and included in cumulative translation differences.

Certain derivative instruments, while providing effective economic hedges under the Group's policies, do not qualify for hedge accounting. Changes in the fair value of any derivative instruments that do not qualify for hedge accounting under IAS 39 are recognized immediately in the income statement.

When a hedging instrument expires or is sold, or when a hedge no longer meets the criteria for hedge accounting, any cumulative gain or loss existing in equity at that time remains in equity and is recognized in the income statement when the committed or forecasted transaction is ultimately recognized in the income statement. However, if a forecasted or committed transaction is no longer expected to occur, the cumulative gain or loss that was recognized in equity is immediately transferred to the income statement.

The purpose of hedge accounting is to match the impact of the hedged item and the hedging instrument in the income statement. To qualify for hedge accounting, the hedging relationship must meet several strict conditions with respect to documentation, probability of occurrence, hedge effectiveness and reliability of measurement. At the inception of the transaction the Group documents the relationship between hedging instruments and hedged items, as well as the risk management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives designed as hedges to specific assets and liabilities or to specific firm commitments or forecasted transactions. The Group also documents its assessment, both at the hedge inception and on an ongoing basis, as to whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in fair values or cash flows of hedged items.

The Group's previous policy on accounting for derivative instruments not considered to be hedges was to value these at the lower of cost on inception and fair value on a portfolio basis. A net unrealized loss was included in the current year's result. A net unrealized gain was not recorded.

The Group's previous policy on accounting for derivative financial instruments considered to be hedges was very similar to IAS 39 requirements although the conditions for hedge effectiveness were less strict.

## NOTES TO THE NOVARTIS GROUP
## CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### 1. Accounting policies (Continued)

**Tangible fixed assets:**   Tangible fixed assets have been valued at cost of acquisition or production cost and depreciated on a straight-line basis to the income statement, over the following estimated useful lives:

| | |
|---|---|
| Buildings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 to 40 years |
| Machinery and equipment . . . . . . . . . . . . . . . . . | 10 to 20 years |
| Furniture and vehicles . . . . . . . . . . . . . . . . . . . . | 5 to 10 years |
| Computer hardware . . . . . . . . . . . . . . . . . . . . . . | 3 to 7 years |

Land is valued at acquisition cost, except if held under long-term lease arrangements, when it is amortized over the life of the lease. Land held under long-term lease agreements relates to upfront payments to lease land on which certain of the Group's buildings are located. Additional costs which extend the useful life of the tangible fixed assets are capitalized. Financing costs associated with the construction of tangible fixed assets are not capitalized. Tangible fixed assets which are financed by leases giving rights to use the assets as if owned are capitalized at their estimated cost at the inception of the lease, and depreciated in the same manner as other tangible fixed assets.

Long-lived assets, including identifiable intangibles and goodwill, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. When such events or changes in circumstances indicate the asset may not be recoverable, the Group estimates the future cash flows expected to result from the use of the asset and its eventual disposition. If the sum of such expected discounted future cash flows is less than the carrying amount of the asset, an impairment loss is recognized for the amount by which the asset's net book value exceeds its fair market value. For purposes of assessing impairment, assets are grouped at the lowest level for which there are separately identifiable cash flows. Fair value can be based on sales of similar assets, or other estimates of fair value such as discounting estimated future cash flows. Considerable management judgment is necessary to estimate discounted future cash flows. Accordingly, actual outcomes could vary significantly from such estimates.

**Intangible assets:**   These are valued at their cost and reviewed periodically and adjusted for any diminution in value as noted in the preceding paragraph. Any resulting impairment loss is recorded in the income statement in general overheads. In the case of business combinations, the excess of the purchase price over the fair value of net identifiable assets acquired is recorded as goodwill in the balance sheet. Goodwill, which is denominated in the local currency of the related acquisition, is amortized to income through administration and general overheads on a straight-line basis over its useful life. The amortization period is determined at the time of the acquisition, based upon the particular circumstances, and ranges from 5 to 20 years. Goodwill relating to acquisitions arising prior to January 1, 1995 has been fully written off against reserves.

Management determines the estimated useful life of goodwill based on its evaluation of the respective companies at the time of the acquisition, considering factors such as existing market share, potential sales growth and other factors inherent in the acquired companies.