# ORGANOGENESIS INC.

## CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except share and per share data)

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 1998 | 1999 | 2000 |
| **Revenues:** | | | |
| Research, development and milestone support from related party | $ 6,750 | $ - | $ 6,057 |
| Product sales to related party | 1,082 | 1,844 | 2,957 |
| Research and development grants | - | 101 | 1,065 |
| Other revenues | 107 | 731 | 161 |
| Total Revenues | 7,939 | 2,676 | 10,240 |
| **COST AND EXPENSES:** | | | |
| Cost of product sales to related party | - | 3,773 | 6,421 |
| Research and development | 17,542 | 19,066 | 17,511 |
| General and administrative | 5,486 | 7,808 | 7,638 |
| Total Costs and Expenses | 23,028 | 30,647 | 31,570 |
| LOSS FROM OPERATIONS | (15,089) | (27,971) | (21,330) |
| **OTHER INCOME (EXPENSE):** | | | |
| Interest income | 1,058 | 902 | 1,159 |
| Interest expense | - | (1,281) | (2,092) |
| NET LOSS BEFORE CUMULATIVE EFFECT OF CHANGE IN ACCOUNTING PRINCIPLE | (14,031) | (28,350) | (22,263) |
| Cumulative effect of adopting Staff Accounting Bulletin 101 ("SAB 101") | - | - | (6,342) |
| NET LOSS | $ (14,031) | $ (28,350) | $ (28,605) |
| Net loss per common share - basic and diluted before cumulative effect of change in accounting principle | $ (0.48) | $ (0.93) | $ (0.66) |
| Cumulative effect of adopting SAB 101 | | | (0.19) |
| Net loss per common share - basic and diluted | $ (0.48) | $ (0.93) | $ (0.85) |
| Weighted average number of common shares outstanding - basic and diluted | 29,453,104 | 30,484,982 | 33,536,507 |
| **PRO FORMA AMOUNTS ASSUMING SAB 101 IS APPLIED RETROACTIVELY:** | | | |
| Revenues | $ 8,222 | $ 3,733 | |
| Net loss | (13,748) | (27,293) | |
| Net loss per common share - basic and diluted | $ (0.47) | $ (0.90) | |

The accompanying notes are an integral part of the consolidated financial statements.

25

## ORGANOGENESIS INC.

### CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands, except share data)

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 1998 | 1999 | 2000 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss | $(14,031) | $(28,350) | $(28,605) |
| Adjustments to reconcile net loss to cash flows used in operating activities: | | | |
| Depreciation and amortization | 1,474 | 1,741 | 2,520 |
| Issuance of stock options and warrants for services | - | 432 | - |
| Amortization of warrants and deferred debt issuance costs relating to long-term convertible debt | - | 338 | 505 |
| Issuance of treasury stock for purchase of incomplete technology | - | 900 | - |
| Issuance of common stock for interest on convertible debt | - | 705 | 1,373 |
| Cumulative effect of adopting SAB 101 | - | - | 6,342 |
| Changes in assets and liabilities: | | | |
| Inventory | - | (176) | (471) |
| Other current assets and receivable from related party | (244) | (1,187) | 369 |
| Accounts payable | 393 | 342 | 1,000 |
| Accrued expenses and other liabilities | 821 | 1,605 | (458) |
| Deferred revenue | - | - | (1,057) |
| Cash used in operating activities | (11,587) | (23,650) | (18,482) |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Purchases of property and equipment | (2,464) | (5,767) | (3,397) |
| Purchases of investments | (16,224) | (23,728) | - |
| Sales/maturities of investments | 9,247 | 29,805 | 4,068 |
| Cash provided by (used in) investing activities | (9,441) | 310 | 671 |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from issuance of long-term convertible debt | - | 20,000 | - |
| Deferred debt issuance costs | - | (575) | - |
| Proceeds (payment) of term loan | - | 4,728 | (394) |
| Preferred stock redeemed in cash | - | - | (6,180) |
| Proceeds from sale of preferred stock - net | 19,117 | - | - |
| Proceeds from sale of common stock - net | 6,000 | - | 15,930 |
| Proceeds from exercise of stock options | 1,021 | 813 | 12,267 |
| Purchase of treasury stock | (391) | (951) | - |
| Cash provided by financing activities | 25,747 | 24,015 | 21,623 |
| | | | |
| Increase in cash and cash equivalents | 4,719 | 675 | 3,812 |
| Cash and cash equivalents, beginning of year | 333 | 5,052 | 5,727 |
| Cash and cash equivalents, end of year | $ 5,052 | $ 5,727 | $ 9,539 |
| | | | |
| Supplemental disclosure of cash flow information: | | | |
| Interest paid in cash during the year | $ - | $ 28 | $ 380 |

Supplemental disclosure of noncash financing activities:
In August 2000, we issued 176,536 shares of common stock for $2,500 face
value convertible notes, plus accrued interest.


The accompanying notes are an integral part of the consolidated financial
statements.

26

ORGANOGENESIS INC.

CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)
--------------------------------------------------------------
(In thousands)

For the Years Ended December 31, 1998, 1999 and 2000

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | | Total Stockholders' Equity (Deficit) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | Shares | Amount | |
| Balance - December 31, 1997 | 23,160 | $232 | $ 98,277 | $ (86,986) | - | $ - | $ 11,523 |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | 146 | 2 | 1,019 | | | | 1,021 |
| One-for-four common stock dividend | 5,826 | 58 | (58) | | | | - |
| Sale of Series C preferred stock-net | | | 19,117 | | | | 19,117 |
| Conversion of Series C preferred stock | 1,136 | 11 | (11) | | | | |
| Sale of common stock to related party | 212 | 2 | 5,998 | | | | 6,000 |
| Purchase of treasury stock | | | | | 40 | (391) | (391) |
| Net loss | | | | (14,031) | | | (14,031) |
| Balance - December 31, 1998 | 30,480 | 305 | 124,342 | (101,017) | 40 | (391) | 23,239 |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | 120 | 1 | 812 | | | | 813 |
| Issuance of warrants with convertible debt | | | 2,318 | | | | 2,318 |
| Series C convertible preferred stock to be redeemed in cash | | | (6,180) | | | | (6,180) |
| Issuance of common stock for interest on convertible debt | 89 | 1 | 704 | | | | 705 |
| Issuance of stock options and warrants to consultants | | | 432 | | | | 432 |
| Purchase of incomplete technology | | | 462 | | (50) | 538 | 1,000 |
| Purchase of treasury stock | | | | | 95 | (951) | (951) |
| Net loss | | | | (28,350) | | | (28,350) |
| Balance - December 31, 1999 | 30,689 | 307 | 122,890 | (129,367) | 85 | (804) | (6,974) |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | 2,534 | 25 | 12,242 | | | | 12,267 |
| Issuance of common stock for interest on convertible debt | 90 | 1 | 1,372 | | | | 1,373 |
| Issuance of common stock for convertible debt | 172 | 2 | 2,223 | | | | 2,225 |
| Sale of common stock | 1,089 | 11 | 15,919 | | | | 15,930 |
| Net loss | | | | (28,605) | | | (28,605) |
| Balance - December 31, 2000 | 34,574 | $346 | $154,646 | $(157,972) | 85 | $(804) | $ (3,784) |

The accompanying notes are an integral part of the consolidated financial statements.

27

233

ORGANOGENESIS INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NATURE OF BUSINESS
-------------------

Organogenesis Inc. - a tissue engineering company - designs, develops and manufactures medical products containing living cells and/or natural connective tissue. We are the developer and manufacturer of the only mass-produced product containing living human cells to gain FDA marketing approval. Our product development focus includes living tissue replacements, a cell-based organ assist device and other tissue-engineered products.

Our lead product, Apligraf living skin substitute, gained FDA marketing approval for use in the treatment of healing-resistant venous leg ulcers in 1998. In June 2000, Apligraf was approved for use in the treatment of healing-resistant diabetic foot ulcers. Novartis Pharma AG ("Novartis") has exclusive global Apligraf marketing rights. In addition to being marketed in the US, Apligraf is also available in select international markets. Novartis expects to submit for marketing approval across the European Union in the Spring of 2001.

Our research and development pipeline includes a living dermal replacement product candidate, Vitrix, which we anticipate beginning human pivotal clinical trials in Spring 2001, a coronary vascular graft and a liver assist device. Additionally, a business unit - Technology Ventures - has been formed in 2000 to commercialize, through partnerships and distributorships, our engineered collagen and conditioned medium technologies. Transactions through Technology Ventures have not been significant to date.

We have a wholly-owned subsidiary, ECM Pharma/TM/, Inc. ECM Pharma was established to discover, develop and commercialize human therapeutics based on the extracellular matrix. We also have a wholly-owned investment subsidiary, Dan Capital Corporation, which holds a substantial portion of our cash, cash equivalents and investments.

We are subject to risks common to entities in the biotechnology industry, including, but not limited to, the following uncertainties:

- Continued operating losses and the time required to achieve profitability;
- Market acceptance of our products and successful marketing and selling of Apligraf by Novartis;
- Development by competitors of new technologies or products that are more effective than ours;
- Dependence on our strategic relationships to market our products;
- Compliance with FDA regulations and similar foreign regulatory bodies;
- Protection of proprietary technology through patents and risks of infringement claims by third parties;
- Manufacture and sale of products in sufficient volume to realize a satisfactory margin;
- Continued availability of raw material for products;
- Dependence on and retention of key personnel;
- Availability of sufficient product liability insurance;
- Adequate third-party reimbursement for products;
- Stock price volatility and fluctuation;
- Availability of additional capital on acceptable terms, if at all;
- Affect of anti-takeover measures on the value of our stock;
- Affect of outstanding options, warrants and convertible debt on the value of our stock; and
- Risk of failure of clinical trials for future indications of Apligraf and for Vitrix and other products.

28

234

Based upon our current plans, we believe existing working capital at December 31, 2000, together with the proceeds of product and other revenues in 2001 and proceeds available from exercising a portion or all of a $20,000,000 equity security put with Novartis, which is at our discretion, will be sufficient to finance operations through at least the first quarter of 2002. We expect to raise additional funds in 2001 through equity financing. However, this statement is forward-looking and changes may occur that would significantly decrease available cash before such time. Factors that may change our cash requirements include:

- Sales volume forecasts not achieved;
- Delays in obtaining regulatory approvals of products in different countries, if needed, and subsequent timing of product launches;
- Delays in commercial acceptance and reimbursement when product launches occur;
- Changes in the progress of research and development programs; and
- Changes in the resources devoted to outside research collaborations or projects, self-funded projects, proprietary manufacturing methods and advanced technologies.

Any of these events could adversely impact our capital resources, requiring us to raise additional funds. Management believes that additional funds may be available through equity or debt financing, strategic alliances with corporate partners, capital lease arrangements, or other sources of financing in the future. There can be no assurances that these funds will be available when required on terms acceptable to us, if at all. If adequate funds are not available when needed, we would need to delay, scale back or eliminate certain research and development programs or license to third parties certain products or technologies that we would otherwise undertake ourselves, resulting in a potential adverse effect on our financial condition and results of operations.

SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
-------------------------------------------

PRINCIPLES OF CONSOLIDATION AND USE OF ESTIMATES

The consolidated statements include the accounts of the Company and its wholly-owned subsidiaries. All intercompany activity has been eliminated. Certain reclassifications have been made for consistent presentation. These reclassifications have no impact on financial position or results of operations. We prepare our financial statements under generally accepted accounting principles that require us to make estimates and assumptions that affect amounts reported and the related disclosures. Actual results could differ from those estimates.

REVENUE RECOGNITION

We previously recognized up front non-refundable research and development support payments as revenue when received. During the year ended December 31, 2000, the Company changed its method of accounting for up front non-refundable research and development support payments to recognize such amounts over the term of the related collaboration with Novartis. This change in accounting principle is in accordance with guidance provided in SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), which was issued in December 1999 and summarizes certain of the Staff's views in applying generally accepted accounting principles to revenue recognition in financial statements. We adopted SAB 101 in the fourth quarter of 2000, effective January 1, 2000, and recorded a cumulative effect of a change in accounting principle related to all up front non-refundable research and development support payments recognized in prior periods of $6,342,000. Of this amount, $1,057,000 was recognized as revenue in 2000, and the remainder will be recognized ratably through December 2005, in accordance with SAB 101's guidance.

Revenues from non-refundable milestone payments are recognized when proceeds are received and the related costs and effort are considered substantial. During the second quarter of 2000, we recognized $5,000,000 of milestone support revenue.

Revenue from product sales are recognized upon shipment or, in certain cases, after fulfillment of firm purchase orders in accordance with the Manufacturing and Supply Agreement with Novartis and after risk of ownership passes to the buyer, collection is probable and we have no performance obligations. Royalty revenue is recorded as earned. Grant revenue is recognized to the extent of allowable costs incurred. Deferred revenue arises from the difference between cash received and revenue recognized in accordance with these policies.

### RESEARCH AND DEVELOPMENT

All research and development costs aimed at the development of new products are expensed as incurred. In addition to research and development, this cost category includes clinical costs and operations support. Prior to 1999, commercial sales were not significant and the full cost of low volume production was included in this cost category.

### PATENTS

As a result of our research and development programs, we have a proprietary portfolio of patent rights and patent applications for a number of patents in the US and abroad. Such patent rights are of significant importance to protect our products and processes. For financial reporting purposes, all costs in connection with patent rights and patent applications have been expensed as incurred.

### INCOME TAXES

Research and development and other tax credits are recognized for financial reporting purposes when they are realized. Deferred taxes are determined based on the difference between the financial reporting and the tax bases of assets and liabilities using enacted income tax rates in effect in the years in which the differences are expected to reverse. However, the realizability of these deferred tax assets is not assured as it depends upon future taxable income. Accordingly, we have recorded a 100% valuation allowance against these assets. Tax credits will be recorded as a reduction in income taxes when utilized.

### NET LOSS PER COMMON SHARE

Net loss per common share (basic and diluted) is based on the weighted average number of common shares outstanding during each period. Potentially dilutive securities at December 31, 2000 include: stock options outstanding to purchase 3,737,019 common shares; warrants to purchase 900,000 common shares; and debt convertible into 1,694,968 common shares; however, such securities have not been included in the net loss per common share calculation because their effect would be antidilutive. Potentially dilutive securities at December 31, 1999 included: stock options outstanding to purchase 7,449,874 common shares; warrants to purchase 900,000 common shares; Series C preferred stock convertible into 213,638 common shares; and debt convertible into 1,957,384 common shares; however, such securities have not been included in the net loss per common share calculation because their effect would be antidilutive.

### CASH AND CASH EQUIVALENTS

Cash and cash equivalents consist of cash and money market funds that are convertible into a known amount of cash and carry an insignificant risk of change in value. These investments are highly liquid and have original maturities of less than three months.

### INVENTORY

Inventory is stated at the lower of cost or market, cost being standard cost, which approximates the first-in, first-out method of accounting.

30

PROPERTY AND EQUIPMENT

Equipment, furniture and fixtures, office equipment and leasehold improvements are stated at cost. Depreciation is provided using the straight-line method over three to ten years. Leasehold improvements are being amortized using the straight-line method over the term of the lease. Construction in progress represents costs incurred to date in connection with facility expansion activities and are capitalized until such facilities become operational. These costs are then amortized using the straight-line method over the remaining lease term. Interest cost incurred during the period of construction in progress relating to expansion of our main facility is capitalized. The interest cost capitalized for the period ended December 31, 1999 and 2000 was $150,000 and $197,000, respectively. No interest was capitalized in 1998.

Maintenance and repairs are charged to expense as incurred and betterments are capitalized. Upon retirement or sale, the cost of assets disposed of and their related accumulated depreciation are removed from the accounts. Any resulting gain or loss is credited or charged to operations.

LONG-LIVED ASSETS

Our policy regarding long-lived assets is to evaluate the recoverability or usefulness of these assets when the facts and circumstances suggest that these assets may be impaired. This analysis relies on a number of factors, including changes in strategic direction or market emphasis, business plans, regulatory developments, economic and budget projections, and operating results. The test of recoverability or usefulness is a comparison of the asset value to its expected cumulative net operating cash flow on the assets usefulness in research and development programs or operations over the remaining life of the asset. Any write-downs would be treated as permanent reductions in the carrying amount of the asset and an operating loss would be recognized.

STOCK-BASED COMPENSATION

Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation," allows us to continue to account for stock-based compensation arrangements under the provisions of Accounting Principles Board No. 25, "Accounting for Stock Issued to Employees," and disclose in a footnote the pro forma effects to net loss and net loss per share assuming the fair value accounting method of SFAS 123 was adopted. Accordingly, no compensation cost has been recognized from stock-based employee awards. Compensation expense for stock awards granted to non-employees is determined by assessing the fair value of the options granted (using an option-pricing model).

CONCENTRATION OF CREDIT RISK

Financial instruments, which potentially subject the Company to concentrations of credit risk, consist of cash, cash equivalents, high grade investments and receivable from Novartis. The Company has established guidelines that relate to credit quality, diversification, and maturity, and that limit exposure to any one issue of securities.

RESEARCH AGREEMENTS
--------------------

We have entered into various collaborative research agreements that are generally funded over a one or two-year period. Each agreement is reviewed at least annually and the amounts to be funded for the next period are then determined. Either party may cancel the agreement upon advance written notice. Total payments made by us to third parties under these agreements were $648,000, $662,000 and $542,000 for 1998, 1999 and 2000, respectively. All our research agreements are early stage today, but have the potential to develop into more material relationships in the future.

In April 1999, we purchased specific equipment and intellectual property, consisting of patents and laboratory documentation, from Baxter Healthcare Corporation relating to the research and development for the design and manufacturing of key mechanical components of an extracorporeal liver assist device. The purchase price consisted of the reissuance of 50,000 shares of common stock held in treasury. In May 1999, we filed a registration statement registering all 50,000 of these shares, 25,000 of which were subject to a one-year lock-up agreement. Additionally, we may be required to make a future cash payment that is contingent on the average closing price of our common stock over the twenty consecutive trading days immediately prior to the earlier of the date we receive FDA approval of an Investigational Device Exemption for a liver assist device or January 1, 2003. We will have no obligation to make such future cash payment if at any time during the period between April 2000 and the date such cash payment is otherwise payable by us, the value of the shares of common stock issued to Baxter is equal to or greater than $1,000,000. If this contingent payment is required in the future, such cash payment will reduce the value of the 50,000 shares issued. Total consideration is $1,000,000, of which $900,000 was recorded as purchase of incomplete technology and is included in research and development expenses and the remaining $100,000 capitalized to property and equipment. The purchase was made to strengthen our resources to our liver assist device program. The charge to purchase of incomplete technology was due to the early stage of the technology which has not provided proof of principle. Additionally, the time and cost to prove this principle is not known. We expect it will cost millions of dollars and take a minimum of 4 to 6 years before we could develop a product which might be approved for commercial sale. It is our intent that if proof of principle is established, we will seek a partnership for the project.

31

INVESTMENTS
------------

The investments held are classified as available-for-sale and are carried at cost plus accrued interest, which approximates fair market value and, accordingly, there was no adjustment to stockholders' equity. We use a specific identification cost method to determine the gross realized gains and losses on the sale of our securities. We also classify investments in accordance with their intended use. At December 31, 2000, the intended use of all investments is to fund working capital and plant expansion in the coming year. We invest excess cash in securities that have an A or A1 rating or better with a maximum maturity of two years.

The aggregate cost and fair market value of investments are as follows (in thousands):

| | December 31, 1999 | | December 31, 2000 | |
| Maturity | Amortized Cost | Market Value | Amortized Cost | Market Value |
| --- | --- | --- | --- | --- |
| Less than one year: | | | | |
| US Government and Agency bonds | $2,082 | $2,098 | $ - | $ - |
| Corporate and other debt securities | 503 | 503 | 1,015 | 1,013 |
| Certificates of deposit | 1,099 | 1,094 | 624 | 624 |
| Greater than one year: | | | | |
| US Government and Agency bonds | 1,005 | 972 | 1,005 | 1,001 |
| Corporate and other debt securities | 2,023 | 2,013 | - | - |
| Total Investments | $6,712 | $6,680 | $2,644 | $2,638 |

Inventory
----------

Inventory, at net realizable value, consisted of the following (in thousands):

| | December 31, 1999 | December 31, 2000 |
| --- | --- | --- |
| Raw materials | $ 348 | $ 488 |
| Work in process | 558 | 889 |
| | $ 906 | $1,377 |

Property and Equipment
-----------------------

Property and equipment consisted of the following (in thousands):

| | Estimated Useful Life (Years) | December 31, 1999 | December 31, 2000 |
| --- | --- | --- | --- |
| Equipment | 3-10 | $ 11,471 | $ 12,439 |
| Furniture, fixtures and office equipment | 3-5 | 2,042 | 2,765 |
| Leasehold improvements | Lease term | 4,277 | 11,004 |
| Construction-in-progress | | 5,021 | - |
| | | 22,811 | 26,208 |
| Less accumulated depreciation | | (11,080) | (13,600) |
| | | $ 11,731 | $ 12,608 |

Construction-in-progress begins to depreciate when it is put into service.

32

238

ACCRUED EXPENSES
-----------------

Accrued expenses consisted of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 1999 | 2000 |
| Compensation and employee benefits | $1,402 | $1,869 |
| Professional services | 825 | 734 |
| Accrued interest | 361 | 368 |
| Other | 850 | 611 |
| | ------ | ------ |
| | $3,438 | $3,582 |
| | ====== | ====== |

TERM LOAN AGREEMENT
-------------------

In November of 1999, we entered into a $5,000,000 term loan agreement with a commercial bank to finance the purchase of certain equipment, leasehold improvements and other items. Borrowings under the term loan are collateralized by a security interest in the items financed. The agreement provides for repayment of the principal amount of the loan in 12 equal quarterly installments commencing December 29, 2000, with final payment due on September 30, 2003. The loan bears interest at a fluctuating rate per annum that is equal to the prime rate in effect from time to time, or we may elect that all or any portion of any term loan be made as a LIBOR loan with an interest period of one month, two months, three months or six months with the interest rate being equal to LIBOR plus an applicable margin (175 to 225 basis points). We are required to comply with certain covenants relating to our outstanding term loans, involving limitations on future indebtedness, dividends and investments, and to maintain certain financial covenants pertaining to liquidity, capital base, and debt service coverage (or, alternatively, maintaining a minimum unencumbered cash balance). During 2000, we exercised our option to redeem all outstanding shares of Series C convertible preferred stock for cash and we did not maintain compliance with the liquidity covenant as of December 31, 1999. The bank granted a waiver from this covenant. After raising additional capital subsequent to December 31, 1999, we were in compliance with all covenants. At December 31, 1999, we borrowed approximately $4,728,000 against this term loan to finance certain research, manufacturing and office equipment and leasehold improvements. We had $4,334,000 outstanding at December 31, 2000. The weighted average interest rate paid during this period was 8.90%. This borrowing is collateralized by a security interest in the fixed assets financed.

Effective December 29, 2000, we amended our covenants for the period through July 1, 2001, to include the effect of exercising a portion or all of the $20,000,000 equity security put with Novartis in the financial covenants calculation. We anticipate raising additional funds that may be available through equity or debt financing, strategic alliances with corporate partners, capital lease arrangements, or other sources of financing in the future. However, if we fail to meet any of the financial covenants after April 30, 2001, we are required to exercise a portion or all of the equity security put with Novartis to maintain compliance.

The current portion of this term loan is $1,576,000 at December 31, 2000 and is included in current liabilities. Long-term future minimum term loan payments at December 31, 2000 are as follows (in thousands):

| | |
|---|---|
| 2002 | $1,576 |
| 2003 | 1,182 |
| | ------ |
| | $2,758 |
| | ====== |

33

239

COMMITMENTS
------------

    Lease Obligations

    We occupy our main office and manufacturing premises under a facility lease for 79,500 square feet of space in Canton, Massachusetts at an annual average base rent of approximately $790,000, plus operating expenses, that expires on September 30, 2004.  This lease has three options to extend the term for an additional five years per option.  Taxes, insurance and operating expenses are our responsibility under the terms of the lease. In May 1999, we entered into another facility lease for approximately 62,500 square feet of additional office and warehouse space in Canton, Massachusetts.  In June 2000, we amended this lease to terminate 42,000 square feet, leaving 20,500 square feet remaining at an annual average base rent of approximately $138,500, plus operating expenses, that expires on December 5, 2004.  This lease has three options to extend the term for an additional five years per option.  In total, we currently lease 100,000 square feet of space.

    Future minimum lease payments are as follows (in thousands):

| | |
|---|---:|
| 2001 | $   973 |
| 2002 | 988 |
| 2003 | 972 |
| 2004 | 758 |
| 2005 | - |
| Thereafter | - |
| | ------ |
| | $3,691 |
| | ====== |

    Rent of approximately $562,000, $800,000 and $1,065,000 was charged to expense during the years ended December 31, 1998, 1999 and 2000, respectively.

34

GRANTS

In November 1999, we received notice of grants to support two research projects: (1) $2,000,000 grant under the Advanced Technology Program of the National Institute for Standards and Technology ("NIST") to help support development of an effective liver assist device prototype of which we have received $769,000 in payments and expect to receive the remaining amount over the period through December 2001; and (2) $100,000 grant under the Small Business Innovation Research Program of the National Institutes of Health to support development of a vascular graft, which was fully received as of September 30, 2000. Both of these grants require that the United States federal government can access for its own purposes technology developed using the funding. A product developed based on the funding from the NIST grant must be manufactured substantially in the United States. In addition, we are subject to regular audit and reporting requirements. We have recorded research and development grant revenue of $101,000 and $1,065,000, during the years ended December 31, 1999 and 2000 respectively, relating to these research and development grants.

INCOME TAXES
-------------

The approximate tax effect of each type of temporary difference and carryforward is reflected in the following table (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 1999 | 2000 |
| Deferred tax assets and (liabilities): |  |  |
| Net operating loss carryforwards | $ 39,507 | $ 53,053 |
| Research and development credits and other credits | 4,782 | 5,516 |
| Depreciation | 8,669 | 13,215 |
| Other | 2,813 | 2,976 |
| Net deferred tax assets before valuation allowance | 55,771 | 74,760 |
| Valuation allowance | (55,771) | (74,760) |
| Net deferred assets after valuation allowance | $ 0 | $ 0 |

Since inception, the Company has generated net losses for which no related tax benefit has been realized.

As of December 31, 2000, the Company had federal and state net operating loss carryforwards of approximately $139,955,000 and $91,139,000 respectively, which may be available to offset future federal and state income tax liabilities and expire at various dates throughout 2019. The Company has recorded a deferred tax asset of approximately $22,513,000 reflecting the benefit of deductions from the exercise of stock options. This deferred tax asset has been fully reserved until it is more likely than not that the benefit from the exercise of stock options will be realized. The benefit from this $22,513,000 deferred tas asset will be recorded as a credit to additional paid-in-capital when realized. At December 31, 2000, the Company had federal and state tax credit carryforwards of approximately $3,769,000 and $2,648,000, respectively, which expire beginning in 2001 and 2006, respectively.

As required by Statement of Financial Accounting Standards No. 109, management of Organogenesis, Inc. has evaluated the positive and negative evidence bearing upon the realizability of its deferred tax assets, which are comprised principally of net operating loss and research and experimentation credit carryforwards. Management has determined that it is more likely than not that Organogenesis, Inc. will be unable to recognize the benefits of federal and state deferred tax assets and, as a result, a valuation allowance of approximately $74,760,000 has been established at December 31, 2000.

Ownership changes, as defined in Internal Revenue Code, may have limited the amount of net operating losses and research and development tax credit carryforwards that can be utilized annually to offset future taxable income. Subsequent ownership changes could further affect the limitation in future years.

35

241

Related Party Transactions and Other Agreements
------------------------------------------------

In January 1996, we entered into a collaborative agreement with Novartis granting Novartis exclusive global marketing rights to Apligraf. Under the agreement, we have received equity investments, non-refundable research, development and milestone support payments, product payments and other payments. During March 2000, we received $5,000,000 from Novartis, which represented a support payment received in advance of achievement of a milestone related to the diabetic foot ulcer indication. In June 2000, we recognized support revenue when achievement of the milestone was met upon FDA approval of Apligraf for use in diabetic foot ulcers. The following table summarizes by year all equity investments, non-refundable research, development and milestone support payments received to date. Product and other payments are included under the captions "Product sales to related party" and "Other revenues" in our financial statements.

| | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Equity investments | $ 5,000,000 | $        - | $ 6,000,000 | $    - | $        - |
| Up front non-refundable research and development support payments | 6,500,000 | 2,500,000 | 750,000 | - | - |
| Non-refundable milestone payments | - | - | 6,000,000 | - | 5,000,000 |
| Total | $11,500,000 | $2,500,000 | $12,750,000 | $    - | $5,000,000 |

During February 2001, we amended our collaborative agreement with Novartis, effective January 2, 2001. The amended agreement:

. Grants Novartis the right to purchase an exclusive option to negotiate terms to license Organogenesis's product Vitrix, soon to commence human pivotal trials, and also for a second living dermal replacement product currently in Organogenesis research;
. Provides Organogenesis with significantly higher payments for units of Apligraf;
. Grants Organogenesis the right for three years to sell, at its discretion, to Novartis up to $20 million in equity;
. Includes funding support from Novartis to upgrade Organogenesis's manufacturing facility and for the facility investment needed for approval and sale of Apligraf in the European Union;
. Includes funding support for Apligraf clinical development activities (e.g., to further broaden its approved uses); and
. Includes development funding support for each living dermal replacement product for which Novartis purchases an option to commence licensing negotiations.

We supply Novartis's global requirements for Apligraf and receive a product payment based on net product sales. Receivable from related party consists of manufacturing and royalty amounts due on product sales to Novartis, funding of certain programs by Novartis and reimbursement of certain test costs related to the manufacturing of the product. Novartis is billed weekly for payments due on product sales and on an as incurred basis for other billings.

We received $6,000,000 from Novartis in 1998 for approximately 240,000 shares of common stock. As a result of these equity investments and a prior equity investment of $5,000,000 for approximately 418,000 shares made in January 1996, Novartis holds approximately 1.9% of outstanding shares as of December 31, 2000.

During the first quarter of 1999, Novartis agreed to provide funding for certain programs to be conducted by us. We have recorded $572,000 and $162,000 for the period ended December 31, 1999 and 2000, respectively, relating to the initiation of these programs, which is included in other revenues.

36

In 1994, we signed a license agreement with Toyobo Ltd. granting Toyobo a license to manufacture and market TestSkin in Japan in exchange for royalty payments. Additionally, Toyobo may, but is not obligated to, purchase collagen and other products from us. Revenues under this arrangement are included in other revenues. This agreement is co-terminous with certain patents.

LICENSE AGREEMENT
------------------

Certain of our technologies are licensed under an exclusive patent license agreement with the Massachusetts Institute of Technology ("MIT"). The agreement with MIT covers certain US patents and corresponding patents in European and Far East countries. Pursuant to the MIT agreement, we have been granted an exclusive, worldwide license to make, use and sell the products covered by the patents and to practice the procedures covered by the patents. The MIT agreement requires us to pay to MIT a royalty on the cumulative net sales of licensed products ranging from 3% to 4.5% of annual sales.

CONVERTIBLE DEBT
------------------

On March 31, 1999, we completed a financing of $20,000,000 through the private placement of five-year convertible debentures and 400,000 warrants to purchase common stock. The debentures are convertible at a fixed price of $14.50 per share at any time on or after March 30, 2000. Interest on the debentures accrues at 7% annually, payable in cash, common stock (at the average trading price for the twenty trading days preceding the due date) or any combination thereof, at our option, semi-annually on September 30 and March 31 or on the date any of the principal outstanding under the notes has been converted into common stock. At our option, at any time on or after March 30, 2002, the debentures may be prepaid by conversion of the principal into common stock at the conversion price of $14.50, cash or any combination thereof and payment of any accrued interest as described above, provided that the average per share market value for the twenty consecutive trading days immediately preceding the date of prepayment equals or exceeds $38.67 per share. The notes mature on March 29, 2004 and are payable in cash. The warrants grant the right to purchase one share of common stock at the exercise price of $21.75 for each $50.00 in face value of the convertible notes at any time before March 30, 2004. Approximately $2,318,000 of the $20,000,000 financing was allocated to the estimated fair value of the warrants and is included in additional paid in capital. This amount is amortized as a non-cash charge to interest expense over the life of the debentures. Debt issuance costs are included in other assets and are amortized to interest expense over the life of the debentures.

In May 1999, we filed a registration statement for 2,096,333 shares of common stock issuable as follows: (1) 1,646,333 shares of common stock which may become issuable by reason of the conversion of the convertible debt, and accrued interest, (2) 400,000 shares which may become issuable upon the exercise of the warrants issued in the financing, and (3) 50,000 shares issued in connection with an asset purchase transaction. All shares have been reserved for issuance. In May 1999, the Securities and Exchange Commission declared this registration statement effective.

In August 2000, we issued 176,536 shares of common stock for $2,500,000 face value convertible notes, plus accrued interest. This conversion was a non-cash transaction.

37

STOCKHOLDERS' EQUITY
--------------------

PREFERRED STOCK

We have authorized 1,000,000 shares of preferred stock at December 31, 2000, comprised of the following designations:

- 250,000 shares Series A convertible preferred stock;
- 50,000 shares Series B Junior participating preferred stock;
- 200 shares Series C convertible preferred stock; and
- 699,800 shares authorized and unissued.

In March 1998, we completed a placement of 200 shares of Series C convertible preferred stock and warrant financing with two institutional investors at a price of $100,000 per share. Proceeds from the offering, net of placement agent fees and expenses, were approximately $19,117,000. In addition, the investors received three-year warrants to purchase an aggregate of 200,000 shares of common stock at $31.20 per share. The warrants may be exercised at any time prior to April 2001. In July 1998, the investors exercised their right to receive additional warrants to purchase 150,000 shares of common stock at $17.45 per share with an expiration date of March 26, 2001. We also issued a warrant to purchase an aggregate of 50,000 shares of common stock at $28.80 per share to the placement agent that expires March 25, 2001. The total fair value of all warrants was estimated to be approximately $2,509,000 and is included in additional paid-in capital.

In May, September and November 1998, an aggregate of $13,800,000 face amount of the Series C preferred stock was converted into common stock resulting in the issuance of approximately 1,136,000 shares of common stock. These conversions are non-cash transactions.

During March 2000, we redeemed for cash all outstanding shares of Series C convertible preferred stock for approximately $6,180,000.

COMMON STOCK

We have authorized 80,000,000 shares of common stock, of which there were 30,604,019 and 34,489,459 shares outstanding as of December 31, 1999 and 2000, respectively.

On February 14, 2000, the Securities and Exchange Commission declared effective a shelf registration for the placement of up to 3,000,000 shares of common stock with an aggregate offering price not to exceed $50,000,000. In February and March 2000, we completed private placements for 1,088,925 shares of common stock under this shelf registration yielding net proceeds of approximately $15,930,000.

In April 2000, we issued 44,035 shares of common stock for payment of interest on our long-term convertible debt. In October 2000, we issued 41,845 shares of common stock for payment of interest on our long-term convertible debt. In August 2000, we issued 176,536 shares of common stock for $2,500,000 face value convertible notes, plus accrued interest

The following one-for-four stock split accounted for as a stock dividend was declared by the Board of Directors during the past three years:

| Stock Dividend | Record Date | Payable Date | Common Shares Issued |
| -------------- | ----------- | ------------ | -------------------- |
| 25% | April 22, 1998 | April 29, 1998 | 5,826,000 |

All related share and per share data in the consolidated financial statements reflect all stock dividends for all periods presented, except for the Statements of Changes in Stockholders' Equity.

38

244

WARRANTS ISSUED TO A CONSULTANT

In October 1999, we executed an agreement granting warrants to purchase 100,000 shares of common stock at an exercise price of $10.00 per share to a consultant. These warrants were fully vested at December 31, 1999, with an expiration of five years. We recorded approximately $411,000 of expense as of December 31, 1999 relating to the fair value of these warrants (using an option-pricing model).

Treasury Stock
---------------

In September 1998, the Board of Directors authorized a common stock repurchase program. Repurchases are allowed through open-market transactions for up to 500,000 shares that will provide us with treasury shares for general corporate purposes. For the periods ended December 31, 1998 and 1999, we repurchased 40,000 and 95,000 shares of common stock for an aggregate purchase price of approximately $391,000 and $951,000, respectively. In April 1999, we reissued 50,000 shares of common stock held in treasury related to the purchase of technology (see "Purchase of Technology" note). We had in treasury 85,000 shares of common stock at a cost of $804,000 at December 31, 1999 and December 31, 2000, respectively.

In December 2000, the Board of Directors authorized a second common stock repurchase program for up to 500,000 additional shares. Subsequent to December 31, 2000, we repurchased 165,000 shares of common stock for an aggregate purchase price of approximately $1,367,000. The stock repurchase program may be discontinued at any time.

STOCKHOLDER RIGHTS PLAN
------------------------

In August 1995, the Board of Directors adopted a Stockholder Rights Plan and declared a dividend of one right for each outstanding share of common stock to stockholders of record on September 1, 1995. After adjusting for two one-for-four stock dividends distributed during 1997 and one one-for-four stock dividend distributed during 1998, there is approximately 0.51 of a right for each outstanding share of common stock. Each right only becomes exercisable and transferable apart from the common stock at the earlier of: (1) ten days after a person or group acquires beneficial ownership of 15% or more of outstanding common stock; or (2) ten business days following an announcement of a tender or exchange offer of 30% or more of outstanding stock.

Initially, each right, upon becoming exercisable, would entitle the holder to purchase one-thousandth of a share of Series B Junior participating preferred stock at an exercise price of $85, subject to adjustment. If a person or group acquires beneficial ownership of 15% or more of the outstanding shares of common stock, then each holder of a right (other than rights held by the acquiring person or group) would have the right to receive that number of shares of common stock which equals the exercise price of the right divided by one-half of the current market price of the common stock.

The rights may be redeemed for $0.01 per right at any time until the tenth day following the stock acquisition date. The rights will expire on September 1, 2005.

STOCK-BASED COMPENSATION
------------------------

At December 31, 2000, we had five stock-based compensation plans (collectively, Stock Option Plans), as described below. Consistent with the provisions prescribed by SFAS 123, the following are the pro forma net loss and net loss per common share (basic and diluted) for the years ended December 31, 1998, 1999 and 2000, respectively, had compensation cost for the Stock Option Plans been determined based on the fair value at the grant date for grants made in 1998, 1999 and 2000 (in thousands, except per share data):

39

|  | 1998 | | 1999 | | 2000 | |
| --- | --- | --- | --- | --- | --- | --- |
|  | As Reported | Pro Forma | As Reported | Pro Forma | As Reported | Pro Forma |
| Net loss | $(14,031) | $(17,985) | $(28,350) | $(33,335) | $(28,605) | $(34,990) |
| Net loss per common share (basic and diluted) | $ (0.48) | $ (0.61) | $ (0.93) | $ (1.09) | $ (0.85) | $ (1.04) |

The effects on 1998, 1999 and 2000 pro forma net loss and net loss per common share (basic and diluted) of expensing the estimated fair value of stock options may not be representative of the effects on reporting pro forma results for future years.

The weighted average fair value of options granted under the Stock Option Plans was estimated using the Black-Scholes option-pricing model. The Black-Scholes option-pricing model was developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, option-pricing models require the input of highly subjective assumptions, including expected stock price volatility. Because our employee stock options have characteristics significantly different from those of traded options and changes in the subjective input assumptions may materially affect the fair value estimate, in our opinion, the existing models do not necessarily provide a reliable single measure of the fair value of employee stock options.

The assumptions used to calculate the weighted average fair value of options granted during 1998, 1999 and 2000 are as follows:

|  | 1998 | 1999 | 2000 |
| --- | --- | --- | --- |
| Assumed life for options issued to employees (years) | 5.0 | 5.0 | 5.0 |
| Assumed life for options issued to directors and officers (years) | 7.0 | 7.0 | 7.0 |
| Risk-free interest rate | 5.3% | 5.8% | 5.9% |
| Volatility | 65.0% | 68.0% | 72.0% |
| Dividend yield | - | - | - |
| Weighted average fair value per common share of options granted during the year | $14.48 | $5.93 | $8.17 |

THE STOCK OPTION PLANS
-----------------------

In March 1999, the Board of Directors adopted the 1999 Nonqualified Stock Option Plan (the "1999 Plan") providing for the issuance of up to 1,000,000 shares of common stock subject to adjustment for any dividend, stock split or other relevant changes in capitalization. The Board of Directors' primary reason for adopting the 1999 Plan was to enhance our ability to retain and motivate key qualified persons who are officers, directors, and consultants. Under the 1999 Plan, the Compensation Committee of the Board of Directors may grant non-qualified stock options to officers, directors, and consultants. The Committee selects the individuals to whom options are granted and determines: (1) the number of shares of common stock covered by the option; (2) when the option becomes exercisable; (3) the duration of the option, which may not exceed ten years; and (4) the vesting period, which, for officers, will generally occur ratably over a five-year period beginning one year from the date of grant. All stock options held under this 1999 Plan fully vest upon a change in control, as defined in the plan.

In May 1995, a stock option plan was approved by shareholders providing for the issuance of up to 5,000,000 shares of common stock options to enable us to attract and retain key employees and consultants. Under the 1995 Plan, we may grant incentive and non-qualified stock options to officers, employees, consultants and advisors. The 1995 Plan, which took effect upon the expiration of the 1986 Stock Option Plan in August 1996, is administered by the compensation committee of the Board of Directors. This Committee selects the individuals to whom options are granted and determines: (1) the type of option to be granted; (2) the number of shares of common stock covered by the option; (3) when the option becomes exercisable; and (4) the duration of the option which, in the case of incentive stock options, may not exceed ten years. Vesting generally occurs ratably over a five-year period beginning one year from the date of

40

246

grant. No one person may be issued options to purchase more than 500,000 shares of common stock in any one calendar year. Stock options granted under the 1995 Plan may not be granted at an exercise price less than 100% of the fair market value of the common stock on the date of grant (or 110% of fair market value in the case of incentive stock options granted to employees holding 10% or more of voting stock). The aggregate fair market value (determined at the time of grant) of shares issuable pursuant to incentive stock options which first become exercisable in any calendar year by an employee may not exceed $100,000.

Our 1986 Stock Option Plan provided for the issuance of an aggregate of 4,882,812 shares of common stock for the granting of incentive and non-qualified stock. The 1986 Plan was also administered by a committee of the Board of Directors and had substantially the same terms and conditions as described under the 1995 Plan. In August 1996, the 1986 Plan expired and no further grants were made. All options outstanding on the expiration date remain in effect.

In 1994, a stock option plan for non-employee directors was approved by shareholders. Under the 1994 Director Plan, non-qualified stock options to purchase up to 488,281 shares of common stock may be granted to non-employee directors. The 1994 Director Plan provides that the option price per share be at fair market value and vest ratably over a five-year period beginning one year from the date of grant, with a duration not to exceed ten years.

The 1991 Director Stock Option Plan provided for the granting of options to purchase 244,141 shares of common stock by non-employee directors and terminated upon the adoption of the 1994 Director Plan. The options were granted at fair market value and were immediately exercisable, subject to repurchase, at the option price, in the event the optionee ceased to be a director. This repurchase right terminates and the shares vest ratably over a five-year period beginning one year from the date of grant. All options outstanding on the termination date remain in effect.

The following table presents the combined activity of all Stock Option Plans for the years ended December 31, 1998, 1999 and 2000:

|  | 1998 | | 1999 | | 2000 | |
|---|---|---|---|---|---|---|
|  | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price |
| Outstanding at beginning of period | 5,320,206 | $ 6.83 | 6,006,138 | $ 9.10 | 7,449,874 | $ 9.09 |
| Granted | 954,889 | 22.00 | 1,721,400 | 9.20 | 713,862 | 12.19 |
| Exercised | (148,413) | 6.39 | (110,262) | 6.59 | (2,520,763) | 4.82 |
| Cancelled | (120,544) | 12.56 | (167,402) | 12.38 | (1,905,954) | 14.14 |
| Outstanding at end of period | 6,006,138 | 9.10 | 7,449,874 | 9.09 | 3,737,019 | 10.02 |
| Exercisable at year end | 3,297,005 | 5.18 | 3,987,847 | 6.39 | 1,666,137 | 8.64 |
| Shares available for granting of options at end of period | 371,105 | | 1,832,702 | | 2,950,274 | |

41

247

The following table presents weighted average price and life information about significant option groups outstanding at December 31, 2000 for the Stock Option Plans:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
| --- | --- | --- | --- | --- | --- |
| | Number Outstanding | Weighted Average Remaining Contractual Life (Years) | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $ 2.458 - 3.738 | 189,932 | 2.1 | $ 3.30 | 189,932 | $ 3.30 |
| 3.891 - 6.144 | 343,808 | 3.2 | 4.97 | 343,808 | 4.97 |
| 6.605 - 9.875 | 1,630,932 | 7.5 | 7.46 | 674,088 | 7.55 |
| 10.00 - 14.88 | 1,167,563 | 8.2 | 12.16 | 299,996 | 11.74 |
| 15.00 - 21.28 | 215,033 | 7.3 | 18.57 | 81,163 | 18.47 |
| 24.05 - 31.00 | 189,751 | 7.3 | 25.14 | 77,150 | 25.14 |
| | 3,737,019 | 7.0 | 10.02 | 1,666,137 | 8.64 |

## THE 1991 EMPLOYEE STOCK PURCHASE PLAN

Under the 1991 Employee Stock Purchase Plan, a total of 366,211 shares of common stock are reserved for issuance (up to 30,000 shares may be issued in any one year). The purchase plan allows eligible employees the option to purchase common stock during two six-month periods of each year at 85% of the lower of the fair market value of the shares at the time the option is granted or is exercised. The term of this plan ends December 31, 2004. During 1998, 1999 and 2000, we issued a total of 5,046, 10,089 and 13,336 shares of common stock, respectively, under this purchase plan. Remaining shares available under this purchase plan were 294,910 as of December 31, 2000.

## EMPLOYEE SAVINGS PLAN

We have a 401(k) savings plan covering full-time employees who are eligible to participate upon hire. Under this savings plan, we may match employee contributions at management's discretion. Contributions made under the savings plan were approximately $62,000, $80,000 and $105,000 as of December 31, 1998, 1999 and 2000, respectively.

## FOURTH QUARTER RECLASSIFICATION

We reclassified $968,000 to cost of product sales during the fourth quarter of 2000, due to higher actual costs compared to standard costs. This adjustment had no effect on our net loss.

42

UNAUDITED QUARTERLY DATA
------------------------

During the year ended December 31, 2000, we changed our method of accounting for up front non-refundable research and development support payments in accordance with the guidance provided by SAB 101 (see "Revenue Recognition" note). The cumulative effect of adopting SAB 101 at January 1, 2000 amounted to $6,342,000 of additional loss and equivalent amount of deferred revenue; $1,057,000 of this amount was recognized as revenue in 2000 and $5,285,000 will be recognized as revenue in future periods.

The as Adjusted column reflects the cumulative effect of adopting SAB 101.

The following summarizes the unaudited quarterly results for the years ended December 31,

(in thousands, except per share data):

| 2000 | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter |
|---|---|---|---|---|---|---|---|
| | As Previously Reported | as Adjusted | As Previously Reported | as Adjusted | As Previously Reported | as Adjusted | |
| Revenues | $ 897 | $1,161 | $6,029 | $6,293 | $1,055 | $1,319 | $ 1,467 |
| Net loss before cumulative effect of change in accounting principle | 6,686 | 6,422 | 2,047 | 1,783 | 6,948 | 6,684 | 7,374 |
| Cumulative effect of adopting Staff Accounting Bulletin 101 ("SAB 101") | - | 6,342 | - | - | - | - | - |
| Net loss | 6,686 | 12,764 | 2,047 | 1,783 | 6,948 | 6,684 | 7,374 |
| Net loss per common share - basic and diluted before cumulative effect of change in accounting principle | (0.21) | (0.21) | (0.06) | (0.05) | (0.20) | (0.19) | (0.21) |
| Cumulative effect of adopting SAB 101 | - | (0.20) | - | - | - | - | - |
| Net loss per common share - basic and diluted | (0.21) | (0.41) | (0.06) | (0.05) | (0.20) | (0.19) | (0.21) |

| 1999 | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | as Adjusted | As Previously Reported | as Adjusted | As Previously Reported | as Adjusted | As Previously Reported | as Adjusted |
| Revenues | $ 486 | $ 750 | $ 624 | $ 888 | $ 708 | $ 972 | $ 858 | $1,123 |
| Net loss | 5,926 | 5,662 | 7,589 | 7,325 | 6,480 | 6,216 | 8,355 | 8,090 |
| Net loss per common share - basic and diluted | (0.19) | (0.19) | (0.25) | (0.24) | (0.21) | (0.20) | (0.27) | (0.27) |

43

ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
ACCOUNTING AND FINANCIAL DISCLOSURE

    None.

44

PART III

ITEM 10.   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

    The information required by this item is contained in our Proxy Statement
for the 2001 Annual Meeting of Stockholders under the captions "Information
About the Board of Directors", "Information About Executive Officers " and
"ELECTION OF DIRECTORS" and is incorporated herein by reference.

ITEM 11.   EXECUTIVE COMPENSATION

    The information required by this item is contained under the caption
"Information About Executive Officers" in our 2001 Proxy Statement and is
incorporated herein by reference.

ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND
MANAGEMENT

    The information required by this item is contained in our 2001 Proxy
Statement under the captions, "Information About Principal Stockholders" and
"Information About Executive Officers" and is incorporated herein by reference.

ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

    The information required by this item is contained under the caption
"Certain Transactions" in our 2001 Proxy Statement and is incorporated herein by
reference.

                                    45

PART IV

Item 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

   (A) The following documents are included in this annual report on Form 10-K

      (1) and (2). See "Index to Consolidated Financial Statements" at Item 8 to this Annual Report on Form 10-K. Other financial statement schedules have not been included because they are not applicable or the information is included in the financial statements or notes thereto.

      (3).  Exhibits

        The exhibits filed as a part of this Annual Report on Form 10-K are listed in the Exhibit Index immediately preceding the exhibits.  The Registrant has identified in the Exhibit Index each management contract and compensatory plan filed as an exhibit to this Form 10-K in response to Item 14(c) of Form 10-K.

   (B)  REPORTS ON FORM 8-K

    A current report on Form 8-K dated March 8, 2001 was filed by the Registrant reporting the following:

    .  An announcement that the federal Health Care Financing Administration, which administers Medicare, has classified Apligraf as a biologic for reimbursement purposes when applied in a doctor's office.

    .  An announcement of the signing of an amendment, effective January 2, 2001, to the Registrant's 1996 agreement with Novartis AG.

    .  Other matters discussed on a conference call dated February 27, 2001.

46

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ORGANOGENESIS INC.

BY:  /s/ PHILIP M. LAUGHLIN
Philip M. Laughlin
President and Chief Executive Officer

Date:  March 30, 2001

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| SIGNATURE | Title | Date |
| --- | --- | --- |
| /s/ PHILIP M. LAUGHLIN<br>Philip M. Laughlin | President, Chief Executive Officer and Director (Principal executive officer) | March 30, 2001 |
| /s/ JOHN J. ARCARI<br>John J. Arcari | Vice President, Finance and Administration, Chief Financial Officer, Treasurer and Secretary (Principal Financial and Accounting Officer) | March 30, 2001 |
| /s/ ALBERT ERANI<br>Albert Erani | Director and Chairman of the Board | March 30, 2001 |
| /s/ JAMES J. APOSTOLAKIS<br>James J. Apostolakis | Director | March 30, 2001 |
| <br>David A. Gardner | Director | March 30, 2001 |
| /s/ BERNARD A. MARDEN<br>Bernard A. Marden | Director | March 30, 2001 |
| <br>Glenn Nussdorf | Director | March 30, 2001 |
| /s/ BJORN R. OLSEN<br>Bjorn R. Olsen | Director | March 30, 2001 |
| /s/ MARGUERITE A. PIRET<br>Marguerite A. Piret | Director | March 30, 2001 |
| /s/ ANTON E. SCHRAFL<br>Anton E. Schrafl | Director | March 30, 2001 |

47