write-downs in the carrying amount of this asset and may negatively impact our results of operations.

### Revenue Recognition

Revenues from non-refundable milestone payments are recognized when proceeds are received and the related costs and effort are considered substantive. Revenue from product sales are recognized upon shipment after risk of ownership passes to the buyer, collection is probable and we have no performance obligations. Product revenues which are performance based are deferred until performance is achieved. Revenue from research grants is recognized to the extent of allowable costs incurred. Other revenues include funding received from Novartis for support activities related to the regulatory filing for Apligraf approval across the European Union and are recognized as costs are incurred. In addition, other revenues related to royalties are recorded as earned. Revenue for funding received from Novartis for reimbursement of manufacturing facility expenditures will be recognized ratably over the period that the completed manufacturing facility is used for production of Apligraf to be sold to Novartis. No such manufacturing facility revenues have been recognized to date. Novartis is the sole distributor of our lead product, Apligraf, and revenues depend substantially upon the efforts of Novartis, which may or may not be successful in marketing and selling Apligraf.

Results of Operations
---------------------

We are currently at low volume production for Apligraf. Although revenues are ramping-up, we expect production costs to exceed product sales for at least the next six months due to the high costs associated with low unit volume production. We expect product sales to increase due to recently expanded Medicare coverage for Apligraf and Novartis sales and marketing efforts.

Fiscal Years Ended December 31, 2000 and 2001

### Revenues

SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), was issued in December 1999 and summarizes certain of the Staff's views in applying generally accepted accounting principles to revenue recognition in financial statements. We adopted SAB 101 in the fourth quarter of 2000, effective January 1, 2000, and recorded a cumulative effect of a change in accounting principle related to all up front non-refundable research and development support payments recognized in prior periods of $6,342,000. Of this amount, $1,057,000 was recognized as revenue in 2000 and 2001, and the remainder will be recognized ratably through December 2005, in accordance with SAB 101's guidance.

Total revenues for the years 2000 and 2001 consisted of:

|  | 2000 | 2001 |
|---|---|---|
| Product sales to related party | $ 2,957,000 | $ 8,191,000 |
| Research, development and milestone support from related party | 6,057,000 | 1,057,000 |
| Research and development grants | 1,065,000 | 1,050,000 |
| Other revenues | 161,000 | 584,000 |
|  | $10,240,000 | $10,882,000 |

In 2001, research, development and milestone support from related party of $1,057,000 represents deferred revenue recognized from implementation of SAB 101 compared to 2000 of $6,057,000 which includes a $5,000,000 milestone payment related to the diabetic foot ulcer indication and $1,057,000 of deferred revenue recognized from implementation of SAB 101. Product sales to related party for 2001 increased 177% to $8,191,000 from $2,957,000 for 2000 due to significantly higher payments received for units of Apligraf sold to Novartis under the amended collaborative agreement that became effective January 2, 2001 and increased unit sales of Apligraf to Novartis. We attribute this unit growth to the FDA approval

24

636

in mid-2000 for diabetic foot ulcers, continued progress in gaining Medicare reimbursement and Novartis sales and marketing support. We expect Apligraf commercial sales to continue to increase. Research and development grants revenue remained flat primarily due to a full year of grant work performed during both years under our government grant (refer to the grant section under the "Commitments" footnote to the Financial Statements for a full description). Other revenues for 2001 increased 263% to $584,000 from $161,000 primarily due to Novartis funding for support activities related to the regulatory filing for Apligraf marketing approval across the European Union and start up revenues related to sales of our bioengineered collagen matrix products.

Costs and Expenses

Cost of product sales to related party: Cost of product sales for 2001
----------------------------------------
increased 94% to $12,483,000, from $6,421,000 in 2000. This increase was due to increased unit sales of Apligraf to Novartis, higher allocation of depreciation and occupancy costs and added infrastructure costs to support higher future unit volume levels. Cost of product sales includes the direct costs to manufacture, quality inspect and package Apligraf and an allocation of our production-related indirect costs. Cost of product sales continues to exceed product sales due to the high costs associated with low volume production. We expect production volume to increase and our margins to continue to improve during 2002. We expect that we will have to revise our estimates of costs and the allocation of costs to product sales in the future as we continue to modify our manufacturing processes.

Research and development: Research and development expenses ("R&D")
-------------------------
consist of costs incurred in performing research and development activities including salaries and benefits, process development, facilities costs, engineering support, overhead costs, clinical trial and related clinical manufacturing costs, contract services and other outside costs. R&D expenses for 2001 decreased 6% to $16,498,000, from $17,511,000 in 2000. This decrease was primarily due to: a decrease in clinical-related costs due to completion of the Apligraf diabetic foot ulcer pivotal trial partially offset by an increase in operations support for supplies and personnel costs; and increases in depreciation expense on significant leasehold improvements put into service during mid-2000. Process development, facilities and engineering support expenses included in research and development were $8,000,000 and $5,908,000 for the periods 2000 and 2001, respectively. We expect our R&D expenses to decrease significantly during 2002 due to our 16% reduction of workforce, which we anticipate will reduce costs by approximately $5 million per year and which primarily impacted our R&D areas for our coronary vascular graft, liver assist device and pancreatic islet cell programs. We are seeking third party funding for these programs. We expect this reduction to help us meet our financial goals.

Selling, general and administrative expenses: Selling, general and
---------------------------------------------
administrative expenses ("SG&A") include the costs of our corporate, finance, information technology, human resource and sales and marketing functions. SG&A expenses for 2001 increased 30% to $9,902,000, from $7,638,000 in 2000. The increase was primarily due to: a one-time severance expense of $1,233,000 related to the separation of employment of a former executive officer, costs related to recording the fair value of stock options issued for consulting services, higher professional service expenses and new selling and marketing expenses related to commercial product launches.

Other Income and Expense: Interest income for 2001 decreased 87% to
-------------------------
$145,000, from $1,159,000 in 2000. The decrease was primarily due to the decrease in funds available for investment. Interest expense for 2001 increased 7% to $2,238,000, from $2,092,000 for 2000. The increase was primarily due to interest on the Novartis convertible note issued during October 2001.

25

Net Loss: We incurred a net loss of $30,094,000 or $0.86 per share (basic and diluted) for 2001, compared to a net loss effected for the change in accounting principle of $28,605,000 or $0.85 per share (basic and diluted) and a net loss before cumulative effect of change in accounting principle of $22,263,000 or $0.66 per share (basic and diluted) for 2000.

Fiscal Years Ended December 31, 1999 and 2000

Revenues

Total revenues for the years 1999 and 2000 consisted of:

|  | 1999 | 2000 |
|---|---|---|
| Product sales to related party | $ 1,844,000 | $ 2,957,000 |
| Research, development and milestone support from related party |  | 6,057,000 |
| Research and development grants | 101,000 | 1,065,000 |
| Other revenues | 731,000 | 161,000 |
|  | $ 2,676,000 | $10,240,000 |

In 2000, research, development and milestone support from related party of $6,057,000 includes a $5,000,000 milestone payment related to the diabetic foot ulcer indication and $1,057,000 of deferred revenue recognized from implementation of SAB 101. No such revenues were earned in 1999. The increase in product sales to related party is due to increased unit sales of Apligraf to Novartis. Research and development grants revenue increased primarily due to a full year of grant work performed during 2000 compared to one month performed during 1999 (refer to the grant section under the "Commitments" footnote to the Financial Statements for a full description). Other revenues decreased in 2000, primarily due to changes in the level of Novartis funding for publication study programs. Revenues for the year 1999 have not been adjusted for the adoption of SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements".

Costs and Expenses

Cost of product sales to related party: Our cost of product sales was $6,421,000 in 2000, compared to $3,773,000 in 1999. These expenses increased due to higher unit sales of Apligraf to Novartis and a higher amount of fixed costs due to infrastructure increases needed to support anticipated future higher unit volume levels. Cost of product sales includes the direct costs to manufacture and package Apligraf and an allocation of our production-related indirect costs. Cost of product sales exceeded product sales due to the high costs associated with low volume production.

Research and development: Research and development expenses ("R&D") consist of costs associated with research, development, clinical, process development, facilities and engineering support excluding the allocation of our production related indirect costs. These expenses decreased to $17,511,000 for 2000 from $19,066,000 in 1999. The decrease was primarily due to: a decrease in clinical-related costs due to completion of the Apligraf diabetic foot ulcer pivotal trial partially offset by an increase in operations support for supplies, personnel costs; and increases in depreciation expense on significant leasehold improvements put into service during 2000. Process development, facilities and engineering support expenses included in research and development were $7,305,000 and $8,000,000 for the periods 1999 and 2000, respectively.

Included in R&D for 1999 is a non-cash charge of $900,000 relating to the purchase of incomplete technology to be used specifically in our liver assist device research and development efforts (refer to the "Commitments" footnote to the Financial Statements for a full description of this technology). The purchase was made to strengthen our resources and intellectual property position. The charge to expense was due to the early stage of the technology that had not provided proof of principle. Additionally, the time and cost to

26

prove this principle was not known. We expect it will cost millions of dollars and take a minimum of 4 to 6 years before we could develop a product which might be approved for commercial sale. It is our intent to to attract third party funding for this project.

Selling, general and administrative expenses: Selling, general and administrative expenses ("SG&A") include the costs of our corporate, finance, information technology and human resource functions. These expenses were $7,638,000 for 2000 and $7,808,000 for 1999. The 2000 decrease was primarily due to decreased personnel costs and professional service fees.

Other Income and Expense: Interest income increased primarily due to the increase in funds available for investment. Interest expense increased to $2,092,000 for 2000 compared to $1,281,000 in 1999, primarily due to a full year of convertible debenture and term loan interest in 2000 compared to 1999. Interest expense was $1,281,000 for 1999 due to the issuance of convertible debentures in March 1999.

Net Loss: We incurred a net loss before cumulative effect of change in accounting principle of $22,263,000 or $0.66 per share (basic and diluted) and a net loss effected for the change in accounting principle of $28,605,000 or $0.85 per share (basic and diluted) for 2000, compared to a net loss of $28,350,000 or $0.93 per share (basic and diluted) for 1999.

Cumulative effect of change in accounting principle: SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), was issued in December 1999 and summarizes certain of the Staff's views in applying generally accepted accounting principles to revenue recognition in financial statements. We adopted SAB 101 in the fourth quarter of 2000, effective January 1, 2000, and recorded a cumulative effect of a change in accounting principle related to all up front non-refundable research and development support payments recognized in prior periods of $6,342,000 or $0.19 per share (basic and diluted) for 2000, with a corresponding increase to deferred revenue which will be recognized in future periods. The impact of adopting SAB 101 is not reflected in the amounts presented in the Results of Operations for the year ended December 31, 1999. See financial statements and related notes for additional details related to this change in accounting principle.

Liquidity and Capital Resources
--------------------------------

Funds Used in Operations

At December 31, 2001, we had cash, cash equivalents and investments in the aggregate amount of $3,284,000, compared to $12,183,000 at December 31, 2000. Cash equivalents consist of money market funds, which are highly liquid and have original maturities of less than three months. Investments consist of securities that have an A or A1 rating or better with a maximum maturity of two years.

Cash used in operating activities was $14,586,000 for the year ended December 31, 2001, primarily for financing our manufacturing operations and research and development activities, offset by $9,765,000 cash received from Novartis related primarily for funding facility upgrades and for the European manufacturing suite in the US facility. Cash used in operating activities was $18,482,000 for the year ended December 31, 2000, primarily for financing our manufacturing operations and research and development activities, offset by $5,000,000 cash received from Novartis in 2000 for achievement of a milestone related to the diabetic foot ulcer indication.

Capital Expenditures

Capital expenditures not related to the European manufacturing suite in the US facility funded by Novartis were $2,912,000 and $1,438,000 during 2000 and 2001, respectively, primarily related to the

27

further build-out of existing facilities to support Apligraf manufacturing. We
expect to continue to utilize funds during 2002 to expand our existing facility
in the areas of Apligraf manufacturing, packaging and other process development
improvement programs.

Capital Expenditures reimbursed from related party

Capital expenditures reimbursed from Novartis were $485,000 and $8,781,000
during 2000 and 2001, respectively, related primarily for funding facility
upgrades and for the European manufacturing suite in the US facility. We expect
capital improvement funding from Novartis to be lower during 2002 than in 2001.

Novartis Support Payments

During 2001, we received cash from Novartis of $9,765,000 related to the
following:

.    During 2001, Novartis provided funding support of $8,964,000 for
     facility upgrades and for the European manufacturing suite in the US
     facility. All payments made have been recorded as deferred revenue for
     the year ended December 31, 2001. Revenue will be recognized over the
     period that the completed manufacturing facility is used for
     production of Apligraf to be sold to Novartis, which is expected to
     start later in 2002. We have incurred $485,000 and $8,781,000 for the
     years ended 2000 and 2001, respectively, relating to this funding
     support.

.    During the third quarter of 2001, Novartis agreed to provide funding
     for support activities related to the regulatory filing for Apligraf
     marketing approval across the European Union. We received $782,000, of
     which $336,000 was recorded as other revenues for the year ended
     December 31, 2001, with the remainder included in deferred revenue
     from related party at December 31, 2001.

.    During the first quarter of 1999, Novartis agreed to provide funding
     for publication study programs to be conducted by us. We have recorded
     other revenues of $162,000 and $19,000 for the years ended 2000 and
     2001, respectively, relating to the initiation of these programs.

At December 31, 2001, deferred revenue from related party of $13,849,000
consisted of: funding received from Novartis for facility upgrades and for the
European manufacturing suite in the US facility of $8,964,000 (with an
additional $302,000 approved and expected to be received during 2002); the
unrecognized portion of funding received from Novartis for support activities
related to the regulatory filing for Apligraf approval across the European Union
of $446,000; the unrecognized portion of product revenues received, which are
performance based of $211,000; and the remaining deferred revenue related to
adopting SAB 101 of $4,228,000.

Financing

From inception, we have financed our operations substantially through
public offerings and private placements of equity and debt securities, as well
as receipt of research support and contract revenues, interest income from
investments, sale of products and receipt of royalties. During 2001, financing
activities provided cash of $15,906,000 primarily due to: the sale of a 7%
Convertible Subordinated Note to Novartis that generated net proceeds of
$9,824,000; the sale of common stock that generated net proceeds of $11,158,000;
cash received from the exercise of stock options of $626,000; and proceeds
received from a bank promissory note of $5,000,000 offset by: the payment of a
term loan for $4,334,000; the payment of a bank promissory note of $5,000,000
and the purchase of treasury stock totaling

28

$1,368,000. During 2000, financing activities provided cash of $21,623,000 primarily from the sale of common stock that generated net proceeds of $15,930,000 and the exercise of stock options that generated $12,267,000, partially offset by the redemption of all Series C redeemable convertible preferred stock in cash for $6,180,000 and payment of a term loan for $394,000.

On February 14, 2000, the Securities and Exchange Commission declared effective a shelf registration for the placement of up to 3,000,000 shares of common stock with an aggregate offering price not to exceed $50,000,000. In February and March 2000, we completed private placements for 1,088,925 shares of common stock under this shelf registration yielding net proceeds of approximately $15,930,000. During May and June 2001, we sold 237,200 shares of common stock at an underwriter yielding net proceeds of $1,342,000. On October 16, 2001, we placed with a group of predominately new investors 1,670,645 shares of common stock under the shelf registration, yielding net proceeds of $6,566,000.

In December 2000, the Board of Directors authorized a common stock repurchase program for up to 500,000 additional shares. During January 2001, we repurchased 165,000 shares of common stock for an aggregate purchase price of approximately $1,368,000. The stock repurchase program may be discontinued at any time.

On June 29, 2001, we entered into a $5,000,000 revolving credit agreement with a commercial bank and borrowed the full $5,000,000 which was held in a cash collateral account pending payment in full of all obligations and release of all liens under the term loan. During July 2001, the full $5,000,000 was released from the cash collateral account and $3,562,000 was used to repay a term loan and the balance was used for general corporate purposes. On October 18, 2001, all outstanding amounts under this revolving credit agreement were paid in full.

During 2001, we completed the following additional financing activities: On August 28, 2001, two directors and one additional investor purchased 503,876 shares of unregistered common stock yielding proceeds of $3,250,000. In addition, the investors received three-year warrants to purchase an aggregate of 62,009 shares of common stock at $8.55 per share.

Liquidity

The Company's consolidated financial statements have been prepared on a going concern basis, which assumes the Company will realize its assets and discharge its liabilities in the normal course of business. The Company has experienced recurring losses from operations of $28,350,000, $28,605,000 and $30,094,000 for the years ended December 31, 1999, 2000, and 2001, respectively, and recurring negative cash flow from operations of $23,650,000, $18,482,000, and $14,586,000 for the years ended December 31, 1999, 2000, and 2001, respectively. In addition, the Company has negative working capital of $2,509,000 and a stockholders' deficit of $21,768,000 at December 31, 2001.

Based upon current forecasts, management believes that the Company has sufficient liquidity to finance operations through March 31, 2003 for the following reasons:

.    Management has implemented a 16% workforce reduction on February 25, 2002 which we expect will reduce costs by approximately $5,000,000 per year

.    The Company has received net proceeds of approximately $15,500,000 on March 21, 2002 from the private placement of common and convertible preferred stock

.    Management has developed additional plans to reduce costs which include an on-going discretionary expense reduction program and a number of product cost reduction programs

.    Management has developed programs to expand revenues from the Apligraf and Portaflex family of products.

Management forecasts are based on these plans, which involve assumptions as to revenue growth and cost reductions which could prove to be incorrect. If those assumptions are incorrect and cause greater cash needs than forecasted, we will seek additional financing. From inception we have been able to finance our operations through public offerings and private placements of equity and debt securities, as well as receipts from research support and contract revenues and product sales.

Although we have a contractual put option to sell an additional $10 million of our securities to Novartis, we must satisfy a number of conditions in order to exercise that option. If we do not satisfy these conditions and Novartis is unwilling to waive any unsatisfied conditions, we will be unable to sell additional securities to Novartis pursuant to the put option (see "Related Party Transactions with Novartis" note). In addition, even if we satisfy the conditions, the closing would occur no sooner than 90 days following the day we send the put option exercise notice.

Factors that may change our cash requirements include:

.    failure to achieve sales volume forecasts;
.    delays in obtaining regulatory approvals of products in different countries, if needed, and subsequent timing of product launches;
.    delays in commercial acceptance and reimbursement when product launches occur;
.    changes in the progress of research and development programs;
.    changes in the resources devoted to outside research collaborations or projects, self-funded projects, proprietary manufacturing methods and advanced technologies.

29

641

- potential repayment of the principal amount of the 7% Convertible Subordinated Promissory Note that we issued to Novartis as of September 28, 2001, together with all accrued but unpaid interest on the Note and other amounts that we owe to Novartis on the date of acceleration of the Note, that would be required if we defaulted on our obligations under the Note; and

- payments to Novartis under the Note if we fail to deliver to Novartis registered shares of our common stock upon Novartis' conversion of the Note.

Any of these events could adversely impact our liquidity and capital resources, requiring us to raise additional funds. Management believes that additional funds may be available through equity or debt financing, strategic alliances with corporate partners, capital lease arrangements, or other sources of financing in the future. For the long-term, we expect to be generating cash from operations and to a lesser extent, raising funds from additional equity financing. There can be no assurances that these funds will be available when required on terms acceptable to us, if at all. If adequate funds are not available when needed, we would need to delay, scale back or eliminate certain programs or license to third parties certain products or technologies that we would otherwise undertake ourselves, resulting in a potential adverse effect on our financial condition and results of operations.

Subsequent Event - Financing Activities

Security Issuance: On March 21, 2002, we completed a private placement of
-----------------
100,000 shares of Series D convertible preferred stock, with rights to acquire an additional 20,000 shares of Series D convertible preferred stock and 7,241,376 shares of common stock, with warrants to acquire 3,620,686 shares of common stock to a select group of institutional investors yielding net proceeds of approximately $15,500,000. We plan to file a registration statement on Form S-3 related to the common stock sold in the private placement and common stock issuable upon conversion of the preferred stock and upon exercise of the warrants. We will file another registration statement if at least 10,000 additional shares of Series D convertible preferred stock is sold upon exercise of the rights sold in the private placement. This registration statement would register the resale of common stock issuable upon conversion of the preferred stock so issued.

Promissory Note Agreements: During February and March of 2002, we borrowed
--------------------------
$600,000 from a commercial bank that was evidenced by two promissory notes. The loans were used for general corporate purposes with the interest rate being equal to the bank's prime rate plus three percent. On March 25, 2002, all outstanding amounts under the promissory notes were paid in full. Loans made under the promissory notes were collateralized by a security interest in all of our assets.

Subsequent Event - Workforce Reduction

On February 25, 2002, we implemented a 16% reduction of workforce, which we anticipate will reduce costs by approximately $5 million per year and which primarily impacted our research and development areas for our coronary vascular graft, liver assist device and pancreatic islet cell programs. We are seeking third party funding for these programs. We expect this reduction to help us meet our financial goals. In the first quarter of fiscal 2002, we reserved approximately $406,000 related to severance of 37 employees.

Taxes

At December 31, 2001, we had federal net operating loss and tax credit carryforwards of approximately $135,869,000 and $4,249,000, and state net operating loss and tax credit carryforwards of approximately $77,351,000 and $2,702,000. These losses and tax credits are available to reduce federal and state taxable income and income taxes, respectively, in future years, if any. However, the realizability of deferred tax assets is not assured as it depends upon future taxable income. Accordingly, we have recorded a 100% valuation allowance against these assets. We are required to recognize all or a portion of

30

net deferred tax assets, with corresponding increases to net income, when we believe, given the weight of all available evidence, that it is more likely than not that all or a portion of the benefits of net operating loss carryforwards and other credits will be realized. However, there can be no assurance that we will ever realize any future cash flows or benefits from these losses and tax credits. Ownership changes, as defined in Internal Revenue Code, may result in future limitations on the utilization of net operating losses and research and development tax credit carryforwards that can be utilized annually to offset future taxable income.

Impact of inflation
-------------------

        Although it is difficult to predict the impact of inflation on our costs and revenues in connection with our products, we do not anticipate that inflation will materially impact our costs of operation or the profitability of our products when marketed.

Impact of New Accounting Pronouncements
---------------------------------------

        In July 2001, the Financial Accounting Standards Board issued SFAS No. 141, "Business Combinations" and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 requires that all business combinations be accounted for under the purchase method only and that certain acquired intangible assets in a business combination be recognized as assets apart from goodwill. SFAS No. 142 requires that ratable amortization of goodwill be replaced with periodic tests of the goodwill's impairment and that certain intangible assets other than goodwill be amortized over their useful lives. SFAS No. 141 is effective for all business combinations initiated after June 30, 2001 and for all business combinations accounted for by the purchase method for which the date of acquisition is after June 30, 2001. The provisions of SFAS No. 142 will be effective for fiscal years beginning after December 15, 2001, and will thus be adopted by us, as required, in fiscal year 2002. We do not expect that the application of SFAS No. 141 and SFAS No. 142 will have a material impact on our financial position or results of operations.

        In October 2001, the Financial Accounting Standards Board issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS 144 supercedes FASB Statement No. 121 (SFAS 121), "Accounting for the Impairment of Long-Lived Assets and for Long Lived Assets to Be Disposed of." SFAS 144 applies to all long-lived assets (including discontinued operations) and consequently amends Accounting Principles Board Opinion No. 30 (APB 30), "Reporting Results of Operations - Reporting the Effects of Disposal of a Segment of a Business." SFAS 144 is effective for financial statements issued for fiscal years beginning after December 15, 2001, and will thus be adopted by us, as required, on January 1, 2002. Management is currently determining what effect, if any, SFAS 144 will have on its financial position and results of operations.

Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

        The exposure of market risk associated with risk-sensitive instruments is not material, as our sales are transacted primarily in United States dollars, we invest primarily in money market funds and we have not entered into hedging transactions.

                                    31

Item 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

ORGANOGENESIS INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Consolidated Financial Statements included in Item 8:

Report of Independent Accountants ............................................................. 33
Consolidated Balance Sheets as of December 31, 2000 and 2001 .................................... 34
Consolidated Statements of Operations For the Years Ended December 31, 1999, 2000 and 2001 ..... 35
Consolidated Statements of Cash Flows For the Years Ended December 31, 1999, 2000 and 2001 ..... 36
Consolidated Statements of Changes in Stockholders' Equity For the Years Ended December 31,
  1999, 2000 and 2001 ......................................................................... 37
Notes to Consolidated Financial Statements ..................................................... 38

32

Report of Independent Accountants

To the Board of Directors and Stockholders of Organogenesis Inc.:

In our opinion, the consolidated financial statements listed in the accompanying index at Item 8 to the Annual Report on Form 10-K present fairly, in all material respects, the financial position of Organogenesis Inc. and its subsidiaries at December 31, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2001 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in the Nature of Business Note to the financial statements, the Company has suffered recurring losses from operations, has a working capital deficiency, a stockholders' deficit, and has long-term debt that may become immediately due upon an event of default that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in the Nature of Business Note. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in the notes to the consolidated financial statements, during the year ended December 31, 2000 the Company changed its method of recognizing revenue.


PricewaterhouseCoopers LLP


Boston, Massachusetts
April 4, 2002

33

ORGANOGENESIS INC.

CONSOLIDATED BALANCE SHEETS
(In thousands, except share and per share data)

|  | At December 31, | |
|  | 2000 | 2001 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 9,539 | $ 2,084 |
| Investments | 2,644 | 1,200 |
| Inventory, net | 1,377 | 2,129 |
| Receivable from related party | 501 | 1,612 |
| Other current assets | 758 | 580 |
| Total current assets | 14,819 | 7,605 |
| Property and equipment, net | 12,608 | 19,263 |
| Other assets | 445 | 502 |
| Total Assets | $ 27,872 | $ 27,370 |
| **Liabilities** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,378 | $ 5,043 |
| Accrued expenses | 3,582 | 4,014 |
| Current portion of term loan | 1,576 | - |
| Deferred revenue from related party | 1,057 | 1,057 |
| Total current liabilities | 8,593 | 10,114 |
| Deferred revenue from related party | 4,228 | 12,792 |
| Long-term convertible debt | 16,077 | 16,460 |
| Long-term convertible note from related party | - | 9,772 |
| Term loan | 2,758 | - |
| Commitments (see Notes) | | |
| **Stockholders' Deficit** | | |
| Preferred stock, par value $1.00; authorized 1,000,000 shares: | | |
| No shares outstanding at December 31, 2000 and 2001, respectively | - | - |
| Common stock, par value $.01; authorized 80,000,000 shares: | | |
| Outstanding 34,489,459 and 37,065,120 shares at December 31, 2000 and 2001, respectively | 346 | 373 |
| Additional paid-in capital | 154,646 | 168,097 |
| Accumulated deficit | (157,972) | (188,066) |
| Treasury stock at cost, 85,000 and 250,000 shares at December 31, 2000 and 2001, respectively | (804) | (2,172) |
| Total stockholders' deficit | (3,784) | (21,768) |
| Total Liabilities and Stockholders' Deficit | $ 27,872 | $ 27,370 |

The accompanying notes are an integral part of the consolidated
financial statements.

34

ORGANOGENESIS INC.

CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except share and per share data)

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 1999 | 2000 | 2001 |
| Revenues: | | | |
| Product sales to related party | $    1,844 | $    2,957 | $    8,191 |
| Research, development and milestone support from related party | - | 6,057 | 1,057 |
| Research and development grants | 101 | 1,065 | 1,050 |
| Other revenues | 731 | 161 | 584 |
| Total Revenues | 2,676 | 10,240 | 10,882 |
| Cost and expenses: | | | |
| Cost of product sales to related party | 3,773 | 6,421 | 12,483 |
| Research and development | 19,066 | 17,511 | 16,498 |
| Selling, general and administrative | 7,808 | 7,638 | 9,902 |
| Total Costs and Expenses | 30,647 | 31,570 | 38,883 |
| Loss from operations | (27,971) | (21,330) | (28,001) |
| Other income (expense): | | | |
| Interest income | 902 | 1,159 | 145 |
| Interest expense | (1,281) | (2,092) | (2,238) |
| Net loss before cumulative effect of change in accounting principle | (28,350) | (22,263) | (30,094) |
| Cumulative effect of adopting Staff Accounting Bulletin 101 ("SAB 101") | - | (6,342) | - |
| Net loss | $   (28,350) | $   (28,605) | $   (30,094) |
| Net loss per common share - basic and diluted before cumulative effect of change in accounting principle | $    (0.93) | $    (0.66) | $    (0.86) |
| Cumulative effect of adopting SAB 101 | - | (0.19) | - |
| Net loss per common share - basic and diluted | $    (0.93) | $    (0.85) | $    (0.86) |
| Weighted average number of common shares outstanding - basic and diluted | 30,484,982 | 33,536,507 | 35,183,859 |
| Pro forma amounts assuming SAB 101 is applied retroactively: | | | |
| Revenues | $    3,733 | | |
| Net loss | (27,293) | | |
| Net loss per common share - basic and diluted | $    (0.90) | | |

The accompanying notes are an integral part of the consolidated
financial statements.

35

ORGANOGENESIS INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands, except share data)

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 1999 | 2000 | 2001 |
| Cash flows from operating activities: | | | |
| Net loss | $(28,350) | $(28,605) | $(30,094) |
| Adjustments to reconcile net loss to cash flows used in operating activities: | | | |
| Depreciation and amortization | 1,741 | 2,520 | 3,564 |
| Issuance of stock options and warrants for services | 432 | -- | 178 |
| Amortization of warrants and deferred debt issuance costs relating to convertible debt as interest expense | 338 | 505 | 516 |
| Issuance of treasury stock for purchase of incomplete technology | 900 | -- | -- |
| Issuance of common stock for interest on convertible debt | 705 | 1,373 | 1,274 |
| Cumulative effect of adopting SAB 101 | -- | 6,342 | -- |
| Changes in assets and liabilities: | | | |
| Inventory, net | (176) | (471) | (752) |
| Other current assets and receivable from related party | (1,187) | 369 | (933) |
| Accounts payable | 342 | 1,000 | 2,665 |
| Accrued expenses | 1,605 | (458) | 432 |
| Deferred revenue from related party | -- | (1,057) | 8,564 |
| Cash used in operating activities | (23,650) | (18,482) | (14,586) |
| | | | |
| Cash flows from investing activities: | | | |
| Capital expenditures | (5,767) | (2,912) | (1,438) |
| Capital expenditures reimbursed from related party | -- | (485) | (8,781) |
| Purchases of investments | (23,728) | -- | (1,200) |
| Sales/maturities of investments | 29,805 | 4,068 | 2,644 |
| Cash provided by (used in) investing activities | 310 | 671 | (8,775) |
| | | | |
| Cash flows from financing activities: | | | |
| Proceeds from issuance of convertible note to related party | -- | -- | 10,000 |
| Proceeds from issuance of convertible debt | 20,000 | -- | -- |
| Deferred debt issuance costs | (575) | -- | (176) |
| Proceeds (payment) of term loan | 4,728 | (394) | (4,334) |
| Preferred stock redeemed in cash | -- | (6,180) | -- |
| Proceeds from sale of common stock - net | -- | 15,930 | 11,158 |
| Proceeds from exercise of stock options | 813 | 12,267 | 626 |
| Bank promissory note | -- | -- | 5,000 |
| Payment of bank promissory note | -- | -- | (5,000) |
| Purchase of treasury stock | (951) | -- | (1,368) |
| Cash provided by financing activities | 24,015 | 21,623 | 15,906 |
| | | | |
| Increase (decrease) in cash and cash equivalents | 675 | 3,812 | (7,455) |
| Cash and cash equivalents, beginning of year | 5,052 | 5,727 | 9,539 |
| Cash and cash equivalents, end of year | $ 5,727 | $ 9,539 | $ 2,084 |
| | | | |
| Supplemental disclosure of cash flow information: | | | |
| Interest paid in cash during the year | $ 28 | $ 380 | $ 222 |

Supplemental disclosure of noncash financing activities:
In August 2000, we issued 176,536 shares of common stock for $2,500
face value convertible notes, plus accrued interest.

The accompanying notes are an integral part of the consolidated financial
statements.

36

ORGANOGENESIS INC.

CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)
(In thousands)

For the Years Ended December 31, 1999, 2000 and 2001

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | Shares | Amount | |
| Balance - December 31, 1998 | 30,480 | $ 305 | $124,342 | $ (101,017) | 40 | $ (391) | $ 23,239 |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | 120 | 1 | 812 | | | | 813 |
| Issuance of warrants with convertible debt | | | 2,318 | | | | 2,318 |
| Series C convertible preferred stock to be redeemed in cash | | | (6,180) | | | | (6,180) |
| Issuance of common stock for interest on convertible debt | 89 | 1 | 704 | | | | 705 |
| Issuance of stock options and warrants to consultants | | | 432 | | | | 432 |
| Purchase of incomplete technology | | | 462 | | (50) | 538 | 1,000 |
| Purchase of treasury stock | | | | | 95 | (951) | (951) |
| Net loss | | | | (28,350) | | | (28,350) |
| Balance - December 31, 1999 | 30,689 | 307 | 122,890 | (129,367) | 85 | (804) | (6,974) |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | 2,534 | 25 | 12,242 | | | | 12,267 |
| Issuance of common stock for interest on convertible debt | 90 | 1 | 1,372 | | | | 1,373 |
| Issuance of common stock for convertible debt | 172 | 2 | 2,223 | | | | 2,225 |
| Sale of common stock - net | 1,089 | 11 | 15,919 | | | | 15,930 |
| Net loss | | | | (28,605) | | | (28,605) |
| Balance - December 31, 2000 | 34,574 | 346 | 154,646 | (157,972) | 85 | (804) | (3,784) |
| Issuance of common stock upon exercise of stock options and in connection with employee stock purchase plan | 164 | 2 | 624 | | | | 626 |
| Issuance of common stock for interest on convertible debt | 165 | 2 | 1,272 | | | | 1,274 |
| Issuance of stock options and warrants to consultants | | | 178 | | | | 178 |
| Sale of common stock - net | 2,412 | 23 | 11,135 | | | | 11,158 |
| Beneficial conversion feature related to convertible debt issued | | | 242 | | | | 242 |
| Purchase of treasury stock | | | | | 165 | (1,368) | (1,368) |
| Net loss | | | | (30,094) | | | (30,094) |
| Balance - December 31, 2001 | 37,315 | $ 373 | $168,097 | $ (188,066) | 250 | $(2,172) | $ (21,768) |

The accompanying notes are an integral part of the consolidated
financial statements.

37

ORGANOGENESIS INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Nature of Business
------------------

Organogenesis Inc. designs, develops and manufactures medical products containing living cells and/or natural connective tissue. We were the first company to develop, manufacture and gain US Food and Drug Administration ("FDA") approval for a mass-produced product containing living human cells. Our lead product, Apligraf living skin substitute, is FDA approved and marketed in the US for two uses: treatment of healing-resistant venous leg ulcers, approved in May 1998, and treatment of healing-resistant diabetic foot ulcers, approved in June 2000. Novartis Pharma AG ("Novartis") has exclusive global Apligraf marketing rights. Our FortaFlex bioengineered collagen matrix product line includes FortaPerm tissue support product and FortaGen tissue repair product. Both FortaPerm and FortaGen are being sold by our sales and marketing team.

The Company's consolidated financial statements have been prepared on a going concern basis, which assumes the Company will realize its assets and discharge its liabilities in the normal course of business. The Company has experienced recurring losses from operations of $28,350,000, $28,605,000 and $30,094,000 for the years ended December 31, 1999, 2000, and 2001, respectively, and recurring negative cash flow from operations of $23,650,000, $18,482,000, and $14,586,000 for the years ended December 31, 1999, 2000, and 2001, respectively. In addition, the Company has negative working capital of $2,509,000 and a stockholders' deficit of $21,768,000 at December 31, 2001.

Based upon current forecasts, management believes that the Company has sufficient liquidity to finance operations through March 31, 2003 for the following reasons:

- Management has implemented a 16% workforce reduction on February 25, 2002 which we expect will reduce costs by approximately $5,000,000 per year

- The Company has received net proceeds of approximately $15,500,000 on March 21, 2002 from the private placement of common and convertible preferred stock

- Management has developed additional plans to reduce costs which include an on-going discretionary expense reduction program and a number of product cost reduction programs

- Management has developed programs to expand revenues from the Apligraf and Fortaflex family of products.

Management forecasts are based on these plans, which involve assumptions as to revenue growth and cost reductions which could prove to be incorrect. If those assumptions are incorrect and cause greater cash needs than forecasted, we will seek additional financing. From inception we have been able to finance our operations through public offerings and private placements of equity and debt securities, as well as receipts from research support and contract revenues and product sales.

The Company does not currently satisfy the American Stock Exchange ("AMEX") guidelines for continued listing principally due to a shareholder equity deficiency and recurring losses. If the Company were delisted, the holders of the Company's $17,500,000 of long-term convertible debt outstanding and $10,000,000 of long-term convertible debt from related party could declare their principal and accrued interest to be immediately payable in cash as a result of a default under those debt agreements. The Company is currently under review by the AMEX and management is in frequent contact with the Exchange regarding the Company's progress in raising capital and meeting projected operating results.

The circumstances noted above raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

We are subject to risks, including, but not limited to, the following uncertainties:

- Continued operating losses and the time required to achieve profitability;
- Availability of additional capital on acceptable terms, if at all;
- Market acceptance of our products and successful marketing and selling of Apligraf by Novartis;
- Dependence on our strategic relationships to market our products;
- Production at a single location for Apligraf;
- Manufacture and sale of products in sufficient volume to realize a satisfactory margin;
- Development by competitors of new technologies or products that are more effective than ours;
- We may not be successful in marketing our own products, which we have just begun to commercialize.
- Risk of failure of clinical trials for future indications of Apligraf and for other products;
- Compliance with FDA regulations and similar foreign regulatory bodies;
- Product quality issues which could lead to product recalls;
- Protection of proprietary technology through patents and risks of infringement claims by third parties;
- Continued availability of raw material for products;
- Dependence on and retention of key personnel;
- Availability of sufficient product liability insurance;
- Adequate third-party reimbursement for products;
- Delays or stoppages in transportation may make it impossible to produce or ship our products;
- Stock price volatility and fluctuation;
- Meeting the American Stock Exchange requirements for listing;
- Meeting obligations under the convertible subordinated promissory note issued to Novartis;
- Affect of anti-takeover measures on the value of our stock; and
- Affect of outstanding options, warrants and convertible securities on the value of our stock.

38

Summary of Significant Accounting Policies
-------------------------------------------

Principles of Consolidation and Use of Estimates

The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All intercompany activity has been eliminated. Certain reclassifications have been made for consistent presentation. These reclassifications have no impact on financial position or results of operations. We prepare our financial statements under generally accepted accounting principles that require us to make estimates and assumptions that affect amounts reported and the related disclosures. Actual results could differ from those estimates. Certain prior amounts have been reclassified to conform to the current year presentation. We also have a wholly-owned investment subsidiary, Dan Capital Corporation, which holds a substantial portion of our cash, cash equivalents and investments.

Cash and Cash Equivalents

Cash and cash equivalents consist of cash and money market funds that are convertible into a known amount of cash and carry an insignificant risk of change in value. These investments are highly liquid and have original maturities of less than three months.

Concentration of credit risk

Financial instruments, which potentially subject us to concentrations of credit risk, consist of cash, cash equivalents, high grade investments and receivable from Novartis. We have established guidelines that relate to credit quality, diversification, and maturity, and that limit exposure to any one issue of securities.

Inventory

Inventory is stated at the lower of cost or market, cost being standard cost, which approximates the first-in, first-out method of accounting.

Property and Equipment

Equipment, furniture and fixtures, office equipment and leasehold improvements are stated at cost. Depreciation is calculated using the straight-line method over three to ten years. Leasehold improvements are being amortized using the straight-line method over the shorter of useful life or term of lease. Construction in progress represents costs incurred to date in connection with facility expansion activities and are not depreciated until such facilities become operational. These costs are then amortized using the straight-line method over the shorter of useful life or lease term. Interest cost incurred during the period of construction in progress relating to expansion of our main facility is capitalized. The interest cost capitalized for the period ended December 31, 1999 and 2000 was $150,000 and $197,000, respectively. No interest was capitalized in 2001.

Maintenance and repairs are charged to expense as incurred and betterments are capitalized. Upon retirement or sale, the cost of assets disposed of and their related accumulated depreciation are removed from the accounts. Any resulting gain or loss is credited or charged to operations.

Long-Lived Assets

Our policy regarding long-lived assets is to evaluate the recoverability or usefulness of these assets when the facts and circumstances suggest that these assets may be impaired. This analysis relies on a number of factors, including changes in strategic direction or market emphasis, business plans, regulatory developments, economic and budget projections, and operating results. The test of recoverability or usefulness is a comparison of the asset value to the present value of its expected cumulative net operating cash flow or the asset's usefulness in research and development programs or operations over the remaining life of the asset. Any write-downs would be treated as permanent reductions in the carrying amount of the asset and an operating loss would be recognized.

39

Debt Issuance Costs

We have incurred debt issuance costs in connection with our long-term debt. These costs are capitalized and amortized over the term of the related debt. Amortization expense related to debt issuance costs was $127,000 and $119,000 in 2000 and 2001, respectively. Accumulated amortization of these costs was $194,000 and $313,000 at December 31, 2000 and 2001, respectively.

Deferred Revenue from Related Party

During 2001, Novartis provided funding support for facility upgrades and for the European manufacturing suite in the US facility. We have recorded the full amount of this funding as deferred revenue which will be recognized over the period the completed manufacturing facility is used for production of Apligraf to be sold to Novartis, which is expected to start later in 2002.

At December 31, 2001, deferred revenue from related party of $13,849,000 consisted of: funding received from Novartis for facility upgrades and for the European manufacturing suite in the US facility of $8,964,000 (with an additional $302,000 expected to be received during 2002); the unrecognized portion of funding received from Novartis for support activities related to the regulatory filing for Apligraf approval across the European Union of $446,000; the unrecognized portion of product revenues received, which are performance based of $211,000; and the remaining deferred revenue related to adopting SAB 101 of $4,228,000.

Revenue Recognition

Prior to 2000, we recognized up front non-refundable research and development support payments as revenue when received. During the year ended December 31, 2000, we changed our method of accounting for up front non-refundable research and development support payments to recognize such amounts over the term of the related collaboration with Novartis Pharma AG ("Novartis"). This change in accounting principle is in accordance with guidance provided in SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), which was issued in December 1999 and summarizes certain of the Staff's views in applying generally accepted accounting principles to revenue recognition in financial statements. We adopted SAB 101 in the fourth quarter of 2000, retroactive to January 1, 2000, and recorded the cumulative effect of a change in accounting principle related to all up front non-refundable research and development support payments recognized in prior periods of $6,342,000. Of this amount, $1,057,000 was recognized as revenue during the years ended December 31, 2000 and 2001, respectively, and the remaining $4,228,000 will be recognized ratably through December 2005, in accordance with SAB 101's guidance.

Revenues from non-refundable milestone payments are recognized when proceeds are received and the related costs and effort are considered substantive. During the second quarter of 2000, we recognized $5,000,000 of milestone support revenue.

Revenue from product sales are recognized upon shipment after risk of ownership passes to the buyer, collection is probable and we have no performance obligations. Product revenues which are performance based are deferred until performance is achieved. Revenue from research grants is recognized to the extent of allowable costs incurred. Other revenues include funding received from Novartis for support activities related to the regulatory filing for Apligraf approval across the European Union and are recognized as costs are incurred. In addition, other revenues related to royalties are recorded as earned. Deferred revenue arises from the difference between cash received and revenue recognized in accordance with these policies.

Revenue for funding received from Novartis for reimbursement of manufacturing facility expenditures will be recognized ratably over the period that the completed manufacturing facility is used for production of Apligraf to be sold to Novartis. No such revenues have been recognized to date. The

40

653

funding was used to support facility investment needed for the approval and sale of Apligraf in the European Union and for upgrades to our manufacturing facility.

### Research and Development

Research and development expenses are comprised of costs incurred in performing research and development activities including salaries and benefits, process development, facilities costs, engineering support, overhead costs, clinical trial and related clinical manufacturing costs, contract services and other outside costs.

### Patents

As a result of our research and development programs, we have a proprietary portfolio of patent rights and patent applications for a number of patents in the US and abroad. Such patent rights are of significant importance to protect our products and processes. All costs in connection with patent rights and patent applications have been expensed as incurred.

### Stock-Based Compensation

Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation," allows us to continue to account for stock-based compensation arrangements under the provisions of Accounting Principles Board No. 25, "Accounting for Stock Issued to Employees," and disclose in a footnote the pro forma effects to net loss and net loss per share assuming the fair value accounting method of SFAS 123 was adopted. Accordingly, no compensation cost has been recognized from stock-based employee awards. Compensation expense for stock awards granted to non-employees is determined by assessing the fair value of the options granted (using an option-pricing model).

### Net Loss Per Common Share

Net loss per common share (basic and diluted) is based on the weighted average number of common shares outstanding during each period. Potentially dilutive securities at December 31, 2001 include: stock options outstanding to purchase 3,271,826 common shares; warrants to purchase 562,009 common shares; and debt convertible into 3,409,540 common shares; however, such securities have not been included in the net loss per common share calculation because their effect would be antidilutive. Potentially dilutive securities at December 31, 2000 include: stock options outstanding to purchase 3,737,019 common shares; warrants to purchase 900,000 common shares; and debt convertible into 1,694,968 common shares; however, such securities have not been included in the net loss per common share calculation because their effect would be antidilutive. Potentially dilutive securities at December 31, 1999 included: stock options outstanding to purchase 7,449,874 common shares; warrants to purchase 900,000 common shares; Series C preferred stock convertible into 213,638 common shares; and debt convertible into 1,957,384 common shares; however, such securities have not been included in the net loss per common share calculation because their effect would be antidilutive.

### Income Taxes

Research and development and other tax credits are recognized for financial reporting purposes when they are realized. Deferred taxes are determined based on the difference between the financial reporting and the tax bases of assets and liabilities using enacted income tax rates in effect in the years in which the differences are expected to reverse. However, the realizability of these deferred tax assets is not assured as it depends upon future taxable income. Accordingly, we have recorded a 100% valuation allowance against these assets. Tax credits will be recorded as a reduction in income taxes when utilized.

41

654

Research Agreements
-------------------

     We have entered into various collaborative research agreements that are
generally funded over a one or two-year period. Each agreement is reviewed at
least annually and the amounts to be funded for the next period are then
determined. Either party may cancel the agreement upon advance written notice.
Total payments made by us to third parties under these agreements were $662,000,
$604,000 and $208,000 for 1999, 2000 and 2001, respectively.

Investments
-----------

     The investments held are classified as available-for-sale and are carried
at cost plus accrued interest, which approximates fair market value and,
accordingly, there was no adjustment to stockholders' equity. We use a specific
identification cost method to determine the gross realized gains and losses on
the sale of our securities. We also classify investments in accordance with
their intended use. At December 31, 2001, the intended use of all investments is
to fund working capital and plant expansion in the coming year. We invest excess
cash in securities that have an A or A1 rating or better with a maximum maturity
of two years.

     The aggregate cost and fair market value of investments are as follows (in
thousands):

|  | December 31, 2000 | | December 31, 2001 | |
| Maturity | Amortized Cost | Market Value | Amortized Cost | Market Value |
| --- | --- | --- | --- | --- |
| Less than one year: | | | | |
| US Government and Agency bonds | $ - | $ - | $1,200 | $1,200 |
| Corporate and other debt securities | 1,015 | 1,013 | - | - |
| Certificates of deposit | 624 | 624 | - | - |
| Greater than one year: | | | - | - |
| US Government and Agency bonds | 1,005 | 1,001 | - | - |
| Corporate and other debt securities | - | - | - | - |
| Total Investments | $2,644 | $2,638 | $1,200 | $1,200 |

Inventory
---------

     Inventory, at net realizable value, consisted of the following (in
thousands):

|  | December 31, | |
|  | 2000 | 2001 |
| --- | --- | --- |
| Raw materials | $ 488 | $ 525 |
| Work in process | 889 | 1,604 |
|  | $ 1,377 | $ 2,129 |

     We have reserved $167,000 and $204,000 for the years ended 2000 and 2001,
respectively, for obsolescence and to reduce the carrying value of inventory to
net realizable value.

42

655

Property and Equipment
----------------------

Property and equipment consisted of the following (in thousands):

| | Estimated Useful Life (Years) | December 31, 2000 | 2001 |
|---|---|---|---|
| Equipment | 3-10 | $ 12,439 | $ 13,593 |
| Equipment funded by related party | 3-10 | - | 3,250 |
| Furniture, fixtures and office equipment | 3-5 | 2,765 | 3,019 |
| Leasehold improvements | Shorter of useful life or lease term | 10,519 | 10,549 |
| Construction-in-progress funded by related party | | 485 | 7,016 |
| | | 26,208 | 36,427 |
| Less accumulated depreciation | | (13,600) | (17,164) |
| | | $ 12,608 | $ 19,263 |

Construction-in-progress begins to depreciate when it is put into service.

Accrued Expenses
----------------

Accrued expenses consisted of the following (in thousands):

| | December 31, 2000 | 2001 |
|---|---|---|
| Compensation and employee benefits | $ 1,869 | $ 1,469 |
| Accrued severance | - | 857 |
| Professional services | 734 | 504 |
| Accrued interest | 368 | 464 |
| Other | 611 | 720 |
| | $ 3,582 | $ 4,014 |

Term Loan Agreement
-------------------

In November of 1999, we entered into a $5,000,000 term loan agreement with a commercial bank to finance the purchase of certain equipment, leasehold improvements and other items. Borrowings under the term loan were collateralized by a security interest in the items financed. The agreement provided for repayment of the principal amount of the loan in 12 equal quarterly installments commencing December 29, 2000, with final payment due on September 30, 2003. The loan bore interest at a fluctuating rate per annum that was equal to the prime rate in effect from time to time, or we could elect that all or any portion of any term loan be made as a LIBOR loan with an interest period of one month, two months, three months or six months with the interest rate being equal to LIBOR plus an applicable margin (175 to 225 basis points). We were required to comply with certain covenants relating to our outstanding term loan, involving limitations on future indebtedness, dividends and investments, and to maintain certain financial covenants pertaining to liquidity, capital base, and debt service coverage (or, alternatively, maintaining a minimum unencumbered cash balance). The weighted average interest rate paid during this period was 7.82%. This borrowing was collateralized by a security interest in the fixed assets financed. On July 6, 2001, we paid the remaining $3,562,000, which represented all outstanding principal and accrued interest under this term loan.

On June 29, 2001, we entered into a $5,000,000 revolving credit agreement with a commercial bank and borrowed the full $5,000,000 which was held in a cash collateral account pending payment in full of all obligations and release of all liens under the term loan. During July 2001, the full $5,000,000 was released from the cash collateral account and $3,562,000 was used to repay the term loan and the balance was used for general corporate purposes. On October 18, 2001, all outstanding amounts under this revolving credit agreement were paid in full.

During February and March of 2002, we borrowed $600,000 from a commercial bank that was evidenced by two promissory notes. The loans were used for general corporate purposes with the interest rate being equal to the bank's prime rate plus three percent. On March 25, 2002, all outstanding amounts under the promissory notes were paid in full. Loans made under the promissory notes were collateralized by a security interest in all of our assets.

43

Commitments
-----------

Lease Obligations

We occupy our main office and manufacturing premises under a facility lease for 79,500 square feet of space in Canton, Massachusetts at an annual average base rent of approximately $790,000, plus operating expenses, that expires on September 30, 2004. This lease has three options to extend the term for an additional five years per option. Taxes, insurance and operating expenses are our responsibility under the terms of the lease. In May 1999, we entered into another facility lease for approximately 20,500 square feet of additional office and warehouse space in Canton, Massachusetts at an annual average base rent of approximately $138,500, plus operating expenses, that expires on December 5, 2004. This lease has three options to extend the term for an additional five years per option. In total, we currently lease 100,000 square feet of space.

Future minimum lease payments are as follows (in thousands):

| | |
|---|---:|
| 2002 | $ 996 |
| 2003 | 980 |
| 2004 | 765 |
| | ------ |
| | $2,741 |
| | ====== |

Rent of approximately $800,000, $1,065,000 and $1,058,000 was charged to expense during the years ended December 31, 1999, 2000 and 2001, respectively.

Purchase of Technology

In April 1999, we purchased specific equipment and intellectual property, consisting of patents and laboratory documentation, from Baxter Healthcare Corporation relating to the research and development for the design and manufacturing of key mechanical components of an extracorporeal liver assist device. The purchase price consisted of the reissuance of 50,000 shares of common stock held in treasury. In May 1999, we filed a registration statement registering all 50,000 of these shares, 25,000 of which were subject to a one-year lock-up agreement. Additionally, we may be required to make a future cash payment to Baxter. That payment may be due on January 31, 2003 or within thirty days of us receiving approval from the FDA of an Investigational Device Exemption for a liver assist device, whichever is first. We expect that January 31, 2003 will be the earlier date and, thus, the potential payment due date. The amount of that payment is determined by subtracting from $1,000,000 the greater of (i) the sum of any gross proceeds received by Baxter from the sale of any its 50,000 shares and the value of any unsold shares at the time the payment is due or (ii) the value of all 50,000 shares at the time the payment is due. The value of the shares is calculated by multiplying the average daily closing price of our common stock over the twenty consecutive trading days immediately prior to January 1, 2003 or the FDA approval. We will have no obligation to make such future cash payment if at any time during the period between April 2000 and the date such cash payment is otherwise payable by us, if the value of the shares of common stock issued to Baxter is equal to or greater than $1,000,000. As of April 9, 2002, the value of the shares had not equaled or exceeded $1,000,000. This estimate assumes that Baxter does not sell all or some of its shares at a price higher than the twenty consecutive trading day average.

Total consideration under the contract is $1,000,000, of which $900,000 was recorded as purchase of incomplete technology and is included in research and development expenses and the remaining $100,000 was capitalized to property and equipment. The purchase was made to strengthen our resources for our liver assist device program. The charge to purchase of incomplete technology was due to the early stage of the technology which had not yet provided proof of principle. We expect it will cost millions of dollars and take a minimum of 4 to 6 years before we could develop a product which might be approved for commercial sale. We are currently seeking third party funding for our liver assist device program.

44

Grants

In November 1999, we received notice of a $2,000,000 grant under the Advanced Technology Program of the National Institute for Standards and Technology ("NIST") to help support development of an effective liver assist device prototype, of which we have received $1,768,000 and expect to receive the remaining amount in 2002. This grant requires that the United States federal government can access for its own purpose technology developed using the funding. A product developed based on the funding from the NIST grant must be manufactured substantially in the United States. In addition, we are subject to regular audit and reporting requirements. We have recorded revenue of $51,000, $963,000 and $947,000 for the years ended December 31, 1999, 2000 and 2001, respectively, relating to this research grant.

Income Taxes
------------

The approximate tax effect of each type of temporary difference and carryforward is reflected in the following table (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2000 | 2001 |
| Deferred tax assets and (liabilities): | | |
| Net operating loss carryforwards | $ 53,053 | $ 50,837 |
| Research and development credits and other credits | 5,516 | 6,359 |
| Depreciation | 13,215 | 18,935 |
| Other | 2,976 | 6,630 |
| Net deferred tax assets before valuation allowance | 74,760 | 82,761 |
| Valuation allowance | (74,760) | (82,761) |
| Net deferred assets after valuation allowance | $ 0 | $ 0 |

Since inception, we have generated net losses for which no related tax benefit has been realized. As of December 31, 2001, we had federal and state net operating loss carryforwards of approximately $135,869,000 and $77,351,000 respectively, which may be available to offset future federal and state income tax liabilities and expire at various dates throughout 2021. We have recorded a deferred tax asset of approximately $23,417,000 reflecting the benefit of deductions from the exercise of stock options. This deferred tax asset has been fully reserved until it is more likely than not that the benefit from the exercise of stock options will be realized. The benefit from this $23,417,000 deferred tax asset will be recorded as a credit to additional paid-in-capital when realized. At December 31, 2001, we had federal and state tax credit carryforwards of approximately $4,249,000 and $2,702,000, respectively, which expire beginning in 2001 and 2006, respectively

As required by Statement of Financial Accounting Standards No. 109, management of Organogenesis, Inc. has evaluated the positive and negative evidence bearing upon the realizability of its deferred tax assets, which are comprised principally of net operating loss and research and experimentation credit carryforwards. Management has determined that it is more likely than not that Organogenesis, Inc. will be unable to recognize the benefits of federal and state deferred tax assets and, as a result, a valuation allowance of approximately $82,761,000 has been established at December 31, 2001.

Ownership changes, as defined in Internal Revenue Code, may limit the amount of net operating losses and research and development tax carryforwards that can be utilized annually to offset future taxable income. Subsequent ownership changes could further affect the limitation in future years.

45

Related Party Transactions with Novartis
----------------------------------------

In January 1996, we entered into a collaborative agreement with Novartis granting Novartis exclusive global marketing rights to Apligraf. Under the agreement, we have received equity investments, non-refundable research, development and milestone support payments, product payments, funding for publication study programs and funding for European regulatory filing for Apligraf marketing approval. Product and other funding for programs are included under the captions "Product sales to related party" and "Other revenues" in our financial statements.

In February 2001, we amended our collaborative agreement with Novartis, effective January 2, 2001. The amended agreement:

- Grants Novartis the right to purchase an exclusive option to negotiate terms to license Organogenesis's product Vitrix and also a second living dermal replacement product currently in research;
- Provides Organogenesis with significantly higher payments for units of Apligraf;
- Grants Organogenesis the right for three years to sell, at its discretion, to Novartis up to $20 million in equity or convertible debt, of which $10 million was received in October 2001;
- Includes funding support from Novartis to upgrade Organogenesis's manufacturing facility and for the facility investment needed for approval and sale of Apligraf in the European Union;
- Includes funding support for Apligraf clinical development activities (e.g., to further broaden its approved uses); and
- Includes development funding support for each living dermal replacement product for which Novartis purchases an option to commence licensing negotiations.

We supply Novartis's global requirements for Apligraf and receive a product payment based on net product sales. Receivable from related party consists of amounts due on product sales to Novartis, funding of certain programs by Novartis and reimbursement of certain test costs related to the manufacturing of the product. Novartis is billed monthly for payments due on product sales and on an as incurred basis for other billings.

On June 29, 2001, we exercised a $10,000,000 security option with Novartis, which closed on October 16, 2001. The security sold was a 7% Convertible Subordinated Note in the principal amount of $10,000,000 with a maturity date of March 29, 2004. The note may be converted into shares of common stock at an adjusted conversion price of $4.49 per share (subject to further adjustment dependent on common stock trading limitations or Novartis Conversion rights change) at any time by Novartis or by us, subject to certain conditions, at any time after March 31, 2002. The conversion price of the Note was below the trading market price on the day the Note was issued. As a result of this beneficial conversion feature, we recorded interest expense of $15,000 during the fourth quarter of 2001 and will record $342,000 of added interest expense over the remaining period the note is outstanding. Interest on the note accrues at 7% annually, payable in cash, common stock (at the average market price for the twenty trading days immediately proceeding the due date) or any combination thereof, at our option, subject to certain conditions, on September 30 and March 31. Principal amounts due under the note, including accrued interest, may become immediately payable in cash if an event of default occurs, defined as: any default in the timely payment of principal, interest or liquidated expenses under the note; any representation or warranty made to Novartis which proves to have been incorrect when we made it under the note or the February 2001 Securities Purchase Agreement with Novartis or related documents; any failure to perform any covenant or agreement, or otherwise commit a breach under, the Note or the February 2001 Securities Purchase Agreement which is not remedied by us within 30 days of notice; any bankruptcy, insolvency or reorganization proceedings involving us or any of our subsidiaries; and the delisting or suspension of our common stock from trading on the AMEX without being relisted or having such suspension lifted within 30 trading days.

46

Additionally, if we fail to deliver to Novartis registered shares of our common stock on conversion of the Note, we will be required to pay to Novartis the greater of (a) actual expenses incurred by Novartis as a result of Novartis' need to purchase shares of common stock to satisfy its delivery requirements, and (b) on each date the conversion is not timely effected, an amount equal to one percent (1%) of the product of the number of shares of common stock not issued to Novartis on a timely basis and the closing bid price of our common stock on the last date that we could have issued shares of our common stock to Novartis without violating our delivery obligations.

As a result of previous equity investments made in prior years and not including conversion of their 7% Convertible Subordinated Note, Novartis holds approximately 1.8% of our outstanding shares as of December 31, 2001. Assuming conversion of the 7% Convertible Subordinated Note, Novartis would hold approximately 7.4% of our outstanding shares as of December 31, 2001.

As of December 31, 2001, Novartis approved funding support of $9,266,000 for facility upgrades and for the European manufacturing suite in the US facility. All payments made have been recorded as deferred revenue for the year ended December 31, 2001. Revenue will be recognized over the period that the completed manufacturing facility is used for production of Apligraf to be sold to Novartis, which is expected to start later in 2002. We have incurred $485,000 and $8,781,000 for the years ended 2000 and 2001, respectively, relating to this funding support.

During the year ended December 31, 2001, Novartis agreed to provide funding for support activities related to the regulatory filing for Apligraf marketing approval across the European Union. We received $782,000, of which $336,000 was recorded as other revenues for the year ended December 31, 2001, with the remainder included in deferred revenue from related party at December 31, 2001. During the first quarter of 1999, Novartis agreed to provide funding for publication study programs to be conducted by us. We have recorded other revenues of $162,000 and $19,000 for the years ended December 31, 2000 and 2001, respectively, relating to the initiation of these programs.

The following table summarizes by year all equity and convertible debt investments, non-refundable research, development and milestone support payments received from Novartis. Product and other payments are included under the captions "Product sales to related party" and "Other revenues" in our financial statements.

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|
| Equity investments | $ 5,000,000 | $ - | $ 6,000,000 | $ - | $ - | $ - |
| Convertible note | | | | | | 10,000,000 |
| Up front non-refundable research and development support payments | 6,500,000 | 2,500,000 | 750,000 | - | - | - |
| Funding support for facility upgrades | - | - | - | - | 485,000 | 8,781,000 |
| Non-refundable milestone payments | - | - | 6,000,000 | - | 5,000,000 | - |
| Total | $11,500,000 | $ 2,500,000 | $12,750,000 | $ - | $ 5,485,000 | $18,781,000 |

License Agreement
------------------

Certain of our technologies are licensed under an exclusive patent license agreement with the Massachusetts Institute of Technology ("MIT"). The agreement with MIT covers certain US patents and corresponding patents in European and Far East countries. Pursuant to the MIT agreement, we have been granted an exclusive, worldwide license to make, use and sell the products covered by the patents and to practice the procedures covered by the patents. The MIT agreement requires us to pay to MIT a royalty on the cumulative net sales of licensed products ranging from 3% to 4.5% of annual sales.

47